IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| JAVIER TAPIA, | NO. 2:22-cv-01141-TL |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. | **JURY DEMANDED** |
| NAPHCARE, INC., an Alabama Corporation; and PIERCE COUNTY, | |
| Defendants. | |

COMES NOW the above-named Plaintiff, pursuant to Fed. R. Civ. P. 15(a)(2), by and through attorneys Ryan D. Dreveskracht and Corinne Sebren, of Galanda Broadman, PLLC, and by way of claim alleges upon personal knowledge as to himself and his own actions, and upon information and belief upon all other matters, as follows:

## I. PARTIES

**A.  PLAINTIFF**

1.  JAVIER TAPIA is an adult residing in Pierce County, Washington.  This is an action arising from Javier's easily preventable injuries and the Defendants' negligence, gross negligence, and deliberate indifference to Javier's serious medical condition.  The claims herein include all claims for damages available under Washington and federal law.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**B.** **DEFENDANTS**

1. Defendant PIERCE COUNTY is a municipal corporation responsible for administering the Pierce County Jail ("Jail"). The Jail is an adult corrections facility that is required to provide proper custody, control, and supervision for county, state, and federal inmates in Pierce County. Pierce County is, and was at all times mentioned herein, responsible for the actions or inactions, and the policies, procedures, and practices/customs of all health services relating to the Jail, including the provision medical treatment at outside facilities when necessary. Although Pierce County has attempted to privatize the provision of healthcare services to Defendant NAPHCARE, INC., it cannot contract-away its constitutional obligations and is legally liable for the negligence and constitutional violations committed by such providers.

2. Defendant NAPHCARE, INC. ("NaphCare") is a limited partnership organized under the laws of the State of Alabama, licensed and doing business in the State of Washington as a foreign for-profit corporation.

    a. NaphCare is in the business of providing healthcare services to jail and prison facilities throughout the United States, including the Pierce County Jail ("Jail"). That is, instead of maintaining their own staff of doctors, nurses, and other health professionals, corrections facilities across the Nation hire NaphCare as an independent contractor to undertake the day-to-day responsibilities of providing their inmates with medical and mental healthcare.

    b. The services provided by NaphCare range from physician and nursing services, dental care, mental health/psychiatric care, pharmaceuticals, utilization management, and administrative support.

    c. The Jail has such an arrangement with NaphCare, as do various institutions in the twenty-three states that NaphCare has entered into fixed-cost contracts with. These

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

contracts are structured to provide an incentive to minimize the cost of care for the corrections institutions—and to maximize NaphCare's profits. Last year, for instance, NaphCare took in roughly $300 million in annual revenue.

d.     The County's contract with NaphCare required that the County pay millions of dollars for NaphCare's services for calendar year 2019. In return, NaphCare guaranteed that its services would comport with the standard of care.

e.     According to Jim McLane, NaphCare's Founder, Owner, and Chairman of the Board, NaphCare is so profitable because it puts up "barriers so that [inmates] do not avail themselves to unnecessary treatment."[1]

f.     NaphCare has been on notice for over a decade that its procedures, practices, and customs are deliberately indifferent to the rights and safety of inmates—having been a named defendant in over 250 lawsuits for this precise conduct.

g.     NaphCare has a long, documented history of civil rights and medical negligence suits against them, and a body count arising from substandard medical care and neglect in Alabama, Nevada, Virginia, Texas, and Washington jails and prisons.

h.     According to a 2019 report: "NaphCare regularly swoops in to take over troubled providers' contracts in the wake of scandal."[2] This is exactly what occurred here, when Pierce County ended its contract with Correct Care Solutions following a string of inmate deaths.

i.     In providing medical care for inmates, NaphCare was acting under the color of state law.

[1] Jenifer Park, *NaphCare Inc.: Prisons, Jails are its Marketplace*, BIRMINGHAM BUSINESS JOURNAL, May 7, 2000, https://www.bizjournals.com/birmingham/stories/2000/05/08/focus4.html.
[2] Tara Herivel, *Profits and Preventable Deaths in Oregon Jails*, STREET ROOTS, Jan. 18, 2019, https://www.streetroots.org/news/2019/01/18/profits-and-preventable-deaths-oregon-jails.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

j.     NaphCare is duly registered and conducts business as a health care provider in Washington state as defined by RCW 7.70 *et seq.*, and provided mental health services and medical care to Javier, as contracted for by Defendant Pierce County.

## II.     JURISDICTION AND VENUE

3.     Plaintiff Javier Tapia has filed a standard tort claim with Pierce County Risk Management, pursuant to Chapter 4.96 RCW.  More than sixty (60) days have elapsed since the claim was filed.  The notice of claim provisions required by RCW 4.96.020 have been satisfied.

4.     This action arises under Washington State law and the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.     Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Pierce County is located in this District, and the events and omissions giving rise to the claims in this action occurred in this District.

## III.     FACTS

### A.     JAVIER'S INCARCERATION AND HOSPITALIZATION

6.     On June 16, 2018, Javier was arrested for driving a stolen vehicle and outstanding Washington State Department of Corrections ("DOC") warrants.  He was booked into the Pierce County Jail ("Jail") as a pretrial detainee at approximately 2:00 a.m.

7.     Registered Nurse Etsuko Yagi, a NaphCare employee, conducted a mental health screening, indicating that Javier had not previously "[h]ad any treatment for mental health issues," been "psychiatric hospitaliz[ed]," or experienced any "delusional thought processes or psychosis."

8.     Javier's incarceration was largely unremarkable for about three months until September 10, when Javier began demonstrating signs of disordered thinking.  Corrections Deputy

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Willie Alley observed that he "[s]eem[ed] to have difficulty following simple rules such as 1400hrs lockdown."

9.     This would have raised a red flag for any medical or mental health professional exercising his or her professional judgment.  A full physical and neurological exam, basic cognitive assessment, and routine "psychiatric" blood screens should be undertaken in all patients presenting with new-onset psychiatric symptoms because they often indicate a medical pathology, such as fecal impaction, medication adverse effects, Wernicke's encephalopathy, or—as in Javier's case— sepsis.

10.     On September 14, Javier put in a sick call request, complaining of "insomnia." Nurse Jesus Perez, a NaphCare employee, canceled the appointment, instructing Javier "to kite MH [mental health] office with current needs."

11.     On September 17, Corrections Deputy Jonathon Knight made the following entry in Javier's chart:

> I observed Inmate Tapia, Javier get off his bunk and throw his hands in the air and roll on to the floor near his bunk and begin to flail around and roll all around the floor. I called for an escort to step in due to his odd behavior and unknown mental state. As I approached him he was laying down in the fetal position and I told him to get up and he just stared at me. I gained control of his right arm and he started crying and mumbling unintelligibly. I then gained control of his other arm and assisted him up and applied wrist restraints without incident. On the way out of the Unit he mumbled a few unintelligible remarks and was tearful and was acting very strange. I escorted him out of the unit and he was placed in a timeout cell by responding deputies.

12.     Javier was seen the next day by Mental Health Provider ("MHP") Darren Nealis for an "initial assessment."  Nealis wrote in the chart:

Assessment:
Met with I/M at about 1100 for initial assessment in response to C/D report. He came to the door and was cooperative during the interview, but appears to be confused and was unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time. His UA was positive for Methamphetamins when he booked in on 6/16/18.

Plan:
S/P: Recommend continued level 1 MH housing at this time for further assessment, MH will f/u.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

MPH Nealis did not refer Javier to a medical provider, order a physical evaluation or other medical assessment, or elevate the level of assessment in any way.

13. Javier began refusing meals at this time.

14. In addition, the decomposition of Javier's foot and leg—due to a blood clot in his groin—became obvious to even the casual observer. Sores and blisters that bled and released a dirty-looking, foul-smelling discharge were readily apparent to anyone even superficially interacting with Javier:



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

15. Because of the vulnerability caused by Javier's perceived or actual disability—i.e., his deteriorating mental condition as a result of sepsis and thrombosis—according to medical records Javier was "involved in several fights" during or shortly before this time period, "develop[ing] trauma to the left head."

16. On the evening of September 19, MHP Nealis assessed Javier again, ignoring his serious and obvious medical condition, writing in Javier's medical chart:

> Assessment:
> Met with I/M at about 1045 for initial assessment in response to C/D report. He presented again today as confused. I/M was again unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time. Officers report that he appears to be "way off his baseline," and he was nonverbal in court today as well. He could have an unknown medical condition.
>
> S/P: Referred to medical for assessment. Recommend continued level 1 MH housing at this time for further assessment, MH will f/u. Referred to medical department for assessment.

Though MHP Nealis referred Javier for medical assessment, he performed no follow up to ensure the assessment was completed.

DEF PC 000288

17. And, in fact, the medical assessment was not completed. Javier was not seen by a medical doctor, but was seen by Licensed Practical Nurse ("LPN") Cameron Carrillo, a NaphCare employee, roughly an hour after Nealis' referral. Carrillo did not physically examine Javier. If he had, he would have noticed the obvious signs of decaying flesh, gangrene, and infection on Javier's

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

left foot and leg. Instead, he simply observed that Javier did "not appear in distress," noted that he did "not have any medical concern at this time," and otherwise ignored his serious and obvious medical condition.

18. Javier was assessed by an LPN rather than a medical doctor or medical provider with more training due to purposefully insufficiently maintained staffing levels caused by Naphcare's established practice of putting profit over care, described in more detail below.

19. Pierce County and NaphCare providers engaged with Javier and observed his serious and obvious medical condition on September 20 (Duane Prather), September 26 (Darren Nealis), and September 28 (Jesus Perez), with no meaningful response. Javier continued to present as worsening in condition and "confused and non-verbal," yet none of these providers referred Javier to a medical doctor, ordered a physical evaluation or other medical assessment, or elevated the level of assessment in any way.

20. On September 29, Pierce County Corrections Deputy Rick Oeltjen observed Javier's serious medical condition and merely noted that Javier was exhibiting "disturbing mannerisms." Deputy Oeltjen did not make a medical referral or take any steps to treat Javier's obviously serious medical condition.

21. When informed of Javier's serious and worsening medical condition, Dr. Miguel Balderrama, a NaphCare employee, ordered that Javier's vitals be taken "once in the a.m." for the next three days. Dr. Balderrama neither physically examined Javier nor provided him with any semblance of medical care. In fact, this order was Dr. Balderrama's only participation in Javier's medical care. This was yet another manifestation of Naphcare's established practice of putting profit over care, which encouraged lower-level nursing staff to do the work of qualified physicians and discouraged patient clinical interaction with qualified physicians—because employing qualified physicians is more expensive than hiring lower-level nursing staff.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

22.     Dr. Balderrama has no corrections medicine experience and is not qualified for the position of Medical Director of a corrections facility.  He is a physician at the Pierce County Jail in name only—so that lower-level medical providers can use his credentials to prescribe medication. He  rarely sees patients and is present at the Jail only once a week.

23.     Later that day, Nurse Elizabeth Warren, a NaphCare employee, allegedly "assessed" Javier by providing only a verbal request for lunch and vitals, otherwise ignoring his obviously serious medical condition:

> Inmate Tapia **would not respond to me verbally** when I asked him if he wanted lunch. He did look up at me but would not give me an answer. A search of his behavior log indicates **he has been refusing meals periodically**. . . . **Cell smells of urine**. Sheet wrapped around waist. . . . Allowed assessment. 96.9, Apical pulse 100 , S1S2, slow, even respirations , rate 14-16 , B/P 127/77. (Emphasis added).

RN Warren did not refer Javier to a medical provider, order a physical evaluation or other medical assessment, or elevate the level of assessment in any way.

24.     On September 30, Javier had no documented interaction with a health care professional despite his obviously deteriorating condition.

25.     On the morning of October 1, LPN Debra Ricci, a NaphCare employee, wrote that Javier "[r]efused" her attempt to take his vitals—because he was nonresponsive as a result of his serious, worsening, and untreated medical condition.  LPN Ricci otherwise ignored Javier's obviously deteriorating medical condition.  LPN Ricci did not refer Javier to a medical provider, order a physical evaluation or other medical assessment, or elevate the level of assessment in any way.

26.     Later in the day, Nurse Ashley Chalk, a NaphCare employee, wrote:

> Asked to see inmate by unit officer for c/o "toes turning black". Upon visual inspection, left foot slightly swollen and severely discolored. Inmate brought to clinic via wheelchair. Vitals: BP 111/80 T 97.9 P 105 SpO2 94% RA Inmate is non-verbal and does not answer questions. Spoken to by MHP and reported having pain, but does not recall what happened or when. Per provider, M. Balderrama and I. Hughes, Inmate referred to Tacoma General ED.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

27.     Javier "was sent to Tacoma General Hospital for a swollen, black foot" for what RN Chalk described as "suspected gangrene."

28.     By this time it was noted by correctional officers that Javier had lost approximately 20 lbs. in the preceding two weeks—again, an obvious, serious, worsening medical condition that was ignored by County and NaphCare employees and prompted no referral to a medical doctor, no physical evaluation or other medical assessment, and no other elevation of the level of assessment.

29.     Intake notes from the Tacoma General ED indicate as follows, in relevant part:

> 36 yo male incarcerated since June 2018
> GENERAL APPEARANCE: sickly appearance, lying in bed tremulous
> SKIN: cool LLE from below knee to foot, (temp change just below knee) cold forefoot
> _____
> LLE - swelling of calf to foot with black gangrenous skin changes of entire forefoot and all toes, unable to move toes, cold forefoot, cool hindfoot and lower calf
> Able to move leg but not toes, can move slightly at ankle
> Sensory deficit at forefoot, sensation preserved in hind foot
> Possible phlegmasia cerulea dolens with gangrene

30.     Javier was then examined by Dr. Nicholas D. Garcia, who noted as follows, in relevant part:

> **[H]as had at least two weeks, possibly up to 1 mos of left leg pain and inability to walk on leg. He also has left leg paralysis of unclear duration but likely over a week** per his limited history. . . . His study notes dilatated veins but clot appears subacute and indeterminate age of clot. . . . Guards that are with patient today state patient had change last month and became more confused and need to be transferred to "old jail" which involves living alone and more supervision and these individuals unable to be in general population. . . . Gait: Not observed, **unable to walk for multiple weaks** [sic]. . . . If this presentation was less than 24-36 hours and potential salvage of limb/digits/function were still present then fasciotomy and consideration of catheter directed thrombolysis would be necessary. However, fasciotomy with this degree of venous occlusion and associated venous hypertension would likely be associated with significant bleeding and unreasonable to proceed with this given current information. If CK's after hydration continue to escalate then fasciotomy or leg amputation would need to be considered to prevent complication of rhabdomyolysis. Given chronicity of symptoms and appearance and dysfunction of left foot, I suspect CK may be trending down at this point and next 24 hours of CK while on heparin will be necessary information for additional treatment recommendations. Regarding catheter directed thrombolysis usually only helpful for acute clot <14 days, history of left leg dysfunction which may or may not be accurate suggest longer duration of venous thrombosis and also risk of catheter

DEF PC 000086
DEF PC 000086
DEF PC 000085
DEF PC 000088

SECOND AMENDED COMPLAINT - 10
(NO. 2:22-cv-01141-TL)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

directed thrombolysis likely unreasonable at this point given information and current paralyzed limb of unclear duration with venous gangrene and paralyzed limb.

31.     The next day, October 2, Dr. Lucas Labine hypothesized that Javier's mental health issues may have been "due to azotemia / uremia," "other metabolic or vasculitis process," or "neoplasm"—in other words, caused by his serious, obvious, and worsening medical condition— and noted that Javier would "likely need brain imaging when renal function is improved."

32.     By October 3, Drs. Labine and Garcia had set out to "medically revascularize as much as possible in order to do the least amount of amputation possible" by using "catheter directed thrombolysis in an attempt to revascularize thigh area."

33.     Javier's left foot, however, was "not salvageable," **given the "long standing event (weeks, likely)"** and because **"foot paralysis already present on admission."**

34.     Dr. Labine assured Javier "that we are doing all we can to salvage what we can of his limb, and that the medical team is well aware of what a drastic and life-changing step an amputation will be for him." Dr. Labine also noted that there was "[n]o clear indication for psychiatric intervention at this time," but that Javier's "[s]evere malnutrition" needed to be addressed.

35.     By October 14, it became clear that thrombolytic therapy would not salvage Javier's leg. As noted by Dr. Branson Propper:

> Unfortunately, following the therapy [Javier] developed ischemia of the forefoot with significant swelling, necrosis of the tissue, and then on top of that a subsequent infection. I discussed with him over the past few days, the need for amputation given that he appeared to have what would be ascending cellulitis in the setting of post venous thrombotic syndrome. He was unwilling to proceed with amputation and waited a few days. Things did seem to get worse, and his white count seems to be high. Finally, I was able to convince him that this was likely going to be a problem if we continue to wait as I thought he would likely have an ascending infection that got worse and he consented to surgery.

36.     Javier's leg was amputated just below the knee.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

37.     Javier's mental health issues completely resolved after receiving treatment at Tacoma General Hospital.

38.     On June 16, 2020—less than a week after Javier filed a Claim for Damages with Pierce County pursuant to Chapter 4.96 RCW—Elliot Wade, NaphCare's Corporate Medical Director, emailed LPN Carrillo, RN Warren, and RN Chalk:

A few times per week, I am asked by our legal department to review a chart, in regards to the care provided by the staff. Usually it's a former patient seeking a claim for damages.

Specifically, Javier Tapia, who was in custody June to November 2018. Your notes were not lengthy at all, but they contained all of the necessary information needed at the time. And helped to establish that he was seen and taken seriously. And in my opinion, had you not seen him immediately on October 1st 2018, called the provider and had him sent to the hospital, he may have died.

So thanks to you, he's alive. He's mad about his below the knee amputation, but in my opinion you did everything right and he's lucky.

**B.     PIERCE COUNTY AND NAPHCARE POLICY AND ESTABLISHED PRACTICE**

39.     The loss of Javier's limb was tragic and could have been prevented by standard approaches to medical and mental health care management.

40.     Despite knowledge of Javier's serious medical needs, Pierce County and NaphCare staff failed to administer and attend to him.  As a result, Javier had to have his leg and foot amputated.  Javier would not have lost his limb if his custodians had not been deliberately indifferent to his needs.  Pierce County and NaphCare knew that Javier faced a substantial risk of pain and anguish, yet callously disregarded that risk by failing to take reasonable measures to abate it.

41.     The policies, established procedures, and protocols in place at the Jail—maintained by Pierce County and NaphCare—put Javier and all other similarly situated patients at an increased risk of serious harm and death.

DEF PC 906629

42.     That these policies, established procedures, and protocols would put similarly situated patients at an increased risk of serious harm and death would be obvious to any medical or mental health professional exercising his or her professional judgment.

SECOND AMENDED COMPLAINT - 12
(NO. 2:22-cv-01141-TL)

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

43.     These policies, established practices, or customs include, but are not limited to, the following:

a.      Pierce County, vis-à-vis NaphCare, employed a "profit over care" model such that it rose to the level of policy, established practice, and custom.

b.      According to Jim McLane, NaphCare is set to generate "revenues greater than $1 billion" in the next ten years.[3]  These revenues necessarily come at patient expense. NaphCare operates under fixed-price contracts.  NaphCare typically responds to requests for proposals for municipalities that have recently experienced an uptick in inmate deaths or serious medical complications while employing other medical contractors.  With the municipality's back against the wall, NaphCare offers better care at lower costs, but delivers the opposite.  Even with lower fixed-price contracts than other providers, NaphCare brings in roughly $300 million per year.  These numbers only work because patient care is cut.

c.      In order to save money, Pierce County and NaphCare maintained a policy of refusing to admit patients in need of medical care to appropriate clinical settings (e.g., hospitalization).

d.      Pierce County and NaphCare similarly maintained a policy, practice, or custom of not escalating the level of assessment for inmates exhibiting serious medical and mental health symptoms. Escalating the level of assessment would include referrals to medical doctors, specialists, or other clinicians with expertise or the ability to perform physical examinations, laboratory or imaging services, and/or transferring care to outside providers or hospitals.

---

[3] https://www.bizjournals.com/birmingham/news/2016/08/25/fast-track-30-naphcare-inc.html

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

e.      NaphCare actually rewards staff for denying lifesaving medical care to people in the jails and prisons in which it operates. The Regional Medical Director for NaphCare, for instance, convenes conference calls with the on-site staff who report to him what patients have been sent to outside medical providers—fewer transfers equating to a more desirable report. The Regional Medical Director uses these calls to pressure the on-site staff to not hospitalize patients to increase NaphCare's profits. To make matters worse, NaphCare's Regional Medical Director is compensated with both a base salary and performance incentives. That is, the Regional Medical Director's  pay increases as NaphCare's profits increase, such that he is incentivized to pressure those down chain to cut costs at patient expense and to falsify services provided.[4]

f.      Pierce County and NaphCare maintained a policy of employing staff at inappropriate levels of training—such as staffing low-level providers like LPNs instead of medical providers with higher levels of training (i.e., BSN, ARNP, PA-C, MD, DO)—to provide care that was out of their scope of practice.

g.      Pierce County and NaphCare caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures. This includes deliberately not complying with formal policies such as the adopted national standards for correctional facilities, which evidences their deliberate indifference and negligence. *See Salter v. Booker*, No. 12-0174, 2016 WL 3645196, at *12 (S.D. Ala. June 29, 2016) ("Defendants acted with deliberate indifference when they failed to enforce or follow the written jail policies and procedures . . . .").

---

[4] NaphCare has recently agreed to pay $694,593 to resolve allegations that the company violated the False Claims Act by knowingly submitting false claims to the Federal Bureau of Prisons in connection with health care services provided. See https://www.justice.gov/opa/press-release/file/1406281/download.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

h. Pierce County and NaphCare failed to enforce their policies and procedures by disciplining officers and employees or by other means.

i. Pierce County and NaphCare maintained a policy of not regularly monitoring inmates.

j. Pierce County and NaphCare failed to maintain adequate monitoring and safety check systems.

k. Pierce County and NaphCare maintained a policy of not protecting vulnerable at-risk inmates from other inmates by providing them with services such as special housing, additional monitoring, or security.

l. Pierce County and NaphCare failed to create systems of information sharing, communication, and clearly delineated roles and lines of authority for County Jail staff and medical providers.

m. Pierce County and NaphCare failed to provide sufficient resources to provide for the necessary medical care for sick and mentally ill inmates.

n. Pierce County and NaphCare routinely ignored information related to serious medical conditions in a measured attempt to avoid liability in a deliberate indifference action, by claiming a lack of knowledge.

o. The maintenance of, or failure to maintain, these policies, practices, and customs—described in this paragraph and elsewhere—and their detrimental effect on Javier's healthcare needs, was not an isolated incident. These are nationwide policies, employed at NaphCare-contracted facilities across the Country every day, including a number of facilities in Washington State (Spokane County, Skagit County, Clark County, Cowlitz County, Washington State Reformatory (Monroe), Pierce County, Kitsap County, Benton County, and Lewis County).

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

44.     Pierce County—*vis-à-vis* NaphCare—also failed to adequately train its employees, resulting in a condition that put Javier and all other similarly situated patients at an increased risk of serious harm and death.  That this failure to train would put similarly situated patients at an increased risk of serious harm and death would be obvious to any medical or mental health professional exercising his or her professional judgment. Upon information and belief, Pierce County and NaphCare staff failed to perform their duties as described in this Complaint due to inadequate training in at least the following areas:

a.     Properly monitoring and protecting inmates with disabilities and/or serious medical conditions.

b.     Properly identifying an inmate's disability and providing appropriate accommodations for them.

c.     Properly identifying and monitoring at-risk inmates generally.

d.     Making referrals and escalating the level of assessment for inmates exhibiting undiagnosed serious medical and mental health symptoms.

e.     Information sharing, communication, and developing clearly delineated roles and lines of authority for County Jail staff and medical providers.

f.     Responding to new-onset psychiatric symptoms.

45.     All of the acts and omissions taken in regard to the care and custody of Javier were in accordance with Pierce County and NaphCare's established practices, policies, or customs, and/or were ratified by policymaking and supervisory personnel.

46.     Each of the above policies and established practices amounts to negligence and deliberate indifference to the known and/or obvious serious medical and safety needs of at-risk detainees, including Javier.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

47. Defendants are not even trying—they have been negligent, grossly negligent, and have showed deliberate indifference to the medical and safety needs of the inmates at the Jail. This includes, again, failing to have and follow proper training, policies, and procedures for the care and treatment of people in the Jail. It also includes a cold-hearted attitude on the part of staff and subcontractors, who ignore medical and safety harms as they present and who refuse to properly observe or listen to people who have serious medical and safety needs.

48. Pierce County, NaphCare, and their policymakers and supervisors had knowledge that their policies, customs, and/or protocols created a substantial risk of serious harm as to Javier's health and safety because it was obvious and because they had resulted in serious harm in the past.

49. NaphCare's policies and established practices have resulted in hundreds, if not thousands, of deaths across the Nation, as evidenced by the fact that "NaphCare, Inc. is no stranger to these claims" because it has been sued for its constitutionally inadequate policies and established practices as described above approximately 150 times. *Johnson v. NaphCare, Inc.*, No. 19-54, 2022 WL 306981, at *18 (S.D. Ohio Feb. 2, 2022); *see, e.g., Brown v. Clark Cnty. Det. Ctr.*, No. 15-1670, 2018 WL 1457292, at *7 (D. Nev. Mar. 23, 2018) ("NaphCare has a policy of denying off-site care as a cost-control measure."); *Sitton v. LVMPD*, No. 17-111, 2020 WL 1916171, at *4 (D. Nev. Apr. 20, 2020) (same); *Bruins v. Osborn*, No. 15-324, 2016 WL 8732299, at *3 (D. Nev. Feb. 5, 2016) ("Naphcare had a policy of understaffing medical personnel"); *Bruins v. Osborn*, No. 15-324, 2016 WL 8732299, at *3 (D. Nev. Feb. 5, 2016) ("NaphCare medics and nurses could not send an inmate to the hospital absent a 'life threatening' issue"); *O'Neal v. Las Vegas Metro. Police Dep't*, No. 17-2765, 2018 WL 4088002, at *4 (D. Nev. Aug. 27, 2018) ("Naphcare had a policy of refusing medical treatment"); *Cheek v. Nueces Cnty. Tex.*, No. 13-26, 2013 WL 4017132, at *20 (S.D. Tex. Aug. 5, 2013) ("Plaintiffs' Complaint includes a litany of past instances of constitutional

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

allegations based on deliberate indifference to serious medical needs against NaphCare, including a policy of cutting costs and maximizing profits to the detriment of the patients it serves.").

50. Pierce County, too, is liable for NaphCare's "profit over care" policy because it had constructive knowledge of it and the established practice deficiencies when it contracted with NaphCare and allowed it to continue to provide services in the Jail. *See O'Neal*, 2018 WL 4088002, at *4 ("Although Naphcare provides the medical care at [the jail, the] County remains liable for any constitutional deprivations caused by the policies, practices, or customs of its contractor.") (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)).

51. Pierce County is also liable for its own constitutionally deficient policies and established practices, described above, which were also well-known to cause harm and even death. *See, e.g.*, *Sullivan v. Cnty. of Pierce*, 216 F.3d 1084 (9th Cir. 2000) (evidence of a Pierce County "policy of inadequate medical treatment"); *Whitmore v. Pierce Cnty. Dep't of Cmty. Corr.*, No. 05-5265, 2007 WL 2116402, at *6 (W.D. Wash. July 19, 2007) (alleging "policies and customs regarding staffing levels and medical practices" that led to an inmate "not receiving constitutionally adequate mental health care"); *Smith v. Pierce Cnty.*, 218 F. Supp. 3d 1220, 1230 (W.D. Wash. 2016) (alleging that Pierce County "maintained unconstitutional policies, procedures and customs with regard to . . . taking detainees to a hospital or acute care facility when symptoms increase, worsen or recur" and "a failure to "provide training on managing individuals who are suffering [from] severe and ongoing symptoms" due to medical needs).

52. Even if Pierce County and NaphCare did not have knowledge of the risk of harm created by their policies, customs, and/or protocols—and lack thereof/lack of training thereon/lack of funding to implement—the risk was obvious in light of reason and the basic general knowledge that these Defendants are presumed to have.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

53. The acts and omissions caused by Defendants through their policies, practices, and customs—including inadequate staffing, training, preparation, procedures, supervision, and discipline—were a proximate cause of Javier's pain, suffering, and permanent disability.

54. The aforesaid acts and omissions of Defendants and their employees acting within the scope of their duties deprived Javier of his right to be free from cruel and unusual punishment and to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution; directly caused and/or directly contributed to his pain, suffering, and a general decline of his quality of life; directly caused and/or directly contributed to cause his family to suffer loss of services and support; and directly caused and/or directly contributed to cause his family to suffer pecuniary losses, including but not limited to medical expenses.

55. All of this suffering was entirely preventable.

## IV. CLAIMS

**A. FIRST CAUSE OF ACTION – NEGLIGENCE, GROSS NEGLIGENCE, AND MEDICAL NEGLIGENCE – PIERCE COUNTY**

56. Defendants had a duty to care for inmates and provide reasonable safety and medical and mental healthcare.

57. This duty is affirmative and nondelegable under both Washington State and federal law because inmates, by virtue of incarceration, are unable to obtain medical care for themselves.

58. Pierce County and NaphCare breached this duty, and were negligent, when they failed to have, and their employees failed to follow, proper training, policies, and procedures on the assessment of persons with apparent medical and psychiatric needs.

59. Pierce County breached this duty, and were negligent, when they contracted with NaphCare without conducting any due diligence whatsoever. A simple Google search would have revealed a profusion of allegations of unconstitutional conduct, resulting in hundreds of inmate

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

deaths throughout the United States.

60.     Pierce County and NaphCare breached this duty, and were negligent, when their employees failed pass on vital lifesaving information from one institution or person to another.

61.     Pierce County and NaphCare breached this duty, and were negligent, when they failed to adequately treat Javier's medical needs.  Indeed, because Javier's obvious medical needs related to his blood clot condition were entirely ignored, Pierce County and NaphCare were grossly negligent.

62.     Pierce County and NaphCare breached this duty, and were negligent, when they failed to have, and their employees failed to follow, proper training, policies, and procedures on the provision of reasonable and necessary medical care, treatment of inmates, and the passing on of information.

63.     Pierce County and NaphCare breached this duty, and were negligent, when they failed to ensure adequate and proper staffing at the Jail.

64.     Pierce County and NaphCare breached this duty, and were negligent, when they failed to ensure that Javier was properly supervised and/or that cell and medical checks were conducted in a safe, timely, and consistent manner.

65.     Pierce County and NaphCare breached this duty, and were negligent, when they failed to ensure that Javier received necessary medication.

66.     Pierce County and NaphCare breached this duty, and were negligent, when they ignored notification of Javier's serious medical condition.

67.     Pierce County and NaphCare breached this duty, and were negligent, when they failed to properly assess and treat Javier as described above.

68.     As a direct and proximate result of the breaches, failures, and negligence of Pierce County and NaphCare, as described above and in other respects as well, Javier **had to have his leg**

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**amputated** just below the knee, resulting in extreme and ongoing pain, permanent disability, suffering, embarrassment, and terror.

69.     As a direct and proximate result of the breaches, failures, and negligence of Pierce County and NaphCare, as described above and in other respects as well, Javier has incurred and will continue to incur economic and noneconomic damages in an amount to be determined at trial.

70.     Municipalities such as Pierce County have a long-standing and special duty to keep inmates in health and safety.  This duty requires officials to consider what is the safest and most humane for the inmates; and what is most conducive to their health, well-being, and safety, despite the costs.  As a matter of law, Washington courts have long recognized a jailer's special relationship with inmates, particularly the duty to ensure health, welfare, and safety.  This heightened duty is derived from the special relationship between custodians and the individuals entrusted to their care. Inmates rely completely on the government to make decisions as to their safety and health care, similar to students relying on schools, guests on innkeepers, and patients on hospitals.  Contributory negligence has no place in such a scheme, and Pierce County is therefore responsible for the negligence of NaphCare and its employees as described herein.

**B.     SECOND CAUSE OF ACTION – CORPORATE NEGLIGENCE – NAPHCARE**

71.     Defendant NaphCare had a duty to select its employees with reasonable care and to supervise all persons practicing medicine under its corporate name and to ensure that they complied with the standard of care and did not put profits ahead of comprehensive patient care.

72.     Defendant NaphCare breached this duty by failing to hire competent and properly trained employees, oversee care, implement safety policies designed to prevent harm to patients, and in many more regards, described above.

73.     As a direct and proximate cause of the aforesaid failure to follow the standard of care, Javier sustained pain, anguish, and permanent physical disability.

SECOND AMENDED COMPLAINT - 21
(NO. 2:22-cv-01141-TL)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## C. THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 – PIERCE COUNTY AND NAPHCARE

74.     At the time Javier was detained by Pierce County, it was clearly established in the law that the Fourteenth Amendment imposes a duty on municipalities, jail officials, and subcontractors to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the inmates.  Being subjected to unnecessary physical pain and suffering is simply not part of the penalty that criminal offenders pay for their offenses against society.

75.     As a result of the conduct alleged in this complaint, Defendants Pierce County and NaphCare are liable under 42 U.S.C. § 1983 for violating Plaintiff's rights under the Fourteenth Amendment by maintaining unconstitutional policies, practices, and customs that resulted in the denial of Javier's constitutional right to adequate medical care and treatment and subjected him to inhumane conditions of confinement. As a direct and proximate result of these Defendants' unconstitutional acts and omissions, Javier suffered extreme physical pain, including the loss of his limb and permanent physical disability, and severe mental and emotional anguish.

76.     As a result of the conduct alleged in this complaint, Defendants Pierce County and NaphCare are liable under 42 U.S.C. § 1983 for violating Plaintiff's rights under the Fourteenth Amendment by failing to adequately train their employees in such a manner that these failures violated Javier's constitutional right to adequate medical care and treatment and subjected him to inhumane conditions of confinement.

77.     As a direct and proximate result of the callous and reckless disregard and/or deliberate indifference of Defendants Pierce County and NaphCare, as described above and in other respects as well, Javier experienced—and continues to experience—extreme pain, permanent physical disability, suffering, anxiety, terror, and emotional distress.  His life will never be the same.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

78.     Defendant NaphCare has shown reckless and callous disregard and indifference to inmates' rights and safety and is therefore subject to an award of punitive damages to deter such conduct in the future.

**D.     FOURTH CAUSE OF ACTION – 42 U.S.C. § 12132 – PIERCE COUNTY**

79.     The Americans with Disabilities Act ("ADA") provides in its relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  A failure to reasonably accommodate a person's disability is an act of discrimination under the ADA. Per 28 C.F.R. § 35.130(b)(7): "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

80.     Defendant Pierce County incarcerates significant numbers of individuals with disabilities, as that term is defined in the ADA and the Rehabilitation Act ("RA"), which is discussed below.  The County fails to provide inmates with disabilities with basic reasonable accommodations to ensure equivalent access to all of the programs, activities, and services offered at the Jail.  The County's failure to accommodate inmates with disabilities not only denies these inmates access to jail programs and services, but also substantially increases the risk that they are injured in an emergency or are the victim of violence or abuse from others.  Moreover, the County's refusal to accommodate inmates with disabilities results in the provision of inadequate medical and mental health care.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

81. For years, Pierce County executed systemic and willful discrimination against, and failure to provide reasonable accommodations in programs, services, and activities to, inmates in the Jail who have, or are perceived to have, disabilities.

82. Relevant here, Javier either had or was perceived by Jail staff to have, present physical or mental impairments that qualified as disability—as alleged above, Jail staff noted his long-standing history of substance use disorder as if it were relevant to his present condition, that Javier exhibited behaviors consistent with severe mental disabilities, that Javier had symptoms of a serious physical disability, and that his condition was worsening. Again, he could not walk for roughly a month, but was given no assistance. He became visibly confused. He was either unintelligible or nonverbal and nonresponsive. He was refusing food and became seriously malnourished. He suffered from poor hygiene and smelled of urine or worse. He had outbursts, displayed "disturbing mannerisms," and was noted by Jail staff to be "[w]ay off his baseline." These actual or perceived disabilities obviously substantially limited his major life activities—i.e., eating, sleeping, walking, concentrating, communicating, and in other ways as described in paragraphs above.

83. Javier was observed hundreds of times by Jail staff during cell checks, and had clinical interactions with both Pierce County staff and NaphCare staff, yet all failed to physically examine him or identify his disability needs and serious medical condition (or, identified and ignored them).

84. Javier did not receive appropriate medical care for his physical disability—i.e., his serious blot clot condition and related symptomology that prevented him from walking—because of his actual or perceived disabilities related to mental illness or substance use disorder. He was never physically examined, and his care was not escalated—he was not seen by a medical doctor or transferred to a hospital despite the fact that he was exhibiting signs of serious medical distress.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

In other words, Javier was denied access to services, including but not limited to, appropriate health care services; and he was denied reasonable accommodations for his disabilities, including but not limited to, accessibility aids/assistive devices, special housing, additional safety checks or other security, because of his actual or perceived mental disability or substance use disorder.

85.     In addition, Pierce County lacks adequate policies and practices for identifying and tracking inmates with disabilities and the accommodations those inmates require. This systemic failure to accommodate inmates with disabilities results in the widespread exclusion of prisoners with disabilities from many of the programs, services, and activities offered by Pierce County, including health care services, exercise, religious services, sleeping, and educational programs. Moreover, Pierce County's lack of adequate policies and procedures makes inmates with disabilities vulnerable to exploitation and violence by other inmates and increases their risk of serious injury or death.

86.     Pierce County failed to adequately train custody and health care staff in how to identify and track inmates with disabilities and provide appropriate and timely accommodations to those inmates.

87.     The lack of training is evident from the numerous and widespread failures to accommodate Javier throughout the last month of his incarceration as described in paragraphs above.  As a result of this lack of adequate training, custody and health care staff do not, among other failings, identify and track individuals with disabilities and the accommodations they require, or provide equal access to Jail services and programs.

88.     Because Pierce County remains liable for the unlawful acts of its agent, even if that agent, a private entity, is not itself liable under Title II, Plaintiff's ADA Claim is brought against Pierce County only.  Even though Javier does not have recourse under Title II directly against NaphCare, he still has recourse against the government when a private contractor violates the ADA.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

*Wilkins-Jones v. County of Alameda*, No. 08-1485 2010 WL 4780291, at *4-9 (N.D. Cal. Nov. 16, 2010); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001).

**E.    FIFTH CAUSE OF ACTION – 29 U.S.C. § 701 – PIERCE COUNTY**

89.    Like the ADA, Section 504 of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, also requires the recipients of federal funds to reasonably accommodate persons with disabilities. The Jail is believed and therefore alleged to receive federal funds.

90.    Pierce County is liable under the Rehabilitation Act for the same reasons as it is liable under the ADA, as set forth in paragraphs above. *See Collings v. Longview Fibre*, 63 F. 3d 828, 832 n. 3 (9th Cir. 1995); *Campen v. Portland Adventist Med. Ctr.*, No 16-792, 2016 WL 5853736, at *4 (D. Or. Sept. 2, 2016).

## V.    JURY DEMAND

185.    Plaintiff hereby demand a trial by jury.

## VI.    AMENDMENTS

186.    Plaintiff hereby reserves the right further to amend his Complaint.

## VII.    RELIEF REQUESTED

187.    Damages have been suffered by Plaintiff and to the extent any state law limitations on such damages are purposed to exist, they are inconsistent with the compensatory, remedial and/or punitive purposes of federal law, and therefore any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

188.    WHEREFORE, Plaintiff requests a judgment against all Defendants:

(a)    Fashioning an appropriate remedy and awarding economic and noneconomic damages, including damages for pain, suffering, terror, loss of consortium, and loss of familial relations, and loss of society and companionship pursuant to 42 U.S.C. §§ 1983 and 1988, in an amount to be determined at trial;

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    (b)    Punitive damages;

2    (c)    Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988,

3    or as otherwise available under the law;

4    (d)    Declaring the defendants jointly and severally liable;

5    (e)    Awarding any and all applicable interest on the judgment; and

6    (f)    Awarding such other and further relief as the Court deems just and proper.

7    Respectfully submitted this 7th day of October, 2022.

GALANDA BROADMAN, PLLC

s/Ryan Dreveskracht
Ryan D. Dreveskracht, WSBA #42593
s/Corinne Sebren
Corinne Sebren, WSBA 58777
Attorneys for Plaintiff
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: ryan@galandabroadman.com
Email: corinne@galandabroadman.com

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509