THE HONORABLE KYMBERLY K. EVANSON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAVIER TAPIA,

               Plaintiff,

   v.

NAPHCARE, INC., and PIERCE COUNTY,

               Defendants.

No. 2:22-cv-01141

NAPHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR: FRIDAY, MAY 31, 2024

**ORAL ARGUMENT REQUESTED**

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................... 1

II.   STATEMENT OF THE CASE ................................................. 3

    A.    Factual Background............................................................ 3

        1.    NaphCare's policies mirror state and national standards. ................. 3

        2.    NaphCare has a defined role at the Pierce County Jail..................... 4

        3.    Tapia's arrest, incarceration, and "temper tantrum."......................... 6

        4.    Pierce County moved Tapia to a mental health unit......................... 7

        5.    Tapia told LPN Carrillo he had no medical concerns. ...................... 8

        6.    Two days before Tapia's hospitalization, a registered nurse visited him in his cell and found he was in "no distress.".............................. 9

        7.    Tapia arrived at the ER alert, talking, and free of infection. ........... 11

        8.    Tapia's foot worsened markedly, requiring amputation.................. 12

    B.    Procedural History................................................................ 12

    C.    Ten undisputed, material facts resolve this case. ................................... 13

III.  SUMMARY JUDGMENT STANDARD .............................................. 15

IV.   ARGUMENT ............................................................................ 15

    A.    *Monell*'s standards of fault and causation are demanding. ................... 16

    B.    Tapia's § 1983 claim against NaphCare fails under *Monell*.................. 17

        1.    There was no underlying constitutional violation. .......................... 17

        2.    NaphCare had no deficient policies, practices, or customs. ........... 18

            a.    NaphCare had no deficient official policies............................ 19

            b.    NaphCare had no deficient unofficial customs or practices. .... 19

            c.    Nothing about the onset of PCD is patently obvious................ 24

        3.    NaphCare policies did not cause Tapia's injury............................. 25

        4.    No final NaphCare policymaker ratified any conduct..................... 26

V.    CONCLUSION............................................................................ 27

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................15

*Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
    520 U.S. 397 (1997)............................................................................................16, 19

*Burghart v. S. Corr. Entity*,
    2023 WL 1766258 (W.D. Wash. Feb. 3, 2023)..............................2, 17, 19, 20

*Castro v. Cnty. of Los Angeles*,
    833 F.3d 1060 (9th Cir. 2016) (en banc) ...........................................................16

*Christie v. Iopa*,
    176 F.3d 1231 (9th Cir. 1999) .............................................................................26

*City of Los Angeles v. Heller*,
    475 U.S. 796 (1986)...............................................................................................18

*City of St. Louis v. Praprotnik*,
    485 U.S. 112 (1988)...............................................................................................26

*Connick v. Thompson*,
    563 U.S. 51 (2011).........................................................................................passim

*Daniels v. Williams*.
    474 U.S. 327 (1986)...............................................................................................17

*Dempsey v. City of Baldwin*,
    143 F. App'x 976 (10th Cir. 2005) .....................................................................27

*German v. Roberts*,
    2017 WL 3407052 (W.D. Wash. Aug. 9, 2017)...............................................27

*Gordon v. Cnty. of Orange*,
    888 F.3d 1118 (9th Cir. 2018) ("*Gordon I*") ....................................................18

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) -- ii

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

# TABLE OF AUTHORITIES

**Page(s)**

*Gordon v. Cnty. of Orange*,
  6 F.4th 961 (9th Cir. 2021) ("*Gordon II*")..................................................2, 16, 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).................................................................................15

*Monell v. Dep't of Soc. Servs. of City of New York*,
  436 U.S. 658 (1978)...........................................................................passim

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*,
  210 F.3d 1099 (9th Cir. 2000) ..................................................................15

*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986).................................................................................19

*Rapp v. NaphCare, Inc.*,
  2023 WL 4705996 (W.D. Wash. July 24, 2023)..............................................18

*Scott v. Henrich*,
  39 F.3d 912 (9th Cir. 1994) ......................................................................18

*Smith v. NaphCare, Inc.*,
  2022 WL 2983942 (W.D. Wash. July 28, 2022)..............................................21

*Smith v. NaphCare, Inc.*,
  2023 WL 2477892 (W.D. Wash. Mar. 13, 2023)..............................................21

*Stevens v. Pierce Cnty.*,
  2023 WL 5177915 (W.D. Wash. Aug. 11, 2023)..............................................21

*Trevino v. Gates*,
  99 F.3d 911 (9th Cir. 1996) ..........................................................20, 22, 24

*Tsao v. Desert Palace, Inc.*,
  698 F.3d 1128 (9th Cir. 2012) .....................................................16, 17, 18, 25

*United States v. Johnson Controls, Inc.*,
  457 F.3d 1009 (9th Cir. 2006) ...................................................................15

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# TABLE OF AUTHORITIES

**Page(s)**

*Van Ort v. Est. of Stanewich*,
   92 F.3d 831 (9th Cir. 1996) ....................................................................25

*Watkins v. City of Oakland*,
   145 F.3d 1087 (9th Cir. 1998) .................................................................27

*West v. Atkins*,
   487 U.S. 42 (1988).....................................................................................16

**CONSTITUTIONAL PROVISIONS AND STATUTES**

U.S. Const. amend. XIV § 1 ......................................................................17

42 U.S.C. § 1983 ....................................................................................passim

RCW 18.79.260........................................................................................4

**RULES**

Fed. R. Civ. P. 56 .....................................................................................15

**ADVISORY OPINIONS**

Washington Dep't of Heath Nursing Care Quality Assurance Comm'n,
   *Advisory Opinion No. NCAO 13.02: Registered Nurse and
   Licensed Practical Nurse Scope of Practice*, 4 (Sept. 13, 2019),
   https://nursing.wa.gov/sites/default/files/2022-07/NCAO13.pdf........................4

**OTHER AUTHORITIES**

AMERICAN CORRECTIONAL ASSOCIATION, *Standards & Accreditation,*
   https://bit.ly/3YKa4yX ...............................................................................3

NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE,
   https://www.ncchc.org/.................................................................................3

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) -- iv

166452635

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

# I.    INTRODUCTION

At 9:51 a.m., on October 1, 2018, Pierce County Jail deputies discovered that Javier Tapia's foot was discolored. NaphCare's employees responded immediately. By 11:20 a.m.—roughly 90 minutes later—Tapia was receiving care in the emergency room of the Tacoma General Hospital. After running a battery of tests, doctors diagnosed Tapia with Phlegmasia Cerulea Dolens ("PCD"), an extremely rare, deadly, and painful presentation of deep vein thrombosis ("DVT"). PCD is so rare that even preeminent vascular surgeons do not encounter it more than a handful of times during their careers.[1] PCD is so dangerous that, according to Tapia's expert, PCD can cause discoloration in a person's limb "[w]ithin a rapid amount of time … probably within hours"—Ex. 3[2] at 36:22-37:2, 174:19-22—and "amputation rates have been reported to be as high as 50% and mortality between 25-40%." Ex. 5 at 6. PCD is so painful that when Tapia presented at the emergency room, he informed doctors that his pain was an "8-9/10 in severity." Ex. 6 at NAPHCARE 000029.

Tapia sued NaphCare and Pierce County after his lower left leg was amputated to save his life. Not even Tapia's experts can agree when his PCD developed, what caused it, or how it affected his mental state (if at all). *See, e.g.*, Ex. 7 at 16:19-17:20 (opining that none of Tapia's mental health symptoms stemmed from his DVT or PCD). But, according to Tapia, he received constitutionally inadequate medical care because NaphCare and its employees failed to identify or anticipate the development of his extremely rare vascular condition. Tapia has no claims against any

---

[1] *See, e.g.*, Ex. 1 at 3 (PCD is "an extremely rare medical condition" that one distinguished doctor has seen "fewer than five times during a fifty-year vascular surgery career."); Ex. 2 at 8-9 ("In my 32-year career as a surgeon, I have only seen three cases of PCD. Two of the patients died after amputation and one survived with their lower extremity intact."); Ex. 3 at 26:24-27:15, 139:19-22 ("It is a rare condition."); Ex. 4 at 10:15-18 ("It's quite rare.").

[2] All exhibits cited in this motion are attached to the Declaration of David A. Perez in Support of NaphCare's Motion for Summary Judgment.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    NaphCare employee who interacted with him. Instead, Tapia sued NaphCare itself

2    under 42 U.S.C. § 1983 for allegedly violating his Fourteenth Amendment rights.

3    In *Monell v. Department of Social Services of City of New York*, the Supreme

4    Court established that § 1983 permits liability for a municipality—or in this case a

5    private entity providing contract services on the municipality's behalf—only where

6    the entity's *policymakers'* own "official" conduct "caused a constitutional tort." 436

7    U.S. 658, 690-91 (1978). *Monell* employs "stringent" standards of fault and causa-

8    tion, which require Tapia to show, at a minimum, that NaphCare policymakers were

9    "deliberately indifferent" to his constitutional rights. *Connick v. Thompson*, 563 U.S.

10   51, 61 (2011) (cleaned up). Under § 1983, NaphCare cannot be held vicariously re-

11   sponsible for the mistakes of its employees; rather, *Monell* requires Tapia to identify

12   a *policy, custom, or practice* that was the proximate cause of his injury. *See Gordon

13   v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) ("*Gordon II*"). Even Tapia's

14   experts agree that NaphCare has no facially deficient official policies. *See* Ex. 8 at

15   138:19-139:3 (NaphCare's "policies don't have any barriers in them for access to

16   health care."); Ex. 7 at 182:1-6 (same). So, to establish liability under *Monell*, Tapia

17   must (1) show a pattern of *very similar* incidents that NaphCare policymakers no-

18   ticed and disregarded; (2) establish it was patently obvious that NaphCare's policies

19   were deficient; or (3) prove that a *final* policymaker ratified the allegedly unconsti-

20   tutional action.

21   In light of the undisputed evidence, Tapia cannot satisfy *Monell*'s require-

22   ments. First, because PCD is extremely rare, Tapia could never identify a pattern of

23   very similar incidents that NaphCare policymakers disregarded. *See Burghart v. S.

24   Corr. Entity*, 2023 WL 1766258, at *5 (W.D. Wash. Feb. 3, 2023). Second, little is

25   known about PCD's onset. Even with the benefit of hindsight, Tapia's own experts

26   disagree about whether his vascular condition caused his mental health changes or

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

1    whether his mental health changes caused his vascular condition. *Compare* Ex. 7 at

2    60:5-7 ("[H]e developed the thrombosis as a result of his mental health condition.")

3    *with* Ex. 3 at 31:9-12 ("[T]he way that PCD causes mental status changes is that it

4    causes metabolic or systemic problems, which in turn, cause mental status

5    changes."). Tapia cannot identify any "patently obvious" policies that policymakers

6    should have instituted to prevent Tapia's alleged injuries stemming from his ex-

7    tremely rare vascular condition. *Connick*, 563 U.S. at 64. And third, Tapia cannot

8    establish that NaphCare's final policymaker ratified any tortious conduct in this case.

9        The Court should grant summary judgment in favor of NaphCare.

## II.    STATEMENT OF THE CASE

**A.    Factual Background.**

**1.    NaphCare's policies mirror state and national standards.**

13       NaphCare provides correctional healthcare services in detention centers

14    across the country "in compliance with the National Commission on Correctional

15    Health Care (NCCHC), the American Correctional Association (ACA), and all ap-

16    plicable local, state and federal regulations." Ex. 9 at NCI 000251. The NCCHC—

17    the primary accrediting and professional-standards organization for correctional

18    healthcare professionals—issues model policies and procedures for providing "con-

19    stitutionally appropriate correctional health care."[3] The ACA likewise promulgates

20    "leading correctional policies, procedures, and practices across all areas of opera-

21    tion."[4] NaphCare's Policy & Procedure Manual sets standards that meet or exceed

22    those issued by these nationally recognized organizations. *Id*. NaphCare employees

23    are instructed to abide by NaphCare's policies, and employees consult the policy

---

[3] NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE, https://www.ncchc.org/.

[4] AMERICAN CORRECTIONAL ASSOCIATION, *Standards & Accreditation,* https://bit.ly/3YKa4yX.

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

manual whenever necessary. *See id.* at NCI 000268-69; *see* Ex. 10 at 73:14 ("If you question something, you go look it up.").

Washington law defines the type of work that licensed healthcare profession-als can undertake. For example, "under the general direction of a licensed physi-cian," a registered nurse ("RN") can "administer medications, treatments, tests, and inoculations" to patients. RCW 18.79.260(2). Where appropriate, RNs are allowed to "supervise" and "delegate tasks" to "other individuals"—including a licensed practical nurse ("LPN"). RCW 18.79.260(3). According to a Washington state agency advisory opinion, an "LPN may perform specific assessments or screening activities, such as mental health status, suicidal risk, cognitive screening, substance use screening, oral health screening, growth and development screening, or nutri-tional assessments."[5] NaphCare trains its employees to implement its policies, in-cluding its mental health policies. *See, e.g.*, Ex. 11 (providing mental health screen-ing tips for RNs & LPNs); Ex. 12 (Health Assessment Questions).

NaphCare has a "default" policy to "always send people to the hospital" if there is any doubt about whether their medical needs can be addressed at the Pierce County Jail. Ex. 13 at 51:13-21 ("When in doubt, send them out."); Ex. 14 at NCI 001313, 001322. And, in fact, NaphCare's employees at the jail "regularly" send detainees to the hospital "if they see something that appears to be emergent." Ex. 13 at 41:15-20.

### 2.    NaphCare has a defined role at the Pierce County Jail.

In 2015, Pierce County contracted with NaphCare to provide certain medical services to individuals incarcerated in the Pierce County Jail. Ex. 15. Under the con-tract, Pierce County retained the responsibility to staff a medical director at the jail

---

[5] Washington Dep't of Heath Nursing Care Quality Assurance Comm'n, *Advisory Opinion No. NCAO 13.02: Registered Nurse and Licensed Practical Nurse Scope of Practice*, 4 (Sept. 13, 2019), https://nursing.wa.gov/sites/default/files/2022-07/NCAO13.pdf.

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

and to provide mental health care to the inmates. *Id.* at DEF PC 400053; Ex. 16 at DEF PC 400019 (Pierce County "shall provide and maintain financial responsibility for any and all mental health services…."); Ex. 17 at 29:7-30:4. NaphCare is responsible for supplying nurses, dental providers, and medication, among other things. NaphCare is also responsible for "[i]ntegrat[ing] its services with the existing mental health providers," Ex. 15 at DEF PC 400051, while the County is responsible for ensuring its mental health personnel use NaphCare's medical charting system, Ex. 18 at DEF PC 400032.

The following chart, in an amended contract between Pierce County and NaphCare, delineates the type and amount of staffing that NaphCare was required to supply to the jail in 2018:

| Position Title | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
|---|---|---|---|---|---|---|---|---|---|
| **Pierce County, WA NaphCare Staffing** | | | | | | | | | |
| **Day Shift** | | | | | | | | | |
| NP/PA | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 4.000 | 4.000 | 48 | 1.200 |
| Health Services Administrator | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Director of Nursing | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| RN - Chronic Care/Infection Control | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Medical Records Clerk | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Administrative Assistant | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Registered Nurse - Booking | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| Registered Nurse - Clinic | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| Registered Nurse - Triage, Old Jail | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | | 12.000 | 72 | 1.800 |
| Registered Nurse - Triage, New Jail | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| LPN - Clinic | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| LPN - Medication | 48.000 | 48.000 | 48.000 | 48.000 | 36.000 | 48.000 | 48.000 | 324 | 8.100 |
| LPN - Float | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| Pharmacy Tech | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psych NP | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Dentist | | 8.000 | | 8.000 | | | | 16 | 0.400 |
| Dental Assistant | | 8.000 | | 8.000 | | | | 16 | 0.400 |
| **Night Shift** | | | | | | | | | |
| Registered Nurse - Booking | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| Registered Nurse - Float | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| LPN - Medication | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 168 | 4.200 |
| | | | | | | | **Total FTEs** | | 36.700 |

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

1  *Id.* at DEF PC 400031. As the chart shows, under the contract, NaphCare is obligated

2  to staff RNs and LPNs around the clock. These staffing levels are consistent with

3  those of other detention centers around the country. *See* Ex. 19 at 16 (comparing

4  Pierce County with the Denver Sheriff Medical Department). Between September

5  16, 2018, and October 13, 2018, the period at issue in this case, **NaphCare provided**

6  **more staffing than it was contractually required to supply** to the jail, even though

7  it was not compensated for this additional staffing.[6] Exs. 18, 20.

8        Under the contract, Pierce County—not NaphCare—is responsible for paying

9  costs arising from inmates who require off-site medical care. Ex. 13 at 51:22-25. In

10  other words, **it costs NaphCare nothing to send patients to the hospital**. And it

11  costs NaphCare nothing to refer patients to Pierce County's medical director—Dr.

12  Miguel Balderrama—or to outside specialist providers. *Id.* at 51:22-25; Ex. 15 at

13  DEF PC 400053.

14      **3.**    **Tapia's arrest, incarceration, and "temper tantrum."**

15        On June 16, 2018, Tapia was incarcerated at the Pierce County Jail for, among

16  other things, possessing a stolen vehicle. Ex. 21. During the intake process, an RN

17  employed by NaphCare checked his vitals, weighed him on a scale,[7] and screened

18  him for drug use. Ex. 6 at NAPHCARE 000592-97.

19        In early September, within a week, Tapia had three incident reports and an

20  altercation[8] with another inmate. Ex. 22 at DEF PC 302595-96 (documenting inci-

21  dents between September 9 and 15). Pierce County officers decided to move Tapia

---

22      [6] NaphCare exceeded the staffing levels as follows: 9.46 hours over the required staffing

23  for a nurse practitioner; 452.03 hours for over the required staffing for RNs; 10.08 hours over the
required staffing for a psychiatric nurse practitioner; and 77.31 hours over the required staffing for

24  LPNs. Ex. 20.

    [7] Tapia weighed 153 pounds. Ex. 6 at NAPHCARE 000217, 000227, 000592.

25      [8] Tapia claims that an inmate tried to punch him in the face, but he moved, and the punch

26  landed on "the back of [his] neck." Ex. 24 at 137:7-38:20. Tapia did not "see the stars" or "g[et]
[his] bell rung" by the strike. *Id.*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  to another unit to preserve "peace and harmony" among the inmates after Tapia ex-

2  pressed concern that he was known as a "snitch." *Id.* at DEF PC 000050.

3      On September 17, Tapia walked without difficulty to his new housing unit.

4  *Id.*; Ex. 23 at 23:1-2. Before the move, a guard informed Tapia that his upcoming

5  visit with his daughter was cancelled. He "got kind of upset." Ex. 24 at 143:17-44:1.

6  Tapia threw, *in his own words*, "a temper tantrum" because he "wanted to see [his]

7  daughter." *Id.* at 144:9-17. Officer Johnathon Knight witnessed Tapia's temper tan-

8  trum. He saw Tapia "get off his bunk and throw his hands in the air." Ex. 22 at DEF

9  PC 000049. He began "to flail around," before he "guided himself down on the

10  ground." Ex. 23 at 33:13-18. Officer Knight gained control over Tapia and walked

11  Tapia to a "time-out cell." The time-out cells are roughly 100-150 yards from the

12  unit and Tapia walked that distance under his own power without a limp or indication

13  of any pain. *Id.* at 34:1-25, 37:6-24. Tapia testified during his deposition that he does

14  not recall limping or being in pain when he walked out of the unit. Ex. 24 at 154:1-

15  55:8.

16      **4.    Pierce County moved Tapia to a mental health unit.**

17      After Tapia threw his "temper tantrum," authorities transferred him to a "level

18  1" mental health unit known as 3SC. Ex. 23 at 30:8-14, 37:19-20; Ex. 22 at DEF PC

19  000049. The unit is used to monitor inmates with mental health or behavioral con-

20  cerns. Ex. 23 at 30:8-14; Ex. 25 at 43:5-19. It consists of two levels of single occu-

21  pancy cells, with a control booth facing the cells. Ex. 26 ¶¶ 3, 5. Each cell door has

22  a window at waist level and a "little trapdoor" for passing food to the detainee. Ex.

23  27 at 43:5-17. Officers generally serve meals by sliding trays through the trapdoor,

24  and so a detainee is regularly required to walk to the door.[9] Ex. 28 at 17:5-22.

---

25      [9] Meals are served at unconventional hours. Breakfast was distributed "around 4:15 in the

26  morning." Ex. 28 at 23:21-24. Lunch was served at "roughly 9:30" in the morning and dinner
    between 3:45 and 4:00 in the afternoon. *Id.* at 24:6-9.

1    Officers check on inmates every thirty minutes to confirm that they are safe
2    and secure. Ex. 23 at 31:1-15. And NaphCare nurses perform daily rounds, seeing
3    every inmate at least once per day. Ex. 10 at 48:4-49:19; *see generally* Ex. 29.
4    Rounds included, at the very least, laying eyes on every inmate and ensuring they
5    have no medical concerns. Ex. 10 at 49:11-51:24. The cells have an emergency call
6    button that detainees can use to request assistance, Ex. 28 at 28:12-23, and Tapia
7    testified during his deposition that he remembered the button. Ex. 24 at 152:7-14.

8    **5.    Tapia told LPN Carrillo he had no medical concerns.**

9    Soon after Tapia's transfer, Darren Nealis, a mental health professional em-
10   ployed by Pierce County, checked on Tapia. Ex. 6 at NAPHCARE 000224-25. Tapia
11   came to the door of the cell and was cooperative, but he did not verbally respond to
12   any of Nealis' questions. Nealis noted Tapia appeared to be "decompensated," which
13   means that Tapia was "seemingly functioning differently than [his] baseline." Ex.
14   17 at 42:6-17.

15   The next day, September 19, Tapia attended a virtual court hearing in a room
16   about a "five-minute walk" from Tapia's unit. Ex. 28 at 31:21-32:4; Ex. 30. Officers
17   noted that Tapia was nonverbal and off his baseline, so Nealis again met with Tapia.
18   Tapia did not verbally respond to Nealis' questions and presented as confused. Ex.
19   22 at DEF PC 302595. Because Nealis was concerned, he verbally informed
20   NaphCare's nursing staff of this interaction. Ex. 17 at 30:8-25; *see* Ex. 7 at 141:14-
21   42:1.

22   Shortly thereafter, NaphCare's Clinic RN dispatched an LPN—Cameron Car-
23   rillo—"to collect the data" and to "check on a patient who was nonresponsive." Ex.
24   31 at 21:5-12, 25:7-12. LPN Carrillo entered Tapia's cell and found him resting
25   comfortably on the floor with a blanket over him. *Id.* at 27:5-17. Tapia "**was very
26   responsive and was talking**." *Id.* at 26:23-25 (emphasis added). Tapia allowed LPN

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Carrillo to take his blood pressure. And Carrillo noted that Tapia did "**not appear to be in distress**." Ex. 6 at NAPHCARE 000224 (emphasis added). Carrillo asked Tapia "if he had any medical concerns." Ex. 31 at 25:13-20. Tapia told LPN Carrillo that he had no medical concerns, but "**he was just upset that he was in the new unit**." *Id.* at 28:24-29:4 (emphasis added). He was especially upset, as Tapia testified in his deposition, because there's "no visitation" in the mental health units—so he was unable to see his daughter. Ex. 24 at 176:8-21.

After interacting with Tapia, LPN Carrillo returned to NaphCare's clinic and reported his observations to the RN on duty. Ex. 31 at 40:20-21, 41:8-10. And NaphCare's TechCare Audit Log reveals that RN Darilyn Ingelmon reviewed Tapia's chart, where LPN Carrillo recorded his observations, shortly thereafter. Ex. 32; *see* Ex. 7 at 110:22-11:5.

### 6. Two days before Tapia's hospitalization, a registered nurse visited him in his cell and found he was in "no distress."

On September 29, two days before Tapia was hospitalized, an officer requested a visit from NaphCare for Tapia because it was unclear whether Tapia was eating his meals.[10] Ex. 6 at NAPHCARE 000223; Ex. 10 at 59:17-20, 110:24-11:11. RN Elizabeth Warren entered Tapia's cell and assessed him. She wanted to know whether Tapia's "vitals show[ed] a person who hasn't eaten or drank in 72 hours." Ex. 10 at 70:14-18. Tapia made eye contact, followed her instructions, and sat on his bunk under his own power. Ex. 6 at NAPHCARE 000223. She checked his tongue and his skin. *Id.* RN Warren found that "**his vitals were perfect**" and he was in "**no distress**." Ex. 10 at 118:17-19, 130:2-5. She asked Tapia if he would drink an Ensure if she walked back across the jail to retrieve one for him. *Id.* at 116:3-23. Tapia indicated yes. *Id.* RN Warren left and returned with the Ensure, and he drank half of

---

[10] During his time in the mental health unit, Tapia refused some meals. *See* Ex. 22 at DEF PC 302594-95; Ex. 6 at NAPHCARE 000223.

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 9

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

1    it. *Id.* At no point during this interaction did Tapia express any pain or indicate any-

2    thing was wrong with his foot. *See* Ex. 6 at DEF PC 100632.

3    Nothing in the assessment alarmed RN Warren. She assessed Tapia as "**nor-**

4    **mal**." Ex. 11 at 67:13-19. If she felt it was warranted, she could have obtained

5    higher-level care for him. *Id.* at 118:5-16. But, in light of her assessment, she "saw

6    no reason" to do so. *Id.* His lack of verbal communication with her was "pretty com-

7    mon" for inmates in the mental health unit. *Id.* at 115:20-25; *see* Ex. 4 at 65:19-21

8    (acknowledging "[i]t can be" common in a correctional setting for inmates to selec-

9    tively communicate); Ex. 17 at 61:21-25 (explaining that detainees are sometimes

10   decompensated for "weeks or months"). This is consistent with NaphCare training

11   materials about "the psychological effects of segregation." Ex. 14 at NCI 001315-

12   22. These effects can include "social withdrawal," "lethargy," "confused thought

13   process," and "disorientation in time and space." *Id.* at NCI 001318-20; *see* Ex. 33

14   at 29 (observing that "difficulty with thinking, concentration, and memory" are "psy-

15   chological consequences associated with lack of social contact"). Tapia testified dur-

16   ing his deposition that while in the mental health unit his "memory was real fuzzy,"

17   he "couldn't stay awake," and he would "sleep a lot." Ex. 24 at 152:13-14, 152:23-

18   25, 153:2-3.

19   Despite assessing Tapia as normal, RN Warren nonetheless requested that of-

20   ficers log all his meals. Ex. 6 at NAPHCARE 000223. And, out of an abundance of

21   caution, **she scheduled Tapia to visit with the jail's doctor on the next business**

22   **day for a full medical evaluation**—which would have been Monday, October 1—

23   "to rule out any medical issues." Ex. 10 at 123:3-15; Ex. 6 at NAPHCARE 000214;

24   Ex. 34.

25   In the evening of September 29, Officer Delgado saw Tapia in the window of

26   his cell. Ex. 26 ¶ 4. Tapia did not appear to be in distress, nor did he push the

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  emergency button located next to the cell door. *Id.*; *see* Ex. 7 at 81:18-23 (explaining

2  it would "probably not" be possible for Tapia to walk to the door of his cell if he had

3  PCD).

4  **7.    Tapia arrived at the ER alert, talking, and free of infection.**

5  On October 1, at 9:51 a.m., an officer observed that Tapia's foot was "a pur-

6  ple/black color." Ex. 22 at DEF PC 302594. The officer "immediately" called the

7  jail's clinic and transported Tapia there in a wheelchair. *Id.* Once at the clinic, Tapia

8  was "surrounded" by medical and mental health professionals. Ex. 13 at 47:1-14.

9  Tapia verbally "sp[oke] with medical staff" and for the first time informed them "his

10  foot hurt." *Id.*; *see* Ex. 6 at NAPHCARE 000223. Tapia could "not recall what hap-

11  pened or when." Ex. 6 at NAPHCARE 000223. At 10:13 a.m., the RN on duty took

12  Tapia's vitals and, one minute later, created an ER referral form for Tapia. *Id.* at

13  NAPHCARE 000217, 611-13. She also called the Tacoma General emergency room

14  to inform them of Tapia's imminent arrival to ensure continuity of care. *Id.* at DEF

15  PC 100637.

16  By 11:20 a.m., roughly ninety minutes after Pierce County officers discovered

17  Tapia's discolored foot, Tapia was in the emergency room. *Id.* at DEF PC 100631.

18  After his arrival, Tapia provided his medical history verbally and informed the ER

19  doctor that he "**just told jail staff today about the pain**." *Id.* at DEF PC 100632.

20  Multiple doctors observed that Tapia was "alert" and "oriented" in the ER. *See, e.g.*,

21  *Id.* at DEF PC 100633. In fact, providers noted that Tapia's "judgment [was] clear

22  and intact," and his "[s]peech [was] clear." *Id.* at NAPHCARE 000031. Unlike two

23  days earlier when RN Warren assessed him, Tapia was in distress. He reported that

24  his pain was at an "8-9/10 in severity." *Id.* at NAPHCARE 000029. Tapia had no

25  sepsis or infections at the time of his arrival. *Id.* at DEF PC 100642; Ex. 7 at 17:6-

26

16, 59:17-22; Ex. 3 at 54:2-4; Ex. 4 at 82:1-12. Doctors ultimately diagnosed Tapia with "Phlegmasia cerulea dolens." Ex. 6 at DEF PC 100641.

### 8. Tapia's foot worsened markedly, requiring amputation.

When Tapia arrived at the ER on October 1, he presented with "swelling, pain, and redness of his left foot and leg." Ex. 6 at NAPHCARE 000029. And his foot had "discoloration" to the "[l]eft forefoot and all toes." *Id.* at DEF PC 100633. But there was "no drainage, sloughing of the skin, vesicles, blistering, or open wounds." *Id.*

Tapia's condition worsened substantially after his arrival at the hospital. Within a few days, his foot developed blisters and became more discolored. *Id.* at TAPIA055624, 055632, 055649. Doctors started antibiotic treatments on the sixth day. *Id.* at DEF PC 100693. And, eventually, doctors performed a guillotine amputation of Tapia's left ankle on October 10 and then another amputation below the knee on October 16. *Id.* at DEF PC 100466.

## B. Procedural History.

On March 31, 2021, Tapia filed this case in the Superior Court of Washington for King County. *See* Dkt. 9 at 8-13. More than a year later, after discovery had commenced, Tapia moved to amend his complaint to add additional defendants and federal tort claims. *Id.* at 250-54. After the motion was granted, Dkt. 9 at 358, the case was removed to this Court. *See* Dkt. 1. Tapia then filed an amended complaint on October 7, 2022. *See* Dkts. 15, 17-1, 18-1. The operative complaint dropped the claims against the individual defendants as well as the state law claims against NaphCare, other than a corporate negligence claim.

NaphCare and Pierce County moved to dismiss. Dkts. 19, 21. The Court dismissed Tapia's corporate negligence claim against NaphCare. Dkt. 31 at 5-6. It also dismissed one of the two theories of § 1983 liability that Tapia pleaded against

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

NaphCare.[11] That left only the "§ 1983 claim[] against … NaphCare for inadequate medical care arising from the policy of withholding care[.]" *Id.* at 6.

**C.    Ten undisputed, material facts resolve this case.**

Only the following ten undisputed, material facts are necessary to resolve this case. NaphCare will cite only these undisputed facts in its argument section below.

➢ **Undisputed Fact 1:** Dr. Elliot Wade is not, and never has been, NaphCare's final policymaker. Ex. 35 at 47:10-19; Dkt. 83 at 2; Dkt. 80 at 5-6.

➢ **Undisputed Fact 2:** Between September 16, 2018, and October 13, 2018, the period at issue in this case, NaphCare supplied more staffing than it was contractually obligated to provide at the jail, for no additional compensation. Exs. 18, 20.

➢ **Undisputed Fact 3:** NaphCare does not cover the costs of Pierce County detainees' outside medical care. Ex. 13 at 51:22-25.

➢ **Undisputed Fact 4:** The agreement between NaphCare and Pierce County establishes a policy requirement to maintain communication between NaphCare and Pierce County's mental health professionals "to ensure continuity of care." Ex. 18 at DEF PC 400032; *see* Ex. 15 at DEF PC 400051.

➢ **Undisputed Fact 5:** On September 19, 2018, twelve days before Tapia was hospitalized, LPN Carrillo visited Tapia's cell "to collect the data" and to "check on a patient who was nonresponsive" at the direction of an RN and in response to a request from a Pierce County mental health professional. Ex. 31 at 21:5-12, 25:7-12; Ex. 17 at 30:8-25. LPN Carrillo found that Tapia "was very responsive and was talking." Ex. 31 at 26:23-25. Tapia told LPN Carrillo that he had no medical concerns and no suicidal ideations, but "he was just

---

[11] The Court dismissed Tapia's "§ 1983 claims against Pierce County and NaphCare for inadequate medical care arising … from a failure to train." Dkt. 31 at 6-8.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    upset that he was in the new unit." *Id.* at 28:17-29:4. LPN Carrillo returned to

2    NaphCare's clinic and verbally reported his observations to the RN on duty.

3    *Id.* at 40:20-21, 41:8-10; Ex. 32; *see* Ex. 7 at 110:22-11:5.

4    ➤ **Undisputed Fact 6:** On September 29, two days before Tapia was hospital-

5    ized, RN Elizabeth Warren visited Tapia in his cell. RN Warren found that

6    "his vitals were perfect" and he was in "no distress." Ex. 10 at 118:17-19,

7    130:2-5. She walked back to the clinic to personally retrieve a dietary supple-

8    ment shake for Tapia. *Id.* at 116:15-23. She set up an appointment with the

9    jail's resident doctor for the next business day—October 1—to "rule out any

10   medical issues" that might be causing Tapia to skip meals. *Id.* at 78:5-19,

11   123:3-15; Ex. 6 at NAPHCARE 000214; Ex. 34.

12   ➤ **Undisputed Fact 7:** On October 1, the day that Tapia was admitted to the

13   hospital, Tapia was capable of expressing, and in fact *did* explain verbally, to

14   NaphCare employees and hospital doctors that he was experiencing foot pain.

15   Ex. 6 at NAPHCARE 000029, 000223; Ex. 13 at 47:1-14.

16   ➤ **Undisputed Fact 8:** Tapia did not inform any person at the Pierce County Jail

17   that he was experiencing foot pain until the day he was admitted to the hospi-

18   tal. Ex. 6 at DEF PC 100632.

19   ➤ **Undisputed Fact 9:** Roughly ninety minutes after NaphCare employees first

20   learned that Tapia's foot was discolored, Tapia was in the emergency room of

21   the Tacoma General Hospital. *See* Ex. 22 at DEF PC 302594; Ex. 6 at DEF

22   PC 100631; Ex. 7 at 305:8-14.

23   ➤ **Undisputed Fact 10:** At the hospital, Tapia was diagnosed with PCD, which

24   is an extremely rare and painful condition with rapid onset. Ex. 6 at DEF PC

25   1000641; Ex. 2 at 8-9; Ex. 3 at 174:19-22.

26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and "the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "genuine" if it constitutes evidence with which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

When applying these standards, the Court should view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See United States v. Johnson Controls, Inc.*, 457 F.3d 1009, 1013 (9th Cir. 2006). The moving party bears the burden of producing evidence that negates an essential element of the nonmoving party's claim, or by establishing that the nonmoving party does not have enough evidence of an essential element to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Then the burden shifts to the party opposing summary judgment, who must go beyond the pleadings and affirmatively establish a genuine issue on the merits of the case. Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment. The nonmovant must do more than simply deny the veracity of everything offered by the moving party or show a mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### IV.    ARGUMENT

Tapia brings a § 1983 claim against NaphCare, seeking redress for an alleged violation of his rights under the Due Process Clause of the Fourteenth Amendment while he was a pre-trial detainee in the Pierce County Jail. Tapia claims NaphCare "maintain[ed] unconstitutional policies, practices, and customs that resulted in the denial of [his] constitutional right to adequate medical care and treatment." Dkt. 17-1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    ("SAC") ¶ 75. Tapia's sole remaining claim fails under the summary judgment

2    standard of Rule 56. The undisputed, material facts show that Tapia, as a matter of

3    law, cannot satisfy his heavy burden to show causation and fault under the Four-

4    teenth Amendment and § 1983.

5    **A.    *Monell*'s standards of fault and causation are demanding.**

6        Under 42 U.S.C. § 1983, any "person" acting "under color of" state law who

7    violates rights "secured by the Constitution" shall be liable to the injured party. To

8    succeed under § 1983, a plaintiff must establish two things: (1) his civil rights were

9    violated (2) by a person acting under the color of state law. *West v. Atkins*, 487 U.S.

10   42, 48-49 (1988). Before 1978, it was an open question whether a municipality—let

11   alone a private, corporate entity like NaphCare—counted as a "person" for the pur-

12   poses of § 1983. In *Monell*, however, the Supreme Court concluded that municipal-

13   ities[12] could be subject to liability under § 1983. 436 U.S. at 700.

14       Although *Monell* opened the door to § 1983 liability for municipalities, it also

15   placed significant restrictions on a plaintiff's ability to obtain relief. Critically, mu-

16   nicipalities may not be held vicariously liable for the constitutional torts of their

17   employees or agents; there is no respondeat superior liability. A municipality can be

18   held liable only for its *own* constitutional violations. *Castro v. Cnty. of Los Angeles*,

19   833 F.3d 1060, 1073 (9th Cir. 2016) (en banc). To prevent an entity from being held

20   liable for the mistakes of its employees, a §1983 plaintiff must prove that **the entity**

21   **itself maintained an unconstitutional policy, practice, or custom that was the**

22   **moving force behind a deprivation of a constitutional right**. *See Board of Cnty.*

23   *Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404-08 (1997); *Gordon II*, 6 F.4th

24   at 973. "Official municipal policy includes the decisions of a government's

25   _____

26   [12] A private company standing in the shoes of the municipality when providing public ser-
     vices under contract also counts as a "person" for the purposes of § 1983. *See Tsao v. Desert
     Palace, Inc.*, 698 F.3d 1128, 1139-40 (9th Cir. 2012).

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61.

"**A 'policy' is a deliberate choice** to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Tsao*, 698 F.3d at 1143 (emphasis added) (cleaned up). When a plaintiff alleges the existence of an **unofficial** policy, custom, or practice—the plaintiff bears a heavy burden to show that it was the result of a deliberate choice by the policymakers. At a minimum, the plaintiff must demonstrate that the policymakers acted with "**deliberate indifference**"— which requires "proof that a municipal actor **disregarded a known or obvious consequence of his action**." *Connick*, 563 U.S. at 61 (emphasis added) (cleaned up). This is "**a stringent standard of fault.**" *Id.* (emphasis added).

In short, to succeed under § 1983 against NaphCare, *Monell* requires Tapia to demonstrate: (1) that he possessed a constitutional right of which he was deprived; (2) that NaphCare had a specific policy; (3) that this policy amounted to deliberate indifference to Tapia's constitutional right, and (4) that the policy was the moving force behind the alleged constitutional violation. *Burghart*, 2023 WL 1766258, at *4. Tapia's § 1983 claim against NaphCare fails because he cannot point to sufficient evidence to establish a disputed, material fact to support any of these requirements, let alone all of them.

**B.    Tapia's § 1983 claim against NaphCare fails under *Monell*.**

**1.    There was no underlying constitutional violation.**

Under the Due Process Clause of the Fourteenth Amendment, no State may "*deprive* any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1 (emphasis added). In *Daniels v. Williams*, the Supreme Court explained that "the Due Process Clause is simply not implicated by a *negligent* act

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 17

166452635

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

… causing unintended loss of or injury to life, liberty, or property." 474 U.S. 327, 328 (1986). Instead, a plaintiff must prove "something akin to reckless disregard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) ("*Gordon I*"). In other words, to establish a constitutional injury, it is not sufficient for Tapia to show that his leg was amputated. To survive a motion for summary judgment, Tapia must point to specific evidence showing that NaphCare employees treated him with, at minimum, reckless disregard.

Tapia's § 1983 claim fails right out of the gate. Tapia has no claims against any individual NaphCare employee. Tapia cannot show a material disputed fact about whether any NaphCare employee demonstrated "reckless disregard" for his constitutional right to adequate medical care—let alone whether a corporate policy caused an employee to commit that constitutional violation. *Gordon I*, 888 F.3d at 1125; *see City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Although there may be some situations where *Monell* liability can be imposed absent a finding that an individual employee violated a § 1983 plaintiff's rights, Tapia nonetheless bears the burden to establish an underlying constitutional violation. *See Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994). Because Tapia cannot establish an underlying violation of his constitutional rights, the Court does not need to reach the question of whether NaphCare's policies caused that violation.

## 2.    NaphCare had no deficient policies, practices, or customs.

Even if Tapia could show that his Fourteenth Amendment rights were violated, he nonetheless has the burden under *Monell* to show that a corporate policy, custom, or practice was the moving force behind the constitutional violation. *See Tsao*, 698 F.3d at 1143; *see Rapp v. NaphCare, Inc.*, 2023 WL 4705996, at *2 (W.D. Wash. July 24, 2023). To succeed under *Monell*, a § 1983 plaintiff must demonstrate that "a municipality's legislative body or authorized decisionmaker" has taken a

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 18

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

1  deliberate action that deprives a plaintiff of a federally protected right. *Brown*, 520

2  U.S. at 405; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).

### a.  NaphCare had no deficient official policies.

4  Tapia's experts acknowledge that NaphCare's official policies are consistent

5  with national and local standards. For example, Tapia's expert RN Denise Panosky

6  testified in a deposition that NaphCare's "policies don't have any barriers in them

7  for access to health care." Ex. 8 at 138:19-139:3. Tapia's expert Dr. Johnny Bates

8  has been "involved in correctional healthcare for over thirty years and [has] owned

9  and managed a correctional healthcare company for the last nineteen years with over

10  350 employees." Ex. 36 at 3. When asked in a deposition whether he was aware "of

11  any NaphCare's policies" that caused Tapia's condition "to slip through the cracks,"

12  Dr. Bates was unequivocal: "No." *See* Ex. 7 at 182:1-6.

13  Tapia's experts contend that NaphCare's employees failed to properly apply

14  NaphCare's policies in Tapia's case. *See, e.g.*, Ex. 8 at 34:7-18; Ex. 7 at 111:14-23,

15  157:4-19, 282:21-83:7. But, under *Monell* and § 1983, NaphCare's policymakers

16  cannot be held vicariously liable for the negligence or mistakes of their employees.

17  *Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a

18  respondeat superior theory."); *see Burghart*, 2023 WL 1766258, at *4 ("[C]ourts

19  routinely dismiss § 1983 claims against employers where plaintiffs allege only inci-

20  dents of employee negligence or misconduct.").

### b.  NaphCare had no deficient unofficial customs or practices.

22  Tapia and his experts contend that NaphCare policymakers maintained—or

23  were deliberately indifferent to—unofficial *customs* and *practices* that caused his

24  alleged constitutional violation. When a plaintiff alleges that an entity has adopted a

25  practice or custom that constitutes a de facto, unwritten policy, the plaintiff must

26  show that the practice is "so persistent and widespread as to practically have the

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

force of law." *Connick*, 563 U.S. at 61; *see Gordon II*, 6 F.4th at 974. "Liability for [an] improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001).

Tapia cannot establish the requisite pattern of similar cases. Tapia's experts acknowledged that they based their conclusions *entirely* on the care provided to Tapia. *See* Ex. 7 at 183:16-21 (Q. "Other than NaphCare's treatment of Tapia, can you point to any other inmates that you considered in coming up with this established practice?" A. "No, I was referring primarily to Tapia in this case."); *see also id.* at 231:16-232:7, 315:13-21; Ex. 8 at 55:6-10 ("I'm relying on Mr. Tapia's care at this point."). This is not surprising. PCD is extraordinarily rare. Vascular surgeons go their entire careers without seeing more than five cases. Tapia could never identify enough similar cases to establish the requisite pattern.

The Court has previously concluded that similar allegations against NaphCare—involving medical conditions more common than PCD—failed to demonstrate a policy as a matter of law because they were not supported with enough sufficiently similar examples. For example, in *Burghart*, an inmate died of alcohol withdrawal at South Correctional Entity ("SCORE"). 2023 WL 1766258 at *1-2. The Court rejected the plaintiffs' *Monell* claim. The Court concluded that the "ten incidents" that the plaintiffs identified did not amount to a policy because "three of [the incidents] do not involve NaphCare, five of which did not occur at SCORE, and six of which do not involve alcohol withdrawal." *Id.* at *5. These incidents "sound[ed] in individualized negligence, not an overarching policy." *Id.*

For each of the following alleged deficient practices or customs, Tapia has failed to adduce sufficient evidence to demonstrate a material, disputed fact to overcome *Monell*'s requirements.

**"Profit over care."** Tapia claims that NaphCare employed a so-called "profit over care" model. SAC ¶ 43(a); *id.* ¶ 43(b) (NaphCare's "revenues necessarily come at patient expense [because] NaphCare operates under fixed-price contracts."). But this bare assertion fails to sufficiently "specify the content of the policies [or] customs … [that] gave rise to the [alleged] Constitutional injuries." *Smith v. NaphCare, Inc.*, 2022 WL 2983942, at *7 (W.D. Wash. July 28, 2022) (citation omitted). For that reason, the Court has, on more than one occasion, rejected this exact claim against NaphCare as a matter of law. *See, e.g.*, *Stevens v. Pierce Cnty.*, 2023 WL 5177915, at *4 (W.D. Wash. Aug. 11, 2023) ("The threadbare allegation that NaphCare focuses on 'profit to the detriment of healthcare,' is not plausible and it is not enough to support the conclusion that a policy was the moving force behind any constitutional deprivation." (cleaned up)); *Smith v. NaphCare, Inc.*, 2023 WL 2477892, at *4 (W.D. Wash. Mar. 13, 2023) ("[T]he general assertion 'profit over care' [does not] provide a policy, established practice, or custom in the abstract."). The Court should do so again here. That is especially true because, during the relevant month of Tapia's incarceration, NaphCare supplied more staffing to the jail than was required under its contract. Undisputed Fact 2.

**Refusing to send patients to the hospital.** Tapia further contends that, to save money, NaphCare "maintained a policy of refusing to admit patients in need of medical care to appropriate clinical settings (e.g., hospitalization)" and refusing to refer patients to specialists and outside providers. SAC ¶¶ 43(c), (d). It is undisputed that, at Pierce County, NaphCare does not pay for the costs associated with sending patients to outside care providers. Undisputed Fact 3. Under the contract between

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1    Pierce County and NaphCare, Pierce County is responsible for those costs.

2    NaphCare has no financial incentive to prevent patients from going to the hospital.

3    **Allowing LPNs to operate outside their licensure.** Tapia contends that

4    NaphCare policymakers had a custom or practice of "staffing low-level providers

5    like LPNs … to provide care that was out of their practice." SAC ¶ 43(f). Tapia's

6    expert witness, Panosky, echoes this contention: "NaphCare had a custom and es-

7    tablished practice of requiring LPNs to work outside of their nursing scope of prac-

8    tice." Ex. 37 at 13. But Panosky expressly based this determination "on the provision

9    of care given to Mr. Tapia." *Id.* As she confirmed in her deposition, Panosky identi-

10   fies no other cases of LPNs acting outside their scope. *See* Ex. 8 at 54:3-9, 55:6-10.

11   Even if Tapia could show that the LPNs who interacted with him acted outside their

12   scope of practice—which he cannot—his one or two isolated experiences are insuf-

13   ficient to show that *NaphCare's policymakers* sanctioned the practice.[13] *Connick*,

14   563 U.S. at 61; *Trevino*, 99 F.3d at 918.

15   In any event, the undisputed facts show that LPN Carrillo acted within the

16   scope of his practice. When LPN Carrillo visited Tapia's cell on September 19, he

17   was there "to collect the data" and to "check on a patient who was nonresponsive."

18   Undisputed Fact 5. And an RN immediately reviewed his observations about Tapia.

19   *Id.* This is well within the scope of the LPN license authorized by Washington law—

20   which Tapia's expert witnesses acknowledged in their depositions. *See, e.g.*, Ex. 7

21   at 111:6-13 (Q. "So you would agree with me that … Mr. Carrillo was acting within

22   his scope of practice when he went to go see Mr. Tapia and then he reported it to the

23   clinic RN, correct?" A. "In this regard, yes."); Ex. 8 at 77:17-21 ("If Nurse Carrillo

24

25   ---

26   [13] Similarly, Tapia's evidence about LPN Debra Ricci failing to obtain a witness signature on the medical refusal form, as NaphCare policies require is nothing more than an isolated incident. *See* Ex. 37 at 11.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  collected data on Mr. Tapia and reported all the data that was collected to a registered

2  nurse, then that would be something that he should do, yes.").

3      Panosky also criticizes the NaphCare LPNs, Jeff Kendig, Franklin Park, and

4  Juddy Marling, who initially assessed Tapia at the very beginning of his incarcera-

5  tion—months before he was hospitalized—for acting outside the scope of practice.

6  *See* Ex. 8 at 31:2-32:19; Ex. 37 at 15. According to Panosky, these LPNs did not

7  correctly document and report their observations after performing COWS assess-

8  ments on Tapia, which is the drug withdrawal protocol that NaphCare uses for re-

9  cently detained individuals.[14] *See id.* at 13. Panosky acknowledged during her dep-

10 osition, however, that this did not cause any of Tapia's alleged constitutional inju-

11 ries. *See* Ex. 8 at 32:20-33:13 ("I didn't say that was the cause."). And, in any event,

12 examples of LPNs failing to correctly perform initial screening assessments do not

13 establish a pattern or practice that should have alerted NaphCare policymakers to

14 any alleged constitutional violation in this case. Nor does merely pointing out these

15 alleged failures establish any evidence that policymakers *disregarded* the infor-

16 mation, which is required to show deliberate indifference. *Connick*, 563 U.S. at 61.

17     **Failure to communicate between Pierce County and NaphCare.** Tapia and

18 his experts also contend that there was a failure to communicate between mental

19 health professionals employed by Pierce County and medical professionals em-

20 ployed by NaphCare. *See* Ex. 36 at 6-7; Ex. 7 at 26:5-20. It is undisputed that the

21 agreement between NaphCare and Pierce County establishes a policy requirement

22 to maintain communication between NaphCare's staff and Pierce County's mental

23 health professionals "to ensure continuity of care." Undisputed Fact 4. The undis-

24 puted facts show there was no breakdown of communication. NaphCare dispatched

25

26

---

[14] Panosky's position is that the LPNs should have reported their observations even if they identified no problems. Ex. 37 at 13. Dr. Bates disagrees. Ex. 7 at 28:21-30:16. For the purposes of *Monell*, it does not matter which one of Tapia's experts is correct.

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 23

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

1    LPN Carrillo to see Tapia the same day that Pierce County mental health profes-

2    sional Darren Nealis requested NaphCare's assistance. Undisputed Fact 5.

3    Even if there were a communication breakdown (there was not), Tapia and his

4    experts do not and cannot point to even one other similar incident that led to a con-

5    stitutional violation. *See* Ex. 7 at 185:21-86:4 (Q. "And that is based just on Mr.

6    Tapia's care, correct?" A. "Correct."). So, this argument fails under *Monell*. *Con-*

7    *nick*, 563 U.S. at 61; *Trevino*, 99 F.3d at 918.

8                    **c.    Nothing about the onset of PCD is patently obvious.**

9    A single incident—as opposed to a pattern of similar incidents—might give

10   rise to *Monell* liability only in the "rare" case where the inevitability of "unconstitu-

11   tional consequences" of a policy failure is "patently obvious." *Connick*, 563 U.S. at

12   64. For example, it should be obvious to policymakers that a constitutional violation

13   could occur if armed officers are set loose on fleeing felons without training in the

14   use of deadly force. *Id.* at 63–64. This is not one of those rare cases.

15   Nothing about the onset of Tapia's extremely rare vascular condition was pa-

16   tently obvious to NaphCare *policymakers*. Dr. Bates—Tapia's expert—agreed that

17   Tapia's behavioral infraction at the jail "had [nothing] to do with [his] [DVT]" or

18   PCD. Ex. 7 at 57:22-58:8. In fact, Dr. Bates speculates that Tapia "developed the

19   thrombosis as a result of his mental health condition." *Id.* at 60:5-7. According to

20   Tapia's complaint, and his expert Dr. Juan Carlos Jimenez, it was the other way

21   around: His vascular disease affected his mental state. SAC ¶ 15; Ex. 3 at 31:9-12.

22   If Tapia cannot determine what happened even with the benefit of hindsight, then it

23   was not patently obvious to policymakers beforehand that their policies would cause

24   constitutional violations.

25   To the extent that Tapia contends that changes in his behavior or mental status

26   made it "obvious" to NaphCare *employees* that his medical condition was

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 24

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  deteriorating, Tapia fails to establish *policymaker* liability under *Monell*. SAC ¶ 17.

2  Again, policymakers cannot be held liable for the mistakes of their employees under

3  § 1983. *Monell*, 436 U.S. at 691.

4  **3.    NaphCare policies did not cause Tapia's injury.**

5  Whether direct or indirect, a corporate policy must be the "actionable cause"

6  of the alleged constitutional violation. *Tsao*, 698 F.3d at 1146. "But-for" causation

7  is not enough; proximate causation is required. *Van Ort v. Est. of Stanewich*, 92 F.3d

8  831, 837 (9th Cir. 1996). PCD, not NaphCare's policies, caused Tapia's alleged in-

9  juries.

10  Even assuming NaphCare had a policy of "refusing to admit patients in need

11  of medical care to appropriate clinical settings" (it did not), the undisputed facts

12  show that Tapia was in the hospital roughly 90 minutes after NaphCare employees

13  learned that there was something wrong with his foot. Undisputed Fact 9. Moreover,

14  although RN Warren determined that Tapia was "normal" on September 29, she

15  scheduled Tapia for an appointment with the jail's doctor for the next business day

16  to "rule out any medical issues." Undisputed Fact 6. Thus, even if NaphCare had a

17  policy, custom, or practice of "refusing to admit patients in need of medical care to

18  appropriate clinical settings," it was not followed in this case, and so it could not

19  have been the cause of Tapia's injuries.

20  Even assuming NaphCare had a policy, custom, or practice of allowing LPNs

21  to practice outside the scope of their licensure (it did not), this purported practice did

22  not cause Tapia's injury. As discussed, only two days before Tapia was hospitalized,

23  Nurse Warren—**who is an RN**—visited Tapia's cell and determined that he was in

24  no distress. Undisputed Fact 6. Tapia's experts acknowledged that Tapia's PCD had

25  not developed on the day that LPN Carrillo visited Tapia in his cell. Ex. 7 at 112:18-

26  21; Ex. 3 at 72:8-15. And, as discussed, not even Tapia's expert believes that the

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 25

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

1    LPNs who initially assessed Tapia for withdrawal caused his alleged constitutional

2    injury. *See* Ex. 8 at 32:20-33:13.

3        **4.    No final NaphCare policymaker ratified any conduct.**

4        An entity "can be liable for an isolated constitutional violation if the [entity's]

5    policymaker ratified a subordinate's actions." *Christie v. Iopa*, 176 F.3d 1231, 1238

6    (9th Cir. 1999) (cleaned up). "[R]atification requires, among other things,

7    knowledge of the alleged constitutional violation." *Id.* at 1239. But knowledge of

8    the act does not, "by itself, constitute ratification." *Id.* "Instead, a plaintiff must es-

9    tablish that the policymaker approved of the subordinate's act." *Id.* Crucially, only

10   those "who have **final policymaking authority** may by their actions subject the

11   [entity] to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)

12   (emphasis added) (internal quotation marks omitted).

13       Tapia's Second Amended Complaint alleges that NaphCare's final policy-

14   maker "ratified" the actions of NaphCare employees "taken in regard to the care and

15   custody" of Tapia. SAC ¶ 45. To support this contention, Tapia points to an E-mail

16   from Dr. Wade, which commends NaphCare employees for saving Tapia's life al-

17   most two years after the fact. SAC ¶ 38 ("[I]n my opinion, had you not seen him

18   immediately on October 1st 2018, called the provider and had him sent to the hospi-

19   tal, he may have died. So thanks to you, he's alive."[15]). Tapia' ratification theory

20   fails because it is undisputed that Dr. Wade was not NaphCare's final policymaker.

21   Undisputed Fact 1. Tapia has expressly conceded this point in briefing before this

22   Court. Dkt. 80 at 3, 5-6 (acknowledging that Dr. Wade was not a final policymaker

23   and that only the final policymaker can provide critical evidence to support a

24

25

26   _____

[15] Tapia acknowledged during his deposition that NaphCare employees' quick actions
saved him from a "life-threatening" condition. Ex. 24 at 245:23-46:2.

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 26

166452635

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

1  ratification theory under *Monell*). Because Dr. Wade was not NaphCare's final pol-

2  icymaker, he could ratify no conduct.

3      Even if Tapia could show ratification by a final policymaker, under *Monell*,

4  "ratification itself" does not create liability "**after the fact of [an] injury**."[16] *German*

5  *v. Roberts*, 2017 WL 3407052, at *3 (W.D. Wash. Aug. 9, 2017) (emphasis added)

6  (discussing *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998)). Instead,

7  "evidence of ratification is merely a method of proving a preexisting government

8  'policy, custom, or practice' that proximately cause[d] a plaintiff's constitutional

9  deprivation." *Id.* As discussed, Tapia cannot establish that he suffered a constitu-

10  tional injury or that any NaphCare policy caused the injury, so his ratification theory

11  necessarily fails as a matter of law.

## V.    CONCLUSION

13      NaphCare respectfully moves the Court to grant summary judgment in its fa-

14  vor on Tapia's § 1983 claim and dismiss NaphCare from the case.

17      RESPECTFULLY SUBMITTED this 3rd day of May, 2024.

19  I certify that this memorandum contains 8,400 words, in compliance with the Lo-
20  cal Civil Rules.

*s/ David A. Perez*
David A. Perez, WSBA No. 43959
Juliana Bennington, WSBA No. 60357
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
E-mail: Dperez@perkinscoie.com
          JBennington@perkinscoie.com

Jacob Dean *(Admitted Pro Hac Vice)*

---

[16] The Tenth Circuit has held that "the ratification *must be the moving force, or cause, of the alleged constitutional violation.*" *Dempsey v. City of Baldwin*, 143 F. App'x 976, 986 (10th Cir. 2005) (emphasis added).

NAPHCARE'S MOTION FOR SUMMARY JUDGMENT
(NO. 2:22-CV-01141) - 27

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000

166452635

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Perkins Coie LLP**
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.3365
Facsimile: 310.788.3365
E-mail: JacobDean@perkinscoie.com
*Attorneys for Defendant NaphCare, Inc.*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: +1.206.359.8000
Fax: +1.206.359.9000