THE HONORABLE KYMBERLY K. EVANSON

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JAVIER TAPIA,

Plaintiff,

v.

NAPHCARE, INC., and PIERCE COUNTY,

Defendants.

NO.  2:22-cv-01141-KKE

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION AND FACTUAL SUMMARY

On June 16, 2018, Plaintiff Javier Tapia was booked into the Pierce County Jail ("Jail").[1] The first three months of his incarceration were "largely unremarkable."[2] Then, on September 17, 2018, Tapia began exhibiting signs of a "mental health crisis."[3] In response, Jail staff transferred Tapia to the mental health unit.[4]

Generally, an altered mental status requires an "immediate transfer" to a hospital "or referral of the patient to medical for evaluation," as the patient could be experiencing a stroke or

---

[1] Declaration of Ryan Dreveskracht in Support of Plaintiff's Response in Opposition to NaphCare, Inc.'s Motion for Summary Judgment ("Dreveskracht Decl."), Exhibit 1.

[2] *Id.*, Ex. 5, at 2.

[3] *Id.*, Ex. 6, at 34 (for ease of reference, Plaintiff cites to original pagination on deposition transcripts). This was diagnosed by providers at Tacoma General Hospital as an "altered mental status." *Id.*, Ex. 3.

[4] *Id.*, Ex. 7, at 12.

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 1
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   any number of life-threatening medical conditions.[5] But the Jail relied on NaphCare to make

2   medical decisions. And, unfortunately for Tapia, NaphCare's "primary focus" is on increasing its

3   revenue and procuring government contracts, not "providing health care."[6]

4   At roughly 3:30 p.m. on September 19, Tapia was referred to NaphCare for "assessment"

5   because he was "confused," "decompensated," "way off his baseline," and was "unable to verbally

6   respond."[7] One hour later, a NaphCare licensed practical nurse ("LPN") "assessed" Tapia by

7   taking his blood pressure, which was elevated.[8] There is no documented evidence that the LPN

8   conveyed the results of this "assessment" to a registered nurse ("RN") or provider.[9] The LPN

9   instead wrote in Tapia's medical chart: "will continue to monitor."[10]

10  Per "NaphCare's policies and established practices" NaphCare's medical "monitoring [is]

11  done by corrections officers."[11] Thus, Tapia had no clinical interaction with medical personnel for

12  the next ten days.[12] During this time, Tapia repeatedly presented as "confused and non-verbal" and

13  "decompensated."[13] In rare moments of clarity, Tapia "would get up [and] make [his] way to the

14  button" notifying corrections staff that he needed assistance, but he "couldn't stay awake" for a

15  response.[14] He did not leave his cell for a shower.[15] He stopped eating and became "severe[ly]

16  maln[ourished]."[16] His cell began to "smell[] of urine."[17]

17

18  [5] *Id.*, Ex. 8, at 4. NaphCare's Health Services Administrator agrees. *See id.*, Ex. 9, at 55-56 (Q. . . . [W]hat is an appropriate clinical response to a sudden altered mental state? A. . . . [T]hat would be an emergency, generally, that somebody would be sent out for.").

19  [6] *Id.*, Ex. 10, at 22-23; *see also id.*, at 255-57 (same).
    [7] *Id.*, Ex. 11, at 6.
    [8] *Id.*, Ex. 12, at 3.

20  [9] *Id.*, Ex. 11, at 6; *see also id.*, Ex. 13, at 14 ("[T]here is no documentation that Carillo LPN ever reported anything to the clinic RN.").
    [10] *Id.*, Ex. 11, at 6.

21  [11] *Id.*, Ex. 14, at 29-30, 34; *see also Hill v. NaphCare, Inc.*, No. 20-410, 2023 WL 6297483, at *7 (E.D. Wash. Sept.

22  27, 2023) ("NaphCare violated the Constitution by using medically untrained jail guards to monitor NaphCare patients in need of medical monitoring by medical professionals.") (quotation omitted).
    [12] Dreveskracht Decl., Ex. 11, at 5-6.

23  [13] *Id.*, Ex. 11, at 6.
    [14] *Id.*, Ex. 15, at 152.

24  [15] *Id.*, at 156.
    [16] *Id.*, Ex. 16, at 4-5.
    [17] *Id.*, Ex. 11, at 5.

25  PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S       **Galanda Broadman PLLC**
    MOTION FOR SUMMARY JUDGMENT - 2                              8606 35th Avenue NE, Ste. L1
    (Case No. 2:22-cv-01141-KKE)                                 Mailing: P.O. Box 15146
                                                                 Seattle, WA 98115
                                                                 (206) 557-7509

On October 1, a *corrections officer* noticed that Tapia's toes were "turning black" and he was transferred to Tacoma General Hospital.[18] At the hospital, Tapia "was noted to have pain, swelling, redness, and gangrene of his left lower extremity," indicating that the blood clot that caused Tapia's "acute mental status changes" was "present for approximately *2-4 weeks* prior to the date of his transfer to the hospital."[19] Tapia's leg was amputated below the knee.[20]

NaphCare submits that (1) Tapia's vascular diagnosis "is so rare" that NaphCare could not possibly be responsible for his amputation; (2) since no individual "NaphCare employee who interacted with" Tapia is a named defendant, NaphCare cannot be liable; and (3) Tapia cannot prove the elements of a 42 U.S.C. § 1983 claim against NaphCare under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978). (Dkt. # 100, at 6–8).

NaphCare is wrong on all accounts. First, the rarity of Tapia's ultimate vascular diagnosis does not negate NaphCare's duty to "provide adequate medical care" that would have prevented his amputation. (Dkt. # 31, at 7). Second, although "[a]ffirmative conduct by an employee is not always required to establish *Monell* liability," Plaintiff has evidenced such conduct by NaphCare employees. (*Id.*). Third, NaphCare's argument that Tapia must verify a "requisite pattern of similar cases" to evidence a *Monell* claim is a misstatement of the law. NaphCare knows better. *Hill*, 2023 WL 6297483, at *6.

NaphCare's motion should be denied.

## II.     LAW AND ARGUMENT

### A.     SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the

---

[18] *Id.*

[19] *Id.*, Ex. 17, at 4, 6 (emphasis added); *see also id.*, Ex. 18, at 23 ("[W]hen it's gangrenous like this, it's generally been there for a while, but at least probably one to two weeks.").

[20] *Id.*, Ex. 20.

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 3
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

2   judgment as a matter of law." A principal purpose of summary judgment "is to isolate and dispose

3   of factually unsupported claims" and stop them "from going to trial with the attendant unwarranted

4   consumption of public and private resources." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 327

5   (1986). In resolving a motion for summary judgment, the court considers "the threshold inquiry of

6   determining whether there is the need for a trial—whether, in other words, there are any genuine

7   factual issues that properly can be resolved only by a finder of fact because they may reasonably

8   be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

9   **B.    *MONELL* STANDARD**

10          A medical contractor is liable under 42 U.S.C. § 1983 if "a policy, practice, or custom of

11  the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty

12  v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). A plaintiff

13  can establish *Monell* liability "by proving that an employee committed [a constitutional] violation

14  pursuant to a formal policy or longstanding practice or custom that constitutes the standard

15  operating procedure of the governmental entity." *Barto v. Miyashiro*, No. 21-56223, 2022 WL

16  17729410, at *1 (9th Cir. Dec. 16, 2022).

17          The Ninth Circuit divides Fourteenth Amendment *Monell* claims into two categories:

18  policies of "action" and policies of "inaction." *Hill*, 2023 WL 6297483, at *14. A policy of action

19  is one where the defendant "'itself violate[d] federal law, or direct[ed] an employee to do so.'" *Id.*

20  (quoting *Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020)). A policy of

21  inaction is one that "create[s] a risk that inmates w[ill] have their constitutional rights violated."[21]

22  *Id.* (citing *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021); *Castro v. Cnty. of

23

24  ─────────────────────
    [21] Some courts refer to policies of inaction as "policy gaps." *See, e.g.*, *Hendrick v. Bryant*, No. 20-249, 2021 WL
    4502159 (N.D. Ill. Sept. 30, 2021).

25  PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S          **Galanda Broadman PLLC**
    MOTION FOR SUMMARY JUDGMENT - 4                                8606 35th Avenue NE, Ste. L1
    (Case No. 2:22-cv-01141-KKE)                                   Mailing: P.O. Box 15146
                                                                   Seattle, WA 98115
                                                                   (206) 557-7509

*Los Angeles*, 833 F.3d 1060, 1077 (9th Cir. 2016)). **Policies of inaction, such as the failure to train,** require a plaintiff to allege **"deliberate indifference,"** whereas **policies of action do not**.[22] *Id.*; *see also Caldwell v. City of San Francisco*, No. 12-1892, 2020 WL 7643124, at *13 (N.D. Cal. Dec. 23, 2020).

The Ninth Circuit applies an "objective standard" to the Fourteenth Amendment deliberate indifference test. *Castro*, 833 F.3d at 1076. Under this test, a claim will proceed upon evidence of "constructive notice" that the alleged policy, custom, or established practice puts inmates at a substantial risk of harm. *Sandoval*, 985 F.3d at 682. In addition to the risk being "obvious" or "substantially certain" to flow from the policy, constructive notice can be inferred from **post-incident evaluations, audits, or reviews**. *See, e.g.*, *Simpkins v. Boyd Cnty. Fiscal Ct.*, No. 21-5477, 2022 WL 17748619, at *12 (6th Cir. Sept. 2, 2022); *Fernandes v. Bouley*, No. 20-11612, 2022 WL 2915702, at *7 (D. Mass. July 25, 2022). Further, because what might not be obvious to the layperson may be obvious to a professional,[23] "[d]eliberate indifference may also be shown through **expert testimony** that a practice condoned . . . was contrary to the practice of most [similarly situated professionals] and was particularly dangerous because it presented an unusually high risk that constitutional rights would be violated." *Felciano v. Town of E. Hartford*, No. 18-

---

[22] NaphCare appears to confuse, or conflate, the law regarding the existence of a *Monell* custom with that regarding the deliberate indifference standard. *See* (Dkt. # 100, at 22, 25). As to the former, the Ninth Circuit has held that a "plaintiff cannot prove **the existence** of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) (emphasis added). As to the later, **deliberate indifference** "ordinarily is shown through 'a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice.'" *Simms-Belaire v. Washington Cnty.*, No. 20-338, 2024 WL 279020, at *16 (D. Or. Jan. 25, 2024) (quoting *Park*, 952 F.3d at 1142). In other words, both the existence of a *Monell* custom and the deliberate indifference standard refer to a pattern of similar conduct. But for different reasons. Whereas the former provides evidence that the conduct was not a one-off, the latter is one of the ways a plaintiff might show constructive notice that the policy was likely to result in constitutional harm. Were the law as NaphCare misrepresents (i.e. such that Tapia's medical emergency is so "extraordinarily rare" that "Tapia could never identify enough similar cases to establish the requisite pattern" (Dkt. # 100, at 25)) "every *Monell* defendant would get 'one free pass' for policies or practices that are substantially certain to violate an individual's constitutional rights." *Sandoval*, 985 F.3d at 682 (quoting *Woodward v. Corr. Med. Servs. of Ill.*, 368 F.3d 917, 929 (7th Cir. 2004)). Thankfully, this is not the law.

[23] *See Chavez v. Cady*, 207 F.3d 901, 905 (7th Cir. 2000) ("[I]t can be assumed that what might not be obvious to a lay person might be obvious to a professional acting within her area of expertise.").

1932, 2023 WL 4826465, at *11 (D. Conn. July 27, 2023) (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)) (emphasis added); *see also, e.g.*, *Cash v. Cnty. of Erie*, 654 F.3d 324, 338 (2d Cir. 2011); *Weger v. Washington State Dep't of Soc. & Health Servs.*, No. 19-5961, 2021 WL 243402, at *5 (W.D. Wash. Jan. 25, 2021). And, of course, as NaphCare points out, **similar incidents** provide actual notice. *See, e.g.*, *Bennett v. Ford,* No. 23-189, 2023 WL 9234933, at *7 (N.D. Fla. Dec. 22, 2023).

## C. PLAINTIFF HAS EVIDENCED THE EXISTENCE OF AT LEAST THREE UNCONSTITUTIONAL POLICIES.

Overwhelming evidence would support a jury's conclusion that NaphCare had at least three widespread customs in place. These customs need not have "received formal approval through . . . official decisionmaking channels." *Monell*, 436 U.S. at 691. Nor must they be written down. *Navarro v. Block*, 72 F.3d 712, 715 (9th Cir. 1995). In fact, the customs may contradict written policy; what matters is evidence of the entity's "actual routine practices." *Castro*, 833 F.3d at 1075 n.10.

### 1. Putting Profit Over Care, NaphCare Maintained A Custom Of Employing Staff At Inappropriate Levels Of Training To Provide Care That Was Out Of Their Scope Of Practice.

First, Tapia's medical record reveals at least *seven* instances where LPNs were "working outside their nursing scope of practice."[24] While NaphCare argues Tapia's "isolated experiences are insufficient to show" a *Monell* custom, (Dkt. # 100, at 27), "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Oyenik v. Corizon Health*, 696 F. App'x 792, 794 (9th Cir. 2017). To the contrary, trial courts in the Ninth Circuit have consistently found that multiple instances of insufficient medical care provided to a single plaintiff can evidence a *Monell* custom. *See, e.g.*, *Tabb v. NaphCare*, No. 21-5541, 2024

---

[24] Dreveskracht Decl., Ex. 13, at 13-14.

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 6
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

WL 1905638, at *7 (W.D. Wash. May 1, 2024) (plausible *Monell* custom where "numerous employees denied [plaintiff] immediate care"); *Jennings v. Cnty. of Riverside*, No. 19-1523, 2023 WL 9379974, at *8 (C.D. Cal. Sept. 1, 2023) (noting that "multiple instances of delayed medical care" constitutes "evidence of a policy or custom") (quotation omitted); *Trejo v. Cnty. of Imperial*, No. 20-1465, 2023 WL 4194442, at *6 (S.D. Cal. June 26, 2023) ("seven" instances of delayed care "over an eight week period" sufficient to evidence a *Monell* custom).

Second, LPN Carrillo himself testified that his "acts and omissions in regard" to Tapia "comport[ed] with NaphCare's policies and established practices."[25] An employee's "belief" that his conduct was "consistent" with the custom is strong evidence supporting *Monell* liability. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013); *see, e.g.*, *Hill*, 2023 WL 6297483, at *8 (nursing testimony that that "everything she did relating to [a patient] was pursuant to regular NaphCare customs and practices" deemed sufficient evidence "for the jury to conclude that" actions were taken "pursuant to NaphCare's custom").

Third, LPN Carrillo's supervisors confirmed that the care he provided complied with "NaphCare policy or established practice"[26] and that LPN Carrillo "did everything right." (Dkt. # 62-1). "[P]ost-event evidence" is "highly probative" for "proving the existence of a municipal defendant's policy or custom." *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997); *see also, e.g.*, *S.R. Nehad v. Browder*, 929 F.3d 1125, 1142 (9th Cir. 2019); *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991).

Fourth, NaphCare's financial motive supports the existence of this custom.[27] NaphCare's "primary focus" is on increasing its revenue and procuring government contracts, not "providing

---

[25] *Id.*, Ex. 14, at 34. This is consistent with NaphCare RN Elizabeth Warren's testimony that it was "customary in the fall of 2018 for LPNs to conduct patient assessments." *Id.*, Ex. 21, at 31.

[26] *Id.*, Ex. 9, at 56.

[27] As counsel for NaphCare has noted elsewhere, Plaintiff's evidence of putting "profits over care" is not a *Monell* custom on its own—it is a "theme" that forms the motive behind NaphCare's customs. *Rapp v. NaphCare, Inc.*, No 21-5800 (W.D. Wash. Oct. 31, 2022) (Dkt. # 83); *cf.* (Dkt. # 100, at 26),

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 7
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

health care."[28] And the use of LPNs in lieu of RNs saves NaphCare roughly 30% in hourly wages.[29] "Courts have regularly found" that corporate entities may be liable for "sanctioning the denial of needed medical care as a result of financial considerations." *Green v. Obsu*, No. 19-2068, 2021 WL 165135, at *15 (D. Md. Jan. 19, 2021); *see also, e.g.*, *Harper v. Wexford Health Sources*, No. 14-4879, 2017 WL 2672299, at *3 (N.D. Ill. June 21, 2017).

Finally, Plaintiff's experts have concluded "that NaphCare had a custom and established practice of requiring LPNs to work outside of their nursing scope of practice."[30] This practice is evidenced, to provide one example of many, by LPN Carrillo's visit with Tapia on September 19 whereby he independently made a medical determination, i.e., that Tapia "does not appear in distress," and he formulated a treatment plan, i.e., "will continue to monitor," without a corresponding review or approval by a supervising RN or provider.[31] Trial courts in the Ninth Circuit frequently hold that expert opinions regarding the existence of a custom "demonstrate that there remain genuine disputes as to material facts with respect to whether" a custom exists. *City of San Diego*, 35 F. Supp. 3d at 1245; *see also, e.g.*, *Weger*, 2021 WL 243402, at *5.

### 2. Putting Profit Over Care, NaphCare Maintained A Custom Of Using Medically Untrained Guards To Monitor Patients In Need Of Medical Monitoring.

First, Tapia's medical record reveals that he spent ten days—from September 19, 2018, to September 29, 2018—being "moniter[ed] . . . by corrections officers" and had no interaction whatsoever with a NaphCare medical provider.[32] This was not a one-off. It persisted over a period of ten days. And it persisted at other NaphCare facilities. In *Hill*, for instance, a jury found that

---

[28] Dreveskracht Decl., Ex. 10, at 22-23; *see also id.*, at 255-57 (same).
[29] *Cf. id.*, Ex. 22, *with id.*, Ex. 23.
[30] *Id.*, Ex. 13, at 13-14; *see also id.*, Ex. 8, at 8-9.
[31] *Id.*, Ex. 11, at 6; *see also id.*, Ex. 10, at 94-99 (additional examples of LPNs acting out of their scope of practice); *id.*, Ex. 24, at 20-21, 40-41, 47, 49, 51, 57, 75-76, 81-82, 99, 108 (same); *id.*, Ex. 25, at 1 (listing 8 examples of LPNs acting out of their scope of practice).
[32] *Id.*, Ex. 14, at 29-30, 34.

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 8
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

"NaphCare violated the Constitution by using medically untrained jail guards to monitor NaphCare patients in need of medical monitoring by medical professionals." 2023 WL 6297483, at *7.

Second, LPN Carrillo testified that having corrections staff "continue to monitor" Tapia "comport[ed] with NaphCare's policies and established practices."[33] Again, an employee's "belief" that his conduct was "consistent" with the custom is strong evidence supporting *Monell* liability. *Gravelet-Blondin*, 728 F.3d at 1097; *Hill*, 2023 WL 6297483, at *8.

Third, LPN Carrillo's supervisors confirmed that the care he and the nursing team provided complied with "NaphCare policy or established practice"[34] and that LPN Carrillo "did everything right." (Dkt. # 62-1). Again, "post-event evidence" is "highly probative" for "proving the existence of a municipal defendant's policy or custom." *Henry*, 132 F.3d at 519.

Finally, NaphCare's financial motive supports the existence of this custom. Relying on county-payrolled jail guards to monitor patients in need of medical monitoring is free.

To be sure, NaphCare's argument that it "has a 'default' policy to 'always send people to the hospital' if there is any doubt about whether their medical needs can be addressed" contradicts this evidence. (Dkt. # 100, at 9) (quoting Dkt. # 101-13, at 7). But that only creates an issue of material fact.[35] Plaintiff's evidence, when interpreted in the light most favorable to him, evidences a *Monell* custom to the contrary.

### 3. NaphCare Maintained Customs Of Noncommunication Between Mental Health And Medical Providers And A Lack Of Any Oversight.

As NaphCare itself notes, it is contractually "responsible for 'integrating its services with the existing mental health providers.'" (Dkt. # 100, at 10) (quoting Dkt. # 101-15, at 13). Unfortunately for Tapia, NaphCare failed to fulfill its contractual obligation.

---

[33] *Id.*, at 34.
[34] *Id.*, Ex. 9, at 56.
[35] *See id.*, Ex. 26, at 5-6 ("The alleged practice or custom is belied by the evidence in this case. . . . There was 'doubt,' but Mr. Tapia was not 'sent out.'").

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT - 9
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    First, Tapia's medical record reveals that there were *multiple* breakdowns of

2  communication regarding the provision of care between September 18 and October 1. On

3  September 18, Mental Health Provider ("MHP") Darren Nealis met with Tapia, who presented as

4  "confused," "unable to verbally respond" and "appear[ed] to be decompensated."[36] Nothing was

5  done in response. There was no referral to NaphCare. The next day, September 19, Tapia again

6  presented as "confused," "unable to verbally respond," and "decompensated."[37] At this point,

7  MHP Nealis "wasn't sure . . . what was wrong with him" and concluded "that it might be a medical

8  issue."[38] So he "walked to the nurses station and made a referral."[39] The content of the alleged

9  "nurses station" conversation is unknown and undocumented,[40] but roughly one hour later LPN

10  Carrillo took Tapia's blood pressure, which was "hypertensive" (150/98).[41]

11    NaphCare's representation that LPN Carrillo "verbally reported his observations to the RN

12  on duty" after this interaction misstates the record. (Dkt. # 100, at 19). LPN Carrillo's *actual*

13  deposition testimony was that he "knows" that he verbally reported to the clinic RN because it was

14  his "standard practice to always report patient conditions back to the RN."[42] "The question of

15  whether [LPN Carrillo] followed his routine practice requires a credibility determination reserved

16  for the trier of fact." *Smith v. Cnty. of Macon*, No. 20-2203, 2024 WL 1832426, at *9 (C.D. Ill.

17  Mar. 26, 2024). A "TechCare Audit Log" presented by NaphCare, apparently depicting who

18  opened Mr. Tapia's electronic medical record and when, says nothing about when or whether LPN

19  Carrillo verbally reported anything to anybody, nor what those persons who opened the record

20

21

---

22  [36] *Id.*, Ex. 11, at 7.
    [37] *Id.*, at 6.
23  [38] *Id.*, Ex. 27, at 32, 45-46.
    [39] *Id.*, at 31.
    [40] *Id.*, at 32.
24  [41] *Id.*, Ex. 11, at 6; *id.*, Ex. 12, at 3.
    [42] *Id.*, Ex. 14, at 17-18. Tellingly, LPN Carrillo does not know who the clinic RN he allegedly reported to is, or what was said to him in response. *Id.*, at 19-20.

25  PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S     **Galanda Broadman PLLC**
    MOTION FOR SUMMARY JUDGMENT - 10                          8606 35th Avenue NE, Ste. L1
    (Case No. 2:22-cv-01141-KKE)                              Mailing: P.O. Box 15146
                                                              Seattle, WA 98115
                                                              (206) 557-7509

1  reviewed.[43] (Dkt. # 100, at 14) (citing Dkt. # 101-32). In addition, there's a generally accepted

2  principle in nursing: "if it wasn't documented, it wasn't done."[44] And there is no documentation

3  of LPN Carrillo receiving instructions from, or reporting to, an RN.[45]

4         Regardless, for the next ten days Tapia continued to present as "confused," "non-verbal,"

5  and "decompensated," none of which was apparently communicated to NaphCare.[46] Then, on

6  November 29, a *corrections officer* requested that NaphCare evaluate Tapia, who, according to

7  NaphCare RN Warren, continued to present as nonverbal and, at this point, was malnourished and

8  "smell[ed] of urine."[47] Prior to this interaction with Tapia, RN Warren did not communicate with

9  any mental health or NaphCare colleagues about Tapia, had not reviewed the medical record, and

10 did not know that he had been nonresponsive and appeared to be decompensated in the preceding

11 days.[48] She knew *nothing* about his ongoing altered mental status. The physician in charge, Dr.

12 Balderrama, had not issued a treatment plan or any instructions regarding the requirements for

13 frequency of contact of assessments for Tapia and, by all accounts, was unaware of Tapia's

14 existence.[49] NaphCare's Health Services Administrator was not "aware of [Tapia] at all . . . prior

15

16

17 [43] Surely, if RN Darilyn Ingelmon—a NaphCare employee—actually "reviewed Tapia's chart," or verbally received data from LPN Carrillo, or had any interaction with LPN Carrillo at all, NaphCare would have presented her testimony in the form of a declaration or affidavit. *Cf.* (Dkt. ## 69, 89, 91).

18 [44]Dreveskracht Decl., Ex. 24, at 103; *see also id.*, at 75-76 (same); *id.*, Ex. 13, at 14 (discussing LPN Carrillo's lack of documentation and inferences drawn therefrom in the nursing field).

19 [45] *See generally id.*, Ex. 13.

    [46] *Id.*, Ex. 11, at 6. Or, if it was, it was ignored or not followed up on. NaphCare's representation that Tapia was "seen"

20 by medical staff "at least once per day" is a bit misleading. (Dkt. # 100, at 13). In her deposition, RN Warren actually described rounds where a nurse would, each shift, walk through the unit and "look in and make sure [the inmate] is

21 still breathing." (Dkt. # 101-10, at 5). This may have occurred. But is irrelevant since Tapia "slept a lot in there" and "couldn't stay awake." (Dkt. # 101-24, at 7).

    [47] Dreveskracht Decl., Ex. 11, at 5.

22 [48] *Id.*, Ex. 21, at 45-46. In fact, aside from LPN Carrillo's visit on September 19, and despite that Tapia was housed in the mental health unit expressly for increased observation, there is no evidence in the record that any nursing staff

23 communicated with mental health staff about Tapia's decompensating condition or status between the September 19 and September 29 visits. *Id.*, Ex. 11, at 5-6. (Tapia's chart notes describing no communication between mental health and medical staff); *see also id.*, Ex. 29, at 2-3 (behavioral log describing no communication between correctional or

24 mental health staff and medical staff). Though mental health chart notes are entered into the TechCare system and are viewable by nursing staff, during this time period, no nursing staff even opened his chart. *Id.*, Ex. 30.

    [49] *Id.*, Ex. 21, at 57-58.

25 PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S          **Galanda Broadman PLLC**
    MOTION FOR SUMMARY JUDGMENT - 11                               8606 35th Avenue NE, Ste. L1
    (Case No. 2:22-cv-01141-KKE)                                   Mailing: P.O. Box 15146
                                                                   Seattle, WA 98115
                                                                   (206) 557-7509

to him being sent out to the hospital."[50] Then, on October 1, LPN Debra Ricci wrote in Tapia's medical record that he "'refused' vital signs," without communicating the alleged "refusal" to a Medical Director, provider, or charge nurse, in violation of NaphCare's written policy.[51] And, according to NaphCare supervisors, all of this was "standard protocol for NaphCare" and "comport[ed] with NaphCare's policies and established practices."[52]

Again, while NaphCare argues Tapia's "isolated experiences are insufficient to show" a *Monell* custom, (Dkt. # 100, at 27), trial courts in the Ninth Circuit have consistently found that multiple instances of insufficient medical care provided to a single plaintiff can evidence a *Monell* custom. *See, e.g.*, *Tabb*, 2024 WL 1905638, at *7; *Jennings*, 2023 WL 9379974, at *8; *Trejo*, 2023 WL 4194442, at *6. And an employee's "belief" that her conduct was "consistent" with the custom is strong evidence supporting *Monell* liability. *Gravelet-Blondin*, 728 F.3d at 1097; *Hill*, 2023 WL 6297483, at *8.

In addition, upon subsequent review of Tapia's medical record, NaphCare supervisors confirmed that the care provided by its employees in regard to Tapia complied with "NaphCare policy or established practice"[53] and that they "did everything right," (Dkt. # 62-1).[54] which is "highly probative" for "proving the existence of a municipal defendant's policy or custom." *Henry*, 132 F.3d at 519; *see also, e.g.*, *S.R. Nehad*, 929 F.3d at 1142; *Larez*, 946 F.2d at 647.

Finally, Plaintiff's experts have reviewed the record in this case and concluded that it:

> is replete with policies and established practices that caused Mr. Tapia's obvious and serious medical condition to slip through the cracks . . . . For instance: . . . The lack of communication between mental health and medical providers [and a] lack of any oversight up the chain on the part of medical providers.[55]

---

[50] *Id.*, Ex. 9, at 22.
[51] *Id.*, Ex. 13, at 11. This also further evidences a custom of NaphCare LPNs acting outside the scope of their practice, as discussed above.
[52] *Id.*, Ex. 21, at 74.
[53] *Id.*, Ex. 9, at 56.
[54] *See also id.*, Ex. 8, at 10 ("NaphCare's top brass' endorsement of the care provided to Mr. Tapia exhibits an institutional reckless disregard to the substantial risk of harm to similarly situated inmates.").
[55] *Id.*, at 7-10; *see also id.*, Ex. 24, at 146-47; *id.*, Ex. 31.

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 12
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Again, trial courts in the Ninth Circuit frequently hold that expert opinions regarding the existence of a custom "demonstrate that there remain genuine disputes as to material facts with respect to whether" a custom exists. *City of San Diego*, 35 F. Supp. 3d at 1245.

\* \* \*

The Ninth Circuit has relied on evidence of significantly lesser quality and quantity to find the existence of a custom for purposes of *Monell* liability. In *Nehad*, for instance, the Court of Appeals found sufficient evidence that a department had a custom of unnecessarily using lethal force based on three things: (1) expert testimony that most shootings were avoidable; (2) the department's approval of the shooting; and (3) evidence that the department looked the other way when officers used such force. 929 F.3d at 1141–42. In *Navarro*, even less evidence sufficed: The plaintiffs showed a "custom of according lower priority to 911 calls related to domestic violence" based solely on deposition testimony from a 911 dispatcher who testified that it was the department's "practice" not to classify domestic violence 911 calls as emergency calls. 72 F.3d at 713, 715. Here, the evidence of NaphCare's custom dwarfs the custom evidence in those cases. The existence of a *Monell* custom presents a jury question.

**D.    NAPHCARE EMPLOYEES COMMITTED CONSTITUTIONAL VIOLATIONS WHILE ACTING PURSUANT TO A NAPHCARE CUSTOM.**

NaphCare's argument that "Tapia's § 1983 claim fails right out of the gate" because "Tapia has no claims against any individual NaphCare employee" is a gross misstatement of the law. (Dkt. # 100, at 23). This Court has already held that "[a]ffirmative conduct by an employee is not always required to establish *Monell* liability" so long as "a link between an omission and the policy,

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 13
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

custom, or practice" is proven. (Dkt. # 31, at 7). There is an abundance of evidence upon which a reasonable juror could so find.[56]

### 1.    LPN Carrillo's Provision Of Care That Was Outside Of His Scope Of Practice Caused Constitutional Harm To Tapia.

According to Plaintiff's corrections nursing expert:[57]

> There [was] no thorough nursing data collection completed by Carrillo LPN or any assessment by a [RN]. . . . Carrillo LPN did not report . . . to his RN supervisor and [was therefore] working outside of his LPN scope of practice by working independently and making independent decisions about Mr. Tapia's care and treatment, or essentially NO care or treatment. . . . Mr. Tapia should have been immediately sent for an assessment by a [RN] or a Medical Healthcare Provider, or for an evaluation at a higher level of care facility in a Hospital Emergency Department. There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained [RN] and/or [LPN] would have recognized, and these nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk . . . was unacceptable and fell below what a reasonable and prudent nurse would do in the same or similar circumstances.

In other words, Plaintiff has adduced evidence of textbook Section 1983 liability had LPN Carrillo been a defendant, *inter alia* by "disregard[ing] known or obvious risks" to Tapia's health. *Dawson v. S. Corr. Entity*, No. 19-1987, 2021 WL 4244202, at *5 (W.D. Wash. Sept. 17, 2021).

Causation is also a question for the jury. According to Tapia's vascular expert, Dr. Carlos Jimenez, the "mental status change" that LPN Carrillo was responding to was caused by Phlegmasia Cerulea Dolens ("PCD")—a blood clot in his groin—"and related systemic manifestations."[58] The timing of the onset of Tapia's mental status change confirms this, as his medical record from Tacoma General corroborates that the systemic manifestations of PCD

---

[56] Some context is also in order. On July 18, 2022, Plaintiff *did* assert claims against individual NaphCare employees. (Dkt. # 1-2). On September 13, 2022, the Parties met and conferred regarding a number of aspects of that pleading, including removal of the individual NaphCare employees and the "relation back" doctrine. Dreveskracht Decl., Ex. 3; (Dkt. # 13). In the spirit of compromise and in order to avoid extensive briefing, Plaintiff agreed to remove the individual NaphCare employees. Dreveskracht Decl., Ex. 4. Plaintiff had already, also in the spirit of compromise, "dropped the simple and/or medical negligence claims it previously raised against NaphCare." (Dkt. # 31, at 6). Plaintiff, maybe naively, did not expect this to be used against him. But here we are.

[57] Dreveskracht Decl., Ex. 13, at 14-15.

[58] *Id.*, Ex. 17, at 6.

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 14
(Case No. 2:22-cv-01141-KKE)

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

"occurred likely weeks" prior to October 1.[59] And, as Dr. Jimenez opines:[60]

> [T]he initial deep venous thrombosis which led to the patient's PCD appears to have been present for approximately 2-4 weeks prior to the date of his transfer to the hospital on 10/1/2018. This delay in diagnosis was a significant contributing factor which led to Mr. Tapia's left lower leg amputation. More likely than not, had the patient's acute deep venous thrombosis been diagnosed earlier and treated with systemic anticoagulation, progression to PCD and limb loss would have been avoided.

Again, the standard of care required that Tapia be "immediately sent for an assessment by a Registered Nurse or a Medical Healthcare Provider, or for an evaluation at a higher level of care facility in a Hospital Emergency Department" upon his first interaction with NaphCare nursing staff.[61] This would have included a "a comprehensive head-to-toe assessment, and neurological assessment" that can only be conducted by an RN or higher-credentialed provider.[62] NaphCare's custom of using LPNs to assess patients outside of their scope of practice prevented this from happening. And Tapia's nursing expert has opined that, had an appropriate assessment occurred, "medical treatment and limb saving interventions could have been given."[63]

NaphCare's arguments to the contrary are misleading and unfounded. Throughout its briefing, NaphCare contends that Tapia's PCD was so "extremely rare" that "NaphCare policymakers" could not have foreseen its occurrence and therefore had no reason to address it as a matter of policy. (Dkt. # 100, at 29). But this argument again "misses the mark." (Dkt. No. 31, at 7). "[A]n inmate's sudden altered mental status is a medical emergency. This is basic

---

[59] *Id.*, Ex. 19, at 4; *see also id.*, Ex. 32, at 2 (same); *id.*, Ex. 19, at 4 (noting that Tapia's clot was a "long standing event (weeks likely)"); *id.*, Ex. 33, at 4 ("Symptoms of unclear duration but likely weeks"); *id.*, Ex. 34, at 1 ("History is unclear, but it sounds like this process may have been going on for weeks."); *id.*, Ex. 18, at 23 (same).

[60] *Id.*, Ex. 17, at 6. NaphCare's numerous insinuations that, for instance, "[n]ot even Tapia's experts can agree when his PCD developed" is not based on Tapia's experts' opinions. (Dkt. # 100, at 6). These insinuations are, rather, based upon deposition questions calling for speculation posed to experts offered to opine on other aspects of Tapia's care. It's akin to asking a plumber to opine on carpentry and a carpenter to opine on plumbing—then claiming "gotcha!" when their opinions diverge. This is a theme in NaphCare's briefing. (*Id.*, at 28 n.14, 29-31). To be clear, this testimony will not be offered at trial and is irrelevant. NaphCare's attempt to sew confusion where there is none should be disregarded.

[61] Dreveskracht Decl., Ex. 13, at 14.

[62] *Id.*, at 16.

[63] *Id.*, at 19.

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 15
(Case No. 2:22-cv-01141-KKE)

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

medicine."[64] NaphCare's custom of having LPNs *not credentialed to assess* Tapia's altered mental status attend to him is the cause of his injury. He was *never appropriately evaluated*, due to NaphCare's custom requiring LPNs do the work of RNs and physicians. Had an appropriate evaluation been conducted, "[m]ore likely than not" Tapia's deep venous thrombosis would have been diagnosed "and would have saved his leg."[65]

Finally, NaphCare's argument that Tapia's ongoing "altered mental status"[66] was apropos of nothing—instead reflecting Tapia's "antiauthoritarian attitude"[67] and a "temper tantrum" (Dkt. # 100, at 12)—is an argument that it can make to a jury. But it is by no means the only (or most reasonable) way to interpret the facts. Causation is a jury question.

### 2. The Use Of Medically Untrained Guards To Monitor Patients In Need Of Medical Monitoring Caused Constitutional Harm To Tapia.

On September 17, Tapia suddenly began exhibiting signs of a "mental health crisis."[68] Two days later, LPN Carrillo "assessed" Tapia by taking his blood pressure,[69] and then wrote in his medical chart: "will continue to monitor."[70]

But LPN Carrillo did *not* continue to monitor Tapia, because NaphCare's medical "monitoring [is] done by corrections officers."[71] Thus, Tapia had no clinical interaction with a NaphCare employee for the next ten days.[72] During this time, Tapia continued to present as "confused and non-verbal" and "decompensated,"[73] caused by "PCD and related systemic manifestations" that would have been identified had a "detailed physical evaluation" been

---

[64] *Id.*, Ex. 8, at 9 (citing https://my.clevelandclinic.org/health/diseases/23159-altered-mental-status-ams).
[65] *Id.*, Ex. 17, at 7.
[66] *Id.*, Ex. 35, at 11, 13; *id.*, Ex. 36, at 2-4.
[67] *Id.*, Ex. 37, at 96.
[68] *Id.*, Ex. 6, at 34.
[69] *Id.*, Ex. 12, at 3.
[70] *Id.*, Ex. 11, at 6.
[71] *Id.*, Ex. 14, at 29-30, 34.
[72] *Id.*, Ex. 11, at 5-6.
[73] *Id.*, at 6.

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT - 16
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

conducted.[74] Instead, Tapia was monitored by corrections officers who had no medical training, were not responsible for medically assessing inmates, and therefore did not identify the signs and symptoms of PCD and related systemic manifestations that Tapia was exhibiting. *See, e.g.* (Dkt. # 101-26).

In short, observation by corrections officers is not a form of medical monitoring. LPN Carrillo knew that Tapia needed continued monitoring, but, per NaphCare custom, relied on corrections officers to do it. As noted by Plaintiff's corrections medicine expert:[75]

> Mr. Tapia was kept in level 1 housing for further assessment; the only problem with this is that an assessment was never performed. . . . The standard of care dictates that an inmate in Mr. Tapia's condition and housing should be evaluated by a medical provider every day. He was not given the opportunity to have his mental health status changes evaluated and treated, which in my medical opinion would have prevented the deep venous thrombosis that the patient developed.

Again, while NaphCare is certainly allowed to make an argument that Tapia's ongoing "altered mental status"[76] was apropos of nothing—that all the medical evaluations in the world would not have prevented his loss of limb—that argument is for the jury. Questions of material fact prevent NaphCare's theory from prevailing at the summary judgment stage.

### 3. NaphCare's Customs Of Noncommunication Between Mental Health And Medical Providers And A Lack Of Any Oversight Caused Tapia's Injury.

Breakdowns in communication between NaphCare and Pierce County (corrections and mental health providers) and a lack of oversight between NaphCare's lower-level providers and their supervisors were a contributing factor to Tapia's injury. Again, from September 19 to September 29, Tapia continued to present as "confused," "non-verbal," and "decompensated," none of which was apparently communicated to NaphCare.[77] On September 29, when a medical

---

[74] *Id.*, Ex. 17, at 7.

[75] *Id.*, Ex. 8, at 8.

[76] *Id.*, Ex. 19, at 4; *id.*, Ex. 32, at 2; *id.*, Ex. 34, at 1; *id.*, Ex. 18, at 23.

[77] *Id.*, Ex. 11, at 5-6. NaphCare's representation that Tapia was "seen" by medical staff "at least once per day" is a bit misleading. (Dkt. # 100, at 13). In her deposition, RN Warren actually described rounds where a nurse would, each

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

provider *finally* became involved in Tapia's care, she was told *nothing* about his ongoing altered mental status—which had been documented and constant *since September 17*. Not to mention the lack of communication between NaphCare LPNs, RNs, and their supervisors, discussed above. According to Dr. Bates:[78]

> [T]he health care provided was disjointed and disorganized. The lack of communication between disciplines was another rung in the ladder of cause and effect that led to the poor outcome for Mr. Tapia. The lack of communication between disciplines falls well below the standard of care. . . . [That t]he lack of communication between mental health and medical providers . . . would result in serious harm or death to inmates would be obvious to any medical provider exercising his or her professional judgment.

In response to this evidence, NaphCare argues that "there was no breakdown of communication" because NaphCare's contract requires it "to maintain communication between NaphCare's staff and Pierce County's mental health professionals." (Dkt. # 100, at 28-29). True, but the evidence shows that NaphCare was not doing its job. Further, whatever LPN Carrillo did (or did not do) on September 19 has nothing to do with the complete lack care provided by subsequent NaphCare employees in the following days. To be clear, between September 19 and October 1, *not a single NaphCare employee who had or attempted to have any interaction with Tapia knew of his ongoing alerted mental status*—which is, again, "a medical emergency."[79]

## E.    DELIBERATE INDIFFERENCE

### 1.    Two Of Plaintiff's Customs Do Not Require A Showing Of Deliberate Indifference.

Plaintiff has presented evidence of three customs that caused his constitutional injury. Citing to *Connick v. Thompson*, 563 U.S. 51 (2011)—a failure to train case—NaphCare argues

---

shift, walk through the unit and "look in and make sure [the inmate] is still breathing." (Dkt. # 101-10, at 5). This may have occurred. But is irrelevant since Tapia "slept a lot in there" and "couldn't stay awake." (Dkt. # 101-24, at 7).
[78] Dreveskracht Decl., Ex. 8, at 5-6.
[79] Dreveskracht Decl., Ex. 8, at 8-9; *see also id.*, Ex. 39, at 7 (noting the lack of communication between mental health and medical staff).

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

that this is not enough.[80] (Dkt. # 100, at 7). According to NaphCare, a *Monell* Plaintiff must additionally "show a pattern of very *similar* incidents."[81] *Id.* (emphasis in original). As discussed above, this is wrong. Where "municipal action *itself* violates federal law, or directs an employee to do so," resolving the issue of fault "is straightforward." *Bd. Of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *see also Hill*, 2023 WL 6297483, at *13 ("'[D]eliberate indifference' is not a stand-alone element required in every *Monell* case."). In such cases, "once a municipal policy is established, it requires only one application to satisfy fully *Monell*'s requirement." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 n.6 (1986). In contrast, specific prior incidents are most helpful "where the policy relied upon is *not* itself unconstitutional." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality; emphasis added).

Here, two of NaphCare's customs fall into the former category—i.e., they do not involve "a failure to train or act." *Hill*, 2023 WL 6297483, at *13. Requiring LPNs to do the work of RNs and using medically untrained corrections officers to monitor patients in need of medical monitoring directly creates a "substantial risk of suffering serious harm" that itself violates the Fourteenth Amendment. *Sandoval*, 985 F.3d at 670. These customs are policies of "action," *Tsao v. Desert Palace*, 698 F.3d 1128, 1141 (9th Cir. 2012), and because they "directly require unconstitutional conduct." *Sandoval*, 985 F.3d at 682 n.17, NaphCare "itself violate[d] federal law, or direct[ed] an employee to do so" by maintaining them. *Park*, 952 F.3d at 1141. In other words, NaphCare's customs violate inmates' care with certainty—patients who need a specific level of

---

[80] NaphCare also repeatedly cites a short passage in *Burghart v. S. Corr. Entity*, No. 22-1248, 2023 WL 1766258, at *4 (W.D. Wash. Feb. 3, 2023), for this proposition. (Dkt # 100, at 2, 17, 19-20). *Burghart* certainly does not override the Ninth Circuit precedent relied upon by Plaintiff. More importantly, this Court already found *Burghart* "inapposite, given the nature of [its] allegations, as compared to this case." (Dkt. # 49, at 2). The Court also noted that more "persuasive cases have come out the other way." (*Id.*).

[81] To the extent that NaphCare argues that "NaphCare policymakers" must have also have "noticed and disregarded" the constitutional harm caused by the custom (Dkt. # 100, at 7), the argument is foreclosed by on-point Ninth Circuit case law. *Davey v. Pierce Cnty.*, No. 21-05068, 2022 WL 2791521, at *12 (W.D. Wash. Mar. 10, 2022) (quoting *Navarro*, 72 F.3d at 714-15).

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 19
(Case No. 2:22-cv-01141-KKE)

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    medical care are denied it. Patients who need medical assessments are tended to by LPNs, who

2    cannot assess. Patients who need medical monitoring are not medically monitored.

3         *Navarro* is illustrative. There, the plaintiffs challenged a department's unofficial "custom

4    of treating domestic violence 911 calls differently from non-domestic violence calls." 72 F.3d at

5    714–16. The Court determined that the plaintiffs "could prove that the domestic violence/non-

6    domestic violence classification" violated the Equal Protection Clause. *Id.* at 717. Because the

7    proffered custom was itself unconstitutional, the Court did not hunt for specific prior incidents.

8    Instead, it found sufficient evidence of the custom based on a 911 dispatcher who "testified that it

9    was the practice" of the department "not to classify domestic violence 911 calls as . . . 'emergency

10   procedure' calls." *Id.* at 715, 717.

11        Likewise, in *Nehad*, the plaintiff challenged a department's unconstitutional custom of

12   unnecessarily using lethal force, and the department argued (just as NaphCare argues here) that a

13   "single" incident was "an insufficient basis for a *Monell* claim." Answering Brief, 2018 WL

14   4098233, at *49. But the Ninth Circuit ruled for the plaintiff based on evidence like the evidence

15   in this case. *Nehad*, 929 F.3d at 1141- 42. That evidence was "sufficient to create a triable issue"

16   as to "the existence of an informal practice or policy." *Id.* at 1142.

17        When it comes to "policies [or] practices" that are themselves unconstitutional, a "series

18   of constitutional violations" is simply unnecessary. *Turbin v. Cnty. of Wood*, 226 F.3d 525, 531

19   (7th Cir. 2000); *see also Wallis v. Spencer*, 202 F.3d 1126, 1133-34, 1142-43 (9th Cir. 2000).

20        **2.    The Obvious Risk Of All Three Customs Shows Deliberate Indifference.**

21        As discussed above, under the "objective standard" applied to pretrial detainees, a claim

22   will proceed upon evidence of "constructive notice" to a medical contractor that the alleged custom

23   puts inmates at a substantial risk of serious harm. *Sandoval*, 985 F.3d at 682. One way to show

24   constructive notice is to provide evidence that the risk posed by the alleged custom "is obvious."

25
**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

*Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1256 (9th Cir. 2016).

While NaphCare pays lip service to the obviousness form of constructive notice, it bungles the application. Whether "the onset of PCD is patently obvious" is not the issue here. (Dkt. # 100, at 24). The constitutional violation most relevant here arises when officials "deny" or "delay" needed medical treatment. *Sandoval*, 985 F.3d at 679 (cleaned up). Correctly framed, the issue is: Is the risk of unconstitutional delays or denials of medical care sufficiently obvious where (1) lower-level medical staff are used to provide medical care that is out of their scope of practice, (2) medically unskilled guards are used in lieu of medical professionals to monitor medical patients, (3.a) medical staff does not communicate with corrections and mental staff regarding the care of patients that they are supposed to be monitoring, or (3.b) there is a lack of oversight between lower-level medical staff and their supervisors.[82] To ask the question is to answer it. Trial courts frequently find that these are precisely the types of questions more appropriately suited for a jury. *See, e.g.*, *Ferreira v. Arpaio*, No. 15-1845, 2017 WL 6554674, at *10 (D. Ariz. Dec. 22, 2017) (municipal defendants "failed to carry their burden of demonstrating that [the alleged] policy did not pose an obvious risk to" the plaintiff); *Franklin v. McDonnell*, No. 16-1192, 2017 WL 10513557, at *4 (C.D. Cal. Oct. 26, 2017) (similar); *Stover v. Corr. Corp. of Am.*, No. 12-393, 2015 WL 874288, at *9 (D. Idaho Feb. 27, 2015) (genuine dispute existed as to whether the defendant's custom of housing transgender prisoner with other male sex offenders created "an obvious risk of sexual assault").

NaphCare's status as a sophisticated corporation in the jail healthcare services industry and its significant deviation from industry norms,[83] only buttresses this conclusion. *See Sharif v. Ghosh*,

---

[82] While any one of these customs is sufficient for the purpose of *Monell*, courts may also "consider how individual policies or practices interact with one another within the larger system" to create an obvious risk of inmate harm. *Sanchez v. Young Cnty.*, 956 F.3d 785, 795 (5th Cir.), *cert. denied*, 141 S. Ct. 901 (2020) (quotation omitted).
[83] *See generally* Dreveskracht Decl., Exs. 8, 13.

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 21
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

No. 12-2309, 2014 WL 1322820, at *3 (N.D. Ill. Apr. 1, 2014) (noting "departure" from "industry standards" is "relevant" to establishing deliberate indifference against correctional healthcare company)

### 3. Constructive Notice Of The Risk Posed By All Three Customs Shows Deliberate Indifference.

As discussed above, in addition to the risk being "obvious" or "substantially certain" to flow from the custom, constructive notice can also be inferred from post-incident evaluations, audits, or reviews; expert testimony; or similar incidents.

Here, as discussed above, NaphCare supervisors confirmed via post-incident evaluations that the care provided by NaphCare staff—which necessarily included LPNs working outside the scope of their practice, medical monitoring by jail guards, and a lack of communication and oversight—complied with "NaphCare policy or established practice"[84] such that they "did everything right." (Dkt. # 62-1).[85]

In addition, Plaintiff's experts have confirmed that "harm or serious injury to patient inmates" resulting from the three customs identified above "would be obvious" to any medical professional "exercising his or her professional judgment."[86]

* * *

"[T]he Ninth Circuit has 'emphasized [that] whether a *Monell* defendant has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question.'" *Cotta v. Cnty. of Kings*, 79 F. Supp. 3d 1148, 1169 (E.D. Cal. 2015) (quoting *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006)). Here, questions of material fact abound.

---

[84] *Id.*, Ex. 9, at 56.
[85] This conclusion was reached after Dr. Elliot Wade—NaphCare's Corporate Medical Director in charge of "23 jails in eight states"—"was asked to review the case" by "[i]nternal counsel for NaphCare," *id.*, Ex. 38, at 10, 38, in response to Tapia's "claim of damages." (Dkt. # 91, ¶ 9).
[86] Dreveskracht Decl., Ex. 13, at 14-15; *id.*, Ex. 8, at 8-9.

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT - 22
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    Deliberate indifference, were it required, is a jury question.

2    **F.    NAPHCARE RATIFIED THE ACTS AND OMISSIONS OF ITS EMPLOYEES.**

3            *Monell* liability may also be found "when an official with final decision-making authority

4    either delegates that authority to, or ratifies the decision of, a subordinate." *Monroe v. City of San*

5    *Bernardino*, No. 09-4354, 2011 WL 13272748, at \*4 (C.D. Cal. Oct. 3, 2011) (citing *Menotti v.*

6    *City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005)); *see also Webb v. Town of Saint Joseph*, 925

7    F.3d 209, 215 (5th Cir. 2019) (an employee may "possess final policymaking authority where the

8    final policymaker has delegated that authority, either expressly or impliedly"). As to ratification,

9    specifically, it can occur if a supervisor approves of a subordinate's "decision and the basis for it."

10   *Selto v. Clark Cnty.*, No. 22-5384, 2023 WL 6311284, at \*7 (W.D. Wash. Sept. 28, 2023) (quoting

11   *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "Ratification is typically a question for

12   the jury. . . ." *Pellum v. City of Fed. Way*, No. 21-1203, 2023 WL 7280907, at \*12 (W.D. Wash.

13   Nov. 3, 2023).

14           At or around June 16, 2020, Dr. Wade—NaphCare's Regional Medical Director—

15   "reviewed Mr. Tapia's records and provided an opinion on his care." (Dkt. # 91, ¶ 9). His opinion

16   was that NaphCare employees "did everything right."[87] This opinion was provided at the request

17   of NaphCare's inhouse legal department, in cooperation with Dr. Jeffery Alvarez,[88] NaphCare's

18   final policymaker (Dkt. # 61-3, at 20, 36), Chief Medical Officer, and "Dr. Wade's supervisor."

19   (Dkt. # 89, ¶ 8). On these facts, material questions abound as to whether Dr. Alvarez impliedly

20   delegated authority to Dr. Wade and whether Dr. Wade approved of his subordinates' decisions

21   and the basis for them.[89]

22
       _____

       [87] *Id.*, Ex. 28, at 13.
23     [88] *Id.*, at 47.
       [89] In the alternative, Plaintiffs move pursuant to Fed. R. Civ. P. 56 (d) to defer ruling on NaphCare's motion so that
24     Dr. Alvarez' deposition can be taken, for the reasons discussed in filings already in the record, including Plaintiff's
       Motion for Leave to Depose Jeffery Alvarez, M.D., which Plaintiffs will re-file upon the Court's instruction. (Dkt. ##
       80-81, 83, 87).
25     PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S        **Galanda Broadman PLLC**
       MOTION FOR SUMMARY JUDGMENT - 23                              8606 35th Avenue NE, Ste. L1
       (Case No. 2:22-cv-01141-KKE)                                  Mailing: P.O. Box 15146
                                                                     Seattle, WA 98115
                                                                     (206) 557-7509

1

## III.    CONCLUSION

2    In light of the above, Plaintiff respectfully requests that NaphCare's Motion for Summary

3  Judgment be DENIED.

4    DATED this 24th day of May, 2024.

5                                                GALANDA BROADMAN, PLLC

6                                                *s/ Ryan D. Dreveskracht*
                                                 Ryan D. Dreveskracht, WSBA #42593
7                                                *s/ Corinne Sebren*

I certify that this memorandum              Corinne Sebren, WSBA #58777
contains 8,229 words, in                    8606 35th Avenue NE, Suite L1
8  compliance with the Local Civil           P.O. Box 15146
   Rules.                                     Seattle, WA 98115
9                                                Phone: (206) 557-7509

10                                               Fax: (206) 299-7690
                                                 ryan@galandabroadman.com
11                                               corinne@galandabroadman.com
                                                 Attorneys for Plaintiff
12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFF'S RESPONSE IN OPPOSITION TO NAPHCARE, INC.'S
MOTION FOR SUMMARY JUDGMENT - 24
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509