# EXHIBIT 5

# Daphne Glindmeyer, M.D.

**611 River Highlands Blvd. Suite B Covington, Louisiana 70433**

Phone: (504) 392-8348　　　　　　　　　Phone: (985) 888-1414
Fax: (504) 398-4334　　　　　　　　　　Fax: (985) 888-1415

March 13, 2024

Ryan Dreveskracht, Esq.
Corinne Sebren, Esq.
Galanda Broadman, P.L.L.C.
Post Office Box 15146
Seattle, Washington 981115

Via email:　ryan@galandabroadman.com
　　　　　　corinne@galandabroadman.com

Re:　Javier Tapia v. NaphCare, Inc., et al.

Dear Mr. Dreveskracht and Ms. Sebren,
My name is Daphne Glindmeyer. My office address is 611 River Highlands Boulevard, Suite B, Covington, Louisiana. I am a medical doctor, licensed to practice medicine in the state of Louisiana and in the state of Texas.

I am a graduate of the Louisiana State University Health Sciences Center. I completed a residency in Adult Psychiatry, a fellowship in Child and Adolescent Psychiatry, and a fellowship in Forensic Psychiatry. I am board certified in Adult Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry. I am a Distinguished Fellow of the American Psychiatric Association, past President of the Louisiana Psychiatric Medical Association, and past President of the Louisiana Council on Child and Adolescent Psychiatry.

I am currently in private practice, providing psychiatric evaluation and medication management services to child, adolescent, and adult clients as well as forensic consultation. My fee for forensic consultation, charged in this case, is $550.00 per hour, with approximately 26 hours spent on this review/report. Testimony, if required, is also charged at $550.00 per hour, in four-hour blocks. For further information, please refer to my attached Curriculum Vitae and Fee Agreement. In addition, I have attached my testimony log detailing depositions and courtroom testimony for the past four years.

Statement of Opinion:
Mr. Dreveskracht and Ms. Sebren requested my opinions in the above noted case. My opinions are based on my skill, education, training, experience, knowledge of medical and scientific literature, other materials reasonably relied upon by members of my

Javier Tapia v. NaphCare, Inc., et al.　　　　　　　　　　　　　　　　　　　　1

medical specialty, and my review of the case information available at this time. Should additional information become available that modifies my opinions and conclusions, an addendum will be authored.

To provide this opinion, information regarding this case including case pleadings, depositions, photographs, medical/mental health, and other records were reviewed. For a complete listing of all information reviewed, please refer to the list of documents and pertinent information from each included below.

Based on the available information, it is my opinion, to a reasonable degree of psychiatric certainty, that there were significant deviations from the standard of care with regard to the medical/mental health treatment and monitoring provided to Mr. Tapia. In my opinion, the failures on the part of medical and mental health staff resulted in Mr. Tapia's preventable injuries.

Document Review:
As part of the evaluation, the following documents, provided by Ryan Dreveskracht, Esq. and Corinne Sebren, Esq., were reviewed: *(Pertinent information regarding each document will be included here. Please note common medical abbreviations have been deciphered for the reader.)*

Legal:
In the United States District Court for the Western District of Washington at Seattle Second Amended Complaint in the case of Javier Tapia v. NaphCare, Inc., et al. filed October 18, 2022. Per this document:
a. NaphCare, Inc. was providing health care services at the Pierce County Jail. "The services provided by NaphCare range from physician and nursing services, dental care, mental health/psychiatric care, pharmaceuticals, utilization management, and administrative support...
b. On June 16, 2018, Javier was arrested for driving a stolen vehicle and outstanding Washington State Department of Corrections...warrants. He was booked into the Pierce County Jail...as a pretrial detainee at approximately 2:00 a.m...
c. Registered Nurse Etsuko Yagi, a NaphCare employee, conducted a mental health screening, indicating that Javier had not previously '[h]ad any treatment for mental health issues,' been 'psychiatric hospitaliz[ed],' or experienced any 'delusional thought processes or psychosis'...
d. Javier's incarceration was largely unremarkable for about three months until September 10, when Javier began demonstrating signs of disordered thinking...
e. On September 14, Javier put in a sick call request, complaining of 'insomnia.' Nurse Jesus Perez...cancelled the appointment, instructing Javier 'to kite'...mental health...
f. On September 17, Corrections Deputy Jonathan Knight made" an entry into Mr. Tapia's chart describing "odd behavior and unknown mental state...he was laying down in the fetal position and I told him to get up and he just stared at me. I gained control of his right arm and he started crying and mumbling

Javier Tapia v. NaphCare, Inc., et al.                                                                                     2

unintelligibly...on the way out of the Unit, he mumbled a few unintelligible remarks and was tearful and was acting very strange...he was placed in a timeout cell by responding deputies."

g. Mr. Tapia was seen the next day by Mental Health Provider, Darren Nealis for an initial assessment. It was documented that Mr. Tapia, "appears to be confused and was unable to verbally respond to my questions...appears to be decompensated at this time. His urinalysis was positive for methamphetamine when he booked in on 6/16/18...Javier began refusing meals at this time...

h. According to medical records, Javier was 'involved in several fights' during or shortly before this time period, 'developing trauma to the left head'...

i. September 19, MHP Nealis assessed Javier again, ignoring his serious and obvious medical condition, writing...He presented again today as confused...unable to verbally respond to my questions. He has been here...since June but appears to be decompensated at this time. Officers report that he appears to be 'way off his baseline' and he was nonverbal in court today...He could have an unknown medical condition...Referred to medical for assessment...mental health will follow up...

j. Javier was not seen by a medical doctor but was seen by Licensed Practical Nurse Cameron Carrillo...roughly an hour after Nealis' referral. Carrillo did not physically examine Javier...he simply observed that Javier did 'not appear in distress...did not have any medical concern at this time..."

k. "Pierce County and NaphCare providers engaged with Javier and observed his serious and obvious medical condition on September 20...September 26...and September 28...Javier continued to present as...'confused and non-verbal'...none of these providers referred Javier to a medical doctor."

l. On September 29, "corrections deputy...observed Javier's serious medical condition...and...noted that Javier was exhibiting 'disturbing mannerisms.'"

m. "Later that day, Nurse Elizabeth Warren...'assessed' Javier...did not refer Javier to a medical provider, order a physical evaluation or other medical assessment."

n. "On the morning of October 1, Licensed Practical Nurse Debra Ricci...wrote that Javier '[r]efused' her attempt to take his vitals...did not refer Javier to a medical provider...Later that day, Nurse Ashley Chalk...write 'asked to see inmate...complaint of 'toes turning black'...inmate is non-verbal and does not answer questions...Inmate transferred to Tacoma General."

o. "October 2, Dr. Lucas Labine hypothesized that Javier's mental health issues may have been 'due to azotemia/uremia...other metabolic or vasculitis process...or neoplasm... Javier's mental health issues completely resolved after receiving treatment at Tacoma General Hospital."

Medical/Corrections Records:

1. Medical records from the Hanger Clinic dated April 2019 through January 2022.

2. Medical records from the State of Washington Health Care Authority dated March 31, 2012 through December 14, 2021:

Javier Tapia v. NaphCare, Inc., et al.                                                    3

     a. In 2012 and 2013, Mr. Tapia had diagnoses including adjustment reaction, not otherwise specified and adjustment disorder with anxiety/depression. The service description noted "alcohol and/or drug outreach" and "behavioral health."

3. Medical records from MultiCare:
     a. 10.1.18 – photographs of Mr. Tapia's feet.
     b. 10.1.18 – 10.22.18 – Tacoma General Hospital admission.
          i. Mr. Tapia was "admitted from jail 10.1.18 for painful swollen left leg with blackened foot and a diagnosis of phlegmasia cerulea dolens and gangrenous left foot.
          ii. Mr. Tapia underwent a "left transtibial guillotine amputation for necrosis and cellulitis of the left foot a complication of end stage phlegmasia cerules dolens."
          iii. 10.1.18 – Mr. Tapia weighed 168 pounds. He was described at admission as "thin, tremulous, tired appearing…oriented to person, place, year. Mood – alert, nervous and affect normal. No visual or auditory hallucinations. No tangential or circumferential thought processes. Judgement clear and intact. Speech clear."
          iv. 10.2.18 Nutrition Assessment Evaluation noted "severe loss of muscle and subcutaneous fat upper extremities…diagnosis: severe malnutrition related to social circumstance (incarceration) as evidenced by weight loss greater than 10% past month self-reported and poor oral intake estimated less than 50% for over one month with physical appearance of severe losses of subcutaneous fat muscle…increased nutrient needs related to wound/gangrene foot.
          v. 10.3.18 – "Mental status changes: unclear etiology, could be due to azotemia/uremia, opiate pain meds vs. other metabolic or vasculitis process vs neoplasm…will likely need brain imaging…reported history of paranoid schizophrenia in distant past, unclear if this is an active diagnosis…no clear indication for psychiatric intervention at this time."
          vi. 10.5.18 – CT of head negative for acute intracranial process.
          vii. 10.9.18 – History of paranoid schizophrenia reported in distant past uncertain if active diagnosis, appears stable at this time. Note: medication list does not include psychotropic medications. Weight on this date 178 pounds.
          viii. 10.11.18 - Mr. Tapia weighed 182 pounds.
          ix. 10.13.18 – Seen by nutrition and felt to have severe malnutrition based on weight loss over the last month secondary to incarceration and poor oral intake.
     c. 9.26.13 – Allenmore Hospital Emergency Room visit due to a motor vehicle accident. Discharge diagnosis "cervical strain…bilateral elbow

contusions ...right upper arm laceration...right lower leg lacerations...lumbar strain."

4. Medical records from NaphCare dated October 2016 through November 2018:
    a.  11.8.16 – 11.9.16 – Auburn Medical Center "he recently got out of jail and has been having a rash on his left shoulder with noted chills."  Discharge diagnosis of "shingles...cellulitis."
    b.  10.1.18 – 10.22.18 – Tacoma General Hospital
    c.  6.16.18 – Receiving Screening weight 153 pounds indicates no known chronic or acute medical conditions and no history of mental health assessments or treatment.  There is a notation of a history of alcohol and drug withdrawal, with use more than five days per week, taking Percocet, "withdrawal:  achy, restless leg."  He was assigned to general population.
    d.  6.16.18 – Mental Health Screening – notes history of substance use.  Notes Mr. Tapia is "mildly unkempt...cooperative...housing assignment general population."
    e.  9.14.18 – Sick Calls complaint of insomnia, cancelled by Jesus Perez on 9.14.18 "please encourage inmate to kite mental health office with current needs."
    f.  9.18.18 – Mental Health Provider Darren Nealis, "met with inmate at about 11:00 for initial assessment...came to the door and was cooperative during the interview, but appears to be confused and was unable to verbally respond to my questions...been here...since June but appears to be decompensated at this time...urinalysis was positive for methamphetamine when he booked in on 6.16.18...recommend continued level 1 mental health housing at this time for further assessment.  Mental health will follow-up."
    g.  9.19.18 – Mental Health Provider Darren Nealis, "met with inmate at about 10:45 for initial assessment...presented again today as confused...again unable to verbally respond to my questions...been here...since June... appears to be decompensated at this time.  Officers report that he appears to be 'way off his baseline' and he was. Nonverbal in court today as well...could have an unknown medical condition...referred to medical for assessment.  Recommend continued level 1 mental health housing at this time for further assessment."
    h.  9.19.18 – RN Cameron Carrillo, "referred to medical due to being nonresponsive...blood pressure hypertensive...does not appear in distress, states he does not have any medical concern at this time...will continue to monitor."
    i.  9.20.18 – Mental Health Provider Duane Prather, "Inmate seen about 11:1- for mental health follow up...awake but stays on his bunk...does not respond in anyway...he just stared...would not even shake his head yes or no...was seen by medical yesterday...recommend level 1 mental health housing for observation.  Mental health to follow-up."

Javier Tapia v. NaphCare, Inc., et al.

j. 9.26.18 – Mental Health Provider Darren Nealis, "attempted to meet with inmate at about 11:00 for initial assessment in response to C/D report...presented again as confused and nonverbal...has been here...since June but appears to be decompensated at this time...recommend continued level 1 mental health housing at this time for further assessment, mental health will follow-up."

k. 9.28.18 – Mental Health Provider Jesus Perez, "seen at about 10:30 for mental health follow up...refused mental health interview...presents [with] mental health symptoms...would not answer mental health questions...just looked at MHP and did not respond to basic questions...continue current housing, mental health will follow-up."

l. 9.29.18 – Sick Calls "mental health ask that a provider evaluate inmate to rule out any medical issues."

m. 9.29.19 – RN Elizabeth Warren "12:10 pm saw inmate in his cell as requested by Sergeant. Cell smells of urine...alert, sitting up, on the side of the bunk...makes eye contact when he is spoken to...will not verbally respond...will follow instructions with calm encouragement...no acute distress noted...not sure if inmate is eating every meal. Offered a chocolate ensure and he drank approximately ½ the container. Officer prepared his sandwich for him...he took the sandwich...ask if inmate could be put on a meal log...start "meal log" schedule daily monitoring of vital signs x3 days and scheduled provider visit for evaluation."

n. 9.30.18 – Mental Health Provider Ismael Conception Poo, "seen at about 10:40 for assessment in response to corrections deputy report...was uncooperative with mental health interview...appeared to be sleeping and did not respond to MHP knocks on door or calling of name...was observed moving and breathing in his bed...cell was observed as messy and disorganized ...recommend level 1 mental health housing. Mental Health to follow-up."

o. 10.1.18 Mental Health Provider Darren Nealis, "met with inmate at about 10:45 for mental health follow up in the clinic. He presented again today as confused and nonverbal but was also calm and cooperating with medical staff...will be sent to emergency room for further assessment. Recommend continued level 1 mental health housing at this time for further assessment. Mental health will follow-up."

p. 10.1.18 12:32 pm CDT – RN Ashley Chalk "asked to see inmate by unit officer for complaint of 'toes turning black'...left foot slightly swollen and severely discolored...patient nonverbal and does not answer questions...referred to Tacoma General Emergency Department."

q. 10.1.18 12:35 pm CDT – Medical Director Dr. Balderrama "seen with nursing staff as evidence of possible vascular deficits on left foot...needs emergency room evaluation for possible emergent surgical management."

r. 10.22.18 – Mental Health Provider Kim Peebles, "seen...upon return from the hospital...processing his current circumstances, but presents

stable...while at hospital...left leg, below the knee was amputated, due to a medical condition...reports he remembers this writer from the day he was oriented x1 and sent to the emergency room...he does not remember how his condition started, other that feeling really tired...now oriented x3, alert, and organized...presents with a flat affect and is beginning to process his los... offered resources on grief and loss, but he declined..."

s.  11.10.18 – Mental Health Provider Jesus Perez "inmate cooperated with mental health interview...oriented...was in stable emotional control...able to deny current risk of harm to self and others...future oriented with family support...good insight and is able to manage as he awaits transport to prison. Inmate discussed PTSD symptoms associated with losing his leg and reviewed coping skills he can use while at Pierce County Jail...expects to go to prison this week and will follow-up with providers there..."

5. Medical records from Pulser Heart Institute:
   a. 11.26.18 – Wound check
   b. 5.24.23 - Mr. Tapia's problem list included: Elevated Factor VIII, on warfarin; Hypercholesterolemia; prior marijuana smoking; prior alcohol use; left lower extremity phlegmasia cerulea dolens with foot venous gangrene/left below the knee amputation.

6. Medical records from St. Joseph's Medical Center dated 2.18.99 through 3.16.22. Per these documents:
   a. 2.18.99- 2.25.99 – admission due to rule out psychosis, "admitted because of paranoid ideation...brought here by his father who was concerned...he and his girlfriend took some marijuana and he has never been the same...very paranoid...fearful...would hardly communicate...very poor historian...very guarded...would only give a few words at a time with thought blocking...urinalysis negative...final diagnosis: atypical psychosis, rule out organic psychosis from marijuana use." Medication prescribed was Zyprexa 10 mg twice daily.

7. Pierce County Corrections
   a. 6.30.19 – 11.23.18 Inmate Behavior Log Printout
      i. 9.18.18 – Mental Health "met with inmate for initial assessment...came to the door and was cooperative...but appears to be confused...unable to verbally respond to my questions...been here...since June...appears to be decompensated at this time. Recommend continued level 1 mental health housing."
      ii. 9.18.18 refused dinner
      iii. 9.18.18 refused breakfast

Javier Tapia v. NaphCare, Inc., et al.                                                    7

iv.   9.19.18 Mental Health - "met with inmate…for initial assessment…presented again today as confused…unable to verbally respond to my questions…continued level 1 mental health housing…referred to medical department for assessment.

v.    9.20.18 refused breakfast

vi.   9.20.18 Mental Health – "Inmate is awake but stays on his bunk…does not respond in any way to mental health provider, he just stared…would not even shake his head yes or no…was seen by medical yesterday…level 1 mental health housing for observation."

vii.  9.21.18 verbally refused dinner

viii. 9.22.18 verbally refused lunch

ix.   9.22.18 verbally refused dinner

x.    9.24.18 verbally refused breakfast

xi.   9.25.18 refused lunch

xii.  9.25.18 verbally refused dinner

xiii. 9.26.18 Mental Health "here…since June but appears to be decompensated at this time…continued level 1 mental health housing."

xiv.  9.26.18 verbally refused dinner

xv.   9.28.18 refused breakfast

xvi.  9.28.18 refused lunch

xvii. 9.28.18 Mental Health "Inmate refused mental health interview…presents [with] mental health symptoms…would not answer mental health questions…just looked at mental health provider and did not respond to basic questions."

xviii. 9.29.18 refused breakfast

xix.  9.29.18 refused lunch

xx.   9.29.18 Inmate Behavior/Disturbing Mannerisms

xxi.  9.29.18 Info "Nurse did an assessment on Tapia de to his odd behavior and lack of response to verbal interaction."

xxii. 9.29.18 refused dinner

xxiii. 9.29.18 Info "Inmate has been mostly unresponsive to verbal interactions, however, he was seen moving around while appearing asleep and was seen at his cell window once tonight."

xxiv. 9.30.18 refused breakfast

xxv.  9.30.18 Mental Health "seen…for assessment…was uncooperative with mental health interview…appeared to be sleeping and did not respond…to knocks on door or calling of name…observed moving and breathing in his bed."

xxvi. 10.1.18 Info "while serving lunch, Corrections Deputy Paukert observed inmate's foot to be a purple/black color…immediately called the clinic…inmate was transported to the clinic bin a wheelchair."

      xxvii.  10.1.18 Mental Health "met with Inmate at about 1045 for mental health follow-up...presented again today as confused and non-verbal but was also calm and cooperating with medical staff.

      xxviii.  10.1.18 Info "Inmate was admitted to the hospital."

  b.  9.16.19 Housing Moves/Peace and Harmony regarding Mr. Tapia, "exited the upper tier...with...possessions and informed me that they needed to move...Tapia told me that the upper tier found out that he was a 'snitch' and that he felt endangered remaining in the unit...didn't point to any individual inmates, but stated it was a general dislike for them among many in the upper tier...Tapia moved to 2B6.."

  c.  9.17.18 Inmate Behavior/Disturbing Mannerisms, documented by J. Knight, "On 9.17.18 at 2025...observed Inmate Tapia...get off his bunk and throw his hands in the air and roll onto the floor...and begin to flail around and roll around the floor...called for an escort to step in due to his odd behavior and unknown mental state...he was laying down in the fetal position and I told him to get up and he just stared at me. I gained control of his right arm and he started crying and mumbling unintelligibly...gained control of his other arm and assisted him up and applied wrist restraints without incident. On the way out of the Unit, he mumbled a few unintelligible remarks and was tearful and was acting very strange...escorted him out of the Unit and he was placed in a time out cell by responding deputies...Tapia arrived to my unit as a...move and I observed him acting odd from the moment he walked it. He wouldn't make eye contact and was looking all around...he didn't acknowledge me verbally...only shook his head...the entire time he spent in 2D, he never made his bed and sat there looking around and intermittently covering his ears which was very strange to me...went to talk to him and asked if he was alright and he just shook his head yes but would not make eye contact...may have taken an unknown substance or suffer from unknown mental health issues...will be moved to 3SC16. Classification review and mental health evaluation requested."

  d.  9.29.18 Inmate Behavior/Disturbing Mannerisms, documented by R. Oeltjen, "Inmate. Tapia would not respond to me verbally when I asked him if he wanted lunch. He did look up at me but would not give me an answer...his behavior log indicates he has been refusing meals periodically...placed a sack meal in his cell and will monitor to see if he eats. Recommend mental health follow-up." Final Approval by F. Ake, "Inmate assessed by Nurse Warren, Mental Health and clinic to follow up. Please log meal refusals."

  e.  Request report dated 6.29.18 through 11.12.18.

      i.  9.13.18 "need sleep medication can't sleep. Having sleep issues."

      9.13.18 "you're scheduled to see the sick call nurse, please go when called."

  f.  Pierce County Detention and Corrections Center Health Services Division Chronological Record of Dental Care dated 10.23.12.

Javier Tapia v. NaphCare, Inc., et al.

      g. Pierce County Detention and Corrections Center Health Services Division Chronological Record of Medical Care dated 3.7.07 through 1.1.14.

8. Pierce County documents regarding Mr. Tapia's arrest including Booking Identification Sheet, Booking Form, Charges and Sentence. Mr. Tapia was booked into the Pierce County Jail June 16, 2018 due to charges of theft of a motor vehicle and obstructing a law enforcement officer.

9. Washington Department of Corrections records regarding Mr. Tapia dated 2014 through 2022.

<u>Depositions:</u>
- Deposition of Darren Nealis dated September 15, 2023 with exhibits. Per this document:
  - a. Mr. Nealis has a bachelor's degree in psychology and a master's degree in clinical social work. He had 20 years of experience in community mental health prior to beginning work at Pierce County in 2015. He stopped working at Pierce County in 2022. In 2018, Mr. Nealis was a Mental Health Professional at Pierce County Jail. He described the role of a Mental Health Professional as "doing assessments... Mental health assessments with inmates, collaborating with the medical team and collaborating with outside agencies and family members to get them linked up with services on their way out or to get more information about them when they were coming in and then sometimes collaborating with the state hospital... collaborating with correctional officers regarding the care of the inmates."
  - b. Mr. Nealis noted that he was required to comply with written policies and established practices at Pierce County and that his interactions with Mr. Tapia comported with those policies and practices.
  - c. He recalled that in the scope of his work at Pierce County, "we weren't required to formulate diagnoses...we were all certified to do so...but we were not formulating diagnosis in the sense that you often do in a setting when you're billing insurance companies...when we would staff cases...or make a referral for medications, we would talk about the symptoms that they were experiencing..." With regard to Mr. Tapia, Mr. Nealis stated, "no one was required to diagnose...". He agreed that "...you have to formulate a diagnosis in order to provide ongoing mental health care...in the jail setting...our system wasn't set up to...include a formulated diagnosis...it was also sometimes difficult to get all of the information needed to formulate a diagnosis..." For Mr. Tapia, he agreed that "no one was responsible for [a] formal diagnosis."
  - d. He recalled two forms of documentation used at Pierce County Jail, the NaphCare electronic medical record and the jail system, "Linx."
  - e. He indicated that Pierce County Jail did not have a policy in place for documentation of refusals of assessments or health care, "if they refused,

Javier Tapia v. NaphCare, Inc., et al.                                    10

we would document that, and then we would see the next person on the unit...we would move on to the next...we would attempt to interact with...everyone each time we went to do rounds on the unit...typically three times a week...I don't believe that was a written policy...based on staffing levels...and also based on the acuity of the unit..."

f.  He recalled that Mr. Tapia was housed in "the Level 1 unit...those units were typically scheduled for [mental health rounds] three times a week."

g.  With regard to documentation, he recalled that there was "not...a separate section for treatment plan that we used."

h.  He indicated that notes were not required to be signed off by a supervisor.

i.  He recalled that assessments, specifically "assessing potential safety issues in terms of suicide risk and also assessing substance use or mental health symptoms" were "more often than not" performed cell side through the door with the port closed.

j.  He recalled that "oftentimes" medical would evaluate an individual "depending on the situation...if we thought there was something going on medically, physically instead of mental health or in addition to mental health symptoms...mental health staff would typically collaborate with the medical staff just by...making a referral or asking them...the collaboration was mostly verbal...then we would document that...we had the interaction...there wasn't a paper form or an electronic form...you would talk to the nurses station and have the interaction...it was still formal, but not a form based...it was just supposed to be documented in your note that you made a referral."

k.  Mr. Nealis recalled that he made a referral to medical for Mr. Tapia, "I did in at least one situation refer him to medical after seeing him...I believe I did document that I made a referral to medical."

l.  Mr. Nealis was not able to recall what he told medical regarding Mr. Tapia, "typically, it would have been whatever I was observing...in this case, I wasn't getting...verbal responses from him, so...I would have told them that..."

m.  Mr. Nealis indicated he was "not sure" that Mr. Tapia was experiencing a medical issue, "but I knew it was possible."

n.  Although Mr. Tapia was scheduled to see medical following a kite request dated September 13, this was cancelled by Jesus Perez on September 14, 2018. Mr. Nealis did not recall seeing cancellations of sick calls.

o.  With regard to the documentation of J. Knight on September 17, Mr. Nealis stated, "I don't think anyone was sure what had happened, but they had moved him to the other unit and then requested that mental health see him...". Mr. Nealis saw Mr. Tapia on September 18th, but he did not recall if he saw Mr. Tapia through the cell door with the port open or closed. He did not have independent memory of the visit but was able to recall the visit via reviewing the progress note. He did recall visualizing Mr. Tapia, "I remember that he did come to the door...like he just wasn't

verbally talking to me, he was just looking at me. He had gotten out of his bunk and come to the door...it looked like he either didn't understand me or wasn't able to respond to my questions."

p. Mr. Nealis saw Mr. Tapia again on September 18, "he did not come to the door on that second interaction...I don't have a specific recollection...on this day, I believe he stayed in his bunk." After this interaction, Mr. Nealis referred Mr. Tapia to medical, "I don't recall exactly what I said to medical, but I would have just made a referral...asking that he be seen."

q. Mr. Nealis did not disagree that after September 20, there was no other mental health interaction with Mr. Tapia until September 26 when Mr. Nealis saw Mr. Tapia who at that time, "appears decompensated...on that day, he didn't come to the door again...". Mr. Nealis described "decompensated" as "seemingly functioning differently than someone's baseline than how they normally are functioning...". Mr. Nealis indicated that while he was credentialed to formulate mental health diagnoses, "we did not formally do that because we didn't bill insurance companies. I was attempting to assess his mental health and/or substance use symptoms to see how I could best help him..."

r. With regard to treatment Mr. Tapia was receiving, "I believe that I was under the impression that he had not been engaging with staff...going to the door and trying to engage...that's a form of treatment...but...if he wasn't engaging, that was the extent of the interaction was the attempt to engage...I wasn't sure...what was wrong with him...". Mr. Nealis did not recall talking to a nurse practitioner or to the medical doctor about Mr. Tapia's condition, "I don't believe so, I would have documented that."

s. Mr. Nealis agreed that Mr. Tapia did not have a mental health interaction from September 20 to September 26, "we would try to...see people three times a week if they were in the Level 1 housing...it looked like it was three days in a row in the one week...typically we weren't doing the rounds on weekends...it looked to me like it was within the three times a week...that could vary based on staffing..."

t. Mr. Nealis not know if a complete assessment of Mr. Tapia was performed.

u. Mr. Nealis stated, "I saw that he appeared to be decompensated...I was unable to complete my typical full assessment...I just made a referral...at the nurse's station...sometimes a referral like that would lead to other medical visits...".

v. Mr. Nealis was not sure if medical attempted to see Mr. Tapia, do a physical assessment of him, or if they met with him through the door like Mr. Nealis did. Six days after Mr. Nealis made this referral, he again saw Mr. Tapia who continued to be decompensated. He agreed that the record indicated that for six days, Mr. Tapia did not have contact with medical or mental health staff. He indicated that this would not violate any established polices because, "he was being seen by the correctional officers..."

    w. He indicated that although mental health does not rely on corrections staff to monitor Mr. Tapia, "that is what happens...it's a collaboration between correctional staff, NaphCare staff, and mental health staff...those three teams were always functioning together...to interact with the inmates."

    x. Mr. Nealis indicated that typically, he reviewed medical records prior to seeing individuals and he would have seen entries regarding Mr. Tapia's declining food and Mr. Carillo's note regarding his interaction with Mr. Tapia and "it looked to me like there was more of an interaction than the mental health staff had been able to have..."

- Deposition of Cameron Carrillo dated October 9, 2023 with exhibits. Per this document:

    a. Mr. Carrillo is a Licensed Practical Nurse who began working at the Pierce County jail in 2013. He recalled transitioning from other jail contract health care companies to NaphCare in 2015.

    b. He described the role of the Licensed Practical Nurse at the jail facility as "med passes and data collection...give medication to the patients on the floor I'm covering for that day." He described data collection as "vitals, general patient condition...take that information and report it to someone with a higher licensure."

    c. Mr. Carrillo reported he can "perform quite a few tasks as delegated by the RN [Registered Nurse] ...I collect the data and then I report back to the RN or provider."

    d. Mr. Carrillo reviewed a progress note regarding Mr. Tapia written by Mr. Carrillo dated September 19, 2018 at 6:23pm CST. He reported that although it was not documented, it would be "standard practice to always report back to the clinic RN...patient condition ..." He indicated this would be via a verbal report to the clinic RN.

    e. Mr. Carrillo recalled that in order to complete the progress note dated September 19, 2018 he "entered [Mr. Tapia's] cell."

    f. He noted that Mr. Tapia was referred to medical due to being nonresponsive, "someone from mental health was talking to the clinic RN about Mr. Tapia being nonresponsive. I made myself part of the conversation because I had just finished my med pass and the RN delegated me to collect the data for them...to check on the patient due to him being nonresponsive."

    g. Mr. Carrillo would not have reviewed the progress note written by Mr. Nealis an hour earlier. He stated, "like it says in my note, he was nonresponsive so they [indicating mental health] wanted someone from medical to check on him. But, when I saw him, he was responsive, and he was talking to me, and I collected blood pressure and reported back to the clinic RN."

    h. Mr. Carrillo indicated he would not have had any other information about when Mr. Tapia began experiencing mental health issues, his length of

incarceration, or meal refusals. Per his license, he is not able to do assessments or to diagnose, "my purpose of my visit was to collect the data and check on a patient who was nonresponsive ...just a general appearance, vital signs...generally ask them if they have any medical or mental health concerns...since he was already being seen by mental health, I just asked him if he had any medical concerns, and he stated no...the data collection was just a general 'see how the patient's doing.' I collect the data and reported back to the clinic RN...they said he was nonresponsive, which was not the case when I saw him..."

i. Mr. Nealis' chart note described Mr. Tapia as "decompensated" but Mr. Carrillo would not have had that information prior to seeing Mr. Tapia, "all I know if I was told that the patient was nonresponsive. I went down, and the patient I saw was very responsive and was talking to me...I believe he was sitting on the ground...with a blanket over...his lap...I took a blood pressure...his appearance was good. He was not diaphoretic. He was not pale, he was not overly fidgety, not guarded, and he said he had no medical concerns...He was just upset about being in the new unit, and...it was okay for me to come get his blood pressure...and that he didn't have any suicidal ideations..."

j. The progress note Mr. Carrillo wrote included the statement "continue to monitor." In the unit where Mr. Tapia was housed at this time, "he's being checked on...every hour or half hour...patients in these cells are seen – I think Pierce County jail allows either once or twice a week to be assessed for any medical or mental health needs..." For the monitoring, Mr. Carrillo stated this would be per "correction officers or as needed by nursing staff."

k. Mr. Carrillo administered medications to Mr. Tapia on October 25, 2018. He did not recall anything about his interaction with Mr. Tapia on that date.

l. Mr. Carrillo stated, "I collected the data and reported the data back to the clinic RN...it would be up to the clinic RN to either follow up with data collection or be okay with the patient's condition...when I reported...it back to the RN and the RN wanted me to get more vitals, I would have to go back and get more vitals."

- Deposition of Jonathon Knight dated September 25, 2003 with exhibits. Per this document:

    a. Mr. Knight received his master's degree in psychology in 2022. In the fall of 2018, Mr. Knight was enrolled in "school...online."

    b. In 2016 after an honorable discharge from military service, Mr. Knight began working as a corrections deputy at Pierce County jail. He reported his job description as "care and custody."

    c. Mr. Knight reviewed a behavior log printout that indicated Mr. Tapia was booked into the jail on June 15, 2018 and "there's nothing annotated in

this behavior log that I'm reviewing that states he was exhibiting any mental health issues leading up to that point [September 2018]."

d. Mr. Knight agreed that he documented on September 17, 2018 that Mr. Tapia was "exhibiting disturbing mannerisms." He did not recall knowing Mr. Tapia before this incident.

e. Mr. Knight was aware that Mr. Tapia experienced a change of housing on September 17, 2018 "a peace and harmony move…on the 17th, he did come to my unit…as a new inmate…that leads into the report that I wrote and what I witnessed…". Mr. Knight did not remember why Mr. Tapia was moved to his unit, 2D.

f. Mr. Knight described unit 2D as "a general population…direct supervision unit…I'm always there…always observing the people that are in custody in the unit. They're not locked behind a door…it's an open dorm setting…there's specific lockdowns and formal count for everyone has to be on their bunks per policy and accounted for…it's an open dorm setting, so people that are in these units are generally pretty well behaved…"

g. Mr. Knight reviewed the report he wrote regarding Mr. Tapia on September 17, 2018, "he came into my unit and was acting a little strange, which isn't uncommon…so I kept an eye on him for his safety…"

h. Mr. Knight recalled, "I don't believe he [indicating Mr. Tapia] said really anything that made sense or was understood clearly, from what I recall…I was under the impression that maybe he was exhibiting some sort of mental health crisis, but I am not a mental health professional, so I wasn't entirely sure what was going on with him…" Mr. Knight further recalled that he recalled Mr. Tapia, "getting up, walking a short distance around and then beginning to flail around while throwing his hands in the air and have kind of a slow fall…more or less like he kind of just guided himself down on the ground and sat down and laid on his back and rolled around…he was abler to stand and he was able to walk out of the unit without incident…"

i. Mr. Knight requested a mental health evaluation for Mr. Tapia via documentation in the LINX system. He did not recall having any interaction with the mental health provider who responded to the evaluation request.

j. After Mr. Knight saw Mr. Tapia and documented his concerns, another corrections officer, Mr. Wade saw Mr. Tapia and Mr. Tapia was transferred to a different unit, "3S…mental health, max security housing…another unit over in our main jail that a lot of people get sent to for mental health concerns, behavioral concerns…it's an indirect supervision unit…officers go through every 30 minutes and check on everyone…the people…assigned to this unit will be allotted one hour out a day…typically, people aren't housed there for very long until mental health can evaluate and medical can evaluate."

     k. Mr. Knight did not have any further interaction with Mr. Tapia after he transferred to mental health housing.

- Deposition of Debra Ricci dated September 29, 2023 with exhibits. Per this document:

     a. Ms. Ricci is a Licensed Practical Nurse who has been working for NaphCare at the Pierce County jail since 2016. She described her job as "passing medications to the jail population and responding to emergencies...I can answer kites, medical kites."

     b. She agreed that in the state of Washington, she can only perform tasks under the direction of a physician or an RN.

     c. Ms. Ricci reviewed a medical record entry she made October 1, 2018 at 7:13 am. She did not recall the name of the physician or RN she was working under on this date. She indicated the document was "a refusal." And that Mr. Tapia refused vital signs.

     d. She agreed that at this time, Mr. Tapia was in a single cell with a closed door and a small window where you could look in and a port that could be opened by corrections staff.

     e. She did not recall speaking with Mr. Tapia at the time of this refusal, "I must have if I got the refusal."

     f. On September 30, there was an entry by I. Concepcion Poo, a mental health professional, who wrote that Mr. Tapia appeared to be sleeping and did not respond to the mental health professional knocks on the door or calling of name. Ms. Ricci did not recall if this was how Mr. Tapia appeared when she attempted to take his vital signs.

     g. Mr. Tapia did not sign the refusal form, Ms. Ricci stated, "when the inmate refuses to sign the refusal...and the witness is generally the corrections officer, and they most of the time don't want to sign it either." Ms. Ricci did not recall if she notified her supervising physician or RN about Mr. Tapia's refusal.

     h. NaphCare policy and procedure regarding "Refusal of Health Care Services" was reviewed, and Ms. Ricci did not follow policy as she did not obtain the signature of a witness, "If I asked the corrections officers and they say no, then I don't have anybody else to ask." She did not recall asking a corrections officer to sign the refusal document, "my general practice is when the inmate refuses his medication or his treatments, then I ask the corrections officer...if the inmate won't sign and the corrections officer won't sign, then...I have to go with that."

     i. Ms. Ricci did not recall informing the facility's medical director of Mr. Tapia's alleged refusal, although she reported "I have the ability to contact the provider or I contact the charge nurse." As this contact was not documented, Ms. Ricci agreed that it is more likely than not that she did not contact a higher-level provider or request a psychiatric evaluation.

      j.  Per policy, Ms. Ricci would not have been required to report Mr. Tapia's refusal to allow vital sign monitoring.

      k.  Ms. Ricci indicated it was not her practice to review Mr. Tapia's behavioral log prior to attempting to interact with Mr. Tapia.

- Deposition of Jesus Tono Perez dated September 14, 2023 with exhibits. Per this document:

      a.  Mr. Perez has a master's degree in counseling and psychology. He began work at the Pierce County jail in 2015 as a mental health professional where he worked full time from 2015 to 2020. While working at the jail, he was employed by the Pierce County Sheriff's Department. His main job was "suicide assessment and then doing rounds checking in on...mental health units on a regular basis...creating release plans...going to the units and checking in with everybody...seeing what their needs are, and then referring them over to medical if they need to be seen by medical..."

      b.  He recalled communicating issues with NaphCare staff and making referrals to medical staff, "we're right there in the same general area...typically we write it in the NaphCare note...as I'm walking by, I'll be like...this guy's not looking well...they'll pull up the chart...you guys should put him on your list and check in...they'll put him on the list...sometimes, they'll go right there and then to check in on a person."

      c.  Mr. Perez did not recall the need to document refusals, "I know NaphCare does...but me as a Pierce County employee...I don't have anything like that." He agreed that if an inmate refused an ordered assessment, he would mark that in the chart notes and move on to the next patient.

      d.  "If the person's not communicating and not engaging...in an assessment, then we keep them in the mental health unit...they're going to stay...not going to leave until...they communicate to use...they'll stay there until I move them, until I clear them to be moved...If I saw someone on Monday and they weren't cooperating, I probably would have got back to them on Wednesday."

      e.  Mr. Perez described the mental health unit and indicated, "I come around and figure out who's...truly mentally ill or who's just...detoxing or just a behavioral problem." Mr. Perez agreed that it would essentially be up to him to determine whether or not it was a mental health issue or a medical issue. "We're assessing for mental health risks, and if I have some kind of medical concern...then I go to the clinic."

      f.  Mr. Perez indicated that if an individual was housed in mental health housing, that it was the County's policy that a stabilization plan is created, "as the person stabilizes...we staff the person's case with my coworkers, so everybody kind of has their take on what is going on with then...everybody's seeing the person, it's not just one mental health provider...as they are getting better...we all just kind of formulate a plan verbally in our morning meetings...they kind of just go up the level

system...". He indicated there is not a specific form or document in the electronic medical record that says stabilization plan.

g. The stabilization plan is not approved by a supervisor, "because we're all licensed, so we...pretty much can do what we need to do,"

h. The stabilization plan is not shared with corrections staff, "corrections wouldn't need to see that. We have our own way of communicating with them in another system, the Linx system."

i. Mr. Perez agreed that one goal of the jail mental health program is to provide a timely assessment. He described an assessment as "an evaluation of how the inmate is doing, essentially...I go and speak to them, I get to know them..." The assessments are performed by mental health providers, and although the mental health providers "could [diagnose mental health disorders] we don't typically need to do that because I would just refer...like if somebody needs to be diagnosed...in order to be prescribed meds, I would document that and then just review it over to the provider who would be the one...to technically diagnose...in my role, there's really no need for it...we look for the ARNP..."

j. The assessments that the mental health providers perform are typically done cell side, "they can't leave [the mental health] unit until we clear them." Mr. Perez stated, "typically we could do it through the door."

k. Mr. Perez indicated there is no specific format for the assessment and that the assessments are documented in the NaphCare medical records.

l. Mr. Perez was not aware of any shared written policies regarding the mental health program working cooperatively with the medical clinic staff. He agreed that medical and mental health staff would typically provide care independent of each other.

m. Mr. Perez is a licensed mental health counselor, and it is within his scope of practice to diagnose mental health disorders, but at Pierce County jail in the fall of 2018, the medical director, Dr. Balderrama and the APRIN Ms. Azusa was responsible for diagnosis. Mr. Perez did not know if either of these individuals ever evaluated Mr. Tapia or if Mr. Tapia was referred to them, "not by me."

n. Mr. Tapia put in a kite to see medical on September 13 at 9:07 am for insomnia. Mr. Tapia was informed he was going to see a sick call nurse, but Mr. Perez cancelled Mr. Tapia's medical kite. He stated, "it looks like that's what I did...we're trying to help...so the system was getting bogged down...there's so many kites coming throughout the time, that we wanted everybody to be communicating directly...Mr. Tapia...he needed to kite me directly, he didn't need to kite medical about insomnia...he needs to communicate directly to me...you don't need to go to...the nursing staff...cut out middleman...that's the way of training staff and then inmates...the inmates catch on pretty quickly...so that was basically an attempt to try and not bog down the system...nursing was saying...insomnia is not something that we're managing, mental health needs to do it, so they'll send me the kite...I didn't cancel the sick

call...my intention wasn't to cancel the sick call nurse meeting. My intention cancelling this was just cancelling this actual sick call kite that was sent directly to mental health...I'm trying to help the nurses understand that...this is not a medical problem...you need to refer him...when they bring it up to you, you need to say...you need to communicate with mental health staff directly and kite them directly...we're trying to teach everybody how to use the system."

o. Mr. Perez agreed that something mentally goes wrong with Mr. Tapia on September 17 and he is nonverbal. He agreed that prior to this time, Mr. Tapia had not shown any signs or symptoms of mental illness. A mental health evaluation was ordered. Mr. Nealis attempted to assess Mr. Tapia but he was not able to because Mr. Tapia was nonverbal, then he began refusing meals. Mr. Perez agreed that would have had knowledge of all these prior entries before he saw him on September 28.

p. When Mr. Perez met with Mr. Tapia on September 28, he did not recall if he had the officers open the trapdoor. Mr. Perez documented "Inmate refused mental health interview" which he stated "I would assume he waved me off...I'm not really sure what he did that made me interpret him refusing the interview...at this point,...we're probably going to start a hunger strike log because he's refusing so many meals...there would be little red flags that are going off in my head..." Mr. Perez did not recall if he made a referral to a higher level provider at this time.

q. Mr. Perez indicated that Mr. Tapia was experiencing "some kind of mental health crisis." He indicated he did not know why he did not make a referral for a higher level of care, "I really don't know why I didn't at the time." If Mr. Perez had made a referral, "I would have wrote a NaphCare note."

r. Mr. Perez indicated that based on the information he reviewed during the deposition that Mr. Tapia's mental health symptoms observed in September 2018 were caused by some sort of issue with his infection and not due to a diagnosable mental disorder, "based on what we reviewed today...it's clearly connected."

s. Mr. Perez did not recall having conversations with or making referrals for Mr. Tapia to Dr. Balderrama or to an advanced practice RN, as if he did, it would have been documented, "I get to decide if somebody gets referred...I make that clinical judgement..."

- Deposition of Elliot Wade, M.D. dated September 28, 2023 with exhibits. Per this document:

  a. Dr. Wade is currently the corporate medical director west for NaphCare. He reports to NaphCare's chief medical officer, Dr. Alvarez.

  b. In this role, Dr. Wade is responsible for "23 jails in eight states...all of those medical directors at the site level report to me...I review all ER send-out and returns throughout all NaphCare facilities, not just specifically the west. I do a lot with our substance abuse care and

Javier Tapia v. NaphCare, Inc., et al.                                                    19

treatments...performance reviews for providers. Keeping people up to date on policies, answering questions...". He is also currently the medical director for Spokane County.

    c. At Pierce County jail, the medical director is Dr. Miguel Balderrama, he is an employee of Pierce County.

    d. Dr. Wade is also responsible for the oversight of advance practice RNs [APRN], but he was not sure if there was currently someone in that role at Pierce County.

    e. With regard to NaphCare policy and procedure, Dr. Wade stated, "it's a team decision, but, ultimately, the final say...is the chief medical officer, Dr. Alvarez.

    f. Dr. Balderrama is the medical director at Pierce County responsible for clinical oversight of medical care at the facility. Dr. Wade does his yearly peer review.

    g. Jonathon Slothower is the health services administrator, "the leader of the site...everyone reports to the health services administrator including the medical director."

    h. Dr. Wade was asked by "NaphCare legal department to review the...care of Javier Tapia...subsequent to that, I sent this email to the staff."

• Deposition of Jonah Bradley dated December 12, 2023 with exhibits. Per this document:

    a. Mr. Bradley is a Corrections Deputy at Pierce County Jail where he has worked since October 2016.

    a. Mr. Bradley indicated that 3SC16 is "3-South-Charlie-16 is "our admin segregation unit...usually housed for Level 1 inmates which could be based on behavior, charges, mental health." In this unit, Mr. Bradley stated inmates are in a cell by themselves and are allowed out "one hour a day."

    b. Mr. Bradley noted that when an inmate refuses a meal, the only option for documenting this in the behavior log is "just verbally refused meal." If an inmate waved him off without saying anything, "I would take that as a refusal," and it would be logged as verbally refused meal.

    c. Mr. Bradley indicated that if an inmate "are refusing meals for I don't know how many days...they end up getting put on a hunger strike."

    d. With regard to reporting meal refusals to medical staff, Mr. Bradley stated, "with the talking to medical, line staff usually does not talk to medical and determine whether the inmate goes on hunger strike. That is between the lieutenant and supervisors."

    e. Mr. Bradley indicated breakfast "usually comes around 4:15 in the morning." Lunch is at "roughly 9:30" and dinner "3:45 to 4:00."

    f. Mr. Bradley noted that he documented "verbally refused" even if an inmate didn't say anything, even if it's a hand motion, or if the inmate didn't acknowledge his presence in any way.

Javier Tapia v. NaphCare, Inc., et al.                                              20

g. Mr. Bradley noted if he saw an inmate limping, he would ask them if anything was wrong or if they needed medical attention. If the inmate didn't respond, "I would continue on." He would not report the information anywhere, "not unless he complained to me."

h. Mr. Bradley indicated it was correct that if an inmate had not eaten a meal that had been served to him, this would not be documented unless the process for a hunger strike was initiated previously by a medical provider.

- Deposition of Jane M. Valley, R.D. dated December 14, 2023 with exhibits. Per this document:

a. Ms. Valley is a licensed registered dietician. In 2018 she was working "between Tacoma General, Good Sam Hospital, and Allenmore Hospital."

b. Ms. Valley performed an initial nutrition assessment for Mr. Tapia on October 2, 2018. Ms. Valley documented that Mr. Tapia was a "poor historian...he would not have been able to answer some of the questions...too many holes for me to make an evaluation."

c. Based on Mr. Tapia's weight in June 2018 documented at 153 pounds, Mr. Tapia did not loose 20 pounds by October when his weight was 168 pounds.

d. Ms. Valley stated it was correct that she could not say for certain that Mr. Tapia's weight loss, poor intake, or physical appearance was due to actual weight loss or Mr. Tapia's self-report.

e. Ms. Valley stated that "based on...the discussion today...I would say no [that she would still have the opinion that Mr. Tapia was severely malnourished at the time of her assessment].

f. As there were two different weights recorded for Mr. Tapia on intake to Pierce County Jail on June 16, 2018 [153 pounds at 2:28 pm and 168 pounds at 2:00 pm] Ms. Valley did not know which weight was accurate, "I don't know the source."

g. Mr. Tapia had two weights documented at the hospital 168 pounds and 147 pounds. The first in the emergency room, the second on admission to the floor. Ms. Valley relied on the weight measurement of 147 as "I would have assumed that that was a more accurate weight because it would have been on the floor...the nurses would have done a more accurate assessment at that point."

h. Ms. Valley stated it was correct that Mr. Tapia's weight fluctuated during the hospital stay, that weights are not the only criteria to determine if Mr. Tapia was malnourished as other criteria include his physical appearance and food intake prior to hospitalization.

i. Ms. Valley stated it was correct that she could not say to a reasonable degree of nutritional certainty that Mr. Tapia was malnourished on October 2nd.

j. Ms. Valley agreed that during the hospitalization, until the amputation, Mr. Tapia was slowly gaining weight, "he did have positive weight gain."

Javier Tapia v. NaphCare, Inc., et al.                                                          21

    k. Ms. Valley indicated if a patient did not eat for a week, 'weight would come down" and that someone can experience malnutrition over the course of a one-week period.

- Deposition of Duane Prather dated October 13, 2023 with exhibits. Per this document:
  a. Mr. Prather has a bachelor's degree in "mental health psychology" and a master's degree. He worked at the Pierce County Jail for five years 2017-2022. At the Pierce County Jail, he was a "mental health evaluation specialist...we would see mental health patients in the units and try to do assessments on their mental state...help classification decide what housing would be appropriate, if they needed mental health housing or not...follow-up in the mental health units...and suicide assessments primarily."
  b. It was within the scope of Mr. Prather's license to diagnose mental disorders.
  c. Mr. Prather indicated that there was no refusal form or policy regarding refusals, "not for mental health...we would document in a behavior tab and typically follow-up the next day...if they were Level 1 housing, we would follow-up daily." He indicted Level 1 was "the most restrictive housing, the sickest people, the people on suicide watch."
  d. Mr. Prather described assessments performed, a suicide risk assessment and "basic mental health status exams...how they were functioning cognitively; are they oriented; are they showing any signs of mental health symptoms...see if they come in drug impaired...we did not do diagnoses, as I recall, because we weren't billing insurance...we would treat symptoms...we would refer to the...mental health nurse practitioner if we had concerns over something that looked like...the patient would benefit from medication."
  e. For the basic mental health status exam, Mr. Prather recalled there "were forms available if somebody felt like they needed 'em." He recalled that the exams were typically done without using a form. He indicated there was no policy or established practice on the criteria for the mental health assessments.
  f. Mr. Prather did not recall Mr. Tapia, but from a review of the record he discussed a referral to the nurse practitioner, "if there was some compelling reason, I would have...when a person's not responding, you can't get an accurate assessment of their mental health status anyway...based on what I'm reading from my note, I probably wouldn't have referred the person...I could have if I felt there was a need..."
  g. Mr. Prather recommended Mr. Tapia move to Level 1 mental health housing, "typically I would recommend Level 1...if a person...didn't seem to be cooperative...you can't do an assessment on somebody who doesn't talk to you, so the logical thing would be to try and keep him in mental health housing until you could get an accurate assessment."
  h. After Mr. Prather saw Mr. Tapia and recommended Level 1 housing, he wasn't seen by mental health for six days, "that's what the record would

indicate." With further questioning, Mr. Prather agreed that Mr. Tapia was in Level 1 mental health housing as of September 18.

- Deposition of Jonathon Slothower dated November 29, 2023 with exhibits. Per this document:
  a. Mr. Slothower is a Registered Nurse and has worked at Pierce County Jail since 2013. He is the Health Services Administrator, "essentially a clinic manager...administrative manager of the clinic...everything except for clinical decisions...the medical director does not report to me."
  b. Mr. Slothower did not recall reviewing any records or having any conversations with other staff regarding Mr. Tapia's care prior to Mr. Tapia being sent to the hospital.
  c. With regard to Mr. Nealis' referral to medical, "Mr. Nealis asked medical to see the patient because he was not responding verbally...Mr. Carrillo went and saw the patient to verify that he was able to respond verbally...Mr. Nealis is a layperson...not a medical person...he is not asking for a medical assessment. He is asking for us to go and look at the patient and...assess whether or not he was verbal."
  d. After Mr. Carrillo had an interaction with Mr. Tapia on the 19th, he was not seen by a NaphCare employee for another ten days, "that's not clear from this. That's the next note that's on this document...doesn't mean that he wasn't seen by medical...we do segregation rounds..."
  e. Mr. Slothower indicated that a sudden altered mental state can be a medical condition "rarely. It can be...rarely. It can hypothetically...there's a lot of reasons that people in our facility act in the ways that were described in that report...correctional officers aren't qualified to recognize mental health conditions. They just ask for mental health to see them...an altered mental state, it can be a medical problem, but it's rare."

- Deposition of Elizabeth Warren dated November 2, 2023 with exhibits. Per this document:
  a. Ms. Warren is a Registered Nurse. She began work with NaphCare in April 2016 at Pierce County Jail until she retired in 2020.
  b. Ms. Warren indicated that "LPNs...do evaluate. They do look and see if people look like they're not normal today or they're not acting normal or their vitals are not normal...then they would call the clinic and tell the charge nurse...an RN would go up and evaluate the patient...if there was a need."
  c. Ms. Warren reviewed the vital signs that were documented after Mr. Tapia's LPN visit, it was not a full set of vitals "generally you're going to take a full set of vitals...you have to do a full set to do an assessment...even with a full set, if there was nothing else...sticking out, you'd still need more information ...you have to assess them."
  d. Ms. Warren saw Mr. Tapia on September 29th. She was not aware of what was going on with Mr. Tapia prior to that date.

Javier Tapia v. NaphCare, Inc., et al.                                    23

e. Ms. Warren stated that with regard to Dr. Balderrama and instructions regarding Mr. Tapia, "everything that Dr. Balderrama would have wanted would have eventually ended up in the medical records."

f. In her assessment of Mr. Tapia September 29th, she wrote that "Inmate will not verbally respond...I didn't say he wasn't able...his vitals are ok. He is not acting strange."

g. Ms. Warren documented that a sergeant requested she see Mr. Tapia, "based on my note, not sure if inmate is eating every meal...they wanted medical to assess him." Ms. Warren was unable to recall anything about Mr. Tapia or this assessment. She indicated that her assessment was "a standard protocol."

h. Ms. Warren documented that Mr. Tapia would be "scheduled...for a provider visit." And that would occur "the following Monday...my only concern was if he really continued the whole weekend not to eat or drink at all, maybe he should be looked at on Monday...it's a Saturday that I saw him."

- Deposition of Nicholas D. Garcia, M.D. dated January 19, 2024 with exhibits. Per this document:

a. Dr. Garcia is a vascular surgeon. He practices at MultiCare via the Pulse Heart Institute Vascular Services.

b. Dr. Garcia reviewed his progress notes related to Mr. Tapia, "I documented that he had poor recollection of the timeline and it was unclear of the exact timing of...what his problem was...this would have been something I put in there because I was uncertain of his mental status exactly as far as his ability to understand everything we were talking about...he did communicate with words...he was having pain...he was telling us he was having pain...it looks like he was not giving me a lot of history and I was given history from other sources...I was able to determine his memory was poor and he was...unable to give me an accurate timeline..."

c. Based on the appearance of Mr. Tapia's foot, "I have been doing this for 22 years and so we see how wounds look and how feet look when they lose their circulation...when it's gangrenous like this, it's...been there for a little while...at least probably one to two weeks."

- Deposition of Lucas P. Labine, M.D. dated January 9, 2024 with exhibits. Per this document:

a. Dr. Labine completed a residency in Family Medicine. He was working as a resident at Tacoma General during Mr. Tapia's hospitalization.

b. Dr. Labine documented that Mr. Tapia was alert, oriented, and nervous, "probably he was a little nervous...just by visual appearance." He indicated that Mr. Tapia's mental status exam was not remarkable for "anything extreme or obvious." This was consistent over the course of Mr. Tapia's hospitalization.

c. There was documentation of a history of intravenous drug use and "a reported history of schizophrenia which apparently has not been treated

for years." Per Dr. Labine, "general information life this would either come from...the computer charts, from information from the patient, or from people who knew him."

- Deposition of Javier Tapia dated February 1, 2024 with exhibits. Per this document:
    a. Mr. Tapia was born March 3, 1982.
    b. Mr. Tapia denied any history of intravenous drug abuse. He last used drugs in 2018 prior to his last admission to Pierce County Jail.
    c. Mr. Tapia reported at approximately age 16-18, "I went to a party...after that party, my father said I was acting strange...like something was put in the drink...he had me checked into St. Josephs and they did drug screens and stuff...they couldn't find anything that would cause me to act that way...follow-up treatment consistent of going to another doctor where he put me on medication, and I took it for a short period of time...for a few months...I stopped...because I felt like I was mentally stable."
    d. Mr. Tapia did not tell anyone at Pierce County Jail about his history of mental health treatment, "I didn't feel...ever feel like that ever since."
    e. While incarcerated and in isolation in 2018 at Pierce County Jail, Mr. Tapia could not recall how often nurses performed rounds, "I don't know the timeframe...at one point in time, they did come check on me for my vitals."
    f. He recalled while in isolation, "I could have been sleeping. I slept a lot in there...the only recollection I have is them coming for my vitals and after...that they had me on meal watch drinking Ensures...it's hard to remember that whole situation...I remember my belongings all over the floor...then just sleeping...I remember trying to push a button to call, but I would just go back to my bunk and fall asleep...it felt like I couldn't stay awake...memory was real fuzzy...I do recall being real confused what was going on in the time in there...I was just confused..."
    g. He recalled, "I was in regular population for X amount of days, almost three months and then I ended up in isolation...like mentally something was going on with me...I slept...my body just wanted to sleep."
    h. Mr. Tapia reported that his infection "could have been...underlying cause to my mental state of mind...there has to be...some type of reason...it was gangrene...I had no recollection to how that happened...it was fuzzy...I couldn't put two and two together...I remember being upset about the situation...there's got to be something you guys can do...the surgeon said...it wasn't gonna be my toes; it was gonna be my foot...I remember being very upset about that, and asked to call my family...and my daughter was like...I don't want to lose my dad, so just do it..."

## Reports:

- Expert report of Denise M. Panosky, DNP, RN, CNE, CCHP, FCNS dated January 31, 2024. Per this report, it was opined that nursing staff at Pierce County Jail providing care to Mr. Tapia, "failed to exercise that degree of care, skill, and learning

expected of a reasonable, prudent nurse acting in the same or similar circumstances. There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained registered nurse and/ or licensed practical nurse would have recognized, and those nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk, based on their nursing training and education, was unacceptable and fell below what a reasonable and prudent nurse would do in the same or similar circumstances. It is my further opinion that the acts and omissions of Registered Nurses... Registered Nurses supervising Licensed Practical Nurses and Licensed Practical Nurses... fell below the nursing standard of care."

Case Summary:
Mr. Javier Tapia was born March 3, 1982, and was 36 years old when he was booked into the Pierce County Jail on June 16, 2018. At the time of his admission to the facility, Mr. Tapia did not report any history of experiencing mental health symptoms or of mental health treatment other than a history of substance use. This was consistent with his prior booking admissions to the facility.

The first three months of Mr. Tapia's incarceration at the Pierce County Jail progressed without incident, typical of his prior admissions to the facility. Beginning in September 2018, Mr. Tapia began to experience difficulties. First, he submitted a health care request or "kite" on September 14, 2018 due to a complaint of "insomnia." Although Mr. Tapia was scheduled to see a nurse the next day, a mental health provider, Mr. Jesus Perez, cancelled the sick call indicating that Mr. Tapia should submit another "kite" to mental health.

Next, Mr. Tapia experienced an acute mental status change. On September 17, 2018 he was reported by a Corrections Deputy as exhibiting "Disturbing Mannerisms" where Mr. Tapia was described as flailing and rolling around on the floor, lying in a fetal position, crying, mumbling unintelligibly, and acting "very strange." Further it was noted that Mr. Tapia would not make eye contact or acknowledge corrections staff verbally. Given this behavior, the corrections deputy requested a mental health evaluation.

Mr. Tapia was seen by mental health, Mr. Nealis, on September 18, 2018 for an initial assessment. Despite Mr. Tapia appearing confused and unable to verbally respond to questions, no further assessment or intervention was requested other than to continue Level 1 mental health housing. Mr. Tapia was seen by mental health on September 19, 2018. Again, Mr. Tapia was noted as "confused...unable to verbally respond to questions... decompensated...way off his baseline." At this time, the mental health provider documented that Mr. Tapia could "have an unknown medical condition" and referred Mr. Tapia to medical for an assessment.

On 9.19.18, a Licensed Practical Nurse, Mr. Carrillo, responded to the request for a medical assessment. There was documentation of a blood pressure measurement,

Javier Tapia v. NaphCare, Inc., et al.                                                      26

but no other assessment was documented. The progress note indicated "will continue to monitor" but there were no further progress notes from nursing or medical staff for the next 10 days.

On 9.20.18, Mr. Tapia was seen by mental health, Mr. Prather. At this time, Mr. Tapia did not respond to the mental health provider, "he just stared...would not even shake his head yes or no." This mental health provider again recommended Mr. Tapia remain in level 1 mental health housing and "mental health to follow up" but there were no further progress notes from mental health staff for the next six days.

On 9.26.18, mental health, Mr. Nealis "attempted" to meet with Mr. Tapia, but he presented as "confused and nonverbal...appears to be decompensated at this time."

On 9.28.18, mental health, Mr. Perez noted that Mr. Tapia, "refused mental health symptoms...would not answer mental health questions." Following each of these meetings, the mental health provider noted that Level 1 mental health housing was appropriate for Mr. Tapia due to the need for further assessment and that mental health would follow-up.

On 9.29.18, in response to a Corrections Deputy request due to Mr. Tapia refusing meals and not responding verbally, Mr. Tapia was again referred to medical and mental health. Nursing saw Mr. Tapia on 9.29.18 and documented that the cell "smells of urine" and that Mr. Tapia, although alert, sitting up, and making eye contact, will not verbally respond. At this point, nursing requested a "meal log" and "daily monitoring of vital signs for three days" and schedule a "provider visit for an evaluation." This provider visit was planned for the next clinic day, Monday October 1, 2018.

Mental health met with Mr. Tapia 9.30.18 in response to the Corrections Deputy report of 9.29.18. Again, Mr. Tapia did not participate in an assessment, he "appeared to be sleeping and did not respond to...knocks on door or calling of name." Mental health again met with Mr. Tapia on 10.1.18, where he again presented as confused and nonverbal. Finally, on 10.1.18, a Corrections Deputy asked medical to see Mr. Tapia as his toes were turning black, and Mr. Tapia was transferred to the emergency department at Tacoma General Hospital.

Mr. Tapia was hospitalized at Tacoma General Hospital where due to advanced circulation issues complicated by gangrene of his left foot; he required a left below the knee amputation. Mr. Tapia returned to the Pierce County Jail 10.22.18 where it was noted that he did not remember how his condition started other than he recalled feeling "really tired."

Conclusions:
Mr. Tapia's injuries as a result of his untreated medical condition resulted from a confluence of system and treatment failures that were identifiable, but in multiple

deviations from the standard of care, were ignored by jail medical and mental health staff. These deviations will be addressed individually below in no particular order:

*Access to Care:*
Mr. Tapia first requested medical care via a "kite" on September 13, 2018. In a deviation from the standard of care and an impediment to Mr. Tapia's access to care, this "kite" where Mr. Tapia reported experiencing insomnia, while initially scheduled for a meeting with nursing staff, was cancelled by mental health staff. This is not appropriate. Requests for medical care must be reviewed by nursing and triaged by nursing staff prior to being referred to mental health.

Per the National Commission on Correctional Health Care [NCCNC] Standards for Health Services in Jails 2018, inmates must have access to care for their serious medical, dental, and mental health needs. The standard indicates that the "responsible health authority must identify and eliminate any unreasonable barriers, intentional and unintentional, to inmates receiving health care." The NCCHC defined access to care as "in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment, and receives care that is ordered."

The NCCHC reviews some barriers to an inmate's access to health services, one of which, seen in this case, is having "an understaffed, underfunded, or poorly organized system with the result that it is not able to provide appropriate and timely access to care." Another barrier, seen in this case, is "having a utilization review process that inappropriately delays or denies necessary health care."

In the deposition of Mr. Jesus Perez, he indicated that he cancelled Mr. Tapia's medical care request because "we're trying to help...the system was getting bogged down...so many kites coming through." While per Mr. Perez "nursing was saying...insomnia is not something we're managing, mental health needs to do it," it is inappropriate for him to cancel the sick call request as nursing must to triage and ensure that Mr. Tapia's report of insomnia is not a symptom of another medical condition.

*Housing:*
Housing was a precipitating factor in Mr. Tapia's injuries as he was ultimately housed in a single cell, isolated from others. Mr. Tapia was referred for a mental health assessment via a corrections deputy on September 17, 2018 due to an acute mental status change. At that time he was transitioned to Level 1 mental health housing, which is described as essentially administrative segregation, single cell housing with one hour outside of the cell per day. He remained in this housing situation from September 17, 2018 until his transfer to Tacoma General Hospital on October 1, 2018. As Mr. Tapia was experiencing an acute mental status change, placement in this type of housing would only serve to further isolate him and potentially exacerbate his pathology as discussed below.

The negative impact of isolation on individuals is well accepted in the scientific literature. Grassian (2006) described "severe psychiatric harm" resulting from solitary confinement wherein individuals experienced either reoccurrence of preexisting mental illness or acute mental health symptoms. He noted that individuals exposed to isolation experienced consistent symptoms including: hyperresponsivity to external stimuli; panic attacks; difficulty with thinking, concentration, and memory; intrusive obsessional thoughts; overt paranoia; problems with impulse control; and delirium.

The deleterious effects of confinement and seclusion have been well documented in adult settings (Haney, 2003). Specific effects include psychological consequences associated with lack of social contact, sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilation. Metzner and Dvoskin (2006) also documented psychological harm associated with seclusion in Supermax correctional settings. Seclusion has been associated with exacerbation of pre-existing conditions, as well as psychoses, depression, and anxiety in individuals with a history of mental health problems. Individuals without a pre-existing history of mental health problems experienced a greater amount of irritability, anxiety, and dysphoric symptoms.

*Failure to Monitor:*
Pierce County Jail policy for Level 1 mental health housing indicates that an individual will be assessed by mental health a minimum of three times per week. A review of records indicated that in a deviation from facility policy, there was a period of six days from 9.20.18 to 9.26.18 where Mr. Tapia was not assessed by mental health.

NCCHC standards for Mental Health Services in Correctional Facilities 2015 indicate that for segregated inmates, such as Mr. Tapia, while residing in Level 1 mental health housing, "the health professional's monitoring of a segregated inmate is based on the degree of isolation…inmates in solitary confinement with little or no contact with other individuals are monitored daily by medical staff." In a deviation from the standard of care, there was no documentation of daily monitoring of Mr. Tapia by medical staff. In fact, medical staff only documented seeing Mr. Tapia twice during the 14 days he was housed in Level 1 mental health housing. Both of those visits were prompted by requests from other staff disciplines, either mental health or correctional staff.

For individuals in mental health programs and residential units such as the Level 1 mental health housing described at Pierce County Jail, an acute mental health residential unit, the NCCHC Standards for Mental Health Services in Correctional Facilities 2015 notes requirements including: a minimum of continuous coverage by mental health staff assigned to the unit, orientation and training for correctional officers assigned to the unit, daily patient evaluation by mental health staff, programming or appropriate therapies, individual treatment plans, and housing in a safe and therapeutic environment. Given the description of the Level 1 mental health housing at Pierce County Jail, it is obvious that in a deviation from the standard of care, these standards were not met.

Per the deposition of Mr. Nealis, although mental health staff does not rely on corrections deputies to monitor inmates, "that is what happens." This is inappropriate and a deviation from the standard of care. Corrections deputies are not trained to monitor inmates in mental health housing or inmates who are experiencing a mental health crisis. There was no documentation of daily cell checks or required corrections deputy monitoring of Mr. Tapia during his stay in Level 1 mental health housing. As noted above, there were significant spans of time (e.g. six days) where other than documenting meal refusals, there was no documentation indicating any attempts on the part of mental health, medical, or corrections deputies to interact with Mr. Tapia.

*Failure to Assess:*
Per the NCCHC standards, Mr. Tapia, like all inmates admitted to the Pierce County Jail, should have had a mental health assessment documented within 14 days of admission that included a structured interview with inquiries into his history of psychiatric hospitalization, psychotropic medication, and outpatient treatment; substance use hospitalization; detoxification and outpatient treatment; suicidal behavior; violent behavior; victimization; special education placement; cerebral trauma or seizures; physical trauma or abuse; sex offenses; his current mental health status; and emotional response to incarceration. If Mr. Tapia had a positive screen for any of the above items, a full mental health evaluation would be required within 30 days. Given Mr. Tapia's history of a substance use disorder, he would have met criteria for a full evaluation. In a deviation from the standard of care, neither of these assessments were documented.

Mr. Tapia was referred for a mental health assessment on September 17, 2018 by a corrections deputy due to a change in mental status. Mr. Tapia was seen by four different mental staff on September 18, 19, 20, 26, 28, 30, and October 1, 2018 and despite repetitive descriptions of Mr. Tapia appearing "confused" and "unable to verbally respond" and "decompensated", mental health staff simply continued his Level 1 mental health housing and indicated they would "follow-up." This is not acceptable and a deviation from the standard of care.

Mental health staff reported that due to Mr. Tapia's lack of verbal interaction, they were unable to complete a mental health assessment or mental status examination. This is inaccurate and a deviation from the standard of care. The mental status examination includes multiple non-verbal components and indicators that can be used to determine an individual's mental state including but not limited to appearance, level of alertness, ability to follow commands, tics/tremors, apparent response to internal stimuli, and psychomotor retardation or agitation. Further, depositions revealed that in a deviation from the standard of care, it was common practice for mental health staff to attempt to engage with inmates through the cell door or through the port hole in the door. They did not typically enter the cell or take the inmate to a separate location, choosing to engage with the inmate cell side. This is inappropriate and a barrier to engagement, assessment, and treatment.

Given Mr. Tapia's acute mental status change, consideration of a medical cause of his difficulties should have been primary.  On September 19, 2018, mental health staff did acknowledge the possibility of a medical cause for Mr. Tapia's difficulties and requested a medical assessment.  In a deviation from the standard of care, an assessment did not occur, rather a Licensed Practical Nurse came to Mr. Tapia's cell and obtained a blood pressure measurement.  No other clinical data were obtained.  Given Mr. Tapia's challenges, an organic work-up or a medical assessment to determine an etiology or cause of Mr. Tapia's symptoms was necessary.

Despite the mental health provider's licensure and experience, they all failed to recognize that Mr. Tapia was experiencing delirium and attributed his behavior to mental health symptoms or volitional behavior.  Mental health staff indicated that while they are qualified to make diagnoses, they do not as they "don't bill insurance" for the care provided in the Pierce County Jail. This is unacceptable.  It is not possible to develop a treatment plan to address specific symptoms related to a diagnosis without a diagnostic formulation.  Mr. Tapia had no diagnostic formulation documented and no treatment plan.  Had the mental health staff generated a diagnostic formulation for Mr. Tapia, an individual with an acute mental status change, delirium would have been included in the differential diagnosis list. Delirium is essentially an acute mental status change or psychosis caused by medical issues, in this case, Mr. Tapia's lower extremity circulation issues and resultant gangrene.

During delirium, individuals become confused and unable to think or remember clearly.  The symptoms are acute, meaning they start suddenly, and they can wax and wane.  The most common symptoms of delirium are memory problems, trouble concentrating, hallucinations and delusions, incontinence, emotional changes, disrupted sleep patterns/sleepiness, disorganized thinking or unintelligible speech, confusion, and changes in levels of consciousness/alertness.  The documentation included in Mr. Tapia's record indicated he was experiencing confusion, disrupted sleep patterns, unintelligible speech, and changes in levels of consciousness/alertness. Given the symptoms Mr. Tapia was experiencing, mental health staff should have referred him for an emergency medical assessment.  Even more concerning is that initially, mental health did request a medical assessment, and this was performed by a Licensed Practical Nurse who, in a deviation from the standard of care, did not fully assess Mr. Tapia or refer him for further assessment by a higher-level clinician.

If the initial mental health assessment and subsequent mental health evaluation were appropriately performed for Mr. Tapia, Pierce County Jail mental health staff would have had access to additional information regarding Mr. Tapia's history.  For example, while hospitalized at Tacoma General, there was a question as to whether Mr. Tapia had engaged in intravenous drug abuse.  Mr. Tapia has denied intravenous use and his toxicology screen on admission to Tacoma General was negative, indicating substance use was not a contributing factor to his condition.

Javier Tapia v. NaphCare, Inc., et al.                                                                                  31

At Tacoma General, there was a question as to whether Mr. Tapia had a history of a diagnosis of Schizophrenia. Had mental health staff at Pierce County Jail completed the required assessment and evaluation process, they would have known that Mr. Tapia did not have a history of Schizophrenia, rather he had a history of an inpatient psychiatric hospitalization as a teenager due to becoming paranoid as a result of experimenting with marijuana. Further, once Mr. Tapia was admitted to Tacoma General and received medical treatment for his serious medical issues, his mental status improved as his delirium resolved.

As discussed above, it is my opinion that Mr. Tapia's acute mental status change due to delirium and the delay in his receiving appropriate medical care resulted from a series of system failures and deviations from the standard of care by medical and mental health staff at Pierce County Jail. Had Mr. Tapia been properly identified, evaluated, monitored, and treated, his injuries could have been averted.

Please note the above opinions are provided to a reasonable degree of psychiatric certainty. If additional information or collateral documentation becomes available, I reserve the right to change my opinions based on such, and that will be included as an addendum to this report. Should you have any questions, or require any further information regarding these opinions, please contact me at 504.392.8348.

Submitted by:

Daphne Glindmeyer, M.D., D.F.A.P.A.
Board Certified Child, Adolescent, and Adult Psychiatrist
Board Certified Forensic Psychiatrist

Testimony and Depositions
Daphne Glindmeyer, M.D.

| | | |
|---|---|---|
| 09.27.05 | Judicial Commitment of J.D. | 24th Judicial District Court |
| 03.23.06 | Deposition – Succession of R.A.A.M. | |
| 11.03.06 | Judicial Commitment of M.T. | 24th Judicial District Court |
| 11.15.06 | Judicial Commitment of A.D. | 24th Judicial District Court |
| 01.05.07 | Judicial Commitment of G.C. | 24th Judicial District Court |
| 01.19.07 | Judicial Commitment of D.E. | 24th Judicial District Court |
| 04.27.07 | Judicial Commitment of L.H. | 24th Judicial District Court |
| 05.15.07 | Judicial Commitment of E.A. | 24th Judicial District Court |
| 08.24.07 | Deposition – C.D. v. H.L.B. Jr. | |
| 05.15.08 | Deposition – R.D. v. P.A., et al | |
| 07.31.08 | Judicial Commitment of G.D. | Orleans Parish Civil Court |
| 10.23.08 | Deposition – S.K. v. Dollar General Corp | |
| 09.02.09 | State of La. v. J.B. | 24th Judicial District Court |
| 10.08.09 | State of La. v. A.C. | 22nd Judicial District Court |
| 11.30.09 | Judicial Commitment of S.K. | 21st Judicial District Court |
| 01.12.10 | The Matter of the Mental Health of R.R. | 22nd Judicial District Court |
| 02.04.10 | State of La. v. T.V. | 22nd Judicial District Court |
| 04.06.10 | State of La. v. E.H.T. | 24th Judicial District Court |
| 04.27.10 | State of La. v. E.W. | 24th Judicial District Court |
| 04.29.10 | Judicial Commitment of S.J. | 22nd Judicial District Court |
| 02.14.11 | Deposition - JB v. Art Catering | |
| 10.19.11 | State of La. v. A.J. | Hammond City Court |
| 10.20.11 | D.G.  v.  R.F. | 24th Judicial District Court |
| 11.07.11 | State of La. v. S.S. | 41st Judicial Criminal Court |
| 12.21.11 | I.F. v. K.K. and Safeco Insurance Company of America | U.S. District Court - Eastern District of Louisiana |
| 01.26.12 | State of La. v. D.B. | 24th Judicial District Court |
| 01.27.12 | Deposition - I.F. v. Tulane University | |
| 02.07.12 | Deposition – J.W. ex rel. Williams v. A.C. Roper | |
| 04.26.12 | I.F. v. Tulane University | Orleans Parish Civil Court |
| 08.17.12 | Deposition –C. H. v. G. J. | |
| 09.12.12 | Hughes v. Judd | United States District Court-Florida, Tampa Division |
| 11.29.12 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 2.14.13 | Deposition – C.H. v. G.J. | |
| 2.19.13 | Judicial Commitment of D.P. | 24th Judicial District Court |
| 2.28.13 | Deposition – C.H. v. G.J. | |
| 4.2.13 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 4.3.13 | J. v. G. | United States District Court – Eastern District of Louisiana |
| 7.2.13 | Deposition – J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | |
| 7.23.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |

| | | |
|---|---|---|
| 7.25.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |
| 10.29.13 | Deposition - Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 11.25.13 thru 11.27.13 | Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 01.21.14 | Deposition - D. H. v. Coroner, St. Tammany Parish The State of Louisiana, et al | 22nd Judicial District Court |
| 02.05.14 | State of La. v. A.T. | 40th Judicial District Court |
| 05.08.14 | Deposition – C.C. V. LC. | |
| 08.27.14 | Jefferson Parish Human Services Authority v. D.T. | 24th Judicial District Court |
| 09.25.14 | In re D.T. | 24th Judicial District Court |
| 01.22.15 | Depositions- J.B. v. R.J. Reynolds Tobacco Co. | |
| 01.23.15 | J.W. ex rel. Williams, et al. v. Birmingham Board of Education, et al. | United States District Court Northern District of AL, Southern Div. |
| 05.15.15 | Deposition- B.P., et al v. River Oaks, Inc., et al | |
| 06.18.14 | E v. E | Orleans Parish Civil District Court |
| 09.22.15 | Deposition- B.D. v. S.D. | |
| 09.28.15 | B.D. v. S.D. | 22nd Judicial District Court |
| 09.29.15 | A.F. v. United States of America | United States District Court for the Eastern District of New York |
| 11.23.15 | Deposition- P.J. v. R.J. Reynolds Tobaccco Co. | |
| 01.13.16 | State of La. V. D.R. | 18th Judicial Court |
| 02.17.16 | State of La. V. E.P. | 24th Judicial Court |
| 03.08.16 | Deposition- G.J. v. C.A., et al | |
| 07.29.16 | Deposition- S.S. v. R.J. Reynolds Tobacco Co. | |
| 12.02.16 | Deposition- D.H., et al v. City of New Orleans, et al | |
| 02.13.17 | State of La. V. J.D. | 29th Judicial Court |
| 08.24.18 | Deposition L.C., et al v. Evergreen, et al | |
| 08.31.18 | M.A. v. R.A. | 24th Judicial Court |
| 11.26.18 | Daubert Hearing- L.C., et al v. Evergreen, et al | 21st Judicial Court |
| 02.07.20 | Deposition- J.A. v. E.C., et al | |
| 02.11.20 | State of La v. A.H. | 24th Judicial Court |
| 11.16.20 | Deposition- D.M. et al v. Erie County, Ohio et al | |
| 03.09.21 | Interdiction of E.M. | 24th Judicial Court |
| 03.12.21 | Deposition- Vargas v. Sheriff of Cook County, et al | United States District Court for the Northern District of Illinois, Eastern Division |
| 05.04.22 | State of LA v. B.J. | 24th Judicial Court |

*Information prior to August 2005 unavailable

Curriculum Vitae
# Daphne A. Glindmeyer, M.D.

---

Business Address:                          Phone:    (504) 392-8348
                                           Fax:      (504) 398-4334
611 River Highlands Blvd., Suite B         Email:    psychdoctors@gmail.com
Covington, Louisiana 70433

Mailing Address:

Post Office Box 4240
Covington, Louisiana 70434

---

## EDUCATION

**Post Graduate Medical Education:**

Louisiana State University Health Sciences Center
Division of Law and Psychiatry
Forensic Psychiatry Fellowship, 1998-1999
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Division of Infant, Child, and Adolescent Psychiatry
Child Psychiatry Fellowship, 1995-1997
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Psychiatry Residency Training Program
Adult Psychiatry Residency, 1993-1995; 1997-1998

**Medical Education:**

Louisiana State University Health Sciences Center
Doctor of Medicine, 1989-1993
New Orleans, Louisiana

**Undergraduate Education:**

University of New Orleans
Premedical Curriculum, 1987-1989
New Orleans, Louisiana

Mississippi Gulf Coast Community College
Premedical Curriculum, 1985-1987
Gulfport, Mississippi

Loyola University
Bachelor of Business Administration/Finance, 1981-1985
New Orleans, Louisiana

---

## PROFESSIONAL LICENSES AND CERTIFICATIONS

**Medical License:**

Louisiana, 1993
Texas, 2015

**Board Certification:**

| | | |
|---|---|---|
| Psychiatry | October 1999 | **Recertification:** December 2019 |
| Forensic Psychiatry | April 2001 | **Recertification:** January 2022 |
| Child and Adolescent Psychiatry | November 2002 | **Recertification:** April 2012 |

---

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

American Psychiatric Association
        Fellow 2009
        Distinguished Fellow 2016

American Academy of Psychiatry and the Law
        Program Committee, 2000-2002

Louisiana Council of Child and Adolescent Psychiatry
        President 2009-2012

Louisiana Psychiatric Medical Association
        Executive Council Resident Program Representative 1997-1999
        Law and Psychiatry Committee 1999-Present
        Chairman Law and Psychiatry Committee 2009-Present
        Co-Chairman Child and Adolescent Psychiatry Committee 2003-2005
        Parliamentarian 2005-2006
        Secretary 2006-2007
        President 2007-2008

Louisiana State Medical Society
    Membership Committee 2004-2007
    Mental Health and Substance Abuse Committee 2004-2007
    Council on Membership Services 2008-2010

Selected by her peers for inclusion in Best Doctors in America® from 2007 to 2018

Orleans Parish Medical Society
    Women's Taskforce 2004-2005

Jefferson Parish Medical Society 2010-Present

Louisiana State University Health Sciences Center
Student Government Association 1989-1993
    Senior Class Vice President
    Executive Council Vice President of Social Affairs
    Sophomore Class Vice President
    Freshman Class Vice President

Student Representative Five Year Planning Committee 1993

Psychiatric Resident Representative to the Committee for
Professional Conduct 1997-1998

---

## CURRENT EXPERIENCE

**March 2004-Present**       Daphne Glindmeyer, M.D., A.P.M.C.
                          Private Practice
Psychiatric evaluation and psychotropic medication management services for children, adolescents and adults are provided in outpatient setting.  Also perform forensic consultations for adolescents and adults (civil and criminal).

**June 2010-Present**       Compliance Monitor
                          Harchik and Associates, L.L.C.
                          State of Texas
Compliance monitoring regarding psychiatric services in supported living centers in the State of Texas pursuant to a consent decree.

**April 2020 – Present**      Subject Matter Expert
                          Iowa Boys State Training School
Compliance monitoring regarding mental health services in a juvenile justice center in the State of Iowa pursuant to a consent decree.

**December 2022 – Present**      United States District Court for the District of Rhode Island
                                 Court Appointed Rule 706 Expert
Consultation regarding conditions of confinement in Rhode Island Department of
Corrections.

**March 2023 – Present**         Subject Matter Expert
                                 Bailey and Associates, L.L.C.
                                 Glenwood Resource Center
Compliance monitoring regarding psychiatric services in a supported living center in the
State of Iowa pursuant to a consent decree.

---

## PAST EXPERIENCE

**August 2016- 2022**            Consultant
                                 Carter Goble Associates, LLC
Completed Consultations:
       Alaska Juvenile Privatization Feasibility Study
       Alabama Department of Corrections
       Florida Department of Corrections
       Montgomery County Jail
       Nevada Juvenile Staffing Review & Organization Assessment Project
       Sacramento County Jail Facilities
       Wyoming Department of Corrections

**2008-2015**                    Psychiatric Consultant
                                 Department of Justice
                                 Special Litigation Section
Completed Consultations:
       Investigation-New York Juvenile Justice System.
       Compliance Monitor-South Bend Juvenile Correctional Center.
       Investigation-California Youth Authority, N.A. Chaderjian Facility.
       Investigation – Pendleton Juvenile Correctional Center
       Compliance Monitor-State of Ohio, Scioto Juvenile Correctional
       Facility.

**September 2011-2015**          S.H. v. Reed
Compliance monitoring regarding psychiatric services in three juvenile correctional facilities
pursuant to a consent decree.

**February 2012-July 2012**      Psychiatric Consultant
Psychiatric consultant to the mental health compliance monitor in New York's secure juvenile
facilities.

**May 2011- December 2014**    Compliance Monitor
Scioto, Ohio
Compliance monitoring regarding psychiatric services in a juvenile correctional facility
pursuant to a consent decree.

**January 2011-April 2015**    Psychiatric Consultant
Southern Poverty Law Center
Completed Consultations:
Walnut Grove Youth Correctional Facility
Birmingham City School District
Polk County Jail
Orleans Parish Prison

**April 2009-January 2014**    Compliance Monitor
Los Angeles County, California
Compliance monitoring regarding psychiatric services in juvenile correctional facilities
pursuant to a consent decree.

**January 2008-2010**    Compliance Monitor
Attorney General's Office
State of Mississippi
Compliance monitoring regarding mental health and rehabilitative
services in Mississippi's secure juvenile correctional facilities pursuant to a
Consent decree.

**March 2004-December 2010**    Psychiatrist
Louisiana State University Health Science Center
Juvenile Justice Program
Provided psychiatric evaluation and medical management to youth in a secure juvenile
correctional facility, Bridge City Center for Youth.  In addition, supervised and directed the
resident rotations for Child and Adolescent Psychiatry and Forensic Psychiatry residents within
the Juvenile Justice Program.

**March 2004-October 2007**    Medical Director
West Jefferson General Hospital
Behavioral Medicine Center
Medical Director for inpatient and outpatient psychiatric services at
West Jefferson Hospital.  Responsible for administrative decisions as well as
providing clinical services to both acutely mentally ill psychiatric
inpatients and outpatients attending intensive outpatient and partial
hospitalization programs.  In addition, provided consult liaison psychiatric
services to the general hospital.

5

**November 2003-August 2015**   Medical Director
Assertive Community Treatment
Administrative responsibilities as well as providing intensive outpatient home based
psychiatric services to adults with serious and persistent mental illness.

**January 2003-September 2012** Consulting Psychiatrist
Community Support Team
Resource Center for Psychiatric and Behavioral
Supports
Stabilization Unit at Northlake Supports and
Services
Provided consultative psychiatric services for individuals with developmental disabilities.


**July 2002-March 2004**       Director of Psychiatry
Louisiana State University Health Sciences
Center
Juvenile Corrections Program
Administrative supervision of lead psychiatrists at individual facilities,
Provided direct psychiatric care to youth in Louisiana's secure correctional facilities, and
supervised psychiatric residents and fellows rotating at
Bridge City Center for Youth.  Additional duties included serving as the
Course Director for the Child and Adolescent Psychiatry Forensic Lecture
Series.

**July 2000-March 2002**       Director of Clinical Operations
Louisiana State University Health Sciences
Center
Juvenile Corrections Program
Administrative supervision and implementation of medical, mental health,
and dental care for youth in Louisiana's secure correctional facilities.

**July 1999-July 2000**        Attending Psychiatrist
Medical Center of Louisiana, New Orleans
Provided psychiatric care to adult patients hospitalized in the acute psychiatric unit,
supervision of medical students, psychology interns, psychiatric interns, and residents.

**July 1999-July 2000**        Medical Director
Jefferson Parish Adult Drug Court Program
Responsible for the clinical quality of court-mandated substance abuse
treatment for first time nonviolent offenders, evaluation and treatment of
dual diagnosis clients, and the supervision of social services staff and
forensic psychiatric fellows.

**July 1999-July 2000**            Medical Director
                                   Jefferson Parish Juvenile Drug Court
                                   Program
Responsible for the clinical quality of court mandated substance abuse
treatment and the psychiatric evaluation and treatment of juvenile offenders.

**July 1999-July 2000**            Medical Director
**July 1995-July 1999**            Staff Psychiatrist
                                   Jefferson Parish Human Services Authority
                                   Mobile Crisis Team
Crisis assessment, evaluation, and disposition planning for adult, child,
and adolescent clients, and the supervision of child psychiatrists and
child psychiatry fellows.

**1994-1999**                      Clinic Psychiatrist
                                   Orleans Parish Prison
Evaluation and treatment of incarcerated individuals.

**1996-1997**                      Duty Doctor
                                   New Orleans Adolescent Hospital
Crisis assessment, evaluation, and emergency hospitalization of
children and adolescents, after hour's management of acute inpatient unit.

**1994-1996**                      On-Call Provider
                                   Child and Adolescent Mental Health
                                   Program
Crisis assessment, evaluation, and treatment disposition for children
and adolescents in Orleans Parish.

_____

## PRESENTATION AND TEACHING ACTIVITIES

Adolescent Brain Development: Implications in Juvenile Justice (May 2018). Daphne
Glindmeyer, M.D. Presented to staff at the Nevada Youth Training Center and Caliente
Youth Center.

Psychotropic Medication and Developmental Disabilities (February, 2015). Daphne
Glindmeyer, M.D. Presented to the Louisiana and Mississippi Councils for Child and
Adolescent Psychiatry Annual Spring Meeting.

Better Living through Chemistry? A review of psychopharmacology and developmental
disabilities. (April, 2011). Daphne Glindmeyer, M.D.  Presented to the Louisiana Disability
Summit Annual Conference.

<u>Autism Spectrum Disorder.</u> (March, 2010).  Daphne Glindmeyer, M.D.   Presented to Louisiana Public Health Association Annual Educational Conference.

Speakers Bureau:        Pfizer, 2007-2011
                        Eli Lily, 2008-2010
                        Astra Zeneca, 2010-2013
                        Abbott, 2007-2008
                        Pam Lab, 2010-2015
                        Otsuka 2012-2015

<u>Landmark Cases in Child and Adolescent Psychiatry</u>.  (May, 2004).
Daphne Glindmeyer, M.D.   Presented to LSUHSC psychology students.

<u>Psychopharmacology and Metabolic Syndrome</u>.  (November, 2008).
 Daphne Glindmeyer, M.D.  Presented to the Medical Staff of Northlake Supports and Services.

<u>Bipolar Mood Disorder:  Diagnosis and Treatment</u>. (October, 2007).
Daphne Glindmeyer, M.D.   Presented to the Louisiana Society of Nurse Practitioners.

<u>Mental Status Examinations</u>.  (May 2004).  Daphne Glindmeyer, M.D.  Presented to psychology students at University of New Orleans.

<u>Psychopharmacology and Developmental Disabilities.</u>  Daphne Glindmeyer, M.D. (March, 2004).  Presented to the American Academy of Family Physicians, and presented to the Region II Office of Citizens with Developmental Disabilities staff.

<u>Child and Adolescent Forensic Lecture Series.</u>  (2003).  Daphne Glindmeyer, M.D.   Course Director.
        Overview of the Juvenile Justice System
        Introduction to the Court Process

<u>Forensic Issues in Inpatient Psychiatry</u>.  (1999).

<u>Stalking:  The Psychiatric Perspective.</u>  (1999).

<u>Child Abuse and Confidentiality in the treatment of Children and Adolescents.</u>
(1998)

<u>Psychiatry Clerkship Small Group Leader.</u>  (1997-1998).

<u>Adolescent Depression and Juvenile Delinquency</u>.  (1997).

<u>Psychiatry and Medicine Small Group Leader.</u> (1996-1997).

**PUBLICATIONS**

Glindmeyer, D.A. & Cruise, K.R.  (2003).  Callous and Unemotional Traits in a Juvenile Offender, A clinical case study.  Published in the Journal of Forensic Psychology Practice, 3, 73-78.

**REFERENCES**

Available upon request.

# Daphne Glindmeyer, M.D.

Post Office Box 4240 Covington, Louisiana 70434

Phone: (504) 392-8348                          Phone: (985) 888-1414
Facsimile: (504) 398-4334                       Facsimile: (985) 888-1415

Fee Schedule

My fee for expert consultation is $550.00 per hour. This includes travel time (portal to portal), record review, interviews, research, report writing, consultation with attorneys, site visits, and any other activity necessary to complete the consultation.

Testimony or depositions are charged at the same rate ($550.00 per hour); however, a four hour minimum is applied. Any testimony or deposition exceeding four hours is charged at a daily rate of $4400.00. A four-business day notice is required for cancellation of appointments, testimony, or court appearances. If the required notice is not provided, the scheduled time will be billed.

Any travel expenses (airfare, hotel, taxi, car rental, food, etc.) are to be reimbursed fully with receipts provided. Incidental expenses (copies, mailing charges) are to be reimbursed fully with receipts provided.

Retainer fees will be discussed with the referring party and determined based on the consultation requested. The client will be billed only for the hours worked, and any unused portion of the retainer will be returned. Any remaining balance must be satisfied prior to the delivery of the final report. Testimony and deposition fees must be satisfied prior to appearance.

A minimum of 60 days is required to complete evaluations/reports. In some cases, this time period may be longer; however, that will be discussed with the referring client. If the services requested must be completed within 60 days, a rush fee will be required. This fee will be discussed with the referring client.