# EXHIBIT 8

Rule 26 Report
March 15, 2024

Javier Tapia v. Naphcare Inc., et. al.

Johnny E. Bates MD MMM CPE CCHP CCHP-P FASAM FACCP
johnny.bates@qchcweb.net

**Introduction:** I have been retained by Plaintiff Counsel's Ryan Dreveskracht with Galanda Broadman, PLLC, to review the case of *Javier Tapia v. Naphcare et.al*.

**Qualifications to Render These Expert Opinions:** My opinions are based on my skill, knowledge, training, education, expertise, and experience as set forth the attached curriculum vitae. My opinions are based on reasonable probability and medical certainty. I have been involved in correctional healthcare for over thirty years and have owned and managed a correctional healthcare company for the last nineteen years with over 350 employees. I am intimately familiar with the correctional setting and the capabilities and limitations of practicing in this setting. I am a CCHP-P through the NCCHC and I am a Fellow of the American College of Correctional Physicians.

**Ongoing Discovery.** I am submitting this report on the specific matters set out below in connection with this litigation. I understand that this case is ongoing discovery and, as such, I reserve the right to amend and modify this report including its summaries, opinions and all other elements.

**Compensation.** I am being compensated at the rate of $650.00 per hour for all activities related to this case.

**Documents Reviewed:**

1) Amended Complaint
2) Deposition Transcript of Bradley, Jonah and exhibits
3) Deposition Transcript of Carrillo, Carmen and exhibits
4) Deposition Transcript of Garcia, Nicholas D and exhibits
5) Deposition Transcript of Knight, Jonathan and exhibits
6) Deposition Transcript of Labine, Lucas and exhibits
7) Deposition Transcript of Nealis, Darren and exhibits
8) Deposition Transcript of Perez, Jesus Tono and exhibits
9) Deposition Transcript of Prather, Duane and exhibits
10) Deposition Transcript of Ricci, Debra and exhibits
11) Deposition Transcript of Slothower, Jonathan and exhibits
12) Deposition Transcript of Tapia, Javier and exhibits
13) Deposition Transcript of Valley, Jane and exhibits
14) Deposition Transcript of Wade, Elliot and exhibits
15) Deposition Transcript of Warren, Elizabeth and exhibits
16) Naphcare Policy Procedure and Employee Job Description
17) Photos Pre and Post Op
18) Pierce County Jail Records
19) Naphcare Medical Records
20) Washington DOC Medical Records
21) Multicare Health System Medical Records including color photos

      22) Medical Records from St. Joseph's Medical Center
      23) 2024-03-08 Pierce County Supplemental Initial Disclosures
      24) Health Care Authority Records
      25) Hanger Clinic Records

**EXPERT OPINION 1**: Mr. Tapia was admitted to the Pierce County Jail in June of 2018 with his lower extremities intact and had the reasonable expectation to leave with both limbs when he was released. Due to a series of repeated half-measures and failures to adhere to common community standards of care, Mr. Tapia was subjected to the loss of a limb. This process was extremely painful and will negatively impact him for the rest of his life. It appears that the problems that led to the below knee amputation began in the early part of September. Mr. Tapia has little recall of these events and so the documentation provided by NaphCare and Pierce County is the best evidence available to piece what happened to him together. A summary of these events follows.

On September 10, 2018, the following is documented in Mr. Tapia's jail records: **"Seems to have difficulty following simple rules such as 1400hrs lockdown. Placed between the Gates, will return to unit at 1445."** There is no prior documentation since his intake in June of 2018 that the patient had problems following directions except for an early cancellation of a scheduled visit on 7/11/2018.

On September 15, 2018, the following is documented in Mr. Tapia's jail records: **"Warned not to cross yellow line by officers station."**

On September 17, 2018, Mr. Tapia's confusion and abnormal behavior continue with the following documentation: **"Inmate Behavior / Disturbing Mannerisms."**[1]

On September 18, 2018, the documentation in Mr. Tapia's jail records is very illuminating and convincing as to the fact of Mr. Tapia's deteriorated condition:

> **Met with I/M at about 1100 for initial assessment in response to C/D report. He came to the door and was cooperative during the interview, but appears to be confused and was unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time. Recommend continued level 1 MH housing at this time for further assessment, MH will f/u.**

This note was provided by mental health practitioner Nealis and is very concerning for its lack of information that one would expect from a similarly situated provider. For example, Mr. Nealis states that the patient appears to be confused but doesn't describe in what manner, which is

---

[1] It should be noted that this title is a choice from a drop-down box and is very limited in the amount of information it conveys. While I understand that more detailed documentation can be added to the drop-down box, the Pierce County Jail would do well to improve the documentation at the jail, as drop-down menus do not allow the full panoply of what might be at-issue and can be misleading, as it was here.

what is expected of a similarly situated provider. Mr. Nealis notes the patient is non-verbal; so how did he assess confusion? It is apparent from this note that the patient was seen at the request of the correctional staff.

Mr. Tapia's sudden altered mental status—demonstrated by confusion, disorientation, and nonverbal presentation—should have set off alarm bells and led to the immediate transfer or referral of the patient to medical for evaluation. It should be noted that in his sworn deposition testimony Mr. Nealis conducted this "interview," to the extent one can call it that, outside the door of the cell. The cell door has a small window and a food trap. This is not conducive to the evaluation of patients because an assessment conducted pursuant to the standard of care requires the patient to be brought out into the light in an area where a visualization of the patient can occur. At the very least, Mr. Nealis should have notified his supervisor that a complete evaluation of the patient had not occurred and that further measures needed to be taken. This is the beginning of half-measures and failure to thoroughly investigate the reason for Mr. Tapia's sudden change in mental status.

This patient had no prior history of mental illness except for a diagnosis of psychosis at the age of 16 without any subsequent admissions or treatment for mental illness.[2] And this diagnosis was not even known to anybody at Pierce County, including its contracted medical providers. There is no explanation or even assessment for why the Mr. Tapia "appears decompensated"—the complete lack of curiosity here is extraordinary and not what is expected of a similarly situated provider with Mr. Nealis' training and licensure under the standard of care.

On September 19, 2018, Mr. Nealis recommended a medical evaluation for Mr. Tapia—the first referral to medical he received for his altered mental status. However, the medical evaluation which occurred was conducted by LPN Mr. Carrillo, who was unqualified to complete a formal evaluation. Mr. Carillo recorded the following in the medical record: **"pt referred to medical due to being nonresponsive, pt BP hypertensive skin PWD, does not appear in distress, states he does not have any medical concern at this time but is upset of being in 3SC, states no SI will continue to monitor 9/19/2018 6:23:31 PM CDT."**[3] This note fails to meet the standard of care for someone being evaluated for an altered mental status. An altered mental status requires a full diagnostic evaluation. That did not occur in regard to Mr. Tapia. First, the vital signs are incomplete with only a blood pressure noted. A full set of vital signs would have included a heart

---

[2] SJMC_0228. In essence, Mr. Tapia went to the hospital because he was paranoid after ingesting marijuana. In his altered state, Mr. Tapia's description of the incident when he was a child may have been interpreted as a "history of paranoid schizophrenia." 191204 Multicare - Recs and Bills.pdf, at 262.

[3] The medical record is replete with time errors in events being recorded—times are recorded in CDT as opposed to PST. This could lead to numerous medication and documentation errors. Ensuring accurate time zone information is important for maintaining the chronological accuracy of medical records, especially for tracking patient care, medication administration, and other critical events. In healthcare settings where patients may travel or providers may operate across different time zones, accurately recording the time zone helps maintain consistency and clarity in patient care documentation. Failure to document times in the correct time zone could lead to confusion, errors in treatment, and potential legal issues. Therefore, it's standard practice for EHR systems to support time zone settings and for healthcare professionals to document times according to the relevant time zone.

rate, respiratory rate, and temperature. Second, the sudden onset of an altered mental status is alarming and required a complete and thorough workup, including a complete and accurate set of vital signs. The failure to perform such a work-up is the antecedent cause for the loss of Mr. Tapia's leg.

This failure to recognize the seriousness of this sudden onset of altered mental status and refer Mr. Tapia for appropriate evaluation extended throughout the organizational structure of NaphCare. In her deposition, Ms. Warren, a Naphcare RN, testified that LPNs did evaluations as a matter of NaphCare established practice. This in confirmed by the number of times NaphCare LPNs "attempted" to evaluate Mr. Tapia. RN Warren stated that "they look and see if people look like they're not normal today or they're not acting normal or their vitals are not normal." According to RN Warren, if the LPN had concerns, they would call the clinic and tell the charge nurse their concerns, and an RN would go up and evaluate the patient at that time, if there was a need. LPN Carrillo testified to the following: "I collected the data and reported the data back to the clinic RN." There is some question as to whether this actually occurred in Mr. Tapia's case because there is no documented record. Assuming that it did take place, if Mr. Carillo did in fact report concerns to the charge nurse, then the RN was negligent in not requesting a full examination, including a complete set of vital signs and a thorough assessment of the patient's mental status, including level or orientation, ability to follow commands, and neurological assessment. This could not be completed by the LPN as being outside their scope of practice, so an RN would have been obligated to complete such an assessment. If Mr. Carillo did not in fact report concerns to the charge nurse, he was practicing outside his scope of practice and failed to comport with the standard of care. This was the earliest time that a NaphCare intervention could have changed the course and outcome for Mr. Tapia, and the opportunity was squandered.

Also on September 19, 2018, the patient was seen again by Mr. Nealis. Mr. Nealis' note is almost a duplicate of his note the day prior, on 9/18/2018:

> **Met with I/M at about 1045 for initial assessment in response to C/D report. He presented again today as confused. I/M was again unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time. Officers report that he appears to be "way off his baseline," and he was nonverbal in court today as well. He could have an unknown medical condition. S/P: Referred to medical for assessment. Recommend continued level 1 MH housing at this time for further assessment, IVH will f/u. Referred to medical department for assessment. R/P: Deferred.**

It is extraordinary that Mr. Nealis documented that the patient was decompensated, way off his baseline, and non-verbal in court and then assumed that he had an unknown medical condition, but did not perform a complete mental health assessment. The standard of care required that he do a much more detailed mental health assessment, review Mr. Tapia's prior records, and initiate frequent reassessments under these circumstances. Mr. Tapia necessitated at least a phone call between mental health and medical providers. It appears throughout this record that the health care provided was disjointed and disorganized. The lack of communication between disciplines

was another rung in the ladder of cause and effect that led to the poor outcome for Mr. Tapia. The lack of communication between disciplines falls well below the standard of care.

There was also a lack of a standardized method of evaluation, as Mental Health provider Duane Prather testified to in his deposition. When asked if there was a standard for evaluating mental health status, Mr. Prather answered: "there could be." Prather also testified that there were forms available if someone felt like they needed them. Unfortunately for Mr. Tapia, Prather needed the form, because he did not "evaluate" Mr. Tapia at all. Instead, Mr. Prather testified that Pierce County mental health providers "did not do diagnoses . . . because we weren't billing insurance."

On September 20, 2018, Mr. Nealis had his next encounter with Mr. Tapia. Mr. Nealis' note is nearly identical to all of Mr. Nealis' previous notes in that it reflects the deterioration of Mr. Tapia. "**Mr. Tapia was awake but stays on bunk. I/M does not respond in any way to MHP, he just stared. I/M would not even shake his head yes or no. I/M was seen by medical yesterday. Recommend level 1 MH housing for observation. M/H to f/u.**" As with the other times that Mr. Tapia is seen by mental health, nothing is undertaken to discern why Mr. Tapia is in the condition he is in.

On September 26, 2018, it is unclear to me why when Mr. Tapia is seen, again by Mr. Nealis, but perhaps it was because he had not been seen by any provider—medical or mental health—in six days, despite his deteriorating condition and in contravention of the standard of care. Mr. Nealis noted: "Assessment: Attempted to meet with I/Mat about 1100 for initial assessment in response to C/D report. He presented again toda yas confused and non-verbal. He has been here at PCJ since June, but appears to be decompensated at this time." The note is almost verbatim to the note of 9/19/2018. The note should have indicated that the patient was continuing to decline and certainly that something beyond observation was needed. This would have been clear to even a non-professional, casual observer.

On September 28, 2018, Mr. Tapia is visited by a mental health provider and it is documented that he "**refused MH interview. IM would not answer mental health questions. IM just looked at MHP and did not respond to basic questions. Continue current housing. MH will f/u.**" Continued housing and follow up were not adequate substitutes for evaluation and treatment, which is what Mr. Tapia required and what the standard of care demanded: a full diagnostic evaluation. This is a case of the failure of the ability to comply and understand being mistook for refusal. This was clearly a case where the patient lacked capacity to refuse and there are no signed refusal documents by the patient. There should have been clear documentation of his mental status, correctly documented and signed refusal forms, and documentation of his mental capacity to refuse.

On September 29, 2018, Elizabeth Warren, RN, finally visited Mr. Tapia at the request of a jail sergeant. She documented the following:

> **Cell smells of urine. Sheet wrapped around waist. Alert, sitting up, one side of his bunk, under his own power. Makes eye contact when he is spoken to. Inmate will not verbally respond. Inmate will follow instructions with calm encouragement. Allowed assessment. 96.9 Apical pulse 100, S1S2 slow even respirations, rate 14-16, BP 127/77. Tongue wet, skin does not tent. No acute distress noted. Not sure inmate is eating every meal. Offered a chocolate ensure and he drank approx. ½ the container. Officer prepared his sandwich for him, handed it to him and he took the sandwich. Spoke with Sgt. Finley and ask if inmate could be put on a meal log and he agreed to start "Meal Log" Scheduled daily monitoring of VS x 3 days and scheduled Provider visit for evaluation.**

I find this note interesting because of the level of dehydration that the patient was noted to have two days later when he was admitted to the hospital with a blood urea nitrogen of 110, indicating severe dehydration. It should also be noted that there had been several days that the patient had been reported as not eating. One very simple way to assess his health status would have been to weigh him and collect a urine sample to assess for urine specific gravity. The fact that the cell smelled like urine was never addressed. Why did the cell smell like urine? Was it because Mr. Tapia was wetting in the floor or his bed because he was unable to get to the toilet? None of the most obvious and simple questions were ever answered by any of the providers who saw Mr. Tapia. The first question of importance would have been what's going on with this man who is way off his baseline? It was likely from the events and care provided to Mr. Tapia up to this point that his situation was not going to end well. That this registered nurse failed to recognize—or recognized and ignored—Mr. Tapia's decompensation is inexcusable. At this point, the need for a full diagnostic evaluation would have been obvious to the layman, let alone a medical or mental health professional.

On September 30, 2018, Mr. Tapia is noted to be "**uncooperative with MH interview. IM appears to be sleeping and did not respond to MHP knocks on door or calling name. I/M was observed moving and breathing in his bed. I/M cell was observed as messy and disorganized**." This is an example of the "drive-by" health care provided to Mr. Tapia. Except for two occasions, none of the practitioners entered the cell. This lack of responsiveness by the patient required a more thorough direct evaluation as to level of consciousness, orientation, and physical condition. There is no indication that this patient was able to cooperate with the MHP and there is no signed documentation of refusal.

On October 1, 2018, Mr. Tapia was seen by a correctional officer, who unlike the numerous medical professionals who had seen the patient in the previous days, noticed that his toes were turning black. The patient was noted to be non-verbal. Finally, Mr. Tapia was going to be transferred and evaluated for the first time in weeks.

Throughout this process, there was a lack of any oversight up the chain on the part of medical providers. There is no evidence that LPNs were being supervised by RNs, and no evidence that RNs are being supervised by a physician. Dr. Balderrama should have known about and

formulated a plan to assess and treat Mr. Tapia. The fact that the care provided to Mr. Tapia was left up to lower-level LPNs and mental health providers is indefensible.

**EXPERT OPINION 2:** The Mental Health Department only treated symptoms and did not make diagnoses. This is clearly not in compliance with the standard of care, which requires a diagnosis. "Diagnosis is a key part of how we communicate with our patients and each other. Indeed, in any situation in which more than one intervention is available some form of classification/diagnosis is needed to guide logical decisions about which intervention is better (or whether no intervention is the optimal option)."[4]

> **Throughout the diagnostic process, there is an ongoing assessment of whether sufficient information has been collected. If the diagnostic team members are not satisfied that the necessary information has been collected to explain the patient's health problem or that the information available is not consistent with a diagnosis, then the process of information gathering, information integration and interpretation, and developing a working diagnosis continues. When the diagnostic team members judge that they have arrived at an accurate and timely explanation of the patient's health problem, they communicate that explanation to the patient as the diagnosis.[5]**

Failure to try to arrive at a diagnosis is another rung in the ladder of failures that led to Mr. Tapia's poor outcome. It is unfortunate, and not consistent with the standard of care or my training and experience, that providers at the Pierce County Jail viewed the importance of a diagnosis as being related to billing insurance instead of a requirement to the provision of inmate care.

**Expert Opinion 3:** Observation is not a form of treatment. Mr. Tapia was kept in level 1 housing for further assessment; the only problem with this is that an assessment was never performed. It was required that all patients in level one housing be seen daily. At one point, Mr. Tapia was not seen for six consecutive days by any mental health or medical provider. Between September 20th to September the 26th the patient was not seen and evaluated, which was not within the standard of care. The standard of care dictates that an inmate in Mr. Tapia's condition and housing should be evaluated by a medical provider every day. He was not given the opportunity to have his mental health status changes evaluated and treated, which in my medical opinion would have prevented the deep venous thrombosis that the patient developed.

**EXPERT OPINION 4:** The medical record is replete with policies and established practices that caused Mr. Tapia's obvious and serious medical condition to slip through the cracks, as identified above. For instance:

---

[4] https://www.cambridge.org/core/journals/the-british-journal-of-psychiatry/article/psychiatric-diagnosis-impersonal-imperfect-and-important/C29813EAC72CCC801F4F17AC96126093
[5] https://www.ncbi.nlm.nih.gov/books/NBK338593/

- Not requiring medical or mental health providers to treat an inmate's sudden altered mental status as a medical emergency. This is basic medicine.[6]

- Attempting assessments through a small window and a food trap on the door of an inmate's cell (a.k.a. "drive-by" healthcare).

- Allowing LPNs to act outside of their scope of practice by conducting medical evaluations without adequate supervision.

- The lack of communication between mental health and medical providers.

- The lack of any oversight up the chain on the part of medical providers.

- Refusals (of medical care, mental health care, and meals) based on an inmate's non-response.

That these policies and established practices would result in serious harm or death to inmates would be obvious to any medical provider exercising his or her professional judgment.

**Expert Opinion 5**: The unfortunate outcome for Mr. Tapia is destined to be repeated. When asked in his deposition whether a sudden alteration in mental status can be a medical condition, Jonathan Slothower, NaphCare's nursing staff supervisor, answered "rarely it can be hypothetically." Mr. Shothower's lack of knowledge regarding the most basic aspects of medical care is astonishing. The evaluation and management of an altered mental status is broad and requires careful history and physical examination to eliminate life-threatening situations. Changes in consciousness can be categorized into changes of arousal, the content of consciousness, or a combination of both. Arousal includes wakefulness and/or alertness and can be described as hypoactivity or hyperactivity, while changes in the content of consciousness can lead to changes in self-awareness, expression, language, and emotions. The type of diagnostic evaluation that would have detected these symptoms did not occur at any time for Mr. Tapia. And, what is worse, even after the results of Mr. Tapia's poor care were known, no change in policy to prevent future such episodes. To the contrary, after Mr. Tapia's leg was amputated Mr. Slothower reviewed the medical record and did not "see anything outside of NaphCare policy or established practice." What is worse, Dr. Elliot Wade, NaphCare's Medical Director for Western States, approved the acts and omissions of the NaphCare nurses and LPNs in charge of Mr. Tapia's care, writing years after the fact, on June 16, 2020:

> Your notes were not lengthy at all, but they contained all of the necessary information needed at the time. And helped to establish that he was seen and taken seriously. . . . He's mad about his below the knee amputation, but in my opinion you did everything right and he's lucky. I know that this is often a thankless job, and just wanted to reach out and thank you all for the great job you did with him.

---

[6] https://my.clevelandclinic.org/health/diseases/23159-altered-mental-status-ams

Mr. Tapia's sudden altered mental status is well documented. It is well documented on multiple occasions that Mr. Tapia was not eating and not being himself. It is documented on more than one occasion that he was non-verbal. NaphCare's top brass' endorsement of the care provided to Mr. Tapia exhibits an institutional reckless disregard to the substantial risk of harm to similarly situated inmates. NaphCare's inability to assess the failure to comply with the standard of care leads one to believe that this could easily result in future patient harm.

In sum, Mr. Tapia suffered from a serious medical condition that would have been apparent to the most casual observer. But despite being seen by multiple providers, he was not given the thorough mental health and physical examination the standard of care required. Even after losing his limb the providers involved fail to recognize their substandard care. This lack of reflective hindsight is probably one of the more troubling aspects of this case.

_____

Johnny E. Bates, MD MMM CPE CCHP CCHP-P FASAM

**Johnny E. Bates, MD MMM CPE CCHP CCHP-P CPHIMS**
**Testimony List**
**Updated June 2023**

1) *Wilder v. Rockdale County, GA et al.*-United States District Court for the Northern District of Georgia (Atlanta Division) Case Number: 1:13-CV-27l5-RWS-Deposition Testimony.

2) *Mary Becker, as Temporary and/or Permanent Administrator of the Estate of Jason Hewitt Armsden v. Gayle Mercer et al.* United States District Court for the Northern District of Georgia (Gainesville Division) Case Number: NO. 2:09-CV-0047-RWS-Deposition Testimony.

3) *Frank Kruse, as Personal Representative of the Estates of Jacob Ashley Jordan v. Jimmie L. Williams et al.*, In Circuit Court of Baldwin County, Alabama Case Number CV-2013-901707-Trial Testimony.

4) *Irvin Shell, as Administrator of the Estate of Annie Ruth Peterson, deceased, v. City of Montgomery*, et al. In the Circuit Court of Montgomery County, Alabama, Case Number- CV- 2014-901569-Deposition Testimony.

5) *Bridgette Minton v. Jarvis Culver, et al.* In the United States District Court for the Middle District of Georgia (Macon Division) Case Number: 5:20-CV-00122-TES-Deposition Testimony.

6) *Wayne Gebhart v. William Spanenberg, M.D. and Crystal Brickert*, In the United States District Court for the Southern District of Indiana Case Number: No.: 2:19-cv-00387 Deposition Testimony

7) *James A. Boley, Jr., as Administrator of the estate of Robert Lee Boley, deceased v. Amor Correctional Services*, et al. In the United States District Court for the Eastern Division of Virginia (Norfolk Division) Case Number: 2:21-cv-00197 *De Bene* Esse Deposition

8) *Laura Garrett and Michael Garrett Sr., individually and as representatives of the Estate of Michael Garrett, Jr., deceased v. Comal County, et al*. In the United States District Court for the Western District of Texas (San Antonio Division) Case Number: 5:21-CV-00803-JKP-RBF Deposition Testimony.

9) *Gwandela Terrell and Lashunda Thompson as administrators of the estate of Lewis Terrell v. Phoebe Putney Memorial Hospital, Inc.*, *et al.* In the State Court of Dougherty County (Georgia) Civil Action No.: STSV2020000374-Deposition Testimony.

# Expert Witness – 2022 Rates

## Johnny Edward "Rusty" Bates, MD, MMM, CPE, CCHP, CCHP-P, CPHIMS

| Activity | Rate |
|---|---|
| **Retainer** (will be applied to initial case review activities) | $1,800.00 |
| **Case Review Expert Services** <br> All case activity, 30+ days before any verbal or written report is due. | $600/Hour |
| **Rush Rates for Case Review Expert Services** <br> Less than 30 Full days before any verbal or written report is due. | $650/Hour |
| **Testifying for Deposition** <br><br> Fee must be paid in advance by requesting attorney, 15 days prior. <br><br> If cancelled or rescheduled, 10 or more days prior, full refund. <br> If cancelled or rescheduled, 4-9 days prior, 75% refund. <br> If cancelled or rescheduled, less than 3 days prior, no refund and no rescheduling without new fee. <br><br> All estimated travel expenses must be paid by requesting attorney, 15 days prior. <br><br> Half day rate is arrival time to departure time at location, 4 hours. Continued questioning after 4 hours is billed. | $3,500 per Half Day Flat Rate 0-4 hours <br><br> $600.00/Hour thereafter |
| **Testifying for Panel Hearings, Trials, Arbitrations, and Mediations** <br><br> Fee must be paid in advance by requesting attorney, 15 days prior. <br><br> If cancelled or rescheduled, 10 or more business days prior, full refund. <br> If cancelled or rescheduled, 4-9 business days prior, 75% refund. <br> If cancelled or rescheduled, less than 3 business days prior, no refund and no rescheduling without new fee. <br><br> All estimated travel expenses must be paid by requesting attorney, 15 days prior. <br><br> Half day rate is arrival to departure time at location., 4 hours. Time on site greater than 4 hours is billed for full day. | $3,500.00 Half Day Flat Rate 0-4 hours <br><br> $6,000 per Full Day |
| **Travel Time for Testifying** <br> Maximum 8 hours per day. Overnight travel will be billed at 8 hours per day. Time calculated door to door. | $250.00/Hour |
| **Billable Expenses** <br> Meals while traveling - $100 per day, flat rate. Prepaid. | $100 Daily for Meals |
| **Invoices will typically be submitted at the end of each month that work is performed.** <br> **Invoices must be paid within 30 days, or case activity will be suspended until account is zero balance.** <br> **Balances 60+ days past due will be assessed a 5% monthly fee charged on 1st of each month until paid in full.** <br> **Zero balance required for all depositions and trial testimony. If short deadline, inquire about estimate to complete.** <br> **Submission of retainer constitutes absolute agreement with fee schedule terms. Do not use USPS for critical payments.** | **REQUIRED TERMS** |

Dr. Johnny Edward "Rusty" Bates
MD FASAM FACCP MMM CPE CCHP CCHP-P CPHIMS
88 Salser Lane
Columbiana, Alabama 35051
Telephone: (205) 382-2619          Email: johnny.bates@qchcweb.net

| | |
|---|---|
| BIOGRAPHICAL | DOB: 4/26/1956 |
| | Spouse: Patricia |
| | Children: Kameron, Bron, Karea |
| EDUCATION | |
| | University of Alabama Birmingham |
| | Bachelor of Science in Mathematics, 1979 |
| | |
| | University of Alabama School of Medicine |
| | Birmingham, Alabama |
| | Medical Doctor, 1983 |
| INTERNSHIP | University of Texas Medical Branch |
| | Galveston, Texas |
| | 4/1/1983 to 3/30/1984 |
| RESIDENCY | University of Texas Medical Branch |
| | Galveston, Texas |
| | 4/1/1984 to 3/30/1986 |
| MASTERS PROGRAMS | Hines School of Public Policy |
| | Carnegie-Mellon University |
| | Degree: Masters of Medical Management, 2002 |
| LICENSES | Alabama, Mississippi, Kentucky, Tennessee, Louisiana, and Illinois |
| BOARD CERTIFICATION | American Board of Preventive Medicine |
| | Specialty: Addiction Medicine |
| | Certification Date: 1/1/2020 Expiration: 12/31/2029 |
| | Certification Number: 61-3290 |
| | |
| | American Board of Internal Medicine |
| | Effective Date: 9/16/1987 Exp: N/A |
| | Certificate Number: 11073 |

OTHER CERTIFICATIONS/HONORS

Fellow, American Society of Addiction Medicine (FASAM)
Fellow, American College Correctional Physicians (FACCP)

Certification: Artificial Intelligence in Health Care Massachusetts Institute of Technology Sloan School of Management, Completed November 2021

The University of Texas at Austin McCombs School of Business Post Graduate Program in Artificial Intelligence and Machine Learning, Completed March 2022

American Board of Artificial Intelligence in Medicine, Credential for Knowledge in the Principles and Application of Artificial Intelligence and Human Cognition in Medicine and Healthcare, Granted February 2023

Certified Correctional Healthcare Professional (CCHP),
Certified Correctional Healthcare Professional-Physician (CCHP-P)
National Commission Correctional Healthcare

Certified Physician Executive
American College of Physician Executives

Certified Professional in Health Information and Management Systems
Healthcare Information and Management Systems Society

Advanced Trauma Life Support
American College of Surgeons

Advanced Cardiac Life Support
American Heart Association

WORK HISTORY

Quality Correctional Health Care
Birmingham, AL
Founder, President & CEO, 8/2005-Present

North Mississippi Medical Center-Hamilton
Hamilton, AL
8/1990-2004, Internal Medicine and Emergency Medicine

Citizens Baptist Medical Center
Talladega, AL
2006-2008, Emergency Medicine

NaphCare, Inc
Birmingham, AL
10/2003 to 8/2005, Corporate Medical Director & Chief Medical Information Officer

Hamilton Aged and Infirm Prison
Hamilton, AL
1992 to 4/2004, Medical Director

Marion County Nursing Home
Hamilton, AL
8/1990 to 4/2004

Johnny E. Bates, MDPC
Fayette, AL
4/1986 to 2/1990, Private Internal Medicine Practice

PROFESSIONAL LEADERSHIP

Patient Safety and Quality Outcomes Committee
Healthcare Information and Management Systems Society
Dates: 2005 to 2008

Alabama Medical Licensure Commission
Montgomery, AL
Dates: 2000 to 2010

Board of Directors NMHS
Dates: 1999 to 2004

Chief of Staff Marion County Medical Center
Dates: 1999 to 2002

Board of Directors Info Solutions
Blue Cross Blue Shield of Alabama
Electronic Health Records

PROFESSIONAL ASSOCIATIONS

American Medical Association
American Medical Informatics Association
American College of Physician Executives

        American College of Physicians
        Healthcare Information and Management Society
        Microsoft Healthcare Users Group
        American Correctional Health Services Association

### PRESENTATIONS

"APPLYING AI AND MACHINE LEARNING IN CORRECTIONAL MEDICINE" National Conference on Correctional Healthcare (NCCHC) Conference Spring 2023 New Orleans, Louisiana

"BODY SCANNERS 101" National Institute of Jail Operations Jail Conference West June 2021 Scottsdale, Arizona

"DRUG UPDATE PART 2: SYMPTOMS AND EFFECTS AND HOW TO BE A FIRST RESPONDER IF MEDICAL IS NOT AVAILABLE" National Institute of Jail Operations Jail Conference West June 2021 Scottsdale, Arizona

"MENTAL HEALTH-PSYCHOSIS AND SELF HARM" National Institute of Jail Operations Jail Conference West June 2021 Scottsdale, Arizona

"BOOKING AND SCREENING FOR WITHDRAWAL" Alabama Jail Training Association -Mental Health Basics October 2020 Prattville, Alabama.

"COMMUNICABLE DISEASES IN JAILS" Detention and Corrections Online Training Academy (DACOTA) for National Institute for Jail Operations (NIJO) March 2020

"THE LAST 48." National Institute of Jail Operations Jail Conference South August 2019 New Orleans, Louisiana

"DETOX: BOOKING, 3 DAY, LONG TERM." National Institute of Jail Operations Jail Conference South August 2019 New Orleans, Louisiana

"DETOX: BOOKING, 3 DAY, LONG TERM." National Institute of Jail Operations Jail Conference West June 2019 Scottsdale, Arizona

"DETOX PROTOCOLS FOR ALCOHOL AND OPIOID WITHDRAWAL" National Institute of Jail Operations Jail Conference South August 2018 New Orleans, Louisiana