# EXHIBIT 13

# Expert Report of
## Denise M. Panosky, DNP, RN, CNE, CCHP, FCNS

*Tapia v. NaphCare Inc., et al.*

1.      I have been a licensed Registered Nurse (RN) for the past 40 years. My professional clinical practice includes 25 years in an emergency department. For the past 17 years, I have taught students and nurses about practicing in a correctional setting, which includes clinical experience in the correctional setting. I earned a B.S. in Nursing in 1983, a M.S. in Nursing in 2006, and a Doctorate in Nursing in 2010. I have certifications as a Clinical Nurse Educator (CNE) and Correctional Health Professional (CCHP), and am a Forensic Clinical Nurse Specialist (FCNS). I have been the Task Force Chair of the International Association of Forensic Nurses (IAFN) Corrections Task Force for two years. I was also a workgroup member on the American Nurses Association (ANA) Correctional Task Force, revising the *Correctional Nursing: Scope and Standards of Practice* (2013). I have given more than 30 podium presentations at national and international correctional conferences, and have received honors in recognition of my contributions to correctional nursing. I have received five grants. I was a co-investigator and project coordinator for a large HRSA grant, "Nurse, Education, Practice, Quality, and Retention" to implement a nursing competency program to all correctional nurses in 12 state prisons/jails.

2.      During the year immediately preceding the occurrence giving rise to this lawsuit, I devoted a majority of my professional time to teaching nursing, including in a correctional setting.

3.      I am generally familiar with Federal Rule of Civil Procedure 26 as it relates to expert witnesses. My qualifications, along with a list of all publications I have authored during the previous 10 years, are attached in my CV as **Appendix A**. A list of cases during the last 4 years in which I have testified as an expert at trial or by deposition is attached as **Appendix B**. A statement of the compensation I am to be paid for my research and testimony in this case is attached as **Appendix C.**

4.      I have reviewed and relied upon the following relevant materials:

    a.      1-2.  8-15-22  First Amended Complaint

    b.      Jail Combined_Records

    c.      302530-302601 Combined_Records

    d.      RFP 27 - NaphCare Policies and Procedures (000247-479)

    e.      210930 PLT 1st Rogs RFP to NaphCare with ANSWERS

    f.      Rog 2, RFP 24 - List of caregivers-providers (000001-000002)

    g.      Rog 10 - Director of Nursing (000037-000040)

    h.      Rog 10 - Health Services Administrator (000041-000043)

  i.  Rog 10 - Licensed Practical-Vocational Nurse (000044-000045)

  j.  Rog 10 - Registered Nurse (000054-000056)

  k.  000060-000064 Kites

  l.  302519-302529 Additional_Records

  m.  000041-000059 Inmate Behavior Log Printout_REDACTED

  n.  Deposition of Carrillo LPN and Exhibits

  o.  Deposition of  Ricci LPN and Exhibits

  p.  Deposition of Warren RN and Exhibits

  q.  Deposition of Slothower RN HSA and Exhibits

  r.  Deposition of Bradley and Exhibits

  s.  Deposition of Knight and Exhibits

  t.  Deposition of Valley RD and Exhibits

  u.  Deposition of Perez and Exhibits

  v.  Deposition of Nealis and Exhibits

  w.  Deposition of Prather and Exhibits

  x.  Deposition of Dr. Wade and Exhibits


5.  It is my opinion, based upon my review of these materials, my background, training, and education that Registered Nurses (RN) Etsuko Yagi and Elizabeth Warren; unknown named Registered Nurses supervising Licensed Practical Nurses; and Licensed Practical Nurses (LPN) Jeff Kendig, Franklin Park, Juddy Marling, Cameron Carrillo, and Debra Ricci failed to exercise that degree of care, skill, and learning expected of a reasonable, prudent nurse acting in the same or similar circumstances.  There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained Registered Nurse and/or Licensed Practical Nurse would have recognized, and these nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk, based on their nursing training and education, was unacceptable and fell below what a reasonable and prudent nurse would do in the same or similar circumstances.  It is my further opinion that the acts and omissions of Registered Nurses Yagi and Warren, unknown named Registered Nurses supervising Licensed Practical Nurses; and Licensed Practical Nurses Kendig, Park, Marling, Carrillo, and Ricci fell below the nursing standard of care.

6.     My opinions are based upon the following facts, which are taken from the record provided to me.  This is not an exhaustive discussion of each and every fact upon which my opinions are based.  These facts are based on the reports and logs of those involved in Mr. Tapia's care; Mr. Tapia's medical record; deposition testimony and exhibits; and materials listed above.

a.     On 6-16-18, Mr. Tapia was arrested by the Tacoma Police.  At 02:00, he was booked into the Pierce County Jail (DEF PC 302590).

On 6-16-18, at 5:04:57 AM, a Receiving Screening was completed by Nurse Yagi RN (DEF PC 000656 – 000661).  Vital Signs were: BP 125/85, Temp. 97.6, Pulse 96, Resp. 16, SaO2 98, Ht. 5'7", and Wt. 153.[1]  Positive answers selected in the checkbox to questions include:

(i)     Substance Use Assessments, and checked was:

(i)     History or risk of alcohol or drug withdrawal, with details ">5days/week taking percoset [sic].Withdrawal:Achy, restless leg. Last taken was last night."

(ii)     Recent use of illegal drugs or prescription pain medications, with details: ">5days/week taking percoset [sic]. Withdrawal:Achy, restless leg. Last taken was last night."

(iii)     Most recent alcohol, sedative (e.g. Xanax, Klonopin, Valium, Ativan), or opioid (e.g. heroin, oxy, Lortab, methadone) with details ">5days/week taking percoset [sic].Withdrawal:Achy, restless leg. Last taken was last night.".

(ii)     Under Most recent alcohol, sedative, or opiate use:

(i)     5 days or less was marked.

(iii)     Disposition/Treatment Plan includes and checked are:

(i)     Release signed to obtain all medical records, pharmacy records, substance abuse records; and Inmate Educated on Access to Care Procedures.

(iv)     Housing Assignment includes and checked is:

(i)     General Population and Low Bunk.

Inmate Behavior Log Printout (DEF PC 000044) documentation by Nurse Yagi RN at 06:00 includes "low bunk/low tier x 3 days, ending 6/19/18, per detox."

---

[1] Note, however, that weight on the Vital Signs form on 6-16-18 is documented at 153 lb at 4:55 am and at 165 lb at 4:37 pm  (DEF PC 000281). Also, weight on 6-17-18 is documented at 165 lb (DEF PC 000281).

On 6-16-18, at 5:05:16 am, *19 seconds later*, a Mental Health Screening was completed by Nurse Yagi RN (DEF PC 000662 - 000666).

    (i)    The Suicide Risk Assessment includes a Positive response to question: 9) How does the inmate feel about the current situation? And the answer "ok" is documented.

    (ii)    The General Mental Health Assessments includes a positive response to questions: 17) Used illegal drugs or abused prescription drugs?; 18) Abused alcohol or sedatives?; and 19) Experienced significant alcohol or drug withdrawal?, with the same response documented ">5days/week taking percoset [sic].Withdrawal:Achy, restless leg. Last taken was last night." for all 3 questions.

    (iii)    General Assessments includes Positive responses to: Inmate Appearance: Mildly unkempt; and Inmate behavior: Cooperative.

    (iv)    Housing Assignment: General Population.

    (v)    Discharge Planning: Drug/Alcohol Treatment and Resource Info Packet are both checked, with Discharge needs reviewed with inmate? checked Yes.

On 6-16-18, at 5:06:42 am, Nurse Yagi RN documented Subjective, Objective, Assessment, and Plan (SOAP) Notes (DEF PC 000289 - 000290) with documentation including:

    (i)    Subjective "Patient with history of recent and/or significant opiate use. >5days/week taking percoset [sic].Withdrawal:Achy, restless leg. Last taken was last night. No symptoms at the time of booking."

    (ii)    Objective "UDS performed and results documented in TechCare.";

    (iii)    Assessment "Opiate withdrawal.";

    (iv)    Plan "Initiate COWS assessments with initiation of buprenorphine taper (different order template) once scores 12 or greater or per provider orders." Also documented is "-Comfort meds as ordered below., -Encourage po fluid intake., -Bottom bunk for safety.", with Treatment and Drug Names listed.

On 6-16-18, at 5:04:32 am, Nurse Yagi RN documented a Comprehensive Detox Screen (DEF PC 000558 - 000560).[2]  Opiate Screening is checked.

---

[2] Note, this time is before the Receiving Screening, Mental Health Screening, and SOAP Note was completed.

(i)      Opiate Withdrawal Screening Questions include: 1. Is the patient currently exhibiting opiate withdrawal symptoms? No checked; 2. Last opiate use: 3 or fewer days ago is marked, and, Number of days use per week, 4 or more days is marked.

This same time, Nurse Yagi RN also documented a COWS assessment (DEF PC 000555 - 000557).  Total COWS Score – 1 with "Minimal withdrawal symptoms. Consider reassessing within 8 hours." is documented.  Resting Pulse Rate "Measured after patient is sitting or lying for one minute 1 81-100" is documented.  Mr. Tapia's Pulse on the Vital Signs form on 6-16-18  is documented as 96 at 4:55 am and 100 at 4:37 pm. All other assessments are documented as 0 (zero).  Additional Comments: ">5days/week taking percoset [sic].Withdrawal:Achy, restless leg. Last taken was last night. No symptoms at the time of booking.".

On 6-16-18, at 4:38:46 pm, Kendig LPN documented a COWS assessment (DEF PC 000561 - 000563).  Total COWS Score – 0 with "Minimal withdrawal symptoms. Consider reassessing within 8 hours." is documented.  Resting Pulse Rate "Measured after patient is sitting or lying for one minute 0 80 or below" is documented, but **Mr. Tapia's Pulse is documented as 100**.  All other assessments are documented as 0 (zero).  Additional Comments: "Pt denies detox symptoms and will not be medicated.  Pt denies suicidal ideation.  Pt was hydrated with Gatorade and water."

b.      On 6-17-18, at 3:39:48 am, Park LPN documented a COWS assessment (DEF PC 000566 - 00056).  Total COWS Score – 0 with "Minimal withdrawal symptoms. Consider reassessing within 8 hours." is documented.  All other assessments are documented as 0 (zero) **Not Assessed**.  Additional Comments: "Did not want to get out of bed, no noted distress, verbally declined assessment.  C/D Otonez witness".  **Mr. Tapia did not have a COWS assessment at this time.**

On 6-17-18, at 4:04:41  pm, Kendig LPN, documented a COWS assessment (DEF PC 000567 - 000569).  Total COWS Score – 3 with "Minimal withdrawal symptoms. Consider reassessing within 8 hours." is documented.  Resting Pulse Rate "Measured after patient is sitting or lying for one minute 1 81-100" is documented.  **Sweating and Runy [sic] nose were not assessed.**  Bone or Joint Aches "1 Mild diffuse discomfort" is documented. Anxiety or Irritability "1  Patient increasing irritability or anxiousness" is documented.  All other assessments are documented as 0 (zero).  Additional Comments: "Pt report mild withdrawal symptoms and will be medicated according to detox protocol. Pt denies suicidal ideations. Pt was hydrated with Gatorade and water." At this same time, Mr. Tapia's **SaO2 was 93%**.  Mr. Tapia was administered PRN medications Loperamide, Ibuprofen, Dicyclomine, and Ondansetron (DEF PC 000256; NAPHCARE 000192).

c.      On 6-18-18, at 4:09:08 am, Marling LPN, documented a COWS assessment (DEF PC 000570 - 0000572).  Total COWS Score – 7 with "Mild withdrawal symptoms.  Consider reassessing within 8 hours." is documented.  Resting Pulse Rate "Measured after patient is sitting or lying for one minute 0 80 or below" is documented, but **Mr. Tapia's Pulse is documented as 96**.  Other assessments documented include: Restless "1 Reports difficulty sitting still but is able to do so"; Bone or Joint Aches "2 Patient reports severe diffuse aching of joints/muscles; Runy

[sic] Nose or Tearing "1 Nasal stuffiness or unusually moist eyes; and Gooseflesh Skin "3 Piloerection of skin can be felt or hairs standing up on arms".   All other assessments are documented as 0 (zero).  Additional Comments: "Pt resting on housing bunk, easily aroused. Able to verbally report restlessness severe body aches. Noted goosee bumpd [sic] to forearms and nasal drainage. Will continue to monitor." The records also indicate that Mr. Tapia was administered PRN medication Ibuprofen previously at 2:50 am (DEF PC 000256; NAPHCARE 000192).

On 6-18-18, at 7:25:11 pm, Kendig LPN, documented a COWS assessment (DEF PC 000573 - 000575). Refused is checked.   Total COWS Score – 0 with "Consider reassessing in 6 hours." is documented. All assessments are documented as "0 [zero] Not Assessed".  Additional Comments: "Pt refused to allow actual detox assessment and hydration with Gatorade and water. Pt denies suicidal ideation and upon casual observation appears free from obvious distress. Pt is oriented and alert."   Yet again, **Mr. Tapia did not have a COWS assessment at this time.**

d.      On 6-19-18, at 2:48:16 am, Park LPN, documented a COWS assessment (DEF PC 000576 - 000578).  Total COWS Score – 3 with "Minimal withdrawal symptoms. Consider reassessing within 8 hours. . Resting Pulse Rate "Measured after patient is sitting or lying for one minute 0 80 Not Assessed" is documented, but **Mr. Tapia's Pulse is documented as 96**.   Other assessments documented include: Bone of Joint Aches "1 Mild diffuse discomfort"; Runy [sic] Nose "1 Nasal stuffiness or unusually moist eyes"; and GI Upset "1 Stomach cramps". All other assessments are documented as 0 (zero).  There are no Additional Comments. Mr. Tapia was administered PRN medication Ibuprofen (DEF PC 000256; NAPHCARE 000192).  **Mr. Tapia was not administered Aluminum-Magnesium PRN as ordered for GI Upset** (DEF PC 000290).

On 6-19-18, at 8:19:39 am, Carrillo LPN documented SOAP Notes, with documentation including: "OPIATE discontinued,  REASON: per Dr. Balderrama ok to dc" (DEF PC 000289).

e.      On 6-20-18, at 11:52:49 am, Nurse Practitioner Irina Hughes documented SOAP Notes with documentation including: "UDA 6/16/18 + MET AMP ECT" (DEF PC 000289). Manual Urine Drug Screen Test results from 6-16-18 are Positive for MET (Methamphetamine), MDMA (Ecstasy), and AMP (Amphetamine)" (DEF PC 000681).  Mr. Tapia was administered PRN medication Ibuprofen previously at 10:06 am (DEF PC 000256; NAPHCARE 000192).

f.      There are no further Progress Notes for roughly the next 3 months.

g.      On 9-10-18, at 14:05 pm, an Inmate Behavior Log Printout  documentation by Alley includes "Seems to have difficulty following simple rules such as 1400hrs lockdown." (DEF PC 000044).

h.      On 9-13-, at 09:07 am, there is a note (Kite) documented "NEED SLEEP MEDICATION CAN'T SLEEP. HAVING SLEEP ISSUES." (DEF PC 000061).

i.      On 9-14-18, at 01:44 am, there is a Response to the above note (Kite) "You're scheduled to see the sick call nurse. please go when called" (DEF PC 000061).   There is also a Sick Call Note entered this same day, with the Mental Health Professional listed under

Name, with Reason "c/o insomnia. Canceled by jesus.perez on 9/14/18 Reason: Please encourage IM to kite MH office with current needs." (NAPHCARE 000214). **There is no further documentation that Mr. Tapia was seen or assessed by nursing staff or mental health staff.** . When asked about this entry in his Deposition (Pgs. 59-61), Perez MPH said:

> Q. . . . And then on the 14th, it looks like, later on that day, you -- **you canceled Mr. Tapia's medical kite; is that correct?**
>
> **A. Yeah, yeah. It looks like that's what I did.**
>
> Q. And so why were you responding to medical kites?
>
> A. . . . [S]o the system was getting bogged down. Like, there's so many kites coming in throughout the time, that we wanted everybody to be communicating directly. . . .
>
> Q. Okay. So it sounds like what you're saying, the system was sort of so bogged down at that time that you would go into the -- the sick call system and -- and you would respond directly to inmates instead of having a NaphCare employee refer it to you; is that fair to say?
>
> A.  Right, right.
>
>  (emphasis added).[3]


      j.      On 9-17-18, at 20:25, a Pierce County Detention and Corrections Center Observation Report by Knight included Inmate Behavior / Disturbing Mannerisms with a Description:

"On 9-17-18 at 2025, I observed Inmate Tapia, Javier[2D40] get off his bunk and throw his hands in the air and roll on to the floor near his bunk and begin to flail around and roll all around the floor. I called for an escort to step in due to his odd behavior and unknown mental state. As I approached him he was laying down in the fetal position and I told him to get up and he just stared at me. I gained control of his right arm and he started crying and mumbling unintelligibly.  I then gained control of his other arm and assisted him up and applied wrist restraints without incident. On the way out of the Unit he mumbled a few unintelligible remarks and was tearful and was acting very strange. I escorted him out of the unit and he was placed in a timeout cell by responding deputies." (DEF PC 000049).

 Comments included: "MHP Eval Requested. I/M Moved to 3SC." (DEF PC 000049). Housing unit 3S is the Pierce County Jail's "mental health, max security housing" unit. (Knight Deposition, Pg. 30); *see also* (Bradley Deposition, Pg. 12) (noting that inmates housed in 3SC are "in their cells for basically 23 hours a day by themselves").

      k.      On 9-18-18, at 4:48:10 pm, Nealis MHP, documented an assessment which included:

---

[3] This reading of the Sick Call Note—that Mr. Perez "canceled" Mr. Tapia's appointment with "the sick call nurse"— is confirmed by fellow mental health provider Duane Prather. (Prather Deposition, Pg. 34).

"Met with I/M about 1100 for initial assessment in response to C/D report.  He came to the door and was cooperative during the interview, but **appears to be confused** and was unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time.  His UA was positive for Methamphetamins [sic] when he booked in on 6/16/18." Documented Plan "Recommended continued level 1 MH housing at this time for further assessments. MH will f/u." (DEF PC 000289; DEF PC 000043) (emphasis added).

Inmate Behavior Log Printout documentation by Vadala at 17:03 includes "Verbally refused dinner meal." (DEF PC 000044).

    l.  On 9-19-18, at 5:36:46 pm, Nealis MHP, documented an assessment  which included:

"Met with I/M at about 1045 for initial assessment in response to C/D report.  He presented again today as **confused**.  I/M was unable to verbally respond to my questions.  He has been here at PCJ since June, but appears to be **decompensated** at this time. Officers report that he appears to be "**way off his baseline**," and he was **nonverbal** in court today as well. He could have an unknown medical condition."   Documented Plan: "Referred to medical for assessment.  Recommended continued level 1 MH housing at this time for further assessment.  MH will f/u. Referred to medical department for assessment." (DEF PC 000288; DEF PC 000043; DEF PC 302595) (emphasis added).

In Nealis MHP Deposition (Pgs. 30-31), he testified that he "walked to the nurses station" and verbally referred Mr. Tapia for an assessment, but does not recall what, specifically, he told medical or who he told it to.

    On 9-19-18, at 6:23:31 pm, Carrillo LPN, documented "pt referred to medical due to being **nonresponsive, pt BP hypertensive** skin PWD, does not appear in distress, stated he does not have any medical concern at this time but is upset of being in 3SC, states no SI will continue to monitor" (DEF PC 000288) (emphasis added).  Mr. Tapia's Blood Pressure (BP) of **150/98** is documented on the Vital Sign form (DEF PC 000281).  There is no documentation that a nurse or doctor (RN, NP, or MD) was notified of these findings.  There is no documentation of any follow up or monitoring, including a BP recheck when Mr. Tapia's **BP was elevated**.  In Carrillo LPN's Deposition (Pg. 15) when asked what "data collection" consists of, he answered "Vitals, general patient condition, and I just take that information and report it to someone with a higher licensure. It could be anything from assisting an RN with an assessment to filling out the forms for detox which are then reviewed by a provider.".  When asked about tasks he can perform, Carrillo LPN answered "I can perform quite a few tasks as delegated by the RN or provider." and "I collect the data and then I report back to the RN or provider.".  Carrillo LPN did not report the data he collected on Mr. Tapia, including his condition and/or elevated BP, to a RN or provider, or ask for assistance with the assessment.

    m.  On 9-20-18, at 9:08:43 pm, Prather MHP, documented "I/M seen about 1110 for MH f/u. I/M is awake but stays on his bunk. I/M does **not respond in any way** to MHP, he just stared. I/M would not even shake his head yes or no. I/M was seen by medical  yesterday." Documented Plan" Recommend level 1 MH housing for observation. MH to f/u.".  (DEF PC 000288; DEF PC 000043) (emphasis added).

n.      From 9-21-18 through 9-29-18, Mr. Tapia's Inmate Behavior Log Printout documentation by Officers includes documentation that Mr. Tapia "verbally refused" at least 8 meals. (DEF PC 000042-000043) This does not mean that Mr. Tapia was actually verbal with the officers. As explained by corrections officer Jonah Bradley in his Deposition (Pgs. 13-15; 24-26), and who documented verbal refusals for Mr. Tapia:

Q.  Okay.  And I think you mentioned earlier that there's a drop-down system, correct?

A.  Correct.

Q.  And one of the options is VRM, which would indicate Verbally Refused Meal, correct?

A. Correct. . . .

Q.  So specifically when it comes to refusing meals, what are the options?

A.  Just verbally refused meal.

Q.  Okay.  There's no other option?

A.  No. . . .

Q.  What if an inmate just waved you off without . . . saying anything?

A.  Then I would take that as a refusal.

Q.  And you would indicate it as VRM?

A.  Correct. . . .

Q.  And if somebody were to wave you off and not saying anything, would you write out "verbally refused breakfast"?

A. Correct.

Q.  Even if someone -- so in this, you would write "verbally" even if they didn't say anything?

A.  Correct. . . .

Q.  And so if they just stared at you and didn't say anything, didn't wave, would you write "verbally refused meal"?

A. Yes. . . .

Q. . . . So let's say that they are sitting in bed just staring at the wall not -- and you come up and ask them if they would like a meal. They don't move. They don't acknowledge your presence in any way. They don't wave. They don't say anything. Would you write "verbally refused breakfast"? . . .

A. Correct. . . .

Q. Okay.  So just so we're clear, if it was observed that an inmate had not eaten a meal that had been served to him, that would not be documented anywhere unless the process for a hunger strike was initiated previously by a medical provider; is that correct? . . .

A.  Correct.

Nor does it indicate that Mr. Tapia ate the meals that he was served (Bradley Deposition, Pg. 38):

Q. Okay.  So just so we're clear, if it was observed that an inmate had not eaten a meal that had been served to him, that would not be documented anywhere unless the process for a hunger strike was initiated previously by a medical provider; is that correct? . . .

A.  Correct.

o.    There are no Progress Notes for the next 5 days (From 9-21-18 through 9-26-18).  **Mr. Tapia was not assessed and did not receive follow up care, or any care at all, as there is no documentation on Progress Notes over these 5 days.**

p.    On 9-26-18, at 5:41:40 pm, Nealis MHP documented "Attempted to meet with I/M about 1100 for initial assessment I response to C/D report.  He presented again today as **confused and non-verbal**.  He has been here at PCJ since June, but appears to be **decompensated** at this time."  Documented Plan: "Recommend continues level 1 MH housing at this time for further assessment. MH will f/u." (DEF PC 000288; DEF PC 000042-000043) (emphasis added).

q.    On 9-28-18, at 6:38:05 pm, Perez MHP documented "I/M was seen at about 10:30 for MH f/u. I/M refused MH interview. I/M presents **MH symptoms**. I/M would not answer MH questions. I/M just looked at MHP and **did not respond** to basic questions."  Documented Plan: "Continue current housing. MH will f/u." (DEF PC 000288; DEF PC 000042) (emphasis added).

r.    On 9-29-18, at 11:00, a Pierce County Detention and Corrections Center Observation Report by Oeltjen included Inmate Behavior / Disturbing Mannerisms with a Description:

"Inmate Tapia **would not respond to me verbally** when I asked him if he wanted lunch. He did look up at me but would not answer. A search of his behavior log indicates he has been **refusing meals** periodically. I place a sack meal in his cell and will monitor to see if he eats. Recommend MHP follow up." Comments: "Inmate assessed by Nurse Warren, Mental Health and clinic to follow up. Please log meal refusals." (DEF PC 000042 and 000048)  (emphasis added).

On 9-29-18, at 3:07:04 pm, Nurse Warren RN was requested by a Seargent to see Mr. Tapia in his cell.  Nurse Warren RN documented:

 "Cell smells of urine. Sheet wrapped around waist. Alert, sitting up, on the side of his bunk, under his own power, Makes eye contact when he is spoken to. **Inmate will not verbally respond**. Inmate will follow instructions with calm encouragement. Allowed assessment. 96.9, Apical pulse 100, S1S2, slow, even respirations, rate 14-16, BP 127/77. Tongue wet skin does not tent. No acute distress noted. Not sure if inmate is eating every  meal. Offered a chocolate ensure and he drank approx ½ the container. Officer prepared his sandwich for him, handed it to him and he tool the sandwich. Spoke with Sgt Finley and asked if inmate could be put on a meal log and he agreed to

10

start "Meal Log" Schedule daily monitoring of VS x 3 days and schedule Provider visit for evaluation." (DEF PC 000287) )  (emphasis added).

**There are no Vital Signs or nursing assessment** documented for the next day, 9-30-18.  There is a Sick Call Note  with documentation "Medical Provider" listed under Name, with Reason: "Mental Health ask that a Provider evaluate inmate to R/O any Medical issues see note dated 9/29/18."  (NAPHCARE 000214).  **There is no documentation that a Provider evaluated Mr. Tapia this day, or any day prior to 10-1-18**.

      s.     On 9-30-18, at 1:52:57 pm, Poo MHP documented "I/M seen at about 1040 for assessment in response to C/D report. I/M was uncooperative with MH interview. I/M appeared to be sleeping and **did not respond** to MHP knocks on door or calling name. I/M was observed moving and breathing in his bed. I/M cell was observed as messy and disorganized." Documented plan includes "Recommend level 1 MH housing. MH to f/u" (DEF PC 000287; DEF PC 000042) (emphasis added).

      t.     On 10-1-18, at 7:13:13 am, Ricci LPN documented on the Treatment Administration form and Medication Refusal form that Mr. Tapia "refused" vital signs (DEF PC 000898; DEF PC 001183).  There is no Progress Note documentation about this refusal and there is no Witness Signature on the Medication Refusal Form that was completed.  When asked in her Deposition (Pg. 18) about why the witness signature if blank, she answered "Well, when the inmate refuses to sign the refusal, then he doesn't sign it, and the witness is generally the corrections officer, and they most of the time don't want to sign it either.".   When asked (pg. 19) Did you notify your supervising physician or RN, she answered "I don't recall."  The Refusal of Health Care Services Policy (NCI 000458) 1) c) was not followed as the Release of Responsibility Form – Specific Procedure was not signed and/or witnessed by medical staff, the patient, and/or a witness; and 1) e ) Refusals of medical treatment for serious conditions will be communicated to the facility's Medical Director, and this was not done (Ricci Deposition, Pgs. 20-22). When asked (Pg. 23) if she contacted the provider or charge nurse, she answered "I don't recall." and when asked if she would have, would it have been somewhere in his medical record, she answered "Yes, usually I would do that." and "I would chart it, yes." There is no documentation that Ricci LPN notified a Registered Nurse or Medical Healthcare Provider.

      On 10-1-18, at 11:10 am, the Inmate Behavior Log Printout documentation by Wilson includes "While serving lunch today, C/D Paukert observed inmate's foot to be purple//black color. C/D immediately called the clinic. Per clinical assessment, inmate was transported to the clinic in a wheelchair." (DEF PC 000042).

      On 10-1-18, at 12:32:57 pm, Nurse Chalk RN documented:

 "Asked to see inmate by unit officer for c/o "**toes turning black**". Upon visual inspection, **left foot slightly swollen and severely discolored**. Inmate brought to clinic via wheelchair. Vital: BP 111/80 T 97.9 P 105 SpO2 94% RA Inmate is **non-verbal and does not answer questions**. Spoken to by MHP and **reported having pain**, but **does not recall what happened** or when. Per provider, M Balderrama and I. Hughes, Inmate **referred to Tacoma General ED**." (DEF PC 000287) (emphasis added).

On 10-1-18, at 12:35:23 pm, Dr. Balderrama, Pierce County's Medical Director, documented:

"pt seen with nursing staff has evidence of poss vascular deficits on left foot with edema needs ER evaluation for poss emergent surgical management" (DEF PC 000287).

On 10-1-18, at 12:14:11 pm, Nurse Chalk RN documented on an ER Referral form (Note this time is before Nurse Chalk's and Medical Director Balderrama's Progress Notes.) Documentation by Nurse Chalk RN includes that Mr. Tapia was sent to the ER by Squad Car for "Suspected gangrene". Vital Signs are documented as her Progress Note above (at 12:32:57), with the Referring Provider: Balderrama, and the Destination ER/Hospital: Tacoma General Hospital. (DEF PC 000675 - 000677). The Pierce County Detention and Corrections Center Incident Report documentation includes "Inmate Tapia was sent to Tacoma General Hospital for a swollen, black foot. Taken by C/D's Ferrell and M. Jackson." (DEF PC 000047).

On 10-1-18, at 15:31 pm, an Inmate Behavior Log Printout documentation by Lee includes: "Inmate was admitted to the hospital during day shift." (DEF PC 000042).

On 10-1-18, at 5:05:52 pm, Nealis MHP documented an assessment "Met with I/M at about 1045 for MH f/u in the clinic. He presented again today as **confused** and non-verbal, but was also calm and cooperating with medical staff." Documented Plan: "Will be sent to ER for further assessment. Recommend continued level 1 MH housing for this time for further assessment. MH will f/u." (DEF PC 000286 - 000287) (emphasis added).

On 10-1-18, at 5:33:55 pm, Nurse Chalk RN documented "Per Isac, RN at Tacoma General ED, inmate will be admitted for gangrene." (DEF PC 000287).

On 10-22-18, at 4:05:51 pm, Nurse Martin RN documented on an ER Discharge form that Mr. Tapia returned from Tacoma General Hospital. Documentation includes: Please list the hospital diagnosis and patient outcomes: "woundcare, pain management, stump shrinker, knee immobilizer, phlegmasia cerulea dolens of left lower extremity (TG medica diagnosis)" is documented. A Provider was notified and the patient was not released from custody. Vital Signs: BP 108/79 Temp 97 Pulse 100 Resp 16 SaO2 98 and Pain 3 are documented. (DEF PC 000678).

u.     From 10-2-18 through 11-12-18, there are further Progress Notes documented by Nursing (DON, RN, NP), Social Worker (MHP), and Medical ACP (Medical Director) throughout Mr. Tapia's hospitalization and return to the Pierce County Jail (DEF PC 000283 - 000286).

7.     "Respect for patients and regard for their well-being must be the primary posture for health care providers" in a correctional setting. (Anno, 2009, Pg. 70). "Correctional nurses have a primary role as patient advocates and champions for inmate health care." (ANA, 2013, Pg. 10). Moreover, "[t]he right to receive care is a fundamental component of the deliberate indifference standard. When access to care is delayed or denied, patients are placed in jeopardy." (Schoenly & Knox, 2013, Pg. 80). "[C]orrectional health professionals must guard against burnout, which usually emerges as a belief that many or most inmates are faking. That . . . can do harm by causing the health professional to ignore valid symptoms and deny or delay needed

treatment." (Anno, Pg. 80)  [H]ealth care staff [are] expected to respond to requests for primary and ambulatory care and make appropriate referrals to clinical specialists (Anno, Pg. 70).  With these general principles in mind, it is my opinion, that the nursing treatment of Mr. Tapia fell far below the appropriate standard of care and violated generally accepted standards for the provision of health care in the following respects:

      a.     On 6-16-18, Nurse Yagi RN completed a Receiving Screening, a Mental Health Screening, a Comprehensive Detox Screening, a COWS Assessment, and documented SOAP Notes on Mr. Tapia.  It was known at this time that Mr. Tapia used Percocet > 5 days/week and his last use was "last night".  Withdrawal symptoms included achy and restless legs, but he had no symptoms at booking.  He was assigned to General Population with a lower bunk for safety.  A Urine Drug Screen was performed with Positive findings for MET (Methamphetamine), MDMA (Ecstasy), and AMP (Amphetamine) and COWS assessments were initiated.

      Over the next 3 days, 7 COWS Assessments were documented, with scores between 0 (zero) and 7 (seven).  One COWS Assessment was completed by Nurse Yagi RN and 6 COWS Assessments were completed independently by LPNs Kendig, Park, and Marling.  Six assessments included documentation of "Consider reassessing within 8 hours." with one "Consider reassessing in 6 hours.", but no COWS Assessment were reassessed within this time period.  Six reassessments were completed between 11 hours and 13 hours later, with one completed 7 hours later.  On 6-19-18, "OPIATE discontinued" per Dr. Balderrama was documented and no further COWS Assessments were completed.

      All 6 COWS Assessment scores by these 3 LPNs are documented inappropriately and/or incorrectly.  It is clearly documented that areas of the COWS Assessment were not assessed, but scores of 0 (zero) were given; Resting Pulse Rate score was 0 (zero) for pulse 80 or below, with documented pulses of 100, 96, 96; and documentation "verbally declined assessment" or "refused to allow actual detox assessment", but a total COWS Score was documented as 0 (zero).  Mr. Tapia had increasing withdrawal signs, from minimal to mild, with an O2Sat of 93%, incorrect  Resting Pulse Assessment of 0 (zero) with Pulse of 96, and incorrect COWS Score of 7.  There is no documentation that any RN or MD was notified of any of these findings. These LPNs are working outside their nursing scope of practice and cannot independently complete assessments and/or make treatment decisions.  Per the NaphCare Policy for the Licensed Practical/Vocational Nurse (LPN/LVN) (NCI 000044-000045) the LPN/LVN Position Summary includes "Under the direct supervision of the Health Service Administrator (HSA), Director of Nursing (DON), and Registered Nurse(s) (RN), the LPN/LVN is responsible for providing nursing care within the scope of the State Board of Nursing Practice as directed by the Registered Nurse(s)."  Registered Nurses are responsible for the direct clinical supervision of nursing/LPN staff, but there was no direct RN supervision. The LPN did not "Work cohesively with the HSA, DON, and RN(s) in the coordination of the healthcare delivery system…" or "…report all changes in patients' conditions." required by NaphCare's written policy.  RNs did not follow the NaphCare's written policy for the Registered Nurse (RN) (NCI 000054-000055) to "Observe and evaluate the performance of the licensed practical/vocational nursing staff."  Mr. Tapia never saw a Registered Nurse during these 6 LPNs COWS Assessments to assess and determine appropriate treatment/observations or care to be provided. Based on the provision of care given to Mr. Tapia during this time period, it appears that NaphCare had a custom and established practice of requiring LPNs to work outside of their nursing scope of practice by independently completing assessments

and/or making treatment decisions. That such a custom or established practice would result in harm or serious injury to patient inmates would be obvious to any nursing professional exercising his or her professional judgment.

b.      There are no further Progress Notes for the next 3 months. There is no documentation that Mr. Tapia was seen or assessed by any nursing staff or medical healthcare providers for 3 months.

c.      On 9-18-18, Mr. Tapia was seen by Nealis MHP, who documented that Mr. Tapia was confused and unable to verbally respond to questions and appeared to be decompensated.  Nealis MHP did not report these assessment findings to any  nurse or medical healthcare provider.  Instead, the documented plan was to continue MH housing and follow up. Mr. Tapia should have been referred and/or sent to medical at this time for a nursing and/or medical assessment. Patients who are confused, unable to verbally respond, and are decompensated need a thorough nursing and/or medical assessment, and/or evaluation at a higher level of care facility in a Hospital Emergency Department.

d.      On 9-19-18, Mr. Tapia was seen again, almost 26 hours later,  by Nealis MHP, who documented that Mr. Tapia presented again as confused, unable to verbally respond to questions, and appears to be decompensated, with Officers reporting Mr. Tapia was "way off his baseline".  Finally, Nealis  MHP referred Mr. Tapia to medical for an assessment, with a plan to continue MH housing and follow up. Mr. Tapia should have been immediately <u>sent</u> to medical at this time for a thorough nursing and/or medical assessment and evaluation. Patients who are confused, unable to verbally respond, and are decompensated need an immediate thorough nursing and/or medical assessment in a timely manner, in order to receive the treatment and care needed. Mr. Tapia was not assessed or seen by  a nurse or a medical healthcare provider at this time.

e.      On 9-19-18, Carrillo LPN documented that Mr. Tapia was referred to medical for being nonresponsive, was hypertensive (high blood pressure) with a BP of 150/98, and does not appear to be in distress.  There is no thorough nursing data collection completed by Carrillo LPN or any assessment by a Registered Nurse.  There is no evaluation or assessment by any Medical Healthcare Provider.  Mr. Tapia was reported to have confusion, unable to verbally respond, was decompensated, and "way off his baseline" for the past 2 days.  There is no neurological assessment, or any assessment, by any Registered Nurse or Healthcare Provider.  No other Vital Signs were obtained.  Carrillo LPN did not report these findings to his RN supervisor, and is working outside of his LPN scope of practice by working independently and making independent decisions about Mr. Tapia's care and treatment, or essentially, <u>NO</u> care or treatment. Carrillo LPN made the independent decision to continue monitor, and <u>not</u> to notify a Registered Nurse or Medical Healthcare Provider, and <u>NOT</u> to deliver the care and treatment(s) Mr. Tapia needed.  When asked in Carrillo LPN's Deposition (Pgs. 18-19 ), questions about what was the name of the physician or RN tht you were working with…and did you report back to the clinic RN working that day…and did you report your note here to an RN or physician, Carrillo LPN continued answering "it's my standard practice to always report back to the clinic RN.", but there is no documentation that Carillo LPN ever reported anything to the clinic RN. There also is no RN assessment for Mr. Tapia this day.  When asked in Carrillo LPN's Deposition (Pgs. 22-25) if he: reviewed the MHP notes; received any other information about Mr. Tapia's previous disposition; had information about when he started expressing this apparent mental health issue; had

14

information about how long Mr. Tapia had been incarcerated' or any other information about his previous health issues, he answered "I did not, other than mental health saying he was nonresponsive".  When asked what was the purpose of your assessment (pg. 25), Carrillo LPN answered "Under my license I'm not allowed to do - - I'm not able to do assessments and I'm not able to diagnose. So my purpose of my visit was to collect date and check on a patient who was nonresponsive.".  When asked what were you looking for when you mean check on - - check on the patient, he answered "Just a general - - just general appearance, vital signs.  I ask - - generally ask them if they have any medical or mental health concerns…I just asked him if he had any medical concerns, and he stated no."  This is now the **second day** that Mr. Tapia was not assessed by a Registered Nurse or Medical Healthcare Provider for a thorough nursing and/or medical assessment when he was having confusion, unable to verbally respond, was decompensated, and "way off his baseline".  Mr. Tapia should have been <u>immediately</u> sent for an assessment by a Registered Nurse or a Medical Healthcare Provider, or for an evaluation at a higher level of care facility in a Hospital Emergency Department.  There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained Registered Nurse and/or Licensed Practical Nurse would have recognized, and these nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk, based on their nursing training and education, was unacceptable and fell below what a reasonable and prudent nurse would do in the same or similar circumstances.  Based on the provision of care to Mr. Tapia during this time period, and LPN Carrillo's Deposition (pg. 34) testimony that his assessment of Mr. Tapia "comport[ed] with NaphCare's policies and established practices," it appears that NaphCare had a custom and established practice of requiring LPNs to work outside of their nursing scope of practice by independently completing assessments and/or making treatment decisions. That such a custom or established practice would result in harm or serious injury to patient inmates would be obvious to any nursing professional exercising his or her professional judgment.

      f.     Licensed Practical Nurses Kendig, Park, Marling, Carrillo, and Ricci are working outside of their LPN nursing scope of practice, with no supervision by a Registered Nurse, or under the direction and supervision of a Licensed Physician, Physician Assistant, Advanced Registered Nurse Practitioner,  or Registered Nurse, which is required under the WA State Board of Nursing Licensed Practical Nursing Practice (RCW 18.79.060) and the NaphCare Policy for the Licensed Practical/Vocational Nurse (LPN/LVN) (NCI 000044-000045). Specifically, these LPNs are functioning independently, completing independent assessments, when their LPN license only allows for data collection, and making independent decisions about patient treatment and care, or lack of care, for Mr. Tapia.  They do not have the authority, or License, to independently complete COWS Assessments with no reporting to a Registered Nurse, or to make independent decisions or assessments regarding any treatment plan(s) and care. These LPNs incorrectly collected data/assessed and incorrectly documented COWS Scores, did not call or notify  a Registered Nurse or Physician about Mr. Tapia's symptoms or condition, did not refer Mr. Tapia to a medical provider, and chose <u>not</u> to send him to the Emergency Department for medical care or evaluation. These LPNs did not practice under the direction of a Registered Nurse or Physician as they are required to do under their LPN license and Scope of Practice.  LPNs working at Pierce County Jail are working outside their Scope and Practice of their LPN license.  There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained Registered Nurse and/or Licensed Practical Nurse would have recognized, and these nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk, based on their nursing training and education, was unacceptable and fell below what a reasonable and prudent nurse would do in the

same or similar circumstances. Based on the provision of care to Mr. Tapia during this time period, it appears that NaphCare had a custom and established practice of requiring LPNs to work outside of their nursing scope of practice by independently completing assessments and/or making treatment decisions. That such a custom or established practice would result in harm or serious injury to patient inmates would be obvious to any nursing professional exercising his or her professional judgment.

g.    On 9-20-18, Mr. Tapia was seen by Prather MHP who documented Mr. Tapia does not respond in any way and he just stared, not even shaking his head yes or no. Prather MHP did not report these assessment findings to any nurse or medical healthcare provider. Instead, the documented plan was to continue MH housing for observation and follow up. Mr. Tapia should have been immediately referred and/or sent to medical at this time for a nursing and/or medical assessment. This was another missed opportunity to help and care for Mr. Tapia. Patients who are confused and unable to respond in any way, need a thorough nursing and/or medical assessment, and/or evaluation at a higher level of care facility in a Hospital Emergency Department.

h.    There are no further Progress Notes for the next 5 days. There was no follow up or observation or care documented for 5 days. There is no documentation that Mr. Tapia was seen or assessed by any mental health staff, nursing staff, or medical healthcare providers for another 5 days. Mr. Tapia's serious medical condition and medical needs were essentially ignored during this time.

i.    On 9-26-18 and 9-28-18, Mr. Tapia was seen by Nealis MHP and Perez MHP. Documentation continues with Mr. Tapia presenting with confusion, being non-verbal, decompensated, and not responding to basic questions. The only plan at this time is to continue MH housing for further assessment and follow up. No MHP seeing Mr. Tapia is reporting these assessment findings to any nurse or medical healthcare provider. Instead, the documented plan was to continue MH housing for observation and follow up. Mr. Tapia should have been immediately referred and/or sent to medical at this time for a nursing or medical assessment. This was another missed opportunity to help and deliver the care that Mr. Tapia needed. Patients who are confused and in Mr. Tapia's condition, need a thorough nursing and/or medical assessment, and/or evaluation at a higher level of care facility in a Hospital Emergency Department.

j.    On 9-29-18, Nurse Warren RN was requested by a Seargent to see Mr. Tapia in his cell. Nurse Warren RN documented that Mr. Tapia's cell smelled of urine and he has a sheet wrapped round his waist; that Mr. Tapia is alert, sitting on his bunk, and making eye contact; and that he will not verbally respond, but follows instructions. Vital Signs were: Pulse 100, Resp 14-16, BP 127/77. There is no documentation that a thorough nursing assessment was completed, specifically a comprehensive head-to-toe assessment, and neurological assessment when it was clearly known and documented many time that Mr. Tapia was confused, unable to verbally respond, was decompensated, and "way off his baseline". There is no documentation about why his cell smells of urine, or if he has any pain. Mr. Tapia needed a thorough nursing assessment and/or thorough medical assessment when he was having confusion, unable to verbally respond, was decompensated, and "way off his baseline". Mr. Tapia should have been immediately sent for an assessment by Medical Healthcare Provider at this time. Nurse Warren RN scheduled a

Provided visit for evaluation, but did not notify a Healthcare Provider of Mr. Tapia's symptoms or condition. Nurse Warren RN could have also <u>immediately</u> sent Mr. Tapia for an evaluation at a higher level of care facility in a Hospital Emergency Department, but she choose **not** to do either. This was a **third** opportunity to get Mr. Tapia the medical care and treatment he needed. There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained Registered Nurse and/or Licensed Practical Nurse would have recognized, and these nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk, based on their nursing training and education, was unacceptable and fell below what a reasonable and prudent nurse would do in the same or similar circumstances.

k.      On 9-30-18, Mr. Tapia was seen by Poo MHP who documented Mr. Tapia was uncooperative; appeared to be sleeping; did not respond to knocks on the door or calling name; and that his cell was messy and disorganized. Once again, a MHP did not report these assessment findings to any nurse or medical healthcare provider. Instead, the documented plan was to recommend MH housing and follow up. Mr. Tapia should have been referred and/or sent to medical at this time for a nursing and/or medical assessment. This was **fourth** missed opportunity to help and care for Mr. Tapia. Patients who are unable to respond in any way, need a thorough nursing and/or medical assessment, and/or evaluation at a higher level of care facility in a Hospital Emergency Department.

l.      On 10-1-18, Nurse Chalk RN was asked to see Mr. Tapia for "toes turning black". Nurse Chalk RN documented that Mr. Tapia's left foot was slightly swollen and severely discolored. Mr. Tapia was finally brought to the clinic for an assessment and medical evaluation. Mr. Tapia continued being non-verbal and did not answer questions. A MHP spoke with him and reported pain, but does not recall what happened or when. Medical Director Balderrama documented that Mr. Tapia "has evidence of poss vascular deficits on left foot with edema needs an ER evaluation for poss emergent surgical management". Mr. Tapia was referred by Medical Director Balderrama and Nurse Hughes NP to Tacoma General Emergency Department. Nurse Chalk RN documented that Mr. Tapia was sent to the ER for "suspected gangrene". It was not until this day, **13 days later**, that Mr. Tapia was **finally** seen, assessed, and evaluated for his symptoms, and change in condition that began on 9-18-18.

m.      In the Deposition of Nurse Slothower RN HSA (Pg. 41), when asked:

Q.  So other than Dr. Balderrama or a nurse practitioner, does anyone at the - - any NaphCare employee at the Pierce County Jail have the responsibility of ensuring that inmates with a serious medical need are transferred to an outside facility in a timely manner?

A.  To some extent, yes, we all do. We - - anybody that recognizes what might be a serious medical need tht is emergent is authorized to send people out to the hospitals. Nurses send people to the hospitals regularly if they see something tht appears to be emergent.

n.      Nurse Villacorta RN was the Director of Clinical Operations, Nurse Slothower RN was the Health Service Administrator (HSA) and Nurse Valencia was the Director of Nursing (DON) at the Pierce County Jail. "Developing…, implementing…, and evaluating policies, procedures, and guidelines to improve the quality of nursing practice" (ANA Standard

10. Quality of Practice, pg. 55) is the responsibility of the correctional registered nurse, especially nurse leaders. Not acting to improve the quality of nursing practice is the antithesis of the role and expectations of correctional nurse leaders and represents a violation of the standards of correctional nursing practice applicable to Registered Nurses Villacorta, Valencia, and Slothower. Registered Nurse leaders are responsible to make sure all nurses working with patient inmates in the Pierce County Jail follow policies and procedures, including assessing patient inmates for medical, mental, and emergency healthcare needs. Supervision and training must include that all nurses follow and work within their scope and standards of practice of their nursing license. (See NaphCare Health Care Policy and Procedure Manual - NCI 000037-000043 for the Director of Nursing/DON and for the Health Services Administrators/HSA Positions. As a leader (Director of Clinical Operations, HSA, DON) Nurse Villacorta RN Director of Clinical Operations, Nurse Slothower RN HAS, and Nurse Valencia DON, and are "the executive nurse leader in the correctional setting [and] is instrumental to safe nursing practice and quality patient care delivery. This individual plays a critical role in . . . articulating standards of practice, . . . and working with other senior colleagues to enhance the delivery of health care (ANA, pg. 23).

Nursing leaders in the correctional setting are expected to have a higher level of education to best prepare them for the administrative roles, leadership skills, complexities, policy issues, and staffing needs of the correctional healthcare facility/system (ANA, pg. 23). "Graduate nursing education at the master's and doctoral level best prepares the correctional nurse to function in administrative roles…" (ANA, pg. 23). It is unknown if Nurse Villacorta RN Director of Clinical Operations and/or Nurse Valencia have any graduate level nursing education for degree(s) at the master's or doctorate level. Nurse Slothower RN HSA did not have any graduate level nursing education for degree(s) at the master's or doctorate level.

o.    Licensed Practical Nurses in Pierce County Jail are working independently and outside their LPN nursing scope of practice and performing RN duties. LPNs are not following policies and procedures, and are not working under the supervision of a Registered Nurse or Licensed Physician. LPNs in Pierce County Jail have been working outside their legal scope of nursing practice, making independent decisions about patient nursing care and treatment (including: Independently and incorrectly completing COWS Assessments with no reporting to a Registered Nurse; making independent assessments and/or decisions regarding treatment plan(s) and care; not administrating medication as ordered, not reporting refusals of care; not calling or notifying a Registered Nurse or Physician to report patient symptoms and/or clinical findings; not referring Mr. Tapia to a medical provider; and choosing not to send to the Emergency Department for medical care or evaluation.). RNs caring for Mr. Tapia did not follow policies and procedures, did not supervise LPNs, and did not make referrals and/or contact the medical provider or mental health provider when medically necessary for Mr. Tapia's and his condition. These are not safe nursing practices and contributed to a **catastrophic** outcome for Mr. Tapia. It is also the responsibility of the registered nurse(s) in a leadership position to "oversee the nursing care given by others while retaining accountability for the quality of care given to the patient" (ANA Standard 12. Leadership, pg. 58). This did not occur. Mr. Tapia did not receive quality health care in his greatest time of need.

8.    I understand that further depositions may be scheduled and I reserve the right to supplement my report after receiving transcripts of those depositions and any other materials/exhibits.

9.    It is my opinion that the above-delineated actions and inactions by Registered Nurses Yagi and Warren; unknown named Registered Nurses supervising Licensed Practical Nurses; and Licensed Practical Nurses Kendig, Park, Marling, Carrillo, and Ricci are breaches of the applicable standards of care, and that these actions/inactions caused or contributed to Mr. Tapia's **tragic outcome** (loss of limb and unnecessary pain). Registered Nurses failed to thoroughly assess; failed to supervise LPNs; failed to follow policies, procedures, and protocols; failed to call a medical provider or mental health provider; and/or failed to send Mr. Tapia for emergency treatment or higher level of care.  Licensed Practical Nurses worked independently and unsupervised, and outside their scope of practice; failed to notify a RN or medical provider or mental health provider of their subjective and objective findings;  failed to document correctly; failed to report refusal(s) of care; failed to administer mediations as ordered; failed to follow policies, procedures, and protocols; and failed to obtain the medical emergency treatment Mr. Tapia needed.  Had Mr. Tapia received appropriate nursing assessments, treatment, and care, reporting of findings required by RNs to a physician, and/or reporting of findings required by LPNs to a registered nurse or physician, for medical care and mental health care, medical treatment and limb saving interventions could have been given.

I, Denise M. Panosky, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

_Denise M. Panosky_

_____

Denise M. Panosky, DNP, RN, CNE, CCHP, FCNS

January 31, 2024

# References

American Nursing Association (2013).  *Correctional Nursing: Scope and Standards of Practice*, 2d Ed. Silver Spring, MD: Nursebooks.org.

Anno, B. J. (2009). *Correctional Health Care: Guidelines for the Management of an Adequate Delivery System*, 3rd Printing. Chicago.

National Commission on Correctional Health Care (2014*).  Standards for Health Services in Jails*, Chicago.

National Commission on Correctional Health Care (2014*).  Standards for Health Services in Prisons*, Chicago.

Schoenly, L. & Knox, C. (2013).  *Essentials of Correctional Nursing*, Springer Publishing Company, NY.

# Appendix A

See Separate Document for CV

# Appendix B

## Denise Panosky DNP, RN, CNE, CCHP, FCNS

### **Legal Nurse Consulting Cases with Deposition and/or Trial Testimony Given**

December 2023  Banning v. Shelby County
       Expert Report 11-2023
       Deposition 12-2023

November 2022  Rapp v. NaphCare Inc.
       Expert Report 9-2022
       Deposition 11-2022

May 2022     Greer v. County of San Diego
       Expert Report 1-2022
       Deposition 5-2022

February 2022   Heth v. LaSalle County
       Expert Report 11-2021
       Deposition 2-2022

December 2021  Rapp v. City of Redding, Kitsap County Jail
       Expert Report 1-2021
       Deposition 12-2021

April 2020    Windhurst v. Arizona Department of Corrections
       Preliminary Expert Affidavit
       Expert Report 1-2020
       Rebuttal Report 2-2020
       Deposition 4-2020

November 2019  Leland v. Yavapai County
       Expert Report 5-2017
       Deposition 8-2018
       Trial Testimony 11-2019

February 2018   Neuroth v. Mendocino County
       Expert Report 10-2017
       Deposition 2-2018

December 2016  Spencer v. Correct Health Bartow
       Deposition 12-2016

October 2016          Garner v. Mohave County
                               Expert Report 4-2016
                               Deposition 10-2016

# Appendix C

# Denise Panosky DNP, RN, CNE, CCHP, FCNS

17 Chriswood Trace
Ledyard, CT  06339

denise.panosky@gmail.com

860-608-2585 cell

**Consulting Customary Fees as of January 1, 2022 for all new cases:**

$1,800 – Retainer

$300/hour – Records Review, Research, Timelines, Analysis and Summaries, Narratives and Case Reports, Phone calls and meetings for case discussions, and Deposition Preparation

$450/hour – Depositions (2-hour minimum, Pre-Paid, Plus expenses) and Trial preparation

$4,000/day – Trial/Testimony Fee (Plus expenses)

**Expenses Detailed – January 1, 2022:**

| Expenses | Cost |
|---|---|
| Travel Hours – Door to Door  (Max. 10 hours/day) | 50% of Hourly Rate  ($150 / hour) |
| Travel – Air Transportation | Actual Cost – Pre-paid |
| Travel – Airport Tapiaing, Hotel Tapiaing | Actual Cost |
| Travel – Mileage | $ 0.585/Mile |
| Transportation – Rental Car, Uber, Taxi | Actual Cost |
| Travel – Lodging | Actual Cost – Pre-paid |
| Travel – Meals | $ 100 / Day |
| Incidental Expenses (e.g. Airline Baggage, Internet) | Actual Cost |

# Denise M. Panosky DNP, RN, CNE, CCHP, FCNS

Associate Research Professor
University of Connecticut School of Nursing
Cell: 860-608-2585
Home Email: denise.panosky@gmail.com
Work Email: denise.panosky@uconn.edu

## CURRICULUM VITAE
Updated January 2022

## I.    EDUCATION

| Degree | Institution | Major Field | Date Completed |
|--------|-------------|-------------|----------------|
| DNP | Duquesne University | Nursing | May 2010 |
| MSN | Quinnipiac University | Forensic Nursing | May 2006 |
| BSN | Southern Connecticut State University | Nursing | May 1983 |

## II.    REGISTRATION

Registered Nurse, Connecticut License # E46688

Forensic Clinical Nurse Specialist

Certified Nurse Educator

Certified Correctional Health Professional

## III.    PROFESSIONAL EXPERIENCE

### A.    Experiences in Higher Education

| Date | Institution | Nature of Work | Academic Status |
|------|-------------|----------------|-----------------|
| 2017 - | University of Connecticut School of Nursing | Clinical and Academic Nursing Professor | Associate Research Professor |
| 2013 - 2016 | University of Connecticut School of Nursing | Clinical and Academic Nursing Professor | Associate Clinical Professor |
| 2008 - 2013 | University of Connecticut | Clinical and Academic | Assistant Clinical |

1

|  | School of Nursing | Nursing Professor | Professor |
| --- | --- | --- | --- |
| 2006 - 2008 | University of Connecticut School of Nursing | Clinical and Academic Nursing Instructor | Clinical Instructor |
| 1996 - 1998 | Three Rivers Community Technical College Norwich, CT | Primary Nursing Instructor for Certified Nurse's Aides | Program Coordinator Adjunct Nursing Professor |

### B.    Experiences in Other than Higher Education

| Date | Position Title | Institution |
| --- | --- | --- |
| 2011 - 2012 | Emergency Department Registered Nurse Sexual Assault Nurse Examiner | North Stonington Health Center North Stonington, CT |
| 1986 - 2011 | Emergency Department Registered Nurse Sexual Assault Nurse Examiner Charge Nurse | Lawrence and Memorial Hospital New London, CT Pequot Health Center Groton, CT |
| 1983 - 1986 | Neuro-Surgical Registered Nurse Charge Nurse | Saint Francis Hospital Hartford, CT |

## IV.    PUBLICATIONS

### Publications in Print

Kline, J. & Panosky, D. (2017).  Increasing the Use of Palliative and Hospice Services. *International Journal for Human Caring*.  21(4), 214-217.

Munger, T., Savage, T., & Panosky, D.  (2015). When Caring for Perpetrators Becomes a Sentence. *Journal of Correctional Health Care*, 21(4), 365-374.

Panosky, D. M. & Shelton, D.  (2015). Evaluating an Adolescent Behavioral Program: Leadership, Education, Achievement, and Development for Adolescent Female Offenders in Corrections. *Journal of Forensic Nursing,* 11(3), 144-153.

Shelton, D., Reagan, L., Weiskopf, C., Panosky, D., Nicholson, M. & Diaz, D. (2015).  Baseline Indicators and Implementation Strategies in a Statewide Correctional Nurse Competencies Program: Mid-year report.  Journal for Continuing Education in Nursing, 46 (10) 455-461. Doi:10.3928/00220124-2015.

Diaz, D., Panosky, D., & Shelton, D. (2014). Simulation: Introduction to Correctional Nursing in a Prison Setting. *Journal of Correctional Health Care* 20(3), 240-248.

Peternelj-Taylor, C. & Panosky, D. (2013).  Advancing Forensic Correctional Nursing.  *Journal of Forensic Nursing*, 1(9), 1-2.

Panosky, D. & Diaz, D. (2009). Teaching Caring and Empathy through Simulation. *International Journal for Human Caring,* 13(3), 44-46.

### Other

Shelton, D., Panosky, D. & Diaz, D. (2009).  Promoting nursing student learning in correctional settings. Conference proceedings: 10th Biennial International Conference on the Nurse's Role in the Criminal Justice System. On-line at: http://www.usask.ca/nursing/custodycaring/index.htm.

Panosky, D., Shelton, D., Riebe, G. & Chaken, M. (2009).  Correctional nursing: An orientation for nursing students. Conference proceedings: 10th Biennial International Conference on the Nurse's Role in the Criminal Justice System. On-line at: http://www.usask.ca/nursing/custodycaring/index.htm.

Panosky, D. (2005).  *Jail Diversion*.  Informational Brochure for State of Connecticut, Department of Mental Health and Addiction Services (DMHAS), Southeastern Mental Health Authority (SMHA), Forensic Services, Norwich, CT.

## V.    RESEARCH AND EVALUATION GRANTS

### A.    Grants

Feb. 2013 - June 2014 "Reducing stress among correctional nurses through focus groups" Project Investigator, Center for the Promotion for Health in the New England Workplace (CPH-NEW), $11,000 funded

June 2012 - 2013    "Student Labor for Aging, Musculoskeletal Disorders, and Work Capacity" Project Investigator and Coordinator at UConn, NIOSH funded grant through UCHC, $48,236 funded

July 2011 - 2014    "Nurse, Education, Practice, Quality, and Retention" Co-Investigator and Project Coordinator, HRSA, $1,145,310 funded

July 2009    "A Feasibility Study for an Adolescent Behavioral Program" Project Investigator, Sigma Theta Tau International Honor Society of Nursing, Mu Chapter, $1,000 funded

February 2009    "Leadership, Education, Achievement and Development (LEAD) for Adolescents in a Correctional Facility" Co-Project Investigator Viola W. Bernard Foundation, $10,000 funded

3

## VI.    DISSERTATION AND THESIS SUPERVISION

| Date | Student Name | Title | Role |
|------|--------------|-------|------|
| 2016 | Jennifer Goodridge | The United States Navy Ship Shape Program… | Committee Member, DNP |
| 2016 | Genice Nelson | Sickle Cell Pain Management… | Committee Member, DNP |
| 2015 | Sarah Knoeckel | Improving Provider Identification and Management of Overweight and Obesity in Primary Care | Associate Advisor, DNP |
| 2014 | Annette Maruca | Incarcerated Veterans with Mental Disorders | Committee Member, PhD |
| 2013 | Mary Ellen Castro | Correctional Diabetic Screening | Major Advisor, DNP |
| 2012 | Tanya Munger-Montavon | When Caring for Perpetrators Becomes a Sentence: Recognizing Vicarious Trauma | Associate Advisor, DNP University of Illinois |
| 2012 | Ceilia Gote | Integrated Healthcare Delivery for Co-morbid Diabetes | Associate Advisor, DNP |
| 2012 | Mary Patricia Lamberti | Improving Sleep in College Students: An Educational Intervention | Associate Advisor, DNP |
| 2012 | Susan Lynch | Nurses' Beliefs about and use of Evidence Based Practice | Committee Member, DNP |
| 2012 | Jessica Planas | Chronic Disease Management through Goal-Setting for Latino Populations | Committee Member, PhD |
| 2011 | Philip Frick | Correctional nurse-inmate interactions | Committee Member, DNP |

4

## VII.    HONORS RECEIVED/ SPECIAL CERTIFICATIONS

### A.    Honors Received

| | |
|---|---|
| October 2014 | Joseph A. Dolan Award for Outstanding Contributions to Nursing Education awarded by the Connecticut Nurses' Association |
| June 2013 | Research Affiliate of Center for the Promotion of Health in the New England Workplace (CPH-NEW) |
| May 2012 | Nightingale Award for Excellence in Nursing |
| October 2009 | The Florence Wald Award for Outstanding Contributions to Nursing Practice awarded by the Connecticut Nurses' Association |
| October 2009 | "Modeling Vulnerabilities and Stressors of Co-Occurring Disorders among a Prison Population", Outstanding Scientific Research and Education Award by International Association of Forensic Nurses 17th Scientific Assembly |
| 2009 - Present | Golden Key International Honour Society |
| 2006 - Present | Sigma Theta Tau International Honor Society of Nursing |
| 2005 - 2006 | HRSA Nursing Traineeship Grant |
| 2004 - Present | Quinnipiac University Nursing Honor  Society |

### B.    Clinical and Other Certifications

| | |
|---|---|
| 2011 - Present | Certified Nurse Educator (CNE) National League for Nursing (NLN) |
| 2008 - Present | Certified Correctional Health Professional (CCHP) American Correctional Health Services Association (ACHSA) |
| 2006 - Present | Critical Incident Stress Management (CISM) |
| 2005 - 2013 | Pediatric Advanced Life Support (PALS) |
| 1998 - Present | Sexual Assault Nurse Examiner (SANE) |
| 1986 - 2013 | Advanced Cardiac Life Support (ACLS) |
| 1983 - Present | Registered Nurse, Connecticut Board of Nursing |

## VIII.   REVIEW ACTIVITIES AND EDITORIAL BOARDS

### A.    Journal Reviewers/Editorial Boards

2015 - Present          Journal for Evidence-based Practices in Correctional Health

2012 - Present          Journal of Forensic Nursing


## IX.    PRESENTATIONS

### A.    Invited Address

"Identifying and Evaluating Stress Reduction Interventions for Correctional Nurses".
4th Annual Community Engagement and Research Symposium: Building on Partnership
Strengths to Improve Community Health, University of Massachusetts Medical School,
Worcester, MA, November 7, 2014.

 "Incarceration and Women's Health" Round Table Discussion.  Human Rights Institute,
University of Connecticut, Storrs, CT, April 10, 2013.

"An Evaluation Project for an Adolescent Behavioral Program: Leadership, Education,
Achievement, and Development (LEAD-C) for Adolescent Offenders in Corrections".
Sigma Theta Tau International Honor Society of Nursing, Mu Chapter 56th Induction
Ceremony, University of Connecticut, Storrs, CT, November 7, 2010.

### B.    International Presentations

Panosky, D. & Shelton, D.  Formalizing education in Correctional Health Nursing to improve
competencies and quality care.  International Association of Forensic Nurses 24th
Scientific Assembly, Denver, CO., October 2016.

Panosky, D.  Correctional Nursing Stress: A review of differences among correctional nurses, 14th
Biennial International Custody and Caring Conference, Saskatchewan, Canada, October 8,
2015.

Díaz, D.A., Reagan, L., Shelton, D & Panosky. D. Psychometric Evaluation and Revision of an
Instrument to Measure Satisfaction with Simulation in Correctional
Nurses.  SimHealth 2014, Adelaide, Australia, August 2014.

Díaz, D.A., Panosky. D., Reagan, L., Shelton, D & Panosky. D.  Nursing Competencies that
include simulation to close the gap in clinical practice- a mobile program.  SimHealth
2014, Adelaide, Australia, August 2014.

Díaz, D.A., Reagan, L., Shelton, D & Panosky. D. The effective use of training simulation super users to bridge the clinical practice gap and engage the workforce. SimHealth 2014, Adelaide, Australia, August 2014.

Panosky, D. Caring for our Inmate Patients with Confidence and Competence: A Case Study Approach, 13th International Custody and Caring Conference, Saskatchewan, Canada, October 3, 2013.

Panosky, D., Shelton, D., Peternelj-Taylor, C., Walsh, E., & Schoenly, L. Contemporary Clinical Topics for Correctional Nurses, International Association of Forensic Nurses 20th Scientific Assembly, Fajardo, Puerto Rico, October 11, 2012.

Shelton, D., Panosky, D., Weiskopf, C., Nicholson, M., Butler, T., Reagan, L. & Diaz, D. Implementation of a statewide correctional nursing competency system: Year 1. International Association of Forensic Nurses 20th Scientific Assembly, Fajardo, Puerto Rico, October 11, 2012.

Panosky, D. A Therapeutic Expressive Arts Program for Female Adolescent Offenders: Interdisciplinary Assessment Results, International Association of Forensic Nurses 20th Scientific Assembly, Fajardo, Puerto Rico, October 10, 2012.

Panosky, D. Using Therapeutic Expressive Arts to Foster Healing among Female Adolescent Offenders, International Association of Forensic Nurses 19th Scientific Assembly, Montreal, Canada, October 21, 2011.

Panosky, D. and Shelton, D. A Study of Nursing Students' Clinical Outcomes, 12th International Custody and Caring Conference, Saskatchewan, Canada, October 7, 2011.

Panosky, D. An Evaluation Project for an Adolescent Behavioral Program: Leadership, Education, Achievement and Development for Adolescent Offenders in Corrections, 12th International Custody and Caring Conference, Saskatchewan, Canada, October 6, 2011.

Shelton, D. and Panosky, D. The Re-Discovery of Self-Care Model: A Guide for Correctional Nursing, 12th International Custody and Caring Conference, Saskatchewan, Canada, October 6, 2011.

Panosky, D. The Value and Effectiveness of a Sexual Assault Nurse Examiner. Haitian Health Foundation, Jeremie, Haiti, July 5, 2011.

Panosky, D. & Plank, G. CT-100 State of Connecticut Sexual Assault Evidence Collection Kit; Workshop. Haitian Health Foundation, Jeremie, Haiti, July 2 and 5, 2011.

Díaz, D.A., Allchin, L., Kuhnly, J., Maruca, A., & Panosky, D. The New Horizon: A Simulated Eight Hour Work Day. Asia-Pacific Association Simulation and Clinical Learning, Hong Kong, China, May 2011.

Shelton, D. & Panosky, D. Application of a Biopsychosocial Framework for Corrections Nursing Research and Clinical Practice.  International Association of Forensic Nurses 18th Scientific Assembly, Pittsburg, PA, October 27, 2010.

Colbert, A., Panosky, D., & Zoucha, R.  Forensic Nursing and High Risk Women Offenders: Opportunities for Innovation.  International Association of Forensic Nurses 18th Scientific Assembly, Pittsburg, PA, October 27, 2010.

Shelton, D. & Panosky, D. Modeling Vulnerabilities and Stressors of Co-Occurring Disorders among a Prison Population Poster. International Association of Forensic Nurses 17th Scientific Assembly, Atlanta, Georgia. October 22, 2009.

Panosky, D., Shelton, D., Riebe, G., & Chaken, M.  Correctional Nursing: An Orientation for Nursing Students. 11th International Custody and Caring Conference, Saskatchewan, Canada, October 2, 2009.

Shelton, D., Panosky, D., & Diaz, D.  Promoting Student Learning in Correctional Settings. 11th International Custody and Caring Conference, Saskatchewan, Canada, October 1, 2009.

### C.    <u>National Presentations</u>

Panosky, D., Reducing Stress among Correctional Nurses through Focus Groups, National Conference on Correctional Health Care, Las Vegas, NE, October 21, 2014.

Panosky, D., Shelton, D., & Weiskopf, C. Essentials of Nurse Leadership: Performance Enhancement.  National Conference on Correctional Health Care, Nashville, TN, October 29, 2013.

Shelton, D., Panosky, D., Diaz, D., Reagan, L., Weiskopf, C., & Nicholson, M.  Changing a culture: Implementing the ANA Correctional Nursing Competencies, National Conference on Correctional Health Care, Nashville, TN, October 28, 2013.

Panosky, D., Shelton, D., & Weiskopf, C.  Evaluation of a Correctional Nursing Competency Program: Evaluation Data Results and Successful Partnership Implementation.  National Conference on Correctional Health Care, Nashville, TN, October 2013.

Diaz, D., Panosky, D, Reagan, L., Shelton, D.  Correctional nurse super-users; the use of simulation to advance practice and engage the workforce, ACCJH conference, Chicago. IL, March 21, 2013.

Panosky, D., Shelton, D., Diaz, D., Reagan, L, Zheng, B.  Advancing Correctional Nurse Competencies for Quality Care: Evaluation of Simulation Learning and Satisfaction, 2013 ACHSA Multidisciplinary Educational Conference, Philadelphia, PA., March 14, 2013.

Shelton, D., Panosky, D., Weiskopf, C., Butler, T., Nicholson, M., Reagan, L. & Diaz, D.

8

One key to quality: Correctional nursing competencies.  National
Conference on Correctional Health Care, Las Vegas, NV., October 22, 2012.

Panosky, D., Shelton, D., & Weiskopf, C.  One Key to Quality: Correctional Nursing
Competences, National Conference on Correctional Health Care, Las Vegas, NV,
October 2012.

Panosky, D.  An Evaluation Project for an Adolescent Behavioral Program: Leadership,
Education, Achievement, and Development for Adolescent Offenders in Corrections.
Duquesne University, Duquesne Room, Student Union, Pittsburgh, PA. May 6, 2010.

Shelton, D. & Panosky, D. Correctional Nursing Competency Development. American
Correctional Health Services Association 2009 Multidisciplinary Professional
Development Conference, Orlando, FL. March 15, 2009.

**D.    Regional Presentations**

Zabin, A. & Panosky, D.  Social Challenges for Correctional Nurses Delivering Healthcare.
University of Connecticut, Frontiers in Undergraduate Research Honor's Conference,
Wilbur Cross, Storrs, CT.  October 29, 2014.

Zheng, B., Panosky, D., & Shelton, D.  Correctional Nurse Competencies: Evaluation of
Simulation Learning and Satisfaction.  University of Connecticut, Frontiers in
Undergraduate Research Honor's Conference, Wilbur Cross, Storrs, CT.  April 12, 2013.

Weiskopf , C., Shelton, D., Panosky, D., & Bassi, S.  Updates in Correctional Nursing
Interventions.  New England Chapter of the American Psychiatric Nurses
Association Resiliency Conference, Middletown, CT. April 30, 2010.

Shelton, D., Panosky, D. & Wakai, S.  Development of a Biopsychosocial Vulnerability-Stress
Model of Mental Illness among Prison Population.  University of Connecticut,
ATHENA Conference, Student Union, Storrs, CT. April 2009.

Shelton, D. & Panosky, D. Competencies for Connecticut Correctional Nurse's, University of
Connecticut, ATHENA Conference, Student Union, Storrs, CT. April 2009.

Balisciano, Belnap, Flanagan, Lutkus, Panosky, Shelton et al. Patterns of Psychotropic
Medication Adherence and Nonadherence Among Male Prison Populations: A Pilot
Study, University of Connecticut, ATHENA Conference, Student Union, Storrs, CT.
April 2008.

**E.    Other Presentations**

Panosky, D. Jail Diversion, Providing Client Care and Enhancing Public Safety.  Quinnipiac
University, Alumni Hall, Hamden, CT. April 2006.

Panosky, D. State v. Garland. Quinnipiac University, Graduate School of Nursing, Hamden, CT. April 2006.

Panosky, D. The Value and Effectiveness of a Sexual Assault Nurse Examiner. Quinnipiac University, Graduate School of Nursing, Hamden, CT. April 2005.

Panosky, D. Conditional Release of Acquittees Under Jurisdiction of the Psychiatric Security Review Board: Community and Citizen Safety. Quinnipiac University, Graduate School of Nursing, Hamden, CT. April 2005.

Panosky, D. Protective Services for the Elderly. Quinnipiac University, Graduate School of Nursing, Hamden, CT. May 2005.

Panosky, D. Virginia Henderson: Nursing to Researching. Quinnipiac University, Graduate School of Nursing, Hamden, CT. October 2003.


## X.     PROFESSIONAL SERVICE

### A.     Offices Held in Professional Organizations

#### a.   International

| July 2012 | International Association of Forensic Nurses (IAFN)<br>Co-Editor for a special edition for *Journal of Forensic Nursing* (JFN) on Correctional Nursing |
| --- | --- |
| 2011 - 2013 | International Association of Forensic Nurses (IAFN)<br>Corrections Task Force Chair |
| 2006 - 2011 | International Association of Forensic Nurses (IAFN)<br>International Governmental Affairs Committee Member |

#### b.   National

| 2011 - 2014 | American National Nurses Association (ANA)<br>Correctional Nursing Workgroup Member |
| --- | --- |
| 2007 - Present | National League for Nursing (NLN)<br>University of Connecticut Ambassador |

#### c.   Regional

| 2007 - 2011 | IAFN Connecticut Chapter<br>Director at Large, Board Member |
| --- | --- |

10

**B.**   **Consultation Activities**

January 2021            *The California Department of Justice's Review of Immigration Detention in California*
Immigration Detention Facility Review Team's Nursing Expert Consultant

2009 - Present          Legal Nurse Consulting: Private consultation with attorneys for legal, forensic, correctional, nursing, and medical cases.

2006 - 2008             Spectrum Nurse Consulting, LLC: Consultation with attorneys for legal, forensic, nursing, and medical cases.

**C.**   **Service to the University**

Fall 2016               Center for Correctional Health Networks Academic and Professional Development Director

Faculty Advisor for the Mentoring Program

Faculty Advisor for 9 Undergraduate Nursing Students

DNP Committee member

CAAR Committee Chair

Recruitment and Selection Committee member

2015 - 2016             Center for Correctional Health Networks Academic and Professional Development Director

Faculty Advisor for the Mentoring Program

Faculty Advisor for 23 Undergraduate Nursing Students

Faculty Advisor for 1 Undergraduate Honors Student

DNP Committee member

CAAR Committee Chair

Reviewer for SURF Awards

Reviewer for IDEA Grant Program

11

| | |
|---|---|
| 2014 - 2015 | Center for Correctional Health Networks Academic and Professional Development Director |
| | Faculty Advisor for the Nursing Learning Community |
| | Faculty Advisor for the Mentoring Program |
| | Faculty Advisor for the Nursing Class of 2015 |
| | Major Advisor for 1 Graduate Student |
| | Associate Advisor for 1 Graduate Students |
| | Faculty Advisor for 23 Undergraduate Nursing Students |
| | Faculty Advisor for 1 Undergraduate Honors Student |
| | DNP Committee member |
| | CAAR Committee member |
| | Reviewer for SHARE and RARE Awards |
| | Reviewer for SURF Awards |
| | Reviewer for IDEA Grant Program |
| 2013 - 2014 | Faculty Advisor for the Nursing Learning Community |
| | Faculty Advisor for the Mentoring Program |
| | Faculty Advisor for the Nursing Class of 2015 |
| | Major Advisor for 1 Graduate Student |
| | Associate Advisor for 1 Graduate Students |
| | Faculty Advisor for 35 Undergraduate Nursing Students |
| | Faculty Advisor for 1 Undergraduate Honors Student |
| | DNP Committee member |

2012 - 2013         Faculty Advisor for the Nursing Learning Community

Faculty Advisor for the Mentoring Program

Faculty Advisor for the Nursing Class of 2015

Major Advisor for 1 Graduate Student

Associate Advisor for 4 Graduate Students

Faculty Advisor for 25 Undergraduate Nursing Students

Faculty Advisor for 1 Undergraduate Honors Student

Pre-licensure Admission (Petitioning, Transfer, MEIN) Committee

DNP Committee member

2011 - 2012         Faculty Advisor for the Nursing Learning Community

Faculty Advisor for the Nursing Class of 2015

Major Advisor for 1 Graduate Student

Associate Advisor for 4 Graduate Students

Faculty Advisor for 25 Undergraduate Nursing Students

Faculty Advisor for 1 Undergraduate Honors Student

Pre-licensure Admission (Petitioning, Transfer, MEIN) Committee

DNP Committee member

2010 - 2011         Faculty Advisor for the Nursing Learning Community

Faculty Advisor for the Nursing Class of 2011

Major Advisor for 1 Graduate Student

Associate Advisor for 5 Graduate Students

Faculty Advisor for 31 Undergraduate Nursing Students

13

Faculty Advisor for 1 Undergraduate Honors Student

Undergraduate Commencement Committee

2009 - 2010        Faculty Advisor to the Nursing Learning Community

Faculty Advisor for the Class of 2011

Faculty Advisor to 32 Individual Nursing Students

Curriculum and Courses Committee

Undergraduate and MbEIN Pinning Ceremony Planning Committee

2008 - 2009        Faculty Advisor to the Nursing Learning Community

Faculty advisor to 3 Senior Engineering Students working on their Senior Engineering Design Project

Faculty Advisor for the Class of 2011

Faculty Advisor to 25 Individual Nursing Students

Curriculum and Courses Committee

Undergraduate and MbEIN Pinning Ceremony Planning Committee

2007 - 2008        Nursing Class of 2011 Advisor

Faculty Advisor to 25 Individual Nursing Students

Commencement/Convocation Planning Committee

Curriculum and Courses Committee

MbEIN Pinning Ceremony Planning Committee

2006 - 2007        Faculty Advisor to 25 Individual Nursing Students

Undergraduate and MbEIN Evaluation Committee

14

XI.    **TEACHING EXPERIENCE**

2006 - Present    Associate Professor, University of Connecticut, School of Nursing, Storrs, CT

   A.    **Undergraduate**

Course number/title                                          Role    Number of Students

Fall 2019
4544    Nursing Practice for Community/Public Health Nursing    Asso. Clinical Prof.    6

Fall 2018
4544    Nursing Practice for Community/Public Health Nursing    Asso. Clinical Prof.    8

Fall 2017
4544    Nursing Practice for Community/Public Health Nursing    Asso. Clinical Prof.    7

Fall 2016
3292    Practicum with Sub-acute & Chronically Ill Adults    Asso. Clinical Prof.    8
3715    Nursing Leadership in the 21st Century    Asso. Clinical Prof.    17

Spring 2016
3120    Health Assessment throughout the Lifespan    Asso. Clinical Prof.    108

Fall 2015
3292    Practicum with Sub-acute & Chronically Ill Adults    Asso. Clinical Prof.    8

Spring 2015
3120    Health Assessment throughout the Lifespan    Asso. Clinical Prof.    136

Fall 2014
3292    Practicum with Sub-acute & Chronically Ill Adults    Asso. Clinical Prof.    8

Spring 2014
50% Time Release for Grant work and programming    Associate Clinical Professor

Fall 2013
3292    Practicum with Sub-acute & Chronically Ill Adults    Asso. Clinical Prof.    8
50% Time Release for Grant work and programming

Summer 2013
4492    Nursing Across the Lifespan I    Asst. Clinical Prof.    8

15

Spring 2013
4392   Health Assessment and Fundamentals of Nursing Praxis    Asst. Clinical Prof.    32
50% Time Release for Grant work and programming

Fall 2012
3292   Practicum with Sub-acute & Chronically Ill Adults    Asst. Clinical Prof.    8
50% Time Release for Grant work and programming

Summer 2012
4492   Nursing Across the Lifespan I    Asst. Clinical Prof.    8

Spring 2012
4392   Health Assessment and Fundamentals of Nursing Praxis    Asst. Clinical Prof.    31
50% Time Release for Grant work and programming

Fall 2011
3292   Practicum with Sub-acute & Chronically Ill Adults    Asst. Clinical Prof.    8
50% Time Release for Grant work and programming

Summer 2011
4492   Nursing Across the Lifespan I    Asst. Clinical Prof.    8

Spring 2011
4392   Health Assessment and Fundamentals of Nursing Praxis    Asst. Clinical Prof.    33
4292   Capstone Clinical Practicum    Asst. Clinical Prof.    8

Fall 2010
3292   Practicum with Sub-acute & Chronically Ill Adults    Asst. Clinical Prof.    8
3292   Practicum with Sub-acute & Chronically Ill Adults    Asst. Clinical Prof.    8
4592   Nursing Across the Lifespan II    Asst. Clinical Prof.    32

Summer 2010
4492   Nursing Across the Lifespan I    Asst. Clinical Prof.    8

Spring 2010
4392   Health Assessment and Fundamentals of Nursing Praxis    Asst. Clinical Prof.    33
4292   Capstone Clinical Practicum    Asst. Clinical Prof.    7

Fall 2009
3292   Practicum with Sub-acute & Chronically Ill Adults    Asst. Clinical Prof.    8
3292   Practicum with Sub-acute & Chronically Ill Adults    Asst. Clinical Prof.    8
20% Time Release for Grant work and programming

Summer 2009
4492   Nursing Across the Lifespan I    Asst. Clinical Prof.    8

16

Spring 2009
4392   Health Assessment and Fundamentals of Nursing Praxis     Asst. Clinical Prof.     32
4292   Capstone Clinical Practicum                             Asst. Clinical Prof.      7

Fall 2008
3292   Practicum with Sub-acute & Chronically Ill Adults       Asst. Clinical Prof.      9
3292   Practicum with Sub-acute & Chronically Ill Adults       Asst. Clinical Prof.      9
3292   Practicum with Sub-acute & Chronically Ill Adults       Asst. Clinical Prof.      9

Summer 2008
4492   Nursing Across the Lifespan I                           Clinical Professor        8

Spring 2008
274    Clinical and Nursing Science for Acutely Ill Adults     Faculty                  64
290    Health Assessment and Fundamentals of Nursing Praxis    Faculty                  31
289    Capstone Clinical Practicum                             Clinical Instructor       9

Fall 2007
272    Clinical Science for Adults with Acute Illness          Faculty                  71
273    Nursing Science for Acutely Ill Adults                  Faculty                  71
219    Practicum with Sub-acute & Chronically Ill Adults       Clinical Instructor       8

Summer 2007
4492   Nursing Across the Lifespan I                           Clinical Professor        8

Spring 2007
273    Nursing Science for Acutely Ill Adults                  Faculty                  68
290    Health Assessment and Fundamentals of Nursing Praxis    Faculty                  32
279    Practicum with Acutely Ill Adults                       Clinical Instructor       7

Fall 2006
272    Clinical Science for Adults with Acute Illness          Faculty                  72
273    Nursing Science for Acutely Ill Adults                  Faculty                  72
219    Practicum with Sub-acute & Chronically Ill Adults       Clinical Instructor       8


1996 - 1998     Adjunct Professor of Nursing, Three Rivers Technical Community
                College, Norwich, CT

1993 - 1997     Co-Developer/Instructor of a *Universal Precautions and Disease Prevention
                Program,* Southeastern Connecticut Elementary Schools

1987 - 2001     Emergency Nurse Pediatric Core Course Instructor, Lawrence and Memorial
                Hospital, New London, CT

1986 - 2003     Advanced Cardiac Life Support (ACLS) Instructor, Lawrence and Memorial

Hospital, New London, CT

    **B.**    <u>**Graduate**</u>

| <u>Course number/title</u> | <u>Role</u> | <u>Number of Students</u> |
|---|---|---|
| <u>Fall 2016</u> | | |
| 5895    Clinical Practice Dissertation Seminar: Semester V | Asso. Clinical Prof. | 4 |
| 5889    Doctor of Nursing Practice Practicum II | Asso. Clinical Prof. | 4 |
| <u>Spring 2016</u> | | |
| 5879    Doctor of Nursing Practice Practicum I | Asso. Clinical Prof. | 5 |
| <u>Fall 2015</u> | | |
| 5889    Doctor of Nursing Practice Practicum II | Asso. Clinical Prof. | 5 |
| <u>Summer 2015</u> | | |
| 5869    Doctor of Nursing Practice Residency Elective | Asso. Clinical Prof. | 3 |
| <u>Spring 2015</u> | | |
| 5895    Clinical Practice Dissertation Seminar: Semester V | Asso. Clinical Prof. | 3 |
| <u>Fall 2014</u> | | |
| 5895    Clinical Practice Dissertation Seminar: Semester IV | Asso. Clinical Prof. | 3 |
| 5889    Doctor of Nursing Practice Practicum II | Asso. Clinical Prof. | 4 |
| <u>Summer 2014</u> | | |
| 5869    Doctor of Nursing Practice Residency Elective | Asso. Clinical Prof. | 3 |
| <u>Spring 2014</u> | | |
| 5895    Clinical Practice Dissertation Seminar: Semester V | Asso. Clinical Prof. | 3 |
| <u>Fall 2013</u> | | |
| 5889    Doctor of Nursing Practice Practicum II | Asso. Clinical Prof. | 4 |
| <u>Summer 2013</u> | | |
| 5869    Doctor of Nursing Practice Residency Elective | Asst. Clinical Prof. | 3 |
| <u>Spring 2013</u> | | |
| 5879    Doctor of Nursing Practice Practicum I | Asst. Clinical Prof. | 4 |
| <u>Summer 2012</u> | | |
| 5869    Doctor of Nursing Practice Practicum Elective | Asst. Clinical Prof. | 3 |

<u>Fall 2011</u>
5889   Doctor of Nursing Practice Practicum II                    Asst. Clinical Prof.    5

<u>Spring 2011</u>
5879   Doctor of Nursing Practice Practicum I                     Asst. Clinical Prof.    5