# EXHIBIT 26

Expert Rebuttal Report

Concerning the Report of Peter B. Crum M.D.

In the Case of Tapia v. Naphcare Inc., et. al.

No. C22-1141-JCC

Johnny E. Bates, MD MMM CPE CPHIMS CCHP-P FACCP FASAM

This report serves as a rebuttal to the report of Dr. Peter Crum submitted on behalf of Naphcare, Inc., dated March 15, 2024.  My curriculum vitae, summary of qualifications and experience, fee schedule, and list of publications and prior testimony were previously provided with my expert report dated March 15, 2024.  I also provided deposition testimony attesting to my qualifications, background, and experience on March 28.2024.  My opinions herein are based upon my skill, knowledge, training, education, expertise, and experience.  My opinions herein are based on reasonable probability and medical certainty.  I have been involved in correctional medicine for over thirty years and have owned and managed a correctional healthcare company for the last nineteen years with over 350 employees.  I am intimately familiar with the correctional setting and the capabilities and limitations of practicing in this setting.  I am a CCHP-P through the NCCHC and I am a Fellow of the American College of Correctional Physicians.

Dr. Crum's report, which outlines his opinions in defense of Naphcare's treatment of Mr. Tapia is replete with errors and omissions.  In addition, some of the facts alluded to within his report are not facts at all.

### Misrepresentations or Assumption of Facts

The first incident of a non-fact masquerading as "fact" is on page 5 of Dr. Crum's report, imputes that Mr. Tapia was involved in the making of "pruno," which is jail alcohol.  There is no factual evidence that Mr. Tapia was involved in making or drinking pruno, but even if he had this would not explain his behavioral changes over the next two weeks.

On page 7 of his report Dr. Crum comments on the initial visit that Mr. Tapia had with LPN Carillo.  He comments that LPN Carillo verbally informed the clinic RN about the information that he had gathered and the RN reviewed LPN Carillo's note in the chart.  This implies that this would have been sufficient and nothing more should have been done.  There is no documentation that LPN Carillo reported anything to an RN.  Similarly there is no note from the RN indicating she reviewed the chart.  The only evidence for this purported fact is a log entry in Naphcare's "TechCare" system that indicated an RN reviewed Mr. Tapia's chart on the same date after LPN Carillo had seen Mr. Tapia.  This log entry provides no information as to what information as to what information was reviewed – it could have been anything in the record.  If the RN indeed reviewed the LPN Carillo note the standard of care would have required her to document her review, findings and any further actions that needed to be taken.  No such documentation exists. If she had indeed reviewed the chart, the first thing that she should have been noted was that there was only one vital sign taken.  She should have requested that Mr. Carillo go back and obtain a complete set of vital signs, and she should have asked him to do a more complete assessment of Mr. Tapia's cognitive status, at the very least.  The other option the RN could have chosen was to visit Mr. Tapia, or have him brought to the clinic to perform a more thorough assessment.

On page 10 of Dr. Crum's report, he relies on Nurse Warrens's deposition transcript to make the assertion that "Naphcare staff performed daily rounds, including seeing every inmate in the Mental Health Observation Unit which includes Mr. Tapia, at least once per day, if not more." However, Dr. Crum ignores that Nurse Warren was describing medication rounds and that Mr. Tapia was not receiving medication, so was not visited during these rounds.  He also ignores that when these medication rounds occur, for those not receiving medications, the nurses pass by them while the inmates are not in full view behind solid cell doors with doors locked.  Dr. Crum ignores that there is no documentation to support that each inmate was actually visited by medical staff.  In fact, there is no documentation in Mr. Tapia's chart that any medical or mental health staff saw him, checked on him, or even viewed his electronic chart for a period of six days while Mr Tapia was in the Mental Health Observation Unit despite his condition being previously described as " confused", "decompensated" and, as Jesus Perez testified, "it was obvious to everyone that Mr. Tapia was … experiencing …some kind of mental health crisis." (Perez Deposition pg. 6)  The standard of care requires all clinical interaction to be documented. If it is not documented, it didn't happen.

Dr. Crum makes assumptions and assertions of fact that despite contrary evidence in the record, or no evidence at all.  His opinions related to these purported facts, as outlined above, are unreliable.

**Errors and Omissions in the Conclusions and Summary of Opinions**

1. **Dr. Crum's Opinion that Naphcare did not withhold care from Mr. Tapia.**   Dr. Crum's report states: "Naphcare personnel provided Mr. Tapia with access to healthcare and did not otherwise withhold any care."  However, Dr. Crum's opinion overlooks the fundamental issue in this case, which is that Mr. Tapia was not provided the *care that he needed* in a timely manner, and that is what ultimately led to the loss of his leg. Withholding or denying care is the antithesis of what the standard of care requires.  Mr. Tapia claimed that Naphcare withheld care as part of a policy of putting profit over care. This policy, as Mr. Tapis cited in his complaint, including hiring and relying on low level staff like LPN's who provide less expensive labor, to perform work outside the scope of their expertise.  It is also quite clear from the documentation and testimony that the majority of referrals for health care and evaluation came not from Naphcare but the correctional staff or lower level (not MD or PhD) mental health staff.  In other words, Naphcare's practice and custom was to rely on correctional staff, mental health staff, and LPN's to alert them to any medical needs; however, those staff are not medically trained to diagnose or comprehensively evaluate medical needs.  For example, the finding of Mr. Tapia's discolored foot was noted by a correctional officer not the medical staff.   The limited contact NaphCare employees did have with Mr. Tapia were almost exclusively with lower-level providers unable to diagnose or perform comprehensive assessments and who did not escalate his care.  Dr. Crum also ignored the September 13, 2024 sick

call for sleeplessness made by Mr. Tapia, this was completely ignored by the medical staff. Jesus Perez cancelled the sick call because their system was "bogged down" with medical requests and no follow-up was performed by either mental health or medical staff. (Perez deposition pg. 60) Mr. Tapia received no care for his sleep difficulties on September 13, 2024, which possibly indicated the start of the symptoms that led to the loss of his leg. This is another example of the untruth of Dr. Crum's statement that NaphCare did not withhold care. Mr. Perez testified that cancelling or redirecting medical sick calls was his regular practice at that time, and that NaphCare was fully aware of the practice and allowed it. What Naphcare had in place in 2018 was a system where they only provided care once the medical team was alerted by non-medically trained staff rather than proactively assessing what medical needs existed. Even when those needs were known Naphcare often relied on the least trained individuals i.e., LPN's to determine what those needs were. The flaws in this system resulted in the obvious consequence that even the untrained (correctional officers) recognized them. Mr. Tapia exhibited symptoms indicating severe medical need –e.g., acute altered mental state, confusion, decompensation, becoming non-verbal, refusing multiple meals—went ignored or untreated. NaphCare cannot claim that they did not withhold care because the evidence is overwhelming that Mr. Tapia needed it and did not receive it. This failure and Dr. Crum's support of it falls well below the standard of care. The patient should have received care that meets the NCCHC standards which are reproduced below:

**Individuals with serious mental illness often experience an exacerbation of their underlying illness when segregated. NCCHC recommends that the health rounds on patients with serious mental illness in segregation take place at the beginning, middle and end of each week to decrease the likelihood of problems during weekend hours.**

**Simply initialing a housing roster upon entering the unit is not enough. Segregation rounds should be documented on individual logs or cell cards (and when filled should be filed in the health record) or in the health record, and include date and time of contact and the signature or initials of the health staff member making the rounds (compliance indicator 3). Significant findings should be documented in the health record (compliance indicator 4).**

**Health staff should note every time they make rounds, whether or not there is a health-related interaction or observation. However, necessary clinical encounters should not take place cellside but in an appropriate clinical setting and noted in the patient's health record. When health care is requested, arrangements should be made for triage, examination and treatment in an appropriate clinical setting. Note that the segregation rounds are required in addition to whatever mechanism is in place for incarcerated individuals to request health services daily (see E-07 Nonemergency Health Care Requests and Services).**

2. **Dr. Crums opinion that Naphcare had policies, procedures, and customs in place in 2018 that provided inmates with access to care, identified appropriate assessments for RN's and LPN's, and employed more RNs than LPNs at the jail.**
I disagree with Dr. Crum that NaphCare's practice and customs in place in 2018 provided Mr. Tapia with access to care and that RNs and LPNs performed appropriate assessments. It does not matter that a written policy identifies what the appropriate assessment or access to care is if the appropriate assessment or access to care is not actually provided as a matter of practice or custom. I do not have personal knowledge about whether NaphCare employed more RNs than LPNs at the jail at any given point; however, whether that is true or not LPNs were utilized to make assessments they were not qualified to make and RNs were not used to evaluate Mr. Tapia at a time when it could have made a difference. Here again, it does not matter the number of RNs that were employed if they are not providing the appropriate care. Dr. Crum's opinion in this regard is unreliable and inconsistent with the standard of care.

3. **There was no cost-saving incentive regarding Mr. Tapia's care during his incarceration. There is no individual billing process by which patients are charged per visit to Naphcare. There is no cost difference whether a patient is seen by an LPN, an RN, or an MD. Therefore, there is not cost savings incentive for a patient to be seen by the appropriate staff, housed in the appropriate clinical setting, and referred out as appropriate during his incarceration.**
It is quite obvious from the documentation and testimony that the timing of referral for offsite care was delayed to the point that the loss of Mr. Tapia's limb was irreversible. Moreover, staffing the medical contract with LPN's and relying on correctional officer referrals is itself a cost saving measure. Although RNs were purportedly onsite, there is little evidence that RNs were employed to perform the appropriate and necessary assessments. Mr. Tapia was not seen by a medical doctor until he was sent to the hospital on October 1, 2018, despite clear indications he needed escalation of care much earlier. Dr. Crum's opinion focuses on medical billing, which is not the only kind of cost-saving measure or incentive in existence. Naphcare's focus as a contracting service provider and not a health care provider as related by the previous CEO and now board Chairman captures its corporate focus: profit. Dr. Crum's opinion in this regard is unreliable and inconsistent with the standard of care.

4. **NaphCare's practice or custom at the Jail in 2018 was "when in doubt, send them out," meaning if any medical staff at NaphCare recognized that a problem could not be adequately treated in NaphCare's facility, NaphCare would send them to an emergency room or a specialty facility because cost was not a concern.**
The alleged practice or custom is belied by the evidence in this case. Mr. Tapia was never

diagnosed, no one knew what the cause of his decompensating condition was between at least September 18, 2024 where he "appeared to be confused and was unable to verbally respond . . . , but appears to be decompensated" and October 1,2018 when he was finally sent to the hospital for his unknown condition. His chart notes from a visit with a mental health staff person on September 19, 2018, related again that Mr. Tapia "appears to be 'way off his baseline' and he was nonverbal in court. . . . He could have unknown medical condition." This note expresses clear doubt as to Mr. Tapia's condition. No treatment was provided. The Naphcare medical provider sent to follow up on this doubt was an LPN unqualified to perform a comprehensive assessment and unqualified to diagnose. This happened over, and over again, representing a policy or established practice. It was therefore impossible from a medical standpoint for these lower-level providers to know how to adequately treat Mr. Tapia's condition, and thus, it was impossible for them to know whether Naphcare could adequately treat his condition. In fact, no treatment was provided—a fact that implies the doubt in and of itself. Despite lingering doubt over what was causing Mr. Tapia's confusion and decompensation and whether they could adequately provide treatment at the jail, he was not "sent out" or referred to a higher-level provider. Mental health care providers noted on September 20, 2018, that Mr. Tapia "does not respond in any way . . . would not even shake his head yes or no." On this date, no diagnosis occurred, referral requested, or treatment was provided; thus doubt still existed as to his condition and whether appropriate treatment could be provided. Not only does this negate Dr. Crum's assumed fact that NaphCare nurses visited patients daily, but these records demonstrate a clear record of the cause of Mr. Tapia's condition. Further, as described above due to the low level of licensure of the providers who did have limited contact, and the fact there was never any diagnosis, there was no way for them to know whether NaphCare could provide adequate treatment. There was "doubt," but Mr. Tapia was not "sent out". Dr. Crum's opinion in this regard is unreliable and inconsistent with the standard of care.

5. **Dr. Crum's opinion that Mr. Tapia was treated appropriately and in a timely fashion by NaphCare from June 16, 2018, to October 1, 2018.**

   Mr. Tapia never received any treatment from NaphCare until October 1st, by which time it was too late to save the patients leg. There is no evidence that the patient was treated for any condition (no condition was ever diagnosed) or that he was monitored appropriately. The closest this comes to being accurate is two days before the patient is sent out when he is seen by nurse Warren. Nurse Warren does a perfunctory job of assessing Mr. Tapia and then makes some assumptions that were false, however, other than offering him something to drink there was no treatment given. RN Warren made the assumption that there are starvation vital signs and that she based the need for referral on the finding that there were no starvation vital signs. I am unfamiliar with the concept of starvation vital signs. I am familiar with dehydration, and this would have required her to perform a tilt test, which she did not perform. Timely care would have been to start immediate IV access for his dehydration, evaluate him for his altered mental status and to elevate his care such that diagnosis could be determined and

appropriate treatment administered. Gentle persuasion is not a form of medical care of which I am familiar. There was nothing appropriate or timely about his care or lack thereof. Dr. Crum's opinion in this regard is unreliable and inconsistent with the standard of care.

6. **Dr. Crum's opinion that LPN Carrillo's "focused assessment" of Mr. Tapia on September 19 was within his scope of practice and met all applicable standards of care.**
    A patient assessment would include a complete set of vital signs including the following: Heart Rate, Blood Pressure, Temperature and Oxygen Saturation. The only vital sign that was taken was a Blood Pressure. LPN Carrillo's assessment was simply a matter of talking to Mr. Tapia, getting him to respond, and calling it a day. He did not illicit any of the standards that should have been conducted during this interview such as orientation to person, time, and place. He did not assess his mental acuity or reasoning abilities. There really wasn't an assessment—"focused" or otherwise. Moreover, there was no documented evidence of LPN Carrillo being directed to perform a certain type of focused assessment by an RN (.i.e.,what type of data he was supposed to collect), or evidence that he reported his findings to a supervising RN, all of which are required under and LPN's scope of practice.

7. **Dr. Crum's opinion that RN Warren's "focused assessment" of Mr. Tapia on September 29 was within her scope of practice and met all applicable standards of care. If RN Warren believed there was anything medically wrong with Mr. Tapia during this assessment, she would have brought him to the clinic to see a provider.**
    The assessment by Nurse Warren was incomplete and inadequate. In her deposition, Nurse Warren makes the bold statement that she would have had the patient referred if he had only had starvation vital signs. To my knowledge there is no medical criterion known as "starvation vital signs." In fact the changes of starvation over time are subtle when it comes to vital sign changes. Howeve,r the changes associated with dehydration can be quite dramatic. Had Ms. Warren perform a tilt test i.e., checking his blood pressure and pulse lying, sitting, and standing I believe it is more likely than not that she would have seen marked vital signs. In the process of performing the tilt test I believe it is more likely than not that she would have discovered his lower extremity symptoms, and that Mr. Tapia would have experienced severe identifiable pain once standing on it. It is quite obvious from the records at Tacoma General that Mr. Tapia was severely dehydrated at the time of his admission and that this had been going on for several days. The patient had an initial BUN of 110, which indicates severe dehydration along with an elevated creatinine.

8. **Dr. Crum's opinion as soon as NaphCare personnel discovered that there was anything remotely wrong with Mr. Tapia's foot, they immediately sent him to Tacoma General Hospital for further care without delay and consideration of the cost.**
    In my deposition, while asked on the spot after having only briefly reviewed Dr. Crum's report, I testified that this was a correct statement. Upon further reflection and re-

reading this, it is not. NaphCare did not discover the problem with Mr. Tapia's foot until it was pointed out to them by a correctional officer. As stated above, almost all of the referrals came at the behest of the correctional officers, and with a degree of medical certainty based upon my expertise, education, and experience, Mr. Tapia would have had symptoms related to his DVT much earlier than October 1, 2018, the day the correctional officer discovered the issue with Mr. Tapia's foot. Accordingly, I agree with Dr. Crum to the extent that it was appropriate care to send Mr. Tapia to the hospital. I disagree with Dr. Crum's statement implies the care provided to Mr. Tapia by NaphCare was appropriate, or that sending him to the hospital on October 1, 2018, rather than earlier was appropriate. I disagree to the extent Dr. Crum's statement implies that NaphCare's failure to recognize Mr. Tapia's DVT symptoms earlier was appropriate, or that it implies NaphCare's reliance on correctional officers to point out the medical needs of inmates was appropriate.

9. **Dr. Crum's opinion that Mr. Tapia was capable of verbally describing any symptoms with his foot from September 19 to October 1. Mr. Tapia verbally told LPN Carrillo on September 19 that he had no medical concerns, and Mr. Tapia verbally told NaphCare personnel in the clinic on October 1 that he was having pain in his foot. Mr. Tapia also verbally told personnel at Tacoma General Hospital on October 1 that he had pain in his foot.**
   There is no evidence in the record that Mr. Tapia was capable of verbally describing symptoms in his foot from September 19 through October 1, 2018. There is, however, plenty of documentation that refutes it. First, LPN Carillo noted on September 19 that Mr. Tapia had no medical concerns, but it is unclear how much verbal interaction they had. LPN Carillo testified in his deposition he had no independent recollection of his visit with Mr. Tapia and could not remember if Mr. Tapia had verbalized statements or not. The mental health provider who saw Mr. Tapia on the same day as LPN Carillo—September 19—noted that Mr. Tapia was "confused…unable to verbally respond…[and] way off his baseline."
   Dr. Crum also completely ignores the chart note from September 20, 2018 from MHP Prather, which states: "Mr. Tapia does not respond in any way to MHP, he just stared. Mr. Tapia would not even shake his head yes or no." No other visit with Mr. Tapia was noted on that date, but these records were available in Mr. Tapia's medical chart accessible to NaphCare. This chart note on its own completely refutes Dr. Crum's opinion and demonstrates its unreliability.
   Dr. Crum ignores the chart note from September 26, 2018, from MHP Nealis, which states Mr. Tapia was "confused and non-verbal. He has been here at PCJ since June, but appears to be decompensated at this time." No other visit with Mr. Tapia was noted on that date, but these records were available in Mr. Tapia's medical chart accessible to NaphCare. This chart note on its own refutes Dr. Crum's opinion and demonstrates its unreliability.

Dr. Crum ignores the chart note from September 28, 2018 from MHP Perez, which states Mr. Tapia "presents MH symptoms. Mr Tapia would not answer MH questions. Mr. Tapia just looked at MHP and did not respond to basic questions. " No other visit with Mr. Tapia was noted on that date, but these records were available in Mr. Tapia's medical chart accessible to NaphCare. This chart note on its own completely refutes Dr. Crum's opinion and demonstrates its unreliability.

Dr. Crum ignores the observation report from September 29th, 2018, by corrections deputy Oeltjen, which states "Inmate Tapia would not respond to me verbally when I asked him if he wanted lunch. He did look up at me but would not answer." On September 29th, RN Warren noted in Mr. Tapia's record that during her visit Mr. Tapia "will not verbally respond." These records completely refute Dr. Crum's opinion and demonstrate its unreliability.

Dr. Crum also ignores the records of Mr. Tapia's Behavior Log which documents that Mr. Tapia refused meals from September 21 to September 29th. Although these logs marked "verbally refused meals" deposition testimony revealed that the term "verbally" is meaningless. Corrections Officer Jonah Bradley stated the following in his deposition:

    Q. Okay. And I think you mentioned earlier that here's a drop-down system; correct?
    A. Correct.
    Q. And one of the options is VRM, which would indicate Verbally Refused Meal, correct?
    A. Correct.
    Q. So specifically when it comes to refusing meals, what are the options?
    A. Just verbally refused meal.
    Q. Okay. There's no other option?
    A. No.
    Q. What if the inmate just waved you off without… saying anything?
    A. Then I would take that as a refusal.
    Q. And you would indicate it as VRM?
    A. Correct.
    Q. Even if someone—so in this, you would write "verbally" even if they didn't say anything?
    A. Correct.
    Q. And so if they just stared at you and didn't say anything, didn't wave, would you write "verbally refused meal"?
    A. Yes
    Q. So let's say that they are sitting in bed just staring at the wall not—and you come Up and ask them if they would like a meal. They don't move. They don't acknowledge your presence in any way. They don't wave. They don't say anything. Would you write "verbally refused breakfast"?
    A. Correct.

It is abundantly clear from the records that Mr. Tapia could not verbally respond and was therefore not capable of verbally describing any symptoms with his foot from the period of September 19 to October 1 as Dr. Crum opines. If he was waxing and waning, which is possible, it was not a clearcut as Dr. Crum opines. Dr. Crum's opinion is unreliable.

10. **Mr. Tapia also had ample opportunity to inform the Pierce County Jail medical and security staff of any medical concerns, specifically regarding pain to his left lower extremity and/or difficulty ambulating on his left lower extremity from September 19 to October 1. According to the Jail medical record, the Jail security record, and the hospital medical records, Mr. Tapia did not. Mr. Tapia did state that October 1 was the first time he mentioned any medical issue regarding his left lower extremity.**
This is not factually correct as the patient was not seen for 6 days during this crucial time frame (September 20th to September 26th) by any medical or mental health personnel. Drive by health care involving passing by the inmates and possibly visualizing them through a window while passing pills does not qualify as an assessment. The records demonstrate that Mr. Tapia was "confused" and "decompensated" and "nonresponsive" or "unable to respond" throughout this period. It is flawed logic and inconsistent with the standard of care to suggest that the patient, who cannot inform staff of their concerns due to a mental status change, had ample opportunity to do so and did not. It is also incorrect to say that October 1 was the first time Mr. Tapia mentioned any medical issue regarding his left lower extremity. Mr. Tapia was clear in his deposition that his memories of this period are unclear at best and not reliable. Mr. Tapia, due to his altered cognitive status, never informed medical of his lower extremity issues—a correctional officer was the one who first took notice of it.

11. **There is no evidence to suggest that Mr. Tapia suffered any mental status changes related to sequelae at bacterial infection at the jail prior to his hospitalization at Tacoma General Hospital. Mr. Tapia was started on empiric antibiotics on the sixth day of his hospitalization due to concern that he may have been developing an infection despite no infection being clinically apparent**.
Dr. Crum seems to imply that, indeed, there were mental status changes—but that they were not due to a bacterial infection. The fact that the mental status changes were not due to bacteremia does not negate the fact that they were indeed present as he is alluding to here. The problem with this line of reasoning is that the fact that Mr. Tapia had obvious mental status changes that required intervention and treatment but were never addressed. It is far more likely than not that the mental status changes, immobility of the patient, and the DVT that eventually led to the loss of his limb occurred many days if not weeks prior to October 1.

12. **There is no evidence that Mr. Tapia was severely malnourished while at the Jail. Mr. Tapia weighed 153 pounds at his booking on June 16, 2018 and did not lose 10% of his weight by October 1, 2018. Mr. Tapia's vitals on September 29 and October 1 were also not consistent with someone who is severely malnourished**.

There is substantial evidence including the reduced creatinine levels for someone with a BUN of 110 at the time of hospital admission. There is also substantial evidence of a failure to eat and multiple missed meals. Vital signs are not a sufficent indicator of malnourishment and only change in the very late stages as the body begins to conserve energy and you see a drop in heart rate and due to eventual heart failure a lowering of Blood Pressure.  Dehydration, on the other hand, is much easier to diagnose and had a tilt test been performed it is more likely than not that Mr. Tapia's serious medical condition would have been discovered.  Additionally, a nutritionist saw Mr. Tapia at the hospital and was secure at that time in diagnosing him as "severely malnourished."  Dr. Crum uses a weight of 153 pounds on June 16. 2018 to state that Mr. Tapia did not lose 10% of his weight by October 1, 2108.  However, this weight measurements throughout the records both NaphCare's and the hospital's are inconsistent and unreliable. Other criteria besides weight measurements are used to diagnose malnutrition.  His physical appearance and health status was such that the hospital ordered a nutritional evaluation, and the nutritionist diagnosed him as "severely malnourished."  He had physical markers of malnourishment, BUN levels indicated severe dehydration while his creatinine levels were inappropriately low for his degree of dehydration indicating a loss of muscle mass.   I cannot agree with Dr. Crum's opinion that there is no evidence that Mr. Tapia was not severely malnourished.

13. **There is no evidence that "the decomposition of Javier's foot and leg . . . because obvious [SIC] to even a casual observer" because "[s]ores and blisters that bled and released a dirty-looking, foul smelling discharge were readily apparent to anyone even superficially interacting with Javier" while he was at Pierce County Jail, as claimed in the Second Amended Complaint. Deputy Paukert described Mr. Tapia's foot was a "purple/black color." DEF PC 000042. Dr. DeLeon described Tapia's foot as having "discoloration" to the "[l]eft forefoot and all toes" but "[t]here [was] no drainage, sloughing of the skin, vesicles, blistering, or open wounds." DEF PC 100633. The first available picture of Mr. Tapia's foot, which is dated October 3, 2018, likewise depicts a foot that is discolored. TAPIA055624. There are no apparent open wounds or signs of discharge. The pictures referred to in Mr. Tapia's Second Amended Complaint was taken on October 5 and 10, 2018, and shows significant changes from how his foot was described on October 1 and how it looked on October 3, and then how it looked two days later on October 5, and five days after that on October 10. DEF PC 100633; TAPIA055624; TAPIA055632; TAPIA055649.**

It was a casual observer, a correctional officer, that noted the issue with Mr. Tapia's foot. The fact that it got to the point it did requiring amputation is the reason we are here now.  This process starts with a clot in the deep veins of the leg and as time progresses the clot grows by extension.  This is one reason it is more likely than not this had been going on for several weeks.  The patient had clotting of all the named venous vessels of his legs which led to the phlegmasia cerulea dolens.  This took time for it to advance to this degree and would not have been present at a time when intervention could have saved Mr. Tapia from the devastating amputation he later had to suffer.

I reserve the right to supplement this opinion in the event additional documentation is provided in this matter. My opinions herein are expressed with a reasonable degree of medical certainty.

Dated this 29th of April, 2024.

_____
Johnny E. Bates, MD MMM CPE CCHP CCHP-P FASAM