# **EXHIBIT 39**

# Daphne Glindmeyer, M.D.

611 River Highlands Blvd. Suite B
Covington, LA 70433

Phone: (504) 392-8348           Phone: (985) 888-1414
Facsimile: (504) 398-4334       Facsimile: (985) 888-1415

April 30, 2024

Ryan Dreveskracht, Esq.
Corinne Sebren, Esq.
Galanda Broadman, P.L.L.C.
Post Office Box 15146
Seattle, Washington 981115
ryan@galandabroadman.com
corinne@galandabroadman.com

Re:   Javier Tapia v. NaphCare, Inc., et al.
      Rebuttal Report

Dear Mr. Dreveskracht and Ms. Sebren,
I authored a report in the above titled case dated March 11, 2024. Subsequent to that, I reviewed additional documentation including but not limited to the reports of Alan A. Abrams, M.D., J.D., FCLM and Andrew Nanton, M.D. The following report contains my rebuttals to the opinions outlined in those reports. I will address each report separately addressing the opinions in the order they are documented in the reports.

Report of Andrew Nanton, M.D. dated March 14, 2024:
1. Dr. Nanton documented "Mr. Tapia sent a kite to the to the medical clinic complaining of insomnia on September 14, 2018. Mr. Jesus Perez identified that problems with sleep should be directed to mental health instead of the general medical clinic. In his deposition on page 65, Mr. Perez said that the communication needed to come to mental health so that he could correspond with Mr. Tapia through their electronic system. Insomnia is a frequent complaint in correctional settings and a low urgency issue. Therefore, this was a reasonable approach."

   Rebuttal Discussion:
   As noted in my report in this case, kites, or health care requests submitted, must be triaged by nursing prior to referral to other health care providers such as mental health. It is inappropriate for mental health to cancel and divert or

Javier Tapia v. NaphCare, Inc., et al.                                          1
Rebuttal Report

delay care. Mr. Perez reported in his deposition that he instructed Mr. Tapia to re-kite to mental health. This side-steps the medical review. Sleep difficulties, while a frequent complaint in correctional settings, may be a symptom of other medical conditions and therefore, must be triaged by a medical provider. Mr. Perez's cancellation of this health care request was an inappropriate barrier to Mr. Tapia's access to medical care.

Per the documentation reviewed, Mr. Tapia's complaint of sleep difficulties was not evaluated by medical or mental health staff following this kite. Although Mr. Tapia had submitted a kite and Mr. Perez was aware of the kite, Mr. Perez requested that Mr. Tapia re-kite mental health, delaying Mr. Tapia's access to care and creating an unnecessary barrier.

2. Dr. Nanton stated that based on Mr. Carrillo's deposition, describing verbal interactions with Mr. Tapia, that Pierce County Mental Health staff could "reasonably conclude... that Mr. Tapia could communicate verbally if he chose to do so, had no active medical complaints, and that NaphCare medical had performed any necessary general medical assessments."

Rebuttal Discussion:
The facility mental health staff were the most qualified at the facility to perform a mental status examination and recognize/ respond to mental health symptoms/crisis. Unfortunately, the mental health staff did not perform adequate mental status examinations. Instead, they cursorily visited with Mr. Tapia through a closed door or the porthole in the cell door. There were no documented attempts to engage with Mr. Tapia outside of his cell, or to perform a formal mental status examination.

Given the lack of an assessment which as noted above, would include a mental status examination, mental health staff could not "reasonably conclude" that Mr. Tapia could communicate verbally. They had not assessed Mr. Tapia, so they would not know this. In addition, prior to and subsequent to Mr. Carrillo's visit with Mr. Tapia on September 19, 2018, mental health described Mr. Tapia as "confused," "decompensated," and "way off his baseline." A review of Mr. Carillo's deposition indicated that although Mr. Carrillo documented that Mr. Tapia had "no medical concerns," at the time of the September 19, 2018 visit, Mr. Carrillo did not have a recollection of his interaction with Mr. Tapia and was not sure if the two had a verbal interaction.

On September 20, 2018, mental health staff documented that Mr. Tapia "does not respond in any way...just stared...would not even shake his head yes or no." On September 26, 2018, mental health staff documented that Mr. Tapia was "confused and non-verbal...here since June...appears to be decompensated

Javier Tapia v. NaphCare, Inc., et al.                                                    2
Rebuttal Report

at this time." Given these reports, it would not be reasonable to conclude that Mr. Tapia was capable of verbal interaction.

As the documented mental health issues continued, mental health should have again referred Mr. Tapia to the facility medical providers. Further, mental health providers, if they were collaborating care with medical providers, should have realized that although Mr. Carrillo stated in his progress note that medical would follow up with Mr. Tapia, that did not occur. In fact, medical did not see Mr. Tapia for another 10 days, and then only after a request from a corrections deputy.

3. Dr. Nanton indicated, "patients who do not respond verbally are often able to identify their needs nonverbally. In his interactions with correctional, medical, and mental health staff, Mr. Tapia could have pointed to or displayed his foot. He showed the capacity for significantly more sophisticated and detailed interaction than merely pointing while in the emergency department at Tacoma General Hospital. The available documentation does not describe a psychiatric or general medical condition that would be expected to result in an inability to speak. In my opinion, Mr. Tapia's lack of verbal communication was more likely related to an unwillingness rather than an inability to speak."

Rebuttal Discussion:
In my opinion, Mr. Tapias symptoms as reported by mental health including confusion, decompensation, being non-verbal, and having decreased interaction overall, is descriptive of an individual experiencing an acute mental status change. Given these symptoms, the serious medical condition, and the isolation that Mr. Tapia was experiencing at that time, it is my opinion that these symptoms were related to a delirium rather than simply an unwillingness to speak. Were Mr. Tapia simply unwilling to speak, he would not have been described as confused and decompensated. Further, as noted in my rebuttal comments above, mental health staff did not perform an adequate assessment of Mr. Tapia, so they would not have known if Mr. Tapia had the ability to engage verbally.

Delirium is a neurocognitive disorder that per the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition [DSM-V], is "a disturbance in attention... and awareness (reduced orientation to the environment)...develops over a short period of time... represents a change from baseline attention and awareness, and tends to fluctuate in severity during the course of a day... an additional disturbance in cognition (e.g., memory deficit, disorientation, language, visual spatial ability, or perception)... not better explained by another preexisting, established, or evolving neurocognitive disorder... evidence from the history, physical examination, or laboratory findings

that the disturbance is a direct physiological consequence of another medical condition." For this case review, the DSM-V criteria was utilized rather than the DSM-V-TR. The DSM-V criteria was published in 2013, and was the source document during 2018, the period of time in question.

Given these diagnostic criteria and the typical presentation of delirium, Mr. Tapia would have had a disturbance in attention and language such that he would not have been able to non-verbally communicate with Pierce County staff. Further, Dr. Nanton indicated that Mr. Tapia was able to communicate at the Emergency Department. As outlined in the diagnostic criteria, fluctuation in the severity of the symptom presentation is a hallmark of delirium as the symptoms tend to wax and wane over time.

4. Dr. Nanton indicated that Mr. Tapia has "the right to refuse to participate in assessments... At the time of his refusals, Mr. Tapia did not have a documented mental health diagnosis and was minimally participatory in assessment rather than refusing an actively offered treatment."

Rebuttal Discussion:
Mr. Tapia did not refuse to participate in assessments, rather the assessments did not occur. Based on the mental health documentation that described Mr. Tapia as "confused," "decompensated," and "way off his baseline," it is not possible to determine that Mr. Tapia was "minimally participatory" in any way. As noted in my initial report, "Mental health staff reported that due to Mr. Tapia's lack of verbal interaction, they were unable to complete a mental health assessment or mental status examination. This is inaccurate and a deviation from the standard of care. The mental status examination includes multiple non-verbal components and indicators that can be used to determine an individual's mental state including but not limited to appearance, level of alertness, ability to follow commands, tics/tremors, apparent response to internal stimuli, and psychomotor retardation or agitation. Further, depositions revealed that in a deviation from the standard of care, it was common practice for mental health staff to attempt to engage with inmates through the cell door or through the port hole in the door. They did not typically enter the cell or take the inmate to a separate location, choosing to engage with the inmate cell side. This is inappropriate and a barrier to engagement, assessment, and treatment."

Given Mr. Tapia's acute mental status change, symptoms of which were consistent with a diagnosis of delirium, Mr. Tapia would have experienced fluctuations in his level of alertness and as documented, confusion and difficulty with verbal communication. There is no documentation of his actual refusal of care. On 9.28.18, mental health staff document that Mr. Tapia "refused...would

not answer mental health questions." Given the lack of a complete assessment and the previous and subsequent documentation of Mr. Tapia's mental status deficits, it is my opinion that Mr. Tapia did not refuse, rather, he was unable to communicate or respond due to the impact of delirium on his mental status.

As noted in the National Commission on Correctional Health Care standards, it is standard of care that when inmate's refuse care, a refusal form is completed. That form would include a "description of the nature of the service being refused, evidence that the inmate has been made aware of any consequences to health/mental health that may occur as a result of the refusal, the signature of the patient, the signature of medical/mental health services staff witness."

Pierce County Jail policy and procedure entitled "Informed Consent and Right to Refuse" indicates that if an inmate refuses health care services, the "Release of Responsibility - Specific Procedure form will be read and signed by the patient that refuses treatment in the presence of a witness and recorded in TechCare. Signing of this form will be witnessed by a member of the health care staff. In the event the patient refuses to sign a Release of Responsibility – Specific Procedure form, the medical staff member will complete the form and write 'patient refuses to sign' in the space for signature. The signature of both the medical staff member and witness are required."

There were no completed refusal forms included in the medical or mental health care records for Mr. Tapia, indicating that he did not refuse medical or mental health assessments or treatment.

5. Dr. Nanton opined, "If Mr. Tapia were experiencing medical problems causing delirium, I would expect a general worsening of the delirium over time. That would mean that his delirium likely would have been at its worst at the time of arrival at Tacoma general hospital."

Rebuttal Discussion:
Delirium such as that experienced by Mr. Tapia can last for weeks. The condition does not necessarily worsen over time, that would depend on the underlying condition which resulted in the delirium. Again, the symptoms including impaired cognition, impaired memory, alterations in verbal communication, disorganized thinking, disruptions in the sleep/wake cycle, and reduced awareness fluctuate, and Mr. Tapia apparently had times when his symptoms had waned to the point that he was able to communicate.

6. Dr. Nanton stated, "it is my opinion that Pierce County Jail Mental Health staff met their obligation to Mr. Tapia by referring him to NaphCare for general medical assessment. Following that referral, the jail mental health staff

Javier Tapia v. NaphCare, Inc., et al.  
Rebuttal Report

5

reasonably and appropriately deferred to the NaphCare general medical staff regarding the type of assessment, monitoring, and intervention needed for general medical problems."

Rebuttal Discussion:
While the mental health staff reportedly referred Mr. Tapia for a medical assessment, the mental health staff did not acknowledge that Mr. Tapia was not subsequently assessed by medical despite documentation that medical would follow up. There was no documentation indicating collaborative care between medical and mental health staff. Further, despite mental health staff continuing to document that Mr. Tapia was confused, they never completed a complete assessment of his mental state. Given his ongoing difficulties, mental health should have prompted another medical consultation.

There were significant gaps in both medical and mental health care staff visits with Mr. Tapia. Mr. Tapia was in level one mental health housing. Per Pierce County Jail policy and procedure entitled "Mental Health Housing" this housing is "one of the most restrictive housing options for those inmates with mental health concerns and recommendations for this housing by mental health staff is for safety concerns only and not for disciplinary purposes." As he was in level one mental health housing, facility policy and procedure indicated the need for mental health visits three times per week. The standard of care would be to assess Mr. Tapia three times per week at regular intervals, but in a deviation from the standard of care, there was a gap of six days between mental health visits as the visits were inappropriately clustered together. Further, the National Commission on Correctional Health Care standards indicate that in this type of setting, medical visits must occur daily. In a deviation from the standard of care, records revealed a ten-day gap between medical health care provider's visits.

Additionally, facility policy and procedure as noted above required mental health assessments three times per week in level one mental health housing. Per the National Commission on Correctional Health Care, acute mental health units such as level one mental health housing at the Pierce County Jail must have, at a minimum, daily patient evaluation by mental health staff. So, even the Pierce County Jail policy and procedure requirements fell below the standard of care.

7. Dr. Nanton opined that Pierce County Jail mental health staff, "continued their attempts to assess his [Mr. Tapia's] mental health... mental health staff were not indifferent to Mr. Tapia's mental health needs. They continued to assess him periodically and referred him to the medical clinic as appropriate."

Javier Tapia v. NaphCare, Inc., et al.
Rebuttal Report

6

Rebuttal Discussion:
As noted in my initial report, Pierce County Jail never completed a mental health assessment of Mr. Tapia. They continued to document that due to a lack of verbal interaction, they were unable to complete the mental health assessment. This is inaccurate as mental health assessments are routinely performed for individuals who are unable to speak.

Dr. Nanton noted that mental health continued to assess Mr. Tapia periodically. This is incorrect as even when mental health staff visited with Mr. Tapia, this was reportedly from outside of the cell, with the cell door impeding their interaction. This was a barrier to assessment. Additionally, here was a period of six days, between September 20 and 26, 2018 where Mr. Tapia was not visited by mental health staff.

As noted above, mental health staff did refer Mr. Tapia to medical on September 19, 2018. Mental health staff did not acknowledge that medical staff failed to follow up with Mr. Tapia as was documented in Mr. Carrillo's progress note. Medical did not see Mr. Tapia for another ten days, until they were prompted to visit by a corrections deputy. Further, as Mr. Tapia remained confused, mental health staff, had they appropriately assessed Mr. Tapia, would have noted the signs and symptoms of delirium, and referred him to medical for another assessment.

8. Dr. Nanton opined that Mr. Tapia's contact with jail mental health professionals was appropriate to his known and apparent mental health needs.

Rebuttal Discussion:
Between September 17, 2018 and Mr. Tapia's transfer to Tacoma General Hospital on October 1, 2018, he was housed in level one mental health housing. Per policy and description, this was a unit where individuals were housed in a single cell 23 hours a day with one hour out of their cell daily for showering. This meets the definition of extreme isolation per the National Commission on Correctional Health Care, "situations in which inmates encounter staff or other inmates fewer than three times per day." As such, as Mr. Tapia was housed in this area due to mental health needs, essentially in an acute mental health residential unit, Mr. Tapia should have been assessed daily by mental health staff.

Pierce County Jail, in a deviation from the standard of care, had policy and procedure indicating that individuals housed in level one mental health housing must be assessed three times per week by mental health staff instead of daily. Even though the policy was not to the standards promulgated by the National Commission on Correctional Health Care, the mental health staff at the Pierce

Javier Tapia v. NaphCare, Inc., et al.
Rebuttal Report

7

County Jail did not even adhere to their own policy of assessing Mr. Tapia three times per week. Instead, they clustered their visits, allowing for a gap of six days between visits. These assessments must be regularly spaced to monitor individuals in isolation settings such as level one mental health housing. Failure to do so is a deviation from the standard of care. It is standard of care that individuals in isolation or mental health observation units are seen at regular intervals, not allowing for gaps in assessment observations.

9. Dr. Nanton indicated that Pierce County Jail mental health staff "reasonably adopted a stance of watchful waiting in coordination with the general medical clinic."

Rebuttal Discussion:
Documentation reviewed in this case did not reveal any notations of coordination of care between mental health staff and medical staff at the Pierce County Jail. In fact, there was an overall lack of coordination of care. For example, mental health staff cancelled Mr. Tapia's kite requesting medical treatment for problems sleeping, instructing Mr. Tapia to re-kite mental health. This is redundant. As mental health knew that Mr. Tapia was reporting sleep issues, knew that he was requesting care, and made the decision to cancel the kite, mental health then became responsible for responding to Mr. Tapia's request. In a deviation from the standard of care, mental health did not follow up with Mr. Tapia to assess his complaints.

Mental health then referred Mr. Tapia to medical staff for an assessment and he was seen by Mr. Carrillo on September 19, 2018. This assessment was incomplete, and as discussed above, devoid of detail. Further, Mr. Carrillo indicated medical would follow up, but this did not occur for the next ten days, and only occurred after prompting from corrections staff. Additionally, during this time mental health staff had a six day gap in assessment during which no follow up occurred. As such, these two disciplines were not communicating about appropriate follow up and monitoring of Mr. Tapia during his stay in level one mental health housing.

Report of Alan A. Abrams, M.D., J.D., FCLM dated March 15, 2024:
1. Dr. Abrams opined, "There is no evidence supporting Mr. Tapia's claim that his mental health was deteriorating and/or that he suffered a mental health crisis at PCJ [Pierce County Jail."

Rebuttal Discussion:
On September 17, 2018, Mr. Tapia was referred for a mental health evaluation by a correctional deputy due to behavior including making "unintelligible remarks and was tearful and was acting very strange." Mr. Tapia was transferred

to Level 1 mental health housing where he was seen by mental health staff on September 18, 2018 who documented an acute mental status change noting Mr. Tapia was "confused and was unable to verbally respond to my questions...been here...since June but appears to be decompensated." A similar presentation was documented by mental health staff over the remainder of Mr. Tapia's stay in Level 1 mental health housing until his transfer to Tacoma General Hospital on October 1, 2018. Given this documentation, it is apparent that Mr. Tapia's mental health was deteriorating. He was noted to be "decompensated" meaning he was not at his baseline level of functioning.

2. Dr. Abram's opined, "There is no evidence that Mr. Tapia was unable to recognize his physical conditions or medical needs while in Pierce County PCJ. Mr. Tapia's current report in deposition of not remembering the events in Pierce County PCJ is not medical evidence that he was suffering from a mental health crisis in September 2018."

Rebuttal Discussion:
The totality of the documentation submitted in this case indicate a diagnosis of delirium as the primary mental health issue that Mr. Tapia was experiencing at Pierce County Jail. Given Mr. Tapia's delirium and the resultant symptoms, he would have experienced an inability to communicate his medical needs to staff at the jail. Memory deficits or impaired recent and immediate memory are one of the symptoms associated with delirium.

During delirium, individuals become confused and unable to think or remember clearly. The symptoms are acute, meaning they start suddenly, and they can wax and wane. The most common symptoms of delirium are memory problems, trouble concentrating, hallucinations and delusions, incontinence, emotional changes, disrupted sleep patterns/sleepiness, disorganized thinking or unintelligible speech, confusion, and changes in levels of consciousness/alertness. The documentation included in Mr. Tapia's record indicated he was experiencing confusion, disrupted sleep patterns, unintelligible speech, and changes in levels of consciousness/alertness.

3. Dr. Abrams indicated, "There is no evidence that Mr. Tapia was suffering pain due to PCD [Phlegmasia Cerulea Dolens] while at PCJ. Mr. Tapia was able to complain at TGH [Tacoma General Hospital] about the severe pain he was feeling shortly after his admission on October 1,2018, however he made no such complaints at PCJ until October 1, 2018. Pain insensibility is one of the practical tests of whether a person is in a coma or markedly altered state of consciousness."

Javier Tapia v. NaphCare, Inc., et al.
Rebuttal Report

9

Rebuttal Discussion:

Dr. Garcia, the vascular surgeon, indicated in his deposition that with regard to Mr. Tapia's PCD, ""I have been doing this for 22 years and so we see how wounds look and how feet look when they lose their circulation...when it's gangrenous like this, it's...been there for a little while...at least probably one to two weeks." As such, Mr. Tapia would have experienced pain due to PCD while at Pierce County Jail, but neither medical nor mental health staff would have known if Mr. Tapia was experiencing pain, as in a deviation from the standard of care, there were significant gaps in monitoring, mental health did not assess Mr. Tapia for six days and medical did not assess Mr. Tapia for ten days.

PCD is a painful condition. The literal translation of Phlegmasia Cerulea Dolens is "painful blue inflammation." Given this condition and Dr. Garcia's estimation of the timeline, it is obvious that Mr. Tapia was experiencing pain due to this condition while at Pierce County Jail. Pain, specifically uncontrolled pain, and placement in isolation are known causes of delirium. Research has indicated that "disturbances in attention, awareness, and cognition are characteristics for delirium and can compromise pain assessment."[1]

Further, "Pain is defined as an unpleasant sensory and emotional experience associated with actual or potential tissue damage, or described in terms of such damage that, as a highly subjective phenomenon, is best assessed via the patient's self-report. Delirium, as a common cause of cognitive impairment, may compromise the capacity of patients to self-report pain, due to a variety of reasons including disturbances of attention, memory, thinking, and language disturbance (such as word finding difficulty, incoherent speech, and problems with writing)...In all delirium subtypes (hyperactive, hypoactive, or mixed-delirium), symptoms fluctuate, so that delirious patients' capacity to self-report pain can vary at different times along a continuum from full capacity (i.e., able to provide comprehensive self-report that can easily be interpreted by someone else) to no capacity at all."[2]

It is my opinion that given the information provided by Dr. Garcia, the vascular surgeon, Mr. Tapia experienced pain because of his medical condition and that pain, in combination with the stress of isolation, resulted in the documented

---

[1] Fischer T, Hosie A. Luckett T, Agar M, Phillips J. Strategies for Pain Assessment in Adult Patients with Delirium: A Scoping Review. J Pain Symptom Manage. 2019 Sep;m58(3): 487-502.

[2] Fischer T, Hosie A. Luckett T, Agar M, Phillips J. Strategies for Pain Assessment in Adult Patients with Delirium: A Scoping Review. J Pain Symptom Manage. 2019 Sep;m58(3): 487-502.

Javier Tapia v. NaphCare, Inc., et al.
Rebuttal Report

10

symptoms that are consistent with delirium. Mr. Tapia's reported symptoms were consistent with hypoactive delirium, specifically unusual drowsiness, and lethargy. Hypoactive delirium may even be mistakenly interpreted as the absence of pain, and delirium in general may mask physiological alterations that can cause pain.[3]

4. Dr. Abrams opined, "Mr. Tapia's alleged confusion or trouble sleeping while at PCJ is not evidence of a mental health crisis or deteriorating mental health. People experience confusion for a wide variety of reasons. Often causes cannot be found. There are only speculative possible causes for Mr. Tapia's mental state or other's perceptions of his mental state in August and September 2018... it is within the standard of care to assess reported confusion by having a conversation with the patient and observing them. Insomnia or excessive sleep similarly can have a wide variety of causes and is not an indication of a serious medical condition. Mr. Tapia's lack of verbal communication was not caused by aphasia, catatonia, aphonia, epilepsy, Major Depressive Disorder or stroke. It is best diagnosed by the term 'selective mutism.' It did not have an organic cause."

Rebuttal Discussion:
Mr. Tapia's confusion and decompensation during the time period in question was documented repeatedly by mental health staff at Pierce County Jail. Given that this was an acute mental status change from Mr. Tapia's reported baseline, this would qualify as a mental health crisis or deteriorating mental health. Unfortunately, in a deviation from the standard of care, Mr. Tapia was never appropriately assessed by mental health staff to determine his mental status. The documentation did not include a differential diagnosis of Mr. Tapia's symptoms requiring continued level one mental health housing. Mr. Tapia did not have a treatment plan developed.

Dr. Abrams indicated that it is within the standard of care to assess confusion by having a conversation with a patient. Unfortunately, the mental health staff did not attempt to meet with Mr. Tapia beyond a cell-side visit. This is not an appropriate clinical consultation. It is not possible to adequately assess or engage with an individual through a locked cell door, it impedes your ability to observe and engage an individual. Additionally, cell-side visits do not allow for privacy and confidentiality because other individuals on the unit can hear the interaction. To provide accurate assessment and treatment, privacy is necessary.

---

[3] Ibid.
Javier Tapia v. NaphCare, Inc., et al.
Rebuttal Report

11

Further, there was a span of approximately six days that mental health did not attempt to interact with Mr. Tapia. As such, it is not known what his mental status was during that period of time. Taken together, Mr. Tapia's documented confusion, decompensation, excessive sleepiness, and lack of verbal interaction signaled that Mr. Tapia was experiencing a medical or mental health crisis. As noted above, Mr. Tapia's difficulties did have an organic cause, specifically pain related to Phlegmasia Cerulea Dolens combined with placement in isolation and resultant delirium.

Please note the above opinions are provided to a reasonable degree of psychiatric certainty. If additional information or collateral documentation becomes available, I reserve the right to change my opinions based on such, and that will be included as an addendum to this report. Should you have any questions, or require any further information regarding these opinions, please contact me at 504.392.8348.

Submitted by:

*[signature]*

Daphne Glindmeyer, M.D., D.F.A.P.A.
Board Certified Child, Adolescent, and Adult Psychiatrist
Board Certified Forensic Psychiatrist

Javier Tapia v. NaphCare, Inc., et al.                                                                 12
Rebuttal Report