# EXHIBIT N

**Kathryn J. Wild, RN, MPA, CCHP-RN**
**1148 Dreamcatcher Bluff, Mesquite, NV 89034**
**Phone: 909-720-0961**

_____

**Expert Report**

## I.   INTRODUCTION

My name is Kathryn J. Wild.  My business address is 1148 Dreamcatcher Bluff, Mesquite, Nevada 89034.  I was retained by Perkins Coie LLP to consult and provide expert opinions in the case of Javier Tapia v. NaphCare, Inc., an Alabama Corporation; Pierce County, a political subdivision of the State of Washington, Case No. 2:22-cv-01141-KKE.

I have been asked to review the care and treatment provided to Mr. Javier Amado Tapia by NaphCare, Inc. (“**NaphCare**”), nursing personnel from the time of his admission to Pierce County Jail on **Saturday, June 16, 2018.**  Specifically, I have been asked to opine on the reasonableness of the care provided throughout his stay, NaphCare personnel’s adherence to the standard of care in the correctional health setting, whether NaphCare’s policies, procedures, and customs encouraged profit over care, and whether NaphCare personnel disregarded Mr. Tapia’s healthcare needs.

I am a licensed registered nurse (“**RN**”) with a master’s degree in public administration and certified as a Corrections Healthcare Professional - RN by the National Commission on Correctional Health Care (“**NCCHC**”) concerning the delivery of specialized nursing care in correctional facilities.  I have worked in the field of corrections healthcare for over 30 years as an RN and health services administrator (**“HSA”**) responsible for the administration of healthcare, training, and supervision of healthcare employees and the formation and implementation of policies applicable to staff who provide healthcare to persons housed in corrections facilities.  My curriculum vitae, which includes my qualifications, all publications authored in the previous 10 years, and a list of all other cases over the last 4 years in which I have testified as an expert at trial or by deposition, is attached to this Report as **Exhibit A**.  A copy of my fee schedule is attached to this Report as **Exhibit B**.

I am retained as an expert witness who is knowledgeable and experienced in the training, supervision, and monitoring of healthcare administered to prisoners housed in the setting of a correctional facility, including but not limited to the areas of corrections nursing care, corrections healthcare, corrections healthcare administration, corrections healthcare policy formation and implementation, and the implementation and maintenance of policies and procedures that comply with national corrections standards, including but not limited to those by the NCCHC, the American Correctional Association (“**ACA**”), and the Prison Rape Elimination Act.  I have served as an accreditation surveyor for the Institute for Medical Quality, providing accreditation surveys in local detention facilities and juvenile halls.  In addition, I have provided many local detention facilities with on-site preparation for NCCHC and ACA accreditation surveys and am very familiar with the standards for the delivery of healthcare in correctional settings.

## II. MATERIALS REVIEWED

I have reviewed the following materials in preparing this Report:

1. Pleadings

    a. Complaint filed 3/31/21

    b. First Amended Complaint filed 7/18/22

    c. Second Amended Complaint filed 10/07/22

2. Discovery

    a. 2021-08-31 - Tapia 1st ROG & RFP to NaphCare

    b. 2021-09-15 - Tapia 1st ROG & RFP to Pierce County

    c. 2021-09-22 - Pierce County 1st ROG & RFP to Tapia

    d. 2021-09-30 - NaphCare Resp to Tapia 1st ROG & RFP

    e. 2021-10-25 - NaphCare 1st ROG & RFP to Tapia

    f. 2021-10-29 - Pierce County Resp to Tapia 1st ROG & RFP

    g. 2021-11-04 - Tapia Resp to Pierce County 1st ROG & RFP

    h. 2021-12-08 - Tapia Resp to NaphCare 1st ROG & RFP

    i. 2022-01-13 - NaphCare Supp Resp to Tapia 1st ROG & RFP

    j. 2022-01-25 - Tapia 1st Supp Resp to NaphCare 1st ROG & RFP

    k. 2023-07-05 - Tapia 1st ROG & RFP to Pierce County

    l. 2023-07-18 - NaphCare 1st RFA to Tapia

    m. 2023-07-18 - NaphCare 1st RFP to Tapia

    n. 2023-07-18 - NaphCare 1st ROG to Tapia

    o. 2024-03-08 - Defendant Pierce County's Supplemental Initial Disclosures Pursuant to FRCP 26(a)(1)

3. Medical Records

    a. NaphCare Medical Records – NAPHCARE 000001-000625

b. DEF PC 000690-001281 – NaphCare – Medical Records 1

c. DEF PC 001282-001550 – NaphCare – Medical Records 2

d. DEF PC 100093-103083 – Multicare Medical Records Vol 1-10

e. TAPIA002707-TAPIA002867 – Multicare Records

f. TAPIA002868-TAPIA005709 – Multicare Records

g. TAPIA005710-005978 – NaphCare Medical Records

h. DEF PC 100002-100092 – Hanger Medical and Billing

i. HANGER_OLYMPIA_0001-0044

j. HANGER_TACOMA_0001-0133

k. DEF PC 000060-000064 – Javier Tapia Kites

l. DEF PC 000041-000059 – Inmate Behavior Log Printout

m. DEF PC 103084-103383 – Washington State DOC Medical

n. DEF PC 300013-300019 – Chronological Care Records from LINX

o. Tapia Imaging – Imaging Discs 1–4

p. DEF PC 100000-100001

q. SJMC Imaging Files

r. SJMC_IMAGING_0001-0003

s. SJMC_0001-0319

t. PULSE_HEART_0001-0029

u. PULSE_HEART_VASCULAR_0001-0017

4. Arrest & Criminal Records

a. DEF PC 000041-000059 – PCC Inmate Behavior Log Printout

b. DEF PC 300004-300007 – Javier Booking Mask

c. DEF PC 300008-300010 – Tapia – Pierce County Detention and Corrections Center – Information Report

d. DEF PC 300011-300012 – Tapia Booking Sheet

  e.  <u>DEF PC 900000-900999</u>

5. <u>Miscellaneous Documents</u>

  a.  <u>DEF PC 000002</u>

  b.  <u>DEF PC 300000-300003</u>

  c.  <u>DEF PC 302631</u>

  d.  <u>DEF PC 400026</u>

  e.  <u>DEF PC 400027-400029</u>

  f.  <u>DEF PC 400030-400032</u>

  g.  <u>DEF PC 400033-400034</u>

  h.  <u>DEF PC 400035-400039</u>

  i.  <u>DEF PC 400040-400063</u>

  j.  <u>DEF PC 400064-400066</u>

  k.  <u>DEF PC 400067-400068</u>

  l.  <u>DEF PC 400069</u>

  m.  <u>DEF PC 402738-402741</u>

  n.  <u>DEF PC 402742-402745</u>

  o.  <u>DEF PC 402746-402749</u>

  p.  <u>DEF PC 402750-402752</u>

  q.  <u>DEF PC 402753-402822</u>

  r.  <u>DEF PC 402823-402824</u>

  s.  <u>DEF PC 402828-402831</u>

  t.  <u>DEF PC 402832-402832</u>

  u.  <u>DEF PC 600161–600193</u>

  v.  <u>NCI 000001-000002</u>

  w.  <u>NCI 000003-000005</u>

x. <u>NCI 000006-000013</u>

y. <u>NCI 000057</u>

z. <u>NCI 000154-000231</u>

aa. <u>NCI 000232-000246</u>

bb. <u>NCI 000247-000479</u>

cc. <u>NCI 000480-000647</u>

dd. <u>NCI 000648-000674</u>

ee. <u>NCI 000701</u>

ff. <u>NCI 000731</u>

gg. <u>NCI 000762-000822</u>

hh. <u>NCI 000823</u>

ii. <u>TAPIA006074-TAPIA006090</u>

jj. <u>TAPIA006098-TAPIA006158</u>

kk. <u>TAPIA006168-TAPIA006416</u>

ll. <u>TAPIA006417-TAPIA006420</u>

mm. <u>TAPIA006425-TAPIA006427</u>

nn. <u>TAPIA006428-TAPIA006429</u>

oo. <u>TAPIA006430-TAPIA006436</u>

pp. <u>TAPIA006437-TAPIA006440</u>

qq. <u>TAPIA006441-TAPIA006443</u>

rr. <u>TAPIA006444-TAPIA006447</u>

ss. <u>TAPIA006501-TAPIA006503</u>

tt. <u>TAPIA006504-TAPIA006505</u>

uu. <u>TAPIA006506-TAPIA006506</u>

vv. <u>TAPIA006507-TAPIA006509</u>

ww. TAPIA006510-TAPIA006524

xx. TAPIA042435-TAPIA042506

yy. TAPIA046345-TAPIA046346

zz. TAPIA046347-TAPIA046348

aaa. TAPIA046349-TAPIA046350

bbb. TAPIA046351-TAPIA046352

ccc. TAPIA046353-TAPIA046355

ddd. TAPIA046356-TAPIA046358

eee. TAPIA046359-TAPIA046360

fff. TAPIA046361-TAPIA046362

ggg. TAPIA047746-TAPIA047759

hhh. TAPIA055621–TAPIA055650

iii. 2024-03-08 Declaration of Steven Delgado

6. Depositions

a. Jonah Bradley, with Exhibits 1-2

b. Cameron Carrillo, LPN, with Exhibits 1-3

c. Nicholas Garcia, with Exhibits 115-117

d. Jonathon Knight, MHP with Exhibits 1-2

e. Lucas Labine, with Exhibits 107-114

f. Darren Nealis, MHP, with Exhibits 1-3, 6-8, 12

g. Jesus Perez, MHP with Exhibits 1-14, 16-17

h. Duane Prather, MHP with Exhibits 1-3, 6-9

i. Debra Ricci, LPN with Exhibits 1-7

j. Jonathon M. Slothower, HSA, with Exhibits 1-10

k. Javier Tapia, with Exhibits 118-134

      l.     Jane Valley, with Exhibits 100-106

      m.    Elliott Wade, MD, NaphCare Western Medical Director with Exhibits 1-10

      n.     Elizabeth Warren, RN, with Exhibits 1-10

7.    Training Materials

      a.     NCI 000908-001006 – Receiving Screening

      b.     NCI 000858-000907 – Mental Health Screening Tips for RN's & LPN's

      c.     NCI 000732-000739 – Health Assessment Training and Post-Test Questions

      d.     NCI 000746-000761 – How to Use Nursing Assessment Protocols

      e.     NCI 000740-000745 – Off-Site Order Entry and Services

      f.     NCI 000702-000730 – Guidelines for Quality Documentation

8.    Statutes and Standards

      a.     Washington State Nursing Practice Act, Licensed practical nurse—Activities allowed, RCW 18.79.270 (2012)

      b.     Washington State Nursing Practice Act, Registered nurse—Activities allowed—Delegation of tasks, RCW 18.79.260 (2012)

      c.     Washington Standards of Nursing Conduct or Practice, WAC 246-840-700, Rule Effective July 2, 2004, https://lawfilesext.leg.wa.gov/law/wsr/2004/14/04-14-065.htm

      d.     Washington State 2016 Jail Accreditation Standards

      e.     ACA Performance-Based Standards for Adult Local Detention Facilities, 4th Edition

      f.     ACA Core Jail Standards

      g.     ACA 2016 Standards Supplement to the ACA Performance-Based Standards for Adult Local Detention Facilities, 4th Edition

      h.     National Commission on Correctional Health Care (NCCHC) – Standards for Health Services in Jails (2018 Edition)

      i.     Department of Health Nursing Care Quality Assurance Commission Advisory Opinion – Registered Nurse and Licensed Practical Nurse Scope of Practice (Sept. 13, 2019)

## III.    SUMMARY OF DOCUMENT REVIEW

| Time | Provider/Service | Comments |
|------|------------------|----------|
| **Saturday, June 16, 2018** | | |
| @ 0200 | Booking Sheet<br>**DEF PC 300011** | Mr. Javier Amado Tapia was booked into Pierce County Jail on charges of possession of a stolen vehicle, obstructing a public servant, and malicious mischief. |
| @ 0304 | Receiving Screening<br>Etsuko Yagi, RN<br>**NaphCare 592-597** | BP 125/85, P 96, R 16, T 97.6, SPO2 98%, <u>weight 153 pounds</u>. The patient denied any medical or mental health conditions but did disclose a history of taking Percocet, last dose the evening prior. Noted to be at risk for withdrawal but no symptoms at time of booking. |
| @ 0304 | Comprehensive Detox Screen<br>Etsuko Yagi, RN<br>**NaphCare 494-496** | Mr. Tapia was not showing symptoms of opiate withdrawal at the time of the screening. |
| @ 0304 | COWS Assessment<br>Etsuko Yagi, RN<br>**NaphCare 491-493** | Total COWS Score = 1 for minimal withdrawal. 1 for elevated pulse. |
| @ 0305 | Mental Health Screening<br>Etsuko Yagi, RN<br>**NaphCare 598-602** | The patient reported that he felt "OK" about his current situation and denied depression or thoughts of self-harm. He was noted to be cooperative and mildly unkempt. He was provided with drug/alcohol treatment and a resource info packet. |
| @ 0306 | Nurse Note<br>Etsuko Yagi, RN<br>**NaphCare 225-226** | Patient with history of recent and/or significant opiate use. Urine drug screen positive for MET AMP ECT.<br>Plan: Initiate COWS assessments and comfort meds as below:<br>• Gatorade TID (three times daily)<br>• Ondansetron 4 mg PRN (as needed) for nausea/vomiting<br>• Aluminum-Magnesium-Simethicone PRN for GI upset<br>• Dicyclomine 20 mg PRN for abdominal cramps<br>• Ibuprofen 600 mg PRN for body aches<br>• Loperamide 2 mg PRN for diarrhea<br>• Low bunk/low tier x 3 days |
| @ 1438 | COWS Assessment<br>Jeff Kendig, LPN<br>**NaphCare 597-499** | BP 112/84, P 100, R 16, T 97.7, SPO2 99%. . The patient denied any detox symptoms and was not medicated. He denied suicidal ideation and was hydrated with Gatorade and water. |

| Time | Provider/Service | Comments |
|---|---|---|
| **Sunday, June 17, 2018** | | |
| @ 0139 | COWS Assessment<br>Franklin Park, LPN<br>**NaphCare 500-502** | The patient did not want to get out of bed for COWS assessment, no noted distress, verbally declined assessment. |
| @ 1404 | COWS Assessment<br>Jeff Kendig, LPN<br>**NaphCare 503-505** | BP 122/72, P 86, R 16, T 97.7, SPO2 93%.  Total COWS Score = 3 for elevated pulse, mild diffuse discomfort, and increasing irritability or anxiousness. The patient reported mild withdrawal symptoms and was medicated according to the detox protocol. He denied suicidal ideation and was hydrated with Gatorade and water. |
| @ 1405 | MAR<br>Jeff Kendig, LPN<br>**DEF PC 892** | Loperamide 2 mg<br>Ibuprofen 600 mg<br>Dicyclomine 20 mg<br>Ondansetron 4 mg<br>Gatorade |
| **Monday, June 18, 2018** | | |
| @ 0209 | COWS Assessment<br>Judy Marling, LPN<br>**NaphCare 506-508** | BP 112/82, P 96, R 18, T 97.8, SPO2 98%.<br>Total COWS Score = 7 for elevated pulse, difficulty sitting still, severe diffuse aching of muscles and/or joints, nasal stuffiness, and gooseflesh.  The patient was resting on his bunk and was easily aroused.  Able to verbally report restlessness and severe body aches.  Noted goose bumps to forearms and nasal drainage. |
| @ 0050 | MAR<br>Judy Marling, LPN<br>**DEF PC 892** | Ibuprofen 600 mg<br>Gatorade |
| @ 1725 | COWS Assessment<br>Jeff Kendig, LPN<br>**NaphCare 509-511** | The patient refused to allow actual detox assessment and hydration with Gatorade and water.  Patient denied suicidal ideation and, upon casual observation, appeared free from obvious distress.  The patient was oriented and alert. |
| @ 1845 | MAR<br>Franklin Park, LPN<br>**DEF PC 899** | Gatorade |
| **Tuesday, June 19, 2018** | | |
| @ 0048 | COWS Assessment<br>Franklin Park, LPN<br>**NaphCare 512-514** | BP 132/82, P 96, R 16, T 96.9, SPO2 98%.<br>Total COWS Score = 3 for mild diffuse discomfort, nasal stuffiness, and stomach cramps. |
| @ 0048 | MAR<br>Franklin Park, LPN<br>**DEF PC 891** | Ibuprofen 600 mg |

| Time | Provider/Service | Comments |
|---|---|---|
| @ 1819 | Nurse Note<br>C. Camillo, LPN<br>**NaphCare 225** | Opiate detox discontinued per order of Dr. Balderrama. |
| **Wednesday, June 20, 2018** | | |
| @ 0805 | MAR<br>Veronica Reed, LPN<br>**DEF PC 891** | Ibuprofen 600 mg<br>Gatorade |
| @ 1221 | MAR<br>Veronica Reed, LPN<br>**DEF PC 898** | Gatorade |
| **Sunday, July 8, 2018** | | |
| @ 0907 | Kite Request<br>**DEF PC 60** | Mr. Tapia submitted a request asking to be a unit worker in 3A. He was told he was not eligible with a no-bail hold. |
| **Wednesday, July 11, 2018** | | |
| @ 0907 | Kite Request<br>**DEF PC 61** | Mr. Tapia submitted a request asking to cancel a visit that day with a Tom Koecke and Elliana Tapia. He received a response that the visit was canceled. |
| **Monday, July 23, 2018** | | |
| @ 1930 | Incident Report<br>M. Brooks<br>**DEF PC 56** | The officer doing a welfare check in the unit found a bin with two coffee bags of pruno. The pruno was discarded, and the upper tier locked down. The pruno creator is unknown. |
| **Saturday, August 18, 2018** | | |
| @ 1300 | Kite Request<br>**DEF PC 61** | Mr. Tapia submitted a request asking to cancel a visit that day with a Tom Koecke. He received a response that the visit was canceled. |
| **Thursday, September 6, 2018** | | |
| @ 1510 | Incident Report<br>C. Rogers<br>**DEF PC 52** | The officer doing a welfare check in the unit found 2 clear plastic tumblers hidden behind a folded mattress. Inside the tumblers was a mixture of fruit, bread, and corn, ingredients commonly used to make "pruno," or jail-made alcohol. The mixture had a strong smell of intoxicants. |
| **Sunday, September 9, 2018** | | |
| @ 1312 | Inmate Behavior Log<br>K. LaLiberte<br>**DEF PC 44** | Mr. Tapia was given a verbal warning for having other inmates on his bunk. He is aware that next time, he will be sanctioned. |

| Time | Provider/Service | Comments |
|------|------------------|----------|
| **Monday, September 10, 2018** | | |
| @ 1405 | Inmate Behavior Log W. Alley **DEF PC 44** | Mr. Tapia seems to have difficulty following simple rules such as **1400 hours** lockdown. Placed between the Gates and will return to unit at **1445 hours**. |
| **Thursday, September 13, 2018** | | |
| @ 0907 | Kite Request **DEF PC 61** | Mr. Tapia submitted a request stating he needed sleep medication, as he was having sleep issues. He was informed that he was set up for nurse sick call. |
| | Jesus Perez, MHP Deposition | Mental Health Professional ("**MHP**") Perez testified (Deposition of Jesus Perez (**"Perez Tr."**) at 59:16-23) that the kite/sick call above was canceled by him the following day. |
| **Friday, September 14, 2018** | | |
| @ 1241 | Kite Request **DEF PC 62** | Mr. Tapia submitted a request asking to be part of a program. He was given information about the reentry after incarceration program. |
| **Saturday, September 15, 2018** | | |
| @ 0444 | Inmate Behavior Log S. Owen **DEF PC 43** | Warned not to cross yellow line by officer's station. |
| **Sunday, September 16, 2018** | | |
| @ 1630 | Incident Report L. Defilippis **DEF PC 50** | Mr. Tapia and another inmate told the officer that they needed to move because inmates on the upper tier found out that he was a "snitch" and that he felt endangered remaining in the unit. Inmate Tapia was moved to 2B6 due to lack of low bunks in other units. He was placed on the move list, and it was noted that if he continued to have issues, they should consider reclassification. He has had 3 warnings documenting his behavior within the past week. |
| **Monday, September 17, 2018** | | |
| @ 2025 | Observation Report J. Knight **DEF PC 49** | The officer observed Mr. Tapia get off his bunk and throw his hand in the air and roll onto the floor near his bunk and begin to flail around and roll all around the floor. He called for an escort to step in due to his odd behavior and unknown mental state. As the officer approached Mr. Tapia, he was lying down in the fetal position, and when he was told to get up, he just stared. The officer gained control of Mr. Tapia's right arm, and he started to cry and mumble unintelligibly. He was assisted up and placed in wrist restraints without incident. On the way out of the unit, he mumbled a few unintelligible remarks and was tearful and |

| Time | Provider/Service | Comments |
|---|---|---|
| | | acting very strange.  He was escorted out of the unit and placed in a time-out cell by responding deputies. |
| | | Inmate Tapia arrived in the new unit and was observed acting odd from the moment he walked in.  He wouldn't make eye contact and was looking all around.  He was explained the rules and told where his bunk was located.  He didn't acknowledge the officer verbally but shook his head.  The entire time he spent in 2D, he never made his bed and sat there looking around and intermittently covering his ears.  The officer asked him if he was alright, and Mr. Tapia shook his head yes.  The officer noted that Mr. Tapia may have taken an unknown substance or suffered from an unknown mental health issue.  A mental health evaluation was requested. |
| | Officer Knight Deposition | Officer Knight testified (Deposition of Jonathon Knight (**"Knight Tr."**) at 23:1-2) that when Mr. Tapia arrived in his unit, he was walking perfectly fine.  He testified (**Knight Tr. at 24:20-25, 25:1-10**) that he was under the impression that he was exhibiting some sort of mental health signs and maybe going through a mental health crisis, so he requested a mental health evaluation.  Officer Knight testified (**Knight Tr. at 37:6-10**) that the time-out cells are roughly 100–150 yards from the unit. |
| @ 2141 | Observation Report A. Wade, Sgt. **DEF PC 49** | Tapia would not respond to any questions or make eye contact when asked what was going on.  Due to his odd behavior and unpredictability, he was assigned to 3S (mental health max security unit).  MHP to evaluate for appropriate housing. |
| **Tuesday, September 18, 2018** | | |
| @ 1100 | Social Worker Note Darren Nealis, MHP **NaphCare 224-225** | Met with inmate for initial assessment in response to C/D (corrections deputy) report.  He came to the door and was cooperative during the interview but appeared to be confused and diddid not verbally respond to questions.  He had been at Pierce County Jail since June but appeared to be decompensated.  His UA was positive for methamphetamines when he was booked in on 6/16/18. |
| | | Plan: Recommended continued Level 1 MH housing for further assessment. |
| @ 1703 | Inmate Behavior Log D. Vadala | Verbally refused dinner meal. |
| **Wednesday, September 19, 2018** | | |
| @ 1045 | Social Worker Note Darren Nealis, MHP **DEF PC 43** | Met with inmate, and he again presented as confused.  Inmate was unable to verbally respond to questions.  Officer reported |

| Time | Provider/Service | Comments |
|------|------------------|----------|
| | | that he appeared "way off his baseline" and he was nonverbal in court today.<br><br>**Plan:** Referred to.to medical Recommended continued Level 1 MH housing. |
| | Darren Nealis, MHP Deposition | MHP Nealis testified (Deposition of Darren Nealis (**"Nealis Tr."**) **at 30:8-11**) that he walked to the nurse's station and made a verbal referral for medical to see Mr. Tapia. |
| @ 1623 | Nurse Note Cameron Carrillo, LPN **NaphCare 224** | Patient referred to medical due to being nonresponsive. Patient BP 150/98 (hypertensive), skin PWD, does not appear in distress, stated he does not have any medical concerns but is upset about being in 3SC. Denied suicide intent. Continue to monitor. |
| | Cameron Carrillo Deposition | LPN Carrillo testified (Deposition Cameron Carrillo (**"Carrillo Tr."**) **at 17:25–19:24**) that it is his standard practice to always report back the above information to the RN. LPN Carrillo testified (**Carrillo Tr. at 23:11-15**) that when he saw Mr. Tapia, he was responsive and was talking to him, and he collected blood pressure and reported it back to the clinic RN. LPN Carrillo testified (**Carrillo Tr. at 27:13 – 28:3**) that Mr. Tapia was sitting comfortably on the floor with a blanket over his lap. He took his blood pressure and noted that his appearance was good, he was not diaphoretic, pale, fidgety, or guarded, and he had no medical concerns. |
| | Jonathon Slothower Deposition | HSA Slothower testified (Deposition of Jonathon Slothower (**"Slothower Tr."**) **at 30:24 – 31:6**) that Mr. Nealis asked for medical to go and look at the patient and assess the problem that he potentially saw, which was that the patient was nonverbal. has Slothower testified (**Slothower Tr. at 50: 5-9**) that most of the assessments they do in the jail are called "focused assessments," and they are used when you have a specific issue. If someone says, "Heyh, my elbow hurts," then you go in and do a focused assessment, which is an assessment that focuses on their elbow. HSA Slothower also testified (**Slothower Tr. at 31:23 – 32:2**) that although the next chart note was September 29, medical made rounds and delivered meds three times a day and Mr. Tapia was certainly seen by medical between that time and the next chart note. |
| @ 1719 | Chart Reviewed RN Darilyn Inglemon | It was noted in the TechCare Audit Log (**NCI 001187**) that RN Inglemon reviewed the note entered by LPN Carrillo shortly after he placed it in the record. |

| Time | Provider/Service | Comments |
|---|---|---|
| **Thursday, September 20, 2018** | | |
| @ 1110 | Social Worker Note Duane Prather, MHP **NaphCare 224** | Inmate seen for mental health follow-up. Inmate was awake but stayed on his bunk. Inmate did not respond in any way to MHP; he just stared. Inmate would not even shake his head yes or no. He was seen by medical yesterday.<br>Plan:   Recommended to stay in Level 1 MH housing for observation. |
| | Duane Prather Deposition | MHP Prather testified (Deposition of Duane Prather (**"Prather Tr."**) at 40:12-18) that if there was some compelling reason, he would have referred Mr. Tapia to the nurse practitioner. Based on his note, he probably wouldn't have referred the person. |
| **Friday, September 21, 2018** | | |
| @ 1638 | Inmate Behavior Log S. Owen **DEF PC 43** | Verbally refused dinner. |
| **Saturday, September 22, 2018** | | |
| @ 0947 | Inmate Behavior Log J. Paukert **DEF PC 43** | Verbally refused lunch. |
| @ 1631 | Inmate Behavior Log J. Cropp **DEF PC 43** | Verbally refused dinner. |
| **Monday, September 24, 2018** | | |
| @ 0453 | Inmate Behavior Log J. Bradley **DEF PC 43** | Verbally refused breakfast. |
| **Tuesday, September 25, 2018** | | |
| @ 1631 | Inmate Behavior Log D. Vadala **DEF PC 43** | Verbally refused dinner. |
| **Wednesday, September 26, 2018** | | |
| @ 1100 | Social Worker Note Darren Nealis, MHP **NaphCare 224** | Attempted to meet with inmate. Tapia presented as confused and nonverbal. He appeared to be decompensated.<br>Plan: Continue Level 1 MH housing. |
| @ 1620 | Inmate Behavior Log P. Byrer **DEF PC 42** | Verbally refused dinner. |

| Time | Provider/Service | Comments |
|------|------------------|----------|
| **Friday, September 28, 2018** | | |
| @ 1030 | Social Worker Note<br>Jesus Perez, MHP<br>**NaphCare 224** | Inmate was seen and refused MH interview. He presented with MH symptoms and would not answer questions. Inmate just looked at MHP and did not respond to basic questions.<br>Plan: Continue MH housing. |
| **Saturday, September 29, 2018** | | |
| @ 0512 | Inmate Behavior Log<br>D. Powell<br>**DEF PC 42** | Refused breakfast. |
| @ 0940 | Inmate Behavior Log<br>J. Houn<br>**DEF PC 42** | Refused lunch. |
| @ 1010 | Nurse Note<br>Elizabeth Warren, RN<br>**NaphCare 223** | Saw inmate in his cell, as requested by Sergeant. Cell smells of urine. Sheet wrapped around waist. Alert, sitting up on the side of the bunk under his own power. Makes eye contact when he is spoken to. Inmate will not verbally respond and will follow instructions with calm encouragement. He allowed an assessment.<br>BP 127/77, P 100, R 14-16, T 96.9, S1S2 heard. Tongue wet, skin does not tent. No acute distress noted. Not sure if inmate is eating every meal. Offered a chocolate Ensure and he drank approximately ½ container. Officer prepared his sandwich for him, handed it to him, and he took the sandwich. Spoke with Sgt. Finley and asked if inmate could be put on a meal log, and he agreed to start "Meal Log." Schedule daily monitoring of VS x 3 days and scheduled provider for evaluation. |
| @ 1243 | Sick Call Request<br>Elizabeth Warren, RN<br>**NaphCare 214**<br>**NCI 001186** | RN Warren scheduled a provider visit with Dr. Balderrama on 10/1/18 to rule out any medical issues and referred to her note above. |
| | Elizabeth Warren<br>Deposition | RN Warren testified (Deposition of Elizabeth Warren (**"Warren Tr."**)at 59:4-9) that Mr. Tapia's vital signs were OK, and he was not acting strange. RN Warren testified that if he had been acting in a medically abnormal manner, she would have brought him downstairs to the clinic to be seen by a provider. RN Warren testified (**Warren Tr. at 62:20 – 63:5**) that Mr. Tapia followed her instruction, he was sitting wrapped in a sheet, and that's not abnormal. He was alert and sitting on |

| Time | Provider/Service | Comments |
|------|------------------|----------|
| | | the bunk under his own power, making eye contact when spoken to. He was not verbally responding, but he followed her instructions and allowed a full assessment as far as what she needed to do. |
| @ 1100 | Observation Report R. Oeltjen **DEF PC 48** | Inmate Tapia would not respond to the officer verbally when asked if he wanted lunch. He did look up but would not give an answer. A search of the inmate's behavior log indicated he had been refusing meals periodically. The officer placed a sack lunch in the cell and indicated he would monitor to see if he ate. Recommended MHP follow-up. |
| @ 1418 | Observation Report F. Ake **DEF PC 48** | Inmate assessed by Nurse Warren, Mental Health, and clinic to follow up. Asked to log meal refusals. |
| @ 2015 | Inmate Behavior Log S. Delgado | Inmate had been mostly nonresponsive to verbal interactions. However, he was seen moving around while appearing asleep and was seen at his cell window once tonight. |
| **Sunday, September 30, 2018** | | |
| @ 1040 | Social Worker Note Ismael Concepcion Poo, MHP **NaphCare 223** | Inmate seen for assessment and was uncooperative with interview. He appeared to be sleeping and did not respond to MHP knocks on door or calling of name. He was observed moving and breathing in his bed. His cell appeared messy and disorganized. Continue Level 1 MH housing. |
| **Monday, October 1, 2018** | | |
| @ 0513 | Refusal Debra Ricci, LPN **NaphCare 207** | Refused vital signs. |
| | Debra Ricci Deposition | LPN Ricci testified (Deposition of Debra Ricci (**"Ricci Tr."**) at **21:13-16**) that when an inmate refuses medications or treatments, then she asks the corrections officer to sign the form. If the corrections officer and inmate refuse to sign the refusal, she has to go with that. Although the policy states that "a refusal of treatment for serious conditions will be communicated to the facility's medical director," she clearly testified (**Ricci Tr. at 34:1-15**) that she does not consider the refusal of vital signs to be a refusal of medical treatment and a referral to the medical director was not required. |
| @ 0951 | Inmate Behavior Log P. Wilson **DEF PC 42** | While serving lunch, C/D Paukert observed inmate's foot to be a purple/black color. C/D immediately called the clinic. Per clinic assessment, inmate was transported to the clinic in a wheelchair. |

| Time | Provider/Service | Comments |
|---|---|---|
| @ 1028 | Vital Signs<br>**NaphCare 217** | BP 109/76, P 103, R 16, T 97.5, SPO2 95%. |
| @ 1032 | Nurse Note<br>Ashley Chalk, RN<br>**NaphCare 223** | Asked to see inmate by unit officer for c/o "toes turning black." Upon visual inspection, left foot slightly swollen and severely discolored. Inmate brought to clinic via wheelchair. BP 111/80, P 105, R 18, T 97.9, SPO2 94%. Inmate was nonverbal and did not answer questions. He was spoken to by MHP and reported having pain but does not recall what happened or when. Per provider, the patient was referred to the ED. |
| @ 1045 | Social Worker Note<br>Darren Nealis, MHP<br>**NaphCare 223** | Met with inmate for MH evaluation in clinic. He presented again as confused and nonverbal but was also calm and cooperating with medical staff. |
| @ 1053 | Provider Note<br>Miguel Balderrama, MD<br>**NaphCare 223** | Patient seen with nursing staff and had evidence of possible vascular deficits on left foot with edema. Needs ER evaluation for possible emergent surgical management. |
| | Jonathon Slothower<br>Deposition | HSA Slothower testified (**Slothower Tr. at 47: 2 – 48:3**) that he was in the clinic when Mr. Tapia was being seen by medical and mental health staff. He was in the clinic sitting up and talking to medical and mental health staff and said his foot hurt. They recognized that he had an issue, and the determination to send him to the hospital had already been made. As soon as the emergency personnel showed up, he was sent to the hospital. After Mr. Tapia left for the hospital, HSA Slothower looked through the chart notes to make sure that they didn't miss something that they should have caught and didn't find anything missed that would have alerted them to his condition earlier. |
| | ER Referral<br>Ashley Chalk, RN<br>**NaphCare 611-612** | Mr. Tapia was referred to the Tacoma General Hospital ER for evaluation of suspected gangrene. His BP was 111/80, P 105, R 18, T 97.9, SPO2 94%. |
| @ 1147 | Tacoma General ED<br>Lyndsey Deleon, MD<br>**Page 286** | The patient has reportedly been in jail since June and had been having foot pain <u>but just told jail staff today about the pain</u>. |
| @ 1726 | Tacoma General<br>Nicholas Garcia, MD<br>**Page 254** | He verbally told guards today about left foot pain and showed guards left foot discolored blue/black and brought to ER for evaluation. |
| **Monday, October 22, 2018** | | |
| @ 1901 | Provider Note<br>M. Balderrama, MD<br>**NaphCare 221** | Case management: Patient arrived today from hospital and had left BKA due to vascular complications. Pain meds as well as antibiotic (Keflex) and anticoagulation management meds |

| Time | Provider/Service | Comments |
|------|------------------|----------|
| | | started. Will have INR this week and will continue to monitor. Will need follow-up with hematology as well as with vascular surgeon per hospital documentation. |
| **Wednesday, December 14, 2018** | | |
| | Washington State Department of Corrections **DEF PC 103084** | Mr. Tapia was transferred to the Washington DOC (Department of Corrections). |

## IV.    DISCUSSION AND OPINIONS

Based on my review of the documents provided to date, my education, training, 38 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that the care provided to Mr. Javier Amado Tapia by NaphCare nursing personnel while he was incarcerated in the Pierce County Jail met reasonable and acceptable practices based on all the circumstances presented to them at the time of the care provided, and they did not disregard Mr. Tapia's healthcare needs.

*Access to Care*

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-A-01 – "Access to Care,"** states that inmates have access to care to meet their serious medical, dental, and mental health needs.

**The American Correctional Association (ACA) Performance-Based Standards for Adult Local Detention Facilities – Fourth Edition, Section 4-ADLF-4C-01 "Access to Care"** states that all inmates are informed about how to access health services and the grievance system during the admission/intake process.

**The Washington State Jail Standards, Chapter 20.1 "Inmate Health Care,"** states that the agency has policies that govern healthcare for inmates (including dental and mental healthcare). Policies shall include the following:

- Access to Care
- Health records, maintenance, confidentially, and transfer
- Medical care authority and qualifications
- Co-pays, if utilized by the agency
- Informed consent
- Treatment plans, including follow-up care
- Availability of first aid kits and AED

**NaphCare Policy and Procedure (NCI 000261-262) – "Health Care Access and Information"** states that it is the policy of NaphCare to provide healthcare to patients in a timely manner and with privacy while practicing within the scope of each employee's professional licensure.

There were no barriers to accessing healthcare created by any NaphCare policy, procedure, or employee. Mr. Tapia was immediately seen upon booking into the Pierce County Jail by NaphCare nursing personnel, who ensured he was monitored for his potential opiate withdrawal and then throughout his incarceration as needs were identified. Elizabeth Warren, RN, testified in deposition (**Warren Tr. at 49:6-19**) that when Mr. Tapia was in the mental health housing unit, he was seen by a nurse on each shift to ensure he was OK, whether or not he was receiving medications.

It is standard of care to have nursing staff make rounds in the mental health units to allow inmates the opportunity to ask questions and request care. If the inmate has nothing to report of a medical need, there would be no requirement to make a medical record entry. This standard was met.


*Receiving Screening*

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-E-02 – "Receiving Screening,"** states that a receiving screening should be performed on all inmates on arrival at the intake facility to ensure that emergent and urgent health needs are met. This standard is intended to fulfill four purposes: 1) to identify and meet any urgent health needs of those admitted, 2) to identify and meet any known or easily identifiable health needs that require medical intervention before the health assessment, 3) to identify and isolate any inmates who appear potentially contagious, and (4) to appropriately obtain a medical clearance when necessary.

**The American Correctional Association (ACA) Performance-Based Standards for Adult Local Detention Facilities – Fourth Edition, Section 4-ADLF-4C-22 "Health Screens"** states that inmate medical screening for inmates commences upon the inmate's arrival at the facility and is performed by health-trained or qualified healthcare personnel.

**The Washington State Jail Standards, Chapter 20 "Inmate Health Care,"** states that "the agency has a policy requiring inmate medical screening at intake by a healthcare professional or employs a process that has been approved by a healthcare professional with corrections/jail experience when the screening is done by corrections staff. The screening shall include screening for traumatic brain injury and/or developmental disability."

**NaphCare Policy and Procedure (NCI 000367-370) – "Initial Screening"** states that NaphCare is committed to identifying and meeting any urgent needs of inmates admitted to the correctional institution, identifying and isolating inmates who appear potentially contagious, and placing those with potential mental health issues into a safe environment. Each inmate who is admitted to the institution will be screened upon arrival, and the appropriate healthcare treatment will be enacted.

As noted above, Mr. Tapia was medically screened by RN Etsuko upon admission into the jail. He was noted to have denied any medical and/or mental health conditions but did disclose a history of taking Percocet with the potential for withdrawal. The nurse obtained vital signs within the normal range and a COWS Score indicating no current withdrawal symptoms. RN Etsuko appropriately placed Mr. Tapia on the protocol to ensure monitoring during the period of potential withdrawal symptoms and comfort medications to use as needed. This standard was met.

_Medically Supervised Withdrawal and Treatment_

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-F-04 – "Medically Supervised Withdrawal and Treatment,"** states that protocols exist for managing inmates under the influence of alcohol or other drugs and those undergoing withdrawal from alcohol, sedatives, or opiates.

**The American Correctional Association (ACA) Performance-Based Standards for Adult Local Detention Facilities – Fourth Edition, Section 4-ADLF-4C-36 "Detoxification"** states that detoxification is done only under medical supervision in accordance with local, state, and federal laws.

**NaphCare Policy and Procedure (NCI 000419-426) – "Intoxication, Withdrawal, and Detoxification"** states that all inmates entering the institution will be screened for any history of alcohol and/or drug diversion and misuse. Inmates who may be intoxicated or experiencing withdrawal symptoms will be identified and managed in accordance with their medical needs.

The Clinical Opiate Withdrawal Scale, or COWS, is a nationally recognized, numbered scale designed to help clinicians tailor opioid withdrawal treatment to individuals going through withdrawal. It is used in both inpatient and outpatient rehabilitation settings to determine the severity of opioid withdrawal and monitor how symptoms change over time during treatment.

The COWS scores obtained for Mr. Tapia, when he agreed to an evaluation, show that his opiate withdrawal symptoms were well within the mild range of the scale (1-7). Throughout Mr. Tapia's period of withdrawal, **June 16–19, 2018**, Mr. Tapia never complained to anyone about any issues with his feet.

Nursing personnel monitored Mr. Tapia when he agreed to assessments, and they recorded their findings in the electronic health record and offered medications to relieve any symptoms as indicated in the Opiate Withdrawal Protocol. The protocol was discontinued by the provider on **Tuesday, June 19, 2018**, after a review of these results. Nursing personnel appropriately monitored and medicated Mr. Tapia for his opiate withdrawal. This standard was met.

_Nursing Assessments and Scope of Practice_

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-E-08 – "Nursing Assessment Protocols and Procedures,"** states that nursing assessment protocols are appropriate to the level of competency and preparation of the nursing personnel who will carry them out and comply with the relevant state practice acts.

**NaphCare Policy and Procedure (NCI 000378) – "Nursing Assessment Protocols"** states that nursing assessment protocols shall be used by nursing staff when providing clinical care to the extent possible. Nurses shall comply with relevant state practice acts and conduct data gathering and treatments appropriate to their skill levels.

NaphCare utilizes a mix of RNs and licensed practical nurses ("**LPNs**") in the healthcare delivery system and has developed assessment protocols to help guide nurses in the collection of data when a protocol is appropriate to the patient complaint. Not all patient encounters require the use of a

protocol when the patient complaint does not fall into an existing protocol symptom. In these cases, nursing staff will document the encounter in a SOAP or focused narrative format. As HSA Slothower explained in his deposition, most of the assessments that NaphCare performs in the jail are called "focused assessments," and they are used when the inmate has a specific issue. If somebody complains that their elbow hurts, then you perform a focused assessment of their elbow. If an LPN sees the patient, they will collect data and report back to the RN or higher. There is always an RN on duty in the jail, and providers are always on call. **Slothower Tr. at 50:5–23.** This is well within the standard of care.

**The Washington RCW 18.79.270 (2012) – Nurse Practice Act defines the activities allowed by an LPN as follows:**

> A licensed practical nurse under his or her license may perform nursing care, as that term is usually understood, of the ill, injured, or infirm, and in the course thereof may, under the direction of a licensed physician and surgeon, osteopathic physician and surgeon, dentist, naturopathic physician, podiatric physician and surgeon, physician assistant, osteopathic physician assistant, advanced registered nurse practitioner, or midwife acting under the scope of his or her license, or at the direction and under the supervision of a registered nurse, administer drugs, medications, treatments, tests, injections, and inoculations, whether or not the piercing of tissues is involved and whether or not a degree of independent judgment and skill is required, when selected to do so by one of the licensed practitioners designated in this section, or by a registered nurse who need not be physically present; if the order given is reduced to writing within a reasonable time and made a part of the patient's record. Such direction must be for acts within the scope of licensed practical nurse practice.

**The Department of Health Nursing Care Quality Assurance Commission for the state of Washington, Advisory Opinion, Registered Nurse and License Practical Nurse, Scope of Practice, NCAO 13.02,** provides distinction between the RN and LPN roles, responsibilities, and functions as it relates solely to professional nursing care (the "**Advisory Opinion**"). The Advisory Opinion states that it is within an LPN's scope of practice to "perform a focused nursing assessment and re-assessment at the direction of the RN or other authorized health care practitioner." The Advisory Opinion also states that an "LPN may perform specific assessments or screening activities, such as mental health status, suicidal risk, cognitive screening, substance use screening, oral health screening, growth and development screening, or nutritional assessments." The Advisory Opinion further states that the "LPN may not analyze, synthesize, or evaluate the data." Instead, the LPN gathers this information and passes it to the RN so that the RN "retains the overall responsibility for verifying data collection, interpreting and analyzing data, and formulating nursing diagnoses."

Mr. Tapia was seen on **Wednesday, September 19, 2018**, by LPN Cameron Carrillo at the request of MHP Darren Nealis, who verbally reported to nursing staff that Mr. Tapia was not responding verbally to questions. LPN Carrillo appropriately went to Mr. Tapia's cell and collected subjective

and objective data focused on the reported problem and reported his findings back to the RN on duty. LPN Carrillo found that Mr. Tapia was in no distress and was able to verbally tell him that he did not have any medical concerns. Mr. Tapia denied suicidal intent and complained only that he was upset about where he was housed. His blood pressure was slightly elevated, and this information was shared with the RN in charge. There was nothing in this medical encounter that indicated any medical emergency or red flag, and Mr. Tapia made no mention of any problems associated with his feet. LPN Carrillo testified that Mr. Tapia was sitting comfortably on the floor with a blanket over his lap. **Carrillo Tr. at 27:5–10.** Without any complaint by Mr. Tapia of issues associated with his foot, there would have been no expectation that a nurse would have evaluated this area of Mr. Tapia's body. This was well within the LPN scope of practice.

**The Washington RCW 18.79.260 – Nurse Practice Act defines the activities allowed by an RN as follows:**

> (1) A registered nurse under his or her license may perform for compensation nursing care, as that term is usually understood, to individuals with illnesses, injuries, or disabilities.
>
> (2) A registered nurse may, at or under the general direction of a licensed physician and surgeon, dentist, osteopathic physician and surgeon, naturopathic physician, optometrist, podiatric physician and surgeon, physician assistant, osteopathic physician assistant, advanced registered nurse practitioner, or midwife acting within the scope of his or her license, administer medications, treatments, tests, and inoculations, whether or not the severing or penetrating of tissues is involved and whether or not a degree of independent judgment and skill is required. Such direction must be for acts which are within the scope of registered nursing practice.
>
> (3) A registered nurse may delegate tasks of nursing care to other individuals where the registered nurse determines that it is in the best interest of the patient.
>
>> (a) The delegating nurse shall:
>>
>>> (i) Determine the competency of the individual to perform the tasks,
>>>
>>> (ii) Evaluate the appropriateness of the delegation,
>>>
>>> (iii) Supervise the actions of the person performing the delegated task; and
>>>
>>> (iv) Delegate only those tasks that are within the registered nurse's scope of practice.

RN Elizabeth Warren was asked to see Mr. Tapia in the Mental Health Unit on **Saturday, September 29, 2018**. She came to Mr. Tapia's cell and noted he was alert with a sheet wrapped around his waist. He was sitting on the side of his bed, and although nonverbal, he followed directions as she assessed him. She obtained vital signs and a heart assessment that were within

the normal range. She offered him an Ensure drink that he drank half of while she was there in the cell, and the officer prepared and gave him a sandwich. The nurse had been told that Mr. Tapia had periodically been refusing meals, so she appropriately asked the officer to place him on a meal log to monitor his intake. She also arranged for him to see Dr. Balderrama on Monday (the next business day) when sick call clinics were scheduled. This was well within the standard of care and the RN's scope of practice.

*Mental Health Services*

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-F-03 – "Mental Health Services,"** states that mental health services are available for all inmates who require them.

**The American Correctional Association (ACA) Performance-Based Standards for Adult Local Detention Facilities – Fourth Edition, Section 4-ADLF-4C-27 "Mental Health Program"** states that mental health services include screening for mental health problems on intake, referral to outpatient services when needed, crisis intervention, stabilization of the mentally ill and prevention of psychiatric deterioration, referral and admission to licensed mental health facilities as needed, and obtaining and documenting informed consent.

The **Personal Services Agreement between NaphCare and the County of Pierce**, which commenced on **August 8, 2015**, clearly states that the County will maintain on-site mental health services consisting of seven mental health professionals, one mental health manager, one office assistant, and one full-time mental health prescriber. Mental health providers will integrate their services with NaphCare, including maintaining shared medical records.

**County Sheriff's Department PCDCC Mental Health Services Policy and Procedure 1.0 – "General Guidelines"** policy states that the Pierce County Detention and Corrections Center (PCDCC) Mental Health Program staff are employees of Pierce County Sheriff's Department – Corrections. As such, they operate according to the guidelines within the policy and procedure manuals for the Pierce County Sheriff's Department, Pierce County, and the Mental Health Unit.

During Mr. Tapia's intake screening, he was questioned by the RN regarding any mental health concerns. He denied any mental health issues at the time and reported that he was not under the care and/or treatment of any mental health provider. He denied any suicidal ideation and was accepted for booking.

Later in his incarceration, on **Monday, September 17, 2018**, Mr. Tapia began to exhibit behaviors that Officer Knight described as "going through a mental health crisis." **Knight Tr. at 24:20–24.** Based on the officer's observations, Mr. Tapia was referred to the Pierce County MHP to evaluate for appropriate housing. Mr. Tapia was seen the following day by the Pierce County MHP, and it was recommended that he be continued in Level 1 MH housing.

The **Pierce County Sheriff's Department PCDCC Mental Health Services Policy and Procedure 13.0 – "Mental Health Housing"** policy states that all inmates classified as "Level 1" by mental health clinicians are seen at least three times weekly (by mental health clinicians), and the behavior required to be sustained to warrant less restrictive housing is documented in the EMS (EMR).

Mr. Tapia was monitored by Pierce County mental health staff for mental health concerns during his stay in Level 1 MH housing. When medical staff were asked to see Mr. Tapia during this period, their assessments and actions were well within the standard of care, as noted above.

*Hospital and Specialty Care*

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-D-08 – "Hospital and Specialty Care,"** states that hospitalization and specialty care are available to patients in need of those.

**The American Correctional Association (ACA) Performance-Based Standards for Adult Local Detention Facilities – Fourth Edition, Section 4-ADLF-4C-05 "Referrals"** states that inmates who need health care beyond the resources available in the facility, are transferred under appropriate security provisions to a facility where such care is on call or available 24 hours per day.

The **Personal Services Agreement between NaphCare and the County of Pierce**, which commenced on **August 8, 2015**, clearly states that the County shall be financially responsible for any and all inmate medical services occurring outside of the jail (including scheduled emergent care and any hospitalizations).

**NaphCare Policy and Procedure (NCI 000352) – "Continuity and Coordination of Care During Incarceration"** states that all aspects of care, including hospitalization and specialty care, are available, coordinated, and monitored from admission to discharge.

As soon as Mr. Tapia was noted to have discoloration on his left foot, he was immediately brought to the clinic for evaluation by the physician and referred out to the emergency room for evaluation and treatment. There was never any delay in getting this patient to specialty care at the hospital when his clinical presentation changed, and it was determined he might have a potential circulatory issue.

The plaintiff alleges that NaphCare has a policy of denying off-site care as a cost-control measure. This allegation is simply incorrect, as demonstrated in the actions of healthcare staff in this case and the fact that NaphCare is not financially responsible for any care provided to inmates outside the correctional facility. The care provided to Mr. Tapia by NaphCare nursing personnel throughout his incarceration was reasonable based on all the facts provided to them and the clinical presentation of this patient at the times he was evaluated.

*Policies and Procedures*

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-A-05 – "Policies and Procedures,"** states that the facility has a manual or compilation of policies and defined procedures regarding healthcare services that addresses each applicable standard in the *Standards for Health Services in Jails*.

**The American Correctional Association (ACA) Performance-Based Standards for Adult Local Detention Facilities – Fourth Edition, Section 4-ADLF-7D-06 "Policies and**

**Procedures"** states that written policies and procedures describe all facets of facility operation, maintenance, and administration, and are reviewed annually.

The **Personal Services Agreement between NaphCare and the County of Pierce**, which commenced on **August 8, 2015**, states that NaphCare will provide services that meet all legal and community standards for correctional healthcare and be consistent with NCCHC guidelines. NaphCare was also required to develop and provide comprehensive written policies and procedures that meet legal and community standards for quality of care in a correctional setting to the County for review and approval.

The **NCCHC Standards** are recommended requirements for the proper management of a correctional health services delivery system. These standards have helped correctional facilities improve the health of their inmates and the communities to which they return, increase the efficiency of their health services delivery, strengthen their organizational effectiveness, and reduce their risk of adverse patient outcomes and legal judgments.

The **ACA Performance-Based Standards** were conceived and developed by professionals to enable administrators and practitioners to not only monitor activities but measure the outcomes of their efforts over time.

I have reviewed the NaphCare policies and procedures in place at the Pierce County Jail. The NaphCare policies and procedures are all in line with the current NCCHC Standards in place at the time of this incident. In addition, the NaphCare policies and procedures also align with the ACA Performance-Based Standards for Adult Local Detention Facilities. Not only are the NaphCare policies and procedures rooted in the national standards for the delivery of healthcare in correctional settings, but it was also obvious through my review that NaphCare staff followed these policies as required.

*Staffing Levels*

The plaintiff alleges in his complaint that NaphCare understaffed medical personnel, and this led to Mr. Tapia not receiving constitutionally adequate medical care.

I have reviewed the contract between Pierce County and NaphCare and note that a robust staffing plan was in place that included an appropriate mix of RNs, LPNs, medical providers (nurse practitioners/physician assistants), medical records staff, pharmacy staff, and dental staff, as well as a full-time HSA and director of nursing. This mix of healthcare professionals and support staff provided an adequate response for an intake medical screening and physical assessments, sick call services, medication administration, chronic care management, emergency response, and other activities required to provide a comprehensive healthcare program.

I have also reviewed the Pierce County Monthly Hours Summary (**NCI 000057**) and found that staffing during this period exceeded the requirements of the contract. The healthcare staffing in place at the Pierce County Jail was well within the range required to provide services to meet the medical needs of the inmate population.

Based on my education and experience in the correctional healthcare setting and review of the records provided, it is my opinion that NaphCare nursing personnel provided appropriate care and

treatment to Mr. Javier Amado Tapia based on his presentation and the information he provided. They unequivocally did not intentionally or recklessly fail to act with reasonable and appropriate care.

## V.    SUMMARY OF OPINIONS

1. There were no barriers to accessing healthcare in the Pierce County Jail facility created by any policy, practice, custom, or employee from NaphCare.

2. The medical screening of Mr. Tapia was performed swiftly and appropriately upon his admission to the Pierce County Jail by RN Etsuko Yagi.  This met the standard of care.

3. Mr. Tapia was started on the appropriate protocol and monitoring for his potential for opiate withdrawal immediately upon his admission to the facility, and NaphCare nursing personnel appropriately monitored and medicated him as ordered.  This met the standard of care.

4. The care provided to Mr. Tapia throughout his incarceration at the Pierce County Jail by NaphCare nursing personnel was well within the standard of care and provided by nursing personnel working within their scope of practice.

5. Mental health services were provided by Pierce County mental health clinicians, and when medical staff were asked to see Mr. Tapia during this period, their assessments and actions were well within the standard of care.

6. As soon as it was reported to healthcare staff that Mr. Tapia was having an issue with his foot, they responded swiftly and appropriately, sending him to the hospital without delay.

7. There is no evidence in the documents reviewed that NaphCare policies, procedures, and customs encouraged profit over care.

8. The NaphCare policies and procedures in place at the Pierce County Jail align with the standards of care expected in local detention facilities authored by the NCCHC and the ACA.  NaphCare nursing personnel followed these policies as outlined.

9. The healthcare staffing in place at the Pierce County Jail was well within the range required to provide services to meet the medical needs of the inmate population.

10. Based on my education and experience in the correctional healthcare setting and review of the records provided, it is my opinion that NaphCare nursing personnel provided appropriate care and treatment to Mr. Tapia based on his presentation and the information he provided.  They unequivocally did not intentionally or recklessly fail to act with reasonable and appropriate care.

My opinions in this case are based on many years of education and experience in the correctional health field and upon the documentation provided to me for review to date.  I reserve the right to

supplement this opinion in the event additional documentation is provided in this matter. My opinions herein are expressed within a reasonable degree of nursing certainty.

Executed on March 15, 2024 in Mesquite, Nevada.

_____

Kathryn J. Wild, RN, MPA, CCHP-RN

# Exhibit A

**Kathryn J. Wild, R.N., M.P.A., C.C.H.P.-R.N.**
1148 Dreamcatcher Bluff, Mesquite, NV 89034
(909) 720-0961
kwild@usa.net (e-mail)
www.correctionalhealthconsultant.com

## PROFESSIONAL EXPERIENCE

Kathryn J. Wild, Reno, NV                                     1993 – Present
*Consultant*

Orange County Health Care Agency                             2010 – 2013
Correctional Health Services, Santa Ana, CA
*Deputy Agency Director*

San Bernardino County Sheriff's Department, San Bernardino, CA    1995 – 2010
*Health Services Administrator*

Orange County Health Care Agency                             1985 – 1993
Correctional Medical Services, Santa Ana, CA
*Senior Comprehensive Care Nurse*

Saint Joseph Hospital, Orange, CA                            1980 – 1985
*LVN/Registered Nurse – Medical Surgical Unit*

## EDUCATION

**Fellow** – California Healthcare Foundation (CHCF) Leadership Fellowship – 2007/2009
**Masters in Public Administration –** National University, San Diego, CA (2005)
**Management Leadership Academy (MLA),** San Bernardino County (1998)
**Bachelor of Science – Health Services Management,** University of La Verne, La Verne, CA (1998)
**Associates Degree in Nursing –** Rancho Santiago College, Santa Ana (1984)

## PROFESSIONAL CERTIFICATIONS, AWARDS AND COMMITTEES

➢ Co-Chair – Medical/Mental Health Workgroup Adult Titles 15 Regulation Revision (Minimum Jail Standards), California Board of State and Community Corrections (January 2016)
➢ California Healthcare Foundation (CHCF) – Health Care Leadership Program, Cohort VII – 2007/2009 Fellowship
➢ 2008 Woman of Distinction – Assemblyman Bill Emerson's 4th Annual 63rd District's - Women of Distinction Awards
➢ 2007 Distinguished Service Award – American Correctional Health Services Association (ACHSA)
➢ Certified Correctional Healthcare Professional (CCHP) since 1991
➢ Certified Correctional Healthcare Professional – RN (CCHP-RN) since 2014
➢ Institute for Medical Quality (IMQ) – Correctional Accreditation Surveyor
➢ Outstanding Mental Health Advocate Award – The California Coalition for Mental Health - 2003

# Kathryn J. Wild, R.N., M.P.A., C.C.H.P.-R.N.

---

## PROFESSIONAL AFFILIATIONS

➢ American Correctional Health Services Association (ACHSA) – Director 2002 - 2004
➢ California/Nevada Chapter ACHSA – Past President 2003/2004
➢ Forensic Mental Health Association (FMHA)
➢ American Correctional Association (ACA)
➢ American Jail Association (AJA)
➢ National Commission on Correctional Health Care (NCCHC)
➢ Academy of Correctional Health Professionals
➢ Visiting Nurse Association of Inland Counties (VNAIC) – Director 1999 – 2003
➢ American Correctional Nurses Association (ACNA)

---

## PRESENTATIONS

September 2017     *"Clinical Management for High Risk Patients in this Litigious Setting"*
- California/Nevada Chapter of ACHSA – San Jose, CA

January 2015     *"Correctional Health Care News Round Up"*
- Correctional Nurse.net - Podcast

October 2013     *"Managing Nursing Sick Call to Reduce Risk"*
- National Commission on Correctional Health Care – Nashville, TN

April 2013     *"10 Ways Correctional Nurses Can End Up in Court"*
- National Commission on Correctional Health Care – Denver, CO

April 2013     *"Managing Nursing Sick Call to Reduce Risk"*
- Correctional Health Care Webinar – OmniSure Consulting Group

October 2012     *"How to Create and Implement Safe and Effective Nursing Protocols"*
- National Commission on Correctional Health Care – Las Vegas

March 2009     *"Nursing Forum – Administrative Issues"*
- American Correctional Health Services Association – Orlando, FL

April 2008     *"Medical Issues – Custody and Medical: Working Together"*
- American Jail Association – Denver, CO

May 2007     *"Forming a Partnership – Mental Health Courts"*
- American Jail Association – Nashville, TN

April 2005     *"Case Management in a Large County Jail"*
- National Commission on Correctional Health Care – Las Vegas

November 2003     *"Contemporary Health Care Issues in Corrections"*
- California State Sheriff's Association – Sacramento, CA

## PUBLICATIONS/PUBLICATION REVIEW

Enchanted Mountain Press Publications – Textbook Chapter Review: **"Correctional Healthcare Patient Safety Handbook: Reduce Clinical Error, Manage Risk, and Improve Quality",** "Recipient of Care", December 2013

Smith, Sue and Wild, Kathy. **"Best Practices in Nursing Sick Call Management (Part 2)"** CorrectCare, The Magazine of the National Commission on Correctional Health Care. Fall 2013: 12-13, 25.

Smith, Sue and Wild, Kathy. **"Understanding Legal Risk with Sick Call Administration."** A Risk Management Bulletin: Omnisure Risk Management Consulting. Fall 2013

Smith, Sue and Wild, Kathy. **"Best Practices in Nursing Sick Call Management (Part 1)"** CorrectCare, The Magazine of the National Commission on Correctional Health Care. Summer 2013: 12-14.

Hurst, Norm and Wild, Kathy. **"Forming a Partnership for Successful Mental Health Courts."** American Jails. November/December 2007: 23-27.

Hurst, Norm and Wild, Kathy. "**Working Together: Health and Security Side by Side**." The State of Corrections: ACA Annual Conference Proceedings.  2006: 189 – 195.

Revised: January 1, 2024

# Kathryn J. Wild, RN, MPA, CCHP-RN
## Legal Cases – Depositions/Trials
### 2020 - 2024

Trials:

1. July 2022     **Austin Bond, as Special Administrator for the Estate of Mitchell Lee Godsey, deceased v Vic Regalado and Armor Correctional Health Services, Inc.,** U.S. District Court for the Northern District of Oklahoma, Case # 18-CV-231-OKF-CDL – Attorney Sean Snider - Defense

2. May 2022     **Bilal Hasanie Hill v Phelps County Sheriff's Department; Phelps County Jail; Sheriff Richard L. Lisenbe, Dr. Arthur Bentley, Dionne Kelley; Kelly Ratcliff, Sergeant Glenn; Lieutenant Joe Taylor; Advanced Correctional Healthcare, et al.,** U.S. District Court for the Eastern District of Missouri Eastern Division, Case # 4:20-cv-00804-JMB – Attorney Tad Eckenrode - Defense

Depositions:

1. September 2023     **James Bingham v Jefferson County, Iowa, and Jefferson County Health Center, Iowa District Court for Jefferson County,** Case #LALA004446, James Palmer – Defense

2. September 2023     **Dontel Deon Crowder v McLean County, et al.** In the Eleventh Judicial Circuit of Illinois McLean County, Illinois, Case #: 2020L0000173, Carrie Haas – Defense

3. June 2023     **Gaven Picciano v Clark County, et al.** U.S. District Court Western District of Washington at Tacoma, # 3:20-cv-06106-DGE – Mason Ji - Defense

4. February 2023     **Georgia Eugenia Thomas v Southern Health Partners, INC,** U.S. District Court Eastern District of Kentucky Northern Division at Covington, # 2:21-cv-00012-WOB-CJS – Bradley Fyffe - Defense

5. January 2023     **Michelle L. Puki, as Personal Representative of the Estate of Lori Langton v Okanogan County, et al**., U.S. District Court Eastern District of Washington at Spokane, # 2:20-cv-00411-SMJ - Alexander Dietz - Plaintiff

6. August 2022     **Dustin Michelle, an individual, v South Correctional Entity ("Score"), Naphcare Inc.** United States District Court Western District of Washington at Seattle, Case # 2:21-CV-00140-JHC – Jonathon Ballard - Defense

7. June 2022     **Jeffery Heth v LaSalle County, Correct Care Solutions, et al.** U.S. District Court Northern District of Illinois Eastern Division, Case # 19 CV 1096 – Attorney Ron Neroda - Defense

8. September 2021     **Tom Montgomery as Personal Representative of the Estate of Michael Travis Clinard, deceased v King County, et al.** Case # 2:20-cv-00855-RAJ, United States District Court for the Western District of Washington – Attorney Ryan Dreveskracht - Plaintiff

9. September 2021 **Monique McNeil, as Administratrix of The Estate of Terrance Duncan v Correctional Medical Care, Inc., CBH Medical, P.C., County of Schenectady, et al.** Case # 9:18-CV-894, United States district Court Northern District of New York – Attorney Jonathan Symer - Defense

10. August 2021 **Jessica Lynne Preston v County of Macomb (CCS),** United States District Court for the Eastern District of Michigan, Southern Division, Case # 5:18-cv-12158, Attorney David Mammel - Defense

11. June 2021 **Russell H. Dawson (Damaris Rodriquez, Deceased) v Naphcare, INC., et al.**, United States District Court Western District of Washington at Seattle, Case # 2:19-cv-01987-RSM – Attorney Heidi Mandt - Defense

12. June 2021 **Patricia Thompson, as PR of the Estate of Marconia Lynn Kesee v Norman Regional Hospital, et al.** United States District Court for the Western District of Oklahoma, Case # CIV-19-113-SLP, Attorney Austin Young - Defense

13. May 2021 **Zuniga v County of San Bernardino, et al.**, Superior Court of California for the County of San Bernardino, Case #: CIVDS1620852, - Attorney Jonathon Bond - Defense

14. March 2021 **Donna Malone, et al. (Thomas Gosier) v Wicomico County, et al. (CCS),** US District Court for the District of Maryland, Case # 1:19-cv-02412-SAG – Attorney Daniel Griffith - Defense

15. February 2021 **Maria Clara Rodado, as the personal representative and on behalf of the heirs and estate of George Marinay, deceased, and Norma Marinay v Corizon Health, INC.** Fourth Judicial District Court in and for ADA County, State of Idaho, Case # CV01-17-19343 – Attorney Dylan Eaton - Defense

16. January 2021 **Keith Crumley, by Next Friend Shirley Crumley v Kerry J. Forestal in his official capacity as Sheriff of Marion County, et. al.** U.S. District Court Southern District of Indiana Indianapolis Division, Case # 1:19-cv-04110-TWP-DM – Attorney Drew Farringdon - Defense

17. August 2020 **Alyson Nale v Nurse Finley, Union Parish Detention Center, and Travelers Insurance.** U.S. District Court, Wester District of Louisiana, Monroe Division, Case # 3:19-CV-00473 – Attorney Joe Long - Plaintiff

18. June 2020 **Tammy Shidler and Gary Shidler, individually and as successors in interest to Joshua Pitts, deceased v County of San Bernardino.** U.S. District Court for the Central District of California, Case #5:19-cv-00503-AB (SHKx) – Attorney Christopher P. Wesierski - Defense

19. April 2020 **The Estate of Kyra Warner v Wellpath, f/k/a Correct Care Solutions, et al.** US District Court Southern District of Indiana, Indianapolis Division, Case # 1:19:cv-00774-RLY-MJD – Attorney Carol Dillon - Defense

# Exhibit B

**Kathryn J. Wild, RN, MPA, CCHP-RN**
**1148 Dreamcatcher Bluff, Mesquite, NV 89034**
**Phone: 909-720-0961**
**kwild@usa.net**

---

# Fee Schedule 2024

## Professional Services – Kathryn J. Wild, RN, MPA, CCHP-RN

| Service | Fee | |
|---|---|---|
| Retainer – Initial Review of Discovery | $ 4,500.00 | Non-Refundable |
| Conference calls, meetings, site visits, report development, document review | $ 450.00 | Per hour |
| Deposition | $ 500.00 | Per hour (Minimum of 2 hours) |
| Trial Daily Rate | $ 3,500.00 | Daily Rate |
| Travel Time | $ 200.00 | Per hour of travel |
| Travel Expenses (airfare, transportation, lodging, meals) | | Actual cost |
| Travel Expenses (mileage) | $.56 per mile | As applicable |
| Incidental Expenses (postage, etc.) | | Actual cost |