# EXHIBIT O

# Kathryn Wild, R.N.

# Tapia v. Naphcare, Inc., et al.

# May 15, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
www.buellrealtime.com
email: info@buellrealtime.com

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

JAVIER TAPIA,                    )
                                 )
        Plaintiff,               )
                                 )
    v.                           ) No. 2:22-CV-01141-KKE
                                 )
NAPHCARE, INC., et al,           )
                                 )
        Defendants.              )
_____ )


VIDEOTAPED VIDEOCONFERENCE DEPOSITION
UPON ORAL EXAMINATION

OF

KATHRYN WILD, RN

_____

TAKEN REMOTELY VIA VIDEOCONFERENCE

MESQUITE, NEVADA


(All participants appeared via videoconference.)






DATE TAKEN:  May 15, 2024

REPORTED BY:  Evelyn M. Adrean, RPR, CCR 22009424

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                          Kathryn Wild, R.N.

Page 2

1                    A P P E A R A N C E S:

2

3     FOR PLAINTIFF:

4     CORINNE SEBREN, ESQUIRE
      Galanda Broadman
5     8606 35th Avenue NE, Suite L1
      Seattle, Washington 98115
6     206-557-7509
      corinne@galanadabroadman.com
7

8

9     FOR DEFENDANT NAPHCARE:

10    JACOB DEAN, ESQUIRE
      Perkins Coie, LLP
11    1201 3rd Avenue, Suite 4900
      Seattle, Washington 98101-3099
12    206-359-8000
      jacobdean@perkinscoie.com
13

14

15    FOR DEFENDANT PIERCE COUNTY:

16    KRISTAL M. COWGER, ESQUIRE
      Pierce County Prosecuting Attorney's Office
17    930 Tacoma Avenue South, Room 946
      Tacoma, Washington 98402-2171
18    253-798-4265
      kristal.cowger@piercecountywa.gov
19

20                          *   *   *   *   *

21

22

23

24    ALSO PRESENT:

25    Sean Lykken, Videographer

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 19

1   I worked evening shift, and I worked nightshift

2   depending on where the need was.

3       Q.  Okay.  And you said you were assigned to

4   special projects.  When -- when you were assigned to

5   special projects, were you also still performing

6   clinical care, or were you doing the special projects

7   exclusively?

8       A.  No.  I mean, typically the way it works in a

9   correctional facility, you know, if you're a nurse

10  working on -- for instance, when I was working on

11  policies and procedures or protocol development, if --

12  if I came into work one day and they were short staffed,

13  I would be doing patient care.  So, you know, it was a

14  combination of patient care and these special projects.

15      Q.  Okay.  And you said you -- in your special

16  projects, you worked on developing policies and

17  procedures and nursing protocols?

18      A.  Nursing protocols, yeah.

19      Q.  Can you break that down for me.  What policies

20  and procedures did you work on for your special

21  projects?

22      A.  Well, we had an operational policy and

23  procedure manual, which is like, you know, there would

24  be policies on, for instance, how do you order a special

25  diet for a patient?  So the policy would be, you know,

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 20

1    we order special diets based on these circumstances, and

2    then the procedures is how to get that done; what

3    paperwork do you need to do to get the diet, who do you

4    call, and the types of diets that would be available to

5    order.  We had policies and procedures on how to do

6    receiving screening --

7         Q.  Okay.

8         A.  -- do it, those sorts of things.

9              MS. SEBREN:  Sorry, I think you just froze

10   up.  Did -- did she freeze up on your end?

11             THE WITNESS:  No.  Oh, okay.

12             MS. SEBREN:  That's okay.  It might be -- it

13   might be my connection.

14             THE REPORTER:  No, no.  She froze up on my

15   end, so I -- I didn't get what she said.  I got:  'We

16   had policies and procedures on how to do receiving

17   screening" -- she froze up, I pick up back at -- "those

18   sorts of things."  So if she could repeat that, please.

19        A.  Okay.  So -- so we developed policies and

20   procedures on how to do receiving screening, you know,

21   how to do sick call, you know, how to work with the

22   doctors in clinic, there were policies -- operational

23   policies and procedures in many different areas.

24        Q.  Okay.  And can you describe the difference

25   between those policies and procedures and the nursing

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 21

1    protocols that you were discussing?

2        A.   Sure.   So nursing protocols are protocols that

3    are developed collaboratively between nursing and

4    medical, for instance the medical director, and it

5    would -- there would perhaps be a protocol on different

6    types of symptoms that a patient would exhibit.   For

7    instance, there would be a protocol on if a patient came

8    to you and they were complaining of constipation, then

9    you would pull up protocol for constipation, and the

10   protocol would say you -- you do these vital signs, you

11   check -- you check these conditions, like you would

12   check the patient's abdomen, you would ask these

13   particular questions.   And then the based on the

14   information that you gleaned from your assessment with

15   the patient, you were authorized to do certain types of

16   treatment.   Like you could give them a laxative or you

17   would tell them -- you know.   Put them on a high fiber

18   diet or whatever protocol would require.

19       Q.   Okay.   So is it fair to say that the nursing

20   protocols were related to specific symptoms or medical

21   complaints and the policies and procedures were related

22   to -- to more administrative tasks?

23       A.   No.   More operational, operationally how you

24   get things done.   You know, how do you do you receiving

25   screening, how do you collect the information, what --

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 22

1    what do you do with certain information, whereas the

2    protocol is very clinical based.  So you're seeing a

3    patient, they've got a symptom, say they're complaining

4    of nausea or vomiting.  You would pull out the protocol

5    for nausea and vomiting, and then it would walk you

6    through -- step you through the different types of

7    information you as the nurse needed to collect.

8        Q.  Okay.  Understood.

9            The policies and procedures that you worked

10   on during your time with Orange County Health Care

11   Agency, were these all policies and procedures related

12   to nursing?

13       A.  Or health care.  You know, providing health

14   care in a correctional facility is kind of a

15   collaborative thing.  So the policy and procedure manual

16   would be focused towards people in the health care part

17   of the system as opposed to custody staff.

18       Q.  Okay.  So break that down.

19           What type of health care staff were you

20   working with outside of nurses?

21       A.  Oh, dentists, dental assistants, we had a

22   pharm -- a pharmacist, we had pharmacy techs, we had

23   mental health people that were working, you know,

24   alongside of us.  There were psychiatrists,

25   psychologists, LCSWs.  I guess that would be the --

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 23

1    Q.  Okay.

2    A.  -- range of different specialties, if you will.

3    Q.  And so did you develop policies and procedures

4  for dentists and dental assistants?

5    A.  Well, yes.  But I wouldn't do it in just

6  isolation by myself, I would work with the -- the dental

7  director, and we would sit down.  Because we wanted all

8  the policies and procedures to flow kind of in the same

9  format so that if you were looking at one and were

10  looking at another, you didn't have to figure out how it

11  was set up.  But I would work with the dentist in how

12  they wanted their policies and procedures to -- how they

13  wanted operationally those things to work.

14    Q.  Okay.  So your role in helping develop policies

15  and procedures for the dental -- the dental specialties

16  was more administrative than clinical?

17    A.  No, not necessarily.  Because there were also

18  nursing protocols that we developed in collaboration

19  with the dentist on what nurses would do if they saw a

20  patient with a toothache.  So I would sit down with the

21  dentist, and the dentist would help define the criteria

22  that the nurse would use to assess a patient.  And then

23  based on the results of that assessment, the dentist

24  would determine what type of treatment or referral we

25  would make for that patient.  So does that make sense --

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 24

1    Q.   Yeah --

2    A.   -- the protocol --

3    Q.   -- I think so.

4    A.   -- and the policy and procedure?

5    Q.   Yeah.  So you were working collaboratively with

6    other specialties and utilizing your specialty as a

7    nurse, and then they would utilize their specialty as a

8    dentist, for example --

9    A.   Right.

10   Q.   -- to create a overall policy or procedure?

11   A.   Yes.

12   Q.   Okay.  And is that the same way that it worked

13   with the mental health specialties?

14   A.   Sure.  So using that same sort of scenario, we

15   would get together with, you know, mental health

16   clinicians and a psychiatrist and go through different

17   scenarios that a nurse might come across.  You know, a

18   nurse might come across a patient that's actively

19   cutting themselves.  And then, you know, the

20   psychiatrist or the mental health clinician would --

21   would help describe criteria nurses should use assess

22   that patient for those -- those behaviors.

23   Q.   Okay.  No, that's helpful.  Thank you.

24        And on your CV it says you worked for this

25   agency until 1993; is that right?

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                              Kathryn Wild, R.N.

Page 65

1      Q.  And you list certain standards here, you list
2  the NCCHC standards, the ACA standards, and Washington
3  State Jail standards; correct?
4      A.  Correct.
5      Q.  And then you have a section on NaphCare policy
6  and procedure; correct?
7      A.  Right.
8      Q.  And it states that in your report that:  "It is
9  the policy of NaphCare to provide health care to
10  patients in a timely manner with privacy while
11  practicing within the scope of each employee's
12  professional licensure."  Correct?
13      A.  Correct.
14      Q.  And is that the entirety of the policy that you
15  reviewed of NaphCare's on health care access and
16  information, or is that --
17      A.  No.  Generally policies and procedures are
18  broken into a policy statement, which is what this is,
19  and then below the policy statement, there's procedural
20  ways you get that done.  So this is just the -- the
21  policy statement.
22      Q.  Okay.  Did you review the entirety of the
23  policies and procedures as they were broken down of
24  NaphCare's in summarizing this opinion?
25      A.  Yes.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 66

1    Q.  Okay.

2    A.  Yeah.  Their policies and procedures are based

3  on the national commission and the -- the ACA standards.

4    Q.  Okay.  And did you do a comparison of those

5  standards?

6    A.  Well I didn't do a side-by-side comparison, but

7  I'm -- I'm very familiar with the standards, and they

8  are in line with those standards.

9    Q.  Okay.  And on the top of page 19, your Access

10  to Care opinion goes on to say:  "There were no barriers

11  to accessing health care created by any NaphCare policy,

12  procedure, or employee."  Correct?

13    A.  Correct.

14    Q.  And what did you base this on?

15    A.  Well, the fact that when Mr. Tapia arrived at

16  the jail, he was immediately seen by the screening

17  nurse.  She -- she gathered his history, she got some

18  vital signs, she -- she got his history about potential

19  for opiate withdrawal, she scheduled him for regular

20  monitoring for his opiate withdrawal, and then -- and

21  then again, every time someone on health care was asked

22  to see this patient for one reason or another, there

23  were no barriers to -- to him being seen by health care

24  staff.

25    Q.  And did you review the deposition of mental

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                                    Kathryn Wild, R.N.

Page 74

1          Q.  But in the day -- well, strike that.

2                On September 20th and on September 18th, he

3     was listed -- or his chart notes noted that he was not

4     verbal; correct?

5          A.  He was not verbal to the mental health

6     clinician, which I think several of them explained

7     during their depositions, and I've seen it myself, a lot

8     of people in a mental health unit like this, they don't

9     want to talk to the mental health clinicians.  That

10    happens a lot.

11         Q.  Do you know whether he did not want to talk to

12    the mental health professionals or whether he could not

13    talk to them?

14         A.  No.  I wasn't -- I wasn't there.

15         Q.  And I'm going to scroll down to the Nursing

16    Assessments and Scope of Practice subheading --

17         A.  Okay.

18         Q.  -- page 20 of your report.

19         A.  Right.

20         Q.  And here you list -- again list an NCCHC

21    standard for nursing assessment protocols and procedures

22    at the top.  Do you see that?

23         A.  Yes.

24         Q.  And you also list NaphCare policy and procedure

25    Bates-stamped NCI 000378 titled Nursing Assessment

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 75

1    Protocols; correct?

2        A.   Right.

3        Q.   And the NaphCare policy and procedure you've

4    listed here, you write that:  "The policy states that

5    nursing assessment protocols shall be used by nursing

6    staff when providing clinical care to the extent

7    possible."  Correct?

8        A.   Right.

9        Q.   So here you have a policy that the protocols

10   shall be used.  You don't --

11       A.   To the extent possible.

12       Q.   Yeah.  Did you review the nursing assessment

13   protocols themselves?

14       A.   I believe I -- I believe I saw some of them.

15   I'm not sure I was given all of them.

16       Q.   Do you have the Bates stamps for those nursing

17   assessment protocols you reviewed?

18       A.   I'd have -- I'd have to dig through it and look

19   and --

20       Q.   Can you recall which protocols you reviewed?

21       A.   No, not offhand.  I would have to go through

22   the records.

23       Q.   Okay.  And what is a nursing assessment

24   protocol?

25       A.   It's the same as a nursing protocol that we

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                                    Kathryn Wild, R.N.

Page 76

1   talked about earlier.  Generally, if you're asked to see
2   somebody for a specific sympton, if you will.  Let's say
3   it's nausea and vomiting, you would get the protocol for
4   nausea and vomiting and go through the steps.  The
5   reason it -- in the -- in the standard it says to the
6   extent possible -- or the policy, to the extent
7   possible, there wouldn't be a nursing protocol for
8   everything.
9           So a lot of times you'll see a patient --
10  and I think I explained it further on in my -- in my
11  report.  That when there's not a protocol available for
12  a specific complaint, the nurse would often just
13  document their focused assessments or their narrative
14  note.
15      Q.  Okay.  I believe you're talking about this
16  sentence on the top of page 21; correct?
17      A.  Right.
18      Q.  Where you say:  "In these cases, nursing staff
19  will document the encounter in a S-O-A-P or focused
20  narrative format."  Correct?
21      A.  Correct.
22      Q.  Did you review a NaphCare polity, procedure, or
23  protocol that described when nurses are supposed to use
24  a S-O-A-P or a focus narrative format?
25      A.  I don't -- I don't remember.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 87

1   integrate their services with NaphCare."  Correct?

2        A.  Correct.  Including maintaining shared medical

3   records.  That's why you find the mental health notes in

4   the -- the NaphCare record.

5        Q.  And is there also a -- conversely, a

6   responsibility of NaphCare to integrate their services

7   with mental health?

8        A.  Well there's only the one medical record, so

9   they're -- they're utilizing a shared medical record.

10  Now, I may be wrong, I don't know, mental health may

11  have records that are outside the NaphCare TechCare

12  system, but I don't -- I wouldn't know that.

13       Q.  Did you review any policies, procedures, or

14  protocols of NaphCare's that discuss coordination of

15  care with mental health at Pierce County Jail?

16       A.  I don't think so.

17       Q.  Did you review any policies, procedures, or

18  protocols governing when nursing staff is required to

19  view mental health provider chart notes?

20       A.  No, I -- I didn't.

21       Q.  And here on the second to the last paragraph of

22  page 23 you wrote:  "Mr. Tapia began to exhibit

23  behaviors that Officer Knight described as going through

24  a mental health crisis on September 17th, 2018."  Do you

25  see that?

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 109

1    plaintiff alleges that NaphCare has a policy of denying

2    off -- offsite care as a cost control measure."

3    Correct?

4        A.  Right.

5        Q.  And then you write:  "This allegation is simply

6    incorrect as demonstrated in the actions of health care

7    staff in this case and the fact that NaphCare is not

8    financially responsible for any care provided to inmates

9    outside the correctional facility."  Correct?

10       A.  Right.

11       Q.  And when you say:  "The actions of health care

12   staff in this case," can you expand upon that?

13       A.  I should have -- well, I'm talking about

14   NaphCare, I'm giving opinions about NaphCare.  So as the

15   paragraph starts out, it says:  "The plaintiff alleges

16   that NaphCare has a policy."  So I'm talking about

17   NaphCare's actions.

18       Q.  Okay.  And in your determination of cost

19   control measures, where you only evaluating offsite

20   care?

21       A.  Yeah, yeah.  According to their contract with

22   Pierce County, NaphCare's not responsible for any costs

23   when patients go out to either specialty care offsite or

24   hospitalization offsite.

25       Q.  Did you review any policies, procedures, or

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 110

1    contract terms related to their costs on site?

2        A.  No.  No, I don't think they -- I don't think

3    they -- I don't think there's anything in the records

4    that I reviewed where they actually split out different

5    costs for different parts of the care on site.  I mean,

6    that might be available to them, but I don't think I

7    reviewed it.

8        Q.  Okay.  So you're not offering an opinion on

9    whether they had any cost-saving measures on site?

10        A.  No.  They probably -- they probably know what

11    they spend in pharmaceuticals and -- and -- and staff

12    and that sort of thing, but no, I didn't review any of

13    that.

14        Q.  Okay.  So moving down to the Policies and

15    Procedures subsection here, I'm just going to skip down

16    to page 25.  And you wrote here:  "I have reviewed" --

17    and it's the last paragraph of this section.  "I have

18    reviewed the NaphCare policies and procedures in place

19    at the Pierce County Jail."  Do you see that sentence?

20        A.  Yes.

21        Q.  "The NaphCare policies and procedures are all

22    in line with the current NCCHC standards in place at the

23    time of this incident."  Correct?

24        A.  Correct.

25        Q.  Which NaphCare policies and procedures did you

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 111

1   review?

2        A.  I can't remember the -- oh, go ahead.

3              MR. DEAN:  Asked and answered.

4        A.  I can't remember the dates on their policies

5   and procedures, but they were all in line with the

6   national commission standards that were -- I referenced

7   in my report.  Hang on a minute.  With the national

8   commission standards that came out in 20 -- 2018, the

9   2018 version.

10       Q.  Okay.  And earlier you said you didn't do a

11  side-by-side review of particular policies with the

12  NCCHC standard or the ACA standard.  Is that --

13       A.  Well, I didn't put them side by side.  But I'm

14  so familiar with national commission standards and the

15  ACA that I know what's required in each of the policies

16  and procedures.

17       Q.  Okay.  Moving to staffing levels here.  Here

18  you -- you write that there was a:  "Robust staffing

19  plan" -- or excuse me.  "A robust staffing plan was in

20  place that included an appropriate mix of RNs, LPNs,

21  medical providers (nurse practitioners/physicians

22  assistants), medical records staff, pharmacy staff, and

23  dental staff as well as a full-time HSA and director of

24  nursing."  Do you see that there?

25       A.  Right.

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 112

1      Q.  Did you review the hours each of these staff
2   type -- staff person types worked?
3      A.  I did.  If you look at the next paragraph down,
4   it says I also reviewed the Pierce County monthly hour
5   summary, which -- which is -- gave you a -- a snapshot
6   of how many hours the different classifications of staff
7   worked during that period of time that Mr. Tapia was
8   there.
9      Q.  And this monthly hours summary was for the
10  month of October of 2018; correct?
11     A.  Well, that's -- that's when he already went to
12  the hospital.
13     Q.  Actually, I have the exhibit.  I can pull it
14  up.
15     A.  I think it was during the date range that
16  services were provided to Mr. Tapia.
17         MR. DEAN:  Corinne, I believe it was
18  September 2018, if I'm remembering correctly.
19         MS. SEBREN:  Okay.  All right.
20  BY MS. SEBREN:
21     Q.  Moving down to point No. 7, we kind of covered
22  this above, but I just want to clarify here in your
23  point No. 7 where you say in your Summary of Opinions:
24  "There is no evidence in the documents reviewed that
25  NaphCare policies, procedures, and customs encouraged

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                    Kathryn Wild, R.N.

Page 113

1    profit over care," you're specifically referring to the
2    offsite measures; correct?
3         A.  Well that and, you know, the fact that, you
4    know, they staffed according to the contract levels, you
5    know, they weren't cutting out staffing or cutting down
6    on staffing, that sort of thing.  It's -- the care they
7    provided, I didn't see any evidence that -- that it was
8    all about the money.
9         Q.  Okay.  And in the hours reviewed of the
10   different staff types, did the documents you reviewed
11   include a breakdown of how much time each of these
12   provider types spent with patients?
13        A.  You mean like if a nurse worked an eight-hour
14   shift, how much of that time was spent doing
15   documentation as -- as opposed to hands-on with
16   patients?
17        Q.  Correct.
18        A.  No.  It just gave you the number of hours these
19   people were at work.  You know, that would almost, I
20   think, be impossible to do.  I mean, the nurse comes in
21   to do a job, and you are all over the place, you are
22   seeing patients at intake, then you're doing sick calls,
23   then you're go emergency, then you're documenting.  I
24   don't know how you would break it down into all the
25   different elements of a day.

29cb6005-530f-4565-a28b-1e0cdb757408

Tapia v. Naphcare, Inc., et al.                        Kathryn Wild, R.N.

Page 137

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF WHATCOM

5

6

7       I, Evelyn M. Adrean, RPR, a Certified Shorthand

8    Reporter in and for the State of Washington, do hereby

9    certify that the foregoing transcript of the deposition

10   of KATHRYN WILD, RN, having been duly sworn on MAY 15,

11   2024, is true and accurate to the best of my knowledge,

12   skill, and ability.  Reading and signing was requested

13   pursuant to FRCP Rule 30(e).

14          IN WITNESS WHEREOF, I have hereunto set my hand

15   and seal this 28th day of May 2024.

16

17

18   _____

19        EVELYN M. ADREAN, RPR, CCR-WA

20

21

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

29cb6005-530f-4565-a28b-1e0cdb757408