# EXHIBIT 6

# Daphne Glindmeyer, M.D.

# Tapia v. Naphcare, Inc., et al.

# April 16, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
www.buellrealtime.com
email: info@buellrealtime.com

Case 2:22-cv-01141-KKE    Document 175-6    Filed 11/25/24    Page 3 of 15

Tapia v. Naphcare, Inc., et al.                               Daphne Glindmeyer, M.D.

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
_____

JAVIER TAPIA,                    )
                                 )
       Plaintiff,                )
                                 )
    v.          ) No. 2:22-cv-01141-KKE
                                 )
NAPHCARE, INC., and              )
PIERCE COUNTY,                   )
                                 )
       Defendants.               )
_____)

VIDEOTAPED VIDEOCONFERENCE DEPOSITION
UPON ORAL EXAMINATION

OF

DAPHNE GLINDMEYER, M.D.
_____

FOLSOM, LOUISIANA
(All participants appeared via videoconference.)

DATE TAKEN: April 16, 2024
REPORTED BY: Evelyn M. Adrean, RPR, CCR 22009424

Page 2

       A P P E A R A N C E S:

FOR PLAINTIFF:
CORINNE SEBREN, ESQUIRE
Galanda Broadman
8606 35th Avenue NE, Suite L1
Seattle, Washington 98115
206-557-7509
corinne@galanadabroadman.com

FOR DEFENDANT NAPHCARE:
JACOB DEAN, ESQUIRE
Perkins Coie, LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067-1721
310-788-3365
jacobdean@perkinscoie.com

FOR DEFENDANT PIERCE COUNTY:
KRISTAL M. COWGER, ESQUIRE
Pierce County Prosecuting Attorney's Office
930 Tacoma Avenue South, Room 946
Tacoma, Washington 98402-2171
253-798-4265
kristal.cowger@piercecountywa.gov

         * * * * *

ALSO PRESENT:
Jason Neuerburg, Videographer

Page 3

DEPOSITION OF DAPHNE GLINDMEYER, M.D.
EXAMINATION INDEX
EXAMINATION BY                          PAGE
Ms. Cowger                               5

Mr. Dean                                 98

Ms. Sebren                              142


EXHIBIT INDEX

EXHIBITS FOR IDENTIFICATION             PAGE

158   Dr. Glindmeyer's expert report     8
159   Curriculum vitae                   9
160   Medical records                   16
161   Dr. Nanton's expert report        85
162   Time out logs 2                  142
163   Time out logs 3                  144
164   Time out logs 4                  146
165   Time out logs 1                  147

Page 4

       FOLSOM, LOUISIANA; APRIL 16, 2024
              8:03 a.m.
       THE VIDEOGRAPHER: We are on the record.
This is the deposition of Daphne Glindmeyer in the
matter of Javier Tapia versus NaphCare, Incorporated, et
al, cause No. 2:22-cv-01141 in the United States
District Court, Western District of Washington at
Seattle and was noticed by Perkins Coie. The time now
is approximately 8:03 a.m. on this 16th day of April
2024, and we are convening via Zoom. My name is Jason
Neuerburg from Buell Realtime Reporting, LLC, located at
1325 Fourth Avenue, Suite 1840, in Seattle, Washington
98101.
       Will counsel and all present please identify
themselves for the record.
       MS. SEBREN: Corinne Sebren for plaintiff,
Javier Tapia.
       MS. COWGER: Kristal Cowger for defendant,
Pierce County.
       MR. DEAN: Jake Dean for NaphCare.
       THE VIDEOGRAPHER: The court reporter may
now swear the witness.
       THE REPORTER: Counsel, may I please get a
stipulation that, because I am a Washington State
certified court reporter and the witness is located in

Case 2:22-cv-01141-KKE    Document 175-6    Filed 11/25/24    Page 4 of 15

Tapia v. Naphcare, Inc., et al.                                    Daphne Glindmeyer, M.D.

Page 13

1  new unit, he looked around, got his bearings because he
2  realized he was in a new location; is that right?
3      A.  I would have to look at the deposition to be a
4  hundred percent sure.
5      Q.  He remembered all of that and testified about
6  it in his deposition that you reviewed; correct?
7      A.  I believe so.
8      Q.  And then he testified that he addressed his
9  frustration about the situation by having what he self
10 described as a temper tantrum; is that right?
11     A.  That's what he said.
12     Q.  And then he also recalled being escorted out of
13 that unit and to a holding cell?
14     A.  I don't remember that.
15     Q.  And it's your opinion to a reasonable degree of
16 medical certainty or scientific certainty that he had an
17 acute mental status change at the time of those events
18 that he self described as a temper tantrum?
19         MS. SEBREN:  Object --
20         THE WITNESS:  I'm sorry.
21         MS. SEBREN:  Object to form.  Go ahead and
22 answer if you can.
23     A.  That was what was described by the corrections
24 deputy which is an objective third-party observer.
25     Q.  And so then going through your report, the next

Page 14

1  paragraph down, you note that he was seen by a mental
2  health evaluation specialist on September 18th of 2018;
3  is that correct?
4      A.  Yes.
5      Q.  And then continuing on into -- or in the same
6  paragraph, it notes that he was also seen by a mental
7  health evaluation specialist on September 19th of 2018?
8      A.  Yes.
9      Q.  And then going on to the next page, page 27, it
10 notes that on September 20th of 2018, he was seen by
11 mental health, Mr. Prather; is that right?
12     A.  Yes.
13     Q.  Do you have any reason to disagree with me if I
14 represent to you that September 18, 19th, and 20th of
15 2018 would have been a Tuesday, Wednesday, and Thursday?
16     A.  I would have to look it up in my handy little
17 date calendar thing on my phone, but if you say it's a
18 Tuesday Wednesday and Thursday, I could agree with you.
19     Q.  And he was seen again by mental health on
20 September 26th; is that right?
21     A.  Yes.
22     Q.  And then again on September 28th; is that
23 right?
24     A.  Yes.
25     Q.  And then September 30th; is that right?

Page 15

1      A.  Yes.
2      Q.  And do you have any reason to disagree with me
3  if I represent to you that September 26th, 28th, and
4  30th were a Wednesday, a Friday, and a Sunday?
5      A.  No.
6      Q.  Okay.  Moving down, your conclusions start on
7  page 27.  And the first heading under conclusions is
8  Access To Care; is that right?
9      A.  Yes.
10     Q.  And under Access To Care you state:  "Tapia
11 requested care via a medical kite on
12 September 13th, 2018, and he was scheduled to meet with
13 nursing staff, and that was canceled by mental health
14 staff."  Is that right?
15     A.  Yes.
16         MS. COWGER:  Okay.  Bear with me for one
17 second.  I want to add one exhibit.
18         MS. SEBREN:  Just a real quick point of
19 clarification, Kristal, I think you said we were on
20 page 27, but the heading you -- you mentioned is on page
21 28; right?
22         MS. COWGER:  Yes, sorry.  27 starts
23 Conclusions.  Access To Care heading starts -- is the
24 first full paragraph on page 28 of her report.
25         MS. SEBREN:  Thanks.

Page 16

1          MS. COWGER:  I added one additional exhibit,
2  Exhibit 160.
3  BY MS. COWGER:
4      Q.  And this is a NaphCare medical record of
5  scheduled sick calls.  Are you able to view the
6  document, Doctor?
7      A.  Yes.
8      Q.  And so looking at the sick calls scheduled for
9  September 14th of 2018, the name in the far left-hand
10 column states Mental Health Professional.  Is that
11 correct?
12     A.  On this document, yes.
13     Q.  Yes.  And the scheduled date of the mental
14 health professional visit was 9/14 of 2018; is that
15 correct?
16     A.  Yes.
17     Q.  And that is the note that says:  "Complaint of
18 insomnia canceled by Jesus Perez on 9/14 of 2018,
19 reason:  Please encourage inmate to kite mental health
20 office with current needs."  Is that correct?
21     A.  That's what it says, yes.
22     Q.  And you opined that -- going back to your
23 report --
24     A.  Can I close this now?
25     Q.  Yes.  In your report, page 28 under that

Case 2:22-cv-01141-KKE   Document 175-6   Filed 11/25/24   Page 5 of 15

Tapia v. Naphcare, Inc., et al.                                                    Daphne Glindmeyer, M.D.

Page 25

1   and a Friday and Sundays; is that right?
2       A. And there were six days in between that he was
3   not seen.
4       Q. In your report, you say: "Another barrier seen
5   in this case is having a utilization review process that
6   appropriately delays or denies necessary health care."
7   Is that directed to mental health and medical, or one or
8   the other?
9       A. That's really geared toward mental health.
10      Q. And can you describe to me what a utilization
11  review process is?
12      A. Basically, that would be a process of providing
13  care, actually performing the assessments and
14  evaluations appropriately, reviewing if those things
15  were done. They weren't done. Reviewing if an -- an
16  adequate assessment was done during the period of time
17  that Mr. Tapia was assigned to level one housing. It
18  wasn't done. There was no review of utilization of
19  mental health services.
20      Q. Moving on to the next heading is Housing, the
21  last paragraph on page 28 of your report. You state
22  that: "Mr. Tapia was transferred to level one mental
23  health housing which is described as administrative
24  segregation." Is that right?
25      A. Essentially.

Page 26

1       Q. And he remained in that same housing described
2   as administrative segregation until his transfer to
3   Tacoma General Hospital; is that right?
4       A. From the 17th until the 1st, correct.
5       Q. Yes.
6           MS. SEBREN: Counsel, excuse me. Did you --
7   did you guys get my object to form there?
8           MS. COWGER: (Shakes head.)
9           MR. DEAN: (Shakes head.)
10          MS. SEBREN: Okay.
11  BY MS. COWGER:
12      Q. And you state that -- the last sentence in that
13  paragraph: "As Mr. Tapia was experiencing an acute
14  mental status change, placement in this type of housing
15  would only serve to further isolate him and potentially
16  exacerbate his pathology." And in coming to that
17  conclusion, you're relying on Mr. Tapia's self described
18  tantrum as the acute mental status change?
19      A. Also that documentation of the mental health
20  providers who saw Mr. Tapia on the 18th. I think it was
21  the 18th. Hold on. The 18th and the 19th where they
22  document Mr. Tapia as being confused, unable to verbally
23  respond to questions, decompensated, and way off his
24  baseline.
25      Q. And going on to the next page, the top of

Page 27

1   page 29, you discuss impacts of isolation; is that
2   right?
3       A. Yes.
4       Q. And would you agree that nearly every
5   correctional facility across the country has some form
6   of isolation?
7       A. I would not.
8       Q. And can you describe why you would not?
9       A. Because there's actually a move against the use
10  of isolation in the United States, and there are
11  numerous areas or states that are working to reduce the
12  use of isolation and actually avoid the use of
13  isolation.
14      Q. And is housing inmates in isolation below any
15  sort of identified standard of care?
16      A. Well, housing them in isolation is not about
17  standard of care. We're talking -- when we're talking
18  about standard of care, we're talking about mental
19  health services provided to individuals in isolation.
20      Q. Is there any standard that you can identify
21  that housing inmates in isolation violates?
22      A. Well, you mean a health care standard?
23      Q. I'm asking you if there's something -- if
24  there's some prohibition against isolation for inmate
25  housing that you can identify?

Page 28

1           MS. SEBREN: Object to form.
2       A. I'm not sure what you're asking me, and I
3   apologize. I'm not sure if you're asking me from a
4   global correctional perspective or you're asking me from
5   a mental health or medical perspective.
6       Q. So just to back up, you discussed the negative
7   impacts of isolation, but in meeting the standard of
8   care and meeting constitutional requirements,
9   correctional facilities are able to house inmates still
10  in isolation --
11      A. Yes.
12      Q. -- would you agree?
13      A. Yes.
14      Q. Okay.
15      A. That's correct.
16      Q. And I'm sorry if I asked that not as clearly
17  previously.
18          And we discussed just before this that
19  inmate Tapia was actually not housed in isolation, he
20  was housed in administrative segregation; correct?
21      A. Which I think at this facility was a 23 and 1
22  program where he was in his cell 23 hours a day and had
23  1 hour out.
24      Q. And so can you describe to me the difference
25  between isolation and segregation?

Case 2:22-cv-01141-KKE   Document 175-6   Filed 11/25/24   Page 6 of 15

Tapia v. Naphcare, Inc., et al.                                Daphne Glindmeyer, M.D.

Page 29

1    A.  For this, there really isn't anything.  He was
2  in an isolation cell 23 in, 1 hour out with limited
3  contact with anyone else.
4    Q.  Is there a specific definition for "isolation"?
5    A.  It depends.  It's different from facility to
6  facility.
7    Q.  Does the NCCHC identify specific standards that
8  would qualify as isolation?
9    A.  They do not.  The NCCHC is a correctional
10 health care organization.  So they talk about the
11 standard of care for monitoring individuals when they're
12 in an isolation type environment such as this.
13   Q.  And so does the NCCHC define what qualifies as
14 isolation when setting those standards?
15   A.  You know, I believe that they do talk about --
16 and I can pull the standards up.  I have them here.  I
17 believe that they do talk about -- hold on just a sec.
18       (Pause in the proceedings.)
19   A.  No, they just refer to it globally as
20 "segregation."
21   Q.  So your testimony is, the NCCHC does not
22 differentiate between segregation and isolation?
23   A.  I'm looking to make absolutely sure.
24       (Pause in the proceedings.)
25   A.  They do -- hold on.  Okay.  They do

Page 30

1  differentiate between segregation and extreme isolation.
2    Q.  And can you tell us the difference?  Let's
3  start with segregation.
4    A.  So segregation appears to -- it's a global
5  term, right, and it can be called many things.  It can
6  be called administrative segregation, protective
7  custody, disciplinary segregation, or a super max tier.
8  And then extreme isolation refers to situation in which
9  inmates encounter staff or other inmates fewer than
10 three times per day.
11   Q.  And does the NCCHC identify either one of those
12 housing classifications as being below any standard of
13 care for inmates?
14   A.  No.  Again, they talk about what should be
15 provided to these individuals when they're in these
16 types of units.
17   Q.  And so as far as your opinion for housing, this
18 is essentially just some background on certain views of
19 impacts and not necessarily an opinion that his housing
20 was below any sort of standard; is that accurate?
21   A.  It's not below any sort of standard, however
22 the housing contributed, in my opinion, to the
23 difficulties that he experienced, specifically the
24 delirium.
25   Q.  Okay.  Moving on to the next section, your

Page 31

1  heading in the middle of page 29 is Failure to Monitor.
2  You state that: "Level one mental health housing
3  indicates that an individual be assessed by mental
4  health a minimum of three times per week.  A review of
5  records indicated that in deviation from facility
6  policy, there was a period of six days from 9/20/18 to
7  9/26/18 when Mr. Tapia was not assessed by mental
8  health."  Is that right?
9    A.  Yes.
10   Q.  And earlier we went through the days of the
11 week that he was seen by mental health; right?
12   A.  Yes.
13   Q.  And each calendar week, he was actually seen at
14 least three days over the course of the week; is that
15 right?
16   A.  With a six-day break.
17   Q.  And is there any requirement that specifies the
18 number of days between each visit?
19   A.  There isn't.  However, when you have an
20 individual such as Mr. Tapia who's experienced an acute
21 mental status change, it defies logic as to why you
22 would not see him on a regularly reoccurring basis
23 rather than skipping six days.
24   Q.  And so as we sit here today, you can't identify
25 a specific policy that a period of six day -- a gap a

Page 32

1  period of six days would violate?
2    A.  Other than the fact that you have a policy that
3  says three times per week and you've skipped six days,
4  which is one day short of a week.
5    Q.  And can you identify any NCCHC standard that
6  specifies a specific number of days, a limit of the
7  number of days between visits?
8    A.  Actually, I believe there is a standard that
9  talks about if a person is in segregation, they should
10 be seen more frequently than three days a week.
11   Q.  Can you point me to that requirement?
12   A.  Sure.  I have to look for it, might take me a
13 minute.  Might actually be in my report.  Hold on just a
14 second.
15       Yeah, daily patient evaluation.  It is in my
16 report.  It's in the last paragraph on page 29 talking
17 about individuals in mental health programs and
18 residential units such as the level one mental health
19 housing, that a minimum of continuous coverage by mental
20 health staff, blah, blah, blah, and then daily patient
21 evaluation by mental health staff.  And that apparently
22 did not occur.
23   Q.  And so your testimony and your opinion is that
24 the NCCHC standards for mental health services in
25 correctional facilities requires every inmate housed in

Case 2:22-cv-01141-KKE    Document 175-6    Filed 11/25/24    Page 7 of 15

Tapia v. Naphcare, Inc., et al.                               Daphne Glindmeyer, M.D.

Page 61

1    (Pause in the proceedings.)
2    A. Dr. Garcia. He thought that Mr. Tapia's foot
3  issues had been there for a little while -- these are
4  his exact words: "A little while, at least probably one
5  to two weeks." So I have to take the opinion of a
6  vascular surgeon with regard to that. And so
7  apparently, he was of the opinion that it had been there
8  at least two weeks prior to Mr. Tapia's presentation to
9  the hospital.
10    Q. And so you -- it's your opinion that at least
11 one to two weeks prior to his admission to the hospital,
12 Mr. Tapia was experiencing enough pain to cause
13 diagnosable delirium?
14    A. Something was causing a diagnosable delirium,
15 and the likelihood is pain, isolation, those things in
16 combination, perhaps.
17    Q. And so can you say with a reasonable degree of
18 medical or scientific certainty what was causing the
19 delirium?
20    MS. SEBREN: Object to form.
21    A. I cannot. I can tell you that it's my opinion
22 that a delirium was present. Given the fact that
23 Mr. Tapia had a DVT with PCD, was ultimately
24 hospitalized on the 1st, the finger points to the DVT
25 and PCD. Can I tell you with a hundred percent

Page 62

1  certainty? I cannot.
2    Q. Was Mr. Tapia's presentation a typical course
3  of delirium?
4    MS. SEBREN: Object to form.
5    A. As far as I can tell. The problem is that the
6  documentation is super poor, so I'm having to use the
7  documentation that we have based on that -- an acute
8  mental status, the sleepiness, the failure to respond,
9  the verbal -- the lack of verbal interaction, the lack
10 of movement. It appears to be delirium, yes.
11    Q. Is it typical with a course of delirium for a
12 person to be suddenly able to communicate at one point
13 such as when he arrived at the hospital?
14    MS. SEBREN: Object to form.
15    A. Yes. One of the one hallmarks symptoms or
16 hallmark signs or whatever of delirium is that it waxes
17 and wanes. Sometimes people seem fine, and they're able
18 to communicate with you, and sometimes they're not.
19    Q. So it's your testimony that delirium as a whole
20 waxes and wanes over time?
21    A. Yes.
22    Q. Does the course of delirium tend to get worse
23 over time?
24    A. It can, yes.
25    Q. Would the point that Mr. Tapia arrived at the

Page 63

1  hospital, would that be the point when you would expect
2  him to be his -- at his worst?
3    A. Not necessarily. Again, like we said, it waxes
4  and wanes. There was documentation, I believe,
5  Dr. Garcia -- and I can go back to his -- the synopsis
6  that I have here -- noted that Mr. Tapia was having
7  issues with cognition and interaction. So it was still
8  there; right? But then when you get Mr. Tapia into the
9  hospital and you start doing things like giving him
10 fluids, reducing his -- he had an elevated BUN, I think,
11 giving him fluids, things are going to start to get
12 better.
13    Q. Would you agree that Mr. Tapia was responsive
14 during his interaction with LPN Cameron Carrillo on
15 September 19th?
16    A. As -- based on the documentation, minimal,
17 though it is, and Mr. Carrillo's deposition, it --
18 apparently.
19    Q. And per the record, LPN Carrillo asked and
20 answered Mr. Tapia what was wrong, and he was able to
21 communicate that he was upset about being in isolation;
22 is that right?
23    A. I don't remember a hundred percent. I remember
24 that there was documentation. I don't remember that
25 being documented on Mr. Carrillo's progress note.

Page 64

1    Q. Do you remember why Mr. Carrillo was asked to
2  check on Mr. Tapia?
3    A. Mr. Nealis asked him to.
4    Q. And was that because Mr. Tapia was not
5  responding to questions?
6    A. That's not clear, because there wasn't
7  documentation of the referral from Mr. Nealis to
8  medical.
9    Q. And didn't Mr. Tapia respond to Mr. Carrillo
10 that he had no medical concerns?
11    MS. SEBREN: Object to form.
12    A. I don't remember that. I -- I want to say that
13 Mr. Carrillo said that he didn't have independent memory
14 of the interaction with Mr. Tapia.
15    Q. So his -- your testimony is that
16 Mr. Carrillo's documentation with Mr. Tapia -- or
17 Mr. Carrillo's interaction with Mr. Tapia was not
18 documented?
19    A. I'm going to look for that right now. There
20 was some documentation, I just don't remember the detail
21 associated with it.
22    (Pause in the proceedings.)
23    A. The documentation from Mr. Carrillo says:
24 "Does not appear in distress, states he does not have
25 any medical concern at this time."

Case 2:22-cv-01141-KKE   Document 175-6   Filed 11/25/24   Page 8 of 15

Tapia v. Naphcare, Inc., et al.                                      Daphne Glindmeyer, M.D.

Page 77

1  factor to his condition." Is that correct?
2      A. Yes.
3      Q. But then you had indicated earlier that
4  specifically because of his substance abuse, that was
5  what met the criteria for a full mental health
6  evaluation within 30 days of booking; is that correct?
7      A. Correct. We're talking here that substance use
8  wasn't a contributing factor to his condition as he
9  wasn't using while he was isolation or while he was at
10 Pierce County. Substance use was an issue prior to him
11 coming into the facility.
12     Q. Do you know that he wasn't using when he was
13 isolation?
14     A. His toxicology screen was negative.
15     Q. At the hospital on October 1st?
16     A. Correct.
17     Q. And so going back, the full mental health
18 evaluation that you say should have been done within 30
19 days of booking, the lack of that assessment didn't lead
20 to his medical condition and associated delirium;
21 correct?
22        MS. SEBREN: Object to form.
23     A. No.
24     Q. Can you explain the relevance of a mental
25 health evaluating within 30 days of his booking in June

Page 78

1  to what then happened to him medically in September?
2        MS. SEBREN: Object to form.
3      A. Well first of all -- I'm sorry.
4        MS. SEBREN: Sorry. Object to form.
5      A. First of all, the mental health evaluation
6  within 30 days is standard of care as noted by the
7  NCCHC. Second of all, there was lots of confusion with
8  regard to does Mr. Tapia or does Mr. Tap -- or does not
9  Mr. Tapia have a history of schizophrenia. He does not.
10 Had the evaluation been performed and they had requested
11 records from where he was treated previously -- Pierce
12 County Jail, I mean -- they would have known that this
13 is not likely related to a prior schizophrenia
14 diagnosis, rather this is an acute mental status change
15 not related to a prior diagnosis.
16     Q. Can you tell me any reason that Mr. Tapia
17 should have received any medical or mental health care
18 between his booking June 16th of 2018 and September 17th
19 of 2018?
20     A. No. Well nothing was documented, so it's hard
21 to know, so --
22     Q. So you can't --
23     A. The only thing that I think about is the
24 complaint of insomnia and the kite that we talked about
25 in detail earlier.

Page 79

1      Q. Okay. And so then to rephrase -- or clarify my
2  question, can you tell me any reason why Mr. Tapia
3  should have had care between his booking on June 16th of
4  2018 and, let's say, September 13th of 2018 prior to him
5  putting in the kite request for insomnia?
6      A. I cannot.
7        MR. DEAN: Kristal, do you mind if we take a
8  five-minute break soon?
9        MS. COWGER: Yeah, sure. We can take a
10 break right now.
11       THE VIDEOGRAPHER: We're going off the
12 record. The time now is 10:16 a.m.
13    (A break was taken from 10:16 to 10:23 a.m.)
14       THE VIDEOGRAPHER: On the record at
15 10:23 a.m.
16 BY MS. COWGER:
17     Q. Going back to your report, at the top of page
18 31, first paragraph, last sentence you state: "Once --
19 further, once Tap -- Mr. Tapia was admitted to the
20 Tacoma General and received medical treatment for his
21 serious medical issues, his mental status improved as
22 his delirium resolved." Is that right?
23     A. What page are you on?
24     Q. This is --
25       MR. DEAN: This is 32, Kristal.

Page 80

1        MS. COWGER: Did I say the wrong thing? I
2  apologize.
3        THE WITNESS: Okay. I'm here now with you.
4        MS. COWGER: Okay.
5  BY MS. COWGER:
6      Q. The top of page 32, first paragraph, last
7  sentence.
8      A. Yes.
9      Q. So you reviewed the MultiCare Tacoma General
10 Hospital records when preparing your report; correct?
11     A. Yes.
12     Q. And was Mr. Tapia diagnosed with delirium at
13 Tacoma General Hospital?
14     A. I don't recall that.
15     Q. And so is it your opinion to a reasonable
16 degree of medical or scientific certainty that Mr. Tapia
17 had delirium when he arrived at Tacoma General Hospital?
18       MS. SEBREN: Object to form.
19     A. As I've stated, yes. And Dr. Garcia even noted
20 some issues with his mental status to the point that I
21 believe they even did imaging of his brain while he was
22 there.
23     Q. You don't recall that there was an actual
24 diagnosis of delirium?
25     A. No. They kept saying that it was

Case 2:22-cv-01141-KKE   Document 175-6   Filed 11/25/24   Page 9 of 15

Tapia v. Naphcare, Inc., et al.                                    Daphne Glindmeyer, M.D.

Page 81

1  schizophrenia, which as we've discussed earlier that
2  Mr. Tapia doesn't have schizophrenia.
3      Q. Okay. So is it your opinion that or from your
4  review, he was diagnosed with schizophrenia at Tacoma
5  General Hospital?
6      A. No. They were questioning that.
7      Q. Did he receive any mental health or psychiatric
8  diagnosis at Tacoma General Hospital?
9      A. Not that I recall. To be a hundred percent
10 sure, I'd have to go back through the lords.
11     Q. Sitting here today, you can't point to a mental
12 health or psychiatric diagnosis that he received at
13 Tacoma General Hospital?
14         MS. SEBREN: Object to form. Asked and
15 answered.
16     A. Not to my memory at this moment.
17     Q. And page 4 of your report under the date of
18 10/9/18, you note that: "At Tacoma General Hospital,
19 the medication list does not include psychotropic
20 medications." Is that right?
21     A. That's correct.
22     Q. So in your review, you didn't identify any
23 psychotropic medications that he was provided with at
24 Tacoma General Hospital?
25     A. No.

Page 82

1      Q. Did Mr. Tapia have sepsis when he arrived at
2  the hospital on October 1st of 2018?
3          MS. SEBREN: Object to form.
4      A. No. They documented mental status changes.
5      Q. Was an infection documented at all upon his
6  arrival --
7          MS. SEBREN: Object to form.
8      Q. -- to Tacoma General Hospital?
9          MS. SEBREN: Sorry, Kristal. Object to
10 form. I didn't mean to interrupt you.
11     A. Not to my knowledge. They documented a number
12 of other diagnoses, however.
13     Q. Do you recall reviewing the records of the
14 treating resident, Dr. Labine?
15     A. Yes.
16     Q. And you reviewed his deposition as well --
17     A. Yes.
18     Q. -- correct?
19     A. Yes.
20     Q. And do you recall that in the records as well
21 as within Dr. Labine's testimony at deposition, he noted
22 that Tapia was able to describe the severity of his pain
23 as an 8 to 9 out of 10 upon his admission at the
24 hospital?
25     A. Yes.

Page 83

1          MS. SEBREN: Object to form.
2          THE WITNESS: Sorry.
3          MS. SEBREN: It's okay.
4  BY MS. COWGER:
5      Q. And you noted earlier that you reviewed
6  Dr. Garcia's deposition as well; correct?
7      A. Yes.
8      Q. And you noted that Dr. Garcia did express some
9  concerns about Mr. Tapia's mental capacity; correct?
10     A. Yes.
11     Q. There was an evaluation where it was determined
12 that he was capable of making medical decisions
13 including but not limited to his amputation?
14     A. Yes.
15     Q. Did you review Dr. Bates' deposition?
16     A. Yes. Briefly.
17     Q. Are you aware that plaintiff's other expert,
18 Dr. Bates, opined that Mr. Tapia could have had
19 catatonia as opposed to delirium?
20     A. I did see that.
21     Q. Do you disagree with Dr. Bates?
22     A. Apparently. I've diagnosed -- I -- my opinion
23 is that Mr. Tapia had a delirium. I mean, I'm not
24 surprised by Dr. Bates categorizing this or classifying
25 this as catatonia. The syndromes are similar, right,

Page 84

1  but I'm a psychiatrist so we use the DSM-5, and so when
2  I looked at the criteria of the DSM-5 and apply it to
3  Mr. Tapia, he meets more symptoms associated with the
4  delirium than with catatonia.
5      Q. Is all of the information that you have related
6  to Pierce County's mental health units' policies
7  identified in your expert report?
8      A. Everything I have, yes.
9      Q. And all information related to Pierce County's
10 practices within the mental health unit?
11     A. Whatever I have, yes.
12     Q. All of the information that you have is with --
13 is specified within your report?
14     A. Yes.
15     Q. Okay. And in reaching the conclusions in your
16 report, were you relying on just the treatment of
17 Mr. Tapia?
18     A. I'm not sure I understand your question.
19     Q. Phrasing it another way: Did you rely on any
20 information about treatment of any other inmates at the
21 Pierce County Jail when reaching the conclusions in your
22 report?
23     A. No.
24     Q. Did you review the report of Dr. Nanton?
25     A. Briefly, yes.

21 (Pages 81 to 84)

Case 2:22-cv-01141-KKE   Document 175-6   Filed 11/25/24   Page 10 of 15

Tapia v. Naphcare, Inc., et al.                                    Daphne Glindmeyer, M.D.

Page 141

1    Q. Did you watch the video of his deposition?
2    A. Did not.
3         MR. DEAN: Got it. You know what, looks
4  like we're at 12:00. Paid for four hours, we're not
5  going to go more. So I don't want -- I don't want to
6  keep you later, and -- and thankfully, we able to get
7  this done during within that -- that four-hour mark. So
8  we can go off the record.
9         MS. SEBREN: I actually did have a very
10 short serious of follow-up questions, but I want to
11 respect your time, Dr. Glindmeyer. I think it will take
12 five minutes. Are you okay going with five minutes?
13        THE WITNESS: Certainly.
14        MR. DEAN: If -- if we do that, though,
15 Corinne, you guys are paying for that because we're
16 not -- we're not paying over that four hours. That --
17 that was made very clear to us, so that --
18        MS. SEBREN: Well, I believe we started at
19 11:08, so --
20        MR. DEAN: We definitely -- we did not. I
21 actually wrote down the time when we started, so --
22        MS. SEBREN: Sure, I can pay for five
23 minutes.
24        MR. DEAN: Yeah. Absolutely.
25        So Dr. Glindmeyer, please feel free to bill

Page 142

1  anything to plaintiff's counseling after that four
2  hours.
3         THE WITNESS: I will. I will.
4         MS. SEBREN: Okay. I'm going to share an
5  exhibit. I believe we're on Exhibit 162; is that
6  correct?
7         MR. DEAN: Give me one second, and I'll pull
8  up the last one we have.
9         MS. COWGER: That's what I have, Corinne.
10        MS. SEBREN: Okay. Thank you.
11          E X A M I N A T I O N
12 BY MS. SEBREN:
13   Q. I just shared an exhibit we'll mark as 162. If
14 you can pull that up, and I can share my screen. Can
15 you see my screen here?
16   A. Yes.
17   Q. I believe earlier, counsel for Pierce County
18 was asking you questions about Hour Out Logs; correct?
19   A. Uh-huh.
20   Q. And you did not review these prior to writing
21 your report; correct?
22   A. No.
23   Q. Okay. And here we have a log noted as Three
24 South Hour Out Log Worksheet; correct?
25   A. Yes.

Page 143

1    Q. And I'll represent to you that on the date
2  that's pictured here of September 20th, 2018, Mr. Tapia
3  was in cell No. 16 of the C unit. Does that sound
4  familiar to you?
5    A. Yes.
6    Q. So here at the top of the page in the middle of
7  page, we have C unit column, and the cell numbers are
8  listed on the left-hand side of that column. Do you see
9  that?
10   A. Yes.
11   Q. For cell No. 16 there is an entry here on
12 September 20th, 2018; correct?
13   A. Wait, what?
14   Q. On September 20th, 2018, the date of this log,
15 on the C unit cell No. 16, do you see this --
16   A. Yes.
17   Q. -- entry here?
18   A. Yes.
19   Q. And can you read the entry?
20   A. Refused.
21   Q. Okay. So it looks like Mr. Tapia did not take
22 an hour out on the 20th of September; correct?
23   A. Apparently not.
24   Q. Okay. And I will share another exhibit here.
25 Just dropped it into the Chat. And this will be exhibit

Page 144

1  premarked Exhibit 163. Scroll to the top of the page
2  here, zoom in a little bit. Can you see my screen here?
3    A. Yes.
4    Q. And this is the Three South Hour Out Log
5  Worksheet for September 21st, 2018; correct?
6    A. Yes.
7    Q. And scrolling down to the C unit, cell No. 16,
8  Mr. Tapia's cell, can you see this entry for his cell?
9    A. Yes.
10   Q. And can you read the in and out section?
11   A. Out 1518, in REF, I'm assuming that means
12 refused.
13   Q. Okay. So you don't know what that means;
14 correct?
15   A. I don't.
16   Q. Do you know if it means he took on hour out?
17   A. I don't.
18   Q. Okay. I'll zoom back out here. And then
19 scrolling down to the next page in this exhibit, we're
20 at Bates stamp DEF PC 402747. This is the log for
21 September 22nd; correct?
22   A. Yes.
23   Q. And going to the C unit, cell No. 16, can you
24 read that entry?
25   A. It looks like RCF, but it could be an E.

Case 2:22-cv-01141-KKE    Document 175-6    Filed 11/25/24    Page 11 of 15

Tapia v. Naphcare, Inc., et al.                                    Daphne Glindmeyer, M.D.

```
                                         Page 149
 1                 C E R T I F I C A T E
 2
 3    STATE OF WASHINGTON
 4    COUNTY OF WHATCOM
 5
 6
 7       I, Evelyn M. Adrean, RPR, a Certified Shorthand
 8    Reporter in and for the State of Washington, do hereby
 9    certify that the foregoing transcript of the deposition
10    of DAPHNE GLINDMEYER, M.D., having been duly sworn on
11    APRIL 16, 2024, is true and accurate to the best of my
12    knowledge, skill, and ability.  Reading and signing was
13    requested pursuant to FRCP Rule 30(e).
14
15       IN WITNESS WHEREOF, I have hereunto set my hand
16    and seal this 22nd day of April 2024.
17
18
19       _____
20       EVELYN M. ADREAN, RPR, CCR-WA
21
22
23
24
25
```

# 3 South Hour Out Log Work Sheet

DATE 9-21-18

Day Shift CDs: W. Stacks / King
Swing Shift CDs: Kim / Desmond

**All out of cell times and hour out refuses will be entered into the LINX Cluster Log in the Hours In/Out Tab.**

## A Unit

| Cell | Time | | Cautions |
|---|---|---|---|
| 1 | Out | 0715 | OWN |
|   | In  | 0805 | |
| 2 | Out | | NEXT HOUR OUT 9-22-18 (N/S) |
|   | In  | | |
| 3 | Out | | Refused |
|   | In  | | |
| 4 | Out | 0805 | OWN |
|   | In  | 0825 | |
| 5 | Out | | NEXT HOUR OUT 9-22-18 |
|   | In  | | |
| 6 | Out | | |
|   | In  | | |
| 7 | Out | | NEXT HOUR OUT 9-22-18 (N/S) |
|   | In  | | |
| 8 | Out | | Refused |
|   | In  | | |
| 9 | Out | | |
|   | In  | | |
| 10 | Out | 1510 | |
|    | In  | 1610 | |

## B Unit

| Cell | Time | | Cautions |
|---|---|---|---|
| 1 | Out | | |
|   | In  | | |
| 2 | Out | | Refused |
|   | In  | | |
| 3 | Out | 0720 | OWN |
|   | In  | 0735 | |
| 4 | Out | 0735 | |
|   | In  | 0835 | |
| 5 | Out | | Refused |
|   | In  | | |
| 6 | Out | | Refused |
|   | In  | | |
| 7 | Out | 0835 | on own |
|   | In  | 0853 | |
| 8 | Out | | No |
|   | In  | | |
| 9 | Out | 1515 | on own |
|   | In  | 1600 | |
| 10 | Out | | NEW 9-20-18 @ 1947 |
|    | In  | | |

## C Unit

| Cell | Time | | Cautions |
|---|---|---|---|
| 1 | Out | | NEXT HOUR OUT 9-22-18 RTM |
|   | In  | | |
| 2 | Out | | Refused |
|   | In  | | |
| 3 | Out | | Refused |
|   | In  | | |
| 4 | Out | | LH |
|   | In  | | |
| 5 | Out | | NEW 9-21-18 @ 0151 |
|   | In  | | |
| 6 | Out | 0725 | |
|   | In  | 0825 | |
| 7 | Out | 0830 | |
|   | In  | 0930 | |
| 8 | Out | | Refused |
|   | In  | | |
| 9 | Out | | |
|   | In  | | |
| 10 | Out | 1114 | own |
|    | In  | | |
| 11 | Out | 0725 | |
|    | In  | 0825 | |
| 12 | Out | | |
|    | In  | | |
| 13 | Out | 0830 | |
|    | In  | 0930 | |
| 14 | Out | 1112 | |
|    | In  | 1212 | |
| 15 | Out | 1518 | |
|    | In  | 1618 | |
| 16 | Out | 1518 | Ref |
|    | In  | | |
| 17 | Out | | NEXT HOUR OUT 9-22-18 RTM |
|    | In  | | |
| 18 | Out | 1218 | |
|    | In  | 1318 | |
| 19 | Out | 1218 | |
|    | In  | 1318 | |
| 20 | Out | | NEXT HOUR OUT 9-22-18 RTM |
|    | In  | | |

## D Unit

| Cell | Time | | Cautions |
|---|---|---|---|
| 1 | Out | 0715 | OWN |
|   | In  | 5745 | |
| 2 | Out | | |
|   | In  | | |
| 3 | Out | | by |
|   | In  | | |
| 4 | Out | | |
|   | In  | | |
| 5 | Out | | CLOSED FOR MAINTENANCE |
|   | In  | | |
| 6 | Out | | |
|   | In  | | |
| 7 | Out | | |
|   | In  | | |
| 8 | Out | 0745 | |
|   | In  | 0845 | |
| 9 | Out | 1108 | OWN |
|   | In  | 1150 | |
| 10 | Out | | |
|    | In  | | |

## E Unit

| Cell | Time | | Cautions |
|---|---|---|---|
| 1 | Out | | NEXT HOUR OUT 9-22-18 |
|   | In  | | |
| 2 | Out | 0727 | |
|   | In  | 0827 | |
| 3 | Out | 0830 | |
|   | In  | | |
| 4 | Out | | |
|   | In  | | |
| 5 | Out | 1050 | 1050 |
|   | In  | 1153 | |
| 6 | Out | 1130 | NO PHONE |
|   | In  | 1230 | |
| 7 | Out | 1230 | |
|   | In  | 1330 | |
| 8 | Out | 1725 | |
|   | In  | 1825 | |
| 9 | Out | 1620 | |
|   | In  | 1720 | |
| 10 | Out | 1520 | |
|    | In  | 1620 | |

DEF PC 402746

04.16.2024 Glindmeyer 163  Buell Realtime Reporting

# 3 South Hour Out Log Work Sheet

DATE 9/22/18　　Day: Wall　　Swing: Kim
　　　　　　　　Shift CDs: Barham　　Shift CDs: Sollas

**All out of cell times and hour out refuses will be entered into the LINX Cluster Log in the Hours In/Out Tab.**

## A Unit

| Cell | Time | | Cautions |
|---|---|---|---|
| 1 | Out | 1115 | Disc No 0cal ① |
| 1 | In | 1130 | |
| 2 | Out | — | 2 C/O Test ① |
| 2 | In | 0845 | |
| 3 | Out | 0845 | ① |
| 3 | In | 0915 | |
| 4 | Out | m ① | |
| 4 | In | | |
| 5 | Out | | Hugged Jack No daly ① |
| 5 | In | | |
| 6 | Out | 1250 | Stars/O No ① |
| 6 | In | 130 | |
| 7 | Out | REF | ① |
| 7 | In | | |
| 8 | Out | 1115 | 2 C/O |
| 8 | In | Refused | |
| 9 | Out | m ① | |
| 9 | In | | |
| 10 | Out | 1140 | 2 C/O |
| 10 | In | 1240 | |

## B Unit

| Cell | Time | | Cautions |
|---|---|---|---|
| 1 | Out | m ① | |
| 1 | In | | |
| 2 | Out | 0715 | Ref ① |
| 2 | In | | |
| 3 | Out | Ref | ① |
| 3 | In | | |
| 4 | Out | 0700 | ③ |
| 4 | In | 0720 | |
| 5 | Out | 0825 | ① |
| 5 | In | Refused | |
| 6 | Out | 0565 | ① |
| 6 | In | Refused | |
| 7 | Out | 0630 | ① |
| 7 | In | 0730 | |
| 8 | Out | m ① | |
| 8 | In | | |
| 9 | Out | 1015 | W.O. ① |
| 9 | In | | |
| 10 | Out | 1040 | on own ① |
| 10 | In | 1120 | |

## C Unit

| Cell | Time | | Cautions |
|---|---|---|---|
| 1 | Out | 1220 | ① |
| 1 | In | 1300 | |
| 2 | Out | Ref | ① |
| 2 | In | | |
| 3 | Out | Ref | ① |
| 3 | In | | |
| 4 | Out | 0730 | ① |
| 4 | In | 0830 | |
| 5 | Out | m ① | m ① |
| 5 | In | | |
| 6 | Out | 0835 | ① |
| 6 | In | 0935 | |
| 7 | Out | 1010 | ① |
| 7 | In | 1120 | |
| 8 | Out | 1130 | ① |
| 8 | In | 1200 | |
| 9 | Out | 1130 | on own ① |
| 9 | In | 1150 | |
| 10 | Out | 1220 | Refused ① |
| 10 | In | | |
| 11 | Out | 1010 | ① |
| 11 | In | 1120 | |
| 12 | Out | m ① | |
| 12 | In | | |
| 13 | Out | | EOD ① |
| 13 | In | | |
| 14 | Out | Ref | ① |
| 14 | In | | |
| 15 | Out | Ref | ① |
| 15 | In | | |
| 16 | Out | Ref | ① |
| 16 | In | | |
| 17 | Out | Ref | ① |
| 17 | In | | |
| 18 | Out | Ref | ① |
| 18 | In | | |
| 19 | Out | 0730 | ① |
| 19 | In | 0830 | |
| 20 | Out | 0830 | ① |
| 20 | In | 0930 | |

## D Unit

| Cell | Time | | Cautions |
|---|---|---|---|
| 1 | Out | New | ① |
| 1 | In | | |
| 2 | Out | | |
| 2 | In | | |
| 3 | Out | | |
| 3 | In | | |
| 4 | Out | | |
| 4 | In | | |
| 5 | Out | | |
| 5 | In | | |
| 6 | Out | | |
| 6 | In | | |
| 7 | Out | | |
| 7 | In | | |
| 8 | Out | | |
| 8 | In | | |
| 9 | Out | 0835 | ① |
| 9 | In | 0905 | |
| 10 | Out | moved | Suicide ① |
| 10 | In | | |

## E Unit

| Cell | Time | | Cautions |
|---|---|---|---|
| 1 | Out | 1505 | on own ① |
| 1 | In | 1515 | |
| 2 | Out | 0715 | ① |
| 2 | In | 0810 | |
| 3 | Out | 0810 | ① |
| 3 | In | 0915 | |
| 4 | Out | 1005 | ① |
| 4 | In | 1105 | |
| 5 | Out | 1110 | ① |
| 5 | In | 1225 | |
| 6 | Out | 1230 | NO Phone ① LID = 4 |
| 6 | In | 1305 | |
| 7 | Out | 1320 | ① |
| 7 | In | 1420 | |
| 8 | Out | 1515 | ① |
| 8 | In | 1615 | |
| 9 | Out | 1710 | ③ |
| 9 | In | 1810 | |
| 10 | Out | 1815 | ② |
| 10 | In | 1915 | |

DEF PC 402747

# 3 South Hour Out Log Work Sheet

DATE 9/23/18

Day Shift CDs: Russell / HOUN
Swing Shift CDs: Borry / Skovinsto

**All out of cell times and hour out refuses will be entered into the LINX Cluster Log in the Hours In/Out Tab.**

## A Unit

| Cell | Out | In | Cautions |
|---|---|---|---|
| 1 | × | × | NEW/EMPTY |
| 2 | × | × | E.O.D |
| 3 | | | Refused |
| 4 | × | × | L/D 9-23 |
| 5 | 1133 | 1210 | SUICIDAL |
| 6 | × | × | E.O.D |
| 7 | | | E.O.D  2 c/o |
| 8 | | | Refusal |
| 9 | × | × | FIGHT |
| 10 | 0725 | | Refused  2 c/o |

## B Unit

| Cell | Out | In | Cautions |
|---|---|---|---|
| 1 | × | × | SUICIDAL |
| 2 | | | refused |
| 3 | | | Refused |
| 4 | 0630 0710 | 0810 | |
| 5 | 0610 | 0710 | |
| 6 | × | × | SUICIDAL |
| 7 | 1058 | | refused |
| 8 | 1058 | 1106 | on own |
| 9 | | | Refused |
| 10 | | | Refused |

## C Unit

| Cell | Out | In | Cautions |
|---|---|---|---|
| 1 | × | × | E.O.D |
| 2 | 1360 | 1400 | |
| 3 | | | Refused |
| 4 | | | NEW |
| 5 | | | Refused |
| 6 | 0710 | 0810 | |
| 7 | 0815 | 0915 | |
| 8 | | | MH |
| 9 | 1058 | 1140 | |
| 10 | 1300 | 1334 | ON OWN |
| 11 | 1200 | 1300 | |
| 12 | × | × | NEW/EMPTY |
| 13 | × | × | L/D 9-23 |
| 14 | | | Refused |
| 15 | 0710 | 0810 | |
| 16 | | | Refused |
| 17 | × | × | E.O.D |
| 18 | | | Refused |
| 19 | 0815 | 0915 | |
| 20 | × | × | E.O.D |

## D Unit

| Cell | Out | In | Cautions |
|---|---|---|---|
| 1 | 0755 | 0825 | on own |
| 2 | × | × | L/D 9-23 |
| 3 | | | Refused |
| 4 | × | × | NEW/EMPTY |
| 5 | | | CLOSED |
| 6 | | | NEW/EMPTY |
| 7 | | | NEW/EMPTY |
| 8 | × | × | NEW EMPTY |
| 9 | 0720 | 0755 | on own |
| 10 | × | × | CLOSED |

## E Unit

| Cell | Out | In | Cautions |
|---|---|---|---|
| 1 | × | × | E.O.D |
| 2 | 1510 | 1610 | |
| 3 | | | Refused |
| 4 | 0720 | 0820 | |
| 5 | 0820 | 0920 | |
| 6 | 1058 | 1200 | |
| 7 | | | L/D |
| 8 | 1215 | 1315 | |
| 9 | 1315 | 1415 | |
| 10 | 1730 | 1830 | |

DEF PC 402748

# 3 South Hour Out Log Work Sheet

DATE: 9-24-18

Day Shift CDs: Lincoln/Olson, /1—/1, 10
Swing Shift CDs: THEO-, Berry, A-

**All out of cell times and hour out refuses will be entered into the LINX Cluster Log in the Hours In/Out Tab.**

## A Unit

| Cell | Time Out | Time In | Cautions |
|---|---|---|---|
| 1 | | | Empty/New |
| 2 | 1135 | 1225 | NS 2-C/o Taser, SA own GoD |
| 3 | 1227 | 1327 | |
| 4 | | | (LD) (SA) 2-2/0 (NS) GoD |
| 5 | | | (NS) suicidal |
| 6 | 0730 | 0830 | SA 2-C/o |
| 7 | | | (SA) 2-C/o (NS) GoD Refused |
| 8 | | | (SA) 2-C/o Refused |
| 9 | 0830 | 0930 | |
| 10 | 1525 | 1625 | SA 2-C/o |

## B Unit

| Cell | Time Out | Time In | Cautions |
|---|---|---|---|
| 1 | | | New/suicidal (NS) |
| 2 | 0815 | 0900 | |
| 3 | | | Refused |
| 4 | 1130 | 1230 | |
| 5 | 1530 | 1630 | MH |
| 6 | | | Empty/New |
| 7 | | | Refused |
| 8 | 0715 | 0740 | on own OWN |
| 9 | | | Refused |
| 10 | 0742 | 0814 | |

## C Unit

| Cell | Time Out | Time In | Cautions |
|---|---|---|---|
| 1 | 1027 | 1127 | RTM GoD |
| 2 | 1130 | 1234 | KeepSep C-3 |
| 3 | 1530 | 1630 | |
| 4 | | | New 9-23 |
| 5 | | | Refused |
| 6 | 0720 | 0820 | |
| 7 | 0820 | 0920 | |
| 8 | | | Refused |
| 9 | | | Refused |
| 10 | | | Refused |
| 11 | 1645 | 1745 | |
| 12 | | | New 9-23 |
| 13 | 1130 | 1230 | |
| 14 | | | Refused |
| 15 | | | Closed |
| 16 | 0720 | 0820 | MH |
| 17 | | | RTM Refused |
| 18 | | | Refused |
| 19 | 0820 | 0920 | |
| 20 | 1023 | 1123 | RTM |

## D Unit

| Cell | Time Out | Time In | Cautions |
|---|---|---|---|
| 1 | | | Refused |
| 2 | 0725 | 0825 | |
| 3 | 1515 | 1615 | |
| 4 | | | New 9-23 |
| 5 | | | Closed |
| 6 | 0708 | 0725 | |
| 7 | | | Empty/New |
| 8 | | | Empty New |
| 9 | | | Refused |
| 10 | | | Closed |

## E Unit

| Cell | Time Out | Time In | Cautions |
|---|---|---|---|
| 1 | 1517 | 1617 | RTM GoD |
| 2 | 1635 | 1735 | MH |
| 3 | 1740 | Refused | Keep Sep C-3 |
| 4 | 0707 | 0725 | OWN |
| 5 | 0728 | 0820 | MH OWN |
| 6 | 0820 | 0920 | 2 no Phone |
| 7 | 1020 | 1120 | |
| 8 | 1128 | 1228 | |
| 9 | 1230 | 1370 | |
| 10 | | | refused |

DEF PC 402749