EXHIBIT 12

# Deposition of Elizabeth Warren

# Tapia v. Naphcare, Inc., et al.

# November 2, 2023



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Case 2:22-cv-01141-KKE    Document 175-12    Filed 11/25/24    Page 3 of 17

Tapia v. Naphcare, Inc., et al.                    Elizabeth Warren



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JAVIER TAPIA,            |

    Plaintiff,           |

    v.                   |   No. C22-1141-JCC

NAPHCARE, INC., et al,   |

    Defendants.          |

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF
ELIZABETH WARREN

[Witness Located in Syracuse, New York
with All Parties Appearing via Zoom.]

DATE TAKEN:  Thursday November 2, 2023, 9:00 a.m.
REPORTED BY: Danielle Schemm CCR 3395

**Page 2**

A P P E A R A N C E S

APPEARING FOR PLAINTIFF TAPIA:
    RYAN DREVESKRACHT, ATTORNEY AT LAW
    Galanda Broadman, PLLC
    8606 35th Avenue Northeast, Apt Lw1
    Seattle, Washington 98115
    ryan@galandabroadman.com
    206.909.3842

APPEARING FOR DEPONENT AND DEFENDANT NAPHCARE, INC.:

    JACOB DEAN, ATTORNEY AT LAW
    Perkins Coie LLP
    1888 Century Park East, Suite 1700
    Los Angeles, California 90067
    jacobdean@perkinscoie.com
    310.788.3289

APPEARING FOR DEFENDANT PIERCE COUNTY:
    KRISTAL COWGER, ATTORNEY AT LAW
    Pierce County Prosecuting Attorney
    930 Tacoma Avenue South, Rm 946
    Tacoma, Washington 98402
    kristal.cowger@piercecountywa.gov
    253.798.4265

ALSO PRESENT:    MICHAEL TAKOS, VIDEOGRAPHER
                 DANI SCHEMM, CERTIFIED COURT REPORTER

**Page 3**

E X A M I N A T I O N   I N D E X
EXAMINATION BY:                              PAGE:
MR. DREVESKRACHT                      4
MR. DEAN                   102
MR. DREVESKRACHT                      128
MR. DEAN                   129
E X H I B I T   I N D E X
EXHIBIT MARKED:     DESCRIPTION:            PAGE:
Exhibit No. 1       Progress Notes for      28
                    Javier Tapia

Exhibit No. 3       4-Page Excerpt from the    32
                    Deposition Transcript of
                    Cameron Carrillo

Exhibit No. 2       Vital Signs for Javier     36
                    Tapia
Exhibit No. 7  ****  Non-Emergent Health Care    84
                    and Services Policy

Exhibit No. 4       Treatment Administration    88
                    Records for Javier Tapia
Exhibit No. 13      8-Page Excerpt from the     104
                    Deposition Transcript of
                    Cameron Carrillo
Exhibit No. 15      Pierce County Detention     110
                    and Corrections Center
                    Incident Report
Exhibit No. 16      Behavioral Log              119
Exhibit No. 14 ****  September 29, 2018 Sick     122
                    Call Record

    * Exhibits with **** marked as CONFIDENTIAL *

**Page 4**

VIDEOGRAPHER:  This is the deposition of Elizabeth Warren in the matter of Tapia versus NaphCare, Inc., et al.  The case number is C22-1141-JCC in the United States District Court for the Western District of Washington at Seattle and was noticed by Galanda Broadman.

The time now is approximately 9:02 a.m. on this 2nd day of November 2023, and we are convening remotely via videoconference.  My name is Michael Takos from Buell Realtime Reporting with offices in Seattle, Washington.

Will counsel please identify themselves for the record?

MR. DREVESKRACHT:  Good morning.  Ryan Dreveskracht for the plaintiff.

MR. DEAN:  Jake Dean for NaphCare.

MS. COWGER:  Kristal Cowger for Pierce County.

VIDEOGRAPHER:  Thank you.  Will the court reporter please swear in the witness?

ELIZABETH WARREN, Witness, having been first duly sworn by a certified court reporter, appeared and testified as follows:

EXAMINATION

BY MR. DREVESKRACHT:

Q  Good morning, Mrs. Warren.  Thanks for being with us today.  Can you please state your full name and spell it out for the record?

Tapia v. Naphcare, Inc., et al.                                     Elizabeth Warren

Page 57

1  instructions regarding diet or medication, that would have
2  been somewhere in the medical record, correct?
3      MR. DEAN: Objection to form. Compound. Calls for
4  speculation.
5      MS. COWGER: Join.
6      A  Everything Dr. Balderrama would have wanted would
7  have eventually ended up in the medical record.
8      Q  [BY: MR. DREVESKRACHT] Okay. You wrote here that
9  Mr. Tapia would not verbally respond; do you see that?
10     A  Yeah.
11     Q  Do you recall, did Mr. Tapia appear angry or
12 upset?
13     A  I don't recall.
14     Q  I imagine that in -- well, I don't want to assume.
15 But in your -- you've worked in corrections for -- you
16 worked at the New York Department of Corrections for
17 four years and then you were at the Pierce County Jail for
18 a number of years. In your experience, is an inmate
19 refusing to be treated or assessed by medical, is that
20 uncommon?
21     A  No, it's not uncommon.
22     Q  Uh-huh. And do you recall, was Mr. Tapia's
23 presentation atypical for someone who is trying to refuse
24 medical care?
25     MR. DEAN: Objection. Lacks foundation. Calls for

Page 58

1  speculation.
2      MS. COWGER: Join.
3      A  So what it says is, "Inmate will follow
4  instructions with calm encouragement. Allowed
5  assessment."
6      Q  [BY: MR. DREVESKRACHT] Right. So he was --
7      A  He allowed me to assess him.
8      Q  Right. So he was someone who didn't verbally
9  respond to you, but he was generally cooperative, right?
10     A  Based on the note, he was cooperative. But they
11 don't always -- they choose not to respond sometimes. It
12 isn't that they're not able to respond. Sometimes they
13 choose not to respond.
14     Q  So in your --
15     A  So what I wrote is, "Inmate will not verbally
16 respond." I didn't say he wasn't able. I said he will
17 not and that inmate will follow instructions with calm
18 encouragement. Allowed assessment.
19     Q  Right. Did that stick out to you? Did anything
20 seem odd about Mr. Tapia's demeanor in the fact that he
21 cooperated with you generally but he did not verbally
22 respond to you?
23     A  No, he's -- no. He is -- I'm assuming, based on
24 that mental health is making this assessment -- making
25 medical -- right? Mental health has been involved in

Page 59

1  telling medical they had some concerns that he's not
2  eating and he wasn't talking. Right. We saw that earlier
3  from whoever, from Nealis.
4      So what was your question? They're not -- he's
5  not acting -- his vitals are okay. He is not acting
6  strange. I would have brought him to the clinic to be
7  seen by a provider this day if he was acting in a abnormal
8  manner, as far as medically abnormal manner. I would have
9  brought him downstairs to the clinic.
10     Q  You wrote here that a sergeant requested you to
11 see Mr. Tapia, correct?
12     A  Yes.
13     Q  Do you recall who that sergeant was?
14     A  No.
15     Q  Do you recall what they told you?
16     A  No.
17     Q  Do you recall why you were requested to see
18 Mr. Tapia?
19     A  Well, based on my note, not sure if inmate is
20 eating every meal means they needed him assessed.
21     Q  Okay. So you were instructed to assess Mr. Tapia;
22 is that correct?
23     A  They wanted medical to assess him, yes.
24     Q  Okay. And you don't recall being told anything
25 else about -- let me strike that.

Page 60

1      Do you recall, prior to seeing Mr. Tapia, being
2  told anything about his care or his presentation or why
3  they wanted you to see Mr. Tapia?
4      MR. DEAN: Compound. Calls for speculation.
5      A  Yeah, I don't recall. I don't remember this
6  patient.
7      Q  [BY: MR. DREVESKRACHT] Do you recall if the
8  sergeant was concerned about Mr. Tapia's presentation at
9  all?
10     A  No.
11     Q  You don't recall anything at all about Mr. Tapia;
12 is that correct?
13     A  I don't recall this day at all. Not Mr. Tapia.
14 Not the sergeant. Not the day. I don't remember the day.
15 I don't --
16     Q  Okay.
17     A  -- remember the provider that would have been in
18 the clinic. I don't know who that was for this day as
19 well. I don't remember.
20     Q  Okay.
21     A  But I know if he needed to be seen, a provider
22 would have seen him. I just would have to bring him
23 downstairs.
24     Q  And do you know if that happened?
25     A  Based on my note, I don't see that he was brought

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Tapia v. Naphcare, Inc., et al.                                                    Elizabeth Warren

---

Page 69

1  record after this time of me seeing him. I have no clue
2  to what happened to him at the hospital, when or what.
3      Q  [BY: MR. DREVESKRACHT] Okay. Is it possible for
4  someone to be in a healthy condition one day and then
5  two days later be diagnosed with severe malnutrition?
6      MR. DEAN: Objection. Lacks foundation. Calls for
7  speculation.
8      MS. COWGER: Join.
9      A  I don't even know what hospital he went to.
10  You're asking me is could he have these normal vital signs
11  and then two days later be diagnosed as severely
12  malnourished? That's what you're asking?
13      Q  [BY: MR. DREVESKRACHT] Well, my question actually
14  didn't have anything to do with Mr. Tapia. I took it out
15  of the context of Mr. Tapia. I just want to know if
16  it's -- in your opinion, if someone can have totally
17  normal vitals signs, be totally healthy, and then two days
18  later be diagnosed with severe malnutrition?
19      MR. DEAN: Objection. Calls for expert testimony.
20      MS. COWGER: Join.
21      A  They also -- you're not considering that they
22  could also have other medical stuff. I -- so I don't have
23  a real answer for you because each -- each person and
24  their vitals and their diagnoses and what's going on
25  with them make a difference.

---

Page 70

1      Q  [BY: MR. DREVESKRACHT] Fair enough. You wrote
2  here, "Allowed assessment," do you see that?
3      A  Uh-huh.
4      Q  What does that mean, assessment?
5      A  He allowed me to do an assessment.
6      Q  And --
7      A  He allowed me to take his vitals and to check
8  his -- he must have opened his mouth so I could check his
9  tongue. If I said, "Open your mouth," he did because I
10  was able to check him. Right. He allowed me to touch him
11  and check his skin to see if it tented.
12      Q  And --
13      A  Do all his vitals and such.
14      Q  Okay. Were you attempting to diagnose what was
15  wrong with Mr. Tapia?
16      A  No, I was doing an assessment to see is he -- is
17  his vitals normal. Is his vitals showing a person who
18  hasn't eaten or drank in 72 hours?
19      Q  Is there --
20      A  And they were not showing that.
21      Q  Right. Is there a standard assessment protocol
22  that you were trying to complete?
23      A  I completed what I needed to.
24      Q  Right. My question is whether there's a standard
25  assessment protocol that you were attempting to conduct?

---

Page 71

1      A  The standard is what I did.
2      Q  Okay. And what's that?
3      A  I did an assessment on him based on whether or not
4  he has eaten or drank in 72 hours.
5      Q  Right. So let me ask that question another way.
6          Did NaphCare have a standard assessment protocol
7  or does the tests and data collected during your
8  assessment depend solely upon your clinical judgment?
9      A  This is clinical judgment because he is not on any
10  protocol at this point. Once you hit a protocol, then you
11  have guidance.
12      Q  Okay. So --
13      A  Right now he's assessed.
14      Q  And he was being assessed not pursuant to a
15  standard assessment protocol; is that correct?
16      A  I don't know what you mean by a standard protocol.
17      Q  I don't -- I'm not a -- I'm not a nurse, and I
18  don't pretend to be. I guess I that sometimes when --
19  when there's a patient who needs to be assessed, there's
20  like a form that says, you know, check the boxes. We
21  checked his vitals. We checked his -- made sure he was
22  breathing okay. We had him stand up, walk around.
23          I've seen that before where there is a standard
24  protocol or form.
25      A  Uh-huh.

---

Page 72

1      Q  And my question to you is whether or not there was
2  something like that in place when you saw Mr. Tapia that
3  you were attempting to conduct or --
4      A  The things that I did are pretty standard.
5      Q  Right.
6      A  I noticed whether or not he is alert, whether or
7  not he's sitting. How is he sitting? Is he --
8  leaning up? Is he having to support himself? He's under
9  his own power. Is he making eye contact with me? Is
10  he -- well, it says make eye contact when he is spoken to.
11  Right.
12          And then he wouldn't respond -- or I didn't say
13  wouldn't. He did not respond, but he did follow the
14  instructions with calm encouragement. I mean, he had to
15  have done whatever I asked. If I said, "Open your mouth
16  so I can see your tongue," he did it.
17      Q  Right. So it sounds like, and I -- I don't mean
18  to interrupt. But it sounds like the assessment that you
19  were conducting was something that was based on your own
20  clinical judgment. It wasn't a standard assessment
21  protocol that you were attempting to employ; is that
22  correct?
23      A  No. This is standard for whatever -- if you're
24  checking this man for dehydration or starvation, you're
25  going to do all of this stuff. This is all standard stuff

---

Tapia v. Naphcare, Inc., et al.                                    Elizabeth Warren

---

Page 109

1    Q  I want to make sure that we're clear on this.  Do
2  you have any independent knowledge regarding what happened
3  on September 29th, 2018 other than what is provided for
4  your note?
5    A  That's all I know.
6    Q  Okay.  So you don't know if you looked at his
7  record or his records before going to see him?
8    A  I do not know if I did before I went to see him at
9  all.
10    Q  So you may have or you may not have; you just
11  don't know?
12    A  I don't know.
13    Q  Okay.  Thank you for clarifying.  Now I also want
14  to go back to your note.  I think it was Exhibit 1.
15  Scrolling up here.  I don't know why that box is showing
16  up.  Let me see if I can -- I'm not used to having one
17  monitor.  For some reason it won't go away.  You know
18  what, it might be -- sorry.  Sorry, everyone, for the
19  technical issues.  There we go.  That's better.
20      Now going up to the time that you saw Mr. Tapia,
21  you saw him on September 29th, 2018, right?
22    A  Yes.
23    Q  And you testified earlier that you saw Mr. Tapia
24  because a sergeant requested that you do it; is that
25  right?

---

Page 110

1    A  Yes.
2    Q  I want to go to -- I'm going to mark this as
3  Exhibit 15.  I know that probably not be -- might not be
4  next in line, but I don't know where we've left off or
5  what you admitted, Ryan.
6      So I'm just going to start off, and this will be
7  Exhibit 15.  This is a Pierce County Detention and
8  Corrections Center Incident Report.  It's Bates labeled
9  DEF PC 000047, and it goes through 49.  Have you ever seen
10  these type of detention or correction incident reports
11  before?
12      (Deposition Exhibit No. 15 was marked
13       for identification.)
14    A  Not that I remember.
15    Q  Okay.  Well, I'm going to scroll down, and this
16  one it says by R. Oeltjen.  There's a note in here,
17  Comments, which looks like it might be from F. Ake, and it
18  says -- actually, excuse me.  Let me go right back up.  I
19  don't want to move there yet.
20      So this is from Oeltjen.
21    A  Is this the book --
22    Q  Oeltjen.
23    A  Is this the book the officers write in?
24    Q  This is part of their -- to my understanding is
25  their observation report, and it says that a search of his

---

Page 111

1  behavior log indicates he has been refusing meals
2  periodically.  Do you see that?
3    A  Yes.
4    Q  And then you go down, it says, "Inmate assessed by
5  Nurse Warren."  Do you see that?
6    A  Yes.
7    Q  So it's -- is it your understanding that you were
8  asked by the correction officer or the sergeant to see
9  Mr. Tapia because there was a claim that he might have
10  been refusing meals periodically?
11    A  Yes.
12      MR. DREVESKRACHT:  Calls for speculation.
13  Mischaracterizes the evidence.
14    Q  [BY: MR. DEAN] So as far as you know, that was the
15  only reason why you were there seeing Mr. Tapia; is that
16  correct?
17    A  Correct, based on -- also on my note.
18    Q  Got it.  So there's no other medical concerns
19  other than not eating --
20    A  Not that I --
21    Q  -- correct?
22    A  I was -- not that I'm aware of by my note.  That's
23  it.
24    Q  And all you know is what's in your note?
25    A  That's what I know.

---

Page 112

1    Q  Okay.
2    A  What's in my note.
3    Q  And it says that you saw the inmate in his cell as
4  requested by the sergeant, right?
5    A  Correct.
6    Q  And that's the Exhibit 15 that we were just
7  looking at, correct?
8    A  Yes.
9    Q  First thing you write is the cell smells of urine;
10  do you see that?
11    A  Yes.
12    Q  Is that atypical to have a cell smell of urine in
13  mental health?
14    A  It's common.
15    Q  Got it.  And I think you said earlier, it's also
16  common to have a cell smell of feces --
17    A  Correct.
18    Q  -- is that correct as well?
19    A  Common.
20    Q  And then you said because the toilet is actually
21  in the cell?
22    A  It's actually like 2 foot from their bunk.
23    Q  Oh, so about --
24    A  It's a very small cell.
25    Q  So about 2 feet from where you were standing to --

---

28  (Pages 109 to 112)

Tapia v. Naphcare, Inc., et al.                                Elizabeth Warren

---

Page 113

1   A   Yes.
2   Q   -- assess Mr. Tapia is where the toilet was?
3   A   Yes.
4   Q   All right.  So that's not uncommon to smell urine
5   2 feet --
6   A   Correct.
7   Q   -- away?
8   A   Well, they don't flush.  Correct.
9   Q   Neither do my children so I understand that.  You
10  also said that you observed a sheet wrapped around his
11  waist; is that right?
12  A   Yes.
13  Q   Okay.  Is that atypical to see an inmate with a
14  sheet wrapped around their waist?
15  A   No.
16  Q   Okay.
17  A   It's common.
18  Q   So then you also talked a little bit earlier about
19  what you did to assess Mr. Tapia.  I just want to make
20  sure we have the record clear here.  So you visually
21  inspected or assessed him, correct?
22  A   Yes.
23  Q   And you saw that he was alert; is that correct?
24  A   Yes.
25  Q   You also saw that he was able to sit up on his own

---

Page 114

1   volition?
2   A   Yes.
3   Q   He wasn't following down?
4   A   No.
5   Q   He wasn't falling over?
6   A   No.
7   Q   He wasn't leaning against wall?
8   A   No.
9   Q   Got it.  You also saw that he was on the side of
10  his bunk, right?
11  A   Correct.
12  Q   So he was able to move from his bed to the side of
13  the bunk?
14  A   Correct.
15  Q   Got it.  And you also said that he was able to do
16  all this under his own power, right?
17  A   Yes.
18  Q   Okay.  You also say in here that he makes eye
19  contact when he is spoken to, correct?
20  A   Correct.
21  Q   So you were communicating with Mr. Tapia?
22  A   Correct.
23  Q   How did you communicate with Mr. Tapia?
24  A   Verbally.
25  Q   Did Mr. Tapia communicate with you?

---

Page 115

1   A   Yes.
2   Q   Where does it say in this report that he was
3   communicating with you?
4   A   Well, it doesn't say he was communicating.  It
5   said he -- he -- inmate will not verbally respond.  So he
6   wasn't going to talk to me.  And I want to know from him
7   if I go get you something to eat or drink, if I go get you
8   a shake, are you going to drink it?  I would have asked
9   this question.
10      I ask everybody the same thing so that I'm not
11  running all over the jail.  If you're not going to -- if
12  you're not going to drink it, I'm not going to go get it.
13  So are you going to drink this Ensure or Boost?  I say it
14  to everybody for this -- this assessment.  When they're
15  not eating and drinking and I'm there to assess them, are
16  you going to drink it?  I'll go get it for you.  They have
17  to communicate yes to me or I'm not going.
18  Q   But he wasn't verbally responding to you; right?
19  A   No, it says I -- it said he didn't.
20  Q   Is that atypical to have an inmate in mental
21  health --
22  A   No, it's pretty common.
23  Q   Okay.  So it's pretty common to have someone in
24  mental health not want to verbally respond --
25  A   Yeah.

---

Page 116

1   Q   -- to an RN?
2   A   Yeah.
3   Q   Okay.  But he did communicate with you because you
4   asked him if he wanted to drink an Ensure drink, correct?
5   A   Yeah, or a Boost, probably I asked.
6   Q   And the reason you know this is because you don't
7   bring those drinks with you to his cell, correct?
8   A   Yeah, I'm not bringing them, no.
9   Q   Okay.  So the only --
10  A   I have to assess first.
11  Q   And the only way you would leave the room to go
12  get an Ensure is if the inmate communicated with you to
13  say, yes, they'll drink it?
14  A   Correct.
15  Q   Got it.  And it's the best of your recollection
16  Mr. Tapia communicated to you that he would drink the
17  Ensure drink if you went and got it, correct?
18  A   Yeah, he probably shaked his head yes.
19  Q   And you went and left the room to get the Ensure
20  drink, correct?
21  A   Yes.  I went back to the clinic to get it.
22  Q   Got it.  And did Mr. Tapia drink the Ensure drink?
23  A   Yes, it says he drank half of it.
24  Q   Got it.  And you also mentioned in here that
25  Mr. Tapia would follow instructions when you were

---

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Tapia v. Naphcare, Inc., et al.                                    Elizabeth Warren

Page 117

1    communicating with him, right?
2        A  Yes.
3        Q  And he also allowed you to take the assessment,
4    correct?
5        A  Correct.
6        Q  Was this a typical or atypical meeting with
7    Mr. Tapia?  And I can ask that in a different way.
8        A  Different way.
9        Q  Yeah.  So is it -- is it pretty common for you to
10   go see someone and have an interaction like you did with
11   Mr. Tapia?
12       A  Yes.
13       Q  So this is a common visit when you saw Mr. Tapia?
14       A  Yes.
15       Q  There was also some communication earlier about --
16   I think counsel said him being diagnosed with extreme --
17   what was it?  Extreme --
18       A  Malnutrition.
19       Q  -- malnutrition.
20       A  Yeah.
21       Q  Are you aware of Mr. Tapia ever being diagnosed
22   with extreme malnutrition?
23       A  No.
24       Q  Is there anything in this record that points to
25   Mr. Tapia having extreme malnutrition?

Page 118

1        A  No.
2        Q  In fact, Mr. Tapia drank fluids when he was with
3    you during this time, correct?
4        A  Correct.
5        Q  And if you had seen anything that would have in
6    any way made it seem that Mr. Tapia was extremely
7    malnourished, would you have made a note of that?
8        A  If he looked malnourished, he would have went to
9    the hospital.  I would have brought him downstairs.  We
10   had a provider.  If he did not look normal, I would have
11   brought him downstairs.  The provider would have assessed
12   him.  He would have went out.  That's it.
13       Q  But you didn't take him downstairs because you
14   didn't see any signs of him --
15       A  I saw no reason for him to need any further
16   medical expertise than what I was giving him.
17       Q  In fact, you noted that there was no acute
18   distress, correct?
19       A  No distress, yup.  No acute distress.
20       Q  Got it.  You also mentioned here that you're not
21   sure if inmate is eating every meal, right?
22       A  I'm not sure because the sergeant called.  That
23   means an officer was concerned.  So we got two people here
24   wanting this man assessed.  Therefore I'm not going to
25   dismiss what they wanted and what their concerns are.

Page 119

1        Q  And I think you were asked if you looked at, you
2    know, behavioral logs or notes before you saw Mr. Tapia,
3    such as meal logs.
4        A  There was -- there wasn't a meal log set up for
5    him prior.
6        Q  Let me -- let me --
7        A  Was there?
8        Q  Let me rephrase my question so I can be a little
9    bit more direct.  If we look at -- I think it's the
10   behavioral log, which I'm going to mark as Exhibit 16.
11   This is the behavioral log.
12           (Deposition Exhibit No. 16 was marked
13            for identification.)
14       A  This -- this isn't something I get to look at.
15       Q  Got it.  So you don't -- you don't know if you saw
16   this beforehand; is that fair to say?
17       A  Correct.
18       Q  Okay.
19       A  Odds are, no, I didn't because this isn't
20   something we look at.
21       Q  Got it.  Understood.  So going back to your note,
22   back to Exhibit 1, there was some communication about the
23   meal log and, I believe, whether there was a hunger strike
24   log that would have needed to be made.  Do you remember
25   that?

Page 120

1        A  Yeah.
2        Q  And counsel was asking whether you knew if
3    Mr. Tapia had consumed food within 72 hours prior to
4    seeing him; is that correct?
5        A  Yeah.
6        Q  So going back to Exhibit 16, which is the
7    behavioral log which is identified as DEF PC 000042
8    through 44, you can see September 28th at 2018, you can
9    see Mr. Tapia ate lunch; do you see that?
10       A  Yes.
11           MR. DREVESKRACHT:  Object to the form.
12   Mischaracterizes the evidence.
13       Q  [BY: MR. DEAN] Got it.  And that would have been
14   about 24 hours before you saw him on September 2019 -- or
15   29th, 2018?
16           MR. DREVESKRACHT:  Calls for speculation.
17       Q  [BY: MR. DEAN] Is that -- is that fair?  Would you
18   agree --
19       A  Yes, based -- based on this.
20       Q  Yeah.  Mathematically speaking --
21       A  Yes.
22       Q  -- September 28th is about one day prior to
23   September 29th?
24       A  Yes.
25       Q  So it wasn't three days before Mr. Tapia had food?

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Tapia v. Naphcare, Inc., et al.                                    Elizabeth Warren

Page 121

```
 1      A  No --
 2      MR. DREVESKRACHT:  Calls for speculation.
 3  Mischaracterizes the evidence.
 4      A  -- it wasn't.
 5      Q  [BY: MR. DEAN] Got it.  And again, he actually ate
 6  food --
 7      A  On the 28th?
 8      Q  -- when you saw him on the 29th?
 9      A  Yes, he drank.
10      Q  Got it.
11      A  And -- and -- and he was given a sandwich.
12      Q  And it looks like he also had dinner on the 29th
13  as well if you see that.
14      A  Yup.
15      MR. DREVESKRACHT:  Mischaracterizes the evidence.
16      Q  [BY: MR. DEAN] And that's consistent with what you
17  saw of Mr. Tapia on the 29th, right?
18      A  Correct.
19      Q  Okay.  You also put in there that you wanted some
20  vitals taken, right?
21      A  Yes.
22      Q  And I believe you said that you asked for there to
23  be a log of his food and the vitals because you saw him on
24  the Saturday, and you wanted to make sure that just
25  someone had their eyes on him before Dr. Balderrama was
```

Page 122

```
 1  able to see him on that following Monday, right?
 2      A  Yes.
 3      Q  Okay.  And you said at the last part of this note
 4  right here, "Scheduled provider visit for evaluation,"
 5  right?
 6      A  Uh-huh.
 7      Q  You scheduled that visit on -- let me make sure
 8  I'm clear on this because there was a little confusion
 9  about how it was phrased earlier.  On September 29th after
10  seeing Mr. Tapia, you went to your computer and you
11  scheduled the visit for Mr. Tapia to see Dr. Balderrama,
12  correct?
13      A  Correct.
14      Q  All right.  Now moving to Exhibit 14, which is
15  Bates labeled NCI 001186, do you see this entry here on
16  September 29th, 2018?
17          (Deposition Exhibit No. 14 was marked
18          for identification.)
19      A  Yes.
20      Q  And this was entered by Elizabeth Warren, RN;
21  that's correct?
22      A  Yes.
23      Q  And what was the reason for you making this entry?
24      A  This is -- this is a scheduled appointment, isn't
25  it?
```

Page 123

```
 1      Q  Yeah, I guess what I'm --
 2      A  With Dr. Balderrama.
 3      Q  Yeah, it says right here that there's a provider
 4  evaluation for an inmate to rule out any medical issues.
 5  Do you see that?
 6      A  Yeah, that would --
 7      Q  Okay.
 8      A  -- have been what I wrote.
 9      Q  So you scheduled an appointment with
10  Dr. Balderrama --
11      A  Yes.
12      Q  -- to rule out any medical issues --
13      A  Yes.
14      Q  -- with Mr. Tapia, correct?
15      A  Yup.
16      Q  But you didn't observe any medical issues with
17  Mr. Tapia when you saw him on September 29th, according to
18  your note --
19      A  Correct.
20      Q  -- correct?  But you wanted to go above and beyond
21  and make sure that he still was able to see a higher
22  provider than you to rule anything out, correct?
23      A  Well, I wanted also, because we weren't sure how
24  much he had eaten or not eaten, you want more data
25  collected so Dr. Balderrama could see it on Monday.
```

Page 124

```
 1  Right?  Like for me, I'm just going and looking and doing
 2  an assessment, but for -- to put him with a provider, you
 3  want there to be some real documentation on his vitals, on
 4  the meal log, on the -- that people had seen him and
 5  they'd done vitals and they'd been checking to see how
 6  much he eats or drinks so that doctor can make a better,
 7  you know, determination on what he needs.
 8      Q  Got it.  So you saw him on the 29th, and you
 9  scheduled an appointment with him that following Monday on
10  October 1st with Dr. Balderrama?
11      A  Correct.  In case he didn't eat or drink the rest
12  of the weekend, in case he wasn't gonna.
13      Q  But as we saw on Exhibit 16, he actually did eat
14  after you saw him, correct?
15      A  He did, yeah.
16      Q  And then on the --
17      MR. DREVESKRACHT:  Mischaracterizes the evidence.
18      MR. DEAN:  Sorry.  Go ahead.  You want to say that
19  again, Ryan?  I think we were talking over each other so
20  they probably didn't catch that.
21      MR. DREVESKRACHT:  Sure.  My objection was that Jake
22  mischaracterized the evidence.
23      Q  [BY: MR. DEAN]  Got it.
24      And then he also ate breakfast on September 30th,
25  right?
```

31 (Pages 121 to 124)

Tapia v. Naphcare, Inc., et al.                                    Elizabeth Warren

Page 129

1  don't -- do not recall one way or the other whether he
2  shook his head yes at you?
3       A   I assumed.  He indicated he would drink it because
4  I went and got it for him, and that is how I handle
5  everybody who's claiming to be on a hunger strike or not
6  eating or drinking.  It's the same routine.  I learned it
7  early.
8       Q   Right.
9       A   Ask them if they're going to drink it.
10      Q   Right.  And I don't want you to assume anything.
11 I want to ask you about your personal knowledge as we sit
12 here today.  Do you have independent recollection of
13 whether or not Mr. Tapia shook his head yes at you?
14      A   I do not have an independent recollection.
15      MR. DREVESKRACHT:  Okay.  No further questions here.
16                    EXAMINATION
17 BY MR. DEAN:
18      Q   Actually just have two follow-up questions really
19 quick.  You said that you didn't see Mr. Tapia stand up
20 because that wasn't in your note.  Do you see in your note
21 that you asked Mr. Tapia to stand up?
22      A   I wouldn't have.
23      Q   There was no need to ask him to stand up.
24      A   There was no need to ask him to stand up.
25      Q   Because you were there to see if he was eating

Page 130

1  food?
2       A   And his vitals were perfect.  He was well
3  hydrated.  He indicated to me he would drink that Ensure,
4  somehow he indicated it.  And since I said he wasn't
5  verbally talking.
6       Q   Okay.
7       A   Right?
8       Q   And you also said that you saw him move to the
9  side of the bed, right?
10      A   Yeah, he was -- he -- well, he had to have sat on
11 the side of the bed for me to do this.
12      Q   So he did move?
13      A   Yes.
14      Q   And there's no note in there saying correction
15 officers moved him because --
16      A   No.
17      Q   -- he couldn't move?  It's actually quite the
18 opposite.  It says that he was able to respond --
19      A   His own power.
20      Q   -- on his own power.
21      A   Sitting, yes, that's what it says.
22      Q   Got it.  And then there was also a question about,
23 you know, whether you personally remember Mr. Tapia
24 shaking his head yes.  I want to understand.  What is your
25 general practice when it comes to operating Ensure drinks

Page 131

1  to patients?  And what I mean by that is do you just walk
2  away and go get it if they want it or how do you handle
3  it?
4       A   No, I talk to them about it.  It's like I have
5  Boost.  I have Ensure.  I'm going to go down and get you
6  something to drink if you're going to drink it.  Are you
7  going to drink it?  And that is just my routine because
8  otherwise they have you running all over the jail and
9  they're not going to drink it.
10      Q   How did that become your routine?
11      A   Because they had me run all over the jail.
12      Q   And you --
13      A   So I ask, "Are you going to drink it?"
14      Q   You said that takes several minutes, I think, to
15 go get it, right?
16      A   Yeah.
17      Q   So early on when you started working at NaphCare,
18 you had to go run around the hospital --
19      A   Yeah.
20      Q   -- or the facility --
21      A   Run around the place to go get them something for
22 them to say no.
23      Q   So you made it part of your practice that, from
24 going on, you were going to ask someone if they were --
25      A   Yeah.

Page 132

1       Q   -- going to take --
2       A   Are you actually going to drink it?
3       Q   Yes.  And they --
4       A   Yeah.
5       Q   -- either had to verbally say yes or indicate a
6  shake of their head, yes, that they would drink it?
7       A   Correct.
8       Q   Right.  And Mr. Tapia did not verbally respond to
9  you in that meeting.
10      A   Yeah, no.  And in the note, it says he did not.
11      Q   So based on your --
12      A   It doesn't say he could not.
13      Q   Yeah.
14      A   It says he did not.
15      Q   So based on your general practice as an RN for
16 30-plus years, if you went and got an Ensure for
17 Mr. Tapia, the only explanation for that is that Mr. Tapia
18 shook his head yes that he would drink it?
19      A   Correct.
20      MR. DEAN:  Okay.  That's it.
21      MR. DREVESKRACHT:  Nothing further from me.
22      VIDEOGRAPHER:  This marks the end of the deposition of
23 Elizabeth Warren.  We are off the record at 12:13 p.m.
24           [Reading and signing was requested
25            pursuant to FRCP Rule 30(e).]
             [Deposition concluded at 12:13 p.m.]

33 (Pages 129 to 132)

Tapia v. Naphcare, Inc., et al.                                          Elizabeth Warren

Page 133

```
 1   STATE OF WASHINGTON        )
 2                              ) SS: C E R T I F I C A T E
     COUNTY OF WHATCOM          )
 3               I, DANIELLE SCHEMM, a Certified Court
 4   Reporter within and for the State of Washington do hereby
 5   certify;
 6               That the witness, Elizabeth Warren,
 7   whose testimony appears in the foregoing interview was
 8   taken by me to the best of my ability and thereafter
 9   reduced to typewriting under my direction and is contained
10   in Pages 1 through 134;
11               That I am neither counsel for, related
12   to, nor employed by any of the parties to the action in
13   which this interview was taken;
14               And further that I am not a relative or
15   employee of any attorney or counsel employed by the
16   parties thereto, nor financially or otherwise interested
17   in the outcome of the action;
18               This transcript and invoice have been
19   prepared and submitted for final production and delivery
20   in accordance with all Washington State laws, rules and
21   regulations, including WAC-308-14-130, WAC-308-14-135, RCW
22   18-145, and applicable court rules regulating formatting
23   and equal terms requirements;
24               Alterations, changes, fees or charges
25   that violate of these provisions are not authorized by me,
```

Page 134

```
 1   and I have no interest in the outcome of said litigation;
 2               This certification does not apply to
 3   reproduction of this transcript by any means not under my
 4   direct supervision and control.
 5               Signed and dated this 13th day of
 6   November 2023.
 7
 8
 9
10
11
12   DANIELLE SCHEMM
13   CERTIFIED COURT REPORTER
     IN AND FOR THE STATE OF
14   WASHINGTON, RESIDING AT
     BELLINGHAM.  LICENSE EXPIRES
15   JULY 16, 2024
16
17
18
19
20
21
22
23
24
25
```

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

NaphCare, Inc.
910 Tacoma Ave. S
Suite 4000
Tacoma, WA 98402

11.02.2023
Warren
**2**
Buell Realtime Reporting

# Vital Signs - TAPIA, JAVIER 2018167002

| Date/Time | Blood Pressure | Temperature | Pulse | Respirations | Height | Weight | O2 Sat | Pain | BMI | Mean Arterial Pressure |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/12/2018 1:39:42 PM | 138 / 91 | 98.7 | 70 | 16 | 0ft 0in | NA lb | 97 | NA | NA | 0 |
| 11/1/2018 7:50:04 PM | NA / NA | NA | NA | 16 | NA ft NA in | NA lb | NA | NA | NA | NA |
| 10/30/2018 12:40:36 PM | 111 / 78 | 97.9 | 83 | 16 | 0ft 0in | NA lb | 99 | NA | NA | 0 |
| 10/22/2018 4:05:48 PM | 108 / 79 | 97 | 100 | 16 | 5ft 7in | NA lb | 98 | 3 | NA | 88.67 |
| 10/1/2018 12:28:13 PM | 109 / 76 | 97.5 | 103 | NA | NA ft NA in | NA lb | 95 | NA | NA | 87 |
| 10/1/2018 12:13:52 PM | 111 / 80 | 97.9 | 105 | 18 | 5ft 7in | NA lb | 94 | NA | NA | 90.33 |
| 9/19/2018 6:20:44 PM | 150 / 98 | NA | NA | NA | 5ft 7in | NA lb | NA | NA | NA | 115.33 |
| 6/19/2018 2:47:58 AM | 132 / 82 | 96.9 | 96 | 16 | 5ft 7in | NA lb | 98 | 7 | NA | 98.67 |
| 6/18/2018 4:07:15 AM | 112 / 82 | 97.8 | 96 | 18 | 5ft 7in | NA lb | 98 | NA | NA | 92 |
| 6/17/2018 4:04:02 PM | 122 / 72 | 97.7 | 86 | 16 | 5ft 7in | 165 lb | 93 | NA | 25.8 | 88.67 |
| 6/16/2018 4:37:42 PM | 112 / 84 | 97.7 | 100 | 16 | 5ft 7in | 165 lb | 99 | NA | 25.8 | 93.33 |
| 6/16/2018 4:55:24 AM | 125 / 85 | 97.6 | 96 | 16 | 5ft 7in | 153 lb | 98 | NA | 24 | 98.33 |
| 8/7/2017 9:10:27 PM | 120 / 88 | 97.2 | 69 | 16 | 5ft 7in | 170 lb | 99 | 0 | 26.6 | 98.67 |
| 8/3/2017 3:14:45 PM | 139 / 92 | 96 | 78 | 16 | 5ft 7in | NA lb | 98 | 6 | NA | 107.67 |
| 8/3/2017 4:09:04 AM | NA / NA | NA | NA | NA | 5ft 7in | NA lb | NA | NA | NA | NA |
| 8/2/2017 1:18:20 PM | 138 / 88 | 97.9 | 85 | 18 | 5ft 7in | NA lb | 98 | 2 | NA | 104.67 |
| 8/2/2017 2:46:01 AM | 100 / 76 | 97.6 | 78 | 16 | 5ft 7in | NA lb | 98 | NA | NA | 84 |
| 8/1/2017 4:44:57 PM | 118 / 70 | 97.5 | 95 | 16 | 5ft 7in | NA lb | 97 | NA | NA | 86 |
| 8/1/2017 2:57:37 AM | 133 / 100 | 98.1 | 80 | 16 | 5ft 7in | NA lb | 98 | 7 | NA | 111 |

TAPIA, JAVIER AMADO 1011290 (2018167002)



NaphCare, Inc.
910 Tacoma Ave. S
Suite 4000
Tacoma, WA 98402

Warren
**14**
Buell Realtime Reporting

10/13/2023 12:16:32 PM PDT

**Sick Calls**

| Patient: | TAPIA, JAVIER AMADO | #: | 1011290 (2018167002) | Lang: | | PICTURE NOT AVAILABLE |
|---|---|---|---|---|---|---|
| DOB: | (Age=41) | Sex: | M | Race: | A | |
| Housing: | MAIN-4S-4SB 1 | SSN#: | **HIDDEN** | Type: | | |
| Status: | NOT ACTIVE | Booking Date: | 6/16/2018 2:00:00 AM PDT | Release: | 11/14/2018 12:09:27 PM | |

| Status | Type | Scheduled Date | Reason | Entered By | Entered On | Edited By | Edited On | Completed By | Completed On | Complete Reason | Priority | Billable |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COMPLETED | Medical Provider | 9/29/2018 12:43:57 PM | Mental Health ask that a Provider evaluate inmate to R/O any Medical issues see note dated 9/29/18. | Elizabeth Warren RN | 9/29/2018 12:45:15 PM | Miguel Balderrama Medical Director | 10/1/2018 10:35:40 AM | Miguel Balderrama Medical Director | 10/1/2018 10:35:40 AM | SEE NOTE IN CHART | No | No |

NCI 001186

# Pierce County Corrections

## Inmate Behavior Log Printout

Report Date: 08/17/20 13:35

Booking ID: **2018167002**        Inmate Name:    TAPIA, JAVIER AMADO

| Cell Event Date | Type | Description | Report ☒ | Officer ID/ Log Date | Officer Name |
|---|---|---|---|---|---|
| 4SB 1 11/23/2018 11:29 | INFO | Property picked up by Eduvijes Tapia | | 94-057 11/23/2018 11:29 | J. Larsen IN |
| 4SB 1 11/10/2018 13:24 | MH | I/M was seen at about 12:30 per C/D report. I/M cooperated with MH interview. I/M was in stable behavioral emotional control. I/M was able to deny current risk of harm to self and others and agrees to no harm and notify. I/M is future oriented with family support. I/M has good insight and able to manage as he awaits transport to prison. Continue to clear per class. | | 15-018 11/10/2018 13:24 | J. Perez MH |
| 4SB 1 11/09/2018 15:16 | SHOW | In clinic. | | 99-061 11/09/2018 15:16 | P. ANTON SH |
| 4SB 1 11/08/2018 15:15 | SHOW | In clinic. | | 99-061 11/09/2018 15:15 | P. ANTON SH |
| 4SB 1 11/07/2018 18:34 | SHOW | Currently in the clinic for shower. OK | | 84-008 11/07/2018 18:34 | R. YELLE SH |
| 4SB 1 11/05/2018 18:35 | SHOW | In clinic | | 99-061 11/05/2018 18:35 | P. ANTON SH |
| 4SB 1 11/05/2018 11:39 | HSR | UPDATED HSR: Low bunk, low tier, crutches, left leg brace, wheelchair for long distances, ok to use ADA shower in clinic. Pt had a left below knee amputation. All for duration of stay. | | 17-061 11/05/2018 11:39 | D. Seymour HS |
| 4SB 1 11/03/2018 21:49 | SHOW | Showered in clinic | | 15-052 11/03/2018 21:49 | J. Peters SH |
| 4SB 1 11/01/2018 18:30 | SHOW | Showered in clinic. | | 99-061 11/01/2018 22:22 | P. ANTON SH |
| 4SB 1 11/01/2018 17:54 | INFO | Inmate showers in clinic at least every other day! | | 99-061 11/01/2018 17:54 | P. ANTON IN |
| 4SB 1 10/28/2018 13:18 | OBSE | Communications / Verbal | ☒ | 05-010 10/28/2018 13:20 | J. HARRIS OB |
| 4SB 1 ~~11/23/2018~~ 10/23/2018 00:25 | ~~HSRM~~ | ~~Assistive Device~~ | | INT001 10/23/2018 07:40 | T. INTEGRATION HS |
| 4SB 1 10/22/2018 23:24 | HSR5 | Bleeding or Coagulation Disorders | | INT001 10/23/2018 06:24 | T. INTEGRATION HS |
| HSP 1 10/22/2018 14:17 | MH | I/M seen at about 1358 upon return from the hospital. I/M was calm and cooperative with the MH interview. I/M is processing his current circumstances, but presents stable, at this time. I/M denies any current risk of harm to self or others, and agrees to no harm and to notify. Clear per class, MH will f/u as needed. | | 16-016 10/22/2018 14:17 | K. Peebles MH |
| HSP 1 10/20/2018 17:00 | VSP | 17:00 - 18:00 TAPIA, DANNY ROCHA  Social Visit while in Hospital | | 88-022 10/20/2018 16:48 | G. Tunnell VS |
| HSP 1 | VSP | 17:00 - 18:00 TAPIA, EDUVIJES CEBALLOS  Social | | 88-022 | G. Tunnell |

DEF PC 000041

| Cell Event Date | Type | Description | Report ☒ | Officer ID/ Log Date | Officer Name |
|---|---|---|---|---|---|
| HSP 1 10/11/2018 17:56 | INCI | General Information / Information | ☒ | 90-001 10/11/2018 17:59 | T. Braswell-Bouyer IN |
| 3SC16 10/01/2018 15:31 | INFO | Inmate was admitted to the hospital during day shift. | | 09-017 10/01/2018 15:31 | I. Lee IN |
| 3SC16 10/01/2018 13:44 | MH | Met with I/M at about 1045 for MH f/u in the clinic. He presented again today as confused and non-verbal, but was also calm and cooperating with medical staff. Recommend continued level 1 MH housing at this time for further assessment, MH will f/u. | | 15-005 10/01/2018 13:44 | D. Nealis MH |
| 3SC16 10/01/2018 12:49 | INCI | Clinic/Medical / Information | ☒ | 00-009 10/01/2018 12:50 | L. WHITE IN |
| 3SC16 10/01/2018 09:51 | INFO | While serving lunch today, C/D Paukert observed inmate's foot to be a purple/black color. C/D immediately called the clinic. Per clinic assessment, inmate was transported to the clinic in a wheelchair. | | 94-059 10/01/2018 09:51 | P. WILSON IN |
| 3SC16 09/30/2018 11:10 | MH | I/M seen at about 1040 for assessment in response to C/D report. I/M was uncooperative with MH interview. I/M appeared to be sleeping and did not respond to MHP knocks on door or calling of name. I/M was observed moving and breathing in his bed. Recommend level 1 MH housing. MH to f/u. | | 18-013 09/30/2018 11:10 | I. Concepcion Poo MH |
| 3SC16 09/30/2018 04:45 | VRM | Breakfast | | 16-096 09/30/2018 04:45 | A. Rosenthal VR |
| 3SC16 09/29/2018 20:15 | INFO | I/M has been mostly nonresponsive to verbal interactions. However, he was seen moving around while appearing asleep and was seen at his cell window once tonight. | | 15-113 09/29/2018 20:15 | S. Delgado IN |
| 3SC16 09/29/2018 17:54 | VRM | Dinner. | | 15-113 09/29/2018 17:54 | S. Delgado VR |
| 3SC16 09/29/2018 13:38 | INFO | Nurse did an accessment on Tapia due to his odd behavior and lack of response to verbal interaction. | | 94-062 09/29/2018 13:38 | C. COOLEY IN |
| 3SC16 09/29/2018 11:00 | OBSE | Inmate Behavior / Disturbing Mannerisms | ☒ | 01-073 09/29/2018 11:11 | R. OELTJEN OB |
| 3SC16 09/29/2018 09:40 | VRM | Refused lunch. | | 17-081 09/29/2018 09:40 | J. Houn VR |
| 3SC16 09/29/2018 05:12 | INFO | Refused breakfast | | 18-076 09/29/2018 05:12 | D. Powell IN |
| 3SC16 09/28/2018 12:49 | MH | I/M was seen at about 10:30 for MH f/u. I/M refused MH interview. I/M presents MH symptoms. I/M would not answer MH questions. I/M just looked at MHP and did not respond to basic questions. Continue current housing. MH will f/u. | | 15-018 09/28/2018 12:49 | J. Perez MH |
| 3SC16 09/28/2018 10:08 | VRM | lunch | | 97-015 09/28/2018 10:08 | H. HERNANDEZ VR |
| 3SC16 09/28/2018 04:41 | VRM | breakfast | | 16-061 09/28/2018 04:41 | J. Spieth VR |
| 3SC16 09/26/2018 16:20 | VRM | verbally refused dinner | | 07-026 09/26/2018 16:20 | P. BYRER VR |

| Cell Event Date | Type | Description | Report ☒ | Officer ID/ Log Date | Officer Name |
|---|---|---|---|---|---|
| | | here at PCJ since June, but appears to be decompensated at this time. Recommend continued level 1 MH housing at this time for further assessment, MH will f/u. | | | |
| 3SC16 09/25/2018 16:38 | VRM | verbally refused dinner | | 97-016 09/25/2018 16:38 | D. VADALA VR |
| 3SC16 09/25/2018 10:22 | VRM | lunch | | 18-018 09/25/2018 10:22 | A. Tucker VR |
| 3SC16 09/24/2018 04:53 | VRM | verbally refused breakfast. | | 16-098 09/24/2018 04:53 | J. Bradley VR |
| 3SC16 09/22/2018 16:31 | VRM | Verbally refused dinner | | 15-105 09/22/2018 16:31 | J. Cropp VR |
| 3SC16 09/22/2018 09:47 | VRM | Verbally refused lunch | | 15-051 09/22/2018 09:47 | J. Paukert VR |
| 3SC16 09/21/2018 16:38 | VRM | Verbally Refused Dinner. | | 17-064 09/21/2018 16:38 | T. Nellenbach VR |
| 3SC16 09/20/2018 16:10 | MH | I/M seen about 1110 for MH f/u. I/M is awake but stays on his bunk. I/M does not respond in any way to MHP, he just stared. I/M would not even shake his head yes or no. I/M was seen by medical yesterday. Recommend level 1 MH housing for observation. MH to f/u. | | 17-033 09/20/2018 16:10 | D. Prather MH |
| 3SC16 09/20/2018 05:03 | VRM | breakfast | | 15-153 09/20/2018 05:03 | M. Papp VR |
| 3SC16 09/19/2018 14:10 | MH | Met with I/M at about 1045 for initial assessment in response to C/D report. He presented again today as confused. I/M was again unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time. Recommend continued level 1 MH housing at this time for further assessment, MH will f/u. Referred to medical department for assessment. | | 15-005 09/19/2018 14:10 | D. Nealis MH |
| 3SC16 09/19/2018 06:21 | VRM | Breakfast. | | 18-017 09/19/2018 06:21 | D. Bartolo VR |
| 3SC16 09/18/2018 17:03 | VRM | Verbally refused dinner meal. | | 97-016 09/18/2018 17:03 | D. VADALA VR |
| 3SC16 09/18/2018 13:32 | MH | Met with I/M at about 1100 for initial assessment in response to C/D report. He came to the door and was cooperative during the interview, but appears to be confused and was unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time. Recommend continued level 1 MH housing at this time for further assessment, MH will f/u. | | 15-005 09/18/2018 13:32 | D. Nealis MH |
| 2D40 09/17/2018 20:25 | OBSE | Inmate Behavior / Disturbing Mannerisms | ☒ | 16-011 09/17/2018 20:27 | J. Knight OB |
| 3B82 09/16/2018 16:30 | INCI | Housing Moves / Peace and Harmony | ☒ | 93-003 09/16/2018 16:48 | L. DEFILIPPIS IN |
| 3B82 | W | Warned not to cross yellow line by officers station. | | 18-011 | S. Owen |

DEF PC 000043

| Cell Event Date | Type | Description | Report ☒ | Officer ID/ Log Date | Officer Name |
|---|---|---|---|---|---|
| 3B82 09/10/2018 14:05 | INFO | Seems to have difficulty following simple rules such as 1400hrs lockdown. Placed between the Gates, will return to unit at 1445 | | 88-035 09/10/2018 14:34 | W. ALLEY IN |
| 3B82 09/09/2018 13:12 | W | Given verbal warning for having other inmates on his bunk. He is aware that next time he will be sanctioned. | | 18-062 09/09/2018 13:12 | K. LaLiberte W |
| 3B82 09/06/2018 15:10 | INCI | Contraband / Controlled Substance Alcohol | ☒ | 16-015 09/06/2018 15:32 | C. Rogers IN |
| 3B82 09/01/2018 18:00 | OBSE | Contraband / ShakeDown | ☒ | 17-063 09/01/2018 18:53 | G. Perry OB |
| 3B82 08/18/2018 13:55 | VCAN | Per I/M request a visit from Koecke, Tom on 8-18-18 @ 1700 has been cancelled. See entry below. | | 95-007 08/18/2018 13:55 | D. Alexander VC |
| 3B82 08/18/2018 13:10 | W | I/M requested cancelation of his 5:00pm visit today. Request made 4 hours prior. I/M has been warned that this is generally not acceptable to cancel a visit on such short notice. I/M has had the request granted, but has been advised this is the one and only time for a short notice visitation cancelation. | | 01-039 08/18/2018 13:10 | M. PETERSEN W |
| 3B82 07/23/2018 19:30 | INCI | Contraband / Controlled Substance Alcohol | ☒ | 17-025 07/23/2018 19:42 | M. Brooks IN |
| 3B82 07/11/2018 19:44 | VCAN | Visit for 7/12/18 # 1700 canceled per I/m Kiosk request. | | 94-061 07/11/2018 19:44 | P. SMITH VC |
| 3B82 06/30/2018 05:00 | INCI | General Information / Information | ☒ | 16-061 06/30/2018 05:57 | J. Spieth IN |
| 2B18 06/17/2018 09:53 | VRM | Lunch | | 96-010 06/17/2018 09:53 | J. NEWKIRK VR |
| 2B18 06/17/2018 00:57 | RCC | Verbally refused AM detox. | | 00-039 06/17/2018 00:57 | B. WADE RC |
| 2B18 06/16/2018 06:00 | HSR | low bunk/low tier x 3 days , ending 6/19/18, per detox. | | 15-115 06/16/2018 06:00 | E. Yagi HS |
| 4SB 1 10/01/2018 06/15/2018 20:05 | HSR3 | Lower Bunk | | INT001 07/18/2018 07:54 | T. INTEGRATION HS |