EXHIBIT 21

# Peter Brice Crum, M.D.

# Tapia v. Naphcare, Inc., et al.

# May 13, 2024



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

Tapia v. Naphcare, Inc., et al.                                    Peter Brice Crum, M.D.

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT.
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JAVIER TAPIA,              )
                          )
      Plaintiff,          )
                          )
v.                        ) No. 2:22-CV-01141-KKE
                          )
NAPHCARE, INC., et al,    )
                          )
      Defendants.         )
_____   )

VIDEOTAPED VIDEOCONFERENCE DEPOSITION
UPON ORAL EXAMINATION

OF

PETER BRICE CRUM, M.D.

_____

TAKEN REMOTELY VIA VIDEOCONFERENCE
DENVER, COLORADO

DATE TAKEN:  May 13, 2024
REPORTED BY:  Evelyn M. Adrean, RPR, CCR 22009424

---

**Page 2**

```
 1          A P P E A R A N C E S:
 2
 3   FOR PLAINTIFF:
 4   CORINNE SEBREN, ESQUIRE
     Galanda Broadman
 5   8606 35th Avenue NE, Suite L1
     Seattle, Washington 98115
 6   206-557-7509
     corinne@galanadabroadman.com
 7
 8
 9   FOR DEFENDANT NAPHCARE:
10   JACOB DEAN, ESQUIRE
     Perkins Coie, LLP
11   1201 3rd Avenue, Suite 4900
     Seattle, Washington 98101-3099
12   206-359-8000
     jacobdean@perkinscoie.com
13
14
15   FOR DEFENDANT PIERCE COUNTY:
16   KRISTAL M. COWGER, ESQUIRE
     Pierce County Prosecuting Attorney's Office
17   930 Tacoma Avenue South, Room 946
     Tacoma, Washington 98402-2171
18   253-798-4265
     kristal.cowger@piercecountywa.gov
19
20
21               * * * * *
22
23
24   ALSO PRESENT:
25   Sean Lykken, Videographer
```

---

**Page 3**

```
 1          DEPOSITION OF PETER BRICE CRUM, M.D.
 2                  EXAMINATION INDEX
 3   EXAMINATION BY                        PAGE
 4   Ms. Sebren                    6
 5   Mr. Dean                      145
 6   Ms. Sebren                    185
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1               EXHIBIT INDEX
 2   EXHIBITS FOR IDENTIFICATION            PAGE
 3    1 Subpoena                  10
 4    2 Report                    10
 5    4 Behavior Log *CONFIDENTIAL*          48
 6    5 Mr. Tapia's deposition transcript   122
 7    7 NCI 001187-89             89
 8   12 Deposition transcript of Jesus Perez    44
 9   14 Rebuttal report           130
10   15 Progress notes            54
11   20 NaphCare 000206-210                 50
12   21 Medical records *CONFIDENTIAL*      124
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

Tapia v. Naphcare, Inc., et al.                                                    Peter Brice Crum, M.D.



Page 193

1          MS. SEBREN:  Okay.  I have no further
2    questions.
3          MR. DEAN:  That's it for me.
4          THE VIDEOGRAPHER:  Okay.  This'll end File 7
5    in the deposition of Dr. Crum.  Off the video record at
6    4:06.
7          (Deposition concluded at 4:06 p.m.)
8    (Reading and signing was requested pursuant to FRCP Rule
9          30(e).)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 194

1          C E R T I F I C A T E
2
3    STATE OF WASHINGTON
4    COUNTY OF WHATCOM
5
6
7      I, Evelyn M. Adrean, RPR, a Certified Shorthand
8    Reporter in and for the State of Washington, do hereby
9    certify that the foregoing transcript of the deposition
10   of PETER BRICE CRUM, M.D., having been duly sworn on May
11   13, 2024, is true and accurate to the best of my
12   knowledge, skill, and ability.
13
14        IN WITNESS WHEREOF, I have hereunto set my hand
15   and seal this 21st day of May 2024.
16
17
18
19
20        EVELYN M. ADREAN, RPR, CCR-WA
21
22
23
24
25

49 (Pages 193 to 194)

05.13.2024
Crum
**2**
Buell Realtime Reporting

**Peter B. Crum, M.D.**

**Medical Director**

**Denver Sheriff Department**

**Denver Detention Facility**

**March 15, 2024**

David Perez, Esq.
Perkins Coie, LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101

**Re: Javier Tapia v. NaphCare, Inc., et al. No. C22-1141-JCC**

Dear Mr. Perez,

This letter summarizes the results of my investigation carried out to date and provides my opinions in the above-referenced litigation. Based on my 30 years of experience as a board-certified internist and serving as a medical director in the corrections setting, my opinions are that NaphCare, Inc. ("**NaphCare**") had policies in place that are consistent with the National Commission on Correctional Health Care ("**NCCHC**") policies providing inmates with access to care and providing for nursing assessments; NaphCare did not withhold any care to Plaintiff Javier Tapia ("**Tapia**") to maximize its profits; NaphCare's custom or practice at the Pierce County Jail ("**Jail**") in 2018 was "when in doubt, send them out" in relation to emergency or specialty care; and as soon as NaphCare personnel discovered that there was anything remotely wrong with Mr. Tapia's foot, NaphCare immediately sent Mr. Tapia to Tacoma General Hospital for emergency care. The following sections describe my background and qualifications, a summary of the records I have reviewed, and all opinions I will provide regarding this case.

I am a board-certified internist and have been practicing medicine for 30 years. I have practiced medicine in the correctional care setting for 29 years and have been the medical director for the Denver Sheriff Department for 17 years. My facilities are accredited through the NCCHC, the American Correctional Association, and the Commission on Accreditation for Law Enforcement Agencies. I know and regularly reference the standards of care, policies, and procedures with respect to correctional care medicine. My CV is attached to this report as **Exhibit A**. A copy of my fee schedule is attached to this report as **Exhibit B**.

# I.    MATERIALS REVIEWED

Below is a listing of the materials that I have reviewed in connection with my investigation into this matter:

**A.    Pleadings:**
1.    2022-07-18 – First Amended Complaint
2.    2022-10-18 – Second Amended Complaint

**B.    Miscellaneous Documents:**

1.    DEF PC 000002
2.    DEF PC 000041-000059
3.    DEF PC 000060-000064
4.    DEF PC 300000-300003
5.    DEF PC 300004-300007
6.    DEF PC 300008-300010
7.    DEF PC 300011-300012
8.    DEF PC 302631
9.    DEF PC 400026
10.    DEF PC 400027-400029
11.    DEF PC 400030-400032
12.    DEF PC 400033-400034
13.    DEF PC 400035-400039
14.    DEF PC 400040-400063
15.    DEF PC 400064-400066
16.    DEF PC 400067-400068
17.    DEF PC 400069
18.    DEF PC 402738-402741
19.    DEF PC 402742-402745
20.    DEF PC 402746-402749
21.    DEF PC 402750-402752
22.    DEF PC 402753-402822
23.    DEF PC 402823-402824
24.    DEF PC 402828-402831
25.    DEF PC 402832-402832
26.    DEF PC 600161–600193
27.    DEF PC 900000-900999
28.    NCI 000232-000246
29.    NCI 000247-000479
30.    TAPIA006074-TAPIA006090
31.    TAPIA006098-TAPIA006158
32.    TAPIA006168-TAPIA006416
33.    TAPIA006417-TAPIA006420
34.    TAPIA006425-TAPIA006427
35.    TAPIA006428-TAPIA006429

36.    TAPIA006430-TAPIA006436
37.    TAPIA006437-TAPIA006440
38.    TAPIA006441-TAPIA006443
39.    TAPIA006444-TAPIA006447
40.    TAPIA006501-TAPIA006503
41.    TAPIA006504-TAPIA006505
42.    TAPIA006506-TAPIA006506
43.    TAPIA006507-TAPIA006509
44.    TAPIA006510-TAPIA006524
45.    TAPIA042435-TAPIA042506
46.    TAPIA046345-TAPIA046346
47.    TAPIA046347-TAPIA046348
48.    TAPIA046349-TAPIA046350
49.    TAPIA046351-TAPIA046352
50.    TAPIA046353-TAPIA046355
51.    TAPIA046356-TAPIA046358
52.    TAPIA046359-TAPIA046360
53.    TAPIA046361-TAPIA046362
54.    TAPIA047746-TAPIA047759
55.    TAPIA055621–TAPIA055650
56.    2024-03-08 Declaration of Steven Delgado

**C.**    **Discovery:**

1.    2021-08-31 – Tapia 1st ROG & RFP to NaphCare
2.    2021-09-15 – Tapia 1st ROG & RFP to Pierce County
3.    2021-09-22 – Pierce County 1st ROG & RFP to Tapia
4.    2021-09-30 – NaphCare Resp to Tapia 1st ROG & RFP
5.    2021-10-25 – NaphCare 1st ROG & RFP to Tapia
6.    2021-10-29 – Pierce County Resp to Tapia 1st ROG & RFP
7.    2021-11-04 – Tapia Resp to Pierce County 1st ROG & RFP
8.    2021-12-08 – Tapia Resp to NaphCare 1st ROG & RFP
9.    2022-01-13 – NaphCare Supp Resp to Tapia 1st ROG & RFP
10.    2022-01-25 – Tapia 1st Supp Resp to NaphCare 1st ROG & RFP
11.    2023-07-05 – Tapia 1st ROG & RFP to Pierce County
12.    2023-07-18 – NaphCare 1st RFA to Tapia
13.    2023-07-18 – NaphCare 1st RFP to Tapia
14.    2023-07-18 – NaphCare 1st ROG to Tapia
15.    2024-03-08 – Defendant Pierce County's Supplemental Initial Disclosures Pursuant to FRCP 26(a)(1)

**D.**    **Medical Records:**

1.    DEF PC 000041-000059
2.    DEF PC 000060-000064
3.    DEF PC 000690-001281
4.    DEF PC 001282-001550

5.  DEF PC 100000-100001
6.  DEF PC 100002-100092
7.  DEF PC 100093-100392
8.  DEF PC 100393-100693
9.  DEF PC 100694-100994
10. DEF PC 100995-101295
11. DEF PC 101296-101596
12. DEF PC 101597-101897
13. DEF PC 101898-102198
14. DEF PC 102199-102499
15. DEF PC 102500-102800
16. DEF PC 102801-103083
17. DEF PC 103084-103383
18. DEF PC 300013-300019
19. NAPHCARE000001-000625
20. TAPIA002708-TAPIA002867
21. TAPIA002868-TAPIA005709
22. TAPIA005710-TAPIA005978
23. SJMC_IMAGING_0001-0003
24. SJMC Imaging Files
25. SJMC_0001-0319
26. Imaging Discs 1-4
27. PULSE_HEART_0001-0029
28. PULSE_HEART_VASCULAR_0001-0017
29. HANGER_TACOMA_0001-0133

**E.    Deposition Transcripts & Exhibits:**

1.  Bradley, Jonah and Exhibits 1-2
2.  Carrillo, Cameron and Exhibits 1-3
3.  Garcia, Nicholas and Exhibits 115-117
4.  Knight, Jonathon and Exhibits 1-2
5.  Labine, Lucas and Exhibits 107-114
6.  Nealis, Darren and Exhibits 1-3, 6-8, 12
7.  Perez, Jesus and Exhibits 1-14, 16-17
8.  Prather, Duane and Exhibits 1-3, 6-9
9.  Ricci, Debra and Exhibits 1-7
10. Slothower, Johnathon and Exhibits 1-10
11. Tapia, Javier and Exhibits 118-134
12. Valley, Jane and Exhibits 100-106
13. Wade, Elliott and Exhibits 1-10
14. Warren, Elizabeth and Exhibits 1-10

**F.    Standards**

1.  ACA Performance-Based Standards for Adult Local Detention Facilities, 4th Edition

- 4 -

2. ACA Core Jail Standards
3. ACA 2016 Standards Supplement to the ACA Performance-Based Standards for Adult Local Detention Facilities, 4th Edition
4. National Commission on Correctional Health Care (NCCHC) – Standards for Health Services in Jails (2018 Edition)
5. Department of Health Nursing Care Quality Assurance Commission Advisory Opinion – Registered Nurse and Licensed Practical Nurse Scope of Practice (Sept. 13, 2019)

## II.    CLINICAL SUMMARY

### A.    Mr. Tapia's Intake at Pierce County Jail

Mr. Tapia was incarcerated at the Jail on **June 16, 2018**. Shortly after being booked, Mr. Tapia had his weight taken using a scale by NaphCare, and Mr. Tapia weighed 153 pounds. Tapia Tr. at 129:13-130:3; NAPHCARE000592.[1] Mr. Tapia did not report any current or previous medical or mental health issues during his receiving screening, other than substance misuse. NAPHCARE000592-602. When Mr. Tapia arrived at the Jail, he was not showing symptoms of withdrawal. NAPHCARE000494-496. Regardless, NaphCare initiated the COWS assessment process. NAPHCARE000225. Mr. Tapia testified during his deposition that NaphCare's treatment of him was "high quality." Tapia Tr. at 244:24-245:15.

### B.    Mr. Tapia's Behavioral Issues at the Pierce County Jail

Mr. Tapia was originally housed in Unit 3B at the Jail, a general population unit with direct supervision from corrections officers. Knight Tr. 18:8-19:19. This means that the inmates are not locked behind doors and can go in and out of rooms as long as they are not interfering with operations at the Jail. Knight Tr. 18:8-19:19.

Mr. Tapia had several issues with his behavior while he was housed in Unit 3B. For example, on July 23, 2018, a corrections officer discovered two coffee bags full of pruno under a bunk, i.e., prison alcohol. DEF PC 000055-56. The "pruno creator" was unknown, but Mr. Tapia was identified as one of the suspected individuals on his behavior log. This was not an isolated incident. Again, on September 6, 2018, a corrections officer discovered two clear plastic tumblers hidden behind a folded mattress containing the ingredients for making pruno. DEF PC 000051-52. The corrections officer noted that the "mixture had a strong smell of intoxicants." DEF PC 000051-52. The "pruno creator" was unknown but was again identified as one of the suspected individuals in his behavior log. Over the next few days, Mr. Tapia continued to receive warnings from the corrections officers for his behavior. For example, on September 9, 2018, Mr. Tapia received a verbal warning for having inmates in his bunk. DEF PC 000044.

---

[1] NaphCare did not perform a full initial health assessment, including a physical exam, because Mr. Tapia had such an assessment on July 4, 2017 and August 7, 2017, which was less than a year before this incarceration and Mr. Tapia indicated no change in health status. NAPHCARE000314-19 (July 4, 2017 assessment); NAPHCARE000320-25 (August 7, 2017 assessment); NAPHCARE000592-602 (June 16, 2018 receiving screening and mental health screening); NCCHC J-E-04(11).

On or around **September 15 or September 16, 2018**, Mr. Tapia got into an altercation with an unidentified inmate. According to Mr. Tapia, he was talking by the inmate's cell when the inmate became upset that Mr. Tapia was talking and punched him in the back of his head/neck. Tapia Tr. at 137:16-138:14. On **September 16, 2018**, after Mr. Tapia was hit in the head, Mr. Tapia gathered his possessions, walked out of Unit 3B, and informed a corrections officer at the Jail that he "needed to move." DEF PC 000050. When asked why, Mr. Tapia responded that "the upper tier found out that he was a 'snitch' and that he felt endangered remaining in the unit." DEF PC 000050. Mr. Tapia did not identify any specific inmate but stated that there was "general dislike" for him "among many on the upper tier and that a move to preserve peace and harmony as well as [his] safety was needed." DEF PC 000050. Mr. Tapia was then moved to Unit 2D, also a general population unit, but the corrections officer noted that "should [Mr. Tapia] continue to have issues," they should consider reclassifying him because he had "3 warning[s] documenting his behavior in the past week." DEF PC 000050; Knight Decl. at 17:14-17, 18:8-16.

### C.    Tapia's Move to the Mental Health Observation Unit

Mr. Tapia was ultimately moved to Unit 2D on **September 17, 2018**. But before he was moved, Mr. Tapia learned that his visit with his daughter was canceled, which upset him. Tapia Tr. at 143:11-144:1. Mr. Tapia was then escorted to his new unit and walked into Unit 2D "perfectly fine." Knight Tr. at 22:2-12; 22:21-23:2. Once Mr. Tapia was at his bunk, Mr. Tapia verbally addressed not being able to see his daughter with Deputy Knight. Tapia Tr. at 143:11-144:1. According to Mr. Tapia, he "threw . . . a temper tantrum" because he "wanted to see [his] daughter." Tapia Tr. at 144:9-17, 146:2-147:16; Knight Tr. at 33:4-21. Deputy Knight helped Mr. Tapia up from the floor after this temper tantrum and observed that Mr. Tapia could stand on his own and walk. Knight Tr. at 34:1-25. Deputy Knight also asked Mr. Tapia if he was "ok." Knight Tr. at 36:17-25. Mr. Tapia responded by shaking his head yes. Knight Tr. at 36:17-25. Deputy Knight then explained the rules of Unit 2D to Mr. Tapia, which he acknowledged and understood. Knight Tr. at 36:17-25. After this, Mr. Tapia walked to a time-out cell approximately 150 yards away, then walked to 3SC, a "pretty big distance" from Unit 2D. Knight Tr. at 37:6-23.[2] Deputy Knight also observed no signs of Mr. Tapia being in pain and that Mr. Tapia was not limping when he walked out of the unit. Knight Tr. at 34:1-25; Knight Tr. at 38:24-39:2. Mr. Tapia testified that he does not recall limping or being in pain when he walked out of the unit. Tapia Tr. at 154:21-155:8.

### D.    Mr. Tapia's Time in the Mental Health Observation Unit

On **September 18, 2018**, Darren Nealis, a mental health professional employed and supervised by Pierce County, checked on Mr. Tapia because Deputy Knight reported Mr. Tapia's behavior to mental health. During this visit, Mr. Nealis observed Mr. Tapia could walk to the door of his cell but did not respond verbally to questions. Nealis Tr. at 36:16-23, 37:4-7. Mr. Nealis saw

---

[2] 3SC is the mental health, max security housing at the Jail for inmates with mental health or behavioral concerns. Knight Tr. at 30:8-14. 3SC is an indirect supervision unit, meaning the inmates stay in their cell and get one hour outside of the cell each day. Knight Tr. at 31:1-15. Officers check on inmates every 30 minutes, which includes looking into each inmate cell to confirm that inmates are safe and secure, confirm they are not exhibiting any mental health issues and, if they are, document them accordingly, and ultimately make sure that there are no major concerns with their mental or physical health. Knight Tr. at 31:3-32:3.

Mr. Tapia again the next day, **September 19, 2018**. Mr. Tapia again did not verbally respond to Mr. Nealis's questions. After the visit, Mr. Nealis walked to the nurse's station and asked if someone could check on Mr. Tapia because Mr. Tapia did not verbally respond to his questions. Nealis Tr. at 30:19-31:14; Carrillo Tr. at 21:3-12, 23:11-12. Mr. Nealis does not recall what he said to NaphCare besides asking that Mr. Tapia be seen. Nealis Tr. at 39:7-14, 52:23-53:4.

After this interaction, the registered nurse ("**RN**") in the clinic, Darilyn Inglemon, directed Licensed Practical Nurse ("**LPN**") Cameron Carrillo to perform a focused assessment regarding Mr. Tapia not responding to questions. Carrillo Tr. at 21:5-18; NCI 001187. LPN Carrillo then entered Mr. Tapia's cell and performed a focused assessment of Mr. Tapia to collect data and check whether Mr. Tapia was responsive. Carrillo Tr. at 20, 25:9-14; Slothower Tr. at 28:17-29:25. During this focused assessment, LPN Carrillo observed that Mr. Tapia "was very responsive and was talking to me." Carrillo Tr. at 26:22-25. For example, Mr. Tapia verbally told LPN Carrillo that he did not have any medical concerns, was upset about being in an isolation unit, and had no suicidal ideations. Carrillo Tr. at 25:15-20, 28:8-29:4; NAPHCARE000224. Mr. Tapia does not dispute LPN Carrillo's account of this interaction and confirmed that he was upset about being in isolation because he lost the privilege to see his daughter. Tapia Tr. at 176:8-178:21. LPN Carrillo also observed that Mr. Tapia's "appearance was good," he "was not diaphoretic," he "was not pale," he "was not overly fidgety, not guarded, and he had no medical concerns." Carrillo Tr. at 27:24-28:3. At no point did Mr. Tapia take off his shoes or socks, identify any issues with his foot, or state or otherwise indicate that he had any medical issues or concerns with his foot. After this focused assessment, LPN Carrillo verbally informed the clinic RN about the information he gathered, and the clinic RN reviewed LPN Carrillo's note in Mr. Tapia's medical chart. Carrillo Tr. at 18:16-19:21, 39:8-22.

Over the next eleven days, NaphCare staff performed daily rounds, including seeing every inmate in isolation at least once per day, if not more. Warren Tr. at 48:4-49:19. Rounds included, among other things, laying eyes on every inmate and verbally interacting with the inmates to make sure there were no medical concerns. Warren Tr. at 49:25-51:1.

On **September 29, 2018**, RN Elizabeth Warren was contacted by a sergeant at the Jail and asked to check on Mr. Tapia because he was not sure whether Mr. Tapia was eating his meals. Warren Tr. at 59:10-23, 109:23-110:1, 111:7-112:15. RN Warren went to Mr. Tapia's cell and performed a focused assessment to determine whether Mr. Tapia's "vitals show[ed] a person who hasn't eaten or drank in 72 hours." Warren Tr. at 70:14-18, 71:3-4. During this focused assessment, RN Warren observed that Mr. Tapia was alert, sitting up on his bed under his own power, making eye contact when spoken to, following her directions, and communicating with her through head nods and/or other gestures. Warren Tr. at 63:1-5, 113:22-117:14, 132:15-19. RN Warren asked Mr. Tapia whether he would drink an Ensure supplement if she got him one, to which he responded that he would. Warren Tr. at 116:3-23, 132:15-19. RN Warren then left to go get the Ensure drink for Mr. Tapia, which he drank. Warren Tr. at 116:3-23. At no point did Mr. Tapia take off his shoes or socks, identify any issues with his foot, or state or otherwise indicate that he had any medical issues or concerns with his foot. Mr. Tapia does not dispute RN Warren's account of this interaction and recalls sitting upright and drinking the Ensure. Tapia Tr. at 179:12-25.

During this focused assessment, RN Warren also took Mr. Tapia's vitals and concluded that his vitals "were not showing" a "person who hasn't eaten or drank in 72 hours." Warren Tr. at 70:14-20. RN Warren testified that there were no signs of malnourishment when she observed Mr. Tapia, Mr. Tapia was drinking fluids while she was present, and if Mr. Tapia "looked malnourished, he would have went to the hospital" or she "would have brought him downstairs" and had a provider assess him. Warren Tr. at 117:21-118:19. RN Warren also testified that had there been anything concerning with Mr. Tapia, she "would have brought [Mr. Tapia downstairs] to the clinic to be seen by a provider" that day. Warren Tr. at 59:6-9, 62:8-11. Even though there appeared to be nothing wrong with Mr. Tapia, RN Warren put Mr. Tapia on a meal log, ordered vitals for the next three days, and scheduled an appointment for Mr. Tapia with Dr. Balderrama in the clinic for the next business day to "rule out any medical issues." Warren Tr. at 78:5-10, 123:17-124:12. Later that evening, Mr. Tapia was observed standing at his cell door, meaning Mr. Tapia was walking around in his cell. DEF PC 000042.

On **October 1, 2018**, LPN Debra Ricci went to take Mr. Tapia's vitals at around 5:15 a.m. PT. Ricci Tr. at 30:23-31:12. Mr. Tapia refused to have them taken. Ricci Tr. at 31:8-32:17, Tapia Tr. at 188:8-20. A few hours later, at around 9:51 a.m. PT, Deputy Paukert observed that Mr. Tapia's foot was a "purple/black color." DEF PC 000042. Deputy Paukert called the clinic, and "[p]er [the] clinic assessment," Mr. Tapia was transported to the clinic in a wheelchair. DEF PC 000042. Shortly thereafter, RN Ashley Chalk visually inspected Mr. Tapia's foot and took Mr. Tapia's vital signs. NAPHCARE000223.

### E.     Mr. Tapia Is Sent to Tacoma General Hospital

Despite not telling anyone or otherwise indicating that he had any issues with his foot, Mr. Tapia for the first time verbally told clinic staff "that his foot hurt" on October 1, 2018. Slothower Tr. at 47:1-14. Mr. Tapia was then immediately referred to Tacoma General Hospital for further treatment. NAPHCARE000223. Mr. Tapia does not recall his foot being discolored, having any pain in his foot, or limping while at the Jail prior to October 1, 2018, nor does he recall reporting any such symptoms to anyone at the Jail. Tapia Tr. at 157:9-19.

Mr. Tapia arrived at Tacoma General Hospital on **October 1, 2018**, presenting with "swelling, pain, and redness of his left foot and leg." Labine Tr. at 16:21-15:5; NAPHCARE000029. His foot had "discoloration" to the "[l]eft forefoot and all toes" but "[t]here [was] no drainage, sloughing of the skin, vesicles, blistering, or open wounds." DEF PC 100633. Mr. Tapia's vitals did not show any signs of sepsis or an infection when Mr. Tapia arrived at Tacoma General Hospital. DEF PC 100633 (temperature, blood press, pulse, oxygenation within normal limits); DEF PC 100634-35 (blood work showing slightly elevated white blood cell count but not high enough to indicate an infection); DEF PC 100647, 624 (blood culture showed no growth). The first signs of an infection did not appear until nearly a week later while Mr. Tapia was at Tacoma General Hospital. Labine Tr. at 67:21-68:10. After arriving at Tacoma General Hospital, Mr. Tapia met with Dr. Lucas Labine. Despite not telling anyone about pain in his foot for the first time until earlier in the day, Mr. Tapia verbally told Dr. Labine that "he had pain for a while in his foot" and that he did not recall any trauma to his leg. Labine Tr. at 18:12-19, 20:1-6. Mr. Tapia also told Dr. Lyndsey Deleon on October 1 that he had "just told the jail staff today about the pain." DEF PC 100632. Mr. Tapia also verbally told Dr. Labine that his pain was an "8 to 9, 10 in severity." Labine Tr. at 20:7-21:3, 22:12-15. During this visit, Dr. Labine observed that

Mr. Tapia was "alert," "oriented," had "[n]o tangential or circumferential thought process," his "judgment [was] clear and intact," and his "speech [was] clear." Labine Tr. at 49:2-15; NAPHCARE000031. Dr. Labine noted that these observations were consistent during Mr. Tapia's stay at Tacoma General Hospital, and Tapia could (and did) verbalize his pain and symptoms during this time. Labine Tr. at 59:4-60:19, 80:2-81:5. Tacoma General Hospital determined on October 3, 2018, that Mr. Tapia "ha[d] capacity for medical decision making," and Mr. Tapia ultimately underwent a below-the-knee amputation due to complications with phlegmasia cerulea dolens. DEF PC 100680.


### III.    STANDARDS AND DISCUSSION

#### A.    ACCESS TO CARE

Based on my review of the documents provided to date, my education, training, 30 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that NaphCare had policies, practices, and customs in place at the Jail that provided inmates with access to care. **The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-A-01 – "Access to Care,"** states that inmates have access to care to meet their serious medical, dental, and mental health needs. **NaphCare Policy and Procedure (NCI 000261-262) – "Health Care Access and Information"** likewise states that it is the policy of NaphCare to provide healthcare to patients in a timely manner and with privacy while practicing within the scope of each employee's professional licensure. Thus, NaphCare's "Health Care Access and Information" policy requires that NaphCare personnel timely provide care to inmates while practicing within their professional licensure and is consistent with NCCHC's "Access to Care" policy.

NaphCare also maintained a custom or practice at the Jail that prioritized providing access to healthcare for inmates regardless of the cost. Health Services Administrator ("**HSA**") Jonathon Slothower testified that there is a Provider on site at the Jail Monday through Saturday and that Providers are "always on call for anything urgent." Slothower Tr. at 54:4-12. HSA Slothower further testified that if for some reason a Provider cannot be reached immediately, then there are staff care Providers that can be reached. Slothower Tr. at 54:4-12. HSA Slothower testified that NaphCare's "default" at the Jail "is always to send people to the hospital. When in doubt, send them out is what we do" and "if any medical staff recognizes that a problem can't be adequately treated in [NaphCare's] facility, we send them to an emergency room or to a specialty facility." Slothower Tr. at 51:13-21. This custom or practice is consistent with NaphCare's written guidance and training that make clear "[w]hen in doubt call the medical staff." NCI 001313. When asked whether there were any concerns about the cost of sending inmates at the Jail to an emergency room or a specialty facility, HSA Slothower stated "No" because NaphCare does not "pay the cost of that. The County pays for any outside care, so it doesn't cost NaphCare more money to send people out." Slothower Tr. at 52:22-25. Accordingly, NaphCare had policies, practices, and customs that required NaphCare personnel to timely provide inmates at the Jail access to healthcare and send them to an emergency room or to a specialty facility if additional care was needed.

Based on my review of the documents provided to date, my education, training, 30 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that NaphCare personnel provided Mr. Tapia with access to healthcare and did not otherwise withhold any care. Mr. Tapia's deposition testimony confirms this point. Mr. Tapia testified that he is not aware of NaphCare withholding care to inmates to maximize their profits; he is not aware of NaphCare withholding care to him to maximize their profits; and NaphCare was responsive, providing high quality care, and treating inmates fairly. Tapia Tr. at 242:18-245:5. When Mr. Tapia arrived at the Jail, there were no medical concerns, and he was not otherwise showing symptoms of withdrawals. NAPHCARE000494-96. Regardless, NaphCare provided Mr. Tapia with access to care and initiated the COWS assessment process. NAPHCARE000225. Mr. Tapia testified during his deposition that NaphCare's treatment of him was "high quality." Tapia Tr. at 244:24-245:15.

A NaphCare employee was asked to perform, and did perform, a focused assessment on Mr. Tapia on September 19. Over the next eleven days, NaphCare staff performed daily rounds, including seeing every inmate in the Mental Health Observation Unit, which includes Mr. Tapia, at least once per day, if not more. Warren Tr. at 48:4-51:1. A NaphCare employee was asked to perform, and did perform, a focused assessment on Mr. Tapia on September 29. RN Warren testified that had there been anything concerning with Mr. Tapia during her September 29 assessment, she "would have brought [Mr. Tapia downstairs] to the clinic to be seen by a provider" that day, which is consistent with NaphCare's policy of sending inmates for additional care if needed. Warren Tr. at 59:6-9, 62:8-11. Regardless, RN Warren put Mr. Tapia on a meal log, ordered vitals for the next three days, and scheduled an appointment for Mr. Tapia with Dr. Balderrama in the clinic for the next business day to "rule out any medical issues." Warren Tr. at 78:5-10, 123:17-124:12. A NaphCare employee was asked to perform, and did perform, a focused assessment on Mr. Tapia on **October 1, 2018** in the clinic. During this assessment, the NaphCare employee observed that Mr. Tapia's foot was discolored, and Mr. Tapia stated that his foot was in pain. NaphCare employees did not hesitate and immediately sent Mr. Tapia to Tacoma General Hospital for additional care as soon as it observed that there was anything medically wrong with Mr. Tapia.

Based on my experience in corrections facilities, NaphCare's personnel appropriately implemented its policies, practices, and customs and provided Mr. Tapia with access to care while at the Jail.

## B.    NURSING ASSESSMENT PROTOCOLS

Based on my review of the documents provided to date, my education, training, 30 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that NaphCare had policies, practices, and customs in place at the Jail requiring nurses to comply with relevant state practices acts when conducting data gathering and treatments that appropriate for their skill level. **The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-E-08 – "Nursing Assessment Protocols and Procedures,"** states that nursing assessment protocols are appropriate to the level of competency and preparation of the nursing personnel who will carry them out and comply with the relevant state practice acts. **NaphCare Policy and Procedure (NCI 000378) – "Nursing Assessment Protocols"** likewise states that nursing assessment protocols shall be used by nursing staff when

providing clinical care to the extent possible. Nurses shall comply with relevant state practice acts and conduct data gathering and treatments appropriate to their skill levels. Accordingly, NaphCare's "Nursing Assessment Protocols" requires nurses to perform their duties in compliance with state law, which is consistent with NCCHC's "Nursing Assessment Protocols."

Based on my review of the documents provided to date, my education, training, 30 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that LPNs and RNs can perform focused assessments in a correctional facility. **The Washington RCW – Nurse Practice Act, Licensed practical nurse—Activities allowed, RCW 18.79.270 (2012)** defines the activities allowed by an LPN as follows:

> A licensed practical nurse under his or her license may perform nursing care, as that term is usually understood, of the ill, injured, or infirm, and in the course thereof may, under the direction of a licensed physician and surgeon, osteopathic physician and surgeon, dentist, naturopathic physician, podiatric physician and surgeon, physician assistant, osteopathic physician assistant, advanced registered nurse practitioner, or midwife acting under the scope of his or her license, or at the direction and under the supervision of a registered nurse, administer drugs, medications, treatments, tests, injections, and inoculations, whether or not the piercing of tissues is involved and whether or not a degree of independent judgment and skill is required, when selected to do so by one of the licensed practitioners designated in this section, or by a registered nurse who need not be physically present; if the order given is reduced to writing within a reasonable time and made a part of the patient's record. Such direction must be for acts within the scope of licensed practical nurse practice.

**The Washington RCW – Nurse Practice Act, Registered nurse—Activities allowed—Delegation of tasks, RCW 18.79.260 (2012) defines the activities allowed by an RN as follows:**

> (1)     A registered nurse under his or her license may perform for compensation nursing care, as that term is usually understood, to individuals with illnesses, injuries, or disabilities.
>
> (2)     A registered nurse may, at or under the general direction of a licensed physician and surgeon, dentist, osteopathic physician and surgeon, naturopathic physician, optometrist, podiatric physician and surgeon, physician assistant, osteopathic physician assistant, advanced registered nurse practitioner, or midwife acting within the scope of his or her license, administer medications, treatments, tests, and inoculations, whether or not the severing or penetrating of tissues is involved and whether or not a degree of independent judgment and skill is required. Such direction

- 11 -

must be for acts which are within the scope of registered nursing practice.

(3)     A registered nurse may delegate tasks of nursing care to other individuals where the registered nurse determines that it is in the best interest of the patient.

(a)     The delegating nurse shall:

(i)     Determine the competency of the individual to perform the tasks,

(ii)     Evaluate the appropriateness of the delegation,

(iii)     Supervise the actions of the person performing the delegated task; and

(iv)     Delegate only those tasks that are within the registered nurse's scope of practice.

**The Department of Health Nursing Care Quality Assurance Commission for the state of Washington**, **Advisory Opinion, Registered Nurse and License Practical Nurse**, **Scope of Practice, NCAO 13.02**, clarifies and provides distinction between the RN and LPN roles, responsibilities, and functions as it relates solely to professional nursing care (the "**Advisory Opinion**"). The Advisory Opinion clarifies that it is within an RN's scope of practice to perform assessments and focused assessments. The Advisory Opinion also clarifies that it is within a LPN's scope of practice to "perform a focused nursing assessment and re-assessment at the direction of the RN or other authorized health care practitioner." The Advisory Opinion further clarifies that an "LPN may perform specific assessments or screening activities, such as mental health status, suicidal risk, cognitive screening, substance use screening, oral health screening, growth and development screening, or nutritional assessments." Although an LPN can perform these focused assessments and collect the data, the "LPN may not analyze, synthesize, or evaluate the data." Instead, the LPN gathers this information and passes it to the RN so that the RN "retains the overall responsibility for verifying data collection, interpreting and analyzing data, and formulating nursing diagnoses."

Based on my review of the documents provided to date, my education, training, 30 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that it was within LPN Carrillo's scope of practice to perform a focused assessment on Mr. Tapia on September 19, 2018. It is also my opinion that LPN Carrillo's focused assessment of Mr. Tapia met the standard of care for a focused assessment in a correctional healthcare facility. On September 19, 2018, MHP Nealis went to the clinic and asked that Mr. Tapia be seen because he was not verbally responding to questions. The clinic RN, Darilyn Inglemon, directed LPN Carrillo to perform a focused assessment regarding Mr. Tapia not responding to questions. Carrillo Tr. at 21:5-18; NCI 001187. RNs, like RN Inglemon, are permitted under The Washington RCW – Nurse Practice Act and the Advisory Opinion to direct LPNs to perform focused assessments. Likewise, LPNs are permitted to perform focused assessment and report the data they collected back to an RN. It is also standard practice in a correctional healthcare facility for clinic RNs to direct an LPN to perform a focused assessment, gather data, and report it back to an RN. Focused assessments, like this assessment, are used when there is a specific issue. For example, if an inmate complains that their elbow hurts, then the nurse will assess the patient's elbow and gather data. The nurse

- 12 -

will not, however, perform a full body assessment or take a full set of vitals or blood work. Slothower Tr. at 49:17-50:23.

LPN Carrillo left the clinic at the direction of RN Inglemon and entered Mr. Tapia's cell to collect data and check whether Mr. Tapia was responsive to questions. Carrillo Tr. at 20, 25:9-14; Slothower Tr. at 28:17-29:25. During this focused assessment, LPN Carrillo observed that Mr. Tapia "was very responsive and was talking to me." Carrillo Tr. at 26:22-25. For example, Mr. Tapia verbally told LPN Carrillo that he did not have any medical concerns, was upset about being in an isolation unit, and had no suicidal ideations. Carrillo Tr. at 25:15-20, 28:8-29:4; NAPHCARE000224. Mr. Tapia cannot dispute LPN Carrillo's account of this interaction and confirmed that he was upset about being in isolation because he lost the privilege to see his daughter. Tapia Tr. at 176:8-178:21. This is consistent with LPN Carrillo's notes of this interaction. LPN Carrillo also observed that Mr. Tapia's "appearance was good," he "was not diaphoretic," he "was not pale," he "was not overly fidgety, not guarded, and he had no medical concerns." Carrillo Tr. at 27:24-28:3. Mr. Tapia did not verbally state that he had any pain in his foot or otherwise indicate that there was anything medically wrong with his foot during this interaction. After this focused assessment, LPN Carrillo verbally informed the clinic RN about the information he gathered and entered this information into his notes. Carrillo Tr. at 18:16-19:21, 39:8-22. The clinic RN then reviewed LPN Carrillo's note in Mr. Tapia's medical chart to analyze and synthesize the data. Based on my experience in the correctional healthcare setting, this focused assessment met the standard of care. Mr. Tapia verbally communicated that he had no medical concerns, and there was no reason to perform any additional tests or refer Mr. Tapia out for additional care.

Based on my review of the documents provided to date, my education, training, 30 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that it was within RN Warren's scope of practice to perform a focused assessment on Mr. Tapia on September 29, 2018. It is also my opinion that RN Warren's focused assessment of Mr. Tapia met the standard of care for a focused assessment in a correctional healthcare facility. On September 29, 2018, RN Warren was contacted by a sergeant at the Jail and asked to check on Mr. Tapia because he was not sure whether Mr. Tapia was eating his meals. Warren Tr. at 59:10-23, 109:23-110:1, 111:7-112:15. RN Warren went to Mr. Tapia's cell and performed a focused assessment to determine whether Mr. Tapia's "vitals show[ed] a person who hasn't eaten or drank in 72 hours." Warren Tr. at 70:14-18, 71:3-4. RNs, like RN Warren, are permitted under The Washington RCW – Nurse Practice Act and the Advisory Opinion to perform focused assessments. It is also standard practice in a correctional healthcare facility for RNs to perform a focused assessment. During this focused assessment, RN Warren observed that Mr. Tapia was alert, sitting up on his bed under his own power, making eye contact when spoken to, following her directions, and communicating with her through head nods and/or other gestures. Warren Tr. at 63:1-5, 113:22-117:14, 132:15-19. RN Warren asked Mr. Tapia whether he would drink an Ensure supplement if she got him one, to which he responded that he would. Warren Tr. at 116:3-23, 132:15-19. Mr. Tapia did not verbally state that he had any pain in his foot or otherwise indicate that there was anything medically wrong with his foot during this interaction.

RN Warren then left to go get the Ensure drink for Mr. Tapia, which he drank. Warren Tr. at 116:3-23. Mr. Tapia does not dispute RN Warren's account of this interaction and recalls sitting

- 13 -

upright and drinking the Ensure. Tapia Tr. at 179:12-25. RN Warren also took Mr. Tapia's vitals during this focused assessment and concluded that his vitals "were not showing" a "person who hasn't eaten or drank in 72 hours." Warren Tr. at 70:14-20. RN Warren testified that there were no signs of malnourishment when she observed Mr. Tapia, he was drinking fluids while she was present, and if Mr. Tapia "looked malnourished, he would have went to the hospital" or she "would have brought him downstairs" and had a provider assess him. Warren Tr. at 117:21-118:19. RN Warren also testified that had there been anything concerning with Mr. Tapia, she "would have brought [Mr. Tapia downstairs] to the clinic to be seen by a provider" that day. Warren Tr. at 59:6-9, 62:8-11. Even though there appeared to be nothing wrong with Mr. Tapia, RN Warren put Mr. Tapia on a meal log, ordered vitals for the next three days, and scheduled an appointment for Mr. Tapia with Dr. Balderrama in the clinic for the next business day to "rule out any medical issues." Warren Tr. at 78:5-10, 123:17-124:12. Based on my experience in the correctional healthcare setting, this focused assessment met the standard of care. RN Warren was asked to look at Mr. Tapia over concerns that he was not eating. RN Warren took Mr. Tapia's vitals, communicated with Tapia, and determined he was not showing any signs of malnutrition. RN Warren also put Mr. Tapia on a meal log, ordered vitals for the next three days, and scheduled an appointment for Mr. Tapia with Dr. Balderrama in the clinic for the next business day to "rule out any medical issues." Warren Tr. at 78:5-10, 123:17-124:12. Accordingly, RN Warren's actions met the standard of care in a correctional healthcare facility for an RN performing a focused assessment, and no care was withheld from Mr. Tapia.

Based on my review of the documents provided to date, my education, training, 30 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that it was within LPN Debra Ricci's scope of practice to take Mr. Tapia's vitals on October 1, 2018. It is also my opinion that LPN Ricci's documentation of Mr. Tapia's refusal to have his vital signs met the standard of care in a correctional healthcare facility. RN Warren put in orders for Mr. Tapia's vitals to be taken after her focused assessment on September 29, 2018. On October 1, 2018, LPN Debra Ricci went to take Mr. Tapia's vitals at around 5:15 a.m. PT. Ricci Tr. at 30:23-31:12. LPN Ricci, however, could not take Mr. Tapia's vitals because Mr. Tapia affirmatively refused to have them taken. Ricci Tr. at 31:8-32:17, Tapia Tr. at 188:8-20. Mr. Tapia did not verbally state that he had any pain in his foot or otherwise indicate that there was anything medically wrong with his foot during this interaction. LPN Ricci asked Mr. Tapia and the corrections deputy to sign the refusal form, but they both declined. LPN Ricci marked that Mr. Tapia refused the vitals. Based on my experience in the correctional healthcare setting, LPN Ricci's attempt to take Mr. Tapia's vitals and documentation of Mr. Tapia's refusal of the vitals met the standard of care. Inmates often refuse vital signs and refuse to sign the acknowledgement forms. Likewise, correction deputies refuse to sign documentation confirming a refusal for vital signs. LPN Ricci correctly noted these refusals.

Based on my review of the documents provided to date, my education, training, 30 years of experience in correctional healthcare, and the facts cited above and below, it is my opinion that it was within RN Chalk's duties to perform a focused assessment on Mr. Tapia on October 1, 2018. It is also my opinion that RN Chalk's focused of Mr. Tapia met the standard of care for a focused assessment in a correctional healthcare facility. On October 1, 2018, around 9:51 a.m. PT, Deputy Paukert observed that Mr. Tapia's foot was a "purple/black color." DEF PC 000042. Deputy Paukert called the clinic, and "[p]er [the] clinic assessment," Mr. Tapia was transported to the

clinic in a wheelchair. DEF PC 000042. Shortly thereafter, RN Ashley Chalk visually inspected Mr. Tapia's foot and took Mr. Tapia's vital signs to perform a focused assessment on Mr. Tapia's foot. NAPHCARE000223. RNs, like RN Chalk, are permitted under The Washington RCW – Nurse Practice Act and the Advisory Opinion to perform focused assessments. It is also standard practice in a correctional healthcare facility for RNs to perform a focused assessment. As soon as it was discovered that anything was remotely wrong with Mr. Tapia's foot and Mr. Tapia, for the first time, indicated he was in pain, Mr. Tapia was immediately transferred to Tacoma General Hospital for further care. Based on my experience in the correctional healthcare setting, this focused assessment met the standard of care because RN Chalk observed that Mr. Tapia had an issue with his foot during this assessment, and Mr. Tapia was immediately transferred to an outside facility for emergent care.

### C.    STAFFING LEVELS

Based on my review of the documents provided to date, my education, training, 30 years of experience in correctional healthcare (including services as a Medical Director and overseeing staffing for correctional facilities), and the facts cited above and below, it is my opinion that NaphCare had adequate staffing levels for a correctional facility at the Pierce County Jail during Mr. Tapia's confinement.

NaphCare contracted with Pierce County to provide the following staffing at the Jail:

| Pierce County, WA NaphCare Staffing | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Mon | Tues | Wed | Thurs | Fri | Sat | Sun | Hours | FTE |
| **Position Title** | **Day Shift** | | | | | | | | |
| NP/PA | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | 4.000 | 4.000 | 48 | 1.200 |
| Health Services Administrator | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Director of Nursing | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| RN - Chronic Care/Infection Control | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Medical Records Clerk | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Administrative Assistant | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Registered Nurse - Booking | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| Registered Nurse - Clinic | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| Registered Nurse - Triage, Old Jail | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | | 12.000 | 72 | 1.800 |
| Registered Nurse - Triage, New Jail | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| LPN - Clinic | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| LPN - Medication | 48.000 | 48.000 | 48.000 | 48.000 | 36.000 | 48.000 | 48.000 | 324 | 8.100 |
| LPN - Float | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| Pharmacy Tech | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Psych NP | 8.000 | 8.000 | 8.000 | 8.000 | 8.000 | | | 40 | 1.000 |
| Dentist | | 8.000 | | 8.000 | | | | 16 | 0.400 |
| Dental Assistant | | 8.000 | | 8.000 | | | | 16 | 0.400 |
| **Night Shift** | | | | | | | | | |
| Registered Nurse - Booking | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| Registered Nurse - Float | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 12.000 | 84 | 2.100 |
| LPN - Medication | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 24.000 | 168 | 4.200 |
| | | | | | | | **Total FTEs** | | 36.700 |

- 15 -

Based on my 17 years of experience as a Medical Director and overseeing staffing levels, NaphCare's staffing at the Jail provided an appropriate mix of medical providers (nurse practitioners/physician assistants), RNs, LPNs, medical records staff, pharmacy staff, dental staff, and a full-time HSA and director of nursing during Mr. Tapia's incarceration. Whereas the NCCHC does not specify a specific number of providers as listed above, the Pierce County Jail has an equal or greater number of medical staff providing clinical care as the Denver Sheriff Medical Department, which is NCCHC accredited. On the three occasions that the medical department was requested to see Mr. Tapia, there was no delay in him being seen. He was seen within a more than adequate timeframe. There was additionally no noted delay in medication administration to suggest understaffing. During September 2018, NaphCare actually provided more staffing than it was contractually required to provide at the Jail. NaphCare exceeded the staffing levels as follows: 9.46 hours over the required staffing for a nurse practitioner; 10.08 hours over the required staffing for a psych nurse practitioner; 77.31 hours over the required staffing for LPNs; and 452.03 hours for over the required staffing for RNs. NCI000057. Based on my experience in the correctional healthcare setting, NaphCare exceeded its own appropriate staffing levels during September 2018.

## IV.   CONCLUSIONS AND SUMMARY OF OPINIONS

1.   NaphCare did not withhold care from Mr. Tapia.

2.   NaphCare had policies, procedures, and customs in place in 2018 that provided inmates access to care, identified appropriate assessments for RNs and LPNs, and employed more RNs than LPNs at the Jail.

3.   There was no cost-saving incentive regarding Mr. Tapia's care during his incarceration. There is no individual billing process by which patients are charged per visit by NaphCare. There is no cost difference whether a patient is seen by an LPN, an RN, or an MD. Therefore, there is no cost saving incentive for a patient to be seen fewer times or by staff considered to have less training. Mr. Tapia was seen by the appropriate staff, housed in the appropriate clinical setting, and referred out as appropriate during his incarceration.

4.   NaphCare's practice or custom at the Jail in 2018 was "when in doubt, send them out," meaning if any medical staff at NaphCare recognized that a problem could not be adequately treated in NaphCare's facility, NaphCare would send them to an emergency room or a specialty facility because cost was not a concern.

5.   Mr. Tapia was treated appropriately and in a timely fashion by NaphCare from June 16, 2018, to October 1, 2018.

6.   LPN Carrillo's focused assessment of Mr. Tapia on September 19 was within his scope of practice and met all applicable standards of care.

7.   RN Warren's focused assessment of Mr. Tapia on September 29 was within her scope of practice and met all applicable standards of care. If RN Warren believed there was

anything medically wrong with Mr. Tapia during this assessment, she would have brought him to the clinic to see a provider.

8. LPN Ricci's and RN Chalk's interactions with Mr. Tapia on October 1 were within their scope of practice and met all applicable standards of care.

9. As soon as NaphCare personnel discovered that there was anything remotely wrong with Mr. Tapia's foot, they immediately sent him to Tacoma General Hospital for further care without delay and consideration of the cost.

10. Mr. Tapia was capable of verbally describing any symptoms with his foot from September 19 to October 1. Mr. Tapia verbally told LPN Carrillo on September 19 that he had no medical concerns, and Mr. Tapia verbally told NaphCare personnel in the clinic on October 1 that he was having pain in his foot. Mr. Tapia also verbally told personnel at Tacoma General Hospital on October 1 that he had pain in his foot.

11. Mr. Tapia also had ample opportunity to inform the Pierce County Jail medical and security staff of any medical concerns, specifically regarding pain to his left lower extremity and/or difficulty ambulating on his left lower extremity from September 19 to October 1. According to the Jail medical record, the Jail security record, and the hospital medical records, Mr. Tapia did not. Mr. Tapia did state that October 1 was the first time he mentioned any medical issue regarding his left lower extremity.

12. There is no evidence to suggest that Mr. Tapia suffered any mental status changes related to sequelae at bacterial infection at the jail prior to his hospitalization at Tacoma General Hospital. Mr. Tapia was started on empiric antibiotics on the sixth day of his hospitalization due to concern that he may have been developing an infection despite no infection being clinically apparent.

13. There is no evidence that Mr. Tapia was severely malnourished while at the Jail. Mr. Tapia weighed 153 pounds at his booking on June 16, 2018 and did not lose 10% of his weight by October 1, 2018. Mr. Tapia's vitals on September 29 and October 1 were also not consistent with someone who is severely malnourished.

14. There is no evidence that "the decomposition of Javier's foot and leg . . . because obvious to even a casual observe" because "[s]ores and blisters that bled and released a dirty-looking, foul smelling discharge were readily apparent to anyone even superficially interacting with Javier" while he was at Pierce County Jail as claimed in the Second Amended Complaint. Deputy Paukert described Mr. Tapia's foot was a "purple/black color." DEF PC 000042. Dr. DeLeon described Tapia's foot as having "discoloration" to the "[l]eft forefoot and all toes" but "[t]here [was] no drainage, sloughing of the skin, vesicles, blistering, or open wounds." DEF PC 100633. The first available picture of Mr. Tapia's foot, which is dated October 3, 2018, likewise depicts a foot that is discolored. TAPIA055624. There are no apparent open wounds or signs of discharge. The pictures referred to in Mr. Tapia's Second Amended Complaint was taken on October 5 and 10, 2018, and shows significant changes from how his foot was

- 17 -

described on October 1 and how it looked on October 3, and then how it looked two days later on October 5, and five days after that on October 10. DEF PC 100633; TAPIA055624; TAPIA055632; TAPIA055649.

My opinions in this case are based on my years of education and experience in the correctional health field and upon review of the documentation provided to me and reviewed to date. I reserve the right to supplement this opinion in the event additional documentation is provided in this matter. My opinions herein are expressed within a reasonable degree of medical certainty.

Sincerely,

DocuSigned by:

*Peter Crum*

5EBC9DF3829E488...

Peter B. Crum, M.D.

- 18 -

# Exhibit A

# CURRICULUM VITAE

**Peter B. Crum, M.D.**

<u>Personal Information</u>

       Born ██████ Oak Park, Illinois
       Home Address: 4411 Sumac Lane
               Littleton, Colorado 80123
       Work Address: 10500 Smith Road
               Denver, Colorado 80239
       E-mail  peter.crum@dhha.org; pbcrum@gmail.com

<u>Present Academic Rank</u>

       Clinical Assistant Professor
       Department of Medicine
       University of Colorado Medical School

       Department of Correctional Care
       Denver Health Medical Center
       Denver Sheriff Department

<u>Education</u>

       Bachelor of Science, Biology
       Virginia Polytechnic Institute and State University
       Blacksburg, Virginia

       Doctor of Medicine
       Eastern Virginia Medical School
       Norfolk, Virginia

       Internal Medicine Internship and Residency
       Maine Medical Center
       Portland, Maine

Board Certification

      American Board of Internal Medicine 2008

Medical Licensure

      State of Colorado #32714

Most Recent Clinical Practice

      Denver Health Medical Center
      Medical Director
      Department of Correctional Care
      Denver Sheriff Department

Previous Professional Experience

      Comphealth/Kron locum tenens
      Raleigh-Durham, North Carolina
      1993-1994

      Rose Hospital, Staff Physician
      Denver, Colorado
      1994-1995

Community Activities

      Physicians for Social Responsibility, Denver

Professional Organizations

      National Commission on Correctional Health Care
      Society of Correctional Physicians
      Certified Correctional Health Professional
      American College of Physicians

# Exhibit B

## **Peter Crum M.D.**

## **Medical-Legal Consulting**

### **Fee Schedule**

Record review, verbal/written reports          $400/hr

Travel time                                    $150/hr

Air, ground, etc transportation               Billed at cost

Mileage, meals, incidentals                   Billed at federal per diem

Depositions                                    $500/hr

Denver Court                                   $500/hr

Overnight Stay                                 $4500/24 hrs


-Billed monthly.