THE HONORABLE KYMBERLY K. EVANSON

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JAVIER TAPIA,

Plaintiff,

v.

NAPHCARE, INC., and PIERCE COUNTY,

Defendants.

NO.  2:22-cv-01141-KKE

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S MOTION FOR SUMMARY JUDGMENT

## I.     INTRODUCTION AND FACTUAL SUMMARY

Defendant Pierce County ("County")'s argument boils down to asking this Court to decide, as a matter of law, that the blood clotting that developed in Plaintiff Javier Tapia's leg, and led to its amputation, was entirely coincidental and unrelated to his sudden deteriorating health status over the preceding two weeks. This belies belief as a matter of common sense, as Tapia's experts confirm.

On June 16, 2018, Tapia was booked into the County Jail. (Dkt. # 104-1). The first three months of his incarceration were "largely unremarkable." (Dkt. # 104-5, at 2). Then, on September 17, 2018, Tapia began exhibiting a "sudden altered mental status." (Dkt. # 104-8, at 5); *see also* (Dkt. ## 104-2, at 3; 104-6, at 5; 104-16, at 6; 104-19, at 5; 104-26, at 5). In response, Jail staff transferred Tapia to "mental health housing"—an "administrative segregation unit" where he was housed alone for "23 hours a day." (Dkt. ## 101-10, at 46; 104-7, at 12). Tapia's condition

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 1
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    continued to worsen over the next two weeks—the few documented interactions that exist from

2    that period demonstrate Tapia was "deteriorating," experiencing high blood pressure, non-verbal,

3    and not eating—yet, Tapia's care was never escalated to a higher-level provider, and he was not

4    sent for emergency care. (Dkt. ## 104-12, at 4; 104-29, at 3–4).

5       Generally, an altered mental status requires an "immediate transfer" to a hospital "or

6    referral of the patient to medical for evaluation," as the patient could be experiencing a stroke or

7    any number of life-threatening medical conditions.[1] (Dkt. # 104-8, at 4). Had any Jail staff, or any

8    employees of the Jail's medical contractor, NaphCare, Inc. ("NaphCare"), taken this appropriate

9    action, Tapia's leg would have been salvaged. (Dkt. # 104-17, at 8).

10      Unfortunately, Tapia was never medically assessed. Instead, he was "seen" by County

11    Mental Health Providers ("MHPs") who asked him, "hey, what's going on" and referred him to

12    NaphCare for a medical "assessment."[2] NaphCare, in turn, sent its licensed practical nurses

13    ("LPNs")—who are "not allowed to . . . do assessments [or] diagnose" under the terms of their

14    licensure—to "collect" unspecified "data" on Tapia. (Dkt. # 104-14, at 11, 25). In essence, he was

15    passed around between corrections staff, mental health staff, and NaphCare medical staff in a

16    "disjointed and disorganized" manner; with a "lack of communication between disciplines";

17    generally ignored for critical stretches of time; and never assessed by a medical provider acting

18    within the scope of their licensure. (Dkt. # 104-8, at 6); *see also generally* (Dkt. # 104-11). As

19    Tapia sat isolated—smelling of urine, "confused," "unable to verbally respond," emaciated, and

20    in "significant" and "profound" pain—his foot and leg rotted off. (Dkt. ## 104-2, at 4; 104-5, at 4,

21    6; 104-8, at 4; 104-11, at 6; 104-15, at 13; 104-17, at 8; 104-29, at 3–4).

22

23

24

---

[1] NaphCare's Health Services Administrator agrees. *See* (Dkt. # 104-9, at 55-56) ("Q. . . . [W]hat is an appropriate clinical response to a sudden altered mental state? A. . . . [T]hat would be an emergency, generally, that somebody would be sent out for.").

[2] Dreveskracht Decl., Exhibit 2, at 40, 42–45; *see also id.*, Exhibit 3, at 26–27.

25

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

On October 1, 2018, a corrections officer noticed that Tapia's toes were "turning black," and he was transferred to Tacoma General Hospital. (Dkt. # 104-11, at 6). At the hospital, Tapia "was noted to have pain, swelling, redness, and gangrene of his left lower extremity," indicating that the blood clot that caused Tapia's "acute mental status changes" was "present *for approximately 2-4 weeks prior to the date of his transfer to the hospital.*" (Dkt. # 104-17, at 4, 6) (emphasis added); *see also* (Dkt. # 104-18, at 23). Tapia's leg was eventually amputated below the knee. (Dkt. # 104-20).

The County submits that (1) neither it nor NaphCare were negligent because Tapia's "extremely rare vascular condition" could not have been anticipated in advance; (2) Tapia cannot show that a "County employee treated him with reckless disregard"; and (3) Tapia cannot prove the elements of a 42 U.S.C. § 1983 claim against it under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978). (Dkt. # 174, at 15, 22).

The County is wrong on all fronts. First, the rarity of Tapia's ultimate vascular diagnosis does not negate its duty to "provide adequate medical care" that would have prevented Tapia's injury from rising to the level of acuity that it did. (Dkt. # 31, at 7). Second, although "[a]ffirmative conduct by an employee is not always required to establish *Monell* liability," Tapia has evidenced such conduct by County and NaphCare employees. (*Id.*). Third, the County's argument that Tapia must "show a pattern of similar cases . . . to support the existence of the alleged customs or practices" misstates the law. (Dkt. # 174, at 23); *cf. Webb v. NaphCare Inc.*, No. 21-5761, 2024 WL 4751514, at *5 (W.D. Wash. Nov. 12, 2024) (citing *Hill v. NaphCare, Inc.*, No. 20-410, 2023 WL 6297483, at *6–7 (E.D. Wash. Sept. 27, 2023)); *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1164 (9th Cir. 2018) (citing *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185–86 (9th Cir. 2002)).

The County's motion should be denied.

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 3
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## II.     LAW AND ARGUMENT

### A.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims" and stop them "from going to trial with the attendant unwarranted consumption of public and private resources." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 327 (1986). In resolving a motion for summary judgment, the court considers "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

### B.     QUESTIONS OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM ARISING UNDER 42 U.S.C. § 1983.

#### 1.     *Monell* Standard

A municipality is liable under 42 U.S.C. § 1983 if a policy of the entity "can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). A plaintiff can establish *Monell* liability "by proving that an employee committed [a constitutional] violation pursuant to a formal policy or longstanding practice or custom that constitutes the standard operating procedure of the governmental entity." *Barto v. Miyashiro*, No. 21-56223, 2022 WL 17729410, at *1 (9th Cir. Dec. 16, 2022).

The Ninth Circuit divides Fourteenth Amendment *Monell* claims into two categories: policies of "action" and policies of "inaction." *Hill*, 2023 WL 6297483, at *14. A policy of action is one where the defendant "'itself violate[d] federal law, or direct[ed] an employee to do so.'" *Id.* (quoting *Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020)). A policy of

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

inaction is one that "create[s] a risk that inmates w[ill] have their constitutional rights violated."[3]

*Id.* (citing *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021); *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1077 (9th Cir. 2016)). **Policies of inaction**, such as the failure to train, require a plaintiff to evidence **"deliberate indifference,"** whereas **policies of action do not**.[4]

*Id.*; *see also Caldwell v. City of San Francisco*, No. 12-1892, 2020 WL 7643124, at *13 (N.D. Cal. Dec. 23, 2020).

An "objective standard" applies to the Fourteenth Amendment deliberate indifference test. *Castro*, 833 F.3d at 1076. Under this test, a claim will proceed upon evidence of "constructive notice" that a policy puts inmates at a substantial risk of harm. *Sandoval*, 985 F.3d at 682. In addition to the risk being "obvious" or "substantially certain" to flow from the policy—because what might not be obvious to the layperson may be obvious to a professional[5]—"[d]eliberate indifference may also be shown through **expert testimony** that a practice condoned . . . was contrary to the practice of most [similarly situated professionals] and was particularly dangerous because it presented an unusually high risk that constitutional rights would be violated." *Felciano v. Town of E. Hartford*, No. 18-1932, 2023 WL 4826465, at *11 (D. Conn. July 27, 2023) (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)) (emphasis added); *see also, e.g.*, *Cash v. Cnty. of Erie*, 654 F.3d 324, 338 (2d Cir. 2011); *Weger v. Washington State Dep't of Soc.*

---

[3] Some courts refer to policies of inaction as "policy gaps." *See, e.g.*, *Hendrick v. Bryant*, No. 20-249, 2021 WL 4502159 (N.D. Ill. Sept. 30, 2021).

[4] The County appears to confuse, or conflate, the law regarding the existence of a *Monell* policy with that regarding the deliberate indifference standard. (Dkt. # 173, at 23). As to the former, the Ninth Circuit has held that a "plaintiff cannot prove **the existence** of a municipal policy based **solely** on the occurrence of a single incident of unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) (emphasis added). As to the later, **deliberate indifference** can be "shown through 'a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice.'" *Simms-Belaire v. Washington Cnty.*, No. 20-338, 2024 WL 279020, at *16 (D. Or. Jan. 25, 2024) (quoting *Park*, 952 F.3d at 1142). In other words, both the existence of a *Monell* policy and the deliberate indifference standard can refer to a pattern of similar conduct. But for different reasons. Whereas the former provides evidence that the conduct was not a one-off, the latter is *one* of the ways a plaintiff might show constructive notice.

[5] *See Chavez v. Cady*, 207 F.3d 901, 905 (7th Cir. 2000) ("[I]t can be assumed that what might not be obvious to a lay person might be obvious to a professional acting within her area of expertise.").

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 5
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

*& Health Servs.*, No. 19-5961, 2021 WL 243402, at *5 (W.D. Wash. Jan. 25, 2021). And, of course, as the County points out, **similar incidents** provide actual notice. *See, e.g.*, *Bennett v. Ford,* No. 23-189, 2023 WL 9234933, at *7 (N.D. Fla. Dec. 22, 2023).

### 2. Plaintiff Has Evidenced The Existence Of At Least Six Unconstitutional Policies.[6]

Overwhelming evidence would support a jury's conclusion that the County had at least six policies in place. These policies need not have "received formal approval through . . . official decisionmaking channels." *Monell*, 436 U.S. at 691. Nor must they be written down. *Navarro v. Block*, 72 F.3d 712, 715 (9th Cir. 1995). In fact, the actual policies may contradict written policy; what matters is evidence of the entity's "actual routine practices." *Castro*, 833 F.3d at 1075 n.10.

#### a. The County Maintained A Policy Of Substandard Assessments.

Testimony of County MHPs establishes that they are tasked with the responsibility to determine, based upon an initial assessment, whether "it was a mental health issue or a medical issue" that is causing an inmate's abnormal behavior.[7] An initial "assessment" is an "informal . . . evaluation of how the inmate is doing, essentially," conducted cell-side through the door, where the MHP "speak[s] to them, [and] get[s] to know them, like hey, what's going on. What are you [sic] needs?"[8] Although County MHPs acknowledge that "in order to treat a mental disorder, a patient needs to be diagnosed,"[9] it is not typical that the MHP "diagnoses mental health disorders" with this assessment—only Dr. Miguel Balderrama (the County's Medical Director) or an

---

[6] Because "the government cannot avoid § 1983 liability by contracting out its constitutional duties to a third party," the County is additionally liable for NaphCare's negligence and *Monell* policies, as described in Plaintiff's opposition to NaphCare's Motion for Summary Judgment (Dkt. # 103). *Klodnicki v. Corr. Healthcare Companies, Inc.*, 323 F. Supp. 3d 1199, 1215 (D. Colo. 2018). To the extent that the County submits that Tapia lacks evidence to support a negligence claim against NaphCare, Tapia rests on and fully incorporates herein the argument and evidence proffered in his Response to NaphCare's Motion for Summary Judgment. (Dkt. ## 103-104).
[7] Dreveskracht Decl., Exhibit 2, at 29-30.
[8] Dreveskracht Decl., Exhibit 2, at 40, 42-45; *see also id.*, Exhibit 3, at 26-27.
[9] Dreveskracht Decl., Exhibit 3, at 17-18.

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 6
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Advanced Registered Nurse Practitioner ("ARNP") are responsible for diagnosis, *upon referral*.[10] Without a referral, "there's no one responsible for rendering a diagnosis."[11]

As to ongoing assessments, County MHPs conduct cell-side "basic mental health status" exams of unknown and unspecified criteria, and "treat symptoms" detected vis-à-vis said undefined exams.[12] Although "any of the mental health staff" are "responsible for diagnosing" mental disorders, this generally did not occur because County MHPs "weren't billing insurance" at the time.[13] Only if MHPs "had concerns over something that looked like . . . the patient would benefit from medication" would they "refer" the patient to Dr. Balderrama or an ARNP for an assessment.[14]

The existence of these policies is not in dispute. County MHPs testified about them. And each and every County MHP has testified that their acts and omissions, which reflect these policies, comported with County policy.[15] An employee's "belief" that his conduct was "consistent" with policy is strong evidence supporting *Monell* liability. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013); *see also Hill*, 2023 WL 6297483, at *8 (nursing testimony that that "everything she did relating to [a patient] was pursuant to regular NaphCare customs and practices" deemed sufficient evidence "for the jury to conclude that" actions were taken "pursuant to NaphCare's custom"); *Ross v. Wellpath*, No. 21-1576, (D. Or. Aug. 13, 2024) (Dkt. # 97, at 23-34) (a reasonable juror could conclude that the acts and omissions of its employees were "baked into [the defendant's] policies and practices" where employees "admitted the existence of the[] policies and practices in their depositions"). In addition, upon review of the record evidence, Plaintiff's experts have concluded that, for instance, the County had a policy of "[a]ttempting

---

[10] Dreveskracht Decl., Exhibit 2, at 41, 56; *see also id.*, Exhibit 3, at 16-17 (same).
[11] Dreveskracht Decl., Exhibit 3, at 18.
[12] Dreveskracht Decl., Exhibit 4, at 25, 27-30.
[13] Dreveskracht Decl., Exhibit 4, at 14, 24.
[14] Dreveskracht Decl., Exhibit 4, at 25.
[15] Dreveskracht Decl., Exhibit 2, at 19; *id.*, Exhibit 3, at 14; *id.*, Exhibit 4, at 13.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

assessments through a small window and a food trap on the door of an inmate's cell (a.k.a. 'drive-by' healthcare)." (Dkt. ## 104-8, at 10; 104-26, at 7). Trial courts in the Ninth Circuit frequently hold that expert opinions regarding the existence of a policy "demonstrate that there remain genuine disputes as to material facts with respect to whether" a *Monell* policy exists. *City of San Diego*, 35 F. Supp. 3d at 1245; *see also, e.g.*, *Weger*, 2021 WL 243402, at *5.

> **b.    The County Maintained A Policy Of Using Medically Untrained Guards To Monitor Patients In Need Of Medical Monitoring.**

First, Tapia spent six days during the critical period of his deteriorating condition immediately preceding his amputation—from September 20, 2018, to September 26, 2018—being "moniter[ed] . . . by corrections officers" and had no interaction whatsoever with a medical or mental health provider. (Dkt. ## 104-11, at 7; 104-14, at 18-19; 104-27, at 23). This was not a one-off. It persisted over a period of six days and was employed by both medical and mental health staff.[16] (Dkt. ## 104-14, at 18-19; 104-27, at 23-24).

Second, MHP Nealis testified that "relying on corrections staff to monitor Mr. Tapia . . . is what happens" and that this practice did not violate County policy. (Dkt. # 104-27, at 24). Again, an employee's "belief" that his conduct was "consistent" with policy is strong evidence supporting *Monell* liability. *Gravelet-Blondin*, 728 F.3d at 1097; *Hill*, 2023 WL 6297483, at *8.

Third, Plaintiff's mental health expert has also found that the County regularly used corrections officers "to monitor inmates in mental health housing or inmates who are experiencing a mental health crisis." (Dkt. # 104-5, at 31). This also supports the existence of this policy. *City of San Diego*, 35 F. Supp. 3d at 1245.

---

[16] NaphCare operates similarly in other jurisdictions. *See, e.g.*, *Hill*, 2023 WL 6297483, at *10 (inmates under NaphCare's care "monitored by medically untrained jail guards").

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

2

    **c.**  ***The County Maintained Policies Of Noncommunication Between Mental Health And Medical Providers And A Lack Of Any Oversight.***

3

   First, Tapia's medical record reveals that there were *multiple* breakdowns of

4

communication regarding the provision of care between September 18 and October 1. On

5

September 18, MHP Nealis met with Tapia, who presented as "confused," "unable to verbally

6

respond," and "appear[ed] to be decompensated." (Dkt. # 104-11, at 7). Nothing was done in

7

response. There was no referral or communication to NaphCare. The next day, September 19,

8

Tapia again presented as "confused," "unable to verbally respond," and "decompensated." (*Id.* at

9

6). At this point, MHP Nealis "wasn't sure . . . what was wrong with him" and concluded "that it

10

might be a medical issue." (Dkt. # 104-27, at 15, 21). He supposedly "walked to the nurse's station

11

and made a referral." (*Id.*, at 14-15). The content of this alleged "nurses' station" conversation is

12

unknown and undocumented, and a question of material fact exists as to whether it even took place.

13

(Dkt. ## 104-8, at 6; 104-10, at 17; 104-24, at 6, 28-29, 37; 104-25, at 3). Nonetheless, roughly

14

one hour later, LPN Carrillo took Tapia's blood pressure, which was "hypertensive" (150/98), and

15

did nothing else. (Dkt. ## 104-11, at 7; 104-12, at 4). Because it was not communicated to him,

16

LPN Carrillo had no knowledge that Tapia was "confused," "unable to verbally respond," "way

17

off his baseline," or "decompensated" for the previous two days and therefore was uninformed as

18

to what it was that he was evaluating or what data to gather.[17] (Dkt. ## 104-14, at 12-13, 15-16;

19

104-11, at 7). For the next ten days, Tapia continued to present as "confused," "non-verbal," and

20

"decompensated," none of which was communicated to NaphCare. (Dkt. # 104-11, at 7-8). Then,

21

on November 29, a *corrections officer* requested that NaphCare evaluate Tapia, who, according to

22

---

23

[17] According to LPN Carrillo, an unidentified RN "delegated to [him] to collect the data for them." (Dkt. # 104-14, at 11). LPN Carrillo was not "instructed to collect any specific data," however. (*Id.*). Thus, assuming Tapia was referred to NaphCare "for assessment," Tapia was never medically assessed—LPN Carrillo is "not allowed to . . . do assessments [or] diagnose" under the terms of his licensure. (*Id.*, at 25; Dkt. # 104-11, at 7). Alternatively, LPN Carrillo was relied upon to independently make a medical determination in his assessment of Tapia, which was outside his scope of license. (Dkt. # 103, at 8).

24

25

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 9
(Case No. 2:22-cv-01141-KKE)

          **Galanda Broadman PLLC**
          8606 35th Avenue NE, Ste. L1
          Mailing: P.O. Box 15146
          Seattle, WA 98115
          (206) 557-7509

NaphCare RN Elizabeth Warren, continued to present as nonverbal and, at this point, was malnourished and "smell[ed] of urine." (*Id.* at 6). Prior to this interaction with Tapia, RN Warren did not communicate with any County MHP about Tapia and did not know that he had been nonresponsive and appeared to be decompensated in the preceding days.[18] (Dkt. # 104-21, at 8-9). She knew *nothing* about his ongoing altered mental status. The physician in charge, Dr. Balderrama, had not issued a treatment plan or any instructions regarding the requirements for frequency of contact of assessments for Tapia and, by all accounts, was unaware of Tapia's existence. (Dkt. # 104-21, at 10-13). NaphCare's Health Services Administrator was not "aware of [Tapia] at all." (Dkt. # 104-9, at 12-13).

Second, each County and NaphCare employee who clinically interacted with Tapia testified that their lack of communication regarding Tapia comported with their employer's policy. (Dkt. ## 104-14, at 22; 104-21, at 20; 104-27, at 4).[19] Again, an employee's "belief" that his conduct was "consistent" with policy is strong evidence supporting *Monell* liability. *Gravelet-Blondin*, 728 F.3d at 1097; *Hill*, 2023 WL 6297483, at *8.

Third, Plaintiff's experts have also found evidence of a policy of a "lack of communication between mental health and medical providers" and a "lack of any oversight up the chain on the part of medical providers." (Dkt. # 104-8, at 10); *see also* (Dkt. ## 104-39, at 9; 104-24, at 55). This also supports the existence of a policy. *City of San Diego*, 35 F. Supp. 3d at 1245.

---

[18] In fact, aside from LPN Carrillo's visit on September 19, and despite that Tapia was housed in the mental health unit expressly for increased observation, there is no evidence that any nursing staff communicated with mental health staff about Tapia's decompensating condition or status between the September 19 and September 29 visits. *See* (Dkt. # 104-11, at 6-7) (Tapia's chart notes indicating no communication between mental health and medical staff); (Dkt. # 104-29, at 3-4) (behavioral log describing no communication between correctional or mental health staff and medical staff). Though mental health chart notes are entered into the TechCare system and are viewable by nursing staff, during this time period *nursing staff did not even open his chart*. (Dkt. # 101-32).

[19] *See also* Dreveskracht Decl., Exhibit 4, at 13; *id.*, Exhibit 2, at 19.

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 10
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1
2

       **d.**    *The County Maintained Policies That Classified "Refusals" Of Medical Care, Mental Health Care, And Meals Based On An Inmate's Non-Response.*

3       First, there were *multiple* instances of Tapia's inability to "comply and understand being

4  mistook for refusal." (Dkt. # 104-8, at 7). Between September 18 and October 1, 2018, for instance,

5  Tapia's behavior log indicates that he "verbally refused" *fifteen* meals. (Dkt. ## 104-29, at 3-4;

6  104-7, at 6). But this is because "verbally refused meal" is the only option available on the drop-

7  down menu when an inmate does not come and pick up his meal. (Dkt. # 104-7, at 6-7). A verbal

8  refusal would still be indicated even if, for instance, the inmate was "sitting in bed staring at the

9  wall" and did not "acknowledge [a corrections officer's] presence in any way"—in all likelihood,

10  how Tapia presented.[20] (*Id.*, at 15; Dkt. # 104-8, at 7). On October 1, 2018, to provide one more

11  example, LPN Debra Ricci indicated that Tapia "refused" to have his vital signs taken, but does

12  not recall if he was sleeping or nonverbal during the alleged attempt.[21] MHP Jesus Perez has

13  testified similarly as to his documented "refusal."[22]

14       Second, Plaintiff's experts have also found evidence of a policy that inappropriately

15  classified "an inmate's non-response" to the provision "of medical care, mental health care, and

16  meals" as a deliberate "refusal." (Dkt. # 104-8, at 10); *see also* (Dkt. # 104-39, at 5-6) (same).

17  This also supports the existence of a policy. *City of San Diego*, 35 F. Supp. 3d at 1245.

18
19

       **e.**    *The County Maintained Policies That Did Not Require Medical Or Mental Health Providers To Treat An Inmate's Sudden Altered Mental Status As A Medical Emergency.*

20       First, from September 17 to October 1, Tapia *consistently* presented with an altered mental

21  status. (Dkt. ## 104-11, at 6-8; 104-29, at 3-4). Not once was this treated as a medical emergency.

22
23

---

[20] As discussed in more detail below, by the time that Tapia was hospitalized he presented as "severely malnourished," "dehydrated," and had lost a significant amount of muscle mass. (Dkt. ## 104-26, at 12; 104-16, at 7).
24  [21] Dreveskracht Decl., Exhibit 5, at 17-18; *id.*, Exhibit 6, at 3; *id.*, Exhibit 7.
[22] Dreveskracht Decl., Exhibit 2, at 81-83.

25  PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S MOTION FOR SUMMARY JUDGMENT - 11
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Second, each and every medical and mental health provider that interacted with Tapia has confirmed that their failure to treat Tapia's sudden altered mental status as a medical emergency comported with County policy. *See, e.g.,* (Dkt. ## 104-14, at 22; 104-21, at 16, 20; 104-27, at 4). Again, this is strong evidence supporting *Monell* liability. *Gravelet-Blondin*, 728 F.3d at 1097; *Hill*, 2023 WL 6297483, at *8.

Third, Plaintiff's experts have also found evidence of a policy that did not require "medical or mental health providers to treat an inmate's sudden altered mental status as a medical emergency." (Dkt. # 104-8, at 10). "This is basic medicine" and also supports the existence of a policy or established practice. (*Id.*); *City of San Diego*, 35 F. Supp. 3d at 1245.

### f. The County Maintained A Policy That Failed To Monitor Mentally Ill Inmates.

Inmates on Level 1 Mental Health Housing are required by written County policy to be "seen" at least three times weekly" by an MHP.[23] The national standard, however, requires that inmates in "residential units such as the Level 1 mental health housing" are evaluated *daily* "by mental health staff." (Dkt. ## 104-5, at 30; 104-39, at 7).[24] According to Plaintiff's corrections mental health expert, Dr. Daphne Glindmeyer, the County's written policy presented an "obvious . . . deviation from the standard of care." (Dkt. # 104-5, at 30).

---

[23] Dreveskracht Decl., Exhibit 9, at 2; *see also id.*, Exhibit 4, at 56-57 (Tapia "was housed in level 1").

[24] The County misrepresents that Plaintiff's expert has testified that this policy "is in line with NCCHC standards." (Dkt. # 174, at 22). Her actual testimony indicates the opposite:
> Q. And can you identify any NCCHC standard that specifies a specific number of days, a limit of the number of days between visits?
> A. Actually, I believe there is a standard that talks about if a person is in segregation, they should be seen more frequently than three days a week.
> Q. Can you point me to that requirement?
> A. Sure. . . . Yeah, daily patient evaluation. It is in my report.

(Dkt. # 175-6, at 6). At any rate, even if the County's policies were in line with NCCHC standards, this is only rebuttal evidence that may be presented to a jury, not definitive evidence that would otherwise override expert opinion. *Zikianda v. Cnty. of Albany*, No. 12-1194, 2015 WL 5510956, at *47 (N.D.N.Y. Sept. 15, 2015).

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 12
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

3.    **County Employees And Subcontractors Committed Constitutional Violations While Acting Pursuant To County Policies.**

A *Monell* claim will be sustained so long as "a link between an omission and the policy, custom, or practice" is proven. (Dkt. # 31, at 7). Here, there is an abundance of evidence upon which a reasonable jury could so find.

a.    ***MHP Jesus Perez's First Interaction With Tapia***

The first documented record that something was wrong with Tapia is a September 13, 2018, sick call request where Tapia sought medical care for insomnia.[25] At 1:44 a.m. the next morning, Tapia was "scheduled to see the sick call nurse."[26] Shortly thereafter, MHP Perez—who was responding to NaphCare medical kites because "the system was getting bogged down"—canceled Tapia's appointment without reason and *without assessing or evaluating him*.[27] Further, MHP Perez *failed to communicate* Tapia's medical need to anyone. Tapia's complaint "was not evaluated by medical or mental health staff following this kite." (Dkt. # 104-39, at 3). "[C]ancelling or redirecting medical sick calls was [MHP Perez's] regular practice at that time," and NaphCare "was fully aware of the practice and allowed it." (Dkt. # 104-26, at 5). According to Dr. Glindmeyer, this incident was a result of the County "having a utilization review process that inappropriately delays or denies necessary health care." (Dkt. # 104-5, at 29). MHP Perez's cancelation of Tapia's medical request was "inappropriate" because "nursing must . . . triage and ensure that Mr. Tapia's report of insomnia is not a symptom of another medical condition"—which we now know it was and resulted in his loss of limb. (*Id.*; Dkt. # 104-26, at 5).

The standard of care requires that upon request, a "patient is seen by a qualified health care professional, is rendered a clinical judgment, and receives care that is ordered." (Dkt. # 104-5, at

---

[25] Dreveskracht Decl., Exhibit 8. The County does not address this evidence at all.
[26] Dreveskracht Decl., Exhibit 8.
[27] Dreveskracht Decl., Exhibit 1; *id.*, Exhibit 2, at 59-60, 69.; *id.*, Exhibit 4, at 34.

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 13
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

29). MHP Perez's interaction with Tapia fell below that standard, substantially contributing to his eventual loss of limb. (*Id.*, at 29, 33); *see also* (Dkt. # 104-26, at 5) (same); (Dkt. 104-24, at 51-52) (discussing County "customs" that result in "barriers to accessing health care").

**b.    MHP Darren Nealis' First And Second Interactions With Tapia**

Notes of MHP Nealis' first and second documented interactions with Tapia read as follows:

> Darren Nealis MHP POSTED ON 9/18/2018 4:48:10 PM CDT                Type: SOCIAL WORKER
>
> **TAPIA, JAVIER AMADO 1011290 (2018167002)**
>
>                                                                     NAPHCARE 000224
>
> Assessment: Case 2:22-cv-01141-KKE   Document 104-11   Filed 05/24/24   Page 8 of 17
> Met with I/M at about 1100 for initial assessment in response to C/D report. He came to the door and was cooperative during the interview, but appears to be confused and was unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time. His UA was positive for Methamphetamins when he booked in on 6/16/18.
>
> Plan:
> S/P: Recommend continued level 1 MH housing at this time for further assessment, MH will f/u.
> R/P: Deferred.
>
> Darren Nealis MHP POSTED ON 9/19/2018 5:36:46 PM CDT                Type: SOCIAL WORKER
>
> Assessment:
> Met with I/M at about 1045 for initial assessment in response to C/D report. He presented again today as confused. I/M was again unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time. Officers report that he appears to be "way off his baseline," and he was nonverbal in court today as well. He could have an unknown medical condition.
>
> S/P: Referred to medical for assessment. Recommend continued level 1 MH housing at this time for further assessment, MH will f/u. Referred to medical department for assessment.
> R/P: Deferred.

A few things are notable about these interactions. First, a "cursor[y] visit[] with Mr. Tapia through a closed door or the porthole in the cell door" is not an appropriate mental health assessment and falls below the standard of care. (Dkt. ## 104-39, at 3; 104-5, at 31-32). Second, Tapia's mental status change was a medical emergency that required an "emergency medical assessment," which did not happen.[28] (Dkt. # 104-5, at 32). Third, despite the fact that MHP Nealis

---

[28] *See also* (Dkt. # 104-13, at 15) ("Patients who are confused, unable to verbally respond, and are decompensated need a thorough nursing and/or medical assessment, and/or evaluation at a higher level of care facility in a Hospital Emergency Department."); (Dkt. # 104-8, at 5) (same). Again, even NaphCare supervisors agree. (Dkt. # 104-9, at 22-23).

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

"couldn't figure out what was wrong" with Tapia over a two-day timespan, and although he thought it "might be a medical issue," MHP Nealis did not refer Tapia to Dr. Balderrama or an ARNP for diagnosis or communicate regarding his serious condition.[29] In fact, not only did MHP Nealis fail to communicate Tapia's issues to any "higher-up" at the County (or NaphCare), he didn't even communicate with his own colleagues.[30] Nor did MHP Nealis generate a stabilization plan that identified the mental health needs of Tapia, the measures taken to meet those needs, or when a follow-up assessment by mental health staff should occur.[31] All of which fell below the standard of care and contributed to Tapia's loss of limb. *See generally* (Dkt. ## 104-5; 104-8; 104-13; 104-17; 104-25; 104-26; 104-39). In addition, MHP Nealis committed model deliberate indifference by "disregard[ing] known or obvious risks" to Tapia's health. *Dawson v. S. Corr. Entity*, No. 19-1987, 2021 WL 4244202, at *5 (W.D. Wash. Sept. 17, 2021).

The County hangs its hat on the fact that Tapia "did not notify [MHP Nealis] that he was in pain or that he needed medical attention" during this interaction. (Dkt. # 174, at 2). This is a red herring. As noted by Dr. Glindmeyer:

> In my opinion, Mr. Tapias symptoms as reported by mental health including confusion, decompensation, being non-verbal, and having decreased interaction overall, is descriptive of an individual experiencing an acute mental status change. Given these symptoms, the serious medical condition, and the isolation that Mr. Tapia was experiencing at that time, it is my opinion that these symptoms were related to a delirium rather than simply an unwillingness to speak. Were Mr. Tapia simply unwilling to speak, he would not have been described as confused and decompensated. Further, as noted in my rebuttal comments above, mental health staff did not perform an adequate assessment of Mr. Tapia, so they would not have known if Mr. Tapia had the ability to engage verbally.
>
> Mr. Tapia did not refuse to participate in assessments, rather the assessments did not occur. Based on the mental health documentation that described Mr. Tapia as "confused," "decompensated," and "way off his baseline," it is not possible to determine that Mr. Tapia was "minimally participatory" in any way.

---

[29] Dreveskracht Decl., Exhibit 3, at 30-31, 45-46.
[30] Dreveskracht Decl., Exhibit 3, at 45-46.
[31] *Cf.* Dreveskracht Decl., Exhibit 9.

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 15
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   (Dkt. # 104-39, at 4-5).[32]

2           *c.*    **MHP Duane Prather's Interaction With Tapia**

3           MHP Prather contacted Tapia on September 19, 2018, at roughly 10:45 a.m. (Dkt. # 101-

4   22, at 4). Per MHP Prather's notes, for the fourth day in a row, Tapia presented with an altered

5   mental status. He did "not respond in any way" to MHP Prather; "he just stared." (*Id.*). MHP

6   Prather did nothing in response. "[D]oing nothing in response to knowledge of harm is an

7   unreasonable response evincing deliberate indifference." *Encinias v. New Mexico Corr. Dep't*, 659

8   F. Supp. 3d 1227, 1242 (D.N.M. 2023), *aff'd*, No. 23-2052, 2024 WL 4380477 (10th Cir. Oct. 3,

9   2024). Again, MHP Prather has testified that all of his acts and omissions in regard to Tapia

10  comported with "County policies."[33]

11          Like with MHP Nealis, the County hangs its hat on the fact that Tapia "did not notify [MHP

12  Prather] that he was in pain or that he needed medical attention" during this interaction. (Dkt. #

13  174, at 2). But this red herring is no excuse. As described above, any reasonable MHP would have

14  known that sudden altered mental status is a medical emergency and carries a significant risk of

15  harm. *See* (Dkt. ## 104-8, at 10; 104-39, at 3–5, 8; 175-9, at 9)

16          *d.*    **MHP Perez's Second Interaction With Tapia**

17          MHP Perez's second documented interaction with Tapia took place on September 28,

18  2018. (Dkt. # 104-11, at 7). At the time of this interaction, MHP Perez had reviewed Tapia's

19  medical chart and was aware that "something mentally [went] wrong with Mr. Tapia on September

20  17th," causing him to present as "nonverbal" and that from September 17 to September 28 Tapia

21

22

23  [32] That in her deposition Dr. Glindmeyer "could not say to a reasonable degree of medical certainty if the delirium
    was related to DVT of PCD specifically" is also a red herring. (Dkt. # 174, at 5). Dr. Glindmeyer is a psychiatrist, not
    a vascular surgeon. (Dkt. # 104-5, at 36). As described in more detail below, Dr. Juan Jimenez, who is a vascular
24  surgeon, has opined that Tapia's "PCD and related systemic manifestations . . . were the cause of [Tapia's] acute
    mental status changes." (Dkt. # 104-17, at 7).
    [33] Dreveskracht Decl., Exhibit 4, at 13.

25  PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S          **Galanda Broadman PLLC**
    MOTION FOR SUMMARY JUDGMENT - 16                               8606 35th Avenue NE, Ste. L1
    (Case No. 2:22-cv-01141-KKE)                                   Mailing: P.O. Box 15146
                                                                   Seattle, WA 98115
                                                                   (206) 557-7509

1  "continued to be nonverbal and nonresponsive, started not eating."[34] It was obvious to MHP Perez

2  that Tapia was experiencing "some kind of mental health crisis" and "was in need of some sort of

3  intervention."[35] MHP Perez did not, however, refer or communicate any of this to medical staff,

4  Dr. Balderrama, or an ARNP.[36] When asked, "Why not?" MHP Perez answered, "I don't know."[37]

5  In MHP Perez's opinion, Tapia's mental health presentation was "clearly connected" to his

6  medical condition.[38] Again, according to MHP Perez, his acts and omissions in regard to Tapia—

7  including canceling Tapia's September 14 appointment (discussed above) and not communicating

8  with medical providers—comported with the "County's established practices." [39] Prior to

9  September 2018, "the only training that [MHP Perez was] provided was an orientation, domestic

10  violence policy, and security awareness training."[40] He "never realized" that the "S/P" blank in

11  NaphCare's electronic medical system "stood for stabilization plan"—a key way that, in theory, a

12  patient's needs and history would have been communicated between Jail, medical, and mental

13  health staff.[41]

14      Like with the other MHPs, the County hangs its hat on the fact that Tapia "did not notify

15  [MHP Prather] that he was in pain or that he needed medical attention" during this interaction.

16  (Dkt. # 174, at 2). But, again, this red herring is no excuse. (Dkt. # 104-39, at 4-5). MHP Prather

17  committed definitive deliberate indifference by "disregard[ing] known or obvious risks" to Tapia's

18  health. *Dawson*, 2021 WL 4244202, at *5.

19      *e.*    ***MHP Nealis' Third Interaction With Tapia***

20      At 10:15 a.m. on October 1, 2018, MHP Nealis entered the following into Tapia's chart:

21

22  [34] Dreveskracht Decl., Exhibit 2, at 76-77, 80-81.
    [35] Dreveskracht Decl., Exhibit 2, at 85-86.
    [36] Dreveskracht Decl., Exhibit 2, at 57, 86, 93.
23  [37] Dreveskracht Decl., Exhibit 2, at 86.
    [38] Dreveskracht Decl., Exhibit 2, at 89.
24  [39] Dreveskracht Decl., Exhibit 2, at 19, 94, 100.
    [40] Dreveskracht Decl., Exhibit 2, at 96.
    [41] Dreveskracht Decl., Exhibit 2, at 37; *id.*, Exhibits 9-10.
25  PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
    MOTION FOR SUMMARY JUDGMENT - 17
    (Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

"He presented again today as confused and non-verbal, but was also calm and cooperating with medical staff. Recommend continued level 1 MH housing at this time for further assessment, MH will f/u." (Dkt. # 104-30, at 2; Dkt # 101-22, at 3). At the time, Tapia's toes were "turning black," and his left foot was "swollen and severely discolored"—as was observed by a *corrections officer* (i.e., someone not responsible for assessments) less than *one minute* after MHP Nealis' supposed interaction with Tapia. (Dkt. # 104-11, at 6; Dkt. # 104-30, at 2). No referrals were made; nothing was communicated to medical staff, corrections staff, or co-workers; no actual assessment was attempted.

> [O]nce persons are incarcerated, they can no longer see to their own medical needs. In these circumstances, the state, which incarcerated them and limited their ability to seek care for themselves, stands in a unique relation that requires it to provide necessary medical care and protect against serious medical risks.

*Disability Rts. Montana v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019). Here, Tapia was not protected against serious medical risks—he lost his leg and nearly lost his life. In addition to the deliberate indifference perpetuated by MHP Nealis' failure to assess or refer Tapia in the previous instances, evidence suggests that by October 1, MHP Nealis knew, by simply looking at him, that Tapia was in serious medical need but "completely ignored" it. *Singleton v. Lopez*, 577 F. App'x 733, 736 (9th Cir. 2014).

### 4.    The Acts And Omissions Of County Employees Caused Tapia's Loss Of Limb.

According to Dr. Jimenez, the "mental status change" that County employees were responding to was caused by PCD—a blood clot in his groin—"and related systemic manifestations." (Dkt. # 104-17, at 7). The timing of the onset of Tapia's mental status change confirms this. His medical record from Tacoma General corroborates that the systemic manifestations of PCD "occurred likely weeks" prior to October 1. (Dkt. # 104-19, at 4). And, as Dr. Jimenez opines:

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

> [T]he initial deep venous thrombosis which led to the patient's PCD appears to have been present for approximately 2-4 weeks prior to the date of his transfer to the hospital on 10/1/2018. This delay in diagnosis was a significant contributing factor which led to Mr. Tapia's left lower leg amputation. More likely than not, had the patient's acute deep venous thrombosis been diagnosed earlier and treated with systemic anticoagulation, progression to PCD and limb loss would have been avoided.

(Dkt. # 104-17, at 7). Again, at a bare minimum, Tapia should have been "immediately sent for an assessment by a Registered Nurse or a Medical Healthcare Provider, or for an evaluation at a higher level of care facility in a Hospital Emergency Department." (Dkt. # 104-13, at 16). This would have included a "a comprehensive head-to-toe assessment, and neurological assessment" that can only be conducted by an RN or higher-credentialed provider. (*Id.*). Had an appropriate assessment occurred, "medical treatment and limb saving interventions could have been given." (*Id.*, at 20).

The County's arguments to the contrary are misleading, unfounded, and ignore that (at the least) conflicting expert opinion creates a genuine issue of material fact. Throughout its briefing, the County contends that Tapia's PCD was so "extremely rare" that it could not have foreseen its occurrence and, therefore, had no reason to address it as a matter of policy. (Dkt. # 174, at 3). But this argument again "misses the mark." (Dkt. No. 31, at 7). "[A]n inmate's sudden altered mental status is a medical emergency. This is basic medicine." (Dkt. # 104-8, at 10); *see also* (Dkt. # 175-9, at 9) ("[A]nybody that has an acute mental status change . . a medical provider has the obligation to rule out a physical or organic or medical cause."). Because of County policies, however, this serious medical condition was never *appropriately evaluated or treated*. "[R]easonable measures to abate the risk" created by Tapia's symptoms were not taken. *Maney v. Oregon*, 729 F. Supp. 3d 1087, 1137 (D. Or. 2024) (emphasis in original). Had they been, Taipa's underlying vascular condition would have been detected earlier, when it was treatable, and his loss of limb would not

have occurred.[42] (Dkt. # 104-17, at 7).

### 5.    Deliberate Indifference

Tapia has presented evidence of six mutually enforcing County policies that caused his constitutional injury. Citing to *Connick v. Thompson*, 563 U.S. 51 (2011)—an inapplicable failure to train case—the County submits that Tapia must also evidence "other incidents that led to a similar constitutional violation." (Dkt. # 174, at 23). This is wrong. Where "municipal action *itself* violates federal law, or directs an employee to do so," resolving the issue of fault "is straightforward." *Bd. Of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *see also Hill*, 2023 WL 6297483, at *13 ("'[D]eliberate indifference' is not a stand-alone element required in every *Monell* case."). In such cases, "once a municipal policy is established, it requires only one application to satisfy fully *Monell*'s requirement." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 n.6 (1986). In contrast, specific prior incidents are helpful "where the policy relied upon is *not* itself unconstitutional." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality; emphasis added).

Here, the bulk of the County's policies fall into the former category—i.e., they do not involve "a failure to train or act." *Hill*, 2023 WL 6297483, at *13. Conducting substandard assessments, using medically untrained corrections officers to monitor patients in need of medical monitoring, a lack of communication between medical and mental health providers, classifying non-responses as "refusals," and not monitoring mentally ill inmates directly creates a "substantial risk of suffering serious harm" that itself violates the Fourteenth Amendment. *Sandoval*, 985 F.3d at 670. These are policies of "action," *Tsao v. Desert Palace*, 698 F.3d 1128, 1141 (9th Cir. 2012), and because they "directly require unconstitutional conduct," *Sandoval*, 985 F.3d at 682 n.17, the

---

[42] The County's suggestion that "Tapia's injuries were caused by his own . . . genetic predisposition" is absurd. (Dkt. # 174, at 25). A "jury cannot engage in such 'it would not have happened to a normal person'" speculation. *Chong v. STL Int'l*, No. 14-244, 2016 WL 4253959, at *9 (D. Or. Aug. 10, 2016).

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 20
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

County "itself violate[d] federal law, or direct[ed] an employee to do so" by maintaining them. *Park*, 952 F.3d at 1141. In other words, the County's customs violate inmates' care with certainty—patients who need a specific level of medical care are denied it. Patients who need standard medical assessments are denied them; patients who need medical monitoring are not medically monitored. These policies themselves are unconstitutional, and a "series of constitutional violations" is unnecessary. *Turbin v. Cnty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000); *see also Wallis v. Spencer*, 202 F.3d 1126, 1133-34, 1142-43 (9th Cir. 2000).

At any rate, "similar incidents" are only one way to show "'obviousness or constructive notice.'" *Castro*, 833 F.3d at 1076 (quoting *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)). The risk of unconstitutional delays or denials of medical care was sufficiently obvious here. A "sudden altered mental status as a medical emergency. This is basic medicine." (Dkt. # 104-8, at 10). A reasonable juror could thus conclude that, for instance, any policy that did not require medical and mental health providers to treat an inmate's sudden altered mental status as a medical emergency would obviously create an increased risk of unconstitutional delays or denials of medical care.[43] Trial courts frequently find that these are precisely the types of questions more appropriately suited for a jury. *See, e.g.*, *Ferreira v. Arpaio*, No. 15-1845, 2017 WL 6554674, at *10 (D. Ariz. Dec. 22, 2017); *Franklin v. McDonnell*, No. 16-1192, 2017 WL 10513557, at *4 (C.D. Cal. Oct. 26, 2017); *Stover v. Corr. Corp. of Am.*, No. 12-393, 2015 WL 874288, at *9 (D. Idaho Feb. 27, 2015). Likewise, the fact that many of the County's policies were contrary to national standards—national standards the County contractually required NaphCare to comply with—evidences obviousness and/or constructive knowledge. (Dkt. ## 104-5, at 29-31; 104-26, at 5; 117-17, at 11); *see, e.g.,*

---

[43] While the County pays lip service to the obviousness form of constructive notice, it bungles the application. "The 'rare' case of Tapia's development of PCD" is not relevant. (Dkt. # 174 at 24). The constitutional violation here arises when officials "deny" or "delay" needed medical treatment, making the relevant inquiry whether the County was on constructive notice that its policies would result in the denial or delay of Tapia's medical care, not whether they would result in PCD. *Sandoval*, 985 F.3d at 679 (cleaned up).

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 21
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

*M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1085 (N.D. Cal. 2014). Finally, Tapia's experts have opined that the risk of harm posed by these policies would have been "obvious." (Dkt. ## 104-13, at 15, 17; 104-5, at 30; 104-8, at 9-10; 104-26, at 5); *see, e.g., Weger*, 2021 WL 243402.

**B.   QUESTIONS OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S NEGLIGENCE CLAIMS.**

**1.    Applicable Standards**

"Negligence requires proof of four elements: (1) the existence of a duty to the person alleging negligence, (2) breach of that duty, (3) resulting injury, and (4) proximate cause between the breach and the injury." *Nguyen v. City of Seattle*, 317 P.3d 518 (Wash. App. 2014).

Generally, municipalities owe the same duties as private parties. RCW 4.96.010. The provision of care in Washington's jails, however, is unique in that our state "undertakes [a] heightened duty to ensure the health of incarcerated individuals" not recognized in many other jurisdictions. *Matter of Williams*, 496 P.3d 289, 299 (Wash. 2021). It is because of this "special relationship" that the provision of in-custody healthcare in our state includes a "'duty of care to protect the plaintiff from foreseeable harm,' which borders on strict liability." *Turner v. Washington State Dep't of Soc. & Health Servs.*, 493 P.3d 117, 126 (Wash. 2021) (quoting *H.B.H. v. State*, 429 P.3d 484, 492 (Wash. 2018)).

**2.    The County Was Negligent And Grossly Negligent.**

Because "one could reasonably infer deliberate indifference" from the evidence submitted above, "it follows that one could also infer gross negligence from the same allegations." *Spencer v. Beard*, No. 08-1166, 2010 WL 2545648, at *8 (W.D. Pa. May 13, 2010) (citing *Wolfe v. Horn*, 130 F. Supp. 2d 648, 659 (E.D. Pa. 2001)). Thus, the Court need not even analyze the issue. *Nelson v. Prison Health Servs.*, 991 F. Supp. 1452, 1466 (M.D. Fla. 1997). However, were the Court to do so, summary judgment must be denied.

First, the County submits that "[t]here is not sufficient evidence of a failure to train." (Dkt.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

# 174, at 9). But there is. The County's official policy requires that a "stabilization plan" be generated in the electronic medical records system for all inmates assigned to mental health housing after initial contact.[44] The stabilization plan must identify "the mental health needs of the inmate and measures taken by the mental health staff to meet those needs" and indicate "when a follow-up assessment by mental health staff should occur."[45] In practice, however, County MHPs "would just kind of formulate a plan verbally in [the] morning meetings . . . so everybody kind of has their take on what's going on with them" without entering anything substantive in the inmate's medical records to communicate with subsequent providers.[46] This is because *none of the MHPs that interacted with Tapia even knew what a "stabilization plan" was*.[47] Numerous courts in the Ninth Circuit and beyond have found that this is the precise type of evidence that allows a failure to train claim to proceed to trial. *See, e.g., Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1076 (S.D. Cal. 2023) (triable issue where employee/medical provider "did not know [w]hat the County's policies required"); *Simpson v. Colbert*, No. 21-0479, 2024 WL 3887393, at *4 (D.D.C. Aug. 21, 2024) (same).

Second, the County argues that there is "ample evidence of effective communication between" County mental health and contracted medical staff. (Dkt. # 174, at 10). But the County falsely equates a few instances of communication (some which are disputed) with effective communication necessary to provide constitutionally adequate medical care. As discussed above, Tapia has adduced evidence, including expert opinion (including causation opinion), that demonstrates otherwise. (Dkt. ## 104-8, at 6-7, 10; 104-24, at 54-55; 104-39, at 9).

Third, the County contends that "even assuming" a mental health provider "was negligent

---

[44] Dreveskracht Decl., Exhibits 9, 10.
[45] Dreveskracht Decl., Exhibits 9, 10.
[46] Dreveskracht Decl., Exhibit 2, at 33-34.
[47] Dreveskracht Decl., Exhibit 3, at 23; *see also id.*, Exhibit 2, at 31-37. "[F]or all intents and purposes, ignoring a policy is the same as having no policy in place in the first place." *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 929 (7th Cir. 2004)

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 23
(Case No. 2:22-cv-01141-KKE)

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  during a mental health assessment"—as discussed above and supported by expert opinion, they

2  were—"it did not cause Tapia's amputation." (Dkt. # 174, at 14). As discussed above, though,

3  causation is a jury question. (Dkt. ## 104-19, at 4; 104-17, at 7; 104-13, at 20).

### III.    CONCLUSION

5      In light of the above, Plaintiff respectfully requests that Pierce County's Motion for

6  Summary Judgment be DENIED.

7      DATED this 16th day of December, 2024.

8                                                              GALANDA BROADMAN, PLLC

9                                                              *s/ Ryan D. Dreveskracht*
                                                               Ryan D. Dreveskracht, WSBA #42593
10  | I certify that this memorandum        *s/ Corinne Sebren*
    | contains 7,949 words, in              Corinne Sebren, WSBA #58777
11  | compliance with the Local Civil       8606 35th Avenue NE, Suite L1
    | Rules.                                P.O. Box 15146
12                                                              Seattle, WA 98115
                                                               Phone: (206) 557-7509
13                                                              Fax: (206) 299-7690
                                                               ryan@galandabroadman.com
14                                                              corinne@galandabroadman.com
                                                               Attorneys for Plaintiff

PLAINTIFF'S RESPONSE IN OPPOSITION TO PIERCE COUNTY'S
MOTION FOR SUMMARY JUDGMENT - 24
(Case No. 2:22-cv-01141-KKE)

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509