# EXHIBIT 2

# Deposition of Jesus Tono Perez

# Tapia v. Naphcare, Inc., et al.

# September 14, 2023



**206.287.9066  |  800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 19

1    desk I get -- get to work.  And so typically, there's a

2    list of people that she needs me to see.  And there will

3    be some kites in the -- that paperwork that -- that

4    needs to be checked in with.

5        Q.  And did -- do you know, does Pierce County

6    require you to comply with its written policies and

7    established practices?

8        A.  Oh, yes, absolutely.

9        Q.  And in your action -- interactions with -- with

10   Mr. Tapia, did you -- your acts and omissions comport

11   with Pierce County's policies and established policies?

12            MS. COWGER:  Object to the form of the

13   question.

14            MR. DEAN:  Same.

15       Q.  You can go ahead.

16            MS. COWGER:  You can go ahead and answer if

17   they didn't get your answer on the record.

18       A.  Yes.

19       Q.  Okay.  And obviously, the reason that you're

20   here, we're here today to talk about Mr. Tapia.  But I'd

21   first like to -- to get to know a little bit about

22   things -- how things operated there in the jail in

23   general in the fall of 2018.  All right?

24       A.  Right.

25       Q.  Okay.  So I'm going to be sharing my screen

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 20

1   with you.  Give me one sec.

2          All right.  You should be seeing what's been

3   premarked Exhibit 3.  Are you familiar with this

4   document?

5          A.  I've never seen this.

6          Q.  Yeah, I don't know why you would.  But I'm

7   going to go down to page 11 -- or excuse me.  All right.

8   Be page 14 of this document.  And this is a contract

9   between Pierce County and NaphCare.  And there's a

10  portion here titled County Responsibilities, and I'm

11  just bringing this up for reference.  I'm going to give

12  us a sort of reference point to talk about.  If you

13  could read the highlighted portions there B through D,

14  and let me when you're done.  Okay?

15         A.  Sure.

16             (Witness reviewing exhibit.)

17         A.  Yes.  Yep, I read it.

18         Q.  Okay.  Great.  So under subsection B there, it

19  requires that the county have seven mental health

20  professionals, one mental health manager, one office

21  assistant, and one full-time mental health prescribe,

22  which I think is probably a typo.  But let me ask you:

23  You -- do you recall back in the fall of 2018 who the

24  mental health manager was, if there was one?

25         A.  Oh, yeah.  I -- oh, Lord.  It was probably

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                          Jesus Tono Perez

Page 21

1  Janet Roton (phonetic).  And if it wasn't her, it would

2  have been -- 2018.  Oh, Lord.  Yeah, Janet Roton.  I

3  believe it was Janet Roton.

4      Q.  Okay.  And you -- do you know what -- what her

5  credentials were?

6      A.  It was probably family and -- she was a

7  licensed family therapist, if I remember correctly.

8      Q.  Okay.

9      A.  LFHF or something like that.

10     Q.  Okay.  And do you recall -- I'm just going to

11 assume that when it says full-time mental health

12 prescribe, it meant to say prescriber.  Do you know back

13 in the fall of 2018 who the mental health prescriber

14 was, if there was one?

15     A.  Oh, gosh.  In 2018, yeah.  We usually had

16 prescribers, several -- several throughout the year.  So

17 I can't recall exactly who.  I remember Jennifer -- I

18 can't remember her last name.  I remember Jennifer.  Who

19 else?  There was a -- there was a man, I can't recall

20 his name.  And then -- and there was another woman that

21 I can't recall her name, so I'm not sure who was there

22 in 2018.

23     Q.  A woman named Jennifer, another woman, and

24 another man?

25     A.  Yeah.  There was the three that I can recall.

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 22

1        Q.  Fair enough.  It was -- it was quite awhile

2    ago.

3        A.  Right.

4        Q.  And do you know what those individuals'

5    credentials were?

6        A.  They would have been ARNPs.

7        Q.  Okay.  And then going to C. there, it says:

8    "Perform initial screenings on inmates and refer any to

9    medical if it's determined that the inmate requires

10   medical attention."  Who is -- who is "medical"?  Do you

11   know who that's referring to?

12       A.  Yeah.  That would have been the clinic, the --

13   the -- all the nursing staff.

14       Q.  And were the -- to your knowledge, would those

15   all have been NaphCare employees?

16       A.  Yes.

17       Q.  And as a mental health professional, you were

18   not considered medical staff, were you?

19       A.  No.

20       Q.  And at any point were you -- did you work under

21   or were you supervised by NaphCare?

22       A.  No.

23       Q.  And we spoke before about the -- the mental

24   health manager.  Was that your only supervisor there at

25   the jail?

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 23

1    A.  Yes.

2    Q.  Okay.  Did you report to anyone else?

3    A.  No.

4    Q.  All right.  Like I said, this subsection here

5  refers to a referral to -- to medical.  Can you walk me

6  through that process?  How would a referral to medical

7  typically work?

8    A.  So I would write my -- my note, my NaphCare

9  note, I would --

10                  (Cross-talking.)

11    Q.  Sorry.  Would that have been in the -- in the

12  NaphCare's electronic medical record system?

13    A.  Yes, yes.

14    Q.  Okay.

15    A.  So I'd write my note in there, print it out,

16  and they have a little box there right on the -- on the

17  wall where I could put -- put a NaphCare note in.  I

18  rarely did that because we had such a good relationship

19  with -- with the NaphCare employees that when I'm

20  walking to my office, I walk through by -- right in

21  front of their desk area, so there's multiple nurses

22  right there that I can just basically say, hey -- and we

23  all know each other, so we could communicate like that

24  verbally, just say, hey, how's this guy doing?  Has he

25  been talking to you?  What's -- what's been going on

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 26

1     A.  Yes, yes.

2     Q.  And what type of training, if any, did you

3  receive on how to use NaphCare's EMR system?

4     A.  When you first -- when you first start, I mean,

5  you basically have a -- someone who's training you,

6  usually the program manager.  But sometimes the other

7  staff, they're so tech savvy and they're so good at that

8  type of stuff that they end up being the trainers, so we

9  basically just all work as a team and get to the know

10  the system.  But it's a pretty -- pretty -- I don't want

11  to say simple system, but it's very simple to use, you

12  just -- you know, you write a note, you upload it, and I

13  can see all the doctors' notes, I can see all the

14  nurses' notes, everybody could see all their write-ups,

15  so it's a -- it's a really good way of communicating.

16     Q.  All right.  And were you trained on what types

17  of interactions to log and where to log them?

18     A.  Yes.

19     Q.  Okay.  And I want to talk now about refusal --

20  refusals specifically.  What about assessment referrals,

21  I assume inmates do sometimes refuse assessments?

22     A.  Yes, yes.

23     Q.  And was there a place to log refusals in

24  NaphCare's EMR system?

25     A.  Yeah.  The same -- the same -- yeah, with the

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                        Jesus Tono Perez

Page 27

1   same NaphCare notes, yeah.

2       Q.  So there was a note section where you would --

3   you would mark that?

4       A.  Yeah.  The same note section, yes.

5       Q.  And I know that some facilities require a

6   refusal form or something like that if assessments are

7   refused where the patient has to sign that he or she is

8   refusing or if they refuse to sign, a supervisor then

9   signs.  Did Pierce County have any system like that in

10  place in the fall of 2018?

11      A.  Oh, not that I know of.  I don't recall us

12  having to do anything specific like that.  I know

13  NaphCare does when the -- when the people come into

14  booking, I've seen their writing where they say inmates

15  refusing to sign, refusing to -- to engage in

16  assessment, stuff -- something along that lines.  But me

17  as a Pierce County employee, I don't -- I don't have

18  anything like that, I just write it in the -- well, I

19  mean, I can communicate that, basically, I'll

20  communicate that through our system.

21      Q.  Okay.  So essentially, then, if an inmate

22  refused an ordered assessment, you would mark that in --

23  in the chart notes, and then you would move on to the

24  next patient; is that fair to say?

25      A.  Yeah, basically.

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 28

1    Q.  And was there a -- a policy where you're
2    supposed to circle back again and try new a assessment
3    again within a certain amount of time?
4    A.  Yeah, yeah.  Because the person -- if the
5    person's not communicating and not engaging in -- in an
6    assessment, then we keep them in the mental health unit,
7    for example.  They're going to stay -- they're not going
8    to leave until we get eyes on them, they communicate to
9    us, and that we -- we see that they're okay, basically.
10   So they'll stay there until I move them, until I clear
11   them to be moved.
12   Q.  Okay.  And were there -- was there a specific
13   amount of time that you were supposed to circle back
14   and -- and assess them -- try to asses them again?
15   A.  It probably would have been a couple of days.
16   So if I saw somebody on Monday and they weren't
17   cooperating, I probably would have got back to them on
18   Wednesday.
19   Q.  Okay.  Gotcha.  Move on to the next exhibit
20   here.  All right.  You should be seeing now what's been
21   premarked as Exhibit 10.  Are you familiar with this
22   policy?
23   A.  Yes.
24   Q.  And can you describe to me what it is?
25   A.  Let's see.  Okay, yeah.  So it's the policy

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 29

1    pertaining to our -- to our mental health units.

2        Q.  Okay.  Right.  So this -- this question may

3    seem dumb, but I'm going to -- I'm going to come at it

4    with I have no knowledge of how the system works there.

5    So this refers to mental health housing.  What is mental

6    health housing?

7        A.  So our mental health units are basically

8    specific units where people who are -- are mentally ill

9    will go.  Or for example, when people first come in,

10   they may be coming off of drugs, but we don't know that,

11   we don't know what's going with them.  So somebody who

12   doesn't have mental health problems but is -- has some

13   kind of -- is detoxing, they're going to end up in our

14   mental health unit just out of an abundance of caution.

15   Like, we don't know what's going on with this person, so

16   they're just going to be housed in our mental health

17   unit.  And then that's when I come around and figure out

18   who's -- who's truly mentally ill or who's just, you

19   know, detoxing or just a behavioral problem, basically.

20       Q.  Okay.  So it would essentially be up to you to

21   determine whether or not it was a mental health issue or

22   a medical issue; is that fair to say?

23       A.  Yeah --

24           MS. COWGER:  Object to the form of the

25   question.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 30

1        A.    Yeah.   The medical part is the one that threw
2   me off.   But definitely mental health.   You know,
3   we're -- we're assessing for mental health risks, and if
4   I have some kind of medical concern, then I -- then I go
5   to the clinic.
6        Q.    Right, right.   So you're there to assess --
7   so -- and again, this is just in general, and I'm coming
8   at it from -- with no knowledge base.   But it sounds
9   like if there's any -- any indiction that an inmate
10  is -- is mentally ill or is exhibiting signs and
11  symptoms of mental illness, then they're transferred to
12  the mental health housing, and then they would see you
13  and you would make a determination as to whether or not
14  it was, indeed, a mental health issue or whether it may
15  be a medical issue, then you would make a referral to
16  medical.   Is that fair to say?
17       A.    Yes.
18       Q.    Okay.   And then they wouldn't come off of
19  mental health housing unless it was -- it was cleared by
20  you to not be a mental health issue; is that correct?
21       A.    Yes.
22       Q.    Okay.   So moving on to this -- what's been
23  premarked Exhibit 10, there's -- on the second page
24  here, there's a couple of references to stabilization
25  plan.   Do you see that?

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                          Jesus Tono Perez

Page 31

1      A.   Yes.

2      Q.   And what -- what is that?

3      A.   Let me see here.

4      Q.   Just in general, can you tell me was a

5   stabilization plan is?

6      A.   Yeah.  So -- so basically, as -- as we're

7   meeting with the individuals and assessing and seeing

8   how they're doing, as they start clearing off of drugs

9   or they start getting -- getting better, they'll --

10  they'll communicate with us and let us know, hey, I'm

11  ready to move, I'm ready to get out of here, it's --

12  it's -- I need to be around people, I want to be able to

13  talk to people.  So once they start having a real

14  conversation with you, you can basically observe that,

15  okay, they're doing a lot better, I'm actually having

16  conversations with these people.  And then the typical

17  questions like, you know:  Did you talk to your family?

18  Who's helping you out?  You know, stuff that shows

19  that -- that they're clear and stable.  That is an

20  indication that, okay, they're ready to go to a regular

21  unit where -- where they can, you know, continue on

22  through their -- their system, the cases that they're

23  doing.

24      Q.   Okay.  And what was the stabilization plan like

25  a uniformed form that was generated by the County for

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 32

1    you to fill out or --

2         A.   No.

3         Q.   No.

4         A.   It would just have been our observations.

5    Typically, if somebody needed to be put on medication

6    once they start -- start their med plan, you know,

7    they'll start feeling better, they'll start doing

8    better, they'll start cooperating with staff, they

9    won't -- they won't be a problem, basically.  And then

10   that's where -- and then we have different levels of

11   mental health units, by the way.  If somebody's acutely

12   mentally ill, they're not doing well when they first get

13   there, that's our level 1 mental health.  So even if

14   somebody's still struggling, I can move them to a level

15   2 mental health housing, we even have a level 3 mental

16   health housing where it's less restrictive, they have

17   more -- more freedoms to -- to do things, come out of

18   their cells for longer periods of time, things -- things

19   of that nature.

20        Q.   Okay.  So it sounds like the -- a stabilization

21   plan isn't like something that's uniform for -- for each

22   patient or -- it sounds like it's more just a -- just a

23   general description of -- of your treatment of them; is

24   that fair to say?

25        A.   Yeah, I would say that.

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 33

1    Q.  Okay.  And is it the County's policy that a
2    stabilization plan be generated for every inmate in the
3    mental health housing?
4              MS. COWGER:  Object to the form of the
5    question.  You can go ahead and answer.
6    A.  Oh, okay.  Can you repeat the question?
7    Q.  Yeah.  My question was whether or not it's the
8    County's policy that a stabilization plan be generated
9    for every inmate in mental health housing?
10   A.  Oh, yes.  I would say yes.
11   Q.  And how soon upon being housed in mental health
12   housing is a stabilization plan supposed to be
13   generated?
14             MS. COWGER:  Object to the form of the
15   question.  Go ahead and answer.
16   A.  Yeah.  Well, I guess it's as the person
17   stabilizes, we -- we -- you know, we staff the person's
18   case with my coworkers, so everybody kind of has their
19   take on what's going on with them.  Because everybody's
20   seeing the person, it's not just one MHP that's checking
21   on a person.  So as they're getting better, doing better
22   throughout the days, we all just kind of formulate a
23   plan verbally in our morning meetings like, yeah, okay,
24   I think it's time for -- for this guy to move, let's
25   give him a -- a shot in level 2 in mental health

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 34

1   housing.  They kind of just go up the level system.  But
2   yeah, there's nothing specifically -- as far as like a
3   stabilization plan, I can't think of a specific form
4   that we fill out.
5       Q.  Okay.  Is there something that's indicated in
6   the electronical (sic) medical records that this is --
7   this patient's stabilization plan?
8       A.  Nothing specific that says stabilization plan
9   that I can recall.
10      Q.  Okay.
11      A.  But, I mean, that's all -- go ahead.  I'm
12  sorry.
13      Q.  Okay.  So it sounds to me like it was more sort
14  of just of an ad hoc process between you and your
15  coworkers that, you know, maybe nonverbally just
16  understanding but amongst you all -- well, let me strike
17  that.
18          Sounds like it's more of an understanding
19  amongst you and your coworkers that this would be this
20  patient's stabilization plan and it wasn't necessarily
21  anything that was written down, it was more communicated
22  verbally between you and your coworkers.  Is that fair
23  to say?
24      A.  Well communicate verbally during out meetings
25  but then documented in our progress notes -- in our

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 35

1  NaphCare notes that we -- that we put in.

2       Q.  Okay.  You would document -- you would document

3  it but not necessarily label it as a stabilization plan?

4       A.  Exactly, exactly.

5       Q.  And who is this stabilization plan generated

6  by?  Would it be you and your fellow MHPs?

7       A.  Right.  Yes.

8       Q.  Okay.  And are they -- is the stabilization

9  plan approved by a supervisor?

10      A.  Not -- not necessarily.  Because we're -- we're

11  all licensed, so we were -- pretty much can do what we

12  need to do.  And now just looking at it, I mean, when I

13  put "assessment," I -- I might as well just put

14  stabilization plan in my -- in my NaphCare notes.

15      Q.  Okay.

16      A.  So it's just like a ver -- a ver -- a verbiage

17  thing that we're using.  Because when I put in my

18  NaphCare note, you'll notice "assessment" on the top.  I

19  mean, you might as well say stabilization plan too.  You

20  could just --

21      Q.  Okay.  And then is that stabilization plan

22  shared with corrections staff?

23      A.  Corrections wouldn't need to see that.  We have

24  our own way of communicating with them in another

25  system, the Linx system.  So when I -- I write a

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                         Jesus Tono Perez

Page 37

1        A.   Oh, no, that's not true.  No, no, that's right.

2    SP at the bottom of my system, that's right.  At the

3    bottom of my NaphCare note, you'll see SP and then

4    you'll see RP.  Oh, that's right, yeah.  Yeah, so we do

5    put SP.  There you go.  See, what am I talking about?

6        Q.   Okay.  Okay.  So -- so you did do a

7    stabilization plan?

8        A.   Well, yes.  This whole time, I never realized

9    that SP stood for stabilization plan or, you know, it's

10   just refreshing my memory now that I'm looking at it

11   like that.  I'm like, oh, that's right, we do do a

12   stabilization plan.

13       Q.   Okay.  So what would you typically put in

14   the -- in the section of the electronic medical record

15   where it said SP?

16       A.   So typically, it would be something along the

17   lines of -- oh, Lord.  Let's see what would I write.

18   Man, maybe if you could just pull one up -- one of my

19   notes, it would be there.  So would I say -- for

20   example, they were on suicide watch, and I would put --

21   oh, gosh.  I know it's -- I'm trying to think.  There's

22   so many examples.  But basically, a typical one could

23   just be as simple as inmate has stabilized, cleared for

24   class, basically.

25       Q.   Okay.

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 40

1    the least restrictive manner consistent with the

2    security needs of PCDCC and the inmate."  So it sounds

3    like one the goals of the mental health program is to

4    provide timely assessments; is that correct?

5         A.  Yes.

6         Q.  And what does the term "assessment" mean?

7         A.  Sure.  It's an evaluation of how the inmate is

8    doing, essentially.  Basically, I go and speak to them,

9    I get to know them, like, hey, what's going on?  What

10   are you needs?  I mean, to give you an example, when I

11   first meet somebody, I go to their cell, and it's just a

12   simple:  "Hey, good morning.  How are you doing?  I'm

13   Jesus from mental health office, just checking in,

14   trying to see what your needs are."  And then right

15   there, that pretty much starts a conversation or the

16   person isn't even responding because they're asleep or

17   they wave me off, like, ah, I don't want to talk to you,

18   you know, something along that lines.

19        Q.  Gotcha.  Now, these assessments are conducted

20   MHPs; is that correct?

21        A.  Yes.

22        Q.  And are they diagnostic, meaning that the

23   assessor diagnoses mental health disorders?

24        A.  We could but we don't typically need to do that

25   because I would just refer over to the -- if I have any

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 42

1    don't in -- in our role.

2        Q.   Okay.  Now these assessments, I think you said

3    that it means an evaluation and -- and I think you

4    described it as a little bit just informal.  Is that

5    fair to say?

6        A.   I wouldn't say informal, but yeah, I could

7    see -- it would be appropriate to say it like that,

8    yeah.

9        Q.   Okay.  It wasn't like a form that you went --

10   you went down and answered questions?

11       A.   Right.

12       Q.   Okay.  And these assessments or, as you

13   described, evaluation, they're done for -- for each

14   inmate who's in the mental health portion of the jail;

15   is that correct?

16       A.   Yes.  Because they can't leave that unit until

17   we clear them.

18       Q.   Okay.  Now, can you -- are these evaluations or

19   assessments typically done cell side?

20       A.   Typically yes, yes.

21       Q.   So you don't actually -- well, let me -- let

22   me -- again coming at it from somebody who -- I've never

23   been to the jail, so I'm not (inaudible).  But can you

24   tell me about how the cells are -- or what the

25   configuration is there when you're doing these

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                        Jesus Tono Perez

Page 43

1   assessments, like -- assessments?  Are you talking to

2   the inmate through a, you know, little hole in the door,

3   or is it on their bars or -- how -- if you can just lay

4   that out, describe the configuration there for me.

5       A.  So typically -- so we got 10 cells on the

6   bottom, 10 cells on the top -- I believe 10, 10 or 12.

7   And -- and yeah, we just go up to the person's door.  I

8   can have the officer open the -- the little trapdoor

9   where they give them food so there's plenty of -- of

10  space to be able to speak to the person.  If the

11  person's not doing well and they're aggressive, then we

12  won't even open the trapdoor, but you can clearly speak

13  to them through the door with no problem.  If the

14  person's doing well and I feel safe, I can pull them

15  into an interview room too, I can have the officer bring

16  them out to the interview room and actually sit down

17  with them.

18      Q.  Okay.  And was it typical that you would just

19  talk to the -- the inmate through the door without

20  having the corrections officer open the -- the trapdoor?

21      A.  Yeah.  Typically, we could do it through the

22  door mostly.

23      Q.  Okay.  And is there a -- is there a window on

24  the door?

25      A.  Yeah.  I'm so sorry, yeah.  There is a window

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 44

1    where -- where you're standing -- it's at face level

2    when you're standing, so you can clearly see the person,

3    you can talk to them.

4        Q.  Okay.  And going back to the assessments, I

5    think you said that there's no specific form used for

6    these assessments or, as you've described them,

7    evaluations?

8        A.  Yes.

9        Q.  Okay.  Is there -- go ahead.

10        A.  Yeah, we -- I do have a cheat sheet that kind

11   of gives you a little idea of kind of how to formulate

12   your thoughts and questions.  But, you know, you've been

13   doing the job so long that you don't really need those

14   anymore.  But we do have something along that lines.

15        Q.  Is it something that's given to you by the

16   County, or is that something that you've developed on

17   your own over the years?

18        A.  No.  You know what, I think over the years, we

19   all just kind of came up with it on our own, like a

20   little guide -- little guideline.

21        Q.  Fair enough.  So it sounds like there's no sort

22   of a series of questions that you're supposed to ask

23   during assessment; is that -- is that fair to say?

24        A.  Nothing specifically that I can think of.

25        Q.  Okay.  And the -- are the assessments

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 45

1    documented in the NaphCare medical records?

2        A.   Yes.

3        Q.   Okay.   So any medical provider or mental health

4    provider has access to those; is that fair to say?

5        A.   Yes.

6        Q.   Going back to the -- the exhibit that we're

7    taking a look at, No. 4 there says:  "Mental health work

8    under the supervision of the jail, mental health manager

9    and in coordination with the medical clinic's manager

10   and medical director."  Do you see that?  Do you know in

11   the fall of 2018 who the medical clinic's manager was?

12       A.   It's always been John, as far as I can recall.

13   Like, that's the person I think of as the manager.

14       Q.   Okay.  And what's John's last name?

15       A.   I have no idea.

16                 (Cross-talking.)

17       Q.   All right.  And what about medical director?

18       A.   Medical -- I -- I'm not sure who the medical

19   director is.

20       Q.   Okay.

21       A.   I probably met them, but I can't -- the main

22   people I interact with is John and -- or Dr. B, but

23   Dr. B is a -- is the Pierce County Jail employee.

24       Q.   Okay.  Dr. Balderrama?

25       A.   Yeah, yeah, yeah.  Sorry, yeah, it's

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 46

1    Dr. Balderrama.

2        Q.   Okay.  And the second sentence there, it says:

3    "It is the goal of the mental health program to work

4    cooperatively with the clinic's policy and procedures."

5    Do you see that?

6        A.   Yes.

7        Q.   What are the -- do you know what the clinic's

8    policy and procedures are?

9        A.   I can't say -- I can't say that I can think

10   about -- about it right now.  No, I don't know.

11       Q.   Okay.  And then it says:  "As well as

12   established shared policies for overlapping medical and

13   mental health issues."  Do you see that?

14       A.   Yes.

15       Q.   Do you know whether there was -- there was ever

16   shared policies between NaphCare and the County for

17   overlapping medical and mental health issues generator?

18             MR. DEAN:  Objection to form.

19             MS. COWGER:  Object to the form of the

20   question.

21       A.   Well, yeah.  I think we're covering all that

22   throughout our daily base -- basis, everything that I'm

23   reading right there.  Like, yeah, we do that.  We do

24   that on a daily base -- basis.

25       Q.   Well, right.  But this is specifically

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 48

1   policies for overlapping medical and mental health
2   issues?
3           MR. DEAN:  Objection to form.  Asked and
4   answered.
5       A.  I -- I don't know.  I can't recall as far as --
6   I think I'm just -- it's confusing me a little bit.
7       Q.  Yeah.
8       A.  Because I want to say yes, but -- I want to say
9   yes, I know we're doing those things, but as far as -- I
10  guess it's confusing me because I'm seeing policies like
11  this as I'm reading them on the screen.
12      Q.  Yeah.
13      A.  And, I mean, I just -- I don't recall seeing
14  policies written where I'm reading them like that for --
15  so --
16      Q.  So you're not aware of any written policies?
17          MS. COWGER:  Again, object to the form of
18  the question.  Asked and answered.
19      Q.  Sorry, I don't know if I got your answer.
20      A.  So I would say -- so what was the question
21  again?
22      Q.  My question was:  You're not aware of any
23  written policies?
24          MS. COWGER:  Same objection.
25      A.  Yeah, no, basically I'm not aware of any

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                        Jesus Tono Perez

Page 49

1    written policies.

2        Q.  Okay.

3        A.  Or -- I can say I haven't reviewed them.  I

4    don't know.

5        Q.  That's fair enough.  And I can only ask -- you

6    know, there's -- I assume that you don't have knowledge

7    base of everything that the County has, but you can only

8    answer for yourself.

9            I'm going to show you what's now been

10   premarked Exhibit 12.  Are you -- are you familiar with

11   this document?

12       A.  Let's see.  Mental health service policy and

13   procedure manual, basic mental health services -- yeah.

14       Q.  Okay.  And going to the highlighted portion

15   here, this is the subsection 4 where it says:  "Mental

16   health staff including psychiatric prescribers documents

17   all contacts in the electronic medical records.  At the

18   minimum, mental health staff documents assessment and

19   plan."  Do you see that?

20       A.  Yeah.

21       Q.  So is it your understanding that this plan this

22   is referring to is the stabilization plan that we had

23   discussed earlier?

24       A.  Yes.

25       Q.  Okay.  And is an assessment necessary to have a

Tapia v. Naphcare, Inc., et al.                          Jesus Tono Perez

Page 50

1    plan?

2         A.  Yes.  It's all together.

3         Q.  Okay.  So you can't have a -- excuse me.  You

4    can't have a stabilization plan without an assessment;

5    is that fair to say?

6         A.  Right, yes.

7         Q.  Okay.  No. 9 here says:  "Mental health

8    services are coordinated with the medical clinic staff

9    to provide appropriate psychiatric treatment to mentally

10   ill inmates with medical concerns."  Do you see that?

11        A.  Yes.

12        Q.  Okay.  Can you walk me through how -- how this

13   might happen?  Was medical clinic staff typically

14   involved in generate -- in generating a patient's a

15   stabilization plan as well?

16        A.  Right.  So yeah, so we have a little sick call

17   system where nursing can send us basically an electronic

18   kite that says, hey, this person is acting bizarre, is

19   not communicating well, can you check in with them when

20   possible.  And then we'll get that, we'll print it out,

21   we'll put it in our file, and then we'll get to the

22   person as soon as possible.

23        Q.  Okay.  Sounds like there's referrals that you

24   would make to medical and medical would make referrals

25   to you, and then medical and mental health staff would

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                          Jesus Tono Perez

Page 51

1   typically provide care independent of each other; is
2   that fair to say?
3        A.   Yes.
4        Q.   Okay.  All right.  And this is the last policy
5   that I'm going to have you look at.
6        A.   Okay.
7        Q.   And this is premarked Exhibit 13.  Are you
8   familiar with this?
9        A.   Yes.
10       Q.   And can you describe for me what it is?
11       A.   So Mental Health Service Policy and Procedure
12  Manual, Continuity of Mental Health Care During
13  Incarceration.
14       Q.   And is this a document that you're familiar
15  with?
16       A.   Yes.  Typically, yeah.
17       Q.   Okay.  Now moving on to -- to No. 2 here, this
18  also references a stabilization plan.  Do you see that?
19       A.   Right.
20       Q.   So just to be clear, for -- for all inmates
21  that are referred to mental health, the stabilization
22  plan is essentially the -- the first step in the
23  provision of mental health care; is that fair to say?
24       A.   Yes.
25       Q.   And it says down here that a hunger strike log

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                                     Jesus Tono Perez

Page 55

1    That'll work.

2              THE VIDEOGRAPHER:  We're going off the

3    record.  The time now is 10:06 a.m.

4        (A break was taken from 10:06 to 10:15 a.m.)

5              THE VIDEOGRAPHER:  We are back on the

6    record.  It's 10:15 a.m.

7    BY MR. DREVESKRACHT:

8        Q.  All right.  So I'm going to show you what's

9    been marked Exhibit 14 once I pull it up.  All right.

10   And this is just your listing from the Washington State

11   Department of Health which lists you as a mental health

12   counselor licensed.  Do you see that?

13       A.  Yes.

14       Q.  And so you're a licensed mental health

15   counselor; is that correct?

16       A.  Yes.

17       Q.  And you don't have a doctorate degree in

18   psychology or psychiatry?

19       A.  No.

20       Q.  And so it's not within the scope of your

21   practice to diagnose mental disorders; is that correct?

22       A.  Yes.  Yes, it is.

23       Q.  And who at Pierce County in the fall of 2018

24   was responsible for diagnosing mental disorders, if you

25   recall?

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 56

1      A.   When you ask me that question, I think of the
2  Washington State Hospital evaluators, the psychiatrists
3  who evaluate the inmates when -- when 10.77s are
4  ordered.
5      Q.   Okay.  So that would be someone not -- someone
6  from Washington State -- I think it's DCYF now, before
7  it was DSHS someone from -- from Washington State not
8  from Pierce County; correct?
9      A.   Right.
10      Q.   Okay.  Is there anyone from -- an employee of
11  Pierce County that would be responsible in the fall of
12  2018 for diagnosing mental disorders?
13      A.   Not from Pierce County.  I mean, Dr. --
14  Dr. Balderrama can or would.  He'd be in the -- in the
15  situation to do that.
16      Q.   Okay.  Dr. Balderrama.  Anyone else?
17      A.   Or Azusa, the ARNP.
18      Q.   And just because the court reporter asked me
19  when we were on the break, who is Azusa?  Do you -- do
20  you know how to spell that name, and do you recall their
21  first name?
22      A.   Azusa -- no.  Azusa is her first name.  It's --
23  Matsubayashi is her last name.  And Azusa -- oh, Lord.
24  How do you spell it?  I think it's spelled, yeah,
25  A-z-u-s-a -- A-z-u-s-a, if I -- I'm not completely --

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                          Jesus Tono Perez

Page 57

1       Q.   That's okay.  That'll give us something to

2    start with.

3       A.   Yeah.

4       Q.   And so Dr. Balderrama is a -- is an MD, and

5    Azusa is an ARNP; is that correct?

6       A.   Right.

7       Q.   And do you know if either one of these, either

8    Dr. Balderrama or Azusa ever evaluated Mr. Tapia?

9       A.   I do not know.

10       Q.   Do you know if a referral was ever made?

11       A.   Not by me.

12       Q.   All right.  I'm showing you now what's been

13    premarked as Exhibit 8.  Are you familiar with this

14    document?

15       A.   Yes, yes.

16       Q.   And can you describe for me what it is?

17       A.   It -- oh, is this the kite system?

18       Q.   You tell me, but it looks like --

19       A.   Yeah, I know.  Yeah, I was confusing this with

20    the NaphCare notes but it's looking like, yeah, it's the

21    kite system.  It says -- oh, yeah, yeah.  Yeah, this is

22    the kite system.  So this is the way inmates can

23    communicate with the -- with the mental health staff,

24    with the medical staff, with anybody, really, that's

25    available to them, chaplain services, yeah.

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 59

1    like Mr. Tapia put in a -- a kite to see medical on
2    September 13th at 9:07 a.m. for insomnia; correct?
3         A.  Okay.  Yeah, that.
4         Q.  And then it looks like at 1:44 a.m. the next
5    morning, he was informed that he was scheduled to see
6    the sick call nurse; is that correct?
7         A.  Yes.
8         Q.  And then I'm looking at what's been premarked
9    Exhibit 1.  Are you familiar with this?
10        A.  Yes.
11        Q.  And can you describe for me what it is?
12        A.  Yes.  It's a sick call -- how do I say this?
13   Sick call chart.  Basically, the nurses would
14   communicate to us directly and let us know what's going
15   on with an inmate.
16        Q.  Okay.  And then it looks like -- again, so
17   there was a response to Mr. Tapia's September 13th kite,
18   and they said the next morning he was informed that he
19   was going to see a sick nurse -- a sick call nurse.  And
20   then on the 14th, it looks like, later on that day,
21   you -- you canceled Mr. Tapia's medical kite; is that
22   correct?
23        A.  Yeah, yeah.  It looks like that's what I did.
24        Q.  And so why were you responding to medical
25   kites?

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 60

1    A.   So I think -- so what happens is -- if I can
2    remember back in 2018 -- though it still happens now --
3    what we were doing at that time, we're trying to help --
4    so the system was getting bogged down.  Like, there's so
5    many kites coming in throughout the time, that we wanted
6    everybody to be communicating directly.  So this -- so
7    for example, Mr. Tapia had -- he needed to kite me
8    directly, he didn't need to kite medical about insomnia,
9    for example.  So there's a way for him to communicate
10   that directly to me which is why I wanted them to say,
11   hey, he needs to communicate directly to me, you don't
12   need to go to the -- to the nursing staff and then --
13   and then to me, you know, like cut out middleman,
14   basically and --
15        Q.   Okay.
16        A.   And that's the way of training staff and the
17   inmates too, because the inmates catch on pretty quickly
18   that, oh, shoot, this is the way I got to do it, and
19   they'll talk and communicate to one another.  So that
20   was basically an attempt to try and not bog down the
21   system where it's like, just communicate directly to me,
22   and then I'll address it through the kite system.
23   Because this way, I can talk to him directly through the
24   kite system.  He'll -- he'll make a comment, I'll
25   respond to it, then he can respond to me again and then

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                          Jesus Tono Perez

Page 61

1   respond to him back.  And the hope is that we can deal

2   with it right here right now through the kite system

3   rather than me having to go and seeing him and

4   evaluating him if I don't need to.

5       Q.  Okay.  So it sounds like what you're saying,

6   the system was sort of so bogged down at that time that

7   you would go into the -- the sick call system and -- and

8   you would respond directly to inmates instead of having

9   a NaphCare employee refer it to you; is that fair to

10  say?

11      A.  Right, right.

12      Q.  Okay.  So -- so essentially, you would answer

13  kites that -- you would go into system and you would

14  answer kites directly that you thought pertained to --

15  to mental health instead of -- instead of medical care;

16  is that correct?

17      A.  Well --

18          MS. COWGER:  Object to the form of the

19  question.

20      A.  Right, yeah.  Kite staff nursing staff sent to

21  me directly.  So it wasn't -- I'm not just fishing in

22  there and looking, whatever I could find.  Nursing staff

23  sent that directly to me to address, and then it's like,

24  oh, wait a minute, this needs to be addressed this way.

25  So yeah, there's specific kites that were sent to me --

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 66

1   staff, kite mental health staff.

2       Q.  Okay.

3       A.  And also the nurses, too, we're -- I'm trying

4   to help the nurses understand that, hey, this is not a

5   medical problem, you need to -- you need to refer him --

6   when they bring it up to you, you need to say, you know

7   what you need to do?  You need to communicate with

8   mental health staff directly and kite them directly.  So

9   it's basically, we're trying to teach everybody how to

10  use the system.

11      Q.  So -- so mental health and medical have

12  different kite systems?

13      A.  No.  We're on the same kite system, but when

14  the inmate wants to speak to the clinic, he sends it --

15  you know, there will be a tab for clinic, there will be

16  a tab for mental health, there will be a tab for the

17  chaplain, there will be a tab for the sergeant, you

18  know, they can speak to a lot of different people in the

19  kite system.

20      Q.  Okay.

21      A.  But if he sends a kite to nursing, I can't

22  respond to it.  So he has to send it directly to me so

23  that we can communicate back and forth.  And the hope is

24  that I don't even have to go see him, my hope is that we

25  can address it right here in the kite system, I can meet

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 69

1    I could send it to his unit.  I could communicate like
2    that.  But in this instance, I can't start a kite, at
3    least I don't know how.  I don't know how to start a --
4    a response via the kite system.  Because he wouldn't
5    even know -- you know, he wouldn't know that I sent him
6    something.  He'd never be able to get it.
7        Q.  You could have just -- you could have gone and
8    seen him; right?
9        A.  Yeah, yeah, I could have gone and seen him, or
10   like I said, I'll -- I'll write them -- if it's
11   something I can address without having to see them --
12   which is typically what we're trying to do because, you
13   know, there's so many inmates, everybody wants to be
14   seen, everybody's, you know, got some issue that they
15   want to address.  So we have to try and, you know,
16   manage who's -- who's acute, who really needs to be
17   seen.  Typically, I don't go see people for
18   insomnia because that's not really a mental health
19   disorder, we don't really treat sleep -- sleeping
20   issues.  So that -- that's kind of a whole 'nother
21   issue, but --
22       Q.  Yeah, that was going to be my question.  Can
23   you -- can you tell me about insomnia --
24       A.  Right.
25       Q.  -- and --

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 76

1      A.  Yeah.

2      Q.  So it looks like on September 17th,

3  Mr. Tapia appears to have some sort of a psychotic break

4  or something and goes nonverbal; right?

5           MS. COWGER:  Object to the form of the

6  question.

7      A.  I wouldn't -- sometimes inmates get a hold

8  of -- of drugs in the jail or they're sharing

9  medications with -- with inmates, they get a hold of

10 somebody else's meds.  So -- so that's not out of the

11 possibility.  I mean, there's definitely something going

12 on that's not okay and which is why they moved him.  So

13 that's good.

14     Q.  Right.

15     A.  But yeah, I can see that it was a -- that's

16 definitely odd behavior.

17     Q.  So something -- something mentally goes wrong

18 with Mr. Tapia on September 17th, and -- and then he --

19 he goes nonverbal; right?

20     A.  Right.

21           MR. DEAN:  Objection to form.

22     Q.  And then up until that point, Mr. Tapia had not

23 shown any signs or symptoms of mental illness; right?

24     A.  Right.

25     Q.  And there were no previous diagnosis of mental

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                          Jesus Tono Perez

Page 77

1    disorders in his record as far as you know; is that fair
2    to say?
3         A.  As far as I know.  I haven't -- yeah, as far as
4    I know.  I don't know.
5         Q.  Okay.  And it looks like here, an MHP
6    evaluation was ordered; correct?
7         A.  Yes.
8         Q.  What is MHP evaluation?  Is that different from
9    the assessment that we were talking about earlier, or is
10   it the same thing?
11        A.  It's the same thing.  Essentially, he was moved
12   to a mental health unit and then that following day or
13   whenever we could get to him, but -- which that's pretty
14   acute, so I'm sure we saw him within a couple of days of
15   him being moved.
16        Q.  Okay.  And I'm showing you now what's been
17   premarked Exhibit 5.  This is a -- it's titled a
18   Behavior Log.  Do you see that?
19        A.  Yeah.
20        Q.  Who makes entries in an inmate's behavior log?
21        A.  I do, for example.  That's a perfect example of
22   how we communicate directly with the officers.  So this
23   isn't NaphCare, this is just the Linx system for the
24   Pierce County Jail.
25        Q.  Okay.

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 80

1      A.  Right, right.

2      Q.  And then on the 26th, he -- he's again still

3  nonverbal and nonresponsive; right?

4      A.  Right.

5      Q.  And then there's mention made by you on the --

6  on the 28th; right?

7      A.  Yeah.

8      Q.  And you would have -- you would have been aware

9  of or had knowledge of all these prior instances --

10 entries on this exhibit before you would have seen

11 Mr. Tapia on the 28th; is that correct?

12     A.  Yeah.  We would -- we would staff -- we would

13 probably that morning --

14     Q.  Uh-huh.

15     A.  -- as we are planning our day, we meet -- all

16 the MHPs meet that are in the building, and we're

17 staffing people's cases and saying, oh, yeah, hey, don't

18 forget this guy's having a hard time.  So yeah, I would

19 imagine -- I can't recall specifically, but that's

20 typically how it would have gone.

21     Q.  Would you have reviewed the entries in this

22 behavior log prior to meeting with Mr. Tapia?

23     A.  Typically, yeah, that's what we do, yes.

24     Q.  Okay.

25     A.  And he would have been -- already been on our

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 81

1  radar, so we would have been aware that he wasn't having

2  a -- that he was having a hard time.

3       Q.  Okay.  And so it looks like from whatever went

4  wrong with him on the -- the 17th, the continued -- he

5  continued to be nonverbal and nonresponsive, started not

6  eating.  This is all information that you would have

7  known prior to your entry here on 28th; is that correct?

8       A.  Yes.

9            MR. DEAN:  Objection to form.  Misstates the

10  record.

11       Q.  And what do you remember at all, if anything,

12  about this interaction with Mr. Tapia on the 28th?

13       A.  Oh, nothing.  I don't recall anything.

14       Q.  Okay.  Would you have been attempting to speak

15  with him through the door like you described earlier?

16       A.  Yeah.  At that point, I probably would have had

17  the officers open the trapdoor, but -- but then I also

18  see that he was verbally communicating with the

19  officers, verbally refused dinner, so -- so I see him

20  talking to somebody.  Refused breakfast, refused lunch.

21  I don't know.

22       Q.  Okay.  Yeah.  So do you know whether or not you

23  did have the officers open the trapdoor?

24       A.  I don't recall.

25       Q.  And you say here -- you typed here:  "Inmate

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 82

1    refused mental health interview."  Do you see that?

2         A.  Yes.

3         Q.  What -- what do you mean by that?

4         A.  I would assume I -- I would assume he waved me

5    off.  Sometimes they're just like, no, I don't want to

6    talk.  Although I would have documented that, so I'm not

7    really sure what he did that made me interpret him

8    refusing the interview.

9         Q.  Right.

10        A.  But it typically would have been something

11   along that lines.

12        Q.  May you have interpreted the fact that he was

13   noncommunicative, nonverbal to mean that he was refusing

14   care?

15             MS. COWGER:  Object to the form of the

16   question.

17        A.  Yeah, I can't recall.  Good Lord, I can't

18   recall what happened that many years ago specifically.

19        Q.  Would it have been consistent with the jail's

20   policies and established practices for you to have

21   interpreted the fact that he was noncommunicative and

22   nonresponsive to mean that he was refusing care?

23             MS. COWGER:  Object to the form of the

24   question.

25        A.  Yeah, I don't know.  I don't know.

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 83

1      Q.  And I'm -- I may have asked this, so you --
2   counsel can object.  But -- but it looks like here you
3   write:  "Inmate refuses -- refused mental health
4   interview."  When an inmate refuses care, do you -- are
5   you required to do anything other than this, just make
6   an entry in the medical record?
7      A.  Yeah.  Because we're going to keep -- keep an
8   eye on him.  But he's in the mental health unit, so I
9   know we're going to continue to check in on him.
10  We're -- at this point, I'm -- we're probably going to
11  start a hunger strike log because he's refusing so many
12  meals.  So yeah, there would be little red flags that
13  are going off in my head that like, okay, this is how
14  we're -- how we're going to address this.
15     Q.  Okay.  This raised red flags for you, but did
16  you make a referral to a higher level provider at all
17  for Mr. Tapia at this point?
18          MS. COWGER:  Object to the form of the
19  question.
20     A.  Yeah, I don't recall.
21     Q.  Okay.  Would have been -- well, strike that.
22          Do you recall ever making a -- a referral
23  to -- to mental health -- or excuse me, referral to
24  medical at this point given these red flags that are
25  raised?

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 84

1      A.  No, I don't recall.
2      Q.  Okay.  Now, do you -- do you -- I think you
3  said you would have been able to observe Mr. Tapia
4  through a window; is that correct?
5      A.  Yes.
6      Q.  Do you know whether or not you saw him?
7      A.  I don't recall.
8      Q.  Okay.  So you don't recall what he was wearing,
9  what he was doing?
10      A.  No.  God, no, no.  I mean, I've seen thousands
11  of people between now and then.
12      Q.  Right.  Right, right.  But at the very least,
13  he's nonresponsive for a number of days, he's not
14  eating -- he's not eating, and you're at this point not
15  able to assess him; is that correct?
16          MR. DEAN:  Objection to the form.
17      A.  Yes.
18      Q.  And --
19      A.  Well, I mean, that is an assessment.  I mean,
20  I'm making an observation, and then I would have been
21  staffing with my -- with my team as to what the next
22  course of action is.  Like I said, we probably would
23  start a hunger strike log, we would have -- I -- we
24  would have passed by the clinic and -- and communicated,
25  like, hey, are you -- are you guys keeping on eye on

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 85

1  him?  Like, what's going on with him?  So there would

2  have been verbal communication of everybody where we

3  know, hey, this guy's having a hard time, what do we

4  about it, basically.

5      Q.  Yeah.  So it was obvious to everyone that

6  Mr. Tapia was having a hard time, as you put it, but

7  experiencing some sort of mental problems or --

8      A.  Yeah.  We could say --

9          MS. COWGER:  Object to the form of the

10  question.

11      Q.  I apologize, you said it was -- obviously,

12  Mr. Tapia was -- was experiencing a crisis; correct?

13      A.  Yeah, some kind of mental health crisis would

14  be my guess at that point.

15      Q.  Okay.

16          MS. COWGER:  Form objection.

17      Q.  All right.  So when you saw Mr. Tapia on the

18  28th, he had not improved at all from his -- what he'd

19  begun experiencing on the 17th; is that fair to say?

20          MS. COWGER:  Object to the form of the

21  question.

22      A.  Yeah.  So can you repeat that question again?

23  Because actually right now, I'm distracting by how

24  long -- how long he's actually been in jail and this

25  started happening.

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 86

1      Q.  Yeah.  It looks like he was --

2      A.  So that was his first booking?

3      Q.  Well, he was booked in June of 2018.

4      A.  Okay.

5      Q.  And then this started happening -- he's fine,

6   and then this started happening on the -- three months

7   later.

8      A.  Yeah.

9      Q.  And then -- oh, just to re-ask the question.

10  So from when Mr. Tapia started experience this --

11  experiencing this mental health crisis on the 17th up

12  until when you saw him on the 28th, he had not -- he had

13  not improved; correct?

14     A.  Yeah.  It looks like he didn't improve, no.

15     Q.  And he was in need of some sort of

16  intervention; would that be fair to say?

17          MS. COWGER:  Object to the form of the

18  question.

19     A.  Yes.

20     Q.  But Mr. Tapia was not referred to -- to medical

21  by you when you attempted to assess him; is that

22  correct?

23     A.  No, I don't believe so.

24     Q.  Why not?

25     A.  I -- I -- I don't know, to be honest with you.

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                          Jesus Tono Perez

Page 89

1      Q.  Yeah.  But you don't recall anything at all
2  about this discussion with Mr. Tapia; is that correct?
3      A.  I -- I honestly don't.
4      Q.  Okay.  Now based on what -- what you observed
5  on the 10th of -- of November and what we were looking
6  at previously, Mr. Tapia's, I think you described it as
7  a mental health crisis, would you say that it's more
8  likely than not that the symptoms, mental health
9  symptoms that you observed back in September of 2018
10 were caused by some sort of issue with his infection and
11 not due -- due to a diagnosable mental disorder?
12              MR. DEAN:  Objection.
13              MS. COWGER:  Objection.  Lack of foundation
14 and form of the question.
15              MR. DEAN:  Join.
16     A.  Yeah, I -- I wouldn't know.
17     Q.  Just based on what we've reviewed today?
18              MS. COWGER:  Same objection.
19              MR. DEAN:  Join.
20     A.  Based on what we reviewed today.  Yeah, it's
21 clearly connected.  You know, in hindsight as you can
22 put it all together now.
23     Q.  Yeah.  What you're seeing now is premarked
24 Exhibit 4.  Do you see that?
25     A.  It's really small, but yeah.

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 93

1    I forgot the ANRP (sic) that you said.

2          A.   Oh, Azusa?

3          Q.   Azusa.

4          A.   No.  Who knows who was there in 20 -- which

5    provider was there in 2018.  I don't remember who was

6    there.  It probably Jennifer, but -- but yeah, she would

7    have been in on the loop, the ARNP providers like Azusa,

8    sometimes they would sit in on cases.  If we -- if we

9    needed them, we'd pull them into the office and talk

10   about the cases.

11         Q.   Okay.  But in regard to Mr. Tapia at all --

12   specifically, do you recall having conversations with or

13   making referrals to Dr. Balderrama or any ANRP?

14         A.   Oh, no, no, I don't.

15         Q.   It would have been documented somewhere,

16   though; correct?

17         A.   Yeah, it would have if we did, yeah.

18         Q.   Okay.  And from what I've reviewed, there

19   was -- there was not a referral to Dr. Balderrama or an

20   ANRP.  Do you have any reason to disagree with me?

21              MS. COWGER:  Object to the form of the

22   question.

23         A.   Yeah, not that I know of.

24         Q.   Okay.  And -- and you didn't make any

25   referrals; is that fair to say?

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 94

1      A.  I don't recall making any, no.

2      Q.  Okay.  Would that be consistent with the

3  County's policies and established practices to not make

4  a referral to an AR -- ANRP or Dr. Balderrama given

5  Mr. Tapia's presentation?

6              MS. COWGER:  Objection.  Form.

7      A.  Well, I mean, I get to -- I get to decide if

8  somebody gets referred.

9      Q.  Okay.

10     A.  I make that clinical judgment.  I get to make

11 that assessment as to when it's an appropriate time.

12     Q.  Okay.  So it's fair to say, then, pursuant to

13 the County's established practices, the decision on

14 whether or not to make the referral is within your

15 discretion; is that correct?

16     A.  Right, exactly.

17             MS. COWGER:  Objection.  Form.

18     Q.  I'm showing you now what's been premarked

19 Exhibit 16.  And it looks like this is a -- Mr. Tapia's

20 medical records from the hospital.  Have you reviewed

21 these prior to today?

22     A.  No.

23     Q.  It looks like when he arrived there at the

24 hospital, he's described as having a sickly appearance.

25 Do you see that?

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 96

1    A.  No.

2    Q.  Okay.  Well, it looks like it's got some

3  trainings that you received when -- throughout years in

4  2021 and 2020 up at the top there.  And then in 2020,

5  again, a one-hour training; 2020, one-hour training; one

6  annual security awareness training in 2017; domestic

7  violence policy, 2015; a new employee orientation in

8  2015; and then two more in 2020 and then two more in

9  2018.  Do you see that?

10    A.  Yes.

11    Q.  Okay.  So it looks like prior to -- does

12  this -- does this accurately reflect your training

13  record with Pierce County?

14    A.  Yes, I believe so.  Yes.

15    Q.  Okay.  And it looks like prior to the fall of

16  2018, then, the only training that you were provided was

17  an orientation, domestic violence policy, and security

18  awareness training; is that correct?

19    A.  Yes.

20        MS. COWGER:  Object to the form of the

21  question.

22    Q.  Okay.  And what did the orientation training

23  consist of, if you recall?

24    A.  Oh, I know that's -- that's hard to say.  I

25  don't -- I don't really recall much of it.

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 100

1    It's -- it's hard.  We're making life and death

2    decisions on a daily basis at the county jail.

3        Q.  Would it be fair to say that everything we've

4    gone over today, all of your actions and -- excuse me.

5    All of your interactions with Mr. Tapia complied with

6    Pierce County's established practices and policies?

7             MS. COWGER:  Object to the form of the

8    question.

9             MR. DEAN:  Objection.

10        A.  I think so, yes.

11            MR. DREVESKRACHT:  All right.  I don't have

12   any other questions.  Counsel here may have some follow

13   up.  But thank you so much for your time,

14   Mr. Perez.

15            THE WITNESS:  Thank you, guys.

16            MR. DEAN:  Perfect.  I -- I have about 10 to

17   15 minutes of questions, if that's okay with you,

18   Mr. Perez?

19            THE WITNESS:  Yes, that's fine.

20            MR. DEAN:  Hopefully, a little bit shorter.

21                 E X A M I N A T I O N

22   BY MR. DEAN:

23        Q.  I just want to go back through some of the

24   testimony you gave earlier today.  I believe earlier,

25   you said that the MHPs like yourself will refer patients

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                    Jesus Tono Perez

Page 116

1     Q.  Okay.  So based on all of your interactions,

2   personal interactions with Mr. Tapia prior to his

3   hospitalization, he was nonverbal; is that correct?

4     A.  Yes.

5     Q.  Do you have any personal knowledge of

6   Mr. Tapia, in fact, being verbal prior to his

7   hospitalization?

8     A.  Not that I can recall.

9     Q.  Okay.  And during counsels' questioning, you

10  also stated that you do not see -- you do not observe

11  whether or not Mr. Tapia was sickly; correct?

12    A.  Right.

13    Q.  But during my earlier questioning, you stated

14  that you do not recall any specifics about your

15  assessments or interactions with Mr. Tapia.  So is it

16  that you do not recall or that you did not observe

17  Mr. Tapia -- whether or not Mr. Tapia was sickly?

18           MS. COWGER:  Object to the form of the

19  question.

20           MR. DEAN:  Object.

21    A.  Yeah, I wouldn't recall.  I can't recall.  It's

22  such a long time ago, I wouldn't remember.

23    Q.  And you stated, I believe, earlier that you did

24  not observe Mr. Tapia lifting his leg or making

25  complaints about his leg, but is it that you did not

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                          Jesus Tono Perez

Page 117

1    observe that or that you do not recall?

2          MS. COWGER:  Object to the form of the

3    question.

4          A.  Yeah, I -- yeah, I wouldn't recall.  Yeah, it

5    wasn't something that was -- yeah, no, I don't know.

6          Q.  Okay.  And I believe you stated earlier that

7    you do not know whether Mr. Tapia's mental health

8    symptoms resolved as a -- as a result of any particular

9    diagnosis; correct?

10         A.  Right.

11         Q.  Let me ask you this:  In your experience as a

12   mental health professional, do you understand that

13   mental health symptoms can sometimes present or resolve

14   as a result of underlying medical conditions?

15         MR. DEAN:  Objection to form.

16         MS. COWGER:  Same objection.

17         MR. DEAN:  Speculation.

18         A.  Yes, yes.

19         MR. DREVESKRACHT:  Okay.  I don't have any

20   other questions.

21         MR. DEAN:  I have one follow-up question.

22   Can you put that exhibit back up, Ryan?

23         MR. DREVESKRACHT:  Yeah.

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

3656bbd5-3887-48cd-ae61-6ddec91f9e8a

Tapia v. Naphcare, Inc., et al.                              Jesus Tono Perez

Page 120

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF WHATCOM

5

6

7        I, Evelyn M. Adrean, RPR, a Certified Shorthand

8    Reporter in and for the State of Washington, do hereby

9    certify that the foregoing transcript of the deposition

10   of JESUS TONO PEREZ, having been duly sworn on

11   SEPTEMBER 14, 2023, is true and accurate to the best of

12   my knowledge, skill, and ability.  Reading and signing

13   was not requested pursuant to FRCP Rule 30(e).

14           IN WITNESS WHEREOF, I have hereunto set my hand

15   and seal this 20th day of September 2023.

16

17

18   _____

19        EVELYN M. ADREAN, CCR, RPR

20

21

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

3656bbd5-3887-48cd-ae61-6ddec91f9e8a