# EXHIBIT 3

Tapia v. Naphcare, Inc., et al.                    Darren Nealis

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

JAVIER TAPIA,                    )
                                 )
        Plaintiff,               )
                                 )
  v.                             ) No. C22-1141-JCC
                                 )
NAPHCARE, INC., et al,           )
                                 )
        Defendants.              )
_____         )


VIDEOTAPED VIDEOCONFERENCE DEPOSITION
UPON ORAL EXAMINATION

OF

DARREN NEALIS
_____

TAKEN REMOTELY VIA VIDEOCONFERENCE

OLYMPIA, WASHINGTON


DATE TAKEN:   September 15, 2023

REPORTED BY:  Evelyn M. Adrean, RPR, FPR, CCR 22009424

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                                    Darren Nealis

Page 2

1                      A P P E A R A N C E S:

2

3    FOR PLAINTIFF:

4    RYAN D. DREVESKRACHT, ESQUIRE
     CORINNE SEBREN, ESQUIRE
5    Galanda Broadman, PLLC
     8606 35th Avenue NE, Suite L1
6    Seattle, Washington 98115
     206-557-7509
7    ryan@galandabroadman.com
     corinne@balandabroadman.com
8

9

     FOR DEFENDANT NAPHCARE:
10

     JACOB DEAN, ESQUIRE
11   Perkins Coie, LLP
     1888 Century Park East
12   Los Angeles, California 90067-1721
     310-788-3289
13   jacobdean@perkinscoie.com

14

15   FOR DEFENDANT PIERCE COUNTY:

16   KRISTAL M. COWGER, ESQUIRE
     Pierce County Prosecutor's Office
17   930 Tacoma Avenue South, Room 946
     Tacoma, Washington 98402-2171
18   253-798-4265
     kristalcowger@piercecountywa.gov
19

20                        *   *   *   *   *

21

22

23   ALSO PRESENT:  Michael Hehenkamp, Videographer

24

25

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                                    Darren Nealis

Page 14

1      A.  Yes.
2            MS. COWGER:  Object to the form of the
3   question.
4      Q.  And in all of your interactions with Mr. Tapia,
5   did your acts and omissions comport with Pierce County's
6   policies and established practices?
7      A.  Yes.
8            MS. BENNINGTON:  Object to the form of
9   question.
10           MR. DEAN:  Join.
11     Q.  And -- well, let me back up.  Obviously, we're
12  here today to talk about Mr. Tapia.  But first I'd like
13  to get to know a little bit about how things operated
14  there at the jail in general.  So I'm going to be asking
15  you about the fall of 2018, how things were operating
16  there at that juncture.  Is that okay?
17     A.  Yes.
18     Q.  Okay.  And at that time you -- I think you said
19  you were a MHP; is that correct?
20     A.  Yes.
21     Q.  And you had a mental health manager supervising
22  you at that time; is that correct?
23     A.  Yes.
24     Q.  And can you tell me the name of that person, if
25  you recall?

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                          Darren Nealis

Page 15

1       A.  I believe it was Karen Bier at that time.
2   There was -- there was a manager who left around that
3   time, so it would have either been Janet Roton
4   (phonetic) or Karen Bier.
5       Q.  And the last name, B-e-e-r?
6       A.  B-i-e-r.
7       Q.  And do you recall what that person's
8   credentials were?
9       A.  No.
10      Q.  Okay.  Do you recall whether it was within the
11  scope of her license to prescribe medication?
12      A.  It was not within the scope of the mental
13  health manager to prescribe medication.
14      Q.  Okay.  What about do you recall whether it was
15  within the scope of her license to diagnose mental
16  disorders?
17      A.  It was within the scope of her license to
18  diagnose.
19      Q.  Okay.  And so Karen Bier, who else working for
20  Pierce County mental health -- the mental health -- the
21  mental health side of corrections you were working at,
22  who else, if you recall, was -- had the authority to
23  diagnose mental disorders other than Karen Bier?
24          MS. COWGER:  Object to the form of the
25  question.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                    Darren Nealis

Page 16

1    Q.  You can go ahead and answer.

2    A.  Okay.  I believe the whole team.  The team was

3    made up of licensed mental health professionals, and at

4    times there would be an unlicensed staff member that was

5    working toward licensure.  So that may have been the

6    case at that time, but I can't recall.

7    Q.  Okay.  So at the time in the fall of 2018, all

8    of the MHPs there were diagnosing mental -- mental

9    disorders; is that correct?

10        MS. COWGER:  Object to the form of the

11   question.

12   A.  Well, we -- I think the previous question was

13   asking about do we have the capacity within our license

14   to do so, and so the capacity was there.  We -- in the

15   scope of that MHP job, we weren't required to formulate

16   diagnoses and we weren't billing insurance companies for

17   the service that we were providing, so we were all

18   certified to do so as far as I recall, but we were not

19   formulating diagnosis in the sense that you often do in

20   a setting when you're billing insurance companies.

21   Q.  Okay.  So you were -- you were formulating

22   diagnoses more informally; is that fair to say?

23   A.  Well, I -- I guess I'm saying that our

24   paperwork didn't require that we put a section with

25   diagnosis listed.  And so we really weren't -- you know,

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                    Darren Nealis

Page 17

1    when we would staff cases, we would talk about -- or

2    make a referral for medications, we would talk about the

3    symptoms that they were experiencing and as -- and how

4    those relate to diagnosis.  But we -- the system there

5    does -- isn't set up for really writing reports that

6    include a full -- you know, a diagnostic section.

7         Q.   Okay.  So in regard to Mr. Tapia, if you

8    recall, who was responsible for diagnosing his mental

9    disorder?

10             MS. COWGER:  Object to the form of the

11   question.

12             MR. DEAN:  Join.

13        A.   Well as I said, we -- no one was required to

14   formally diagnose.

15        Q.   Okay.

16        A.   But the mental health professionals who would

17   see any inmate that was referred to us, we would meet

18   with them, ask -- try to get their history and try to

19   assess what kind of symptoms they were having and how we

20   could assist with that while they were incarcerated.

21        Q.   Okay.  But you'd agree with me, wouldn't you,

22   that in order to treat a mental disorder, the patient

23   needs to be diagnosed; correct?

24             MS. COWGER:  Object to the form of the

25   question.  I think Jake joined, but I was talking over

Tapia v. Naphcare, Inc., et al.                    Darren Nealis

Page 18

1   him.

2        MR. DEAN:  Yes.  Joined.

3        A.  I -- I believe -- I -- yes.  I believe you have

4   to formulate a diagnosis in order to provide ongoing

5   mental health care.  And in the jail setting, it -- not

6   only was the paperwork -- our system wasn't set up to

7   formulate -- you know, include a formulated diagnosis

8   because we weren't billing, but it was also sometimes

9   difficult to get all of the information needed to

10  formulate a diagnosis.

11       Q.  Okay.  So when you were working there in the

12  jail in the fall of 2018, you -- you -- in regard to

13  Mr. Tapia, there's no one responsible for rendering a

14  diagnosis of his mental disorder; is that fair to say?

15           MS. COWGER:  Object to the form of the

16  question.

17       A.  Well, I would say yes.  That's -- no one was

18  responsible for formally diagnose, that's correct.

19       Q.  Let me back up.  Again, bigger picture.  I

20  don't want to get into the minutia of Mr. Tapia -- we'll

21  get there -- but let me talk about how you were at the

22  time in the fall of 2018, the medical records system.

23  I -- from what I understand, the mental health staff

24  there at Pierce County was using NaphCare's, like,

25  electronic medical record system; is that correct?

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                    Darren Nealis

Page 20

1   health team started using that record right when
2   NaphCare got the contract, but at some point after
3   that --
4        Q.  Okay.
5        A.  -- we went from paper notes to the NaphCare
6   electronic medical record.
7        Q.  And do you recall whether you were trained on
8   what types of interactions to log and where to log them?
9            MR. DEAN:  Objection to form.
10           MS. COWGER:  Join.
11       A.  We -- we were trained, yes, where to enter
12  our -- our interactions, yes.
13       Q.  Okay.  And what about refusals of assessments,
14  was there a place to log refusals in NaphCare's EMR
15  system?  Do you recall?
16       A.  It was -- I believe it was in the same
17  location, yes.
18       Q.  And I know that some facilities require a
19  refusal form if assessments are refused, essentially
20  where the patient has to sign or if the patient refuses
21  to sign, a supervisor has to sign.  Did the Pierce
22  County Jail have any policy like that in place in the
23  fall of 2018?  Do you recall?
24       A.  No.
25           MR. DEAN:  Form.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                          Darren Nealis

Page 23

1   most -- in many cases, people that were identified as
2   possibly having a mental health -- a mental illness or
3   had been determined to have a mental illness were housed
4   in.  And sometimes the units had people that --
5   sometimes the mental health unit was -- they didn't
6   contain all people that had been identified as having a
7   mental illness.  So sometimes people would be sent to
8   those same units as a result of a behavioral interaction
9   with correctional officers, and so it would -- so the
10  units were mixed.  But for the most part, a mental
11  health unit was where there were a number of people that
12  were suspected of having mental health issues or already
13  had confirmed mental health issues.
14       Q.  Right.  Okay.  That makes sense.  And then you
15  said Mr. Tapia was housed in Level 1; is that correct?
16       A.  Yes.  At the time I saw him.
17       Q.  And what is -- what does that mean, Level 1?
18       A.  That is a unit where the -- the people housed
19  there would get an hour per day out of their cell.
20       Q.  Okay.  And I'm taking a look at this -- this
21  policy here, and it refers to a stabilization plan.  And
22  do you know what that is?
23       A.  I can't recall that right now.
24       Q.  Okay.  Do you recall whether it was the
25  County's policy that a stabilization plan be generated

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                          Darren Nealis

Page 25

1   that would have been included in the -- in the Linx

2   behavior tab.

3        Q.  Okay.  So --

4        A.  If you're -- yeah.  I mean, the plan that we

5   would do, you know, was not, like, what I could consider

6   a full treatment plan, like -- like you would do in

7   other settings.  It was a plan about next steps, and it

8   usually was shared in the Linx note as well.

9        Q.  Okay.  So it was more of a chart note; is that

10  fair to say?

11       A.  Yes.

12       Q.  And -- and do you -- where were the full

13  treatment plans documented, if -- if it at all?

14            MS. COWGER:  Objection.  Form.

15       A.  The -- as far as I recall, the plan was

16  included in the note, and there was not a section

17  with -- a separate section for treatment plan that we

18  used.

19       Q.  Okay.  Okay.  And was that note required to be

20  signed off by a supervisor?

21            MS. COWGER:  Objection.  Form.

22       A.  No.

23       Q.  Was it typically reviewed by a supervisor?

24       A.  I don't know about that.

25       Q.  You should be seeing now what's been marked

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Tapia v. Naphcare, Inc., et al.                    Darren Nealis

Page 26

1    Exhibit 2.  And this -- this is a -- do you -- do you

2    recognize this exhibit?

3         A.  Yes.

4         Q.  Okay.  And is -- looks like this is the Pierce

5    County policy -- you required policy to comport while

6    you were employed there by Pierce County?

7         A.  Yes.

8              MS. COWGER:  Objection.  Form.

9         Q.  And down under General, No. 1, it refers to the

10   goal of providing assessments.  Do you see that?

11        A.  Yes.

12        Q.  What does the term "assessment" mean?

13        A.  I think it can have -- it can have various

14   meanings.  I think in here it means in the jail setting

15   it was, you know, often you were looking at assessing

16   potential safety issues in terms of suicide risk and

17   also assessing substance use or mental health symptoms.

18        Q.  And were you required to provide a diagnostic,

19   meaning, you know, a diagnosis of mental health

20   disorders along with this assessment?

21        A.  No.

22        Q.  And were these assessments typically conducted

23   cell side through the door with the -- the port closed?

24        A.  More often than not, yes.

25        Q.  Okay.  And do you recall with your interactions

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                    Darren Nealis

Page 27

1    with Mr. Tapia, were they conducted cell side with the
2    port closed through the door?
3        A.  They were definitely conducted cell side.
4    If -- if I had inter -- if I had interactions with an
5    inmate and they were not talking with me, I would often
6    open the port.  And I cannot recall if I did in that
7    case or not.
8        Q.  Okay.  Is there any type of formulated criteria
9    for these assessments, like a policy that instructs you
10   on what you're supposed to be looking for, what the
11   purpose of them is, etcetera?
12       A.  I don't recall if there's a -- I mean, from
13   what I recall, is -- it's, you know, sort of my answer
14   from the pre -- the other question when you asked
15   what -- what were we doing when we assessed.  That's my
16   basic understanding of it, is that we were looking for
17   those things.  But I don't recall a section of the
18   policy and procedure manual.
19       Q.  All right.
20       A.  That delineated that.
21       Q.  And would you typically have medical evaluate
22   the patient as well?
23           MS. COWGER:  Objection.  Form.
24           MR. DEAN:  Join.
25       A.  Oftentimes we -- we would.  It would depend on

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                                    Darren Nealis

Page 30

1   nurse, can we have someone go see her.  So the

2   collaboration was mostly verbal, you know, and then we

3   would document typically that we -- we had the

4   interaction.

5       Q.  Okay.  So it sounds like it was more informal;

6   is that fair to say?

7           MS. COWGER:  Objection.  Form.

8       A.  Well I think it was -- it was just -- there

9   wasn't a paper form or an electronic form, it was

10  typically the -- you would talk to the nurses station

11  and have the interaction.

12      Q.  Okay.

13      A.  So it was still formal, but it was not a form

14  based.

15      Q.  Gotcha.  It wasn't documented?

16          MS. COWGER:  Objection.  Form.

17      A.  It was -- it was just supposed to be documented

18  in your note that you made a referral.

19      Q.  Okay.  And do you recall whether in regard to

20  Mr. Tapia you did that, you walked to the nurses station

21  and made a referral?

22      A.  Yes.

23      Q.  So you did?

24      A.  I did in at least one situation refer him to

25  medical after seeing him.

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                              Darren Nealis

Page 31

1      Q.   And do you recall who you made that referral
2   to?
3      A.   No.
4      Q.   And do you recall whether or not you documented
5   that referral?
6      A.   I -- I believe I did.  I believe I did document
7   that I made a referral to medical.
8      Q.   And did you document what you told medical?
9      A.   No.
10     Q.   And did you recall what you told medical?
11     A.   I don't recall.  I -- typically, it would have
12   just been whatever I was observing.  And -- and in his
13   case, I wasn't getting, you know, verbal responses from
14   him, so I -- I would have told them that.
15     Q.   So you thought that it might be a medical
16   issue; is that correct?
17          MS. COWGER:  Objection.  Form.
18          MR. DEAN:  Join.
19     A.   I wasn't sure, but I knew it was possible.
20     Q.   All right.  So after making a -- a mental
21   health -- or excuse me.  After making a referral to
22   medical, what sort of documentation -- documentation are
23   you required to put in the chart note, if anything?  Do
24   you recall?
25          MS. COWGER:  Objection.  Form.

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                    Darren Nealis

Page 36

1   the 18th; is that correct?

2       A.  Yes.

3       Q.  And do you recall anything about that

4   interaction?  Can you tell me anything about it?

5       A.  Only -- I don't have a memory in my mind about

6   it, but in reading my note, that's the only way I can

7   really recall it.

8       Q.  Okay.  And do you recall, did you speak

9   through him -- excuse me.  Did you speak to him through

10  the door without opening the port, or did you have the

11  port open?

12      A.  I don't recall.

13      Q.  Did you visually observe Mr. Tapia?

14      A.  Yes.

15      Q.  Okay.  And what did -- what did you see?

16      A.  In reading this, I mean, I remember that he did

17  come to the door and it looks to me like -- like he just

18  wasn't verbally talking to me, he was just looking at

19  me.  He had gotten out of his bunk and come to the door,

20  and it looked like he either didn't understand me or

21  wasn't able to respond to my questions.

22      Q.  But he was walking, is that your testimony?

23      A.  He did come to the door, yes.

24      Q.  Was he limping?

25      A.  I don't -- I don't recall if I even -- if I saw

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                          Darren Nealis

Page 37

1    that.

2          Q.   Okay.   Was he wearing socks?

3          A.   I don't recall.

4          Q.   And it sounds like your testimony is that he

5    was just looking at you and was nonverbal; is that

6    correct?

7          A.   Yes.

8          Q.   Can you tell me anything else about his

9    appearance at that time or his mannerisms?

10         A.   Only if there's something else in the NaphCare

11   note from that day.   But I suspect since it was a short

12   interaction, my note might not contain much more than

13   what's in this one.

14         Q.   Okay.

15         A.   But I know I would have done a separate one.

16         Q.   So just to be clear, as we sit here today, you

17   don't remember independently anything about your

18   interaction with Mr. Tapia on the 18th, all that you're

19   relying on is the -- is the notes that you documented;

20   is that correct?

21         A.   That's correct.

22              MS. COWGER:   Objection.   Form.

23         Q.   And then it looks like according to your note,

24   you also had a separate -- another interaction with

25   Mr. Tapia on the 19th; is that correct?

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                              Darren Nealis

Page 38

1      A.  Yes.

2      Q.  And can you tell me anything about that

3  interaction?  Do you recall anything about that?

4      A.  Only what I see in the note here.

5      Q.  And do you recall whether this interaction was

6  through the door with the port open or with the port

7  closed?

8      A.  I don't recall.

9      Q.  And do you recall whether you saw Mr. Tapia

10  standing up, walking to the door or not?

11      A.  I don't recall.

12      Q.  Do you recall whether Mr. Tapia was wearing

13  foot coverings, or was he in bed, under a blanket, or

14  was his foot exposed?

15          MR. DEAN:  Objection to form.  Compound.

16          MS. COWGER:  Join.

17      A.  I don't recall.  I believe that he did not come

18  to the door on that second interaction because I didn't

19  put that in there as I did in the first one, that he had

20  come to the door on the 18th.

21      Q.  Okay.  And do you recall whether or not he was

22  in bed?

23      A.  I don't recall -- I would assume he was, but I

24  don't have a specific recollection.  I -- I know that on

25  the day before, he came to the door, and on the -- on

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                                    Darren Nealis

Page 40

1    question because he's not a medical professional.

2              MR. DREVESKRACHT:  Okay.  All right.

3    There's a form of the question, but all right.  Duly

4    noted.

5    BY MR. DREVESKRACHT:

6         Q.  Let's move on to your interaction with

7    Mr. Tapia on the 20th.  Looks like you had an

8    interaction with him as well on the 20th?

9         A.  No, that's not my -- I didn't write that one.

10        Q.  Oh, right, right.  That was -- who's D.

11   Prather?

12        A.  He was -- he was another mental health

13   professional there.

14        Q.  Okay.  It looks like he had an interaction with

15   him where Mr. Tapia was also nonverbal, essentially; is

16   that correct?

17        A.  That's what it says there, yes.

18        Q.  And then on the 26th -- well, let me back up.

19             Mental health attempted to assess him on the

20   18th, 19th, and 20th, and then there's no other mental

21   health interaction with Mr. Tapia until the 26th; is

22   that correct?

23        A.   That's what it looks like here, yes.

24        Q.  Okay.  Do you have any reason to disagree with

25   me that there's no mental health interaction with

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                                    Darren Nealis

Page 41

1    Mr. Tapia between the 20th and the 26th?

2         A.  No.

3         Q.  And looks like you saw him on the 26th, and

4    he -- he was -- basically, he continued to be nonverbal;

5    is that correct?

6         A.  Yes.

7         Q.  And by that point, you write that he had

8    decompensated; right?

9         A.  Well, I wrote he appears to be decompensated at

10   this time and I, you know, I would say that I was -- I

11   mean, he's probably appeared decompensated at each of

12   the visits, but I did write that on that day.

13        Q.  Okay.  And between the 26th and the 20th -- or

14   between the 26th when you last saw him on the 19th,

15   looks like he was not eating.  Do you recall whether or

16   not he had -- his decompensation appeared to you to be

17   due to malnourishment?

18             MR. DEAN:  Objection to form.

19             MS. COWGER:  Join.

20        A.  I don't -- I don't recall anything like that.

21        Q.  Okay.  Do you recall whether or not he looked

22   malnourished on the 26th when you saw him?

23        A.  I don't recall.  I believe on that day, he

24   didn't come to the door again.

25        Q.  And you wrote again that he appears to be

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                          Darren Nealis

Page 45

1   to the door; and then on the 20th, Mr. Prather went to

2   the door, and then you went to the door on the 26th;

3   right?

4        A.  Yes.

5             MS. COWGER:  Objection.  Form.

6        Q.  In between the 20th and the 26th, he did not

7   receive any sort of treatment for his decompensation; is

8   that correct?

9             MS. COWGER:  Objection.  Form.

10       A.  I know that those were the mental health

11  visits.  I'm not sure about other forms of -- there --

12  there may have been other contacts from other

13  departments.

14       Q.  And from -- basically, like, just stepping --

15  stepping back, y'all couldn't figure out what was wrong

16  with him; is that fair to say?

17       A.  I wasn't sure what was -- what was wrong with

18  him, yes, that's correct.

19       Q.  Right.  And did you ever talk to a higher-up

20  to let -- to let them know about Mr. Tapia and that

21  y'all couldn't figure out what was going on with him?

22            MS. COWGER:  Objection form.

23            MR. DEAN:  Join.

24       A.  I don't recall that.

25       Q.  Did you talk to Dr. Balderrama about Mr. Tapia?

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                                    Darren Nealis

Page 46

1      A.  I don't believe so.  I believe I would have

2   documented that.

3      Q.  Did you talk to an ANRP (sic) to -- about

4   Mr. Tapia?

5      A.  I don't believe so.  I would have documented

6   that.

7      Q.  Did you talk to anyone with a higher credential

8   than MHP about Mr. Tapia?

9          MS. COWGER:  Objection.  Form.

10     A.  I don't believe I did talk -- the only other

11  people I would have talked about him would have been,

12  you know, maybe consulting within the office or making

13  the medical -- making the referral to the medical

14  department.

15     Q.  Okay.  Do you recall any conversations about

16  folks in the mental health office about Mr. Tapia?

17     A.  No.

18     Q.  What do you recall about Mr. Tapia being sent

19  to the hospital?  Do you have any involvement in that?

20         MR. DEAN:  Objection to form.

21         MS. COWGER:  Join.

22     A.  I would have to see any notes that I -- that I

23  wrote at that time.  I don't recall of my -- I don't

24  recall being involved with it, but I may have -- if I

25  wrote some other notes, I may have -- may have had an

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                              Darren Nealis

Page 57

1   or not when you interacted with Mr. Tapia on the 26th,

2   it was your assumption based on the chart note here that

3   medical would continue to monitor Mr. Tapia, that

4   Mr. Tapia was being monitored by medical and that his

5   decompensation was being addressed by medical.  Was that

6   your understanding on the 26th when you interacted with

7   him?

8            MS. COWGER:  Objection.  Form.

9            MR. DEAN:  Objection.  Form.

10       A.  My understanding was that, you know, as his

11  note indicates, that there would be some continued

12  monitoring.  And I believe that, you know, both teams

13  were -- were trying to figure out what was going on.

14       Q.  Right.  And we saw from the medical record that

15  Mr. Tapia -- as far as I can tell from the medical

16  record, there are six days where Mr. Tapia was not --

17  had no interaction with medical or mental health; is

18  that correct?

19            MS. COWGER:  Objection.  Form.

20       A.  That's what that record indicates.

21       Q.  Okay.  And is that consistent with the Pierce

22  County established practices and policies?

23            MS. COWGER:  Objection.  Form.

24       A.  Well, the practice and policies, you know, are

25  determined on the case by case -- in a sense, on a

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                    Darren Nealis

Page 58

1    case-by-case basis depending on information that we can

2    gather from the person.

3         Q.  Right.  But let me ask that in another way.

4              Were any Pierce County policies and

5    established perhaps violated by Mr. Tapia going unseen

6    for -- for six days while he was decompensated?

7              MS. COWGER:  Objection.  Form.

8         A.  Not that I know of.  And he was being seen by

9    the correctional officers --

10        Q.  Okay.  He --

11        A.  -- of the unit.

12        Q.  Okay.  He just wasn't seen by any medical staff

13   or mental health staff that you're aware of; correct?

14             MS. COWGER:  Objection.  Form.

15        A.  Not that I'm aware of.

16        Q.  Okay.  So essentially, you were relying on

17   corrections staff to monitor Mr. Tapia during that time;

18   is that correct?

19             MS. COWGER:  Objection.  Form.

20        A.  The mental health team is not relying on that,

21   but that is what was happens.  I mean, that's -- it's --

22   it's a collaboration between correctional staff,

23   NaphCare staff, and mental health staff.

24        Q.  Okay.  And that was the established practice

25   there at Pierce County in the fall of 2018?

ae723c0d-3ebe-406d-b3e7-a889df8b7c2a

Tapia v. Naphcare, Inc., et al.                                    Darren Nealis

Page 66

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF WHATCOM

5

6

7       I, Evelyn M. Adrean, RPR, a Certified Shorthand

8    Reporter in and for the State of Washington, do hereby

9    certify that the foregoing transcript of the deposition

10   of DARREN NEALIS, having been duly sworn on

11   SEPTEMBER 15, 2023, is true and accurate to the best of

12   my knowledge, skill, and ability.  Reading and signing

13   was not requested pursuant to FRCP Rule 30(e).

14          IN WITNESS WHEREOF, I have hereunto set my hand

15   and seal this 19th day of September 2023.

16

17

18

19   _____
     EVELYN M. ADREAN, CCR, RPR

20

21

22

23

24

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989