# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---

JAVIER TAPIA, )
)
Plaintiff, )
)
v. ) CASE NO. C22-1141-JCC
)
NAPHCARE, INC., et al., )
)
Defendant. )

---

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

DUANE PRATHER

---

(All participants appearing via Zoom videoconference.)

Taken at

Puyallup, Washington

DATE TAKEN: October 13, 2023

REPORTED BY: KATHLEEN HAMILTON, RPR, CRR, CCR 1917
California CSR 11595



82bebc23-a5ba-49fb-8bb1-faa12469dce2

A P P E A R A N C E S

APPEARING VIA ZOOM FOR THE PLAINTIFF:

RYAN D. DREVESKRACHT
Galanda Broadman, PLLC
8606 35th Avenue NE
Suite L1
Seattle, Washington 98115
206.557.7509
ryan@galandabroadman.com

APPEARING VIA ZOOM FOR THE DEFENDANT NAPHCARE:

JULIANA BENNINGTON
Perkins Coie, LLP
1201 Third Avenue
Suite 4900
Seattle, Washington 98101
206.359.8000
jbennington@perkinscoie.com

APPEARING VIA ZOOM FOR THE DEFENDANT PIERCE COUNTY:

KRISTAL M. COWGER
Pierce County Prosecutor's Office
930 Tacoma Avenue South
Room 946
Tacoma, Washington 98402
253.798.4265
kristalcowger@piercecountywa.gov

APPEARING VIA ZOOM, THE VIDEOGRAPHER:

JASON NEUERBURG
Buell Realtime Reporting, LLC
1325 Fourth Avenue
Suite 1840
Seattle, Washington 98101
206.287.9066

* * * * *

question.

BY MR. DREVESKRACHT:

Q. And --

MS. BENNINGTON: Join.

BY MR. DREVESKRACHT:

Q. And to the extent that -- that you recall, did all of your interactions with Mr. Tapia and your acts and omissions comport with Pierce County policies and established practices?

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

MS. COWGER: You can go ahead and answer.

THE WITNESS: Oh, okay.

From what I remember, yes. I mean, I pretty much treated everybody the same way.

BY MR. DREVESKRACHT:

Q. And obviously, you know, we're here to talk about Mr. Tapia. But first I'd like to know a little bit more about things, about how things operated there in the jail in general in the fall of 2018; okay?

A. Okay.

Q. And do you recall -- well, did you have a supervising mental health manager there when you were working in the fall of 2018?



82bebc23-a5ba-49fb-8bb1-faa12469dce2

A. Yes. It changed somewhere along the way, but I believe we did.

Q. And do you know who that person was?

A. I think it was Janet Roton.

Q. And do you know what her credentials are?

A. No, not off the top of my head.

Q. Was it within the scope of her license to prescribe medication?

A. No.

Q. Okay. And what about to diagnose mental disorders?

A. Yes.

Q. And was it within the scope of your license to diagnose mental disorders?

A. Yes.

Q. And do you -- do you recall, in regard to Mr. Tapia, who would have been responsible for diagnosing a mental disorder?

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

THE WITNESS: It would have been any of the mental health staff.

BY MR. DREVESKRACHT:

Q. And that would include you?



82bebc23-a5ba-49fb-8bb1-faa12469dce2

A. Correct.
Q. And when you say "mental health staff," I think you said that your position was a mental health evaluations specialist. Is that what you're referring to as mental health evaluations specialists?
A. Correct. We all had master's degree and we were all licensed.
Q. Okay.
And I believe that I've -- I -- I've reviewed the records and I've seen entries that you made in NaphCare's electronic medical records system; is that correct?
A. Yes, we did Naph- -- did NaphCare charting.
Q. Okay. And do you recall receiving some sort of training from NaphCare on how to use its EMR system?
MS. BENNINGTON: Object to the form of the question.
THE WITNESS: I'm sure I did, because -- (laughter) -- I'm old and I don't know anything about -- I had never done any electronic records before that.
BY MR. DREVESKRACHT:
Q. Okay. Do you recall, were you trained on what types of interactions to log and where to log them, that sort of thing?
MS. BENNINGTON: Object to the form of the



82bebc23-a5ba-49fb-8bb1-faa12469dce2

question.

MS. COWGER: Join.

THE WITNESS: Boy. I'm sure there was. I -- I know that there was an outline, I think, that we followed.

BY MR. DREVESKRACHT:

Q. Okay. But just sitting here today, you don't recall that sort of training?

A. I don't. I can't say for a hundred percent sure.

Q. That's fair enough. Like I -- like I said, this was -- it was some time ago, so that's understandable.

What about refusals to participate in assessments, was there a place to log refusals in NaphCare's EMR system?

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

THE WITNESS: Yes, I'm -- I'm sure there was, because we always documented both behavior tabs and in the NaphCare system.

BY MR. DREVESKRACHT:

Q. Okay. When you say "behavior tabs," what's that?

A. That was the information log that jail staff,



82bebc23-a5ba-49fb-8bb1-faa12469dce2

the Corrections deputies and Classifications, would use to determine housing.

Q. Okay. So when you would assess a patient, you would basically make entries into both NaphCare's electronic medical records, and then the -- the jail system, which I believe is called Linx; is that correct?

A. Correct.

Q. Okay.

And now, I know that some facilities require a refusal form if assessments are refused or where the patient's refused to participate, where the patient has to sign that he or she was -- she is refusing, and if they refuse to sign, then a witness signs.

Did Pierce County have any policy like that in place in the fall of 2018?

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

THE WITNESS: Not for mental health.

BY MR. DREVESKRACHT:

Q. Okay.

A. That I remember.

Q. So if -- so if an inmate refused to participate in an ordered assessment, what was the County's established practice as to next steps, if anything?



82bebc23-a5ba-49fb-8bb1-faa12469dce2

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

THE WITNESS: We would document in a behavior tab, and typically follow up the next day.

BY MR. DREVESKRACHT:

Q. Was there a specific allotted amount of time you were supposed to follow up?

A. It depended on their level of housing. If they were Level 1 housing, we would follow up daily. If they were in a higher level of housing, it could be -- oh, I don't remember exactly the -- the timeframes, but I would say within probably three to five days we would follow up.

Q. And when you say Level -- Level 1 housing, what's that?

A. That would be the most-restrictive housing, the sickest people, the people on suicide watch.

Q. Okay. And then what was the other type of housing you mentioned?

A. And then there was a Level 2 and a Level 3. And the Level 3 was the highest functioning. Those were the people typically stabilized on any medication and doing well, or getting ready for discharge.

And then Level 2 was sort of a balance in

between. They -- they were improving, but not quite ready for the higher level of housing.

Q. Okay. And I believe you testified that, for inmates on Level 1, you're required to essentially try to reassess them daily; is that correct?

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

THE WITNESS: Yes.

BY MR. DREVESKRACHT:

Q. And what about Level 2, if they refuse to participate in an assessment, what was the allotted time for you to circle back and attempt to reassess the patient?

A. I can't recall specifically. I would -- because we -- the way our schedules were, I would say it would probably be three to five days. It may have been sooner than that.

Q. And what about for Level 3 inmates?

A. Level 3, depending on our staffing and how many people there were to see, that was infrequent. It would probably be about every week and a half.

Q. And do you recall the level of housing that Mr. Tapia was housed in?

A. I don't.



82bebc23-a5ba-49fb-8bb1-faa12469dce2

would go to booking to do assessments. If somebody was suicidal, it was always immediately.

Q. So let me stop you there. That sounds like that's one type of assessment, a suicide risk assessment; right?

A. Correct.

Q. What were the other type of assessments that this is referring to?

A. Basic mental health status exams.

Q. Basic mental health status exams.

A. Yeah.

Q. What does that mean?

A. How -- how they were functioning cognitively; are they oriented; are they showing any signs of mental health symptoms. We would look to see if they come in drug impaired.

Q. And are they diagnostic, meaning that the assessor diagnoses a mental health disorder?

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

THE WITNESS: We did not do diagnoses, as I recall, because we weren't billing insurance. But you could form a diagnostic opinion.

BY MR. DREVESKRACHT:

Q. Well, you'd agree with me that, in order to provide treatment, that you need to provide a diagnosis; right?

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

THE WITNESS: Not necessarily.

BY MR. DREVESKRACHT:

Q. Okay.

A. We would treat symptoms.

Because it was a different situation than an outpatient program or an actual treatment program, we -- we tried to stabilize. And we never knew when anybody was gonna be released.

Q. Right.

So when you -- when you say you would treat symptoms, would you treat symptoms with medication?

A. We would refer to the... mental health nurse practitioner if we had concerns over something that looked like it would -- the patient would benefit from medication.

Q. And would you also make referrals to -- I believe -- well, let me start from the -- the bottom up.

You have NAPs who are at your level who are providing assessments for -- for inmates. And then

If we felt like there -- there was a medication concern or maybe a medication switch, we could go and talk with him.

Q. Okay.

And back to the assessments that you would conduct. Were these typically conducted cell-side?

A. Most of the time. Occasionally it would be in an interview room.

Q. And I think Mr. -- we've deduced that Mr. Tapia was housed in Level 2. Were assessments there typically conducted cell-side through the -- the door with the port closed or open?

A. Depending on the behavior, if it felt safe or not, which was up to the deputies a lot of the time. If they didn't think it was safe, they would ask us to keep the port closed. With Level 2 housing, usually it would be cell-side, unless a person asked or wanted to be in an interview room.

Q. And would it usually be done cell-side with the port closed?

A. Yes. It's --

Q. And -- oh, sorry. Go ahead.

A. Well, it's hard to say yes or no, because it -- there's so many factors it depended on in terms of safety and noise level. You know, inmates would bang



82bebc23-a5ba-49fb-8bb1-faa12469dce2

and call us names and -- so some -- it would be pretty chaotic at times. Level 2 not as much as Level 1, but that was also a factor in trying to complete interviews.

Q. Fair enough.

Now, there was a -- you mentioned two different kind of assessments. One was a suicide risk assessment. Another was a basic mental health status exam; right?

A. Correct.

Q. And was there a formulated criteria for conducting a suicide risk assessment?

A. I don't recall if there was a -- I -- I think there was a form that could be used. But since everybody there was pretty seasoned, they all knew how to do a suicide risk assessment.

Q. Okay. And what about for the basic mental health status exam, was there any sort of formulated criteria for those assessments?

A. There could be. There were forms available if somebody felt like they needed 'em.

Q. And do you recall what the forms were titled or what they looked like?

A. I -- I don't remember.

Q. Do you recall where they were located?

A. Well, we would carry some on our clipboards, if we needed 'em.

Q. Okay.

And was it a policy or established practice that you were to do basic mental health status exams using these forms?

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

THE WITNESS: No, not that I remember.

BY MR. DREVESKRACHT:

Q. So they were more -- more typically done without using a form; is that correct?

A. Correct.

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

BY MR. DREVESKRACHT:

Q. And just so I'm clear, was there any policy or established practice on the criteria for -- for those assessments that you did not complete using the form?

MS. COWGER: Object to the form of the question.

MS. BENNINGTON: Join.

THE WITNESS: I'm not sure I understand the question.

BY MR. DREVESKRACHT:



82bebc23-a5ba-49fb-8bb1-faa12469dce2

Q. Right. Well, maybe we'll have the court reporter read it back, and then I can clarify if you still need me to.

(Question was read back.)

THE WITNESS: No.

BY MR. DREVESKRACHT:

Q. All right. So I'm showing you now what's been pre-marked Exhibit 3.

(Exhibit No. 3 marked.)

BY MR. DREVESKRACHT:

Q. Are you familiar with this document?

A. (Reviews exhibit.)

Yes.

Q. And number 4 here, this refers to a -- a plan. Do you see that?

A. Correct. Yes.

Q. Is -- is -- is it that -- is it your understanding that that's the stabilization plan that we discussed earlier?

A. (Reviews exhibit.)

Yes.

Q. And is -- is an assessment necessary to have a plan?

MS. COWGER: Object to the form of the question.

document requests for appointments or concerns, as I recall.

Q. Okay. And do you know who -- there's a highlighted one here that's on September 14th, 2018. And it mentions someone named Jesus Perez. Do you see that?

A. Yep, yes.

Q. Do you know who that is?

A. I do.

Q. And who is that?

A. He was one of the mental health professionals.

Q. Okay. And from what I'm able to piece together here, it looks like, again, there was a request put in by Mr. Tapia, responded to at 1:44 a.m. on September 14th. Says: You're scheduled to see the sick call nurse. Please go when called.

And then it looks like, later that day, Jesus Perez canceled that. Is that your understanding?

MS. COWGER: Objection. Lack of foundation.

MS. BENNINGTON: Join.

THE WITNESS: That's how I would read that.

BY MR. DREVESKRACHT:

Q. And my question to you is: Was it customary for mental health staff to respond to medical Kites in the fall of 2018?



82bebc23-a5ba-49fb-8bb1-faa12469dce2

continue in Level 1 housing; is that right?

A. Correct.

Q. And so then you saw the inmate the next day after that, on September 20th, and your note says: Recommend Level 1 mental health -- mental health housing for observation; is that right?

A. Correct.

Q. So you weren't necessarily making a change in making a recommendation for change in his housing, you were recommending that he just continue on in the same housing that he had been in as recommended by your colleague the two days prior; is that right?

A. Based on all three of those notes, that is how I would read it.

Q. Okay.

I don't have any other questions.

F U R T H E R E X A M I N A T I O N

BY MR. DREVESKRACHT:

Q. Just one quick follow-up.

Based on the questioning by counsel, it is more likely than not that Mr. Tapia now was housed in Level 1?

A. Was that to me, a question to me?

Q. To you, yeah, yeah.

A. Based on those notes, that's how I would read it.

Q. Okay. Nothing else. Thank you so much for your time.

A. Thank you.

THE VIDEOGRAPHER: This concludes the deposition. The time now is 10:30 a.m. We are going off the record.

THE REPORTER: Are you ordering the transcript?

MR. DREVESKRACHT: Yes. Just the PDF, and I don't need the exhibits.

THE REPORTER: Copies of the transcript?

MS. COWGER: Yes, please.

MS. BENNINGTON: Same here.

(Deposition concluded at 10:30 a.m.)

(Reading and signing was not requested pursuant to FRCP Rule 30(e).)

-o0o-



82bebc23-a5ba-49fb-8bb1-faa12469dce2

C E R T I F I C A T E

STATE OF WASHINGTON
COUNTY OF KING

I, Kathleen Hamilton, a Certified Shorthand Reporter and Notary Public in and for the State of Washington, do hereby certify that the foregoing transcript of the deposition of DUANE PRATHER, having been duly sworn, on OCTOBER 13, 2023, is true and accurate to the best of my knowledge, skill and ability. Reading and signing was not requested pursuant to FRCP Rule 30(e).

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 17TH day of OCTOBER, 2023.

NDTCA Signed Electronic Transcript

________________________________________
KATHLEEN HAMILTON, RPR, CRR, CCR #1917



82bebc23-a5ba-49fb-8bb1-faa12469dce2