1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAVIER TAPIA,<br><br>                    Plaintiff(s),<br>   v.<br><br>NAPHCARE INC., et al.,<br><br>                Defendant(s). | CASE NO. C22-1141-KKE<br><br>ORDER DENYING DEFENDANT NAPHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT |

While incarcerated as a pretrial detainee at Pierce County Jail, Plaintiff Javier Tapia developed a blood clot, which ultimately led to his left leg being amputated below the knee. Tapia sued both Pierce County, and NaphCare, Inc. ("NaphCare"), the private company contracted to provide medical care to Pierce County Jail inmates. Tapia claims that NaphCare violated his constitutional rights by failing to provide adequate medical care under 42 U.S.C. § 1983. NaphCare moved for summary judgment on Tapia's § 1983 claim and to dismiss NaphCare from the case. Dkt. No. 100.

Because Tapia sufficiently raises genuine issues of material fact regarding NaphCare's potential liability for Tapia's injuries, the Court denies NaphCare's motion for summary judgment (Dkt. No. 100).

1

## I.    BACKGROUND

2
3
4
5
6
7
8
9

Tapia was incarcerated at the Pierce County Jail as a pretrial detainee beginning on June 16, 2018.  Dkt. No. 104-1 at 2.  On the day he was booked, a Registered Nurse ("RN") documented a Comprehensive Detox Screen, including an Opiate Withdrawal Screening.  Dkt. No. 104-13 at 5–6.  Over the following days, Licensed Practical Nurses ("LPN") conducted "COWS" (clinical opiate withdrawal scale)[1] assessments twice daily to monitor Tapia's opiate withdrawal symptoms.  *Id.* at 6–7.  Tapia's symptoms were mild, and the assessments were discontinued on June 19, 2018.  *Id.* at 7.  The first three months of Tapia's incarceration were "largely unremarkable."  Dkt. No. 104-5 at 3.

10
11
12
13
14

On September 17, 2018, Corrections Deputy Jonathon Knight came "under the impression that [Tapia] was exhibiting some sort of mental health signs and maybe going through [a] mental health crisis."[2]  Dkt. No. 104-6 at 5.  Tapia was transferred from general population to mental health housing.  *Id.* at 7.  Mental health housing was an "indirect supervision unit" where "officers go through every 30 minutes and check on everyone."  *Id.*

15
16
17
18

On September 18, 2018, a Pierce County Mental Health Provider ("MHP")[3] met with Tapia.  Dkt. No. 104-11 at 7–8.  The MHP charted:

> Met with [inmate] at about 1100 for initial assessment in response to C/D report. He came to the door and was cooperative during interview, but appears to be

19
20
21

[1] "Per the protocol, medical staff performs a ['COWS'] assessment to measure the presence and severity of certain [withdrawal] symptoms—pulse rate, sweating, restlessness, pupil size, bone and joint aches, runny nose or tearing, gastrointestinal distress (including nausea and vomiting), tremors, yawning, anxiety, and irritability."  *Smith v. Cnty. of Macon*, No. 20-2203, 2024 WL 1832426, at *2 (C.D. Ill. Mar. 26, 2024).  "Each symptom is measured individually on a scale of 0-5, using a checklist that provides direction as to how observations should translate into a particular score.  The scores for each symptom are then totaled to obtain an overall score."  *Id.*

22
23

[2] As summarized in Dr. Daphne Glindmeyer's expert report, Deputy Knight made an entry into Tapia's chart describing "odd behavior and unknown mental state … he was laying down in the fetal position and I told him to get up and he just stared at me.  I gained control of his right arm and he started crying and mumbling unintelligibly."  Dkt. No. 104-5 at 3–4.

24

[3] The MHPs are employees of Pierce County and are not NaphCare employees.

ORDER DENYING DEFENDANT NAPHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT - 2

confused and was unable to verbally respond to my questions.  He has been here at [Pierce County Jail] since June, but appears to be decompensated at this time.

*Id.*  An MHP met with Tapia again on September 19, 2018.  The MHP charted:

Met with [inmate] at about 1045 for initial assessment in response to C/D report. He presented again today as confused.  [Inmate] was again unable to verbally respond to my questions.  He has been here at [Pierce County Jail] since June, but appears to be decompensated at this time.  Officers report that he appears to be "way off his baseline," and he was nonverbal in court today as well.  He could have an unknown medical condition.

*Id.* at 7.  The MHP also charted that he "[r]eferred to medical for assessment. Recommend continued level 1 [mental health] housing at this time for further assessment."  *Id.*

Later that same day, Cameron Carillo, LPN visited Tapia's cell.  Dkt. No. 104-11 at 7. LPN Carillo charted "[patient] referred to medical due to being nonresponsive, [patient blood pressure] hypertensive skin PWD, does not appear in distress, states he does not have any medical concern at this time but is upset of being in 3SC, states no [suicidal ideation] will continue to monitor."  *Id.*  While there is no written record of LPN Carillo relaying this information to an RN, he testified that he must have reported his observations to the RN on duty because that was his usual practice.  Dkt. No. 104-14 at 9.  In contrast, Tapia testified he could not remember the visit from LPN Carillo or making these statements to him.  Dkt. No. 101-24 at 9.

On September 20, 2018, an MHP met with Tapia and charted "[inmate] seen about 1110 for [mental health follow up].  [Inmate] is awake but stays on his bunk.  [Inmate] does not respond in any way to MHP, he just stared.  [Inmate] would not even shake his head yes or no.  [Inmate] was seen by medical yesterday."  Dkt. No. 104-11 at 7.

Tapia was next seen by an MHP six days later, on September 26, 2018.  Dkt. No. 104-11 at 7.  The MHP charted: "Attempted to meet with [inmate] at about 1100 for initial assessment in response to C/D report.  He is presented again today as confused and non-verbal.  He has been here at [Pierce County Jail] since June, but appears to be decompensated at this time."  *Id.*

On September 28, 2018, an MHP charted: "[Inmate] was seen at about 10:30 for [mental health follow up]. [Inmate] refused [mental health] interview. [Inmate] presents [mental health] symptoms. [Inmate] would not answer [mental health] questions. [Inmate] just looked at MHP and did not respond to basic questions." Dkt. No. 104-11 at 7.

The access log for Tapia's medical chart shows that no NaphCare employee opened it between the evening of September 19, 2018, until the morning of September 29, 2018. Dkt. No. 104-30 at 2.

On September 29, 2018, Tapia was seen by RN Elizabeth Warren, at the request of the corrections sergeant. Dkt. No. 104-11 at 6. RN Warren charted:

> Saw inmate in his cell as requested by Sergeant. Cell smells of urine. Sheet wrapped around waist. Alert, sitting up, on the side of his bunk, under his [own] power. Makes eye contact when he is spoken to. Inmate will not verbally respond. Inmate will follow instructions with calm encouragement. Allowed assessment.
>
> 96.9 Apical pulse 100, S1S2, sow, even respirations, rate 14–16, B/P 127/77. Tongue wet, skin does not tent. No acute distress noted.
>
> Not sure if inmate is eating every meal. Offered a chocolate ensure and he drank approx. ½ the container. Officer prepared his sandwich for him, handed it to him and he took the sandwich. Spoke with Sgt Finley and ask if inmate could be put on a meal log and agreed to start "Meal Log" Schedule daily monitoring of VS x 3 days and scheduled Provider visit for evaluation.

*Id.*

On September 30, 2018, an MHP attempted to contact Tapia, and charted

> [Inmate] seen at about 1040 for assessment in response to C/D report. [Inmate] was uncooperative with MH interview. [Inmate] appeared to be sleeping and did not respond to MHP knocks on door or calling of name. [Inmate] was observed moving and breathing in his bed. [Inmate] cell was observed as messy and disorganized.

Dkt. No. 104-11 at 6.

On October 1, 2018, RN Ashley Chalk charted:

> Asked to see inmate by unit officer for c/o "toes turning black". Upon visual inspection, left foot slightly swollen and severely discolored. Inmate brought to

1
2
3

clinic via wheelchair.  Vitals: BP 111/80 T 97.9 P 105 SpO2 94% RA.  Inmate is non-verbal and does not answer questions.  Spoken to by MHP and reported having pain, but does not recall what happened or when ....  Inmate referred to Tacoma General [Emergency Department].

Dkt. No. 104-11 at 6.  At Tacoma General Hospital, Tapia was admitted for gangrene, with an admitting diagnosis of Phlegmasia Cerulea Dolens ("PCD").  *Id.* at 5.  Tapia's condition worsened, and his leg was amputated below the knee over the course of two surgeries on October 10 and October 16, 2018.  Dkt. No. 101-6 at 19.

On June 16, 2020, Dr. Elliot Wade, NaphCare's Regional Medical Director, sent an e-mail to RN Warren, LPN Carillo, and RN Chalk.  Dkt. No. 62-1 at 2, Dkt. No. 91 at 1–2.  NaphCare had tasked Dr. Wade with reviewing Tapia's medical records and providing an opinion on his care in anticipation of litigation.  Dkt. No. 91 at 3.  In his June 16, 2020 e-mail, he wrote that the NaphCare employees' notes "contained all of the necessary information needed at the time."  Dkt. No. 62-1 at 2.  Dr. Wade then concluded, "[I]n my opinion you did everything right[.]"  *Id.*

## A.    Procedural History

Tapia initially filed suit and amended his complaint in King County Superior Court.  Dkt. No. 1-2.  NaphCare removed the action to this Court on August 15, 2022.  Dkt. No. 1.

Tapia filed a second amended complaint on October 7, 2022.  Dkt. No. 15.  The second amended complaint contained two claims against NaphCare: corporate negligence (*id.* at 21), and deprivation of constitutional rights under § 1983 (*id.* at 22).

NaphCare moved to dismiss the second amended complaint (Dkt. No. 19).  The Court granted that motion in part, dismissing Tapia's claim against NaphCare for corporate negligence without prejudice because Tapia had not pleaded "facts to suggest that NaphCare is a hospital or that the actions of its employees could not be attributed to NaphCare."  Dkt. No. 31 at 5–6.  The Court also dismissed Tapia's § 1983 claim against NaphCare for inadequate medical care arising

from a failure to train, but preserved Tapia's § 1983 claim "for inadequate medical care arising from the policy of withholding care." *Id.* at 6. As such, the only surviving claim against NaphCare is Tapia's § 1983 claim based on NaphCare's policy of withholding proper medical care. *See id.* at 8. NaphCare now moves for summary judgment. Dkt. No. 100.

## II.    LEGAL STANDARDS

### A.    Legal Standard for Summary Judgment

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (cleaned up). A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The burden then shifts to the party opposing summary judgment, who must affirmatively establish a genuine issue on the merits of the case. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

The Court does not resolve evidentiary conflicts or make credibility determinations in ruling on a motion for summary judgment. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (citing *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013)). Rather, such determinations are left to the province of the jury at trial. *See id.* at 795–97.

### B.    Legal Standards for Establishing *Monell* Liability

Under § 1983, any "person" acting "under color of" state law who violates rights "secured by the Constitution" shall be liable to the injured party. A plaintiff must establish (1) that their civil rights were violated, (2) by a person acting under the color of state law. *West v. Atkins*, 487

U.S. 42, 48 (1988).  "Pretrial detainees[, like Tapia,] have a constitutional right to adequate medical care while in the custody of the government and awaiting trial."  *Est. of Nelson v. Chelan Cnty.*, No. 2:22-CV-0308-TOR, 2024 WL 1705923, at *9 (E.D. Wash. Apr. 19, 2024) (citing *Russell v. Lumitap*, 31 F.4th 729, 738 (9th Cir. 2022)).

Municipalities and other bodies of local government are "persons" subject to liability under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]"  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  A private company is a "person" under § 1983 when it stands in the shoes of a municipality while providing public services under a contract.  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139–40 (9th Cir. 2012).

There are three pathways to municipal liability for constitutional violations under § 1983: (1) the municipality's official policies or longstanding practice or custom inflict the constitutional injury, (2) the municipality's omissions or failures to act "when such omissions amount to the local government's own official policy[,]" or (3) a municipal policymaker ratifies a subordinate's unconstitutional decision or action and the basis for it.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

To establish liability pursuant to a policy or custom, a plaintiff must show (1) that a policy or custom existed; (2) a direct causal link between the policy or custom and the constitutional deprivation; and (3) if the policy is one of inaction (*i.e.*, if the policy does not directly require unconstitutional conduct) that the defendant acted with deliberate indifference.  *Est. of Hill v. NaphCare, Inc.*, No. 2:20-CV-00410-MKD, 2023 WL 6297483, at *12–14 (E.D. Wash. Sept. 27, 2023); *see also Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 681–82 (9th Cir. 2021) (*Monell* analysis proceeding in this order).  Policies of inaction occur when a plaintiff "pursues liability

based on a failure to act[,]" such as claims that the defendant failed to train employees. *Hill*, 2023 WL 6297483, at *14 (quoting *Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020)). In contrast, policies of action constitute "policies, customs, or practices [that] directly require unconstitutional conduct[.]" *Sandoval*, 985 F.3d at 682 n.17.

To show that a defendant maintained a policy or custom, a plaintiff needs to demonstrate that such policy was "so permanent and well settled as to constitute a custom or usage with the force of law." *Gordon v. Cnty. of Orange (Gordon II)*, 6 F.4th 961, 974 (9th Cir. 2021) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)) (cleaned up). That said, "[a]n unconstitutional policy need not be formal or written to create municipal liability under section 1983." *Id.* "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)). In showing that a policy exists, a plaintiff must show "some evidence of municipal policy or custom independent of [the employee's] misconduct[.]" *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985) (concurring opinion). "To infer the existence of a [municipal] policy from the isolated misconduct of a single, low-level officer, and then to hold the [municipality] liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*." *Id.*

For a plaintiff to establish direct causation between the policy and purported constitutional injury, a plaintiff must prove causation-in-fact and proximate causation. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). "Pointing to a municipal policy action or inaction as a 'but-for' cause is not enough to prove a causal connection under *Monell*. Rather, the policy must be the proximate cause of the section 1983 injury." *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (citations omitted). In § 1983 actions, "[t]raditional tort law defines

intervening causes that break the chain of proximate causation." *Id.* A defendant's conduct is not the proximate cause of a plaintiff's alleged injuries "if another cause intervenes and supersedes his liability for the subsequent events." *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990). But "*foreseeable* intervening causes" do not supersede a defendant's responsibility. *Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th Cir. 2010) (en banc), *vacated by City of Reno v. Conn*, 563 U.S. 915 (2011), *reinstated in relevant part by Conn v. City of Reno*, 658 F.3d 897 (9th Cir. 2011). "If reasonable persons could differ over the question of foreseeability, summary judgment is inappropriate and the question should be left to the jury." *Id.* (cleaned up).

## III.  ANALYSIS

### A.    The Court Has Jurisdiction.

This Court has jurisdiction over this case because Tapia alleges violations of the Fourteenth Amendment via § 1983. *See* 28 U.S.C. § 1331 (federal question jurisdiction).

### B.    Tapia Raises Sufficient Issues of Fact to Proceed to Trial on His *Monell* Claim against NaphCare.

NaphCare argues Tapia cannot establish that NaphCare maintained an unconstitutional custom and that even if he could, Tapia does not show that any NaphCare policy directly caused Tapia's injuries.[4]  Dkt. No. 100 at 20–21, 30.  In response, Tapia alleges three unofficial "widespread customs" that he contends violated his constitutional right to medical care.  Dkt. No. 103 at 6–13.  First, Tapia claims that NaphCare maintained a policy of LPNs working outside their

---

[4] Throughout its motion, NaphCare emphasizes that PCD is a rare disease with rapid onset.  Dkt. No. 100 at 19, 25, 29 ("Nothing about the onset of PCD is patently obvious.").  NaphCare also asserts that "PCD, not NaphCare's policies, caused Tapia's alleged injuries."  *Id.* at 30.  In so arguing, NaphCare conflates the alleged constitutional injury (denial of adequate medical care) with the physical injury (Tapia's amputation).

To be clear, PCD's rarity does not foreclose NaphCare's potential liability.  *Monell* requires plaintiffs to show that "implementation of … official policies or established customs inflict[ed] the constitutional injury"—a broader inquiry than NaphCare suggests.  *Monell*, 436 U.S. at 708.  As such, the Court considers whether Tapia presents a genuine dispute as to whether any NaphCare policy led to delay or denial of medical care, and further, whether inadequate medical care was a reasonably foreseeable consequence of NaphCare's policies.

nursing scope of practice. *Id.* at 6. Second, Tapia argues that NaphCare had a policy of using correctional officers to provide medical monitoring, rather than trained medical professionals. *Id.* at 8. And third, Tapia asserts that NaphCare had a policy of non-communication between mental health and medical providers and a custom of lack of oversight. *Id.* at 9.

Despite NaphCare's contentions, Tapia sufficiently presents genuine disputes of material fact as to whether these three policies exist and whether they, either individually or jointly, provided the moving force behind his injury. These factual disputes are reserved for the jury, and as such, the Court denies NaphCare's motion for summary judgment.

    1. <u>LPNs working outside their nursing scope of practice</u>

        a.    *Tapia's interactions with NaphCare's LPNs raise issues of fact as to the existence of the LPN Policy.*

Tapia argues that NaphCare maintained an unofficial policy of requiring LPNs to work outside the scope of their license and that this practice caused his injury ("LPN Policy"). Dkt. No. 103 at 6, 14. To show that an unofficial policy exists, Tapia must point to "practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Gordon II*, 6 F.4th at 974 (quoting *Trevino*, 99 F.3d at 918). Tapia argues that the LPN Policy is evidenced by a pattern of LPNs acting without required supervision, identifying the use of LPNs to conduct COWS assessments in June 2018, and LPN Carillo's actions when he visited Tapia on September 19, 2018. Dkt. No. 103 at 6 (citing Dkt. No. 104-13 at 13–14). Tapia's expert Denise Panosky, RN, opines that the LPNs acted outside their scope of practice during each of these activities. Dkt. No. 104-13 at 14–15. For purposes of summary judgment, Tapia has sufficiently met his burden.

First, Tapia's expert opined that over the course of the six COWS assessments, Tapia showed increased withdrawal signs, from minimal to mild, that no LPN documented correctly.

Dkt. No. 104-13 at 14. No documentation shows that any LPN notified an RN or physician of these findings. *Id.* A reasonable factfinder could conclude, based on the absence of proper documentation, that from June 16, 2018, to June 18, 2018, Tapia showed increasing withdrawal signs, which the LPNs dismissed without notifying an RN or medical provider. *Id.*

Similarly, LPN Carillo's unsupervised assessment of Tapia on September 19, and the lack of documentation that he reported his assessment to an RN, further demonstrate LPNs acting without adequate supervision. While NaphCare points to Carillo's testimony that it is his "standard practice to always report back to the clinic RN" (Dkt. No. 100 at 19, 27; Dkt. No. 104-14 at 9), at the summary judgment stage, this testimony merely presents a factual dispute for the jury.

Moreover, LPN Carillo's notes and testimony raise, rather than resolve, additional factual disputes. MHP Nealis referred Tapia to medical due to being "nonresponsive" for a second day in a row, noting that he was "again unable to verbally respond to my questions" and "nonverbal in court today." Dkt. No. 104-11 at 7. Carillo's note records this referral, but also records that Tapia "state[d] he does not have any medical concern at this time." *Id.* In his deposition, Carillo testified that when he visited Tapia, he was both "responsive" and "talking" though he could not recall how he was able to solicit information from Tapia. Dkt. No. 104-14 at 13–14. Carillo's note is the only instance in Tapia's medical record of any verbal responses by Tapia in the relevant period. *See* Dkt. No. 104-11 at 5. In other words, LPN Carillo is the only provider who charted that Tapia was able to verbally respond to questions, whereas all other recorded interactions with Tapia by NaphCare or County staff between September 17 and October 1 describe him as "non-verbal" or "non-responsive." *Id.* at 6–8.

Tapia testified that he could not recall LPN Carillo's September 19 visit. Dkt. No. 101-24 at 9. From these facts, a jury could reasonably infer that Tapia cannot remember the September 19 interaction with LPN Carillo because his condition had severely deteriorated at that point. And

a jury could question LPN Carillo's credibility and conclude that this conduct evidences another example in which an LPN examined Tapia and failed to accurately report or document his symptoms for a supervisor to review. *See Gonzalez*, 747 F.3d at 795; *see also Berry v. Baca*, 379 F.3d 764, 770 (9th Cir. 2004) (concluding that the defendants' "self-serving declarations … would be an improper basis for summary judgment" because these explanations "depend on disputed facts and inferences that are proper for jury determination" (cleaned up)).

Finally, NaphCare argues this evidence fails to establish "a material fact dispute about whether NaphCare has a widespread, longstanding custom of allowing LPNs acting outside the scope of their licensure" because Tapia relies only on his treatment and not on other incidents of LPNs acting outside the scope of their practice with other detainees. Dkt. No. 105 at 12.

It is true that *Monell* liability based on an "improper custom may not be predicated on isolated or sporadic incidents[.]" *Trevino*, 99 F.3d at 918. However, Tapia correctly argues "trial courts in the Ninth Circuit have consistently found that multiple instances of insufficient medical care provided to a single plaintiff can evidence a *Monell* custom." Dkt. No. 103 at 6 (citing *Tabb v. NaphCare*, No. 3:21-cv-05541-LK-TLF, 2024 WL 1905638, at *7 (W.D. Wash. May 1, 2024); *Jennings v. Cnty. of Riverside*, No. 5:19-01523 JFW (ADS), 2023 WL 9379974, at *2 (C.D. Cal. Sept. 1, 2023); *Trejo v. Cnty. of Imperial*, No. 20-cv-1465-LAB-DDL, 2023 WL 4194442, at *1–2 (S.D. Cal. June 26, 2023)). The Ninth Circuit has acknowledged the same. *See Sandoval*, 985 F.3d at 682 ("This standard does not require proof of a prior injury. A constitutional injury can be substantially certain to follow from a practice even if an injury has yet to occur. Otherwise, every *Monell* defendant would get 'one free … pass' for policies or practices that are substantially certain to violate an individual's constitutional rights.").

Indeed, "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual[.]" *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794

(9th Cir. 2017) (unpublished); *see also Manzo v. Cnty. of Santa Clara*, No. 17-CV-01099-BLF, 2020 WL 6940935, at *12 (N.D. Cal. Nov. 25, 2020) ("Although *Oyenik* is not a precedential opinion, the observation about the state of Ninth Circuit law is unquestionably correct."); *see also Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) ("The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act.").

On this record, a reasonable jury could find that at least seven separate times, an LPN examined Tapia without adequate supervision.  Courts in the Ninth Circuit have found a pattern based on less frequent maltreatment.  *See, e.g.*, *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) (finding a pattern based on three instances).  Likewise, a reasonable juror could conclude that these seven LPN interactions, ranging from June to September 2018, occurred over a sufficient timespan to constitute a pattern and that they present a consistent series of misconduct. *See, e.g.*, *Tabb*, 2024 WL 1905638, at *7 (detainee adequately alleged a policy where NaphCare and local county employees denied immediate medical treatment over the course of eight days); *Jennings*, 2023 WL 9379974, at *3 (prisoner complained of pain for three and a half months); *Trejo*, 2023 WL 4194442, at *6 ("[T]he TAC doesn't simply identify a single instance of a delayed appointment—it identifies seven over an eight week period[.]").

In sum, Tapia's recorded interactions with NaphCare LPNs sufficiently raise fact issues regarding the existence of the LPN Policy.

1

2

        b.     *Circumstantial evidence also raises fact issues as to the existence of the LPN Policy.[5]*

3    In addition to the seven interactions before his injury, Tapia also proffers evidence that

4    arose after his amputation tending to show a custom of LPNs acting out of their scope.

5    Specifically, Tapia points to: (1) NaphCare employees' beliefs that the medical staff charged with

6    Tapia's care complied with NaphCare policy, (2) post-event testimony showing that NaphCare

7    supervisors did not consider any employees' conduct improper, (3) expert testimony concluding

8    that this policy existed, and (4) NaphCare's underlying financial motivations.  Dkt. No. 103 at 7,

9    9, 12.  In totality, this circumstantial evidence supports the Court's conclusion that fact issues exist

    regarding whether NaphCare maintained a policy of LPNs practicing outside their nursing scope.

10    For example, as to the first and third categories, an employee's belief that their conduct

11    complies with an organization's policy and corresponding expert testimony can support existence

12    of a *Monell* policy.  *See, e.g.*, *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013)

13    (finding a sergeant's statement that he acted according to policy when he tased a non-threatening

14    suspect relevant to whether "such policy was the moving force behind his use of the taser"); *Hill*,

15    2023 WL 6297483, at *8 (nurse's testimony that "everything she did relating to Ms. Hill was

16    pursuant to regular NaphCare customs and practices" supported theory that nurse sent plaintiff to

17    medical watch based on NaphCare policy); *Silva v. San Pablo Police Dep't*, 805 F. App'x 482,

18    485 (9th Cir. 2020) (unpublished) (expert testimony that defendant's conduct was "consistent with

19    … departmental policies" supports existence of a municipal policy under *Monell*).

20

21

22

23

---

24    [5] For brevity, the Court discusses this evidence in detail only with respect to the LPN Policy, however, this evidence also supports the Court's conclusions with respect to the additional policies alleged as well.

ORDER DENYING DEFENDANT NAPHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT - 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Here, LPN Carillo conceded he was not licensed to conduct patient assessments, but then also testified that all his acts regarding Tapia comported with NaphCare's policies.  Dkt. No. 104-14 at 15, 22.  Similarly, RN Warren testified during her deposition:

> **Q**:     *And according to this note [from a Mental Health Provider], Mr. Tapia was referred to medical department for an assessment, correct?*
> **A**:     *That's what the note says.*
> **Q**:     *And according to this exhibit, the progress notes entered here, it looks like about an hour later Mr. Tapia was assessed by LPN Cameron Carrillo, correct?*
> **A**:     *Carrillo.  Uh-huh, yes.*
> **Q**:     *And was it customary in the fall of 2018 for LPNs to conduct patient assessments?  [Objection – calls for speculation, etc.]*
> **A**:     ***The LPNs do it – they do evaluate**.  They do look and see if people look like they're not normal today or they're not acting normal or their vitals are not normal.*

Dkt. No. 104-21 at 5. (emphasis added).  Based on this testimony, a reasonable jury may conclude that RN Warren allowed LPNs to conduct assessments outside of their nursing scope because it was regular NaphCare practice.  The weight and credibility afforded to this testimony are issues for the factfinder at trial, not for the Court.  *See Gonzalez*, 747 F.3d at 795–97.

Tapia also presents expert testimony concluding that "NaphCare had a custom and established practice of requiring LPNs to work outside of their nursing scope of practice[.]"  Dkt. No. 104-13 at 16–17.  This expert testimony, read in context with the entire record, further supports the Court's finding that issues of fact remain as to the existence of this policy.  *See Wegner v. Wash. DSHS*, No. C19-5961 RJB-DWC, 2021 WL 243402, at *5 (W.D. Wash. Jan. 25, 2021) (denying summary judgment based in part on an expert's opinion that DSHS's practice of using a certain algorithm to manage patient placement "unnecessarily put[] patients at risk").

Next, Tapia offers post-hoc remarks by NaphCare supervisors that Tapia's care comported with established NaphCare practices.  Dkt. No. 104-9 at 23 (deposition testimony from Jonathon Slothower).  Tapia also cites a June 16, 2020 email sent from Dr. Elliot Wade, a NaphCare Medical Director, in which he tells NaphCare employees involved in Tapia's care, "in my opinion you did

everything right[.]" *Id.*  Like the statements from LPN Carillo and RN Warren, the NaphCare supervisors' statements after reviewing Tapia's medical file support a reasonable inference that the LPNs' alleged failure to properly document and assess Tapia's symptoms is a regular practice—because omission of any record of medical referrals to the RNs or medical doctors raised no alarm from Slothower and Dr. Wade even after Tapia's injury.  The Ninth Circuit has found that similar circumstantial evidence is "highly probative" of the existence of a municipal defendant's policy under *Monell*. *See, e.g.*, *Henry*, 132 F.3d at 518–21 ("[P]ost-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom but is highly probative with respect to that inquiry."); *see also S.R. Nehad v. Browder*, 929 F.3d 1125, 1141 (9th Cir. 2019) (considering police department's approval of an officer-involved shooting as evidence of a *Monell* custom).

Lastly, Tapia cites deposition testimony from his expert, Dr. Bates, who previously worked for NaphCare as the Corporate Medical Director in Alabama, suggesting that NaphCare prioritized profits over healthcare.  *See* Dkt. No. 104-8 at 16; Dkt. No. 104-10 at 6–7.  Tapia compares wage estimates for LPNs with estimates for RNs, claiming that because LPNs are generally paid less, NaphCare was financially incentivized to staff LPNs instead of RNs as a cost-cutting measure. Dkt. No. 104-22 (LPN wage estimates); Dkt. No. 104-23 (RN wage estimates).  In response, NaphCare contends that it provided more RN hours than contractually required during Tapia's detention. Dkt. No. 100 at 11; Dkt. Nos. 101-18 (services agreement between NaphCare and Pierce County), 101-20 (LPN and RN monthly hour summary from September 16 to October 13, 2018).

Viewing the facts in Tapia's favor, this evidence,[6] when considered in combination with the entire record, supports the existence of factual disputes regarding the LPN Policy. While Tapia does not expressly address NaphCare's evidence that it provided more RN hours than required by its contract, the Court cannot resolve this issue as a matter of law. *See, e.g.*, *Hill*, 2023 WL 6297483, at *8–9 (denying NaphCare's post-trial motions and finding that circumstantial evidence, including testimony on NaphCare's financial incentives to send inmates to medical watch, sufficiently illustrated an unconstitutional custom).

Based on the totality of the evidence outlined above, Tapia has sufficiently raised genuine disputes of material fact as to whether NaphCare had a policy of LPNs practicing outside of their nursing scope.

        c.     *Tapia presents a genuine factual dispute as to whether this policy was a moving force behind his constitutional injury.*

Next, the Court considers whether Tapia adequately put forth facts showing a "direct causal link" between the LPN Policy and Tapia's constitutional injury (*i.e.*, inadequate medical care). *Sandoval*, 985 F.3d at 681. To show that an entity's action was the "moving force" or direct cause behind an injury, Tapia needs to raise triable issues with respect to causation-in-fact and proximate causation. *Harper*, 533 F.3d at 1026.

At the summary judgment stage, Tapia has met his burden. Tapia offers testimony from Dr. Juan Carlos Jimenez, a medical expert specialized in PCD, who concludes that:

> [T]he initial deep venous thrombosis which led to the patient's PCD appears to have been present for approximately 2-4 weeks prior to the date of his transfer to the hospital on 10/1/2018. This delay in diagnosis was a significant contributing factor which led to Mr. Tapia's left lower leg amputation. More likely than not, had the patient's acute deep venous thrombosis been diagnosed earlier and treated

---

[6] After the close of briefing on NaphCare's motion, Tapia moved for contempt sanctions against NaphCare for purportedly providing incomplete discovery responses regarding NaphCare's business structure and financial condition. Dkt. No. 170. Tapia argues that this information is relevant to NaphCare's liability and to the issue of punitive damages. *Id.* at 13. While the Court will resolve Tapia's Rule 11 motion in due course, the facts currently before the Court provide a sufficient basis to deny summary judgment.

1

with systemic anticoagulation, progression to PCD and limb loss would have been avoided.

2

Dkt. No. 104-17 at 7. Dr. Jimenez continues, noting that Tapia's PCD and related diagnoses (*e.g.*,

3

rhabdomyolysis, renal failure, compartment syndrome, and infected gangrene) caused his "acute

4

mental status changes recorded in the weeks leading up to" his hospital admission. *Id.*

5

6

Additionally, Nurse Panosky, Tapia's expert on nursing practices, opined that "[t]here was

7

an obvious risk of Mr. Tapia suffering serious harm, or even death" that any trained RN or LPN

8

should have recognized based on Tapia's decompensation on September 19. Dkt. No. 104-13 at

9

16. Though MHP Nealis had referred Tapia to medical for an assessment, LPN Carillo conceded

10

that patient assessments are outside the scope of his licensure. Dkt. No. 104-14 at 15 ("Under my

11

license[,] I'm not allowed to do—I'm not able to do assessments and I'm not able to diagnose.")

12

Yet Carillo was the only NaphCare medical professional who saw Tapia as a result of the referral.

13

Dr. Bates similarly opines that "[a]n altered mental status requires a full diagnostic

14

evaluation," which "could not be completed by the LPN as being outside their scope of practice."

15

Dkt. No. 104-8 at 5, 6. Dr. Bates also concluded that LPN Carillo's September 19 visit was "the

16

earliest time that a NaphCare intervention could have changed the course and outcome for Mr.

17

Tapia, and the opportunity was squandered." *Id.* at 6. Then, from September 19 to September

18

29—when RN Warren assessed Tapia—no NaphCare employee even opened Tapia's medical file,

19

let alone continued to "monitor" him. Dkt. No. 104-30 at 2.

20

In response, NaphCare argues that PCD is an "extremely rare" disease and that "Tapia's

21

experts acknowledged that Tapia's PCD had not developed on the day that LPN Carillo visited

22

Tapia in his cell." Dkt. No. 100 at 30. NaphCare suggests that Tapia's PCD was not reasonably

23

foreseeable by any NaphCare employee or policymaker, and as such, he cannot establish proximate

24

cause. *See id.*

NaphCare is incorrect.  Tapia does not need to show that the PCD's onset was "patently obvious" to NaphCare staff.  Dkt. No. 100 at 29.  The relevant question the jury must consider with regard to proximate cause is whether NaphCare could reasonably expect that requiring LPNs to make decisions outside of their licensure would lead to denial or delay of medical care.  *See Van Ort*, 92 F.3d at 837.  Viewing the record in Tapia's favor, as the Court must, a reasonable juror could conclude that the practice of LPNs making independent assessments outside of their scope of practice directly led to Tapia's delayed care (and subsequently, his amputation).  Though NaphCare may ultimately prevail on the merits, at this stage of the case, Tapia has set forth enough evidence for the question to go to the jury.  To the extent NaphCare takes issue with Tapia's experts' interpretation of his medical file, such challenges are better suited for cross-examination at trial.

In sum, Tapia has raised triable issues on his first theory of liability, and the Court therefore denies summary judgment.

2.  Relying on Correctional Officers for Medical Monitoring

a.  *Tapia presents a genuine factual dispute as to whether as a practice, NaphCare relied on correctional officers to medically monitor detainees.*

Tapia claims that NaphCare also had a custom of relying on correctional officers for medical monitoring.  Dkt. No. 103 at 8–9.  According to Tapia, this policy is evidenced by his "medical record [which] reveals that he spent ten days—from September 19, 2018, to September 29, 2018—being 'monitor[ed]…by corrections officers' and had no interaction whatsoever with a NaphCare medical provider."  *Id.* at 8.  Tapia also argues that this practice "persisted at other NaphCare facilities," pointing to *Hill v. NaphCare, Inc.*, as proof that NaphCare had a widespread practice of relying on correctional officers for this purpose.  2023 WL 6297483.  Tapia argues that based on the lack of documentation in his chart evidencing any NaphCare staff interaction with

Tapia over the ten-day span at issue, a juror could reasonably infer that NaphCare routinely relied on correctional officers to monitor Tapia.

To challenge Tapia's assertion that he had "no interaction whatsoever" with medical staff, NaphCare cites evidence that Tapia's unit *was* monitored by medical staff, and not just guards, from September 19–29.  RN Warren testified that when nurses did medication rounds, which occurred at least once and up to four times a day, the nurses "would see every single person" in the unit that was receiving medication, and "[the nurses] are going to look in and make sure you're still breathing and get your ok."  Dkt. No. 101-10 at 4–5.  NaphCare also cites to a Pierce County Sheriff's Department Cluster Operations Report ("Cluster Operations Report") for Tapia's unit that appears to show records of welfare checks completed between September 19 and 29.  Dkt. No. 101-29 at 6–55.

Despite NaphCare's contentions, Tapia meets his burden here.  RN Warren's testimony does not conclusively establish that a NaphCare RN or medical provider visited *Tapia* himself during the ten-day period.  His medical file reflects no visits from any medical staff and no RN testified that they assessed or performed a welfare check on Tapia between September 19 and 29, 2018.  And while the Cluster Operations Report shows that medication rounds were made to Tapia's unit, again, it does not document visits to Tapia himself nor does this report identify which RNs or medical personnel completed the checks.  *See* Dkt. No. 101-29 at 6–55.  Moreover, NaphCare does not provide any information on the duration and scope of the alleged welfare checks.  Even if welfare checks were conducted on Tapia, a factfinder could still reasonably conclude that NaphCare relied on correctional officers as their primary means for medical monitoring because these RN check-ins were too brief and insubstantial to constitute adequate medical care.  Dkt. No. 101-10 at 4–5; *see also Hill*, 2023 WL 6297483, at *2 (jury properly found

NaphCare custom of using correctional officers for medical monitoring, even though plaintiff was visited by an RN for "less than two minutes" before her death).

      b.    *There is a genuine dispute of material fact as to whether NaphCare's reliance on correctional guards for medical monitoring led to Tapia's constitutional injury.*

NaphCare asserts that correctional officers monitored Tapia in addition to the medical staff, and as such, Tapia "does not explain how having additional people watching him somehow caused his injuries." Dkt. No. 105 at 17. NaphCare's argument is unpersuasive. Tapia sufficiently raises questions of fact as to whether NaphCare *primarily* relied on medically untrained correctional officers for monitoring in the place of trained medical staff. For instance, it is undisputed that RN Warren visited Tapia on September 29 "as requested by [the] Sergeant." Dkt. No. 104-11 at 6. It is also undisputed that RN Chalk assessed Tapia on October 1, 2018, because she was "asked to see inmate by [the] unit officer." *Id.* It is further undisputed that no NaphCare medical provider assessed Tapia in between September 19 and September 29.[7] These facts permit a reasonable inference that NaphCare relied on correctional officers to monitor Tapia's symptoms and escalate his case to the medical staff.  In other words, construing the facts in Tapia's favor, a reasonable jury could find NaphCare failed to visit Tapia for 10 days and failed to communicate with Pierce County's MHPs (*see infra* Section III(B)(3)), which ultimately put the onus on the correctional officers to recognize Tapia's evolving medical needs.

From these facts, a jury could rationally conclude that this means of monitoring Tapia—with untrained guards acting as the fail-safe—unconstitutionally delayed his care. Thus, the Court denies summary judgment on Tapia's second theory of liability.

---

[7] While Tapia did not explicitly ask to see an RN in this period, a verbal request for medical care is not required to show a pattern of delayed care. *See, e.g.*, *Hill*, 2023 WL 6297483 (plaintiff exhibited withdrawal symptoms and complained of pain, but did not expressly request care, and later passed away). This is particularly true where the plaintiff is subject to increased monitoring for having suddenly become non-verbal.

3. <u>Non-Communication Between Pierce County's Mental Health Providers and NaphCare's Medical Staff.</u>

    a. *Tapia sufficiently raises issues of material fact regarding a NaphCare custom of non-communication.*

Tapia argues NaphCare maintained a policy of non-communication between Pierce County-employed mental health staff and NaphCare-employed medical staff. *See* Dkt. No. 103 at 9–10. As evidence, Tapia cites instances in his medical record in which MHPs documented his concerning symptoms but had no follow up by any NaphCare medical staff. For instance, on September 18, 2018, MHP Nealis charted that Tapia "came to the door and was cooperative during the interview, but appears to be confused and was unable to verbally respond to my questions" and that Tapia "appears to be decompensated at this time." Dkt. No. 104-11 at 8. No referral to NaphCare medical staff was made. *Id.* Tapia's expert, Dr. Bates, opined that his altered mental status "should have set off alarm bells and led to the immediate transfer or referral of the patient to medical for evaluation." Dkt. No. 104-8 at 5.

    The next day, MHP Nealis charted that Tapia "presented again today as confused[, and] was unable to verbally respond to my questions." Dkt. No. 104-11 at 7. He also noted that Tapia "appears to be decompensated at this time," and that corrections officers "report that he appears to be 'way off his baseline[.]'" *Id.* This time, MHP Nealis recorded that Tapia was "[r]eferred to medical department for assessment." *Id.* About an hour later, LPN Carillo visited Tapia. *Id.* As detailed above, LPN Carillo independently concluded that Tapia should continue to be monitored, but there is a factual dispute as to whether his conclusion was ever communicated to the on-duty RN. *Id.*; Dkt. No. 104-14 at 7–8. While NaphCare points to this visit as evidence of communication, Carillo conceded he had not read the MHP notes before visiting Tapia. Dkt. No. 104-14 at 12–13, 16. Moreover, there is no evidence that Carillo or any other NaphCare employee followed up with any MHP about their observations or the basis for the referral.

ORDER DENYING DEFENDANT NAPHCARE, INC.'S MOTION FOR SUMMARY JUDGMENT - 22

Tapia also points to his chart from September 20 to 28, during which MHPs visited him and continued to record additional concerning observations. Dkt. No. 104-11 at 7. Again, the MHPs' notes do not indicate that they reported their observations to NaphCare, and there is no evidence of any effort by any NaphCare employee to review or act on the MHPs' observations. *See id.* To the contrary, the access log for Tapia's chart shows when it was accessed and who accessed it. Dkt. No. 104-30 at 2. Despite concluding that Tapia warranted additional monitoring, no NaphCare employee even opened Tapia's chart from September 20, 2018, until September 29, 2018. *Id.* Though NaphCare argues they are not at fault for the MHPs' failures to escalate Tapia's case, the lack of referrals is relevant to the alleged custom of communication failures between NaphCare and the County. Further, a reasonable jury could fault NaphCare for its failure to take any steps over the course of ten days to review the MHPs' observations made in Tapia's medical chart or take any other documented steps to communicate with the MHPs.

Finally, NaphCare argues that Tapia cannot show a policy of non-communication exists because NaphCare and Pierce County have a contractual "policy requirement to maintain communication between NaphCare and Pierce County's mental health professionals 'to ensure continuity of care.'" Dkt. No. 100 at 18, 28 (citing Dkt. Nos. 101-15, 101-18). But Tapia does not challenge the constitutionality of NaphCare and Pierce County's written policies. Rather, Tapia argues that this policy was consistently not followed. Dkt. No. 103 at 18. Whether NaphCare, in *practice*, ensured communication between MHPs and NaphCare staff is an open question for the jury. *See Nehad*, 929 F.3d at 1141 (plaintiff "need not show evidence of a policy or deficient training; evidence of an informal practice or custom will suffice."). NaphCare's written policy and its conclusory assurances in its brief that "there was no breakdown of communication" are insufficient to support summary judgment, particularly when the record

suggests that NaphCare did not review Tapia's chart, and was therefore unaware of the MHPs' notes and Tapia's continual decline.  Dkt. No. 100 at 28–29.

In sum, Tapia has raised a triable issue as to the existence of a custom of non-communication between NaphCare and Pierce County.

> b.    *The record supports a reasonable inference that the lack of communication between the medical staff and MHPs amounted to deliberate indifference.*

Tapia's third theory of liability is premised on NaphCare's failure to communicate. Therefore, because Tapia alleges a policy of inaction, he must establish that the policy constituted deliberate indifference to Tapia's constitutional right to adequate medical care.[8]  *Tsao*, 689 F.3d at 1143; Dkt. No. 103 at 19.

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Park*, 952 F.3d at 1141 (cleaned up).  In other words, Tapia must show "actual or constructive notice" that NaphCare's custom of non-communication "is substantially certain to result in the violation of [] constitutional rights." *Hill*, 2023 WL 6297483, at *14 (citing *Castro*, 833 F.3d at 1076); *Park*, 952 F.3d at 1143 (citing *Tsao*, 698 F.3d at 1145) (requiring reason to know of foreseeable risk to plaintiff's constitutional rights).  A factfinder can infer deliberate indifference from circumstantial evidence.  *Sandoval*, 985 F.3d at 683.

---

[8] Because Tapia's allegations of LPNs acting outside their licensure and medical monitoring by guards are both "policies of action" by which NaphCare's unofficial customs directly require unconstitutional conduct, a separate showing of deliberate indifference is not required.  "'[D]eliberate indifference' is not a stand-alone element required in every *Monell* case."  *Hill*, 2023 WL 6297483 at *13.  Rather, a plaintiff needs to establish deliberate indifference where liability is premised on a failure to train or act.  *Id.*; *see also Sandoval*, 985 F.3d at 682 n.17 ("This deliberate indifference standard does not apply when a *Monell* defendant's policies, customs, or practices directly require unconstitutional conduct[.]"); *Tsao*, 698 F.3d at 1143–44 (finding that "heightened requirements" are necessary "for a policy of omission" but that "such concerns are not present '[w]here a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so'").

1    In Tapia's case, Dr. Bates opines that "[t]he medical record is replete with policies and

2    established practices that caused Mr. Tapia's obvious and serious medical condition to slip through

3    the cracks." Dkt. No. 104-8 at 9. He then specifically identifies the "lack of communication

4    between mental health and medical providers" and "lack of any oversight up the chain on the part

5    of medical providers." *Id.* at 10. According to Dr. Bates, the potential "serious harm or death to

6    inmates" caused by these policies "would be obvious to any medical provider exercising his or her

7    professional judgment." *Id.*

8    Indeed, as noted above, NaphCare's own policies required it to maintain adequate

9    communication with Pierce County to ensure continuity of care. Dkt. Nos. 101-15 at 13, 101-18

10    at 3. Moreover, it is undisputed that NaphCare is a sophisticated actor with ample experience in

11    the correctional healthcare industry. NaphCare "provides correctional healthcare services in

12    detention centers across the country[.]" Dkt. No. 100 at 8 (citing Dkt. No. 101-9). While it is a

13    close call, viewing the facts in the Tapia's favor, the Court concludes that a reasonable jury could

14    find that NaphCare, a regular government contractor for correctional medical services, possessed

15    constructive notice that this lack of oversight and communication between Pierce County's MHPs

16    and its own medical staff was substantially certain to result in unconstitutional delay of medical

17    care. *See Hill*, 2023 WL 6297483, at *15; *see also Sandoval*, 985 F. 3d at 657 (jury could infer

18    County's knowledge from County policies on medical treatment and observation).

19        c.    *There is a genuine factual dispute as to whether a custom of non-*
             *communication between the medical and mental health staff directly led to*
20           *Tapia's constitutional injury.*

21    Again, in totality, Tapia has offered enough evidence to raise factual issues as to whether

22    a custom of non-communication was the moving force behind his inadequate medical care. As

23    Dr. Jimenez opines, Tapia's blood clot and resulting complications were more likely than not the

24    cause of his "acute mental status changes." Dkt. No. 104-17 at 7. Dr. Jimenez further opines that

these changes, which were documented as early as September 18, 2024 by MHPs "should have alerted medical personnel…to perform a more detailed physical evaluation." *Id.* at 8. The absence of documentation showing any NaphCare RN or medical provider responding or following up on the MHPs' observations—or even opening Tapia's medical file to track his condition—supports the reasonable inference that NaphCare's communication failures led to delayed diagnosis and treatment. The jury could find this expert testimony credible and agree that but for NaphCare's failure to communicate with the MHPs (and appropriately act on their observations), Tapia's condition could have "been evaluated and treated in a timely fashion[,]" thus preventing his limb loss and the "high physical and mental pain associated with th[e] amputations." *Id.*; *see also id.* at 7 ("More likely than not, had the patient's acute deep venous thrombosis been diagnosed earlier and treated with systemic anticoagulation, progression to PCD and limb loss would have been avoided."). And again, Dr. Bates' testimony shows that NaphCare could reasonably expect that deficient communication between the two health care teams would lead to delayed care for a detainee. Dkt. No. 104-8 at 9; *see Van Ort*, 92 F.3d at 837.

To the extent NaphCare takes issue with the credibility of Tapia's experts or whether his PCD was foreseeable, these inquiries must be decided by a factfinder. *Conn*, 591 F.3d at 1101 ("If reasonable persons could differ over the question of foreseeability, summary judgment is inappropriate and the question should be left to the jury."); *Gonzalez*, 747 F.3d at 795 (leaving credibility determinations to the jury). NaphCare may argue that the symptoms documented by the MHPs were insufficient to reasonably alert NaphCare staff to Tapia's medical emergency— even if a NaphCare employee had read the MHP notes, which they did not— but NaphCare must make any such argument at trial. The Court cannot make such determinations as a matter of law. As such, NaphCare's motion for summary judgment on Tapia's third theory of liability is denied.

**C.    NaphCare Did Not Ratify Unconstitutional Conduct by its Employees.**

Lastly, Tapia argues that Dr. Wade ratified the care Tapia received when he sent his June 16, 2020 e-mail, telling providers they "did everything right." Dkt. No. 103 at 23. Distinct from *Monell* liability predicated on unofficial policies, an entity may also be held liable under § 1983 when a "final policy-making authority…ratifie[s] a subordinate's unconstitutional decision or action and the basis for it." *Clouthier*, 591 F.3d at 1250 (cleaned up). Tapia argues "material questions abound as to whether Dr. Alvarez[, NaphCare's final policymaker,] impliedly delegated authority to Dr. Wade and whether Dr. Wade approved of his subordinates' decisions and the basis for them." Dkt. No. 103 at 23. In so arguing, Tapia moves the Court to defer ruling on NaphCare's motion for summary judgment so that he can depose Dr. Alvarez. *Id.* n.89. The Court previously denied Tapia's motion for leave to depose Dr. Alvarez. Dkt. No. 87. NaphCare argues that, because Tapia acknowledges Dr. Wade is not the final policymaker, there is no material fact dispute on this issue. Dkt. No. 100 at 31–32.

NaphCare is correct. "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *Id.* at 123. In this case, Tapia has conceded that Dr. Wade is not a final policymaker for NaphCare. Accordingly, while Dr. Wade's email is relevant to the existence of the alleged policies, it does not support a separate theory of *Monell* liability premised on ratification.

1

## IV.  CONCLUSION

Viewing the evidence in Tapia's favor, the Court concludes that there are multiple triable issues of fact as to NaphCare's liability under *Monell*.   NaphCare's motion for summary judgment (Dkt. No. 100) is DENIED.

Dated this 14th day of January, 2025.

Kymberly K. Evanson
United States District Judge