1
2
3
4
5
6                              UNITED STATES DISTRICT COURT
                            WESTERN DISTRICT OF WASHINGTON
7                                      AT SEATTLE

8    JAVIER TAPIA,                                CASE NO. C22-1141-KKE

9                         Plaintiff(s),           ORDER GRANTING IN PART AND
              v.                                  DENYING IN PART PIERCE COUNTY'S
                                                  MOTION FOR SUMMARY JUDGMENT
10   NAPHCARE INC., et al.,

11                        Defendant(s).

12

13        Javier Tapia sues Pierce County for negligence, gross negligence, medical negligence, and

14   violation of his constitutional right to adequate medical care.  His claims arise from his Phlegmesia

15   Cerula Dolens ("PCD") diagnosis and subsequent lower leg amputation, which occurred while he

16   was detained at Pierce County Jail.  Pierce County moves for summary judgment, arguing that

17   Tapia's negligence and constitutional claims fail as a matter of law.  Dkt. No. 174.

18        Because numerous issues of material fact preclude summary judgment on the majority of

19   Tapia's claims, the Court grants in part and denies in part Pierce County's motion for summary

20   judgment.

21                                   I.    BACKGROUND

22        The Court summarized the facts of this case in its order on NaphCare, Inc.'s ("NaphCare")

23   motion for summary judgment and only reiterates this information as necessary for context.

24

In ruling on Defendants' motions to dismiss (Dkt. Nos. 19, 21), the Court dismissed Tapia's claims based on alleged violations of the Americans with Disabilities Act and the Rehabilitation Act. Dkt. No. 31 at 8. The Court also dismissed Tapia's § 1983 claim against Pierce County premised on a failure to train. *Id.* All remaining negligence and § 1983 claims against Pierce County survived. *Id.*

## II. LEGAL STANDARDS

### A. Summary Judgment

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (cleaned up).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* The burden then shifts to the party opposing summary judgment, who must affirmatively establish a genuine issue on the merits of the case. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

The Court does not resolve evidentiary conflicts or make credibility determinations in ruling on a motion for summary judgment. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (citing *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013)). Rather, such determinations are left to the province of the jury at trial. *See id.* at 795–97.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**B.    Municipal Liability Under *Monell***

Under 42 U.S.C. § 1983, any "person" acting "under color of" state law who violates rights "secured by the Constitution" shall be liable to the injured party.  A plaintiff must establish (1) that their civil rights were violated, (2) by a person acting under the color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).  "Pretrial detainees[, like Tapia,] have a constitutional right to adequate medical care while in the custody of the government and awaiting trial."  *Est. of Nelson v. Chelan Cnty.*, No. 2:22-CV-0308-TOR, 2024 WL 1705923, at *9 (E.D. Wash. Apr. 19, 2024) (citing *Russell v. Lumitap*, 31 F.4th 729, 738 (9th Cir. 2022)).

Municipalities and other bodies of local government are "persons" subject to liability under 42 U.S.C. § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]"  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  A private company is a "person" under § 1983 when it stands in the shoes of a municipality while providing public services under a contract.  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139–40 (9th Cir. 2012).

There are three pathways to municipal liability for constitutional violations under § 1983: constitutional injury caused by (1) the municipality's official policies or longstanding practice or custom, (2) the municipality's omissions or failures to act "when such omissions amount to the local government's own official policy[,]" or (3) a municipal policymaker ratifies a subordinate's unconstitutional decision or action and the basis for it.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

To establish liability pursuant to a policy or custom, a plaintiff must show (1) that a policy or custom existed; (2) a direct causal link between the policy or custom and the constitutional

deprivation; and (3) if the policy is one of inaction (*i.e.*, if the policy does not directly require unconstitutional conduct) that the defendant acted with deliberate indifference. *Est. of Hill v. NaphCare, Inc.*, No. 2:20-CV-00410-MKD, 2023 WL 6297483, at *12–14 (E.D. Wash. Sept. 27, 2023); *see also Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 681–83 (9th Cir. 2021) (*Monell* analysis proceeding in this order).

To show that a defendant maintained a policy or custom, a plaintiff needs to demonstrate that such policy was "so permanent and well settled as to constitute a custom or usage with the force of law." *Gordon v. Cnty. of Orange (Gordon II)*, 6 F.4th 961, 974 (9th Cir. 2021) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)) (cleaned up). That said, "[a]n unconstitutional policy need not be formal or written to create municipal liability under section 1983[.]" *Id.* "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)). In showing that a policy exists, a plaintiff must show "some evidence of municipal policy or custom independent of [the employee's] misconduct[.]" *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985) (concurring opinion). "To infer the existence of a [municipal] policy from the isolated misconduct of a single, low-level officer, and then to hold the [municipality] liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*." *Id.*

For a plaintiff to establish direct causation between the policy and purported constitutional injury, a plaintiff must prove causation-in-fact and proximate causation. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). "Pointing to a municipal policy action or inaction as a 'but-for' cause is not enough to prove a causal connection under *Monell*. Rather, the policy must be the proximate cause of the section 1983 injury." *Van Ort v. Est. of Stanewich*, 92 F.3d

831, 837 (9th Cir. 1996) (citations omitted). In § 1983 actions, "[t]raditional tort law defines intervening causes that break the chain of proximate causation." *Id.* A defendant's conduct is not the proximate cause of a plaintiff's alleged injuries "if another cause intervenes and supersedes his liability for the subsequent events." *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990). But "*foreseeable* intervening causes" do not supersede a defendant's responsibility. *Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th Cir. 2010) (en banc), *vacated by City of Reno v. Conn*, 563 U.S. 915 (2011), *reinstated in relevant part by Conn v. City of Reno*, 658 F.3d 897 (9th Cir. 2011). "If reasonable persons could differ over the question of foreseeability, summary judgment is inappropriate and the question should be left to the jury." *Id.* (cleaned up).

Tapia needs to prove that Pierce County acted with deliberate indifference if he alleges a policy of inaction. *Tsao*, 698 F.3d at 1143; *Hill*, 2023 WL 6297483, at *14. Policies of inaction occur when a plaintiff "pursues liability based on a failure to act," such as when a plaintiff claims that the defendant failed to train employees. *Hill*, 2023 WL 6297483, at *14. In contrast, policies of action constitute "policies, customs, or practices [that] directly require unconstitutional conduct[.]" *Sandoval*, 985 F.3d at 682 n.17.

## C. Negligence

The elements of a negligence claim are (1) existence of a duty to the plaintiff, (2) breach of the duty, (3) injury to the plaintiff, and (4) proximate cause. *Baker v. State, Dep't of Corr.*, No. 51906–9–I, 2004 WL 2284309, at *2 (Wash. Ct. App. 2004) (citing *Hertog v. City of Seattle*, 979 P.2d 400, 406 (Wash. 1999)). Whether a duty exists is a question of law, while breach and proximate cause are generally questions of fact reserved for the jury unless "reasonable minds could not differ." *Hertog*, 979 P.2d at 406.

Washington courts recognize "a jailer's special relationship with inmates, particularly the duty to ensure health, welfare, and safety." *Matter of Williams*, 496 P.3d 289, 299 (Wash. 2021)

(quoting *Gregoire v. City of Oak Harbor*, 244 P.3d 924, 927 (Wash. 2010) (plurality opinion)). "[T]his duty of providing for the health of a prisoner is nondelegable." *Gregoire*, 244 P.3d at 928. Further, this duty goes "beyond the mere exercise of ordinary care in the selection of a jail physician[.]" *Shea v. City of Spokane*, 562 P.2d 264, 268 (Wash. 1977), *aff'd*, 578 P.2d 42 (Wash. 1978). Rather, because the duty to ensure the inmate's welfare is nondelegable, the local government's liability includes the negligence of the jail physician. *Id.* (finding that the city, as a prisoner's custodian, cannot avoid liability for negligent exercise of duty to ensure a prisoner's health by delegating this duty to an independent contractor). In contrast, "[g]ross negligence most obviously differs from simple negligence in that it requires a greater breach[.]" *Harper v. State*, 429 P.3d 1071, 1076 (Wash. 2018). To prove gross negligence, a plaintiff must show that a defendant "*substantially* breached its duty by failing to act with even slight care." *Id.* (cleaned up).[1]

### III.   ANALYSIS

**A.     Material Factual Disputes Remain as to Tapia's *Monell* Claims Against Pierce County.**

Pierce County claims that it did not have constitutionally deficient customs and that Tapia cannot show a "pattern of similar cases as required to support the existence of the alleged customs or practices." Dkt. No. 174 at 23. Pierce County also asserts that Tapia's experts (Dr. Bates and Dr. Glindmeyer) did not identify other incidents that led to a similar constitutional violation. *Id.* Pierce County further contends that Tapia cannot show causation because PCD has a rapid onset and if Elizabeth Warren, a Registered Nurse ("RN"), found that his "vitals were perfect" two days

---

[1] Plaintiff also asserted a medical negligence claim, but conceded at oral argument that claim was not distinct from the ordinary negligence claims.

before his hospitalization, then none of the alleged policies could have been the moving force behind Tapia's constitutional injury.  Dkt. No. 184 at 13.

Tapia identifies six purportedly unconstitutional policies maintained by Pierce County: (1) a policy of substandard assessments, (2) a policy of using medically untrained guards to monitor patients in need of medical monitoring, (3) policies of non-communication between Mental Health Providers ("MHPs") and medical providers and a lack of oversight, (4) a policy to classify inmates' non-response as "refusals" of care, (5) a failure to require MHPs to treat sudden altered mental statuses as medical emergencies, and (6) a failure of MHPs to monitor mentally ill inmates.  Dkt. No. 182 at 6–12.  Notably, two identified policies overlap with the *Monell* claims asserted against NaphCare, on which the Court has already denied summary judgment—the practice of using correctional officers to provide medical monitoring and the custom of non-communication and lack of oversight.  Dkt. No. 186 at 21, 26.

For the reasons explained below, the Court finds that material factual disputes exist as to five of the six alleged policies.  As such, the Court grants in part and denies in part Pierce County's motion for summary judgment on Tapia's claims.

1.  Substandard assessments

Tapia argues that Pierce County's practice of MHPs conducting substandard mental health assessments led to delayed medical care.  Tapia offers testimony by MHPs defining assessments as "informal…evaluation[s] of how an inmate is doing," in which the MHPs conduct cell-side "'basic mental health status' exams."  Dkt. No. 182 at 6–7.  If the MHPs identified concerns, they were meant to "refer" the patient to an RN or Dr. Balderrama, Pierce County Jail's medical director.  *Id.*  These interactions occurred while the inmate stayed inside the cell.  *Id.*

Pierce County does not seriously dispute that the MHPs performed assessments in this manner.  Dkt. No. 184 at 10.  Rather, Pierce County argues that "Tapia does not offer any

description of how this is an unconstitutional policy." Dkt. No. 184 at 10.  However, there are multiple issues of fact as to whether these cell-side assessments could have resulted in the delay or denial of adequate medical care.

For example, Dr. Bates reviewed records and testimony describing MHP Darren Nealis' September 18, 2018 assessment.  Dkt. No. 104-8 at 3.  He noted that

> Mr. Nealis conducted this 'interview,' to the extent one can call it that, outside the door of the cell.  The cell door has a small window and a food trap.  This is not conducive to the evaluation of patients because an assessment conducted pursuant to the standard of care requires the patient to be brought out into the light in an area where a visualization of the patient can occur.

*Id.* at 5.  In his expert report, Dr. Bates describes this type of interaction as "drive-by" healthcare, noting that except for two instances, "none of the practitioners entered the cell." *Id.* at 8.  Dr. Bates opines that "[t]his lack of responsiveness by the patient required a more thorough direct evaluation" than what was provided.  *Id.*  Dr. Bates also opines on the inadequacy of MHP Nealis' documentation, finding that "[t]here is no explanation or even assessment for why the [sic] Mr. Tapia 'appears decompensated.'" *Id.* at 5.

Tapia also offers Dr. Glindmeyer's expert opinion, which concurs with Dr. Bates.  Dr. Glindmeyer explains that "the mental status examination includes multiple non-verbal components and indicators that can be used to determine an individual's mental state[.]" Dkt. No. 104-5 at 31. According to Dr. Glindmeyer, by reporting that they could not complete a mental health assessment or examination because Tapia was unresponsive, the MHPs "deviat[ed] from the standard of care." *Id.*  Dr. Glindmeyer also pointed out that failing to enter the cell or take the inmate to a separate location created "a barrier to engagement, assessment, and treatment." *Id.*  As a result, she concluded that the MHPs "all failed to recognize that Mr. Tapia was experiencing delirium and attributed his behavior to mental health symptoms or volitional behavior." *Id.* at 32. Finally, Dr. Glindmeyer observed that Tapia was seen by mental health staff on seven occasions

between September 18 and October 1 and "despite repetitive descriptions of Mr. Tapia appearing 'confused' and 'unable to verbally respond' and 'decompensated', mental health staff simply continued his Level 1 mental health housing and indicated they would 'follow-up'." *Id.* at 31. The record reflects that with the exception of the September 19 visit from Licensed Practical Nurse ("LPN") Cameron Carillo, at which Tapia's blood pressure was taken, these assessments did not result in a more fulsome evaluation by mental health or medical staff.

Moreover, as Dr. Bates observed, the record shows that over several weeks, the MHPs consistently conducted assessments from outside Tapia's cell. *See, e.g.*, Dkt. No. 104-27 at 12 (MHP Nealis testifying that "[m]ore often than not[,]" MHP assessments were typically conducted cell-side through the door, with the food port closed), Dkt. No. 104-11 at 6 ("[Inmate] appeared to be sleeping and did not respond to MHP knocks on door or calling of name. [Inmate] observed moving and breathing in his bed."), Dkt. No. 104-8 at 8 ("Except for two occasions, none of the practitioners entered the cell."). Therefore, a factfinder could reasonably conclude that these cell-side assessments constituted a widespread practice at Pierce County Jail, rather than acts of individualized negligence. *See Trevino*, 99 F.3d at 918 (holding that a *Monell* policy must be founded on practices of sufficient duration, frequency, and consistency).

Further, a reasonable jury could find Dr. Bates and Dr. Glindmeyer credible and thus conclude that the MHPs' cell-side assessments led to inaccurate documentation and tracking of Tapia's symptoms and subsequently, delayed response to his serious medical needs. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Accordingly, the Court denies Pierce County's motion for summary judgment on Tapia's *Monell* theory of MHPs conducting substandard assessments.

2. <u>Correctional staff providing medical monitoring and lack of communication between medical and mental health providers.</u>

Tapia claims that Pierce County maintained a policy of untrained correctional staff providing medical monitoring and a custom of non-communication between the MHPs and medical staff. Dkt. No. 182 at 8–9. Tapia argues that these policies led to delayed care and subsequently, his amputation. *Id.* The Court denied NaphCare's motion for summary judgment with respect to these policies, finding disputed issues of fact as to the policies' existence and their role in Tapia's injuries. Dkt. No. 186 at 21, 26. The same factual disputes are present here, and as such, Pierce County's Motion is denied with respect to these two policies as well.

3. <u>Classifying inmates' non-response as "refusals" of care</u>

Tapia argues that the County maintained policies that inappropriately classified "an inmate's non-response to the provision of medical care, mental health care, and meals as a deliberate refusal." Dkt. 182 at 11. Pierce County does not directly contest the existence of this policy, but instead, summarily asserts, "There is no evidence that Tapia could not communicate." Dkt. No. 184 at 11.

Disputed facts preclude summary judgment on this alleged policy for several reasons. First, as to Pierce County's threshold assertion, it is undisputed that multiple MHPs recorded observations that Tapia was "unable to verbally respond[,]" "non-responsive[,]" "decompensated" or deteriorating over several weeks before his hospitalization. Dkt. No. 175-2 at 15–17. During one MHP's assessment, Tapia was not even conscious. *Id.* at 15 ("[Tapia] appeared to be sleeping and did not respond to MHP knocks on door or calling of name."). During another, the MHP observed that Tapia "does not respond in any way to MHP, he just stared…[and] would not even shake his head yes or no." *Id.* at 16. When asked to recall how his condition and injury came

about, days after his hospitalization and during his deposition, Tapia answered that he could not remember. *Id.* at 14.

Second, the record shows that on at least two of these occasions, an MHP documented Tapia as refusing care or being "uncooperative" after observing that he was unresponsive. *Id.* at 15, 16. With respect to meals, while Tapia's behavior log indicates that he "verbally refused" 15 meals between September 18 and October 1, 2018 (Dkt. No. 175-1), this evidence in inconclusive. There is a question of fact as to whether a notation of "[v]erbally refused meal" actually requires any verbal response from an inmate at all. Jonah Bradley, a Pierce County corrections officer, testified that "verbally refused meal" is the only option in a drop-down menu that correctional staff can record in the log when an inmate does not come and pick up his meal. *See* Dkt. No. 104-7 at 6–7, Dkt. No. 104-8 at 4 n.1 (Dr. Bates opining that the drop-down box is "very limited in the amount of information it conveys" and "can be misleading"), Dkt. No. 104-13 at 10 (Denise Panosky opining on Bradley's deposition testimony).

Finally, Tapia offers expert testimony that shows he was physically unable to respond, and that there was a pattern of MHPs classifying Tapia's lack of response as refusals. Dkt. No. 104-8 at 10, *see* Dkt. No. 104-5 at 32 ("The documentation included in Mr. Tapia's record indicated he was experiencing confusion, disrupted sleep patterns, unintelligible speech, and changes in levels of consciousness/alertness."), 32 ("During delirium, individuals become confused and unable to think or remember clearly. The symptoms are acute, meaning they start suddenly, and they can wax and wane.").

While Pierce County disputes the import of this testimony, the Court cannot resolve these issues at summary judgment. *See Anderson*, 477 U.S. at 255. Rather, a triable issue exists as to whether Pierce County had a policy of classifying non-responses as refusals of care.

1   Moreover, a jury could reasonably find a direct causal link between this policy and denial

2   of care. It is "plainly obvious" that documenting an inmate's non-response as an affirmative

3   refusal of care could lead to delayed or denied medical treatment. *See, e.g.*, *Pope v. McComas*,

4   No. 07-CV-1191-RSM-JPD, 2011 WL 1584213, at *15 (W.D. Wash. Mar. 10, 2011), *report and*

5   *recommendation adopted*, No. C07-1191 RSM, 2011 WL 1584200 (W.D. Wash. Apr. 26, 2011)

6   (denying summary judgment on an inmate's medical deliberate indifference claim where the

7   county had a practice of terminating medical screenings of uncommunicative inmates).

8   As such, the Court denies Pierce County's summary judgment motion with respect to this

9   policy.

10   4. Failure to treat sudden altered mental statuses as medical emergencies

11   Tapia argues that Pierce County maintained policies that did not require medical staff or

12   MHPs to treat an inmate's "sudden altered mental status" as a medical emergency. Dkt. No. 182

13   at 11. Tapia asserts that he "consistently presented with an altered mental status" from September

14   17, 2017 to October 1, 2018. *Id.* Tapia claims that despite these signs of decompensation, every

15   MHP and medical provider failed to treat this as a medical emergency. *Id.* at 12. Again, Pierce

16   County does not meaningfully dispute the allegations, but suggests without acknowledging the

17   record that Tapia's mental status changes were not "consistent." Dkt. No. 184 at 11.

18   To demonstrate a pattern or practice, Tapia points to occasions where MHPs documented

19   his decompensation, but did not escalate his case to an RN or physician. Dkt. No. 104-29 at 3–4

20   (Tapia's behavior log from September 17, 2018 to October 22, 2018), 4 (correctional staff

21   documents Tapia's changed behavior and "[d]isturbing [m]annerisms" on September 17, 2018);

22   Dkt. No. 104-11 at 6–8 (Tapia's medical chart notes from September 17, 2018 to October 1, 2018).

23   For example, on September 18, 2018, MHP Nealis observed that Tapia was non-verbal, confused,

24   and decompensated. Dkt. No. 104-11 at 7–8. He did not refer Tapia for a medical assessment.

1

*Id.* MHPs continued to record Tapia's decompensated state three more times without referring

2

him to an RN or physician. *Id.* at 6–7. Multiple MHPs testified that all their acts comported with

3

Pierce County's established practices. *See, e.g.*, Dkt. No. 104-27 at 4 (MHP Nealis' deposition),

4

Dkt. No. 183-2 at 3 (MHP Jesus Perez), Dkt. No. 183-4 at 4 (MHP Duane Prather).

5

Pierce County points out that an MHP referred Tapia to medical staff one time, on

6

September 19, 2018. Dkt. No. 104-11 at 7. However, while LPN Carillo visited Tapia shortly

7

after this referral, there is no evidence in the record that an RN or physician conducted a follow-

8

up after LPN Carillo's visit or were otherwise aware that Tapia was decompensating. *Id.*

9

Eventually, ten days later, Tapia was visited by RN Warren and RN Chalk, but on both occasions,

10

correctional staff made the referral, not an MHP. *Id.* at 6.

11

Based on Tapia's medical file, a reasonable factfinder could conclude that at least five

12

times, an MHP observed Tapia's "altered mental status" and failed to escalate his case to an RN

13

or physician. Tapia's interactions with the MHPs span across four weeks and exhibit sufficient

14

duration, consistency, and frequency to constitute a widespread custom under *Monell*. *See*

15

*Trevino*, 99 F.3d at 918; *see e.g.*, *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997)

16

(finding a pattern based on three instances of maltreatment); *Tabb v. NaphCare*, No. 3:21-cv-

17

05541-LK-TLF, 2024 WL 1905638, at *7 (W.D. Wash. May 1, 2024) (detainee adequately alleged

18

*Monell* policy based on purported denial of immediate medical treatment over eight days).

19

Additionally, after reviewing the record, Tapia's experts concluded that Tapia's "medical

20

record is replete with policies and established practices that caused [his] obvious and serious

21

medical condition to slip through the cracks," including the practice of "[n]ot requiring medical or

22

mental health providers to treat an inmate's sudden altered mental status as a medical emergency."

23

Dkt. No. 104-8 at 9–10. As the Court explained in its prior order on NaphCare's summary

24

judgment motion (Dkt. No. 186 at 14), both an employee's belief that their conduct comports with

an organization's policy and accordant expert testimony can establish existence of a *Monell* policy. *See, e.g.*, *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013); *Hill*, 2023 WL 6297483, at *8–9; *Silva v. San Pablo Police Dep't*, 805 F. App'x 482, 485 (9th Cir. 2020) (unpublished).  Thus, a genuine factual dispute exists as to whether Pierce County maintained a practice of failing to respond to sudden altered mental status changes as a medical emergency.

Because Tapia alleges a policy of inaction, the Court considers whether there is a material dispute of fact as to whether Pierce County's policy constitutes deliberate indifference.  *See Hill*, 2023 WL 6297483, at *12–14; *Sandoval*, 985 F.3d at 681–83.  While neither party expressly argues in their briefing that this policy constitutes one of inaction, Tapia alleges that Pierce County "did not require" MHPs to classify his symptoms as a medical emergency, which is a policy premised on a failure to act.  Dkt. No. 182 at 12.  Therefore, Tapia must show that a genuine dispute exists regarding Pierce County's purported deliberate indifference.

Here, Tapia has met his burden.  To demonstrate deliberate indifference, Tapia must show that Pierce County had "actual or constructive notice" that Pierce County's custom "is substantially certain to result in the violation of [] constitutional rights."  *Hill*, 2023 WL 6297483, at *14 (citing *Castro*, 833 F.3d at 1076); *Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1143 (9th Cir. 2020) (requiring reason to know of foreseeable risk to plaintiff's constitutional rights).  Dr. Bates observed that "Mr. Tapia's sudden altered mental status is well documented.  It is well documented on multiple occasions that Mr. Tapia was not eating and not being himself.  It is documented on more than one occasion that he was non-verbal."  Dkt. No. 104-8 at 11.  He then concluded that "Mr. Tapia suffered from a serious medical condition that would have been apparent *to the most casual observer*.  But despite being seen by multiple providers, he was not given the thorough mental health and physician examination the standard of care required."  *Id.* (emphasis added).  A reasonable factfinder could find Dr. Bates' testimony credible and conclude that Pierce County

had reason to know that inadequate responses to an inmate's "sudden altered mental state" is substantially certain to result in delayed or inadequate medical care. *See Gonzalez*, 747 F.3d at 795 (leaving credibility determinations to the jury); *Pope*, 2011 WL 1584213, at *15 (denying summary judgment where delayed medical care was a "plainly obvious" consequence of the county's medical screening policy).

Lastly, the Court considers whether there is genuine factual dispute as to whether this custom was the moving force behind Tapia's constitutional deprivation. Tapia has set forth sufficient facts to survive summary judgment on this issue.

Tapia submits testimony from a vascular specialist, Dr. Jimenez, who opined that Tapia's "PCD and related systemic manifestations…were the cause of his acute mental status changes recorded in the weeks leading up to his admission to Tacoma General Hospital on October 1, 2018." Dkt. No. 104-17 at 7. Dr. Jimenez also concluded that these documented acute mental status changes should have alerted medical personnel at Pierce County to perform a more detailed physical evaluation, which "would have led to an earlier diagnosis of deep venous thrombosis prior to progression to PCD and the onset of gangrene and would have saved his leg." *Id.* at 8. The jury may reasonably rely on this expert testimony and find that but for the MHPs' failure to escalate Tapia's case to an RN or physician, Tapia's care would not have been so delayed. *Id.* The absence of documented follow-ups by any RN or medical provider allows the reasonable inference that the MHPs' failure to act directly led to Tapia's deferred diagnosis and treatment. And just as Dr. Bates' testimony supports a finding of deliberate indifference, a reasonable juror could rely on his opinion in finding that Pierce County could reasonably anticipate that deficient responses to altered mental status changes would lead to delayed care. *See Van Ort*, 92 F.3d at 837; *Pope*, 2011 WL 158421, at *15 (finding a material dispute as to whether an "affirmative" causal link exists between

1    an entity's policy and denial of adequate medical care).  Therefore, genuine disputes of fact remain,

2    and the Court denies Pierce County summary judgment on this policy.

3        5.  Failure to monitor mentally ill inmates

4        Under his final theory of *Monell* liability, Tapia argues that Pierce County failed to ensure

5    adequate monitoring of mentally ill inmates.  Dkt. No. 182 at 12.  Tapia asserts that the standard

6    of care espoused by the National Commission on Correctional Health Care ("NCCHC") requires

7    that "inmates in residential units such as the Level 1 mental health housing are evaluated daily by

8    mental health staff."  Dkt. No. 182 at 12 (citing Dkt. No. 104-5 at 30, Dkt. No. 104-39 at 7).  Tapia

9    offers Dr. Glindmeyer's expert opinion, which provides that because he resided in Level 1 mental

10   health monitoring, he should have been monitored daily by medical staff.  Dkt. No. 104-5 at 30.

11   Pierce County responds that the applicable NCCHC standard only recommends those in "acute

12   mental health residential units" require daily patient evaluation, which Pierce County argues does

13   not apply to Tapia.  Dkt. No. 174 at 5, Dkt. No. 175-8 at 2–3.

14       While the record is unclear as to what NCCHC standard applies to Level 1 housing at

15   Pierce County jail, Tapia nonetheless fails to meet his burden here.  Again, Tapia alleges a *Monell*

16   policy premised on a failure to act, or specifically, a failure to monitor Tapia daily.  Therefore,

17   Tapia must show a genuine dispute as to whether this alleged policy rises to the level of deliberate

18   indifference.

19       The briefing on this issue from both Tapia and the County is thin.  Tapia points solely to

20   Dr. Glindmeyer's report to demonstrate why Pierce County's monitoring policy was

21   constitutionally inadequate.  Dkt. No. 182 at 8.  Dr. Glindmeyer opines that the lack of

22   documentation of daily monitoring is a deviation from the standard of case.  Dkt. No. 104-5 at 30.

23   However, a mere deviation from the standard of care does not establish deliberate indifference.

24   *L.W. v. Grubbs ("Grubbs II")*, 92 F.3d 894, 900 (9th Cir. 1996) ("Deliberate indifference to a

ORDER GRANTING IN PART AND DENYING IN PART PIERCE COUNTY'S MOTION FOR SUMMARY
JUDGMENT - 16

known, or so obvious as to imply knowledge of, danger, by a supervisor who participated in creating the danger, is enough.  Less is not enough."); *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015) ("Deliberate indifference is something more than mere negligence but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." (cleaned up)).  Therefore, even if the jury were to conclude that Dr. Glindmeyer is credible, at most, the jury could conclude that Pierce County's practice of monitoring inmates in mental health housing three days a week was negligent.  There are not enough facts in the record to support a greater standard of fault based on a failure to provide daily monitoring.  As such, the Court grants summary judgment as to this *Monell* theory.

**B.   Tapia Presents a Genuine Factual Dispute as to Whether Pierce County Was Negligent.**

Pierce County does not dispute that it owed Tapia "an affirmative duty to ensure [his] health, welfare, and safety."  Dkt. No. 174 at 8.  Nor does the County dispute that Tapia suffered damages.  Instead, Pierce County asserts that Tapia cannot prove breach or causation.  *Id.*  The Court disagrees and denies summary judgment on Tapia's negligence claims.

1.   Fact issues preclude summary judgment on NaphCare-related negligence claims against Pierce County.

Relying on Pierce County's nondelegable duty to provide adequate medical care to inmates in its custody, Tapia's Second Amended Complaint alleges that Pierce County is "responsible for the negligence of NaphCare and its employees[.]"  Dkt. No. 18-1 at 19–21.  In its reply, Pierce County argues that Tapia waived his NaphCare-related negligence claim against the County by failing to address it in its opposition brief.

Tapia does not offer evidence on NaphCare's negligence outside a single footnote arguing that "the County is additionally liable for NaphCare's negligence and *Monell* policies, as described in Plaintiff's opposition to NaphCare's Motion for Summary Judgment."  Dkt. No. 182 at 6 n.6.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Tapia's opposition likewise does not expressly argue that NaphCare acted negligently, though in support of his *Monell* claims, he cites to expert testimony opining that NaphCare provided substandard medical care. Dkt. No. 103 at 15. At oral argument, counsel for Tapia argued that he ran out of room to fully brief the negligence issues and therefore incorporated the arguments against NaphCare's motion by reference to save space. It goes without saying that counsel could have sought relief from the word limits by motion if necessary to fully present his argument. Local Rules W.D. Wash. LCR 7(f) (rule governing motions to file over-length briefs).

Nonetheless, the Court has discretion to consider this footnoted argument. To be sure, this is "poor advocacy: a request in a footnote is much more likely to be overlooked or missed by the Court. If an argument is worth making, a party should put the argument in the body of its brief." *Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1127, 1131–32 (W.D. Wash. 2007). The Court can choose to give little weight to arguments that a party opts to present in a footnote, but a trial court is not precluded from considering the arguments altogether at this point. *See, e.g., Dick Corp. v. SNC-Lavalin Constructors, Inc.*, No. C06-715-MJB, 2006 WL 8454968, at *3 (W.D. Wash. Oct. 2, 2006) (giving little weight to an argument contained entirely in a footnote but still providing analysis on the merits); *Howse v. Dep't of Corr.*, No. C16-5939 BHS, 2018 WL 4931571, at *4 n.1 (W.D. Wash. Oct. 11, 2018) (finding that a failure to oppose arguments in support of summary judgment operates as a waiver of those arguments on appeal—but does not result in complete abandonment of those claims). Because the Court favors resolution of issues on their merits, the Court will exercise its discretion and will consider the negligence claims arising out of NaphCare's alleged conduct.

As noted above, Pierce County's duty to inmates is nondelegable and does not only include its duty of care in contracting with NaphCare, but also NaphCare employees' conduct. *See Shea*, 562 P.2d at 268. Thus, the Court considers whether there is a genuine dispute as to whether any

NaphCare employee failed to exercise "the standard of care of a reasonably prudent health care provider in that same profession" and whether such failure proximately caused Tapia's injury. *Frausto v. Yakima HMA, LLC*, 393 P.3d 776, 779 (Wash. 2017); *see also Shea*, 562 P.2d at 270 ("[T]he jail physician, a general practitioner, is required to exercise the same standard of care of the average, competent doctor, and this is the class to which he belongs.").

To support its argument that Pierce County should be liable for NaphCare employees' conduct, Tapia relies on the evidence discussed in the Court's order denying NaphCare's motion for summary judgment. As detailed there, Tapia offers fact and expert testimony supporting his claims that NaphCare LPNs purportedly practiced out of scope, that RN Warren's visit to Tapia on September 29, 2024 was below the standard of care, and that NaphCare medical staff failed to properly monitor Tapia, or even open Tapia's medical file for 10 days. Dkt. No. 104-13 at 14, Dkt. No. 104-11 at 6, Dkt. No. 104-30. Though Pierce County (understandably) objects to the manner in which Tapia argues this claim, it does not seriously contend that there are no facts in dispute as to NaphCare's negligence, nor could it. The record is replete with conflicting declarations about the care provided by NaphCare employees and whether it complied with applicable standards. These questions are for the jury. *Hertog*, 979 P.2d at 406 (reserving questions on breach and causation for the jury unless reasonable minds cannot differ). Pierce County's motion on the NaphCare-related negligence claims is denied.

2. Pierce County's motion as to its own negligence is denied.

Tapia's negligence claims against Pierce County generally allege that the County failed to provide adequate medical care to Tapia while in custody, in violation of its undisputed duty to do so. Dkt. No. 182 at 22–23. Tapia argues that the County's failures, in the form of poor communication, substandard assessments and monitoring, and inadequate training and supervision, caused his injuries. *Id.*

1    As with the evidence relating to NaphCare's employees and policies, the record contains

2    multiple competing expert declarations and conflicting factual testimony regarding Pierce County

3    employees' conduct vis-à-vis the applicable standards of care.  Though the County insists that no

4    disputes remain for trial, and repeatedly alleges "no evidence" supports various claims, its brief

5    fails to acknowledge the bulk of the record before the Court, nor provide a credible pathway for a

6    ruling in its favor as a matter of law.

7    As a threshold matter, in arguing against Tapia's *Monell* policy claims, Pierce County

8    effectively concedes that Tapia has raised fact issues with respect to whether County and NaphCare

9    mental health and medical staff provided inadequate medical care.  Dkt. No. 184 at 7 ("Tapia lists

10    situations where he and his experts believe the conduct of Pierce County employees fell below the

11    standard of care.").  And the County is correct, in so far as the record reflects multiple disputes of

12    fact as to whether the County's MHPs evaluated Tapia in a manner consistent with the standard of

13    care in the context of allegedly substandard assessments, communication failures, monitoring by

14    untrained corrections staff, failing to treat acute mental status changes as an emergency, and failing

15    to adequately monitor mental health inmates. *See* Dkt. No. 104-8 at 4–7, 9 ("Observation is not a

16    form of assessment."), 10 (opining on communication issues between MHPs and medical staff);

17    Dkt. No. 104-13 at 11, Dkt. No. 104-5 at 31.  And because the Court has concluded that Tapia has

18    sufficiently raised fact issues with respect to whether these policies exist and whether they caused

19    Tapia's constitutional injuries, the same factual disputes preclude entry of summary judgment in

20    the negligence context.

21    In addition to the *Monell* policies, Tapia asserts that Pierce County negligently trained and

22    supervised its MHPs on its "stabilization plan" policy.  Dkt. No. 182 at 23.  It is undisputed that

23    Pierce County's express policy requires mental health staff to generate a "stabilization plan

24    (indicated by "SP" in the Plan section of the electronic medical record)…that identifies the mental

health needs of the inmate and measures taken by the mental health staff to meet those needs[.]" Dkt. No. 183-9 at 3. Examples of such measures include "referral to a psychiatric prescriber," plans for "a follow-up assessment by mental health staff" and other "appropriate follow-up." *Id.* Pierce County's policy instructs mental health staff to place the follow-up request "on the follow-up board with [the] date of [the] next requested follow-up." *Id.*

Viewing the record in Tapia's favor, the Court finds material factual disputes as to whether the MHPs negligently applied the stabilization plan policy and whether this directly led to delayed care and Tapia's subsequent amputation. Tapia points to various MHPs' testimony to show that the MHPs were unfamiliar with this policy or improperly implemented its requirements. For example, Tapia offers MHP Nealis' deposition testimony in which he first testified that he could not recall what a stabilization plan was, but later clarified that MHPs would document a treatment plan that was not signed off by a supervisor. Dkt. No. 183-3 at 10, 11.

In addition, MHP Perez also described that while MHPs would "formulate a plan verbally in our morning meetings," "there's nothing specifically—as far as like a stabilization plan—I can't think of a specific form that we fill out." Dkt. No. 183-2 at 16. MHP Perez also could not recall anything "specific that says stabilization plan" in the medical files. *Id.* When asked whether he conducted a stabilization plan for Tapia during his deposition, MHP Perez replied, "Well, yes. This whole time, I never realized that SP stood for stabilization plan[.]" Dkt. No. 183-2 at 18. Tapia's medical file shows that during the relevant period, MHPs who visited Tapia and charted their observations—including MHP Perez—included notes titled "S/P." *See* Dkt. No. 175-2. But beyond the chart notes, the record contains no plan regarding any specific care or follow-up action. Rather, the record shows that after MHP Prather charted on September 20, 2018, that mental health staff will follow up on Tapia, no MHP opened his medical file for six days. Dkt. No. 175-2 at 16.

Tapia also points to expert testimony supporting his negligence claim related to the stabilization plan. Specifically, Dr. Bates criticizes the MHPs' documentation, including whether the MHPs properly provided a follow-up plan to address Tapia's medical needs. *See, e.g.*, Dkt. No. 104-8 at 5 ("At the very least, Mr. Nealis should have notified his supervisor that a complete evaluation of the patient had not occurred and that further measures needed to be taken."), 7 (observing that MHP Nealis' notes are all nearly identical in that they reflect Tapia's continued deterioration, but that no follow-up action was taken in response), 8–9 ("Dr. Balderrama should have known about and formulated a plan to assess and treat Mr. Tapia. The fact that the care provided to Mr. Tapia was left up to lower-level LPNs and mental health providers is indefensible.").

Altogether, a jury could reasonably conclude from this evidence that Pierce County negligently trained MHPs on the stabilization plan process and that as a result, MHPs failed to properly ensure follow-up and continuity of care to Tapia's medical needs. *See* Dkt. No. 104-8 at 4 ("Due to a series of repeated half-measures and failures to adhere to common community standards of care, Mr. Tapia was subjected to the loss of a limb."), 5 (describing MHP Nealis' September 18, 2018 visit as "the beginning of half-measures").

Likewise, as the Court previously concluded, Tapia sufficiently raises a factual dispute as to whether Pierce County and NaphCare maintained a policy of non-communication. *See supra* Section III(A)(2). In further support of this claim, Tapia offers expert testimony that the MHPs' communication methods fell below the standard of care. In particular, Dr. Bates opined that

> [T]hroughout this record [] the health care provided was disjointed and disorganized. The lack of communication between disciplines was another rung in the ladder of cause and effect that led to the poor outcome for Mr. Tapia. The lack of communication between disciplines falls well below the standard of care.

Dkt. No. 104-8 at 6–7, *see also* Dkt. No. 104-24 at 54, Dkt. No. 104-39 at 9 ("Documentation reviewed in this case did not reveal any notations of coordination of care between mental health staff and medical staff at the Pierce County Jail.").  This is sufficient to show a material factual dispute as to whether Pierce County negligently communicated with NaphCare regarding Tapia's care and whether this purported break in communication led to Tapia's constitutional injury.

Finally, a reasonable jury could conclude that Pierce County staff breached the applicable standard of care by failing to properly document and communicate Tapia's symptoms and decompensation to other staff as well as denying his requests for care.  *See* Dkt. No. 183-1 at 2, Dkt. No. 104-5 at 29 (Dr. Glindmeyer's conclusion that cancellation of Tapia's September 13, 2018 kite[2] was "not appropriate" and improperly delayed care), Dkt. No. 104-13 at 8 (Panosky's observation that the record includes "no further documentation that Mr. Tapia was seen or assessed by nursing or mental health staff" after the kite cancellation).  The jury can also reasonably conclude from Tapia's proffered expert testimony that the delay in diagnosis directly led to his injury.  *See, e.g.*, Dkt. No. 104-5 at 33 ("It is my opinion that Mr. Tapia's acute mental status change due to delirium and the delay in his receiving appropriate medical care resulted from a series of system failures and deviations from the standard of care by medical and mental health staff at Pierce County Jail."), Dkt. No. 104-17 at 8 (opining that the "initial deep venous thrombosis which led to the patient's PCD appears to have been present for approximately 2-4 weeks prior to the date of his transfer to the hospital on 10/1/2018").  Ultimately, the same facts supporting Tapia's *Monell* claim also support denial of summary judgment on Tapia's negligence claim arising from this course of conduct.

As a result, the Court denies summary judgment on Tapia's negligence claims.

---

[2] A "kite" is a request for medical care.  Dkt. No. 104-5 at 29, Dkt. No. 183-2 at 27 (MHP Perez's testimony describing kites and the sick call system at Pierce County Jail).

1

## IV.   CONCLUSION

Material factual disputes remain as to Pierce County's potential liability under § 1983 and for negligence.  Accordingly, the Court DENIES Pierce County's motion for summary judgment as to Tapia's first five theories of § 1983 liability and GRANTS summary judgment as to Tapia's *Monell* claim based on Pierce County's failure to provide daily monitoring by MHPs.  Dkt. No. 174.  The Court DENIES summary judgment as to all negligence claims.  *Id.*

    Dated this 27th day of January, 2025.

_____
Kymberly K. Evanson
United States District Judge