1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAVIER TAPIA, | CASE NO. C22-1141-KKE |
| Plaintiff(s), | ORDER ON MOTIONS TO STRIKE AND MOTIONS TO EXCLUDE EXPERT TESTIMONY |
| v. | |
| NAPHCARE INC., et al., | |
| Defendant(s). | |

Plaintiff Javier Tapia sues Defendants NaphCare Inc. ("NaphCare") and Pierce County (the "County") under 42 U.S.C. § 1983 and Washington state law, arguing that he received inadequate medical care while detained at the Pierce County Jail. Tapia claims that Defendants' denial or delay of care directly caused the amputation of his leg. All parties retained experts to opine on issues relating to Defendants' liability and Tapia's potential damages. Several motions to strike or exclude expert witnesses are ripe for the Court's consideration. Dkt. Nos. 109, 111, 113, 115, 116.

For the reasons below, the Court grants in part and denies in part each party's motions to exclude. Dkt. Nos. 109, 111, 113, 115, 116.

## I.    BACKGROUND

The Court provided a detailed factual background in its order on NaphCare's motion for summary judgment (Dkt. No. 186). The Court incorporates by reference the Background section

in that prior order, and for brevity, only recites the facts and procedural history as necessary for context.

On June 10, 2024, both NaphCare and the County moved to strike or exclude testimony from Tapia's experts.  Dkt. Nos. 109, 111, 113.  The same day, Tapia also moved to exclude NaphCare's and the County's expert testimony.  Dkt. Nos. 115, 116.  On August 1, 2024, the Court held oral argument on these evidentiary motions and NaphCare's motion for summary judgment. Dkt. No. 151.  On January 14, 2025, the Court denied NaphCare's motion for summary judgment on Tapia's § 1983 *Monell* claim.  Dkt. No. 186.  On January 24, 2025, the Court granted in part and denied in part Tapia's motion for summary judgment.  Dkt. No. 189.  On January 27, 2025, the Court granted in part and denied in part Pierce County's motion for summary judgment.  Dkt. No. 190.  The Court now turns to the parties' pending motions to exclude.

## II.    LEGAL STANDARDS

### A.    Motion to Strike

Under Federal Rule of Civil Procedure 26, parties must disclose all expert reports "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  And a party must also "supplement or correct its disclosure…in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect[.]"  Fed. R. Civ. P. 26(e)(1)(A).  "If a party fails to provide information…as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) ("Rule 37(c)(1) is a self-executing, automatic sanction designed to provide a strong inducement for disclosure." (cleaned up)).  Rule 37 allows district courts to "properly impose an exclusion sanction where a noncompliant party has failed to show that the discovery violation was either

substantially justified or harmless." *Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 740 (9th Cir. 2021).

**B.      Motion to Exclude Expert Testimony**

Federal Rule of Evidence 702 allows a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to provide opinion testimony based on "scientific, technical, or other specialized knowledge" if that knowledge will help the fact-finder to "understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Courts liberally construe Rule 702 in favor of admissibility. *See Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579, 588 (1993).

Put simply, Rule 702 requires expert testimony to be both relevant and reliable. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002) ("Whether testimony is helpful within the meaning of Rule 702 is in essence a relevancy inquiry."); *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); *see also* Fed. R. Evid. 403 (permitting exclusion of relevant evidence if its probative value is "substantially outweighed" by the danger of unfair prejudice, confusion of the issues, or misleading the jury, among other concerns).

In considering the reliability of an expert's testimony, the Court weighs whether (1) "the testimony is based on sufficient facts or data[,]" (2) the expert uses reliable principles and methods, and (3) the expert reliably applied the principles and methods to the instant facts. Fed. R. Evid. 702. The Supreme Court outlined a non-exhaustive list of factors[1] for deciding the reliability of scientific testimony, but these factors are not applicable to non-scientific testimony, which heavily

---

[1] The *Daubert* factors for weighing the reliability of scientific testimony includes (1) whether the theory can be and has been tested, (2) whether it has been peer reviewed, (3) the known or potential rate of error, and (4) whether the theory used is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593–94.

depends on an expert's experience and knowledge versus methodology. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004).

## III.  ANALYSIS

**A.  Motions to Exclude Tapia's Experts**

NaphCare and Pierce County move to exclude Tapia's liability and damages experts: Dr. Johnny Bates, Ms. Denise Panosky, Dr. Daphne Glindmeyer, Dr. Juan Carlos Jimenez, Dr. Hans Carlson, Mr. Timothy Andenmatten, and Mr. Volkov.  Dkt. Nos. 109, 111, 113.

1. <u>Dr. Johnny E. Bates</u>

Dr. Johnny Bates is a board-certified doctor with clinical experience in correctional healthcare.  Dkt. No. 104-8 at 14, 15.  He currently manages a correctional healthcare company with over 350 employees and previously worked as the corporate medical director at a NaphCare facility in Alabama.  *Id.* at 3, 16.  Altogether, he has over 30 years of experience in correctional healthcare as a clinician and manager.  *Id.* at 3.

Both NaphCare and the County move to exclude and strike Dr. Bates' expert testimony. NaphCare seeks to exclude Dr. Bates because (1) he is unqualified to opine on Phlegmasia Cerulea Dolens ("PCD") because he had never encountered the disease in his practice before this case, (2) Dr. Bates' opinion that LPN Carillo practiced outside the scope of his license is contradicted by Dr. Bates' deposition testimony, and (3) Dr. Bates' opinions on whether unconstitutional policies existed is unreliable because they are based on insufficient facts.  Dkt. No. 111 at 8–9, 14, 21. NaphCare also seeks to specifically exclude Dr. Bates' testimony that LPN Carillo acted outside his scope of practice because it violates Federal Rules of Civil Procedure 26 and 37.  *Id.* at 22.

The County argues that Dr. Bates' testimony should be stricken because his opinions are speculative, unreliable, and unhelpful to the jury because Dr. Bates could not identify what care Tapia should have received or what mental health condition he likely had.  Dkt. No. 109 at 9–10.

Further, the County challenges Dr. Bates' testimony because in his opinion on whether deficient policies existed at the Pierce County Jail, Dr. Bates did not identify a written policy or support his conclusion with other detainees' treatment. *Id.*

Neither Defendant has provided a sufficient basis to exclude Dr. Bates.

As an initial matter, Dr. Bates' testimony does not violate Rule 26 or 37 because Tapia timely disclosed his opinion, and his deposition testimony did not go beyond his expert report. NaphCare relies on *Brumley v. Pfizer, Inc.*, a case from the Southern District of Texas in which the district court excluded an expert's affidavit because it was untimely and added a theory of causation that was not disclosed in the original report. 200 F.R.D. 596 (S.D. Tex. 2001).

*Brumley* is not analogous to Tapia's case. In *Brumley*, the disputed expert affidavit was submitted after the end of discovery and was "materially different" from the original expert report because the affidavit proposed a new theory of causation connecting Viagra to cardiac risks. 200 F.R.D. at 603–04. The *Brumley* expert admitted that this theory was based on a report that he had not read until after his original opinion was filed. *Id.* at 604. The district court also considered the plaintiffs' "discovery abuse by not proffering him for deposition in a timely manner," thus exacerbating prejudice to the defendant. *Id.*

Dr. Bates' subsequent testimony on LPN Carillo's conduct was not "materially different" from his Rule 26 report. In his report, Dr. Bates reviewed LPN Carrillo's testimony that he reported Tapia's symptoms back to the clinic Registered Nurse ("RN") on September 19, 2018. Dkt. No. 112-3 at 6. He opined that "[t]here is some question as to whether this actually occurred in Mr. Tapia's case because there is no documented record" and proceeded to provide a conclusion based on specific hypotheticals, including whether LPN Carillo practiced outside the scope of his license if he did report Tapia's symptoms to the charge nurse. *See id.* (concluding that if LPN Carillo had properly reported the symptoms, the charge nurse—not LPN Carillo—improperly

failed to conduct a follow-up).  During his deposition testimony, NaphCare's counsel posed the same hypothetical, to which Dr. Bates gave the same answer.  Dkt. No. 112-4 at 7–8.

Dr. Bates' testimony does not include new or divergent theories in violation of Rule 26 or 37.  He couches his opinions in hypothetical language in recognition that whether LPN Carillo actually reported to an RN is a fact issue for the jury.  And Ninth Circuit case law allows experts to "address a hypothetical world that never existed."  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022).  If NaphCare seeks to challenge inconsistencies between Dr. Bates' report and deposition, it should do so during cross-examination at trial.

The Court also rejects NaphCare's argument that Dr. Bates should be excluded because he had never encountered PCD in his practice. Dkt. No. 111 at 21.  Dr. Bates does not opine on PCD in his report.  *See* Dkt. No. 112-3.  When NaphCare's counsel asked him to explain what PCD is during his deposition, he provided a definition based on his general understanding as a medical provider.  Dkt. No. 112-4 at 5.  The references to PCD made in his report and deposition "d[o] not disqualify his opinions based on a lack of particularized experience."  *City of Seattle v. Monsanto Co.*, No. C16-107-RAJ-MLP, 2023 WL 4014294, at *11 (W.D. Wash. June 15, 2023).  Moreover, on the topics Dr. Bates does seek to offer opinions on, he is well-qualified to do so.  Dkt. No. 104-8 at 14.  For example, Dr. Bates offers opinions on when subordinate health care staffers (such as the MHPs or LPNs) should have reported to their supervisor, whether Tapia's initial symptoms were severe enough to require a full diagnostic evaluation, and what was reasonably expected of the NaphCare supervisors (RNs and medical providers).  *Id.* at 4, 5.

Additionally, NaphCare broadly requests the Court preclude Tapia's experts from offering testimony on whether "NaphCare maintain[ed] any alleged constitutionally deficient policy, custom, or practice."  Dkt. No. 111 at 17, 8–9, 14, 21.  To the extent NaphCare seeks to exclude legal conclusions from Dr. Bates' testimony, the Court agrees that "[e]xpert testimony is not proper

1    for issues of law[,]" such as whether a *Monell* policy exists or whether Pierce County is liable for

2    negligence. *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996). However, the

3    Court will not preclude Dr. Bates from testifying that "if it is not documented, it didn't happen."

4    *See* Dkt. No. 111 at 21.

5        The County's objections are also unavailing. The County takes issue with Dr. Bates'

6    failure to identify, with a reasonable degree of medical certainty, what treatment Tapia should have

7    received in prison or what illness he should have been diagnosed with. Dkt. No. 109 at 9. It is

8    true that Washington law requires medical expert testimony to be based on a "reasonable degree

9    of medical certainty[.]" *Reese v. Stroh*, 907 P.2d 282, 286 (Wash. 1995). But Dr. Bates explains

10   that he is unable to diagnose Tapia or identify what treatment he should have received because

11   "there is not enough documentation there." Dkt. No. 110-5 at 10. Based on the symptoms that

12   were documented—that is, Tapia's "decompensated" state—he provides an opinion on what

13   should have happened next: Pierce County should have completed a full diagnostic evaluation.

14   Dkt. No. 112-3 at 5. Dr. Bates' opinion that Tapia's medical file did not contain sufficient

15   information to support a diagnosis is helpful to the jury in deciding whether the County's conduct

16   delayed Tapia's PCD diagnosis, and ultimately, whether Pierce County was negligent.

17       The County also argues that Dr. Bates' testimony should be excluded because he "listed

18   out other 'policies' but could not identify any other inmates he relied upon to determine those

19   established 'policies.'" Dkt. No. 109 at 10. The County is incorrect. As the Court explained in

20   its prior order on NaphCare's motion for summary judgment, a *Monell* policy can be founded upon

21   a pattern of conduct towards an individual. *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794

22   (9th Cir. 2017) ("There is no case law indicating that a custom cannot be inferred from a pattern

23   of behavior toward a single individual[.]") (unpublished); *see also Manzo v. Cnty. of Santa Clara*,

24   No. 17-CV-01099-BLF, 2020 WL 6940935, at *12 (N.D. Cal. Nov. 25, 2020) ("Although *Oyenik*

is not a precedential opinion, the observation about the state of Ninth Circuit law is unquestionably correct.").

As such, the Court denies NaphCare's and the County's motion to exclude Dr. Bates' testimony.

2. <u>Dr. Daphne Glindmeyer</u>

Tapia retains Dr. Glindmeyer, a forensic psychiatrist, to opine on whether Tapia received adequate medical and mental health treatment at Pierce County Jail.  Dr. Glindmeyer is a licensed, board-certified psychiatrist and currently works in private practice, providing psychiatric evaluation and medication management services to child, adolescent, and adult clients.  Dkt. No. 104-5 at 2.  She has experience consulting for various state and local correctional institutions across the country.  *Id.* at 39–40.

The County challenges the reliability of Dr. Glindmeyer's testimony, while NaphCare argues Dr. Glindmeyer should be excluded because she "does not identify a single alleged NaphCare policy in her report that is deficient.  Nor did she identify any such alleged policy during her deposition."  Dkt. No. 111 at 9, Dkt. No. 109 at 11.

These arguments are unpersuasive.  First, the County argues that Dr. Glindmeyer should be excluded because she concluded that certain National Commission on Correctional Healthcare ("NCCHC") Standards were violated, without citation to specific standards, requirements, or definitions.  Dkt. No. 109 at 11.  The County also takes issue with Dr. Glindmeyer's failure to specify treatment that Plaintiff should have received between the time he was booked and September 17, 2018, when he was transferred to mental health housing.  *Id.*  A review of the record shows that Dr. Glindmeyer did set out the NCCHC standards at issue in her report and deposition testimony.  *See* Dkt. No. 110-6 at 7 (Dr. Glindmeyer's deposition describing a "global statement…from the NCCHC" that addresses "various difficulties that health care systems can

have with regard to providing access to care"), 9–10 (explanation on NCCHC's definition of "isolation" and "segregation" and standards for monitoring inmates in mental health housing); Dkt. No. 104-5 at 29 (citing 2018 NCCHC standards for health services in jails), 30 (citing scientific literature on effects of isolation and segregation), 30 (citing 2015 NCCHC standards for mental health services in correctional facilities).

The County does not provide compelling authority requiring a greater level of specificity. Dkt. No. 109 at 11–12. Indeed, the Ninth Circuit has recognized that "much of medical decision-making relies on judgment—a process that is difficult to quantify or even to assess qualitatively." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010). District courts in this circuit have also declined to exclude expert testimony for lack of detailed citations where the expert adequately explained the basis for her opinion and the expert's training, knowledge, and experience demonstrate reliability. *See, e.g.*, *Witkin v. Lotersztain*, No. 2:19-cv-0406 TLN KJN P, 2022 WL 2276663, at *5 (E.D. Cal. June 23, 2022) ("Although Dr. Burgar did not describe in detail how she arrived at her opinion, or expressly set forth the standard of care, Dr. Burgar sufficiently disclosed the basis for her conclusion."); *Rapp v. NaphCare, Inc.*, No. 3:21-cv-05800-DGE, 2023 WL 3983662, at *4 (W.D. Wash. June 13, 2023); *Allphin v. Peter K. Fitness, LLC*, 78 F. Supp. 3d 987, 993 (N.D. Cal. 2015) ("[A]n expert does not need to specifically say the words 'medical standard of care' if he clearly, and specifically, describes what care a doctor, operating under similar circumstances as the plaintiff's treating physicians, would have exercised in treating a similarly situated plaintiff."). And again, the Court rejects the argument that Dr. Glindmeyer should be excluded because she did not identify what care Tapia should have received. Like Dr. Bates, Dr. Glindmeyer acknowledged the lack of assessments and documentation in Tapia's medical file, which limited her conclusions. Dkt. No. 110-6 at 13 (responding that she could not

identify care Tapia should have received between June 16, 2018, and September 18, 2018, because "nothing was documented, so it's hard to know").

Next, the County contends that Dr. Glindmeyer's testimony is deficient because she "could not say to a reasonable degree of medical certainty if Tapia's delirium was related in any way to the [Deep Vein Thrombosis] DVT or PCD." Dkt. No. 109 at 7. Rather, Dr. Glindmeyer opined that underlying medical conditions that cause pain can trigger delirium and observed that Tapia's PCD developed the same time Tapia exhibited delirium. Dkt. No. 104-5 at 32, Dkt. No. 110-6 at 15 ("I'm saying whatever happened down there in that leg, the pain related to that caused delirium."). And while the County claims that this opinion is speculative, it does not challenge the medical records Dr. Glindmeyer reviewed in reaching this conclusion or her qualifications to opine on the causes of delirium. The County can challenge Dr. Glindmeyer's opinion on the connection between Tapia's delirium and underlying DVT or PCD through cross-examination.

The County next asserts that Dr. Glindmeyer's opinion on delirium must be excluded because other expert opinions contradict it. Expert testimony cannot be admitted if it is contradicted by indisputable facts in the record, but different experts can come to divergent conclusions by using a different methodology. *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005) (quoting *Weinstein's Federal Evidence* § 702.05[3], at 702–80.12 to 702–80.13); *Kauffman v. Manchester Tank & Equip. Co.*, No. 98–35218, 1999 WL 1103357, at *2 (9th Cir. Dec. 3, 1999) ("Expert opinion is insufficient if it 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable….'") (quoting *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995)) (unpublished). Because this inquiry goes to weight and credibility, the jury holds the "[a]uthority to determine the victor in such a 'battle of expert witnesses[.]'" *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001).

NaphCare also fails to justify exclusion. NaphCare claims that Dr. Glindmeyer does not identify deficient NaphCare practices and customs that caused Tapia's constitutional injury. But Dr. Glindmeyer provided opinions on whether LPN Carillo's conduct met the standard of care on September 19, alleged backlogs and understaffing at Pierce County Jail, and whether NCCHC standards required NaphCare medical providers to visit Tapia daily. Dkt. No. 104-5 at 32; Dkt. No. 137-2 at 9, 38–39. These opinions are relevant to NaphCare's potential *Monell* liability.

As a result, the Court denies the motions to exclude Dr. Glindmeyer as an expert.

3. Denise Panosky

NaphCare challenges the reliability and relevancy of Denise Panosky's testimony. Denise Panosky is an RN with about 40 years of experience, including 25 years in an emergency department. Dkt. No. 104-13 at 2. She is certified as a Forensic Clinical Nurse Specialist and Correctional Health Professional, among other certifications. *Id.* Ms. Panosky served as a workgroup member on the American Nurses Association ("ANA") Correctional Task Force, which worked to revise the ANA's standards and scope of practice guides for correctional nurses.

None of NaphCare's arguments provide a sufficient basis for exclusion. First, NaphCare claims that Denise Panosky's testimony is unhelpful to the jury and irrelevant because Ms. Panosky opines that NaphCare employees' negligent conduct caused Tapia's injury. Dkt. No. 111 at 12. According to NaphCare, because Tapia's negligence claim against NaphCare has been dismissed, any testimony about NaphCare employees' purported negligence is prejudicial and likely to mislead or confuse the jury. *Id.*

Ms. Panosky's opinions do not solely revolve around whether NaphCare employees comported with applicable standards of care. Rather, Ms. Panosky opines that she found a repeated and consistent pattern of NaphCare LPNs practicing outside of their license. *See* Dkt. No. 104-13 at 14 ("Based on the provision of care given to Mr. Tapia during this time period, it appears that

NaphCare had a custom and established practice of requiring LPNs to work outside of their nursing scope of practice by independently completing assessments and/or making treatment decisions."). Moreover, the jury must determine the severity of NaphCare's lack of care to decide whether any allegedly deficient NaphCare policy demonstrates deliberate indifference. *See Russell v. Lumitap*, 31 F.4th 729, 741 (9th Cir. 2022) ("[A]lthough medical negligence is not by itself unconstitutional, the care rendered can be so inadequate to the circumstances known to the medical staff as to amount to deliberate indifference."); *see also Arnold v. Lewis*, 803 F. Supp. 246, 256–57 (D. Ariz. 1992) (finding that "defendants provided grossly inadequate mental health care for plaintiff" which "demonstrates deliberate indifference to plaintiff's serious mental health care needs"). In other words, whether NaphCare employees acted according to applicable medical standards of care is an essential part of the jury's calculus of whether NaphCare is liable under *Monell*. The Court will not exclude Ms. Panosky for this reason, especially as NaphCare's concerns regarding confusion to the jury are better addressed through jury instructions.

Next, NaphCare contends that Ms. Panosky's testimony is unreliable because she bases her conclusions about the standard of care on California law. Dkt. No. 111 at 19. In support, NaphCare cites an excerpt of Ms. Panosky's deposition in which she answered a question about Dr. Bates' testimony regarding the nursing scope practiced at his Alabama facilities. Dkt. No. 137-3 at 21 ("Dr. Bates testified that nurses are allowed to perform focused assessments at his facilities. Do you agree that—do you disagree that LPNs are permitted to perform focused assessments?"). In this excerpt, Ms. Panosky answered and cited to a California statute. *Id.* This singular reference to non-Washington sources for medical standards of care does not justify excluding Ms. Panosky's testimony. During her deposition and in her report, Ms. Panosky makes clear she bases her opinions on Washington law. Dkt. No. 137-3 at 20–21, Dkt. No. 104-13 at 16 (citing WASH. REV. CODE § 18.79.060).

1        Similarly, NaphCare claims that Ms. Panosky's testimony conflicts with local Washington

2  law because "it is in direct contrast to an advisory opinion issued by the Washington State Board

3  of Nursing [WABON]." Dkt. No. 111 at 19. NaphCare provides no citation to the authority or

4  further explanation of how Ms. Panosky's testimony conflicts with this opinion, and as such, the

5  Court rejects this argument.

6        NaphCare also argues that Ms. Panosky's testimony should be excluded because she bases

7  her conclusion that NaphCare had a practice of LPNs working outside their nursing scope solely

8  on Tapia's care. Dkt. No. 111 at 15–16. Again, as the Court concluded in its order denying

9  NaphCare's motion for summary judgment, a *Monell* custom can be established based on conduct

10  towards an individual. Dkt. No. 186 at 12–13; *Oyenik*, 696 F. App'x at 794. NaphCare fails to

11  provide persuasive authority directing a different result.

12        Lastly, NaphCare argues that Ms. Panosky's testimony impermissibly weighs the evidence,

13  thus attempting to substitute her own judgment for the jury's. Dkt. No. 111 at 20. However, "[an

14  expert's] decision as to what evidence he found more persuasive does not mean his opinion is

15  subject to exclusion." *Stenson v. King Cnty.*, No. C23-1316-MJP, 2024 WL 5108472, at *9 (W.D.

16  Wash. Dec. 13, 2024), *on reconsideration*, No. C23-1316 MJP, 2024 WL 5202555 (W.D. Wash.

17  Dec. 23, 2024). NaphCare may cross-examine Ms. Panosky on her decision to rely on certain

18  evidence and discount other parts of the record, but the Court will not exclude her before trial.

19        As such, the Court denies NaphCare's motion to exclude Denise Panosky.

20        4.  <u>Dr. Juan Carlos Jimenez</u>

21        NaphCare seeks to exclude Dr. Juan Carlos Jimenez, Tapia's medical expert on PCD. Dr.

22  Jimenez currently serves as the director of UCLA Gonda (Goldschmied) Venous Center. Dkt. No.

23  104-17 at 10. He is a board-certified surgeon with a specialty in vascular surgery. *Id.* at 11. He

24  has served as a vascular surgeon at three separate hospitals and medical centers. *Id.*

NaphCare asserts three arguments for exclusion: (1) Dr. Jimenez did not identify a deficient NaphCare policy, established practice, or custom; (2) he is not a correctional officer and does not have prior experience with healthcare protocols in a jail setting; and (3) Dr. Jimenez's experiences with PCD are "extremely dissimilar" to Tapia's case. Dkt. No. 111 at 9–10, 17–18. First, as noted in the Court's order on NaphCare's motion for summary judgment, Dr. Jimenez's testimony goes to whether Tapia's onset PCD and other systemic manifestations could have manifested in mental health changes and whether such changes should have alerted NaphCare and Pierce County personnel to perform a full diagnostic assessment. *See* Dkt. No. 186, Dkt. No. 104-17 at 7–8. These inquiries go to causation (*i.e.*, whether but-for NaphCare's delayed care, as perpetuated through deficient policies, Tapia could have received an earlier diagnosis and better outcome). Dkt. No. 104-17 at 8. Dr. Jimenez's testimony need not "establish every element that the plaintiff must prove, in order to be admissible." *Primiano*, 598 F.3d at 565.

Second, NaphCare argues that Dr. Jimenez should be excluded because he lacks experience in correctional logistics and healthcare. Dkt. No. 111 at 13. The Court disagrees. Dr. Jimenez had not indicated that he intends to offer any opinion on NaphCare policies and procedures. And NaphCare does not challenge Dr. Jimenez's qualifications as a vascular surgeon and a PCD specialist, nor does NaphCare specify a difference between the standard of care in correctional and non-correctional medicine that would preclude Dr. Jimenez's expertise from applying here. Indeed, other district courts in this circuit have declined to exclude medical experts due to their unfamiliarity with correctional medicine. *See, e.g.*, *Est. of Wilson v. Cnty. of San Diego*, No. 3:20-cv-00457-RBM-DEB, 2023 WL 8360011, at *4 (S.D. Cal. Dec. 1, 2023) ("Dr. Steinberg has extensive experience in treating patients with CHF. And any lack of experience or knowledge concerning the standards in correctional facilities goes to the weight, not admissibility[.]"); *Ball v.*

*Kootenai Cnty.*, No. 2:14-cv-00246-EJL-CWD, 2016 WL 4974949, at *5 (D. Idaho Sept. 16, 2016).

Third, NaphCare argues that Dr. Jimenez's testimony is unreliable because he offers opinions "that are completely unsubstantiated by any medical reasoning" and are "based on nothing but his own experience." Dkt. No. 111 at 17–18. NaphCare is wrong. Dr. Jimenez has disclosed what he relied on for his conclusions—Tapia's medical and jail records, various deposition transcripts, and other expert reports. Dkt. No. 104-17 at 4–5. He also details his qualifications and explains the foundation for his expertise in treating venous diseases, including DVT. *Id.* at 3 (describing 16 years of experience as a vascular specialist, including Dr. Jimenez's current position as director of the UCLA Goldschmied Venous Center and experience as a vascular surgeon at three different medical centers). And in providing his conclusions, Dr. Jimenez also cites to Tapia's medical record and his interpretation of these materials. *See id.* at 6 (explanation of Tapia's diagnosis upon admission to Tacoma General Hospital, with citations to relevant medical literature), 7 (estimating when the onset of Tapia's PCD began based on how far advanced Tapia's left foot necrosis and gangrene was and the complications documented when he was admitted to Tacoma General Hospital), 7–8 (opining on the clinical note written by Tapia's physician at the hospital and Tapia's September 18 progress notes), 8 (providing opinions based on Tapia's clinical photos and Dr. Jimenez's "experience treating similar patients"). In short, Dr. Jimenez does not rely solely on his own experience for his conclusions. And despite NaphCare's objections, physicians and medical experts are permitted to rely on their experience in providing opinions. *Primiano*, 598 F.3d at 565; *Pajas v. Cty. of Monterey*, No. 16-cv-00945-BLF, 2019 WL 188660, at *2 (N.D. Cal. Jan. 14, 2019) ("When the expert is a physician, it may be more appropriate to focus on the physician's experience rather than the *Daubert* factors."). NaphCare

fails to articulate why Dr. Jimenez's opinions are "unsubstantiated" and thus, necessitate exclusion.

Finally, NaphCare claims that Dr. Jimenez made "statements in direct contradiction of another of Plaintiff's experts" during his deposition and that he relied on patient experiences that are "extremely dissimilar" to Tapia's case. Dkt. No. 111 at 18. Both arguments go to weight, not admissibility. Again, any contradictions between Tapia's experts can be elicited on cross-examination. *See Dorn*, 397 F.3d at 1196. Likewise, the jury may evaluate Dr. Jimenez's credibility by comparing his prior experiences with PCD to Tapia's case, but the Court will "not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, Inc., 738 F.3d 960, 969 (9th Cir. 2013).

Accordingly, the Court denies NaphCare's motion to exclude Dr. Jimenez's testimony.

### 5. Dr. Hans Carlson

NaphCare next seeks to exclude Dr. Hans Carlson, one of Tapia's damages experts. Dr. Carlson is a board-certified licensed physician with certifications as a Life Care Planner ("CLCP") and Physician Life Care Planner ("CPLCP"). Dkt. No. 114-24 at 7. He is a member of the American Academy of Physician Life Care Planners. *Id.* His specialty is in physical medicine and rehabilitation, and electrodiagnostic medicine. *Id.* at 8.

NaphCare first argues that Dr. Carlson and Mr. Andenmatten (another of Tapia's damages experts) both failed to specify the data they considered in reaching their conclusions. Specifically, NaphCare argues that Dr. Carlson relied on materials located in his company's database that were not disclosed in his expert report or before his deposition, including Tapia's "physical capacity evaluation completed…on January 7, 2024" and the "examinee information form." Dkt. No. 114-14 at 18. During his deposition, Dr. Carlson testified that "[t]he notes became the report. All of the information…that I used to determine this is in my report." Dkt. No. 137-11 at 18–19. A

review of the record shows that Dr. Carlson's report includes conclusions drawn from his physical evaluation of and interview with Tapia. Dkt. No. 114-24 at 18–19, 49, 52.

In response, Tapia claims that Dr. Carlson testified that the evaluation form and "workflow" notes are located in his company's database and that he is unsure if they can be extracted. Dkt. No. 135 at 7. Tapia claims that failure to provide the notes is not prejudicial because "the notes became the report." *Id.*

The Court disagrees. Despite Tapia's argument that these notes cannot be extracted, it appears that another expert, Mr. Andenmatten, cited to and relied upon these same materials. Dkt. No. 114-19 at 41 (citing materials created by Dr. Carlson, including a physician consultation report, physical capacity evaluation completed by Dr. Carlson on January 7, 2024, and a catastrophic life care plan completed on January 17, 2024).

In response to requests from NaphCare, Tapia refused to timely disclose this information, claiming that "source materials do not have to be turned over with an expert report as long as they are identified in the report." Dkt. No. 114-21 at 2. Tapia is wrong. Rule 26(a)(2)(B) requires expert witnesses to provide "the facts or data considered by the witness in forming them." NaphCare is entitled to access all materials that Mr. Andenmatten and Dr. Carlson reviewed and considered. "This is an affirmative disclosure obligation—an adverse party need not serve discovery to obtain the information within the scope of the rule." *Eisen v. Day*, No. 21-cv-05349-VKD, 2024 WL 1244482, at *6 (N.D. Cal. Mar. 21, 2024).

Rule 37(c)(1) provides an "automatic" sanction that bars the use of improperly disclosed evidence. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). That said, "[t]he automatic nature of the rule's application does not mean that a district court *must* exclude evidence that runs afoul of Rule 26(a) or (e)—Rule 37(c)(1) authorizes appropriate sanctions '[i]n addition to or instead of [exclusion].'" *Merchant*, 993 F.3d at 740. "Rather, the

rule is automatic in the sense that a district court *may* properly impose an exclusion sanction where a noncompliant party has failed to show that the discovery violation was either substantially justified or harmless." *Id.*

Here, the Court declines to exclude Dr. Carlson or Mr. Andenmatten based on their reliance on these two improperly withheld materials. Rather, the Court orders Tapia to disclose the following materials cited by Mr. Andenmatten and created by Dr. Carlson:

- Physician Consultation Report completed by Dr. Carlson

- Physical Capacity Evaluation completed by Dr. Carlson on January 7, 2024

Dkt. No. 114-19 at 41. To the extent NaphCare claims an additional deposition of either expert is necessitated by the late disclosures, Tapia shall bear the costs of re-opening both depositions. Any such deposition shall be limited solely to the newly disclosed materials.

Beyond NaphCare's claims regarding non-disclosure, NaphCare argues that the Court should exclude Dr. Carlson's opinions on causation, life expectancy, emotional damages, and prosthetics because he lacks expertise in these areas. Dkt. No. 113 at 6. According to NaphCare, Tapia's damages experts should limit their testimony to damages only. *Id.* at 17. In his response, Tapia asserts that Dr. Volkov, Dr. Carlson, and Mr. Andenmatten will not offer opinions on causation. Dkt. No. 135 at 11. NaphCare does not address this representation in its reply. *See* Dkt. No. 139. Therefore, the Court declines to exclude Tapia's damages experts on this basis.

With respect to life expectancy, NaphCare criticizes Dr. Carlson because 1) he testified that he could not recall offering an opinion on life expectancy for an individual with historical or current opioid abuse; and 2) because Dr. Carlson chose not to consider Tapia's past drug use since Tapia is currently sober. Dkt. No. 113 at 17, Dkt. No. 114-24. NaphCare does not explain why further specialization from Dr. Carlson is necessary. Indeed, in cases involving individuals with a history of drug abuse, courts have admitted life expectancy experts without specific experience in

life expectancy estimation for opioid users.  *See, e.g.*, *Pajas v. Cty. of Monterey*, , 2019 WL 188660, at *7  (admitting a cardiologist with training on opioid detoxification and experience testifying at trial regarding life expectancy); *see also* Dkt. No. 114-14 at 11 (Dr. Carlson opining that he had at least one other experience providing a life expectancy analysis for an opioid user).

Next, NaphCare asserts that Dr. Carlson is unqualified to opine on prosthetic components and coding.  Generally, medical coding systems consist of groups of codes that correspond to specific procedures or diagnoses.[2]  These systems are used to track information about a patient's health condition in their medical record and in the medical billing process.  In the context of prosthetics, coding is used to categorize prosthetic devices relative to their componentry.[3] Prosthetics coding allows prosthetic devices to be classified by function and pricing.[4]  As part of his report, Dr. Carlson included a cost analysis of Tapia's prosthetics, which required prosthetics coding.  Dkt. No. 114-24 at 61–62 (medical equipment and prosthetics summary), 68–69 (explanation of what coding system was used to determine cost of prosthetics), 89 (cost projection for Tapia's medical equipment).

NaphCare concedes that "Dr. Carlson regularly works with amputees," but takes issue with his reliance on a prosthetist in his team to complete coding for Tapia's devices.  Dkt. No. 113 at 18, Dkt. No. 114-14 at 6 ("I work with a prosthetist in our multidisciplinary clinic, so we will discuss the needs and I will write the prescription, but the coding is done by the prosthetist.").  Tapia does not respond to this argument.  Indeed, while Dr. Carlson has provided life care planning

---

[2]  *See  What  Is  Medical  Coding?*,  AAPC,  https://www.aapc.com/resources/what-is-medical-coding?msockid=2a1c83e5afd06838356e969eae816979.

[3] Dep't of Veterans Affs., VHA Directive 1045(1), *Coding, Market Analyses and Contract Guidance for Prosthetic Limb  and/or  Custom  Orthotic  Device  Procurement*  (Feb.  17,  2021),  https://www.va.gov/vhapublications/ViewPublication.asp?pub_ID=8895.

[4] *Id.*

for individuals with amputations, this more general expertise does not "*ipso facto* qualify him to testify as an expert in all related areas." *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, No. 8:14-cv-01352-JLS-KES, 2019 WL 8138163, at *14 (C.D. Cal. Nov. 20, 2019), *aff'd*, 35 F.4th 1367 (Fed. Cir. 2022); *Scolaro v. Vons Companies, Inc.*, No. 2:17-cv-01979-JAD-VCF, 2020 WL 8920999 (D. Nev. Mar. 2, 2020) (excluding testimony from a licensed nurse practitioner who lacked specific experience with injuries in the extremities and regularly referred patients to orthopedists for such problems). And during his deposition, he testified that he is "somewhat familiar with the coding for prosthetics." Dkt. No. 114-14 at 6. As for experience with prosthetic components themselves, though Dr. Carlson would prescribe prosthetics for his patients, he would not complete fittings, and he relied on a prosthetist to determine the appropriate specifications (*e.g.*, socket shape, suspension, etc.). *Id.* at 14. Tapia does not respond to this argument. Therefore, based on Dr. Carlson's testimony, the Court finds that he lacks experience to provide a reliable opinion on prosthetic coding and components.

Lastly, NaphCare contends that Dr. Carlson's testimony about Tapia's mental health is irrelevant because via communications between parties' counsel, Tapia purportedly disclaimed any damages "stemming from 'a clinically diagnosable injury related to his mental health and caused by NaphCare's negligence or constitutional violations." Dkt. No. 113 at 19 (citing *Aldan v. Home Depot USA Inc.*, No. 3:20-CV-05694-TL, 2023 WL 5630076, at *8 (W.D. Wash. Aug. 31, 2023)). The Court disagrees with NaphCare's representation. Reading Tapia's counsel's statements in context, he confirmed that "Plaintiff will not be asserting 'something more than just a claim of emotional distress[.]'" Dkt. No. 114-13 at 3. A review of Dr. Carlson's report shows that he does not provide a mental health diagnosis for Tapia or argue that Tapia experienced a "clinically diagnosable [mental health] injury." *Id.* Therefore, the Court declines to limit Dr. Carlson's testimony on emotional distress damages.

In conclusion, while the Court finds that wholesale exclusion of Dr. Carlson as an expert is not required, Dr. Carlson's is unqualified to testify on prosthetic coding and components. Further, the Court directs Tapia to disclose Dr. Carlson's Physician Consultation Report and Physician Capacity Evaluation.  Tapia must provide this information within 7 days of this order and pay the costs of any additional deposition as directed above.

      6.  <u>Timothy Andenmatten</u>

Timothy Andenmatten is a Certified Rehabilitation Counselor and Certified Vocational Evaluation Specialist with experience providing vocational evaluations, rehabilitation, and counseling as well as labor market evaluation and job placement services for individuals with disabilities.  Dkt. No. 114-19 at 57.  He regularly testifies as a vocational expert in social security disability benefit adjudication hearings, and is a member of the American Board of Vocational Experts.  *Id.*

First, NaphCare argues that Mr. Andenmatten's amended report should be excluded as untimely.  Dkt. No. 113 at 12.  On February 5, 2024, Mr. Andenmatten submitted his initial report, which was based on Tapia's $18 hourly wage.  *See* Dkt. No. 114-19.  Mr. Andenmatten received Tapia's deposition a week later.  Dkt. No. 137-13 at 2.  During his deposition, Tapia had testified that he made about $20.50 per hour.  Dkt. No. 114-2 at 7.  Expert reports were due by March 15, 2024.  Dkt. No. 63.  Mr. Andenmatten testified at his deposition on March 29, 2024, during which he explained that Tapia's deposition was not available to him when he submitted his report and that his report was based on the $18 hourly wage.  Dkt. No. 137-4 at 29–31.  He also explained that he would amend his report if he was directed to do so.  *Id.* at 29.  On April 19, 2024, Tapia served Mr. Andenmatten's and Dr. Volkov's amended reports.  Dkt. No. 114-15, Dkt. No. 114-16 at 5.  Discovery closed on May 15, 2024.  Dkt. No. 63.

1       In response to NaphCare's motion, Tapia counters that Federal Rule of Civil Procedure 26

2 required Tapia to amend Mr. Andenmatten's and Volkov's reports and that any injury to NaphCare

3 is harmless.  Dkt. No. 135 at 3.  Tapia asserts that his deposition—and his updated hourly wage

4 information—was not available to Mr. Andenmatten before the initial expert report was submitted

5 on February 5, 2023.  *Id.*; *see* Fed. R. Civ. P. 26(e)(1)(A).  Tapia also asserts that even if Mr.

6 Andenmatten's report was submitted after the disclosure deadline, his amended report does not

7 prejudice NaphCare.

8       Rule 37 bars use of improperly disclosed information at trial "unless the failure was

9 substantially justified or is harmless."  *Goodman*, 644 F.3d at 827; Fed. R. Civ. P. 37(c)(1).  To

10 decide whether an improper disclosure is "either substantially justified or harmless," *Merchant*,

11 993 F.3d at 740, the Court considers four factors: "(1) prejudice or surprise to the party against

12 whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood

13 of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the

14 evidence." *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010) (unpublished).

15       Here, while Mr. Andenmatten's amended report is technically untimely, overall, the factors

16 disfavor striking the report.  First, NaphCare likely suffered little surprise by the evidence offered.

17 NaphCare learned about Tapia's higher hourly wage in February 2024, and used that information

18 during Mr. Andenmatten's deposition the following month.  Dkt. No. 114-6 at 23.  Mr.

19 Andenmatten also told NaphCare that he would amend his report based on the higher hourly figure

20 if he was directed to do so. *Id.*  Similarly, NaphCare had the ability to cure any potential prejudice.

21 Mr. Andenmatten provided his amended report a month before discovery closed.  NaphCare could

22 have requested an extension from the Court to decide whether it needed to depose Mr.

23 Andenmatten a second time or otherwise seek further discovery.  It did neither.  Moreover, trial is

24 also unlikely to be disrupted by Mr. Andenmatten's amended report.  Trial is set for March 2025,

and NaphCare has not suggested or requested that discovery be reopened based on this expert testimony. And lastly, while Tapia's counsel has not explained why Mr. Andenmatten was not provided updated salary information in February 2024, the ultimate revised report works in NaphCare's favor. *Compare* Dkt. No. 114-15 at 56 (amended report stating Tapia's estimated loss in annual earnings capacity is $10,148) *with* Dkt. No. 114-19 at 55 (original report estimating Tapia's loss in annual earnings capacity at $13,996). Therefore, it is unlikely that the untimely disclosure resulted from bad faith or attempt at gamesmanship in the expert disclosure process. As such, a Rule 37(c) sanction is unnecessary at this juncture.

Second, NaphCare substantively attacks Mr. Andenmatten's opinion, arguing that his opinion on Tapia's loss of earning capacity is unreliable and speculative because Mr. Andenmatten "assum[es] that Tapia would have held a full-time, well-paying job if his life continued on the same path it was on prior to his injury." Dkt. No. 139 at 8. According to NaphCare, "the entire record refutes" Mr. Andenmatten's opinion that but for Tapia's amputation, he would have left prison and maximized his earning capacity by maintaining full-time employment as a construction worker. Dkt. No. 113 at 14. NaphCare also claims that Mr. Andenmatten failed to consider Tapia's employment history prior to incarceration, which had gaps and sometimes included part-time jobs. *Id.* at 12. In response, Tapia argues that NaphCare's argument constitutes a factual dispute rather than a challenge to Mr. Andenmatten's methodology. Dkt. No. 135 at 7–8.

NaphCare's argument does not go to reliability, but rather to the weight of Mr. Andenmatten's testimony. Despite NaphCare's representation of the record, during his deposition, Mr. Andenmatten testified that he considered Tapia's prior gaps in employment and type of employment when he calculated Tapia's loss of earning capacity. Dkt. No. 114-6 at 19, 20–21. Mr. Andenmatten also testified that he reviewed Tapia's past and current employment records. Dkt. No. 114-6 at 6; *see also* Dkt. No. 114-2 at 7. While NaphCare takes issue with Mr.

Andenmatten's conclusion and how he weighed Tapia's past work experience, this issue should be resolved by a fact-finder, not by the Court on a motion to exclude. NaphCare may cross-examine Mr. Andenmatten on how he weighed Tapia's employment history and present its own expert testimony disagreeing with Mr. Andenmatten's method. But conflicting expert testimony or mere disagreement with an expert's conclusion does not render an expert wholly unreliable. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable.").

Lastly, NaphCare argues that Mr. Andenmatten's "amended report undermines his initial report" and is an "implicit[t] conce[ssion] that the information was central to the report and its exclusion would mean his opinion on loss of earnings was not based on 'sufficient data or facts.'" Dkt. No. 113 at 15. This argument is unpersuasive. NaphCare does not argue that Mr. Andenmatten changed his methodology, which Mr. Andenmatten explains in his report. Dkt. No. 114-19 at 6–8. Rather, Mr. Andenmatten revised his report to include Tapia's updated wage estimate, and testified during his deposition that such change in the factual input would necessarily impact his overall calculations. Dkt. No. 137-4 at 30–31. Further, Mr. Andenmatten's testimony cannot be fairly taken as an admission that he relied on insufficient data when procedurally, experts are permitted to amend their reports if they encounter new information. Fed. R. Civ. P. 26(e); *see Medtronic Vascular, Inc. v. Abbott Cardiovascular Sys., Inc.*, No. C-06-1066PJH(EMC), 2008 WL 4601038, at *2 (N.D. Cal. Oct. 15, 2008) (denying motion to strike a supplemental report where the report included "nothing more than honest mistakes" and did not indicate an "attempt to mask inadequate preparation of the original report").

Thus, for the above reasons, the Court denies NaphCare's motion to exclude Timothy Andenmatten's testimony.

7.  <u>Nik Volkov</u>

Dr. Nik Volkov is a forensic economist with a practice focused on calculating economic damages in cases involving personal injury, wrongful death, wrongful termination, intellectual property, and commercial torts.  Dkt. No. 114-20 at 26.  He holds a Ph.D. in finance and certifications as a Certified Valuation Analysis and Master Analyst in Financial Forensics.  *Id.* Altogether, he has more than seven years of experience as a forensic economist and business valuator.  *Id.*

NaphCare first argues that Dr. Volkov's reports should be excluded because they rely on Mr. Andenmatten's purportedly flawed reports.  Dkt. No. 113 at 15–16.  Because the Court finds that Mr. Andenmatten's reports are sufficiently reliable to satisfy the *Daubert* standard, Dr. Volkov's reliance on Mr. Andenmatten's opinions is not a proper basis for exclusion.

Next, NaphCare asserts that Dr. Volkov lacks specialization in life expectancy or work-life expectancy.  In particular, NaphCare claims that "Volkov expressly disclaimed being an expert on life expectancy and work-life expectancy" and therefore, his conclusions on which work-life expectancy table to use should not be offered.  Dkt. No. 113 at 17–18.  However, Dr. Volkov does not seek to offer an opinion on Tapia's life expectancy.  Instead, Dr. Volkov testified that he used a life expectancy source to compute "full-function life expectancy", which is then used in calculating loss of household services.  Dkt. No. 137-12 at 24–26.  He distinguished between work-life expectancy estimates in forensic economics and the broader field of life expectancy, stating that "these are two distinctly different methodologies with distinctly different objectives."  *Id.* at 28.  Moreover, NaphCare does not attack the reliability of the life expectancy tables Dr. Volkov uses, nor does it address the cases in which federal courts have allowed economist experts to rely on similar sources in calculating household expenses and services.  *See, e.g.*, *Myers-Clark v. Frahler Elec. Co.*, No. C05-5553 JKA, 2007 WL 189248, at *1–2 (W.D. Wash. Jan. 22, 2007).

Lastly, NaphCare challenges the reliability of Dr. Volkov's conclusions on loss of household services, arguing that Dr. Volkov's opinions are flawed because he relies on Tapia's representations as to the time he spent doing various activities prior to his injury.  Dkt. No. 113 at 16.  NaphCare also claims that Dr. Volkov did not consider other changes in Tapia's life pre- and post-injury, such as the fact that Tapia "was not working prior to his injury but is working presently."  *Id.*  To NaphCare, "Tapia's change in employment status accounts for the entire difference in Tapia's household hours worked."  *Id.* (emphasis omitted).  In other words, NaphCare claims that Dr. Volkov ignored alternative explanations in Tapia's loss of household services, and thus should be excluded.

NaphCare's arguments are better suited for cross-examination at trial.  Dr. Volkov testified that a juror could weigh Tapia's credibility and conclude that his loss of hours was due more to his consistent employment than his injury.  Dkt. No. 137-12 at 22.  Therefore, NaphCare's challenge to Dr. Volkov hinges on credibility determinations rather than on Dr. Volkov's methodology or qualifications, which is insufficient to survive a *Daubert* motion.  *See Primiano*, 598 F.3d at 565 ("[T]he district judge is a gatekeeper, not a fact finder."); *City of Pomona*, 750 F.3d at 1053  ("Facts casting doubt on the credibility of an expert witness and contested facts regarding the strength of a particular scientific method are questions reserved for the fact finder.").

Therefore, the Court denies NaphCare's motion to exclude Dr. Volkov.

## B.    Motions to Exclude NaphCare's Experts

Tapia moves to exclude or limit the opinions of Dr. Alan Abrams, Dr. Peter Crum, Kathryn Wild, and Dr. Benjamin Starnes.  Dkt. No. 115.

### 1.    Dr. Alan Abrams

Dr. Alan Abrams is a licensed psychiatrist with a background in correctional, adult, forensic, and addiction psychiatry and addiction medicine.  Dkt. No. 117-1 at 3.  He served as the

1   director of the Forensic Psychiatry Fellowship Program at Georgetown Medical School, a chief

2   psychiatrist at two California prisons, and the medical director at an inpatient psychiatric hospital

3   at the California Medical Facility (CMF – Vacaville)—a state prison.  *Id.*  He currently serves as

4   a forensic psychiatry instructor for residency training at the University of California, San Diego.

5   *Id.*  Tapia seeks to exclude Dr. Abrams' opinions relating to Tapia's life expectancy, purported

6   "selective mutism," and Tapia's vascular disorders.  Dkt. No. 115 at 3, 6, 8.  He also moves to

7   exclude Dr. Abrams' opinion that Tapia verbally refused meals.  *Id.* at 7.

8       Tapia asserts that Dr. Abrams' opinions about Tapia's life expectancy are unreliable

9   because Dr. Abrams provides no methodology, statistics, or scientific principles that form the basis

10  for this opinion.  Dkt. No. 115 at 3.  NaphCare counters that this opinion is properly supported and

11  within Dr. Abrams' scope of expertise as a specialist in addiction psychiatry and addiction

12  medicine.  Dkt. No. 131 at 9.  Dr. Abrams also cites various academic sources documenting how

13  substance use can affect life spans, though as Tapia points out, these sources do not appear to

14  account for the impact of prior substance use on life expectancy where the former user is now

15  sober.  Dkt. No. 132-3 at 35, Dkt. No. 145 at 2.

16      The Court will not exclude Dr. Abrams' testimony as to Tapia's life expectancy.  Rather,

17  he can be cross-examined on the alleged lack of support for his conclusions.  However, Dr.

18  Abrams' opinion on Tapia's life expectancy is also partly based on his own determination that

19  Tapia's self-report of sobriety since 2018 is not credible, or that Tapia is likely to relapse.  Dkt.

20  No. 117-2 at 54.  Dr. Abrams does not explain how his conclusions as to Tapia's life expectancy

21  would change if the jury were to find Tapia credible.  Accordingly, while the Court agrees with

22  NaphCare that Dr. Abrams is generally qualified to opine on the effect of Tapia's past opioid use

23  on his estimated life expectancy, Dr. Abrams may not offer opinions on whether Tapia's self-

24  report regarding his sobriety is credible.  *Rhine v. Buttigieg*, No. 2:20-cv-01761-RAJ-BAT, 2022

WL 7729817, at *4 (W.D. Wash. Sept. 15, 2022) ("[W]hether a witness is truthful or accurate is generally not a proper subject for expert testimony as it infringes upon the jury's role and does not assist the trier of fact.").  Rather, NaphCare may attack Tapia's or his expert's credibility on cross-examination.

Tapia next asserts that Dr. Abrams' opinion that Tapia had "selective mutism" should be excluded as unreliable.  The Court disagrees.  Dr. Abrams based this conclusion on his experience and training, and his review of the record that included instances in which Tapia verbally communicated with medical providers.  Dkt. No. 117-1 at 12 (explaining what "selective mutism" is and why he believed selective mutism to be more likely than other potential medical illnesses). Tapia's disagreement with Dr. Abrams' conclusions is not a proper basis for exclusion under *Daubert.  Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998).

Tapia then argues that Dr. Abrams' conclusion that Tapia verbally refused meals should be excluded because whether Tapia was verbally communicating during this period is under dispute.  Dkt. No. 115 at 7–8.  In response, NaphCare argues that Dr. Abrams merely summarized Tapia's behavior log.  The Court will not exclude Dr. Abrams based on his decision to rely on some parts of the record and discount others.  *Stenson*, 2024 WL 5108472, at *9.  On cross-examination, Tapia may challenge Dr. Abrams' reliance on the behavior log and question whether Pierce County or NaphCare employees correctly documented Tapia's behavior.

As mentioned in the Court's order on NaphCare's motion for summary judgment, there is sufficient evidence from which the jury could conclude that the documentation that Tapia was able to speak (and subsequently refuse care or meals) was inaccurate.  Therefore, Dr. Abrams cannot definitively conclude that "Tapia verbally communicated with Pierce County personnel about his meals." Dkt. No. 117-1 at 13.  That said, while it is appropriate to limit Dr. Abrams' testimony on this issue, Tapia has not shown that Dr. Abrams is unreliable and should be excluded.

Tapia asserts that Dr. Abrams' testimony should be excluded because he offers unqualified opinions relating to vascular disorders. Dkt. No. 115 at 8. The Court is unpersuaded. Dr. Abrams acknowledged he would defer to a vascular surgeon for issues related to vascular disorders. Dkt. No. 117-2 at 31. And Tapia does not challenge Dr. Abrams' qualifications as a psychiatrist, nor explain why he would be unqualified to opine on Tapia's mental health symptoms as they were related to his vascular conditions. Dkt. No. 115 at 8−9.

The Court denies Tapia's motion to exclude Dr. Abrams and finds his testimony admissible subject to the limitations explained above.

2. <u>Dr. Peter Crum</u>

Dr. Peter Crum is a board-certified internist who has practiced medicine in the correctional setting for 29 years and served as the medical director for the Denver Sheriff's Department for 17 years. Dkt. No. 117-10 at 2. He is accredited through the NCCHC, the American Correctional Association, and the Commission on Accreditation for Law Enforcement Agencies. *Id.* Tapia argues Dr. Crum's testimony should be excluded for four reasons. None are persuasive.

First, Tapia claims that Dr. Crum offers the opinion that "Tapia had a behavior issue involving the creation of illegal prison alcohol while incarcerated," which Tapia argues is not based on reliable facts and is prejudicial to the jury. Dkt. No. 115 at 12. NaphCare responds that Dr. Crum is merely summarizing Tapia's behavior log, and as such, there is no opinion to strike. Dkt. No. 131 at 15–16. Tapia's complaint is better suited to a motion in limine, as he attacks the prejudicial nature of the underlying facts Dr. Crum relies on more so than the expert's qualifications or reliability. As such, the Court declines to exclude Dr. Crum on this basis.

Tapia then argues that Dr. Crum should be barred from offering opinions on nursing standards because he has never been licensed as a nurse. Dkt. No. 115 at 12. Tapia also points

out that Dr. Crum lacks experience supervising RNs and LPNs, as he typically oversees higher level medical staff.  Dkt. No. 117-12 at 7–9.

In response, NaphCare argues that Dr. Crum's experience as the medical director at the Denver Sheriff Department qualifies him to opine on nursing standards.  Dkt. No. 131 at 16.  To support its opposition, NaphCare filed a declaration from Dr. Crum, in which the expert explained that he "clinically supervise[s] nurses, both [LPNs] and [RNs]."  Dkt. No. 133.  Tapia opposes reliance on this declaration, claiming Dr. Crum impermissibly offers new opinions to buttress his expert report outside the discovery deadline.  Dkt. No. 145 at 5 n.2.

Courts allow experts to clarify or explain their reports or qualifications via declaration, but experts are barred from "substantively supplementing their opinions outside of the expert report." *Johnson v. Kelly*, No. C16-0635JLR, 2017 WL 1838140, at *6 (W.D. Wash. May 8, 2017) (citations omitted).  The Court finds that this supplemental declaration provides clarification of the extent of supervision Dr. Crum has over the nursing staff at the Denver Sheriff Department.  Dkt. No. 133 at 2 ("To properly clinically supervise the nurses at my facility, I know the scope of practice for their different licenses and what type of assessments each license permits.").  Dr. Crum's position at the Denver Sheriff Department was disclosed in his expert report and he discussed this role during his deposition.  Thus, this declaration does not constitute improper substitution or expansion outside of this report, and the Court declines to strike this declaration from the record.

Tapia further asserts that Dr. Crum's opinions on nursing standards "pertain[ed] solely to Washington statute and [a] Department of Health advisory opinion" that was not in effect during the relevant period.  Dkt. No. 115 at 12.  NaphCare counters that Dr. Crum did not solely depend on this source material, and that these sources are relevant because the statute underlying the advisory opinion was passed six years prior to Tapia's incarceration.  Dkt. No. 131 at 17 n.8 (citing

WASH. REV. CODE § 18.79.270), *see also* Dkt. No. 132-16.   Dr. Crum's alleged reliance on inapplicable materials is a proper subject for cross-examination, and the Court will not exclude him on this basis.

Next, Tapia contends that Dr. Crum's opinion regarding NaphCare's cost-saving incentives is unreliable.  Dkt. No. 115 at 13.  According to Tapia, Dr. Crum only "helps develop *medical* policies and protocols in his role as medical director for Denver Health"—a government entity— as opposed to a for-profit correctional corporation like NaphCare.  *Id.*   This particularized challenge is inappropriate for a *Daubert* motion.  The Court agrees that Dr. Crum's role as a medical director, which includes overseeing correctional facilities' staffing levels, is sufficient to enable him to opine on this topic.  Dkt. No. 132-1 at 16–17 (comparing NaphCare's staffing levels and composition to the Denver Sheriff Medical Department, which Dr. Crum explains is NCCHC accredited).  To the extent Tapia has further criticisms of Dr. Crum's basis for comparison, he may address them via cross-examination at trial.

Lastly, Tapia claims that Dr. Crum is unqualified to offer rebuttal opinions for Denise Panosky, Dr. Glindmeyer, and Dr. Jimenez because he lacks their expertise and specialization in nursing, psychiatry, and venous diseases.  Dkt. No. 115 at 14–15.  For the same reasons stated above, the Court finds that Dr. Crum is qualified to provide a rebuttal report to Ms. Panosky's opinions because of his experience supervising nurses at the Denver Sheriff Medical Department. This motion is denied with regard to Dr. Crum's rebuttal to Ms. Panosky's report.

However, the Court agrees that Dr. Crum is not qualified to opine on Tapia's mental health or standards of care for mental health generally because he lacks experience supervising MHPs and specialization in psychiatry.  That said, to the extent that Dr. Crum's rebuttal addresses Dr. Glindmeyer's conclusions regarding the medical staff's potential negligence, Dr. Crum is qualified to provide those opinions.  *See* Dkt. No. 132-17 at 6 (discussing whether NaphCare's medical staff

neglected to perform a medical assessment on September 19). Tapia's motion is thus granted in part and denied in part as to Dr. Crum's rebuttal to Dr. Glindmeyer's report.

Likewise, Dr. Crum is also not qualified to rebut Dr. Jimenez's opinion because he lacks experience in vascular diseases. While Dr. Jimenez's demonstrated experience in this specialty allows him to opine on when Tapia began to exhibit early warning signs of compartment syndrome and PCD—diseases which Defendants have both emphasized are rare—Dr. Crum lacks the requisite specialization to rebut Dr. Jimenez's conclusions. *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) ("[L]ack of specialization may go to weight only as long as an expert stays within the reasonable confines of his subject area." (cleaned up)) (finding that while an expert had chemistry degrees, nothing in the record showed that he had special training regarding metal working industries). For example, Dr. Crum states without basis that "[c]ompartment syndrome is not typically associated with mental status changes." Dkt. No. 132-17 at 5. It is unclear to the Court what authority Dr. Crum bases his opinion on since he lacks clinical experience with compartment syndrome. As such, the Court grants Tapia's motion to exclude Dr. Crum's rebuttal opinions to Dr. Jimenez's report.

3. Kathryn Wild

Kathryn Wild is a licensed RN who holds a master's degree in public administration. Dkt. No. 117-14 at 2. She is certified as a Corrections Healthcare Professional – RN by NCCHC. *Id.* She has worked in the corrections healthcare field for over 30 years as an RN and health services administrator ("HSA"). *Id.* Tapia argues that Ms. Wild's report "consists entirely of conclusory opinions" and should thus be excluded as unreliable, not based on sound principles or methods, and unhelpful. Dkt. No. 115 at 15. Tapia offers three ways in which Ms. Wild's report is purportedly unreliable. None of these reasons provide sufficient basis for exclusion.

First, Tapia claims that Ms. Wild's opinion on cost-saving incentives is not founded on sufficient data or reliable principles. Ms. Wild opines that "there is no evidence in the documents reviewed that NaphCare policies, procedures, and customs encouraged profit over care." Dkt. No. 117-14 at 27. To show that Ms. Wild's conclusions lack basis, Tapia points to Ms. Wild's deposition testimony, in which Ms. Wild stated that her determination of cost control measures was based only on evaluating offsite care. Dkt. No. 117-15 at 17−18. According to Tapia, Ms. Wild then "backtracked" on her answer. *Id.* at 20−21.

This argument goes to weight, rather than admissibility. Ms. Wild's report shows that she based her conclusions on NaphCare's cost control measures on review of the staffing levels at Pierce County Jail, NaphCare and Pierce County's Personal Services Agreement, which made the County financially responsible for off-site services such as referral to a hospital, and records showing that once Tapia was reported to have discoloration on his foot, he was brought to the clinic for evaluation and referred out the same day. Dkt. No. 117-14 at 25−26. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

Second, Tapia characterizes Ms. Wild's opinion that "all NaphCare policies, procedures, and customs met national standards" as hyperbolic and beyond her scope of expertise. Dkt. No. 115 at 16. Tapia further takes issue with Ms. Wild's deposition testimony in which she admitted that she did not review all the nursing assessment protocols themselves. Dkt. No. 117-15 at 14. But Ms. Wild clarifies during the same deposition that protocols are distinct from NaphCare policies and procedures. *Id.* at 7−8. When asked whether in preparing her opinion, she reviewed all of NaphCare's policies and procedures, she answered affirmatively. *Id.* at 11. Not every NaphCare protocol is relevant to Tapia's case, and Tapia fails to identify what key protocol Ms. Wild failed to consider that justifies exclusion.

Third, Tapia takes issue with Ms. Wild's credentials, arguing that her expertise does not allow her to opine on whether NaphCare's policies met national standards because she "cannot create policies for providers with a different or higher licensure without consulting with them" as an RN with a master's degree in public health administration. Dkt. No. 115 at 18. But Ms. Wild has experience in "corrections healthcare policy formation and implementation [and maintenance]" from her years working as a health services administrator. Dkt. No. 117-14 at 2. Tapia does not explain why her experience is deficient or renders her unqualified in this area.

As such, the Court denies NaphCare's motion to exclude her testimony.

4. Rebuttal Opinions by Dr. Abrams, Kathryn Wild, and Dr. Benjamin Starnes

Tapia moves to exclude Dr. Abrams', Kathryn Wild's, and Dr. Benjamin Starnes' rebuttal opinions because they purportedly constitute improper rebuttal and improperly expand upon their original opinions. Dkt. No. 115 at 6, 12, 18. Federal Rule of Civil Procedure 26(a)(2)(D) requires parties to "make [expert] disclosures at the times and in the sequence that the court orders." Absent a stipulation or court order, parties must make expert disclosures "within 30 days after the other party's disclosure" "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)[.]" Fed. R. Civ. P. 26(a)(2)(D)(ii).

To qualify as a rebuttal report, an expert's report must "address the same subject matter as another party's expert report and must be intended solely to contradict or rebut that report." *U.S. Bank, N.A. v. Glogowski Law Firm, PLLC*, 339 F.R.D. 579, 580 (W.D. Wash. 2021) (holding that a rebuttal opinion may contradict or rebut anticipated evidence); *Rapp,* 2023 WL 3983662, at *2.

Tapia's arguments here are sparse. In fact, for Dr. Abrams, he fails to identify or cite exactly which portions of the expert's report allegedly constitute improper rebuttal. Dkt. No. 115 at 6. As for his arguments on Kathryn Wild and Dr. Starnes, Tapia provides the conclusory

statement that each expert's report contains improper rebuttal without any further explanation.  *Id.* at 12, 18.  The Court therefore denies Tapia's motion with respect to these experts.

## C.    Motions to Exclude the County's Experts

Tapia seeks to exclude Pierce County's experts, including Dr. Andrew Nanton, Dr. Kaj Johansen, Dr. Molly Timmerman, Gary Berke, Shelley Lewis, and Eric Knowles.[5]  Tapia's motion is granted in part and denied in part.

### 1.  Dr. Andrew Nanton

Dr. Andrew Nanton is a forensic psychiatrist with a specialty in child and adolescent psychiatry.  Dkt. No. 117-19 at 2.  He has employment experience in juvenile and adult corrections, inpatient, and outpatient settings.  *Id.*  He previously worked at Sacramento County Jail, Oregon State Hospital, and Oregon Youth Authority, the latter of which manages inmates up to age 23.  *Id.* at 2–3.

Tapia seeks to exclude certain opinions by Dr. Nanton.  Dkt. No. 116 at 4–5.  Specifically, Tapia argues that portions of Dr. Nanton's rebuttal report fail to properly rebut any other expert opinion, and thus, should be excluded.  *Id.* at 4, Dkt. No. 117-20.  Tapia identifies four sections where Dr. Nanton purportedly offered no rebuttal or presented a new conclusory opinion unrelated to Tapia's experts' opinions: "Jail Mental Health," "Drug Induced Psychosis," "Life Expectancy," and "Summary."  Dkt. No. 116 at 4.

The "Jail Mental Health" section of Dr. Nanton's report addresses the same subject matter as Dr. Glindmeyer's report—whether Pierce County's mental health staff adequately monitored Tapia.  Dr. Glindmeyer opined that Pierce County failed to properly monitor Tapia because under NCCHC standards, inmates in acute mental health residential units like Tapia should be visited

---

[5] Eric Knowles, Shelley Lewis, Dr. Molly Timmerman, and Dr. Gary Berke provided identical rebuttal reports for both NaphCare and Pierce County.

1

2

3

daily.  Dkt. No. 104-5 at 30–31.  Dr. Nanton disagrees with Dr. Glindmeyer's opinion, finding that Pierce County's documented frequency and pattern of visits meets NCCHC guidelines and Pierce County's written policy.  Dkt. No. 117-20 at 5.

4

5

6

7

8

9

10

11

Similarly, Dr. Nanton's opinion on whether drug-induced psychosis can cause brief changes in mental statuses is proper rebuttal to Dr. Glindmeyer's opinions.  Dr. Glindmeyer reviewed Tapia's toxicology screen in reaching her conclusions and observed that the toxicology screen was negative in concluding that his changed mental status indicated delirium.  Dkt. No. 110-6 at 13, 48.  In his rebuttal report, Dr. Nanton noted that he "he could not find the urine drug screen mentioned by Dr. Glindmeyer" but that such "documentation would not change [his] opinion if it did not show any detected substances."  Dkt. No. 117-20 at 5–6.  Despite Tapia's contentions, this conclusion contradicts Dr. Glindmeyer's opinion.

12

13

14

15

16

17

18

19

20

21

22

23

24

That said, Dr. Nanton's opinion on drug-induced psychosis should be excluded as speculative.  Dr. Nanton cannot rely on any positive drug screening because there is none in the record.  Dkt. No. 117-20 at 5–6.  He admits that it is not his opinion that Tapia's altered mental status was caused by drug-induced psychosis (Dkt. No. 117-21 at 5), but nonetheless that he "cannot conclude that [drug induced-psychosis] is more likely than not the cause of Mr. Tapia's mental status changes."  Dkt. No. 117-20 at 6.  In his deposition, he concedes that while in his general experience, it is possible to obtain illicit substances in jails, he "did not see any specific mention of Mr. Tapia using substances" nor did he review any other inmate's information showing use of drugs at Pierce County Jail during Tapia's incarceration.  Dkt. No. 117-21 at 5.  In the Court's view, Dr. Nanton's opinion that Tapia could have been using illicit substances and that the drug use could have caused his mental status changes is based on his general understanding that drugs like methamphetamine are typically undetectable via drug screening within a few days of use.  Dkt. No. 117-20 at 6.  Dr. Nanton relies on nothing else in the record, and Pierce County does

1    not respond to Tapia's argument.  Dkt. No. 128 at 3.  This is insufficient to satisfy Rule 702 and

2    the *Daubert* test.  *See A.B. v. Cnty. of San Diego*, No. 18cv1541-MMA-LL, 2020 WL 4431982, at

3    *13 (S.D. Cal. July 31, 2020) (excluding a medical expert's opinion that decedent was potentially

4    under the use of opioids because he did not see a negative toxicology screen in the medical

5    records).  As such, the Court excludes Dr. Nanton's opinion on drug-induced psychosis.

6        Tapia claims that Dr. Nanton's opinion on life expectancy is improper because "he simply

7    agrees with another defense expert's opinion."  Dkt. No. 116 at 4.  The Court agrees.  Dr. Nanton

8    quotes an excerpt from Dr. Abrams' opinion, which concluded that Tapia's life expectancy is about

9    53 years because the average life span of a heroin and opioid user is "on average about 20 years

10   less than normal[.]" Dkt. No. 117-20 at 6.  Dr. Nanton opines that "the conclusion of a 20-year

11   reduction in expected life span…is reasonable, if not conservative[.]"  *Id.*  Dr. Nanton offers no

12   other opinions on Dr. Abrams' report.  Because his observation is consistent with Dr. Abrams'

13   analysis, the Court excludes the "Life Expectancy" section of Dr. Nanton's report as improper

14   rebuttal.[6]

15       Tapia contends that in the "Summary" section, Dr. Nanton offered a new conclusory

16   opinion, unrelated to Tapia's expert's opinions.  Specifically, he claims that Dr. Nanton offered a

17   new opinion when he stated, "Because of the unusual nature of Mr. Tapia's presentation, even

18   with the benefit of hindsight, it is my opinion that that the development of a blood clot resulting in

19   his need for an amputation was not foreseeable."  Dkt. No. 116 at 4 (quoting Dkt. No. 117-20 at

20   7).

21       This is not a new opinion.  Rather, this opinion is responsive to Tapia's experts'

22   conclusions that Tapia was experiencing delirium potentially from the blood clot and that such

23

24   _____

[6] The Court's conclusion also moots Tapia's footnoted argument that Dr. Nanton's rebuttal regarding life expectancy is unreliable.  Dkt. No. 116 at 4 n.2.

mental health changes should have led to escalated care.  Dkt. No. 104-5 at 32, Dkt. No. 104-8 at 8 ("Mr. Tapia's sudden altered mental status…should have set off alarm bells and led to the immediate transfer or referral of the patient to medical for evaluation.").  The "Summary" section sufficiently contradicts Tapia's experts' opinions and thus, is proper rebuttal.  However, the concept of "foreseeability" is a legal conclusion, and Dr. Nanton will not be permitted to testify to legal conclusions.  *Hangarter*, 373 F.3d at 1016 ("[A]n expert witness cannot give an opinion as to [their] legal conclusion, i.e., an opinion on an ultimate issue of law.").

Accordingly, the Court grants in part and denies in part Tapia's motion to exclude Dr. Nanton.  The Court excludes the "Drug-Induced Psychosis" and "Life Expectancy" sections of Dr. Nanton's rebuttal report, but finds that his remaining testimony is admissible subject to the restriction noted above.

### 2.  Dr. Kaj Johansen

Dr. Kaj Johansen is a licensed, board-certified vascular surgeon.  Dkt. No. 117-22 at 3.  He is retired from clinical practice, but previously served as the attending surgeon at the Cherry Hill and First Hill Campuses/Swedish Medical Center in Seattle.  *Id.*  He currently serves as a clinical professor of surgery at the University of Washington School of Medicine.  *Id.*  Dr. Johansen previously served as the director and chief of vascular surgery at various medical centers in Seattle.  *Id.* at 1.

Tapia moves to strike as unreliable and prejudicial Dr. Johansen's opinions on the standards of care for nurses and MHPs.  According to Tapia, Dr. Johansen is unqualified to provide opinions on nursing, mental health, or correctional health care.  *Id.* at 6.  Tapia also asserts that Dr. Johansen attempts to "rela[y] character assessments" by characterizing Tapia's allegations as "disingenuous."  *Id.* at 7.  In response, Pierce County argues that Dr. Johansen has not provided opinions on nursing or mental health standards, and instead only provides opinions on the

development of Tapia's DVT and PCD.  Dkt. No. 128 at 4.  Pierce County asserts that, at most, Dr. Johansen described how Tapia presented to mental health and nursing staff.  *Id.*

The Court disagrees with Pierce County.  In his rebuttal report, Dr. Johansen concludes that from September 15 to September 29, Tapia displayed "no abnormalities so noteworthy that they should have warranted a further and more detailed assessment[.]"  Dkt. No. 117-23 at 5.  This statement goes beyond merely reiterating the MHPs and nurses' observations; rather, Dr. Johansen provided an opinion on whether the mental health and nursing staff should have escalated Tapia's case, ultimately concluding that their lack of referral was warranted.  As such, to the extent Dr. Johansen's opinions go to whether the MHPs and nurses acted according to mental health and nursing standards of care, they will be excluded.  *See, e.g.*, Dkt. No. 117-28 at 9 ("Evaluation prior to [October 1, 2018] would likely have demonstrated simply a swollen foot with normal arterial pulses, not likely triggering any further assessment or intervention at that time.").

The Court also agrees that Dr. Johansen's characterization of Tapia's allegations in the Second Amended Complaint as "disingenuous" should be stricken.  Dkt. No. 117-28 at 8.  Such character assessments are not the proper subject for expert testimony as they are unhelpful to the fact-finder and infringe upon the jury's role.  *United States v. Nguyen*, No. 05-10576, 2006 U.S. App. LEXIS 17395, at *2 (9th Cir. July 10, 2006); *Rhine*,  2022 WL 7729817, at *4.

As a result, the Court grants Tapia's motion to exclude portions of Dr. Johansen's testimony.  The Court excludes Dr. Johansen's opinions that go to whether the MHPs and nursing staff properly assessed and monitored Tapia.  The Court also excludes Dr. Johansen's statements regarding whether Tapia's allegations were "disingenuous."  Dkt. No. 117-28 at 8.

3.  <u>Dr. Molly Timmerman</u>

Dr. Molly Timmerman is a board-certified physical medicine and rehabilitation physician, with a clinical focus in amputation medicine.  Dkt. No. 117-25 at 2.  She currently practices

amputation medicine at the Veterans Health Administration in Palo Alto and serves as the medical director at the Regional Amputation Center. *Id.* She has experience directing lifetime prosthetic and rehabilitation care to patients with amputations and is an affiliated clinical assistant professor at Stanford University Orthopedic Surgery/Physical Medicine and Rehabilitation Department. *Id.*

In her rebuttal report, Dr. Timmerman stated:

> I defer the necessity of psychological needs to a psychiatry expert; however, I do note that physical and rehabilitation medicine providers such as myself and Dr. Carlson do not typically diagnose mental health condition [sic] and determine the proper cause of treatment. Rather, we refer patients to mental health providers for evaluation should we be concerned.

Dkt. No. 117-25 at 9. Tapia contends that this statement is improper because it offers an opinion on Dr. Carlson's qualifications to opine on Tapia's future mental health needs and provides an improper legal conclusion. Dkt. No. 116 at 8. Pierce County does not respond to this argument. Tapia is correct. Dr. Timmerman's opinion does not go to whether any NaphCare or Pierce County employee provided adequate medical care to Tapia. Rather, this conclusion challenges Dr. Carlson's qualifications to diagnose mental health conditions and relatedly, to opine on Tapia's mental health care in this instant case. Such opinions constitute impermissible legal conclusions and should be excluded. *See United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (reaffirming rule that experts may not provide testimony going to an "ultimate issue").

Tapia also contends that Dr. Timmerman presents conclusory opinions without support from medical literature, research, or other citations. Dkt. No. 116 at 8. Specifically, Tapia challenges Dr. Timmerman's opinion that Tapia's condition does not require a pain management subspecialist because "[t]here is no evidence to suggest that Mr. Tapia has an especially complicated pain condition that would require a sub-specialist." Dkt. No. 117-25 at 8.

Though Dr. Timmerman does not include detailed citations in support of her opinions, she has adequately explained the basis for her opinion and her training and experience demonstrates

adequate reliability.   For example, in support of her conclusion that a pain management subspeciality is unnecessary, she pointed to Dr. Carlson's interview with Tapia, in which he indicated that Tapia was not currently on any pain medications, though he previously used gabapentin.  *Id.*  She also explained that pain management falls within the scope of training of physical medicine and rehabilitation physicians—which is her demonstrated field of expertise. Dkt. No. 117-25 at 2.

As such, the Court grants in part and denies in part Tapia's motion to exclude Dr. Timmerman's rebuttal testimony.

4.  Gary Berke

Gary Berke is a certified prosthetist with 37 years of experience.  Dkt. No. 117-24 at 2.  He is certified in orthotics, prosthetics, and pedorthotics.  *Id.*  He has consulting experience at various clinics, and currently serves as an Adjunct Clinical Associate Professor at Stanford University.  *Id.* In this position, he instructs medical students and professionals about prosthetics and amputation. *Id.*

Tapia argues that Mr. Berke improperly proposes conclusory rebuttal opinions that should be excluded.  Dkt. No. 116 at 7-8.  First, Tapia takes issue with Mr. Berke's disagreement with Dr. Volkov's conclusion "that Mr. Tapia's amputation was the cause of him doing fewer hours of household services."  Dkt. No. 117-24 at 5.  According to Tapia, this conclusion is problematic because Mr. Berke only based this conclusion on Tapia's "K3 level ambulator" status and Mr. Berke's unsupported statement that "K3 level ambulators have the physical strength, balance, and capability to participate in recreational activities[.]"  *Id.*  Tapia argues that Mr. Berke does not provide any authority for this proposition, while simultaneously disregarding interview data from Tapia explaining his decreases in ability to perform household services.  Dkt. No. 146 at 2.

However, a holistic review of Mr. Berke's rebuttal shows that Mr. Berke has sufficiently explained the connection between a K3 level ambulator status and potential limitations on ability to provide household services. For example, in Mr. Berke's rebuttal report, he summarizes Tapia's medical records from a prosthetics clinic and explains the meaning of "K3 level ambulator," which he states is consistent with Dr. Carlson's observation of Tapia's range of motion and abilities. Dkt. No. 117-24 at 3; Dkt. No. 127-4 at 5. Mr. Berke also reviewed and relied on Tapia's testimony regarding his vocational activities and hobbies. *Id.* at 5. Mr. Berke expressly states that this information on Tapia's mobility—as described by Tapia and in Dr. Carlson's report—led him to the conclusion that Tapia should be able to perform household services, including bending and kneeling occasionally. *Id.* Mr. Berke's explanation of his sources, in combination with his experience and qualifications, is sufficient to satisfy *Daubert*'s reliability requirements.

Accordingly, the Court denies Tapia's motion to exclude Gary Berke's testimony.

5.  Shelley Lewis

Shelley Lewis is certified as a rehabilitation counselor, life care planner, and vocational expert. Dkt. No. 117-26 at 48. She currently owns and manages a rehabilitation counseling facility. *Id.* She holds a Master's degree in Rehabilitation Counseling and a Bachelor's degree in Sociology. *Id.*

First, Tapia takes issue with Lewis' opinion that "[a]side from Mr. Tapia's legal history, there are other factors that may also have negatively impacted his ongoing earning capacity including his use/abuse of alcohol and illegal drugs." Dkt. No. 117-26 at 15. Tapia argues that Lewis is unqualified to offer such opinions related to substance abuse because she is not an addiction specialist. Dkt. No. 116 at 9. Likewise, Tapia asserts that Lewis should not offer opinions on criminology or criminality because she lacks expertise in these areas and does not support her opinions with a clear methodology or sufficient facts. *Id.* at 10.

Despite Tapia's arguments, Lewis is qualified to opine on the effects of Tapia's drug and criminal history on his employability.  Tapia does not seriously challenge her expertise as a vocational rehabilitation counselor, or the underlying methodologies she cites in her rebuttal report.  Dkt. No. 116 at 9, Dkt. No. 117-26 at 3 (describing Lewis' qualifications and her reliance on RAPEL[7] methodologies), 31–43 (summary of Lewis' sources on the effects of criminality and substance use on employability).  To the extent Tapia seeks to exclude Lewis' statements based on their prejudicial nature, such arguments are better suited for a motion in limine.

Second, Tapia contends that portions of Lewis' report should be excluded because they do not properly rebut any other expert opinion.  Dkt. No. 116 at 10.  Tapia seeks to exclude the first 17 pages of Lewis' report, arguing that this portion provides Lewis' opinions, a review of the records, and no reference to Tapia's experts.  Tapia is incorrect.  Whether the rebuttal expert references or cites the opposing expert is not determinative of whether their rebuttal report is proper.  *Theoharis v. Rongen*, No. C13-1345RAJ, 2014 WL 3563386, at *4 (W.D. Wash. July 18, 2014) (citing *Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 636 (D. Haw. 2008)).

Rather, the Court finds that Lewis' report sufficiently contradicts Mr. Andenmatten's opinion on loss of earnings.  *Compare* Dkt. No. 117-26 at 15–18 (finding that $42,640 annual salary represents Tapia's current earning capacity plus annual cost of living increases over time and that Tapia has "not experienced any impact on his ability to earn wages"), *with* Dkt. No. 127-9 at 57 (Andenmatten's conclusion that $52,788 annual salary was Tapia's pre-injury earning capacity and that Tapia will suffer a partial loss of $10,148 annually if he maintains his current

---

[7] RAPEL stands for "Rehabilitation Plan, Access to Labor Market, Placability, Earning Capacity, Labor Force Participation" and has been used by vocational experts in courts to assess earning capacity in vocational rehabilitation. *Petersen v. United States*, No. 1:21-cv-00097-AKB, 2024 WL 1116161, at *1 (D. Idaho Mar. 14, 2024).

employment).  And Lewis also provides an alternative life care plan which diverges from Dr. Carlson's.  *See* Dkt. No. 117-26 at 20–29.  These portions of her report are proper rebuttal.

That said, some of Lewis' report is not proper rebuttal testimony.  At trial, Lewis cannot testify about her review of the record except as to support her rebuttal opinions.  *See, e.g.*, *Theoharis*, 2014 WL 3563386, at *5.  She may not testify as to Tapia's potential current and future drug use because such assessments are beyond the scope of her rebuttal.  *See id.*  However, she may opine on how Tapia's past criminal and drug history impacted his past employment and how such facts may affect his future earning capacity because this issue was referenced by Tapia's experts.  Dkt. No. 127-8 at 4, 5; Dkt. No. 127-9 at 28.

Finally, again, in a footnote, Tapia claims that Pierce County improperly disclosed Lewis' rebuttal report and "challenges the sufficiency of Pierce County's disclosure under Fed. R. 26."  Dkt. No. 116 at 10 n.4.  This is the third time Tapia has attempted to assert substantive arguments in the footnotes of his motions.  Moreover, Tapia provides no explanation for this argument beyond this conclusory statement.  As such, the Court exercises its discretion to disregard Tapia's allegation of improper disclosure.  *Myers v. Alstead*, No. C16-1580 RAJ, 2017 WL 3872408, at *2 n.2 (W.D. Wash. Sept. 5, 2017) ("When parties leave arguments in footnotes, it suggests to the Court that the arguments do not hold much weight.").

As a result, the Court grants in part and denies in part Tapia's motion to exclude Shelley Lewis.

6.  Eric Knowles

Eric Knowles is an economist, with a Master's and Bachelor's degree in Business Administration.  Dkt. No. 117-27 at 17.  He owns the Knowles Group, an economic consulting firm.  Dkt. 116-27 at 16-17.  Tapia seeks to exclude portions of Knowles' testimony on two bases.

First, Tapia argues that Knowles provided a legal conclusion when he stated that Dr. Volkov was "unqualified" to calculate Tapia's loss of household services.  Dkt. No. 116 at 11. Like with Dr. Timmerman, the Court precludes Knowles from testifying as to whether other experts are qualified to testify in this case because whether Dr. Volkov is sufficiently qualified to pass the *Daubert* test is the Court's decision.  *See Diaz*, 876 F.3d at 1197.

Second, Tapia asserts that Knowles is "unqualified to opine on the effects of past drug use or the impacts of past incarcerations or convictions on life expectancy and work-life expectancy." Dkt. No. 146 at 6.  Throughout his report, Knowles relies on Dr. Abrams' life expectancy estimate of 53 years. Dkt. No. 117-27 at 8, 10, 13.  He uses Dr. Abrams' estimate to critique Dr. Volkov's earnings loss assessment and loss of household services calculation.  *Id.* at 8.  Knowles also uses Dr. Abrams' estimate to calculate the present value of Lewis' life care plan.  *Id.* at 13.  Tapia argues that Knowles' reliance on Dr. Abrams' report is problematic because Knowles did not (1) conduct an independent analysis or rely on other sources to show that Dr. Abrams' estimate is reliable or (2) show that economists would widely accept Dr. Abrams' methodology and data when calculating economic loss.  *Id.* at 6.

The mere fact that Knowles relied on other experts is not basis for exclusion.  *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."); *Paeschke v. Gen. Motors LLC*, 4:16-CV-5050-LRS, 2017 WL 4003382, at *3 (E.D. Wash. Aug. 18, 2017) ("The facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonably rely on other expert's opinions and findings."). However, "[a]n expert's sole or primary reliance on the opinions of other experts raises serious reliability questions."  *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014) (citing *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 629 (W.D. Wash. 2011)).  An expert may

not "rely exclusively" on another expert's opinion, but rather must demonstrate that his opinions are informed by his direct experience, observations, and facts in the record. *Guadiana v. State Farm Fire & Cas. Co.*, No. CIV 07-326 TUC FRZ (LAB), 2013 WL 1217621, *4 (D. Ariz. Oct. 18, 2013).

Here, Knowles does not provide an adequate basis for his reliance of Dr. Abrams' life expectancy estimate. He agrees with Dr. Abrams' conclusion that Tapia's life expectancy should be shortened to 53 years due to Tapia's past drug use, but he cites no other sources that support such a reduction. And Knowles does not explain what parts of the record he believes supports or concurs with Dr. Abrams' conclusion. At most, Knowles cites two Journal of Forensic Economics articles which "quantify the impact of past conviction and incarceration on future losses of income and work-life." Dkt. No. 117-27 at 12. While these articles support Knowles' conclusion that Tapia's work-life expectancy is impacted by his criminal history, they do not go to why his life expectancy should be shortened and by how much. Moreover, unlike Dr. Abrams, who is an addiction specialist, Knowles is not informed by direct experience or observations of individuals facing chronic drug abuse. Overall, it appears that Knowles relied exclusively on Dr. Abrams' report.

As such, the Court excludes Knowles' testimony that relied on Dr. Abrams' life expectancy estimate.

## IV.  CONCLUSION

Accordingly, Defendants' motions to exclude Tapia's experts (Dkt. Nos. 109, 111, 113) are decided as follows. The motion to exclude:

- Dr. Johnny Bates is DENIED;

- Dr. Denise Glindmeyer is DENIED;

- Denise Panosky is DENIED;

- Dr. Juan Carlos Jimenez is DENIED;

- Dr. Hans Carlson is GRANTED IN PART AND DENIED IN PART;

- Timothy Andenmatten is DENIED; and

- Dr. Nik Volkov is DENIED.

Further, the Court ORDERS Tapia to disclose Dr. Carlson's Physician Consultation Report and Physician Capacity Evaluation. Tapia must provide this information within 7 days of this order and pay the costs of any additional deposition as directed above.

Tapia's motion to exclude NaphCare's experts (Dkt. No. 115) is decided as follows. The motion to exclude:

- Dr. Alan Abrams is DENIED;

- Dr. Peter Crum is GRANTED IN PART and DENIED IN PART;

- Kathryn Wild is DENIED; and

- Dr. Benjamin Starnes is DENIED.

Tapia's motion to exclude Pierce County's experts (Dkt. No. 116) is decided as follows. The motion to exclude:

- Dr. Andrew Nanton is GRANTED IN PART and DENIED IN PART;

- Dr. Kaj Johansen is GRANTED;

- Dr. Molly Timmerman is GRANTED IN PART and DENIED IN PART;

- Gary Berke is DENIED;

- Shelley Lewis is GRANTED IN PART and DENIED IN PART, and

- Eric Knowles is GRANTED.

Dated this 7th day of February, 2025.

Kymberly K. Evanson
United States District Judge