# EXHIBIT 14

THE HONORABLE KYMBERLY K. EVANSON

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

JAVIER TAPIA,

Plaintiff,

v.

NAPHCARE, INC., and PIERCE COUNTY,

Defendants.

NO.  2:22-cv-01141-KKE

PLAINTIFF'S EXPERT WITNESS
DISCLOSURE

## I.     EXPERT DISCLOSURE

Pursuant to Fed. R. Civ. P. 26(a)(2), Plaintiffs discloses the following primary expert witnesses in regard to claims made in their Second Amended Complaint:

**1.  Timothy Andenmatten**
Physician Life Care Planning
12707 Silicon Drive, Suite 150
San Antonio, Texas 78249
(210) 501-0995

Timothy Andenmatten is a Certified Rehabilitation Counselor, and a Certified Vocational Evaluation Specialist who has provided Vocational Assessment and Rehabilitation Services since 2006. Mr. Andenmatten has numerous years of vocational rehabilitation counseling experience specializing in Long Term Disability with specific knowledge of Own Occupation Analyses, Transferable Skills Analyses, and Vocational Rehabilitation Services including ADA

PLAINTIFFS' EXPERT WITNESS DISCLOSURE
(3:21-CV-05800-DGE) - 1

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Accommodations. Mr. Andenmatten is the Founder of Greylock Placement Services, and his professional career includes numerous appointments at institutions including: VRS Disability Management and Massachusetts Rehabilitation Commission. Mr. Andenmatten professional associations include the American Board of Vocational Experts, and the International Association of Rehabilitation Professionals. It is anticipated that Mr. Andenmatten will testify consistent with the opinions stated in his report.  A report by Mr. Andenmatten is attached hereto as **Exhibit A**.

    **2.  Denise Panosky**
       17 Chriswood Trace
       Ledyard, CT 06339
       denise.panosky@gmail.com
       860-608-2585

Ms. Panosky has been a licensed Registered Nurse (RN) for 40 years. Her professional clinical practice includes 25 years in an emergency department. For the past 16 years, she taught students and nurses about practicing in a correctional setting, which includes clinical experience in the correctional setting. She earned a B.S. in Nursing in 1983, a M.S. in Nursing in 2006, and a Doctorate in Nursing in 2010. She has certifications as a Clinical Nurse Educator (CNE) and Correctional Health Professional (CCHP), and is a Forensic Clinical Nurse Specialist (FCNS). She has been the Task Force Chair of the International Association of Forensic Nurses (IAFN) Corrections Task Force for two years. She was also a workgroup member on the American Nurses Association (ANA) Correctional Task Force, revising the *Correctional Nursing: Scope and Standards of Practice* (2013). She has given more than 30 podium presentations at national and international correctional conferences and has received honors in recognition of her contributions to correctional nursing. She has received five grants, most recently, she was a co-investigator and project coordinator for a large HRSA grant, "Nurse, Education, Practice, Quality, and Retention" to implement a nursing competency program to all correctional nurses in 12 state prisons/jails. During the year immediately preceding the occurrence giving rise to this lawsuit, she devoted a

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

majority of her professional time to teaching nursing, including in a correctional setting. Ms. Panosky is disclosed as a corrections healthcare expert.  It is anticipated that Ms. Panosky will testify consistent with the opinions stated in her report, attached hereto as **Exhibit B**.

    **3. Dr. Nik Volkov**
       Physician Life Care Planning
       12707 Silicon Drive, Suite 150
       San Antonio, Texas 78249
       (210) 501-0995

Dr. Nik Volkov is an Associate Professor of Finance and formerly a Director of the Masters of Science of Business Analytics program at Mercer University, where he teaches classes in corporate finance, financial analytics, international finance, investments, mergers and acquisitions, capital budgeting, and venture funding at the undergraduate and graduate levels. In addition to the courses taught at the university, Dr. Volkov has taught a number of continuing legal education courses on the topic of calculation of economic damages in civil litigation. Dr. Volkov holds a Certified Valuation Analyst and a Master Analyst in Financial Forensics certifications by the National Association of Certified Valuators and Analysts. Dr. Volkov's research interests are in the area of information disclosure, investments, investor behavior, corporate diversification, mergers and acquisitions, and forensic economics and finance. His research is published in the Journal of Banking and Finance, Journal of Corporate Finance, Quarterly Review of Economics and Finance, Research in International Business and Finance, Global Finance Journal, Financial Services Review and the Journal of Forensic Economics among other peer reviewed academic publications. Dr. Volkov is a recipient of a 40 under 40 Award by the National Association of Certified Valuators and Analysts. In 2019, Dr. Volkov was presented with Young Alumni Achievement Award from Millersville University and was a Featured Member of the National Association of Forensic Economics. He is also a recipient of the 2017 Exemplary Faculty Award from Mercer University and the Florida Atlantic University Presidential Doctoral Fellowship Award in 2011 and 2012. He

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

was also selected to the Financial Management Association Doctoral Student Consortium in 2014.

Dr. Volkov's research on the effect of Exchange Traded Funds on the return and volatility of

underlying securities has been awarded an ETF Research Academy Grant sponsored by the Paris-

Dauphine House of Finance and Lyxor Asset Management. Prior to a career in academia, Dr.

Volkov owned a financial service firm in Lancaster, PA, which focused on investing in longevity-

related assets, and worked as a financial analyst at Franklin Templeton Investments. It is anticipated

that Dr. Volkov will testify consistent with the opinions stated in his reports, attached hereto as

**Exhibit C**.

> **4.  Dr. Juan Carlos Jimenez**
> Gonda (Goldschmied) Vascular Center at UCLA
> 200 Medical Plaza, Suite 526
> Los Angeles, CA 90095
> Office: (310) 206-1786
> Fax: (310) 206-8382
> jcjimenez@mednet.ucla.edu

Dr. Jimenez obtained a B.A. in Psychology from the University of California, Berkeley in

1994. He then obtained his M.D. from the University of California, Irvine in 1999. After graduating

from medical school, he completed resident training in General Surgery at the University of

California, Irvine from 1999 to 2005. From 2005 to 2007, he completed fellowship training in

Vascular Surgery at the University of California, Los Angeles ("UCLA"). Dr. Jimenez was selected

for the sole position that year from a pool of greater than 80 applicants. Dr. Jimenez also recently

obtained a Master of Business Administration ("MBA") from the UCLA Anderson School of

Management in 2019. Dr. Jimenez am currently board certified in Vascular Surgery. His last

recertification was in 2023. Following his fellowship training at UCLA, Dr. Jimenez began serving

on the Attending Vascular Surgery Staff at both the Ronald Reagan UCLA Medical Center and the

UCLA Santa Monica Medical Center and he continues in these roles today. In 2007, Dr. Jimenez

became the Division Chief for Vascular Surgery at Olive View-UCLA Medical Center, where he

PLAINTIFFS' EXPERT WITNESS DISCLOSURE
(3:21-CV-05800-DGE) - 4

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    worked until 2015.  At that time, he transitioned to a full time academic and clinical appointment

2    at Ronald Reagan UCLA Medical Center in Westwood, CA.  Dr. Jimenez is the current Director of

3    the UCLA Gonda (Goldschmied) Venous Center.  Dr. Jimenez regularly diagnoses and manages

4    patients with a wide spectrum of both central and superficial venous disease, including deep venous

5    thrombosis and its complications. Dr. Jimenez also has expertise in the treatment of vascular

6    disorders of blood vessels for the purpose of limb salvage and preservation.  He also has extensive

7    experience treating patients with deep venous thrombosis, compartment syndrome, and Phlegmasia

8    Cerulea Dolens, and has published book chapters and articles in high quality peer reviewed journals

9    on these topics. Dr. Jimenez has expertise in the management of complications related to venous

10    disorders and limb salvage over his 16 years as a vascular surgeon.  For the past 12 years, Dr.

11    Jimenez has served as the Co-Chair for the UCLA Vascular and Endovascular Surgery Board

12    Review course attended by vascular surgeons and trainees from around the globe.  He has also

13    edited four internationally published textbooks of Vascular Surgery (two additional texts are

14    currently in press).  Both the course and the texts cover the topic of management of complications

15    related to deep venous thrombosis. It is anticipated that Dr. Jimenez will testify consistent with the

16    opinions stated in his report.  A report by Dr. Jimenez is attached hereto as **Exhibit D**.

17       **5.  Dr. Hans L. Carlson**
          Physician Life Care Planning
18        12707 Silicon Drive, Suite 150
          San Antonio, Texas 78249
19        (210) 501-0995

20       Dr. Dr. Hans Carlson is a Physical Medicine & Rehabilitation specialist, and an

21    Electrodiagnostic Medicine specialist who has practiced medicine since 1992. Dr. Carlson is a

22    licensed physician in the state of Oregon, and he is certified by the American Board of Physical

23    Medicine & Rehabilitation and the American Board of Electrodiagnostic Medicine. He is also a

24    Certified Life Care Planner (CLCP), as designated by the International Commission on Health Care

25    PLAINTIFFS' EXPERT WITNESS DISCLOSURE
(3:21-CV-05800-DGE) - 5

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Certification. Dr. Carlson's professional career includes clinical, hospital, and academic appointments at institutions including: Oregon Health & Sciences University, Providence St. Vincent's Medical Center, Tuality Healthcare, and the University of Illinois at Chicago Medical Center. Dr. Carlson's professional associations include the American Academy of Physical Medicine & Rehabilitation, the American Academy of Physician Life Care Planners, and the American Association of Neuromuscular and Electrodiagnostic Medicine. Dr. Carlson earned a Doctor of Medicine from Oregon Health & Science University in Portland, and a Bachelor of Arts in Mathematics from Willamette University in Salem, Oregon. In addition to practicing clinical physiatry, Dr. Carlson is a prolific lecturer and author on topics of Physical Medicine and Rehabilitation, Electrodiagnostic Medicine, and Musculoskeletal Medicine. It is anticipated that he will testify consistent with the opinions stated in his report. A report by Dr. Carlson is attached hereto as **Exhibit E**.

> **6. Dr. Johnny Edward "Rusty" Bates**
> 88 Salser Lane
> Columbiana, Alabama 35051
> Telephone: (205) 382-2619
> Email: johnny.bates@qchcweb.net

Dr. Bates has been involved in correctional healthcare for over thirty years and have owned and managed a correctional healthcare company for the last nineteen years with over 350 employees. He is intimately familiar with the correctional setting and the capabilities and limitations of practicing in this setting. He is a CCHP-P through the NCCHC and is a Fellow of the American College of Correctional Physicians. Dr. Bates was the Corporate Medical Director & Chief Medical Information Officer for NaphCare, Inc., from October of 2003 to August of 2005. It is anticipated that he will testify consistent with the opinions stated in his report. A report by Dr. Hayward is attached hereto as **Exhibit F**.

PLAINTIFFS' EXPERT WITNESS DISCLOSURE
(3:21-CV-05800-DGE) - 6

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

2

3

**7. Dr. Daphne Glindmeyer**
611 River Highlands Blvd. Suite B
Covington, Louisiana 70433
(504) 392-8348

Dr. Glindmeyer is a graduate of the Louisiana State University Health Sciences Center. She completed a residency in Adult Psychiatry, a fellowship in Child and Adolescent Psychiatry, and a fellowship in Forensic Psychiatry. She is board certified in Adult Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry. She is a Distinguished Fellow of the American Psychiatric Association, past President of the Louisiana Psychiatric Medical Association, and past President of the Louisiana Council on Child and Adolescent Psychiatry. She is currently in private practice, providing psychiatric evaluation and medication management services to child, adolescent, and adult clients as well as forensic consultation. It is anticipated that Dr. Glindmeyer will testify consistent with the opinions stated in her report. A report by Dr. Glindmeyer is attached hereto as **Exhibit G**.

## II.    RESERVATION OF RIGHTS

Plaintiffs reserve the right to disclose rebuttal expert witnesses after the disclosure of experts by other parties. Plaintiffs also reserve the right to submit supplemental or amended expert reports upon receipt of additional information.

DATED this 15th day of March, 2024.

GALANDA BROADMAN, PLLC

*s/ Ryan D. Dreveskracht*
Ryan D. Dreveskracht, WSBA #42593
*s/ Corinne Sebren*
Corinne Sebren, WSBA #58777
8606 35th Avenue NE, Suite L1
P.O. Box 15146
Seattle, WA 98115
Phone: (206) 557-7509
Fax: (206) 299-7690
ryan@galandabroadman.com

PLAINTIFFS' EXPERT WITNESS DISCLOSURE
(3:21-CV-05800-DGE) - 7

corinne@galandabroadman.com
Attorneys for Plaintiff

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

# Exhibit A



# Vocational Loss of Earnings Capacity Assessment

Prepared for Mr. Javier Tapia

**February 5, 2024**

Prepared by: Timothy R. Andenmatten, MEd, CRC, CVE, IPEC
Requested by: Galanda Broadman, PLLC



Physician Life Care Planning™

## Table of Contents

1    Preface ................................................................................................................................ 3

2    Referral Information .......................................................................................................... 4

3    Certification ....................................................................................................................... 4

4    Professional Disclosure .................................................................................................... 4

5    Case Conceptualization Model ........................................................................................ 5

6    Vocational Evaluation Methodology ................................................................................ 6

7    Summary of Records ......................................................................................................... 7

8    Vocational Evaluation Interview ..................................................................................... 40

9    Education & Training History .......................................................................................... 42

10   Employment Experience ................................................................................................. 42

11   Employment Analysis & Vocational Profile .................................................................... 43

12   Functional Capacity ........................................................................................................ 45

13   Post-Injury Vocational Profile ........................................................................................ 48

14   Transferable Skills Analysis ........................................................................................... 49

15   Employability Analysis .................................................................................................... 51

16   Vocational Rehabilitation ................................................................................................ 52

17   Analysis of Earnings/Earnings Capacity ....................................................................... 53

18   Summary .......................................................................................................................... 54

19   Author .............................................................................................................................. 56

20   Sources ............................................................................................................................ 57

21   Exhibits ............................................................................................................................ 58

# 1   Preface

I, Timothy R. Andenmatten, an Associate Vocational Specialist of Physician Life Care Planning, LLC, was tasked to assess the vocational and earning capacity of Mr. Javier Tapia.

This Vocational Rehabilitation Assessment and Earning Capacity Evaluation ("Report") is intended for use by Galanda Broadman, PLLC in the case of Mr. Tapia.

The work I performed, and the opinions I express herein, are a product of my education, training, skill, and professional experience as a Certified Rehabilitation Counselor (CRC) and as a Certified Vocational Evaluation Specialist (CVE).

The measures undertaken by me to formulate my opinions in this matter are ones I deemed necessary. These measures include: the performance of appropriate research, the collection and analysis of relevant documents and data, and a personal interview and assessment of Mr. Tapia.

The opinions which are expressed, and the conclusions which are exhibited in this Report were established by me at the time this Report was prepared. I hereby reserve the right to amend my opinions and conclusions should additional information become available, or should it be necessary for me to supplement and/or update this Report in the future.

Timothy R. Andenmatten, MEd, CRC, CVE, IPEC
Certified Rehabilitation Counselor
Certified Vocational Evaluation Specialist
International Psychometric Evaluation Certification
Physician Life Care Planning, LLC

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

## 2   Referral Information

- **Name**: Javier Tapia
- **Date of Evaluation Interview**: January 24, 2024 at 4:00 PM EST
- **Age**: 41
- **Date of Birth**: March 3, 1982
- **Gender**: Male
- **Date of Injury**: October 1, 2018

Mr. Tapia's case was referred for a Vocational Rehabilitation Assessment & Earning Capacity Evaluation to determine if, as a result of injuries incurred while incarcerated on October 1, 2018, he sustained a Vocational Impairment or Work Disability, and if so, how that impairment or disability might affect his earning capacity. In addition, determination was made as to whether he would benefit from vocational rehabilitation services. A Vocational Evaluation was conducted based upon assessment of pertinent information provided regarding Mr. Tapia's age, education, past relevant employment and earnings history, functional capacity, and current employment and earnings (if any). The information gathered pertains to the relevant vocational factors for Mr. Tapia in relation to the competitive employment market.

## 3   Certification

This is to certify that I, Timothy R. Andenmatten, am not related to any of the parties to the subject action, nor do I have any present or intended financial interest in the outcome of this case beyond the fees due for professional services rendered in connection with this report and possible subsequent services associated with the production of this report. Further, I certify that my professional fees are not contingent upon the resultant financial awarding of this matter but are based only upon the contracted services provided in connection with the subject action. This is to further certify that all assumptions, methodologies and calculations utilized in this evaluation and assessment report are based on current knowledge and methods applied in the determination of employability, labor market access, job placement, and earnings capacity.

## 4   Professional Disclosure

Mr. Tapia was interviewed and received a comprehensive vocational evaluation on January 24, 2024, at 4:00 PM EST. Mr. Tapia was evaluated via Doxy.me video conference. Mr. Tapia provided his Washington Driver's License as proof of identity.  Timothy R. Andenmatten introduced himself to Mr. Tapia and provided him with an overview of his education, professional certifications, and experience in the field of vocational rehabilitation counseling. Mr. Tapia was informed that the Vocational Rehabilitation Assessment & Earning Capacity Evaluation would be completed in compliance with the Commission on Rehabilitation Counselor Certification (CRCC) code of Professional Ethics for Rehabilitation Counselors.[1] Mr. Tapia was advised about the purpose of the evaluation, the methods of the evaluation, and that the evaluation was being conducted within the parameters of litigation and therefore any information

---

[1] https://crccertification.com/code-of-ethics-4/

obtained during the evaluation was not confidential.  Mr. Tapia was informed that the information gathered in his evaluation would be included in a written report that would be provided to his attorney Mr. Ryan Dreveskracht of Galanda Broadman, PLLC

Mr. Tapia was advised that this was a one-time evaluation, forensic in nature, and that no client-counselor relationship exists or was implied between himself and Timothy Andenmatten; that no direct rehabilitation services would be provided to him by Timothy Andenmatten; and that an unbiased, objective evaluation of his employability, labor market access, and post injury earning capacity, was the only purpose of the interview. Mr. Tapia was advised that Timothy Andenmatten maintains confidentiality of all his medical records and personally identifiable information and that once the case was resolved, the policy is to destroy the case records. Mr. Tapia stated his understanding of these rules of procedure and conduct and provided his verbal consent to proceed with the vocational rehabilitation assessment and earning capacity evaluation.

# 5   Case Conceptualization Model

Case conceptualization for forensic vocational consulting should rely upon a methodology that is reliable and valid; reliability and validity are paramount to completing an objective vocational evaluation. The Vocational Rehabilitation Professional must select a case conceptualization model that is referenced in the peer reviewed literature and one that is regarded as a sound methodology within the field of vocational rehabilitation. This Vocational Assessment and Earnings Capacity Evaluation uses the RAPEL[2] method developed by Roger. O Weed, because it offers a comprehensive approach to determining employability and earning capacity. Field (2008) states that RAPEL is a widely inclusive model, encompassing many resources ranging from labor market access, placeability considerations, attention to earning capacity issues, and other facets that assist in case conceptualization.[3] Robinson (2014) states that RAPEL is the most frequently referenced methodology for earning capacity analysis, with high levels of content validity and face validity.[4]

The RAPEL model defines five domains: rehabilitation plan, access to the labor market, placeability, earning capacity, and labor force participation.

**(R) *Rehabilitation plan:*** The rehabilitation plan is an individualized plan tailored to the specific needs of the evaluee, and all factors affecting return to work should be considered. In this vocational evaluation, rehabilitation considerations and job accommodations are often found in the Vocational Rehabilitation and Assistive Technologies sections, though they may be absent depending on the viability of rehabilitative efforts for the evaluee.

**(A) *Access to the labor market*:** Access to the labor market is based on the evaluee's ability to obtain work, or, in other words, personal access to the competitive labor market. This issue is addressed in the Analysis of Employability section via the transferable skills analysis.

---

[2] Weed, R., & Field, T. (2012). *Rehabilitation Consultant's Handbook*. Athens, GA: Elliot & Fitzpatrick

[3] Field, T. (2008). Estimating earning capacity: Venues, factors, and methods. *Estimating Earning Capacity; A Journal of Debate and Discussion,* 1(1), 5-40.

[4] Robinson, R.H., (2014). *Foundations of Forensic Vocational Rehabilitation*. Springer Publishing Company. New York, New York.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

**(P) Placeability**: Placeability can be regarded as the ability to secure employment based on the interaction of an individual's employability and factors in the community, such as job availability and employer attitudes. The transferable skills analysis considers the availability of jobs in the evaluee's labor market. The specificity of the McCroskey Transferable Skills Programs allows analysis at the county level.

**(E) Earning Capacity**: Earning capacity is a function of the capacity to perform work. Pre-injury earning capacity must be considered versus post-injury earning capacity.[5] Any difference in earning capacities attributable to loss of access to the labor market can result in lost earnings, which are addressed in the Analysis of Earning Capacity section.

**(L) Labor force participation**: Labor force participation represents issues of working life. Loss of access to the competitive labor market can result in a reduced worklife expectancy, including being unable to hold employment (total absence from the labor market and substantial gainful activities), being limited to part-time work, or being able to carry on a full-time work schedule. Labor force participation is also addressed in the Employability Analysis section.

# 6   Vocational Evaluation Methodology

1.  Medical and other records[6] regarding Mr. Tapia were provided by his attorney Mr. Ryan Dreveskracht for review and use in evaluating his employability and earning capacity. A medical records summary is provided in Section 7 of this report.

2.  Mr. Tapia was interviewed[7] on January 24, 2024, at 4:00 PM EST via Doxy.me video conference. A vocational evaluation interview summary is provided in Section 8 of this report.

3.  Mr. Tapia's employment history[8] was researched using the standard vocational reference materials that are detailed in the Resources and References section of this report. This employed the McCroskey Transferable Skills Program, a job-person matching system that enables the comparison of individual abilities and job requirements to see where the two intersect. This system, which has been shown to have a high degree of reliability and validity, employs the U.S. Department of Labor (DOL) worker trait factor system as a means of comparing individual capacities against the mental and physical demands of jobs as they exist in the local labor market.[9] In addition, the McCroskey Vocational Quotient System (MVQS) was used to analyze further the employability of Mr. Tapia. Labor market and wage information was gathered for the Washington area. From the information generated and reviewed, a pre-injury profile of worker trait capacity levels was established and used to compare the pre-injury capacities of Mr. Tapia against the demands of jobs as they exist in the local labor market. Educational attainment level and vocational preparation were also considered. Mr. Tapia's Employment Experience & Vocational Profile is summarized in section 11 of this report.

---

[5] Field, T. (2012). Estimating earning capacity: A historical review. The Rehabilitation Professional, 20(4), 51-62.
[6] Evaluation Assumption: The medical records were provided in their entirety and accurately reflect the medical condition and functional abilities of Mr. Tapia.
[7] Evaluation Assumption: Mr. Tapia provided true and accurate information in the vocational interview.
[8] Evaluation Assumption: Mr. Tapia's employment history, education, and training are demonstrative of his vocational capacities and ability to benefit from job training.
[9] Robinson, R.H., (2014). *Foundations of Forensic Vocational Rehabilitation*. Springer Publishing Company. New York, New York.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

4.  Professional medical opinions were received and reviewed to determine the nature, extent, and duration of injuries sustained and any permanent functional limitations resulting from injury. Mr. Tapia's Functional Capacity is summarized in section 12 of this report.

5.  Mr. Tapia's functional capacity information was then used to adjust the pre-injury profile, leading to the development of a post-injury vocational profile in the context of Mr. Tapia's injuries and the functional impairments and limitations resulting from injury. Mr. Tapia's post-injury vocational profile is summarized in section 13 of this report.

6.  Both the pre-injury and post-injury profiles were then compared to profiles for all 12,775 jobs in the Dictionary of Occupational Titles, combined with a labor market survey of the most frequently hired for jobs in the State of Washington, 2023. This was done using the McCroskey Transferable Skills Program, which evaluates vocational information in accordance with U.S. Department of Labor criteria (worker trait-factor capacity levels). Mr. Tapia's Transferable Skills Analysis is summarized in section 14 of this report.

7.  From Mr. Tapia's Transferable Skills Analysis, further assessment was then done to ascertain pre- and post- injury employability, labor market access, job placement potential, vocational rehabilitation needs, and wage-earning capacity at this time. Mr. Tapia's employability analysis is summarized in section 15 of this report and vocational rehabilitation is addressed in section 16 of this report.

8.  An analysis of Mr. Tapia's earnings and an earnings capacity evaluation was completed and is addressed in section 17 of this report.

# 7   Summary of Records

This Summary of Records is a chronological synopsis of Mr. Javier Tapia's medical records, and other relevant documents, presented first by the facility, and then by treating physicians and/or other relevant medical personnel.

1.  NaphCare, Inc. (Medical) - Tacoma, Washington
    Ashley Valencia Chalk, R.N.
    Miguel Balderrama, M.D.
    Dimita Smith, R.N.
    Christie Steele, N.P.
2.  Tacoma General Hospital (Medical & Billing) - Tacoma, Washington
    Tod E. Wurst, M.D.
    Nicholas D. Garcia, M.D.
    Aditya P. Sunidja, M.D.
    Aml Raafat, M.D.
    Lucas P. Labine, M.D.
    Ashley M. Pearson, R.N.
    Roger H. Liu, M.D.
    Justin Robert Waters, M.D.
    Leslie A. Linares-Hengen, M.D.
    Charles Leusner, M.D.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

Physician Life Care Planning™

Brandon W. Propper, M.D.
Cindy P. Ha, M.D.
3. Washington Corrections Center (Medical) - Shelton, Washington
   W. Rollins, M.D.
   Mark A. Wentworth, M.D.
   W. McMullum, D.D.S.
4. Stafford Creek Corrections Center (Medical) - Aberdeen, Washington
   J. Hoag, D.D.S.
   Scott M. Light, P.A.-C.
   T. St. Germain, L.P.N.
   Gilliver, P.A.-C.
   L. Blattner, A.R.N.P.
   L. Prieto, Psy.D.
   B. Bobek, M.D.
   J. Richards, L.P.N.
   Prasolova, R.N.
5. TRA Medical Imaging (Medical) - Tacoma, Washington
   Anand Suresh, M.D.
6. Hanger Clinic (Medical & Billing) - Olympia, Washington
   Cerise Knakal, L.C.P.O.
   Justin Williams, L.C.P.O.
7. RubiconMD (Medical) - Olympia, Washington
8. Department of Corrections Washington State (Medical) - Tumwater, Washington
   Richard Bowers, S.U.D.P.
9. St. Joseph Medical Center (Medical) - Tacoma, Washington
   Thomas Vascik, P.A.C.
   Aaron C. Laird, M.D.

Chronological Synopsis of Medical Records

- October 1, 2018:  Mr. Javier Tapia was seen by Ashley Valencia Chalk, R.N. with NaphCare (Records did not indicate name of attending physician), who indicated she was asked to see Mr. Tapia by unit officer for c/o "toes turning black."  Ms. Chalk noted Mr. Tapia was brought to clinic via wheelchair.  Examination revealed left foot was slightly swollen and severely discolored, and Mr. Tapia was non-verbal and did not answer questions.  Ms. Chalk indicated Mr. Tapia was reported as having pain but did not recall what happened or when.  Ms. Chalk indicated per provider, M. Balderrama and I. Hughes, Mr. Tapia was referred to Tacoma General ED.

- Mr. Tapia was seen by Miguel Balderrama, M.D. with the nursing staff.  Dr. Balderrama indicated Mr. Tapia had evidence of possible vascular deficits on his left foot with edema and needed ER evaluation for possible emergent surgical management.

- Upon arrival to the Emergency Department of Tacoma General Hospital, Mr. Tapia presented for evaluation of left foot swelling, pain, and discoloration which began about 1-2 weeks prior and had been gradually worsening.  Records indicate Mr. Tapia had reportedly been in jail since June and had been having foot pain for a while but just told jail staff that day about the pain.  Records indicate Mr. Tapia was unsure if he had a fever but had been unable to walk for a while, although he could not remember the exact time that he had been unable to walk due to the left foot

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

symptoms. Records indicate Mr. Tapia was not on any anticoagulation. Mr. Tapia stated his left foot pain was severe and he had not tried medications for pain. Mr. Tapia denied a history of similar symptoms in the past. Records indicated HPI was limited by the fact that Mr. Tapia was a very poor historian, minimally cooperative and would not answer many questions. Examination revealed Mr. Tapia was anxious appearing, minimally cooperative with exam, mildly tachycardic, left calf and foot swollen, left forefoot and all toes were cold with bluish/black discoloration, erythema of the proximal foot and lower leg, a very faint DP pulse palpable, the foot was diffusely tender, and Mr. Tapia was able to lift lower extremity against gravity at knee, unable to flex or move at ankle. X-rays of the left foot (ordered by Lyndsey Deleon, M.D. and interpreted by Tod E. Wurst, M.D.) revealed moderate diffuse soft tissue swelling over the forefoot, a mild amount of soft tissue swelling about the mid-foot, underlying skeletal structures appeared intact without acute fracture or dislocation seen, and no significant foot deformities, and the impressions revealed moderate diffuse soft tissue swelling of the forefoot and lesser degree the mid-foot region, no radiopaque foreign bodies were detected, and no acute fracture or dislocation left foot identified. Vascular ankle/brachial index with PPG (ordered by Lyndsey Deleon, M.D. and interpreted by Nicholas D. Garcia, M.D.) revealed resting right ABI was 1.0 which indicated normal arterial perfusion, resting left ABI was 0.93 which indicated normal arterial perfusion, triphasic waveform at ankles bilaterally, right digit pressures pulsatile bilaterally, left 1st toe digit was pulsatile, 3rd, 5th toes were pulsatile, left 2nd digit with flattened, and left 4th digit was flattened flow. Vascular venous duplex of left extremity (ordered by Lyndsey Deleon, M.D. and interpreted by Dr. Garcia) revealed subacute DVT of left common femoral vein, femoral vein, popliteal vein, posterior tibial vein, peroneal vein, left gastrocnemius vein with acute DVT, left greater saphenous vein and left lesser saphenous vein occluded with subacute superficial thrombophlebitis, and right common femoral vein was patent. A CT of the left lower extremity (ordered by Lyndsey Deleon, M.D. and interpreted by Aditya P. Sunidja, M.D.) revealed soft tissue swelling surrounding the left foot, with otherwise no soft tissue air or radiopaque foreign body, small calcaneal spur/enthesophyte at the Achilles tendon insertion, and bony structures otherwise appear intact, with no evidence for fracture, dislocation/malalignment, bony erosion/destruction, or other acute bony abnormality, and an impression revealed soft tissue swelling, with otherwise no evidence for osteomyelitis or other acute bony abnormality at that time. Labs revealed high WBC (17.81), abs neuts (14.55), abs immature grans (0.31), abs monos (1.38), immature grans (171), lactate (2.1), BUN (110), creatinine (1.65), bilirubin total (1.8), glucose (133), SGOT/AST (48), and CK (1,081) and low platelet (113), GFR non-African American (47), GFR African American (57), A:G ratio (1.0). Mr. Tapia was provided impressions of left foot cellulitis and gangrene, acute renal failure, non-severe sepsis, and elevated CK. Mr. Tapia was admitted to med/surg in guarded condition, recommended IV fluids, pain control, antibiotics, follow up cultures, follow up vascular surgery consult, follow up vascular studies, and continued monitoring.

- Mr. Tapia had an ACSS consultation with Aml Raafat, M.D. for gangrene/infection of foot and concern regarding necrotizing fasciitis. Dr. Raafat noted Mr. Tapia was incarcerated since June 2018. Dr. Raafat indicated Mr. Tapia was a poor historian and presented with approximately 7 day history of foot and leg pain, gangrene of toes noted in ED. Dr. Raafat noted Mr. Tapia had fever possible prior to admit and had no fever in ED. Dr. Raafat noted Mr. Tapia's creatinine elevated to 1.65, CK was 1,000, and Na was 135. Dr. Raafat noted vascular surgery was also consulted. Examination revealed sickly appearance, lying in bed tremulous, cool LLE from below knee to foot, (temp change just below knee), LLE - swelling of calf to foot with black gangrenous skin changes of entire forefoot and all toes, Mr. Tapia was unable to move toes, cold forefoot, cool hindfoot and lower calf, calf mildly swollen and tender to touch, no streaking of cellulitis up the

leg though the calf was mildly erythematous, palpable PT, faint DP on left, he was able to move leg but not toes, could move slightly at ankle, sensory deficit at forefoot, and sensation preserved in hind foot.  Dr. Raafat reviewed x-rays of the left foot, venous duplex of left LE, and labs performed on October 1, 2018.  Dr. Raafat provided assessments of LLE with venous outflow obstruction, likely cellulitis/erythema related to vascular outflow causing inflow issue as well, and possible phlegmasia cerulea dolens with gangrene - likely to need anticoagulation/embolectomy.  Dr. Raafat indicated Mr. Tapia had no evidence for necrotizing fasciitis or compartment syndrome.  Dr. Raafat agreed with vascular surgery consult.  Dr. Raafat indicated Mr. Tapia likely to need tissue debridement at later date, deferred to vascular surgery.  Dr. Raafat indicated no intervention per general surgery and discussed with Dr. Shah.

- Mr. Tapia had a Vascular consultation with Dr. Garcia, who indicated Mr. Tapia presented with foot problem - left gangrenous foot, cool to touch, unable to palpate pedal pulses.  Dr. Garcia noted Mr. Tapia was escorted by officers from jail.  Dr. Garcia noted Mr. Tapia with a history of IVDU and was presently incarcerated.  Dr. Garcia noted Mr. Tapia had a poor memory and was unable to provide accurate timeline of issues with left foot, but had at least 2 weeks, possibly up to 1 month of left leg pain and inability to walk on leg.  Dr. Garcia noted Mr. Tapia also had left leg paralysis of unclear duration but likely over a week per his limited history.  Dr. Garcia noted Mr. Tapia had had arterial study noting normal arterial circulation left leg, his digit ppg note flattening of 2 digits, he had extensive DVT of left leg of all named vessels of left leg, and his study noted dilated veins, but clot appeared subacute and indeterminate age of clot.  Dr. Garcia indicated Mr. Tapia told guards that day that he had left foot pain and showed guards left foot was discolored blue/black and was brought to ER for evaluation.  Dr. Garcia indicated guards that were with Mr. Tapia that day stated Mr. Tapia had change last month and became more confused and need to be transferred to "old jail" which involved living alone and more supervision for individuals unable to be in general population.  Dr. Garcia noted Mr. Tapia's creatine was 1.6, BUN was 110, and CK was 1,000.  Examination revealed disheveled appearance, Mallampati score was 2, carotid - bruit, + femoral, popliteal, DP, left calf and foot swollen, left forefoot bluish/black discoloration, left foot paralyzed, left leg hypoesthetic knee down, and venous gangrene of left foot.  Dr. Garcia independently visualized images of ABI noting normal arterial circulation and indicated left venous flow occluded femoral veins->ankle.  Dr. Garcia provided assessments of phlegmasia cerulea dolens with venous gangrene, venous compartment syndrome, and left leg paralysis of unclear duration.  Dr. Garcia indicated symptoms of unclear duration but likely weeks per Mr. Tapia limited history, recommended to continue serial CK, and start IV Heparin.  Dr. Garcia indicated if that presentation was less than 24-36 hours and potential salvage of limb/digits/function were still present then fasciotomy and consideration of catheter directed thrombolysis would be necessary.  Dr. Garcia indicated however, fasciotomy with that degree of venous occlusion and associated venous hypertension would likely be associated with significant bleeding and unreasonable to proceed given that information.  Dr. Garcia indicated if CK's after hydration continue to escalate then fasciotomy or leg amputation would need to be considered to prevent complication of rhabdomyolysis and given chronicity of symptoms and appearance and dysfunction of left foot, suspected CK might be trending down at that point and next 24 hours of CK while on Heparin would be necessary information for additional treatment recommendations.  Dr. Garcia indicated regarding catheter directed thrombolysis usually only helpful for acute clot <14 days, history of left leg dysfunction which might or might not be accurate suggest longer duration of venous thrombosis and also risk of catheter directed thrombolysis likely unreasonable at that point given information and paralyzed limb of unclear duration with venous gangrene and paralyzed limb.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

- Mr. Tapia was evaluated by Lucas P. Labine, M.D., who indicated Mr. Tapia presented with foot problem - left gangrenous foot, cool to touch, unable to palpate pedal pulses. Dr. Garcia noted Mr. Tapia was escorted by officers from jail. Dr. Labine indicated Mr. Tapia was incarcerated male who was a poor historian, with a past medical history significant for distant IVDU, presenting to the ED that day c/o swelling, pain, and redness of his left foot and leg, which started approximately 1-2 weeks prior. Dr. Labine indicated Mr. Tapia was unclear of the exact timeline but stated that he had pain for "a while" and that he had to limp around for a while. Dr. Labine indicated Mr. Tapia noted no trauma to the leg that he remembered. Dr. Labine indicated Mr. Tapia stated that the pain was predominately in his foot, achy in quality, 8-9/10 in severity. Dr. Labine noted Mr. Tapia had not tried any medications but had noted that wrapping it made it feel better. Dr. Labine indicated Mr. Tapia noted no recent drug or alcohol use. Dr. Labine noted Mr. Tapia had never had anything like that happen before and had no insight or thoughts as to what caused it. Dr. Labine indicated further history from jail guards included Mr. Tapia had been incarcerated since June 2018, and that he was a model prisoner, including being designated "trustee" prisoner. Dr. Labine noted a couple of weeks prior he had a dramatic change in personality, rumors among prisoners were that he drank some kind of cleaner, which he denied. Dr. Labine indicated regardless Mr. Tapia had recently had poor memory which was a dramatic change for him. Dr. Labine indicated after evaluation in the ED he was admitted for phlegmasia cerulea dolens of his left lower extremity, with management assistance per vascular surgery. Examination revealed thin, tremulous tired appearing male, nervous, dental fillings present on lower teeth but otherwise good dentition, peripheral pitting edema of the left leg with tense anterior compartments, left foot cold to touch, left pedal pulses absent, absent of obvious rashes and lesions other than his left lower extremity, fingers had spooning of the fingernails, clubbing of the fingernails, Mr. Tapia was not alert to date, remembered 1/3 items on memory testing, 2/3 with prompting, serial 75 x 1, was able to spell "world" forwards but not backwards, able to lift lower extremity against gravity at knee, unable to flex or move at ankle, hyperalgesia to left foot, sensation decreased on dorsum of left foot, left arm handcuffed to bed, unable to complete upper extremity strength, strength was 2/4 in left leg, unable to satisfactorily test DTR state of Mr. Tapia. Dr. Labine reviewed x-rays of the left foot, venous duplex, and labs performed on October 1, 2018. Dr. Labine provided an assessment of phlegmasia cerulea dolens of left LE, AKI, rhabdomyolysis, personality changes, and chronic conditions - history of IVDU. Dr. Labine vascular US showed extensive clot burden, with ABI and x-rays unremarkable, no infectious process suspected, and etiology of phlegmasia cerulea dolens of left LE still unknown, with minimal history per interview. Dr. Labine indicated that given unknown timeline, difficult to assess whether surgical/catheter intervention was necessary now versus a.m., and to what extent his limb was salvageable. Dr. Labine indicated AKI was likely secondary to rhabdomyolysis versus prerenal (BUN/Cr), however, could consider rare etiology like vasculitis, nephrotic syndrome, etc. if that failed to improve with fluids. Dr. Labine indicated rhabdomyolysis was secondary from soft tissue injury as above, unclear if trending upward (more acute) or downward (subacute timeline), and likely related to elevated AST, lactate, and WBC. Dr. Labine recommended full diet, IVF - NS at 100 ml/hour, Heparin gtt, vascular to reassess the following day, plan to bridge to Warfarin per pharmacy, Morphine and Tylenol p.r.n. for pain, IV fluids, trend Cr, follow up blood cultures, and to recheck CK levels q.8.h. Dr. Labine per guards, Mr. Tapia had been "trustee," very easy to hold a conversation with, just a few months prior, apparently reported ingestion of toxic material (cleaner of some kind?) but unconfirmed and advised to consider systemic process (rheum/vasculitis), metabolic, and vascular (hypercoagulable) and consider MRI of the brain later in admission, further workup after LE addressed.

- October 3, 2018:  Mr. Tapia underwent left popliteal vein access, left leg venogram, left superficial vein venoplasty 6 mm x 4 cm, and left iliac vein, left superficial femoral vein, left common iliac vein EKOS catheter 40 cm treatment length with initiation of TPA (1 mg/hour), performed by Dr. Garcia, who provided the findings of left superficial vein and popliteal vein chronically occluded requiring venoplasty to advance EKOS sheath into iliofemoral segment.

- October 4, 2018:  Mr. Tapia had a Wound Care consultation with Ashley M. Pearson, R.N. (Records did not indicate name of attending physician) for left foot wound.  Ms. Pearson indicated wound care nurse had completed a review of chart information pertinent to wound causation and healing including but not limited to, medications, laboratory values, diagnostic tests, nutrition, hydration, and mobility.  Ms. Pearson noted Mr. Tapia was in a lot of pain and did not want to touch his foot.  Ms. Pearson noted no open wounds, area of demarcation beginning to develop.  Ms. Pearson indicated she sprayed foot with Cavilon, which would keep foot dry.  Ms. Pearson indicated staff nurses were responsible for performing treatments and interventions as ordered, wound care would see Mr. Tapia at least weekly to reassess wounds and update orders as needed, recommended daily, left foot, lower leg - spray left foot with Cavilon spray, leave OTA, elevate left foot so heel was not on bed.  Ms. Pearson indicated the goals of the treatment were to prevent infection and promote wound healing.  Ms. Pearson indicated would continue to follow up with Mr. Tapia the following week.  Records indicated Mr. Tapia was last seen for wound care on October 12, 2018.

- Mr. Tapia underwent left leg venous EKOS TPA catheter lytic check, left leg venogram, left iliac vein venoplasty 10 mm x 4 cm along entire length, and left superficial vein venoplasty 8 mm x 6 cm below, performed by Dr. Garcia, who provided the findings of left superficial femoral vein and left iliac vein patent and left superficial femoral vein stenosis resolved.

- October 5, 2018:  A CT angiogram of lumbar for pulmonary embolism (ordered by Lucas P. Labine, M.D. and interpreted by Roger H. Liu, M.D.) revealed poor opacification of the pulmonary arteries, no filling defects were identified, the main pulmonary artery was normal in caliber, a 9 mm nodule in the right lower lobe on 13:51 was unchanged and likely benign, the lungs were otherwise clear, the heart was normal in size with no pericardial effusion, an aortopulmonary lymph node measured 1.2 cm, subcutaneous edema in the left lateral chest wall, the aorta was normal in course and caliber, and no focal bony lesions, and the impressions revealed no evidence of pulmonary emboli in the main and right and left pulmonary arteries, non-diagnostic evaluation of the segmental and subsegmental pulmonary arteries due to poor contrast opacification, essentially clear lungs, non-specific, enlarged aortopulmonary lymph node, and non-specific left chest wall subcutaneous edema.

- A CT of the head (ordered by Lucas P. Labine, M.D. and interpreted by Justin Robert Waters, M.D.) revealed no evidence of acute intracranial hemorrhage, transcortical infarction, or mass, the gray white differentiation was normal, no abnormality of gray or white matter, the ventricles and sulci were normal for Mr. Tapia's age, no mid-line shift, no extra-axial fluid collections, the visible vascular structures were unremarkable, mild to moderate polypoid, mucosal thickening involved the right maxillary sinus, no paranasal sinus air fluid levels, the mastoid air cells were clear, the skull base and calvarium were normal, the craniocervical junction was normal, and the orbits were unremarkable, and the impressions revealed no evidence of acute intracranial hemorrhage,

transcortical infarction or mass, mild to moderate polypoid mucosal thickening within the right maxillary sinus, and no paranasal sinus air fluid levels to suggest acute sinusitis.

- A CT of the abdomen/pelvis (ordered by Lucas P. Labine, M.D. and interpreted by Dr. Liu) revealed unremarkable lung bases, the liver parenchyma was homogeneous, no focal liver lesions, normal gallbladder, spleen, pancreas, adrenal glands, and genitourinary, kidneys demonstrated no hydronephrosis or renal/ureteral stones and no focal renal lesions, the ureters were normal in course and caliber, the small and large bowel were normal in caliber without wall thickening or inflammatory changes, no masses were identified, the appendix was normal, the left inguinal and external iliac chain lymph nodes were mildly enlarged and enhancing, the abdominal aorta and IVC were normal in caliber, the left external iliac vein was small in caliber in comparison to the right side and slightly more hypodense, abdominal wall/peritoneal cavity demonstrates no free air, a trace amount of free fluid in the pelvis, mesenteric edema was diffuse, a tiny, fat containing right periumbilical hernia, the left thigh was enlarged due to severe, extensive subcutaneous edema, the edema extended into the deep compartments of the anterior proximal thigh, the edema also extended into the left hernia and inguinal regions, the extensive subcutaneous edema coursed superiorly along the lateral abdominal and chest walls, no discrete, rim enhancing fluid collections were identified, the left iliopsoas muscles were asymmetrically enlarged, no subcutaneous gas, and no focal bony lesions, and the impressions revealed no masses to suggest a primary malignancy, no extrinsic compression of the left iliac veins, smaller caliber of the left external iliac vein and relatively decreased contrast within the left external iliac vein, which might be due to decreased flow secondary to known deep venous thrombosis in the left lower extremity, extensive subcutaneous edema in the left thigh, involving the deep compartment of the left proximal anterior thigh, and extending into the left perineal and inguinal regions as well as superiorly in the lateral abdominal and chest walls, which might represent infection/cellulitis, no subcutaneous gas or abscess, enlarged left iliopsoas muscles, likely representing myositis, non-specific, diffuse mesenteric edema, and enlarged, enhancing left external iliac chain and inguinal lymph nodes, possibly reactive.

- October 8, 2018:  Mr. Tapia had an Infectious Disease consultation with Leslie A. Linares-Hengen, M.D. for phlegmasia cerulea dolens.  Dr. Linares-Hengen indicated Mr. Tapia was admitted on October 1, 2018, with worsening left foot achy pain, 8/10 in severity, worse with manipulation of foot, redness and setting for at least 2 days prior to admission.  Dr. Linares-Hengen noted Mr. Tapia had remote history of IVDU but had been incarcerated since June 2018.  Examination revealed marked edema left lower extremity, left foot with black gangrenous toes, marked edema, bullae formation with serous discharge, and patchy erythema/induration along left leg extending to left flank.  Dr. Linares-Hengen reviewed CT of the LLE and arterial doppler performed on October 1, 2018, CT of the abdomen/pelvis and CTA of the chest performed on October 5, 2018, and labs performed on November 8, 2016, and from October 1, 2018 to October 8, 2018.  Dr. Linares-Hengen provided impressions of phlegmasia cerulea dolens of left lower extremity awaiting left BKA, massive inflammatory process to be expected given extent of thrombosis, left flank induration probably related to massive left lower extremity DVT, if superinfected, would expect Gram-positive infection rather than resistant Gram-negatives, possible left iliopsoas myositis, again most likely a gram-positive infection, rhabdomyolysis, resolving, and history of injection drug use, but had been incarcerated since June 2018.  Dr. Linares-Hengen indicated Clindamycin would cover anaerobes and help limit toxin production.  Dr. Linares-Hengen ordered Procalcitonin, and recommended to collect aerobic and anaerobic cultures of discharge from foot, begin Clindamycin 900 mg IV every 8 hours, begin Cefazolin 2 g IV

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

Physician Life Care Planning™

every 8 hours, continue Vancomycin until MRSA ruled out, stop Piperacillin/Tazobactam, and follow blood cultures.

- A non-vascular ultrasound of the left lower extremity (ordered by Chrystal Buchanan, P.A.-C. and interpreted by Charles Leusner, M.D.) revealed edema interdigitated throughout the subcutaneous tissues without abscess or drainable fluid collection and an impression revealed edema.

- October 10, 2018:  Mr. Tapia underwent guillotine amputation of the left lower extremity, performed by Brandon W. Propper, M.D., who provided a finding of necrotic tissue in the distal foot with healthy appearing tissue in the ankle itself.

- October 15, 2018:  Mr. Tapia had a Physical Therapy evaluation for impaired mobility and was provided a treatment plan, which included therapy 1 x/day for 5-7 days/week with short-term goals of bed mobility to EOB with no assist, sit to stand with front wheeled walker and no assist, transfers with front wheeled walker and no assist, ambulating 100 feet with front wheeled walker with no assist, and propel manual wheelchair 200 feet with no assist to be achieved by hospital discharge, and a long-term goal of Mr. Tapia would maximize level of mobility within the safety limits to be achieved by 1 month.  Records indicate Mr. Tapia was last seen for physical therapy on October 22, 2018.

- October 16, 2018:  Mr. Tapia underwent left below knee amputation, performed by Cindy P. Ha, M.D. without complications.  The findings revealed healthy viable muscle and tissue and formalization of left below knee amputation.

- October 18, 2018:  Mr. Tapia had an Occupational Therapy evaluation for self-care deficit and was provided a treatment plan, which included therapy 1 x/day for 5-7 days/week.  Records indicate Mr. Tapia was last seen for occupational therapy on October 22, 2018.

- October 22, 2018:  Mr. Tapia was discharged to Pierce County Correctional Facilities in stable condition by Dr. Labine, who provided discharge diagnoses of phlegmasia cerulea dolens of left lower extremity, status post guillotine amputation of left ankle, then BKA of left lower extremity, rhabdomyolysis, and related AKI - resolved, uremia - resolved, acute metabolic encephalopathy - resolved, hypercoagulability with increased factor VIII, thrombocytosis, chronic normocytic anemia, severe malnutrition, history of reported paranoid schizophrenia, and history of IV drug use.  Dr. Labine provided instruction on wound care, pain medication management, continued Warfarin bridging with Lovenox until INR therapeutic, and continuation of antibiotics until October 24, 2018, recommended full diet, with boost supplements as needed to ensure nutrition, to continue LMWH until therapeutic, continue Warfarin (Coumadin) 5 mg 1 tablet by mouth once daily, to be titrated to achieve INR between 2-3, continue PT, continue Morphine (MS Contin, Oramorph SR) 15 mg Tbcr 1 tablet by mouth every 12 hours for 7 days for breakthrough pain, continue Oxycodone (Roxicodone) 5 mg 1-2 tablet by mouth every 6 hours as needed for severe pain for up to 4 days, continue Gabapentin (Neurontin) 300 mg 1 capsule q.a.m., 1 q.afternoon, and 2 capsules at bedtime for 3 days, then 1 cap q.a.m., 2 q.afternoon, and 2 capsule at bedtime for 3 days, then 2 cap t.i.d., continue Cephalexin (Keflex) 500 mg 1 capsule by mouth 4 times daily for 2 days, start taking Acetaminophen 500 mg (Tylenol) 2 tablets by mouth 4 times daily, Enoxaparin (Lovenox) 100 mg/1 ml injection 1.05 ml into the skin once daily, Melatonin 3 mg 1 tablet by mouth at bedtime, Polyethylene Glycol (MiraLAX) 1 packet by mouth once daily, Senna-

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

Docusate (Senokot-S) 8.6-50 mg 1 tablet by mouth twice daily, and advised outpatient follow up with heme/oncology and outpatient follow up with Dr. Ha in Vascular Surgery on November 12, 2018.

- Dr. Balderrama issued a note indicating Mr. Tapia arrived that day from hospital management.  Dr. Balderrama indicated Mr. Tapia had left BKA due to vascular complications.  Dr. Balderrama indicated pain medications as well as antibiotics (Keflex) and anticoagulation management medications restarted.  Dr. Balderrama indicated Mr. Tapia would have INR that week, would continue to monitor him, and advised to follow up with hematology as well as with vascular surgeon per hospital documentation.

- October 23, 2018:  Mr. Tapia was administered Lovenox injection at NaphCare by Ms. Chalk.

- October 24, 2018:  Dimita Smith, R.N. (Records did not indicate name of attending physician) issued a note indicating wound care completed as ordered after Mr. Tapia showered in medical clinic.  Ms. Smith indicated Mr. Tapia verbalized to nurse that he had fallen and hit his amputation BKA stump when up to use the bathroom earlier in the morning. "I guess I was still mostly asleep when I got up to the bathroom and I forgot to lock the wheelchair."  Ms. Smith indicated upon visual inspection of surgical incision of left amputation stump noted incisional wound still approximated with scant amount of serosanguineous drainage and staples and sutures intact.  Records indicate Mr. Tapia was last seen for Wound Care at NaphCare on November 14, 2018.

- October 30, 2018:  Mr. Tapia had a follow up visit with Dr. Balderrama for evaluation of episode of phlegmasia cerulea dolens that resulted in BKA of his left lower extremity.  Dr. Balderrama indicated Mr. Tapia had very elevated INR last week (8) and Coumadin dose was reduced to 2.5 mg q.h.s. now, and his last INR was 1.4 on that day's visit.  Dr. Balderrama indicated Mr. Tapia was not reporting new symptoms.  Examination revealed wound check on site of amputation left lower extremity with staples and sutures in place, and surgical wound was clear with no evidence of infection.  Dr. Balderrama provided an assessment of history of phlegmasia cerulea dolens that affected his left lower extremity and resulted on BKA.  Dr. Balderrama indicated would adjust Coumadin dose that day and would recheck PT in 48 hours.  Dr. Balderrama indicated Mr. Tapia had follow up appointment with vascular surgeon.

- November 1, 2018:  Mr. Tapia had a follow up visit with Ms. Smith for contact dermatitis.  Ms. Smith noted Mr. Tapia had scattered clusters of fine pinpoint sized red bumps to both antecubital areas for approximately 1.5 weeks prior.  Ms. Smith indicated Mr. Tapia was complaining of onset after use of "jailhouse soap."  Ms. Smith noted Mr. Tapia had pruritus/itching.  Ms. Smith noted rash was not located in any other areas per Mr. Tapia.  Examination revealed redness and itching.  Ms. Smith provided an assessment of skin irritation.  Ms. Smith recommended to apply Hydrocortisone 1% cream b.i.d. p.r.n. to affected site for 7 days if no contraindications or allergies and educated on the use of Hydrocortisone cream sparingly and use only on affected areas, not covering affected area with occlusive dressings, avoiding allergen, and submitting request to see health care provider if symptoms did not resolve in 1 week.

- November 12, 2018:  Mr. Tapia had an office visit with Christie Steele, N.P. (Records did not indicate name of attending physician), who indicated Mr. Tapia with history of right BKA and anticoagulation presented to clinic for follow up on anticoagulation.  Ms. Steele noted Mr. Tapia's

INR was out of therapeutic range at 3.5 on previous check.  Ms. Steele noted Warfarin was held, Mr. Tapia did not have it for 4 days and was taking 5 mg Monday-Friday and 2.5 mg on Saturday and Sunday.  Examination revealed right below knee amputation.  Ms. Steele provided assessments of right below knee amputation and anticoagulation.  Ms. Steele indicated would restart the previous dosing and check INR on Thursday and discussed that Warfarin was impacted by food and other factors.

- November 14, 2018:  Mr. Tapia was evaluated by W. Rollins, M.D., who indicated Mr. Tapia with right BKA was hospitalized from October 1st, with right foot osteomyelitis.  Dr. Rollins indicated Mr. Tapia had first right foot amputation followed by BKA on October 16th.  Dr. Rollins noted Mr. Tapia had phantom pain and hypersensitivity of stump.  Dr. Rollins noted Mr. Tapia was off antibiotics.  Examination revealed right knee stump, wound clean, and sutures at stump.  Dr. Rollins provided an assessment of foot osteomyelitis.  Dr. Rollins indicated wound appeared closed under tension.

- Records indicate Mr. Tapia was in Infirmary/Extended Observation Unit at Washington Corrections Center from November 14, 2018 to December 6, 2018.

- November 20, 2018:  Mr. Tapia was evaluated by Mark A. Wentworth, M.D. for pain in left leg stump (BKA).  Dr. Wentworth noted Mr. Tapia was amputated 1 month prior.  Dr. Wentworth provided impressions of BKA of left leg, Methamphetamine abuse, and mental health issues (PTSD).  Dr. Wentworth already requested Tacoma General Hospital and Brandon Hopper, M.D.'s records.  Dr. Wentworth ordered RPR, CBC, CMP, lipid profile, PT/INR, hepatitis panel, and HIV test.  Dr. Wentworth indicated Mr. Tapia declined HIV test and accepted hepatitis testing, and would evaluate the need for vaccination after laboratory results were reviewed.

- Mr. Tapia was seen by W. McMullum, D.D.S. for initial dental screening examination.  Examination revealed moderate calculus and gingivitis.  Dr. McMullum indicated oral hygiene instructions were given.

- January 2, 2019:  Mr. Tapia was seen by J. Hoag, D.D.S. for dental examination at Stafford Creek Corrections Center.  Dr. Hoag indicated Mr. Tapia reported no pain.  Dr. Hoag noted Mr. Tapia's INR was 2.9-3.0.  Dr. Hoag noted Mr. Tapia had blood clot and was on blood thinners.  Dr. Hoag indicated the treatment need for extractions reviewed with Mr. Tapia.  Dr. Hoag indicated Mr. Tapia requested treatment.  Dr. Hoag indicated recommended #3, #4, and #14 extraction root tips, 18(B) clean out and fill.  Dr. Hoag indicated Mr. Tapia would kite when he got his INR in range for dental 1, 5 to 20, and would schedule for extraction.  Dr. Hoag advised the next visit for extractions of root tips.

- January 31, 2019:  Mr. Tapia had an office visit with Scott M. Light, P.A.-C. (Records did not indicate name of attending physician), who indicated Mr. Tapia had an unfortunate situation that occurred while he was in the county jail.  Mr. Light noted Mr. Tapia was unaware of having a factor VIII elevation.  Mr. Light indicated apparently, he developed septic blood clot in his left lower extremity and ultimately, he was hospitalized and in effort to salvage his left lower extremity were unsuccessful despite medical therapy, and considering forefoot ray amputation, and he ended up undergoing a left below the knee amputation sometime in late October or early November.  Mr. Light indicated Mr. Tapia explained that prior to going to the hospital, he had

become confused and what sounded like encephalopathic. Mr. Light noted Mr. Tapia had been on Warfarin since then and lifelong anticoagulation was recommended during the hospitalization. Mr. Light noted Mr. Tapia still got some phantom pain and when he touched the anterior part of the stump, he felt his calf was being pressed on. Mr. Light indicated there was still little scab down at the stump, but otherwise, he felt like it was healing up fairly well. Mr. Light noted Mr. Tapia had not had any problems on Warfarin and his INR had been fairly stable between 2 and 3 on 4 mg. Mr. Light indicated Mr. Tapia got on medication for hyperlipidemia at the reception center but otherwise he considered himself fairly healthy, and he had never really had any medical problems. Examination revealed Mr. Tapia was in a wheelchair, slightly flat affect, a below the knee amputation on the left, along the scar line, which was a sort of anterior on the stump on the lateral edge, an area of scabbed tissue, but no purulence, fluctuance, or erythema surrounding it, no particular pain to palpation though he got the phantom pain described above. Mr. Light reviewed some of his INR results and indicated it looked like he had been fairly stable between 2.2 and 2.7 on 4 mg. Mr. Light provided assessments of coagulopathy, fairly recent left below the knee amputation, and possible hyperlipidemia. Mr. Light indicated Mr. Tapia was doing fairly well on Coumadin and would make that KOP at that time, recommended lifelong anticoagulation, and advised to follow up with the orthopedist, who performed the surgery, to assess the stump and determine when he was ready to proceed to fit with prosthesis, so when that recommendation was made could try to get approval for below the knee prosthesis, and he would be with them for about 5 years. Mr. Light was concerned that there had been incomplete healing at that point, so going to get some inflammatory markers and order him some Mupirocin ointment for that unhealed area. Mr. Light indicated would start working on all that and follow up with Mr. Tapia in about 3 months or sooner if needed.

- February 1, 2019: X-rays of the left knee performed at TRA Medical Imaging (ordered by Scott M. Light, P.A.-C. and interpreted by Anand Suresh, M.D.) revealed a below the knee amputation, periosteal reaction at the distal tibia and distal fibula, which could represent osteomyelitis, clinical correlation was advised, soft tissue swelling at the stump, and MRI could be helpful.

- March 15, 2019: Mr. Tapia had a follow up visit with Mr. Light for left stump - level III for MRI. Mr. Light indicated Mr. Tapia stated wound much improved with Mupirocin. Mr. Light noted Mr. Tapia still with phantom pain. Examination of the left stump revealed 1 cm x 1 cm of scab on the lateral edge of the wound. Mr. Light provided an assessment of the left stump BTK amputation - looked really good. Mr. Light thought they could proceed with prosthetics consultation starting with stump shrinking.

- April 26, 2019: Mr. Tapia had an office visit at Hanger Clinic with Cerise Knakal, L.C.P.O. for evaluation of a left transtibial prosthesis. Ms. Knakal indicated Mr. Tapia was with the diagnosis of acquired absence of left leg below knee. Ms. Knakal noted Mr. Tapia had gained 20 pounds in the past years. Examination revealed left bulbous, ADL score of 29, function score of 16, limb strength score of 20, K-PAVET score of 65, and expected K level was K3. Ms. Knakal provided a prosthetic assessment of the new amputee. Ms. Knakal indicated Mr. Tapia was residing at a correctional facility where he was required to walk at variable cadence daily and ambulate over uneven terrain daily as he moved from building to building and walked outside. Ms. Knakal indicated Mr. Tapia would have a job within the facility that might require him to lift or carry items depending on the day or the job. Ms. Knakal indicated his jobs include walking more than 400 yards daily and actively seeking out exercise as it was available to him at the facility. Ms. Knakal indicated occasionally, Mr. Tapia would be required to jog or walk quickly within the facility. Ms. Knakal

indicated Mr. Tapia's activity level was expected to increase again as he transitioned out of the Correction Facility and joined the civilian workforce.  Ms. Knakal indicated that 2 prosthetic sockets would be required to confirm the fit and comfort of prosthetic socket before moving to a definitive prosthesis.  Ms. Knakal indicated a flexible inner liner with a rigid outer frame was necessary for Mr. Tapia to increase the comfort of the socket fit by providing a softer interface against Mr. Tapia's limb while maintaining a rigid outer structure so the socket maintains durability and structure throughout the life of the socket.  Ms. Knakal indicated total contact was indicated to distribute pressures in the socket and limb evenly and to avoid excessive pressures along the sensitive anatomy of the residual limb.  Ms. Knakal indicated Mr. Tapia had a scar on his distal end that was healing slowly.  Ms. Knakal indicated a cushion liner with a suspension sleeve and flexible inner liner will help promote healing without risk of pistoning in the socket and slowing healing at the incision site and it would also provide comfort for Mr. Tapia's limb as it heals.  Ms. Knakal indicated due to Mr. Tapia's weight, activity level, and strength, he was in need of ultralight materials that made ambulating easier and more energy efficient while also providing a durable prosthesis that would last him for years.  Ms. Knakal indicated an alignable system was required to accommodate Mr. Tapia's anatomical alignment and allow him to ambulate safely through an efficient and stable gait pattern.  Ms. Knakal reported vertical loading was included in the foot recommendation and no need for additional components.  Ms. Knakal indicated Mr. Tapia was fit with size 2 shrinkers due to being a new amputee and having a bulbous shaped distal end and he tolerated the procedure without incident or problem.  Ms. Knakal recommended to wear the shrinkers for 2 weeks prior to being scanned for his first check socket and indicated the prosthetic components would be ordered at that time.

- June 6, 2019:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia was living in a long-term care at Stafford Creek Department of Corrections and his environmental barriers included level surfaces, uneven surfaces, multilevels, linoleum, and level areas with steps.  Ms. Knakal indicated Mr. Tapia was scanned for his left transtibial prosthesis and he tolerated the procedure without incident or problem.  Ms. Knakal indicated Mr. Tapia's components would be ordered and a test socket would be fit at next appointment.

- July 22, 2019:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia was fitted with Vivak test socket #1 and the modifications were necessary to improve total contact, contours, and sock ply/volume.  Ms. Knakal indicated Mr. Tapia was dynamically aligned, alignment was evaluated by parallel bars, and results of alignment process were satisfactory in sagittal coronal transverse plane.  Ms. Knakal indicated additional test socket was not required.  Ms. Knakal indicated pretibial pads were added and distal tibia flared out to provide appropriate fit and function and the foot would need to be aligned more anterior compared to the socket for improved gait.  Ms. Knakal indicated Mr. Tapia was not leaving the office on a test socket and he was ready to be scheduled for delivery of prosthesis.

- August 6, 2019:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia was seen that day for delivery of his left TT prosthesis.  Ms. Knakal indicated 3-5 sock ply fitted upon delivery.  Ms. Knakal indicated functional goals from evaluation fully accomplished.  Ms. Knakal indicated Mr. Tapia stated dissatisfactory with the fit and function of the device and he reported concern about not feeling comfortable walking without the parallel bars at that point.  Ms. Knakal indicated no custom shaped protective cover to be provided and no additional supplies provided.  Ms. Knakal indicated Mr. Tapia reported discomfort with walking independently at that point while he was still getting use to walking on prosthesis.  Ms. Knakal noted Mr. Tapia had a

tendency to scuff his toe during initial swing of the gait cycle.  Ms. Knakal indicated the prosthesis was adjusted to have more flexion and/or dorsiflexion at the foot, and the prosthesis was shortened, but his steps were still inconsistent.  Ms. Knakal indicated flexing the socket or dorsiflexing the foot further would have led to an excessive flexion moment at initial contact that would have been concerning, physical therapy was recommended for Mr. Tapia to help with gait training and move him away from the use of assistive devices with his prosthesis.  Ms. Knakal indicated Mr. Tapia tolerated the procedure without incident or problem.  Ms. Knakal advised to follow up with physician regarding use of device as directed by physician and follow up in 1-3 weeks.

- August 21, 2019:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia had not been able to wear his prosthesis since the delivery due to not receiving physical therapy at that time and he was expected to receive physical therapy that week at which time his prosthesis would be provided to him by the facility.  Ms. Knakal indicated 0-3 sock ply at beginning of visit and 3 sock ply at end of visit.  Ms. Knakal reported replacement device was not indicated.  Ms. Knakal indicated device checked for structural safety/integrity and compliance with manufacturer guidelines.  Ms. Knakal indicated there were not reported concerns with the prosthesis except some discomfort due to unfamiliarity and Mr. Tapia felt as though it was too difficult to stand on his prosthesis with 100% of his weight as he walked and was hesitant to try walking without the parallel bars as he walked in the clinic.  Ms. Knakal reported the alignment was adjusted to allow more plantarflexion and increased load on the foot.  Ms. Knakal indicated Mr. Tapia also discovered that externally rotating his hip so his knee was not perfectly in line with his line of progression helped increase stability in the sagittal plane and he was able to walk with one hand on the parallel bars instead of 2.  Ms. Knakal indicated Mr. Tapia had shown increased potential and improvement in walking at the appointment alone and he needed physical therapy to keep improving strength and balance with the prosthesis to become an effective full time user and increase his independence.  Ms. Knakal indicated the prosthesis might need further adjustments that would be addressed after he had started physical therapy and increased wear time on the prosthesis.  Ms. Knakal advised to follow up with physician regarding use of device p.r.n. and follow up in 1 month.

- August 22, 2019:  Mr. Tapia had a Physical Therapy evaluation for stump on lower extremity and was provided a treatment plan, which included therapy follow up in 2-3 weeks and daily HEP.

- October 11, 2019:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia had some discomfort while wearing the socket for prolonged periods of time and he reported the distal end of his limb had been sore and was sensitive.  Ms. Knakal indicated 8 sock ply at beginning of visit and 1 sock ply at end of visit.  Ms. Knakal indicated Mr. Tapia had visible decrease in volume of limb and increased use and function with prosthesis.  Ms. Knakal noted Mr. Tapia had decreased in limb volume and increase in activity due to the device not fitting/functioning properly.  Ms. Knakal indicated skin showed excessive pressure at distal end of limb along tibia and medial/lateral distal end, so added padding at popliteal 1/4" Aliplast and pretibial pads 1/8" Aliplast, and silicone treated Proflex inner liner.  Ms. Knakal indicated adjustment to device solved problem and Mr. Tapia reported the sensitivity in his limb was no longer painful with the addition of pads.  Ms. Knakal indicated Mr. Tapia was down to a 1 ply sock fit.  Ms. Knakal noted Mr. Tapia also walked more efficiently and did not appear to have a leg length discrepancy after the adjustments.  Ms. Knakal indicated Mr. Tapia also received a 1/8" and 1/4 insert to be added to his right shoe to accommodate a leg length discrepancy between his

right and left side.  Ms. Knakal indicated device was checked for structural safety/integrity and compliance with manufacturer guidelines.  Ms. Knakal indicated Mr. Tapia's walking had improved significantly since his previous visit and he was walking well enough that it would be difficult to know he was walking with prosthesis.

- Mr. Tapia was discharged from Physical Therapy and was recommended to continue with daily independent HEP.

- November 8, 2019:  Mr. Tapia had a follow up visit with Mr. Light, who indicated Mr. Tapia was status post below the knee amputation on the left and recently did get a prosthetic leg that he had been working with physical therapy on.  Mr. Light communicated with the physical therapist a few weeks prior, and he thought that Mr. Tapia was doing quite well with the leg and had no doubts that he would continue to progress.  Mr. Light noted Mr. Tapia still using a wheelchair for distance.  Mr. Light talked about slowly trying to use the wheelchair less and less and he was in agreement with that plan.  Mr. Light indicated Mr. Tapia remained on Coumadin for a factor VIII elevation that was discovered at the time of his incident of multiple blood clots in the left lower extremity and that would likely be lifelong anticoagulation.  Mr. Light indicated Mr. Tapia's only concern that day were some facial lesions that appeared like freckles on the bilateral cheeks and that occurred only after the last year when he had been on Coumadin.  Mr. Light noted Mr. Tapia had no history of similar lesions and no family history of similar lesions, and he was of Latin American ancestry.  Mr. Light noted Mr. Tapia had minimal sun exposure over the last year.  Examination revealed a coalescence of flat hyperpigmented small irregular lesions on the bilateral cheeks, the left BTK stump was examined, and healthy appearing stump.  Mr. Light provided diagnoses of left BTK amputation, facial lesions, and elevated factor VIII.  Mr. Light indicated facial lesions were pure like freckles, but Mr. Tapia had minimal if any sun exposure for the past year or so, and he had never had freckles in the past and took photographs and sent a consult to Rubicon to query dermatology.  Mr. Light indicated would query colleagues, and DOC or so about Canadian crutches that might assist Mr. Tapia when he was not using his prosthetic leg in trying to get away from the wheelchair and he was agreeable to that plan.  Mr. Light indicated otherwise Mr. Tapia seemed to be doing really well and expect that he would continue to increase the use of his prosthetic and remain on Coumadin, which would likely be lifelong and probably follow up annually and sooner when necessary.

- RubiconMD Dermatologist's eConsult note indicating that based on the clinical images and history provided, the differential diagnoses included melasma, post inflammatory hyperpigmentation, drug-induced hyperpigmentation, exogenous ochronosis, or erythema dyschromicum perstans.  Dermatologist requested to provide Mr. Tapia's medication list and skincare products (creams, cleansers, etc.) and that additional information could help to narrow the diagnosis.  Dermatologist would like to know if Mr. Tapia had any prior rash in the affected area.  Dermatologist recommended daily sun protection with a mineral (Zinc oxide or Titanium dioxide) sunscreen, to apply Hydroquinone 4% cream to affected areas b.i.d. for 3 months and follow up in 3 months.

- November 15, 2019:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia had some minor pain/discomfort along the end of his limb that he reported as sensitivity after many hours of prosthetic wear.  Ms. Knakal indicated 0-1 sock ply at beginning of visit and 1 sock ply at end of visit.  Ms. Knakal indicated Mr. Tapia had small fluctuations in volume with increase wear of prosthesis as expected with new amputees.  Ms. Knakal indicated Mr. Tapia had increased

discomfort/sensitivity along distal end with long time wear of prosthesis due to device not fitting/functioning properly.  Ms. Knakal added black puff and Plastazote padding at distal end and lateral condyle.  Ms. Knakal indicated adjustment to device solved problem.

- November 20, 2019:  Mr. Light issued a note indicating Mr. Tapia was taking Warfarin 3 mg daily, and Simvastatin 40 mg daily.  Mr. Light indicated skin lightening agents such as Hydroquinone were not available in their department of corrections formulary.  Mr. Light thought being able to give Mr. Tapia a diagnosis and expected course would be sufficient.  Mr. Light indicated Mr. Tapia should be eligible for release in about 3.5 years.  Mr. Light indicated it looked like anticoagulants had been implicated in drug induced hyperpigmentation.  Mr. Light questioned if they were considering Warfarin as a possible cause (as that developed sometime after he started Warfarin last year), would it go away if he were put on a different anticoagulant.  Mr. Light indicated of course changing anticoagulant would not necessarily be possible, because Mr. Tapia was found to have an inherited thromboembolic condition.  Mr. Light indicated only other formulary option would be Rivaroxaban and had to do some checking to see if Xarelto was ok with his history.

- RubiconMD Dermatologist's eConsult note indicated Warfarin rarely caused drug-induced hyperpigmentation but, if it was contributing to Mr. Tapia's discoloration the Dermatologist recommended the topical Hydroquinone 4% cream b.i.d. for 3 months.

- December 19, 2019:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated the proximal M/L pad had packed out slightly and was causing some instability side to side that Mr. Tapia would like to be resolved and he also had requested a stabilizing post along the lateral pretibial pad to help improve fit and stability of his limb inside the socket.  Ms. Knakal noted visible decrease in limb size and shape since prosthesis delivery due to device not fitting/functioning properly.  Ms. Knakal added black puff padding at stabilizing bar with lateral pretibial pad, proximal M/L pad.  Ms. Knakal indicated Mr. Tapia reported the prosthesis felt snug and comfortable.  Ms. Knakal reported 4-6 sock ply at beginning of visit and 3 sock ply at end of visit.  Ms. Knakal indicated Mr. Tapia would require a new socket replacement soon and the adjustments had been maxed out and the life of the socket had been extended as long as possible.  Ms. Knakal indicated Mr. Tapia was in 3 ply socks but was instructed to see his physician for a prescription for a socket replacement when his sock ply increased into double digits, or the socket fit was compromised due to a mismatch of size and shape compared to his limb's anatomical size and shape and he appeared to understand.  Ms. Knakal advised to follow up in 3 months.

- March 23, 2020:  Mr. Tapia had a follow up visit with Ms. Knakal for evaluation of left transtibial prosthesis and socket replacement.  Examination revealed definitive prosthesis, ADL score of 40, function score of 20, limb strength score of 20, K-PAVET score of 80.  Ms. Knakal indicated Mr. Tapia had significant decrease in limb size so socket no longer fits and the prosthesis prevents him from accomplishing ADLs.  Ms. Knakal indicated Mr. Tapia's socket was too large causing play to occur within the socket given the thickness of the socks.  Ms. Knakal indicated even with 14 ply socks; Mr. Tapia felt as though his limb was "bottoming out" in the socket causing pain along the bottom of his leg.  Ms. Knakal indicated Mr. Tapia's leg had shrunk, he also had more bony prominences that were protruding through his limb more than when he was casted first.  Ms. Knakal indicated PTB/TBS Hybrid socket was much too big compared to size and shape of Mr. Tapia's anatomical limb, 1/4" padding at popliteal and pretibial added and 14 ply socks worn currently.  Ms. Knakal indicated suspension liner was beginning to wear beyond repair and he would need a VIP vacuum pump added for additional support.  Ms. Knakal indicated Mr. Tapia was

using WillowWood alpha hybrid size large liner/insert, and his limb fitted into a size medium plus and would need to be replaced with such.  Ms. Knakal indicated further socket modification/adjustment would not improve socket fit or comfort, socket did not fit Mr. Tapia's due to change in residual limb, hence recommended socket replacement.  Ms. Knakal indicated diagnostic prosthetic sockets would be required to confirm fit and comfort of prosthetic socket prior to moving to a definitive prosthesis.  Ms. Knakal indicated a rigid, light weight, carbon fiber socket design was necessary to maintain durability and strength as Mr. Tapia walked on the prosthesis through 1,000 of steps each day, the PTB/TSB hybrid would allow an even distribution of pressures over tolerant areas of the limb and offload pressure intolerant areas of the limb, and total contact was indicated to distribute pressures in the socket and limb evenly and to avoid excessive pressures along sensitive anatomy of the residual limb.  Ms. Knakal indicated a suspension sleeve and cushion liner was optimal for Mr. Tapia's comfort within the socket in addition to a vacuum suspension to provide and hold negative pressure and allow a more optimal suspension of the prosthesis on the limb through swing phases of gait.  Ms. Knakal indicated Mr. Tapia had volume fluctuations throughout the day causing him to add more socks in the afternoon compared to the morning.  Ms. Knakal indicated total contact also prevents verrucous hyperplasia of the distal limb.  Ms. Knakal indicated due to Mr. Tapia's weight, activity level, and strength, he was in need of ultralight materials that made ambulating easier and more energy efficient while also providing a durable prosthesis that would increase the life of the device and ultralight materials included the carbon fiber laminated into the prosthetic socket.

- May 29, 2020:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia was fitted with Vivak test socket #1 and the modifications were necessary to improve total contact, contours, and sock ply/volume.  Ms. Knakal indicated Mr. Tapia was dynamically aligned, alignment was evaluated by parallel bars, and results of alignment process were satisfactory in sagittal coronal transverse plane.  Ms. Knakal indicated additional test socket was not required.  Ms. Knakal recommended to reduce proximal A/P and M/L to provide appropriate fit and function.  Ms. Knakal indicated Mr. Tapia was not leaving the office on a test socket and he was ready to be scheduled for delivery of prosthesis.

- June 26, 2020:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia had 3 sock ply fitted upon delivery.  Ms. Knakal indicated functional goals from evaluation were fully accomplished.  Ms. Knakal indicated Mr. Tapia did not state dissatisfactory with the fit and function of the device.  Ms. Knakal indicated no custom shaped protective cover to be provided and no additional supplies provided.  Ms. Knakal advised to follow up with physician regarding use of device as directed by physician and follow up in 1-3 weeks.

- July 28, 2020:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia reported movement of his limb in the socket along the A/P.  Ms. Knakal indicated 0-3 sock ply at beginning of visit and 1 sock ply at end of visit.  Ms. Knakal noted small decrease in limb volume leading to extra space in socket.  Ms. Knakal indicated change in sensation and fit of socket along distal A/P due to device not fitting/functioning properly.  Ms. Knakal added padding at pretibial pads to prevent movement of distal limb and indicated adjustment to device solved problem and replacement device was not indicated.  Ms. Knakal advised to follow up with physician regarding use of device p.r.n. and follow up in 3 months.

22

- October 14, 2020:  Mr. Tapia had a follow up visit with Mr. Light, who indicated Mr. Tapia with an LLE BTK amputation and prosthesis and came in that day for a rash, which started about 2 weeks prior on an area on the lateral side of his stump and it was worse with walking.  Mr. Light noted Mr. Tapia had been doing well with his prosthesis previously up to that point.  Mr. Light indicated Mr. Tapia reported that the wound was an area of friction from the prosthetic leg.  Examination of left lower extremity BTK stump revealed small 0.5 mm lesion that appeared to be an unroofed blister without surrounding erythema, fluctuance, or purulence, and 2 much smaller lesions superior to that.  Mr. Light provided a diagnosis of left below the knee amputation stump wound.  Mr. Light indicated left below the knee amputation stump wound was secondary to the prosthesis rubbing on the lateral aspect of the proximal fibula that remained.  Mr. Light recommended to use Exuderm dressing, and have nursing check that every other day to make sure it was not getting worse and advised to use his wheelchair as much as possible to avoid using the prosthesis as much as possible until they could get it fixed and would put in a consult to have him go back to Hanger to try to get that area on the socket "blown out" to avoid friction.

- October 16, 2020:  Records indicate Mr. Tapia was first seen for Wound Care at Stafford Creek Corrections Center and last seen on December 8, 2020.

- October 22, 2020:  Mr. Tapia was seen by T. St. Germain, L.P.N., who indicated Mr. Tapia ambulated from unit with cane, A x O x 3, denied pain, admits to tenderness at site.  Mr. Germain noted trace clear exudate.  Mr. Germain indicated Mr. Tapia admitted that wound was continually improving and resolving.  Examination revealed 2 adjacent locations measuring 0.6 cm diameter and 0.2 cm diameter with dark pink to pink to light pink in color.  Mr. Germain cleaned the wound with normal saline dried aseptically, and applied Exuderm.  Mr. Germain indicated Mr. Tapia demonstrated understanding of keeping bandage clean, dry, intact, and agreed to continue to show for dressing changes every other day, RN at bedside to view wound.

- January 28, 2021:  Mr. Tapia was seen by Gilliver, P.A.-C. (Records did not indicate name of attending physician) in housing unit for positive COVID.  Mr. Gilliver noted Mr. Tapia was in isolation due to a positive COVID test following suspected exposure.  Mr. Gilliver Mr. Tapia denied all symptoms of COVID.  Mr. Gilliver provided a diagnosis of COVID 19 asymptomatic.

- February 9, 2021:  Mr. Tapia was seen by L. Blattner, A.R.N.P. (Records did not indicate name of attending physician) for sun irritation and blister on limb.  Ms. Blattner indicated Mr. Tapia reported he was putting more weight on his prosthetic limb the previous week due to a sprained ankle on the opposite side and he had redeveloped a "blister" on his knee where it met the prosthetic.  Ms. Blattner indicated Mr. Tapia requested more bandages to keep area covered and prevent "blister".  Examination of the lateral knee revealed approximately 1.5 cm area of ulceration, yellow sloughing wound bed, very fine line of erythema in wound margin but no surrounding erythema or edema, and slight duskiness surrounding ulcer.  Ms. Blattner provided an assessment of stage III pressure ulcer.  Ms. Blattner indicated Mr. Tapia was given non-adhesive Telfa adhesive dressing to keep area covered and instructed to stop using his prosthetic and change back to wheelchair until the area was healed or he was able to have his prosthesis refitted and follow up for new or worsening symptoms.  Ms. Blattner emailed scheduler to follow up on Mr. Tapia's outpatient consult to have prosthesis altered.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

- February 10, 2021:  Mr. Tapia was seen by L. Prieto, Psy.D. to check in on mental state following cellmates suicide attempt.  Dr. Prieto indicated Mr. Tapia stated, "I'm ok, I just felt bad for him."  Dr. Prieto indicated Mr. Tapia reported he had not witnessed anything out of the ordinary for cellmate.  Dr. Prieto indicated Mr. Tapia reported cellmate often wrote in a journal stating they were song lyrics, cellmate listened to heavy metal/rock music "all day." and believed cellmate had the opportunity to commit suicide during the 2 week period.  Dr. Prieto noted Mr. Tapia was on COVID quarantine leaving cellmate alone but believed that recent act might be a "cry for help."  Dr. Prieto indicated Mr. Tapia denied suicidal ideation and/or intent.  Examination revealed Mr. Tapia ambulated with 1 prosthetic leg stating he was having some difficulty walking around in his shower shoes since his tennis shoes "were covered in blood," and mood and affect were mildly guarded, and genuinely appeared saddened for his cellmate.  Dr. Prieto indicated when queried about mental health follow up Mr. Tapia denied requiring a follow up and indicated he would submit kite as needed.  Dr. Prieto indicated at time of interview Mr. Tapia was working on putting his cell back together as it required hazmat cleaning, no immediate concerns noted during interview, would conduct COVID isolation mental health rounds in 1 week at which time a brief check-in would be conducted, no other referrals required at that time, and he was able to advocate to get needs met.  Dr. Prieto instructed to submit kite as necessary and notify unit officer for immediate needs.

- February 22, 2021:  Mr. Tapia had an office visit with Justin Williams, L.C.P.O., who indicated Mr. Tapia reported that he had developed an ulcer due to adverse socket pressure against his left fibular head.  Mr. Williams indicated socket required modification to offload pressure against left fibular head and advised Mr. Tapia to discontinue use of prosthesis until ulcer had fully healed and modifications could be made to offload adverse socket pressure against left fibular head.  Mr. Williams indicated would contact DOC to schedule follow up visit with Cerise Knakal, C.P.O. at their clinic to assess healing of ulcer and perform socket modifications to offload fibular head if ulcer was fully healed.

- February 25, 2021:  Mr. Tapia had a follow up visit with Mr. Light, who indicated Mr. Tapia with the left below the knee amputation, he went out to have his prosthetic socket adjusted, and they found him to have an ulcer right over the bony prominence of the lateral aspect of his stump.  Mr. Light indicated Mr. Tapia stated he thought he was compensating onto his prosthetic leg when he injured his ankle while playing.  Mr. Light noted Mr. Tapia was in isolation for COVID.  Mr. Light indicated Mr. Tapia stated that the prosthetist was going to simply "blowout" that portion of the socket to relieve the pressure on that spot, but that they were not allowed (due to other litigation) to do any changes while someone had an open wound.  Mr. Light asked Mr. Tapia to come back in about 3 weeks.  Examination revealed fit appearing walking well in his prosthetic leg, left stump-on the lateral bony prominence inferior from the knee there was a 0.6 x 0.6 cm ulceration that appeared to be the result of abrasion/blistering, fairly superficial.  Mr. Light provided a diagnosis of ulceration left below the knee stump.  Mr. Light recommended Hydro-cellular foam cut to fit with Medipore dressing over that, to have that seen by nursing at least 2 or 3 times a week to make sure it was improving but Mr. Tapia really did not like to come down to medical and indicated Mr. Tapia agreed to once a week checks by nursing.  Mr. Light indicated thought until Mr. Tapia's socket was modified, he should stay out of the socket/prosthetic which he was hesitant to agree to, but ultimately did agree to using his wheelchair until that was healed up.

- March 22, 2021:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia had visible fibular head pressures that had caused a sore.  Ms. Knakal noted fibular head redness and skin breakdown due to device not fitting/functioning properly and device was in disrepair.  Ms. Knakal indicated 1 sock ply at beginning and end of visit.  Ms. Knakal indicated skin showed excessive pressure at fibular head skin breakdown.  Ms. Knakal removed material to reduce pressure or allow for growth at fibular head and proximal to fibular head, added padding at lateral pretibial bar to support fibular head, provided 2 x 1/8" right inserts for right shoe, and used 1/8" puff for padding inside socket, skived down.  Ms. Knakal indicated adjustment to device solved problem and replacement device indicated.  Ms. Knakal advised liner reported to have tear along threading along anterior, Mr. Tapia would bring that liner with him next to be replaced via the warranty, the item would not be replaced with something other than what was utilized, and to follow up in 1 month.

- April 26, 2021:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia arrived to replace his liner serial number 112187515 under the warranty due to premature wear along the anterior threading and he also reported some skin irritation due to pressure along the distal medial aspect of his limb.  Ms. Knakal noted beginning of a pressure sore along distal medial aspect of residual limb.  Ms. Knakal indicated alignment appeared appropriate and volume/weight appeared stable.  Ms. Knakal indicated Mr. Tapia had increased skin irritation with prosthesis on due to device not fitting/functioning properly.  Ms. Knakal removed material to reduce pressure or allow for growth at distal medial socket - pressure spot tracked with lipstick transfer.  Ms. Knakal indicated adjustment to device solved problem.  Ms. Knakal indicated 1-3 sock ply at beginning and end of visit.

- July 22, 2021:  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia requested the suspension sleeve be exchanged due to a slit into the edge along the trimline.  Ms. Knakal noted skin condition appeared healthy and device was in disrepair.  Ms. Knakal indicated device was damaged due to daily use, general wear, and wear into the gel of the suspension sleeve.  Ms. Knakal indicated DAWSkin added to trimlines to help reduce slicing through gel in suspension sleeve, repair adequately fixed the device, and the suspension sleeve being replaced did solve the issue.

- November 18, 2021:  Mr. Tapia had a follow up visit with Cerise Knakal Gay, L.C.P.O. for evaluation for new prosthetic supplies.  Ms. Knakal Gay indicated Mr. Tapia reported tears and cuts in his M+ liners and he was wearing his size large liners as they were the only liners available.  Ms. Knakal Gay noted Mr. Tapia's suspension sleeves both had slices through them, and his socks were beginning to show signs of wear and tear that were causing them to fall/droop when he was wearing his prosthesis.  Ms. Knakal Gay noted small blister along fibular head, excessive pressure at fibular head, and liners worn beyond repair and in need of being replaced.  Ms. Knakal Gay noted significant wear and tear in liners and wear and tear in other supplies and Mr. Tapia had increased discomfort due to ill-fitting liners.  Ms. Knakal Gay removed material to reduce pressure or allow for growth and ground into carbon at fibular head and created a channel.  Ms. Knakal Gay indicated adjustment to device solved problem and the adjustment to the carbon appeared to have improved the fit of the prosthesis and relieved the fibular head.  Ms. Knakal Gay noted tears in gel on liners and suspension sleeves due to daily use over the last year, damage was not repairable, and replacement device was indicated.  Ms. Knakal Gay indicated 1 sock ply at beginning and end of visit.  Ms. Knakal Gay advised to follow up with physician regarding use of device p.r.n. and follow up in 1 month.

- November 30, 2021:  Mr. Tapia had an office visit with B. Bobek, M.D., who indicated Mr. Tapia with BKA and was complaining of left lateral stump abrasions. Examination revealed left lateral stump abrasion with surrounding erythema.  Dr. Bobek provided an assessment of left lateral stump abrasion with surrounding cellulitis.  Dr. Bobek recommended Keflex 500 mg p.o. for q.i.d. 5 days and nurse to see wound daily.

- December 1, 2021:  Mr. Tapia was discharged by Richard Bowers, S.U.D.P. at the Department of Corrections Washington State and was recommended to attend LOC 1.0 outpatient treatment when he was released and back into the community.  Mr. Bowers indicated Mr. Tapia needed to learn to set and maintain better boundaries to be successful in recovery.  Mr. Bowers indicated Mr. Tapia lost his leg while in prison and was on a prosthetic leg and using a cane to walk with because of it fitting uncomfortable.  Mr. Bowers indicated Mr. Tapia needed to continue going to medical so the prosthetic leg can be fitted comfortably, and he could be able to walk without a cane.  Mr. Bowers indicated Mr. Tapia needed to identify what emotions he experienced with each triggers/warning signs he had, so he did not relapse back into old addictive behaviors.  Mr. Bowers indicated Mr. Tapia was present for his discharge, was on time and appropriately dressed, completed three service plans with goals of increasing his knowledge of the disease of addiction and the process of recovery, having a working relapse prevention plan in place for now and when he released and back into the community, and having good support at home and good sober support outside the home.  Mr. Bowers discussed sober support within the home, and he reported his family was very supportive of his recovery efforts and sharing job opportunities.  Mr. Bowers indicated Mr. Tapia was in the preparation stage of change as he was able to identify all the negative consequences his substance use has had in his life, the changes he will make in order to live a clean and sober lifestyle, and activities he can do to help meet sober minded people.  Mr. Bowers indicated Mr. Tapia had begun to apply recovery tools to help him change thinking errors and behaviors.  Mr. Bowers indicated Mr. Tapia had good attendance and participation in group, and had been infraction free since 2014, which shows readiness to change.  Mr. Bowers recommended no use of non-prescribed mind/mood-altering substances, including alcohol and marijuana, no employment in any retail alcohol or marijuana industry unless therapeutically cleared by treating agency, self-help support groups (3 per week) and support group sponsor, enroll in and complete recommended treatment: Level 1 OP.

- December 20, 2021:  Mr. Tapia was seen by J. Richards, L.P.N. (Records did not indicate name of attending physician) to check wound.  Richards indicated Mr. Tapia would like ABD.  Richards noted wound was open, 1 x 0.5 cm on outer aspect of the stump.  Richards indicated Mr. Tapia stated that the sleeve was too large and had been waiting for authorization for smaller sleeve.  Richards indicated Mr. Tapia had wheelchair in his unit.  Richards indicated Mr. Tapia was told to stop using prosthetic and to use wheelchair until he went on out trip or wound healed.  Richards educated Mr. Tapia to have officer call if redness grew or new drainage.  Richards indicated Mr. Tapia returned to his unit.

- January 3, 2022:  Mr. Tapia had an office visit with Prasolova, R.N. (Records did not indicate name of attending physician) for pressure ulcer checkup.  Records indicated ulcer was measured 1 x 0.5 cm; antibiotics were prescribed (Cephalexin 500 mg 4 times per day for 14 days).  Records indicated Mr. Tapia stated that ulcer appeared on the same spot several times already and every time it was taking longer and longer to heal.  Examination revealed measurements 1.1 x 0.5 cm, depth was less than 0.1 cm, red, no discharge, no edema or induration around.  Records indicated

an assessment was provided of impaired skin integrity (pressure ulcer).  Records indicated ulcer was cleaned with NS, gently pat dried with gauze, covered with Hydrocolloid dressing, additional Hydrocolloid dressings were issued to Mr. Tapia, and instructed to keep ulcer dry and clean, reduce the amount of direct pressure on the ulcer, and return to OPU when needed.

- January 6, 2022:  Mr. Tapia had a follow up visit with Ms. Knakal Gay for lower prosthetic delivery.  Ms. Knakal Gay indicated alignment was evaluated by parallel bars and results of alignment process were satisfactory in sagittal coronal transverse plane.  Ms. Knakal Gay indicated 1 sock ply fitted upon delivery.  Ms. Knakal Gay indicated functional goals from evaluation fully accomplished.  Ms. Knakal Gay indicated Mr. Tapia did not state dissatisfactory with the fit and function of the device.  Ms. Knakal indicated the socket would need to be reinforced with black epoxy as the relief ground through the socket.  Ms. Knakal advised to follow up with physician regarding use of device p.r.n. and follow up in 1 month.

- March 16, 2022:  Thomas Vascik, P.A.C. with St. Joseph Medical Center, provided a work note which indicated Mr. Tapia may return to work on March 21, 2022.

- April 6, 2022:  Aaron C. Laird, M.D. provided a work note which indicated Mr. Tapia may return to work on April 11, 2022, and needed to be able to remain off left leg until cleared by physician.

Diagnostics

October 1, 2018

- X-rays left foot, moderate diffuse soft tissue swelling over the forefoot, a mild amount of soft tissue swelling about the mid-foot, underlying skeletal structures appeared intact without acute fracture or dislocation seen, and no significant foot deformities, impressions of moderate diffuse soft tissue swelling of the forefoot and lesser degree the mid-foot region, no radiopaque foreign bodies were detected, and no acute fracture or dislocation left foot identified.

- Vascular ankle/brachial index with PPG, resting right ABI was 1.0 which indicated normal arterial perfusion, resting left ABI was 0.93 which indicated normal arterial perfusion, triphasic waveform at ankles bilaterally, right digit pressures pulsatile bilaterally, left 1st toe digit was pulsatile, 3rd, 5th toes were pulsatile, left 2nd digit with flattened, and left 4th digit was flattened flow.

- Vascular venous duplex left extremity, subacute DVT of left common femoral vein, femoral vein, popliteal vein, posterior tibial vein, peroneal vein, left gastrocnemius vein with acute DVT, left greater saphenous vein and left lesser saphenous vein occluded with subacute superficial thrombophlebitis, and right common femoral vein was patent.

- CT left lower extremity, soft tissue swelling surrounding the left foot, with otherwise no soft tissue air or radiopaque foreign body, small calcaneal spur/enthesophyte at the Achilles tendon insertion, and bony structures otherwise appear intact, with no evidence for fracture, dislocation/malalignment, bony erosion/destruction, or other acute bony abnormality, impression of soft tissue swelling, with otherwise no evidence for osteomyelitis or other acute bony abnormality at that time.

October 5, 2018

- <u>CT angiogram lumbar</u>, poor opacification of the pulmonary arteries, no filling defects were identified, the main pulmonary artery was normal in caliber, a 9 mm nodule in the right lower lobe on 13:51 was unchanged and likely benign, the lungs were otherwise clear, the heart was normal in size with no pericardial effusion, an aortopulmonary lymph node measured 1.2 cm, subcutaneous edema in the left lateral chest wall, the aorta was normal in course and caliber, and no focal bony lesions, impressions of no evidence of pulmonary emboli in the main and right and left pulmonary arteries, non-diagnostic evaluation of the segmental and subsegmental pulmonary arteries due to poor contrast opacification, essentially clear lungs, non-specific, enlarged aortopulmonary lymph node, and non-specific left chest wall subcutaneous edema.

- <u>CT head</u>, no evidence of acute intracranial hemorrhage, transcortical infarction, or mass, the gray white differentiation was normal, no abnormality of gray or white matter, the ventricles and sulci were normal for Mr. Tapia's age, no mid-line shift, no extra-axial fluid collections, the visible vascular structures were unremarkable, mild to moderate polypoid, mucosal thickening involved the right maxillary sinus, no paranasal sinus air fluid levels, the mastoid air cells were clear, the skull base and calvarium were normal, the craniocervical junction was normal, and the orbits were unremarkable, impressions of no evidence of acute intracranial hemorrhage, transcortical infarction or mass, mild to moderate polypoid mucosal thickening within the right maxillary sinus, and no paranasal sinus air fluid levels to suggest acute sinusitis.

- <u>CT abdomen/pelvis</u>, unremarkable lung bases, the liver parenchyma was homogeneous, no focal liver lesions, normal gallbladder, spleen, pancreas, adrenal glands, and genitourinary, kidneys demonstrated no hydronephrosis or renal/ureteral stones and no focal renal lesions, the ureters were normal in course and caliber, the small and large bowel were normal in caliber without wall thickening or inflammatory changes, no masses were identified, the appendix was normal, the left inguinal and external iliac chain lymph nodes were mildly enlarged and enhancing, the abdominal aorta and IVC were normal in caliber, the left external iliac vein was small in caliber in comparison to the right side and slightly more hypodense, abdominal wall/peritoneal cavity demonstrates no free air, a trace amount of free fluid in the pelvis, mesenteric edema was diffuse, a tiny, fat containing right periumbilical hernia, the left thigh was enlarged due to severe, extensive subcutaneous edema, the edema extended into the deep compartments of the anterior proximal thigh, the edema also extended into the left hernia and inguinal regions, the extensive subcutaneous edema coursed superiorly along the lateral abdominal and chest walls, no discrete, rim enhancing fluid collections were identified, the left iliopsoas muscles were asymmetrically enlarged, no subcutaneous gas, and no focal bony lesions, impressions of no masses to suggest a primary malignancy, no extrinsic compression of the left iliac veins, smaller caliber of the left external iliac vein and relatively decreased contrast within the left external iliac vein, which might be due to decreased flow secondary to known deep venous thrombosis in the left lower extremity, extensive subcutaneous edema in the left thigh, involving the deep compartment of the left proximal anterior thigh, and extending into the left perineal and inguinal regions as well as superiorly in the lateral abdominal and chest walls, which might represent infection/cellulitis, no subcutaneous gas or abscess, enlarged left iliopsoas muscles, likely representing myositis, non-specific, diffuse mesenteric edema, and enlarged, enhancing left external iliac chain and inguinal lymph nodes, possibly reactive.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

February 1, 2019

- <u>X-rays left knee</u>, a below the knee amputation, periosteal reaction at the distal tibia and distal fibula, which could represent osteomyelitis, clinical correlation was advised, soft tissue swelling at the stump, and MRI could be helpful.

Procedures

October 3, 2018

- Left popliteal vein access, left leg venogram, left superficial vein venoplasty 6 mm x 4 cm, and left iliac vein, left superficial femoral vein, left common iliac vein EKOS catheter 40 cm treatment length with initiation of TPA (1 mg/hour), <u>Dr. Nicholas D. Garcia</u>.

October 4, 2018

- Left leg venous EKOS TPA catheter lytic check, left leg venogram, left iliac vein venoplasty 10 mm x 4 cm along entire length, and left superficial vein venoplasty 8 mm x 6 cm below, <u>Dr. Nicholas D. Garcia</u>.

October 10, 2018

- Guillotine amputation of the left lower extremity, <u>Dr. Brandon W. Propper</u>.

October 16, 2018

- Left below knee amputation, <u>Dr. Cindy P. Ha</u>.

Summary of Medical Records that Pre-date the Cause of Relevant Injury/Illness

Sources

1. Pierce County Detention and Corrections Center (Medical) - Tacoma, Washington
   Juliette Pohl-Y-Baca, P.A.-C.
   Ms. Margaret Holmes-Strand
   Ms. Sandra Pedersen
   Ms. Diana Blowers
   Gregory Hermsen, D.D.S.
   Mercedes Kostkas, R.N.
   Noor Aaf, P.A.-C.
   Ms. Alison Joseph
   Ms. Kendra Hanson
2. Allenmore Hospital (Medical) - Tacoma, Washington
   Amanda Kijac, D.O.
   Raymond K. Hung, M.D.
   Alison J. Reinbold, M.D.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

 Jonathan M. Kell, M.D.
 Travis M. Paoli, A.R.N.P.
3. Washington Corrections Center (Medical) - Shelton, Washington
 Natalie Dahlgren, A.R.N.P.
 R. Brucker, D.D.S.
4. Larch Corrections Center (Medical) - Yacolt, Washington
 D. Lusche, P.A.-C.
 Carol Thamert, A.R.N.P.
 A.R. Anderson, D.D.S.
5. Tacoma General Hospital (Medical) - Tacoma, Washington
 Andrew Benefield, M.D.
 Bonnie L. Bessner, R.N.
6. NaphCare, Inc. (Medical) - Tacoma, Washington
 Etsuko Yagi, R.N.
 Lorraine Fisher, R.N.
 Megan Eliasson, R.N.
 Gurpreet Minhas, R.N.
 Sabrina Bual, R.N.
 Meghan Bailey, R.N.
 Cameron Carrillo, L.P.N.
 Elizabeth Warren, R.N.

Chronological Synopsis of Records

- March 7, 2007:  Mr. Javier Tapia had an office visit at Pierce County Detention and Corrections Center with Juliette Pohl-Y-Baca, P.A.-C. (Records did not indicate name of attending physician) for exam.  Ms. Pohl-Y-Baca indicated Mr. Tapia applied for trusty status but listed knee pain on booking sheet.  Ms. Pohl-Y-Baca indicated Mr. Tapia reported was confined in small cell at Puyallup Jail and developed knee pain secondary to confined space and had resolved since he was booked into custody and able to move around.  Ms. Pohl-Y-Baca noted Mr. Tapia had no previous knee problems or surgeries in past.  Ms. Pohl-Y-Baca indicated Mr. Tapia's exam was WNL and he cleared for trusty without restrictions and advised to follow up p.r.n.

- March 14, 2007:  Mr. Tapia was seen by Ms. Margaret Holmes-Strand for rashes on upper arms bilateral which was associated with dish soap.  Ms. Holmes-Strand noted Mr. Tapia had moved from 2D to 2C.  Examination revealed fine papules rash and itching.  Ms. Holmes-Strand provided an assessment of probable contract dermatitis.  Ms. Holmes-Strand recommended HC x 6 with instruction on application and to kite p.r.n.

- April 13, 2007:  Mr. Tapia was seen by Ms. Sandra Pedersen, who indicated Mr. Tapia worked in the warehouse and scrapped his arm on piece of metal.  Examination revealed a superficial laceration approximately 6 mm wide and 2 cm long on left wrist and minimal to no bleeding.  Ms. Pedersen provided an assessment of small superficial laceration on left wrist.  Ms. Pedersen cleansed the wound with $H2O2$, applied antibiotic ointment and dressing, instructed to keep it clean and dry for 24 hours, provided antibiotic ointment and Band-Aid for self-care after that, and advised to kite if any problems.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

- December 2, 2011:  Mr. Tapia had a follow up visit with Ms. Pohl-Y-Baca for back pain ongoing since 2001.  Ms. Pohl-Y-Baca indicated Mr. Tapia reported used chiropractor in past and treated his pain with OTC Aleve.  Ms. Pohl-Y-Baca indicated Mr. Tapia admitted to opiate abuse with last use prior to arrest on November 25, 2011.  Ms. Pohl-Y-Baca indicated Mr. Tapia reported only remaining symptom was insomnia.  Examination revealed tandem gait, back ROM with limited extension due to pain, and tenderness LS spine on palpation.  Ms. Pohl-Y-Baca provided an assessment of LBP.  Ms. Pohl-Y-Baca indicated Mr. Tapia had no reported history of stomach ulcers or GI upset with medication and recommended NSAID (Ibuprofen 600 mg) for pain for 10 days then purchase from commissary.

- April 21, 2012:  Pierce County Detention and Corrections Center records indicate there was a telephonic encounter with Mr. Tapia.  Called to booking bar, told by deputies that Mr. Tapia had stated history of Percocet use.  Mr. Tapia reported he used 1-2 pills, "maybe" 3 times a week.  Mr. Tapia reported the last time he stopped using, he had a lot of aches, but was using "a lot more" at the time: "I was much worse back then."  Mr. Tapia stated that his last dose was 1-2 days before.

- August 17, 2012:  Mr. Tapia was seen by Ms. Diana Blowers for a wound to right deltoid.  Ms. Blowers noted Mr. Tapia signed ROI seen late July for that issue, went against my advice and did not receive full course of ABOs and MOD notified of that and new orders received.  Ms. Blowers noted Mr. Tapia was given Bactrim DS from the e-kit that night and needed a dose in the a.m.  Ms. Blowers provided an assessment of non-infected abscess.  Ms. Blowers prescribed Bactrim DS (Sulfamethoxazole; Trimethoprim) 800 mg; 160 mg 1 tablet oral b.i.d. 10 day supply and recommended medications from e-kit until they arrive from pharmacy, daily wound care, and to follow up with JPB, P.A.-C.

- September 3, 2012:  Ms. Blowers issued a note indicating Mr. Tapia reported "I have a tooth ache, can't drink hot or cold water.  Also, it's very hard to eat, please see me ASAP.  In pain need to see dentist.  Once again in pain please see me asap."  Ms. Blowers provided an assessment of dental pain.  Ms. Blowers indicated RK sent informing Mr. Tapia that a dental appointment was made.

- October 23, 2012:  Mr. Tapia was seen by Gregory Hermsen, D.D.S., who indicated Mr. Tapia reported "My tooth on the upper left hurts with chewing with a dull ache.  The pain comes and goes.  I think I need a filling." and he pointed to #14.  Examination revealed tooth #14 had MOL caries that were at or near the pulpal chamber, percussion ++, and cold negative.  Dr. Hermsen provided an assessment of tooth #14 was necrotic with apical periodontitis.  Dr. Hermsen indicated Mr. Tapia understood he might need an RCT and that placing a restoration might make the tooth hurt more than right now.  Dr. Hermsen indicated Mr. Tapia stated he would be out soon and wanted to wait until he got out for treatment.

- May 10, 2013:  Mercedes Kostkas, R.N. (Records did not indicate name of attending physician) issued a note indicating Mr. Tapia had history of Percocet and Xanax abuse per booking sheet and urine toxicology screen positive for Amp, Mamp, Benzodiazepines per Nurse Grouley.  Ms. Kostkas provided assessments of history of opiate abuse and history of Benzodiazepines abuse.  Ms. Kostkas indicated Mr. Tapia was started on opiate w/d protocol on May 9, 2013, prescribed Valium (Diazepam) 2 mg 1 tablet oral 14 day supply and advised to follow up with Ms. Pohl-Y-Baca, P.A.-C. on May 14, 2013.

- September 26, 2013:  Upon arrival to the Emergency Department of Allenmore Hospital, Mr. Tapia was complaining of trauma after MVA that day.  Records indicate Mr. Tapia was involved in roll over MVA, airbags deployed, and per picture from EMS, SUV was on side with mostly passenger side damage.  Per report Mr. Tapia self-extricated and attempted to run from scene, when he was apprehended by police.  Records indicate Mr. Tapia arrived by medics with c-collar and backboard and leg cuffs.  Records indicate upon questioning, Mr. Tapia stated he was having pain in neck and lower back.  Mr. Tapia stated lacerations to right lower leg and upper arm.  Mr. Tapia was complaining of left elbow and wrist pain.  Examination revealed neck in hard collar, tenderness over bilateral elbows, cleared of board with log roll, mild upper left chest abrasion, laceration of right upper inner arm was 2 cm, and 3 separate lacerations on right lower arm, 1.5 cm, 1 cm, and 1 cm each.  An electrocardiogram (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Amanda Kijac, D.O.) revealed sinus tachycardia, rate > 103, borderline prolonged PR interval, lateral infarct, acute, ST elevation, diffuse, likely early repolarization pattern, consider inferior injury, abnormal ECG, and acute MI.  An electrocardiogram (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Dr. Kijac) revealed sinus rhythm, rate 80, ST elevation, probable normal early repol pattern, no STEMI, and normal ECG.  X-rays of the left and right elbow (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Raymond K. Hung, M.D.) revealed bone mineralization within normal limits, no acute fracture, no subluxation, normal anatomic alignment, joint spaces well maintained, no radiopaque foreign body, and no abnormal soft tissue calcifications, and an impression revealed no acute osseous abnormalities of left and right elbow.  X-rays of the left wrist (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Alison J. Reinbold, M.D.) revealed bony alignment was normal, joint spaces were normal, no focal bony abnormality and the navicular was intact, and an impression revealed normal.  X-rays of the right tibia/fibula (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Dr. Hung) revealed bone mineralization within normal limits, no acute fracture, no subluxation, normal anatomic alignment, joint spaces well maintained, no radiopaque foreign body, and no abnormal soft tissue calcifications, and an impression revealed no acute osseous abnormalities of right tibia/fibula.  A CT of the head (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Jonathan M. Kell, M.D.) revealed moderate polypoid mucosal thickening within the maxillary sinuses bilaterally, minimal fluid within the dependent left maxillary sinus as well, linear and symmetric benign appearing calcification along the tentorium cerebelli bilaterally, without definite evidence for superimposed subarachnoid or subdural hemorrhage, no intra-axial or definite extra-axial fluid collections, no evidence for acute infarction no definite hemorrhage, the cortical sulci, cerebral ventricles and basal cisterns were symmetrical and within normal limits, no mass lesion, mass effect, or shift of mid-line structures, and the bony calvarium appeared intact, and the impressions revealed likely benign thin and symmetric dural calcifications along the tentorium, subtle superimposed subdural or subarachnoid blood was difficult to exclude, but considered unlikely, if symptoms persisted, recommended follow up with CT or MRI, moderate chronic bilateral maxillary sinusitis, and dependent fluid within the left maxillary sinus might represent superimposed acute sinus disease or hemorrhage.  A CT of the cervical spine (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Dr. Kell) revealed straightening of cervical lordosis, uncovertebral and facet hypertrophy caused mild right neural foraminal stenosis at C2-C3 and C3-C4, with mild bilateral neural foraminal stenosis at C5-C6, annular disc bulges caused mild apparent spinal canal at C3-C4 and C4-C5, no acute fracture or dislocation, the vertebral bodies otherwise well aligned, and the remainder of the disc spaces were well preserved, and the paravertebral soft tissues appeared unremarkable, and the impressions revealed loss of cervical lordosis, which might be related to muscular spasm or Mr. Tapia's positioning and mild degenerative changes.  A CT of the thoracic and lumbar spine (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Dr. Kell) revealed no acute fracture or dislocation, the vertebral bodies were

well aligned, and the disc spaces appeared well preserved, and the paravertebral soft tissues appeared unremarkable, and an impression revealed unremarkable examination of the thoracic and lumbar spine.  A CT of the chest, abdomen, and pelvis (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Dr. Hung) revealed unremarkable thoracic inlet without abnormal fluid collection, no evidence of mediastinal widening, no lung infiltrate or nodule, no pneumothorax, no adenopathy, mediastinum without masses or lymphadenopathy, hila without adenopathy, no effusion or pneumothorax, heart size not enlarged, no pericardial effusion, thoracic aorta with normal caliber, central tracheobronchial tree normal, no discrete suspicious osseous lesion, normal liver, and spleen, no splenic lacerations, splenic fluid, accessory splenule in the splenic hilar region, normal pancreas, kidneys, and adrenal glands, abdominal aorta without aneurysmal dilatation, IVC with normal caliber, normal gallbladder and biliary tree, bowel without obstruction or mural thickening, scattered diverticulosis of the colon, peritoneum, mesentery, omentum without ascites, nodules, free air or adenopathy, retroperitoneum without adenopathy, unremarkable prostate and urinary bladder, no free fluid, no adenopathy of lymph nodes, and no discrete suspicious osseous lesion, and the impressions revealed unremarkable CT scan of chest, abdomen and pelvis for acute traumatic injury, and diverticulosis.  Labs revealed low K (3.4), high glucose (159), WBC (15.67), abs neuts (13.75), abs immature grans (0.12), blood drug abuse screen revealed low Acetaminophen (<3.0), and UA revealed high specific gravity (>1.030), and abnormal protein (trace).  Mr. Tapia was provided impressions of cervical strain, neck pain, bilateral elbow contusions, right upper arm laceration, right lower leg lacerations, and lumbar strain.  Mr. Tapia underwent left upper arm x 1 and right lower leg x 3 laceration repair, performed by Travis M. Paoli, A.R.N.P. (Nurse practitioner for Amanda Kijac, D.O.).  Mr. Tapia was discharged in stable condition, prescribed Keflex p.o., and recommended wound care, sutures out in 7-10 days, to keep collar on at all times until follow up with trauma clinic next week, continue antibiotic ointment 2 times per day, return for any redness, swelling, drainage or fevers, take antibiotics as prescribed, and return immediately for any increasing pain, headaches, vomiting, abdominal pain or other concerns.

- September 27, 2013:  Ms. Kostkas issued a note indicating Mr. Tapia had history of MVA, seen at AH ER per copy of ER chart, and diagnosed with cervical strain, multiple lacerations/contusions, and lumbar strain.  Ms. Kostkas indicated prescription was sent with ER paperwork.  Ms. Kostkas provided an assessment of status post MVA.  Ms. Kostkas discussed with N. Aaf, P.A., prescribed Keflex (Cephalexin) EQ 500 mg base 2.00 capsule oral b.i.d. 10 days' supply and Ibuprofen 600 mg 1 tablet oral t.i.d. 7 day supply, and advised to follow up with Aaf, P.A. on September 27, 2013.

- September 30, 2013:  Mr. Tapia had an office visit with Noor Aaf, P.A.-C. (Records did not indicate name of attending physician) for follow up on multiple small laceration which were sutured in Allenmore hospital on September 26, 2013, after having an accident.  Mr. Aaf noted Mr. Tapia was wearing a cervical collar which applied in hospital for neck strain.  Mr. Aaf noted Mr. Tapia was told that his CT was negative.  Mr. Aaf noted Mr. Tapia had pain on his leg where had suture.  Examination revealed Mr. Tapia had a cervical collar, a single laceration at medial side of right arm, and few small lacerations on lateral side right lower leg.  Mr. Aaf provided an assessment of multiple skin laceration.  Mr. Aaf indicated no need to have cervical collar on, and recommended to continue treatment, and follow up on October 4, 2013, for SR.

- October 4, 2013:  Mr. Tapia had a follow up visit with Mr. Aaf for suture removal.  Mr. Aaf indicated Mr. Tapia had multiple lacerations on right upper arm and right lower leg due to accident and wounds were sutured in ER a week prior.  Mr. Aaf noted no dressing on

wounds.  Examination revealed multiple wounds, the largest wound at medial side of upper arm with 4 sutures, 3 other wounds on right leg which had been closed with suture and few more superficial laceration with no stitches which already got scabs on them, all wounds were clean and dry, and mild erythema around the lower leg wounds.  Mr. Aaf removed sutures from all 4 lacerations without any problems and advised to follow up p.r.n.

- October 18, 2013:  Ms. Alison Joseph issued a note indicating kite requesting Band-Aids and antibiotic ointment.  Ms. Joseph indicated call to unit c/d to check on supply, which Mr. Tapia said was running low.  Ms. Joseph indicated antibiotic ointment and Band-Aids sent to unit and RK informing I/M that were available from old.

- November 8, 2013:  Mr. Tapia had a follow up visit with Ms. Pohl-Y-Baca for STD exposure.  Ms. Pohl-Y-Baca indicated Mr. Tapia informed they received a telephone call from PHD, that he was listed a sexual contact for someone who tested positive for gonorrhea.  Ms. Pohl-Y-Baca noted Mr. Tapia used condoms with sexual encounters.  Ms. Pohl-Y-Baca indicated Mr. Tapia was requesting Band-Aids for wounds on his right leg.  Examination revealed several scabbed lesion right lower leg.  Ms. Pohl-Y-Baca provided an assessment of STD exposure.  Ms. Pohl-Y-Baca indicated Mr. Tapia was administered Zithromax 1 gm p.o. for presumptive chlamydia and Rocephin 250 mg I.M. for presumptive gonorrhea from e-kit as ordered and he tolerated well.  Ms. Pohl-Y-Baca recommended urine GC/CT, presumptive treatment for GC and CT, and advised would notify per results of STD testing.

- January 1, 2014:  Ms. Kendra Hanson issued a note indicating Mr. Tapia stated, "Would like to have ingrown hair on my cheek/face looked at looks infected."  Mr. Tapia was housed in new jail and that writer was in the main jail.  Ms. Hanson provided an assessment of c/o ingrown hair.  Mr. Tapia placed on nurse call list to assess and refer to providers as needed.

- January 30, 2014:  Mr. Tapia was evaluated at Washington Corrections Center by Natalie Dahlgren, A.R.N.P. (Records did not indicate name of attending physician) for right sided neck stiffness from recent car accident.  Ms. Dahlgren indicated Mr. Tapia reported occasional mild headache with neck stiffness.  Ms. Dahlgren noted Mr. Tapia had car accident on September 2013 and had stiches to right arm, and neck brace for 1 week.  Ms. Dahlgren noted Mr. Tapia also had car accident in 2003 and had lumbar strain (no ongoing pain/issues).  Examination revealed lumps in neck and neck tightness at right base.  Ms. Dahlgren provided impressions of history of MVA and neck strain muscular.  Ms. Dahlgren ordered RPR, hepatitis panel, and HIV test, indicated Mr. Tapia orally consented to HIV test, he accepted hepatitis testing, would evaluate the need for vaccination after laboratory results were reviewed, cleared for food service, and advised sick call/periodic physical p.r.n..

- Mr. Tapia was seen by R. Brucker, D.D.S. for dental health exam.  Examination revealed soft tissue within normal limits, moderate calculus, and gingivitis.

- March 7, 2014:  Mr. Tapia was seen by D. Lusche, P.A.-C. (Records did not indicate name of attending physician) at Larch Corrections Center, who indicated Mr. Tapia had a history of opiate abuse (Oxycodone and Percocet).  Ms. Lusche advised to follow up and sick call p.r.n.

- November 10, 2014:  Mr. Tapia was seen by Carol Thamert, A.R.N.P. (Records did not indicate name of attending physician), who indicated Mr. Tapia had a history of surgical removal of chalazion on the left upper eyelid.  Examination revealed left lower eyelid with a large chalazion in center, conjunctiva was red and yellowish discharge, and mild swelling in upper cheek.  Ms. Thamert provided an assessment of chalazion with conjunctivitis.  Ms. Thamert discussed self-management and recommended hot pack for 20 minutes q.i.d., Gentamicin ophthalmic 0.3% ointment, and to return to clinic if did not resolve.

- December 30, 2014:  Mr. Tapia was seen by A.R. Anderson, D.D.S., who indicated Mr. Tapia presented with pain and he pointed to #14.  Examination revealed caries tooth fracture and inflammation.  Dr. Anderson provided an assessment of extraction.  Dr. Anderson indicated Mr. Tapia requested extraction, prescribed antibiotic, and recommended R/S extraction of #1, #4, and #14.

- August 27, 2015:  Upon arrival to the Emergency Department of Tacoma General Hospital, Mr. Tapia was complaining of swelling to left side of neck.  Mr. Tapia reported swelling to back side of the head near the left ear.  Mr. Tapia stated neck stiffness/discomfort.  Mr. Tapia stated he noticed the swelling 3 days prior and progressively worsened.  Mr. Tapia stated that he had soreness to his neck and pressure when he moved his neck.  Mr. Tapia denied history of similar symptoms.  Records indicate Mr. Tapia worked as an ironworker and thought it was due to dirt.  Examination revealed left posterior auricular scalp there was a 2 cm area of fluctuance concerning for abscess, with 4 cm of induration, slight warm to touch.  Mr. Tapia underwent left posterior auricular scalp abscess incision and drainage, performed by Andrew Benefield, M.D. without complications.  Mr. Tapia was provided an impression of left posterior auricular scalp abscess.  Mr. Tapia was discharged home in stable condition, prescribed Bactrim and Norco, given strict return precautions, and advised to return here in 48 hours for re-evaluation, and to follow up with his primary care physician in 2-3 days for re-evaluation.

- Bonnie L. Bessner, R.N. issued a correspondence indicating Mr. Tapia was in that clinic on August 27, 2015, and he was advised to be off until August 29, 2015, and he might return sooner if he was feeling up to it.

- December 21, 2015:  Upon arrival to the Emergency Department of Allenmore Hospital, Mr. Tapia was complaining of red and edematous left cheek and redness, swelling, and pain to left earlobe.  Mr. Tapia reported he tried to re-insert an earring through it approximately 2 weeks prior.  Mr. Tapia reported that he developed swelling and redness to his left cheek the previous day, which had gotten worse that day.  Mr. Tapia denied any drainage from that area of swelling.  Records indicate Mr. Tapia was concerned for possible abscess of his left cheek.  Mr. Tapia reported history of ingrown hairs.  Examination revealed scattered areas of folliculitis to face and arms, with suspected picking behavior, focal area of swelling to left cheek with surrounding erythema, and suspected underlying cystic lesion as skin was firm.  Mr. Tapia was provided impressions of folliculitis and developing facial cellulitis.  Mr. Tapia was discharged home in stable condition, recommended to start Cephalexin (Keflex) 500 mg 1 capsule by mouth 4 times daily, until finished, Ibuprofen (Motrin) 600 mg 1 tablet by mouth every 8 hours as needed for pain, Sulfamethoxazole-Trimethoprim (Bactrim) 800-160 mg 1 tablet by mouth twice daily, and Tramadol (Ultram) 50 mg 1 tablet by mouth every 6 hours as needed, and instructed to take prescriptions as instructed, follow up with primary care in 2-3 days, and return to the emergency

department if he was unable to see that doctor for any reason or if he felt worse in any way prior to his follow up appointment.

- June 16, 2016:  Mr. Tapia was seen at NaphCare by Etsuko Yagi, R.N. (Records did not indicate name of attending physician), who indicated Mr. Tapia with history of recent and/or significant opiate use.  Ms. Yagi noted for > 5 days/week taking Percocet and previously taken was previous night.  Ms. Yagi noted Mr. Tapia had withdrawal symptoms - achy and restless leg.  Ms. Yagi indicated no symptom at the time of booking.  Ms. Yagi provided an assessment of opiate withdrawal.  Ms. Yagi recommended initiating COWS assessments with initiation of Buprenorphine taper (different order template) once scores 12 or greater or per provider orders, bottom bunk for safety, comfort medication including Ondansetron HCl 4 mg by mouth twice per day for 7 days, Aluminum-Magnesium-Simethicone 600-600-650 mg/15 ml by mouth twice per day for 7 days, Dicyclomine HCl 20 mg by mouth 3 times per day for 7 days, Ibuprofen 600 mg by mouth twice per day for 7 days, and Loperamide HCl 2 mg by mouth twice per day for 7 days, to give cool fluids or electrolyte solution (E.G., Gatorade) p.o. if alert 3 times per day and encourage p.o. fluid intake.

- October 4, 2016:  Mr. Tapia was seen by Lorraine Fisher, R.N. (Records did not indicate name of attending physician), who indicated Mr. Tapia reported history of (Heroin, 1 gm daily for the past 4 months) (Percocet, 2-3 tablets, every other day, for the past 6 months) and his previous use was that day for Heroin and previous day for Percocet.  Examination revealed left hip skin abscesses.  Ms. Fisher provided an assessment of opiate abuse.  Ms. Fisher recommended COWS protocol enacted per verbal/telephone order by Dr. Balderrama, Clonidine p.r.n. per COWS assessment, Promethazine HCl 25 mg by mouth 3 times per day for 5 days, Loperamide HCl 2 mg by mouth 3 times per day for 3 days, Methocarbamol 500 mg by mouth twice per day for 5 days, Dicyclomine HCl 20 mg by mouth twice per day for 5 days, plenty of fluids, to alert staff for any acute symptoms, and indicated might give Tylenol or Ibuprofen nursing protocol (allergy verification).

- November 8, 2016:  Upon arrival to the Emergency Department of Tacoma General Hospital, Mr. Tapia was complaining of rash and pain to left shoulder for couple of days, no known injection although pulled approximately 5 hairs in that area, skin pale and moist, out of jail for couple days as well.  Mr. Tapia stated he started having burning pain in left shoulder and neck on October 28th and then had bubbles that appeared that popped and then he had red scabs and the continuing severe, burning pain without radiation.  Mr. Tapia reported he had not taken anything for pain.  Records indicate Mr. Tapia's previous IVDA was 3 years prior and otherwise he was well.  Examination of the left shoulder revealed dermatomal rash and some lesions had tender erythema and induration.  Labs revealed high lactate (2.1) and low A:G ratio (1.0).  Mr. Tapia was provided impressions of shingles and cellulitis.  Mr. Tapia was discharged in stable condition, and instructed to take the medications as prescribed for symptoms, keep the rash covered, avoid contact with pregnant women as he might spread infection to their babies, he might take Ibuprofen 400 mg every 6 hours with food and/or Acetaminophen 1,000 mg every 6 hours for pain control, and advised he should understand that it was his responsibility to follow up as instructed, not doing so could result in pain, disability, or death, and return to the emergency department or seek immediate medical care if symptoms did not improve in 72 hours, symptoms worsened at any time, if he were unable to follow up with a medical provider as instructed, or he developed any worrisome symptoms such as fever >100.4 degrees, uncontrolled pain, increasing redness, vision changes or any other concerns.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

Physician Life Care Planning™

- November 23, 2016:  Mr. Tapia was seen by Megan Eliasson, R.N. (Records did not indicate name of attending physician), who indicated Mr. Tapia reported taking 2-3 of Percocet 30 mg daily off and on for the last 2 years and his previous use was on November 23, 2016.  Ms. Eliasson indicated Mr. Tapia stated he had symptoms of body aches, restless legs, and anxiety with past withdrawal.  Ms. Eliasson noted Mr. Tapia also had smoked Heroin (unknown amount) daily in the past but his previous use was 3 days prior.  Ms. Eliasson provided an assessment of opiate abuse.  Ms. Eliasson recommended COWS protocol enacted per verbal/telephone order by Dr. Balderrama, Clonidine p.r.n. per COWS assessment, Promethazine HCl 25 mg by mouth 3 times per day for 5 days, Loperamide HCl 2 mg by mouth 3 times per day for 3 days, Methocarbamol 500 mg by mouth twice per day for 5 days, Dicyclomine HCl 20 mg by mouth twice per day for 5 days, plenty of fluids, to alert staff for any acute symptoms, and indicated might give Tylenol or Ibuprofen nursing protocol (allergy verification).

- January 15, 2017:  Mr. Tapia was seen by Gurpreet Minhas, R.N. (Records did not indicate name of attending physician) during nurse sick call at 2:25 p.m. (attempted earlier and Mr. Tapia was at work) for kite in regard to head cold/fever/and head cold.  Ms. Minhas indicated Mr. Tapia stated that he had longer symptoms for 2 days and temp was 98.0 F, he felt better and because they were late, he no longer needed any medication.  Ms. Minhas indicated all questions answered and no other needs identified.

- June 21, 2017:  Mr. Tapia was seen by Sabrina Bual, R.N. (Records did not indicate name of attending physician), who indicated Mr. Tapia reported history of taking Percocet, purchased off the streets, took up to 2-5 pills daily, no complaints, and denied any history of seizures.  Ms. Bual provided an assessment of opiate abuse.  Ms. Bual recommended COWS protocol enacted per verbal/telephone order by Dr. Balderrama, Clonidine p.r.n. per COWS assessment, Promethazine HCl 25 mg by mouth 3 times per day for 5 days, Loperamide HCl 2 mg by mouth 3 times per day for 3 days, Methocarbamol 500 mg by mouth twice per day for 5 days, Dicyclomine HCl 20 mg by mouth twice per day for 5 days, plenty of fluids, and to alert staff for any acute symptoms, and indicated might give Tylenol or Ibuprofen nursing protocol (allergy verification).

- July 29, 2017:  Mr. Tapia was seen by Meghan Bailey, R.N. (Records did not indicate name of attending physician), who indicated Mr. Tapia smoked Percocet in varying amounts daily for the past 15 years and he experienced n/v/d, muscle aches, chills when he stopped using.  Ms. Bailey indicated Mr. Tapia last experienced withdrawal approximately 4 days prior.  Ms. Bailey indicated Mr. Tapia previously used Percocet about 6 hours prior.  Ms. Bailey noted Mr. Tapia previously attended treatment in 2003 at Olalla.  Ms. Bailey indicated Mr. Tapia had no active s/s of withdrawal at that time.  Ms. Bailey provided an assessment of opiate abuse.  Ms. Bailey recommended COWS protocol enacted per verbal/telephone order by Dr. Balderrama, Clonidine p.r.n. per COWS assessment, Loperamide HCl 2 mg by mouth 3 times per day for 5 days, Promethazine HCl 25 mg by mouth 3 times per day for 5 days, Dicyclomine HCl 20 mg by mouth 3 times per day for 5 days, Methocarbamol 500 mg by mouth twice per day for 5 days, plenty of fluids, to give cool fluids or electrolyte solution (E.G., Gatorade) p.o. if alert 3 times per day, to alert staff for any acute symptoms, and indicated might give Tylenol or Ibuprofen nursing protocol (allergy verification).

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

- September 19, 2018: Cameron Carrillo, L.P.N. (Records did not indicate name of attending physician) issued a note indicating Mr. Tapia was referred to medical due to being non-responsive, his BP hypertensive skin PWD, and he did not appear in distress. Mr. Carrillo indicated Mr. Tapia stated he did not have any medical concern at that time but was upset of being in 3SC and had no SI. Mr. Carrillo indicated would continue to monitor.

- September 29, 2018: Mr. Tapia was seen by Elizabeth Warren, R.N. (Records did not indicate name of attending physician), who indicated saw Mr. Tapia in his cell as requested by Sergeant. Ms. Warren noted cell smells of urine and sheet wrapped around waist. Ms. Warren indicated Mr. Tapia was alert, sitting up, on the side of his bunk, under his on power and made eye contact when he was spoken to. Ms. Warren indicated Mr. Tapia would not verbally respond, would follow instructions with calm encouragement, and he allowed assessment. Examination revealed apical pulse 100, S1S2, slow. Ms. Warren indicated not sure if Mr. Tapia was eating every meal, offered a chocolate ensure and he drank approximately 1/2 the container. Ms. Warren indicated officer prepared Mr. Tapia's sandwich for him, handed it to him and he took the sandwich. Ms. Warren spoke with sergeant and asked if Mr. Tapia could be put on a meal log and he agreed to start "Meal Log." Ms. Warren scheduled daily monitoring of VS x 3 days and scheduled provider visit for evaluation.


Diagnostics

September 26, 2013

- <u>Electrocardiogram</u>, sinus tachycardia, rate > 103, borderline prolonged PR interval, lateral infarct, acute, ST elevation, diffuse, likely early repolarization pattern, consider inferior injury, abnormal ECG, and acute MI.

- <u>Electrocardiogram</u>, sinus rhythm, rate 80, ST elevation, probable normal early repol pattern, no STEMI, and normal ECG.

- <u>X-rays left/right elbow</u>, bone mineralization within normal limits, no acute fracture, no subluxation, normal anatomic alignment, joint spaces well maintained, no radiopaque foreign body, and no abnormal soft tissue calcifications, impression of no acute osseous abnormalities of left and right elbow.

- <u>X-rays right tibia/fibula</u>, bone mineralization within normal limits, no acute fracture, no subluxation, normal anatomic alignment, joint spaces well maintained, no radiopaque foreign body, and no abnormal soft tissue calcifications, impression of no acute osseous abnormalities of right tibia/fibula.

- <u>CT head</u>, moderate polypoid mucosal thickening within the maxillary sinuses bilaterally, minimal fluid within the dependent left maxillary sinus as well, linear and symmetric benign appearing calcification along the tentorium cerebelli bilaterally, without definite evidence for superimposed subarachnoid or subdural hemorrhage, no intra-axial or definite extra-axial fluid collections, no evidence for acute infarction no definite hemorrhage, the cortical sulci, cerebral ventricles and basal cisterns were symmetrical and within normal limits, no mass lesion, mass effect, or shift of mid-line structures, and the bony calvarium appeared intact, impressions of likely benign thin and

Physician Life Care Planning™

symmetric dural calcifications along the tentorium, subtle superimposed subdural or subarachnoid blood was difficult to exclude, but considered unlikely, if symptoms persisted, recommended follow up with CT or MRI, moderate chronic bilateral maxillary sinusitis, and dependent fluid within the left maxillary sinus might represent superimposed acute sinus disease or hemorrhage.

- <u>CT cervical spine</u>, straightening of cervical lordosis, uncovertebral and facet hypertrophy caused mild right neural foraminal stenosis at C2-C3 and C3-C4, with mild bilateral neural foraminal stenosis at C5-C6, annular disc bulges caused mild apparent spinal canal at C3-C4 and C4-C5, no acute fracture or dislocation, the vertebral bodies otherwise well aligned, and the remainder of the disc spaces were well preserved, and the paravertebral soft tissues appeared unremarkable, impressions of loss of cervical lordosis, which might be related to muscular spasm or Mr. Tapia's positioning and mild degenerative changes.

- <u>CT thoracic/lumbar spine</u>, no acute fracture or dislocation, the vertebral bodies were well aligned, and the disc spaces appeared well preserved, and the paravertebral soft tissues appeared unremarkable, and an impression revealed unremarkable examination of the thoracic and lumbar spine.

- <u>CT chest/abdomen/pelvis</u>, unremarkable thoracic inlet without abnormal fluid collection, no evidence of mediastinal widening, no lung infiltrate or nodule, no pneumothorax, no adenopathy, mediastinum without masses or lymphadenopathy, hila without adenopathy, no effusion or pneumothorax, heart size not enlarged, no pericardial effusion, thoracic aorta with normal caliber, central tracheobronchial tree normal, no discrete suspicious osseous lesion, normal liver, and spleen, no splenic lacerations, splenic fluid, accessory splenule in the splenic hilar region, normal pancreas, kidneys, and adrenal glands, abdominal aorta without aneurysmal dilatation, IVC with normal caliber, normal gallbladder and biliary tree, bowel without obstruction or mural thickening, scattered diverticulosis of the colon, peritoneum, mesentery, omentum without ascites, nodules, free air or adenopathy, retroperitoneum without adenopathy, unremarkable prostate and urinary bladder, no free fluid, no adenopathy of lymph nodes, and no discrete suspicious osseous lesion, impressions of unremarkable CT scan of chest, abdomen and pelvis for acute traumatic injury, and diverticulosis.

Procedures

September 26, 2013

- Left upper arm x 1 and right lower leg x 3 laceration repair, <u>Mr. Travis M. Paoli</u>.

August 27, 2015

- Left posterior auricular scalp abscess incision and drainage, <u>Dr. Andrew Benefield</u>.

Other Documents

In addition to reviewing Mr. John Doe's medical records, I have also had the opportunity to review the other documents relevant to Mr. John Doe's cause of injury or illness, which include:

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

- Cheque to Ressler and Tesh, P.L.L.C. (Document)
- Civil Trial Scheduling Order (Document)
- Claims Ledger as of December 14, 2021 (Document)
- Clinical Photo of Foot - Scan (Photographs)
- Criminal History Information of Mr. Javier Tapia (Document)
- Earnings Statement (Document)
- Employee Withholding Certificate (Document)
- Employment Security Department (Document)
- Inmate Behavior Log Printout/Observation Report/Incident Report (Document)
- Pierce County Sheriff Booking ID Sheet/Form/Charges and Sentence/Pierce County Detention and Corrections Center Records of Mr. Javier Tapia (Document)
- Photographs of Wound on Leg (Photographs)
- Request Report for Inmate Mr. Javier Tapia (Document)
- Sandisk Pen Drive Photograph (Photographs)
- Stipulation and Authorization for Release of Employment Records of Javier Tapia (Document)
- Superior Court of Washington for Pierce County Court Order (Document)
- Warranty and Validation of Receipt Assignment of Benefits/Authorization to Release Information (Document)
- X-rays Image of Unspecified Body Part (Photographs)
- Physician Consultation Report completed by Dr. Hans Carlson
- Physical Capacity Evaluation completed by Dr. Hans Carlson on January 7, 2024
- Catastrophic Life Care Plan completed Dr. Hans Carlson on January 17, 2024

# 8   Vocational Evaluation Interview

Mr. Tapia was interviewed on January 24, 2024, at 4:00 PM EST via Doxy.me video conference. Mr. Tapia provided his Washington Driver's License as proof of identity.  After being provided with a professional disclosure statement, Mr. Tapia provided his verbal consent to commence the Vocational Rehabilitation Assessment and Earning Capacity Evaluation.

Mr. Tapia is a 41-year-old single Hispanic male born in Tacoma, WA on March 3, 1982.  Mr. Tapia informed that he has one son aged 11 who lives with an aunt and his daughter is deceased. Mr. Tapia reported that he lives alone in an apartment on the 2nd floor and his address is 1813 S 82nd St., Apt 3, Tacoma, WA, 98408 which is in Pierce County. Mr. Tapia reported that he is 5'7" and prior to the accident he weighed 180 pounds and that he now weighs 175 pounds. Mr. Tapia informed that prior to the accident he enjoyed all kinds of outdoor activities including fishing, walking on the beach, family outings, jet skiing and his main hobby was working on cars.  Mr. Tapia reported that after the injury, these prior leisure activities are now severely limited.

Mr. Tapia was pleasant and cooperative and appeared to be a reliable historian. Mr. Tapia informed that he was incarcerated in State Prison for 4 years from 2018 to 2023. Mr. Tapia informed that while he was incarcerated, he believes he developed a blood clot in his left foot and at some point, he went into sceptic shock so he was acting strangely and the prison put him into isolation where he was left alone for 9 to 12 days.  On October 1, 2018, Mr. Tapia informed that a mental health technician came to evaluate him in isolation for the first time and that's when they discovered his foot injury and immediately transferred him to the emergency room. Mr. Tapia informed that after medical evaluation, the doctors amputated his left foot due to a gangrene infection and then a few days later they had to amputate his left leg below the knee as the infection was continuing to spread. Mr. Tapia informed that he was in the hospital for 22 days

post amputation and then he was transferred back to prison. Mr. Tapia informed that he was wheelchair bound for the next year. Mr. Tapia informed that the prison sent him to get fitted for a prosthetic leg a year later. Mr. Tapia reported that it took him about 5 months to learn to walk with the prosthetic and with a cane and his maximum distance at that time was up to 500 yards.

Mr. Tapia informed that he suffers intermittent left leg phantom pain that comes and goes during the day and the pain ranges from 4 to 5 out of 10 on the pain scale. Mr. Tapia informed that he also has intermittent left leg pain at the amputation site that is sharp but quick and he rates it an 8 out of 10 on the pain scale; Mr. Tapia informed the stump pain often happens at night and wakes him up if he is sleeping. Mr. Tapia informed that the old prosthetic socket he had caused him to develop open sores, but his new socket has remedied this issue for now. Mr. Tapia informed he now has intermittent lumbar pain due to the change in his walking stride that ranges from 4 to 5 out of 10 on the pain scale and increased with activity. Mr. Tapia informed he also has intermittent pain in his shoulder blades ranging from 3 to 5 out of 10 on the pain scale and this is from having to push himself up to a standing position using his arms.

Mr. Tapia informed that he is limited to about 20 pounds of lifting and carrying. Mr. Tapia informed that he can sit for about 1 hour at a time before he has to stand up due to the pins and needles feeling that he gets in his left knee. Mr. Tapia reported that he has trouble standing for prolonged periods of time and at work he must lean on the workbench when he has to stand, and he has to keep shifting his weight to alleviate the pain. Mr. Tapia informed he is no longer walking with a cane, but he is unable to walk on uneven surfaces. Mr. Tapia informed that he is able to drive. Mr. Tapia informed that his balance is off due to his left leg amputation, and he has to be careful that other people don't bump into him. Mr. Tapia informed that he has no ability to climb a ladder or scaffolding and he has some trouble on the stairs. Mr. Tapia reported that he has trouble bending, stooping, kneeling, and crouching due to his leg injury and wearing a prosthetic. Mr. Tapia informed that he can do his ADL's, but he has to sit in a chair to shower and things like cooking and cleaning take much longer to complete than they used to. Mr. Tapia reported that he did not have any serious physical or mental medical problems prior to the accident. Mr. Tapia reported that he sometimes feels depressed when he thinks about what he has lost due to the amputation, but he is not treating with any medical providers or taking any psychiatric medication.

Mr. Tapia informed that he was allowed to participate in an incarcerated re-entry work program starting in February 2022 at which time he was moved to temporary housing and placed on house arrest but was allowed to work out in the community. Mr. Tapia informed that he was immediately hired through a temporary agency (Tera Staffing Agency) to work at Pioneer Distribution Center as an Order Picker (Airplane Parts). Mr. Tapia informed that he completed the graduated reentry program in December 2022 and was free to seek his own housing and other employment at that time, but he choose to stay on with Tera Staffing. Mr. Tapia informed that in July 2023, Pioneer Distribution hired him as a regular full-time employee. Mr. Tapia informed that he works in the parts department and his duties are to pick orders, pack orders, and cross reference orders for quality control. Mr. Tapia informed that the job description states that lifting up to 30 pounds is required, but the employer accommodates him so he does not have to lift over 25 pounds. Mr. Tapia informed that he is standing and walking the entire shift, but sometimes he can sit for one hour to file paperwork and check orders. Mr. Tapia informed that he must lean on the packing table for support when he is standing and packing orders. Mr. Tapia informed that the employer provides him with a reasonable accommodation that allows him to sit down for brief periods of time as needed to alleviate his pain. Mr. Tapia informed that he missed a lot of work when he had his old prosthetic socket due to the open sores the friction was causing at his stump site, but his new socket has allowed him to miss much less work due to his injury. Mr. Tapia informed that he enjoys the job, and the

employer is great, but his post incarceration employment plan prior to the date of injury was to return to his previous occupation as a construction worker because the wages are much higher.

# 9   Education & Training History

Mr. Tapia reported that he did not graduate from high school and that 10th grade was the last grade he completed; he has not obtained a GED. Mr. Tapia informed that he did not serve in the military.

# 10 Employment Experience

Mr. Tapia's employment experience, as related by him in the vocational interview, is as follows:

- **Job Title:**      **DS2 Support**
  Employer:      Pioneer Distribution Center
  Location:      Fife, WA
  Dates:         February 2022 to Present
  Earnings:      $18 per hour
  Duties:        Pick orders, pack orders, cross reference orders for quality control for shipping.

- **Job Title:**      **Laborer - Rebar**
  Employer:      Addison Construction Company
  Location:      Tacoma, WA
  Dates:         April 2015 to August 2015
  Earnings:      Could not recall
  Duties:        Tying rebar for concrete forms.

- **Job Title:**      **Dishwasher / Prep**
  Employer:      Silk Thai Cafe
  Location:      Tacoma, WA
  Dates:         January 2015 to April 2015 (Part Time)
  Earnings:      Could not recall
  Duties:        Washing dishes and prepping vegetables.

- **Job Title:**      **Machine Operator**
  Employer:      Haris Rebar
  Location:      Tacoma, WA
  Dates:         2009 to 2011
  Earnings:      Could not recall
  Duties:        Spinning rebar, loading it, packing it, shipping it.

- **Job Title:**      **Laborer - Concrete**
  Employer:      Concrete Tech
  Location:      Tacoma, WA
  Dates:         2008 to 2009
  Earnings:      Could not recall
  Duties:        Tying steel rings to pretension cable for concrete forms.

- **Job Title:**   **Laborer**
  Employer:        Riverton Contractors
  Location:        Pacific, WA
  Dates:           2005 to 2006
  Earnings:        Could not recall
  Duties:          Installing underground piping for utilities, sewers, and manholes.

- **Job Title:**   **Order Picker**
  Employer:        Fred Meyer Distribution Center
  Location:        Puyallup, WA
  Dates:           2000 to 2004
  Earnings:        Could not recall
  Duties:          Pick and pack orders.

## 11 Employment Analysis & Vocational Profile

According to Shahnasarian (2011), "Establishing a benchmark of an individual's premorbid earning capacity is a prerequisite to analyzing potential comparative post-incident earning capacity changes. Trends in earnings history, projections about the demand for skills, and a professional analysis of a person's pre-incident career development prospects facilitate the formulation of pre-incident earning capacity estimates."[10]

The jobs that Mr. Tapia has successfully performed in the past 15 years were researched in the U.S. Department of Labor's Dictionary of Occupational Titles, along with addendum publications that include the Revised Handbook for Analyzing Jobs, the O*Net Dictionary of Occupational Titles, the Selected Characteristics of Occupations, and the Occupational Outlook Handbook. The occupation definitions provided from the Dictionary of Occupational Titles are not intended to be exact representations of the jobs performed in Mr. Tapia's employment history.  To some degree, most job positions in the workforce vary due to unique work environments and employer needs. The occupation definitions are intended to provide a synthesis of general information that most closely encapsulates the skills, abilities, educational requirements, and physical capacities that are required to perform a specific job position or array of work tasks. Reference to these occupational titles is important, since they have known capacity statements attached to them, which represent modal ability levels associated with the types of jobs Mr. Tapia has performed in the past.  Mr. Tapia's past jobs are classified by the following occupations.

---

[10] Shahnasarian, M., (2011). *Assessment of Earning Capacity, 3rd Edition,*. Lawyers and Judges Publishing Company, Inc. Tucson, Arizona.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

| Vocational Profile | | | | |
|---|---|---|---|---|
| DOT Title | DOT # | VQ[11] | SVP[12] | DOT Physical Demand Level[13] |
| Laborer, Stores | 922.687-058 | 85 | 2 | Medium |
| Construction Worker II | 869.687-026 | 90 | 2 | Very Heavy |
| Kitchen Helper | 318.687-010 | 85 | 2 | Medium |
| Coiler | 613.685-010 | 90 | 4 | Light |
| Construction Worker I | 869.664-014 | 113 | 4 | Heavy |

These occupations require the following combined General Education Development (GED)[14] and Aptitude[15] levels:

| GED | | |
|---|---|---|
| Code | GED Division | Development Level[16] |
| R | Reasoning Development | 3 |
| M | Mathematical Development | 3 |
| L | Language Development | 3 |

| Code | Aptitude | Aptitude Level[17] |
|---|---|---|
| S | Spatial Perception | 3 |
| P | Form Perception | 3 |
| Q | Clerical Perception | 5 |
| K | Motor Coordination | 3 |

[11] Vocational Quotient (VQ) – the McCroskey Vocational Quotient Scale is a standardized empirically-derived index of vocational difficulty that considers all of the worker traits that are measures of mental and physical capacity in order to derive an overall statistical index of job difficulty. This index ranges from a low of 72.00 to a high of 154.00. The VQ distribution for all jobs in the DOT has been transformed (McCroskey, 1992) to a mean of 100.00 and a standard deviation of 15.00. In general, the higher the VQ, the more difficult and rewarding is the job. Jobs with VQs ranging between 85.00 and 115.00 fall within the average range of overall job difficulty.

[12] Specific Vocational Preparation (SVP) is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation; includes vocational education, apprenticeship, in-plant training, on-the-job training, and essential experience gained on other jobs. SVP 4 = Between 3 month and 6 months.  SVP 2 = Up to 1 month.

[13] Light Work: Lifting, Carrying, Pushing, Pulling 20 Lbs. occasionally, frequently up to 10 Lbs., or negligible amount constantly. Can include walking and or standing frequently even though weight is negligible. Can include pushing and or pulling of arm and or leg controls. Medium Work: Lifting, Carrying, Pushing, Pulling 20 - 50 Lbs. occasionally, 10 - 25 Lbs. frequently or up to 10 Lbs. constantly. Heavy Work: Lifting, Carrying, Pushing, Pulling 50 - 100 Lbs. occasionally, 20 - 50 Lbs. frequently, 10 - 20 Lbs. constantly. Very Heavy Work: Lifting, Carrying, Pushing, Pulling over 100 Lbs. occasionally, 50+ Lbs. frequently, 20+ Lbs. constantly.

[14] General Educational Development (GED) embraces those aspects of education (formal and informal) which contribute to the worker's (a) reasoning development and ability to follow instructions, and (b) acquisition of "tool" knowledge such as language and mathematical skills. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

[15] Aptitudes are the capacities or specific abilities which an individual must have in order to perform a given work activity.

[16] The GED Scale is a range from 1 (low) to 6 (high):

R3 = Apply commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

M3 = Compute discount, interest, profit, and loss; commission, markup, and selling price; ratio and proportion, and percentage. Calculate surfaces, volume, weights, and measures. Algebra: Calculate variables and formulas; monomials and polynomials; ratio & proportion variables; and square roots & radicals. Geometry: Calculate plane and solid figures; circumference, area and volume. Understand kinds of angles, and properties of pairs of angles.

L3 = Reading: Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work. Writing: Write reports and essays with proper format, punctuation, spelling and grammar, using all parts of speech. Speaking: Speak before audience with poise, voice control, and confidence, using correct English and well-modulated voice.

[17] Level 1 (Very High, Top 10th Percentile); Level 2 (High, Upper Third, Not Top 10th Percentile); Level 3 (Average, Middle Third); Level 4 (Low, Lower Third, Not Bottom 10th Percentile); Level 5 (Bottom 10th Percentile)

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

| | | |
|---|---|---|
| F | Finger Dexterity | 3 |
| M | Manual Dexterity | 3 |
| E | Eye Hand Foot Coordination | 4 |
| C | Color Discrimination | 4 |

# 12 Functional Capacity

Dr. Hans Carlson completed an independent medical evaluation on Mr. Javier Tapia and in his Physician Consultation Report, Dr. Carlson outlined the following symptoms associated with Mr. Tapia's injuries:

"Mr. Tapia obtained his initial prosthetic leg in August 2019 with subsequent prosthetic modifications / socket replacement secondary to residual limb remodeling and pressure sores/skin breakdown.  He reports that his current socket was fabricated in January 2023 and prior to the current socket he had skin issues secondary to pressure at the posterolateral knee, and distal residual limb.  He notes difficulty while ambulating including the need to scan the ground while walking as his knee hyperextends and this is increased on unlevel or soft terrain occasionally requiring him to use a cane.  He has intermittent left lower extremity phantom limb pain and sensation.  He also has unpredictable residual limb pain described as a sharp pain with intermittent paresthesia and this can be related to his socket fit.  While wearing the prosthesis, he notes limitations with routine activities that involve kneeling and finds it more difficult to get in and out of his vehicle.  When he has been unable to wear his prosthesis secondary to pain or skin issues, he uses a wheelchair or walker for mobility.  He uses his prosthesis at night to go to the bathroom.

Mr. Tapia describes associated musculoskeletal pain since his amputation with increased fatigue with activities and walking.  He has difficulty climbing stairs, needing to take only one step at a time secondary to fear of falling down the stairs while using his prosthetic limb.  Mr. Tapia reports increased left knee pain and phantom limb pain with prolonged sitting that limits his activities.  He has increased back pain and neck pain with prolonged standing, and this is temporarily relieved with massage or stretching.  Mr. Tapia reports right foot and ankle pain in the arch and Achilles' tendon region with occasional right foot paresthesia that is exacerbated while using his prosthesis which he attributes to compensatory increased right lower extremity weightbearing.  These symptoms are improved by limiting walking and weightbearing as well as stretching.  He notes no history of significant lower extremity or spine pain, injuries, fractures, or surgeries prior to the amputation.  Mr. Tapia also reports intermittent left shoulder pain, upper extremity paresthesia and decreased grip strength when he is unable to use his prosthesis and has to use his upper extremities for weightbearing, mobility, or transfers.

Since his amputation Mr. Tapia has had increased emotional distress with anxiety, worry, sadness, hopelessness and decreased enjoyment of routine activities and family events related to his limited abilities.  He expresses frustration, depression, fatigue and lack of motivation following his injury.  He finds that spending time with others such as family and coworkers is helpful."

In the Life Care Plan completed January 17, 2024, Dr. Carlson provided the following central opinions regarding Mr. Tapia's diagnostic conditions as they pertain to his relevant cause of injury and the consequent circumstances of the diagnostic conditions which, for the purpose of life care planning, include resulting disabilities and/or effects on life expectancy.:

- Diagnostic Condition 1: Complications associated with left lower extremity phlegmasia cerulea dolens (acute extensive venous thrombosis) reported to have been diagnosed on October 1, 2018.

- Diagnostic Condition 2: Status post left transtibial amputation on October 10, 2018.
- Diagnostic Condition 3: Residual limb pain and skin problems.
- Diagnostic Condition 4: Phantom limb sensation and pain.
- Diagnostic Condition 5: Gait disorder with mobility and activities of daily living skills deficits.
- Diagnostic Condition 6: Left knee pain.
- Diagnostic Condition 7: Right ankle/foot pain.
- Diagnostic Condition 8: Mechanical cervical and lumbar spine pain.
- Diagnostic Condition 9: Left shoulder pain.
- Diagnostic Condition 10: Adjustment disorder with anxiety and depressed mood.

Consequent Circumstance per Dr. Carlson as presented in the Life Care Plan completed January 17, 2024, are as follows:

- Decreased ability to perform activities of daily living (ADLs) e.g. bathing, dressing, etc.
- Decreased locomotion e.g. walking, transferring, etc.
- Decreased external mobility e.g. community ambulation, etc.
- Decreased ability to perform household services e.g. inside housework, food cooking & cleanup, caring for and maintaining pets, home and vehicles, household management, shopping for household, etc.
- Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc.
- Decreased ability to perform or maintain traditional roles within family, relationships or other social units.
- Decreased ability to interact and/or socialize with family, and/or friends and acquaintances.
- Decreased ability to participate in social avocational activities, i.e. participation in activities with others e.g. participation in sports, participation in community activities, etc.
- Decreased physical function affecting a loss of vocational capacities/opportunities.

In the Probable Duration of Care section of the Life Care Plan completed January 17, 2024, Dr. Carlson opines that Mr. Tapia will have lifelong disfigurement, progressive symptoms, as well as, physical and psychological impairments and disabilities, which require lifelong medical care and that Mr. Tapia's Average Residual Years is 37 years and that his Life Expectancy is age 78.

In the Physical Capacity Evaluation completed December 30, 2023, Dr. Carlson provided the following information regarding Mr. Tapia's Physical Functional Capacity:

Mr. Tapia is able to perform the following activities for the following total amounts of time during an 8-hour workday:

- Sitting 8 Hours total, 2 hours on a continuous/uninterrupted basis.

- Standing 6 Hours total, 2 hours on a continuous/uninterrupted basis.

- Walking 6 Hours total, 2 hours on a continuous/uninterrupted basis.

- 8 hours is the total number of hours per day that Mr. Tapia can work.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

Dr. Carlson opined that Mr. Tapia is able to push, pull, lift, or carry the following amounts of weight in the following frequencies[18]:  Up to 25 pounds occasionally, up to 10 pounds frequently. Dr. Carlson opined that Mr. Tapia has the ability to perform the following physical activities:

| Physical Activity | Frequency |
|---|---|
| Jump | Not at all |
| Climb Stairs | Occasionally |
| Climb hand over hand | Occasionally |
| Bend | Frequently |
| Stoop | Frequently |
| Reach | Constantly |
| Crawl | Not at all |
| Kneel | Occasionally |
| Twist/rotate | Occasionally |
| Balance | Constantly |
| Push/pull | Frequently |

Dr. Carlson opined that Mr. Tapia's hands can be used for the following repetitive actions:

| | |
|---|---|
| Simple Grasping, right hand | Yes |
| Simple Grasping, left hand | Yes |
| Firm Grasping, right hand | Yes |
| Firm Grasping, left hand | Yes |
| Fine Manipulation, right hand | Yes |
| Fine Manipulation, left hand | Yes |

Dr. Carlson opined that Mr. Tapia can use is feet for repetitive movements, e.g. operating foot controls, in the following manner:

| | |
|---|---|
| Right Foot | Yes |
| Left Foot | No |
| Both Feet | No |

Dr. Carlson opined that Mr. Tapia can manipulate his head and neck in the following ways:

| | |
|---|---|
| Frequent Flexing | Yes |
| Frequent Rotating | Yes |

Dr. Carlson opined that Mr. Tapia appeared to be mentally stable, that he does expect Mr. Tapia's physical capacities to improve or increase over time, and that the following treatments would improve Mr. Tapia's physical capacities: Surgery, Physical Therapy, Orthotic/Prosthetic Device.

---

[18] The United States Department of Labor's Dictionary of Occupational Titles defines frequencies as:
Occasionally = Up to 2.5 hours during a workday
Frequently = More than 2.5 hours, and up to 5.5 hours during a workday
Continuously = More than 5.5 hours during a workday

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

Mr. Tapia's self-reported restrictions and limitations are noted and considered. For the purposes of determining his residual functional capacity, the medical opinions of Dr. Carlson are relied upon. Based upon Dr. Carlson's opinions, Mr. Tapia has physical functional impairments that adversely impact his employability and functional abilities to perform work; Dr. Carlson has opined that Mr. Tapia is limited to 8 hours of Light work per day. As such, Mr. Tapia was assessed at the Sedentary and Light levels.

## 13 Post-Injury Vocational Profile

The vocational profile[19] from the education and employment experience was adjusted to reflect the functional limitations that Mr. Tapia currently demonstrates outlined in the functional capacity section of this report.

Mr. Tapia's Post-Injury Vocational Profile is comprised of the following factors:

1. Education & Training:

   a. Mr. Tapia completed the 10th grade; he does not have a high school diploma or a GED.

2. Employment History:

   a. Pre-injury: Light, Medium, Heavy, & Very Heavy physical demand levels.

   b. Post-injury: Light physical demand level.

3. Functional Capacity:

   a. Post-injury: Sedentary and Light.

Based upon Dr. Carlson's opinion, Mr. Tapia was limited to the Sedentary and Light levels of work, which is a hypothetical medical-vocational scenario. This would preclude him from activities involving medium, and heavier physical exertion. The pre-injury profile was adjusted to account for the following: No crawling; Occasional climbing and kneeling; Frequent stooping.

According to the Dictionary of Occupational Titles, Sedentary work is defined as follows: Exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally, and all other sedentary criteria are met.

According to the Dictionary of Occupational Titles, Light work is defined as follows: Exerting up to 20 pounds of force occasionally, or up to 10 pounds frequently, or a negligible amount of force constantly to move objects. Physical demand requirements are in excess of those for Sedentary work. Even though the weight lifted may be only a negligible amount, a job should be rated Light: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing or

---

[19] See Section 11 of this report.

pulling of arm or leg controls; or (3) work the job requires working at a production rate pace entailing the constant pushing or puling of materials even though the weight of those materials is negligible.

# 14 Transferable Skills Analysis

According to Power (2006)[20], there are three types of skills that a person may possess; they are adaptive skills, functional skills, and content skills.

- Adaptive skills are related to a worker's personality traits;

- Functional skills are related to a worker's behavior and/or their abilities related to the interaction with data, people, and things in the work environment;

- Content skills are the competencies a worker has that are directly related to the performance of a specific job.

Powers (2006) proffers that when a person is unable to perform their previous work due to their residual functional capacity, the identification of alternative occupations within their functional skill level becomes necessary; the identification of the workers preinjury skills is a prerequisite to the Transferable Skills Analysis that may potentially identify new occupations that can be performed within the individual's residual functional capacity.

Per Robinson (2014)[21], "The concepts of vocational employability and placeability are core elements in every assessment of vocational capacity. Employability addresses the issue of whether an evaluee is ready for work. Central employability issues involve selection of appropriate vocational goals that consider the evaluee's vocational readiness characteristics such as aptitudes, personality, temperament, and residual functional capacity. The complementary yet very different concept of vocational placeability addresses the question of whether an individual meets the hiring requirements of actual employers within a specific geographical labor market. While a job may exist within a particular labor market, if the evaluee in question would not be a reasonable candidate for employment consideration, then the suitability of the job as a vocational goal must be questioned. To be considered a viable work opportunity, the concepts of vocational employability and placeability must be demonstrated.

Per Weed & Field (2001)[22], the access to the labor market component within RAPEL considers issues related to a person's access to job opportunities in their labor market before and after an injury. In other words, the ability to perform a job does not mean that it exists in a labor market and therefore this must be considered.

Both the pre-injury profile of worker traits and the post-injury profile for Mr. Tapia were compared to all 12,775 jobs in the D.O.T., interfaced with a labor market survey of the most frequently hired jobs in the State of Washington, 2023. This was completed utilizing the McCroskey Vocational Quotient System (MVQS) database and its McCroskey Transferable Skills Program (MTSP) that generates a list of occupations that are reasonably available in a specific labor market that are also consistent with a

---

[20] Power, P. W. (2006). *A guide to vocational assessment*. Austin, TX: Pro-Ed.
[21] Robinson, R.H., (2014). *Foundations of Forensic Vocational Rehabilitation*. Springer Publishing Company. New York, New York.
[22] Weed, R., & Field, T. (2012). Rehabilitation Consultant's Handbook. Athens, GA: Elliot & Fitzpatrick

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

person's unique worker trait profile.  Multiple peer reviewed research studies have proven that the MVQS has a high degree of validity and reliability for measuring probable transferable skill outcomes and labor market entry-point wages.

Pre-injury, Mr. Tapia's profile matched 192 of the 1095 most frequently hired jobs statewide, or about 18% of this job database using the MVQS MTSP. This is reflective of his prior employment experience, and it also indicates that he had the capacity to perform, or to learn to perform, these jobs. Post-injury, Mr. Tapia's profile matched 64 of the 1,278 most frequently hired jobs statewide, or about 6% of this job database using the MVQS MTSP which is indicative of a 67% diminution of personal access to the competitive local labor market, pre-injury versus post-injury.  The matching pre-impairment jobs for each of the 10 categories of work in the D.O.T. are indicated in Table 1 below.

Table 1: Pre-Impairment & Post Impairment Job Matches (By Job Category)

| Job Category # | Pre-impairment # of Jobs | Post-impairment # of Jobs |
|---|---|---|
| 0 Professional | 0 | 0 |
| 1 Technical | 2 | 1 |
| 2 Clerical/Sales | 11 | 5 |
| 3 Services | 63 | 31 |
| 4 Agriculture | 19 | 2 |
| 5 Processing | 7 | 3 |
| 6 Machine Trades | 17 | 4 |
| 7 Bench Work | 19 | 11 |
| 8 Structural | 35 | 0 |
| 9 Miscellaneous | 19 | 7 |
| Total | 192 | 64 |

Jobs with transferable skills are indicated in Table 2 below.

Table 2: Pre-Impairment & Post-Impairment Job Transferability (# of Jobs by Level of Transferable Job Skills)

| Category | Pre-impairment # | Post-impairment # |
|---|---|---|
| Moderate to high skill transferability | 20 | 2 |
| Job transferability requiring little or no transferable skills | 172 | 62 |

Transferable Skills Analysis Conclusion:

Pre-injury, Mr. Tapia's profile matched 192 of the 1095 most frequently hired jobs statewide, or about 18% of this job database using the MVQS MTSP. This is reflective of his prior employment experience, and it also indicates that he had the capacity to perform, or to learn to perform, these jobs. Post-injury, Mr. Tapia's profile matched 64 of the 1,278 most frequently hired jobs statewide, or about 6% of this job database using the MVQS MTSP which is indicative of a 67% diminution of personal access to the competitive local labor market, pre-injury versus post-injury.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

# 15 Employability Analysis

According to Field (1993) Employability is a status that "exists if a person possesses skills, abilities, and traits necessary to perform a job or jobs."[23] Per McCroskey, employability theoretically exists when "worker capacity equals or exceeds the demands of a job."[24]  Employability addresses the core rehabilitation counseling issue "is the person ready for work" given their vocational goal, capacities, experiences, and skills. Employability is solely a measure of individual capacity measured against job demands. While interests associated with jobs are indicators of preference, not capacity, they nevertheless provide signals as to what types of work and environment an individual prefers.

Mr. Tapia's employability is influenced by and dependent upon a synthesis of different factors. In Mr. Tapia's case, the following factors are pertinent:

Functional capacity (restrictions and limitations):

- o   Based upon Dr. Carlson's opinion, Mr. Tapia was limited to the Sedentary and Light levels of work, which is a hypothetical medical-vocational scenario. This would preclude him from activities involving medium, and heavier physical exertion. The pre-injury profile was adjusted to account for the following: No crawling; Occasional climbing and kneeling; Frequent stooping.

Transferability of previously developed vocational skills:

- o   Mr. Tapia's physical functional capacity has a direct impact on the transferability of his previously developed vocational skills. Accordingly, Post-injury, Mr. Tapia's profile matched 64 of the 1,278 most frequently hired jobs statewide, or about 6% of this job database using the MVQS MTSP which is indicative of a 67% diminution of personal access to the competitive local labor market, pre-injury versus post-injury.  These results did not factor in Mr. Tapia's lack of a high school diploma or GED which may be required by some of the alternate occupations identified.

Academic abilities for job retraining:

- o   Mr. Tapia's academic abilities for job retraining are best represented by his past educational attainment, and the type of training from which he has benefited in the past.  Mr. Tapia completed the 10th grade; he did not graduate from high school, nor did he obtain a GED. Mr. Tapia has demonstrated the ability to learn and perform semi-skilled occupational duties with training.

Vocational Age

- o   Mr. Tapia is 41 years old and therefore considered a person of young vocational age; he has a substantial amount of time to devote to educational and vocational activities, prior to reaching retirement age.

---

[23] Field, T., (1993). *Strategies for the Rehabilitation Consultant*, pp. I-7, Elliott & Fitzpatrick, Inc., Athens, GA.
[24] McCroskey, B.J., (1994). *Manual for the McCroskey Transferable Skills Program*, *Expert Vocationologist Edition, Ver. 7*, Vocationology, Inc., Minneapolis, MN.

Candidacy for vocational rehabilitation services:

- o Mr. Tapia's ability to benefit from vocational rehabilitation services is a function of all of the factors discussed above. The viability of these resources will be discussed in the Vocational Rehabilitation section below.

Employability Conclusion:

As previously noted, Mr. Tapia is currently employed full time as a Laborer, Stores (DOT Code 922.687-058) and he is receiving reasonable accommodations from the employer who allow him to sit down and/or briefly change positions as needed to alleviate his pain and to not have to lift and/or carry anything weighing over 25 pounds.

## 16 Vocational Rehabilitation

The purpose of vocational rehabilitation is to provide training and other services when there is reasonable probability of the individual returning to gainful employment. This often includes provision of vocational rehabilitation counseling, vocational evaluation, vocational plan development, educational training, on-the-job training, job development and placement, assistive technologies, and other related services.

The vocational rehabilitation process has five phases in order of preference. Vocational rehabilitation clients receive services for the phase best suited to their specific needs:

Phase One: The vocational rehabilitation counselor assists the worker to return to the same job with the pre-impairment employer. Interventions at this phase may include programs of physical conditioning or work-hardening, graduated return to work, work evaluation, and refresher training or skill upgrading.

Phase Two: If it is determined the worker cannot return to the same job, the vocational rehabilitation counselor encourages and works with the pre-impairment employer to make worksite accommodations and job modification, or to provide alternative in-service placement.

Phase Three: If the employer is unable or unwilling to accommodate the worker, the vocational rehabilitation counselor identifies suitable occupational options in the same or related industry.

Phase Four: If the worker is unable to return to alternative employment in the same or related industry, the vocational rehabilitation counselor explores opportunities in all industries, with emphasis placed on the worker's transferable skills, aptitudes, and interests.

Phase Five: If existing skills are insufficient to return the worker to suitable employment, the vocational rehabilitation counselor uses training programs to enable the worker to acquire new occupational skills. In addition, the vocational rehabilitation counselor assists the worker to secure employment once the training is complete.

In Mr. Tapia's case, he is currently employed on a full-time basis, is receiving reasonable accommodations from the employer, and appears to be working at the full capacity level opined by Dr. Carlson. Therefore, it is my opinion that Mr. Tapia is not currently suitable for Vocational Rehabilitation at this time; however,

should his current employment situation cease, and depending on his medical condition at that time, he may then be suitable for vocational rehabilitation services between Phases Two and Five.

# 17  Analysis of Earnings/Earnings Capacity

The power to earn money is a function of the capacity to perform work. The capacity to perform work is predicated upon individual mental and physical abilities that are measurable and quantifiable. This analysis was done in accordance with the worker trait-factor system developed by the U.S. Department of Labor, which provides the means for such measurement.

Per the Washington State Employment Security Department letter dated October 23, 2023, Mr. Tapia's reported wages are summarized in the following table:

| Year | Employer | Wages | Hours | Wage per Hour |
|------|----------|-------|-------|---------------|
| 2023 | Pioneer Human Services | $28,898.91 | 1,568 | $18.43 |
| 2022 | Pioneer Human Services | $14,751.44 | 873 | $16.90 |
| 2022 | Terra Staffing Group | $11,789.50 | 694 | $16.99 |
| 2015 | Silk Thai Café LLC | $2,593.20 | 259 | $10.01 |
| 2015 | Addison Construction Supply | $25,794.55 | 1,686 | $15.30 |
| 2009 | Nucor Harris Rebar | $18,312.24 | 1,172 | $15.63 |

The minimum wage in Washington is now $16.28 per hour. Mr. Tapia's current hourly wage is $18.43 per hour which is significantly higher than the median hourly wage[25] of any of the jobs identified in the transferable skills analysis. In his current employment situation, Mr. Tapia is earning the maximum hourly wage that is available to him given his post-injury vocational profile.

Mr. Tapia informed that prior to his injury, his post incarceration employment plan was to return to work as a construction worker because that was the best paying industry for which he had prior work experience.  According to the Economic Research Institute[26], individuals employed full time as a Construction Worker II in the Tacoma, Washington labor market earn a median annual salary of $52,330 (or $25.16 per hour) in the first year of experience and this is the best representation of Mr. Tapia's pre-injury earning capacity.

From the DOI until February 2022 when he was released into the graduated reentry program, Mr. Tapia was unable to work due to being incarcerated and therefore he did not sustain an earnings loss during this time period due to his injury. From February 2022 through January 2024, Mr. Tapia sustained a partial loss of earnings totaling $38,415; below is a summary table of Mr. Tapia's partial earnings loss.

---

[25] See Transferable Skills Analysis Report exhibited at the end of this report (Section: MTSP – Report 10)
[26] Economic Research Institute, Salary Assessor Licensed Professional Version, Data as of 01/01/2024, www.erieri.com.

Physician Life Care Planning™

| Year | Pre-Injury Earning Capacity[27] | Post-Injury Earnings | Earnings Loss |
|---|---|---|---|
| 2022 (11 Months) | $47,969 | $26,451[28] | $21,518 |
| 2023 (12 months) | $52,330 | $36,600[29] | $15,730 |
| 2024 (1 Month) | $4,361 | $3,195[30] | $1,166 |
| Partial Earnings Loss Total from February 2022 through January 2024 | | | $38,414 |

If Mr. Tapia's is able to maintain his current employment situation, he will sustain a partial loss of earnings through the duration of his worklife expectancy amounting to a loss of approximately $13,996[31] in annual earning capacity.

The above wage-earnings do not include computation of such variables as wage growth over time, lost promotional opportunities and advancement, the value of fringe benefits, income taxes, present value computation, and other economic factors. The figures do represent an estimate of the diminution of annual gross wage-earning power as a consequence of diminished functional work capacity for Mr. Tapia.

## 18 Summary

In summary, based on the results of the vocational rehabilitation assessment and earning evaluation of Mr. Tapia, and considering his age, education, prior work experience, and the functional capacity medical opinions provided for the purposes of this report, the following is a summary of my findings and opinions within a reasonable degree of vocational certainty regarding Mr. Tapia's employability and earning capacity.

1. Based upon Dr. Carlson's opinions, Mr. Tapia has physical functional impairments that adversely impact his employability and functional abilities to perform work; Dr. Carlson has opined that Mr. Tapia is limited to 8 hours of Light work per day. As such, Mr. Tapia was assessed at the Sedentary and Light levels.

2. Mr. Tapia's physical functional capacity has a direct impact on the transferability of his previously developed vocational skills. Accordingly, Post-injury, Mr. Tapia's profile matched 64 of the 1,278 most frequently hired jobs statewide, or about 6% of this job database using the MVQS MTSP which is indicative of a 67% diminution of personal access to the competitive local labor market, pre-injury versus post-injury. These results did not factor in Mr. Tapia's lack of a high school diploma or GED which may be required by some of the alternate occupations identified.

3. Mr. Tapia is currently employed full time as a Laborer, Stores (DOT Code 922.687-058) and he is receiving reasonable accommodations from the employer who allow him to sit down and/or briefly change positions as needed to alleviate his pain and to not have to lift and/or carry anything weighing over 25 pounds. In his current employment situation, Mr. Tapia is earning the maximum hourly wage that is available to him given his post-injury vocational profile.

---

[27] Prorated based on the number of months employed in the year if less than 12 months.
[28] From Mr. Tapia's Washington State Employment Security Department letter dated October 23, 2023.
[29] 2023 4th Quarter wage data was not available and was estimated to be the same as 2023 Quarter 3.
[30] Calculated as follows: ($18.43 (current hourly wage) * 40 hours per week * 52 weeks) / 12 months
[31] $52,330 – (40 hours per week x $18.43 per hour x 52 weeks) = $13,996

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

4.  Given Mr. Tapia is currently employed on a full-time basis, is receiving reasonable accommodations from the employer, and appears to be working at the full capacity level opined by Dr. Carlson, it is my opinion that he is not currently suitable for Vocational Rehabilitation; however, should his current employment situation cease, and depending on his medical condition at that time, he may then be suitable for vocational rehabilitation services between Phases Two and Five.

5.  $52,330 per annum is the best representation of Mr. Tapia's pre-injury earning capacity. From the DOI until February 2022 when he was released into the graduated reentry program, Mr. Tapia was unable to work due to being incarcerated and therefore he did not sustain an earnings loss due to his injuries. From February 2022 through January 2024, Mr. Tapia sustained a partial loss of earnings totaling $38,414. If Mr. Tapia can maintain his current employment situation, he will sustain a partial loss of earnings through the duration of his worklife expectancy amounting to a loss of approximately $13,996 in annual earning capacity.

The opinions expressed in this report are to a reasonable degree of vocational rehabilitation probability. If additional information is made available, I reserve the right to amend my conclusions as needed.

Respectfully Submitted,

Timothy R. Andenmatten, MEd, CRC, CVE, IPEC
Certified Rehabilitation Counselor
Certified Vocational Evaluation Specialist
International Psychometric Evaluation Certification
Physician Life Care Planning, LLC

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

# 19 Author

Timothy R. Andenmatten is a Certified Rehabilitation Counselor (CRC) and a Certified Vocational Evaluation Specialist (CVE) who has provided vocational evaluation, vocational rehabilitation (VR) counseling, and labor market evaluation and job placement services for individuals with disabilities since 2006. Mr. Andenmatten regularly testifies as a Vocational Expert in Social Security Administrative Law Judge disability benefit adjudication hearings.

Mr. Andenmatten's professional career includes work with the Massachusetts Rehabilitation Commission (Public VR), Disability Insurance Companies, VRS Disability Management (Workers Compensation), TDIYOU Inc. (Non-profit Disabled Veterans Benefit Assistance), and Greylock Placement Services, LLC (Expert Witness & VR Services).

His professional associations include the International Association of Rehabilitation Professionals and the American Board of Vocational Experts.

Mr. Andenmatten earned a Bachelor of Science from the University of Massachusetts, Amherst, and a Master of Education in Rehabilitation Counseling from Springfield College.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

# 20 Sources

1. Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook online at http://www.bls.gov/ooh/

2. Commission on Rehabilitation Counselor Certification; online at https://crccertification.com/code-of-ethics-4/

3. Dictionary of Occupational Titles Revised 4th edition, 1992, U.S. Department of Labor Employment and Training Administration, Government Printing Office, Washington, D.C.

4. Economic Research Institute, Salary Assessor Licensed Professional Version, data as of January 1, 2024, at www.erieri.com

5. Field, T., (1993). Strategies for the Rehabilitation Consultant, pp. I-7, Elliott & Fitzpatrick, Inc., Athens, GA.

6. Field, T. (2008). Estimating earning capacity: Venues, factors, and methods. Estimating Earning Capacity; A Journal of Debate and Discussion, 1(1), 5-40.

7. Field, T. (2012). Estimating earning capacity: A historical review. The Rehabilitation Professional, 20(4), 51-62.

8. Job Browser Pro (Web Version). SkillTRAN. Spokane, Washington.

9. McCroskey, B.J., (1994). Manual for the McCroskey Transferable Skills Program, Expert Vocationologist Edition, Ver. 7, Vocationology, Inc., Minneapolis, MN.

10. O*Net OnLine (Occupational Information Network), online at https://www.onetonline.org/

11. Power, P. W. (2006). A guide to vocational assessment. Austin, TX: Pro-Ed.

12. Robinson, R.H., (2014). Foundations of Forensic Vocational Rehabilitation. Springer Publishing Company. New York, New York.

13. Shahnasarian, M., (2011). Assessment of Earning Capacity, 3rd Edition,. Lawyers and Judges Publishing Company, Inc. Tucson, Arizona.

14. The Revised Handbook for Analyzing Jobs, 1991, U.S. Department of Labor, Employment and Training Administration, Government Printing Office, Washington, D.C.

15. Weed, R., & Field, T. (2012). Rehabilitation Consultant's Handbook. Athens, GA: Elliot & Fitzpatrick.

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC

## 21 Exhibits

Exhibit A: The McCroskey Transferable Skills Analysis Report – Javier Tapia

Confidential Record – Mr. Javier Tapia
© 2024, Physician Life Care Planning, LLC



**MVQS - Transferrable Skills - Report 1**

**Client Identification, Labor Market Area, VIPR Type and Reason for Referral**

Sunday, February 4, 2024

| | |
|---|---|
| **Evaluee Name:** | Javier  Tapia |
| **Address1:** | 1813 S 82nd St. Apt 3 |
| **Address2:** | |
| **City/State/Zip:** | Tacoma                    WA      98408 |
| | USA |

**Labor Market Area**

| | | | |
|---|---|---|---|
| Job Bank Name: | Pierce | Evaluation Year: | 2023 |
| StateParishProvince: | WA | Inflation Rate: | 1.440389 |
| Country Name: | USA | ECLR Rate: | 0.5774367 |

**VIPRType:**

**Reason for Referral:**

**Email for Claims:**

**Case Name:**

**Case Diagnosis:**

**Case Notes:**

# MVQS - Transferrable Skills - Report 3

## Worker Trait Profiles

Sunday, February 4, 2024

**Evaluee Name:** Javier Tapia

| | Worker Trait Profiles | VQ | GED | | | Aptitudes | | | | | | | | Physical Demands | | | | | | Environmental Conditions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | R | M | L | S | P | Q | K | F | M | E | C | 1 | 2 | 3 | 4 | 5 | 6 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| **Profile 1:** | Work History Profile | 114.90 | 3 | 3 | 2 | 3 | 3 | 2 | 3 | 3 | 3 | 2 | 2 | 5 | 1 | 1 | 1 | 0 | 1 | 3 | 0 | 1 | 0 | 1 | 1 | 1 |
| **Profile 2:** | Evaluative Profile | 113.92 | 3 | 3 | 2 | 3 | 3 | 2 | 3 | 3 | 3 | 2 | 2 | 2 | 0 | 1 | 1 | 1 | 1 | 3 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Profile 3:** | Pre Profile | 120.25 | 3 | 3 | 2 | 3 | 3 | 2 | 3 | 3 | 3 | 2 | 2 | 5 | 1 | 1 | 1 | 1 | 1 | 3 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Profile 4:** | Post Profile | 113.82 | 3 | 3 | 2 | 3 | 3 | 2 | 3 | 3 | 3 | 2 | 2 | 2 | 0 | 1 | 1 | 1 | 1 | 3 | 1 | 1 | 1 | 1 | 1 | 1 |

**Profile 1:** Highest Levels of Worker Trait Functioning demonstrated across Past Relevant Work History over the past 15 years.

**Profile 2:** The Evaluative Data Profile of Current Vocational Functioning derived from demonstrated and retained Work History functioning, confirmed by review of available relevant Medical, Psychological, Social, Educational and Vocational Information and extended through available relevant Vocational Tests, Measures, Ratings and Functional Capacities Assessment data.

**Profile 3:** Highest Levels of Worker Trait Functioning across demonstrated Work History (Profile 1) and Evaluative Data (Profile 2).

**Profile 4:** The Final Adjusted Residual Employability and Earnings Capacity Profile of Vocational Functioning for Job-Person Matching.

**Notes:** Worker Trait Profile Levels of "4" on GED and Aptitude Traits reflect Middle-Average (50th %ile) Vocational Functioning. The Middle-Average Vocational Quotient (VQ) for Jobs is 100 and for People is 140. Both have a Standard Deviation of 15. Perfect Job-Person Profile Matches are rare. Reasonable Job Matches are typically 22.5 VQ Points below the Person's VQ. Theoretical Underpinnings of the McCroskey Vocational Quotient System (MVQS) include: Parson's (1909)  Informal 3-Part Theory. The Formal Minnesota Theory of Work Adjustment (Dawis, Lofquist & Weiss, 1968). The Vocational Diagnosis and Assessment of Residual Employability (VDARE, McCroskey, Wattenbarger, Field and  Sink, 1977), and the Scientific Research on Job-Person Matching and Earning Capacity Prediction Studies contained in national peer-reviewed Journals including; Vols. 1 - 7 of the Journal of Forensic Vocationology (1995-2014), The Earnings Analyst (TEA) Journals of the American Rehabilitation Economics Association (Vols 1 - 4, 1998 - 2001) and The American Board of Vocational Expert (ABVE) Journals of Forensic Vocational Assessment (Vols 1 - 4, 1996 - 2001). High to Very High Transferable Skills Analysis Validity has been demonstrated.

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.



**MVQS - Transferrable Skills - Report 4**
**Pre and Post Comparisons**

Sunday, February 4, 2024

**Evaluee Name:** Javier Tapia

## SECTION 5, PART 1:  ACCESS TO THE LABOR MARKET

**Jobs Searched:** 1095     In this Job Bank

### Job Matches in each of the 10 DOT Job Categories*

| | Prof | TechMgr | ClerSales | Services | Agri | Process | MachTr | Bench | Struct | Misc | - Total - | Labor Market Access** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JobCats*: | - 0 - | - 1 - | - 2 - | - 3 - | - 4 - | - 5 - | - 6 - | - 7 - | - 8 - | - 9 - | | |
| Pre: | 0 | 2 | 11 | 63 | 19 | 7 | 17 | 19 | 35 | 19 | 192 | 18 |
| Post: | 0 | 1 | 5 | 31 | 2 | 3 | 4 | 11 | 0 | 7 | 64 | 6 |
| Residual: | 0% | 50% | 45% | 49% | 11% | 43% | 24% | 58% | 0% | 37% | 33% | 33% |

*** Mean=85, Std Dev=8. Access to Specific Jobs and Earnings depend on Qualifications, Skills, Abilities, General and Specific Educational Development, Aptitudes, Training, Experience, Supply-Demand Factors in Relevant Labor Markets.*

## SECTION 5, PART 2:  EARNING CAPACITY AND TRAINING POTENTIAL

**Overall Earning Capacity: Mean Present Value Earning Capacity Estimates - Pre/Post Summary**

**Note: See Table 4a for EC Rxy, SEe and Confidence Intervals.**

| | Max VQ | Avg VQ | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile | Training Potential** |
|---|---|---|---|---|---|---|---|---|---|
| Pre: | 112.55 | 91.12 | $10.68 | $6.34 | $7.73 | $9.87 | $12.85 | $16.52 | 73 |
| Post: | 102.44 | 89.18 | $10.39 | $6.21 | $7.53 | $9.59 | $12.47 | $16.02 | 67 |
| Residual: | 91% | 98% | 97% | 98% | 98% | 97% | 97% | 97% | 91% |

*** Mean=85, Std Dev=8. Access to Specific Training Programs depend on Qualifications, General and Specific Educational Development, Aptitudes, Motivation, Supply and Demand Factors in Relevant Training Markets and Funding Availability.*

## SECTION 5, PART 3:  TRANSFERABLE SKILLS (TS) AVAILABILITY and UTILIZATION

| | No TSkills Available | Few, if any TSkills Available | Low TSkills Available | Moderate TSkills Available | High TSkills Available | Utilization** |
|---|---|---|---|---|---|---|
| TS Levels*: | 0 - 19% | 20 - 39% | 40 - 59% | 60 - 79% | 80 - 97% | |
| Pre: | 42 | 107 | 23 | 19 | 1 | 24 |
| Post: | 21 | 38 | 3 | 2 | 0 | 9 |
| Residual: | 50% | 36% | 13% | 11% | 0% | 37% |

*** Mean=85, Std Dev=8. Access to TS Jobs depends on Level of Qualifications, Skills, Training, Experience, Availability of Skills Updating/Enhancement Training to Bridge Employment Barriers, a Positive Attitude  and a Motivated, Optimistic, Enthusiastic, Persistent and, above all, a Realistic Job Search.*

*\* See MVQS2003 Reports: Selected Symbols, Codes and Scales. (MVQS 2003 Resources, p. 42).*

# MTSP - Report 5
## Client Work History Job Demands/Worker Trait Requirements

Javier Tapia

Sunday, February 4, 2024

Report 5: Work History Job Demands/Worker Trait Requirements

| Dot Code | Job Title | VQ | VIPR | SVP | Skill Level | GED | | | Aptitudes | | | | | | | | Physical Demands | | | | | | Environmental Conditions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | R | M | L | S | P | Q | K | F | M | E | C | 1 | 2 | 3 | 4 | 5 | 6 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 318.687-010 | Kitchen Helper | 85.02 | ESTJ | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | 1 | 2 | 2 | 2 | 2 | 2 | 3 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 0 |
| 613.685-010 | Coiler | 89.86 | ESTJ | 4 | Semi-Skilled | 2 | 1 | 1 | 3 | 3 | 1 | 3 | 3 | 3 | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 1 | 1 |
| 869.664-014 | Construction Worker I | 112.55 | ESTJ | 4 | Semi-Skilled | 3 | 3 | 2 | 3 | 2 | 3 | 3 | 3 | 3 | 2 | 2 | 4 | 1 | 1 | 1 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 1 | 1 |
| 869.687-026 | Construction Worker II | 90.01 | ESTJ | 2 | Unskilled | 2 | 1 | 1 | 2 | 1 | 2 | 2 | 2 | 3 | 2 | 1 | 5 | 0 | 1 | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 1 | 1 | 0 |
| 922.687-058 | Laborer, Stores | 84.88 | ESTJ | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

Javier Tapia

Sunday, February 4, 2024

# MTSP - Report 8
## Job Matches by Transferable Skills (TS) - Job Demands

Job Profile Report 8: Job Matches by Transferable Skills (TS) - Job Demands

| Dot Code | Job Title | TS | VQ | VIPR | VA | SVP | Skill Level | GED R | GED M | GED L | Apt S | Apt P | Apt Q | Apt K | Apt F | Apt M | Apt E | Apt C | PD 1 | PD 2 | PD 3 | PD 4 | PD 5 | PD 6 | EC 1 | EC 2 | EC 3 | EC 4 | EC 5 | EC 6 | EC 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 589.687-022 | Fabric-Lay-Out Worker | 63% | 86.77 | ESTP | 43% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 922.137-026 | Warehouse Traffic Supervisor | 60% | 96.73 | ESTJ | 14% | 5 | Semi-Skilled | 3 | 2 | 2 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 0 |
| 921.685-062 | Stacker Tender | 40% | 85.81 | ISFJ | 30% | 3 | Semi-Skilled | 2 | 1 | 1 | 3 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 921.685-054 | Sorter Operator | 40% | 92.49 | ESTJ | 23% | 4 | Semi-Skilled | 2 | 1 | 1 | 3 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 0 |
| 616.682-026 | Kick-Press Operator I | 40% | 99.91 | ESTJ | 30% | 4 | Semi-Skilled | 3 | 2 | 2 | 3 | # | # | # | 3 | 3 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 780.682-018 | Upholstery Sewer | 23% | 101.77 | ISFP | 29% | 3 | Semi-Skilled | 3 | 2 | 2 | 3 | # | # | # | 3 | 3 | 2 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 209.667-014 | Order Caller | 23% | 86.53 | ESFP | 20% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 372.667-010 | Airline Security Representative | 20% | 90.56 | ESTJ | 32% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 319.484-010 | Food Assembler, Kitchen | 20% | 91.20 | ESFP | 40% | 3 | Semi-Skilled | 2 | 2 | 1 | 2 | # | # | # | 3 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 349.673-010 | Drive-in Theater Attendant | 20% | 88.00 | ESFJ | 37% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 311.477-030 | Waiter/Waitress, Informal | 20% | 97.58 | ESFP | 35% | 3 | Semi-Skilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 3 | 2 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 376.667-010 | Bouncer | 20% | 85.00 | ISTP | 32% | 3 | Semi-Skilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 2 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 352.677-018 | Waiter/Waitress, Club | 20% | 91.29 | ESFP | 35% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 2 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 350.677-030 | Waiter/Waitress | 20% | 96.81 | ESFP | 35% | 3 | Semi-Skilled | 3 | 1 | 2 | 2 | # | # | # | 2 | 3 | 2 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 349.677-014 | Coach Driver | 20% | 87.16 | ESFJ | 35% | 3 | Semi-Skilled | 3 | 1 | 1 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 311.477-026 | Waiter/Waitress, Formal | 20% | 102.44 | ESFP | 35% | 4 | Semi-Skilled | 3 | 2 | 2 | 2 | # | # | # | 3 | 3 | 2 | 2 | 2 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 344.667-010 | Ticket Taker | 20% | 87.96 | ESFJ | 37% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 2 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 379.364-010 | Automobile Tester | 20% | 97.09 | ESFP | 25% | 4 | Semi-Skilled | 3 | 2 | 2 | 3 | # | # | # | 3 | 3 | 2 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 319.677-010 | Caterer Helper | 20% | 99.19 | ESTJ | 40% | 3 | Semi-Skilled | 3 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 305.281-010 | Cook | 20% | 94.84 | ESTJ | 43% | 6 | Skilled | 3 | 2 | 2 | 2 | # | # | # | 3 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 319.474-010 | Fountain Server | 20% | 90.67 | INTP | 36% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 319.464-014 | Vending-Machine Attendant | 20% | 87.76 | ESFP | 39% | 2 | Unskilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |

Column group headers: GED (R M L); Aptitudes (S P Q K F M E C); Physical Demands (1 2 3 4 5 6); Environmental Conditions (1 2 3 4 5 6 7)

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

Javier Tapia

**Job Profile Report 8: Job Matches by Transferable Skills (TS) - Job Demands**

Sunday, February 4, 2024

| Dot Code | Job Title | TS | VQ | VIPR | VA | SVP | Skill Level | GED R | GED M | GED L | Apt S | Apt P | Apt Q | Apt K | Apt F | Apt M | Apt E | Apt C | PD 1 | PD 2 | PD 3 | PD 4 | PD 5 | PD 6 | EC 1 | EC 2 | EC 3 | EC 4 | EC 5 | EC 6 | EC 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 316.684-014 | Deli Cutter-Slicer | 20% | 91.20 | ESTJ | 40% | 2 | Unskilled | 2 | 2 | 1 | 2 | # | # | # | 3 | 3 | 1 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 316.661-010 | Carver | 20% | 96.49 | ESTJ | 40% | 4 | Semi-Skilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 313.374-014 | Cook, Short Order | 20% | 99.69 | ESTJ | 36% | 3 | Semi-Skilled | 3 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| 312.477-010 | Bar Attendant | 20% | 90.87 | ESFP | 35% | 2 | Unskilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 311.674-018 | Waiter/Waitress, Buffet | 20% | 90.73 | ESFP | 35% | 3 | Semi-Skilled | 2 | 2 | 1 | 2 | # | # | # | 3 | 3 | 1 | 2 | 2 | 0 | 1 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 705.687-018 | Metal Sander and Finisher | 20% | 85.60 | ISFP | 39% | 3 | Semi-Skilled | 2 | 1 | 1 | 2 | # | # | # | 3 | 3 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 207.685-014 | Photocopying-Machine Operator | 20% | 85.92 | ISFP | 37% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 311.477-014 | Counter Attendant, Lunchroom or Co | 20% | 92.07 | ESFP | 33% | 2 | Unskilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 3 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 774.684-022 | Handler | 20% | 95.67 | ISFP | 33% | 5 | Semi-Skilled | 3 | 1 | 1 | 3 | # | # | # | 3 | 3 | 1 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 737.687-046 | Explosive Operator II | 20% | 85.82 | ISFP | 33% | 2 | Unskilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 727.687-054 | Final Inspector | 20% | 86.16 | ESTJ | 23% | 2 | Unskilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 309.674-014 | Personal Attendant | 20% | 89.00 | ESTP | 43% | 3 | Semi-Skilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 3 | 2 | 2 | 2 | 0 | 1 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 710.381-010 | Assembler II | 20% | 100.37 | ISFP | 24% | 3 | Semi-Skilled | 3 | 2 | 2 | 3 | # | # | # | 3 | 3 | 1 | 2 | 2 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 311.677-014 | Counter Attendant, Cafeteria | 20% | 90.23 | ESFP | 36% | 3 | Semi-Skilled | 2 | 1 | 2 | 2 | # | # | # | 3 | 3 | 1 | 1 | 2 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 704.682-010 | Engraver, Machine I | 20% | 94.84 | ISFP | 32% | 3 | Semi-Skilled | 3 | 2 | 2 | 2 | # | # | # | 3 | 3 | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 669.137-010 | Supervisor, Wood-Crew | 20% | 99.29 | ESFP | 13% | 6 | Skilled | 3 | 2 | 2 | 2 | # | # | # | 3 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 653.667-010 | Inspector, Publications | 20% | 97.82 | ESTJ | 23% | 5 | Semi-Skilled | 3 | 1 | 2 | 3 | # | # | # | 3 | 3 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 1 |
| 299.364-014 | Gift Wrapper | 20% | 97.93 | ESFP | 24% | 3 | Semi-Skilled | 3 | 2 | 1 | 3 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 590.684-042 | Integrated Circuit Fabricator | 20% | 98.72 | ESTJ | 26% | 3 | Semi-Skilled | 3 | 2 | 2 | 2 | # | # | # | 3 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 418.677-010 | Dog Bather | 20% | 102.14 | ISFP | 33% | 2 | Unskilled | 3 | 2 | 1 | 2 | # | # | # | 3 | 3 | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 311.477-018 | Waiter/Waitress, Bar | 20% | 101.87 | ESFP | 35% | 3 | Semi-Skilled | 3 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 230.687-010 | Advertising-Material Distributor | 6% | 80.13 | ESTJ | 43% | 2 | Unskilled | 1 | 1 | 1 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 323.687-014 | Cleaner, Housekeeping | 3% | 75.07 | ESFJ | 40% | 2 | Unskilled | 1 | 1 | 1 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 0 |
| 922.687-042 | Cotton Sampler | 3% | 80.36 | ISFP | 33% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 762.687-014 | Box Inspector | 3% | 83.94 | ESTJ | 23% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

Javier Tapia

Sunday, February 4, 2024

## Job Profile Report 8: Job Matches by Transferable Skills (TS) - Job Demands

| Dot Code | Job Title | TS | VQ | VIPR | VA | SVP | Skill Level | GED | | | Aptitudes | | | | | | | | Physical Demands | | | | | | Environmental Conditions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | R | M | L | S | P | Q | K | F | M | E | C | 1 | 2 | 3 | 4 | 5 | 6 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 369.687-018 | Folder | 3% | 80.41 | ESTJ | 43% | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | # | # | 2 | 2 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 |
| 358.677-018 | Rest Room Attendant | 3% | 76.16 | ISFP | 38% | 2 | Unskilled | 2 | 1 | 1 | 1 | 1 | # | # | 2 | 2 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 230.663-010 | Deliverer, Outside | 0% | 84.86 | ISFP | 38% | 2 | Unskilled | 2 | 1 | 2 | 2 | 2 | # | # | 2 | 2 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 311.677-010 | Cafeteria Attendant | 0% | 81.94 | ESTJ | 42% | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | # | # | 2 | 2 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 339.687-010 | Supply Clerk | 0% | 84.21 | ISFP | 36% | 3 | Semi-Skilled | 2 | 2 | 1 | 2 | 2 | # | # | 2 | 2 | 2 | 2 | 2 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 159.647-014 | Extra | 0% | 82.04 | ENFJ | 36% | 2 | Unskilled | 2 | 2 | 2 | 2 | 2 | # | # | 2 | 2 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 363.685-026 | Shirt Presser | 0% | 81.61 | ESTJ | 30% | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | # | # | 2 | 3 | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 |
| 405.687-010 | Flower Picker | 0% | 79.44 | ISFP | 45% | 1 | Unskilled | 1 | 1 | 1 | 2 | 2 | # | # | 2 | 3 | 3 | 2 | 2 | 0 | 1 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 1 | 0 |
| 556.685-038 | Injection-Molding-Machine Tender | 0% | 79.83 | ESTJ | 27% | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | # | # | 2 | 2 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 603.685-050 | Deburrer | 0% | 82.52 | ESTJ | 32% | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | # | # | 2 | 3 | 3 | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 713.684-014 | Assembler, Molded Frames | 0% | 83.60 | ISFP | 33% | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | # | # | 3 | 2 | 3 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 794.687-054 | Stringer | 0% | 75.84 | ISFP | 39% | 1 | Unskilled | 1 | 1 | 1 | 1 | 1 | # | # | 3 | 3 | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 794.687-058 | Tabber | 0% | 75.42 | ISFP | 39% | 1 | Unskilled | 1 | 1 | 1 | 2 | 2 | # | # | 3 | 3 | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 915.667-014 | Parking Lot Signaler | 0% | 84.69 | ESTJ | 38% | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | # | # | 2 | 2 | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 3 | 0 | 0 | 1 | 0 | 0 | 0 |
| 920.685-066 | Labeling-Machine Operator | 0% | 83.74 | ESTJ | 32% | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | # | # | 2 | 3 | 3 | 1 | 2 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| 920.687-170 | Shot Bagger | 0% | 80.53 | ESTJ | 38% | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | # | # | 2 | 3 | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 363.685-010 | Press Operator | 0% | 81.41 | ESTJ | 30% | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | # | # | 2 | 3 | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

# MTSP - Report 10
## Job Matches by Transferable Skills (TS) - Present Value Earning Capacity

Javier Tapia

Sunday, February 4, 2024

Report 10: Job Matches by Transferable Skills-Present Value Earning Capacity

Note: See JOFV Table 4a, for EC Rxy, SEe and Confidence Intervals.

| Dot Code | Job Title | TS | VQ | SVP | VA | VIPR | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 159.647-014 | Extra | 0% | 82.04 | 2 | 36% | ENFJ | $9.87 | $6.00 | $7.20 | $9.10 | $11.79 | $15.17 |
| 207.685-014 | Photocopying-Machine Operator | 20% | 85.92 | 2 | 37% | ISFP | $10.13 | $6.10 | $7.36 | $9.34 | $12.13 | $15.59 |
| 209.667-014 | Order Caller | 23% | 86.53 | 2 | 20% | ESFP | $10.17 | $6.12 | $7.39 | $9.38 | $12.19 | $15.66 |
| 230.663-010 | Deliverer, Outside | 0% | 84.86 | 2 | 38% | ISFP | $10.06 | $6.07 | $7.32 | $9.28 | $12.04 | $15.48 |
| 230.687-010 | Advertising-Material Distributor | 6% | 80.13 | 2 | 43% | ESTJ | $9.75 | $5.95 | $7.12 | $8.98 | $11.62 | $14.96 |
| 299.364-014 | Gift Wrapper | 20% | 97.93 | 3 | 24% | ISFP | $10.92 | $6.41 | $7.87 | $10.10 | $13.19 | $16.90 |
| 305.281-010 | Cook | 20% | 94.84 | 6 | 43% | ESTJ | $10.72 | $6.33 | $7.74 | $9.90 | $12.92 | $16.57 |
| 309.674-014 | Personal Attendant | 20% | 89.00 | 3 | 43% | ESTP | $10.33 | $6.18 | $7.49 | $9.54 | $12.41 | $15.93 |
| 311.477-014 | Counter Attendant, Lunchroom or Coffee | 20% | 92.07 | 2 | 36% | ESFP | $10.53 | $6.26 | $7.62 | $9.73 | $12.68 | $16.26 |
| 311.477-018 | Waiter/Waitress, Bar | 20% | 101.87 | 3 | 35% | ESFP | $11.83 | $6.86 | $8.49 | $10.94 | $14.29 | $18.39 |
| 311.477-026 | Waiter/Waitress, Formal | 20% | 102.44 | 4 | 35% | ESFP | $12.10 | $6.98 | $8.66 | $11.19 | $14.63 | $18.85 |
| 311.477-030 | Waiter/Waitress, Informal | 20% | 97.58 | 3 | 35% | ESFP | $10.90 | $6.40 | $7.86 | $10.08 | $13.16 | $16.87 |
| 311.674-018 | Waiter/Waitress, Buffet | 20% | 90.73 | 3 | 35% | ESFP | $10.45 | $6.23 | $7.57 | $9.65 | $12.56 | $16.12 |
| 311.677-010 | Cafeteria Attendant | 0% | 81.94 | 2 | 42% | ESTJ | $9.87 | $6.00 | $7.20 | $9.09 | $11.78 | $15.16 |
| 311.677-014 | Counter Attendant, Cafeteria | 20% | 90.23 | 3 | 36% | ESFP | $10.41 | $6.21 | $7.55 | $9.61 | $12.51 | $16.06 |
| 312.477-010 | Bar Attendant | 20% | 90.87 | 2 | 35% | ESFP | $10.46 | $6.23 | $7.57 | $9.65 | $12.57 | $16.13 |
| 313.374-014 | Cook, Short Order | 20% | 99.69 | 3 | 36% | ESTJ | $11.04 | $6.46 | $7.95 | $10.21 | $13.35 | $17.10 |
| 316.661-010 | Carver | 20% | 96.49 | 4 | 40% | ESTJ | $10.82 | $6.38 | $7.81 | $10.01 | $13.07 | $16.75 |
| 316.684-014 | Deli Cutter-Slicer | 20% | 91.20 | 2 | 40% | ESTJ | $10.48 | $6.24 | $7.59 | $9.68 | $12.60 | $16.17 |
| 319.464-014 | Vending-Machine Attendant | 20% | 87.76 | 2 | 39% | ESFP | $10.25 | $6.15 | $7.44 | $9.46 | $12.30 | $15.79 |
| 319.474-010 | Fountain Server | 20% | 90.67 | 2 | 36% | INTP | $10.44 | $6.22 | $7.56 | $9.64 | $12.55 | $16.11 |
| 319.484-010 | Food Assembler, Kitchen | 20% | 91.20 | 3 | 40% | ESFP | $10.48 | $6.24 | $7.59 | $9.68 | $12.60 | $16.17 |
| 319.677-010 | Caterer Helper | 20% | 99.19 | 3 | 40% | ESTJ | $11.00 | $6.45 | $7.92 | $10.18 | $13.30 | $17.04 |
| 323.687-014 | Cleaner, Housekeeping | 3% | 75.07 | 2 | 40% | ESFJ | $9.42 | $5.82 | $6.91 | $8.66 | $11.18 | $14.41 |
| 339.687-010 | Supply Clerk | 0% | 84.21 | 3 | 36% | ISFP | $10.02 | $6.06 | $7.29 | $9.23 | $11.98 | $15.41 |
| 344.667-010 | Ticket Taker | 20% | 87.96 | 2 | 37% | ESFJ | $10.26 | $6.15 | $7.45 | $9.47 | $12.31 | $15.81 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

Javier Tapia

Sunday, February 4, 2024

**Report 10: Job Matches by Transferable Skills-Present Value Earning Capacity**

Note: See JOFV Table 4a, for EC Rxy, SEe and Confidence Intervals.

| Dot Code | Job Title | TS | VQ | SVP | VA | VIPR | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 349.673-010 | Drive-in Theater Attendant | 20% | 88.00 | 2 | 37% | ESFJ | $10.27 | $6.15 | $7.45 | $9.47 | $12.32 | $15.82 |
| 349.677-014 | Coach Driver | 20% | 87.16 | 3 | 35% | ESFJ | $10.21 | $6.13 | $7.42 | $9.42 | $12.24 | $15.73 |
| 350.677-030 | Waiter/Waitress | 20% | 96.81 | 3 | 35% | ESFP | $10.85 | $6.38 | $7.82 | $10.03 | $13.09 | $16.78 |
| 352.677-018 | Waiter/Waitress, Club | 20% | 91.29 | 2 | 35% | ESFP | $10.48 | $6.24 | $7.59 | $9.68 | $12.61 | $16.18 |
| 358.677-018 | Rest Room Attendant | 3% | 76.16 | 2 | 38% | ISFP | $9.49 | $5.85 | $6.95 | $8.73 | $11.27 | $14.53 |
| 363.685-010 | Press Operator | 0% | 81.41 | 2 | 30% | ISFP | $9.83 | $5.98 | $7.17 | $9.06 | $11.74 | $15.10 |
| 363.685-026 | Shirt Presser | 0% | 81.61 | 2 | 30% | ESTJ | $9.85 | $5.99 | $7.18 | $9.07 | $11.75 | $15.12 |
| 369.687-018 | Folder | 3% | 80.41 | 2 | 43% | ESTJ | $9.77 | $5.96 | $7.13 | $8.99 | $11.65 | $14.99 |
| 372.667-010 | Airline Security Representative | 20% | 90.56 | 2 | 32% | ESTJ | $10.43 | $6.22 | $7.56 | $9.63 | $12.54 | $16.10 |
| 376.667-010 | Bouncer | 20% | 85.00 | 3 | 32% | ISTP | $10.07 | $6.08 | $7.32 | $9.28 | $12.05 | $15.49 |
| 379.364-010 | Automobile Tester | 20% | 97.09 | 4 | 25% | ESFP | $10.86 | $6.39 | $7.84 | $10.05 | $13.12 | $16.81 |
| 405.687-010 | Flower Picker | 0% | 79.44 | 1 | 45% | ISFP | $9.70 | $5.93 | $7.09 | $8.93 | $11.56 | $14.88 |
| 418.677-010 | Dog Bather | 20% | 102.14 | 2 | 33% | ISFP | $11.96 | $6.92 | $8.57 | $11.06 | $14.45 | $18.61 |
| 556.685-038 | Injection-Molding-Machine Tender | 0% | 79.83 | 2 | 27% | ESTJ | $9.73 | $5.94 | $7.11 | $8.96 | $11.60 | $14.93 |
| 589.687-022 | Fabric-Lay-Out Worker | 63% | 86.77 | 2 | 43% | ESTP | $10.19 | $6.12 | $7.40 | $9.40 | $12.21 | $15.68 |
| 590.684-042 | Integrated Circuit Fabricator | 20% | 98.72 | 3 | 26% | ESTJ | $10.97 | $6.43 | $7.90 | $10.15 | $13.26 | $16.99 |
| 603.685-050 | Deburrer | 0% | 82.52 | 2 | 32% | ESTJ | $9.91 | $6.01 | $7.22 | $9.13 | $11.83 | $15.22 |
| 616.682-026 | Kick-Press Operator I | 40% | 99.91 | 4 | 30% | ISFP | $11.05 | $6.46 | $7.95 | $10.22 | $13.37 | $17.12 |
| 653.667-010 | Inspector, Publications | 20% | 97.82 | 5 | 23% | ESTJ | $10.91 | $6.41 | $7.87 | $10.09 | $13.18 | $16.89 |
| 669.137-010 | Supervisor, Wood-Crew | 20% | 99.29 | 6 | 13% | ESFP | $11.01 | $6.45 | $7.93 | $10.19 | $13.31 | $17.05 |
| 704.682-010 | Engraver, Machine I | 20% | 94.84 | 3 | 32% | ISFP | $10.72 | $6.33 | $7.74 | $9.90 | $12.92 | $16.57 |
| 705.687-018 | Metal Sander and Finisher | 20% | 85.60 | 3 | 39% | ISFP | $10.11 | $6.09 | $7.35 | $9.32 | $12.11 | $15.56 |
| 710.381-010 | Assembler II | 20% | 100.37 | 5 | 24% | ISFP | $11.12 | $6.55 | $8.03 | $10.27 | $13.39 | $17.15 |
| 713.684-014 | Assembler, Molded Frames | 0% | 83.60 | 2 | 33% | ISFP | $9.98 | $6.04 | $7.27 | $9.20 | $11.93 | $15.34 |
| 727.687-054 | Final Inspector | 20% | 86.16 | 2 | 23% | ESTJ | $10.15 | $6.11 | $7.37 | $9.36 | $12.15 | $15.62 |
| 737.687-046 | Explosive Operator II | 20% | 85.82 | 2 | 33% | ISFP | $10.12 | $6.10 | $7.36 | $9.34 | $12.12 | $15.58 |
| 762.687-014 | Box Inspector | 3% | 83.94 | 2 | 23% | ESTJ | $10.00 | $6.05 | $7.28 | $9.22 | $11.96 | $15.38 |
| 774.684-022 | Handler | 20% | 95.67 | 5 | 33% | ISFP | $10.77 | $6.35 | $7.78 | $9.96 | $12.99 | $16.66 |
| 780.682-018 | Upholstery Sewer | 23% | 101.77 | 4 | 29% | ISFP | $11.78 | $6.84 | $8.46 | $10.89 | $14.23 | $18.30 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

Javier Tapia

**Report 10 : Job Matches by Transferable Skills-Present Value Earning Capacity**

Sunday, February 4, 2024

Note: See JOFV Table 4a, for EC' Rxy, SEe and Confidence Intervals.

| Dot Code | Job Title | TS | VQ | SVP | VA | VIPR | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile |
|----------|-----------|-----|-------|-----|-----|------|-------|----------|----------|----------|----------|----------|
| 794.687-054 | Stringer | 0% | 75.84 | 1 | 39% | ISFP | $9.47 | $5.84 | $6.94 | $8.71 | $11.24 | $14.49 |
| 794.687-058 | Tabber | 0% | 75.42 | 1 | 39% | ISFP | $9.44 | $5.83 | $6.92 | $8.68 | $11.21 | $14.44 |
| 915.667-014 | Parking Lot Signaler | 0% | 84.69 | 2 | 38% | ESTJ | $10.05 | $6.07 | $7.31 | $9.27 | $12.03 | $15.46 |
| 920.685-066 | Labeling-Machine Operator | 0% | 83.74 | 2 | 32% | ESTJ | $9.99 | $6.04 | $7.27 | $9.21 | $11.94 | $15.35 |
| 920.687-170 | Shot Bagger | 0% | 80.53 | 2 | 38% | ESTJ | $9.78 | $5.96 | $7.14 | $9.00 | $11.66 | $15.00 |
| 921.685-054 | Sorter Operator | 40% | 92.49 | 4 | 23% | ESTJ | $10.56 | $6.27 | $7.64 | $9.76 | $12.71 | $16.31 |
| 921.685-062 | Stacker Tender | 40% | 85.81 | 3 | 30% | ISFJ | $10.12 | $6.10 | $7.36 | $9.34 | $12.12 | $15.58 |
| 922.137-026 | Warehouse Traffic Supervisor | 60% | 96.73 | 5 | 14% | ESTJ | $10.84 | $6.38 | $7.82 | $10.02 | $13.09 | $16.77 |
| 922.687-042 | Cotton Sampler | 3% | 80.36 | 2 | 33% | ISFP | $9.76 | $5.96 | $7.13 | $8.99 | $11.64 | $14.98 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

## Timothy Andenmatten
### MEd, CRC, CVE, IPEC

**BIOGRAPHY**



**Mr. Timothy Andenmatten** is a Certified Rehabilitation Counselor, and a Certified Vocational Evaluation Specialist who has provided Vocational Assessment and Rehabilitation Services since 2006.

Mr. Andenmatten has numerous years of vocational rehabilitation counseling experience specializing in Long Term Disability with specific knowledge of Own Occupation Analyses, Transferable Skills Analyses, and Vocational Rehabilitation Services including ADA Accommodations.

Mr. Andenmatten is the Founder of Greylock Placement Services, and his professional career includes numerous appointments at institutions including: VRS Disability Management and Massachusetts Rehabilitation Commission.

Mr. Andenmatten professional associations include the American Board of Vocational Experts, and the International Association of Rehabilitation Professionals.

Mr. Andenmatten earned a Master of Education in Rehabilitation Counseling from Springfield College in Massachusetts, and a Bachelor of Science in Plant and Soil Science from the University of Massachusetts in Amherst.



12707 Silicon Drive
Suite 150
San Antonio, Texas 78249
Phone: (210) 501-0995
email: info@PhysicianLCP.com

## Timothy Andenmatten
**MEd, CRC, CVE, IPEC**

# Curriculum Vitae



## Specialties

- Vocational & Occupational Assessment

- Certified Rehabilitation Counselor

- Certified Vocational Evaluation Specialist

- International Psychometric Evaluation Certification

## Educational Background

Springfield College
Springfield, Massachusetts
Degree: Master of Education, Rehabilitation Counseling
Awarded: 2006

University of Massachusetts, Amherst
Amherst, Massachusetts
Degree: Bachelor of Science, Plant & Soil Science
Awarded: 2002

## Accreditations

Commission on Rehabilitation Counselor Certification
Certified Vocational Evaluation
Status: Active
Issued: 2021

American Board of Vocational Experts
International Psychometric Evaluation Certification
Status: Active
Issued: 2021

Commission on Rehabilitation Counselor Certification
Certified Rehabilitation Counselor
Status: Active
Issued: 2006



**Physician** Life Care Planning™
America's Leading Life Care Planner

12707 Silicon Drive
Suite 150
San Antonio, Texas 78249
Phone: (210) 501-0995
email: info@PhysicianLCP.com

**Timothy Andenmatten**
MEd, CRC, CVE, IPEC

# CURRICULUM VITAE

# PROFESSIONAL EXPERIENCE

Physician Life Care Planning, LLC
Associate Expert
San Antonio, Texas
2023 - Present

Greylock Placement Services, LLC
Founder
Williamstown, Massachusetts
2019 - Present

VRS Disability Management
Vocational Rehabilitation Counselor
Waterbury Center, Vermont
2021 - 2022

Sun Life
Vocational Rehabilitation Counselor
Wellesley Hills, Massachusetts
2018 - 2021

Massachusetts Rehabilitation Commission
District Supervisor
Boston, Massachusetts
2015 - 2018

Massachusetts Rehabilitation Commission
Senior Vocational Rehabilitation Counselor
Boston, Massachusetts
2012 - 2015

MetLife
Vocational Rehabilitation Consultant
New York, New York
2011 - 2012

Massachusetts Rehabilitation Commission
Job Placement Specialist
Boston, Massachusetts
2010

Unum
Vocational Rehabilitation Consultant
Boston, Massachusetts
2006 - 2009

# PROFESSIONAL ASSOCIATIONS

- American Board of Vocational Experts
- International Association of Rehabilitation Professionals

**Depositions by Timothy R. Andenmatten, MEd, CRC, CVE, IPEC**

| Date | First Name | Last Name | Type | Lawyer/ Firm | Counter Party | Style | Cause # | Court # |
|------|-----------|-----------|------|--------------|---------------|-------|---------|---------|
| 10/13/2021 | Tony | Barnett | Defense | Maynard Cooper | Sun Life Assurance Company of Canada | Deposition (Remote) | Civil Action No. 3:20-cv-01879-LCB | District Court for the Northern District of Alabama; |
| 10/27/2023 | Aime | Montero | Plaintiff | DC Law | United Services Automobile Association | Deposition (Remote) | 22-0751-C368 | 368th Judicial District, Williamson County, TX |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Court Appearances/Trials by Timothy R. Andenmatten, MEd, CRC, CVE, IPEC**

| Date | First Name | Last Name | Type | Law Firm | Counter Party | Location | Docket No. |
|------|-----------|-----------|------|----------|---------------|----------|-----------|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |



**RETENTION AGREEMENT**

This Retention Agreement ("Agreement") defines the terms that shall govern this engagement between You and Us, and which pertains to Mr. Javier Tapia.

**PRODUCTS**

**Life Care Planning**

- Life Care Plans (includes interview and examination)      $10,950

- Catastrophic Life Care Plans (includes interview and examination)      $15,950

- Counter-Party Life Care Plan Reviews & Analyses      $750/hour (8 hr. min)

- Record Review with/without Narrative      $750/hour (5 hr. min)

- Narratives, Updates, Amendments, and Supplemental Assessments      $750/hour (3 hr. min)

While we make a good faith effort at the beginning of an engagement to anticipate the correct classification of the type of life care plan your case will require, the final classification of a life care plan (Life Care Plan vs. Catastrophic Life Care Plan) shall ultimately be determined at the sole discretion of the physician life care planner in this engagement.

**Vocational / Loss-of-Earnings-Capacity Assessments**

- Vocational/Loss of Earnings Capacity Assessments      $5,250

- Narratives, Updates, Amendments, Supplemental Assessments      $575/hour (3 hr. min)

**Financial & Economic Assessments**

- Present Value Assessments of Life Care Plans      $3,250

- Present Value Assessments of Catastrophic Life Care Plans      $3,750

- Present Value Loss of Earnings Assessments      $5,250

- Present Value Loss of Household Services Assessments      $575/hour (6 hr. min)

- Updates, Amendments, Supplemental Assessments      $575/hour (3 hr. min)

**Record Analyses**

- Past Medical Care Assessment      $750/hour (2 hr. min)
  (Assessment of the medical necessity of past medical care)

- Narratives, Updates, Amendments, Supplemental Assessments      $750/hour (3 hr. min)

Copyright © 2023 – Physician Life Care Planning, LLC      1
All Rights Reserved

**Expert Designation:** In the event You wish to designate an expert, prior to ordering a Product(s), you shall be charged $3,500 per expert on a non-refundable basis. Payment for such charges are due upon receipt of invoice. If at a later date, you choose to have the designated expert(s) produce assessments associated with this case, then 50% of each expert-specific non-refundable retainer shall be applied towards the cost of each expert-specific assessment(s).

**Standard Delivery** for Products is typically 8 weeks (subject to scheduling availability). Add 2 weeks additional lead-time for each additional product. Standard lead times for Narratives, Updates, Amendments, and Supplemental Assessments are 6 weeks (subject to scheduling availability). Add 1 week of additional lead-time for each additional product.

**Expedite Delivery Available** (subject to scheduling availability)

| | |
|---|---|
| Level 1 Expedite (per product) | $ 2,500 |
| Level 2 Expedite (per product) | $ 3,000 |
| Level 3 Expedite (per product) | $ 3,500 |
| Level 4 Expedite (per product) | $ 4,500 |

**Delivery Schedule**

| Number of Products | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Standard Delivery | ≥ 8 weeks | ≥ 10 weeks | ≥ 12 weeks | ≥ 14 weeks | ≥ 16 weeks | ≥ 18 weeks |
| Level 1 Expedite | < 8 weeks | < 10 weeks | < 12 weeks | < 14 weeks | < 16 weeks | < 18 weeks |
| Level 2 Expedite | ≤ 6 weeks | ≤ 8 weeks | ≤ 10 weeks | ≤ 12 weeks | ≤ 14 weeks | ≤ 16 weeks |
| Level 3 Expedite | ≤ 4 weeks | ≤ 6 weeks | ≤ 8 weeks | ≤ 10 weeks | ≤ 12 weeks | ≤ 14 weeks |
| Level 4 Expedite | ≤ 2 weeks | ≤ 4 weeks | ≤ 6 weeks | ≤ 8 weeks | ≤ 10 weeks | ≤ 12 weeks |

**Corresponding Expedite Charges**

| Number of Products | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Standard Delivery | $ - | $ - | $ - | $ - | $ - | $ - |
| Level 1 Expedite | $ 2,500 | $ 5,000 | $ 7,500 | $ 10,000 | $ 12,500 | $ 15,000 |
| Level 2 Expedite | $ 3,000 | $ 6,000 | $ 9,000 | $ 12,000 | $ 15,000 | $ 18,000 |
| Level 3 Expedite | $ 3,500 | $ 7,000 | $ 10,500 | $ 14,000 | $ 17,500 | $ 21,000 |
| Level 4 Expedite | $ 4,500 | $ 9,000 | $ 13,500 | $ 18,000 | $ 22,500 | $ 27,000 |

Expedite delivery of Narratives, Updates, Amendments, and Supplemental Assessments = a Level 1 Expedite when requested in less than 6 weeks, a Level 2 Expedite when requested in less than 4 weeks, a Level 3 Expedite when requested in less than 2 weeks, and a Level 4 Expedite when requested in less than 1 week.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**SERVICES**

**Life Care Planning**

- In-office Life Care Plan Interviews and Examinations          $1,500

- Sworn Testimonies/Court Appearance          $4,250/½ day + travel + expenses

- Sworn Testimonies/Court Appearance          $8,500/day + travel + expenses

- Travel (half day/full day (10-hour max))          $3,750/$7,500 + expenses

- Additional Time in Testimony          $850/hour

- Additional Travel          $750/hour + expenses

- Preparation Time, Meetings, Conferences, etc.          $750/hour ($187.50/15 mins.)

**Vocational**

- In-office Vocational Examination          $575/hour (2 hr. min.)

- Sworn Testimonies/Court Appearance          $3,000/½ day + travel + expenses

- Sworn Testimonies/Court Appearance          $6,000/day + travel + expenses

- Travel (half day/full day (10-hour max))          $2,750/$5,500 + expenses

- Additional Time in Testimony          $600/hour

- Additional Travel          $575/hour + expenses

- Preparation Time, Meetings, Conferences, etc.          $575/hour ($143.75/15 mins.)

**Financial & Economic**

- Sworn Testimonies/Court Appearance          $3,000/½ day + travel + expenses

- Sworn Testimonies/Court Appearance          $6,000/day + travel + expenses

- Travel (half day/full day (10-hour max))          $2,750/$5,500 + expenses

- Additional Time in Testimony          $600/hour

- Additional Travel          $575/hour + expenses

- Preparation Time, Meetings, Conferences, etc.          $575/hour ($143.75/15 mins.)

**Record Analyses**

- Sworn Testimonies/Court Appearance          $4,250/½ day + travel + expenses

- Sworn Testimonies/Court Appearance          $8,500/day + travel + expenses

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

- Travel (half day/full day (10-hour max))          $3,750/$7,500 + expenses

- Additional Time in Testimony                       $850/hour

- Additional Travel                                  $750/hour + expenses

- Preparation Time, Meetings, Conferences, etc.      $750/hour ($187.50/15 mins.)

**TERMS**

**Products**: An initial non-refundable retainer of 50% of the professional fee is due upon the commencement of the engagement. The initial retainer must be received before we can assure our availability. The remaining 50% of the professional fee, and any reimbursable expenses are payable prior to the release of any product. All expedite fees [if any] are payable in full upon initial invoice. Products billed on an hourly basis, e.g. Narratives, Updates, Amendments, Supplements, or those Products billed on an hourly basis, are payable in full upon invoice.

**Life Care Plans vs. Catastrophic Life Care Plans**: The guiding principle in determining whether a life care plan, for the purposes of this engagement, is classified as a Life Care Plan, or as a Catastrophic Life Care Plan, is the subject's current, and/or anticipated loss of capacity to perform basic activities of daily living (basic ADLs). While we make a good faith effort at the beginning of an engagement to anticipate the correct classification of the type of life care plan your case will require, the final classification of a life care plan (Life Care Plan vs. Catastrophic Life Care Plan) shall ultimately be determined at the sole discretion of the physician life care planner assigned to your case.

**Present Value Assessments of 3rd Party Life Care Plans** are billed at $575/hour (8 hr. min).

**Record Submission Deadline, and Late/Additional Records:**

- IN ORDER TO GUARANTEE COMPLETION OF YOUR REPORT(S) BY FEBRUARY 12, 2024, ALL MEDICAL AND/OR OTHER RECORDS MUST BE SUBMITTED TO US BY JANUARY 01, 2024.

- Records submitted after January 01, 2024, and before the finalization of a life care plan's Diagnostic Conditions, shall affect a movement of the Product Delivery Deadline to a later date (to be determined subject to scheduling/availability) at no charge; or

- Records submitted after January 01, 2024, and after the finalization of a life care plan's Diagnostic Conditions, shall be incorporated into the life care plan at an hourly rate of $750 per hour, and the original deadline shall be maintained (subject to scheduling/availability).

In instances in which additional records are submitted after a life care plan has been completed:

- You can instruct Us to review the additional records and amend/supplement the existing report. Cost: $750/hr. (3 hr. min.). Completion date/deadline subject to availability.

- You can instruct Us to review the records, and standby for further instruction. Cost $750/hr.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

- Additional records which need to be reviewed prior to deposition or trial must be received ≥ 30 days prior to such deposition or trial to guarantee their review.

**Amended Deadlines**

In the event the deadline date(s) for the delivery of product(s) are amended for any reason, the parties to this Agreement (You and Us) shall memorialize the newly agreed upon deadline(s) with an Amended Deadline Addendum, which shall be signed by both parties, and which shall then supersede the Product Delivery Deadline specified in the Engagement Details provision of this Agreement.

**Services**: Payment for Services is due upon invoice.

<u>YOU ARE ULTIMATELY RESPONSIBLE FOR ALL PAYMENTS TO US, PURSUANT TO THE TERMS OF THIS AGREEMENT, REGARDLESS OF LOCAL CUSTOM AND/OR CIVIL PROCEDURE. UNDER NO CIRCUMSTANCE SHALL WE BE RESPONSIBLE FOR COLLECTING PAYMENT FROM ANY OPPOSING COUNSEL OR THIRD PARTY FOR ANY SERVICES.</u>

Payment for depositions and trials must be received within seven (7) calendar days of invoice in order to guarantee the reservation of an expert's time.

**Deposition Transcripts & Opposing Expert Reports:** Transcripts of depositions and opposing expert reports will be reviewed at the hourly rate of the relevant professional, e.g., $750 per hour for a life care planner, $575 per hour for a vocational specialist, financial analyst, economist, etc.

**Preparation Time for sworn testimonies** will be invoiced at the hourly rate of the relevant professional, e.g. $750 per hour for a life care planner, $575 per hour for a vocational specialist, financial analyst, economist, etc. Any/all billing for preparation time is payable by You regardless of local custom or civil procedure. Records which need to be reviewed prior to deposition or trial must be received ≥ 30 days prior to such deposition or trial to guarantee their review.

**Out of Office Interviews & Examinations** will be invoiced at the rate of the relevant professional, e.g. $1500 for a life care planner, $575 per hour for a vocational specialist, etc.

**Travel for Out of Office Interviews & Examinations:** Local transit for interviews & examinations will be billed at the hourly rate of the relevant professional, e.g. $750 per hour for a life care planner, $575 per hour for a vocational specialist, etc. Out of town travel for interviews & examinations will be billed on a full day/half day basis, according to this Agreement's Services fee schedule.

**Travel for Sworn Testimonies & Court Appearances:** Local transit for sworn testimonies and court appearances will be billed at the hourly rate of the relevant professional, e.g. $750 per hour for a life care planner, $575 per hour for a vocational specialist, etc. Out of town travel for sworn testimonies and court appearances will be billed on a full day/half day basis, according to this Agreement's Services fee schedule. Any/all billing for travel time is payable by You regardless of local custom or civil procedure.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**Stand-by Status:** You will be invoiced, pursuant to the terms of this Agreement, for any additional time associated with the placement of any Associate Physician or other expert, on stand-by status, whether such status is the result of a request made by You, or any request, verbal or written order, and/or demand of any judge, court, or other third party. Any/all billing for stand-by-status is payable by You regardless of local custom or civil procedure.

**Expenses:** You are responsible to reimburse Us for all out-of-pocket expenses; and all such expenses are payable upon invoice. Such expenses may include, but are not limited to airfare, accommodation, auto rental, tolls, parking, meals, printing, postage, etc. Any/all billing for expenses is payable by You regardless of local custom or civil procedure.

**Conference Rooms for Deposition** will be charged to You at cost. Payment for conference room charges is due upon invoice. Any/all billing for conference room for depositions is payable by You regardless of local custom or civil procedure.

**Scheduling for Depositions & Trials** requires more than four (4) weeks' notice for deposition, and more than six (6) weeks' notice for trials. Hold times for deposition and trial are no greater than 3 business days for confirmation.

Scheduling not performed within requisite lead times will affect a 25% increase in the billable rates for trial and deposition services.

Scheduling performed with less than six (6) business days will incur a 50% increase in the billable rates for trial and deposition services.

Scheduling performed within less than four (4) business days will incur a 100% increase in the billable rates for trial and deposition services.

*Note: In the unlikely event an expert is unexpectedly notified they must attend trial on a date on which they were previously scheduled to attend an unrelated deposition, the necessities of trial will take precedence over the previously scheduled deposition. These occurrences are rare. We sincerely appreciate your understanding, as we do our best to accommodate the pressing needs of all our clients. In such cases, every effort will be made to accommodate the previously scheduled party by rescheduling their deposition at a time which is most convenient for them.*

**Cancellations, Rescheduling & Missed Appointments**:

- No refunds will be issued for deposition or trial cancellations or rescheduling with less than eight (8) business days prior notice.

- No refunds will be issued for deposits on vocational evaluation appointments for cancellations or rescheduling with less than four (4) business days prior notice.

- No refunds will be issued for cancellation or rescheduling of a Life Care Plan Interview and Examination with less than four (4) business days prior notice. Interviews and examinations that are included with life care plans, and which are canceled or rescheduled with less than

four (4) business days prior notice will be forfeited, and any subsequent rescheduling will be billed at the cost of a Life Care Plan Interview and Examination, i.e. $1500.

**Late Payment:** Accounts not paid within the Terms specified herein are subject to a 2% monthly finance charge.

**Electronic Records:** All medical and/or other records are required to be submitted in electronic format. Records not submitted in electronic format will incur a $500 electronic conversion fee. Should You request physical records be returned to You, courier fees will be billed to You at cost

**Ownership:** Upon receipt of your full payment, we grant You a limited, non-exclusive, royalty-free right to reproduce and distribute the Life Care Plan, Vocational Assessment, Present Value Assessment, Record Analysis, etc. delivered to You under this Agreement, solely for use in connection with the matter for which the Product was originally developed. We retain all other rights in our Products.

**Non-solicitation:** You agree that during the term of this Agreement and for 24 months thereafter, you shall not: (i) solicit, directly or indirectly, any of our Associate Physicians and/or other Experts to reduce or terminate their relationship with us, or (ii) solicit any of our Associate Physicians and/or other Experts for employment or engagement as an independent contractor, subcontractor, and/or consultant, or employ or engage as an independent contractor, subcontractor, and/or consultant any of our Associate Physicians and/or other Experts.

**No Doctor/Patient Relationship:** You expressly recognize and agree that the services performed by Us will not give rise to a doctor/patient relationship between Us (and/or our Associate Physicians, and/or other Experts) and You (and/or your clients). The purpose of this Agreement is not to have Us render medical care or treatment, nor is the purpose of this Agreement to have Us render medical advice.

**HIPAA & Privacy:** Attorney and Firm, on behalf of their client(s), acknowledge that films, images, interpretation reports, medical records, lab reports, itemized billing statements, confidential records, proprietary material, or private documents (collectively "Case Material") may constitute private or trade secret information, or Protected Health Information for purposes of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the regulations promulgated thereunder. Attorney and Firm, on behalf of, and with authorization of their client(s), hereby authorize Physician Life Care Planning and/or its assigns to review and utilize Case Material in its work, and to release said Case Material to other third parties as it deems necessary to perform work on the case. Attorney and Firm acknowledge that these third parties may, or may not, be subject to the HIPAA privacy standards. Attorney and Firm's authority to make this authorization shall expire upon dismissal, abandonment, settlement, satisfaction or judgment of Attorney's client's claim, or upon termination of Attorney and Firm's representation of their client.

**Sole Agreement:** This Retention Agreement is the sole, entire, and final Agreement between You and Us regarding the subject matter hereof, and it supersedes any and all other written and/or oral agreements, understandings, statements and/or representations.

**Authority:** Attorney and Firm, individually and collectively, represent and warrant that each has the power and authority to enter into this Agreement, and to perform the obligations hereunder. This

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

Agreement has been duly authorized, executed and delivered by, and constitutes a valid and binding obligation of Attorney and Firm, jointly, and severally, enforceable against Attorney and Firm in accordance with its terms. Attorney and Firm also represent and warrant that the individual signing this Agreement has the right, power and authority to bind Attorney and Firm to perform the obligations hereunder.

**Effective Date:** The effective date of this Agreement will be retroactive to the date that we first performed consulting services on the Case. Even if this Agreement is not properly executed or is lost, Attorney and Firm are jointly, severally and individually responsible to pay the reasonable value of any service performed by Physician Life Care Planning as well as any incurred expenses.

**Termination:** Either party may at any time and without cause terminate this Agreement by giving 30 days written notice of termination to the other party. In the event of such termination, You shall pay Us for all work product and services rendered, and expenses incurred by Us prior to the date of termination.

**Disclaimer:** The work product and services provided hereunder will be provided in a professional and workmanlike manner. The preceding is our only warranty concerning any work product and services and is made expressly in lieu of all other warranties and representations, express or implied, including any implied warranties of fitness for a particular purpose, merchantability or otherwise. We make no warranty regarding the outcome of any settlement, arbitration or trial related to the subject matter of our work products or services.

**Assignable:** Attorney and Firm agree that the rights of Physician Life Care Planning, LLC to receive payment from Attorney and Firm can be assigned to a third-party. Attorney and Firm waive any objection to any such assignment and consent to any such assignment. In the event these rights are assigned, Attorney and Firm agree that the assignee will receive and be entitled to the same rights as Physician Life Care Planning, LLC under this Agreement.

**Indemnification:** You shall indemnify and hold harmless, Us, our partners, employees, Associate Physicians and other experts from and against any loss, claim, damage, or liability (or actions in respect thereof that may be asserted by any third party) that may result from any third party claims arising out of or relating to the services, the products, or any use by You of any services or products and You will reimburse Us for all expenses (including attorney's fees) as incurred by Us in connection with any such action or claim, except to the extent any such claim (i) is finally determined to have resulted from our negligence or willful misconduct.

Should Physician Life Care Planning, LLC, and/or its partners, Associate Physicians, experts, employees and/or representatives require the services of independent legal counsel, in respect to any matter associated with this engagement, Physician Life Care Planning, and/or its members, partners, Associate Physicians, experts, employees and/or representatives hereby retain the right to hire legal counsel of its/their own choosing, and You shall be responsible for paying all fees and expenses incurred.

**Limitation of Liability:** Neither party shall be liable for consequential, incidental, or punitive loss, damages or expenses (including lost profits or savings) even if advised of their possible existence. The limit of our liability (whether in contract, tort, negligence, strict liability in tort or by statute, or

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

otherwise) to You or your client(s) concerning performance or non-performance by Us, or in any manner related to this Agreement, for any and all claims shall not in the aggregate exceed the fees and expenses paid by You hereunder with respect to the Products or Services involved.

**Attorneys' Fees:** If a legal action or other proceeding is brought related to this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party will be entitled to recover reasonable attorney's fees, costs and all expenses, even if not taxable as court costs, incurred in the legal action.

**COURT FILINGS: <u>IF ANY FILING IS MADE WITH A COURT TO STRIKE, PROHIBIT, OR CHALLENGE (INCLUDING CHALLENGES TO ANY DAUBERT, FRYE, RULE 702, AND/OR SIMILAR CHALLENGES), OR IN ANY WAY LIMIT ANY OR ALL OF THE PRODUCTS OR SERVICES OF, OR THE TESTIMONY OF PHYSICIAN LIFE CARE PLANNING, ITS ASSOCIATE PHYSICIANS AND/OR OTHER REPRESENTATIVES, AND/OR EXPERTS SUBJECT TO THIS AGREEMENT, ATTORNEY AND FIRM AGREE TO: 1) PROVIDE COPIES OF ALL SUCH DOCUMENTS TO PHYSICIAN LIFE CARE PLANNING WITHIN THREE (3) CALENDAR DAYS SUBSEQUENT TO SUCH FILING;</u>** 2) FULLY, TIMELY AND COMPLETELY RESPOND IN WRITING TO SUCH COURT FILING, AND CONSIDER RECOMMENDATIONS OF PHYSICIAN LIFE CARE PLANNING, ITS ASSOCIATE PHYSICIANS AND/OR OTHER REPRESENTATIVES AND/OR EXPERTS; AND 3) ATTEND ANY AND ALL HEARINGS OR OTHER PROCEEDINGS RELATING TO SUCH COURT FILING, THEREBY STRENUOUSLY ARGUING AGAINST ANY STRIKE, PROHIBITION OR ANY OTHER LIMITATION, WITHOUT EXCEPTION, OF ANY AND ALL PRODUCTS SERVICES, OR TESTIMONY PHYSICIAN LIFE CARE PLANNING, ITS ASSOCIATE PHYSICIANS AND/OR OTHER REPRESENTATIVES AND/OR EXPERTS. IF ATTORNEY OR FIRM FAIL OR REFUSE TO ADEQUATELY PERFORM ANY OF THE OBLIGATIONS SET OUT IN THIS CLAUSE, THEN PHYSICIAN LIFE CARE PLANNING, LLC MAY HIRE ATTORNEYS OF ITS CHOOSING TO PERFORM SUCH OBLIGATIONS AND ATTORNEY AND FIRM WILL INDEMNIFY AND/OR REIMBURSE PHYSICIAN LIFE CARE PLANNING FOR ALL SUCH FEES, EXPENSES AND DAMAGES INCURRED INCLUDING, BUT NOT LIMITED TO, ATTORNEY FEES AND EXPENSES.

**Confidentiality:** Any information disclosed by one party ("Disclosing Party") to the other party ("Recipient") in connection with this Agreement that is marked confidential or that due to its character and nature, a reasonable person under like circumstances would treat as confidential (the "Confidential Information") will be protected and held in confidence by the Recipient.

Confidential Information will be used only for the purposes of this Agreement and related internal administrative purposes. Disclosure of the Confidential Information will be restricted to the Recipient's employees, contractors, or agents on a "need to know" basis in connection with the services, who are bound by confidentiality obligations no less stringent than these prior to any disclosure. Confidential Information does not include information which: (i) is already known to the other party at the time of disclosure; (ii) or becomes publicly known through no wrongful act or failure of the Recipient; (iii) is independently developed without use or benefit of the other's Confidential Information; or (iv) is received from a third party which is not under, and does not thereby breach an obligation of confidentiality. Each party agrees to protect the other's Confidential Information at all times and in the same manner as each protects the confidentiality of its own proprietary and confidential materials, but in no event with less than a reasonable standard of care. A Recipient may disclose Confidential Information to the extent required by law, but that disclosure does not relieve Recipient of its confidentiality obligations with respect to any other party.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**Maintenance of Records:** Physician Life Care Planning is authorized, after the case is concluded, to destroy records provided by the Attorney and/or Firm and any papers remaining in Physician Life Care Planning's possession if the Attorney and/or Firm has not retrieved such records and any original papers within three (3) months from the date the Case is resolved or otherwise concluded, or this Agreement is terminated, unless specifically instructed in writing by Attorney or Firm to the contrary. Physician Life Care Planning reserves the right, at its sole discretion, to maintain copies of reports or materials created by or originating from the clerical and professional work performed directly by Physician Life Care Planning and any consultants engaged by it for services rendered.

**Severability:** Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any party or under any circumstances, is invalid or unenforceable to any extent under applicable law, then such provision will be deemed severed from this Agreement with respect to such party or such circumstance, without invalidating the remainder of this Agreement, and a new provision will be deemed substituted in lieu of the provision so severed which new provision will, to the extent possible, accomplish the intent of the parties hereto as evidenced by the provision so severed.

**Enforcement:** Failure to enforce any provision of this Agreement in a given instance shall not constitute a waiver of such provision with regard to any other instance or any other term of this Agreement.

**Counterparts, Electronic Signatures:** This Agreement may be executed in counterparts, each of which shall be deemed an original and binding on the signatory thereto, but both of which together will constitute one and the same instrument. Facsimile signatures, scanned and e-mailed signatures, and other electronic signatures on this Agreement shall be deemed to be original signatures, for all purposes.

**Choice of Law and Venue:** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without giving effect to the principles of conflict of laws. The parties hereby submit to the jurisdiction of all courts of Bexar County, Texas and hereby agree that any such court shall be a proper forum for the determination of any dispute arising hereunder.

### MISCELLANEOUS

- You agree to promptly notify US, our Associate Physician(s) and other expert(s) of all parties and lawyers in the case so that they may check for conflicts of interest.

- You shall consult with our Associate Physician(s) and other expert(s) before drafting any answers to interrogatories concerning them or their testimonies.

- You agree to be available to prepare our Associate Physician(s) and other expert(s) for any testimony.

- You shall promptly notify Us, our Associate Physician(s) and other expert(s) regarding any settlement or final resolution of the underlying case.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

- Our Associate Physician(s) and other expert(s) maintain the right to withdraw from your case and/or this engagement if not provided adequate time and resources to form a well-founded opinion(s). In the event of, and at the time of such a withdrawal, You shall pay Us for all work product and/or services rendered, and expenses incurred by Us prior to the date of termination.

- Necessary travel and hotel accommodations for Associate Physician and other experts shall be arranged by You, unless otherwise notified by Us. All flights shall be direct, and non-stop if available. Any voyage of greater than three (3) total hours in duration shall be business class, or first class, if business class is unavailable.

- Physician Life Care Planning, LLC, and its Associate Physicians and other experts maintain the right to withdraw from your case if You breach any rules of professional conduct. In the event of, and at the time of such a withdrawal, You shall pay Us for all work product and/or services rendered, and expenses incurred by Us prior to the date of termination.

- Physician Life Care Planning, LLC, and its Associate Physicians and other experts maintain the right to withdraw from your case if You breach, or if you are in breach of any of the terms of this Agreement. In the event of, and at the time of such a withdrawal, You shall pay Us for all work product and/or services rendered, and expenses incurred by Us prior to the date of termination.

- Physician Life Care Planning, LLC, and its Associate Physicians and other experts are under no duty and/or obligation to work for/with a successor law firm and You shall inform Us and them promptly should the Firm cease to be lead counsel in the matter.

**ENGAGEMENT DETAILS**

- Name of Subject:                                                      Javier Tapia

- Date of Intake:                                                        August 17, 2023

- Date of Engagement:                                              August 17, 2023

- Record Submission Deadline:                                 January 01, 2024

- Product(s) Delivery Deadline:                                 February 12, 2024

[This space left intentionally blank.]

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**SIGNATURES**

**Attorney & Firm ("You")**

_Ryan DREVESKRACHT_

Ryan Dreveskracht, Individually, and on behalf of Galanda Broadman, PLLC

**Physician Life Care Planning LLC ("Us")**

William L. Davenport, President & Chief Financial Officer

[This space left intentionally blank.]

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

# Exhibit B

# Expert Report of
## Denise M. Panosky, DNP, RN, CNE, CCHP, FCNS

*Tapia v. NaphCare Inc., et al.*

1.　　I have been a licensed Registered Nurse (RN) for the past 40 years. My professional clinical practice includes 25 years in an emergency department. For the past 17 years, I have taught students and nurses about practicing in a correctional setting, which includes clinical experience in the correctional setting. I earned a B.S. in Nursing in 1983, a M.S. in Nursing in 2006, and a Doctorate in Nursing in 2010. I have certifications as a Clinical Nurse Educator (CNE) and Correctional Health Professional (CCHP), and am a Forensic Clinical Nurse Specialist (FCNS). I have been the Task Force Chair of the International Association of Forensic Nurses (IAFN) Corrections Task Force for two years. I was also a workgroup member on the American Nurses Association (ANA) Correctional Task Force, revising the *Correctional Nursing: Scope and Standards of Practice* (2013). I have given more than 30 podium presentations at national and international correctional conferences, and have received honors in recognition of my contributions to correctional nursing. I have received five grants.  I was a co-investigator and project coordinator for a large HRSA grant, "Nurse, Education, Practice, Quality, and Retention" to implement a nursing competency program to all correctional nurses in 12 state prisons/jails.

2.　　During the year immediately preceding the occurrence giving rise to this lawsuit, I devoted a majority of my professional time to teaching nursing, including in a correctional setting.

3.　　I am generally familiar with Federal Rule of Civil Procedure 26 as it relates to expert witnesses. My qualifications, along with a list of all publications I have authored during the previous 10 years, are attached in my CV as **Appendix A**. A list of cases during the last 4 years in which I have testified as an expert at trial or by deposition is attached as **Appendix B**. A statement of the compensation I am to be paid for my research and testimony in this case is attached as **Appendix C.**

4.　　I have reviewed and relied upon the following relevant materials:

  a.　　1-2.  8-15-22  First Amended Complaint

  b.　　Jail Combined_Records

  c.　　302530-302601 Combined_Records

  d.　　RFP 27 - NaphCare Policies and Procedures (000247-479)

  e.　　210930 PLT 1st Rogs RFP to NaphCare with ANSWERS

  f.　　Rog 2, RFP 24 - List of caregivers-providers (000001-000002)

  g.　　Rog 10 - Director of Nursing (000037-000040)

  h.　　Rog 10 - Health Services Administrator (000041-000043)

i.      Rog 10 - Licensed Practical-Vocational Nurse (000044-000045)

j.      Rog 10 - Registered Nurse (000054-000056)

k.      000060-000064 Kites

l.      302519-302529 Additional_Records

m.      000041-000059 Inmate Behavior Log Printout_REDACTED

n.      Deposition of Carrillo LPN and Exhibits

o.      Deposition of  Ricci LPN and Exhibits

p.      Deposition of Warren RN and Exhibits

q.      Deposition of Slothower RN HSA and Exhibits

r.      Deposition of Bradley and Exhibits

s.      Deposition of Knight and Exhibits

t.      Deposition of Valley RD and Exhibits

u.      Deposition of Perez and Exhibits

v.      Deposition of Nealis and Exhibits

w.      Deposition of Prather and Exhibits

x.      Deposition of Dr. Wade and Exhibits

5.      It is my opinion, based upon my review of these materials, my background, training, and education that Registered Nurses (RN) Etsuko Yagi and Elizabeth Warren; unknown named Registered Nurses supervising Licensed Practical Nurses; and Licensed Practical Nurses (LPN) Jeff Kendig, Franklin Park, Juddy Marling, Cameron Carrillo, and Debra Ricci failed to exercise that degree of care, skill, and learning expected of a reasonable, prudent nurse acting in the same or similar circumstances.  There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained Registered Nurse and/or Licensed Practical Nurse would have recognized, and these nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk, based on their nursing training and education, was unacceptable and fell below what a reasonable and prudent nurse would do in the same or similar circumstances.  It is my further opinion that the acts and omissions of Registered Nurses Yagi and Warren, unknown named Registered Nurses supervising Licensed Practical Nurses; and Licensed Practical Nurses Kendig, Park, Marling, Carrillo, and Ricci fell below the nursing standard of care.

2

6.    My opinions are based upon the following facts, which are taken from the record provided to me.  This is not an exhaustive discussion of each and every fact upon which my opinions are based.  These facts are based on the reports and logs of those involved in Mr. Tapia's care; Mr. Tapia's medical record; deposition testimony and exhibits; and materials listed above.

a.    On 6-16-18, Mr. Tapia was arrested by the Tacoma Police.  At 02:00, he was booked into the Pierce County Jail (DEF PC 302590).

On 6-16-18, at 5:04:57 AM, a Receiving Screening was completed by Nurse Yagi RN (DEF PC 000656 – 000661).  Vital Signs were: BP 125/85, Temp. 97.6, Pulse 96, Resp. 16, SaO2 98, Ht. 5'7", and Wt. 153.[1]  Positive answers selected in the checkbox to questions include:

(i)    Substance Use Assessments, and checked was:

(i)    History or risk of alcohol or drug withdrawal, with details ">5days/week taking percoset [sic].Withdrawal:Achy, restless leg. Last taken was last night."

(ii)    Recent use of illegal drugs or prescription pain medications, with details: ">5days/week taking percoset [sic]. Withdrawal:Achy, restless leg. Last taken was last night."

(iii)    Most recent alcohol, sedative (e.g. Xanax, Klonopin, Valium, Ativan), or opioid (e.g. heroin, oxy, Lortab, methadone) with details ">5days/week taking percoset [sic].Withdrawal:Achy, restless leg. Last taken was last night.".

(ii)    Under Most recent alcohol, sedative, or opiate use:

(i)    5 days or less was marked.

(iii)    Disposition/Treatment Plan includes and checked are:

(i)    Release signed to obtain all medical records, pharmacy records, substance abuse records; and Inmate Educated on Access to Care Procedures.

(iv)    Housing Assignment includes and checked is:

(i)    General Population and Low Bunk.

Inmate Behavior Log Printout (DEF PC 000044) documentation by Nurse Yagi RN at 06:00 includes "low bunk/low tier x 3 days, ending 6/19/18, per detox."

---

[1] Note, however, that weight on the Vital Signs form on 6-16-18 is documented at 153 lb at 4:55 am and at 165 lb at 4:37 pm  (DEF PC 000281). Also, weight on 6-17-18 is documented at 165 lb (DEF PC 000281).

On 6-16-18, at 5:05:16 am, *19 seconds later*, a Mental Health Screening was completed by Nurse Yagi RN (DEF PC 000662 - 000666).

(i)     The Suicide Risk Assessment includes a Positive response to question: 9) How does the inmate feel about the current situation? And the answer "ok" is documented.

(ii)    The General Mental Health Assessments includes a positive response to questions: 17) Used illegal drugs or abused prescription drugs?; 18) Abused alcohol or sedatives?; and 19) Experienced significant alcohol or drug withdrawal?, with the same response documented ">5days/week taking percoset [sic].Withdrawal:Achy, restless leg. Last taken was last night." for all 3 questions.

(iii)   General Assessments includes Positive responses to: Inmate Appearance: Mildly unkempt; and Inmate behavior: Cooperative.

(iv)    Housing Assignment: General Population.

(v)     Discharge Planning: Drug/Alcohol Treatment and Resource Info Packet are both checked, with Discharge needs reviewed with inmate? checked Yes.

On 6-16-18, at 5:06:42 am, Nurse Yagi RN documented Subjective, Objective, Assessment, and Plan (SOAP) Notes (DEF PC 000289 - 000290) with documentation including:

(i)     Subjective "Patient with history of recent and/or significant opiate use. >5days/week taking percoset [sic].Withdrawal:Achy, restless leg. Last taken was last night. No symptoms at the time of booking."

(ii)    Objective "UDS performed and results documented in TechCare.";

(iii)   Assessment  "Opiate withdrawal.";

(iv)    Plan "Initiate COWS assessments with initiation of buprenorphine taper (different order template) once scores 12 or greater or per provider orders." Also documented is "-Comfort meds as ordered below., -Encourage po fluid intake., -Bottom bunk for safety.", with Treatment and Drug Names listed.

On 6-16-18, at 5:04:32 am, Nurse Yagi RN documented a Comprehensive Detox Screen (DEF PC 000558 - 000560).[2]  Opiate Screening is checked.

---

[2] Note, this time is before the Receiving Screening, Mental Health Screening, and SOAP Note was completed.

4

(i)     Opiate Withdrawal Screening Questions include: 1. Is the patient currently exhibiting opiate withdrawal symptoms? No checked; 2. Last opiate use: 3 or fewer days ago is marked, and, Number of days use per week, 4 or more days is marked.

This same time, Nurse Yagi RN also documented a COWS assessment (DEF PC 000555 - 000557). Total COWS Score – 1 with "Minimal withdrawal symptoms. Consider reassessing within 8 hours." is documented. Resting Pulse Rate "Measured after patient is sitting or lying for one minute 1 81-100" is documented. Mr. Tapia's Pulse on the Vital Signs form on 6-16-18 is documented as 96 at 4:55 am and 100 at 4:37 pm. All other assessments are documented as 0 (zero). Additional Comments: ">5days/week taking percoset [sic].Withdrawal:Achy, restless leg. Last taken was last night. No symptoms at the time of booking.".

On 6-16-18, at 4:38:46 pm, Kendig LPN documented a COWS assessment (DEF PC 000561 - 000563). Total COWS Score – 0 with "Minimal withdrawal symptoms. Consider reassessing within 8 hours." is documented. Resting Pulse Rate "Measured after patient is sitting or lying for one minute 0 80 or below" is documented, but **Mr. Tapia's Pulse is documented as 100**. All other assessments are documented as 0 (zero). Additional Comments: "Pt denies detox symptoms and will not be medicated. Pt denies suicidal ideation. Pt was hydrated with Gatorade and water."

b.     On 6-17-18, at 3:39:48 am, Park LPN documented a COWS assessment (DEF PC 000566 - 00056). Total COWS Score – 0 with "Minimal withdrawal symptoms. Consider reassessing within 8 hours." is documented. All other assessments are documented as 0 (zero) **Not Assessed**. Additional Comments: "Did not want to get out of bed, no noted distress, verbally declined assessment. C/D Otonez witness". **Mr. Tapia did not have a COWS assessment at this time.**

On 6-17-18, at 4:04:41 pm, Kendig LPN, documented a COWS assessment (DEF PC 000567 - 000569). Total COWS Score – 3 with "Minimal withdrawal symptoms. Consider reassessing within 8 hours." is documented. Resting Pulse Rate "Measured after patient is sitting or lying for one minute 1 81-100" is documented. **Sweating and Runy [sic] nose were not assessed.** Bone or Joint Aches "1 Mild diffuse discomfort" is documented. Anxiety or Irritability "1 Patient increasing irritability or anxiousness" is documented. All other assessments are documented as 0 (zero). Additional Comments: "Pt report mild withdrawal symptoms and will be medicated according to detox protocol. Pt denies suicidal ideations. Pt was hydrated with Gatorade and water." At this same time, Mr. Tapia's **SaO2 was 93%**. Mr. Tapia was administered PRN medications Loperamide, Ibuprofen, Dicyclomine, and Ondansetron (DEF PC 000256; NAPHCARE 000192).

c.     On 6-18-18, at 4:09:08 am, Marling LPN, documented a COWS assessment (DEF PC 000570 - 0000572). Total COWS Score – 7 with "Mild withdrawal symptoms. Consider reassessing within 8 hours." is documented. Resting Pulse Rate "Measured after patient is sitting or lying for one minute 0 80 or below" is documented, but **Mr. Tapia's Pulse is documented as 96**. Other assessments documented include: Restless "1 Reports difficulty sitting still but is able to do so"; Bone or Joint Aches "2 Patient reports severe diffuse aching of joints/muscles; Runy

5

[sic] Nose or Tearing "1 Nasal stuffiness or unusually moist eyes; and Gooseflesh Skin "3 Piloerection of skin can be felt or hairs standing up on arms".  All other assessments are documented as 0 (zero).  Additional Comments: "Pt resting on housing bunk, easily aroused. Able to verbally report restlessness severe body aches. Noted goosee bumpd [sic] to forearms and nasal drainage. Will continue to monitor." The records also indicate that Mr. Tapia was administered PRN medication Ibuprofen previously at 2:50 am (DEF PC 000256; NAPHCARE 000192).

On 6-18-18, at 7:25:11 pm, Kendig LPN, documented a COWS assessment (DEF PC 000573 - 000575). Refused is checked.  Total COWS Score – 0 with "Consider reassessing in 6 hours." is documented. All assessments are documented as "0 [zero] Not Assessed".  Additional Comments: "Pt refused to allow actual detox assessment and hydration with Gatorade and water. Pt denies suicidal ideation and upon casual observation appears free from obvious distress. Pt is oriented and alert."  Yet again, **Mr. Tapia did not have a COWS assessment at this time.**

d.    On 6-19-18, at 2:48:16 am, Park LPN, documented a COWS assessment (DEF PC 000576 - 000578).  Total COWS Score – 3 with "Minimal withdrawal symptoms. Consider reassessing within 8 hours. . Resting Pulse Rate "Measured after patient is sitting or lying for one minute 0 80 Not Assessed" is documented, but **Mr. Tapia's Pulse is documented as 96**.   Other assessments documented include: Bone of Joint Aches "1 Mild diffuse discomfort"; Runy [sic] Nose "1 Nasal stuffiness or unusually moist eyes"; and GI Upset "1 Stomach cramps". All other assessments are documented as 0 (zero).  There are no Additional Comments. Mr. Tapia was administered PRN medication Ibuprofen (DEF PC 000256; NAPHCARE 000192).  **Mr. Tapia was not administered Aluminum-Magnesium PRN as ordered for GI Upset** (DEF PC 000290).

On 6-19-18, at 8:19:39 am, Carrillo LPN documented SOAP Notes, with documentation including: "OPIATE discontinued,  REASON: per Dr. Balderrama ok to dc" (DEF PC 000289).

e.    On 6-20-18, at 11:52:49 am, Nurse Practitioner Irina Hughes documented SOAP Notes with documentation including: "UDA 6/16/18 + MET AMP ECT" (DEF PC 000289). Manual Urine Drug Screen Test results from 6-16-18 are Positive for MET (Methamphetamine), MDMA (Ecstasy), and AMP (Amphetamine)" (DEF PC 000681).  Mr. Tapia was administered PRN medication Ibuprofen previously at 10:06 am (DEF PC 000256; NAPHCARE 000192).

f.    There are no further Progress Notes for roughly the next 3 months.

g.    On 9-10-18, at 14:05 pm, an Inmate Behavior Log Printout  documentation by Alley includes "Seems to have difficulty following simple rules such as 1400hrs lockdown." (DEF PC 000044).

h.    On 9-13-, at 09:07 am, there is a note (Kite) documented "NEED SLEEP MEDICATION CAN'T SLEEP. HAVING SLEEP ISSUES." (DEF PC 000061).

i.    On 9-14-18, at 01:44 am, there is a Response to the above note (Kite) "You're scheduled to see the sick call nurse. please go when called" (DEF PC 000061).   There is also a Sick Call Note entered this same day, with the Mental Health Professional listed under

Name, with Reason "c/o insomnia. Canceled by jesus.perez on 9/14/18 Reason: Please encourage IM to kite MH office with current needs." (NAPHCARE 000214). **There is no further documentation that Mr. Tapia was seen or assessed by nursing staff or mental health staff.** . When asked about this entry in his Deposition (Pgs. 59-61), Perez MPH said:

> Q. . . . And then on the 14th, it looks like, later on that day, you -- **you canceled Mr. Tapia's medical kite; is that correct?**
>
> **A. Yeah, yeah. It looks like that's what I did.**
>
> Q. And so why were you responding to medical kites?
>
> A. . . . [S]o the system was getting bogged down. Like, there's so many kites coming in throughout the time, that we wanted everybody to be communicating directly. . . .
>
> Q. Okay. So it sounds like what you're saying, the system was sort of so bogged down at that time that you would go into the -- the sick call system and -- and you would respond directly to inmates instead of having a NaphCare employee refer it to you; is that fair to say?
>
> A.  Right, right.
>
> (emphasis added).[3]

> j.      On 9-17-18, at 20:25, a Pierce County Detention and Corrections Center Observation Report by Knight included Inmate Behavior / Disturbing Mannerisms with a Description:

"On 9-17-18 at 2025, I observed Inmate Tapia, Javier[2D40] get off his bunk and throw his hands in the air and roll on to the floor near his bunk and begin to flail around and roll all around the floor. I called for an escort to step in due to his odd behavior and unknown mental state. As I approached him he was laying down in the fetal position and I told him to get up and he just stared at me. I gained control of his right arm and he started crying and mumbling unintelligibly.  I then gained control of his other arm and assisted him up and applied wrist restraints without incident. On the way out of the Unit he mumbled a few unintelligible remarks and was tearful and was acting very strange. I escorted him out of the unit and he was placed in a timeout cell by responding deputies." (DEF PC 000049).

 Comments included: "MHP Eval Requested. I/M Moved to 3SC." (DEF PC 000049). Housing unit 3S is the Pierce County Jail's "mental health, max security housing" unit. (Knight Deposition, Pg. 30); *see also* (Bradley Deposition, Pg. 12) (noting that inmates housed in 3SC are "in their cells for basically 23 hours a day by themselves").

> k.      On 9-18-18, at 4:48:10 pm, Nealis MHP, documented an assessment which included:

---

[3] This reading of the Sick Call Note—that Mr. Perez "canceled" Mr. Tapia's appointment with "the sick call nurse"—is confirmed by fellow mental health provider Duane Prather. (Prather Deposition, Pg. 34).

"Met with I/M about 1100 for initial assessment in response to C/D report.  He came to the door and was cooperative during the interview, but **appears to be confused** and was unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time.  His UA was positive for Methamphetamins [sic] when he booked in on 6/16/18." Documented Plan "Recommended continued level 1 MH housing at this time for further assessments. MH will f/u." (DEF PC 000289; DEF PC 000043) (emphasis added).

Inmate Behavior Log Printout documentation by Vadala at 17:03 includes "Verbally refused dinner meal." (DEF PC 000044).

   l. On 9-19-18, at 5:36:46 pm, Nealis MHP, documented an assessment which included:

"Met with I/M at about 1045 for initial assessment in response to C/D report.  He presented again today as **confused**.  I/M was unable to verbally respond to my questions.  He has been here at PCJ since June, but appears to be **decompensated** at this time. Officers report that he appears to be "**way off his baseline**," and he was **nonverbal** in court today as well. He could have an unknown medical condition."  Documented Plan: "Referred to medical for assessment.  Recommended continued level 1 MH housing at this time for further assessment.  MH will f/u. Referred to medical department for assessment." (DEF PC 000288; DEF PC 000043; DEF PC 302595) (emphasis added).

In Nealis MHP Deposition (Pgs. 30-31), he testified that he "walked to the nurses station" and verbally referred Mr. Tapia for an assessment, but does not recall what, specifically, he told medical or who he told it to.

   On 9-19-18, at 6:23:31 pm, Carrillo LPN, documented "pt referred to medical due to being **nonresponsive, pt BP hypertensive** skin PWD, does not appear in distress, stated he does not have any medical concern at this time but is upset of being in 3SC, states no SI will continue to monitor" (DEF PC 000288) (emphasis added).  Mr. Tapia's Blood Pressure (BP) of **150/98** is documented on the Vital Sign form (DEF PC 000281).  There is no documentation that a nurse or doctor (RN, NP, or MD) was notified of these findings.  There is no documentation of any follow up or monitoring, including a BP recheck when Mr. Tapia's **BP was elevated**.  In Carrillo LPN's Deposition (Pg. 15) when asked what "data collection" consists of, he answered "Vitals, general patient condition, and I just take that information and report it to someone with a higher licensure. It could be anything from assisting an RN with an assessment to filling out the forms for detox which are then reviewed by a provider.".  When asked about tasks he can perform, Carrillo LPN answered "I can perform quite a few tasks as delegated by the RN or provider." and "I collect the data and then I report back to the RN or provider.".  Carrillo LPN did not report the data he collected on Mr. Tapia, including his condition and/or elevated BP, to a RN or provider, or ask for assistance with the assessment.

   m. On 9-20-18, at 9:08:43 pm, Prather MHP, documented "I/M seen about 1110 for MH f/u. I/M is awake but stays on his bunk. I/M does **not respond in any way** to MHP, he just stared. I/M would not even shake his head yes or no. I/M was seen by medical  yesterday." Documented Plan" Recommend level 1 MH housing for observation. MH to f/u.".  (DEF PC 000288; DEF PC 000043) (emphasis added).

n.    From 9-21-18 through 9-29-18, Mr. Tapia's Inmate Behavior Log Printout documentation by Officers includes documentation that Mr. Tapia "verbally refused" at least 8 meals. (DEF PC 000042-000043) This does not mean that Mr. Tapia was actually verbal with the officers. As explained by corrections officer Jonah Bradley in his Deposition (Pgs. 13-15; 24-26), and who documented verbal refusals for Mr. Tapia:

Q.  Okay.  And I think you mentioned earlier that there's a drop-down system, correct?

A.  Correct.

Q.  And one of the options is VRM, which would indicate Verbally Refused Meal, correct?

A. Correct. . . .

Q.  So specifically when it comes to refusing meals, what are the options?

A.  Just verbally refused meal.

Q.  Okay.  There's no other option?

A.  No. . . .

Q.  What if an inmate just waved you off without . . . saying anything?

A.  Then I would take that as a refusal.

Q.  And you would indicate it as VRM?

A.  Correct. . . .

Q.  And if somebody were to wave you off and not saying anything, would you write out "verbally refused breakfast"?

A. Correct.

Q.  Even if someone -- so in this, you would write "verbally" even if they didn't say anything?

A.  Correct. . . .

Q.  And so if they just stared at you and didn't say anything, didn't wave, would you write "verbally refused meal"?

A. Yes. . . .

Q. . . . So let's say that they are sitting in bed just staring at the wall not -- and you come up and ask them if they would like a meal. They don't move. They don't acknowledge your presence in any way. They don't wave. They don't say anything. Would you write "verbally refused breakfast"? . . .

A. Correct. . . .

Q. Okay.  So just so we're clear, if it was observed that an inmate had not eaten a meal that had been served to him, that would not be documented anywhere unless the process for a hunger strike was initiated previously by a medical provider; is that correct? . . .

9

A.  Correct.

Nor does it indicate that Mr. Tapia ate the meals that he was served (Bradley Deposition, Pg. 38):

Q. Okay.  So just so we're clear, if it was observed that an inmate had not eaten a meal that had been served to him, that would not be documented anywhere unless the process for a hunger strike was initiated previously by a medical provider; is that correct? . . .

A.  Correct.

o.      There are no Progress Notes for the next 5 days (From 9-21-18 through 9-26-18).  **Mr. Tapia was not assessed and did not receive follow up care, or any care at all, as there is no documentation on Progress Notes over these 5 days.**

p.      On 9-26-18, at 5:41:40 pm, Nealis MHP documented "Attempted to meet with I/M about 1100 for initial assessment I response to C/D report.  He presented again today as **confused and non-verbal**.  He has been here at PCJ since June, but appears to be **decompensated** at this time."  Documented Plan: "Recommend continues level 1 MH housing at this time for further assessment. MH will f/u." (DEF PC 000288; DEF PC 000042-000043) (emphasis added).

q.      On 9-28-18, at 6:38:05 pm, Perez MHP documented "I/M was seen at about 10:30 for MH f/u. I/M refused MH interview. I/M presents **MH symptoms**. I/M would not answer MH questions. I/M just looked at MHP and **did not respond** to basic questions."  Documented Plan: "Continue current housing. MH will f/u." (DEF PC 000288; DEF PC 000042) (emphasis added).

r.      On 9-29-18, at 11:00, a Pierce County Detention and Corrections Center Observation Report by Oeltjen included Inmate Behavior / Disturbing Mannerisms with a Description:

"Inmate Tapia **would not respond to me verbally** when I asked him if he wanted lunch. He did look up at me but would not answer. A search of his behavior log indicates he has been **refusing meals** periodically. I place a sack meal in his cell and will monitor to see if he eats. Recommend MHP follow up." Comments: "Inmate assessed by Nurse Warren, Mental Health and clinic to follow up. Please log meal refusals." (DEF PC 000042 and 000048)  (emphasis added).

On 9-29-18, at 3:07:04 pm, Nurse Warren RN was requested by a Seargent to see Mr. Tapia in his cell.  Nurse Warren RN documented:

 "Cell smells of urine. Sheet wrapped around waist. Alert, sitting up, on the side of his bunk, under his own power, Makes eye contact when he is spoken to. **Inmate will not verbally respond**. Inmate will follow instructions with calm encouragement. Allowed assessment. 96.9, Apical pulse 100, S1S2, slow, even respirations, rate 14-16, BP 127/77. Tongue wet skin does not tent. No acute distress noted. Not sure if inmate is eating every  meal. Offered a chocolate ensure and he drank approx ½ the container. Officer prepared his sandwich for him, handed it to him and he tool the sandwich. Spoke with Sgt Finley and asked if inmate could be put on a meal log and he agreed to

10

start "Meal Log" Schedule daily monitoring of VS x 3 days and schedule Provider visit for evaluation." (DEF PC 000287) )  (emphasis added).

**There are no Vital Signs or nursing assessment** documented for the next day, 9-30-18.  There is a Sick Call Note  with documentation "Medical Provider" listed under Name, with Reason: "Mental Health ask that a Provider evaluate inmate to R/O any Medical issues see note dated 9/29/18."  (NAPHCARE 000214).  **There is no documentation that a Provider evaluated Mr. Tapia this day, or any day prior to 10-1-18**.

      s.     On 9-30-18, at 1:52:57 pm, Poo MHP documented "I/M seen at about 1040 for assessment in response to C/D report. I/M was uncooperative with MH interview. I/M appeared to be sleeping and **did not respond** to MHP knocks on door or calling name. I/M was observed moving and breathing in his bed. I/M cell was observed as messy and disorganized." Documented plan includes "Recommend level 1 MH housing. MH to f/u" (DEF PC 000287; DEF PC 000042) (emphasis added).

      t.     On 10-1-18, at 7:13:13 am, Ricci LPN documented on the Treatment Administration form and Medication Refusal form that Mr. Tapia "refused" vital signs (DEF PC 000898; DEF PC 001183).  There is no Progress Note documentation about this refusal and there is no Witness Signature on the Medication Refusal Form that was completed.  When asked in her Deposition (Pg. 18) about why the witness signature if blank, she answered "Well, when the inmate refuses to sign the refusal, then he doesn't sign it, and the witness is generally the corrections officer, and they most of the time don't want to sign it either.".   When asked (pg. 19) Did you notify your supervising physician or RN, she answered "I don't recall."  The Refusal of Health Care Services Policy (NCI 000458) 1) c) was not followed as the Release of Responsibility Form – Specific Procedure was not signed and/or witnessed by medical staff, the patient, and/or a witness; and 1) e ) Refusals of medical treatment for serious conditions will be communicated to the facility's Medical Director, and this was not done (Ricci Deposition, Pgs. 20-22). When asked (Pg. 23) if she contacted the provider or charge nurse, she answered "I don't recall." and when asked if she would have, would it have been somewhere in his medical record, she answered "Yes, usually I would do that." and "I would chart it, yes." There is no documentation that Ricci LPN notified a Registered Nurse or Medical Healthcare Provider.

      On 10-1-18, at 11:10 am, the Inmate Behavior Log Printout documentation by Wilson includes "While serving lunch today, C/D Paukert observed inmate's foot to be purple//black color. C/D immediately called the clinic. Per clinical assessment, inmate was transported to the clinic in a wheelchair." (DEF PC 000042).

      On 10-1-18, at 12:32:57 pm, Nurse Chalk RN documented:

  "Asked to see inmate by unit officer for c/o "**toes turning black**". Upon visual inspection, **left foot slightly swollen and severely discolored**. Inmate brought to clinic via wheelchair. Vital: BP 111/80 T 97.9 P 105 SpO2 94% RA Inmate is **non-verbal and does not answer questions**. Spoken to by MHP and **reported having pain**, but **does not recall what happened** or when. Per provider, M Balderrama and I. Hughes, Inmate **referred to Tacoma General ED**." (DEF PC 000287) (emphasis added).

11

On 10-1-18, at 12:35:23 pm, Dr. Balderrama, Pierce County's Medical Director, documented:

"pt seen with nursing staff has evidence of poss vascular deficits on left foot with edema needs ER evaluation for poss emergent surgical management" (DEF PC 000287).

On 10-1-18, at 12:14:11 pm, Nurse Chalk RN documented on an ER Referral form (Note this time is before Nurse Chalk's and Medical Director Balderrama's Progress Notes.) Documentation by Nurse Chalk RN includes that Mr. Tapia was sent to the ER by Squad Car for "Suspected gangrene". Vital Signs are documented as her Progress Note above (at 12:32:57), with the Referring Provider: Balderrama, and the Destination ER/Hospital: Tacoma General Hospital. (DEF PC 000675 - 000677). The Pierce County Detention and Corrections Center Incident Report documentation includes "Inmate Tapia was sent to Tacoma General Hospital for a swollen, black foot. Taken by C/D's Ferrell and M. Jackson." (DEF PC 000047).

On 10-1-18, at 15:31 pm, an Inmate Behavior Log Printout documentation by Lee includes: "Inmate was admitted to the hospital during day shift." (DEF PC 000042).

On 10-1-18, at 5:05:52 pm, Nealis MHP documented an assessment "Met with I/M at about 1045 for MH f/u in the clinic. He presented again today as **confused** and non-verbal, but was also calm and cooperating with medical staff." Documented Plan: "Will be sent to ER for further assessment. Recommend continued level 1 MH housing for this time for further assessment. MH will f/u." (DEF PC 000286 - 000287) (emphasis added).

On 10-1-18, at 5:33:55 pm, Nurse Chalk RN documented "Per Isac, RN at Tacoma General ED, inmate will be admitted for gangrene." (DEF PC 000287).

On 10-22-18, at 4:05:51 pm, Nurse Martin RN documented on an ER Discharge form that Mr. Tapia returned from Tacoma General Hospital. Documentation includes: Please list the hospital diagnosis and patient outcomes: "woundcare, pain management, stump shrinker, knee immobilizer, phlegmasia cerulea dolens of left lower extremity (TG medica diagnosis)" is documented. A Provider was notified and the patient was not released from custody. Vital Signs: BP 108/79 Temp 97 Pulse 100 Resp 16 SaO2 98 and Pain 3 are documented. (DEF PC 000678).

u.    From 10-2-18 through 11-12-18, there are further Progress Notes documented by Nursing (DON, RN, NP), Social Worker (MHP), and Medical ACP (Medical Director) throughout Mr. Tapia's hospitalization and return to the Pierce County Jail (DEF PC 000283 - 000286).

7.    "Respect for patients and regard for their well-being must be the primary posture for health care providers" in a correctional setting. (Anno, 2009, Pg. 70). "Correctional nurses have a primary role as patient advocates and champions for inmate health care." (ANA, 2013, Pg. 10). Moreover, "[t]he right to receive care is a fundamental component of the deliberate indifference standard. When access to care is delayed or denied, patients are placed in jeopardy." (Schoenly & Knox, 2013, Pg. 80). "[C]orrectional health professionals must guard against burnout, which usually emerges as a belief that many or most inmates are faking. That . . . can do harm by causing the health professional to ignore valid symptoms and deny or delay needed

treatment." (Anno, Pg. 80)  [H]ealth care staff [are] expected to respond to requests for primary and ambulatory care and make appropriate referrals to clinical specialists (Anno, Pg. 70).  With these general principles in mind, it is my opinion, that the nursing treatment of Mr. Tapia fell far below the appropriate standard of care and violated generally accepted standards for the provision of health care in the following respects:

       a.     On 6-16-18, Nurse Yagi RN completed a Receiving Screening, a Mental Health Screening, a Comprehensive Detox Screening, a COWS Assessment, and documented SOAP Notes on Mr. Tapia.  It was known at this time that Mr. Tapia used Percocet > 5 days/week and his last use was "last night".  Withdrawal symptoms included achy and restless legs, but he had no symptoms at booking.  He was assigned to General Population with a lower bunk for safety.  A Urine Drug Screen was performed with Positive findings for MET (Methamphetamine), MDMA (Ecstasy), and AMP (Amphetamine) and COWS assessments were initiated.

       Over the next 3 days, 7 COWS Assessments were documented, with scores between 0 (zero) and 7 (seven).  One COWS Assessment was completed by Nurse Yagi RN and 6 COWS Assessments were completed independently by LPNs Kendig, Park, and Marling.  Six assessments included documentation of "Consider reassessing within 8 hours." with one "Consider reassessing in 6 hours.", but no COWS Assessment were reassessed within this time period.  Six reassessments were completed between 11 hours and 13 hours later, with one completed 7 hours later.  On 6-19-18, "OPIATE discontinued" per Dr. Balderrama was documented and no further COWS Assessments were completed.

       All 6 COWS Assessment scores by these 3 LPNs are documented inappropriately and/or incorrectly.  It is clearly documented that areas of the COWS Assessment were not assessed, but scores of 0 (zero) were given; Resting Pulse Rate score was 0 (zero) for pulse 80 or below, with documented pulses of 100, 96, 96; and documentation "verbally declined assessment" or "refused to allow actual detox assessment", but a total COWS Score was documented as 0 (zero).  Mr. Tapia had increasing withdrawal signs, from minimal to mild, with an O2Sat of 93%, incorrect  Resting Pulse Assessment of 0 (zero) with Pulse of 96, and incorrect COWS Score of 7.  There is no documentation that any RN or MD was notified of any of these findings. These LPNs are working outside their nursing scope of practice and cannot independently complete assessments and/or make treatment decisions.  Per the NaphCare Policy for the Licensed Practical/Vocational Nurse (LPN/LVN) (NCI 000044-000045) the LPN/LVN Position Summary includes "Under the direct supervision of the Health Service Administrator (HSA), Director of Nursing (DON), and Registered Nurse(s) (RN), the LPN/LVN is responsible for providing nursing care within the scope of the State Board of Nursing Practice as directed by the Registered Nurse(s)."  Registered Nurses are responsible for the direct clinical supervision of nursing/LPN staff, but there was no direct RN supervision. The LPN did not "Work cohesively with the HSA, DON, and RN(s) in the coordination of the healthcare delivery system…" or "…report all changes in patients' conditions." required by NaphCare's written policy.  RNs did not follow the NaphCare's written policy for the Registered Nurse (RN) (NCI 000054-000055) to "Observe and evaluate the performance of the licensed practical/vocational nursing staff."  Mr. Tapia never saw a Registered Nurse during these 6 LPNs COWS Assessments to assess and determine appropriate treatment/observations or care to be provided. Based on the provision of care given to Mr. Tapia during this time period, it appears that NaphCare had a custom and established practice of requiring LPNs to work outside of their nursing scope of practice by independently completing assessments

and/or making treatment decisions. That such a custom or established practice would result in harm or serious injury to patient inmates would be obvious to any nursing professional exercising his or her professional judgment.

b.    There are no further Progress Notes for the next 3 months. There is no documentation that Mr. Tapia was seen or assessed by any nursing staff or medical healthcare providers for 3 months.

c.    On 9-18-18, Mr. Tapia was seen by Nealis MHP, who documented that Mr. Tapia was confused and unable to verbally respond to questions and appeared to be decompensated.  Nealis MHP did not report these assessment findings to any  nurse or medical healthcare provider.  Instead, the documented plan was to continue MH housing and follow up. Mr. Tapia should have been referred and/or sent to medical at this time for a nursing and/or medical assessment. Patients who are confused, unable to verbally respond, and are decompensated need a thorough nursing and/or medical assessment, and/or evaluation at a higher level of care facility in a Hospital Emergency Department.

d.    On 9-19-18, Mr. Tapia was seen again, almost 26 hours later,  by Nealis MHP, who documented that Mr. Tapia presented again as confused, unable to verbally respond to questions, and appears to be decompensated, with Officers reporting Mr. Tapia was "way off his baseline".  Finally, Nealis  MHP referred Mr. Tapia to medical for an assessment, with a plan to continue MH housing and follow up. Mr. Tapia should have been immediately <u>sent</u> to medical at this time for a thorough nursing and/or medical assessment and evaluation. Patients who are confused, unable to verbally respond, and are decompensated need an immediate thorough nursing and/or medical assessment in a timely manner, in order to receive the treatment and care needed. Mr. Tapia was not assessed or seen by  a nurse or a medical healthcare provider at this time.

e.    On 9-19-18, Carrillo LPN documented that Mr. Tapia was referred to medical for being nonresponsive, was hypertensive (high blood pressure) with a BP of 150/98, and does not appear to be in distress.  There is no thorough nursing data collection completed by Carrillo LPN or any assessment by a Registered Nurse.  There is no evaluation or assessment by any Medical Healthcare Provider.  Mr. Tapia was reported to have confusion, unable to verbally respond, was decompensated, and "way off his baseline" for the past 2 days.  There is no neurological assessment, or any assessment, by any Registered Nurse or Healthcare Provider.  No other Vital Signs were obtained.  Carrillo LPN did not report these findings to his RN supervisor, and is working outside of his LPN scope of practice by working independently and making independent decisions about Mr. Tapia's care and treatment, or essentially, <u>NO</u> care or treatment. Carrillo LPN made the independent decision to continue monitor, and <u>not</u> to notify a Registered Nurse or Medical Healthcare Provider, and <u>NOT</u> to deliver the care and treatment(s) Mr. Tapia needed.  When asked in Carrillo LPN's Deposition (Pgs. 18-19 ), questions about what was the name of the physician or RN tht you were working with…and did you report back to the clinic RN working that day…and did you report your note here to an RN or physician, Carrillo LPN continued answering "it's my standard practice to always report back to the clinic RN.", but there is no documentation that Carillo LPN ever reported anything to the clinic RN. There also is no RN assessment for Mr. Tapia this day.  When asked in Carrillo LPN's Deposition (Pgs. 22-25) if he: reviewed the MHP notes; received any other information about Mr. Tapia's previous disposition; had information about when he started expressing this apparent mental health issue; had

14

information about how long Mr. Tapia had been incarcerated' or any other information about his previous health issues, he answered "I did not, other than mental health saying he was nonresponsive". When asked what was the purpose of your assessment (pg. 25), Carrillo LPN answered "Under my license I'm not allowed to do - - I'm not able to do assessments and I'm not able to diagnose. So my purpose of my visit was to collect date and check on a patient who was nonresponsive.". When asked what were you looking for when you mean check on - - check on the patient, he answered "Just a general - - just general appearance, vital signs. I ask - - generally ask them if they have any medical or mental health concerns…I just asked him if he had any medical concerns, and he stated no." This is now the **second day** that Mr. Tapia was not assessed by a Registered Nurse or Medical Healthcare Provider for a thorough nursing and/or medical assessment when he was having confusion, unable to verbally respond, was decompensated, and "way off his baseline". Mr. Tapia should have been <u>immediately</u> sent for an assessment by a Registered Nurse or a Medical Healthcare Provider, or for an evaluation at a higher level of care facility in a Hospital Emergency Department. There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained Registered Nurse and/or Licensed Practical Nurse would have recognized, and these nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk, based on their nursing training and education, was unacceptable and fell below what a reasonable and prudent nurse would do in the same or similar circumstances. Based on the provision of care to Mr. Tapia during this time period, and LPN Carrillo's Deposition (pg. 34) testimony that his assessment of Mr. Tapia "comport[ed] with NaphCare's policies and established practices," it appears that NaphCare had a custom and established practice of requiring LPNs to work outside of their nursing scope of practice by independently completing assessments and/or making treatment decisions. That such a custom or established practice would result in harm or serious injury to patient inmates would be obvious to any nursing professional exercising his or her professional judgment.

       f.     Licensed Practical Nurses Kendig, Park, Marling, Carrillo, and Ricci are working outside of their LPN nursing scope of practice, with no supervision by a Registered Nurse, or under the direction and supervision of a Licensed Physician, Physician Assistant, Advanced Registered Nurse Practitioner, or Registered Nurse, which is required under the WA State Board of Nursing Licensed Practical Nursing Practice (RCW 18.79.060) and the NaphCare Policy for the Licensed Practical/Vocational Nurse (LPN/LVN) (NCI 000044-000045). Specifically, these LPNs are functioning independently, completing independent assessments, when their LPN license only allows for data collection, and making independent decisions about patient treatment and care, or lack of care, for Mr. Tapia. They do not have the authority, or License, to independently complete COWS Assessments with no reporting to a Registered Nurse, or to make independent decisions or assessments regarding any treatment plan(s) and care. These LPNs incorrectly collected data/assessed and incorrectly documented COWS Scores, did not call or notify a Registered Nurse or Physician about Mr. Tapia's symptoms or condition, did not refer Mr. Tapia to a medical provider, and chose <u>not</u> to send him to the Emergency Department for medical care or evaluation. These LPNs did not practice under the direction of a Registered Nurse or Physician as they are required to do under their LPN license and Scope of Practice. LPNs working at Pierce County Jail are working outside their Scope and Practice of their LPN license. There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained Registered Nurse and/or Licensed Practical Nurse would have recognized, and these nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk, based on their nursing training and education, was unacceptable and fell below what a reasonable and prudent nurse would do in the

same or similar circumstances. Based on the provision of care to Mr. Tapia during this time period, it appears that NaphCare had a custom and established practice of requiring LPNs to work outside of their nursing scope of practice by independently completing assessments and/or making treatment decisions. That such a custom or established practice would result in harm or serious injury to patient inmates would be obvious to any nursing professional exercising his or her professional judgment.

g.    On 9-20-18, Mr. Tapia was seen by Prather MHP who documented Mr. Tapia does not respond in any way and he just stared, not even shaking his head yes or no. Prather MHP did not report these assessment findings to any nurse or medical healthcare provider. Instead, the documented plan was to continue MH housing for observation and follow up. Mr. Tapia should have been immediately referred and/or sent to medical at this time for a nursing and/or medical assessment. This was another missed opportunity to help and care for Mr. Tapia. Patients who are confused and unable to respond in any way, need a thorough nursing and/or medical assessment, and/or evaluation at a higher level of care facility in a Hospital Emergency Department.

h.    There are no further Progress Notes for the next 5 days. There was no follow up or observation or care documented for 5 days. There is no documentation that Mr. Tapia was seen or assessed by any mental health staff, nursing staff, or medical healthcare providers for another 5 days. Mr. Tapia's serious medical condition and medical needs were essentially ignored during this time.

i.    On 9-26-18 and 9-28-18, Mr. Tapia was seen by Nealis MHP and Perez MHP. Documentation continues with Mr. Tapia presenting with confusion, being non-verbal, decompensated, and not responding to basic questions. The only plan at this time is to continue MH housing for further assessment and follow up. No MHP seeing Mr. Tapia is reporting these assessment findings to any nurse or medical healthcare provider. Instead, the documented plan was to continue MH housing for observation and follow up. Mr. Tapia should have been immediately referred and/or sent to medical at this time for a nursing or medical assessment. This was another missed opportunity to help and deliver the care that Mr. Tapia needed. Patients who are confused and in Mr. Tapia's condition, need a thorough nursing and/or medical assessment, and/or evaluation at a higher level of care facility in a Hospital Emergency Department.

j.    On 9-29-18, Nurse Warren RN was requested by a Seargent to see Mr. Tapia in his cell. Nurse Warren RN documented that Mr. Tapia's cell smelled of urine and he has a sheet wrapped round his waist; that Mr. Tapia is alert, sitting on his bunk, and making eye contact; and that he will not verbally respond, but follows instructions. Vital Signs were: Pulse 100, Resp 14-16, BP 127/77. There is no documentation that a thorough nursing assessment was completed, specifically a comprehensive head-to-toe assessment, and neurological assessment when it was clearly known and documented many time that Mr. Tapia was confused, unable to verbally respond, was decompensated, and "way off his baseline". There is no documentation about why his cell smells of urine, or if he has any pain. Mr. Tapia needed a thorough nursing assessment and/or thorough medical assessment when he was having confusion, unable to verbally respond, was decompensated, and "way off his baseline". Mr. Tapia should have been immediately sent for an assessment by Medical Healthcare Provider at this time. Nurse Warren RN scheduled a

16

Provided visit for evaluation, but did not notify a Healthcare Provider of Mr. Tapia's symptoms or condition. Nurse Warren RN could have also <u>immediately</u> sent Mr. Tapia for an evaluation at a higher level of care facility in a Hospital Emergency Department, but she choose **not** to do either. This was a **third** opportunity to get Mr. Tapia the medical care and treatment he needed. There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained Registered Nurse and/or Licensed Practical Nurse would have recognized, and these nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk, based on their nursing training and education, was unacceptable and fell below what a reasonable and prudent nurse would do in the same or similar circumstances.

   k. On 9-30-18, Mr. Tapia was seen by Poo MHP who documented Mr. Tapia was uncooperative; appeared to be sleeping; did not respond to knocks on the door or calling name; and that his cell was messy and disorganized. Once again, a MHP did not report these assessment findings to any nurse or medical healthcare provider. Instead, the documented plan was to recommend MH housing and follow up. Mr. Tapia should have been referred and/or sent to medical at this time for a nursing and/or medical assessment. This was **fourth** missed opportunity to help and care for Mr. Tapia. Patients who are unable to respond in any way, need a thorough nursing and/or medical assessment, and/or evaluation at a higher level of care facility in a Hospital Emergency Department.

   l. On 10-1-18, Nurse Chalk RN was asked to see Mr. Tapia for "toes turning black". Nurse Chalk RN documented that Mr. Tapia's left foot was slightly swollen and severely discolored. Mr. Tapia was finally brought to the clinic for an assessment and medical evaluation. Mr. Tapia continued being non-verbal and did not answer questions. A MHP spoke with him and reported pain, but does not recall what happened or when. Medical Director Balderrama documented that Mr. Tapia "has evidence of poss vascular deficits on left foot with edema needs an ER evaluation for poss emergent surgical management". Mr. Tapia was referred by Medical Director Balderrama and Nurse Hughes NP to Tacoma General Emergency Department. Nurse Chalk RN documented that Mr. Tapia was sent to the ER for "suspected gangrene". It was not until this day, **13 days later**, that Mr. Tapia was **finally** seen, assessed, and evaluated for his symptoms, and change in condition that began on 9-18-18.

   m. In the Deposition of Nurse Slothower RN HSA (Pg. 41), when asked:

Q. So other than Dr. Balderrama or a nurse practitioner, does anyone at the - - any NaphCare employee at the Pierce County Jail have the responsibility of ensuring that inmates with a serious medical need are transferred to an outside facility in a timely manner?

A. To some extent, yes, we all do. We - - anybody that recognizes what might be a serious medical need tht is emergent is authorized to send people out to the hospitals. Nurses send people to the hospitals regularly if they see something tht appears to be emergent.

   n. Nurse Villacorta RN was the Director of Clinical Operations, Nurse Slothower RN was the Health Service Administrator (HSA) and Nurse Valencia was the Director of Nursing (DON) at the Pierce County Jail. "Developing…, implementing…, and evaluating policies, procedures, and guidelines to improve the quality of nursing practice" (ANA Standard

17

10. Quality of Practice, pg. 55) is the responsibility of the correctional registered nurse, especially nurse leaders. Not acting to improve the quality of nursing practice is the antithesis of the role and expectations of correctional nurse leaders and represents a violation of the standards of correctional nursing practice applicable to Registered Nurses Villacorta, Valencia, and Slothower. Registered Nurse leaders are responsible to make sure all nurses working with patient inmates in the Pierce County Jail follow policies and procedures, including assessing patient inmates for medical, mental, and emergency healthcare needs. Supervision and training must include that all nurses follow and work within their scope and standards of practice of their nursing license. (See NaphCare Health Care Policy and Procedure Manual - NCI 000037-000043 for the Director of Nursing/DON and for the Health Services Administrators/HSA Positions. As a leader (Director of Clinical Operations, HSA, DON) Nurse Villacorta RN Director of Clinical Operations, Nurse Slothower RN HAS, and Nurse Valencia DON, and are "the executive nurse leader in the correctional setting [and] is instrumental to safe nursing practice and quality patient care delivery. This individual plays a critical role in . . . articulating standards of practice, . . . and working with other senior colleagues to enhance the delivery of health care (ANA, pg. 23).

Nursing leaders in the correctional setting are expected to have a higher level of education to best prepare them for the administrative roles, leadership skills, complexities, policy issues, and staffing needs of the correctional healthcare facility/system (ANA, pg. 23). "Graduate nursing education at the master's and doctoral level best prepares the correctional nurse to function in administrative roles…" (ANA, pg. 23). It is unknown if Nurse Villacorta RN Director of Clinical Operations and/or Nurse Valencia have any graduate level nursing education for degree(s) at the master's or doctorate level. Nurse Slothower RN HSA did not have any graduate level nursing education for degree(s) at the master's or doctorate level.

o.      Licensed Practical Nurses in Pierce County Jail are working independently and outside their LPN nursing scope of practice and performing RN duties. LPNs are not following policies and procedures, and are not working under the supervision of a Registered Nurse or Licensed Physician. LPNs in Pierce County Jail have been working outside their legal scope of nursing practice, making independent decisions about patient nursing care and treatment (including: Independently and incorrectly completing COWS Assessments with no reporting to a Registered Nurse; making independent assessments and/or decisions regarding treatment plan(s) and care; not administrating medication as ordered, not reporting refusals of care; not calling or notifying a Registered Nurse or Physician to report patient symptoms and/or clinical findings; not referring Mr. Tapia to a medical provider; and choosing not to send to the Emergency Department for medical care or evaluation.). RNs caring for Mr. Tapia did not follow policies and procedures, did not supervise LPNs, and did not make referrals and/or contact the medical provider or mental health provider when medically necessary for Mr. Tapia's and his condition. These are not safe nursing practices and contributed to a **catastrophic** outcome for Mr. Tapia. It is also the responsibility of the registered nurse(s) in a leadership position to "oversee the nursing care given by others while retaining accountability for the quality of care given to the patient" (ANA Standard 12. Leadership, pg. 58). This did not occur. Mr. Tapia did not receive quality health care in his greatest time of need.

8.    I understand that further depositions may be scheduled and I reserve the right to supplement my report after receiving transcripts of those depositions and any other materials/exhibits.

9.    It is my opinion that the above-delineated actions and inactions by Registered Nurses Yagi and Warren; unknown named Registered Nurses supervising Licensed Practical Nurses; and Licensed Practical Nurses Kendig, Park, Marling, Carrillo, and Ricci are breaches of the applicable standards of care, and that these actions/inactions caused or contributed to Mr. Tapia's **tragic outcome** (loss of limb and unnecessary pain). Registered Nurses failed to thoroughly assess; failed to supervise LPNs; failed to follow policies, procedures, and protocols; failed to call a  medical provider or mental health provider; and/or failed to send Mr. Tapia for emergency treatment or higher level of care.  Licensed Practical Nurses worked independently and unsupervised, and outside their scope of practice; failed to notify a RN or medical provider or mental health provider of their subjective and objective findings;  failed to document correctly; failed to report refusal(s) of care; failed to administer mediations as ordered; failed to follow policies, procedures, and protocols; and failed to obtain the medical emergency treatment Mr. Tapia needed.  Had Mr. Tapia received appropriate nursing assessments, treatment, and care, reporting of findings required by RNs to a physician, and/or reporting of findings required by LPNs to a registered nurse or physician, for medical care and mental health care, medical treatment and limb saving interventions could have been given.


I, Denise M. Panosky, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.


_Denise M. Panosky_

_____
Denise M. Panosky, DNP, RN, CNE, CCHP, FCNS

January 31, 2024

# References

American Nursing Association (2013).  *Correctional Nursing: Scope and Standards of Practice*, 2d Ed. Silver Spring, MD: Nursebooks.org.

Anno, B. J. (2009). *Correctional Health Care: Guidelines for the Management of an Adequate Delivery System*, 3rd Printing. Chicago.

National Commission on Correctional Health Care (2014*).  Standards for Health Services in Jails*, Chicago.

National Commission on Correctional Health Care (2014*).  Standards for Health Services in Prisons*, Chicago.

Schoenly, L. & Knox, C. (2013).  *Essentials of Correctional Nursing*, Springer Publishing Company, NY.

# Appendix A

See Separate Document for CV

# Appendix B

# Denise Panosky DNP, RN, CNE, CCHP, FCNS

## **Legal Nurse Consulting Cases with Deposition and/or Trial Testimony Given**

December 2023    Banning v. Shelby County
                 Expert Report 11-2023
                 Deposition 12-2023

November 2022    Rapp v. NaphCare Inc.
                 Expert Report 9-2022
                 Deposition 11-2022

May 2022         Greer v. County of San Diego
                 Expert Report 1-2022
                 Deposition 5-2022

February 2022    Heth v. LaSalle County
                 Expert Report 11-2021
                 Deposition 2-2022

December 2021    Rapp v. City of Redding, Kitsap County Jail
                 Expert Report 1-2021
                 Deposition 12-2021

April 2020       Windhurst v. Arizona Department of Corrections
                 Preliminary Expert Affidavit
                 Expert Report 1-2020
                 Rebuttal Report 2-2020
                 Deposition 4-2020

November 2019    Leland v. Yavapai County
                 Expert Report 5-2017
                 Deposition 8-2018
                 Trial Testimony 11-2019

February 2018    Neuroth v. Mendocino County
                 Expert Report 10-2017
                 Deposition 2-2018

December 2016    Spencer v. Correct Health Bartow
                 Deposition 12-2016

23

October 2016          Garner v. Mohave County
                      Expert Report 4-2016
                      Deposition 10-2016

# Appendix C

# Denise Panosky DNP, RN, CNE, CCHP, FCNS

17 Chriswood Trace
Ledyard, CT  06339

denise.panosky@gmail.com

860-608-2585 cell

**Consulting Customary Fees as of January 1, 2022 for all new cases:**

$1,800 – Retainer

$300/hour – Records Review, Research, Timelines, Analysis and Summaries, Narratives and Case Reports, Phone calls and meetings for case discussions, and Deposition Preparation

$450/hour – Depositions (2-hour minimum, Pre-Paid, Plus expenses) and Trial preparation

$4,000/day – Trial/Testimony Fee (Plus expenses)

**Expenses Detailed – January 1, 2022:**

| Expenses | Cost |
|---|---|
| Travel Hours – Door to Door  (Max. 10 hours/day) | 50% of Hourly Rate  ($150 / hour) |
| Travel – Air Transportation | Actual Cost – Pre-paid |
| Travel – Airport Tapiaing, Hotel Tapiaing | Actual Cost |
| Travel – Mileage | $ 0.585/Mile |
| Transportation – Rental Car, Uber, Taxi | Actual Cost |
| Travel – Lodging | Actual Cost – Pre-paid |
| Travel – Meals | $ 100 / Day |
| Incidental Expenses (e.g. Airline Baggage, Internet) | Actual Cost |

# Denise M. Panosky DNP, RN, CNE, CCHP, FCNS

Associate Research Professor
University of Connecticut School of Nursing
Cell: 860-608-2585
Home Email: denise.panosky@gmail.com
Work Email: denise.panosky@uconn.edu

## CURRICULUM VITAE
Updated January 2022

## I.    EDUCATION

| Degree | Institution | Major Field | Date Completed |
|--------|-------------|-------------|----------------|
| DNP | Duquesne University | Nursing | May 2010 |
| MSN | Quinnipiac University | Forensic Nursing | May 2006 |
| BSN | Southern Connecticut State University | Nursing | May 1983 |

## II.    REGISTRATION

Registered Nurse, Connecticut License # E46688

Forensic Clinical Nurse Specialist

Certified Nurse Educator

Certified Correctional Health Professional

## III.    PROFESSIONAL EXPERIENCE

### A.    Experiences in Higher Education

| Date | Institution | Nature of Work | Academic Status |
|------|-------------|----------------|-----------------|
| 2017 - | University of Connecticut School of Nursing | Clinical and Academic Nursing Professor | Associate Research Professor |
| 2013 - 2016 | University of Connecticut School of Nursing | Clinical and Academic Nursing Professor | Associate Clinical Professor |
| 2008 - 2013 | University of Connecticut | Clinical and Academic | Assistant Clinical |

1

|  | School of Nursing | Nursing Professor | Professor |
| --- | --- | --- | --- |
| 2006 - 2008 | University of Connecticut School of Nursing | Clinical and Academic Nursing Instructor | Clinical Instructor |
| 1996 - 1998 | Three Rivers Community Technical College Norwich, CT | Primary Nursing Instructor for Certified Nurse's Aides | Program Coordinator Adjunct Nursing Professor |

### B.    Experiences in Other than Higher Education

| Date | Position Title | Institution |
| --- | --- | --- |
| 2011 - 2012 | Emergency Department Registered Nurse Sexual Assault Nurse Examiner | North Stonington Health Center North Stonington, CT |
| 1986 - 2011 | Emergency Department Registered Nurse Sexual Assault Nurse Examiner Charge Nurse | Lawrence and Memorial Hospital New London, CT Pequot Health Center Groton, CT |
| 1983 - 1986 | Neuro-Surgical Registered Nurse Charge Nurse | Saint Francis Hospital Hartford, CT |

## IV.    PUBLICATIONS

### Publications in Print

Kline, J. & Panosky, D. (2017).  Increasing the Use of Palliative and Hospice Services. *International Journal for Human Caring*.  21(4), 214-217.

Munger, T., Savage, T., & Panosky, D.  (2015). When Caring for Perpetrators Becomes a Sentence. *Journal of Correctional Health Care*, 21(4), 365-374.

Panosky, D. M. & Shelton, D.  (2015). Evaluating an Adolescent Behavioral Program: Leadership, Education, Achievement, and Development for Adolescent Female Offenders in Corrections. *Journal of Forensic Nursing,* 11(3), 144-153.

Shelton, D., Reagan, L., Weiskopf, C., Panosky, D., Nicholson, M. & Diaz, D. (2015).  Baseline Indicators and Implementation Strategies in a Statewide Correctional Nurse Competencies Program: Mid-year report.  Journal for Continuing Education in Nursing, 46 (10) 455-461. Doi:10.3928/00220124-2015.

Diaz, D., Panosky, D., & Shelton, D. (2014). Simulation: Introduction to Correctional Nursing in a Prison Setting. *Journal of Correctional Health Care* 20(3), 240-248.

Peternelj-Taylor, C. & Panosky, D. (2013).  Advancing Forensic Correctional Nursing.  *Journal of Forensic Nursing*, 1(9), 1-2.

Panosky, D. & Diaz, D. (2009). Teaching Caring and Empathy through Simulation. *International Journal for Human Caring,* 13(3), 44-46.

### Other

Shelton, D., Panosky, D. & Diaz, D. (2009).  Promoting nursing student learning in correctional settings. Conference proceedings: 10th Biennial International Conference on the Nurse's Role in the Criminal Justice System. On-line at: http://www.usask.ca/nursing/custodycaring/index.htm.

Panosky, D., Shelton, D., Riebe, G. & Chaken, M. (2009).  Correctional nursing: An orientation for nursing students. Conference proceedings: 10th Biennial International Conference on the Nurse's Role in the Criminal Justice System. On-line at: http://www.usask.ca/nursing/custodycaring/index.htm.

Panosky, D. (2005).  *Jail Diversion*.  Informational Brochure for State of Connecticut, Department of Mental Health and Addiction Services (DMHAS), Southeastern Mental Health Authority (SMHA), Forensic Services, Norwich, CT.

## V.    RESEARCH AND EVALUATION GRANTS

### A.    Grants

Feb. 2013 - June 2014 "Reducing stress among correctional nurses through focus groups"
Project Investigator, Center for the Promotion for Health in the New England Workplace (CPH-NEW), $11,000 funded

June 2012 - 2013    "Student Labor for Aging, Musculoskeletal Disorders, and Work Capacity"
Project Investigator and Coordinator at UConn, NIOSH funded grant through UCHC, $48,236 funded

July 2011 - 2014    "Nurse, Education, Practice, Quality, and Retention"
Co-Investigator and Project Coordinator, HRSA, $1,145,310 funded

July 2009    "A Feasibility Study for an Adolescent Behavioral Program"
Project Investigator, Sigma Theta Tau International Honor Society of Nursing, Mu Chapter, $1,000 funded

February 2009    "Leadership, Education, Achievement and Development (LEAD) for Adolescents in a Correctional Facility"
Co-Project Investigator Viola W. Bernard Foundation, $10,000 funded

3

## VI.    DISSERTATION AND THESIS SUPERVISION

| Date | Student Name | Title | Role |
|---|---|---|---|
| 2016 | Jennifer Goodridge | The United States Navy Ship Shape Program… | Committee Member, DNP |
| 2016 | Genice Nelson | Sickle Cell Pain Management… | Committee Member, DNP |
| 2015 | Sarah Knoeckel | Improving Provider Identification and Management of Overweight and Obesity in Primary Care | Associate Advisor, DNP |
| 2014 | Annette Maruca | Incarcerated Veterans with Mental Disorders | Committee Member, PhD |
| 2013 | Mary Ellen Castro | Correctional Diabetic Screening | Major Advisor, DNP |
| 2012 | Tanya Munger-Montavon | When Caring for Perpetrators Becomes a Sentence: Recognizing Vicarious Trauma | Associate Advisor, DNP University of Illinois |
| 2012 | Ceilia Gote | Integrated Healthcare Delivery for Co-morbid Diabetes | Associate Advisor, DNP |
| 2012 | Mary Patricia Lamberti | Improving Sleep in College Students: An Educational Intervention | Associate Advisor, DNP |
| 2012 | Susan Lynch | Nurses' Beliefs about and use of Evidence Based Practice | Committee Member, DNP |
| 2012 | Jessica Planas | Chronic Disease Management through Goal-Setting for Latino Populations | Committee Member, PhD |
| 2011 | Philip Frick | Correctional nurse-inmate interactions | Committee Member, DNP |

4

## VII.   HONORS RECEIVED/ SPECIAL CERTIFICATIONS

### A.   Honors Received

| | |
|---|---|
| October 2014 | Joseph A. Dolan Award for Outstanding Contributions to Nursing Education awarded by the Connecticut Nurses' Association |
| June 2013 | Research Affiliate of Center for the Promotion of Health in the New England Workplace (CPH-NEW) |
| May 2012 | Nightingale Award for Excellence in Nursing |
| October 2009 | The Florence Wald Award for Outstanding Contributions to Nursing Practice awarded by the Connecticut Nurses' Association |
| October 2009 | "Modeling Vulnerabilities and Stressors of Co-Occurring Disorders among a Prison Population", Outstanding Scientific Research and Education Award by International Association of Forensic Nurses 17th Scientific Assembly |
| 2009 - Present | Golden Key International Honour Society |
| 2006 - Present | Sigma Theta Tau International Honor Society of Nursing |
| 2005 - 2006 | HRSA Nursing Traineeship Grant |
| 2004 - Present | Quinnipiac University Nursing Honor  Society |

### B.   Clinical and Other Certifications

| | |
|---|---|
| 2011 - Present | Certified Nurse Educator (CNE) National League for Nursing (NLN) |
| 2008 - Present | Certified Correctional Health Professional (CCHP) American Correctional Health Services Association (ACHSA) |
| 2006 - Present | Critical Incident Stress Management (CISM) |
| 2005 - 2013 | Pediatric Advanced Life Support (PALS) |
| 1998 - Present | Sexual Assault Nurse Examiner (SANE) |
| 1986 - 2013 | Advanced Cardiac Life Support (ACLS) |
| 1983 - Present | Registered Nurse, Connecticut Board of Nursing |

## VIII.  REVIEW ACTIVITIES AND EDITORIAL BOARDS

### A.  Journal Reviewers/Editorial Boards

2015 - Present        Journal for Evidence-based Practices in Correctional Health

2012 - Present        Journal of Forensic Nursing

## IX.  PRESENTATIONS

### A.  Invited Address

"Identifying and Evaluating Stress Reduction Interventions for Correctional Nurses".
    4th Annual Community Engagement and Research Symposium: Building on Partnership
    Strengths to Improve Community Health, University of Massachusetts Medical School,
    Worcester, MA, November 7, 2014.

"Incarceration and Women's Health" Round Table Discussion.  Human Rights Institute,
    University of Connecticut, Storrs, CT, April 10, 2013.

"An Evaluation Project for an Adolescent Behavioral Program: Leadership, Education,
    Achievement, and Development (LEAD-C) for Adolescent Offenders in Corrections".
    Sigma Theta Tau International Honor Society of Nursing, Mu Chapter 56th Induction
    Ceremony, University of Connecticut, Storrs, CT, November 7, 2010.

### B.  International Presentations

Panosky, D. & Shelton, D.  Formalizing education in Correctional Health Nursing to improve
    competencies and quality care.  International Association of Forensic Nurses 24th
    Scientific Assembly, Denver, CO., October 2016.

Panosky, D.  Correctional Nursing Stress: A review of differences among correctional nurses, 14th
    Biennial International Custody and Caring Conference, Saskatchewan, Canada, October 8,
    2015.

Díaz, D.A., Reagan, L., Shelton, D & Panosky. D. Psychometric Evaluation and Revision of an
    Instrument to Measure Satisfaction with Simulation in Correctional
    Nurses.  SimHealth 2014, Adelaide, Australia, August 2014.

Díaz, D.A., Panosky. D., Reagan, L., Shelton, D & Panosky. D.  Nursing Competencies that
    include simulation to close the gap in clinical practice- a mobile program.  SimHealth
    2014, Adelaide, Australia, August 2014.

6

Díaz, D.A., Reagan, L., Shelton, D & Panosky. D. The effective use of training simulation super users to bridge the clinical practice gap and engage the workforce. SimHealth 2014, Adelaide, Australia, August 2014.

Panosky, D.  Caring for our Inmate Patients with Confidence and Competence: A Case Study Approach, 13th International Custody and Caring Conference, Saskatchewan, Canada, October 3, 2013.

Panosky, D., Shelton, D., Peternelj-Taylor, C., Walsh, E., & Schoenly, L. Contemporary Clinical Topics for Correctional Nurses, International Association of Forensic Nurses 20th Scientific Assembly, Fajardo, Puerto Rico, October 11, 2012.

Shelton, D., Panosky, D., Weiskopf, C., Nicholson, M., Butler, T., Reagan, L. & Diaz, D. Implementation of a statewide correctional nursing competency system: Year 1. International Association of Forensic Nurses 20th Scientific Assembly, Fajardo, Puerto Rico, October 11, 2012.

Panosky, D.  A Therapeutic Expressive Arts Program for Female Adolescent Offenders: Interdisciplinary Assessment Results, International Association of Forensic Nurses 20th Scientific Assembly, Fajardo, Puerto Rico, October 10, 2012.

Panosky, D.  Using Therapeutic Expressive Arts to Foster Healing among Female Adolescent Offenders, International Association of Forensic Nurses 19th Scientific Assembly, Montreal, Canada, October 21, 2011.

Panosky, D. and Shelton, D.  A Study of Nursing Students' Clinical Outcomes, 12th International Custody and Caring Conference, Saskatchewan, Canada, October 7, 2011.

Panosky, D.  An Evaluation Project for an Adolescent Behavioral Program: Leadership, Education, Achievement and Development for Adolescent Offenders in Corrections, 12th International Custody and Caring Conference, Saskatchewan, Canada, October 6, 2011.

Shelton, D. and Panosky, D.  The Re-Discovery of Self-Care Model: A Guide for  Correctional Nursing, 12th International Custody and Caring Conference, Saskatchewan, Canada, October 6, 2011.

Panosky, D.  The Value and Effectiveness of a Sexual Assault Nurse Examiner.  Haitian Health Foundation, Jeremie, Haiti, July 5, 2011.

Panosky, D. & Plank, G.  CT-100 State of Connecticut Sexual Assault Evidence Collection Kit; Workshop.  Haitian Health Foundation, Jeremie, Haiti, July 2 and 5, 2011.

Díaz, D.A., Allchin, L., Kuhnly, J., Maruca, A., & Panosky, D. The New Horizon: A Simulated Eight Hour Work Day. Asia-Pacific Association Simulation and Clinical Learning, Hong Kong, China, May 2011.

Shelton, D. & Panosky, D. Application of a Biopsychosocial Framework for Corrections Nursing Research and Clinical Practice.  International Association of Forensic Nurses 18th Scientific Assembly, Pittsburg, PA, October 27, 2010.

Colbert, A., Panosky, D., & Zoucha, R.  Forensic Nursing and High Risk Women Offenders: Opportunities for Innovation.  International Association of Forensic Nurses 18th Scientific Assembly, Pittsburg, PA, October 27, 2010.

Shelton, D. & Panosky, D. Modeling Vulnerabilities and Stressors of Co-Occurring Disorders among a Prison Population Poster. International Association of Forensic Nurses 17th Scientific Assembly, Atlanta, Georgia. October 22, 2009.

Panosky, D., Shelton, D., Riebe, G., & Chaken, M.  Correctional Nursing: An Orientation for Nursing Students. 11th International Custody and Caring Conference, Saskatchewan, Canada, October 2, 2009.

Shelton, D., Panosky, D., & Diaz, D.  Promoting Student Learning in Correctional Settings. 11th International Custody and Caring Conference, Saskatchewan, Canada, October 1, 2009.

## C.    National Presentations

Panosky, D., Reducing Stress among Correctional Nurses through Focus Groups, National Conference on Correctional Health Care, Las Vegas, NE, October 21, 2014.

Panosky, D., Shelton, D., & Weiskopf, C. Essentials of Nurse Leadership: Performance Enhancement.  National Conference on Correctional Health Care, Nashville, TN, October 29, 2013.

Shelton, D., Panosky, D., Diaz, D., Reagan, L., Weiskopf, C., & Nicholson, M.  Changing a culture: Implementing the ANA Correctional Nursing Competencies, National Conference on Correctional Health Care, Nashville, TN, October 28, 2013.

Panosky, D., Shelton, D., & Weiskopf, C.  Evaluation of a Correctional Nursing Competency Program: Evaluation Data Results and Successful Partnership Implementation.  National Conference on Correctional Health Care, Nashville, TN, October 2013.

Diaz, D., Panosky, D, Reagan, L., Shelton, D.  Correctional nurse super-users; the use of simulation to advance practice and engage the workforce, ACCJH conference, Chicago. IL, March 21, 2013.

Panosky, D., Shelton, D., Diaz, D., Reagan, L, Zheng, B.  Advancing Correctional Nurse Competencies for Quality Care: Evaluation of Simulation Learning and Satisfaction, 2013 ACHSA Multidisciplinary Educational Conference, Philadelphia, PA., March 14, 2013.

Shelton, D., Panosky, D., Weiskopf, C., Butler, T., Nicholson, M., Reagan, L. & Diaz, D.

8

One key to quality: Correctional nursing competencies.  National
Conference on Correctional Health Care, Las Vegas, NV., October 22, 2012.

Panosky, D., Shelton, D., & Weiskopf, C.  One Key to Quality: Correctional Nursing
Competences, National Conference on Correctional Health Care, Las Vegas, NV,
October 2012.

Panosky, D.  An Evaluation Project for an Adolescent Behavioral Program: Leadership,
Education, Achievement, and Development for Adolescent Offenders in Corrections.
Duquesne University, Duquesne Room, Student Union, Pittsburgh, PA. May 6, 2010.

Shelton, D. & Panosky, D. Correctional Nursing Competency Development. American
Correctional Health Services Association 2009 Multidisciplinary Professional
Development Conference, Orlando, FL. March 15, 2009.

### D.    Regional Presentations

Zabin, A. & Panosky, D.  Social Challenges for Correctional Nurses Delivering Healthcare.
University of Connecticut, Frontiers in Undergraduate Research Honor's Conference,
Wilbur Cross, Storrs, CT.  October 29, 2014.

Zheng, B., Panosky, D., & Shelton, D.  Correctional Nurse Competencies: Evaluation of
Simulation Learning and Satisfaction.  University of Connecticut, Frontiers in
Undergraduate Research Honor's Conference, Wilbur Cross, Storrs, CT.  April 12, 2013.

Weiskopf , C., Shelton, D., Panosky, D., & Bassi, S.  Updates in Correctional Nursing
Interventions.  New England Chapter of the American Psychiatric Nurses
Association Resiliency Conference, Middletown, CT. April 30, 2010.

Shelton, D., Panosky, D. & Wakai, S.  Development of a Biopsychosocial Vulnerability-Stress
Model of Mental Illness among Prison Population.  University of Connecticut,
ATHENA Conference, Student Union, Storrs, CT. April 2009.

Shelton, D. & Panosky, D. Competencies for Connecticut Correctional Nurse's, University of
Connecticut, ATHENA Conference, Student Union, Storrs, CT. April 2009.

Balisciano, Belnap, Flanagan, Lutkus, Panosky, Shelton et al. Patterns of Psychotropic
Medication Adherence and Nonadherence Among Male Prison Populations: A Pilot
Study, University of Connecticut, ATHENA Conference, Student Union, Storrs, CT.
April 2008.

### E.    Other Presentations

Panosky, D. Jail Diversion, Providing Client Care and Enhancing Public Safety.  Quinnipiac
University, Alumni Hall, Hamden, CT. April 2006.

Panosky, D. State v. Garland. Quinnipiac University, Graduate School of Nursing, Hamden, CT. April 2006.

Panosky, D. The Value and Effectiveness of a Sexual Assault Nurse Examiner. Quinnipiac University, Graduate School of Nursing, Hamden, CT. April 2005.

Panosky, D. Conditional Release of Acquittees Under Jurisdiction of the Psychiatric Security Review Board: Community and Citizen Safety. Quinnipiac University, Graduate School of Nursing, Hamden, CT. April 2005.

Panosky, D. Protective Services for the Elderly. Quinnipiac University, Graduate School of Nursing, Hamden, CT. May 2005.

Panosky, D. Virginia Henderson: Nursing to Researching. Quinnipiac University, Graduate School of Nursing, Hamden, CT. October 2003.

## X.    PROFESSIONAL SERVICE

### A.    Offices Held in Professional Organizations

#### a.    International

| | |
|---|---|
| July 2012 | International Association of Forensic Nurses (IAFN)<br>Co-Editor for a special edition for *Journal of Forensic Nursing* (JFN) on Correctional Nursing |
| 2011 - 2013 | International Association of Forensic Nurses (IAFN)<br>Corrections Task Force Chair |
| 2006 - 2011 | International Association of Forensic Nurses (IAFN)<br>International Governmental Affairs Committee Member |

#### b.    National

| | |
|---|---|
| 2011 - 2014 | American National Nurses Association (ANA)<br>Correctional Nursing Workgroup Member |
| 2007 - Present | National League for Nursing (NLN)<br>University of Connecticut Ambassador |

#### c.    Regional

| | |
|---|---|
| 2007 - 2011 | IAFN Connecticut Chapter<br>Director at Large, Board Member |

10

### B.    Consultation Activities

January 2021          *The California Department of Justice's Review of Immigration Detention in California*
Immigration Detention Facility Review Team's Nursing Expert Consultant

2009 - Present        Legal Nurse Consulting: Private consultation with attorneys for legal, forensic, correctional, nursing, and medical cases.

2006 - 2008          Spectrum Nurse Consulting, LLC: Consultation with attorneys for legal, forensic, nursing, and medical cases.

### C.    Service to the University

Fall 2016            Center for Correctional Health Networks Academic and Professional Development Director

Faculty Advisor for the Mentoring Program

Faculty Advisor for 9 Undergraduate Nursing Students

DNP Committee member

CAAR Committee Chair

Recruitment and Selection Committee member

2015 - 2016          Center for Correctional Health Networks Academic and Professional Development Director

Faculty Advisor for the Mentoring Program

Faculty Advisor for 23 Undergraduate Nursing Students

Faculty Advisor for 1 Undergraduate Honors Student

DNP Committee member

CAAR Committee Chair

Reviewer for SURF Awards

Reviewer for IDEA Grant Program

11

2014 - 2015         Center for Correctional Health Networks Academic and Professional
                    Development Director

                    Faculty Advisor for the Nursing Learning Community

                    Faculty Advisor for the Mentoring Program

                    Faculty Advisor for the Nursing Class of 2015

                    Major Advisor for 1 Graduate Student

                    Associate Advisor for 1 Graduate Students

                    Faculty Advisor for 23 Undergraduate Nursing Students

                    Faculty Advisor for 1 Undergraduate Honors Student

                    DNP Committee member

                    CAAR Committee member

                    Reviewer for SHARE and RARE Awards

                    Reviewer for SURF Awards

                    Reviewer for IDEA Grant Program


2013 - 2014         Faculty Advisor for the Nursing Learning Community

                    Faculty Advisor for the Mentoring Program

                    Faculty Advisor for the Nursing Class of 2015

                    Major Advisor for 1 Graduate Student

                    Associate Advisor for 1 Graduate Students

                    Faculty Advisor for 35 Undergraduate Nursing Students

                    Faculty Advisor for 1 Undergraduate Honors Student

                    DNP Committee member

2012 - 2013    Faculty Advisor for the Nursing Learning Community

Faculty Advisor for the Mentoring Program

Faculty Advisor for the Nursing Class of 2015

Major Advisor for 1 Graduate Student

Associate Advisor for 4 Graduate Students

Faculty Advisor for 25 Undergraduate Nursing Students

Faculty Advisor for 1 Undergraduate Honors Student

Pre-licensure Admission (Petitioning, Transfer, MEIN) Committee

DNP Committee member

2011 - 2012    Faculty Advisor for the Nursing Learning Community

Faculty Advisor for the Nursing Class of 2015

Major Advisor for 1 Graduate Student

Associate Advisor for 4 Graduate Students

Faculty Advisor for 25 Undergraduate Nursing Students

Faculty Advisor for 1 Undergraduate Honors Student

Pre-licensure Admission (Petitioning, Transfer, MEIN) Committee

DNP Committee member

2010 - 2011    Faculty Advisor for the Nursing Learning Community

Faculty Advisor for the Nursing Class of 2011

Major Advisor for 1 Graduate Student

Associate Advisor for 5 Graduate Students

Faculty Advisor for 31 Undergraduate Nursing Students

13

Faculty Advisor for 1 Undergraduate Honors Student

Undergraduate Commencement Committee

2009 - 2010      Faculty Advisor to the Nursing Learning Community

Faculty Advisor for the Class of 2011

Faculty Advisor to 32 Individual Nursing Students

Curriculum and Courses Committee

Undergraduate and MbEIN Pinning Ceremony Planning Committee

2008 - 2009      Faculty Advisor to the Nursing Learning Community

Faculty advisor to 3 Senior Engineering Students working on their Senior Engineering Design Project

Faculty Advisor for the Class of 2011

Faculty Advisor to 25 Individual Nursing Students

Curriculum and Courses Committee

Undergraduate and MbEIN Pinning Ceremony Planning Committee

2007 - 2008      Nursing Class of 2011 Advisor

Faculty Advisor to 25 Individual Nursing Students

Commencement/Convocation Planning Committee

Curriculum and Courses Committee

MbEIN Pinning Ceremony Planning Committee

2006 - 2007      Faculty Advisor to 25 Individual Nursing Students

Undergraduate and MbEIN Evaluation Committee

14

## XI.    <u>TEACHING EXPERIENCE</u>

2006 - Present    Associate Professor, University of Connecticut, School of Nursing, Storrs, CT

### A.    <u>Undergraduate</u>

| <u>Course number/title</u> | <u>Role</u> | <u>Number of Students</u> |
|---|---|---|
| <u>Fall 2019</u> | | |
| 4544    Nursing Practice for Community/Public Health Nursing | Asso. Clinical Prof. | 6 |
| <u>Fall 2018</u> | | |
| 4544    Nursing Practice for Community/Public Health Nursing | Asso. Clinical Prof. | 8 |
| <u>Fall 2017</u> | | |
| 4544    Nursing Practice for Community/Public Health Nursing | Asso. Clinical Prof. | 7 |
| <u>Fall 2016</u> | | |
| 3292    Practicum with Sub-acute & Chronically Ill Adults | Asso. Clinical Prof. | 8 |
| 3715    Nursing Leadership in the 21st Century | Asso. Clinical Prof. | 17 |
| <u>Spring 2016</u> | | |
| 3120    Health Assessment throughout the Lifespan | Asso. Clinical Prof. | 108 |
| <u>Fall 2015</u> | | |
| 3292    Practicum with Sub-acute & Chronically Ill Adults | Asso. Clinical Prof. | 8 |
| <u>Spring 2015</u> | | |
| 3120    Health Assessment throughout the Lifespan | Asso. Clinical Prof. | 136 |
| <u>Fall 2014</u> | | |
| 3292    Practicum with Sub-acute & Chronically Ill Adults | Asso. Clinical Prof. | 8 |
| <u>Spring 2014</u> | | |
| 50% Time Release for Grant work and programming | Associate Clinical Professor | |
| <u>Fall 2013</u> | | |
| 3292    Practicum with Sub-acute & Chronically Ill Adults | Asso. Clinical Prof. | 8 |
| 50% Time Release for Grant work and programming | | |
| <u>Summer 2013</u> | | |
| 4492    Nursing Across the Lifespan I | Asst. Clinical Prof. | 8 |

Spring 2013
4392   Health Assessment and Fundamentals of Nursing Praxis      Asst. Clinical Prof.      32
50% Time Release for Grant work and programming

Fall 2012
3292   Practicum with Sub-acute & Chronically Ill Adults      Asst. Clinical Prof.      8
50% Time Release for Grant work and programming

Summer 2012
4492   Nursing Across the Lifespan I      Asst. Clinical Prof.      8

Spring 2012
4392   Health Assessment and Fundamentals of Nursing Praxis      Asst. Clinical Prof.      31
50% Time Release for Grant work and programming

Fall 2011
3292   Practicum with Sub-acute & Chronically Ill Adults      Asst. Clinical Prof.      8
50% Time Release for Grant work and programming

Summer 2011
4492   Nursing Across the Lifespan I      Asst. Clinical Prof.      8

Spring 2011
4392   Health Assessment and Fundamentals of Nursing Praxis      Asst. Clinical Prof.      33
4292   Capstone Clinical Practicum      Asst. Clinical Prof.      8

Fall 2010
3292   Practicum with Sub-acute & Chronically Ill Adults      Asst. Clinical Prof.      8
3292   Practicum with Sub-acute & Chronically Ill Adults      Asst. Clinical Prof.      8
4592   Nursing Across the Lifespan II      Asst. Clinical Prof.      32

Summer 2010
4492   Nursing Across the Lifespan I      Asst. Clinical Prof.      8

Spring 2010
4392   Health Assessment and Fundamentals of Nursing Praxis      Asst. Clinical Prof.      33
4292   Capstone Clinical Practicum      Asst. Clinical Prof.      7

Fall 2009
3292   Practicum with Sub-acute & Chronically Ill Adults      Asst. Clinical Prof.      8
3292   Practicum with Sub-acute & Chronically Ill Adults      Asst. Clinical Prof.      8
20% Time Release for Grant work and programming

Summer 2009
4492   Nursing Across the Lifespan I      Asst. Clinical Prof.      8

16

Spring 2009
| 4392 | Health Assessment and Fundamentals of Nursing Praxis | Asst. Clinical Prof. | 32 |
| 4292 | Capstone Clinical Practicum | Asst. Clinical Prof. | 7 |

Fall 2008
| 3292 | Practicum with Sub-acute & Chronically Ill Adults | Asst. Clinical Prof. | 9 |
| 3292 | Practicum with Sub-acute & Chronically Ill Adults | Asst. Clinical Prof. | 9 |
| 3292 | Practicum with Sub-acute & Chronically Ill Adults | Asst. Clinical Prof. | 9 |

Summer 2008
| 4492 | Nursing Across the Lifespan I | Clinical Professor | 8 |

Spring 2008
| 274 | Clinical and Nursing Science for Acutely Ill Adults | Faculty | 64 |
| 290 | Health Assessment and Fundamentals of Nursing Praxis | Faculty | 31 |
| 289 | Capstone Clinical Practicum | Clinical Instructor | 9 |

Fall 2007
| 272 | Clinical Science for Adults with Acute Illness | Faculty | 71 |
| 273 | Nursing Science for Acutely Ill Adults | Faculty | 71 |
| 219 | Practicum with Sub-acute & Chronically Ill Adults | Clinical Instructor | 8 |

Summer 2007
| 4492 | Nursing Across the Lifespan I | Clinical Professor | 8 |

Spring 2007
| 273 | Nursing Science for Acutely Ill Adults | Faculty | 68 |
| 290 | Health Assessment and Fundamentals of Nursing Praxis | Faculty | 32 |
| 279 | Practicum with Acutely Ill Adults | Clinical Instructor | 7 |

Fall 2006
| 272 | Clinical Science for Adults with Acute Illness | Faculty | 72 |
| 273 | Nursing Science for Acutely Ill Adults | Faculty | 72 |
| 219 | Practicum with Sub-acute & Chronically Ill Adults | Clinical Instructor | 8 |


1996 - 1998    Adjunct Professor of Nursing, Three Rivers Technical Community
College, Norwich, CT

1993 - 1997    Co-Developer/Instructor of a *Universal Precautions and Disease Prevention
Program,* Southeastern Connecticut Elementary Schools

1987 - 2001    Emergency Nurse Pediatric Core Course Instructor, Lawrence and Memorial
Hospital, New London, CT

1986 - 2003    Advanced Cardiac Life Support (ACLS) Instructor, Lawrence and Memorial

17

Hospital, New London, CT

**B.**    **Graduate**

| Course number/title | Role | Number of Students |
|---|---|---|

Fall 2016
5895   Clinical Practice Dissertation Seminar: Semester V    Asso. Clinical Prof.    4
5889   Doctor of Nursing Practice Practicum II    Asso. Clinical Prof.    4

Spring 2016
5879   Doctor of Nursing Practice Practicum I    Asso. Clinical Prof.    5

Fall 2015
5889   Doctor of Nursing Practice Practicum II    Asso. Clinical Prof.    5

Summer 2015
5869   Doctor of Nursing Practice Residency Elective    Asso. Clinical Prof.    3

Spring 2015
5895   Clinical Practice Dissertation Seminar: Semester V    Asso. Clinical Prof.    3

Fall 2014
5895   Clinical Practice Dissertation Seminar: Semester IV    Asso. Clinical Prof.    3
5889   Doctor of Nursing Practice Practicum II    Asso. Clinical Prof.    4

Summer 2014
5869   Doctor of Nursing Practice Residency Elective    Asso. Clinical Prof.    3

Spring 2014
5895   Clinical Practice Dissertation Seminar: Semester V    Asso. Clinical Prof.    3

Fall 2013
5889   Doctor of Nursing Practice Practicum II    Asso. Clinical Prof.    4

Summer 2013
5869   Doctor of Nursing Practice Residency Elective    Asst. Clinical Prof.    3

Spring 2013
5879   Doctor of Nursing Practice Practicum I    Asst. Clinical Prof.    4

Summer 2012
5869   Doctor of Nursing Practice Practicum Elective    Asst. Clinical Prof.    3

18

Fall 2011
5889    Doctor of Nursing Practice Practicum II                Asst. Clinical Prof.    5

Spring 2011
5879    Doctor of Nursing Practice Practicum I                 Asst. Clinical Prof.    5

# Exhibit C



# Present Value
# Loss of Household Services

Prepared for Mr. Javier Tapia

**February 7, 2024**

Prepared by: Nik Volkov, Ph.D., CVA, MAFF
Requested by: Galanda Broadman, PLLC



## Table of Contents

Preface ........................................................................................................................................... iii

1    Executive Summary ................................................................................................................. 1

2    Household Services ................................................................................................................. 2

3    Methodology – Measuring the Nominal Value of Household Services ................................. 2

4    Personal & Household Characteristics ................................................................................... 5

5    The Time Value of Money ..................................................................................................... 10

6    Growth of Household Services Replacement Costs .............................................................. 10

7    Discount Rates ...................................................................................................................... 12

8    Quantitative Methods ........................................................................................................... 14

9    Calculations .......................................................................................................................... 18

10   Conclusion ............................................................................................................................ 20

11   The Author ............................................................................................................................ 21

12   Sources ................................................................................................................................. 22

# Preface

I, Nik Volkov, Ph.D., CVA, MAFF, Associate Economist of Physician Life Care Planning, was tasked to determine the present value loss of household services in the case of Mr. Javier Tapia.

This Present Value Loss of Household Services Report (this "Analysis", or "Report") is intended for use by Galanda Broadman, PLLC in the Case of Mr. Tapia.

The work I performed, and the opinions I express herein, are a product of my education, training, skill, and experience as qualified financial professional.

The measures undertaken by me to formulate my opinions in this matter are ones I deemed necessary. These measures include: the performance of appropriate research, the collection and analysis of relevant information and data, and the execution of applicable formulaic calculations.

The opinions which are expressed, and the conclusions which are exhibited in this Report were established by me at the time this Report was prepared.  I hereby here reserve the right to amend my opinions and conclusions should additional information become available, or should it become necessary for me to supplement and/or update this Report in the future.

Nik Volkov, Ph.D., CVA, MAFF
Associate Economist
Physician Life Care Planning, LLC

# 1   Executive Summary

This report assesses the economic loss of household services to Mr. Javier Tapia as a result of his injury on October 1, 2018. The economic losses consist of past and future lost Household Services assuming that the loss of the household services is represented by the change from the pre-injury (pre-incarceration) to the present household services production of Mr. Tapia (as reported by him during an interview) applied to the average household services produced by individuals with the same household and employment characteristics. The present value of the loss is estimated at **$212,310**. The future value of the lost household services is estimated at $376,253.

### Household Services Economic Damages Report

**Plaintiff:**      **Javier Tapia**

| Case Information |
|---|

Trial Date: 3/1/2024                                         Date of Injury: 10/1/2018
                                                              Discount Rate: Laddered

Present Value of Future Damages Calculated Annually at Midyear
Present Value Computed Using Compound Interest

| Plaintiff |
|---|

Sex: Male                                               Education Level: 0-12
Birth Date: 3/3/1982                                Age at Damages Date: 36.58
Life Expectancy: 8/3/2060                            Expected Age at LE: 78.42
Full-Function Life Expectancy: 3/24/2057             Expected Age at FFLE: 75.06

| Damages Summary |
|---|

| Type of Damage | Future Values | | Present Values | |
|---|---|---|---|---|
| | Past Loss | Future Loss | Past Loss | Future Loss |
| Lost Household Services: | $10,214 | $366,039 | $10,214 | $202,096 |
| Total Damages: | $10,214 | $366,039 | $10,214 | $202,096 |
| **Grand Total Damages:** | $376,253 | | **$212,310** | |

I have based my opinions on the information currently available to me. I reserve the right to update my report if additional information is provided.

Javier Tapia was born on March 3, 1982 and was 36.58 years of age at the time of the injury. He is single and has one son who is not in his custody.  He presently resides in Tacoma, WA (Seattle-Tacoma-Bellevue, WA metropolitan area). At the time of the injury, Mr. Tapia was incarcerated. He was released on February 9, 2022. He presently works for Pioneer Distribution, an airplane parts distribution company that works with Boeing. Mr. Tapia completed 10 grades of education.

I conducted an interview of Mr. Tapia on February 2, 2024. He reported a 35.29% loss in his ability to perform household services as a result of the injury that he sustained. I assume a 35.29% loss of household

services production in the present calculation starting on the date of Mr. Tapia's release on February 9, 2022.

I assume March 1, 2024 as the trial/settlement date.

## 2    Household Services

Household services also referred to in financial and economic literature as "home services", "household production", "non-market production", and "non-market work" represent significant value to most households.  Simply stated, household services are services provided by individuals within their homes which can be quantified, and which have economic value.

The concept of "non-market production" is succinctly described by Stanley P. Stepshenson in his 2006 article, *Determining the Value of Household Production as a Component of Economic Damages[1]*: "The productive use of time may arise in both labor market and non-market settings.  In the labor market (market work setting), the individual exchanges skilled services for a "rent" called compensation.  In a non-market setting we can divide time into leisure, and non-market work.  Non-market work includes activities you would be willing to pay someone else to do for you, i.e. grocery shopping, lawn mowing, etc.  All non-market activities, such as sleeping, bathing, eating, etc., we refer to as "leisure".  All activities then fall into three categories: market work, non-market work, and leisure."

**The purpose of this Report is to quantify the non-market work contribution of Mr. Javier Tapia to his household; or more specifically, to quantify the financial loss that will accrue to Mr. Tapia's household as a result of his injury, and its impact on his ability to perform non-market work, namely household services.**

## 3    Methodology – Measuring the Nominal Value of Household Services

When quantifying household services, financial professionals and economists (analysts) commonly employ one of two valuation methodologies: *the Opportunity Cost Method*, or *the Replacement Cost Method*.  The Opportunity Cost Method focuses on measuring economic cost, and it values time devoted to household production at the rate an individual can earn in the market. The Replacement Cost Method, the more common approach, values household services by measuring market costs to replace such services.[2]

This analysis uses the Replacement Cost Method, Labor Value Approach to quantify household services, analysts must account for two factors: time, and cost.  <u>To account for both time and cost, this Report relies upon Expectancy Data's *The Dollar Value of a Day, 2020 Dollar Valuation*.[3]</u>

### 3.1.1    The Dollar Value of a Day

*The Dollar Value of a Day*, published by Expectancy Data, is the most commonly employed, and most often cited data source pertaining to household services valuation.

---

[1] Stepshenson, Stanley P., *Determining the Value of Household Production as a Component of Economic Damages*, Valuation Strategies, May/June 2006, Volume 9, Number 5, pp. 10-17

[2] Matthew J. Cushing and David I. Rosenbaum. 2012. Valuing Household Services: A New Look at the Replacement Cost Approach. Journal of Legal Economics 19(1): pp. 37-60.

[3] Expectancy Data, The Dollar Value of a Day: 2020 Dollar Valuation.  Shawnee Mission, Kansas, 2021.

*The Dollar Value of a Day* "calculates a market estimate of time value attained with time use, or the cost needed to support or replace time use.  Relying on 2003 - 2020 time-diary data from the U.S. Department of Labor's Bureau of Labor Statistics' (BLS's) *American Time Use Survey* (ATUS), and a wage survey produced by the BLS, Expectancy Data calculates the value created in a day as measured by the price of hiring persons whose marketplace work relates to the time use of people during the course of a day.  Multiplying time use hours in an activity by a relevant hourly market price of hiring workers within that activity creates a replacement value, or a cost to produce or supplement the use of time."[4]

According to Expectancy Data, "the estimates of value presented [in *The Dollar Value of a Day*] relate to the cost to employ someone to work in the confines of activities that a person might perform in a day without regard to how individuals might value specific time use. The dollar value in a day is the sum across activities of the multiplication of hours and assigned values based upon hourly wage rates."[5]

Determining replacement costs in the manner employed by Expectancy Data effects a *Labor Value Approach*, as described by Cushing and Rosenbaum (2012).  The Labor Value Approach values time spent on household services. It begins by measuring an individual's time spent in a variety of household service activities. The hours in each activity are then valued at the market wage rate for someone employed in a firm producing that activity.[6]

**The Dollar Value of a Day Methodology**

*The Dollar Value of a Day* provides a valuation of one, primary activity per minute. The time diary data used in the Dollar Value of a Day are the only such data provided by a federal statistical collection agency, and the *American Time Use Survey* is the largest time survey ever undertaken in the United States.  In "assigning dollar values [Expectancy Data] uses a United States Department of Labor survey that provides their largest survey of wages by occupation by geographical area. The dollar valuations presented in *The Dollar Value of a Day's* summary tables are based upon average wages in all of the United States."  Expectancy Data also provides wage adjustment factors—that are employed in this Report—and that account for state and metropolitan-specific wage variations.[7]

To account for variation in the volume of time different people spend performing household services, Expectancy Data categorizes individuals surveyed in the ATUS into **group classifications** by age and gender, and then by household characteristics, such as marital status, labor force status, disability status, and presence of children.

**The Dollar Value of a Day Group Classifications**

The *Dollar Value of a Day's* 385 individual group classification summary tables provide time use, hourly values, and dollar values for 5 primary categories of household services:

---

[4] Ibid.

[5] Ibid.

[6] Matthew J. Cushing and David I. Rosenbaum. 2012. Valuing Household Services: A New Look at the Replacement Cost Approach. Journal of Legal Economics 19(1): pp. 37-60.

[7] Expectancy Data, The Dollar Value of a Day: 2020 Dollar Valuation.  Shawnee Mission, Kansas, 2021.

1. Household Production

2. Caring and Helping

3. Personal Time

4. Leisure

5. Work and Education

This Report accounts for and quantifies only those activities associated with **Household Production**, which include:

1. Inside Housework

2. Food Cooking & Clean-up

3. Pets, Home & Vehicles

4. Household Management

5. Shopping

6. Obtaining Services

7. Travel for Household Activity

As this Report quantifies only the Household Production category of household services, this Report theretofore uses the terms "household production" and "household services" interchangeably.

### 3.2    Methodological Sequence – Quantifying the Nominal Value of Household Production

The methodological sequence employed in this Report to apply the Replacement Cost Method for the purpose of quantifying the value of Mr. Tapia's loss household production consist of 6 sequential steps:

1. Collecting personal information about Mr. Tapia and his household characteristics to facilitate use of *The Dollar Value of a Day's* group classifications.

2. Using Mr. Tapia's personal and household characteristics data to map his The *Dollar Value of a Day* group classifications throughout the duration of this Report's time series.

3. Using Mr. Tapia's *The Dollar Value of a Day* group classification to determine the dollar value of a day for each household production subcategory, i.e. inside housework, food cooking and clean-up, etc.

4. Applying information collected about Mr. Tapia's capacity to perform household services to determine Mr. Tapia's nominal per annum loss of household services.

5. Applying *The Dollar Value of a Day*'s wage adjustment factors, to adjust the nominal value of Mr. Tapia's loss of household services for applicable geographic wage variation.

6. Quantify the time value of money and its effect on the nominal value of Mr. Tapia's loss of household services for the purpose of formulating a present value loss of household services.

## 4   Personal & Household Characteristics

The personal and household characteristics exhibited below are used to define Mr. Tapia's *The Dollar Value of a Day Group Classifications*.

| Personal & Household Characteristics | |
|---|---|
| Name | Javier Tapia |
| Gender | Male |
| Date of Birth | 3/3/1982 |
| Date of Injury | 10/1/2018 |
| Age at Date of Injury | 36.58 |
| Disabled (unable to work), prior to injury | No |
| Employment Status at Date of Injury | Incarcerated |
| Date of Release | 2/9/2022 |
| Marital Status (at time of injury) | single |
| Gender of Spouse | N/A |
| Spouse Date of Birth | N/A |
| Employment Status of Spouse | N/A |
| Child/Children Living in Household | 0 |
| Youngest Child in Household | N/A |
| Members of Household | 1 |
| Location | Tacoma, WA |
| Metropolitan Area | Seattle-Tacoma-Bellevue, WA |

**4.1    Life Expectancy**

Mr. Tapia's statistical life expectancy based on the life expectancy of a male and calculated from his age of 36.58 years at the date of the injury is to age 78.4, in August 2060, according to data in Healthy Life Expectancy, 2018 Tables, Shawnee Mission, Kansas, 2020. The data source is the United States Life Tables, 2018, from the National Vital Statistics Reports.

His full function life expectancy is to age 75.1 in March 2057. The full function life expectancy is the time until which Mr. Tapia would be expected to produce household services.

# Javier Tapia

**Table 2: Life table for males: United States**
Expectancy Data *Healthy Life Expectancy: 2018 Tables*.  Shawnee Mission, Kansas, 2020.

|  | Life Expectancy | Full Function Life Expectancy*, FFLE |
|---|---|---|
| 36 | 42.37 | 38.94 |
| **36.58** | **41.84** | **38.48** |
| 37 | 41.46 | 38.14 |

| Date of Injury | LE | FFLE |
|---|---|---|
| Actual | Actual | Actual |
| 10/1/2018 | 8/3/2060 | 3/24/2057 |
|  | **78.4** | **75.1** |

I compute the loss of household services for the duration of the full function life expectancy as of the date of the injury through March 2057.

**4.2   Work Life Expectancy**

Work life expectancy (WLE) is determined by education level, activity status in the labor market, age and sex. Mr. Tapia was age 36.58 at the damages date. The WLE of a 36.58-year-old male with 10 to 12 grades of education, no diploma (initially active in the labor market) is 18.77 years, with a standard deviation of 8.07 years. This information is derived from "The Markov Process Model of Labor Force Activity 2012-2017: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors" by Mr. Skoog, Mr. Ciecka, and Kurt Krueger, *Journal of Forensic Economics*, Vol. 28, No. 1, 2019, pp. 15-108 (published in 2019). Using these data and assuming continuous work, one would expect Mr. Tapia to be active in the labor market until July 2037. At that date, he would be age 55.35.

## Javier Tapia

### Table 3. Initially Active Men, 10th Grade to 12th Grade, No Diploma

| Age (At DOI) | Worklife Expectancy | SD | Estimated | 25% | 75% |
|---|---|---|---|---|---|
| 36 | 19.15 | 8.15 | 55.15 | 13.5 | 24.5 |
| 36.58 | **18.77** | **8.07** | **55.35** | **12.9** | **24.5** |
| 37 | 18.5 | 8.01 | 55.50 | 12.5 | 24.5 |

| Date of Injury | Worklife Expectancy Ends | | Lower Bound | Upper Bound |
|---|---|---|---|---|
| 10/1/2018 | 7/8/2037 | 50% range around | 49.5 | 61.1 |
| At age | 55.35 | WLE | | |

**4.3    Reported Household Services Production of Mr. Tapia**

I conducted an interview of Mr. Tapia on February 2, 2024. According to Mr. Tapia, prior to his incarceration, he produced more than average household services (17 v. 11.27 hours per week on average).

The following table provides the summary of the information pertaining to the pre-incarceration and the post-injury (post-incarceration) household services production of Mr. Tapia base on my interview of him on February 2, 2024.

| Javier Tapia Home Services | Pre-incarceration | |
|---|---|---|
| | Pre-injury | Post-injury |
| Inside Housework | 3 | 2 |
| Food cooking and cleanup | 2 | 1 |
| Outdoor chores | 2 | 1 |
| Home & Auto Maintenance | 8 | 5 |
| Obtaining Goods and Services | 2 | 2 |
| Total | 17 | 11 |
| | | -35.29% |

According to the interview, Mr. Tapia lost 35.29% of his ability to produce household services as a result of the injury.

**4.4     Average Household Services Production**

The following table provides a summary of the household services production of an average single male who works full-time and has no minor children in the household and retired single men based on Tables 262 and 300 of *The Dollar Value of a Day.*

The average household services production figures are adjusted for the regional cost of living factor for Seattle-Tacoma-Bellevue, WA metropolitan area (123.93% of the national average) based on the data obtained from Table 414 of the DVD.

**Home Services (Production)**
Per Expectancy Data, *"The Dollar Value of a Day: 2020 Dollar Valuation."* Shawnee Mission, Kansas, 2021

**Table 262. Single men, Employed full-time, All ages, No minor children in home**
Used Average Weekly Hours

| | Period | | Hours per Week | Loss of HHS | Lost Hours per Week | Hourly Value (2020$) | Annual Value | Seattle-Tacoma-Bellevue, WA | Adjusted for regional cost of living |
|---|---|---|---|---|---|---|---|---|---|
| 2/9/2022 | to | 7/8/2037 | 11.27 | 35.3% | 3.98 | $16.86 | $3,487 | 123.9% | **$4,322** |
| Release | | WLE | | | | | | | |

**Table 300. Single men, Retired, All ages, No minor children in home**
Used Average Weekly Hours

| | Period | | Hours per Week | Loss of HHS | Lost Hours per Week | Hourly Value (2020$) | Annual Value | Seattle-Tacoma-Bellevue, WA | Adjusted for regional cost of living |
|---|---|---|---|---|---|---|---|---|---|
| 7/9/2037 | to | 3/24/2057 | 18.53 | 35.3% | 6.54 | $17.01 | $5,785 | 123.9% | **$7,169** |
| | | FFLE | | | | | | | |

| Home Services Summary | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Period | | Hours per Week | Loss of HHS | Lost Hours per Week | Hourly Value (2020$) | Annual Value | Seattle-Tacoma-Bellevue, WA | Adjusted for regional cost of living |
| 2/9/2022 | to | 7/8/2037 | 11.27 | 35.3% | 3.98 | $16.86 | $3,487 | 123.9% | **$4,322** |
| 7/9/2037 | to | 3/24/2057 | 18.53 | 35.3% | 6.54 | $17.01 | $5,785 | 123.9% | **$7,169** |

Thus, an average single man who works full-time and has no minor children produces 11.27 hours of weekly household services. Please note that, according to my interview of Mr. Tapia, he produced more than the average household services prior to his injury. Assuming a 35.29% loss of household services production of Mr. Tapia and using the average hourly production figures, Mr. Tapia lost 3.98 hours of weekly household services production for the period while he was expected to work full-time and 6.54 hours of household services production upon his retirement.

Note that I start the calculation of the loss of household services on the date of the release of Mr. Tapia from incarceration on February 9, 2022.

If converted to dollars, this implies a loss of $4,322 annually in 2020$ while working full-time and $7,169 annually in 2020$ during retirement considering the local cost of living adjustment.

If the trier of fact determines that Mr. Tapia produced more than average household services prior to the injury, the damages figures presented in this report should be adjusted accordingly.

## 5    The Time Value of Money

The time value of money is the foundational concept of financial theory.  It simply maintains that money today is worth more than money tomorrow. This is true because money has time value and can earn interest.

Time value of money calculations seek to equate the present value of money (what it's worth today) to the future value of money (what it's worth tomorrow), and vice versa. To accurately calculate the amount of money Mr. Tapia would require today to pay for household services that will occur in the future, two important considerations must be accounted for:

1.  The impact of inflation on the cost of household services, and

2.  The amount of interest Mr. Tapia will be able to earn between now, and the times at which his future expenditures for household services are forecast to occur.

This Report calculates the future values of household services by accounting for inflation, and it then discounts those future (inflation-adjusted) values into present values using discount rates (appropriately risk-adjusted rates of return which can be earned on Mr. Tapia's money).

## 6    Growth of Household Services Replacement Costs

Inflation is the general rise in the price of goods and services over time.  In order to calculate the effects of inflation on the value of household services, it is necessary to identify rates that are appropriately applicable to the provision household services.  That is to say, it is necessary to specify rates of change in the cost of employing someone to perform such services.

Data and research (see for example, "Changes in the Distribution of Workers' Hourly Wages between 1979 and 2009" by the CBO), for wage growth for less skilled workers (those without 4-year college degrees) and skilled workers (those with a 4-year degree or higher), show that over the long-term earnings for male workers with college degrees are increasing at about 1% above the rate of inflation, or approximately the change in the Employment Cost Index (ECI), while the wages for less skilled workers are increasing at about the rate of increase in the Consumer Price Index (CPI).

The ECI increased by 4.0% in 2021 and by 5.1% in 2022; it is expected to increase by 4.5% in 2023, by 3.8% in 2024, by 3.5% in 2025, by 3.3% in 2026-2027, and by 3.2% in 2028-2033, per "The Congressional Budget Office An Update to the Budget and Economic Outlook: Years 2022-2032, February 2023" Table 2-1.

The CPI increased by 4.7% in 2021 and by 7.1% in 2022; it is expected to increase by 4.0% in 2023, by 2.4% in 2024, by 2.1% in 2025-2027, and by 2.3% in 2028-2033, per "The Congressional Budget Office An Update to the Budget and Economic Outlook: Years 2023-2033, February 2023" Table 2-1.

The Office of the Actuary of the Social Security Administration publishes a long-range forecast of expected wages in covered employment in the economy, titled "2023 Annual Report of the Board of Trustees of the Federal Old Age and Survivors Insurance and Federal Disability Insurance (OASDI) Trust Funds".  The intermediate (most likely) forecast for the CPI is projected to increase by 2.4% in 2034-2096. The

intermediate (most likely) forecast for average annual wages in covered employment are projected to increase by 3.56% in 2032-2096.

Based on the above data and research, I have increased Mr. Tapia's expected lost household services by the actual CPI and the average of the CBO projections for the CPI growth from year 2023 to year 2033. For years beyond 2033 the projected growth rate for the CPI from the OASDI 2023 is used.

# 7   Discount Rates

## 7.1   The Function of Discount Rates in Present Value Analysis

Discount rates are rates of return used to perform calculations which convert (discount) future values into present values.

Discounting is necessary because any monetary reward received by Mr. Tapia to cover the cost of his future household services requirements will most likely be received in the present year, which means Mr. Tapia's principle will be able to be invested, and can thereby earn interest until his future household services are required.

The present value of Mr. Tapia's household services is the amount of money it would take, if it were invested today earning compound interest, to equal the future (inflationary-adjusted) value of each of his household services expenditures at the various points in time when such expenditures are forecast to occur.

The rate of interest/return at which Mr. Tapia's principle is invested *is* the discount rate. It is the rate which makes the present values and the future values of his anticipated household services expenditures equal, even though they are considered at different points in time.

## 7.2   Discount Rate Selection

When selecting discount rates, two things must be considered:

1.   Risk: Rate (return) is a function of risk; and rate and risk increase in relative proportions to one another.  The appropriate investment objective for Mr. Tapia is *capital preservation*, which means we need to select relatively risk-free (low rate) instruments to perform an appropriately risk-adjusted present value assessment.

2.   Tax Consequences: Taxes reduce returns on investments and add complexity to investment analysis. Therefore, taxes on any interest earned on the investment of a potential award must be accounted for.

For these reasons, I have selected United States, AAA Rated, Tax-Exempt, Municipal Bonds.

### AAA Municipal Bond Yields

In finance and economics, low risk bonds (e.g. U.S. Treasuries and AAA Municipal Bonds) are commonly used to price assets.  A yield curve expresses individual yields on different maturities of a fixed income security at given moments in time.

The yield curve used to discount future values to present values in this Report is produced by Municipal Market Analytics (MMA), an independent financial research firm that provides U.S. Municipal Bond Market analytics for purposes of fixed income analysis, portfolio management, risk management, etc.

MMA consolidates and calculates yield curve information and publishes the results on Bloomberg under the symbol CMMA.

Physician Life Care Planning™

**7.3    Municipal Market Analytics' AAA Municipal Bond Yield Curve, as published on February 1, 2024**[8]



| Period | Year | Yield* |
|--------|------|--------|
| 1 | 2024 | 2.83 |
| 2 | 2025 | 2.56 |
| 3 | 2026 | 2.41 |
| 4 | 2027 | 2.31 |
| 5 | 2028 | 2.26 |
| 6 | 2029 | 2.25 |
| 7 | 2030 | 2.29 |
| 8 | 2031 | 2.35 |
| 9 | 2032 | 2.42 |
| 10 | 2033 | 2.48 |
| 11 | 2034 | 2.55 |
| 12 | 2035 | 2.64 |
| 13 | 2036 | 2.73 |
| 14 | 2037 | 2.84 |
| 15 | 2038 | 2.94 |
| 16 | 2039 | 3.03 |
| 17 | 2040 | 3.10 |
| 18 | 2041 | 3.13 |
| 19 | 2042 | 3.16 |
| 20 | 2043 | 3.18 |
| 21 | 2044 | 3.20 |
| 22 | 2045 | 3.21 |
| 23 | 2046 | 3.22 |
| 24 | 2047 | 3.23 |
| 25 | 2048 | 3.24 |
| 26 | 2049 | 3.25 |
| 27 | 2050 | 3.26 |
| 28 | 2051 | 3.27 |
| 29 | 2052 | 3.28 |
| 30 | 2053 | 3.29 |

**Average Laddered Yield 30-year:** **2.86**

---

[8] Municipal High Grade AAA G.O. (General Obligation) Index, Municipal Market Analytics, Concord, MA, February 1, 2024.

# 8   Quantitative Methods

All quantitative methods, variables and calculations employed in this Report are disclosed herein.

## 8.1   Nominal Value

The methodological sequence used to formulate nominal value in this Report outlined in Section 3.2.

The results of the formulation are reported in the table included in Section 4.2 of this report

### 8.1.1   Definitions

- **Hours per Week**: "Weekly average time in hours while the activity category describes the main activity that was being performed by the respondent."[9]

- **Hourly Value**: hourly values represent weighted averages calculated by Expectancy Data's Dollar Value of a day.  These weighted averages account for Standard Occupational Classifications exhibited in *The Dollar Value of a Day*, Tables 386 – 392.

- **Loss of HHS**: The percentage loss of household services reported during the interview.

- **Annual Value**: Hours per Week times Hourly Value times Loss of HHS times 52 (weeks in a year).

- **Regional Adjustment**: Region-specific cost of living adjustment

- **Adjusted for Regional Cost of Living**: Nominal Value of the annual loss of household services.

### 8.1.2   Duration

The duration of this analysis is **38.48** years, the time between the year of Mr. Tapia's injury, and his full function life expectancy.

### 8.1.3   General Assumptions

The general assumptions affecting the formulation of this Analysis:

- It is assumed that the information regarding Mr. Tapia's change in the capacity to perform household services is accurate and reliable.

- In respect to formulating group classifications for employment status, it is assumed that:

  - If an individual was employed during the period immediately prior to his/her date of injury, then his/her employment status (full-time or part-time) is maintained until retirement.

---

[9] Expectancy Data, The Dollar Value of a Day: 2020 Dollar Valuation.  Shawnee Mission, Kansas, 2021.

- The employment status of an individual's spouse, immediately preceding the individual's date of injury, is maintained as constant until retirement classification (if applicable).

**8.2    Accounting for the Time Value of Money: Formulation of Future Value and Present Values**

This Report employs a proforma discounted cash flow method of financial valuation to formulate a present value of Mr. Tapia's Loss of Household Services.

The present value method of financial valuation in this Report consists of two sequential steps:

1. Step 1: calculates the future value (FV) of each of Mr. Tapia's future household services expenditures within each period of time in which each expenditure is forecast to occur.  The future value formula used to formulate future value in this report is:

$$FV = \sum_{r=rate\ (first)}^{last} PV\ (Nominal\ Value)\ x\ (1+r)^n$$

   In the preceding formula, FV = future value; r = rate = a category-specific and period-specific inflation rate corresponding to a period-specific value; rate first = a rate corresponding to the first period in which forecasted consumption of the specific item in question occurs, and rate last = a rate corresponding to the last period in which the forecast consumption of the specific item in question occurs.

2. Step 3: discounts discrete future values into discrete present values employing the present value formula: **PV = FV / (1 + r)$^t$** [10], whereas  PV = present value; FV = future value; r = rate (in this case, a discount rate with appropriately corresponding maturity); and t = time (expressed as a number of periods).

**The Variable "n"**

In order to execute the future value formula $FV = \sum_{r=rate\ (first)}^{last} PV\ (Nominal\ Value)\ x\ (1+r)^n,$ it is necessary to define the variable "n".

1. When executing the formula $FV = \sum_{r=rate\ (first)}^{last} PV\ (Nominal\ Value)\ x\ (1+r)^n$ "n" is a constant, i.e. "n" = 1, as $FV = \sum_{r=rate\ (first)}^{last} PV\ (Nominal\ Value)\ x\ (1+r)^n$ employs the OASDI's variable rate Intermediate Forecast of the Average Annual Wage in Covered Employment, so for each year, a discrete rate of interest will be accounted for, for only 1 period.

**The Variable "r"**

In order to execute the future value formula $FV = \sum_{r=rate\ (first)}^{last} PV\ (Nominal\ Value)\ x\ (1+r)^n$ it is necessary to define the variable "r".  R ("r") in this formula represents "rate"; or more specifically, a period-specific rate of inflation; namely a period specific rate from OASDI's Intermediate Forecast of the Average Annual Wage in Covered Employment.

In order to execute the present value formula, PV = FV / (1 + r)$^t$, it is also necessary to define the variable "r". R ("r") in this formula represents "rate"; or more specifically, a rate of return.  This Assessment

---

[10] Ross AR, Randolph WW, Jeffery J, Corporate Finance, New York; McGraw-Hill; 2002; 78

discounts the future value of Mr. Tapia's household services using period-specific yields on AAA-rated, tax-exempt municipal bonds, as published by Municipal Market Analytics (MMA) (see Section 7.3 of this Report). When applying the present value formula to discount future values in this Analysis "r" = MMA's published yields for each specific period in question.

**The Variable "t"**

In order to execute the present value formula, $PV = FV / (1 + r)^t$, it is necessary to define the variable "t". It is assumed that Mr. Tapia will make no investment in the present year, so year 2021 - 2023 in this report is not discounted; therefore, the application of the present value formula, and thereby the variable "t" is not applicable. Beginning in 2024, "t" = 0.5, and "t" then increases by a single integer each calendar year thereafter.

# 9   Calculations

The following tables provide the calculations of the loss of household services production of Mr. Tapia assuming that Mr. Tapia produced average household services prior to his injury. The loss of household services is computed as 35.29% of the average household services production.

The loss of past (prior to the assumed date of the trial) and future (post the assumed date of the trial) household services is computed and presented separately in the following two tables.

## Javier Tapia
### Past Lost Household Services

| | |
|---|---|
| Date of Injury: | **10/1/2018** |
| Date Start Damages: | **2/9/2022** |
| Damages Year Fraction: | **0.89** |
| Trial Date: | **3/1/2024** |
| Trial-Year Fraction: | **0.17** |

| | | | | Lost HHS | | Cumulative Loss |
|---|---|---|---|---|---|---|
| Date From | Date To | Date Fraction | HHS Growth* | Lost Household Services | PV Total Damages | |
| 2/9/2022 | 12/31/2022 | 0.89 | 7.10% | $4,312 | $4,312 | $4,312 |
| 1/1/2023 | 12/31/2023 | 1.00 | 4.00% | $5,040 | $5,040 | $9,352 |
| 1/1/2024 | 3/1/2024 | 0.17 | 2.40% | $862 | $862 | $10,214 |
| **Totals** | | | | $10,214 | $10,214 | |

*Actual CPI and 2023-2033: CPI Growth from CBO Budget and Economic Outlook: 2023 to 2033, February 2023

**Javier Tapia**
**Future Lost Household Services**

| Home Services Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Period | | | Lost Hours per Week | Hourly Value (2020$) | Annual Value | Seattle-Tacoma-Bellevue, WA | Adjusted for regional cost of living |
| 2/9/2022 | to | 7/8/2037 | 3.98 | $16.86 | $3,487 | 123.9% | $4,322 |
| 7/9/2037 | to | 3/24/2057 | 6.54 | $17.01 | $5,785 | 123.9% | $7,169 |

Date Start Damages: **2/9/2022**

FFLE Date: **3/24/2057**
FFLE Year Fraction: **0.23**

| | | | | | Loss of Household Services | | Totals | | |
|---|---|---|---|---|---|---|---|---|---|
| Years in the Future | Year Ending | HHS Growth* | Date Fraction | Discount Rate | Lost Household Services | PV Loss of Household Services | FV Total Loss | PV Total Loss | Cumulative Loss |
| 1 | 12/31/2024 | 2.40% | 0.83 | 2.83% | $4,299 | $4,239 | $4,299 | $4,239 | $14,454 |
| 2 | 12/31/2025 | 2.10% | 1.00 | 2.56% | $5,269 | $5,073 | $5,269 | $5,073 | $19,527 |
| 3 | 12/31/2026 | 2.10% | 1.00 | 2.41% | $5,380 | $5,069 | $5,380 | $5,069 | $24,596 |
| 4 | 12/31/2027 | 2.10% | 1.00 | 2.31% | $5,493 | $5,071 | $5,493 | $5,071 | $29,667 |
| 5 | 12/31/2028 | 2.30% | 1.00 | 2.26% | $5,619 | $5,082 | $5,619 | $5,082 | $34,749 |
| 6 | 12/31/2029 | 2.30% | 1.00 | 2.25% | $5,749 | $5,086 | $5,749 | $5,086 | $39,835 |
| 7 | 12/31/2030 | 2.30% | 1.00 | 2.29% | $5,881 | $5,076 | $5,881 | $5,076 | $44,911 |
| 8 | 12/31/2031 | 2.30% | 1.00 | 2.35% | $6,016 | $5,054 | $6,016 | $5,054 | $49,965 |
| 9 | 12/31/2032 | 2.30% | 1.00 | 2.42% | $6,154 | $5,022 | $6,154 | $5,022 | $54,988 |
| 10 | 12/31/2033 | 2.30% | 1.00 | 2.48% | $6,296 | $4,989 | $6,296 | $4,989 | $59,977 |
| 11 | 12/31/2034 | 2.40% | 1.00 | 2.55% | $6,447 | $4,949 | $6,447 | $4,949 | $64,926 |
| 12 | 12/31/2035 | 2.40% | 1.00 | 2.64% | $6,602 | $4,892 | $6,602 | $4,892 | $69,818 |
| 13 | 12/31/2036 | 2.40% | 1.00 | 2.73% | $6,760 | $4,828 | $6,760 | $4,828 | $74,646 |
| 14 | 12/31/2037 | 2.40% | 1.00 | 2.84% | $6,923 | $4,743 | $6,923 | $4,743 | $79,389 |
| 15 | 12/31/2038 | 2.40% | 1.00 | 2.94% | $11,759 | $7,725 | $11,759 | $7,725 | $87,114 |
| 16 | 12/31/2039 | 2.40% | 1.00 | 3.03% | $12,041 | $7,581 | $12,041 | $7,581 | $94,695 |
| 17 | 12/31/2040 | 2.40% | 1.00 | 3.10% | $12,330 | $7,451 | $12,330 | $7,451 | $102,146 |
| 18 | 12/31/2041 | 2.40% | 1.00 | 3.13% | $12,626 | $7,362 | $12,626 | $7,362 | $109,508 |
| 19 | 12/31/2042 | 2.40% | 1.00 | 3.16% | $12,929 | $7,271 | $12,929 | $7,271 | $116,779 |
| 20 | 12/31/2043 | 2.40% | 1.00 | 3.18% | $13,239 | $7,190 | $13,239 | $7,190 | $123,970 |
| 21 | 12/31/2044 | 2.40% | 1.00 | 3.20% | $13,557 | $7,108 | $13,557 | $7,108 | $131,077 |
| 22 | 12/31/2045 | 2.40% | 1.00 | 3.21% | $13,882 | $7,038 | $13,882 | $7,038 | $138,115 |
| 23 | 12/31/2046 | 2.40% | 1.00 | 3.22% | $14,215 | $6,967 | $14,215 | $6,967 | $145,083 |
| 24 | 12/31/2047 | 2.40% | 1.00 | 3.23% | $14,557 | $6,896 | $14,557 | $6,896 | $151,979 |
| 25 | 12/31/2048 | 2.40% | 1.00 | 3.24% | $14,906 | $6,825 | $14,906 | $6,825 | $158,804 |
| 26 | 12/31/2049 | 2.40% | 1.00 | 3.25% | $15,264 | $6,753 | $15,264 | $6,753 | $165,556 |
| 27 | 12/31/2050 | 2.40% | 1.00 | 3.26% | $15,630 | $6,680 | $15,630 | $6,680 | $172,236 |
| 28 | 12/31/2051 | 2.40% | 1.00 | 3.27% | $16,005 | $6,607 | $16,005 | $6,607 | $178,843 |
| 29 | 12/31/2052 | 2.40% | 1.00 | 3.28% | $16,389 | $6,533 | $16,389 | $6,533 | $185,376 |
| 30 | 12/31/2053 | 2.40% | 1.00 | 3.29% | $16,783 | $6,459 | $16,783 | $6,459 | $191,834 |
| 31 | 12/31/2054 | 2.40% | 1.00 | 3.29% | $17,185 | $6,403 | $17,185 | $6,403 | $198,237 |
| 32 | 12/31/2055 | 2.40% | 1.00 | 3.29% | $17,598 | $6,348 | $17,598 | $6,348 | $204,585 |
| 33 | 12/31/2056 | 2.40% | 1.00 | 3.29% | $18,020 | $6,293 | $18,020 | $6,293 | $210,878 |
| 34 | 12/31/2057 | 2.40% | 0.23 | 3.29% | $4,235 | $1,432 | $4,235 | $1,432 | $212,310 |
| | **Totals** | | | | $366,039 | $202,096 | $366,039 | $202,096 | $212,310 |

*2023-2033: CPI Growth from CBO Budget and Economic Outlook: 2023 to 2033, February 2023, OASDI 2023 thereafter

## 10  Conclusion

It is my opinion that the Present Value (PV) of Mr. Tapia's loss of household services = $212,310.

## 11  The Author

Dr. Nik Volkov is an Associate Economist with Physicians Life Care Planning. He is also an Associate Professor of Finance and formerly a Director of the Masters of Science of Business Analytics program at Mercer University, where he teaches classes in corporate finance, financial analytics, international finance, investments, mergers and acquisitions, capital budgeting, and venture funding at the undergraduate and graduate levels. In addition to the courses taught at the university, Dr. Volkov has taught a number of continuing legal education courses on the topic of calculation of economic damages in civil litigation. Dr. Volkov holds a Certified Valuation Analyst and a Master Analyst in Financial Forensics certifications by the National Association of Certified Valuators and Analysts.

Dr. Volkov frequently provides litigation support in the area of forensic economics and finance. The primary focus of his consulting work is in the area of economic damages calculations and expert witness testimony in personal injury, wrongful death, employment, and commercial litigation.

Dr. Volkov's research interests are in the area of information disclosure, investments, investor behavior, corporate diversification, mergers and acquisitions, and forensic economics and finance. His research is published in the Journal of Banking and Finance, Journal of Corporate Finance, Quarterly Review of Economics and Finance, Research in International Business and Finance, Global Finance Journal, Financial Services Review and the Journal of Forensic Economics among other peer reviewed academic publications.

Dr. Volkov is a recipient of a 40 under 40 Award by the National Association of Certified Valuators and Analysts. In 2019, Dr. Volkov was presented with Young Alumni Achievement Award from Millersville University and was a Featured Member of the National Association of Forensic Economics. He is also a recipient of the 2017 Exemplary Faculty Award from Mercer University and the Florida Atlantic University Presidential Doctoral Fellowship Award in 2011 and 2012. He was also selected to the Financial Management Association Doctoral Student Consortium in 2014. Dr. Volkov's research on the effect of Exchange Traded Funds on the return and volatility of underlying securities has been awarded an ETF Research Academy Grant sponsored by the Paris-Dauphine House of Finance and Lyxor Asset Management.

Prior to a career in academia, Dr. Volkov owned a financial service firm in Lancaster, PA, which focused on investing in longevity-related assets, and worked as a financial analyst at Franklin Templeton Investments.

Dr. Volkov received his Bachelor's Degree in International Studies (2005) and a Master's in Business Administration (2007) from Millersville University and a Ph.D. in Finance from Florida Atlantic University (2015).

© 2024, Physician Life Care Planning, LLC

## 12  Sources

### 12.1  Sources in this Report

- Expectancy Data, *The Dollar Value of a Day: 2020 Dollar Valuation*.  Shawnee Mission, Kansas, 2021.

- Municipal High-Grade AAA G.O. (General Obligation) Index, Municipal Market Analytics, Concord, MA, [February 1, 2024].

- Matthew J. Cushing and David I. Rosenbaum. 2012. Va*luing Household Services: A New Look at the Replacement Cost Approach*. Journal of Legal Economics 19(1): pp. 37-60.

- Telephone interview of Mr. Tapia on February 2, 2024.

- Ross AR, Randolph WW, Jeffery J, *Corporate Finance*, New York; McGraw-Hill; 2002; 71.

- Stepshenson, Stanley P., *Determining the Value of Household Production as a Component of Economic Damages*, Valuation Strategies, May/June 2006, Volume 9, Number 5, pp. 10-17.

- The 2023 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds, United States Government Publishing Office, Washington DC, 2021.

- Healthy Life Expectancy, 2018 Tables, Shawnee Mission, Kansas, 2020.

### 12.2  Other Sources

In addition to the sources that were used in this report, I also considered:

- Financial Industry Regulatory Authority (FINRA) Rules, specifically FINRA Rule 2111; Suitability[11]

---

[11] Financial Industry Regulatory Authority Website, as of March 1, 2016:
http://finra.complinet.com/en/display/display.html?rbid=2403&record_id=15663&element_id=9859&highlight=2111#r15663



# Present Value Loss of Earnings Assessment

Prepared for Mr. Javier Tapia

**February 7, 2024**

Prepared by: Nik Volkov, Ph.D., CVA, MAFF
Requested by: Galanda Broadman, PLLC



Physician Life Care Planning

# Sources

Preface .................................................................................................................................. ii

1    Introduction .................................................................................................................... 1

2    Life Expectancy ............................................................................................................... 1

3    Work Life Expectancy ..................................................................................................... 2

4    Discount Rate .................................................................................................................. 3

5    Growth of Earnings ......................................................................................................... 5

6    Computed Lost Earning Capacity ................................................................................... 6

7    Summary ......................................................................................................................... 7

8    Additional Sources .......................................................................................................... 8

9    Economic Calculations & Data ....................................................................................... 9

Physician Life Care Planning

## Preface

This report is intended for the use of the counsel in the case of Mr. Tapia.

I, Nik Volkov, Ph.D., CVA, MAFF, an Associate Economist of Physician Life Care Planning, have been asked to determine the present value of the lost earning capacity of Mr. Tapia.

This Present Value Assessment ("Assessment", or "Report") is intended for use by Galanda Broadman, PLLC in the case of Mr. Tapia.

The work performed, and the opinions established are based on my education, training and experience as a forensic economist. The measures taken to form opinions in this matter are ones that I deemed necessary. These measures include:  the analysis of relevant documents, the performance of appropriate research and analysis, and the execution of applicable formulaic calculations.

The opinions and conclusions expressed in this report reflect my opinions at the time at which this report was prepared.  I reserve the right to amend my conclusions and my opinions should additional information become available, or if it becomes necessary to supplement and/or update this report at a future date.

A list of the documents that I reviewed when forming my opinions is attached.

Nik Volkov, Ph.D., CVA, MAFF
Associate Economist
Physician Life Care Planning, LLC

Physician Life Care Planning

# 1   Introduction

This report assesses the present value of lost past and future earning capacity of Mr. Tapia. Mr. Tapia was injured on October 1, 2018.

I was provided with a Vocational Loss of Earnings Capacity Assessment Report prepared for Mr. Tapia by Timothy R. Andenmatten, MEd, CRC, CVE, IPEC on February 5, 2024. Mr. Andenmatten concludes that Mr. Tapia's pre-injury earning capacity amounted to $52,330 in 2023$ and that he suffered a loss of earning capacity as a result of the injury. Mr. Andenmatten further concludes that Mr. Tapia sustained a loss of future earning capacity in the amount of $13,996 annually in 2023$. This scenario presented in the Vocational Report assumes that Mr. Tapia will be able to maintain his current employment for the duration of his work life expectancy.

I rely on the conclusions of the Vocational Report in the calculations performed in the following report.

The present value of the past and the future lost earning capacity of Mr. Tapia is estimated at **$219,448.**

The damages figures presented above include the loss of the past and the future earning capacity of Mr. Tapia.

I have based my opinions on the information available to me at this time. Should additional information become available, I reserve the right to update my report.

Javier Tapia was born on March 3, 1982 and was 36.58 years of age at the time of the injury. He is not married and has one child, who is not in his custody.

At the time of the injury, Mr. Tapia was incarcerated. He was released on February 9, 2022 through the graduate and reentry program. He works as a Laborer/DS2 Support for Pioneer Distributors, an airplane parts company that works with Boeing. Mr. Tapia resides in Tacoma, WA  (Seattle-Tacoma-Bellevue, WA metropolitan area). He completed ten grades of school.

I assume March 1, 2024 as the trial/settlement date.

# 2   Life Expectancy

Mr. Tapia's statistical life expectancy based on the life expectancy of a male and calculated from his age of 36.58 years at the date of the injury is to age 78.4, in August 2060, according to data in Healthy Life Expectancy, 2018 Tables; the data source is the United States Life Tables 2018.

Mr. Tapia's full function life expectancy is to age 75.1 in March 2057 according to Healthy Life Expectancy, 2018 Tables, Shawnee Mission, Kansas, 2020. The full function life expectancy is the time until which Mr. Tapia is expected to produce household services.

Confidential Record Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC

Physician Life Care Planning

# Javier Tapia

**Table 2: Life table for males: United States**
Expectancy Data *Healthy Life Expectancy: 2018 Tables*. Shawnee Mission, Kansas, 2020.

|  | Life Expectancy | Full Function Life Expectancy*, FFLE |
| --- | --- | --- |
| 36 | 42.37 | 38.94 |
| **36.58** | **41.84** | **38.48** |
| 37 | 41.46 | 38.14 |

| Date of Injury | LE | FFLE |
| --- | --- | --- |
| Actual | Actual | Actual |
| 10/1/2018 | 8/3/2060 | 3/24/2057 |
|  | **78.4** | **75.1** |

## 3   Work Life Expectancy

Work life expectancy (WLE) is determined by education level, activity status in the labor market, age and sex. Mr. Tapia was age 36.58 at the damages date. The WLE of a 36.58-year-old male with 10 to 12 grades of education (initially active in the labor market) is 18.77 years, with a standard deviation of 8.07 years. This information is derived from "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors" by Mr. Skoog, Mr. Ciecka, and Kurt Krueger, Journal of Forensic Economics, Vol. 28, No. 1, 2019, pp. 15-108 (published in 2019). Using these data and assuming continuous work, one would expect Mr. Tapia to be active in the labor market until July 2037. At that date, he would be age 55.35.

It is more likely than not that the WLE would fall between 12.9 and 24.5 years.

Confidential Record Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC

# Javier Tapia

**Table 3. Initially Active Men with 10th Grade to 12th Grade, No Diploma**

| Age (At DOI) | Worklife Expectancy | SD | Estimated | 25% | 75% |
|---|---|---|---|---|---|
| 36 | 19.15 | 8.15 | 55.15 | 13.5 | 24.5 |
| 36.58 | **18.77** | **8.07** | **55.35** | **12.9** | **24.5** |
| 37 | 18.5 | 8.01 | 55.50 | 12.5 | 24.5 |

| Date of Injury | Worklife Expectancy Ends | | Lower Bound | Upper Bound |
|---|---|---|---|---|
| 10/1/2018 | 7/8/2037 | 50% range around | 49.5 | 61.1 |
| At age | 55.35 | WLE | | |

I compute the loss of earning capacity through July 2037.

## 4   Discount Rate

The future streams of payments to replace the loss of earning capacity are discounted to their present value in recognition that the award will be received in the present year and this principal will be invested in a relatively risk-free instrument and earn interest. The present value of each of these future payments is the amount it would take, if invested today with interest compounded, to equal the amount of the payment at the point it is to be made. These individual payment streams are then added to give the individual totals for the losses. The interest rate on this invested principal is the discount rate.

Any taxes on the interest earned on the investment of a potential award must be accounted for. For this reason, I have used National Municipal Bond Yields on tax-free, Triple A rated, Tax-Exempt Bonds to calculate the discount rate on future payments. The current (as of February 1, 2024) yield on 1-year to 30-year Municipal Bonds ranges from 2.25% to 3.29%. For example, the average yield of a laddered portfolio for 30 years is 2.86%. The current bond yield was applied to the appropriate periods to calculate the present value, i.e. a "laddered portfolio". For example, the present value of losses in year ten is discounted by the yield on a 10-year bond and in year fifteen by the yield on a 15-year bond. Values are discounted on an annual basis at midyear. See chart below.

Confidential Record Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC



**Independent & Data Driven**

# MUNICIPAL HIGH GRADE
# AAA G.O. INDEX
## February 1, 2024

| Period | Year | Yield* |
|:------:|:----:|:------:|
| 1 | 2024 | 2.83 |
| 2 | 2025 | 2.56 |
| 3 | 2026 | 2.41 |
| 4 | 2027 | 2.31 |
| 5 | 2028 | 2.26 |
| 6 | 2029 | 2.25 |
| 7 | 2030 | 2.29 |
| 8 | 2031 | 2.35 |
| 9 | 2032 | 2.42 |
| 10 | 2033 | 2.48 |
| 11 | 2034 | 2.55 |
| 12 | 2035 | 2.64 |
| 13 | 2036 | 2.73 |
| 14 | 2037 | 2.84 |
| 15 | 2038 | 2.94 |
| 16 | 2039 | 3.03 |
| 17 | 2040 | 3.10 |
| 18 | 2041 | 3.13 |
| 19 | 2042 | 3.16 |
| 20 | 2043 | 3.18 |
| 21 | 2044 | 3.20 |
| 22 | 2045 | 3.21 |
| 23 | 2046 | 3.22 |
| 24 | 2047 | 3.23 |
| 25 | 2048 | 3.24 |
| 26 | 2049 | 3.25 |
| 27 | 2050 | 3.26 |
| 28 | 2051 | 3.27 |
| 29 | 2052 | 3.28 |
| 30 | 2053 | 3.29 |

**Average Laddered Yield 30-year:** 2.86

4

Confidential Record Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC

Physician Life Care Planning

## 5   Growth of Earnings

Data and research (see for example, "Changes in the Distribution of Workers' Hourly Wages between 1979 and 2009" by the CBO), for wage growth for less skilled workers (those without 4-year college degrees) and skilled workers (those with a 4-year degree or higher), show that over the long-term earnings for male workers with college degrees are increasing at about 1% above the rate of inflation, or approximately the change in the Employment Cost Index (ECI), while the wages for less skilled workers are increasing at about the rate of increase in the Consumer Price Index (CPI).

The ECI increased by 4.0% in 2021 and by 5.1% in 2022; it is expected to increase by 4.5% in 2023, by 3.8% in 2024, by 3.5% in 2025, by 3.3% in 2026-2027, and by 3.2% in 2028-2033, per "The Congressional Budget Office An Update to the Budget and Economic Outlook: Years 2022-2032, February 2023" Table 2-1.

The CPI increased by 4.7% in 2021 and by 7.1% in 2022; it is expected to increase by 4.0% in 2023, by 2.4% in 2024, by 2.1% in 2025-2027, and by 2.3% in 2028-2033, per "The Congressional Budget Office An Update to the Budget and Economic Outlook: Years 2023-2033, February 2023" Table 2-1.

The Office of the Actuary of the Social Security Administration publishes a long-range forecast of expected wages in covered employment in the economy, titled "2023 Annual Report of the Board of Trustees of the Federal Old Age and Survivors Insurance and Federal Disability Insurance (OASDI) Trust Funds".  The intermediate (most likely) forecast for the CPI is projected to increase by 2.40% in 2031-2092. The intermediate (most likely) forecast for the covered wages is projected to increase by 3.56% in 2031-2092.

According to the Bureau of Labor Statistics Occupational Employment Survey, the average wages in the Laborers and Freight, Stock, and Material Movers, Hand in the Seattle-Tacoma-Bellevue, WA metropolitan area grew at an average rate of about 4.1% between 2012 and 2022 (see table below). The average CPI growth rate over the same time period was about 2.4% while the ECI growth was about 3.0% on average. Thus, the occupational wages in this occupation were higher than the rates of growth of the CPI and the ECI.

Confidential Record Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC

# Javier Tapia

**OES Data**

Bureau of Labor Statistics, Occupational Employment Statistics

May Metropolitan and Nonmetropolitan Occupational Employment and Wage Estimates

Seattle-Tacoma-Bellevue, WA

National Employment Statistics

**Employment**        29,950        (2022)

**Laborers and Freight, Stock, and Material Movers, Hand**

Occupation Code:    53-7062

[http://www.bls.gov/oes/](http://www.bls.gov/oes/)

| Year | Median | % Change |
|------|--------|----------|
| 2012 | $13.26 |          |
| 2013 | $14.42 | 8.7%     |
| 2014 | $14.72 | 2.1%     |
| 2015 | $16.29 | 10.7%    |
| 2016 | $14.89 | -8.6%    |
| 2017 | $15.26 | 2.5%     |
| 2018 | $16.28 | 6.7%     |
| 2019 | $16.98 | 4.3%     |
| 2020 | $17.94 | 5.7%     |
| 2021 | $18.27 | 1.8%     |
| 2022 | $19.61 | 7.3%     |

Average Annual Increase 2012-2022:    **4.12%**

Based on the data provided to me and the level of Mr. Tapia's education, I have increased Mr. Tapia's lost earning capacity by the CBO projections for the CPI growth from year 2023 to year 2033. For years beyond 2033 the OASDI projection for the CPI growth is used.

## 6    Computed Lost Earning Capacity

Mr. Tapia was injured on October 1, 2018. At the time of the injury, Mr. Tapia was incarcerated. He was released on February 9, 2022 through the graduate and reentry program.

I was provided with a Vocational Loss of Earnings Capacity Assessment Report prepared for Mr. Tapia by Timothy R. Andenmatten, MEd, CRC, CVE, IPEC on February 5, 2024. Mr. Andenmatten concludes that Mr. Tapia's pre-injury earning capacity amounted to $52,330 in 2023$ and that he suffered a loss of earning capacity as a result of the injury. Mr. Andenmatten further concludes that Mr. Tapia sustained a loss of future earning capacity in the amount of $13,996 annually in 2023$. In his determination of the loss of earning capacity of Mr. Tapia, Mr. Andenmatten assumes that Mr. Tapia will maintain employment with his current employer until his work life expectancy.

Confidential Record Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC

Physician Life Care Planning

I rely on the conclusions of Mr. Andenmatten in the calculations of the present value of the lost earning capacity of Mr. Tapia. As per the Vocational Report, I start the calculation of the loss of earning capacity on February 9, 2022 and conduct them through the work life expectancy of Mr. Tapia.

I use the actual earnings of Mr. Tapia per the State of Washington Employment Security Department statement dated October 23, 2023. The Quarter 4 2023 earnings are assumed to be equal to Quarter 3 2023 earnings with growth of 1.7%, which equals the Quarter 2 to Quarter 3 2023 earnings growth. Thus, the assumed full year 2023 earnings used in the calculations are $39,275. The 2022 mitigating earnings amount to $26,540 based on the same source.

Starting in year 2024, I assume the loss of earning capacity at $13,996 in 2023$ as opined upon in the Vocational Report.

The growth rates are applied as discussed in the previous section of this report. Please refer to the attached tables for the detailed calculations.

The present value of the lost earning capacity of Mr. Tapia amounts to $33,641 in the past and to $185,807 in the future.

## 7   Summary

The present value of the lost past and future earning capacity of Mr. Tapia is estimated at **$219,448.**

The damages figures presented above include the loss of the past and the future earning capacity.

I reserve the right to update my report should additional information become available.

Confidential Record Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC

# 8   Additional Sources

In addition to the documents and sources cited in this report, the following documents were also reviewed and considered in the formulation of my opinions:

- U.S. Bureau of Labor Statistics Consumer Price Index, *All Urban Consumers (CPI-U) U.S. city average*. http://data.bls.gov/

- Municipal Bonds AAA Yield Curve: 1 - 30 Year Maturities, *Municipal Bonds Yields: Triple-A Rated, Tax-Exempt Insured Bonds*, February 1, 2024. Report produced by Municipal Market Advisors (MMA). http://www.mma-research.com

- CBO's Year-by-Year Forecast and Projections, Table 2-1, An Update to The Budget and Economic Outlook: Years 2023 to 2033, February 2023, The Congress of the United States, Congressional Budget Office. http://www.cbo.gov/

- Expectancy Data, *Healthy Life Expectancy: 2018 Tables.* Shawnee Mission, Kansas, 2020, Table 2, males.

- "The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors", Gary Skoog, Ms. Ciecka, and Kurt Krueger. *Journal of Forensic Economics*, Vol. 28, No. 1, 2019, pp. 15-108 (published in 2019) Table 3.

- The 2023 Annual Report of the Board of Trustees of the Federal Old Age and Survivors Insurance and Federal Disability Insurance Trust Funds, Table V.B1. Principal Economic Assumptions (Cont.)

- Changes in the Distribution of Worker's Hourly Wages Between 1979 and 2009, The Congress of the United States, Congressional Budget Office. http://www.cbo.gov/

- Vocational Loss of Earnings Capacity Assessment Report prepared for Mr. Tapia by Timothy R. Andenmatten, MEd, CRC, CVE, IPEC on February 5, 2024.

- WA_ESD_0001-0010 State of Washington Employment Security Department statement dated October 23, 2023

- TERRA_0001-0049 containing employment records of Mr. Tapia

Confidential Record Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC

# 9   Economic Calculations & Data

### Personal Injury Economic Report

**Plaintiff:**   **Javier Tapia**

| Case Information |
|---|

Trial Date: 3/1/2024

Date of Injury: 10/1/2018
Discount Rate: Laddered

Present Value of Future Damages Calculated Annually at Midyear
Present Value Computed Using Compound Interest

| Plaintiff |
|---|

Sex: Male
Birth Date: 3/3/1982
Work Life Expectancy: 7/8/2037
Life Expectancy: 8/3/2060
Full-Function Life Expectancy: 3/24/2057

Education Level: 0-12
Age at Damages Date: 36.58
Retirement Age at WLE: 55.35
Expected Age at LE: 78.42
Expected Age at FFLE: 75.06

| Damages Summary |
|---|

| Type of Damage | Future Values | | Present Values | |
|---|---|---|---|---|
| | Past Loss | Future Loss | Past Loss | Future Loss |
| Lost Earning Capacity: | $33,641 | $220,981 | $33,641 | $185,807 |
| Total: | $33,641 | $220,981 | $33,641 | $185,807 |
| **Grand Total:** | $254,622 | | **$219,448** | |

Confidential Record Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC

## Javier Tapia

### Past Lost Earning Capacity

|  |  |  |
|--:|:--|:--|
| Date of Injury: | **10/1/2018** | |
| Date Start Damages: | **2/9/2022** | |
| Damages Year Fraction: | **0.89** | |
| Pre-Injury Earning Capacity: | **$52,330** | 2023$ |
| Loss of Earn. Capacity (per Voc): | **$13,996** | 2023$ |
| Trial Date: | **3/1/2024** | |
| Trial-Year Fraction: | **0.16** | |

| | | | | Lost Earning Capacity | | | | Cumulative Loss |
|---|---|---|---|---|---|---|---|---|
| Date From | Date To | Date Fraction | Earnings Growth* | Pre-Injury Earning Capacity | Mitigating Earnigns** | Lost Earning Capacity | PV Total Damages | |
| 2/9/2022 | 12/31/2022 | 0.89 | 7.10% | $44,772 | $26,541 | $18,231 | $18,231 | $18,231 |
| 1/1/2023 | 12/31/2023 | 1.00 | 4.00% | $52,330 | $39,275 | $13,055 | $13,055 | $31,287 |
| 1/1/2024 | 3/1/2024 | 0.16 | 2.40% | | | $2,354 | $2,354 | $33,641 |
| **Totals** | | | | $97,102 | $65,816 | $33,641 | $33,641 | |

*__2022-2033__: Actual CPI and CPI Growth from CBO The Budget and Economic Outlook: 2023 to 2033, February 2023.

** per Employment Security Department October 23, 2023 letter

Physician Life Care Planning™

## Javier Tapia
## Future Lost Earning Capacity

| | | |
|---|---|---|
| Lost Earning Capacity: | **$13,996** | 2022$ |
| Work-Life Expectancy Date: | **7/8/2037** | |
| Work-Life Expectancy Fraction: | **0.52** | |

| Years in the Future | Year Ending | Earnings Growth* | Date Fraction | Discount Rate | Lost Earning Capacity | PV Lost Earning Capacity | FV Total Loss | PV Total | Cumulative |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/31/2024 | 2.40% | 0.84 | 2.83% | $11,978 | $11,812 | $11,978 | $11,812 | $45,453 |
| 2 | 12/31/2025 | 2.10% | 1.00 | 2.56% | $14,633 | $14,088 | $14,633 | $14,088 | $59,541 |
| 3 | 12/31/2026 | 2.10% | 1.00 | 2.41% | $14,940 | $14,077 | $14,940 | $14,077 | $73,618 |
| 4 | 12/31/2027 | 2.10% | 1.00 | 2.31% | $15,254 | $14,082 | $15,254 | $14,082 | $87,700 |
| 5 | 12/31/2028 | 2.30% | 1.00 | 2.26% | $15,605 | $14,112 | $15,605 | $14,112 | $101,812 |
| 6 | 12/31/2029 | 2.30% | 1.00 | 2.25% | $15,964 | $14,125 | $15,964 | $14,125 | $115,936 |
| 7 | 12/31/2030 | 2.30% | 1.00 | 2.29% | $16,331 | $14,096 | $16,331 | $14,096 | $130,032 |
| 8 | 12/31/2031 | 2.30% | 1.00 | 2.35% | $16,706 | $14,035 | $16,706 | $14,035 | $144,068 |
| 9 | 12/31/2032 | 2.30% | 1.00 | 2.42% | $17,091 | $13,947 | $17,091 | $13,947 | $158,015 |
| 10 | 12/31/2033 | 2.30% | 1.00 | 2.48% | $17,484 | $13,854 | $17,484 | $13,854 | $171,869 |
| 11 | 12/31/2034 | 2.40% | 1.00 | 2.55% | $17,903 | $13,744 | $17,903 | $13,744 | $185,613 |
| 12 | 12/31/2035 | 2.40% | 1.00 | 2.64% | $18,333 | $13,586 | $18,333 | $13,586 | $199,199 |
| 13 | 12/31/2036 | 2.40% | 1.00 | 2.73% | $18,773 | $13,407 | $18,773 | $13,407 | $212,605 |
| 14 | 12/31/2037 | 2.40% | 0.52 | 2.84% | $9,986 | $6,843 | $9,986 | $6,843 | $219,448 |
| | **Totals** | | | | $220,981 | $185,807 | $220,981 | $185,807 | **$219,448** |

*Above table headers: "Lost Earning Capacity" spans Lost Earning Capacity / PV Lost Earning Capacity columns; "Totals" spans FV Total Loss / PV Total / Cumulative columns.*

*__2023-2033__: Projected CPI Growth from CBO The Budget and Economic Outlook: 2023 to 2033, February 2023; OASDI CPI thereafter

Confidential Record Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC



**MVQS - Transferrable Skills - Report 1**

**Client Identification, Labor Market Area, VIPR Type and Reason for Referral**

Sunday, February 4, 2024

| | | | |
|---|---|---|---|
| **Evaluee Name:** | Javier  Tapia | | |
| **Address1:** | 1813 S 82nd St. Apt 3 | | |
| **Address2:** | | | |
| **City/State/Zip:** | Tacoma | WA | 98408 |
| | USA | | |

**Labor Market Area**

| | | | |
|---|---|---|---|
| Job Bank Name: | Pierce | Evaluation Year: | 2023 |
| StateParishProvince: | WA | Inflation Rate: | 1.440389 |
| Country Name: | USA | ECLR Rate: | 0.5774367 |

**VIPRType:**

**Reason for Referral:**

**Email for Claims:**

**Case Name:**

**Case Diagnosis:**

**Case Notes:**



**MVQS - Transferrable Skills - Report 3**
**Worker Trait Profiles**
Sunday, February 4, 2024

**Evaluee Name:  Javier  Tapia**

| Worker Trait Profiles | VQ | GED R M L | Aptitudes S P Q K F M E C | Physical Demands 1 2 3 4 5 6 | Environmental Conditions 1 2 3 4 5 6 7 |
|---|---|---|---|---|---|
| **Profile 1:** Work History Profile | 114.90 | 3 3 2 | 3 3 2 3 3 3 2 2 | 5 1 1 1 0 1 | 3 0 1 0 1 1 1 |
| **Profile 2:** Evaluative Profile | 113.92 | 3 3 2 | 3 3 2 3 3 3 2 2 | 2 0 1 1 1 1 | 3 1 1 1 1 1 1 |
| **Profile 3:** Pre Profile | 120.25 | 3 3 2 | 3 3 2 3 3 3 2 2 | 5 1 1 1 1 1 | 3 1 1 1 1 1 1 |
| **Profile 4:** Post Profile | 113.82 | 3 3 2 | 3 3 2 3 3 3 2 2 | 2 0 1 1 1 1 | 3 1 1 1 1 1 1 |

**Profile 1:** Highest Levels of Worker Trait Functioning demonstrated across Past Relevant Work History over the past 15 years.

**Profile 2:** The Evaluative Data Profile of Current Vocational Functioning derived from demonstrated and retained Work History functioning, confirmed by review of available relevant Medical, Psychological, Social, Educational and Vocational Information and extended through available relevant Vocational Tests, Measures, Ratings and Functional Capacities Assessment data.

**Profile 3:** Highest Levels of Worker Trait Functioning across demonstrated Work History (Profile 1) and Evaluative Data (Profile 2).

**Profile 4:** The Final Adjusted Residual Employability and Earnings Capacity Profile of Vocational Functioning for Job-Person Matching.

Notes: Worker Trait Profile Levels of "4" on GED and Aptitude Traits reflect Middle-Average (50th %ile) Vocational Functioning. The Middle-Average Vocational Quotient (VQ) for Jobs is 100 and for People is 140. Both have a Standard Deviation of 15. Perfect Job-Person Profile Matches are rare. Reasonable Job Matches are typically 22.5 VQ Points below the Person's VQ. Theoretical Underpinnings of the McCroskey Vocational Quotient System (MVQS) include: Parson's (1909) Informal 3-Part Theory. The Formal Minnesota Theory of Work Adjustment (Dawis, Lofquist & Weiss, 1968). The Vocational Diagnosis and Assessment of of Residual Employability (VDARE, McCroskey, Wattenbarger, Field and Sink, 1977), and the Scientific Research on Job-Person Matching and Earning Capacity Prediction Studies contained in national peer-reviewed Journals including: Vols. 1 - 7 of the Journal of Forensic Vocationology (1995-2014), The Earnings Analyst (TEA) Journals of the American Rehabilitation Economics Association (Vols 1 - 4, 1998 - 2001) and The American Board of Vocational Expert (ABVE) Journals of Forensic Vocational Assessment (Vols 1 - 4, 1996 - 2001). High to Very High Transferable Skills Analysis Validity has been demonstrated.

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.



**MVQS - Transferrable Skills - Report 4**

**Pre and Post Comparisons**

Sunday, February 4, 2024

**Evaluee Name:** Javier Tapia

## SECTION 5, PART 1:  ACCESS TO THE LABOR MARKET

**Jobs Searched:** 1095    In this Job Bank

**Job Matches in each of the 10 DOT Job Categories\***

| JobCats*: | Prof<br>- 0 - | TechMgr<br>- 1 - | ClerSales<br>- 2 - | Services<br>- 3 - | Agri<br>- 4 - | Process<br>- 5 - | MachTr<br>- 6 - | Bench<br>- 7 - | Struct<br>- 8 - | Misc<br>- 9 - | - Total - | Labor Market Access** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre: | 0 | 2 | 11 | 63 | 19 | 7 | 17 | 19 | 35 | 19 | 192 | 18 |
| Post: | 0 | 1 | 5 | 31 | 2 | 3 | 4 | 11 | 0 | 7 | 64 | 6 |
| Residual: | 0% | 50% | 45% | 49% | 11% | 43% | 24% | 58% | 0% | 37% | 33% | 33% |

*\*\* Mean=85, Std Dev=8. Access to Specific Jobs and Earnings depend on Qualifications, Skills, Abilities, General and Specific Educational Development, Aptitudes, Training, Experience, Supply-Demand Factors in Relevant Labor Markets.*

## SECTION 5, PART 2:  EARNING CAPACITY AND TRAINING POTENTIAL

**Overall Earning Capacity: Mean Present Value Earning Capacity Estimates - Pre/Post Summary**

**Note: See Table 4a for EC Rxy, SEe and Confidence Intervals.**

| | Max VQ | Avg VQ | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile | Training Potential** |
|---|---|---|---|---|---|---|---|---|---|
| Pre: | 112.55 | 91.12 | $10.68 | $6.34 | $7.73 | $9.87 | $12.85 | $16.52 | 73 |
| Post: | 102.44 | 89.18 | $10.39 | $6.21 | $7.53 | $9.59 | $12.47 | $16.02 | 67 |
| Residual: | 91% | 98% | 97% | 98% | 98% | 97% | 97% | 97% | 91% |

*\*\* Mean=85, Std Dev=8. Access to Specific Training Programs depend on Qualifications, General and Specific Educational Development, Aptitudes, Motivation, Supply and Demand Factors in Relevant Training Markets and Funding Availability.*

## SECTION 5, PART 3:  TRANSFERABLE SKILLS (TS) AVAILABILITY and UTILIZATION

| TS Levels*: | No TSkills Available<br>0 - 19% | Few, if any TSkills Available<br>20 - 39% | Low TSkills Available<br>40 - 59% | Moderate TSkills Available<br>60 - 79% | High TSkills Available<br>80 - 97% | Utilization** |
|---|---|---|---|---|---|---|
| Pre: | 42 | 107 | 23 | 19 | 1 | 24 |
| Post: | 21 | 38 | 3 | 2 | 0 | 9 |
| Residual: | 50% | 36% | 13% | 11% | 0% | 37% |

*\*\* Mean=85, Std Dev=8. Access to TS Jobs depends on Level of Qualifications, Skills, Training, Experience, Availability of Skills Updating/Enhancement Training to Bridge Employment Barriers, a Positive Attitude and a Motivated, Optimistic, Enthusiastic, Persistent and, above all, a Realistic Job Search.*

*\* See MVQS2003 Reports: Selected Symbols, Codes and Scales. (MVQS 2003 Resources, p. 42).*

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

## MTSP - Report 5
### Client Work History Job Demands/Worker Trait Requirements

Javier  Tapia                    **Report 5:  Work History Job Demands/Worker Trait Requirements**                    Sunday, February 4, 2024

| Dot Code | Job Title | VQ | VIPR | SVP | Skill Level | GED | | | Aptitudes | | | | | | | | Physical Demands | | | | | | Environmental Conditions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | R | M | L | S | P | Q | K | F | M | E | C | 1 | 2 | 3 | 4 | 5 | 6 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 318.687-010 | Kitchen Helper | 85.02 | ESTJ | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | 1 | 2 | 2 | 2 | 2 | 2 | 3 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 0 |
| 613.685-010 | Coiler | 89.86 | ESTJ | 4 | Semi-Skilled | 2 | 1 | 1 | 3 | 3 | 1 | 3 | 3 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 1 | 1 |
| 869.664-014 | Construction Worker I | 112.55 | ESTJ | 4 | Semi-Skilled | 3 | 3 | 2 | 3 | 3 | 2 | 3 | 3 | 3 | 2 | 2 | 4 | 1 | 1 | 1 | 0 | 1 | 3 | 0 | 0 | 0 | 1 | 1 | 1 |
| 869.687-026 | Construction Worker II | 90.01 | ESTJ | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | 1 | 2 | 2 | 3 | 2 | 1 | 5 | 0 | 1 | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 1 | 1 | 0 |
| 922.687-058 | Laborer, Stores | 84.88 | ESTJ | 2 | Unskilled | 2 | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

## MTSP - Report 8
### Job Matches by Transferable Skills (TS) - Job Demands

Javier  Tapia     **Job Profile Report 8:  Job Matches by Transferable Skills (TS)  - Job Demands**     Sunday, February 4, 2024

| Dot Code | Job Title | TS | VQ | VIPR | VA | SVP | Skill Level | GED R | M | L | S | P | Q | K | F | M | E | C | PD 1 | 2 | 3 | 4 | 5 | 6 | EC 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 589.687-022 | Fabric-Lay-Out Worker | 63% | 86.77 | ESTP | 43% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 922.137-026 | Warehouse Traffic Supervisor | 60% | 96.73 | ESTJ | 14% | 5 | Semi-Skilled | 3 | 2 | 2 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 0 |
| 921.685-062 | Stacker Tender | 40% | 85.81 | ISFJ | 30% | 3 | Semi-Skilled | 2 | 1 | 1 | 3 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 921.685-054 | Sorter Operator | 40% | 92.49 | ESTJ | 23% | 4 | Semi-Skilled | 2 | 1 | 1 | 3 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 0 |
| 616.682-026 | Kick-Press Operator I | 40% | 99.91 | ESTJ | 30% | 4 | Semi-Skilled | 3 | 2 | 2 | 3 | # | # | # | 3 | 3 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 780.682-018 | Upholstery Sewer | 23% | 101.77 | ISFP | 29% | 4 | Semi-Skilled | 3 | 2 | 2 | 3 | # | # | # | 3 | 3 | 2 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 209.667-014 | Order Caller | 23% | 86.53 | ESFP | 20% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 372.667-010 | Airline Security Representative | 20% | 90.56 | ESTJ | 32% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 319.484-010 | Food Assembler, Kitchen | 20% | 91.20 | ESFP | 40% | 3 | Semi-Skilled | 2 | 2 | 1 | 2 | # | # | # | 3 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 349.673-010 | Drive-in Theater Attendant | 20% | 88.00 | ESFJ | 37% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 311.477-030 | Waiter/Waitress, Informal | 20% | 97.58 | ESFP | 35% | 3 | Semi-Skilled | 3 | 2 | 2 | 2 | # | # | # | 3 | 3 | 2 | 1 | 2 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 376.667-010 | Bouncer | 20% | 85.00 | ISTP | 32% | 3 | Semi-Skilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 2 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 352.677-018 | Waiter/Waitress, Club | 20% | 91.29 | ESFP | 35% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 3 | 2 | 2 | 2 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 350.677-030 | Waiter/Waitress | 20% | 96.81 | ESFP | 35% | 3 | Semi-Skilled | 3 | 1 | 2 | 2 | # | # | # | 2 | 3 | 2 | 1 | 2 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 349.677-014 | Coach Driver | 20% | 87.16 | ESFJ | 35% | 2 | Semi-Skilled | 3 | 1 | 1 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 311.477-026 | Waiter/Waitress, Formal | 20% | 102.44 | ESFP | 35% | 4 | Semi-Skilled | 3 | 2 | 2 | 2 | # | # | # | 3 | 3 | 2 | 1 | 2 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 344.667-010 | Ticket Taker | 20% | 87.96 | ESFJ | 37% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 1 | 2 | 2 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 379.364-010 | Automobile Tester | 20% | 97.09 | ESFP | 25% | 4 | Semi-Skilled | 2 | 2 | 2 | 3 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 319.677-010 | Caterer Helper | 20% | 99.19 | ESTJ | 40% | 3 | Semi-Skilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 305.281-010 | Cook | 20% | 94.84 | ESTJ | 43% | 6 | Skilled | 3 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 319.474-010 | Fountain Server | 20% | 90.67 | INTP | 36% | 2 | Unskilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 319.464-014 | Vending-Machine Attendant | 20% | 87.76 | ESFP | 39% | 2 | Unskilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |

Javier Tapia

**Job Profile Report 8:  Job Matches by Transferable Skills (TS)  - Job Demands**

Sunday, February 4, 2024

| Dot Code | Job Title | TS | VQ | VIPR | VA | SVP | Skill Level | GED R M L | Aptitudes S P Q K F M E C | Physical Demands 1 2 3 4 5 6 | Environmental Conditions 1 2 3 4 5 6 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 316.684-014 | Deli Cutter-Slicer | 20% | 91.20 | ESTJ | 40% | 2 | Unskilled | 2 2 1 | 2 # # # 3 3 1 2 | 2 0 0 1 0 1 | 1 0 0 0 0 1 0 |
| 316.661-010 | Carver | 20% | 96.49 | ESTJ | 40% | 4 | Semi-Skilled | 3 2 2 | 2 # # # 2 3 1 2 | 2 0 0 1 0 1 | 1 0 0 0 0 0 0 |
| 313.374-014 | Cook, Short Order | 20% | 99.69 | ESTJ | 36% | 3 | Semi-Skilled | 3 2 2 | 2 # # # 2 3 1 2 | 2 0 0 1 1 1 | 1 0 1 0 0 1 0 |
| 312.477-010 | Bar Attendant | 20% | 90.87 | ESFP | 35% | 2 | Unskilled | 2 2 2 | 2 # # # 2 3 1 1 | 2 0 0 1 1 1 | 1 0 0 0 0 0 0 |
| 311.674-018 | Waiter/Waitress, Buffet | 20% | 90.73 | ESFP | 35% | 3 | Semi-Skilled | 2 2 1 | 2 # # # 2 3 1 1 | 2 0 1 1 1 0 | 1 0 0 0 0 0 0 |
| 705.687-018 | Metal Sander and Finisher | 20% | 85.60 | ISFP | 39% | 3 | Semi-Skilled | 2 1 1 | 2 # # # 3 3 1 1 | 2 0 0 1 0 0 | 1 0 0 0 0 0 0 |
| 207.685-014 | Photocopying-Machine Operator | 20% | 85.92 | ISFP | 37% | 2 | Unskilled | 2 1 1 | 2 # # # 2 3 1 1 | 2 0 0 1 0 0 | 1 0 0 0 0 0 0 |
| 311.477-014 | Counter Attendant, Lunchroom or Co | 20% | 92.07 | ESFP | 36% | 2 | Unskilled | 2 2 2 | 2 # # # 2 3 2 1 | 2 0 0 1 1 0 | 1 0 0 0 0 0 0 |
| 774.684-022 | Handler | 20% | 95.67 | ISFP | 33% | 5 | Semi-Skilled | 3 1 1 | 3 # # # 3 3 1 1 | 2 0 0 1 0 1 | 1 0 0 0 1 0 0 |
| 737.687-046 | Explosive Operator II | 20% | 85.82 | ISFP | 33% | 2 | Unskilled | 2 2 2 | 2 # # # 2 3 1 1 | 2 0 0 1 0 1 | 1 0 0 0 0 1 0 |
| 727.687-054 | Final Inspector | 20% | 86.16 | ESTJ | 23% | 2 | Unskilled | 2 2 2 | 2 # # # 2 3 1 1 | 2 0 0 1 0 0 | 1 0 0 0 0 0 0 |
| 309.674-014 | Personal Attendant | 20% | 89.00 | ESTP | 43% | 3 | Semi-Skilled | 2 2 2 | 2 # # # 2 3 2 2 | 2 0 1 1 0 1 | 1 0 0 0 0 0 0 |
| 710.381-010 | Assembler II | 20% | 100.37 | ISFP | 24% | 5 | Semi-Skilled | 3 2 2 | 3 # # # 3 3 1 2 | 2 0 0 1 0 1 | 1 0 0 0 0 0 0 |
| 311.677-014 | Counter Attendant, Cafeteria | 20% | 90.23 | ESFP | 36% | 3 | Semi-Skilled | 2 1 2 | 2 # # # 3 3 1 1 | 2 0 1 1 0 1 | 1 0 0 0 1 0 0 |
| 704.682-010 | Engraver, Machine I | 20% | 94.84 | ISFP | 32% | 3 | Semi-Skilled | 3 2 2 | 2 # # # 3 3 1 1 | 1 0 0 1 0 1 | 1 0 0 0 0 0 0 |
| 669.137-010 | Supervisor, Wood-Crew | 20% | 99.29 | ESTJ | 13% | 6 | Skilled | 3 2 2 | 2 # # # 2 3 1 1 | 2 0 0 1 1 1 | 2 0 0 0 0 0 0 |
| 653.667-010 | Inspector, Publications | 20% | 97.82 | ESTJ | 23% | 5 | Semi-Skilled | 3 1 2 | 3 # # # 3 3 1 2 | 2 0 0 1 0 1 | 1 0 0 0 1 1 1 |
| 299.364-014 | Gift Wrapper | 20% | 97.93 | ISFP | 24% | 3 | Semi-Skilled | 2 2 1 | 3 # # # 3 2 1 2 | 2 0 1 1 1 1 | 1 0 0 0 0 0 0 |
| 590.684-042 | Integrated Circuit Fabricator | 20% | 98.72 | ESTJ | 26% | 3 | Semi-Skilled | 2 2 2 | 2 # # # 3 3 1 2 | 2 0 0 1 0 1 | 1 0 0 0 0 0 0 |
| 418.677-010 | Dog Bather | 20% | 102.14 | ISFP | 33% | 2 | Unskilled | 3 2 2 | 2 # # # 3 3 2 2 | 2 0 0 1 0 1 | 1 0 0 1 0 0 0 |
| 311.477-018 | Waiter/Waitress, Bar | 20% | 101.87 | ESFP | 35% | 3 | Semi-Skilled | 3 2 2 | 2 # # # 2 3 2 2 | 2 0 0 1 1 1 | 1 0 0 0 1 0 0 |
| 230.687-010 | Advertising-Material Distributor | 6% | 80.13 | ESTJ | 40% | 2 | Unskilled | 1 1 1 | 2 # # # 2 3 1 1 | 2 0 0 1 0 0 | 0 3 0 0 0 0 0 |
| 323.687-014 | Cleaner, Housekeeping | 3% | 75.07 | ESFJ | 40% | 2 | Unskilled | 1 1 1 | 2 # # # 2 2 1 1 | 2 0 0 1 0 0 | 1 0 0 0 0 0 0 |
| 922.687-042 | Cotton Sampler | 3% | 80.36 | ISFP | 33% | 2 | Unskilled | 2 1 1 | 2 # # # 2 2 1 1 | 2 0 0 1 0 0 | 1 0 0 0 0 0 0 |
| 762.687-014 | Box Inspector | 3% | 83.94 | ESTJ | 23% | 2 | Unskilled | 2 1 2 | 2 # # # 2 3 1 1 | 2 0 0 1 0 1 | 1 0 0 0 0 0 0 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

Javier Tapia     **Job Profile Report 8:  Job Matches by Transferable Skills (TS)  - Job Demands**     Sunday, February 4, 2024

| Dot Code | Job Title | TS | VQ | VIPR | VA | SVP | Skill Level | GED R | M | L | S | P | Q | K | F | M | E | C | PD 1 | 2 | 3 | 4 | 5 | 6 | EC 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 369.687-018 | Folder | 3% | 80.41 | ESTJ | 43% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 2 | 1 | 2 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| 358.677-018 | Rest Room Attendant | 3% | 76.16 | ISFP | 38% | 2 | Unskilled | 2 | 1 | 1 | 1 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 230.663-010 | Deliverer, Outside | 0% | 84.86 | ISFP | 38% | 2 | Unskilled | 2 | 1 | 2 | 2 | # | # | # | 2 | 2 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 311.677-010 | Cafeteria Attendant | 0% | 81.94 | ESTJ | 42% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 3 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 339.687-010 | Supply Clerk | 0% | 84.21 | ISFP | 36% | 3 | Semi-Skilled | 2 | 2 | 1 | 2 | # | # | # | 2 | 2 | 1 | 2 | 2 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| 159.647-014 | Extra | 0% | 82.04 | ENFJ | 36% | 2 | Unskilled | 2 | 2 | 2 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 363.685-026 | Shirt Presser | 0% | 81.61 | ESTJ | 30% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 |
| 405.687-010 | Flower Picker | 0% | 79.44 | ISFP | 45% | 1 | Unskilled | 1 | 1 | 1 | 2 | # | # | # | 2 | 3 | 1 | 2 | 2 | 0 | 1 | 1 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 1 | 0 |
| 556.685-038 | Injection-Molding-Machine Tender | 0% | 79.83 | ESTJ | 27% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 603.685-050 | Deburrer | 0% | 82.52 | ESTJ | 32% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 2 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 713.684-014 | Assembler, Molded Frames | 0% | 83.60 | ISFP | 33% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 3 | 2 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 794.687-054 | Stringer | 0% | 75.84 | ISFP | 39% | 1 | Unskilled | 1 | 1 | 1 | 1 | # | # | # | 3 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 794.687-058 | Tabber | 0% | 75.42 | ISFP | 39% | 1 | Unskilled | 1 | 1 | 1 | 2 | # | # | # | 3 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 915.667-014 | Parking Lot Signaler | 0% | 84.69 | ESTJ | 38% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 3 | 0 | 0 | 0 | 1 | 1 | 0 |
| 920.685-066 | Labeling-Machine Operator | 0% | 83.74 | ESTJ | 32% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| 920.687-170 | Shot Bagger | 0% | 80.53 | ESTJ | 38% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 363.685-010 | Press Operator | 0% | 81.41 | ESTJ | 30% | 2 | Unskilled | 2 | 1 | 1 | 2 | # | # | # | 2 | 3 | 1 | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

## MTSP - Report 10
### Job Matches by Transferable Skills (TS) - Present Value Earning Capacity

Javier Tapia

**Report 10: Job Matches by Transferable Skills-Present Value Earning Capacity**

Sunday, February 4, 2024

Note: See JOFV Table 4a, for EC Rxy, SEe and Confidence Intervals.

| Dot Code | Job Title | TS | VQ | SVP | VA | VIPR | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile |
|----------|-----------|-----|-----|-----|-----|------|------|----------|----------|----------|----------|----------|
| 159.647-014 | Extra | 0% | 82.04 | 2 | 36% | ENFJ | $9.87 | $6.00 | $7.20 | $9.10 | $11.79 | $15.17 |
| 207.685-014 | Photocopying-Machine Operator | 20% | 85.92 | 2 | 37% | ISFP | $10.13 | $6.10 | $7.36 | $9.34 | $12.13 | $15.59 |
| 209.667-014 | Order Caller | 23% | 86.53 | 2 | 20% | ESFP | $10.17 | $6.12 | $7.39 | $9.38 | $12.19 | $15.66 |
| 230.663-010 | Deliverer, Outside | 0% | 84.86 | 2 | 38% | ISFP | $10.06 | $6.07 | $7.32 | $9.28 | $12.04 | $15.48 |
| 230.687-010 | Advertising-Material Distributor | 6% | 80.13 | 2 | 43% | ESTJ | $9.75 | $5.95 | $7.12 | $8.98 | $11.62 | $14.96 |
| 299.364-014 | Gift Wrapper | 20% | 97.93 | 3 | 24% | ISFP | $10.92 | $6.41 | $7.87 | $10.10 | $13.19 | $16.90 |
| 305.281-010 | Cook | 20% | 94.84 | 6 | 43% | ESTJ | $10.72 | $6.33 | $7.74 | $9.90 | $12.92 | $16.57 |
| 309.674-014 | Personal Attendant | 20% | 89.00 | 3 | 43% | ESTP | $10.33 | $6.18 | $7.49 | $9.54 | $12.41 | $15.93 |
| 311.477-014 | Counter Attendant, Lunchroom or Coffee | 20% | 92.07 | 2 | 36% | ESFP | $10.53 | $6.26 | $7.62 | $9.73 | $12.68 | $16.26 |
| 311.477-018 | Waiter/Waitress, Bar | 20% | 101.87 | 3 | 35% | ESFP | $11.83 | $6.86 | $8.49 | $10.94 | $14.29 | $18.39 |
| 311.477-026 | Waiter/Waitress, Formal | 20% | 102.44 | 4 | 35% | ESFP | $12.10 | $6.98 | $8.66 | $11.19 | $14.63 | $18.85 |
| 311.477-030 | Waiter/Waitress, Informal | 20% | 97.58 | 3 | 35% | ESFP | $10.90 | $6.40 | $7.86 | $10.08 | $13.16 | $16.87 |
| 311.674-018 | Waiter/Waitress, Buffet | 20% | 90.73 | 3 | 35% | ESFP | $10.45 | $6.23 | $7.57 | $9.65 | $12.56 | $16.12 |
| 311.677-010 | Cafeteria Attendant | 0% | 81.94 | 2 | 42% | ESTJ | $9.87 | $6.00 | $7.20 | $9.09 | $11.78 | $15.16 |
| 311.677-014 | Counter Attendant, Cafeteria | 20% | 90.23 | 3 | 36% | ESFP | $10.41 | $6.21 | $7.55 | $9.61 | $12.51 | $16.06 |
| 312.477-010 | Bar Attendant | 20% | 90.87 | 2 | 35% | ESFP | $10.46 | $6.23 | $7.57 | $9.65 | $12.57 | $16.13 |
| 313.374-014 | Cook, Short Order | 20% | 99.69 | 3 | 36% | ESTJ | $11.04 | $6.46 | $7.95 | $10.21 | $13.35 | $17.10 |
| 316.661-010 | Carver | 20% | 96.49 | 4 | 40% | ESTJ | $10.82 | $6.38 | $7.81 | $10.01 | $13.07 | $16.75 |
| 316.684-014 | Deli Cutter-Slicer | 20% | 91.20 | 2 | 40% | ESTJ | $10.48 | $6.24 | $7.59 | $9.68 | $12.60 | $16.17 |
| 319.464-014 | Vending-Machine Attendant | 20% | 87.76 | 2 | 39% | ESFP | $10.25 | $6.15 | $7.44 | $9.46 | $12.30 | $15.79 |
| 319.474-010 | Fountain Server | 20% | 90.67 | 2 | 36% | INTP | $10.44 | $6.22 | $7.56 | $9.64 | $12.55 | $16.11 |
| 319.484-010 | Food Assembler, Kitchen | 20% | 91.20 | 3 | 40% | ESFP | $10.48 | $6.24 | $7.59 | $9.68 | $12.60 | $16.17 |
| 319.677-010 | Caterer Helper | 20% | 99.19 | 3 | 40% | ESTJ | $11.00 | $6.45 | $7.92 | $10.18 | $13.30 | $17.04 |
| 323.687-014 | Cleaner, Housekeeping | 3% | 75.07 | 2 | 40% | ESFJ | $9.42 | $5.82 | $6.91 | $8.66 | $11.18 | $14.41 |
| 339.687-010 | Supply Clerk | 0% | 84.21 | 3 | 36% | ISFP | $10.02 | $6.06 | $7.29 | $9.23 | $11.98 | $15.41 |
| 344.667-010 | Ticket Taker | 20% | 87.96 | 2 | 37% | ESFJ | $10.26 | $6.15 | $7.45 | $9.47 | $12.31 | $15.81 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

Javier  Tapia

**Report 10:  Job Matches by Transferable Skills-Present Value Earning Capacity**

Sunday, February 4, 2024

Note: See JOFV Table 4a, for EC Rxy, SEe and Confidence Intervals.

| Dot Code | Job Title | TS | VQ | SVP | VA | VIPR | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile |
|----------|-----------|-----|------|-----|-----|------|-------|----------|----------|----------|----------|----------|
| 349.673-010 | Drive-in Theater Attendant | 20% | 88.00 | 2 | 37% | ESFJ | $10.27 | $6.15 | $7.45 | $9.47 | $12.32 | $15.82 |
| 349.677-014 | Coach Driver | 20% | 87.16 | 3 | 35% | ESFJ | $10.21 | $6.13 | $7.42 | $9.42 | $12.24 | $15.73 |
| 350.677-030 | Waiter/Waitress | 20% | 96.81 | 3 | 35% | ESFP | $10.85 | $6.38 | $7.82 | $10.03 | $13.09 | $16.78 |
| 352.677-018 | Waiter/Waitress, Club | 20% | 91.29 | 2 | 35% | ESFP | $10.48 | $6.24 | $7.59 | $9.68 | $12.61 | $16.18 |
| 358.677-018 | Rest Room Attendant | 3% | 76.16 | 2 | 38% | ISFP | $9.49 | $5.85 | $6.95 | $8.73 | $11.27 | $14.53 |
| 363.685-010 | Press Operator | 0% | 81.41 | 2 | 30% | ESTJ | $9.83 | $5.98 | $7.17 | $9.06 | $11.74 | $15.10 |
| 363.685-026 | Shirt Presser | 0% | 81.61 | 2 | 30% | ESTJ | $9.85 | $5.99 | $7.18 | $9.07 | $11.75 | $15.12 |
| 369.687-018 | Folder | 3% | 80.41 | 2 | 43% | ESTJ | $9.77 | $5.97 | $7.13 | $8.99 | $11.65 | $14.99 |
| 372.667-010 | Airline Security Representative | 20% | 90.56 | 2 | 32% | ESTJ | $10.43 | $6.22 | $7.56 | $9.63 | $12.54 | $16.10 |
| 376.667-010 | Bouncer | 20% | 85.00 | 3 | 32% | ISTP | $10.07 | $6.08 | $7.32 | $9.28 | $12.05 | $15.49 |
| 379.364-010 | Automobile Tester | 20% | 97.09 | 4 | 25% | ESFP | $10.86 | $6.39 | $7.84 | $10.05 | $13.12 | $16.81 |
| 405.687-010 | Flower Picker | 0% | 79.44 | 1 | 45% | ISFP | $9.70 | $5.93 | $7.09 | $8.93 | $11.56 | $14.88 |
| 418.677-010 | Dog Bather | 20% | 102.14 | 2 | 33% | ISFP | $11.96 | $6.92 | $8.57 | $11.06 | $14.45 | $18.61 |
| 556.685-038 | Injection-Molding-Machine Tender | 0% | 79.83 | 2 | 27% | ESTJ | $9.73 | $5.94 | $7.11 | $8.96 | $11.60 | $14.93 |
| 589.687-022 | Fabric-Lay-Out Worker | 63% | 86.77 | 2 | 43% | ESTP | $10.19 | $6.12 | $7.40 | $9.40 | $12.21 | $15.68 |
| 590.684-042 | Integrated Circuit Fabricator | 20% | 98.72 | 3 | 26% | ESTJ | $10.97 | $6.43 | $7.90 | $10.15 | $13.26 | $16.99 |
| 603.685-050 | Deburrer | 0% | 82.52 | 2 | 32% | ESTJ | $9.91 | $6.01 | $7.22 | $9.13 | $11.83 | $15.22 |
| 616.682-026 | Kick-Press Operator I | 40% | 99.91 | 4 | 30% | ESTJ | $11.05 | $6.46 | $7.95 | $10.22 | $13.37 | $17.12 |
| 653.667-010 | Inspector, Publications | 20% | 97.82 | 5 | 23% | ESTJ | $10.91 | $6.41 | $7.87 | $10.09 | $13.18 | $16.89 |
| 669.137-010 | Supervisor, Wood-Crew | 20% | 99.29 | 6 | 13% | ESFP | $11.01 | $6.45 | $7.93 | $10.19 | $13.31 | $17.05 |
| 704.682-010 | Engraver, Machine I | 20% | 94.84 | 3 | 32% | ISFP | $10.72 | $6.33 | $7.74 | $9.90 | $12.92 | $16.57 |
| 705.687-018 | Metal Sander and Finisher | 20% | 85.60 | 3 | 39% | ISFP | $10.11 | $6.09 | $7.35 | $9.32 | $12.11 | $15.56 |
| 710.381-010 | Assembler II | 20% | 100.37 | 5 | 24% | ISFP | $11.12 | $6.55 | $8.03 | $10.27 | $13.39 | $17.15 |
| 713.684-014 | Assembler, Molded Frames | 0% | 83.60 | 2 | 33% | ISFP | $9.98 | $6.04 | $7.27 | $9.20 | $11.93 | $15.34 |
| 727.687-054 | Final Inspector | 20% | 86.16 | 2 | 23% | ESTJ | $10.15 | $6.11 | $7.37 | $9.36 | $12.15 | $15.62 |
| 737.687-046 | Explosive Operator II | 20% | 85.82 | 2 | 33% | ISFP | $10.12 | $6.10 | $7.36 | $9.34 | $12.12 | $15.58 |
| 762.687-014 | Box Inspector | 3% | 83.94 | 2 | 23% | ESTJ | $10.00 | $6.05 | $7.28 | $9.22 | $11.96 | $15.38 |
| 774.684-022 | Handler | 20% | 95.67 | 5 | 33% | ISFP | $10.77 | $6.35 | $7.78 | $9.96 | $12.99 | $16.66 |
| 780.682-018 | Upholstery Sewer | 23% | 101.77 | 4 | 29% | ISFP | $11.78 | $6.84 | $8.46 | $10.89 | $14.23 | $18.30 |

Javier Tapia

**Report 10: Job Matches by Transferable Skills-Present Value Earning Capacity**

Sunday, February 4, 2024

Note: See JOFV Table 4a, for EC Rxy, SEe and Confidence Intervals.

| Dot Code | Job Title | TS | VQ | SVP | VA | VIPR | Mean | 10th%ile | 25th%ile | 50th%ile | 75th%ile | 90th%ile |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 794.687-054 | Stringer | 0% | 75.84 | 1 | 39% | ISFP | $9.47 | $5.84 | $6.94 | $8.71 | $11.24 | $14.49 |
| 794.687-058 | Tabber | 0% | 75.42 | 1 | 39% | ISFP | $9.44 | $5.83 | $6.92 | $8.68 | $11.21 | $14.44 |
| 915.667-014 | Parking Lot Signaler | 0% | 84.69 | 2 | 38% | ESTJ | $10.05 | $6.07 | $7.31 | $9.27 | $12.03 | $15.46 |
| 920.685-066 | Labeling-Machine Operator | 0% | 83.74 | 2 | 32% | ESTJ | $9.99 | $6.04 | $7.27 | $9.21 | $11.94 | $15.35 |
| 920.687-170 | Shot Bagger | 0% | 80.53 | 2 | 38% | ESTJ | $9.78 | $5.96 | $7.14 | $9.00 | $11.66 | $15.00 |
| 921.685-054 | Sorter Operator | 40% | 92.49 | 4 | 23% | ESTJ | $10.56 | $6.27 | $7.64 | $9.76 | $12.71 | $16.31 |
| 921.685-062 | Stacker Tender | 40% | 85.81 | 3 | 30% | ISFJ | $10.12 | $6.10 | $7.36 | $9.34 | $12.12 | $15.58 |
| 922.137-026 | Warehouse Traffic Supervisor | 60% | 96.73 | 5 | 14% | ESTJ | $10.84 | $6.38 | $7.82 | $10.02 | $13.09 | $16.77 |
| 922.687-042 | Cotton Sampler | 3% | 80.36 | 2 | 33% | ISFP | $9.76 | $5.96 | $7.13 | $8.99 | $11.64 | $14.98 |

(c) Copyright 2002-2021 by Billy J. McCroskey, Ph.D.

## NIK VOLKOV, Ph.D., CVA, MAFF
### Forensic Economist - Economic Damages Expert

---

### EDUCATION & EXPERIENCE SUMMARY

Dr. Volkov is a Forensic Economist on the Arrowfish team.  He has more than seven years of experience in academia and as a forensic economist and business valuator.  His practice focuses on calculating economic damages and critiquing opposing damages experts in cases involving personal injury, wrongful death, wrongful termination, intellectual property and commercial torts. He has been retained as a damages expert many times and has testified in both State and Federal Court.

Dr. Volkov's responsibilities often require preparing, researching and analyzing financial and economic data, as well as providing economic damages calculations, consulting services and expert reports in support of litigation.

In addition to holding a Ph.D. in Finance, Dr. Volkov also holds the Certified Valuation Analyst (CVA®) and Master Analyst in Financial Forensics (MAFF®) credentials from the National Association of Certified Valuators and Analysts (NACVA).

Representative assignments include:

- Personal Injury
    - Medical Malpractice
- Employment Discrimination
- Wrongful Death
- Commercial Damages

### EMPLOYMENT HISTORY

**Economics Consulting**
Forensic Economist providing economic consulting services and expert testimony in personal-injury, wrongful-death, commercial litigation and employment matters (2016 – present).

**Teaching**
Assistant Professor of Finance at Mercer University in Atlanta, Georgia. (2015 – present).

Visiting Assistant Professor of Finance at Florida Atlantic University in Boca Raton, Florida (Summer of 2016)

Instructor at Florida Atlantic University in Boca Raton, Florida (2013 - 2015)

Dr. Volkov has taught the following courses: Principles of Finance (U), Corporation Finance (G), Investment Analysis (U) Investment analysis and Portfolio Management (G), Financial Analytics (G), International Economics and Finance (U, G), Corporate Restructuring via Mergers and Acquisitions (G), Venture Funding (G), Capital Budgeting (G).

arrowfish

## *NIK VOLKOV, Ph.D., CVA, MAFF*
### *Forensic Economist - Economic Damages Expert*

### *EDUCATION*

| | |
|---|---|
| Ph.D. Finance, Florida Atlantic University | 2015 |
| MBA, Millersville University | 2007 |
| BA, International Studies, Millersville University | 2005 |
| Political Science, Peoples Friendship University, Moscow Russia | 1999 – 2001 |

### *PROFESSIONAL AFFILIATIONS*

American Finance Association

Financial Management Association

Eastern Finance Association,

Midwestern Finance Association

Southern Finance Association

Academy of Financial Services,

Southern Economics Association

Western Economic Association

National Association of Forensic Economics

National Association of Certified Valuators and Analysts

Member of the Nominating Committee of the National Association of Forensic Economics

### *RECENT TESTIMONY AND REPRESENTATIVE CASE EXPERIENCE*

**Economic Damages – Expert Witness Analysis and Testimony**

Testimony re economic damages in a personal injury case: Dominique Sampson v. Sherrie Chisholm; Rohoho Inc., D/B/A Papa John's and Papa John's USA, Inc., Civil Action Case Number 18-C-02188-5 in the State Court of Gwinnett County, State of Georgia. February 24, 2020 for Johnathan Johnson, Johnathan W. Johnson, LLC, Atlanta, Georgia.

Testimony re economic damages in a personal injury case: Aldo Carpinteri and Lisa Carpinteri v. Toyota Material Handling U.S.A. Inc., and Atlanta Fork Lifts inc., a/k/a Toyota Forklifts of Atlanta, Civil Action Number 18-A-68777 in the State Court of DeKalb County, State of Georgia. February 13, 2020 for Michael Warshauer, Esq., Warshauer Law Group, P.C., Atlanta, Georgia.



### NIK VOLKOV, Ph.D., CVA, MAFF
#### Forensic Economist - Economic Damages Expert

Testimony re economic damages and the present value of a life care plan in a personal injury case: John Conover Jones v. Waste Management of Carolinas, Inc Case No. 19-CVS-770 in the General Court of Justice Superior Court Division, State of North Carolina. December 18, 2019 for Ron L. Trimyer, Jr., Mast, Mast, Johnson, Wells & Trimyer, P.A., Garner, North Carolina.

Testimony re economic damages and the present value of a life care plan in a personal injury case: Craig Salvani v. Corizon Health Inc., Josue Jorge Caraballo, M.D., et al. Case No. 1:17-CV-24567-RNS in the United States District Court Southern District of Florida. July 23, 2019 for J. Alistair McKenzie, Esq., McKenzie Law Firm, P.A., Pensacola, Florida.

Testimony re economic damages in a personal injury case: Richard Tolson and Tami Tolson v. Prim Industrial Contractors, Inc. File No. SUCV2016000225 in the Superior Court of Monroe County, State of Georgia. February 19, 2019 for Michael Warshauer, Esq., Warshauer Law Group, P.C., Atlanta, Georgia.

Testimony re economic damages and the present value of a life care plan in a personal injury case: Vazquez v. The Raymond Corporation and Carolina Handling, LLC File No. 2:17-CV-00020-WCO in the United States District Court For The Northern District Of Georgia Gainesville Division. February 22, 2018 for Michael Warshauer, Esq., Warshauer Law Group, P.C., Atlanta, Georgia.

Testimony in an employment discrimination case: Kenneth Hess v. Brentwood Industries, Inc; and David Muharaj, CC-02-2016-C-188 in the Circuit Court of Berkley County, West Virginia. November 2, 2017, for David Hammer, Esq., Hammer Ferretti & Schiavoni, Martinsburg, West Virginia.

Testimony re economic damages and the present value of a life care plan in a personal injury medical malpractice case: Harriet Larkin v. Woodrow Wilson Gray, Jr., M.D.; the Medical Center of Central Georgia, Inc.; Navicent Health, Inc.; et el. File No. 2015-CV-062475 in the Superior Court of Bibb County, Georgia. March 9, 2017, for Joshua A. Carroll, Esq., Buzzel, Graham & Welsh, LLP, Macon, Georgia.

## PAPERS AND PRESENTATIONS

### Peer Reviewed Publications

Chira, I. and Volkov, N., 2020. Career and education choice as the central elements of wealth maximization. *Financial Services Review*, Forthcoming

Agapova, A. and Volkov, N., 2019. Guidance on strategic information: investor-management disagreement and firm intrinsic value. *Journal of Banking and Finance*, 108, 105632.

Volkov, N.I., 2018. Assessing Economic Damages in Personal Injury and Wrongful Death Litigation: The State of South Carolina. *Journal of Forensic Economics*, 27(2).

Chira, I. and Volkov, N. I., 2017. The Choice of Sale Method and its Consequences in Mergers and Acquisitions. *The Quarterly Review of Economics and Finance*, 63, pp. 170-184.



### NIK VOLKOV, Ph.D., CVA, MAFF
#### Forensic Economist - Economic Damages Expert

Volkov, N.I. and Yuhn, K.H., 2016. Oil Price Shocks and Exchange Rate Movements. *Global Finance Journal*, 31, pp. 18-30.

Volkov, N.I., Chira, I. and Premti, A., 2016. Who is successful on the finance Ph.D. job market? *Journal of Corporate Finance*, 37, pp. 109-131.

Volkov, N.I. and Smith, G.C., 2015. Corporate diversification and firm value during economic downturns. *The Quarterly Review of Economics and Finance*, 55, pp.160-175.

**Working Papers**

Tax-Induced Trading: the Effect of Capital Gain Tax Changes, submitted, with Anna Agapova

Bond ETFs and Price Volatility of Underlying Securities, submitted, with Anna Agapova

Information Leakage of ADRs Prior to Company Issued Guidance, Revise & Resubmit, with Anna Agapova and Jeff Madura

Estimating present value of future earnings or earning capacity for an undocumented worker, with Thomas Roney and Brittany Pearce

Corporate Governance, Strategic Information Disclosure, and the Disclosure Bonus, with Anna Agapova

Student Loans: ROI, Personal Consumption, and Borrowers' Perception, with Inga Chira

Degree of Corporate Diversification and Stock Returns: An Empirical Test, with Garrett Smith

**Book Chapters**

Mutual Funds as an Investment Vehicle for the Middle Class, in *The American Middle Class: An Economic Encyclopedia of Progress and Poverty*, 2017, with Anna Agapova, edited by Robert S. Rycroft

**Presentations**

I have presented CLE programs and spoken on issues relating to finance and economic to the following groups:

2020: American Social Science Association (San Diego, CA), Association for Marketing and Health Care Research (Breckenridge, CO)

2019: American Finance Association (Atlanta, GA), Association for Marketing and Health Care Research (Jackson, WY)



### *NIK VOLKOV, Ph.D., CVA, MAFF*
#### *Forensic Economist - Economic Damages Expert*

2018: Association for Marketing and Health Care Research (Telluride, CO), National Association of Forensic Economics (Vancouver, BC), Financial Management Association (San Diego, CA); Southern Finance Association (Asheville, NC)

2017: Eastern Finance Association (Jacksonville, FL), Southern Finance Association (Key West, FL), Academy of Financial Services (Nashville, TN);

2016: Midwestern Finance Association (Atlanta, GA), Eastern Finance Association (Baltimore, MD); Academy of Financial Services (Las Vegas, NV), Southern Finance Association (Miramar Beach, FL);
2015: Eastern Finance Association (New Orleans, LA), Financial Management Association (Orlando, FL);

2014: Midwestern Finance Association (Orlando, FL), Eastern Finance Association (Pittsburgh, PA), Financial Management Association (Nashville, TN);

2013: Southern Finance Association (Fajardo, Puerto Rico).

**REVIEWER/PROGRAM COMMITTEE**

Peer-reviewed Journals: Journal of International Money and Finance, International Review of Economics and Finance, International Economic Journal

Conferences: Eastern Finance Association, Southern Finance Association

**Special Seminars and Talks**

Case Development Using Economists, Vocational Experts and Life Care Planners    2020
Continuing Legal Education, Florida

How to Prove Damages in Civil Cases – What Experts Want you to Know    2019
State Bar of Georgia, Institute of Continuing Legal Education

Funding Strategies    2016-2019
American Financial Services Association (EDGE Program)

Valuation and Financing    2017
FOM University of Applied Sciences for Economics and Management

**CV current as of March 2020**
**Testimony list current as of April 2020**





## RETENTION AGREEMENT

This Retention Agreement ("Agreement") defines the terms that shall govern this engagement between You and Us, and which pertains to Mr. Javier Tapia.

**PRODUCTS**

**Life Care Planning**

- Life Care Plans (includes interview and examination)                    $10,950

- Catastrophic Life Care Plans (includes interview and examination)       $15,950

- Counter-Party Life Care Plan Reviews & Analyses                         $750/hour (8 hr. min)

- Record Review with/without Narrative                                    $750/hour (5 hr. min)

- Narratives, Updates, Amendments, and Supplemental Assessments           $750/hour (3 hr. min)

While we make a good faith effort at the beginning of an engagement to anticipate the correct classification of the type of life care plan your case will require, the final classification of a life care plan (Life Care Plan vs. Catastrophic Life Care Plan) shall ultimately be determined at the sole discretion of the physician life care planner in this engagement.

**Vocational / Loss-of-Earnings-Capacity Assessments**

- Vocational/Loss of Earnings Capacity Assessments                        $5,250

- Narratives, Updates, Amendments, Supplemental Assessments               $575/hour (3 hr. min)

**Financial & Economic Assessments**

- Present Value Assessments of Life Care Plans                            $3,250

- Present Value Assessments of Catastrophic Life Care Plans               $3,750

- Present Value Loss of Earnings Assessments                             $5,250

- Present Value Loss of Household Services Assessments                    $575/hour (6 hr. min)

- Updates, Amendments, Supplemental Assessments                          $575/hour (3 hr. min)

**Record Analyses**

- Past Medical Care Assessment                                           $750/hour (2 hr. min)
  (Assessment of the medical necessity of past medical care)

- Narratives, Updates, Amendments, Supplemental Assessments              $750/hour (3 hr. min)

Copyright © 2023 – Physician Life Care Planning, LLC                                        1
All Rights Reserved

**Expert Designation:** In the event You wish to designate an expert, prior to ordering a Product(s), you shall be charged $3,500 per expert on a non-refundable basis. Payment for such charges are due upon receipt of invoice. If at a later date, you choose to have the designated expert(s) produce assessments associated with this case, then 50% of each expert-specific non-refundable retainer shall be applied towards the cost of each expert-specific assessment(s).

**Standard Delivery** for Products is typically 8 weeks (subject to scheduling availability). Add 2 weeks additional lead-time for each additional product. Standard lead times for Narratives, Updates, Amendments, and Supplemental Assessments are 6 weeks (subject to scheduling availability). Add 1 week of additional lead-time for each additional product.

**Expedite Delivery Available** (subject to scheduling availability)

| | |
|---|---|
| Level 1 Expedite (per product) | $ 2,500 |
| Level 2 Expedite (per product) | $ 3,000 |
| Level 3 Expedite (per product) | $ 3,500 |
| Level 4 Expedite (per product) | $ 4,500 |

**Delivery Schedule**

| Number of Products | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Standard Delivery | ≥ 8 weeks | ≥ 10 weeks | ≥ 12 weeks | ≥ 14 weeks | ≥ 16 weeks | ≥ 18 weeks |
| Level 1 Expedite | < 8 weeks | < 10 weeks | < 12 weeks | < 14 weeks | < 16 weeks | < 18 weeks |
| Level 2 Expedite | ≤ 6 weeks | ≤ 8 weeks | ≤ 10 weeks | ≤ 12 weeks | ≤ 14 weeks | ≤ 16 weeks |
| Level 3 Expedite | ≤ 4 weeks | ≤ 6 weeks | ≤ 8 weeks | ≤ 10 weeks | ≤ 12 weeks | ≤ 14 weeks |
| Level 4 Expedite | ≤ 2 weeks | ≤ 4 weeks | ≤ 6 weeks | ≤ 8 weeks | ≤ 10 weeks | ≤ 12 weeks |

**Corresponding Expedite Charges**

| Number of Products | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Standard Delivery | $ - | $ - | $ - | $ - | $ - | $ - |
| Level 1 Expedite | $ 2,500 | $ 5,000 | $ 7,500 | $ 10,000 | $ 12,500 | $ 15,000 |
| Level 2 Expedite | $ 3,000 | $ 6,000 | $ 9,000 | $ 12,000 | $ 15,000 | $ 18,000 |
| Level 3 Expedite | $ 3,500 | $ 7,000 | $ 10,500 | $ 14,000 | $ 17,500 | $ 21,000 |
| Level 4 Expedite | $ 4,500 | $ 9,000 | $ 13,500 | $ 18,000 | $ 22,500 | $ 27,000 |

Expedite delivery of Narratives, Updates, Amendments, and Supplemental Assessments = a Level 1 Expedite when requested in less than 6 weeks, a Level 2 Expedite when requested in less than 4 weeks, a Level 3 Expedite when requested in less than 2 weeks, and a Level 4 Expedite when requested in less than 1 week.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**SERVICES**

**Life Care Planning**

- In-office Life Care Plan Interviews and Examinations      $1,500

- Sworn Testimonies/Court Appearance      $4,250/½ day + travel + expenses

- Sworn Testimonies/Court Appearance      $8,500/day + travel + expenses

- Travel (half day/full day (10-hour max))      $3,750/$7,500 + expenses

- Additional Time in Testimony      $850/hour

- Additional Travel      $750/hour + expenses

- Preparation Time, Meetings, Conferences, etc.      $750/hour ($187.50/15 mins.)

**Vocational**

- In-office Vocational Examination      $575/hour (2 hr. min.)

- Sworn Testimonies/Court Appearance      $3,000/½ day + travel + expenses

- Sworn Testimonies/Court Appearance      $6,000/day + travel + expenses

- Travel (half day/full day (10-hour max))      $2,750/$5,500 + expenses

- Additional Time in Testimony      $600/hour

- Additional Travel      $575/hour + expenses

- Preparation Time, Meetings, Conferences, etc.      $575/hour ($143.75/15 mins.)

**Financial & Economic**

- Sworn Testimonies/Court Appearance      $3,000/½ day + travel + expenses

- Sworn Testimonies/Court Appearance      $6,000/day + travel + expenses

- Travel (half day/full day (10-hour max))      $2,750/$5,500 + expenses

- Additional Time in Testimony      $600/hour

- Additional Travel      $575/hour + expenses

- Preparation Time, Meetings, Conferences, etc.      $575/hour ($143.75/15 mins.)

**Record Analyses**

- Sworn Testimonies/Court Appearance      $4,250/½ day + travel + expenses

- Sworn Testimonies/Court Appearance      $8,500/day + travel + expenses

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

- Travel (half day/full day (10-hour max))       $3,750/$7,500 + expenses

- Additional Time in Testimony       $850/hour

- Additional Travel       $750/hour + expenses

- Preparation Time, Meetings, Conferences, etc.       $750/hour ($187.50/15 mins.)

**TERMS**

**Products**: An initial non-refundable retainer of 50% of the professional fee is due upon the commencement of the engagement. The initial retainer must be received before we can assure our availability. The remaining 50% of the professional fee, and any reimbursable expenses are payable prior to the release of any product. All expedite fees [if any] are payable in full upon initial invoice. Products billed on an hourly basis, e.g. Narratives, Updates, Amendments, Supplements, or those Products billed on an hourly basis, are payable in full upon invoice.

**Life Care Plans vs. Catastrophic Life Care Plans**: The guiding principle in determining whether a life care plan, for the purposes of this engagement, is classified as a Life Care Plan, or as a Catastrophic Life Care Plan, is the subject's current, and/or anticipated loss of capacity to perform basic activities of daily living (basic ADLs). While we make a good faith effort at the beginning of an engagement to anticipate the correct classification of the type of life care plan your case will require, the final classification of a life care plan (Life Care Plan vs. Catastrophic Life Care Plan) shall ultimately be determined at the sole discretion of the physician life care planner assigned to your case.

**Present Value Assessments of 3ʳᵈ Party Life Care Plans** are billed at $575/hour (8 hr. min).

**Record Submission Deadline, and Late/Additional Records:**

- IN ORDER TO GUARANTEE COMPLETION OF YOUR REPORT(S) BY FEBRUARY 12, 2024, ALL MEDICAL AND/OR OTHER RECORDS MUST BE SUBMITTED TO US BY JANUARY 01, 2024.

- Records submitted after January 01, 2024, and before the finalization of a life care plan's Diagnostic Conditions, shall affect a movement of the Product Delivery Deadline to a later date (to be determined subject to scheduling/availability) at no charge; or

- Records submitted after January 01, 2024, and after the finalization of a life care plan's Diagnostic Conditions, shall be incorporated into the life care plan at an hourly rate of $750 per hour, and the original deadline shall be maintained (subject to scheduling/availability).

In instances in which additional records are submitted after a life care plan has been completed:

- You can instruct Us to review the additional records and amend/supplement the existing report. Cost: $750/hr. (3 hr. min.). Completion date/deadline subject to availability.

- You can instruct Us to review the records, and standby for further instruction. Cost $750/hr.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

- Additional records which need to be reviewed prior to deposition or trial must be received ≥ 30 days prior to such deposition or trial to guarantee their review.

**Amended Deadlines**

In the event the deadline date(s) for the delivery of product(s) are amended for any reason, the parties to this Agreement (You and Us) shall memorialize the newly agreed upon deadline(s) with an Amended Deadline Addendum, which shall be signed by both parties, and which shall then supersede the Product Delivery Deadline specified in the Engagement Details provision of this Agreement.

**Services**: Payment for Services is due upon invoice.

YOU ARE ULTIMATELY RESPONSIBLE FOR ALL PAYMENTS TO US, PURSUANT TO THE TERMS OF THIS AGREEMENT, REGARDLESS OF LOCAL CUSTOM AND/OR CIVIL PROCEDURE. UNDER NO CIRCUMSTANCE SHALL WE BE RESPONSIBLE FOR COLLECTING PAYMENT FROM ANY OPPOSING COUNSEL OR THIRD PARTY FOR ANY SERVICES.

Payment for depositions and trials must be received within seven (7) calendar days of invoice in order to guarantee the reservation of an expert's time.

**Deposition Transcripts & Opposing Expert Reports:** Transcripts of depositions and opposing expert reports will be reviewed at the hourly rate of the relevant professional, e.g., $750 per hour for a life care planner, $575 per hour for a vocational specialist, financial analyst, economist, etc.

**Preparation Time for sworn testimonies** will be invoiced at the hourly rate of the relevant professional, e.g. $750 per hour for a life care planner, $575 per hour for a vocational specialist, financial analyst, economist, etc. Any/all billing for preparation time is payable by You regardless of local custom or civil procedure. Records which need to be reviewed prior to deposition or trial must be received ≥ 30 days prior to such deposition or trial to guarantee their review.

**Out of Office Interviews & Examinations** will be invoiced at the rate of the relevant professional, e.g. $1500 for a life care planner, $575 per hour for a vocational specialist, etc.

**Travel for Out of Office Interviews & Examinations:** Local transit for interviews & examinations will be billed at the hourly rate of the relevant professional, e.g. $750 per hour for a life care planner, $575 per hour for a vocational specialist, etc. Out of town travel for interviews & examinations will be billed on a full day/half day basis, according to this Agreement's Services fee schedule.

**Travel for Sworn Testimonies & Court Appearances:** Local transit for sworn testimonies and court appearances will be billed at the hourly rate of the relevant professional, e.g. $750 per hour for a life care planner, $575 per hour for a vocational specialist, etc. Out of town travel for sworn testimonies and court appearances will be billed on a full day/half day basis, according to this Agreement's Services fee schedule. Any/all billing for travel time is payable by You regardless of local custom or civil procedure.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**Stand-by Status:** You will be invoiced, pursuant to the terms of this Agreement, for any additional time associated with the placement of any Associate Physician or other expert, on stand-by status, whether such status is the result of a request made by You, or any request, verbal or written order, and/or demand of any judge, court, or other third party. Any/all billing for stand-by-status is payable by You regardless of local custom or civil procedure.

**Expenses:** You are responsible to reimburse Us for all out-of-pocket expenses; and all such expenses are payable upon invoice. Such expenses may include, but are not limited to airfare, accommodation, auto rental, tolls, parking, meals, printing, postage, etc. Any/all billing for expenses is payable by You regardless of local custom or civil procedure.

**Conference Rooms for Deposition** will be charged to You at cost. Payment for conference room charges is due upon invoice. Any/all billing for conference room for depositions is payable by You regardless of local custom or civil procedure.

**Scheduling for Depositions & Trials** requires more than four (4) weeks' notice for deposition, and more than six (6) weeks' notice for trials. Hold times for deposition and trial are no greater than 3 business days for confirmation.

Scheduling not performed within requisite lead times will affect a 25% increase in the billable rates for trial and deposition services.

Scheduling performed with less than six (6) business days will incur a 50% increase in the billable rates for trial and deposition services.

Scheduling performed within less than four (4) business days will incur a 100% increase in the billable rates for trial and deposition services.

*Note: In the unlikely event an expert is unexpectedly notified they must attend trial on a date on which they were previously scheduled to attend an unrelated deposition, the necessities of trial will take precedence over the previously scheduled deposition. These occurrences are rare. We sincerely appreciate your understanding, as we do our best to accommodate the pressing needs of all our clients. In such cases, every effort will be made to accommodate the previously scheduled party by rescheduling their deposition at a time which is most convenient for them.*

**Cancellations, Rescheduling & Missed Appointments**:

- No refunds will be issued for deposition or trial cancellations or rescheduling with less than eight (8) business days prior notice.

- No refunds will be issued for deposits on vocational evaluation appointments for cancellations or rescheduling with less than four (4) business days prior notice.

- No refunds will be issued for cancellation or rescheduling of a Life Care Plan Interview and Examination with less than four (4) business days prior notice. Interviews and examinations that are included with life care plans, and which are canceled or rescheduled with less than

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

four (4) business days prior notice will be forfeited, and any subsequent rescheduling will be billed at the cost of a Life Care Plan Interview and Examination, i.e. $1500.

**Late Payment:** Accounts not paid within the Terms specified herein are subject to a 2% monthly finance charge.

**Electronic Records:** All medical and/or other records are required to be submitted in electronic format. Records not submitted in electronic format will incur a $500 electronic conversion fee. Should You request physical records be returned to You, courier fees will be billed to You at cost

**Ownership:** Upon receipt of your full payment, we grant You a limited, non-exclusive, royalty-free right to reproduce and distribute the Life Care Plan, Vocational Assessment, Present Value Assessment, Record Analysis, etc. delivered to You under this Agreement, solely for use in connection with the matter for which the Product was originally developed. We retain all other rights in our Products.

**Non-solicitation:** You agree that during the term of this Agreement and for 24 months thereafter, you shall not: (i) solicit, directly or indirectly, any of our Associate Physicians and/or other Experts to reduce or terminate their relationship with us, or (ii) solicit any of our Associate Physicians and/or other Experts for employment or engagement as an independent contractor, subcontractor, and/or consultant, or employ or engage as an independent contractor, subcontractor, and/or consultant any of our Associate Physicians and/or other Experts.

**No Doctor/Patient Relationship:** You expressly recognize and agree that the services performed by Us will not give rise to a doctor/patient relationship between Us (and/or our Associate Physicians, and/or other Experts) and You (and/or your clients). The purpose of this Agreement is not to have Us render medical care or treatment, nor is the purpose of this Agreement to have Us render medical advice.

**HIPAA & Privacy:** Attorney and Firm, on behalf of their client(s), acknowledge that films, images, interpretation reports, medical records, lab reports, itemized billing statements, confidential records, proprietary material, or private documents (collectively "Case Material") may constitute private or trade secret information, or Protected Health Information for purposes of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the regulations promulgated thereunder. Attorney and Firm, on behalf of, and with authorization of their client(s), hereby authorize Physician Life Care Planning and/or its assigns to review and utilize Case Material in its work, and to release said Case Material to other third parties as it deems necessary to perform work on the case. Attorney and Firm acknowledge that these third parties may, or may not, be subject to the HIPAA privacy standards. Attorney and Firm's authority to make this authorization shall expire upon dismissal, abandonment, settlement, satisfaction or judgment of Attorney's client's claim, or upon termination of Attorney and Firm's representation of their client.

**Sole Agreement:** This Retention Agreement is the sole, entire, and final Agreement between You and Us regarding the subject matter hereof, and it supersedes any and all other written and/or oral agreements, understandings, statements and/or representations.

**Authority:** Attorney and Firm, individually and collectively, represent and warrant that each has the power and authority to enter into this Agreement, and to perform the obligations hereunder. This

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

Agreement has been duly authorized, executed and delivered by, and constitutes a valid and binding obligation of Attorney and Firm, jointly, and severally, enforceable against Attorney and Firm in accordance with its terms. Attorney and Firm also represent and warrant that the individual signing this Agreement has the right, power and authority to bind Attorney and Firm to perform the obligations hereunder.

**Effective Date:** The effective date of this Agreement will be retroactive to the date that we first performed consulting services on the Case. Even if this Agreement is not properly executed or is lost, Attorney and Firm are jointly, severally and individually responsible to pay the reasonable value of any service performed by Physician Life Care Planning as well as any incurred expenses.

**Termination:** Either party may at any time and without cause terminate this Agreement by giving 30 days written notice of termination to the other party. In the event of such termination, You shall pay Us for all work product and services rendered, and expenses incurred by Us prior to the date of termination.

**Disclaimer:** The work product and services provided hereunder will be provided in a professional and workmanlike manner. The preceding is our only warranty concerning any work product and services and is made expressly in lieu of all other warranties and representations, express or implied, including any implied warranties of fitness for a particular purpose, merchantability or otherwise. We make no warranty regarding the outcome of any settlement, arbitration or trial related to the subject matter of our work products or services.

**Assignable:** Attorney and Firm agree that the rights of Physician Life Care Planning, LLC to receive payment from Attorney and Firm can be assigned to a third-party. Attorney and Firm waive any objection to any such assignment and consent to any such assignment. In the event these rights are assigned, Attorney and Firm agree that the assignee will receive and be entitled to the same rights as Physician Life Care Planning, LLC under this Agreement.

**Indemnification:** You shall indemnify and hold harmless, Us, our partners, employees, Associate Physicians and other experts from and against any loss, claim, damage, or liability (or actions in respect thereof) that may be asserted by any third party) that may result from any third party claims arising out of or relating to the services, the products, or any use by You of any services or products and You will reimburse Us for all expenses (including attorney's fees) as incurred by Us in connection with any such action or claim, except to the extent any such claim (i) is finally determined to have resulted from our negligence or willful misconduct.

Should Physician Life Care Planning, LLC, and/or its partners, Associate Physicians, experts, employees and/or representatives require the services of independent legal counsel, in respect to any matter associated with this engagement, Physician Life Care Planning, and/or its members, partners, Associate Physicians, experts, employees and/or representatives hereby retain the right to hire legal counsel of its/their own choosing, and You shall be responsible for paying all fees and expenses incurred.

**Limitation of Liability:** Neither party shall be liable for consequential, incidental, or punitive loss, damages or expenses (including lost profits or savings) even if advised of their possible existence. The limit of our liability (whether in contract, tort, negligence, strict liability in tort or by statute, or

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

otherwise) to You or your client(s) concerning performance or non-performance by Us, or in any manner related to this Agreement, for any and all claims shall not in the aggregate exceed the fees and expenses paid by You hereunder with respect to the Products or Services involved.

**Attorneys' Fees:** If a legal action or other proceeding is brought related to this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party will be entitled to recover reasonable attorney's fees, costs and all expenses, even if not taxable as court costs, incurred in the legal action.

**COURT FILINGS: <u>IF ANY FILING IS MADE WITH A COURT TO STRIKE, PROHIBIT, OR CHALLENGE (INCLUDING CHALLENGES TO ANY DAUBERT, FRYE, RULE 702, AND/OR SIMILAR CHALLENGES), OR IN ANY WAY LIMIT ANY OR ALL OF THE PRODUCTS OR SERVICES OF, OR THE TESTIMONY OF PHYSICIAN LIFE CARE PLANNING, ITS ASSOCIATE PHYSICIANS AND/OR OTHER REPRESENTATIVES, AND/OR EXPERTS SUBJECT TO THIS AGREEMENT, ATTORNEY AND FIRM AGREE TO: 1) PROVIDE COPIES OF ALL SUCH DOCUMENTS TO PHYSICIAN LIFE CARE PLANNING WITHIN THREE (3) CALENDAR DAYS SUBSEQUENT TO SUCH FILING;</u>** 2) FULLY, TIMELY AND COMPLETELY RESPOND IN WRITING TO SUCH COURT FILING, AND CONSIDER RECOMMENDATIONS OF PHYSICIAN LIFE CARE PLANNING, ITS ASSOCIATE PHYSICIANS AND/OR OTHER REPRESENTATIVES AND/OR EXPERTS; AND 3) ATTEND ANY AND ALL HEARINGS OR OTHER PROCEEDINGS RELATING TO SUCH COURT FILING, THEREBY STRENUOUSLY ARGUING AGAINST ANY STRIKE, PROHIBITION OR ANY OTHER LIMITATION, WITHOUT EXCEPTION, OF ANY AND ALL PRODUCTS SERVICES, OR TESTIMONY PHYSICIAN LIFE CARE PLANNING, ITS ASSOCIATE PHYSICIANS AND/OR OTHER REPRESENTATIVES AND/OR EXPERTS. IF ATTORNEY OR FIRM FAIL OR REFUSE TO ADEQUATELY PERFORM ANY OF THE OBLIGATIONS SET OUT IN THIS CLAUSE, THEN PHYSICIAN LIFE CARE PLANNING, LLC MAY HIRE ATTORNEYS OF ITS CHOOSING TO PERFORM SUCH OBLIGATIONS AND ATTORNEY AND FIRM WILL INDEMNIFY AND/OR REIMBURSE PHYSICIAN LIFE CARE PLANNING FOR ALL SUCH FEES, EXPENSES AND DAMAGES INCURRED INCLUDING, BUT NOT LIMITED TO, ATTORNEY FEES AND EXPENSES.

**Confidentiality:** Any information disclosed by one party ("Disclosing Party") to the other party ("Recipient") in connection with this Agreement that is marked confidential or that due to its character and nature, a reasonable person under like circumstances would treat as confidential (the "Confidential Information") will be protected and held in confidence by the Recipient.

Confidential Information will be used only for the purposes of this Agreement and related internal administrative purposes. Disclosure of the Confidential Information will be restricted to the Recipient's employees, contractors, or agents on a "need to know" basis in connection with the services, who are bound by confidentiality obligations no less stringent than these prior to any disclosure. Confidential Information does not include information which: (i) is already known to the other party at the time of disclosure; (ii) or becomes publicly known through no wrongful act or failure of the Recipient; (iii) is independently developed without use or benefit of the other's Confidential Information; or (iv) is received from a third party which is not under, and does not thereby breach an obligation of confidentiality. Each party agrees to protect the other's Confidential Information at all times and in the same manner as each protects the confidentiality of its own proprietary and confidential materials, but in no event with less than a reasonable standard of care. A Recipient may disclose Confidential Information to the extent required by law, but that disclosure does not relieve Recipient of its confidentiality obligations with respect to any other party.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**Maintenance of Records:** Physician Life Care Planning is authorized, after the case is concluded, to destroy records provided by the Attorney and/or Firm and any papers remaining in Physician Life Care Planning's possession if the Attorney and/or Firm has not retrieved such records and any original papers within three (3) months from the date the Case is resolved or otherwise concluded, or this Agreement is terminated, unless specifically instructed in writing by Attorney or Firm to the contrary. Physician Life Care Planning reserves the right, at its sole discretion, to maintain copies of reports or materials created by or originating from the clerical and professional work performed directly by Physician Life Care Planning and any consultants engaged by it for services rendered.

**Severability:** Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any party or under any circumstances, is invalid or unenforceable to any extent under applicable law, then such provision will be deemed severed from this Agreement with respect to such party or such circumstance, without invalidating the remainder of this Agreement, and a new provision will be deemed substituted in lieu of the provision so severed which new provision will, to the extent possible, accomplish the intent of the parties hereto as evidenced by the provision so severed.

**Enforcement:** Failure to enforce any provision of this Agreement in a given instance shall not constitute a waiver of such provision with regard to any other instance or any other term of this Agreement.

**Counterparts, Electronic Signatures:** This Agreement may be executed in counterparts, each of which shall be deemed an original and binding on the signatory thereto, but both of which together will constitute one and the same instrument. Facsimile signatures, scanned and e-mailed signatures, and other electronic signatures on this Agreement shall be deemed to be original signatures, for all purposes.

**Choice of Law and Venue:** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without giving effect to the principles of conflict of laws. The parties hereby submit to the jurisdiction of all courts of Bexar County, Texas and hereby agree that any such court shall be a proper forum for the determination of any dispute arising hereunder.

### MISCELLANEOUS

- You agree to promptly notify US, our Associate Physician(s) and other expert(s) of all parties and lawyers in the case so that they may check for conflicts of interest.

- You shall consult with our Associate Physician(s) and other expert(s) before drafting any answers to interrogatories concerning them or their testimonies.

- You agree to be available to prepare our Associate Physician(s) and other expert(s) for any testimony.

- You shall promptly notify Us, our Associate Physician(s) and other expert(s) regarding any settlement or final resolution of the underlying case.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

- Our Associate Physician(s) and other expert(s) maintain the right to withdraw from your case and/or this engagement if not provided adequate time and resources to form a well-founded opinion(s). In the event of, and at the time of such a withdrawal, You shall pay Us for all work product and/or services rendered, and expenses incurred by Us prior to the date of termination.

- Necessary travel and hotel accommodations for Associate Physician and other experts shall be arranged by You, unless otherwise notified by Us. All flights shall be direct, and non-stop if available. Any voyage of greater than three (3) total hours in duration shall be business class, or first class, if business class is unavailable.

- Physician Life Care Planning, LLC, and its Associate Physicians and other experts maintain the right to withdraw from your case if You breach any rules of professional conduct. In the event of, and at the time of such a withdrawal, You shall pay Us for all work product and/or services rendered, and expenses incurred by Us prior to the date of termination.

- Physician Life Care Planning, LLC, and its Associate Physicians and other experts maintain the right to withdraw from your case if You breach, or if you are in breach of any of the terms of this Agreement. In the event of, and at the time of such a withdrawal, You shall pay Us for all work product and/or services rendered, and expenses incurred by Us prior to the date of termination.

- Physician Life Care Planning, LLC, and its Associate Physicians and other experts are under no duty and/or obligation to work for/with a successor law firm and You shall inform Us and them promptly should the Firm cease to be lead counsel in the matter.

**ENGAGEMENT DETAILS**

- Name of Subject:                                                    Javier Tapia

- Date of Intake:                                                    August 17, 2023

- Date of Engagement:                                                August 17, 2023

- Record Submission Deadline:                                        January 01, 2024

- Product(s) Delivery Deadline:                                    February 12, 2024

[This space left intentionally blank.]

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**SIGNATURES**

**Attorney & Firm ("You")**

_Ryan DREVESKRACHT_

Ryan Dreveskracht, Individually, and on behalf of Galanda Broadman, PLLC

**Physician Life Care Planning LLC ("Us")**

William L. Davenport, President & Chief Financial Officer

[This space left intentionally blank.]

# Exhibit D

UNIVERSITY OF CALIFORNIA, LOS ANGELES                                    UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ



JUAN CARLOS JIMENEZ, M.D. MBA, F.A.C.S.
Clinical Professor
David Geffen School of Medicine at UCLA
Co-Medical Director, UCLA Hyperbarics
Director, UCLA Gonda Venous Center
Tel: 310-206-1786
Fax: (310) 267-0189
E-mail: jcjimenez@mednet.ucla.edu

DIVISION OF VASCULAR SURGERY
DEPARTMENT OF SURGERY
DAVID GEFFEN SCHOOL OF MEDICINE AT UCLA

GONDA (GOLDSCHMIED) VASCULAR CENTER
200 UCLA MEDICAL PLAZA, STE. 526
LOS ANGELES, CALIFORNIA 90095-6908

## EXPERT REPORT OF JUAN CARLOS JIMENEZ, M.D.

All the opinions offered in this report are given to a reasonable degree of medical probability and/or certainty, and they are based on my education, training, knowledge, experience, prior medical literature review and conference attendance, peer-to-peer discussions, and/or materials that I have reviewed in connection with this litigation. My curriculum vitae (CV), which details my education and experience, and includes a list of all publications authored by me in the past 10 years, is attached to this report.

I reserve the right to supplement this list, as well as to amend and supplement the opinions expressed in this report as additional materials become available for review.

## I.        BACKGROUND AND QUALIFICATIONS

I received my B.A. in Psychology from the University of California, Berkeley in 1994. I then obtained my M.D. from the University of California, Irvine in 1999. After graduating from medical school, I completed my resident training in General Surgery at the University of California, Irvine from 1999 to 2005. From 2005 to 2007, I completed my fellowship training in Vascular Surgery at the University of California, Los Angeles ("UCLA"). I was selected for the sole position that year from a pool of greater than 80 applicants. I also recently obtained a Master of Business Administration ("MBA") from the UCLA Anderson School of Management in 2019. I am currently board certified in Vascular Surgery. My last recertification was in 2023.

UNIVERSITY OF CALIFORNIA, LOS ANGELES                                    UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO        SANTA BARBARA • SANTA CRUZ



Following my fellowship training at UCLA, I began serving on the Attending Vascular

Surgery Staff at both the Ronald Reagan UCLA Medical Center and the UCLA Santa Monica

Medical Center and continue in these roles today.  In 2007, I became the Division Chief for

Vascular Surgery at Olive View-UCLA Medical Center, where I worked until 2015.  At that

time, I transitioned to a full time academic and clinical appointment at Ronald Reagan UCLA

Medical Center in Westwood, CA.  I am the current Director of the UCLA Gonda

(Goldschmied) Venous Center.  I regularly diagnose and manage patients with a wide spectrum

of both central and superficial venous disease, including deep venous thrombosis and its

complications.  I also have expertise in the treatment of vascular disorders of blood vessels for

the purpose of limb salvage and preservation.  I also have extensive experience treating patients

with deep venous thrombosis[1], compartment syndrome[2] and Phlegmasia Cerulea Dolens[3] and

have published book chapters and articles in high quality peer reviewed journals on these topics.

I have expertise in the management of complications related to venous disorders and limb

salvage over my 16 years as a vascular surgeon.  For the past 12 years, I have served as the

Co-Chair for the UCLA Vascular and Endovascular Surgery Board Review course attended by

vascular surgeons and trainees from around the globe.  I have also edited four internationally

published textbooks of Vascular Surgery (two additional texts are currently in press).  Both the

course and the texts cover the topic of management of complications related to deep venous

thrombosis

As detailed on my CV, I have held several academic appointments within the Department

of Surgery, Division of Vascular Surgery at the David Geffen School of Medicine at UCLA.  I

am the recipient of two "Excellence in Teaching" awards for medical students and residents from

2



two different academic hospitals (UCLA and UC Irvine).  I have also been selected by my peers to the prestigious "Super Doctors" and "Top Doctors" lists in both the *Los Angeles Times* and *Los Angeles Magazine* for 14 years in a row.

## II.    MATERIALS REVIEWED:

1. Pierce County Jail records

2. Medical Records

   A. Washington Corrections

   B. Pierce County

   C. NaphCare

   D. MultiCare Health System

   E. Health Care Authority

   F. Hanger Clinic

3. Deposition Transcripts:

   A. Darren Nealis and Exhibits

   B. Jesus Tono Perez and Exhibits

   C. Jane N Valley and Exhibits

   D. Jonah Bradley and Exhibits

   E. Nicholas Garcia

   F. Cameron Carrillo and Exhibits

   G. Jonathon Knight and Exhibits

   H. Debra Ricci and Exhibits

   I. Elliot Wade and Exhibits

UNIVERSITY OF CALIFORNIA, LOS ANGELES                    UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO        SANTA BARBARA • SANTA CRUZ



     **J.**  Lucas Labine and Exhibits

     **K.**  Javier Tapia and Exhibits

**4.**  Expert Reports:

     **A.**  Denise M. Panosky

**5.**  Civil Trial Scheduling Order

**III.**   **CASE SUMMARY:**

Javier Tapia is a 42-year-old male (Date of birth: 03/03/1982) who was transferred to

Tacoma General Hospital from Pierce County Correctional Facility for evaluation of complaints

related to his left leg and foot on 10/1/2018.  Based on the Pierce County Corrections Inmate

Behavior Log, Mr. Tapia was noted repeatedly as having mental status changes, confusion, and

inability to respond to questions beginning in mid-September 2018.  On 10/1/2028, his foot was

observed to be a "purple/black color" and was subsequently transferred to the hospital.   In the

Emergency department, he was noted to have pain, swelling, redness and gangrene of his left

lower extremity.  On physical examination, the skin of his left lower extremity was noted to be

"cool" from below knee to the foot and his forefoot was noted to be "cold".  The clinical

documentation describes swelling of his "calf to foot with black gangrenous skin changes of

entire forefoot and all toes."  He was unable to move his toes and his left calf was swollen and

tender to the touch.  His white blood cell count (17.81- Normal range 4-12 K/uL), creatine kinase

(1,081- Normal range 0-200 IU/L)) and Blood Urea Nitrogen (110- Normal range 8-24 mg/dL)

levels were elevated.  He also had an elevated creatinine level (1.65- Normal range 0.7-1.5

mg/dl) indicative of likely rhabdomyolysis and renal failure.

UNIVERSITY OF CALIFORNIA, LOS ANGELES                                    UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO        SANTA BARBARA • SANTA CRUZ



A venous duplex ultrasound of his left leg demonstrated extensive "subacute" deep venous thrombosis in every major vein within both the deep and superficial venous systems. These included: common femoral, femoral vein, popliteal vein, posterior tibial, peroneal, gastrocnemius, great saphenous and lesser saphenous veins. Within the medical community, "subacute" refers to thrombus present 14 to 30 days. Based on his clinical and radiographic findings, Mr. Tapia was diagnosed with Phlegmasia Cerulea Dolens (PCD), compartment syndrome and gangrene. Systemic anticoagulation with heparin and intravenous antibiotics were initiated, and Vascular surgery was consulted. Catheter directed thrombolysis was performed with partial restoration of venous patency in the left femoral and iliac veins. Despite this therapy, the patient developed worsened gangrene of his left foot and erythema of his left leg. Due to the extent of his irreversible tissue loss upon his presentation to the hospital, the Mr. Tapia underwent a guillotine amputation of his left ankle on 10/10/2018. He then underwent formal below knee amputation with closure on 10/16/2018. He was subsequently transferred back to the Pierce County Correctional Facility on 10/24/2018.

Phlegmasia Cerulea Dolens (PCD) with resultant compartment syndrome is a severe limb and life-threatening condition. With this condition, patients develop deep venous thrombosis which can result in extension of thrombus to multiple outflow veins of the upper and lower extremities. This can result in irreversible tissue gangrene due to severe venous outflow obstruction. Severe swelling is a hallmark of PCD and can lead to increased pressure within extremity muscle compartments and permanent muscle damage. Prompt diagnosis and treatment of PCD is critical to preserve limb salvage. Treatment options for PCD include systemic anticoagulation, catheter directed thrombolysis, endovenous mechanical and surgical

UNIVERSITY OF CALIFORNIA, LOS ANGELES                                                    UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ



thrombectomy.  When deep venous thrombosis is not promptly diagnosed and leads to PCD, amputation rates have been reported to be as high as 50% and mortality between 25-40%.[4]

### IV.    PROFESSIONAL OPINIONS:

1.  Based on the patient's advanced level of left foot necrosis and gangrene, his other related systemic complications (rhabdomyolysis, uremia, renal failure, compartment syndrome and infected gangrene) and the presence of extensive "subacute" appearing thrombus in his left leg superficial and deep veins above and below the knee, the initial deep venous thrombosis which led to the patient's PCD appears to have been present for approximately 2-4 weeks prior to the date of his transfer to the hospital on 10/1/2018. This delay in diagnosis was a significant contributing factor which led to Mr. Tapia's left lower leg amputation.  More likely than not, had the patient's acute deep venous thrombosis been diagnosed earlier and treated with systemic anticoagulation, progression to PCD and limb loss would have been avoided.


2.  More likely than not, to a reasonable degree of medical certainty, the patient's PCD and related systemic manifestations (rhabdomyolysis, uremia, renal failure, compartment syndrome and infected gangrene) were the cause of his acute mental status changes recorded in the weeks leading up to his admission to Tacoma General Hospital on 10/1/2018.  In the clinical note by Dr. Labine dated 10/1/2018, he documents "consider systemic changes" as the cause of his personality changes.  A neurologic workup, including computed tomography of the head, was performed which was negative.  In the

UNIVERSITY OF CALIFORNIA, LOS ANGELES                                         UCLA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO    SANTA BARBARA • SANTA CRUZ



patient's discharge summary dated 10/22/2018, his mental status changes improved over the course of his medical treatment in the hospital.  Mr. Tapia's documented acute mental status changes on 9/18/2024 should have alerted medical personnel at Pierce County Correctional Facility to perform a more detailed physical evaluation.  More likely than not, this would have led to an earlier diagnosis of deep venous thrombosis prior to progression to PCD and the onset of gangrene and would have saved his leg.

3.  More likely than not, Mr. Tapia experienced profound pain and suffering during the onset of his deep venous thrombosis (2-4 weeks prior to his diagnosis),  through his hospitalization, and in the post-operative recovery period following his two amputation procedures.  The advanced soft tissue infection with blistering, edema and necrosis, as demonstrated in the clinical photos reviewed, are associated with high levels of pain and psychological distress in my experience treating similar patients.  Due to the severity of his condition, Mr. Tapia was forced to undergo an open guillotine leg amputation which could not be closed due to the high degree of infection.  This required another completion amputation six days later to close the tissue and skin.  More likely than not, the high physical and mental pain associated with these amputations could have been avoided if the patient's condition had been evaluated and treated in a timely fashion.

UNIVERSITY OF CALIFORNIA, LOS ANGELES                                                    UCLA



BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

Juan Carlos Jimenez MD, MBA, FACS
Clinical Professor of Surgery
Director, Gonda (Goldschmied) Venous Center
Division of Vascular Surgery
Department of Surgery
David Geffen School of Medicine at UCLA

---

[1] DeRubertis BG, Alktaifi A, Lawrence PF, Jimenez JC, Rigberg DA, Gelabert HG. Endovascular management of chronic nonmalignant iliocaval venous lesions. Ann Vasc Surg 2013;27:577-86. (PMID:29037346)

[2] Jimenez JC.  Non-Infectious Complications in Vascular Surgery. Vascular and Endovascular Surgery, 9th Edition. Moore WS, Lawrence PF, Oderich G. (ed:) Elsevier (Saunders), 2017.

[3] Chun TT, Jimenez JC, Pantola JL, Moriarty JM, Freeman S.  Phlegmasia cerulea dolens associated with acute Covid-19 pneumonia despite supratherapeutic warfarin anticoagulation. J Vasc Surg Cases Innov Tech. 2020;6:653-656. (PMID: 33102992)

[4] Abdul W, Hickey B, Wilson C.  Lower extremity compartment syndrome in the setting of iliofemoral deep vein thrombosis, phlegmasia cerulea dolens and factor VII deficiency.  BMJ Case Rep. 2016;2016:bcr2016215078. (PMID:27113791)

Updated: 3/2024

<u>CURRICULUM VITAE:</u>

Juan Carlos Jimenez, MD, MBA, FACS
Clinical Professor of Surgery
Gonda (Goldschmied) Vascular Center
Division of Vascular and Endovascular Surgery
David Geffen School of Medicine at UCLA

| | |
|---|---|
| Business Address: | Gonda (Goldschmied) Vascular Center at UCLA |
| | 200 Medical Plaza, Suite 526 |
| | Los Angeles, CA 90095 |
| | Office: (310) 206-1786 |
| | Fax: (310) 206-8382 |
| | jcjimenez@mednet.ucla.edu |
| | |
| Current Position: | Clinical Professor of Surgery |
| | Vice Chair for Justice, Equity, Diversity and Inclusion |
| | Director, UCLA Gonda (Goldschmied) Venous Center |
| | Co-Director, UCLA Hyperbaric Center |
| | Gonda (Goldschmied) Vascular Center |
| | Department of Surgery |
| | David Geffen School of Medicine at UCLA |

<u>EDUCATION:</u>

| | |
|---|---|
| Baccalaureate Degree | B.A., Psychology |
| | University of California, Berkeley |
| | 1994 |
| Advanced Degrees | M.D., University of California, Irvine |
| | 1999 |
| Resident Training | General Surgery, University of California, Irvine, |
| | 1999-2005 |
| Fellowship Training | Vascular Surgery, University of California, Los |
| | Angeles, 2005-2007 |
| Master of Business Administration | University of California, Los Angeles Anderson School of Management 2019 |

1

Updated: 3/2024

LICENSURE
California Medical License, A75166                          2001-present

Fluoroscopy Supervisor and Operator License                2005-present

BOARD CERTIFICATION:

Surgery                  The American Board of Surgery
Board Certification      February 2006-2021
                         #050906

Vascular Surgery         The American Board of Surgery
Board Certification      May 2009-present
                         #101925

PROFESSIONAL EXPERIENCE:

Staff Appointments

Attending Vascular Surgery Staff                            2007-present
Ronald Reagan UCLA Medical Center
Los Angeles, California

Attending Vascular Surgery Staff                            2007-present
UCLA Santa Monica Hospital
Santa Monica, California

Chief, Vascular Surgery                                     2007-2015
Attending Vascular Surgery Staff
Olive View-UCLA Medical Center
Sylmar, California

ACADEMIC APPOINTMENTS

Health Sciences Clinical Professor, Step II                2022-present
Department of Surgery
Division of Vascular Surgery
David Geffen School of Medicine at UCLA
Los Angeles, California

Updated: 3/2024

Health Sciences Clinical Professor, Step I                         2019-2022
Department of Surgery
Division of Vascular Surgery
David Geffen School of Medicine at UCLA
Los Angeles, California

Health Sciences Associate Clinical Professor, Step III            2017-2019
Department of Surgery
Division of Vascular Surgery
David Geffen School of Medicine at UCLA
Los Angeles, California

Health Sciences Associate Clinical Professor, Step II             2015-2017
Department of Surgery
Division of Vascular Surgery
David Geffen School of Medicine at UCLA
Los Angeles, California

Health Sciences Associate Clinical Professor, Step I              2013-2015
Department of Surgery
Division of Vascular Surgery
David Geffen School of Medicine at UCLA
Los Angeles, California

Health Sciences Assistant Clinical Professor                      2010-2013
Department of Surgery
Division of Vascular Surgery
David Geffen School of Medicine at UCLA
Los Angeles, California

Assistant Professor-in-Residence                                  2007-2010
Department of Surgery
Division of Vascular Surgery
David Geffen School of Medicine at UCLA
Los Angeles, California


## RESEARCH GRANTS AND FELLOWSHIPS RECEIVED:


Investigator: Cooperative Studies

Positive Impact of EndoVascular Options for
Treating Aneurysms Early (PIVOTAL)

Updated: 3/2024

Medtronic
Clinical Trial
Co-Investigator
<u>UCLA Medical Center</u>                                                          2007-2009


TAG 08-01Conformable GORE TAG
Thoracic Endoprosthesis Dissection Trial
Clinical Trial
Gore Medical
<u>Co-Investigator</u>
<u>UCLA Medical Center</u>                                                          2010-2012

A Pivotal Clinical Study to Evaluate the Safety
and Effectiveness of the Trivascular AAA Stent Graft System
Protocol number 771-0006
Medtronic
Clinical Trial
<u>Co-Investigator</u>
<u>UCLA Medical Center</u>                                                          2010-2013

A Non-Interventional Safety Study Providing 12 Months
Follow-Up from First Exposure to HP802-247
In Subjects with Venous Leg Ulcer
Smith and Nephew
Protocol number 802-247-09-030
<u>Olive View-UCLA Medical Center</u>
<u>Primary Investigator</u>
$48,375.00                                                                             2012-2015

A Phase 3 Randomized, Double Blind, Vehicle Controlled
Study Investigating the Safety and Efficacy of
HP802-247 in the Treatment of Venous Leg Ulcers
Smith and Nephew
Protocol Number 802-247-09-029
<u>Olive View-UCLA Medical Center</u>
<u>Primary Investigator</u>
$193,300.00                                                                            2012-2014

A Multicenter, Randomized, Double-Blind, Placebo-Controlled,
Parallel Group Study to Evaluate the Efficacy, Safety,
And Tolerability of Ixmyelocel-T in Subjects with
Critical Limb Ischemia and No Options for
Revascularization
Protocol Number 55-1009-1
<u>UCLA Medical Center</u>

4

Updated: 3/2024

<u>Co-Investigator</u>                                                                                            2012


A Phase 3 Randomized, Double Blind, Vehicle Controlled Study Investigating the Safety and Efficacy of HP802-247 in the Treatment of Venous Leg Ulcers > 12 cm$^2$  to $\leq$ 36 cm$^2$

Sponsor: Smith and Nephew
Protocol Number 802-247-09-031
<u>Olive-View UCLA Medical Center</u>
<u>Primary Investigator</u>
<u>Ronald Reagan-UCLA Medical Center</u>
<u>Co-Investigator</u>
$137,250.00                                                                                        2013

In Balance VLU: Inflammation, Bacteria, and Angiogenesis effects in Launching Venous Leg Ulcer Healing- A Prospective, Randomized, Controlled Multicenter Pilot Study of the Effects of MIST Therapy on Chronic Lower Extremity Venous Ulcer

Registration Number: NCT01549860
Sponsor: Celleration
<u>Olive-View UCLA Medical Center</u>
 <u>Primary Investigator</u>
<u>$226, 336.00</u>
<u>Ronald Reagan-UCLA Medical Center</u>
<u>Co-Investigator</u>
<u>$226, 336.00   </u>                                                                             2013

Clinical Outcomes Associated with Enzymatic Debridement of Diabetic Foot Ulcers for Up to 12 weeks with Clostridial Collagenase (Santyl Ointment)

Sponsor:  Smith and Nephew
<u>Olive-View UCLA Medical Center</u>
<u>Primary Investigator</u>
<u>*Highest Enrolling Study Center Nationally</u>
<u>$130,488.75</u>                                                                                   2014


A Phase-3 Prospective, Multicenter, Randomized, Double-Blind, Placebo Controlled Study to Evaluate the Safety, Tolerability and Efficacy of CureXcell ® as an Adjunct to Good Ulcer Care Measures in Treating Chronic Venous Leg Ulcers

Updated: 3/2024

Sponsor: Macrocure
<u>Olive-View UCLA Medical Center</u>
<u>Primary Investigator</u>
<u>$ 196,188.00</u>                                                    2014


A Prospective Multicenter, Non-Blinded, Non-Randomized Study of the RelayPro Thoracic Stent-Graft in Subjects with Traumatic Injury of the Descending Thoracic Aorta

<u>Sponsor: Bolton Medical</u>
<u>Ronald Reagan-UCLA Medical Center</u>
<u>Principal </u>Investigator                                          2018-2020


The Carotid Revascularization and Medical Management for Asymptomatic Carotid Stenosis Study- CREST-2

<u>National Institute of Health</u>
<u>Multicenter, Randomized Controlled Trial</u>
<u>Ronald Reagan-UCLA Medical Center</u>
<u>Co-Investigator</u>                                                2023


<u>PROFESSIONAL ACTIVITIES:</u>

Professional Membership

      Longmire Surgical Society, 2006-present

      Connolly Surgery Society, 2006-present

      Society for Vascular Surgery
          -Candidate, 2006-2008
          -Fellow, 2008-present

      Los Angeles Surgical Society, 2007-2013

      American College of Surgeons, Southern California Chapter, 2007-present

      American College of Surgeons, Associate Fellow 2007-2009

      Vascular and Endovascular Surgery Society, 2008-present

      Southern California Vascular Surgery Society, 2008-present
          -Chairman-Local Arrangements Committee-Palos Verdes Ca. 2010

Updated: 3/2024

                -Program Chairman-Ojai, Ca. 2012
                -Program Chairman-Palm Springs, Ca. 2013
                -Secretary-Treasurer-2014
                -Secretary-Treasurer-2015
                -Secretary-Treasurer-2016
                -President- 2019-2020

American College of Surgeons, Fellow, 2009-present
Pacific Coast Surgical Association, 2010-present
        -Publications Committee-2021
        -Publications Committee-2024

Western Vascular Society, 2010
        -Local Arrangements Chair-Park City, Utah. 2012
        -Membership Committee - 2024

Society for Clinical Vascular Surgery,
        -Candidate 2007-2012
        -Active Member-2012-present

Society for University Surgeons, 2014-present

American Venous Forum 2020-present
        -Annual Program Committee-2021-2022
        -Membership Committee- 2023-2024
        -Membership Committee- 2024-2025

American Vein and Lymphatic Society, 2023


EDUCATIONAL ACTIVITIES:

Surgical Education Committee
Department of Surgery
David Geffen School of Medicine at UCLA                    2007-2010

Faculty Instructor
Medical Student Suturing and Knot Tying Workshop
David Geffen School of Medicine at UCLA                    2007-present


Faculty Instructor
MS III Vascular Physical Examination Module
David Geffen School of Medicine at UCLA                    2007-present

Faculty Lecturer

Updated: 3/2024

Third Year Medical Student Clerkship
"Diseases in Vascular Surgery"
David Geffen School of Medicine at UCLA                    2007-present


Medical School Admissions Committee
David Geffen School of Medicine at UCLA                    2008-2018

Faculty Instructor
General Surgery Intern Skills Lab
Department of Surgery
David Geffen School of Medicine at UCLA                    2008-present

Faculty Mentor
Short Term Training Program (STTP)
UCLA Medical Student Research Program
David Geffen School of Medicine at UCLA                    2009-present

Associate Course Chair
30th Annual UCLA Vascular Symposium
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Hollywood, Ca.                                            2012


Faculty Supervisor
Vascular Surgery Residency
Olive View-UCLA Medical Center                            2012-2015


Associate Course Chair                                   2013
31st Annual UCLA Vascular Symposium
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. September 9-12, 2013.


Associate Course Chair                                   2014
32nd Annual UCLA Vascular Symposium
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. September 8-11, 2014.

Associate Course Chair                                   2015
33rd Annual UCLA Vascular Symposium

Updated: 3/2024

A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. August 31-September 3, 2015

Co-Chair                                                         2016
First Joint Annual UCLA-SVS Course
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. August 27-29, 2016.

Co-Chair                                                         2017
Second Joint Annual UCLA-SVS Course
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. August 26-28, 2017.

Co-Chair                                                         2018
Third Joint Annual UCLA-SVS Course
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. August 25-27, 2018.

Faculty Instructor                                              2018-present
DGSOM Vascular Surgery Interest Group
Center for Advanced Surgical and Interventional Technology (CASIT)
Medical Student Simulation Program

Co-Chair                                                         2019
Fourth Joint Annual UCLA-SVS Course
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. August 24-26, 2019.

Faculty Panel Discussant and Mock Interviewer                   2019
"Road to Residency"
David Geffen School of Medicine
Office of Equity and Diversity Inclusion
September 7th, 2019

Co-Chair                                                         2020
Fifth Joint Annual UCLA-SVS Course

9

Updated: 3/2024

A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery.  August 2020
Virtual Meeting

Faculty Panel Discussant
Diversity and Climate Faculty Discussion
Equity, Diversity and Inclusion Open House
David Geffen School of Medicine
January 17th, 2020                                                              2020

Mock Interviewer
"Road to Residency"
David Geffen School of Medicine
Office of Equity and Diversity Inclusion
September 12th, 2020                                                           2020

EDI Champions Training Program
David Geffen School of Medicine
Office of Equity and Diversity Inclusion
January 15th and 19th, 2021                                                  2021

Diversity and Climate Faculty Panel
Graduate Medical Education Open House
David Geffen School of Medicine
January 15th, 2021                                                              2021

UCLA Vascular Surgery Faculty Representative
Latino Medical Student Association
National Conference
March 13th, 2021                                                                2021

Faculty Mentor
Urban Underserved College
Charles R. Drew/UCLA Medical Education Program
David Geffen School of Medicine at UCLA                             2021-present

Vice Chair for Justice, Equity, Diversity and Inclusion
Department of Surgery
David Geffen School of Medicine at UCLA                             2021-present

Mock Interviewer
"Road to Residency"

Updated: 3/2024

David Geffen School of Medicine
Office of Equity and Diversity Inclusion
September 11th, 2021                                          2021-Present

Co-Chair
Sixth Joint Annual UCLA-SVS Course
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. Oct 1-3, 2021                             2021

Faculty Mentor
Justice, Equity, Diversity and Inclusion
Academic Mentorship Program (JAM Council)
David Geffen School of Medicine at UCLA                      2022-present

Faculty Member
Program Evaluation Committee
General Surgery Residency Training Program
UCLA Department of Surgery                                   2022-present

Co-Chair
Seventh Joint Annual UCLA-SVS Course
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. Aug 25-28, 2022                           2022

Faculty Instructor
MS2 Intersessions
Clinical Surgery Rotation
David Geffen School of Medicine at UCLA                      2022-present

Invited Faculty Panel Member and Discussant
7th Annual Graduate Medical Education
Open House for Justice, Equity, Diversity and Inclusion
David Geffen School of Medicine at UCLA
January 13, 2023                                             2023

Co-Chair
Eighth Joint Annual UCLA-SVS Course
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. Aug 23-26, 2022                           2023

11

Updated: 3/2024

Invited Panelist
National LatinX Physicians Day
Webinar
UCLA Health
David Geffen School of Medicine
October 5th, 2023                                                    2023

Invited Panelist
8th Annual Graduate Medical Education
Open House for Equity, Diversity and Inclusion
David Geffen School of Medicine
January 12, 2024                                                    2024

Co-Chair
Ninth Joint Annual UCLA-SVS Course
A Comprehensive Review and Update of What's
New in Vascular and Endovascular Surgery
Beverly Hills, Ca. Aug 21-24, 2024                                  2024

ADMINISTRATIVE ROLES AND COMMITTEES

Pharmacy and Therapeutics Committee
Olive-View Medical Center                                           2011-2015

Graduate Medical Education Committee
Olive-View Medical Center                                           2012-2015

Surgical Chair's Advisory Committee on Diversity
David Geffen School of Medicine at UCLA
Ronald Reagan UCLA Medical Center                                   2015-2016

Surgical Chair's Advisory Committee on "Funds Flow"     2019-present
David Geffen School of Medicine at UCLA
Ronald Reagan UCLA Medical Center

Equity, Diversity and Inclusion Committee
David Geffen School of Medicine at UCLA                             2019-present

12

Updated: 3/2024

| | |
|---|---|
| Graduate Medical Education EDI Committee<br>David Geffen School of Medicine at UCLA | 2019-present |
| Chair of JEDI Committee for Department of Surgery<br>Department of Surgery Diversity Officer<br>David Geffen School of Medicine at UCLA | 2020-present |
| Invited Committee Member<br>Search Committee for Associate Dean of Faculty Affairs<br>David Geffen School of Medicine at UCLA | 2020 |
| Extended Stakeholder Group<br>EDI and URG Task Force<br>UCLA Anderson School of Management | 2020 |
| Finance Committee<br>Education Subcommittee<br>Department of Surgery<br>David Geffen School of Medicine at UCLA | 2020 |
| Chair<br>Vascular Surgery Faculty Search Committee<br>David Geffen School of Medicine at UCLA | 2021 |
| Invited Member<br>Cultural North Star Steering Committee<br>Office of the Dean<br>David Geffen School of Medicine at UCLA | 2021-2022 |
| Medical Director<br>UCLA Gonda (Goldschmied) Venous Center | 2021-present |
| Medical Director<br>UCLA Gonda (Goldschmied) Ambulatory Procedure Unit | 2021-present |
| Invited Committee Member<br>Search Committee for Liver Transplant Faculty<br>David Geffen School of Medicine at UCLA | 2021 |
| Invited Admissions Interviewer<br>Medical School Admissions<br>David Geffen School of Medicine at UCLA | 2021-present |

13

Updated: 3/2024

Invited Committee Member
Search Committee for Vascular Surgery Chief
David Geffen School of Medicine at UCLA                    2022

Invited Committee Member
Search Committee for Chief of Family Medicine
David Geffen School of Medicine at UCLA                    2022

Invited Committee Member
Vascular Surgery
Interventional Directors Meeting
David Geffen School of Medicine at UCLA                    2022-present

Vascular Surgery Representative
Catheterization Lab Operations and Strategy Meeting
David Geffen School of Medicine at UCLA                    2022-present

Vice Chairs Executive Committee
Department of Surgery
David Geffen School of Medicine at UCLA                    2022-present

Co-Medical Director
UCLA Hyperbaric Center
David Geffen School of Medicine at UCLA                    2022-present

Invited Committee Member
Application Review Committee
Bruin Scholars Program
David Geffen School of Medicine at UCLA                    2023

Invited Committee Member
Pediatric Surgery Chief Search Committee
Department of Surgery
David Geffen School of Medicine at UCLA                    2023

Invited Committee Member
Aortic Vascular Surgeon Search Committee
Department of Surgery
David Geffen School of Medicine at UCLA                    2023

Invited Committee Member
Search Committee for Liver Transplant Faculty
David Geffen School of Medicine at UCLA                    2023

Updated: 3/2024

Invited Committee Member
Department Chairs Review Committee
Department of Computational Medicine
Department of Human Genetics
Dean's Office
David Geffen School of Medicine at UCLA                    2023

Invited Committee Member
Humacyte Inc
Study No. CLN-PRO-V005
Adjudication Committee                                      2023

Invited Committee Member
Department Chairs Review Committee
Dean's Office
David Geffen School of Medicine at UCLA                    2024

Invited Committee Member
Application Review Committee
Bruin Scholars Program
David Geffen School of Medicine at UCLA                    2024

Invited Committee Member
Search Committee for Academic Liver and Pancreas Faculty
David Geffen School of Medicine at UCLA                    2024

INVITED REVIEWER PEER-REVIEWED JOURNALS:

Journal of Endovascular Therapy

JAMA Surgery

Journal of Vascular Surgery

Journal of Vascular Surgery Venous and Lymphatic Disorders

Journal of Vascular Surgery Cases, Innovations and Techniques

Vascular and Endovascular Surgery

VASA

Updated: 3/2024

Annals of Vascular Surgery

Vascular

Journal of Cardiovascular Surgery

VASCULAR SURGERY FELLOWS TRAINED:

| | |
|---|---|
| Kristen L. Biggs MD | 2007-2008 |
| Jessica O'Connell MD | 2007-2009 |
| Ankur Chandra MD | 2008-2010 |
| Steven Farley MD | 2009-2011 |
| Wesley Lew  MD | 2010-2012 |
| Andrew Barleben MD | 2011-2013 |
| Sharon Kiang MD | 2012-2014 |
| Allan Tulloch MD | 2013-2015 |
| Adam Oskowitz MD, PhD | 2014-2016 |
| Warren Chow MD | 2015-2017 |
| Tamuir Saleem MD | 2016-2018 |
| Kevin Chang MD | 2017-2019 |
| Jesus Ulloa MD, MBA | 2018-2020 |
| Tristen Chun MD | 2019-2021 |
| Michael Cheng MD | 2020-2022 |
| Stephanie Talutis MD | 2021-2023 |
| Will Duong MD | 2022-present |
| Annie Mooser | 2023-present |

Updated: 3/2024

### VASCULAR SURGERY RESIDENTS TRAINED:

| | |
|---|---|
| Johnathan Rollo MD | 2014-2017 |
| Mark Archie MD | 2013-2018 |
| Meena Archie MD | 2014-2019 |
| Rameen Moridzadeh MD | 2015-2020 |
| Rhusheet Patel MD | 2016-2021 |
| Joe Pantoja MD | 2018-2022 |
| Mark Ajalat MD | 2018-2023 |
| Marianna Pavlyha MD | 2019-present |
| Amanda Chin MD | 2020-present |
| Marvin Chau MD | 2021-present |
| Joanna Shaw MD | 2022-present |
| Mitali Doshi MD | 2023-present |

### HONORS AND SPECIAL AWARDS:

| | |
|---|---|
| Letter of Commendation | University of California, Irvine Department of Surgery, 1998. |
| Excellence in Teaching Award | University of California, Irvine College of Medicine, May 5th, 2005. |
| Outstanding Student Teaching Award UCLA Department of Surgery | 2006-2007 |
| Faculty Mentor for Best Trainee Presentation "Is Heparin Reversal Required for Safe Performance of Percutaneous Endovascular Aneurysm Repair?" | 30th Annual Meeting of the Southern California Vascular Surgical Society, Ojai, Ca. 2012 |

17

Updated: 3/2024

Selected Southern California
"Super Doctors"
(Peer Reviewed)                              Los Angeles Magazine, 2012

Selected Southern California
"Super Doctors"
(Peer Reviewed)                              Los Angeles Magazine, 2013

Selected Southern California
"Super Doctors"
(Peer Reviewed)                              Los Angeles Magazine, 2014

Selected Southern California
"Super Doctors"
(Peer Reviewed)                              Los Angeles Magazine, 2015

Selected Southern California
"Super Doctors"
(Peer Reviewed)                              Los Angeles Magazine, 2016

Selected Southern California
"Super Doctors"
(Peer Reviewed)                              Los Angeles Magazine, 2017

Selected Los Angeles'
"Top Doctors"
(Peer Reviewed)                              Los Angeles Times, 2018

Selected Southern California
"Super Doctors"
(Peer Reviewed)                              Los Angeles Times, 2018

Selected Southern California
"Super Doctors"
(Peer Reviewed)                              Los Angeles Times, 2019

Selected Southern California
"Super Doctors"
(Peer Reviewed)                              Los Angeles Times, 2020

Selected Southern California
"Top Doctors"
(Peer Reviewed)                              Los Angeles Magazine, 2020

Updated: 3/2024

| | |
|---|---|
| Selected Southern California "Super Doctors" (Peer Reviewed) | Los Angeles Times, 2021 |
| Selected Southern California "Top Doctors" (Peer Reviewed) | Los Angeles Magazine, 2021 |
| Selected Southern California "Top Doctors" (Peer Reviewed) | Los Angeles Magazine, 2022 |
| Selected Southern California "Super Doctors" (Peer Reviewed) | Los Angeles Times, 2022 |
| Selected Southern California "Super Doctors" (Peer Reviewed) | Los Angeles Times, 2023 |
| Selected Southern California "Super Doctors" (Peer Reviewed) | Los Angeles Times, 2024 |

| | |
|---|---|
| JEDI Trailblazer Award Recipient on behalf of Department of Surgery Best Structural Elements Section-JEDI Plan David Geffen School of Medicine at UCLA | 2022-2023 |

PUBLICATIONS/BIBLIOGRAPHY:

RESEARCH PAPERS (PEER REVIEWED)

1. Wilson SE, Jimenez JC. Key management issues in intra-abdominal infections: A surgeon's perspective. Infectious Diseases Today 2001; 1(2):6-8.

19

Updated: 3/2024

2. Podnos YD, Jimenez JC, Wilson SE . Intra-abdominal sepsis in elderly persons, Clinical Infectious Diseases 2002 Jul 1;35 (1):62-8. (PMID:12060876)

3. Podnos YD, Jimenez JC, Zainabadi K, Jakowatz JG, Barr RJ.  Minimal deviation melanoma.  Cancer Treat Rev 2002 Oct;28:219-21.(PMID: 12435369)

4. Podnos YD, Williams RA, Jimenez JC, Stemmer EA, Gordon IL, Wilson SE.  Reducing the noneducational and nonclinical workload of the surgical resident: Defining the role of the health technician. Current Surgery 2003; 60(5):529-532. (PMID:14972219)

5. Podnos YD, Jimenez JC, Zainabadi K, Ji P, Cooke J, Bussuttil RW, Imagawa DK.  Carcinoid tumors of the common bile duct: A report of two cases. Surgery Today 2003; 33(7): 553-555. (PMID:14507005)

6. Podnos YD, Jimenez JC, Wilson SE , Stevens M, Nguyen NT, Complications of  laparoscopic gastric bypass: Review of 3464 cases, Archives of Surgery  2003;138:957-61. (PMID:14507005)

7. Jimenez JC, Wilson SE.  Prophylaxis of infection for elective colorectal surgery.  Surgical Infections; 4(3):241-248, 2003. (PMID:14588162)

8. Jimenez JC, Cosentino N, Hagstrom M, Kobayashi M, Evans GRD. Indirect upper extremity revascularization with the latissimus dorsi pedicle flap following traumatic amputation,  Journal of Trauma, Injury, Infection and Critical Care 2003; 55:566-567. (PMID:14501906)

9. Jimenez JC, Emil S, Podnos YD, Nguyen NX.  Annular pancreas in children:  a recent decade's experience.  Journal of Pediatric Surgery, 2004 Nov;39(11):1654-57. (PMID:15547829)

10. Jimenez JC, Tyson D, Dhar S, Nguyen TD, Hamake Y, Evans GRD. Human embryonic kidney cells (HEK-293): Characterization and dose response for modulated release of NGF for nerve regeneration.  Plastic and Reconstructive Surgery. 2004 Feb;113(2):605-10. (PMID:14758223)

11. Jimenez JC, Smith MM, Wilson SE.  Sexual function in men after open or endovascular repair of abdominal aortic aneurysms. Vascular 2004;12(3):1-6. (PMID:15586527)

12. Jimenez JC, Emil S, Steinmeitz B, Romansky S, Weller M.  Recurrent Gastrointestinal Bleeding Secondary to Jejunal Gastric Heterotopia, 2004. Journal of Pediatric Surgery 2005 Oct; 40(10): 1654-7. (PMID:16227002)

Updated: 3/2024

13. Wilson SE Gelfand DV, Jimenez JC. Comparison of the results of percutaneous transluminal angioplasty and stenting with medical treatment for claudicants who have superficial femoral artery occlusive disease. Vascular 2006;14:81-7.

14. Jimenez JC, Lawrence PF. Minimally invasive distal limb bypasses. Techniques and results. J Cardiovasc Surg 2006;47:415-23. (PMID:16953161)

15. Gelabert HG, Jimenez JC, Rigberg DA. Comparison of retavase and urokinase for management of spontaneous subclavian vein thrombosis. Ann Vasc Surg, 2007; 21:149-54. (PMID:17349354)

16. Jimenez JC, Lawrence PF, Rigberg DA, Quinones-Baldrich WJ. Technical modifications in endoscopic vein harvest facilitate its use in lower extremity limb salvage procedures. J Vasc Surg 2007;45:549-53. (PMID:17275245)

17. Jimenez JC , Moore WS, Quinones-Baldrich WJ. Acute and chronic open conversion after endovascular aortic aneurysm repair: A 14-year review. J Vasc Surg, 2007;46:642-7. (PMID:17764870)

18. Jimenez JC, Moore WS, Lawrence PF, Quinones-Baldrich WJ. Technical strategies for recurrent carotid stenosis following angioplasty and stenting. Ann Vasc Surg, 2008;22:179-84. (PMID:18023558)

19. Jimenez JC, Lawrence PF, Reil TD. Endovascular exclusion of superior mesenteric artery pseudoaneurysms: An alternative to open laparotomy in high-risk patients. Vascular and Endovascular Surgery, 2008;42:184-6. (PMID:18421036)

20. Rigberg DA, Jimenez JC, Gelabert H, Lawrence PF. Balloon control of the suprahepatic inferior vena cava: A novel technique for renal cell carcinoma tumor thrombus. Ann Vasc Surg, 2008; 22:200-2. (PMID:18346572)

21. Lawrence PF, Lund O, Jimenez JC, Muttalib R. Substitution of smokeless tobacco for cigarettes in Buerger's disease does not prevent limb loss. J Vasc Surg, 2008; 48:210-2. (PMID:18589234)

22. Jimenez JC, Moore WS. A Staged Replacement of the Entire Aorta from the Ascending Arch to the Hypogastric Arteries using a Hybrid Approach. J Vasc Surg, 2008; 48:1593-6. (PMID:19118741)

Updated: 3/2024

23. Quinones-Baldrich WJ, Jimenez JC, DeRubertis B, Moore WS.  Combined endovascular and surgical approach (CESA) to thoracoabdominal aortic pathology: A 10-year experience.  J Vasc Surg 2009;49:1125-34. (PMID:19394542)

24. Rigberg DR, Jimenez JC, Lawrence PF, Gelabert HG.  A combined endovascular and open "Reverse Hybrid" technique for repair of complex juxtarenal inflammatory aortic aneurysms. Vascular and Endovascular Surgery 2009;43:494-6. (PMID: 19850595)

25. Chandra A, O'Connell J, Quinones-Baldrich WJ, Gelabert H, Rigberg D, Jimenez JC, Derubertis BG.  Aneurysmectomy with arterial reconstruction of renal artery aneurysms in the endovascular era: A safe and effective treatment for both aneurysm and associated hypertension.  Ann Vasc Surg 2010;24:503-10. (PMID:20036510)

26. Saltzman DJ, Chang JC, Jimenez JC, Carson JG, Abolhoda A, Newman RS, Milliken JC.  Postoperative Thrombotic Thrombocytopenic Purpura after open heart operations.  Ann Thoracic Surg 2010;89:119-23. (PMID:20103218)

27. Dickinson BP, Jimenez JC, Lawrence PF, DeRubertis, BG.  Functional limb salvage following muscle rigor in a pediatric patient.  Vasc Endovasc Surg 2010;44:315-8. (PMID:20403955)

28. Lawrence PF, Chandra, A, Wu, M,  Rigberg DA, DeRubertis, BG, Gelabert HG, Jimenez JC, Carter, V. Classification of proximal endovenous closure levels and treatment algorithm. J Vasc Surg 2010;52:388-93 (PMID:20646894)

29. Tulloch A, Jimenez JC, Lawrence PF, Dutson EP, Moore WS, Rigberg DA, DeRubertis BG, Quinones-Baldrich WJ.  Laparoscopic vs. open celiac ganglionectomy in patients with median arcuate ligament syndrome.  J Vasc Surg 2010;52:1283-9. (PMID:20630683)

30.  Jimenez JC, Nassoura Z, Morris L, Hu D.  Late traumatic aneurysm of the superficial temporal artery. J Vasc Surg 2011;54:1174. (PMID:20875714)

31. Bath J, Lawrence P, Chandra A, O'Connell J, Uijtdehaage S, Jimenez JC, Davis G, Hiatt J. Standardization is superior to traditional methods of teaching open vascular simulation.  J Vasc Surg, 2011;53:229-235.e2. (PMID: 21115317)

32. Jimenez JC, Quinones-Baldrich WJ.  Technical Modifications for Endovascular Infrarenal AAA Repair for the angulated and dumbbell

Updated: 3/2024

shaped neck: The Pre-cuff Kilt Technique.  Ann Vasc Surg 2011;25:423-30. (PMID:21276708)

33. Jimenez JC, Rafidi F, Morris L.  True celiac artery aneurysm secondary to median arcuate ligament syndrome. Vasc Endovasc Surg 2011;45:288-9. (PMID:21478249)

34. Gelabert HA, Jimenez JC, Davis GR, Derubertis BG, Rigberg DA.  Early postoperative hemorrhage following first rib resection for vascular thoracic outlet syndrome.  Ann Vasc Surg 2011;25:624-9. (PMID:21724102)

35. Lawrence PF, Alktaifi A, Rigberg D, DeRubertis B, Gelabert H, Jimenez JC.  Endovenous ablation of incompetent perforating vein is effective treatment for recalcitrant venous ulcers.  J Vasc Surg 2011;54:737-42. (PMID:21658887)

36. Farley SM, Rigberg DA, Jimenez JC, Moore WS, Quinones-Baldrich WJ.  A retrospective review of Palmaz stenting of the aortic neck for endovascular aneurysm repair.  Ann Vasc Surg 2011;25:624-9. (PMID:21665423)

37. Jimenez JC, Delano F, Wilson JM, Kokubun BA, Bennion RS, Thompson JE, Schmid-Schonbein G, Saltzman DJ.  Analysis of exhaled volatile compounds following acute superior mesenteric artery occlusion in a pilot rat study.  Ann Vasc Surg 2011;25:1113-7. (PMID:21945333)

38. Gabriel V, Jimenez JC, Alktaifi A, Lawrence PF, O'Connell JB, Derubertis BG, Rigberg DA, Gelabert HG.  Success of endovenous saphenous and perforator ablation in patients with symptomatic venous insufficiency on chronic warfarin therapy.  Ann Vasc Surg, 2012;26:607-11 (PMID:22516240)

39. Harlander-Locke M, Lawrence PF, Jimenez JC, Rigberg DR, DeRubertis B,  Gelabert HG.  Combined treatment with compression therapy and ablation of incompetent superficial and perforating veins reduces ulcer recurrence in patients with CEAP 5 venous disease.  J Vasc Surg 2012;55:446-50 (PMID:22104338)

40. Harlander-Locke M, Lawrence PF, Alktaifi A, Jimenez JC, Rigberg DA, Derubertis BG.  The impact of ablation of incompetent superficial and perforator veins on ulcer healing rates.  J Vasc Surg 2012;55:458-64. (PMID:22133452)

41. DeRubertis BG, Quinones-Baldrich WJ, Greenberg JI, Jimenez JC, Lee JT.  Results of a double-barrel technique with commercially available

Updated: 3/2024

devices for hypogastric preservation during aortoiliac endovascular abdominal aortic aneurysm repair.  J Vasc Surg 2012;56:1252-9. (PMID:22743017)

42. Jimenez JC, Harlander-Locke M, Dutson EP.  Open and laparoscopic treatment of median arcuate ligament syndrome.  Journal of Vascular Surgery 2012;56:869-73. (PMID:22743019)

43. Saltzman DJ, Kerger H, Jimenez JC, Farzan D, Wilson JM, Intaglietta M. Microvascular changes following four-hour single arteriole occlusion. Microsurgery 2012;33:207-15. (PMID: 23152084)

44. DeRubertis BG, Alktaifi A, Lawrence PF, Jimenez JC, Rigberg DA, Gelabert HG. Endovascular management of chronic nonmalignant iliocaval venous lesions. Ann Vasc Surg 2013;27:577-86. (PMID:29037346)

45. Harlander-Locke M, Jimenez JC, Lawrence PF, Derubertis BG, Rigberg DA, Gelabert HG.  Endovenous ablation with concomitant phlebectomy is a safe and effective method of treatment for symptomatic patients with axial reflux and large incompetent tributaries. J Vasc Surg 2013;58:166-172. (PMID:23571079)

46. Harlander-Locke M, Jimenez JC, Lawrence PF, Derubertis BG, Rigberg DA, Gelabert H, Farley A.  Management of endovenous heat-induced thrombus (EHIT) using a classification system and treatment algorithm following segmental thermal ablation of the small saphenous vein.  J Vasc Surg 2013;58:427-31. (PMID:23663871)

47. Jabori S, Jimenez JC, Gabriel V, Quinones-Baldrich WJ, Derubertis BG, Farley SM, Gelabert HG, and Rigberg DA.  Is Heparin Reversal Required for Safe Performance of Percutaneous Endovascular Aortic Aneurysm Repair?  Ann Vasc Surg 2013;27:1049-53. (PMID:24011808)

48. Jimenez JC and Bernstein J.  Inferior vena cava thrombosis following endovascular repair of acute aortocaval fistula: A word of caution.  Vasc Endovasc Surg 2013;47:467-9. (PMID:23709272)

49. Merz AE, Jimenez JC, Gelabert HA, Hame SL.  Cystic adventitial disease of the popliteal artery causing intermittent exertional claudication in a young male athlete: A case report. Am J Sports Med 2013;41:2573-6. (PMID:23989350)

50. Gelabert HA, Jabori S, Barleben A, Kiang S, O'Connell J, Jimenez JC, Derubertis B, Rigberg D.  Regrown first rib in patients with recurrent

Updated: 3/2024

thoracic outlet syndrome.  Ann Vasc Surg 2014;28:933-8.
(PMID:24462650)

51. Yang JK, Jabori S, Jimenez JC.  Antiplatelet therapy before, during and
    after extremity revascularization.  J Vasc Surg 2014;60:1085-91.
    (PMID:25124360)

52. Harlander-Locke M, Jimenez JC, Lawrence PF, Gelabert HG, Derubertis
    BG, Rigberg DA, Farley SM.  Bovine Carotid Artery (Artegraft) for Use as
    a Hemodialysis Access Conduit in Patients Who are not Candidates for
    Native Arteriovenous Fistulae.  Vasc Endovasc Surg 2014;48(7-8);497-
    502. (PMID:25487247)

53. Jimenez JC, Jabori S, Gelabert HA, Moore WS, Quinones-Baldrich WJ,
    O'Connell JB. Recognition and surgical techniques for management of
    non-recurrent laryngeal nerve during carotid endarterectomy.  Ann Vasc
    Surg 2016;33:79-82. (PMID: 26965812) Role: Senior author, first author,
    analyzed data, assisted with manuscript, reviewed manuscript, edited
    manuscript, advisor.

54. Rollo JC, Farley SM, Jimenez JC, Woo K, Lawrence PF, Derubertis BG.
    Contemporary outcomes of elective iliocaval and infrainguinal venous
    interventions for post-thrombotic chronic venous occlusive disease.  J
    Vasc Surg Venous Lymphat Disord 2017; 5(6):789-799.
    (PMID:29037346) Role: Co-author, analyzed data, assisted with
    manuscript, reviewed manuscript, edited manuscript, advisor.

55. Jimenez JC, Agnew PS, Mayer P, Clements JR, Lange DL, Dickerson JE,
    Slade HB.  Enzymatic debridement of chronic non-ischemic diabetic foot
    ulcers: Results of a randomized controlled trial.  Wounds 2017;29:133-
    139. (PMID:28267678) Role: Senior author, first author, performed
    research, analyzed data, reviewed manuscript, edited manuscript.

56. Juo YY, Skancke M, Sanaiha Y, Mantha A, Jimenez JC, Benharash P.
    Efficacy of distal perfusion cannulae in preventing limb ischemia during
    extracorporeal membrane oxygenation: A systematic review and meta-
    analysis.  Artif Organs 2017; 41(11):E263-E273. (PMID:28762511) Role:
    Role: co-author, reviewed manuscript, edited manuscript, mentor, advisor,
    developed hypothesis, performed research

57. Gelabert HA, Rigberg DA, O'Connell JB, Jabori S, Jimenez JC, Farley S.
    Trans-axillary decompression of thoracic outlet syndrome patients
    presenting with cervical ribs.  J Vasc Surg 2018; S0741-5214:30415-4.

25

Updated: 3/2024

(PMID:29705086) <u>Role: Co-author, analyzed data, assisted with manuscript preparation, edited manuscript, performed research.</u>

58. Khrucharoen U, Juo YY, Sanaiha Y, Chen Y, Jimenez JC, Dutson EP. Robotic-assisted laparoscopic median arcuate ligament release: 7-year experience from a single tertiary care center. Surg Endosc 2018;32:4029-4035 (PMID:29785455) Role: <u>Role: co-author, reviewed manuscript, edited manuscript, mentor, advisor, developed hypothesis.</u>

59. Jimenez JC. Invited Commentary on: Prevalence of signs of celiac axis compression by the median arcuate ligament on computed tomography angiography in asymptomatic patients. J Vasc Surg 2018;68:1787-1788. (PMID:30470367) <u>Role: First author, responsible for publication, prepared manuscript, edited manuscript</u>

60. Khrucharoen U, Juo YY. Chen Y, Jimenez JC, Dutson EP. Short and intermediate-term clinical outcome comparison between laparoscopic and robotic-assisted median arcuate ligament release. J Robot Surg 2020;14:123-129. (PMID: 30900153) Role: <u>Role: co-author, reviewed manuscript, edited manuscript, mentor, advisor, developed hypothesis</u>

61. Khrucharoen U, Juo YY, Sanaiha Y, Finn JP, Jimenez JC, Dutson EP. Factors associated with symptomatology of celiac artery compression and outcomes following Median Arcuate Ligament Release. Ann Vasc Surg 2020;62:248-257. (PMID:31449931) <u>Role: co-author, reviewed manuscript, edited manuscript, mentor, advisor, developed hypothesis</u>

62. Chun TT, Jimenez JC, Pantola JL, Moriarty JM, Freeman S. Phlegmasia cerulea dolens associated with acute Covid-19 pneumonia despite supratherapeutic warfarin anticoagulation. J Vasc Surg Cases Innov Tech. 2020;6:653-656. (PMID: 33102992) <u>Role: Responsible for publication, senior author, reviewed manuscript, edited manuscript, mentor.</u>

63. Jimenez JC, Lawrence PF, Woo K, Chun TT, Farley SM, Rigberg DA, Baril DT, Derubertis BG. Adjunctive techniques to minimize thrombotic complications following microfoam sclerotherapy of saphenous trunks and tributaries. J Vasc Surg Venous Lymphat Disord 2021;9:904-909. (PMID:33248297) Role:<u> Responsible for publication, senior author, reviewed manuscript, edited manuscript, mentor.</u>

64. Ulloa JG, Jimenez JC, Pantoja JL, Farley SM, Gelabert HA, Rigberg DA, Danovitch GM. Elective resection of symptomatic arteriovenous fistulae

Updated: 3/2024

and grafts in patients with functioning renal allografts at a high volume transplant hospital.  Ann Vasc Surg 2021; 24:S0890-5096(21)00352-6. (PMID:33905849)  Responsible for publication, senior author, reviewed manuscript, edited manuscript, mentor.

65. Jimenez JC, Lawrence PF, Pavlyha M, Farley SM, Rigberg DA, DeRubertis BG, Woo K.  Endovenous microfoam ablation of below knee superficial truncal veins is safe and effective in patients with prior saphenous treatment across a wide range of CEAP Classes.  J Vasc Surg Venous Lymphat Disord 2021; 30:S2213-333x(21)00425-X (PMID:34474174).  Responsible for publication, senior author, reviewed manuscript, edited manuscript, mentor.

66. Chun TT, O'Connell JB, Rigberg DA, Deruberts BG, Jimenez JC, Farley SM, Baril DT, Gelabert HA.  Preoperative thrombolysis is associated with improved vein patency and functional outcomes following first rib resection in acute Paget-Schroetter Syndrome (PSS).  J Vasc Surg. 2022 Sep;76:806-13.e1. (PMID:35643200)  Reviewed manuscript, edited manuscript, mentor.

67. Patel R, Moore WS, Jimenez JC.  Severe symptomatic nickel allergy following stent-graft implantation requiring excision and external iliac reconstruction. J Vasc Surg Cases Innov Tech.  2022;8:562-564. (PMID:36248398) Responsible for publication, senior author, reviewed manuscript, edited manuscript, mentor.

68. Escobar G, Oderich GS, Farber M, de Souza L, Quinones-Baldrich WJ, Patel H, Eliason J, Upchurch, Jr. G, Timaran CH, Black J, Ellozy S, Woo E, Fillinger M, Singh M, Lee J, Jimenez JC, Lall P, Gloviczki P, Kalra M, Duncan A, Lyden S, and Tenorio E.  Results of the North American Complex Abdominal Aortic Debranching (NACAAD) Registry.  Circulation 2022.  Oct 11;146:1149-1158. (PMID:36148651) Collected and analyzed data.  Reviewed and edited manuscript.

69. Chin AL, Talutis SD, Lawrence PF, Jimenez JC.  A comparison of radiofrequency ablation and microfoam sclerotherapy of large diameter truncal veins results in excellent early closure rates and symptomatic relief.  J Vasc Surg Venous Lymphat Disord. 2023 Jul;11:716-722. (PMID: 37030444) Responsible for publication, senior author, reviewed manuscript, edited manuscript, mentor.

70. Talutis SD, Woo K, Lawrence PF, Jimenez JC.  Comparison of outcomes following polidocanol microfoam sclerotherapy and radiofrequency ablation of incompetent thigh great and accessory saphenous veins.  J Vasc Surg Venous Lymphat Disord 2023. Sep;11:916-920. (PMID:

Updated: 3/2024

37030446) <u>Responsible for publication, senior author, reviewed manuscript, edited manuscript, mentor.</u>

71. Chin AL, Talutis SD, Lawrence PF, Woo K, Farley SM, Duong W, Jimenez JC.  Increased body mass index and vein diameter are associated with incomplete target vein closure following microfoam ablation of incompetent saphenous veins.  J Vasc Surg Venous Lymphat Disord 2023;1:S2213-333X(23)00391-8. PMID: 37788744. <u>Responsible for publication, senior author, reviewed manuscript, edited manuscript, mentor.</u>

72. Chin AL, Talutis SD, Lawrence PF, Woo K, Rigberg D, Rollo J, Jimenez JC.  Factors associated with ablation related thrombus extension (ARTE) following microfoam versus radiofrequency saphenous vein closure.  J Vasc Surg Venous Lymphat Disord. 2023.  In Press <u>Responsible for publication, senior author, reviewed manuscript, edited manuscript, mentor.</u>

73. Wang KM, Gelabert H, Jimenez JC, Rigberg D, Woo K.  Short-term mortality and revisions to promote maturation after arteriovenous fistula creation.  J Vasc Surg. 2023. In Press.  <u>Reviewed manuscript, edited manuscript, mentor.</u>

<u>RESEARCH PAPERS (SUBMITTED)</u>

1. Wang KM, Gelabert H, Jimenez JC, Rigberg D, Woo K.  Association of frailty with post-operative survival and outcomes following hemodialysis vascular access creation.  Ann Vasc Surg. 2023 (In revision)

2.  Kabnick LS, Jimenez JC, Coogan SM, Gache L, Frame D, Gunarsson CL, Ozsvath K.  Comparative effectiveness of non-compounded polidocanol 1% endovenous microfoam (Varithena) ablation versus endovenous thermal ablation: A systematic review and network meta-analysis.  J Vasc Surg Venous Lymphat Disord. 2024. (In Revision)

<u>TEXTBOOKS:</u>

1. A Handbook of Vascular Disease Management.  Moore WS and Jimenez JC (ed:) World Scientific Publishing, 2011.

Updated: 3/2024

2. Vascular Surgery: Principles and Practice. 4th Edition. Wilson SE, Jimenez JC, Veith FJ,  Naylor AR, Buckels J (ed:) Taylor and Francis, 2017.

3. Fifty Landmark Papers Every Vascular and Endovascular Surgeon Should Know.  1st Edition.  Jimenez JC, Wilson SE. (Ed:) Taylor and Francis, 2020.

4. Contemporary Management of Acute and Chronic Venous Disease.  1st Edition.  Jimenez JC, Wilson SE. (Ed:) Taylor and Francis (CRC Press). 2024 In Press

5. Vascular and Endovascular Surgery: A Comprehensive Review.  10th Edition.  Moore WS, Duncan A, Jimenez JC, Rigberg DA. (Ed:) Elsevier. 2024 In Press

BOOK CHAPTERS:

1. Jimenez JC, Evans GRD.  Chest Wall Reconstruction with Omentum, In Evans GRD (ed:) Reconstructive Surgery of the Chest, Abdomen and Pelvis, 1st edition, Marcel Dekker, Inc. 2003.

2. Jimenez JC , Podnos YD, Wilson SE . Cholecystitis and Cholangitis, In Bartlett, Blacklow and Gorbach (eds): Infectious Diseases, 3rd edition, 2003.

3. Jimenez JC, Wilson SE:  Aneurysmal Disease, In White RA, Hollier LH (eds): Vascular Surgery: Basic Science and Clinical Correlations, 2nd edition, Futura Publishing, 2003.

4. Jimenez JC, Lawrence PF:  Gangrene of the Foot in Cameron JL (ed:) Current Surgical Therapy, 9th edition, Elsevier Mosby 2007.

5. Jimenez JC, Ahn SS:  Peripheral arterial occlusive disease:  Angioplasty, stenting, and endovascular graft treatment in Cameron JL (ed:) Current Surgical Therapy, 9th edition, Elsevier Mosby, 2007.

6. Jimenez JC, Quinones-Baldrich WJ.  Mesenteric Artery Disease: General Considerations.  Rutherford, 7th edition, Elsevier Mosby, 2009

7. Jimenez JC.  Endoscopic Vein Harvesting.  Moore WS & Ahn SS (ed:), Endovascular Therapy, 4th edition, Elsevier (Saunders), 2010.

Updated: 3/2024

8. Jimenez JC.  Complications Associated with Endovascular Management of Aortoiliac Arterial Occlusive  Disease. Moore WS & Ahn SS (eds:), Endovascular Therapy, 4th edition, Elsevier (Saunders), 2010.

9. Jimenez JC, Bennion RS.  Socioeconomic Implications of Vascular Access Surgery.  Wilson SE (ed:), Vascular Access: Principles and Practice, 5th edition, Lippincott Williams and Wilkins, 2010.

10. Jimenez JC, Lawrence PF.  Upper Extremity Arterial Occlusive Disease.  Cameron JL (ed:) Current Surgical Therapy, 10th edition, Elsevier Mosby, 2010.

11. Gevorgyan A, Jimenez JC, Ahn SS.  Endovascular Treatment of Visceral Artery Aneurysms.  Moore WS and Ahn SS(eds:). Endovascular Therapy, 4th edition, Elsevier (Saunders), 2010.

12. Jimenez JC, Saltzman DJ. Management of Visceral and Renovascular Occlusive and Aneurysmal Disease.  Moore WS and Jimenez JC (eds:)  A Handbook of Vascular Disease Management, World Scientific Publishing. 2011.

13. Jimenez JC, Aktaifi A.  Management of Peripheral Artery Aneurysms.  Moore WS and Jimenez JC (eds:)  A Handbook of Vascular Disease Management, World Scientific Publishing. 2011.

14. Jimenez JC.  Diagnostic Imaging of the Vascular System. Moore WS and Jimenez JC (eds:)  A Handbook of Vascular Disease Management, World Scientific Publishing. 2011.

15. Jimenez JC, Quinones-Baldrich WJ. Celiac Artery Compression Syndrome.  Haimovici's Vascular Surgery. Ascher E (ed:) Blackwell Publishing. 2013

16. Veith FJ, Jimenez JC.  Arterial Thoracic Outlet Syndrome.  Haimovici's Vascular Surgery. Ascher E (ed:) Blackwell Publishing. 2013.

17. Patel MS, Jimenez JC, Wilson SE.  Hemodialysis and Vascular Access.  Vascular and Endovascular Surgery, 8th Edition.  Moore WS(ed:) Elsevier (Saunders), 2013.

18. Jimenez JC, Eisenring C.  Endoscopic Vein Harvest. Vascular and Endovascular Surgery, 8th Edition.  Moore WS(ed:) Elsevier (Saunders), 2013.

19. Jimenez JC.  Acute and Chronic Aortic Dissection: Medical Management, Surgical Management, Endovascular Management, and Results.

Updated: 3/2024

Vascular and Endovascular Surgery, 8th Edition.  Moore WS(ed:) Elsevier (Saunders), 2013.

20. Patel MS, Jimenez JC, Wilson SE.  Management of Chyloperitoneum and Chylothorax After Aortic Reconstruction.  Current Therapy in Vascular and Endovascular Surgery, 5th Edition.  Stanley J(ed:) Elsevier (Saunders),2013.

21. Jimenez JC, Patel MS, Wilson SE.  External Methods of Angioaccess. Current Therapy in Vascular and Endovascular Surgery, 5th Edition. Stanley J(ed:) Elsevier (Saunders), 2013.

22. Jimenez JC, Lawrence PF.  Indications for Treatment of Isolated Degenerative Femoral Aneurysms.  Current Vascular Surgery: 2015 (Editors: Eskandari MK, Pearce WH, Yao JST)

23. Jimenez JC, Dutson EP.  MALS-Results of Open and Laparoscopic Median Arcuate Ligament Release.  Mesenteric Vascular Disease: Current Therapy, 1st Edition, Oderich G (Ed:) (Springer), 2015

24. Jimenez JC.  Adventitial Cystic Disease and Entrapment Syndromes Involving the Popliteal Artery.  Vascular Surgery: Principles and Practice, 4th Edition. (Editors: Wilson SE, Veith FJ, Naylor AR, Jimenez JC and Buckels JAC).  2017

25. Gillespie JA, Wilson SE, Jimenez JC.  Extracranial Carotid Aneurysms. Vascular Surgery: Principles and Practice, 4th Edition. (Editors: Wilson SE, Veith FJ, Naylor AR, Jimenez JC and Buckels JAC).  2017

26. Wilson SE, Jimenez JC, Bennion RS,.  Principles of Vascular Access Surgery. Vascular Surgery: Principles and Practice, 4th Edition. (Editors: Wilson SE, Veith FJ, Naylor AR, Jimenez JC and Buckels JAC).  2017

27. Wilson SE, Jimenez JC.  Popliteal artery aneurysm.  Vascular Surgery: Principles and Practice, 4th Edition. (Editors: Wilson SE, Veith FJ, Naylor AR, Jimenez JC and Buckels JAC).  2017

28. Jimenez JC.  Endovenous and Surgical Management of Varicose Veins. . Vascular Surgery: Principles and Practice, 4th Edition. (Editors: Wilson SE, Veith FJ, Naylor AR, Jimenez JC and Buckels JAC). Taylor and Francis. 2017

29. Jimenez JC.  Non-Infectious Complications in Vascular Surgery. Vascular and Endovascular Surgery, 9th Edition.  Moore WS, Lawrence PF, Oderich G. (ed:) Elsevier (Saunders), 2017.

Updated: 3/2024

30. Jimenez JC.  Lower Extremity Amputation for End Stage Vascular Disease. Vascular and Endovascular Surgery, 9th Edition.  Moore WS, Lawrence PF, Oderich G. (ed:) Elsevier (Saunders), 2017.

31. Jimenez JC. Commentary on: Late Results following operative repair for celiac artery compression syndrome.  Fifty Landmark Papers Every Vascular and Endovascular Surgeon Should Know.  1st Edition.  Jimenez JC, Wilson SE. (Ed:) Taylor and Francis. 2020

32. Jimenez JC.  Commentary on: The VANISH-2 study.  A randomized, blinded, multicenter study to evaluate the efficacy and safety of polidocanol endovenous microfoam 0.5% and 1.0% compared with placebo for the treatment of saphenofemoral junction incompetence.  Fifty Landmark Papers Every Vascular and Endovascular Surgeon Should Know.  1st Edition.  Jimenez JC, Wilson SE. (Ed:) Taylor and Francis. 2020

33. Jimenez JC. Commentary on: Rosuvastatin to prevent vascular events in men and women with elevated C-reactive protein.  Fifty Landmark Papers Every Vascular and Endovascular Surgeon Should Know.  1st Edition. Jimenez JC, Wilson SE. (Ed:) Taylor and Francis. 2020

CHAPTERS (IN PRESS)

1. Jimenez JC.  Polidocanol Microfoam Ablation of Refluxing Superficial Veins- Techniques and Results.  In Contemporary Management of Acute and Chronic Venous Disease.  1st Edition.  Jimenez JC, Wilson SE. (Ed:)) Taylor and Francis (CRC Press).  In Press

2. Rollo JC, Jimenez JC. Thrombotic Complications Following Treatment of Peripheral Varicose Veins. In Contemporary Management of Acute and Chronic Venous Disease.  1st Edition.  Jimenez JC, Wilson SE. (Ed:)) Taylor and Francis (CRC Press).  In Press

3. Wilson, SE, Arnot SP, Jimenez JC. High Ligation and Stripping of the Saphenous Veins. In Contemporary Management of Acute and Chronic Venous Disease.  1st Edition.  Jimenez JC, Wilson SE. (Ed:)) Taylor and Francis (CRC Press).  In Press

4. Lawrence PF, Jimenez JC, and Brown KR.  Management of Thrombotic Complications of Endovenous Ablations.  Handbook of Venous and

Updated: 3/2024

Lymphatic Disorders: Guidelines of the American Venous Forum, 5th Edition.  Gloviczki P (Ed:) Taylor and Francis (CRC Press).  In Press

5.  Jimenez JC, Lawrence PF.  Endovenous Microfoam Sclerotherapy for Ablation of Superficial Truncal Veins and Varicose Tributaries.  Handbook of Venous and Lymphatic Disorders: Guidelines of the American Venous Forum, 5th Edition.  Gloviczki P (Ed:) Taylor and Francis (CRC Press).  In Press

6.  Jimenez JC.  Non-infectious Complications in Vascular and Endovascular Surgery. Vascular and Endovascular Surgery, 10th Edition.  Moore WS, Duncan A, Jimenez JC, Rigberg DA. (ed:) Elsevier (Saunders).  In Press

7.  Jimenez JC.  The Muscle Compartment Syndromes: Diagnosis and Management, Vascular and Endovascular Surgery, 10th Edition.  Moore WS, Duncan A, Jimenez JC, Rigberg DA. (ed:) Elsevier (Saunders).  In Press

8.  Jimenez JC.  Lower Extremity Amputation.  Vascular and Endovascular Surgery, 10th Edition.  Moore WS, Duncan A, Jimenez JC, Rigberg DA. (ed:) Elsevier (Saunders).  In Press

EDUCATIONAL MATERIALS:

1.  Invited Author, Vascular Education and Self-Assessment Program (VESAP 2), Mesenteric Disease, 2008.

2.  Invited Author, Vascular Education and Self-Assessment Program (VESAP 3), Vascular Medicine, 2013.

3.  Invited Author, Vascular Education and Self-Assessment Program (VESAP 5), Society for Vascular Surgery-Vascular Medicine, 2019.

4.  Invited Author, Vascular Education and Self-Assessment Program (VESAP 6), Society for Vascular Surgery-Vascular Medicine, 2023.

ADDITIONAL PUBLICATIONS:

1.  Jimenez JC, Wilson SE.  Complications of acute diverticulitis: Medical and surgical management.  Current Techniques in Surgical Profiles. 2002 ;1:1-12.

Updated: 3/2024

2.  Jimenez JC, Kiang SC, Quinones-Baldrich WJ.  Endovascular Repair of a Traumatic Aortic Tear with the Conformable Gore Tag Device.  Endovascular Today September 2012. Supplement: p.21-23.

3.  Jimenez JC.  Strategies for Real-World Use of Varithena Microfoam for Safe and Effective Management of Symptomatic Varicose Veins.  Endovascular Today September 2021.

4.  Jimenez JC.  Ask the Experts:  In which clinical presentations do you prefer nonthermal options, and which are better suited to thermal ablation?  Endovascular Today.  March 2022.

ABSTRACTS:

ABSTRACTS AND PRESENTATIONS AT NATIONAL MEETINGS:

1.  Daniel R. Reichner, Thomas Scholz, Juan Carlos Jimenez, Victoria Van Der Kam, Socorro Gutierrez, Earl Steward and Gregory R.D. Evans.  Laser Flap Delay, Comparison of CO2 and Erbium and Optical Scanning of Flap   Perfusion.  Plastic Surgery Research Council 47th Annual Meeting, April 19th 2002. Boston Massachusetts.  Oral Presentation

2.  Juan Carlos Jimenez, Darren Tyson, Sanjay Dhar, Ralph Bradshaw and Gregory R.D. Evans. Human Embryonic Kidney Cells (HEK-293): Modulated Release of NGF for Nerve Regeneration.  Plastic Surgery Research Council 47th Annual Meeting April 19th 2002. Boston, Massachusetts.  Oral Presentation

3.  Juan Carlos Jimenez, Peter Henry Ashjian, Amir Elbarbary, Earl Steward, Mark H. Hedrick, Gregory R.D. Evans.  Growth and Survival of Rat Processed Lipoaspirate Cells Following Autologous Hindleg In Vivo Culture.  Annual Meeting of the American Society for Aesthetic Plastic Surgery, Las Vegas, Nevada. April 30th, 2002. Poster Presentation.

4.  Juan Carlos Jimenez, Darren R. Tyson, Sanjay Dhar, Thang Nguyen, Gregory R.D. Evans. Human Embryonic Kidney Cells (HEK-293): Inducible Drug Delivery for Tissue Engineered Nerve Constructs. Annual Meeting: Pacific Coast Surgical Association, February 17, 2003.  Poster Presentation

Updated: 3/2024

5. Yale D. Podnos, Juan Carlos Jimenez, Samuel E Wilson, Ninh T. Nguyen. Complications of Laparoscopic Gastric Bypass: A Review of 2818 Reported cases.
Annual Meeting: Pacific Coast Surgical Association, February 17, 2003. Poster Presentation

6. Juan Carlos Jimenez, Sherif Emil, Yale Podnos, Nam Nguyen.  Annular Pancreas in Children: A Ten-Year Review.  36th Annual meeting of the Pacific Association of Pediatric Surgeons with the Australasian association of paediatric surgeons, Sydney, Australia, May, 2003. Poster Presentation

7. Sherif Emil, Juan Carlos Jimenez, Barry Steinmetz.  Massive Gastrointestinal Bleeding Secondary to Jejunal Gastric Heterotopia. Canadian Association of Paediatric Surgeons, 35th Annual Meeting, Sept. 19-21, 2003, Niagra-On-The Lake (Ontario), Canada. Abstract

8. Dimitri V. Gelfand, Juan Carlos Jimenez , Samuel Eric Wilson .  PTA and Stenting is Not Better than Medical Treatment for Superficial Femoral Artery Disease.  31st Annual Veith Symposium, November 18th, 2004, New York City, New York.

9. Juan Carlos Jimenez, Peter F. Lawrence, David A. Rigberg, William J. Quinones-Baldrich.  Technical Modifications in Endoscopic Vein Harvest (EVH) Facilitate Its Use in Lower Extremity Limb Salvage Procedures. 21st Annual Meeting of the Western Vascular Society, La Jolla, California, September 18, 2006.

10. Juan Carlos Jimenez, Wesley S. Moore, William J. Quinones-Baldrich. Surgical conversion following endovascular aortic aneurysm repair:  A 14-year review.  Society for Clinical Vascular Surgery, 35th Annual Symposium, Orlando, Florida, March 21st, 2007.

11. William J. Quinones-Baldrich, Juan Carlos Jimenez, Brian DeRubertis, Wesley S. Moore.  Combined endovascular and surgical approach (CESA) to thoracoabdominal aortic pathology: A ten-year experience.  23rd Annual Meeting of the Western Vascular Society, Napa Valley, Ca. September 16, 2008

12. Peter F. Lawrence, Vicki Carter, Dennis Baker, David Rigberg, Hugh Gelabert, Juan Carlos Jimenez, Brian DeRubertis, MD. Classification of Endovenous Closure and Treatment Algorithm Reduces the Need for Post Procedure Anticoagulation. 24th Annual Meeting of the Western Vascular Society, Tucson, AZ. September 19th, 2009.

13. Allan W. Tulloch, Juan C. Jimenez, Peter F. Lawrence, Erik P. Dutson,

Updated: 3/2024

Wesley S. Moore, MD, David A. Rigberg, MD, Hugh A. Gelabert, MD, Brian G. Derubertis, MD, William J. Quinones-Baldrich. Laparoscopic vs. Open Celiac Ganglionectomy in Patients with Median Arcuate Ligament Syndrome- A Ten-Year Review. Society for Clinical Vascular Surgery 38th Annual Symposium on Vascular Surgery, Scottsdale AZ, April 9, 2010.

14. Bath J, O'Connell J, Hiatt J, Uijtdehaage S, Jimenez JC, Davis G, Lawrence PF. Standardization is Superior to Traditional Methods of Teaching Simulated Vascular Anastomoses. Society for Vascular Surgery Annual Meeting, Boston, MA, June 13, 2010.

15. Derubertis BG, Alktaifi A, Lawrence PF, Jimenez JC, Rigberg DA, Gelabert HA. Endovascular Management of Chronic Non-malignant Iliocaval Venous Occlusive Disease. 82nd Annual Meeting of the Pacific Coast Surgical Association, Scottsdale, AZ, Feb 18, 2010.

16. Kao KK, Jimenez JC, Stelzner MG, Thompson JE, Saltzman DJ. Arteriole vasospasm, capillary flow and cell death in skeletal muscle ischemia-reperfusion. 6th Annual Academic Surgical Congress, Society of University Surgeons, February 01, 2011.

17. Harlander-Locke M, Lawrence PF, Jimenez JC, Rigberg DA, MD, DeRubertis BG, MD, Gelabert HA. Combined Treatment with Endovenous Ablation and Compression Therapy Reduces Ulcer Recurrence in Patients with CEAP 5 Venous Disease. Society for Clinical Vascular Surgery 38th Annual Symposium on Vascular Surgery, Orlando, Fla, March 17, 2011.

18. Oderich GS, Gloviczki P, Farber M, Quinones-Baldrich WJ, Greenberg R, Timaran C, Black J, Ellozy S, Woo E, Singh M, Fillinger M, Lee JT, Jimenez JC, Lall P, Duncan A, Kalra M, Clagett P for the NACAAD investigators. Abdominal debranching with aortic stent grafts for complex aortic aneurysms: Preliminary results of the North American Complex Abdominal Aortic Debranching (NACAAD) Registry. Society for Vascular Surgery, Vascular Annual Meeting, Chicago, Illinois, June 18, 2011.

19. DeRubertis BG, Quinones-Baldrich WJ, Greenberg J, Jimenez JC, Lee JT. Results of a Double-Barrel Technique with Commercially Available Devices for Hypogastric Preservation during Aortoiliac EVAR. 26th Annual Meeting of the Western Vascular Society, Kauai, Hi., September 20th, 2011.

20. Jimenez JC, Harlander-Locke M, Lawrence PF, Derubertis BG, Rigberg DA, Gelabert HA. A Shift in the Management of Symptomatic Chronic Venous Insufficiency: Clinical Outcomes following 1000 Consecutive Radiofrequency Saphenous Vein Ablations in the Ambulatory Setting. 83rd Annual Meeting of the Pacific Coast Surgical Association, Feb

Updated: 3/2024

19,2012 Napa Valley, Ca.

21. Harlander-Locke, Lawrence PF, Jimenez JC, Derubertis BG, Rigberg D, Gelabert HG, Farley S. Segmental Thermal Ablation of the Small Saphenous Vein (SSV) Using an Endovenous Heat Induced Thrombus (EHIT) Classification System and Treatment Algorithm. Western Vascular Society, 27th Annual Meeting, September 24th, 2012.

22. Derubertis BG, Lew W, Jabori S, Barleben A, Jimenez JC, Lawrence PF. Importance of Intravascular Ultrasound during Percutaneous Treatment of May-Thurner Syndrome. Western Vascular Society, 27th Annual Meeting, September 23rd, 2012.

23. Jabori SO, Gelabert HA, Barleben A, Jimenez JC, Derubertis BG, Klausner J, Rigberg DA. Trans-axillary Decompression of Thoracic Outlet Syndrome Patients Presenting with Cervical Ribs. Society for Clinical Vascular Surgery, 41st Annual Symposium on Vascular Surgery, Miami, Florida March 12, 2013.

24. Derubertis BG, Jabori S, Quinones-Baldrich WJ, Jimenez JC, Farley S, Rigberg D, Gelabert H, Lawrence PF. Percutaneous Access for Endovascular Repair of Aortic Emergencies. Pacific Coast Surgical Association, 84th Annual Meeting. Kauai, Hi, February 16, 2013.

25. Kiang SC, Gelabert HA, Derubertis BG, Rigberg DA, Farley SM, O'Connell JB, Jimenez JC, Lawrence PF. Intravenous Ultrasound (IVUS) Identifies Stenosis in Venographically Normal Appearing Veins at the Thoracic Outlet. Western Vascular Society, 28th Annual Meeting, Jasper Canada September 24th, 2013.

26. Kiang SC, Gelabert BG, Farley SM, Rigberg DA, Jimenez JC, Yang JK, O'Connell JB. Use of Intravascular Ultrasound (IVUS) and Catheter Venography in the Evaluation of Patients with Venous Thoracic Outlet Syndrome. Vascular and Endovascular Surgery Society. Spring Meeting SVS/VAM, Boston, MA. June 4th, 2014

27. Sabaiha Y, Ramos GR, Juo Y, Jimenez JC, Benharash PB. Distal Perfusion Catheters Reduce Vascular Complications Associated With Veno-Arterial ECMO Therapy. 12th Annual Academic Surgical Congress. Las Vegas, NV. February 7th, 2017.

28. Jabori S, Gelabert H, O'Connell JB, Chan KN, Rigberg DA, Jimenez JC. Trans-axillary decompression of thoracic outlet syndrome patients presenting with cervical ribs. Society for Vascular Surgery, Annual Meeting. San Diego, Ca. June 3rd, 2017.

Updated: 3/2024

29. Chun TT, O'Connell JB, Rigberg DA, Derubertis BG, Jimenez JC, Farley SM, Baril DT, Gelabert HA.  Preoperative thrombolysis affords significant benefit in patency and outcome following first rib resection in Acute Paget-Schroetter Syndrome (PSS).  35th Annual Meeting of the Western Vascular Society. Jackson Hole, Wy. September 28, 2020.

30. Pavlyha M, Jimenez JC, Woo K, Lawrence PF.  Impact of new ultrasound classification system for EHIT of the great saphenous vein.  34th Annual Meeting of the American Venous Forum. Orlando, Fl.  February 24, 2022.

31. Talutis SD, Woo K, Lawrence PF, Jimenez JC.  Comparison of outcomes following polidocanol microfoam sclerotherapy and radiofrequency ablation of incompetent thigh great and accessory saphenous veins.  35th Annual Meeting og the American Venous Forum. San Antonio, Tx. Feb 23, 2023.

32. Chin AL, Talutis SD, Lawrence PF, Jimenez JC.  A comparison of radiofrequency ablation and microfoam sclerotherapy of large diameter truncal veins results in excellent early closure rates and symptomatic relief.  50th Annual Symposium on Vascular Surgery- Society for Clinical Vascular Surgery.  Miami, Fl. March 29, 2023.

33. Wang KM, Gelabert H, Jimenez JC, Rigberg DA, Woo K.  Revisions to promote maturation and short term death after arteriovenous fistula creation.  38th Western Vascular Society Annual Meeting.  Kauai, Hi. September 10th, 2023

34. Chin AL, Talutis SD, Lawrence PF, Woo K, Rollo J, Jimenez JC.  Factors associated with ablation related thrombus extension (ARTE) following radiofrequency versus microfoam saphenous vein closure. 38th Western Vascular Society Annual Meeting. Kauai, Hi.   September 12th, 2023

35. Sullins VF, Harari A, Tillou A, Gilyard S, Wagner JP, McIntosh DF, Hines OJ, Jimenez JC.  Organizational change using a novel, structured plan for Justice, Equity, Diversity and Inclusion in an academic surgical department.  19th Annual Academic Surgical Congress.  Washington DC. February 8th, 2024/

ABSTRACTS AND PRESENTATIONS AT REGIONAL MEETINGS:

1. Peter Ashjian, Juan Carlos Jimenez, Gregory R.D. Evans, Mark Hedrick. Neural Progenitors from Human Adipose Tissue.  First Annual California Neural Regeneration/Spinal Cord Injury Consortium Meeting, Reeve-Irvine

Updated: 3/2024

Research Center, University of California, Irvine, March 20th, 2002.  Poster Presentation

2. Juan Carlos Jimenez, Sherif Emil.  A Teenager with Recurrent Pancreatitis.  1st Annual M. James Warden Visiting Professor.  January 23, 2003.  University of California, Irvine Medical Center.  Oral Presentation

3. Juan Carlos Jimenez , Sherif Emil.  Upper Gastrointestinal Bleeding in a Toddler with Malrotation.  14th Annual Conference of the Southern California Chapter of the American College of Surgeons. , Santa Barbara, California, January 25, 2003. Oral Presentation

4. Juan Carlos Jimenez, Todd Reil, Peter F. Lawrence, Samuel S. Ahn.  Endovascular Repair of a Superior Mesenteric Artery Aneurysm with a Covered Stent Graft.  17th Annual Conference of the Southern California Chapter of the American College of Surgeons, Santa Barbara, California, January 22nd, 2006.  Oral Presentation

5. Juan Carlos Jimenez, Todd Reil, Carlos Gracia, Sydney Guo, Peter F. Lawrence, Samuel S. Ahn.  Minimally Invasive Treatment of Median Arcuate Ligament Syndrome: Combined Laparoscopic and Endovascular Approach.  17th Annual Conference of the Southern California Chapter of the American College of Surgeons, Santa Barbara, California, January 22nd, 2006.  Oral Presentation

6. Hugh A. Gelabert, Juan Carlos Jimenez, David Rigberg.  Analysis of thrombolysis with urokinase or retavase in the surgical management of Paget-Schroetter syndrome.  24th Annual meeting of the Southern California Vascular Surgical Society, Temecula, California, May 6th, 2006.  Oral Presentation

7. Juan Carlos Jimenez.  Minimally Invasive Venous Surgery.  18th Annual Conference of the Southern California Chapter of the American College of Surgeons, Santa Barbara, California,  January 21st, 2007.  Oral Presentation

8. Juan Carlos Jimenez, Wesley S. Moore, William J. Quinones-Baldrich, Peter F. Lawrence.  Operative Strategies for Recurrent Carotid Stenosis Following Angioplasty and Stenting.  25th Annual Meeting of the Southern California Vascular Society, Coronado, California, May 5th, 2007

9. Juan Carlos Jimenez, Peter F. Lawrence, Erik Dutson, David Rigberg, William J. Quinones-Baldrich.  Minimally Invasive Treatment of Median Arcuate Ligament Syndrome: A 4-year review. 19th Annual Conference of

Updated: 3/2024

the Southern California Chapter of the American College of Surgeons, Santa Barbara, California, January 20st, 2008.

10. Juan Carlos Jimenez, Wesley S. Moore.  Replacement and Rerouting of the Complete Native Aorta and Common Iliac Arteries using a Five-Stage Hybrid Repair.  26th Annual meeting of the Southern California Vascular Surgical Society, Westlake Village, California, May 3rd, 2008.

11. David Rigberg MD, Juan Carlos Jimenez MD, Hugh Gelabert MD.  Hybrid Approach for Complex Juxta-Renal Inflammatory Aortic Aneurysm: A Novel Technique.  26th Annual meeting of the Southern California Vascular Surgical Society, Westlake Village, California, May 3rd, 2008

12. Rahgozar P, Thompson J, Jimenez JC, DeLano F, Schmid-Schoenbein F, Saltzman D.  Adrenergic innervation of skeletal muscle arterioles. . 20th Annual Conference of the Southern California Chapter of the American College of Surgeons, Santa Barbara, California, January 20st, 2008.

13. Ankur Chandra, Jessica Beth O'Connell, William J. Quinones-Baldrich MD, Peter F. Lawrence MD, Wesley S. Moore MD, Hugh A. Gelabert MD, Juan Carlos Jimenez MD, David A. Rigberg MD, Brian G. Derubertis MD.  Open Surgical Repair of Renal Artery Aneurysms in the Endovascular Era: A Safe, Effective Treatment for Both Aneurysm and Associated Hypertension.  27th Annual Meeting of the Southern California Vascular Surgical Society, Dana Point, California, May 2nd, 2009.

14. Juan Carlos Jimenez MD, William J. Quinones-Baldrich MD.  Technical Modifications for Endovascular Infrarenal AAA Repair for the Tortuous and/or Short Conical Neck in High Risk Patients: The Use of the Pre-cuff Kilt Technique. 28th Annual Meeting of the Southern California Vascular Surgical Society, Carlsbad, California, May 2, 2010.

15. Gavin Davis, Juan Carlos Jimenez MD, Hugh Gelabert MD, David A. Rigberg MD, Brian G. Derubertis MD. Early Postoperative Hemorrhage Following First Rib Resection for Vascular Thoracic Outlet Syndrome. 28th Annual Meeting of the Southern California Vascular Surgical Society, Carlsbad, California, May 1, 2010

16. Nancy Pham, Steven Farley MD, Peter F. Lawrence MD, Juan Carlos Jimenez MD. Current Femoral Aneurysm Treatment May Be Too Aggressive for Its Natural History. 28th Annual Meeting of the Southern California Vascular Surgical Society, Carlsbad, California, May 2, 2010.

Updated: 3/2024

17. Brian G. Derubertis MD, Ali Alktaifi MD, Juan Carlos Jimenez MD, Wesley Lew MD, Peter F. Lawrence MD.  The Evolution of Splenic Artery Aneurysm Treatment:  Open Surgical, Laparoscopic, and Interventional Options.  29th Annual Meeting of the Southern California Vascular Surgical Society, Palos Verdes, Ca, May 14th, 2011.

18. Viktor Gabriel, Ali Alktaifi MD, Juan Carlos Jimenez MD, Peter F. Lawrence MD, David A. Rigberg MD, Hugh A. Gelabert MD, Brian G. Derubertis.  Success of Endovenous Ablation Procedures With Symptomatic Venous Insufficiency on Chronic Warfarin.  29th Annual Meeting of the Southern California Vascular Surgical Society, Palos Verdes, Ca, May 15th, 2011.

19. Allan Tulloch MD, Jessica B. O'Connell MD, David A. Rigberg MD, Juan Carlos Jimenez MD, Brian G. Derubertis MD, Hugh A. Gelabert MD.  Thoracic Outlet Syndrome in the Teenaged Athlete. 29th Annual Meeting of the Southern California Vascular Surgical Society, Palos Verdes, Ca, May 15th, 2011.

20. Michael Harlander-Locke MD, Juan Carlos Jimenez MD, Peter F. Lawrence MD, Hugh A. Gelabert MD, Brian Derubertis MD, David A. Rigberg MD, Steven M. Farley.  Bovine Carotid Artery (Artegraft) for Use as a Hemodialysis Access Conduit in Patients Who are not Candidates for Native Arteriovenous Fistulae.  30th Annual Meeting of the Southern California Vascular Surgical Society, Ojai, Ca, May 5th, 2012

21. Andrew Barleben MD MPH, Wesley Lew MD, Hugh A. Gelabert MD, Juan Carlos Jimenez MD, Peter F. Lawrence and Brian Derubertis MD.  Claudication in Young Patients: Uncommon Symptoms Suggest Uncommon Pathology. 30th Annual Meeting of the Southern California Vascular Surgical Society, Ojai, Ca, May 5th, 2012

22. Sinan Jabori, Juan Carlos Jimenez MD, Viktor Gabriel MD, William J. Quinones-Baldrich MD, Brian G. Derubertis MD, Steven M. Farley MD, Hugh A. Gelabert MD, and David A. Rigberg MD.  Is Heparin Reversal Required for Safe Performance of Percutaneous Endovascular Aortic Aneurysm Repair?  30th Annual Meeting of the Southern California Vascular Surgical Society, Ojai, Ca, May 5th, 2012

23. Sinan Jabori, Andrew Barleben MD, Hugh Gelabert MD, Sharon Kiang MD, Juan Carlos Jimenez MD, Brian Derubertis MD, David Rigberg MD.  Regrown First Rib in Patients with Recurrent Thoracic Outlet Syndrome. 31st Annual Meeting of the Southern California Vascular Surgical Society, Rancho Mirage, Ca, May 4th, 2013

Updated: 3/2024

24. Andrew Barleben MD, William J. Quinones-Baldrich MD, Juan Carlos
    Jimenez MD, Sinan Jabori, Elizabeth Levin MD, Brian Derubertis MD.
    Initial Experience with Off-Label Use of Commercial Devices in Patients
    Unfit for Open Repair of Perivisceral Aortic Aneurysms. 31st Annual
    Meeting of the Southern California Vascular Surgical Society, Rancho
    Mirage, Ca, May 5th, 2013

25. Sinan Jabori, Juan Carlos Jimenez MD, Brian G. Derubertis MD, Peter F.
    Lawrence MD, David Rigberg MD, Steven Farley MD, William J.
    Quinones-Baldrich MD, Viktor Gabriel MD.  Outcomes Following
    Peripheral Endovascular Interventions in Solid Organ Transplant
    Recipients. 31st Annual Meeting of the Southern California Vascular
    Surgical Society, Rancho Mirage, Ca, May 5th, 2013

26. Allan W. Tulloch, Sharon Kiang, Steven M. Farley, Juan Carlos Jimenez,
    Brian G. Derubertis, Hugh A. Gelabert, William J. Quinones-Baldrich,
    Peter F. Lawrence, David A. Rigberg.  Completion Cerebral Angiography
    after Carotid Endarterectomy:  How Often Does it Change Management?
    32nd Annual Meeting of the Southern California Vascular Surgical Society,
    Carlsbad, Ca, May 4th, 2014.

27. Sharon C. Kiang, Mark Archie, Allan W. Tulloch, KF Kuchta, Brian G.
    Derubertis, David A. Rigberg, Hugh A. Gelabert, Juan Carlos Jimenez,
    Jessica B. O'Connell, Peter F. Lawrence, William J. Quinones-Baldrich,
    Steven M. Farley.  Arterial Injuries in Ultrasound Guided Catheter
    Placements: A New Pattern of Arterial Cannulation. 32nd Annual Meeting
    of the Southern California Vascular Surgical Society, Carlsbad, Ca, May
    4th, 2014.

28. Allan W. Tulloch, Jane Yang, Steven M. Farley, Juan Carlos Jimenez,
    David A. Rigberg, Hugh A. Gelabert, William J. Quinones, Peter F.
    Lawrence and Brian G. Derubertis.  Vascular Access Complications with
    Extracorporeal Membranous Oxygenation.  33rd Annual Meeting of the
    Southern California Vascular Surgical Society, San Diego, Ca, May 3rd,
    2015.

29. Sinan Jabori, Hugh A. Gelabert, Juan Carlos Jimenez, Wesley Moore,
    William J. Quinones-Baldrich and Jessica B. O'Connell.  Non-recurrent
    Laryngeal Nerve During Carotid Endarterectomy: Recognition and
    Surgical Management.  33rd Annual Meeting of the Southern California
    Vascular Surgical Society, San Diego, Ca, May 3rd, 2015.

30. Kaelan N. Chan, Juan C. Jimenez, Peter F. Lawrence, Karen Woo.
    Mechanochemical Ablation Is Associated with Higher Incidence Of  Deep
    Vein Thrombus Extension Than Thermal Techniques. 36th Annual

Updated: 3/2024

Meeting of the Southern California Vascular Surgical Society, Laguna Beach, Ca, May 6th, 2018.

31. Taimur Saleem, Mark Archie, Juan Carlos Jimenez. Novel Technique for Management of Ruptured Infrarenal  Segment of Thoracoabdominal Aortic Aneurysm Using Ovation Endograft  36th Annual Meeting of the Southern California Vascular Surgical Society, Laguna Beach, Ca, May 6th, 2018.

32. Jesus Ulloa, Joe Pantoja, Juan Carlos Jimenez, Steven M. Farley, Hugh A. Gelabert, David A. Rigberg, Gabriel M. Danovitch.  Elective Resection of Symptomatic Arteriovenous Access in Patients with Functioning Renal Allografts at a High Volume Transplant Center. 38th Annual Meeting of the Southern California Vascular Surgical Society,  October 23rd , 2020.

33. Tristen Chun, Juan Carlos Jimenez, Peter F. Lawrence, Karen Woo, Steven Farley, David A. Rigberg, Donald Baril, Brian Derubertis. Technical Modifications During Endovenous Microfoam Ablation of Axial and Tributary Veins Result in Decreased Thrombotic Complications.  . 38th Annual Meeting of the Southern California Vascular Surgical Society October 23rd , 2020.

34. Rhusheet Patel, Wesley Moore, Juan Carlos Jimenez.  Severe Symptomatic Nickel Allergy Following Implanted Stent-Graft for External Iliac Artery Endofibrosis Requiring Excision and Arterial Reconstruction. 39th Annual Meeting of the Southern California Vascular Surgical Society, Ojai California, June 18, 2021

35. Maryanna Pavlyha, Juan Carlos Jimenez, Peter Lawrence, Steven Farley, David Rigberg, Brian Derubertis.  Endovenous Microfoam Ablation of Symptomatic Below Knee Truncal and Associated Tributary Veins is a Safe and Effective Alternative to Avoid Thermal Nerve Injury. 39th Annual Meeting of the Southern California Vascular Surgical Society, Ojai California, June 18, 2021

36. Amanda Chin, Juan Carlos Jimenez, Peter Lawrence, Steve Farley, Brian Derubertis.  Endovenous Microfoam Ablation of Truncal Veins with a Large Diameter Saphenofemoral and Saphenopopliteal Junction Results in Excellent Closure and Low Thrombotic Complication Rates.  39th Annual Meeting of the Southern California Vascular Surgical Society, Ojai California, June 18, 2021

37. Stephanie D Talutis, Amanda L. Chin, Peter F. Lawrence, Steven M. Farley, William Duong, Juan Carlos Jimenez.  Increased Body Mass Index and Reflux Times are Associated with Incomplete Target Vein Closure following Microfoam Ablation of Incompetent Saphenous Veins.  41st

Updated: 3/2024

Annual Meeting of the Southern California Vascular Surgical Society, La Quinta, Ca, April 30, 2023.

38. Karissa M Wang, Hugh Gelabert, Juan Carlos Jimenez, David Rigberg, Karen Woo.  Post-operative Survival and Outcomes Following Hemodialysis Vascular Access Creation.   41st Annual Meeting of the Southern California Vascular Surgical Society, La Quinta, Ca, April 30, 2023.

INVITED PRESENTATIONS:

1.  Juan Carlos Jimenez. Management of Traumatic and Non-Traumatic Chylothorax.  University of California, Davis Medical Center, Trauma/Critical Care Conference. November, 1998.

2.  Juan Carlos Jimenez. Principles of ELISA: Enzyme Linked Immunosorbent Assay.  University of California, Irvine Department of Plastic Surgery and The Center for Biomedical Engineering, Research Conference. February 4, 2002.

3.  Juan Carlos Jimenez. Tissue Engineering Research at The University of California, Irvine: A Work in Progress.  University of California, Irvine, Department of Plastic Surgery and The Center Biomedical Engineering, Research Conference. August, 2001.

4.  Juan Carlos Jimenez.  Radiation Arteritis.  University of California, Irvine Department of Surgery Grand Rounds.  March 24, 2005.

5.  Juan Carlos Jimenez.  Radiation-Induced Arterial Disease. Grand Rounds, Division of Vascular Surgery, David Geffen School of Medicine, University of California, Los Angeles, July 13th, 2006.

6.  Juan Carlos Jimenez. Compartment Syndrome: Pathophysiology, Diagnosis and Indications for Treatment.  Department of Surgery Grand Rounds, David Geffen School of Medicine, University of California, Los Angeles.  May 30th, 2007

7.  Juan Carlos Jimenez.  Diseases in Vascular Surgery.  David Geffen School of Medicine at UCLA. September, 5th, 2007.

8.  Juan Carlos Jimenez.  Endoscopic Harvest of the Greater Saphenous Vein.  26th  Annual UCLA Symposium: A Comprehensive Review and Update: What's  New in Vascular and Endovascular Surgery, Beverly Hills, Ca. September 6th, 2008.

Updated: 3/2024

9. Juan Carlos Jimenez. Invited Session Moderator.  27th Annual UCLA Symposium: A Comprehensive Review and Update: What's New in Vascular and Endovascular Surgery, Hollywood, Ca. September 16th, 2009

10. Juan Carlos Jimenez.  The Role of Endoscopic Vein Harvest and Minimally Invasive Limb Bypass Surgery.  27th Annual UCLA Symposium: A Comprehensive Review and Update: What's New in Vascular and Endovascular Surgery, Hollywood, Ca. September 15th, 2009

11. Juan Carlos Jimenez.  Infrainguinal Occlusive Disease: Techniques and Results.  28th Annual UCLA Symposium: A Comprehensive Review and Update: What's New in Vascular and Endovascular Surgery, Hollywood, Ca. September 15th, 2010.

12. Juan Carlos Jimenez. Invited Session Moderator.  28th Annual UCLA Symposium: A Comprehensive Review and Update: What's New in Vascular and Endovascular Surgery, Hollywood, Ca. September 15th, 2010.

13. Juan Carlos Jimenez. Everything You Want to Know about Critical Limb Ischemia but were Afraid to Ask.  UCLA Department of Surgery Grand Rounds. David Geffen School of Medicine at UCLA. May 25, 2011. Los Angeles, Ca.

14. Juan Carlos Jimenez.  Advancements in the Treatment of Thoracoabdominal and Abdominal Aortic Aneurysms.  45th Annual John E. Connolly Surgical Society and Department of Surgery Symposium.  June 10th, 2011, University of California, Irvine Department of Surgery, Irvine, Ca.

15. Juan Carlos Jimenez. Invited Session Moderator.  29th Annual UCLA Symposium: A Comprehensive Review and Update: What's New in Vascular and Endovascular Surgery, Hollywood, Ca. September 14th, 2011.

16. Juan Carlos Jimenez. Invited Discussant.  Correlation of CEAP clinical class, Venous Clinical Severity Scores (VCSS), Vein Diameter, and Reflux Time in the Great Saphenous Vein (GSV) in Patients with Superficial Venous Insufficiency.  26th Annual Meeting of the Western Vascular Society, Kauai, Hi. September 20th, 2011.

17. Juan Carlos Jimenez. Invited Lecturer. Lymphedema: Principles and Treatment.  American Venous Forum:  2011 Fellows Course in Venous Disease, Los Angeles, Ca. December 4th, 2011.

Updated: 3/2024

18. Juan Carlos Jimenez.  Invited Lecturer.  Symposium on Venous Disease. Department of Surgery Grand Rounds.  David Geffen School of Medicine at UCLA , May 9th, 2012.

19. Juan Carlos Jimenez. Invited Session Moderator.  30th Annual UCLA Symposium: A Comprehensive Review and Update:  What's New in Vascular and Endovascular Surgery, Hollywood Ca. September 12th, 2012

20. Juan Carlos Jimenez.  Invited Lecturer.  Lower Extremity Amputation for End Stage Vascular Disease.  30th Annual UCLA Symposium: A Comprehensive Review and Update:  What's New in Vascular and Endovascular Surgery, David Geffen School of Medicine at UCLA. Hollywood, Ca. September 12th, 2012

21. Juan Carlos Jimenez.  Invited Discussant.  Endoscopic Vein Harvest for Infra-inguinal Arterial Bypass.  27th Annual Meeting of the Western Vascular Society. Park City, Utah. September 24th, 2012.

22. Juan Carlos Jimenez.  Invited Lecturer.  End-Stage Renal Disease in 2012:  Socio-economic Impact.  16th Annual Max Gaspar Symposium. University of Southern California, Keck School of Medicine. Los Angeles, Ca.  September 27th, 2012.

23. Juan Carlos Jimenez.  Invited Lecturer.  Update on AV Graft Options: PTFE, Bovine Carotid Artery, HERO Graft.  Advances and Debates in Dialysis Access.  Harbor-UCLA Medical Center, Torrance , Ca.  December 8th, 2012.

24. Juan Carlos Jimenez.  Invited Lecturer.  Vascular Surgery in the Diabetic Patient.  UCLA Combined Endocrinology Grand Rounds.  David Geffen School of Medicine at UCLA. Ronald Reagan UCLA Medical Center, Los Angeles, Ca. March 6th, 2012.

25. Juan Carlos Jimenez.  Invited Lecturer.  Lower Extremity Amputation for End Stage Vascular Disease.  31st Annual UCLA Symposium: A Comprehensive Review and Update:  What's New in Vascular and Endovascular Surgery, David Geffen School of Medicine at UCLA. Beverly Hills Ca. September , 2013

26. Juan Carlos Jimenez.  Invited Lecturer. Saphenous Vein Stripping and Stab Phlebectomy.   17th Annual Max Gaspar Sympsium.  University of Southern California, Keck School of Medicine. Los Angeles, Ca. September, 2013.

Updated: 3/2024

27. Juan Carlos Jimenez. Invited Lecturer. Lymphedema: Principles and Treatment.  American Venous Forum:  2013 Fellows Course in Venous Disease, Los Angeles, Ca. December 7th, 2013.

28. Juan Carlos Jimenez. Invited Lecturer. Lower Extremity Amputation for End Stage Vascular Disease.  31st Annual UCLA Symposium: A Comprehensive Review and Update:  What's New in Vascular and Endovascular Surgery, Beverly Hills Ca. September 11, 2014

29. Juan Carlos Jimenez. Symptomatic and Ruptured Abdominal Aortic Aneurysms: What to Do, When to Do it and What Not to Do.  UCLA Symposium on Aortic Disease:  Acute Aortic Syndromes.  David Geffen School of Medicine at UCLA, Los Angeles Ca. November 15, 2014.

30. Juan Carlos Jimenez. Invited Lecturer. Lower Extremity Amputation for End Stage Vascular Disease.  32nd Annual UCLA Symposium: A Comprehensive Review and Update:  What's New in Vascular and Endovascular Surgery, David Geffen School of Medicine at UCLA. Beverly Hills Ca. September 3, 2015

31. Juan Carlos Jimenez. Invited Lecturer. Non-Infectious Complications in Vascular Surgery.  32nd Annual UCLA Symposium: A Comprehensive Review and Update:  What's New in Vascular and Endovascular Surgery, David Geffen School of Medicine at UCLA. Beverly Hills Ca. August 30th, 2015

32. Juan Carlos Jimenez. Invited Lecturer. Lower Extremity Amputation for End Stage Vascular Disease.  Sharp Grossmont Hospital Heart and Vascular Conference.  San Diego, Ca. November 7th, 2015.

33. Juan Carlos Jimenez. Invited Lecturer. Vascular Surgical Techniques for Revascularizing the Ischemia Limb prior to HBOT.  Undersea Hyperbaric Medical Society Pacific Chapter Annual Meeting, Ventura Ca.  November 14th, 2015.

34. Juan Carlos Jimenez. Symptomatic and Ruptured Abdominal Aortic Aneurysms: What to Do, When to Do it and What Not to Do.  UCLA Symposium on Aortic Disease:  Endovascular Interventions for Acute and Chronic Aortic Pathology.  David Geffen School of Medicine at UCLA, Los Angeles Ca. November 14, 2015.

35. Juan Carlos Jimenez MD. Non-Infectious Complications in Vascular Surgery.  First Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, Beverly Hills, Ca. August 27th, 2016.

47

Updated: 3/2024

36. Juan Carlos Jimenez MD.  Salvage Techniques after Failed Endovascular Aneurysm Repair.  2016 UCLA Aortic Center Symposium: Advances in Treatment of Aortic Pathology.  David Geffen School of Medicine at UCLA.  Los Angeles, Ca.  November 5, 2016.

37. Juan Carlos Jimenez MD.  Non-Recurrent Laryngeal Nerve Encountered during Carotid Endarterectomy: Diagnosis and Operative Management. 12th Annual Academic Surgical Congress.  Las Vegas, NV. February 8th, 2017.

38. Juan Carlos Jimenez MD. Non-Infectious Complications in Vascular Surgery.  Second Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, Beverly Hills, Ca. August 26th, 2017.

39. Juan Carlos Jimenez MD. Invited Discussant. Arterial Eversion is a Safe Technique for Primary and Redo Carotid Endarterectomy.  American College of Surgeons: Clinical Congress 2017, San Diego, Ca. October 24th, 2017.

40. Juan Carlos Jimenez MD. Prevention of Spinal Cord Injury in Patients Having Complex Aortic Repair/Invited Session Moderator.  2017 UCLA Aortic Center Symposium: Advances in Treatment of Aortic Pathology. David Geffen School of Medicine at UCLA.  Los Angeles, Ca.  November 4, 2017.

41. Juan Carlos Jimenez MD.  Non-Infectious Complications in Vascular Surgery.  Third Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, Beverly Hills, Ca. August 25th, 2018.

42. Juan Carlos Jimenez MD.  Non-Infectious Complications in Vascular Surgery.  Fourth Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, Beverly Hills, Ca. August 24th, 2019.

43. Juan Carlos Jimenez MD, MBA.  Abdominal Aortic Aneurysm: Etiology, Diagnosis and Management.  2019 UCLA Aortic Center Symposium: Advances in Treatment of Aortic Pathology.  David Geffen School of Medicine at UCLA.  Los Angeles, Ca.  November 5, 2019.

44. Juan Carlos Jimenez MD, MBA.  Invited Lecturer and Panelist. Medical Professionals' Panel. UCLA Anderson School of Management.  Los

Updated: 3/2024

Angeles, Ca. February 23rd, 2020.

45. Juan Carlos Jimenez MD, MBA. Thinking Fast and Slow: Recognition and Elimination of Unconscious Bias.  Invited Lecturer. Department of Surgery Grand Rounds.  June 24th, 2020.

46. Juan Carlos Jimenez MD, MBA.  Non-Infectious Complications in Vascular Surgery.  Fifth Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, August 28th, 2020.

47. Juan Carlos Jimenez MD, MBA. Invited Discussant A Single Center's 15-Year Experience with Palliative Limb Care for Critical Limb Ischemia in Frail Patients.  35th Western Vascular Society Annual Meeting. September 29th, 2020.

48. Juan Carlos Jimenez MD, MBA. Invited Lecturer. Mesenteric Ischemia. Department of Surgery Grand Rounds.  David Geffen School of Medicine at UCLA.  October 14th, 2020.

49. Juan Carlos Jimenez MD, MBA.  Invited Lecturer.  Abdominal Aortic Aneurysm: Etiology, Diagnosis and Management. 7th Annual UCLA Symposium on Advances in Treatment of Aortic Pathology. November 7th, 2020.

50. Juan Carlos Jimenez MD, MBA.  Invited Lecturer and Moderator: Combined Grand Rounds-Departments of Surgery and Medicine "Bias at the Bedside: A Conversation of Educators".  David Geffen School of Medicine at UCLA.  October 28th, 2020.

51. Juan Carlos Jimenez MD, MBA.  Invited Lecturer and Panelist. "Embracing Diversity Conference."  November 21, 2020.  UCLA Anderson School of Management. Los Angeles, Ca.

52. Juan Carlos Jimenez MD, MBA.  Invited Lecturer and Moderator.  Racism – It Exists and Why Language Matters. Department of Surgery: Equity, Diversity and Inclusion Forum.  David Geffen School of Medicine at UCLA. March 24th, 2021.

53. Juan Carlos Jimenez MD, MBA. Invited Lecturer. Fundamentals of Hyperbaric Oxygen Therapy in Surgical Patients.  Department of Surgery Grand Rounds.  David Geffen School of Medicine at UCLA. June 2nd , 2021.

Updated: 3/2024

54. Juan Carlos Jimenez MD, MBA.  Non-Infectious Complications in Vascular Surgery.  Sixth Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, October 1st, 2021.

55. Juan Carlos Jimenez MD, MBA.  Session Moderator.  Sixth Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, October 3rd, 2021.

56. Juan Carlos Jimenez MD, MBA.  Carotid Bifurcation Intervention-CEA Technique and Results.  Sixth Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, October 3rd, 2021.

57. Juan Carlos Jimenez MD, MBA.  Invited Discussant. Vascular Trainee Perceptions of Diversity, Equity, and Inclusion Within United States Vascular Surgery Training Programs. 36th Western Vascular Society Annual Meeting, October 18th, 2021.  Jackson Hole, Wyoming.

58. Juan Carlos Jimenez MD, MBA.  Session Moderator. Carotid/Venous/Miscellaneous.  40th Annual Meeting of the Southern California Vascular Surgical Society, May 1, 2022.  Coronado, Ca.

59. Juan Carlos Jimenez MD, MBA. Moderator and Speaker: JEDI Town Hall Meeting: Three- and Five-Year Goals.  Department of Surgery Grand Rounds.  David Geffen School of Medicine at UCLA. June 8, 2022.

60. Juan Carlos Jimenez MD, MBA.  Session Moderator.  Sixth Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, August 26, 2022.

61. Juan Carlos Jimenez MD, MBA.  Non-Infectious Complications in Vascular Surgery.  Sixth Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, August 27, 2022.

62. Juan Carlos Jimenez MD, MBA.  Aortic Aneurysms: Etiology, Diagnosis, and Pathology.  UCLA 9th Annual Aortic Pathology Symposium.  David Geffen School of Medicine at UCLA.  November 5th, 2022

63. Juan Carlos Jimenez MD, MBA. Our Institutional Experience with Polidocanol Microfoam for Treatment of Symptomatic Chronic Venous Insufficiency.  Pharmameet 2023, Porto, Portugal, Feb 9th, 2023.

Updated: 3/2024

64. Juan Carlos Jimenez MD, MBA.  Invited Moderator. Karmody ePoster Competition-Education/Imaging/Misc.  Miami, Fl.  March 28. 2023.

65. Juan Carlos Jimenez MD, MBA.  Invited Judge. . Karmody ePoster Competition-Education/Imaging/Misc.  Miami, Fl.  March 28. 2023.

66. Juan Carlos Jimenez MD, MBA.  Invited Panelist.  Anti-Racism Roadmap, 2023 Update Series. (Virtual) Office of Justice, Equity, Diversity and Inclusion (JEDI).  David Geffen School of Medicine.  March 23, 2023.

67. Juan Carlos Jimenez MD, MBA.  Non-Infectious Complications in Vascular Surgery.  Sixth Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, August 24, 2023.

68. Juan Carlos Jimenez MD, MBA.  Session Moderator.  Sixth Annual UCLA/Society for Vascular Surgery Symposium: What's New in Vascular and Endovascular Surgery. David Geffen School of Medicine at UCLA, August 25, 2023.

69. Juan Carlos Jimenez MD, MBA.  Treatment of Refractory Superficial Reflux and Advanced Venous Stasis with Varithena.  Veith Symposium Venous Workshop.  New York City, NY.  November 15, 2023.

70. Juan Carlos Jimenez MD, MBA.  Invited Panelist. Superficial Disease Real Life Case Challenge.  Veith Symposium Venous Workshop.  New York City, NY.  November 15, 2023.

71. Juan Carlos Jimenez MD, MBA.  Adjunctive Techniques to Minimize Thrombotic Complications Following Microfoam Ablation of Symptomatic Truncal and Tributary Veins.  50th Annual Veith Symposium.  New York City, NY.  November 16th, 2023.

72. Juan Carlos Jimenez MD, MBA.  Radiofrequency Ablation Versus Polidocanol Endovenous Microfoam Ablation of Large Diameter Saphenous and Tributary Veins. 50th Annual Veith Symposium.  New York City, NY.  November 16th, 2023.

73. Juan Carlos Jimenez MD, MBA.  Microfoam and Radiofrequency Ablation of Incompetent Thigh Saphenous Veins.  Advanced Phlebology Webinar. Egyptian African Venous and Lymphatic Association and American Venous Forum.  January 13, 2024. (Virtual)

74. Juan Carlos Jimenez MD, MBA.  What's New in Vascular Surgery. Annual Scientific Meeting of the Southern California Chapter of the

Updated: 3/2024

American College of Surgeons.  Santa Barbara, Ca. January 20, 2024.

75. Juan Carlos Jimenez MD, MBA. Invited Discussant.  Factors Associated with In-Hospital Major Amputation After Revascularization for Lower Extremity Trauma: A National Evaluation.  Pacific Coast Surgical Association, 95th Annual Meeting. Rancho Mirage, Ca. February 10, 2024

76. Juan Carlos Jimenez MD, MBA.  Invited Session Moderator.  Pacific Coast Surgical Association, 95th Annual Meeting. Rancho Mirage, Ca. February 10, 2024

77. Juan Carlos Jimenez MD, MBA.  Superficial Venous Reflux and Wounds: My Approach to Treating These Patients.  2024 Pacific Northwest Endovascular Conference (PNEC), Seattle, Wa. May 24th, 2024 (Upcoming)

VIDEOS/MEDIA

1. Endovascular Treatment of Ruptured Aortic Aneurysms- Before, During and After https://www.youtube.com/watch?v=Zml0Idckf-4

2. Drive Time: The UCLA Anderson FEMBA Podcast "Meet Two FEMBA MD's" Episode 38 : https://dylanucla.wordpress.com/podcasts/

3. The Reset: Superficial Vein Disease-Practical Points for Better Care. Venous Edge Podcast  May 2021-Vol 1 Issue 2. http://www.venousedge.com/current-issue.html

4. Strategies for Real-World Use of Varithena® Chemical Ablation for Safe and Effective Management of Symptomatic Varicose Veins. Endovascular Today Online, Sept. 2021.  https://evtoday.com/articles/2021-sept/strategies-for-real-world-use-of-varithena-chemical-ablation-for-safe-and-effective-management-of-symptomatic-varicose-veins

5. Ask the Experts: In Which Clinical Presentations Do You Prefer Nonthermal options, and Which Are Better Suited to Thermal Ablation? Endovascular Today Online, March 2022. https://evtoday.com/articles/2022-mar/ask-the-experts-in-which-clinical-presentations-do-you-prefer-nonthermal-options-and-which-are-better-suited-to-thermal-ablation

6. Invited Panelist:  National Latinx Physicians Day at UCLA Health.  David Geffen School of Medicine at UCLA.  October 5th, 2023. https://www.youtube.com/watch?v=-Q7shOSTp10

Updated: 3/2024

7. JVS Author Spotlight- Chang, Talutis, Jimenez. Audible Bleeding Podcast. November 6. 2023.  https://www.audiblebleeding.com/2023/11/06/jvs-author-spotlight-chang-talutis-jimenez/

Juan Carlos Jimenez MD, MBA, FACS: Testimony – 2017-2023

2023- Hall vs. Rikers Island- Case No. 21-cv-2308 (Plaintiff)

2023- Kari Smith vs. Spokane Orthopedics, et al., State of Washington- Case No. 21-2-03315-32- Deposition Testimony (Plaintiff)

2022- Sargent vs. Adventist Health Sonora- County of Stanislaus, State of California- Case No. CV19003767-Deposition Testimony (Plaintiff)

2021-Loring Vs. Modern Vascular- Maricopa County Superior Court, State of Arizona – Case No. CV2020-052466-Deposition Testimony (Plaintiff)

2021- Chavira vs. Mendez- Los Angeles Superior Courts, Spring Street Courthouse, Los Angeles, CA – Case No. 19STCV36828- Deposition Testimony (Plaintiff)

2021- Roe vs. Mayeli-Los Angeles County Superior Court, State of California- Case No. MC027949 - Deposition Testimony (Plaintiff)

2020- Strickland vs. Providence Hospital- King County, State of Washington- Case No. 18-2-20970-6-Deposition testimony (Plaintiff)

2019- Henson vs. UC Regents- Los Angeles County Superior Court, State of California, Case No. BC573583 - Trial Testimony (Defense)

2019- Henson vs. UC Regents- Los Angeles County Superior Court, State of California, Case No. BC573583 - Deposition Testimony (Defense)

2019- Banasiak v. Holy Cross Hospital- Cook County Circuit Court, State of Chicago, Case No. 2016L012486 -Trial Testimony (Plaintiff)

2019-Banasiak vs. Holy Cross Hospital- Cook County Circuit Court, State of Chicago, Case No. 2016L012486 - Deposition Testimony (Plaintiff)

2019- Huffman vs. Mission Pharmacal Company- Harris County District Court, State of Texas- Case No. 2017-52458 - Deposition Testimony (Plaintiff)

2018- Zendler vs. University of Utah- Third District Court, Salt Lake Department, State of Utah, Case No. 160907183 - Deposition Testimony (Plaintiff)

Updated: 1/1/2022

**Juan Carlos Jimenez, MD, MBA, F.A.C.S.**
**Clinical Professor of Surgery**
**Division of Vascular Surgery**
**200 Peter Morton Medical Plaza, Suite 526**
**Los Angeles, CA  90095**
**(310) 206-1786 Office**
**(310) 206-2592 Cell**


**<u>Medical Review and Court Fees</u>**

Retainer: $2500.00

$700.00 per hour-Record Review/Phone conferences/Preparation of reports/Attorney Meetings

$800.00 per hour-Deposition

$7500.00-Court Testimony (Half Day Minimum or full day)

$500.00 per hour-Travel time (car and air) plus mileage, airfare, meals and lodging as applicable


Please make all checks payable to:    **Juan C. Jimenez, MD**
**200 UCLA Medical Plaza, Suite 526**
**Los Angeles, CA  90095**
**TIN: 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**

# Exhibit E



# CATASTROPHIC LIFE CARE PLAN

## Prepared for Mr. Javier Tapia

**January 17, 2024**

Prepared by: Hans L. Carlson MD, FAAPMR, CLCP™, CPLCP™

Requested by: Galanda Broadman, PLLC



# Contents

1    **Overview** .................................................................................................................... 1

    1.1    Executive Summary ............................................................................................ 1

    1.2    Life Care Planning & Life Care Plans ................................................................ 1

    1.3    Methodology ..................................................................................................... 2

    1.4    Biography of Author .......................................................................................... 3

    1.5    Physician Life Care Planning ............................................................................. 4

    1.6    Context: A Catastrophic Life Care Plan for Mr. Javier Tapia ............................ 5

2    **Summary of Records** ................................................................................................... 7

    2.1    Summary of Medical Records ............................................................................ 7

    2.2    Summary of Medical Records that Pre-date the Cause of Relevant Injury/Illness .............. 32

    2.3    Other Documents ............................................................................................. 43

3    **Interview & Examination** ........................................................................................... 45

    3.1    History of Present Injury/Illness ...................................................................... 45

    3.2    Current Symptoms .......................................................................................... 45

    3.3    Activities of Daily Living ................................................................................. 46

    3.4    Review of Systems .......................................................................................... 46

    3.5    Medical History Prior to Present Injury/Illness ............................................... 46

    3.6    Family History ................................................................................................. 46

    3.7    Drug & Other Allergies ................................................................................... 46

    3.8    Current Medications, Equipment and Supplies ............................................... 47

    3.9    Current Physicians .......................................................................................... 47

    3.10 Social History .................................................................................................. 47

    3.11 Education History ............................................................................................ 47

    3.12 Professional/Work History .............................................................................. 47

    3.13 Habits .............................................................................................................. 47

    3.14 Avocational Activities ..................................................................................... 48

    3.15 Residential Situation ....................................................................................... 48

    3.16 Transportation ................................................................................................ 48

Confidential Medical Record – Mr. Javier Tapia
© Copyright 2024 Physician Life Care Planning, LLC

3.17 Household Services ................................................................................................. 48

3.18 Examination ...................................................................................................... 48

**4    Central Opinions** ...................................................................................................... **49**

4.1 Diagnostic Conditions ................................................................................ 49

4.2 Consequent Circumstances ....................................................................... 50

**5    Future Medical Requirements** ....................................................................... **54**

5.1 Physician Services ...................................................................................... 54

5.2 Routine Diagnostics .................................................................................. 55

5.3 Medications ............................................................................................. 56

5.4 Laboratory Studies .................................................................................. 56

5.5 Rehabilitation Services ............................................................................ 56

5.6 Equipment & Supplies .............................................................................. 57

5.7 Environmental Modifications & Essential Services ............................... 58

5.8 Nursing & Attendant Care ....................................................................... 59

5.9 Acute Care Services .................................................................................. 59

**6    Cost/Vendor Survey** ................................................................................................. **60**

6.1 Methods, Definitions & Discussion ......................................................... 60

6.2 Cost Data/Vendor Sample ....................................................................... 66

**7    Cost Analysis** ............................................................................................................... **81**

7.1 Definition & Discussion of Quantitative Methods ................................. 81

7.2 Summary Restatement of Central Opinions ............................................ 83

7.3 Quantitative Summary of Future Medical Requirements ..................... 85

7.4 Categorical Quantification of Future Medical Requirements ............... 87

**8    Exhibits** ...................................................................................................................... **177**

# 1   Overview

## 1.1   Executive Summary

This Life Care Plan (this "Report") has been prepared for Mr. Javier Tapia, a 41-year-old, right-hand dominant male who suffered injuries associated with left lower extremity phlegmasia cerulea dolens (acute extensive venous thrombosis) reported to have been diagnosed on October 1, 2018.

The total nominal value of Mr. Tapia's future medical requirements, as formulated in this life care plan, and which pertain to his relevant diagnostic conditions and disabilities = $2,452,449.51.[1]

| Mr. Tapia's Future Medical Requirements | Nominal Value | Percentage |
|---|---|---|
| Physician Services | $99,257.55 | 4.05% |
| Routine Diagnostics | $16,177.28 | 0.66% |
| Medications | $208,595.88 | 8.51% |
| Laboratory Studies | $7,482.46 | 0.31% |
| Rehabilitation Services | $81,456.76 | 3.32% |
| Equipment & Supplies | $694,902.50 | 28.34% |
| Environmental Modifications & Essential Services | $44,400.00 | 1.81% |
| Nursing & Attendant Care | $1,197,175.20 | 48.82% |
| Acute Care Services | $103,001.88 | 4.20% |
| **Total** | **$2,452,449.51** | **100%** |

## 1.2   Life Care Planning & Life Care Plans

### 1.2.1   Life Care Planning

Life care planning is a process of applying objective methodological analysis to formulate diagnostic conclusions and opinions regarding physical and/or mental impairment and disability for the purpose of determining care requirements for individuals with permanent or chronic medical conditions.

According to the tenets, methods and best practices advocated by the American Academy of Physician Life Care Planners, a life care planner's primary objective is to achieve the Clinical Objectives of Life Care Planning by answering the Basic Questions of Life Care Planning.

**The Clinical Objectives of Life Care Planning**:

1.   Diminish or eliminate physical and psychological pain and suffering.

2.   Reach and maintain the highest level of function given an individual's unique circumstance.

---

[1] Nominal value represents the value of Mr. Tapia's future medical requirements expressed in current market prices ("today's dollars"); i.e. nominal value does not account for inflation or discounts, nor does it quantify the time value of money.

3. Prevent complications to which an individual's unique physical and mental conditions predispose them.

4. Afford the individual the best possible quality of life in light of their condition[2].

**The Basic Questions of Life Care Planning:**

1. What is a subject's condition?

2. What medically-related goods and services does a subject's condition require?

3. How much will the medically-related goods and services cost over time?[3]

## 1.2.2  Life Care Plans

Life care plans are comprehensive documents that objectively identify the residual medical conditions and ongoing care requirements of ill/injured individuals, and they quantify the costs of supplying these individuals with requisite, medically-related goods and services throughout probable durations of care.

The content and structure of a life care plan, and the methods used to produce it, are based upon comprehensive assessments, interviews and/or examinations, research and analysis, and published methodologies and standards of practice.

Life care plans are objective works that provide material evidence regarding the existence, significance and validity of an individual's medical conditions.  They provide litigators, insurance companies, trusts and courts with a qualified, quantitative, and referenceable basis upon which to assess and substantiate the monetary value of an individual's future medical needs.[4]

## 1.3  Methodology

This life care plan has been formulated in accordance with the Tenets, Methods, and Best Practices advocated by the American Academy of Physician Life Care Planners.  This published, reliable, and regularly employed peer-reviewed methodology is widely accepted within the discipline of life care planning; and it has been reliably employed in thousands of state and federal court cases throughout the United States.

---

[2] American Academy of Physician Life Care Planners, A Physician's Guide to Life Care Planning: Tenets, Methods, and Best Practices for Physician Life Care Planners, American Academy of Physician Life Care Planners, Austin, Texas, 2017.

[3] American Academy of Physician Life Care Planners, A Physician's Guide to Life Care Planning: Tenets, Methods, and Best Practices for Physician Life Care Planners, American Academy of Physician Life Care Planners, Austin, Texas, 2017.

[4] Gonzales JG, Zotovas A. Life Care Planning: A Natural Domain of Physiatry. PM&R: the Journal of Injury Function and Rehabilitation. 2014; Volume 6, Issue 2, 184 – 187

Training in the methodology advocated by the American Academy of Physician Life Care Planners has been reviewed by the International Commission on Health Care Certification (ICHCC), the certifying body which governs the Certified Life Care Planning Certification (CLCP™), the oldest and most widely held certification in the field of life care planning.  Further, the ICHCC peer-reviews and accepts life care plans which employ the methodology advocated by the American Academy of Physician Life Care Planners for purposes of awarding CLCP™ Certification to CLCP™ Certification Candidates. The ICHCC also affords ICHCC Continuing Education Units (CEUs) to CLCP™ Certification Holders who receive methodological and clinical education from the American Academy of Physician Life Care Planners.

Training in the methodology advocated by the American Academy of Physician Life Care Planners is also reviewed and accepted by the American Medical Association (AMA), in conjunction with the Accreditation Council for Continuing Medical Education (ACCME), and the University of Texas Health Science Center of San Antonio. The AMA affords its highest level Continuing Medical Education Credits (CME Credits) to licensed physicians who receive methodological and clinical training and education from the American Academy of Physician Life Care Planners.

Further, training in the methodology advocated by the American Academy of Physician Life Care Planners is reviewed and accepted by the Certified Physician Life Care Planner Certification Board (CPLCP™ Certification Board).  The CPLCP™ Certification Board affords Continuing Education Credits (CE Credits) to CPLCP™ Certification Holders who receive methodological and clinical education from the American Academy of Physician Life Care Planners.

Both plaintiff and defense bars in the United States have awarded Continuing Legal Education Credits (CLE Credits) to their members who have received education and training pertaining to the tenets, methods and best practices advocated by the American Academy of Physician Life Care Planners.

## 1.4    Biography of Author

Dr. Hans Carlson is a Physical Medicine & Rehabilitation, and Electrodiagnostic Medicine Specialist who has practiced medicine since 1992.

Dr. Carlson is a licensed physician in the state of Oregon, and he is certified by the American Board of Physical Medicine & Rehabilitation and the American Board of Electrodiagnostic Medicine.  He is also a Certified Life Care Planner™ (CLCP™), as designated by the International Commission on Health Care Certification, and he is a Certified Physician Life Care Planner™ (CPLCP™), as designated by the Certified Physician Life Care Planner Certification Board.

Dr. Carlson's professional career includes clinical, hospital, and academic appointments at institutions including: Oregon Health & Sciences University, Providence St. Vincent's Medical Center, Tuality Healthcare, and the University of Illinois at Chicago Medical Center.

Dr. Carlson's professional associations include the American Academy of Physical Medicine & Rehabilitation, the American Academy of Physician Life Care Planners, and the American Association of Neuromuscular and Electrodiagnostic Medicine.

Dr. Carlson earned a Doctor of Medicine from Oregon Health & Science University in Portland, and a Bachelor of Arts in Mathematics from Willamette University in Salem, Oregon.

In addition to practicing clinical physiatry, Dr. Carlson is a prolific lecturer and author on topics of Physical Medicine and Rehabilitation, Electrodiagnostic Medicine, and Musculoskeletal Medicine.

## 1.5    Physician Life Care Planning

Physician Life Care Planning (PLCP) is a healthcare information services company headquartered in San Antonio, Texas.  PLCP produces case-specific, physician-directed life care plans, vocational evaluations, economic damages assessments, and other high quality damages valuation services throughout the United States.

PLCP physicians have extensive clinical experience and are Board Certified in the field of Physical Medicine and Rehabilitation (Physiatry), and/or other relevant medical specializations.

According to the *Life Care Planning and Case Management Handbook*:

> "*For a life care plan to appropriately provide for all the needs of an individual, the plan must have a strong medical foundation.  Physicians specializing in physical medicine and rehabilitation (physiatrists) are uniquely qualified to provide a strong medical foundation for life care planning based on their training and experience in providing medical and rehabilitative services to individuals with disabilities. Physiatrists are, by their training, experienced in dealing with individuals who have catastrophic functional problems.  Additionally, physiatrists are trained to anticipate the long term needs of their patients.*" [5]

Physiatrists are experts in the medical and physical treatment of disabling illness and injury (Law, 2014)[6], and have long been recognized as uniquely qualified among medical specialists to provide the scientific and medical foundations essential to the development of life care plans (Lacerte, 2013).[7]

Associate physicians at Physician Life Care Planning have extensive experience diagnosing and treating patients with a wide variety of complex diagnostic conditions (impairments) and disabilities.  They also engage in long-term medical and rehabilitative care and disability management.

Many of PLCP's associate physicians are Certified Life Care Planners (CLCP), as designated by the International Commission on Health Care Certification, and Certified Physician Life Care Planners (CPLCP), as designated by the American Academy of Physician Life Care Planners.  PLCP Physicians stay abreast of topics involving life care planning, and relevant developments within their respective specialties.  At times during the course of their duties, they may consult with other medical and therapeutic specialists.

---

[5] Bonfiglio, R. P. (2010). The Role of the Physiatrist in Life Care Planning. In R. O. Weed and D. E. Berens (eds.), *Life Care Planning and Case Management Handbook* (3rd ed., pp. 17–25). Boca Raton, FL: CRC Press.

[6] Law CR, Dennis MJ, The Role of the Pediatric Physiatrist in Life Care Planning. In: Riddick-Grisham S, Deming LA. Pediatric Life Care Planning and Case Management, Second Edition. Boca Raton, FL. CRC Press; 2011, 91 95.

[7] Lacerte, M, Johnson, CB. Preface. In: Physical Medicine and Rehabilitation Clinics of North America, Clinics Review Articles: Life Care Planning, Volume 24, Number 3. Philadelphia, PA: Elsevier, 2013.

## 1.6    Context: A Catastrophic Life Care Plan for Mr. Javier Tapia

1.  It is my hope this life care plan will serve as a guide for Mr. Tapia, and/or his family, case managers and health care providers.  This life care plan has been formulated to provide optimal medical care in an effort to accomplish the Clinical Objectives of Life Care Planning.

2.  This life care plan employs an anticipatory (preventative) model of care, and its formulation relies upon reasonable degrees of medical probability.  It should be understood, this life care plan is not a prescription for care.  Rather, it represents a logical model of care which anticipates the medically-related goods and services that will likely be required by Mr. Tapia throughout his probable duration of care.  This life care plan may be utilized as a case management tool, and for the purpose of substantiating appropriate medically-related financial reserves.

3.  My best effort has been made to consider and utilize all past medical, social, psychological, educational, vocational, and rehabilitation data to the extent they are available and applicable.  When possible, the goals and desires of Mr. Tapia and/or his family are expressed within this life care plan, if they are known, and if I believe they support his best interests.  To accomplish the Clinical Objective of Life Care Planning, I have relied upon my education, training, skill, and professional experience as a practicing physician, Board Certified Physical Medicine & Rehabilitation Specialist, Board Certified Electrodiagnostic Medicine Specialist, Certified Life Care Planner™, and Certified Physician Life Care Planner™.

4.  Consideration has been afforded to prospective phase changes due to aging and the progression of Mr. Tapia's relevant diagnostic conditions and disabilities.  Employing an anticipatory/preventative model of care, I have also considered probable complications likely to be associated with Mr. Tapia's diagnostic conditions, disabilities and/or comorbidities.

5.  This Life Care Plan presumes that optimal medical care positively affects life expectancy and overall health outcomes for individuals with lifelong and/or long-term medical conditions, as optimal medical care is presumed to mitigate many potential risk factors and complications associated with Mr. Tapia's known medical conditions.

6.  I consider all future medical requirements in this Life Care Plan's Cost Analysis medically necessary, and I consider them specifically attributable to the medical conditions which resulted from Mr. Tapia's neglect, with October 1, 2018 admission for extensive left lower extremity thrombosis and subsequent amputation.

7.  It is my opinion Mr. Tapia will have lifelong disfigurement, progressive symptoms, as well as, physical and psychological impairments and disabilities, which require lifelong medical care.

8.  It is my professional medical opinion that Mr. Tapia's diagnostic conditions and consequent circumstances will adversely impact his vocational and avocational activities and opportunities, as well as his and his family's general quality of life.

The opinions and conclusions expressed herein reflect my opinions and conclusions at the time this Life Care Plan was prepared.  I hereby expressly reserve the right to modify and/or amend my opinions and/or conclusions should additional information become available, or should it become necessary for me to supplement and/or update this Report in the future, or should I have an opportunity to perform an in-person interview and examination of Mr. Tapia.

Please do not hesitate to contact me if you have any questions.

Hans L. Carlson, MD, FAAPMR, CLCP™, CPLCP™
Board Certified Physical Medicine & Rehabilitation
Board Certified Electrodiagnostic Medicine
Certified Life Care Planner™
Certified Physician Life Care Planner™

## 2   Summary of Records

This Summary of Records ("Summary") is a chronological synopsis of Mr. Javier Tapia's medical records, and other relevant documents, presented first by facility, and then by treating physicians and/or other relevant medical personnel.

For the purpose of determining Mr. Javier Tapia's diagnostic conditions and consequent circumstances, I have reviewed and considered the medical records and/or other records summarized herein.

### 2.1   Summary of Medical Records

### 2.1.1   Sources

1. **NaphCare, Inc. (Medical) - Tacoma, Washington**

   Ashley Valencia Chalk, R.N.

   Miguel Balderrama, M.D.

   Dimita Smith, R.N.

   Christie Steele, N.P.

2. **Tacoma General Hospital (Medical & Billing) - Tacoma, Washington**

   Tod E. Wurst, M.D.

   Nicholas D. Garcia, M.D.

   Aditya P. Sunidja, M.D.

   Aml Raafat, M.D.

   Lucas P. Labine, M.D.

   Ashley M. Pearson, R.N.

   Roger H. Liu, M.D.

   Justin Robert Waters, M.D.

   Leslie A. Linares-Hengen, M.D.

   Charles Leusner, M.D.

   Brandon W. Propper, M.D.

   Cindy P. Ha, M.D.

3. **Washington Corrections Center (Medical) - Shelton, Washington**

   W. Rollins, M.D.

   Mark A. Wentworth, M.D.

   W. McMullum, D.D.S.

4. **Stafford Creek Corrections Center (Medical) - Aberdeen, Washington**

   J. Hoag, D.D.S.

   Scott M. Light, P.A.-C.

   T. St. Germain, L.P.N.

   Gilliver, P.A.-C.

   L. Blattner, A.R.N.P.

   L. Prieto, Psy.D.

   B. Bobek, M.D.

   J. Richards, L.P.N.

   Prasolova, R.N.

5. **TRA Medical Imaging (Medical) - Tacoma, Washington**

   Anand Suresh, M.D.

6. **Hanger Clinic (Medical & Billing) - Olympia, Washington**

   Cerise Knakal, L.C.P.O.

   Justin Williams, L.C.P.O.

7. **RubiconMD (Medical) - Olympia, Washington**

8. **Department of Corrections Washington State (Medical) - Tumwater, Washington**

   Richard Bowers, S.U.D.P.

9. **St. Joseph Medical Center (Medical) - Tacoma, Washington**

   Thomas Vascik, P.A.C.

   Aaron C. Laird, M.D.

### 2.1.2   Chronological Synopsis of Medical Records

- **October 1, 2018:** Mr. Javier Tapia was seen by **Ashley Valencia Chalk, R.N.** with **NaphCare** (Records did not indicate name of attending physician), who indicated she was asked to see Mr. Tapia by unit officer for c/o "toes turning black."  Ms. Chalk noted Mr. Tapia was brought to clinic via wheelchair.  Examination revealed left foot was slightly swollen and severely discolored, and Mr. Tapia was non-verbal and did not answer questions.  Ms. Chalk indicated Mr. Tapia was reported as having pain but did not recall what happened or when.  Ms. Chalk indicated per provider, M. Balderrama and I. Hughes, Mr. Tapia was referred to Tacoma General ED.

- Mr. Tapia was seen by **Miguel Balderrama, M.D.** with the nursing staff.  Dr. Balderrama indicated Mr. Tapia had evidence of possible vascular deficits on his left foot with edema and needed ER evaluation for possible emergent surgical management.

- Upon arrival to the Emergency Department of **Tacoma General Hospital**, Mr. Tapia presented for evaluation of left foot swelling, pain, and discoloration which began about 1-2 weeks prior and had been gradually worsening.  Records indicate Mr. Tapia had reportedly been in jail since June and had been having foot pain for a while but just told jail staff that day about the pain.  Records indicate Mr. Tapia was unsure if he had a fever but had been unable to walk for a while, although he could not remember the exact time that he had been unable to walk due to the left foot symptoms.  Records indicate Mr. Tapia was not on any anticoagulation.  Mr. Tapia stated his left foot pain was severe and he had not tried medications for pain.  Mr. Tapia denied a history of similar symptoms in the past.  Records indicated HPI was limited by the fact that Mr. Tapia was a very poor historian, minimally cooperative and would not answer many questions.  Examination revealed Mr. Tapia was anxious appearing, minimally cooperative with exam, mildly tachycardic, left calf and foot swollen, left forefoot and all toes were cold with bluish/black discoloration, erythema of the proximal foot and lower leg, a very faint DP pulse palpable, the foot was diffusely tender, and Mr. Tapia was able to lift lower extremity against gravity at knee, unable to flex or move at ankle.  X-rays of the left foot (ordered by Lyndsey Deleon, M.D. and interpreted by **Tod E. Wurst, M.D.**) revealed moderate diffuse soft tissue swelling over the forefoot, a mild amount of soft tissue swelling about the mid-foot, underlying skeletal structures appeared intact without acute fracture or dislocation seen, and no significant foot deformities, and the impressions revealed moderate diffuse soft tissue swelling of the forefoot and lesser degree the mid-foot region, no radiopaque foreign bodies were detected, and no acute fracture or dislocation left foot identified.  Vascular ankle/brachial index with PPG (ordered by Lyndsey Deleon, M.D. and interpreted by **Nicholas D. Garcia, M.D.**) revealed resting right ABI was 1.0 which indicated normal arterial perfusion, resting left ABI was 0.93 which indicated normal arterial perfusion, triphasic waveform at ankles bilaterally, right digit pressures pulsatile bilaterally, left 1st toe digit was pulsatile, 3rd, 5th toes were pulsatile, left 2nd digit with flattened, and left 4th digit was flattened flow.  Vascular venous duplex of left extremity (ordered by Lyndsey Deleon, M.D. and interpreted by Dr. Garcia) revealed subacute DVT of left common femoral vein, femoral vein, popliteal vein, posterior tibial vein, peroneal vein, left gastrocnemius vein with acute DVT, left greater saphenous vein and left lesser saphenous vein occluded with subacute superficial thrombophlebitis, and right common femoral vein was patent.  A CT of the left lower extremity (ordered by Lyndsey Deleon, M.D. and interpreted by

**Aditya P. Sunidja, M.D.**) revealed soft tissue swelling surrounding the left foot, with otherwise no soft tissue air or radiopaque foreign body, small calcaneal spur/enthesophyte at the Achilles tendon insertion, and bony structures otherwise appear intact, with no evidence for fracture, dislocation/malalignment, bony erosion/destruction, or other acute bony abnormality, and an impression revealed soft tissue swelling, with otherwise no evidence for osteomyelitis or other acute bony abnormality at that time. Labs revealed high WBC (17.81), abs neuts (14.55), abs immature grans (0.31), abs monos (1.38), immature grans (171), lactate (2.1), BUN (110), creatinine (1.65), bilirubin total (1.8), glucose (133), SGOT/AST (48), and CK (1,081) and low platelet (113), GFR non-African American (47), GFR African American (57), A:G ratio (1.0). Mr. Tapia was provided impressions of left foot cellulitis and gangrene, acute renal failure, non-severe sepsis, and elevated CK. Mr. Tapia was admitted to med/surg in guarded condition, recommended IV fluids, pain control, antibiotics, follow up cultures, follow up vascular surgery consult, follow up vascular studies, and continued monitoring.

- Mr. Tapia had an ACSS consultation with **Aml Raafat, M.D.** for gangrene/infection of foot and concern regarding necrotizing fasciitis. Dr. Raafat noted Mr. Tapia was incarcerated since June 2018. Dr. Raafat indicated Mr. Tapia was a poor historian and presented with approximately 7 day history of foot and leg pain, gangrene of toes noted in ED. Dr. Raafat noted Mr. Tapia had fever possible prior to admit and had no fever in ED. Dr. Raafat noted Mr. Tapia's creatinine elevated to 1.65, CK was 1,000, and Na was 135. Dr. Raafat noted vascular surgery was also consulted. Examination revealed sickly appearance, lying in bed tremulous, cool LLE from below knee to foot, (temp change just below knee), LLE - swelling of calf to foot with black gangrenous skin changes of entire forefoot and all toes, Mr. Tapia was unable to move toes, cold forefoot, cool hindfoot and lower calf, calf mildly swollen and tender to touch, no streaking of cellulitis up the leg though the calf was mildly erythematous, palpable PT, faint DP on left, he was able to move leg but not toes, could move slightly at ankle, sensory deficit at forefoot, and sensation preserved in hind foot. Dr. Raafat reviewed x-rays of the left foot, venous duplex of left LE, and labs performed on October 1, 2018. Dr. Raafat provided assessments of LLE with venous outflow obstruction, likely cellulitis/erythema related to vascular outflow causing inflow issue as well, and possible phlegmasia cerulea dolens with gangrene - likely to need anticoagulation/embolectomy. Dr. Raafat indicated Mr. Tapia had no evidence for necrotizing fasciitis or compartment syndrome. Dr. Raafat agreed with vascular surgery consult. Dr. Raafat indicated Mr. Tapia likely to need tissue debridement at later date, deferred to vascular surgery. Dr. Raafat indicated no intervention per general surgery and discussed with Dr. Shah.

- Mr. Tapia had a Vascular consultation with Dr. Garcia, who indicated Mr. Tapia presented with foot problem - left gangrenous foot, cool to touch, unable to palpate pedal pulses. Dr. Garcia noted Mr. Tapia was escorted by officers from jail. Dr. Garcia noted Mr. Tapia with a history of IVDU and was presently incarcerated. Dr. Garcia noted Mr. Tapia had a poor memory and was unable to provide accurate timeline of issues with left foot, but had at least 2 weeks, possibly up to 1 month of left leg pain and inability to walk on leg. Dr. Garcia noted Mr. Tapia also had left leg paralysis of unclear duration but likely over a week per his limited history. Dr. Garcia noted Mr. Tapia had had arterial study noting normal arterial circulation left leg, his digit ppg note flattening of 2 digits, he had extensive DVT of left leg of all named vessels of left leg, and his study noted dilated veins, but clot appeared subacute and indeterminate age of clot. Dr. Garcia indicated Mr. Tapia told guards that day that he had left foot pain and showed guards left foot

was discolored blue/black and was brought to ER for evaluation.  Dr. Garcia indicated guards that were with Mr. Tapia that day stated Mr. Tapia had change last month and became more confused and need to be transferred to "old jail" which involved living alone and more supervision for individuals unable to be in general population.  Dr. Garcia noted Mr. Tapia's creatine was 1.6, BUN was 110, and CK was 1,000.  Examination revealed disheveled appearance, Mallampati score was 2, carotid - bruit, + femoral, popliteal, DP, left calf and foot swollen, left forefoot bluish/black discoloration, left foot paralyzed, left leg hypoesthetic knee down, and venous gangrene of left foot.  Dr. Garcia independently visualized images of ABI noting normal arterial circulation and indicated left venous flow occluded femoral veins->ankle.  Dr. Garcia provided assessments of phlegmasia cerulea dolens with venous gangrene, venous compartment syndrome, and left leg paralysis of unclear duration.  Dr. Garcia indicated symptoms of unclear duration but likely weeks per Mr. Tapia limited history, recommended to continue serial CK, and start IV Heparin.  Dr. Garcia indicated if that presentation was less than 24-36 hours and potential salvage of limb/digits/function were still present then fasciotomy and consideration of catheter directed thrombolysis would be necessary.  Dr. Garcia indicated however, fasciotomy with that degree of venous occlusion and associated venous hypertension would likely be associated with significant bleeding and unreasonable to proceed given that information.  Dr. Garcia indicated if CK's after hydration continue to escalate then fasciotomy or leg amputation would need to be considered to prevent complication of rhabdomyolysis and given chronicity of symptoms and appearance and dysfunction of left foot, suspected CK might be trending down at that point and next 24 hours of CK would be necessary information for additional treatment recommendations.  Dr. Garcia indicated regarding catheter directed thrombolysis usually only helpful for acute clot <14 days, history of left leg dysfunction which might or might not be accurate suggest longer duration of venous thrombosis and also risk of catheter directed thrombolysis likely unreasonable at that point given information and paralyzed limb of unclear duration with venous gangrene and paralyzed limb.

- Mr. Tapia was evaluated by **Lucas P. Labine, M.D.**, who indicated Mr. Tapia presented with foot problem - left gangrenous foot, cool to touch, unable to palpate pedal pulses.  Dr. Garcia noted Mr. Tapia was escorted by officers from jail.  Dr. Labine indicated Mr. Tapia was incarcerated male who was a poor historian, with a past medical history significant for distant IVDU, presenting to the ED that day c/o swelling, pain, and redness of his left foot and leg, which started approximately 1-2 weeks prior.  Dr. Labine indicated Mr. Tapia was unclear of the exact timeline but stated that he had pain for "a while" and that he had to limp around for a while.  Dr. Labine indicated Mr. Tapia noted no trauma to the leg that he remembered.  Dr. Labine indicated Mr. Tapia stated that the pain was predominately in his foot, achy in quality, 8-9/10 in severity.  Dr. Labine noted Mr. Tapia had not tried any medications but had noted that wrapping it made it feel better.  Dr. Labine indicated Mr. Tapia noted no recent drug or alcohol use.  Dr. Labine noted Mr. Tapia had never had anything like that happen before and had no insight or thoughts as to what caused it.  Dr. Labine indicated further history from jail guards included Mr. Tapia had been incarcerated since June 2018, and that he was a model prisoner, including being designated "trustee" prisoner.  Dr. Labine noted a couple of weeks prior he had a dramatic change in personality, rumors among prisoners were that he drank some kind of cleaner, which he denied.  Dr. Labine indicated regardless Mr. Tapia had recently had poor memory which was a dramatic change for him.  Dr. Labine indicated after evaluation in the ED he was admitted for phlegmasia cerulea dolens of his left lower extremity, with management assistance per vascular surgery.  Examination revealed thin, tremulous tired appearing male, nervous, dental fillings

present on lower teeth but otherwise good dentition, peripheral pitting edema of the left leg with tense anterior compartments, left foot cold to touch, left pedal pulses absent, absent of obvious rashes and lesions other than his left lower extremity, fingers had spooning of the fingernails, clubbing of the fingernails, Mr. Tapia was not alert to date, remembered 1/3 items on memory testing, 2/3 with prompting, serial 75 x 1, was able to spell "world" forwards but not backwards, able to lift lower extremity against gravity at knee, unable to flex or move at ankle, hyperalgesia to left foot, sensation decreased on dorsum of left foot, left arm handcuffed to bed, unable to complete upper extremity strength, strength was 2/4 in left leg, unable to satisfactorily test DTR state of Mr. Tapia.  Dr. Labine reviewed x-rays of the left foot, venous duplex, and labs performed on October 1, 2018.  Dr. Labine provided an assessment of phlegmasia cerulea dolens of left LE, AKI, rhabdomyolysis, personality changes, and chronic conditions - history of IVDU.  Dr. Labine vascular US showed extensive clot burden, with ABI and x-rays unremarkable, no infectious process suspected, and etiology of phlegmasia cerulea dolens of left LE still unknown, with minimal history per interview.  Dr. Labine indicated that given unknown timeline, difficult to assess whether surgical/catheter intervention was necessary now versus a.m., and to what extent his limb was salvageable.  Dr. Labine indicated AKI was likely secondary to rhabdomyolysis versus prerenal (BUN/Cr), however, could consider rare etiology like vasculitis, nephrotic syndrome, etc. if that failed to improve with fluids.  Dr. Labine indicated rhabdomyolysis was secondary from soft tissue injury as above, unclear if trending upward (more acute) or downward (subacute timeline), and likely related to elevated AST, lactate, and WBC.  Dr. Labine recommended full diet, IVF - NS at 100 ml/hour, Heparin gtt, vascular to reassess the following day, plan to bridge to Warfarin per pharmacy, Morphine and Tylenol p.r.n. for pain, IV fluids, trend Cr, follow up blood cultures, and to recheck CK levels q.8.h.  Dr. Labine per guards, Mr. Tapia had been "trustee," very easy to hold a conversation with, just a few months prior, apparently reported ingestion of toxic material (cleaner of some kind?) but unconfirmed and advised to consider systemic process (rheum/vasculitis), metabolic, and vascular (hypercoagulable) and consider MRI of the brain later in admission, further workup after LE addressed.

- **October 3, 2018:**  Mr. Tapia underwent left popliteal vein access, left leg venogram, left superficial vein venoplasty 6 mm x 4 cm, and left iliac vein, left superficial femoral vein, left common iliac vein EKOS catheter 40 cm treatment length with initiation of TPA (1 mg/hour), performed by Dr. Garcia, who provided the findings of left superficial vein and popliteal vein chronically occluded requiring venoplasty to advance EKOS sheath into iliofemoral segment.

- **October 4, 2018:**  Mr. Tapia had a Wound Care consultation with **Ashley M. Pearson, R.N.** (Records did not indicate name of attending physician) for left foot wound.  Ms. Pearson indicated wound care nurse had completed a review of chart information pertinent to wound causation and healing including but not limited to, medications, laboratory values, diagnostic tests, nutrition, hydration, and mobility.  Ms. Pearson noted Mr. Tapia was in a lot of pain and did not want to touch his foot.  Ms. Pearson noted no open wounds, area of demarcation beginning to develop.  Ms. Pearson indicated she sprayed foot with Cavilon, which would keep foot dry.  Ms. Pearson indicated staff nurses were responsible for performing treatments and interventions as ordered, wound care would see Mr. Tapia at least weekly to reassess wounds and update orders as needed, recommended daily, left foot, lower leg - spray left foot with Cavilon spray, leave OTA, elevate left foot so heel was not on bed.  Ms. Pearson indicated the

goals of the treatment were to prevent infection and promote wound healing. Ms. Pearson indicated would continue to follow up with Mr. Tapia the following week. Records indicated Mr. Tapia was last seen for wound care on October 12, 2018.

- Mr. Tapia underwent left leg venous EKOS TPA catheter lytic check, left leg venogram, left iliac vein venoplasty 10 mm x 4 cm along entire length, and left superficial vein venoplasty 8 mm x 6 cm below, performed by Dr. Garcia, who provided the findings of left superficial femoral vein and left iliac vein patent and left superficial femoral vein stenosis resolved.

- **October 5, 2018:** A CT angiogram of lumbar for pulmonary embolism (ordered by Lucas P. Labine, M.D. and interpreted by **Roger H. Liu, M.D.**) revealed poor opacification of the pulmonary arteries, no filling defects were identified, the main pulmonary artery was normal in caliber, a 9 mm nodule in the right lower lobe on 13:51 was unchanged and likely benign, the lungs were otherwise clear, the heart was normal in size with no pericardial effusion, an aortopulmonary lymph node measured 1.2 cm, subcutaneous edema in the left lateral chest wall, the aorta was normal in course and caliber, and no focal bony lesions, and the impressions revealed no evidence of pulmonary emboli in the main and right and left pulmonary arteries, non-diagnostic evaluation of the segmental and subsegmental pulmonary arteries due to poor contrast opacification, essentially clear lungs, non-specific, enlarged aortopulmonary lymph node, and non-specific left chest wall subcutaneous edema.

- A CT of the head (ordered by Lucas P. Labine, M.D. and interpreted by **Justin Robert Waters, M.D.**) revealed no evidence of acute intracranial hemorrhage, transcortical infarction, or mass, the gray white differentiation was normal, no abnormality of gray or white matter, the ventricles and sulci were normal for Mr. Tapia's age, no mid-line shift, no extra-axial fluid collections, the visible vascular structures were unremarkable, mild to moderate polypoid, mucosal thickening involved the right maxillary sinus, no paranasal sinus air fluid levels, the mastoid air cells were clear, the skull base and calvarium were normal, the craniocervical junction was normal, and the orbits were unremarkable, and the impressions revealed no evidence of acute intracranial hemorrhage, transcortical infarction or mass, mild to moderate polypoid mucosal thickening within the right maxillary sinus, and no paranasal sinus air fluid levels to suggest acute sinusitis.

- A CT of the abdomen/pelvis (ordered by Lucas P. Labine, M.D. and interpreted by Dr. Liu) revealed unremarkable lung bases, the liver parenchyma was homogeneous, no focal liver lesions, normal gallbladder, spleen, pancreas, adrenal glands, and genitourinary, kidneys demonstrated no hydronephrosis or renal/ureteral stones and no focal renal lesions, the ureters were normal in course and caliber, the small and large bowel were normal in caliber without wall thickening or inflammatory changes, no masses were identified, the appendix was normal, the left inguinal and external iliac chain lymph nodes were mildly enlarged and enhancing, the abdominal aorta and IVC were normal in caliber, the left external iliac vein was small in caliber in comparison to the right side and slightly more hypodense, abdominal wall/peritoneal cavity demonstrates no free air, a trace amount of free fluid in the pelvis, mesenteric edema was diffuse, a tiny, fat containing right periumbilical hernia, the left thigh was enlarged due to severe, extensive subcutaneous edema, the edema extended into the deep compartments of

the anterior proximal thigh, the edema also extended into the left hernia and inguinal regions, the extensive subcutaneous edema coursed superiorly along the lateral abdominal and chest walls, no discrete, rim enhancing fluid collections were identified, the left iliopsoas muscles were asymmetrically enlarged, no subcutaneous gas, and no focal bony lesions, and the impressions revealed no masses to suggest a primary malignancy, no extrinsic compression of the left iliac veins, smaller caliber of the left external iliac vein and relatively decreased contrast within the left external iliac vein, which might be due to decreased flow secondary to known deep venous thrombosis in the left lower extremity, extensive subcutaneous edema in the left thigh, involving the deep compartment of the left proximal anterior thigh, and extending into the left perineal and inguinal regions as well as superiorly in the lateral abdominal and chest walls, which might represent infection/cellulitis, no subcutaneous gas or abscess, enlarged left iliopsoas muscles, likely representing myositis, non-specific, diffuse mesenteric edema, and enlarged, enhancing left external iliac chain and inguinal lymph nodes, possibly reactive.

- **October 8, 2018:** Mr. Tapia had an Infectious Disease consultation with **Leslie A. Linares-Hengen, M.D.** for phlegmasia cerulea dolens. Dr. Linares-Hengen indicated Mr. Tapia was admitted on October 1, 2018, with worsening left foot achy pain, 8/10 in severity, worse with manipulation of foot, redness and setting for at least 2 days prior to admission. Dr. Linares-Hengen noted Mr. Tapia had remote history of IVDU but had been incarcerated since June 2018. Examination revealed marked edema left lower extremity, left foot with black gangrenous toes, marked edema, bullae formation with serous discharge, and patchy erythema/induration along left leg extending to left flank. Dr. Linares-Hengen reviewed CT of the LLE and arterial doppler performed on October 1, 2018, CT of the abdomen/pelvis and CTA of the chest performed on October 5, 2018, and labs performed on November 8, 2016, and from October 1, 2018 to October 8, 2018. Dr. Linares-Hengen provided impressions of phlegmasia cerulea dolens of left lower extremity awaiting left BKA, massive inflammatory process to be expected given extent of thrombosis, left flank induration probably related to massive left lower extremity DVT, if superinfected, would expect Gram-positive infection rather than resistant Gram-negatives, possible left iliopsoas myositis, again most likely a gram-positive infection, rhabdomyolysis, resolving, and history of injection drug use, but had been incarcerated since June 2018. Dr. Linares-Hengen indicated Clindamycin would cover anaerobes and help limit toxin production. Dr. Linares-Hengen ordered Procalcitonin, and recommended to collect aerobic and anaerobic cultures of discharge from foot, begin Clindamycin 900 mg IV every 8 hours, begin Cefazolin 2 g IV every 8 hours, continue Vancomycin until MRSA ruled out, stop Piperacillin/Tazobactam, and follow blood cultures.

- A non-vascular ultrasound of the left lower extremity (ordered by Chrystal Buchanan, P.A.-C. and interpreted by **Charles Leusner, M.D.**) revealed edema interdigitated throughout the subcutaneous tissues without abscess or drainable fluid collection and an impression revealed edema.

- **October 10, 2018:** Mr. Tapia underwent guillotine amputation of the left lower extremity, performed by **Brandon W. Propper, M.D.**, who provided a finding of necrotic tissue in the distal foot with healthy appearing tissue in the ankle itself.

- **October 15, 2018:** Mr. Tapia had a Physical Therapy evaluation for impaired mobility and was provided a treatment plan, which included therapy 1 x/day for 5-7 days/week with short-term goals of bed mobility to EOB with no assist, sit to stand with front wheeled walker and no assist, transfers with front wheeled walker and no assist, ambulating 100 feet with front wheeled walker with no assist, and propel manual wheelchair 200 feet with no assist to be achieved by hospital discharge, and a long-term goal of Mr. Tapia would maximize level of mobility within the safety limits to be achieved by 1 month. Records indicate Mr. Tapia was last seen for physical therapy on October 22, 2018.

- **October 16, 2018:** Mr. Tapia underwent left below knee amputation, performed by **Cindy P. Ha, M.D.** without complications. The findings revealed healthy viable muscle and tissue and formalization of left below knee amputation.

- **October 18, 2018:** Mr. Tapia had an Occupational Therapy evaluation for self-care deficit and was provided a treatment plan, which included therapy 1 x/day for 5-7 days/week. Records indicate Mr. Tapia was last seen for occupational therapy on October 22, 2018.

- **October 22, 2018:** Mr. Tapia was discharged to Pierce County Correctional Facilities in stable condition by Dr. Labine, who provided discharge diagnoses of phlegmasia cerulea dolens of left lower extremity, status post guillotine amputation of left ankle, then BKA of left lower extremity, rhabdomyolysis, and related AKI - resolved, uremia - resolved, acute metabolic encephalopathy - resolved, hypercoagulability with increased factor VIII, thrombocytosis, chronic normocytic anemia, severe malnutrition, history of reported paranoid schizophrenia, and history of IV drug use. Dr. Labine provided instruction on wound care, pain medication management, continued Warfarin bridging with Lovenox until INR therapeutic, and continuation of antibiotics until October 24, 2018, recommended full diet, with boost supplements as needed to ensure nutrition, to continue LMWH until therapeutic, continue Warfarin (Coumadin) 5 mg 1 tablet by mouth once daily, to be titrated to achieve INR between 2-3, continue PT, continue Morphine (MS Contin, Oramorph SR) 15 mg Tbcr 1 tablet by mouth every 12 hours for 7 days for breakthrough pain, continue Oxycodone (Roxicodone) 5 mg 1-2 tablet by mouth every 6 hours as needed for severe pain for up to 4 days, continue Gabapentin (Neurontin) 300 mg 1 capsule q.a.m., 1 q.afternoon, and 2 capsules at bedtime for 3 days, then 1 cap q.a.m., 2 q.afternoon, and 2 capsule at bedtime for 3 days, then 2 cap t.i.d., continue Cephalexin (Keflex) 500 mg 1 capsule by mouth 4 times daily for 2 days, start taking Acetaminophen 500 mg (Tylenol) 2 tablets by mouth 4 times daily, Enoxaparin (Lovenox) 100 mg/1 ml injection 1.05 ml into the skin once daily, Melatonin 3 mg 1 tablet by mouth at bedtime, Polyethylene Glycol (MiraLAX) 1 packet by mouth once daily, Senna-Docusate (Senokot-S) 8.6-50 mg 1 tablet by mouth twice daily, and advised outpatient follow up with heme/oncology and outpatient follow up with Dr. Ha in Vascular Surgery on November 12, 2018.

- Dr. Balderrama issued a note indicating Mr. Tapia arrived that day from hospital management. Dr. Balderrama indicated Mr. Tapia had left BKA due to vascular complications. Dr. Balderrama indicated pain medications as well as antibiotics (Keflex) and anticoagulation management medications restarted. Dr. Balderrama indicated Mr. Tapia would have INR that week, would continue to monitor him, and advised to follow up with hematology as well as with vascular surgeon per hospital documentation.

- **October 23, 2018:** Mr. Tapia was administered Lovenox injection at NaphCare by Ms. Chalk.

- **October 24, 2018: Dimita Smith, R.N.** (Records did not indicate name of attending physician) issued a note indicating wound care completed as ordered after Mr. Tapia showered in medical clinic. Ms. Smith indicated Mr. Tapia verbalized to nurse that he had fallen and hit his amputation BKA stump when up to use the bathroom earlier in the morning. "I guess I was still mostly asleep when I got up to the bathroom and I forgot to lock the wheelchair." Ms. Smith indicated upon visual inspection of surgical incision of left amputation stump noted incisional wound still approximated with scant amount of serosanguineous drainage and staples and sutures intact. Records indicate Mr. Tapia was last seen for Wound Care at NaphCare on November 14, 2018.

- **October 30, 2018:** Mr. Tapia had a follow up visit with Dr. Balderrama for evaluation of episode of phlegmasia cerulea dolens that resulted in BKA of his left lower extremity. Dr. Balderrama indicated Mr. Tapia had very elevated INR last week (8) and Coumadin dose was reduced to 2.5 mg q.h.s. now, and his last INR was 1.4 on that day's visit. Dr. Balderrama indicated Mr. Tapia was not reporting new symptoms. Examination revealed wound check on site of amputation left lower extremity with staples and sutures in place, and surgical wound was clear with no evidence of infection. Dr. Balderrama provided an assessment of history of phlegmasia cerulea dolens that affected his left lower extremity and resulted on BKA. Dr. Balderrama indicated would adjust Coumadin dose that day and would recheck PT in 48 hours. Dr. Balderrama indicated Mr. Tapia had follow up appointment with vascular surgeon.

- **November 1, 2018:** Mr. Tapia had a follow up visit with Ms. Smith for contact dermatitis. Ms. Smith noted Mr. Tapia had scattered clusters of fine pinpoint sized red bumps to both antecubital areas for approximately 1.5 weeks prior. Ms. Smith indicated Mr. Tapia was complaining of onset after use of "jailhouse soap." Ms. Smith noted Mr. Tapia had pruritus/itching. Ms. Smith noted rash was not located in any other areas per Mr. Tapia. Examination revealed redness and itching. Ms. Smith provided an assessment of skin irritation. Ms. Smith recommended to apply Hydrocortisone 1% cream b.i.d. p.r.n. to affected site for 7 days if no contraindications or allergies and educated on the use of Hydrocortisone cream sparingly and use only on affected areas, not covering affected area with occlusive dressings, avoiding allergen, and submitting request to see health care provider if symptoms did not resolve in 1 week.

- **November 12, 2018:**  Mr. Tapia had an office visit with **Christie Steele, N.P.** (Records did not indicate name of attending physician), who indicated Mr. Tapia with history of right BKA and anticoagulation presented to clinic for follow up on anticoagulation.  Ms. Steele noted Mr. Tapia's INR was out of therapeutic range at 3.5 on previous check.  Ms. Steele noted Warfarin was held, Mr. Tapia did not have it for 4 days and was taking 5 mg Monday-Friday and 2.5 mg on Saturday and Sunday.  Examination revealed right below knee amputation.  Ms. Steele provided assessments of right below knee amputation and anticoagulation.  Ms. Steele indicated would restart the previous dosing and check INR on Thursday and discussed that Warfarin was impacted by food and other factors.

- **November 14, 2018:**  Mr. Tapia was evaluated by **W. Rollins, M.D.**, who indicated Mr. Tapia with right BKA was hospitalized from October 1st, with right foot osteomyelitis.  Dr. Rollins indicated Mr. Tapia had first right foot amputation followed by BKA on October 16th.  Dr. Rollins noted Mr. Tapia had phantom pain and hypersensitivity of stump.  Dr. Rollins noted Mr. Tapia was off antibiotics.  Examination revealed right knee stump, wound clean, and sutures at stump.  Dr. Rollins provided an assessment of foot osteomyelitis.  Dr. Rollins indicated wound appeared closed under tension.

- Records indicate Mr. Tapia was in Infirmary/Extended Observation Unit at **Washington Corrections Center** from November 14, 2018 to December 6, 2018.

- **November 20, 2018:**  Mr. Tapia was evaluated by **Mark A. Wentworth, M.D.** for pain in left leg stump (BKA).  Dr. Wentworth noted Mr. Tapia was amputated 1 month prior.  Dr. Wentworth provided impressions of BKA of left leg, Methamphetamine abuse, and mental health issues (PTSD).  Dr. Wentworth already requested Tacoma General Hospital and Brandon Hopper, M.D.'s records.  Dr. Wentworth ordered RPR, CBC, CMP, lipid profile, PT/INR, hepatitis panel, and HIV test.  Dr. Wentworth indicated Mr. Tapia declined HIV test and accepted hepatitis testing, and would evaluate the need for vaccination after laboratory results were reviewed.

- Mr. Tapia was seen by **W. McMullum, D.D.S.** for initial dental screening examination.  Examination revealed moderate calculus and gingivitis.  Dr. McMullum indicated oral hygiene instructions were given.

- **January 2, 2019:**  Mr. Tapia was seen by **J. Hoag, D.D.S.** for dental examination at **Stafford Creek Corrections Center**.  Dr. Hoag indicated Mr. Tapia reported no pain.  Dr. Hoag noted Mr. Tapia's INR was 2.9-3.0.  Dr. Hoag noted Mr. Tapia had blood clot and was on blood thinners.  Dr. Hoag indicated the treatment need for extractions reviewed with Mr. Tapia.  Dr. Hoag indicated Mr. Tapia requested treatment.  Dr. Hoag indicated recommended #3, #4, and #14 extraction root tips, 18(B) clean out and fill.  Dr. Hoag indicated Mr. Tapia would kite when he got his INR in range for dental 1, 5 to 20, and would schedule for extraction.  Dr. Hoag advised the next visit for extractions of root tips.

- **January 31, 2019:** Mr. Tapia had an office visit with **Scott M. Light, P.A.-C.** (Records did not indicate name of attending physician), who indicated Mr. Tapia had an unfortunate situation that occurred while he was in the county jail.  Mr. Light noted Mr. Tapia was unaware of having a factor VIII elevation.  Mr. Light indicated apparently, he developed septic blood clot in his left lower extremity and ultimately, he was hospitalized and in effort to salvage his left lower extremity were unsuccessful despite medical therapy, and considering forefoot ray amputation, and he ended up undergoing a left below the knee amputation sometime in late October or early November.  Mr. Light indicated Mr. Tapia explained that prior to going to the hospital, he had become confused and what sounded like encephalopathic.  Mr. Light noted Mr. Tapia had been on Warfarin since then and lifelong anticoagulation was recommended during the hospitalization.  Mr. Light noted Mr. Tapia still got some phantom pain and when he touched the anterior part of the stump, he felt like his calf was being pressed on.  Mr. Light indicated there was still little scab down at the stump, but otherwise, he felt like it was healing up fairly well.  Mr. Light noted Mr. Tapia had not had any problems on Warfarin and his INR had been fairly stable between 2 and 3 on 4 mg.  Mr. Light indicated Mr. Tapia got on medication for hyperlipidemia at the reception center but otherwise he considered himself fairly healthy, and he had never really had any medical problems.  Examination revealed Mr. Tapia was in a wheelchair, slightly flat affect, a below the knee amputation on the left, along the scar line, which was a sort of anterior on the stump on the lateral edge, an area of scabbed tissue, but no purulence, fluctuance, or erythema surrounding it, no particular pain to palpation though he got the phantom pain described above.  Mr. Light reviewed some of his INR results and indicated it looked like he had been fairly stable between 2.2 and 2.7 on 4 mg.  Mr. Light provided assessments of coagulopathy, fairly recent left below the knee amputation, and possible hyperlipidemia.  Mr. Light indicated Mr. Tapia was doing fairly well on Coumadin and would make that KOP at that time, recommended lifelong anticoagulation, and advised to follow up with the orthopedist, who performed the surgery, to assess the stump and determine when he was ready to proceed to fit with prosthesis, so when that recommendation was made could try to get approval for below the knee prosthesis, and he would be with them for about 5 years.  Mr. Light was concerned that there had been incomplete healing at that point, so going to get some inflammatory markers and order him some Mupirocin ointment for that unhealed area.  Mr. Light indicated would start working on all that and follow up with Mr. Tapia in about 3 months or sooner if needed.

- **February 1, 2019:** X-rays of the left knee performed at **TRA Medical Imaging** (ordered by Scott M. Light, P.A.-C. and interpreted by **Anand Suresh, M.D.**) revealed a below the knee amputation, periosteal reaction at the distal tibia and distal fibula, which could represent osteomyelitis, clinical correlation was advised, soft tissue swelling at the stump, and MRI could be helpful.

- **March 15, 2019:** Mr. Tapia had a follow up visit with Mr. Light for left stump - level III for MRI.  Mr. Light indicated Mr. Tapia stated wound much improved with Mupirocin.  Mr. Light noted Mr. Tapia still with phantom pain.  Examination of the left stump revealed 1 cm x 1 cm of scab on the lateral edge of the wound.  Mr. Light provided an assessment of the left stump BTK amputation - looked really good.  Mr. Light thought they could proceed with prosthetics consultation starting with stump shrinking.

- **April 26, 2019:**  Mr. Tapia had an office visit at **Hanger Clinic** with **Cerise Knakal, L.C.P.O.** for evaluation of a left transtibial prosthesis.  Ms. Knakal indicated Mr. Tapia was with the diagnosis of acquired absence of left leg below knee.  Ms. Knakal noted Mr. Tapia had gained 20 pounds in the past years.  Examination revealed left bulbous, ADL score of 29, function score of 16, limb strength score of 20, K-PAVET score of 65, and expected K level was K3.  Ms. Knakal provided a prosthetic assessment of the new amputee.  Ms. Knakal indicated Mr. Tapia was residing at a correctional facility where he was required to walk at variable cadence daily and ambulate over uneven terrain daily as he moved from building to building and walked outside.  Ms. Knakal indicated Mr. Tapia would have a job within the facility that might require him to lift or carry items depending on the day or the job.  Ms. Knakal indicated his jobs include walking more than 400 yards daily and actively seeking out exercise as it was available to him at the facility.  Ms. Knakal indicated occasionally, Mr. Tapia would be required to jog or walk quickly within the facility.  Ms. Knakal indicated Mr. Tapia's activity level was expected to increase again as he transitioned out of the Correction Facility and joined the civilian workforce.  Ms. Knakal indicated that 2 prosthetic sockets would be required to confirm the fit and comfort of prosthetic socket before moving to a definitive prosthesis.  Ms. Knakal indicated a flexible inner liner with a rigid outer frame was necessary for Mr. Tapia to increase the comfort of the socket fit by providing a softer interface against Mr. Tapia's limb while maintaining a rigid outer structure so the socket maintains durability and structure throughout the life of the socket.  Ms. Knakal indicated total contact was indicated to distribute pressures in the socket and limb evenly and to avoid excessive pressures along the sensitive anatomy of the residual limb.  Ms. Knakal indicated Mr. Tapia had a scar on his distal end that was healing slowly.  Ms. Knakal indicated a cushion liner with a suspension sleeve and flexible inner liner will help promote healing without risk of pistoning in the socket and slowing healing at the incision site and it would also provide comfort for Mr. Tapia's limb as it heals.  Ms. Knakal indicated due to Mr. Tapia's weight, activity level, and strength, he was in need of ultralight materials that made ambulating easier and more energy efficient while also providing a durable prosthesis that would last him for years.  Ms. Knakal indicated an alignable system was required to accommodate Mr. Tapia's anatomical alignment and allow him to ambulate safely through an efficient and stable gait pattern.  Ms. Knakal reported vertical loading was included in the foot recommendation and no need for additional components.  Ms. Knakal indicated Mr. Tapia was fit with size 2 shrinkers due to being a new amputee and having a bulbous shaped distal end and he tolerated the procedure without incident or problem.  Ms. Knakal recommended to wear the shrinkers for 2 weeks prior to being scanned for his first check socket and indicated the prosthetic components would be ordered at that time.

- **June 6, 2019:**  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia was living in a long-term care at Stafford Creek Department of Corrections and his environmental barriers included level surfaces, uneven surfaces, multilevels, linoleum, and level areas with steps.  Ms. Knakal indicated Mr. Tapia was scanned for his left transtibial prosthesis and he tolerated the procedure without incident or problem.  Ms. Knakal indicated Mr. Tapia's components would be ordered and a test socket would be fit at next appointment.

- **July 22, 2019:** Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia was fitted with Vivak test socket #1 and the modifications were necessary to improve total contact, contours, and sock ply/volume. Ms. Knakal indicated Mr. Tapia was dynamically aligned, alignment was evaluated by parallel bars, and results of alignment process were satisfactory in sagittal coronal transverse plane. Ms. Knakal indicated additional test socket was not required. Ms. Knakal indicated pretibial pads were added and distal tibia flared out to provide appropriate fit and function and the foot would need to be aligned more anterior compared to the socket for improved gait. Ms. Knakal indicated Mr. Tapia was not leaving the office on a test socket and he was ready to be scheduled for delivery of prosthesis.

- **August 6, 2019:** Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia was seen that day for delivery of his left TT prosthesis. Ms. Knakal indicated 3-5 sock ply fitted upon delivery. Ms. Knakal indicated functional goals from evaluation fully accomplished. Ms. Knakal indicated Mr. Tapia stated dissatisfactory with the fit and function of the device and he reported concern about not feeling comfortable walking without the parallel bars at that point. Ms. Knakal indicated no custom shaped protective cover to be provided and no additional supplies provided. Ms. Knakal indicated Mr. Tapia reported discomfort with walking independently at that point while he was still getting use to walking on prosthesis. Ms. Knakal noted Mr. Tapia had a tendency to scuff his toe during initial swing of the gait cycle. Ms. Knakal indicated the prosthesis was adjusted to have more flexion and/or dorsiflexion at the foot, and the prosthesis was shortened, but his steps were still inconsistent. Ms. Knakal indicated flexing the socket or dorsiflexing the foot further would have led to an excessive flexion moment at initial contact that would have been concerning, physical therapy was recommended for Mr. Tapia to help with gait training and move him away from the use of assistive devices with his prosthesis. Ms. Knakal indicated Mr. Tapia tolerated the procedure without incident or problem. Ms. Knakal advised to follow up with physician regarding use of device as directed by physician and follow up in 1-3 weeks.

- **August 21, 2019:** Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia had not been able to wear his prosthesis since the delivery due to not receiving physical therapy at that time and he was expected to receive physical therapy that week at which time his prosthesis would be provided to him by the facility. Ms. Knakal indicated 0-3 sock ply at beginning of visit and 3 sock ply at end of visit. Ms. Knakal reported replacement device was not indicated. Ms. Knakal indicated device checked for structural safety/integrity and compliance with manufacturer guidelines. Ms. Knakal indicated there were not reported concerns with the prosthesis except some discomfort due to unfamiliarity and Mr. Tapia felt as though it was too difficult to stand on his prosthesis with 100% of his weight as he walked and was hesitant to try walking without the parallel bars as he walked in the clinic. Ms. Knakal reported the alignment was adjusted to allow more plantarflexion and increased load on the foot. Ms. Knakal indicated Mr. Tapia also discovered that externally rotating his hip so his knee was not perfectly in line with his line of progression helped increase stability in the sagittal plane and he was able to walk with one hand on the parallel bars instead of 2. Ms. Knakal indicated Mr. Tapia had shown increased potential and improvement in walking at the appointment alone and he needed physical therapy to keep improving strength and balance with the prosthesis to become an effective full time user and increase his independence. Ms. Knakal indicated the prosthesis might need further adjustments that would be addressed after he had started physical therapy

and increased wear time on the prosthesis.  Ms. Knakal advised to follow up with physician regarding use of device p.r.n. and follow up in 1 month.

- **August 22, 2019:** Mr. Tapia had a Physical Therapy evaluation for stump on lower extremity and was provided a treatment plan, which included therapy follow up in 2-3 weeks and daily HEP.

- **October 11, 2019:** Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia had some discomfort while wearing the socket for prolonged periods of time and he reported the distal end of his limb had been sore and was sensitive.  Ms. Knakal indicated 8 sock ply at beginning of visit and 1 sock ply at end of visit.  Ms. Knakal indicated Mr. Tapia had visible decrease in volume of limb and increased use and function with prosthesis.  Ms. Knakal noted Mr. Tapia had decreased in limb volume and increase in activity due to the device not fitting/functioning properly.  Ms. Knakal indicated skin showed excessive pressure at distal end of limb along tibia and medial/lateral distal end, so added padding at popliteal 1/4" Aliplast and pretibial pads 1/8" Aliplast, and silicone treated Proflex inner liner.  Ms. Knakal indicated adjustment to device solved problem and Mr. Tapia reported the sensitivity in his limb was no longer painful with the addition of pads.  Ms. Knakal indicated Mr. Tapia was down to a 1 ply sock fit.  Ms. Knakal noted Mr. Tapia also walked more efficiently and did not appear to have a leg length discrepancy after the adjustments.  Ms. Knakal indicated Mr. Tapia also received a 1/8" and 1/4 insert to be added to his right shoe to accommodate a leg length discrepancy between his right and left side.  Ms. Knakal indicated device was checked for structural safety/integrity and compliance with manufacturer guidelines.  Ms. Knakal indicated Mr. Tapia's walking had improved significantly since his previous visit and he was walking well enough that it would be difficult to know he was walking with prosthesis.

- Mr. Tapia was discharged from Physical Therapy and was recommended to continue with daily independent HEP.

- **November 8, 2019:** Mr. Tapia had a follow up visit with Mr. Light, who indicated Mr. Tapia was status post below the knee amputation on the left and recently did get a prosthetic leg that he had been working with physical therapy on.  Mr. Light communicated with the physical therapist a few weeks prior, and he thought that Mr. Tapia was doing quite well with the leg and had no doubts that he would continue to progress.  Mr. Light noted Mr. Tapia still using a wheelchair for distance.  Mr. Light talked about slowly trying to use the wheelchair less and less and he was in agreement with that plan.  Mr. Light indicated Mr. Tapia remained on Coumadin for a factor VIII elevation that was discovered at the time of his incident of multiple blood clots in the left lower extremity and that would likely be lifelong anticoagulation.  Mr. Light indicated Mr. Tapia's only concern that day were some facial lesions that appeared like freckles on the bilateral cheeks and that occurred only after the last year when he had been on Coumadin.  Mr. Light noted Mr. Tapia had no history of similar lesions and no family history of similar lesions, and he was of Latin American ancestry.  Mr. Light noted Mr. Tapia had minimal sun exposure over the last year.  Examination revealed a coalescence of flat hyperpigmented small irregular lesions on the bilateral cheeks, the left BTK stump was examined, and healthy appearing stump.  Mr. Light provided diagnoses of left BTK amputation, facial lesions, and elevated factor VIII.  Mr. Light indicated facial lesions were pure like freckles, but Mr. Tapia had minimal if any sun

exposure for the past year or so, and he had never had freckles in the past and took photographs and sent a consult to Rubicon to query dermatology. Mr. Light indicated would query colleagues, and DOC or so about Canadian crutches that might assist Mr. Tapia when he was not using his prosthetic leg in trying to get away from the wheelchair and he was agreeable to that plan. Mr. Light indicated otherwise Mr. Tapia seemed to be doing really well and expect that he would continue to increase the use of his prosthetic and remain on Coumadin, which would likely be lifelong and probably follow up annually and sooner when necessary.

- **RubiconMD** Dermatologist's eConsult note indicating that based on the clinical images and history provided, the differential diagnoses included melasma, post inflammatory hyperpigmentation, drug-induced hyperpigmentation, exogenous ochronosis, or erythema dyschromicum perstans. Dermatologist requested to provide Mr. Tapia's medication list and skincare products (creams, cleansers, etc.) and that additional information could help to narrow the diagnosis. Dermatologist would like to know if Mr. Tapia had any prior rash in the affected area. Dermatologist recommended daily sun protection with a mineral (Zinc oxide or Titanium dioxide) sunscreen, to apply Hydroquinone 4% cream to affected areas b.i.d. for 3 months and follow up in 3 months.

- **November 15, 2019:** Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia had some minor pain/discomfort along the end of his limb that he reported as sensitivity after many hours of prosthetic wear. Ms. Knakal indicated 0-1 sock ply at beginning of visit and 1 sock ply at end of visit. Ms. Knakal indicated Mr. Tapia had small fluctuations in volume with increase wear of prosthesis as expected with new amputees. Ms. Knakal indicated Mr. Tapia had increased discomfort/sensitivity along distal end with long time wear of prosthesis due to device not fitting/functioning properly. Ms. Knakal added black puff and Plastazote padding at distal end and lateral condyle. Ms. Knakal indicated adjustment to device solved problem.

- **November 20, 2019:** Mr. Light issued a note indicating Mr. Tapia was taking Warfarin 3 mg daily, and Simvastatin 40 mg daily. Mr. Light indicated skin lightening agents such as Hydroquinone were not available in their department of corrections formulary. Mr. Light thought being able to give Mr. Tapia a diagnosis and expected course would be sufficient. Mr. Light indicated Mr. Tapia should be eligible for release in about 3.5 years. Mr. Light indicated it looked like anticoagulants had been implicated in drug induced hyperpigmentation. Mr. Light questioned if they were considering Warfarin as a possible cause (as that developed sometime after he started Warfarin last year), would it go away if he were put on a different anticoagulant. Mr. Light indicated of course changing anticoagulant would not necessarily be possible, because Mr. Tapia was found to have an inherited thromboembolic condition. Mr. Light indicated only other formulary option would be Rivaroxaban and had to do some checking to see if Xarelto was ok with his history.

- RubiconMD Dermatologist's eConsult note indicated Warfarin rarely caused drug-induced hyperpigmentation but, if it was contributing to Mr. Tapia's discoloration the Dermatologist recommended the topical Hydroquinone 4% cream b.i.d. for 3 months.

- **December 19, 2019:** Mr. Tapia had a follow up visit with Ms. Knakal, who indicated the proximal M/L pad had packed out slightly and was causing some instability side to side that Mr. Tapia would like to be resolved and he also had requested a stabilizing post along the lateral pretibial pad to help improve fit and stability of his limb inside the socket. Ms. Knakal noted visible decrease in limb size and shape since prosthesis delivery due to device not fitting/functioning properly. Ms. Knakal added black puff padding at stabilizing bar with lateral pretibial pad, proximal M/L pad. Ms. Knakal indicated Mr. Tapia reported the prosthesis felt snug and comfortable. Ms. Knakal reported 4-6 sock ply at beginning of visit and 3 sock ply at end of visit. Ms. Knakal indicated Mr. Tapia would require a new socket replacement soon and the adjustments had been maxed out and the life of the socket had been extended as long as possible. Ms. Knakal indicated Mr. Tapia was in 3 ply socks but was instructed to see his physician for a prescription for a socket replacement when his sock ply increased into double digits, or the socket fit was compromised due to a mismatch of size and shape compared to his limb's anatomical size and shape and he appeared to understand. Ms. Knakal advised to follow up in 3 months.

- **March 23, 2020:** Mr. Tapia had a follow up visit with Ms. Knakal for evaluation of left transtibial prosthesis and socket replacement. Examination revealed definitive prosthesis, ADL score of 40, function score of 20, limb strength score of 20, K-PAVET score of 80. Ms. Knakal indicated Mr. Tapia had significant decrease in limb size so socket no longer fits and the prosthesis prevents him from accomplishing ADLs. Ms. Knakal indicated Mr. Tapia's socket was too large causing play to occur within the socket given the thickness of the socks. Ms. Knakal indicated even with 14 ply socks; Mr. Tapia felt as though his limb was "bottoming out" in the socket causing pain along the bottom of his leg. Ms. Knakal indicated Mr. Tapia's leg had shrunk, he also had more bony prominences that were protruding through his limb more than when he was casted first. Ms. Knakal indicated PTB/TBS Hybrid socket was much too big compared to size and shape of Mr. Tapia's anatomical limb, 1/4" padding at popliteal and pretibial added and 14 ply socks worn currently. Ms. Knakal indicated suspension liner was beginning to wear beyond repair and he would need a VIP vacuum pump added for additional support. Ms. Knakal indicated Mr. Tapia was using WillowWood alpha hybrid size large liner/insert, and his limb fitted into a size medium plus and would need to be replaced with such. Ms. Knakal indicated further socket modification/adjustment would not improve socket fit or comfort, socket did not fit Mr. Tapia's due to change in residual limb, hence recommended socket replacement. Ms. Knakal indicated diagnostic prosthetic sockets would be required to confirm fit and comfort of prosthetic socket prior to moving to a definitive prosthesis. Ms. Knakal indicated a rigid, light weight, carbon fiber socket design was necessary to maintain durability and strength as Mr. Tapia walked on the prosthesis through 1,000 of steps each day, the PTB/TSB hybrid would allow an even distribution of pressures over tolerant areas of the limb and offload pressure intolerant areas of the limb, and total contact was indicated to distribute pressures in the socket and limb evenly and to avoid excessive pressures along sensitive anatomy of the residual limb. Ms. Knakal indicated a suspension sleeve and cushion liner was optimal for Mr. Tapia's comfort within the socket in addition to a vacuum suspension to provide and hold negative pressure and allow a more optimal suspension of the prosthesis on the limb through swing phases of gait. Ms. Knakal indicated Mr. Tapia had volume fluctuations throughout the day causing him to add more socks in the afternoon compared to the morning. Ms. Knakal indicated total contact also prevents verrucous hyperplasia of the distal limb. Ms. Knakal indicated due to Mr. Tapia's weight, activity level, and strength, he was in need of ultralight materials that made ambulating easier and more

energy efficient while also providing a durable prosthesis that would increase the life of the device and ultralight materials included the carbon fiber laminated into the prosthetic socket.

- **May 29, 2020:** Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia was fitted with Vivak test socket #1 and the modifications were necessary to improve total contact, contours, and sock ply/volume. Ms. Knakal indicated Mr. Tapia was dynamically aligned, alignment was evaluated by parallel bars, and results of alignment process were satisfactory in sagittal coronal transverse plane. Ms. Knakal indicated additional test socket was not required. Ms. Knakal recommended to reduce proximal A/P and M/L to provide appropriate fit and function. Ms. Knakal indicated Mr. Tapia was not leaving the office on a test socket and he was ready to be scheduled for delivery of prosthesis.

- **June 26, 2020:** Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia had 3 sock ply fitted upon delivery. Ms. Knakal indicated functional goals from evaluation were fully accomplished. Ms. Knakal indicated Mr. Tapia did not state dissatisfactory with the fit and function of the device. Ms. Knakal indicated no custom shaped protective cover to be provided and no additional supplies provided. Ms. Knakal advised to follow up with physician regarding use of device as directed by physician and follow up in 1-3 weeks.

- **July 28, 2020:** Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia reported movement of his limb in the socket along the A/P. Ms. Knakal indicated 0-3 sock ply at beginning of visit and 1 sock ply at end of visit. Ms. Knakal noted small decrease in limb volume leading to extra space in socket. Ms. Knakal indicated change in sensation and fit of socket along distal A/P due to device not fitting/functioning properly. Ms. Knakal added padding at pretibial pads to prevent movement of distal limb and indicated adjustment to device solved problem and replacement device was not indicated. Ms. Knakal advised to follow up with physician regarding use of device p.r.n. and follow up in 3 months.

- **October 14, 2020:** Mr. Tapia had a follow up visit with Mr. Light, who indicated Mr. Tapia with an LLE BTK amputation and prosthesis and came in that day for a rash, which started about 2 weeks prior on an area on the lateral side of his stump and it was worse with walking. Mr. Light noted Mr. Tapia had been doing well with his prosthesis previously up to that point. Mr. Light indicated Mr. Tapia reported that the wound was an area of friction from the prosthetic leg. Examination of left lower extremity BTK stump revealed small 0.5 mm lesion that appeared to be an unroofed blister without surrounding erythema, fluctuance, or purulence, and 2 much smaller lesions superior to that. Mr. Light provided a diagnosis of left below the knee amputation stump wound. Mr. Light indicated left below the knee amputation stump wound was secondary to the prosthesis rubbing on the lateral aspect of the proximal fibula that remained. Mr. Light recommended to use Exuderm dressing, and have nursing check that every other day to make sure it was not getting worse and advised to use his wheelchair as much as possible to avoid using the prosthesis as much as possible until they could get it fixed and would put in a consult to have him go back to Hanger to try to get that area on the socket "blown out" to avoid friction.

- **October 16, 2020:**  Records indicate Mr. Tapia was first seen for Wound Care at Stafford Creek Corrections Center and last seen on December 8, 2020.

- **October 22, 2020:**  Mr. Tapia was seen by **T. St. Germain, L.P.N.**, who indicated Mr. Tapia ambulated from unit with cane, A x O x 3, denied pain, admits to tenderness at site.  Mr. Germain noted trace clear exudate.  Mr. Germain indicated Mr. Tapia admitted that wound was continually improving and resolving.  Examination revealed 2 adjacent locations measuring 0.6 cm diameter and 0.2 cm diameter with dark pink to pink to light pink in color.  Mr. Germain cleaned the wound with normal saline dried aseptically, and applied Exuderm.  Mr. Germain indicated Mr. Tapia demonstrated understanding of keeping bandage clean, dry, intact, and agreed to continue to show for dressing changes every other day, RN at bedside to view wound.

- **January 28, 2021:**  Mr. Tapia was seen by **Gilliver, P.A.-C.** (Records did not indicate name of attending physician) in housing unit for positive COVID.  Mr. Gilliver noted Mr. Tapia was in isolation due to a positive COVID test following suspected exposure.  Mr. Gilliver Mr. Tapia denied all symptoms of COVID.  Mr. Gilliver provided a diagnosis of COVID 19 asymptomatic.

- **February 9, 2021:**  Mr. Tapia was seen by **L. Blattner, A.R.N.P.** (Records did not indicate name of attending physician) for sun irritation and blister on limb.  Ms. Blattner indicated Mr. Tapia reported he was putting more weight on his prosthetic limb the previous week due to a sprained ankle on the opposite side and he had redeveloped a "blister" on his knee where it met the prosthetic.  Ms. Blattner indicated Mr. Tapia requested more bandages to keep area covered and prevent "blister".  Examination of the lateral knee revealed approximately 1.5 cm area of ulceration, yellow sloughing wound bed, very fine line of erythema in wound margin but no surrounding erythema or edema, and slight duskiness surrounding ulcer.  Ms. Blattner provided an assessment of stage III pressure ulcer.  Ms. Blattner indicated Mr. Tapia was given non-adhesive Telfa adhesive dressing to keep area covered and instructed to stop using his prosthetic and change back to wheelchair until the area was healed or he was able to have his prosthesis refitted and follow up for new or worsening symptoms.  Ms. Blattner emailed scheduler to follow up on Mr. Tapia's outpatient consult to have prosthesis altered.

- **February 10, 2021:**  Mr. Tapia was seen by **L. Prieto, Psy.D.** to check in on mental state following cellmates suicide attempt.  Dr. Prieto indicated Mr. Tapia stated, "I'm ok, I just felt bad for him."  Dr. Prieto indicated Mr. Tapia reported he had not witnessed anything out of the ordinary for cellmate.  Dr. Prieto indicated Mr. Tapia reported cellmate often wrote in a journal stating they were song lyrics, cellmate listened to heavy metal/rock music "all day." and believed cellmate had the opportunity to commit suicide during the 2 week period.  Dr. Prieto noted Mr. Tapia was on COVID quarantine leaving cellmate alone but believed that recent act might be a "cry for help."  Dr. Prieto indicated Mr. Tapia denied suicidal ideation and/or intent.  Examination revealed Mr. Tapia ambulated with 1 prosthetic leg stating he was having some difficulty walking around in his shower shoes since his tennis shoes "were covered in blood," and mood and affect were mildly guarded, and genuinely appeared saddened for his cellmate.  Dr. Prieto indicated when queried about mental health follow up Mr. Tapia denied requiring a follow up and indicated he would submit kite as needed.  Dr. Prieto indicated at time of interview Mr. Tapia was working on putting his cell back together as it required hazmat cleaning, no

immediate concerns noted during interview, would conduct COVID isolation mental health rounds in 1 week at which time a brief check-in would be conducted, no other referrals required at that time, and he was able to advocate to get needs met.  Dr. Prieto instructed to submit kite as necessary and notify unit officer for immediate needs.

- **February 22, 2021:**  Mr. Tapia had an office visit with **Justin Williams, L.C.P.O.**, who indicated Mr. Tapia reported that he had developed an ulcer due to adverse socket pressure against his left fibular head.  Mr. Williams indicated socket required modification to offload pressure against left fibular head and advised Mr. Tapia to discontinue use of prosthesis until ulcer had fully healed and modifications could be made to offload adverse socket pressure against left fibular head.  Mr. Williams indicated would contact DOC to schedule follow up visit with Cerise Knakal, C.P.O. at their clinic to assess healing of ulcer and perform socket modifications to offload fibular head if ulcer was fully healed.

- **February 25, 2021:**  Mr. Tapia had a follow up visit with Mr. Light, who indicated Mr. Tapia with the left below the knee amputation, he went out to have his prosthetic socket adjusted, and they found him to have an ulcer right over the bony prominence of the lateral aspect of his stump.  Mr. Light indicated Mr. Tapia stated he thought he was compensating onto his prosthetic leg when he injured his ankle while playing.  Mr. Light noted Mr. Tapia was in isolation for COVID.  Mr. Light indicated Mr. Tapia stated that the prosthetist was going to simply "blowout" that portion of the socket to relieve the pressure on that spot, but that they were not allowed (due to other litigation) to do any changes while someone had an open wound.  Mr. Light asked Mr. Tapia to come back in about 3 weeks.  Examination revealed fit appearing walking well in his prosthetic leg, left stump-on the lateral bony prominence inferior from the knee there was a 0.6 x 0.6 cm ulceration that appeared to be the result of abrasion/blistering, fairly superficial.  Mr. Light provided a diagnosis of ulceration left below the knee stump.  Mr. Light recommended Hydro-cellular foam cut to fit with Medipore dressing over that, to have that seen by nursing at least 2 or 3 times a week to make sure it was improving but Mr. Tapia really did not like to come down to medical and indicated Mr. Tapia agreed to once a week checks by nursing.  Mr. Light indicated thought until Mr. Tapia's socket was modified, he should stay out of the socket/prosthetic which he was hesitant to agree to, but ultimately did agree to using his wheelchair until that was healed up.

- **March 22, 2021:**  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia had visible fibular head pressures that had caused a sore.  Ms. Knakal noted fibular head redness and skin breakdown due to device not fitting/functioning properly and device was in disrepair.  Ms. Knakal indicated 1 sock ply at beginning and end of visit.  Ms. Knakal indicated skin showed excessive pressure at fibular head skin breakdown.  Ms. Knakal removed material to reduce pressure or allow for growth at fibular head and proximal to fibular head, added padding at lateral pretibial bar to support fibular head, provided 2 x 1/8" right inserts for right shoe, and used 1/8" puff for padding inside socket, skived down.  Ms. Knakal indicated adjustment to device solved problem and replacement device indicated.  Ms. Knakal advised liner reported to have tear along threading along anterior, Mr. Tapia would bring that liner with him next to be replaced via the warranty, the item would not be replaced with something other than what was utilized, and to follow up in 1 month.

- **April 26, 2021:**  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia arrived to replace his liner serial number 112187515 under the warranty due to premature wear along the anterior threading and he also reported some skin irritation due to pressure along the distal medial aspect of his limb.  Ms. Knakal noted beginning of a pressure sore along distal medial aspect of residual limb.  Ms. Knakal indicated alignment appeared appropriate and volume/weight appeared stable.  Ms. Knakal indicated Mr. Tapia had increased skin irritation with prosthesis on due to device not fitting/functioning properly.  Ms. Knakal removed material to reduce pressure or allow for growth at distal medial socket - pressure spot tracked with lipstick transfer.  Ms. Knakal indicated adjustment to device solved problem.  Ms. Knakal indicated 1-3 sock ply at beginning and end of visit.

- **July 22, 2021:**  Mr. Tapia had a follow up visit with Ms. Knakal, who indicated Mr. Tapia requested the suspension sleeve be exchanged due to a slit into the edge along the trimline.  Ms. Knakal noted skin condition appeared healthy and device was in disrepair.  Ms. Knakal indicated device was damaged due to daily use, general wear, and wear into the gel of the suspension sleeve.  Ms. Knakal indicated DAWSkin added to trimlines to help reduce slicing through gel in suspension sleeve, repair adequately fixed the device, and the suspension sleeve being replaced did solve the issue.

- **November 18, 2021:**  Mr. Tapia had a follow up visit with Cerise Knakal Gay, L.C.P.O. for evaluation for new prosthetic supplies.  Ms. Knakal Gay indicated Mr. Tapia reported tears and cuts in his M+ liners and he was wearing his size large liners as they were the only liners available.  Ms. Knakal Gay noted Mr. Tapia's suspension sleeves both had slices through them, and his socks were beginning to show signs of wear and tear that were causing them to fall/droop when he was wearing his prosthesis.  Ms. Knakal Gay noted small blister along fibular head, excessive pressure at fibular head, and liners worn beyond repair and in need of being replaced.  Ms. Knakal Gay noted significant wear and tear in liners and wear and tear in other supplies and Mr. Tapia had increased discomfort due to ill-fitting liners.  Ms. Knakal Gay removed material to reduce pressure or allow for growth and ground into carbon at fibular head and created a channel.  Ms. Knakal Gay indicated adjustment to device solved problem and the adjustment to the carbon appeared to have improved the fit of the prosthesis and relieved the fibular head.  Ms. Knakal Gay noted tears in gel on liners and suspension sleeves due to daily use over the last year, damage was not repairable, and replacement device was indicated.  Ms. Knakal Gay indicated 1 sock ply at beginning and end of visit.  Ms. Knakal Gay advised to follow up with physician regarding use of device p.r.n. and follow up in 1 month.

- **November 30, 2021:**  Mr. Tapia had an office visit with **B. Bobek, M.D.**, who indicated Mr. Tapia with BKA and was complaining of left lateral stump abrasions. Examination revealed left lateral stump abrasion with surrounding erythema.  Dr. Bobek provided an assessment of left lateral stump abrasion with surrounding cellulitis.  Dr. Bobek recommended Keflex 500 mg p.o. for q.i.d. 5 days and nurse to see wound daily.

- **December 1, 2021:** Mr. Tapia was discharged by **Richard Bowers, S.U.D.P.** at the **Department of Corrections Washington State** and was recommended to attend LOC 1.0 outpatient treatment when he was released and back into the community.  Mr. Tapia needed to learn to set and maintain better boundaries to be successful in recovery.  Mr. Bowers indicated Mr. Tapia lost his leg while in prison and was on a prosthetic leg and using a cane to walk with because of it fitting uncomfortable.  Mr. Bowers indicated Mr. Tapia needed to continue going to medical so the prosthetic leg can be fitted comfortably, and he could be able to walk without a cane.  Mr. Bowers indicated Mr. Tapia needed to identify what emotions he experienced with each triggers/warning signs he had, so he did not relapse back into old addictive behaviors.  Mr. Bowers indicated Mr. Tapia was present for his discharge, was on time and appropriately dressed, completed three service plans with goals of increasing his knowledge of the disease of addiction and the process of recovery, having a working relapse prevention plan in place for now and when he released and back into the community, and having good support at home and good sober support outside the home.  Mr. Bowers discussed sober support within the home, and he reported his family was very supportive of his recovery efforts and sharing job opportunities.  Mr. Bowers indicated Mr. Tapia was in the preparation stage of change as he was able to identify all the negative consequences his substance use has had in his life, the changes he will make in order to live a clean and sober lifestyle, and activities he can do to help meet sober minded people.  Mr. Bowers indicated Mr. Tapia had begun to apply recovery tools to help him change thinking errors and behaviors.  Mr. Bowers indicated Mr. Tapia had good attendance and participation in group, and had been infraction free since 2014, which shows readiness to change.  Mr. Bowers recommended no use of non-prescribed mind/mood-altering substances, including alcohol and marijuana, no employment in any retail alcohol or marijuana industry unless therapeutically cleared by treating agency, self-help support groups (3 per week) and support group sponsor, enroll in and complete recommended treatment: Level 1 OP.

- **December 20, 2021:** Mr. Tapia was seen by **J. Richards, L.P.N.** (Records did not indicate name of attending physician) to check wound.  Richards indicated Mr. Tapia would like ABD.  Richards noted wound was open, 1 x 0.5 cm on outer aspect of the stump.  Richards indicated Mr. Tapia stated that the sleeve was too large and had been waiting for authorization for smaller sleeve.  Richards indicated Mr. Tapia had wheelchair in his unit.  Richards indicated Mr. Tapia was told to stop using prosthetic and to use wheelchair until he went on out trip or wound healed.  Richards educated Mr. Tapia to have officer call if redness grew or new drainage.  Richards indicated Mr. Tapia returned to his unit.

- **January 3, 2022:** Mr. Tapia had an office visit with **Prasolova, R.N.** (Records did not indicate name of attending physician) for pressure ulcer checkup.  Records indicated ulcer was measured 1 x 0.5 cm; antibiotics were prescribed (Cephalexin 500 mg 4 times per day for 14 days). Records indicated Mr. Tapia stated that ulcer appeared on the same spot several times already and every time it was taking longer and longer to heal.  Examination revealed measurements 1.1 x 0.5 cm, depth was less than 0.1 cm, red, no discharge, no edema or induration around. Records indicated an assessment was provided of impaired skin integrity (pressure ulcer). Records indicated ulcer was cleaned with NS, gently pat dried with gauze, covered with Hydrocolloid dressing, additional Hydrocolloid dressings were issued to Mr. Tapia, and

instructed to keep ulcer dry and clean, reduce the amount of direct pressure on the ulcer, and return to OPU when needed.

- **January 6, 2022:**  Mr. Tapia had a follow up visit with Ms. Knakal Gay for lower prosthetic delivery.  Ms. Knakal Gay indicated alignment was evaluated by parallel bars and results of alignment process were satisfactory in sagittal coronal transverse plane.  Ms. Knakal Gay indicated 1 sock ply fitted upon delivery.  Ms. Knakal Gay indicated functional goals from evaluation fully accomplished.  Ms. Knakal Gay indicated Mr. Tapia did not state dissatisfactory with the fit and function of the device.  Ms. Knakal indicated the socket would need to be reinforced with black epoxy as the relief ground through the socket.  Ms. Knakal advised to follow up with physician regarding use of device p.r.n. and follow up in 1 month.

- **March 16, 2022:  Thomas Vascik, P.A.C.** with **St. Joseph Medical Center**, provided a work note which indicated Mr. Tapia may return to work on March 21, 2022.

- **April 6, 2022:  Aaron C. Laird, M.D.** provided a work note which indicated Mr. Tapia may return to work on April 11, 2022, and needed to be able to remain off left leg until cleared by physician.

### 2.1.3   Noteworthy Considerations

**2.1.3.1   Diagnostics**

**October 1, 2018**

- <u>X-rays left foot</u>, moderate diffuse soft tissue swelling over the forefoot, a mild amount of soft tissue swelling about the mid-foot, underlying skeletal structures appeared intact without acute fracture or dislocation seen, and no significant foot deformities, impressions of moderate diffuse soft tissue swelling of the forefoot and lesser degree the mid-foot region, no radiopaque foreign bodies were detected, and no acute fracture or dislocation left foot identified.

- <u>Vascular ankle/brachial index with PPG</u>, resting right ABI was 1.0 which indicated normal arterial perfusion, resting left ABI was 0.93 which indicated normal arterial perfusion, triphasic waveform at ankles bilaterally, right digit pressures pulsatile bilaterally, left 1st toe digit was pulsatile, 3rd, 5th toes were pulsatile, left 2nd digit with flattened, and left 4th digit was flattened flow.

- <u>Vascular venous duplex left extremity</u>, subacute DVT of left common femoral vein, femoral vein, popliteal vein, posterior tibial vein, peroneal vein, left gastrocnemius vein with acute DVT, left greater saphenous vein and left lesser saphenous vein occluded with subacute superficial thrombophlebitis, and right common femoral vein was patent.

- <u>CT left lower extremity</u>, soft tissue swelling surrounding the left foot, with otherwise no soft tissue air or radiopaque foreign body, small calcaneal spur/enthesophyte at the Achilles tendon insertion, and bony structures otherwise appear intact, with no evidence for fracture, dislocation/malalignment, bony erosion/destruction, or other acute bony abnormality, impression of soft tissue swelling, with otherwise no evidence for osteomyelitis or other acute bony abnormality at that time.

**October 5, 2018**

- <u>CT angiogram lumbar</u>, poor opacification of the pulmonary arteries, no filling defects were identified, the main pulmonary artery was normal in caliber, a 9 mm nodule in the right lower lobe on 13:51 was unchanged and likely benign, the lungs were otherwise clear, the heart was normal in size with no pericardial effusion, an aortopulmonary lymph node measured 1.2 cm, subcutaneous edema in the left lateral chest wall, the aorta was normal in course and caliber, and no focal bony lesions, impressions of no evidence of pulmonary emboli in the main and right and left pulmonary arteries, non-diagnostic evaluation of the segmental and subsegmental pulmonary arteries due to poor contrast opacification, essentially clear lungs, non-specific, enlarged aortopulmonary lymph node, and non-specific left chest wall subcutaneous edema.

- <u>CT head</u>, no evidence of acute intracranial hemorrhage, transcortical infarction, or mass, the gray white differentiation was normal, no abnormality of gray or white matter, the ventricles and sulci were normal for Mr. Tapia's age, no mid-line shift, no extra-axial fluid collections, the visible vascular structures were unremarkable, mild to moderate polypoid, mucosal thickening involved the right maxillary sinus, no paranasal sinus air fluid levels, the mastoid air cells were clear, the skull base and calvarium were normal, the craniocervical junction was normal, and the orbits were unremarkable, impressions of no evidence of acute intracranial hemorrhage, transcortical infarction or mass, mild to moderate polypoid mucosal thickening within the right maxillary sinus, and no paranasal sinus air fluid levels to suggest acute sinusitis.

- <u>CT abdomen/pelvis</u>, unremarkable lung bases, the liver parenchyma was homogeneous, no focal liver lesions, normal gallbladder, spleen, pancreas, adrenal glands, and genitourinary, kidneys demonstrated no hydronephrosis or renal/ureteral stones and no focal renal lesions, the ureters were normal in course and caliber, the small and large bowel were normal in caliber without wall thickening or inflammatory changes, no masses were identified, the appendix was normal, the left inguinal and external iliac chain lymph nodes were mildly enlarged and enhancing, the abdominal aorta and IVC were normal in caliber, the left external iliac vein was small in caliber in comparison to the right side and slightly more hypodense, abdominal wall/peritoneal cavity demonstrates no free air, a trace amount of free fluid in the pelvis, mesenteric edema was diffuse, a tiny, fat containing right periumbilical hernia, the left thigh was enlarged due to severe, extensive subcutaneous edema, the edema extended into the deep compartments of the anterior proximal thigh, the edema also extended into the left hernia and inguinal regions, the extensive subcutaneous edema coursed superiorly along the lateral abdominal and chest walls, no discrete, rim enhancing fluid collections were identified, the left iliopsoas muscles were asymmetrically enlarged, no subcutaneous gas, and no focal bony lesions, impressions of no masses to suggest a primary malignancy, no extrinsic compression of the left iliac veins, smaller caliber of the left external iliac vein and relatively decreased contrast within the left

external iliac vein, which might be due to decreased flow secondary to known deep venous thrombosis in the left lower extremity, extensive subcutaneous edema in the left thigh, involving the deep compartment of the left proximal anterior thigh, and extending into the left perineal and inguinal regions as well as superiorly in the lateral abdominal and chest walls, which might represent infection/cellulitis, no subcutaneous gas or abscess, enlarged left iliopsoas muscles, likely representing myositis, non-specific, diffuse mesenteric edema, and enlarged, enhancing left external iliac chain and inguinal lymph nodes, possibly reactive.

**February 1, 2019**

- X-rays left knee, a below the knee amputation, periosteal reaction at the distal tibia and distal fibula, which could represent osteomyelitis, clinical correlation was advised, soft tissue swelling at the stump, and MRI could be helpful.

### 2.1.3.2   Procedures

**October 3, 2018**

- Left popliteal vein access, left leg venogram, left superficial vein venoplasty 6 mm x 4 cm, and left iliac vein, left superficial femoral vein, left common iliac vein EKOS catheter 40 cm treatment length with initiation of TPA (1 mg/hour), Dr. Nicholas D. Garcia.

**October 4, 2018**

- Left leg venous EKOS TPA catheter lytic check, left leg venogram, left iliac vein venoplasty 10 mm x 4 cm along entire length, and left superficial vein venoplasty 8 mm x 6 cm below, Dr. Nicholas D. Garcia.

**October 10, 2018**

- Guillotine amputation of the left lower extremity, Dr. Brandon W. Propper.

**October 16, 2018**

- Left below knee amputation, Dr. Cindy P. Ha.

## 2.2    Summary of Medical Records that Pre-date the Cause of Relevant Injury/Illness

### 2.2.1    Sources

1. **Pierce County Detention and Corrections Center (Medical) - Tacoma, Washington**

   Juliette Pohl-Y-Baca, P.A.-C.

   Ms. Margaret Holmes-Strand

   Ms. Sandra Pedersen

   Ms. Diana Blowers Gregory Hermsen, D.D.S.

   Mercedes Kostkas, R.N.

   Noor Aaf, P.A.-C.

   Ms. Alison Joseph

   Ms. Kendra Hanson

2. **Allenmore Hospital (Medical) - Tacoma, Washington**

   Amanda Kijac, D.O.

   Raymond K. Hung, M.D.

   Alison J. Reinbold, M.D. Jonathan M. Kell, M.D.

   Travis M. Paoli, A.R.N.P.

3. **Washington Corrections Center (Medical) - Shelton, Washington**

   Natalie Dahlgren, A.R.N.P.

   R. Brucker, D.D.S.

4. **Larch Corrections Center (Medical) - Yacolt, Washington**

   D. Lusche, P.A.-C.

   Carol Thamert, A.R.N.P.

   A.R. Anderson, D.D.S.

5. **Tacoma General Hospital (Medical) - Tacoma, Washington**

   Andrew Benefield, M.D.

   Bonnie L. Bessner, R.N.

6. **NaphCare, Inc. (Medical) - Tacoma, Washington**

Etsuko Yagi, R.N.

Lorraine Fisher, R.N.

Megan Eliasson, R.N.

Gurpreet Minhas, R.N.

Sabrina Bual, R.N.

Meghan Bailey, R.N.

Cameron Carrillo, L.P.N.

Elizabeth Warren, R.N.

## 2.2.2  Chronological Synopsis of Records

- **March 7, 2007:**  Mr. Javier Tapia had an office visit at **Pierce County Detention and Corrections Center** with **Juliette Pohl-Y-Baca, P.A.-C.** (Records did not indicate name of attending physician) for exam.  Ms. Pohl-Y-Baca indicated Mr. Tapia applied for trusty status but listed knee pain on booking sheet.  Ms. Pohl-Y-Baca indicated Mr. Tapia reported was confined in small cell at Puyallup Jail and developed knee pain secondary to confined space and had resolved since he was booked into custody and able to move around.  Ms. Pohl-Y-Baca noted Mr. Tapia had no previous knee problems or surgeries in past.  Ms. Pohl-Y-Baca indicated Mr. Tapia's exam was WNL and he cleared for trusty without restrictions and advised to follow up p.r.n.

- **March 14, 2007:**  Mr. Tapia was seen by **Ms. Margaret Holmes-Strand** for rashes on upper arms bilateral which was associated with dish soap.  Ms. Holmes-Strand noted Mr. Tapia had moved from 2D to 2C.  Examination revealed fine papules rash and itching.  Ms. Holmes-Strand provided an assessment of probable contract dermatitis.  Ms. Holmes-Strand recommended HC x 6 with instruction on application and to kite p.r.n.

- **April 13, 2007:**  Mr. Tapia was seen by **Ms. Sandra Pedersen**, who indicated Mr. Tapia worked in the warehouse and scrapped his arm on piece of metal.  Examination revealed a superficial laceration approximately 6 mm wide and 2 cm long on left wrist and minimal to no bleeding.  Ms. Pedersen provided an assessment of small superficial laceration on left wrist.  Ms. Pedersen cleansed the wound with H2O2, applied antibiotic ointment and dressing, instructed to keep it clean and dry for 24 hours, provided antibiotic ointment and Band-Aid for self-care after that, and advised to kite if any problems.

- **December 2, 2011:** Mr. Tapia had a follow up visit with Ms. Pohl-Y-Baca for back pain ongoing since 2001. Ms. Pohl-Y-Baca indicated Mr. Tapia reported used chiropractor in past and treated his pain with OTC Aleve. Ms. Pohl-Y-Baca indicated Mr. Tapia admitted to opiate abuse with last use prior to arrest on November 25, 2011. Ms. Pohl-Y-Baca indicated Mr. Tapia reported only remaining symptom was insomnia. Examination revealed tandem gait, back ROM with limited extension due to pain, and tenderness LS spine on palpation. Ms. Pohl-Y-Baca provided an assessment of LBP. Ms. Pohl-Y-Baca indicated Mr. Tapia had no reported history of stomach ulcers or GI upset with medication and recommended NSAID (Ibuprofen 600 mg) for pain for 10 days then purchase from commissary.

- **April 21, 2012:** Pierce County Detention and Corrections Center records indicate there was a telephonic encounter with Mr. Tapia. Called to booking bar, told by deputies that Mr. Tapia had stated history of Percocet use. Mr. Tapia reported he used 1-2 pills, "maybe" 3 times a week. Mr. Tapia reported the last time he stopped using, he had a lot of aches, but was using "a lot more" at the time: "I was much worse back then." Mr. Tapia stated that his last dose was 1-2 days before.

- **August 17, 2012:** Mr. Tapia was seen by **Ms. Diana Blowers** for a wound to right deltoid. Ms. Blowers noted Mr. Tapia signed ROI seen late July for that issue, went against my advice and did not receive full course of ABOs and MOD notified of that and new orders received. Ms. Blowers noted Mr. Tapia was given Bactrim DS from the e-kit that night and needed a dose in the a.m. Ms. Blowers provided an assessment of non-infected abscess. Ms. Blowers prescribed Bactrim DS (Sulfamethoxazole; Trimethoprim) 800 mg; 160 mg 1 tablet oral b.i.d. 10 day supply and recommended medications from e-kit until they arrive from pharmacy, daily wound care, and to follow up with JPB, P.A.-C.

- **September 3, 2012:** Ms. Blowers issued a note indicating Mr. Tapia reported "I have a tooth ache, can't drink hot or cold water. Also, it's very hard to eat, please see me ASAP. In pain need to see dentist. Once again in pain please see me asap." Ms. Blowers provided an assessment of dental pain. Ms. Blowers indicated RK sent informing Mr. Tapia that a dental appointment was made.

- **October 23, 2012:** Mr. Tapia was seen by **Gregory Hermsen, D.D.S.**, who indicated Mr. Tapia reported "My tooth on the upper left hurts with chewing with a dull ache. The pain comes and goes. I think I need a filling." and he pointed to #14. Examination revealed tooth #14 had MOL caries that were at or near the pulpal chamber, percussion ++, and cold negative. Dr. Hermsen provided an assessment of tooth #14 was necrotic with apical periodontitis. Dr. Hermsen indicated Mr. Tapia understood he might need an RCT and that placing a restoration might make the the tooth hurt more than right now. Dr. Hermsen indicated Mr. Tapia stated he would be out soon and wanted to wait until he got out for treatment.

- **May 10, 2013:  Mercedes Kostkas, R.N.** (Records did not indicate name of attending physician) issued a note indicating Mr. Tapia had history of Percocet and Xanax abuse per booking sheet and urine toxicology screen positive for Amp, Mamp, Benzodiazepines per Nurse Grouley.  Ms. Kostkas provided assessments of history of opiate abuse and history of Benzodiazepines abuse.  Ms. Kostkas indicated Mr. Tapia was started on opiate w/d protocol on May 9, 2013, prescribed Valium (Diazepam) 2 mg 1 tablet oral 14 day supply and advised to follow up with Ms. Pohl-Y-Baca, P.A.-C. on May 14, 2013.

- **September 26, 2013:**  Upon arrival to the Emergency Department of **Allenmore Hospital**, Mr. Tapia was complaining of trauma after MVA that day.  Records indicate Mr. Tapia was involved in roll over MVA, airbags deployed, and per picture from EMS, SUV was on side with mostly passenger side damage.  Per report Mr. Tapia self-extricated and attempted to run from scene, when he was apprehended by police.  Records indicate Mr. Tapia arrived by medics with c-collar and backboard and leg cuffs.  Records indicate upon questioning, Mr. Tapia stated he was having pain in neck and lower back.  Mr. Tapia stated lacerations to right lower leg and upper arm.  Mr. Tapia was complaining of left elbow and wrist pain.  Examination revealed neck in hard collar, tenderness over bilateral elbows, cleared of board with log roll, mild upper left chest abrasion, laceration of right upper inner arm was 2 cm, and 3 separate lacerations on right lower arm, 1.5 cm, 1 cm, and 1 cm each.  An electrocardiogram (ordered by Travis M. Paoli, A.R.N.P. and interpreted by **Amanda Kijac, D.O.**) revealed sinus tachycardia, rate > 103, borderline prolonged PR interval, lateral infarct, acute, ST elevation, diffuse, likely early repolarization pattern, consider inferior injury, abnormal ECG, and acute MI.  An electrocardiogram (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Dr. Kijac) revealed sinus rhythm, rate 80, ST elevation, probable normal early repol pattern, no STEMI, and normal ECG.  X-rays of the left and right elbow (ordered by Travis M. Paoli, A.R.N.P. and interpreted by **Raymond K. Hung, M.D.**) revealed bone mineralization within normal limits, no acute fracture, no subluxation, normal anatomic alignment, joint spaces well maintained, no radiopaque foreign body, and no abnormal soft tissue calcifications, and an impression revealed no acute osseous abnormalities of left and right elbow.  X-rays of the left wrist (ordered by Travis M. Paoli, A.R.N.P. and interpreted by **Alison J. Reinbold, M.D.**) revealed bony alignment was normal, joint spaces were normal, no focal bony abnormality and the navicular was intact, and an impression revealed normal.  X-rays of the right tibia/fibula (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Dr. Hung) revealed bone mineralization within normal limits, no acute fracture, no subluxation, normal anatomic alignment, joint spaces well maintained, no radiopaque foreign body, and no abnormal soft tissue calcifications, and an impression revealed no acute osseous abnormalities of right tibia/fibula.  A CT of the head (ordered by Travis M. Paoli, A.R.N.P. and interpreted by **Jonathan M. Kell, M.D.**) revealed moderate polypoid mucosal thickening within the maxillary sinuses bilaterally, minimal fluid within the dependent left maxillary sinus as well, linear and symmetric benign appearing calcification along the tentorium cerebelli bilaterally, without definite evidence for superimposed subarachnoid or subdural hemorrhage, no intra-axial or definite extra-axial fluid collections, no evidence for acute infarction no definite hemorrhage, the cortical sulci, cerebral ventricles and basal cisterns were symmetrical and within normal limits, no mass lesion, mass effect, or shift of mid-line structures, and the bony calvarium appeared intact, and the impressions revealed likely benign thin and symmetric dural calcifications along the tentorium, subtle superimposed subdural or subarachnoid blood was difficult to exclude, but considered unlikely, if symptoms persisted, recommended follow up with CT or MRI, moderate chronic bilateral maxillary sinusitis, and dependent fluid within the

left maxillary sinus might represent superimposed acute sinus disease or hemorrhage.  A CT of the cervical spine (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Dr. Kell) revealed straightening of cervical lordosis, uncovertebral and facet hypertrophy caused mild right neural foraminal stenosis at C2-C3 and C3-C4, with mild bilateral neural foraminal stenosis at C5-C6, annular disc bulges caused mild apparent spinal canal at C3-C4 and C4-C5, no acute fracture or dislocation, the vertebral bodies otherwise well aligned, and the remainder of the disc spaces were well preserved, and the paravertebral soft tissues appeared unremarkable, and the impressions revealed loss of cervical lordosis, which might be related to muscular spasm or Mr. Tapia's positioning and mild degenerative changes.  A CT of the thoracic and lumbar spine (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Dr. Kell) revealed no acute fracture or dislocation, the vertebral bodies were well aligned, and the disc spaces appeared well preserved, and the paravertebral soft tissues appeared unremarkable, and an impression revealed unremarkable examination of the thoracic and lumbar spine.  A CT of the chest, abdomen, and pelvis (ordered by Travis M. Paoli, A.R.N.P. and interpreted by Dr. Hung) revealed unremarkable thoracic inlet without abnormal fluid collection, no evidence of mediastinal widening, no lung infiltrate or nodule, no pneumothorax, no adenopathy, mediastinum without masses or lymphadenopathy, hila without adenopathy, no effusion or pneumothorax, heart size not enlarged, no pericardial effusion, thoracic aorta with normal caliber, central tracheobronchial tree normal, no discrete suspicious osseous lesion, normal liver, and spleen, no splenic lacerations, splenic fluid, accessory splenule in the splenic hilar region, normal pancreas, kidneys, and adrenal glands, abdominal aorta without aneurysmal dilatation, IVC with normal caliber, normal gallbladder and biliary tree, bowel without obstruction or mural thickening, scattered diverticulosis of the colon, peritoneum, mesentery, omentum without ascites, nodules, free air or adenopathy, retroperitoneum without adenopathy, unremarkable prostate and urinary bladder, no free fluid, no adenopathy of lymph nodes, and no discrete suspicious osseous lesion, and the impressions revealed unremarkable CT scan of chest, abdomen and pelvis for acute traumatic injury, and diverticulosis.  Labs revealed low K (3.4), high glucose (159), WBC (15.67), abs neuts (13.75), abs immature grans (0.12), blood drug abuse screen revealed low Acetaminophen (<3.0), and UA revealed high specific gravity (>1.030), and abnormal protein (trace).  Mr. Tapia was provided impressions of cervical strain, neck pain, bilateral elbow contusions, right upper arm laceration, right lower leg lacerations, and lumbar strain.  Mr. Tapia underwent left upper arm x 1 and right lower leg x 3 laceration repair, performed by **Travis M. Paoli, A.R.N.P.** (Nurse practitioner for Amanda Kijac, D.O.).  Mr. Tapia was discharged in stable condition, prescribed Keflex p.o., and recommended wound care, sutures out in 7-10 days, to keep collar on at all times until follow up with trauma clinic next week, continue antibiotic ointment 2 times per day, return for any redness, swelling, drainage or fevers, take antibiotics as prescribed, and return immediately for any increasing pain, headaches, vomiting, abdominal pain or other concerns.

- **September 27, 2013:**  Ms. Kostkas issued a note indicating Mr. Tapia had history of MVA, seen at AH ER per copy of ER chart, and diagnosed with cervical strain, multiple lacerations/contusions, and lumbar strain.  Ms. Kostkas indicated prescription was sent with ER paperwork.  Ms. Kostkas provided an assessment of status post MVA.  Ms. Kostkas discussed with N. Aaf, P.A., prescribed Keflex (Cephalexin) EQ 500 mg base 2.00 capsule oral b.i.d. 10 days' supply and Ibuprofen 600 mg 1 tablet oral t.i.d. 7 day supply, and advised to follow up with Aaf, P.A. on September 27, 2013.

- **September 30, 2013:** Mr. Tapia had an office visit with **Noor Aaf, P.A.-C.** (Records did not indicate name of attending physician) for follow up on multiple small laceration which were sutured in Allenmore hospital on September 26, 2013, after having an accident. Mr. Aaf noted Mr. Tapia was wearing a cervical collar which applied in hospital for neck strain. Mr. Aaf noted Mr. Tapia was told that his CT was negative. Mr. Aaf noted Mr. Tapia had pain on his leg where had suture. Examination revealed Mr. Tapia had a cervical collar, a single laceration at medial side of right arm, and few small lacerations on lateral side right lower leg. Mr. Aaf provided an assessment of multiple skin laceration. Mr. Aaf indicated no need to have cervical collar on, and recommended to continue treatment, and follow up on October 4, 2013, for SR.

- **October 4, 2013:** Mr. Tapia had a follow up visit with Mr. Aaf for suture removal. Mr. Aaf indicated Mr. Tapia had multiple lacerations on right upper arm and right lower leg due to accident and wounds were sutured in ER a week prior. Mr. Aaf noted no dressing on wounds. Examination revealed multiple wounds, the largest wound at medial side of upper arm with 4 sutures, 3 other wounds on right leg which had been closed with suture and few more superficial laceration with no stitches which already got scabs on them, all wounds were clean and dry, and mild erythema around the lower leg wounds. Mr. Aaf removed sutures from all 4 lacerations without any problems and advised to follow up p.r.n.

- **October 18, 2013:** **Ms. Alison Joseph** issued a note indicating kite requesting Band-Aids and antibiotic ointment. Ms. Joseph indicated call to unit c/d to check on supply, which Mr. Tapia said was running low. Ms. Joseph indicated antibiotic ointment and Band-Aids sent to unit and RK informing l/M that were available from old.

- **November 8, 2013:** Mr. Tapia had a follow up visit with Ms. Pohl-Y-Baca for STD exposure. Ms. Pohl-Y-Baca indicated Mr. Tapia informed they received a telephone call from PHD, that he was listed a sexual contact for someone who tested positive for gonorrhea. Ms. Pohl-Y-Baca noted Mr. Tapia used condoms with sexual encounters. Ms. Pohl-Y-Baca indicated Mr. Tapia was requesting Band-Aids for wounds on his right leg. Examination revealed several scabbed lesion right lower leg. Ms. Pohl-Y-Baca provided an assessment of STD exposure. Ms. Pohl-Y-Baca indicated Mr. Tapia was administered Zithromax 1 gm p.o. for presumptive chlamydia and Rocephin 250 mg I.M. for presumptive gonorrhea from e-kit as ordered and he tolerated well. Ms. Pohl-Y-Baca recommended urine GC/CT, presumptive treatment for GC and CT, and advised would notify per results of STD testing.

- **January 1, 2014:** **Ms. Kendra Hanson** issued a note indicating Mr. Tapia stated, "Would like to have ingrown hair on my cheek/face looked at looks infected." Mr. Tapia was housed in new jail and that writer was in the main jail. Ms. Hanson provided an assessment of c/o ingrown hair. Mr. Tapia placed on nurse call list to assess and refer to providers as needed.

- **January 30, 2014:** Mr. Tapia was evaluated at **Washington Corrections Center** by **Natalie Dahlgren, A.R.N.P.** (Records did not indicate name of attending physician) for right sided neck stiffness from recent car accident.  Ms. Dahlgren indicated Mr. Tapia reported occasional mild headache with neck stiffness.  Ms. Dahlgren noted Mr. Tapia had car accident on September 2013 and had stiches to right arm, and neck brace for 1 week.  Ms. Dahlgren noted Mr. Tapia also had car accident in 2003 and had lumbar strain (no ongoing pain/issues).  Examination revealed lumps in neck and neck tightness at right base.  Ms. Dahlgren provided impressions of history of MVA and neck strain muscular.  Ms. Dahlgren ordered RPR, hepatitis panel, and HIV test, indicated Mr. Tapia orally consented to HIV test, he accepted hepatitis testing, would evaluate the need for vaccination after laboratory results were reviewed, cleared for food service, and advised sick call/periodic physical p.r.n..

- Mr. Tapia was seen by **R. Brucker, D.D.S.** for dental health exam.  Examination revealed soft tissue within normal limits, moderate calculus, and gingivitis.

- **March 7, 2014:**  Mr. Tapia was seen by **D. Lusche, P.A.-C.** (Records did not indicate name of attending physician) at **Larch Corrections Center**, who indicated Mr. Tapia had a history of opiate abuse (Oxycodone and Percocet).  Ms. Lusche advised to follow up and sick call p.r.n.

- **November 10, 2014:**  Mr. Tapia was seen by **Carol Thamert, A.R.N.P.** (Records did not indicate name of attending physician), who indicated Mr. Tapia had a history of surgical removal of chalazion on the left upper eyelid.  Examination revealed left lower eyelid with a large chalazion in center, conjunctiva was red and yellowish discharge, and mild swelling in upper cheek.  Ms. Thamert provided an assessment of chalazion with conjunctivitis.  Ms. Thamert discussed self-management and recommended hot pack for 20 minutes q.i.d., Gentamicin ophthalmic 0.3% ointment, and to return to clinic if did not resolve.

- **December 30, 2014:**  Mr. Tapia was seen by **A.R. Anderson, D.D.S.**, who indicated Mr. Tapia presented with pain and he pointed to #14.  Examination revealed caries tooth fracture and inflammation.  Dr. Anderson provided an assessment of extraction.  Dr. Anderson indicated Mr. Tapia requested extraction, prescribed antibiotic, and recommended R/S extraction of #1, #4, and #14.

- **August 27, 2015:**  Upon arrival to the Emergency Department of **Tacoma General Hospital**, Mr. Tapia was complaining of swelling to left side of neck.  Mr. Tapia reported swelling to back side of the head near the left ear.  Mr. Tapia stated neck stiffness/discomfort.  Mr. Tapia stated he noticed the swelling 3 days prior and progressively worsened.  Mr. Tapia stated that he had soreness to his neck and pressure when he moved his neck.  Mr. Tapia denied history of similar symptoms.  Records indicate Mr. Tapia worked as an ironworker and thought it was due to dirt.  Examination revealed left posterior auricular scalp there was a 2 cm area of fluctuance concerning for abscess, with 4 cm of induration, slight warm to touch.  Mr. Tapia underwent left posterior auricular scalp abscess incision and drainage, performed by **Andrew Benefield, M.D.** without complications.  Mr. Tapia was provided an impression of left posterior auricular scalp abscess.  Mr. Tapia was discharged home in stable condition, prescribed Bactrim and Norco,

given strict return precautions, and advised to return here in 48 hours for re-evaluation, and to follow up with his primary care physician in 2-3 days for re-evaluation.

- **Bonnie L. Bessner, R.N.** issued a correspondence indicating Mr. Tapia was in that clinic on August 27, 2015, and he was advised to be off until August 29, 2015, and he might return sooner if he was feeling up to it.

- **December 21, 2015:** Upon arrival to the Emergency Department of Allenmore Hospital, Mr. Tapia was complaining of red and edematous left cheek and redness, swelling, and pain to left earlobe. Mr. Tapia reported he tried to re-insert an earring through it approximately 2 weeks prior. Mr. Tapia reported that he developed swelling and redness to his left cheek the previous day, which had gotten worse that day. Mr. Tapia denied any drainage from that area of swelling. Records indicate Mr. Tapia was concerned for possible abscess of his left cheek. Mr. Tapia reported history of ingrown hairs. Examination revealed scattered areas of folliculitis to face and arms, with suspected picking behavior, focal area of swelling to left cheek with surrounding erythema, and suspected underlying cystic lesion as skin was firm. Mr. Tapia was provided impressions of folliculitis and developing facial cellulitis. Mr. Tapia was discharged home in stable condition, recommended to start Cephalexin (Keflex) 500 mg 1 capsule by mouth 4 times daily, until finished, Ibuprofen (Motrin) 600 mg 1 tablet by mouth every 8 hours as needed for pain, Sulfamethoxazole-Trimethoprim (Bactrim) 800-160 mg 1 tablet by mouth twice daily, and Tramadol (Ultram) 50 mg 1 tablet by mouth every 6 hours as needed, and instructed to take prescriptions as instructed, follow up with primary care in 2-3 days, and return to the emergency department if he was unable to see that doctor for any reason or if he felt worse in any way prior to his follow up appointment.

- **June 16, 2016:** Mr. Tapia was seen at **NaphCare** by **Etsuko Yagi, R.N.** (Records did not indicate name of attending physician), who indicated Mr. Tapia with history of recent and/or significant opiate use. Ms. Yagi noted for > 5 days/week taking Percocet and previously taken was previous night. Ms. Yagi noted Mr. Tapia had withdrawal symptoms - achy and restless leg. Ms. Yagi indicated no symptom at the time of booking. Ms. Yagi provided an assessment of opiate withdrawal. Ms. Yagi recommended initiating COWS assessments with initiation of Buprenorphine taper (different order template) once scores 12 or greater or per provider orders, bottom bunk for safety, comfort medication including Ondansetron HCl 4 mg by mouth twice per day for 7 days, Aluminum-Magnesium-Simethicone 600-600-650 mg/15 ml by mouth twice per day for 7 days, Dicyclomine HCl 20 mg by mouth 3 times per day for 7 days, Ibuprofen 600 mg by mouth twice per day for 7 days, and Loperamide HCl 2 mg by mouth twice per day for 7 days, to give cool fluids or electrolyte solution (E.G., Gatorade) p.o. if alert 3 times per day and encourage p.o. fluid intake.

- **October 4, 2016:** Mr. Tapia was seen by **Lorraine Fisher, R.N.** (Records did not indicate name of attending physician), who indicated Mr. Tapia reported history of (Heroin, 1 gm daily for the past 4 months) (Percocet, 2-3 tablets, every other day, for the past 6 months) and his previous use was that day for Heroin and previous day for Percocet). Examination revealed left hip skin abscesses. Ms. Fisher provided an assessment of opiate abuse. Ms. Fisher recommended COWS protocol enacted per verbal/telephone order by Dr. Balderrama, Clonidine p.r.n. per COWS

assessment, Promethazine HCl 25 mg by mouth 3 times per day for 5 days, Loperamide HCl 2 mg by mouth 3 times per day for 3 days, Methocarbamol 500 mg by mouth twice per day for 5 days, Dicyclomine HCl 20 mg by mouth twice per day for 5 days, plenty of fluids, to alert staff for any acute symptoms, and indicated might give Tylenol or Ibuprofen nursing protocol (allergy verification).

- **November 8, 2016:** Upon arrival to the Emergency Department of Tacoma General Hospital, Mr. Tapia was complaining of rash and pain to left shoulder for couple of days, no known injection although pulled approximately 5 hairs in that area, skin pale and moist, out of jail for couple days as well. Mr. Tapia stated he started having burning pain in left shoulder and neck on October 28th and then had bubbles that appeared that popped and then he had red scabs and the continuing severe, burning pain without radiation. Mr. Tapia reported he had not taken anything for pain. Records indicate Mr. Tapia's previous IVDA was 3 years prior and otherwise he was well. Examination of the left shoulder revealed dermatomal rash and some lesions had tender erythema and induration. Labs revealed high lactate (2.1) and low A:G ratio (1.0). Mr. Tapia was provided impressions of shingles and cellulitis. Mr. Tapia was discharged in stable condition, and instructed to take the medications as prescribed for symptoms, keep the rash covered, avoid contact with pregnant women as he might spread infection to their babies, he might take Ibuprofen 400 mg every 6 hours with food and/or Acetaminophen 1,000 mg every 6 hours for pain control, and advised he should understand that it was his responsibility to follow up as instructed, not doing so could result in pain, disability, or death, and return to the emergency department or seek immediate medical care if symptoms did not improve in 72 hours, symptoms worsened at any time, if he were unable to follow up with a medical provider as instructed, or he developed any worrisome symptoms such as fever >100.4 degrees, uncontrolled pain, increasing redness, vision changes or any other concerns.

- **November 23, 2016:** Mr. Tapia was seen by **Megan Eliasson, R.N.** (Records did not indicate name of attending physician), who indicated Mr. Tapia reported taking 2-3 of Percocet 30 mg daily off and on for the last 2 years and his previous use was on November 23, 2016. Ms. Eliasson indicated Mr. Tapia stated he had symptoms of body aches, restless legs, and anxiety with past withdrawal. Ms. Eliasson noted Mr. Tapia also had smoked Heroin (unknown amount) daily in the past but his previous use was 3 days prior. Ms. Eliasson provided an assessment of opiate abuse. Ms. Eliasson recommended COWS protocol enacted per verbal/telephone order by Dr. Balderrama, Clonidine p.r.n. per COWS assessment, Promethazine HCl 25 mg by mouth 3 times per day for 5 days, Loperamide HCl 2 mg by mouth 3 times per day for 3 days, Methocarbamol 500 mg by mouth twice per day for 5 days, Dicyclomine HCl 20 mg by mouth twice per day for 5 days, plenty of fluids, to alert staff for any acute symptoms, and indicated might give Tylenol or Ibuprofen nursing protocol (allergy verification).

- **January 15, 2017:** Mr. Tapia was seen by **Gurpreet Minhas, R.N.** (Records did not indicate name of attending physician) during nurse sick call at 2:25 p.m. (attempted earlier and Mr. Tapia was at work) for kite in regard to head cold/fever/and head cold. Ms. Minhas indicated Mr. Tapia stated that he had longer symptoms for 2 days and temp was 98.0 F, he felt better and because they were late, he no longer needed any medication. Ms. Minhas indicated all questions answered and no other needs identified.

- **June 21, 2017:** Mr. Tapia was seen by **Sabrina Bual, R.N.** (Records did not indicate name of attending physician), who indicated Mr. Tapia reported history of taking Percocet, purchased off the streets, took up to 2-5 pills daily, no complaints, and denied any history of seizures. Ms. Bual provided an assessment of opiate abuse. Ms. Bual recommended COWS protocol enacted per verbal/telephone order by Dr. Balderrama, Clonidine p.r.n. per COWS assessment, Promethazine HCl 25 mg by mouth 3 times per day for 5 days, Loperamide HCl 2 mg by mouth 3 times per day for 3 days, Methocarbamol 500 mg by mouth twice per day for 5 days, Dicyclomine HCl 20 mg by mouth twice per day for 5 days, plenty of fluids, and to alert staff for any acute symptoms, and indicated might give Tylenol or Ibuprofen nursing protocol (allergy verification).

- **July 29, 2017:** Mr. Tapia was seen by **Meghan Bailey, R.N.** (Records did not indicate name of attending physician), who indicated Mr. Tapia smoked Percocet in varying amounts daily for the past 15 years and he experienced n/v/d, muscle aches, chills when he stopped using. Ms. Bailey indicated Mr. Tapia last experienced withdrawal approximately 4 days prior. Ms. Bailey indicated Mr. Tapia previously used Percocet about 6 hours prior. Ms. Bailey noted Mr. Tapia previously attended treatment in 2003 at Olalla. Ms. Bailey indicated Mr. Tapia had no active s/s of withdrawal at that time. Ms. Bailey provided an assessment of opiate abuse. Ms. Bailey recommended COWS protocol enacted per verbal/telephone order by Dr. Balderrama, Clonidine p.r.n. per COWS assessment, Loperamide HCl 2 mg by mouth 3 times per day for 5 days, Promethazine HCl 25 mg by mouth 3 times per day for 5 days, Dicyclomine HCl 20 mg by mouth 3 times per day for 5 days, Methocarbamol 500 mg by mouth twice per day for 5 days, plenty of fluids, to give cool fluids or electrolyte solution (E.G., Gatorade) p.o. if alert 3 times per day, to alert staff for any acute symptoms, and indicated might give Tylenol or Ibuprofen nursing protocol (allergy verification).

- **September 19, 2018: Cameron Carrillo, L.P.N.** (Records did not indicate name of attending physician) issued a note indicating Mr. Tapia was referred to medical due to being non-responsive, his BP hypertensive skin PWD, and he did not appear in distress. Mr. Carrillo indicated Mr. Tapia stated he did not have any medical concern at that time but was upset of being in 3SC and had no SI. Mr. Carrillo indicated would continue to monitor.

- **September 29, 2018:** Mr. Tapia was seen by **Elizabeth Warren, R.N.** (Records did not indicate name of attending physician), who indicated saw Mr. Tapia in his cell as requested by Sergeant. Ms. Warren noted cell smells of urine and sheet wrapped around waist. Ms. Warren indicated Mr. Tapia was alert, sitting up, on the side of his bunk, under his on power and made eye contact when he was spoken to. Ms. Warren indicated Mr. Tapia would not verbally respond, would follow instructions with calm encouragement, and he allowed assessment. Examination revealed apical pulse 100, S1S2, slow. Ms. Warren indicated not sure if Mr. Tapia was eating every meal, offered a chocolate ensure and he drank approximately 1/2 the container. Ms. Warren indicated officer prepared Mr. Tapia's sandwich for him, handed it to him and he took the sandwich. Ms. Warren spoke with sergeant and asked if Mr. Tapia could be put on a meal log and he agreed to start "Meal Log." Ms. Warren scheduled daily monitoring of VS x 3 days and scheduled provider visit for evaluation.

### 2.2.3   Noteworthy Conclusions

**2.2.3.1   Diagnostics**

**September 26, 2013**

- <u>Electrocardiogram</u>, sinus tachycardia, rate > 103, borderline prolonged PR interval, lateral infarct, acute, ST elevation, diffuse, likely early repolarization pattern, consider inferior injury, abnormal ECG, and acute MI.

- <u>Electrocardiogram</u>, sinus rhythm, rate 80, ST elevation, probable normal early repol pattern, no STEMI, and normal ECG.

- <u>X-rays left/right elbow</u>, bone mineralization within normal limits, no acute fracture, no subluxation, normal anatomic alignment, joint spaces well maintained, no radiopaque foreign body, and no abnormal soft tissue calcifications, impression of no acute osseous abnormalities of left and right elbow.

- <u>X-rays right tibia/fibula</u>, bone mineralization within normal limits, no acute fracture, no subluxation, normal anatomic alignment, joint spaces well maintained, no radiopaque foreign body, and no abnormal soft tissue calcifications, impression of no acute osseous abnormalities of right tibia/fibula.

- <u>CT head</u>, moderate polypoid mucosal thickening within the maxillary sinuses bilaterally, minimal fluid within the dependent left maxillary sinus as well, linear and symmetric benign appearing calcification along the tentorium cerebelli bilaterally, without definite evidence for superimposed subarachnoid or subdural hemorrhage, no intra-axial or definite extra-axial fluid collections, no evidence for acute infarction no definite hemorrhage, the cortical sulci, cerebral ventricles and basal cisterns were symmetrical and within normal limits, no mass lesion, mass effect, or shift of mid-line structures, and the bony calvarium appeared intact, impressions of likely benign thin and symmetric dural calcifications along the tentorium, subtle superimposed subdural or subarachnoid blood was difficult to exclude, but considered unlikely, if symptoms persisted, recommended follow up with CT or MRI, moderate chronic bilateral maxillary sinusitis, and dependent fluid within the left maxillary sinus might represent superimposed acute sinus disease or hemorrhage.

- <u>CT cervical spine</u>, straightening of cervical lordosis, uncovertebral and facet hypertrophy caused mild right neural foraminal stenosis at C2-C3 and C3-C4, with mild bilateral neural foraminal stenosis at C5-C6, annular disc bulges caused mild apparent spinal canal at C3-C4 and C4-C5, no acute fracture or dislocation, the vertebral bodies otherwise well aligned, and the remainder of the disc spaces were well preserved, and the paravertebral soft tissues appeared unremarkable, impressions of loss of cervical lordosis, which might be related to muscular spasm or Mr. Tapia's positioning and mild degenerative changes.

- <u>CT thoracic/lumbar spine</u>, no acute fracture or dislocation, the vertebral bodies were well aligned, and the disc spaces appeared well preserved, and the paravertebral soft tissues appeared unremarkable, and an impression revealed unremarkable examination of the thoracic and lumbar spine.

- <u>CT chest/abdomen/pelvis</u>, unremarkable thoracic inlet without abnormal fluid collection, no evidence of mediastinal widening, no lung infiltrate or nodule, no pneumothorax, no adenopathy, mediastinum without masses or lymphadenopathy, hila without adenopathy, no effusion or pneumothorax, heart size not enlarged, no pericardial effusion, thoracic aorta with normal caliber, central tracheobronchial tree normal, no discrete suspicious osseous lesion, normal liver, and spleen, no splenic lacerations, splenic fluid, accessory splenule in the splenic hilar region, normal pancreas, kidneys, and adrenal glands, abdominal aorta without aneurysmal dilatation, IVC with normal caliber, normal gallbladder and biliary tree, bowel without obstruction or mural thickening, scattered diverticulosis of the colon, peritoneum, mesentery, omentum without ascites, nodules, free air or adenopathy, retroperitoneum without adenopathy, unremarkable prostate and urinary bladder, no free fluid, no adenopathy of lymph nodes, and no discrete suspicious osseous lesion, impressions of unremarkable CT scan of chest, abdomen and pelvis for acute traumatic injury, and diverticulosis.

### 2.2.3.2    Procedures

**September 26, 2013**

- Left upper arm x 1 and right lower leg x 3 laceration repair, <u>Mr. Travis M. Paoli</u>.

**August 27, 2015**

- Left posterior auricular scalp abscess incision and drainage, <u>Dr. Andrew Benefield</u>.

## 2.3    Other Documents

In addition to reviewing Mr. Javier Tapia's medical records, I have also had the opportunity to review the other documents relevant to Mr. Javier Tapia's cause of injury or illness, which include:

- Cheque to Ressler and Tesh, P.L.L.C. (Document)

- Civil Trial Scheduling Order (Document)

- Claims Ledger as of December 14, 2021 (Document)

- Clinical Photo of Foot - Scan (Photographs)

- Criminal History Information of Mr. Javier Tapia (Document)

- Earnings Statement (Document)

- Employee Withholding Certificate (Document)

- Employment Security Department (Document)

- Inmate Behavior Log Printout/Observation Report/Incident Report (Document)

- Pierce County Sheriff Booking ID Sheet/Form/Charges and Sentence/Pierce County Detention and Corrections Center Records of Mr. Javier Tapia (Document)

- Photographs of Wound on Leg (Photographs)

- Request Report for Inmate Mr. Javier Tapia (Document)

- Sandisk Pen Drive Photograph (Photographs)

- Stipulation and Authorization for Release of Employment Records of Javier Tapia (Document)

- Superior Court of Washington for Pierce County Court Order (Document)

- Warranty and Validation of Receipt Assignment of Benefits/Authorization to Release Information (Document)

- X-rays Image of Unspecified Body Part (Photographs)

# 3   Interview & Examination

I obtained the information presented herein during my video interview and examination of Mr. Tapia, which took place on November 8, 2023. My interview and examination of Mr. Tapia was performed to obtain information which can be used in conjunction with the information I obtained from his medical records and/or other relevant documents for the purpose of determining his diagnostic conditions and consequent circumstances.

## 3.1   History of Present Injury/Illness

Mr. Javier Tapia is a 41 year old right hand dominant male resident of Tacoma, Washington, who presented virtually for the purpose of evaluating his residual medical condition as it relates to injuries he sustained secondary to complications associated with left lower extremity phlegmasia cerulea dolens (acute extensive venous thrombosis) diagnosed on October 1, 2018 following emergency department evaluation and hospital admission for a painful, swollen left leg with blackened foot. He had an open left transtibial (below knee) amputation for a gangrenous left lower extremity on October 10, 2018 followed by formalization of the left transtibial amputation on October 16, 2018. Mr. Tapia was unaccompanied, was pleasant and cooperative, and appeared to be a reliable historian during this history and examination. He alternated between sitting and standing, was ambulating with a prosthesis, and did not exhibit any abnormal pain behavior.

## 3.2   Current Symptoms

Mr. Tapia obtained his initial prosthetic leg in August 2019 with subsequent prosthetic modifications/socket replacement secondary to residual limb remodeling and pressure sores/skin breakdown. He reports that his current socket was fabricated in January 2023 and prior to the current socket he had skin issues secondary to pressure at the posterolateral knee, and distal residual limb. He notes difficulty while ambulating including the need to scan the ground while walking as his knee hyperextends and this is increased on unlevel or soft terrain occasionally requiring him to use a cane. He has intermittent left lower extremity phantom limb pain and sensation. He also has unpredictable residual limb pain described as a sharp pain with intermittent paresthesia and this can be related to his socket fit. While wearing the prosthesis, he notes limitations with routine activities that involve kneeling and finds it more difficult to get in and out of his vehicle. When he has been unable to wear his prosthesis secondary to pain or skin issues, he uses a wheelchair or walker for mobility. He uses his prosthesis at night to go to the bathroom.

Mr. Tapia describes associated musculoskeletal pain since his amputation with increased fatigue with activities and walking. He has difficulty climbing stairs, needing to take only one step at a time secondary to fear of falling down the stairs while using his prosthetic limb. Mr. Tapia reports increased left knee pain and phantom limb pain with prolonged sitting that limits his activities. He has increased back pain and neck pain with prolonged standing, and this is temporarily relieved with massage or stretching. Mr. Tapia reports right foot and ankle pain in the arch and Achilles' tendon region with occasional right foot paresthesia that is exacerbated while using his prosthesis which he attributes to compensatory increased right lower extremity weightbearing. These symptoms are improved by limiting walking and weightbearing as well as stretching. He notes no history of significant lower extremity or spine pain, injuries, fractures, or surgeries prior to the amputation. Mr. Tapia also reports intermittent left shoulder pain, upper extremity paresthesia and decreased grip strength when he is

unable to use his prosthesis and has to use his upper extremities for weightbearing, mobility, or transfers.

Since his amputation Mr. Tapia has had increased emotional distress with anxiety, worry, sadness, hopelessness and decreased enjoyment of routine activities and family events related to his limited abilities.  He expresses frustration, depression, fatigue and lack of motivation following his injury.  He finds that spending time with others such as family and coworkers is helpful.

### 3.3    Activities of Daily Living

Mr. Tapia is able to walk independently and transfer with his prosthesis.  If he is unable to use his prosthesis secondary to pain or skin issues, he relies on a wheelchair or walker.  He is independent with food preparation, feeding and meal cleanup.  He is independent with bathing, transferring into the shower chair, washing, grooming, and dressing.  He is independent with bowel and bladder function and management, medications, and communication.

### 3.4    Review of Systems

With review of systems Mr. Tapia notes a sense of weakness, intermittent lower extremity paresthesia, spine and joint pain.  He has intermittent swelling of the right leg and right ankle increased with prolonged standing, weightbearing and ambulating.  He has areas of rash and redness at the residual limb with increased ease of bruising.  He describes no respiratory or digestive issues, no urinary or genitoreproductive issues.  Mr. Tapia describes episodes of depression and frustration.

### 3.5    Medical History Prior to Present Injury/Illness

Mr. Tapia's past medical history is notable for a hypercoagulable disorder with elevated Factor VIII diagnosed following his amputation that requires ongoing Warfarin use.  He notes no history of significant arthritis, cancer, diabetes, prior lower extremity injuries, heart, kidney, or vascular problems.  The medical records suggest a possible history of schizophrenia reported in the past without records of a specific diagnosis or treatment.  He notes a mental health evaluation when he was 16 years old and reports being on medications for a few years.  Mr. Tapia describes an episode of altered cognition/confusion related to his recent illness/infection.  Mr. Tapia reports that his only surgeries have been the 2018 transtibial amputation.  He has had physical therapy for prosthetic gait training.

### 3.6    Family History

Mr. Tapia's family history is notable for heart disease and stroke.  His mother is not living, and his father is alive and reported to be healthy.

### 3.7    Drug & Other Allergies

Mr. Tapia has no known allergies to drugs or other items.

### 3.8    Current Medications, Equipment and Supplies

#### 3.8.1    Medications

Mr. Tapia's current medications consist of Warfarin 3 mg per day.  He was previously taking Gabapentin for pain following his amputation.

#### 3.8.2    Equipment

Mr. Tapia's equipment consists of a shower chair, wheelchair, walker, cane, and prosthetic limb.  He currently uses a liner and 3 ply sock in his prosthesis.  His bathroom has no grab bars.

### 3.9    Current Physicians

Mr. Tapia's recent health care provider was Iain Brewer, A.R.N.P., primary care family medicine, for Warfarin management and this has been transitioned to Allenmore Hospital.  His prosthetic care is at Hanger Clinic in Tacoma, Washington.

### 3.10    Social History

Mr. Tapia is single, and has four brothers and two sisters.  He has a 12 year old son in good health who lives with his mother.  His daughter passed away at 17 years old.

### 3.11    Education History

Mr. Tapia did not graduate from high school and did not obtain a GED.

### 3.12    Professional/Work History

Mr. Tapia previously was a member of the Teamsters union and has performed work involving flagging, carpentry, equipment operation and rebar fabrication.  He was not employed at the time of his injury. He is currently working in a job that distributes airplane parts and he describes his role as picking and shipping parts, emailing, and completing paperwork.  This job involves a combination of sitting, standing, and walking, and he estimates that he is on his feet for approximately 8 hours per day.  He has not been able to return to the same level of employment he had prior to his injury and his current level of annual income is $35,000.00 per year.  He notes since his injury that his sitting, standing, and walking is limited secondary to pain.  He estimates that he is able to lift up to 10 pounds frequently, 25 pounds occasionally and is unable to lift heavier items.  He is interested in vocational rehabilitation and is getting job specific computer training through his current employer.  Mr. Tapia reports that his medical condition and symptoms have caused him to miss work up to 5 to 7 days at a time.

### 3.13    Habits

Mr. Tapia currently reports no tobacco, alcohol, or illicit drug use.

### 3.14  Avocational Activities

Mr. Tapia enjoyed swimming and running prior to his injury and is interested in trying to return to these activities but is concerned about hurting himself.  He currently enjoys lifting weights although this can aggravate his left shoulder pain.  He enjoys working on cars, which is a longstanding hobby, and his ability to participate is limited with some tasks secondary to positioning/kneeling with the prosthetic limb.  He enjoyed activities with family and friends such as gatherings, and barbecues and currently these are less pleasurable secondary to fatigue, pain, decreased energy and lower extremity and spine pain.

### 3.15  Residential Situation

Mr. Tapia lives in a 1,000 square foot, one bedroom, one bathroom, second floor apartment without an elevator.  His home modifications consist of a shower chair.  He has been unable at this point to get a ground floor apartment.

### 3.16  Transportation

Mr. Tapia drives a 2014 Hyundai with no vehicle modifications.

### 3.17  Household Services

Mr. Tapia reports that his ability to perform housework, cooking, cleaning, home and vehicle maintenance has decreased secondary to difficulties with kneeling stooping, bending, prolonged standing and walking.  He notes limitations with shopping secondary to difficulties carrying items and climbing stairs with his prosthesis.  He is independent with budgeting, obtaining services and providing transportation for himself.

### 3.18  Examination

Mr. Tapia appears alert, oriented and cooperative with the examination.  He is independent with transitioning from sitting and standing.  He uses his upper extremities for support when rising from a sitting position.  He is able to ambulate with his prosthesis and is independent with donning and doffing the prosthesis.  His residual limb examination is relatively unremarkable to visual inspection with some skin discoloration/bruising without apparent skin breakdown at the posterolateral knee and distal residual limb.  He has mildly decreased active range of motion of the left knee with extension.  He has normal left and right knee flexion and normal right knee extension active range of motion.  His bilateral hip active range of motion appears normal and is without pain with internal rotation, external rotation, and flexion.  His lumbar flexion and extension range of motion appears mildly decreased.  His cervical spine active range of motion is full, and he notes occasional cervical spine crepitus with range of motion.  His left shoulder abduction range of motion is limited secondary to pain in the region of the scapula and chest wall.  His right shoulder range of motion is unremarkable.  He is able to perform calf raises on the right leg although this recreates his ankle pain in the Achilles region.

# 4   Central Opinions

The Central Opinions expressed in this Life Care Plan constitute my professional medical opinions regarding Mr. Tapia's relevant diagnostic conditions, and consequent circumstances.  The information I relied upon to formulate the opinions expressed herein were obtained from my review of Mr. Tapia's medical and/or other relevant records, and from my video interview & examination of him.

The Central Opinions in this Life Care Plan are structured to make it easy to understand the relationships between Mr. Tapia's diagnostic conditions, and consequent circumstances.

## 4.1   Diagnostic Conditions

For the purpose of Life Care Planning, a diagnostic condition can be defined as an impairment, which according to the American Medical Association's *Guides to the Evaluation of Permanent Impairment, 5th Edition*, is defined as "a loss of use, or a derangement of any body part, organ system or organ function."[8]

The following represents my professional medical opinion regarding Mr. Tapia's diagnostic conditions, as they pertain to Mr. Tapia's relevant cause of injury:

- **Diagnostic Condition 1:** Complications associated with left lower extremity phlegmasia cerulea dolens (acute extensive venous thrombosis) reported to have been diagnosed on October 1, 2018.

- **Diagnostic Condition 2:** Status post left transtibial amputation on October 10, 2018.

- **Diagnostic Condition 3:** Residual limb pain and skin problems.

- **Diagnostic Condition 4:** Phantom limb sensation and pain.

- **Diagnostic Condition 5:** Gait disorder with mobility and activities of daily living skills deficits.

- **Diagnostic Condition 6:** Left knee pain.

- **Diagnostic Condition 7:** Right ankle/foot pain.

- **Diagnostic Condition 8:** Mechanical cervical and lumbar spine pain.

- **Diagnostic Condition 9:** Left shoulder pain.

- **Diagnostic Condition 10:** Adjustment disorder with anxiety and depressed mood.

---

[8] Cocchiarella, Linda, and Gunnar B. J. Andersson, Guides to the Evaluation of Permanent Impairment, Fifth Edition, American Medical Association, 2000.

## 4.2    Consequent Circumstances

Consequent circumstances can be defined as consequential effects of a subject's relevant diagnostic conditions. For the purpose of life care planning, consequent circumstances of a diagnostic condition include resulting disabilities and/or effects on life expectancy.

### 4.2.1    Disabilities

According to the American Medical Association's *Guides to the Evaluation of Permanent Impairment, 5th Edition*, a disability is defined as "an alteration of an individual's capacity to meet personal, social, or occupational demands because of an impairment."[9]

It is my professional medical opinion that the disabilities specified herein are attributable to Mr. Tapia's relevant impairments, as presented in Section 4.1.

- Decreased ability to perform activities of daily living (ADLs) e.g. bathing, dressing, etc.

- Decreased locomotion e.g. walking, transferring, etc.

- Decreased external mobility e.g. community ambulation, etc.

- Decreased ability to perform household services e.g. inside housework, food cooking & clean-up, caring for and maintaining pets, home and vehicles, household management, shopping for household, etc.

- Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc.

- Decreased ability to perform or maintain traditional roles within family, relationships or other social units.

- Decreased ability to interact and/or socialize with family, and/or friends and acquaintances.

- Decreased ability to participate in social avocational activities, i.e. participation in activities with others e.g. participation in sports, participation in community activities, etc.

- Decreased physical function affecting a loss of vocational capacities/opportunities.

---

[9] Cocchiarella, Linda, and Gunnar B. J. Andersson, Guides to the Evaluation of Permanent Impairment, Fifth Edition, American Medical Association, 2000.

### 4.2.2   Probable Duration of Care

This formulation of Mr. Tapia's Probable Duration of Care has been performed by me, Hans L. Carlson, for the purpose of formulating this life care plan.  In formulating Mr. Tapia's Probable Duration of Care, I have applied my best professional efforts; I have considered published literature; and I have relied upon my education, training, skill and professional experience as a practicing medical doctor, Board Certified Physical Medicine & Rehabilitation Specialist, Board Certified Electrodiagnostic Medicine Specialist, Certified Life Care Planner™, and Certified Physician Life Care Planner™, as well as a reasonable degree of medical probability.

The methodology I have employed to formulate Mr. Tapia's Probable Duration of Care is that which is advocated by the American Academy of Physician Life Care Planners.  This methodology requires a physician life care planner to:

1.  Establish a subject's Average Residual Years.

2.  Use Average Residual Years to calculate a subject's Life Expectancy.

3.  Formulate Adjustments to Life Expectancy (if any).

4.  Use Adjustments to Life Expectancy (if any) to calculate Projected Residual Years.

5.  Use Projected Residual Years to calculate Projected Life Expectancy.

6.  Determine Probable Duration of Care using the following methodological sequence:

    a.  If a physician life care planner makes no Adjustment to Life Expectancy, and a physician life care planner believes a subject will require life-long care, then Probable Duration of Care = Average Residual Years.

    b.  If a physician life care planner makes an Adjustment to Life Expectancy, and a physician life care planner believes a subject will require life-long care, then Probable Duration of Care = Projected Residual Years.

    c.  If a physician life care planner makes no Adjustment to Life Expectancy, and a physician life care planner believes a subject will require less-than-life-long care, then Probable Duration of Care = the amount of time within Average Residual Years, during which a subject will receive active medical care, as specified within a life care plan's Future Medical Requirements.

    d.  If a physician life care planner makes an Adjustment to Life Expectancy, and a physician life care planner believes a subject will require less-than-life-long care, then Probable Duration of Care = the amount of time within Projected Residual Years, during which a subject will receive active medical care, as specified within a life care plan's Future Medical Requirements.[10]

---

[10] American Academy of Physician Life Care Planners, A Physician's Guide to Life Care Planning: Tenets, Methods, and Best Practices for Physician Life Care Planners, American Academy of Physician Life Care Planners, Austin, Texas, 2017.

#### 4.2.2.1   Average Residual Years

To establish Mr. Tapia's Average Residual Years, I have relied upon *The National Vital Statistics Reports, United States Life Tables 2021, Volume 72, Number 12*, published by the National Center for Health Statistics, a part of the United States Department of Health & Human Services.

*The National Vital Statistics Reports (NVSR), United States Life Tables* provides age ranges to determine Average Residual Years ("Expectation of Life at Age 'X'"), e.g.  40 – 41, 41 – 42, and so on.   Because Mr. Tapia is beyond his 41st birth date, and had not yet reached beyond his 42nd birth date, Mr. Tapia falls into the NVSR's 41 - 42 age range classification.  *The National Vital Statistics Reports, United State Life Tables* "Expectation of Life at Age X'" for the 41 - 42 age range classification = 36.6.[11]

In accordance with methodology advocated by the American Academy of Physician Life Care Planners, I have rounded Mr. Tapia's "Expectation of Life at X" to the nearest whole number. Therefore, Mr. Tapia's Average Residual Years = 37.

#### 4.2.2.2   Life Expectancy

According to the methodology advocated by the American Academy of Physician Life Care Planners:

- Life Expectancy = Current Age + Average Residual Years[12]

- Mr. Tapia's Current Age = 41

- Mr. Tapia's Average Residual Years = 37

Therefore, Mr. Tapia's Life Expectancy = 41 + 37 = 78

#### 4.2.2.3   Adjustments to Life Expectancy

In formulating Adjustments to Mr. Tapia's Life Expectancy, I have considered the potential impact of Mr. Tapia's:

- Diagnostic Conditions

- Disabilities

- Pre-existing comorbidities

- Other comorbidities (whether caused by or adversely affected by Mr. Tapia's relevant injuries/illnesses)

---

[11] Arias, E. (2023). United States Life Tables 2021. The National Vital Statistics Reports, Volume 72, Number 12. Retrieved from http://www.cdc.gov/nchs/products/life_tables.htm

[12] American Academy of Physician Life Care Planners, A Physician's Guide to Life Care Planning: Tenets, Methods, and Best Practices for Physician Life Care Planners, American Academy of Physician Life Care Planners, Austin, Texas, 2017.

- Adverse lifestyle behaviors/mental health conditions

- Associated conditions and/or consequences

- Pre-existing and/or newly developed conditions

- Family health history

- Unique risk factors, whether caused by, or adversely affected by Mr. Tapia's relevant injuries/illnesses, or whether they result from preexisting or recently developed comorbidities

In addition, I have also considered how receiving care which is specifically designed to mitigate Mr. Tapia's unique risk factors may mitigate the deleterious effects of such risk factors on his Life Expectancy. I also presume the provision of optimal care will have a mitigating influence on the deleterious impact of Mr. Tapia's unique risk factors on his Life Expectancy.

In consideration of the potential impact of the factors expressed above, and in my effort to formulate a medically probable Projected Duration of Care, it is my opinion Mr. Tapia's Average Residual Years will not be impacted. I have therefore, made a 0.0% adjustment to Mr. Tapia's Average Residual Years.

#### 4.2.2.4    Probable Duration of Care

As previously stated, it is my opinion Mr. Tapia will have lifelong disfigurement, progressive symptoms, as well as, physical and psychological impairments and disabilities, which require lifelong medical care.

According to the methodology advocated by the American Academy of Physician Life Care Planners, in cases in which a physician Life care planner makes no Adjustment to Life Expectancy, and a physician Life care planner believes a subject will require lifelong care, then Probable Duration of Care = Average Residual Years.[13]

Therefore, Mr. Tapia's Average Residual Years = **37 years**, the Probable Duration of Care upon which this Life Care Plan is based.

---

[13] American Academy of Physician Life Care Planners, A Physician's Guide to Life Care Planning: Tenets, Methods, and Best Practices for Physician Life Care Planners, American Academy of Physician Life Care Planners, Austin, Texas, 2017.

Physician Life Care Planning™

# 5   Future Medical Requirements

The future medical requirements specified herein are intended to address the diagnostic conditions and consequent circumstances specified in Section 4 of this Life Care Plan.

The future medical requirements specified herein are grouped into care categories, in which the names of the specific care item(s) are presented, and in applicable cases, are accompanied by relevant CPT, HCPC, and DRG codes.  Asterisks ("*") in the place of codes for any item(s) denote item(s) for which coding was either not possible, (e.g. in the case of nursing and attendant care, environmental modifications, essential services, etc.), or in cases in which coding is not applicable, as it relates to using such codes to perform a cost/vendor survey for the purpose of obtaining unit costs that can be used within this Life Care Plan's Cost Analysis [e.g. in the case of medications, in which it is possible to assign National Drug Codes ("NDC codes") to medication items, but in which case it is not possible to use such codes to obtain data-correlated cost information, such as Usual, Customary and Reasonable (UCR) cost data].

I have formulated Mr. Tapia's future medical requirements based upon my education, training and professional experience as a practicing physician, Board Certified Physical Medicine & Rehabilitation Specialist, Board Certified Electrodiagnostic Medicine Specialist, Certified Life Care Planner™, and Certified Physician Life Care Planner™.

I have employed a reasonable degree of medical probability as a primary criterion in the formulation of my medical recommendations, and I have made such recommendations with the intent of accomplishing the following Clinical Objectives of Life Care Planning:

1.  Diminish or eliminate Mr. Tapia's physical and psychological pain and suffering.

2.  Reach and maintain the highest level of function given Mr. Tapia's unique circumstances.

3.  Prevent complications to which Mr. Tapia's unique physical and mental conditions predispose him.

4.  Afford Mr. Tapia the best possible quality of life in light of his condition.

## 5.1   Physician Services

- Physical Medicine & Rehabilitation - New                                    Medical: 99204

- Physical Medicine & Rehabilitation                                              Medical: 99214

Physician Life Care Planning™

- Pain Management - New                                              Medical: 99204

- Pain Management                                                    Medical: 99214

- Orthopedic Surgeon - New                                          Medical: 99204

- Orthopedic Surgeon                                                Medical: 99214

- Primary Care Physician                                            Medical: 99213

- Wound Management - New                                            Medical: 99204

- Wound Management                                                  Medical: 99214

- Psychologist (1 hr) - New                                         Medical: 90791

- Psychologist (1 hr)                                               Medical: 90837

**5.2   Routine Diagnostics**

- X-Rays: Tibia/Fibula                                              Medical: 73590

- X-Rays: Foot: Complete (Min 3 Views)                             Medical: 73630

- X-Rays: Ankle                                                     Medical: 73610

- X-Rays: Knee (Bilateral)                                          Medical: 73564

- X-Rays: Hip (Min 3-4 views Bilateral)                            Medical: 73522

- X-Rays: Lumbar Spine (2-3 Views)                                 Medical: 72100

- X-Rays: Cervical Spine (2-3 Views)                               Medical: 72040

- X-Rays: Shoulder (Min 2 Views)                                                    Medical: 73030

- EMG/NCS: Upper Extremity (Bilateral, 11-12 Studies)         Medical: 95886, Medical: 95886, Medical: 95912

## 5.3    Medications

- <u>Neuroleptic</u>: Neurontin                                                              *

- <u>NSAID</u>: Naprosyn                                                                       *

- <u>Analgesic</u>: Tylenol                                                                    *

## 5.4    Laboratory Studies

- Comprehensive Metabolic Panel (Chemistry Profile)                     Medical: 80053

- Complete Blood Count (CBC)                                                       Medical: 85025

- Urinalysis                                                                              Medical: 81001

- Wound Culture                                                                         Medical: 87070

## 5.5    Rehabilitation Services

- Physical Therapy Evaluation (1 hr)                                               Medical: 97162

- Physical Therapy Evaluation: Post Operative (1 hr)                        Medical: 97162

- Physical Therapy: Periodic (1 hr)                                                 Medical: 97110

- Physical Therapy: Post Operative (1 hr)                                        Medical: 97110

- Gym Membership (Aquatics)                                                        *

- Personal Trainer                                                                                      *

- Vocational Evaluation                                                                            *

- Vocational Counseling                                                                           *

## 5.6   Equipment & Supplies

- Below Knee Prosthesis                                             HCPCS: L5301, HCPCS: L5620, HCPCS: L5629
                                                                              HCPCS: L5637, HCPCS: L5645, HCPCS: L5647
                                                                              HCPCS: L5685, HCPCS: L5781, HCPCS: L5910
                                                                              HCPCS: L5940, HCPCS: L5970, HCPCS: L5988
                                                                                           HCPCS: L8400, HCPCS: L8440

- Below Knee Prosthesis: Repair/Maintenance (45 min)                 HCPCS: L7510, HCPCS: L7520

- Below Knee Prosthesis: Recreational Leg                          HCPCS: L5301, HCPCS: L5620, HCPCS: L5629
                                                                              HCPCS: L5637, HCPCS: L5645, HCPCS: L5647
                                                                              HCPCS: L5671, HCPCS: L5781, HCPCS: L5910
                                                                              HCPCS: L5940, HCPCS: L5980, HCPCS: L5984
                                                                              HCPCS: L5986, HCPCS: L5988, HCPCS: L8400
                                                                                                        HCPCS: L8440

- Below Knee Prosthesis: Recreational Leg - Repair/Maintenance (45 min)        HCPCS: L7510, HCPCS: L7520

- Below Knee Prosthesis: Water Leg                                 HCPCS: L5301, HCPCS: L5622, HCPCS: L5637
                                                                              HCPCS: L5645, HCPCS: L5647, HCPCS: L5653
                                                                              HCPCS: L5679, HCPCS: L5685, HCPCS: L5910
                                                                              HCPCS: L5940, HCPCS: L5981, HCPCS: L5986

- Below Knee Prosthesis: Water Leg - Repair/Maintenance (45 min)        HCPCS: L7510, HCPCS: L7520

- Below Knee Prosthesis: Liner & Sealing Sleeve                        HCPCS: L5679, HCPCS: L5685

- Below Knee Prosthesis: Sock (Single Ply)                                                    HCPCS: L8470

- Below Knee Prosthesis: Sock (Multiple Ply)                                               HCPCS: L8420

- Single Tip Cane                                                                                             HCPCS: E0100

- Crutches                                                                                                        HCPCS: E0114

- Folding Walker                                                                                              HCPCS: E0135

- Lightweight Wheelchair for Travel/Backup                                               HCPCS: K0004

- Wheelchair Seat Cushion                                                                            HCPCS: E2601

- Wheelchair Seat Cushion Cover                                                                 HCPCS: E2619

- Manual Wheelchair: Maintenance                                                                                *

- Power Scooter                                                                           HCPCS: E1230, HCPCS: E2363

- Power Scooter: Battery (2)                                                                          HCPCS: E2363

- Power Scooter: Maintenance                                                                                     *

- Power Scooter Lift for Vehicle (Hold, Raise & Store)                                              *

- Power Scooter Lift for Vehicle (Hold, Raise & Store): Maintenance                        *

**5.7   Environmental Modifications & Essential Services**

- Essential Services                                                                                                      *

**5.8    Nursing & Attendant Care**

- Home Health Aide 4 Hours                                                              *

- Home Health Aide 8 Hours                                                              *

- RN Supervision                                                                        *

**5.9    Acute Care Services**

- Below Knee Residual Limb Revision: Minor              DRG-IP FAC: 00476, Anesthesia: 01482, Medical: 27884

# 6   Cost/Vendor Survey

The purpose of this Cost/Vendor Survey (the "Survey") is to enhance the transparency of this Life Care Plan's Cost Analysis.

This Survey is presented in two sections:

1. The *Methods, Definitions & Discussion* section discloses the methods and parameters used to perform this Survey.

2. The *Cost Data Sample* exhibits all unit costs and other source-specific information obtained during this Survey that are employed in this Life Care Plan's Cost Analysis.

## 6.1    Methods, Definitions & Discussion

### 6.1.1    Survey Method[14]

1. In cases in which vendors/providers are specified (e.g. in cases in which specific Acute Care Services are to be performed at specified facilities, or in cases in which a life care plan's subject, his/her family member(s), care giver(s), treating physician(s), et al. specify particular physician(s) they are currently seeing and/or wish to see in the future), then the costs associated with the specified vendor(s)'/provider(s)' provision of such goods/services are cited in this Life Care Plan's Vendor Survey, and these values are used as unit costs for respective line items in this Life Care Plan's Cost Analysis (assuming it is possible to obtain such cost information from the specific vendor(s)/provider(s) in question).

2. In the absence of specific vendors/providers being specified, or in cases in which specific vendor(s)/provider(s) are specified, but from whom it is not possible to obtain cost information, then Usual, Customary & Reasonable (UCR) cost data is sourced, cited in this Life Care Plan's Vendor Survey, and used for applicable line items in this Life Care Plan's Cost Analysis (assuming it is possible to obtain UCR data using the zip code I assigned to Mr. Tapia's probable location of care, which is 98408, or in the absence of the availability of such data, by relying upon UCR data obtained from within alternative geographical regions located within a 35 mile radius of Mr. Tapia's probable location of care.

3. In the absence of preferred vendors/providers being specified, or in cases in which specific vendor(s)/provider(s) are specified, but from whom it is not possible to obtain cost information, and in the absence of UCR data being available for relevant geographic regions and/or for specific future medical requirements, then cost data in this Survey has been sourced via world-wide web, and/or telephone inquiry from vendors/providers located within a 35 mile radius of Mr. Tapia's probable location of care.  In all cases in which it was reasonably practical to obtain such information; an attempt was made to obtain at least 3 discrete costs from 3 discrete sources, all of which are exhibited (along with the direct contact information for all vendors/providers from which such cost data was obtained) in this Life Care Plan's Cost

---

[14] American Academy of Physician Life Care Planners, A Physician's Guide to Life Care Planning: Tenets, Methods, and Best Practices for Physician Life Care Planners, American Academy of Physician Life Care Planners, Austin, Texas, 2017.

Physician Life Care Planning™

Data/Vendor Sample.  Averages (arithmetic means) for each future medical requirement were then calculated, and the arithmetic mean values were used as the unit costs for respective line items in this Life Care Plan's Cost Analysis.

When sourcing cost data via world-wide web, this Vendor Survey has also included cost data from national online medication, durable equipment and other vendors, e.g. CVS.com, Walgreens.com, Drugstore.com, etc. without affording consideration to the national vendor's actual location, relative to Mr. Tapia's probable location of care.  In cases in which cost data is sourced from such vendors, it has been treated in the same manner as cost data sourced from vendors located within my previously specified 35 miles radius of Mr. Tapia's probable location of care, i.e. such data is cited in this Life Care Plan's Vendor Survey, along with relevant vendor information.  The values of such data were then used in the calculation of arithmetic means which constitute unit costs for respective line items in this Life Care Plan's Cost Analysis.

4.  In cases in which particular medically-related goods/services require sourcing multiple data in order to formulate the cost of a single future medical requirement, e.g. as in the case of an acute care service, such as a surgery in which a cost for an actual surgical procedure, and a cost for a patient's hospitalization may not be able to be sourced as a single value, then values for each individual cost component were obtained, and then summed to calculate a total unit cost for the particular acute care service in question. When obtaining costs in such circumstances, I first looked for the specification of any preferred vendors/providers, and in the absence of such specification/availability, I looked for UCR data, and in the absence of available UCR data, I have sought to obtain cost data from individual vendors/sources via the World Wide Web and/or direct telephone inquiry. All sources from which any component costs were obtained are cited in this life care plan's vendor survey, and the values of such component costs have been summed to establish consolidated unit costs for respective line items.

## 6.1.2   Definitions & Discussion

- **Probable Location of Care & Proximity**

  Prices of medically-related goods and services can vary based upon geographic location.   The geographic scope of this survey is generally defined as a specified radius from the subject's primary residence.  Primary residence ("probable location of care") is defined by the subject's zip code.

  Geographic scope is defined as a 35 mile radius; and the probable location of care is defined using the subject's zip code: 98408.

- **Usual Customary & Reasonable (UCR) Cost Data**

  According to the American Medical Association's *UCR Definition: AMA Policy H-385.923:*

  1. *"Our AMA adopts as policy the following definitions:*

     a. *'usual'; fee means that fee usually charged, for a given service, by an individual physician to his private patient (i.e., his own usual fee);*

     b. *a fee is 'customary' when it is within the range of usual fees currently charged by physicians of similar training and experience, for the same service within the same specific and limited geographical area; and*

     c. *a fee is 'reasonable' when it meets the above two criteria and is justifiable, considering the special circumstances of the particular case in question, without regard to payments that have been discounted under governmental or private plans.*

  2. *Our AMA takes the position that there is no relationship between the Medicare fee schedule and Usual, Customary and Reasonable Fees."[15]*

- **Context4Healthcare**

  Usual Customary & Reasonable cost data in this Life Care Plan is sourced from Context4HealthCare, Inc. **Context4 Healthcare is an independent, disinterested, 3rd-party provider of medical cost data which is <u>endorsed and recommended by the Texas Medical Association</u>** in their essential text, *Business Basics for Physicians*:

  > *"Fees for service should be fair and reasonable for the medical specialty and according to community standards. Practice managers or administrators can perform a fee schedule analysis to determine whether physicians' fees are in line with market rates."*

  Context4 Healthcare's UCR Database is the largest publicly available database of its kind in the United States; and its UCR database is used by hundreds of healthcare organizations across the United States, including by some of the nation's largest payers, such as insurance companies.

  According to Context4Healthcare, its database contains approximately 70 percent of all health care charges submitted for payment in the United States. Context4 Healthcare's UCR Database is representative of charges for a national population of providers, representing a variety of contractual arrangements between payers and providers, and it is large enough to support statistically reliable and valid estimates at small levels of geographic disaggregation, i.e. within small groups of zip codes.

---

[15] https://policysearch.ama-assn.org/policyfinder/detail/Policy%20H-385.923%20?uri=%2FAMADoc%2FHOD.xml-0-3242.xml

Context4Healthcare's UCR Database incorporates data from approximately one billion de-identified medical bills, obtained every six months from a variety of sources—primarily from companies that provide electronic billing and claims processing services to health care providers.  Context4Healthcare's statistical model uses the latest two years of data, which it adjusts for inflation every six months.

Context4Healthcare's UCR Database is arrayed in percentiles from the 25th through the 95th percentile, and is divided into geographical regions throughout the country to account for regional differences in healthcare costs.

Context4Healthcare is one of the longest-standing providers of UCR data, and it has been a leader in UCR fee analysis for over 25 years.  Context4Healthcare is led by a team of highly skilled physicians, statisticians, programmers, software engineers, and executives: www.context4healthcare.com/about/our-management-team.

- **UCR Percentiles & "UCR 80"**

  UCR data as maintained by Context4Healthcare is organized into "conversion factors." These conversion factors are commonly used within the healthcare payer industry for the purpose of establishing benchmarks by which to filter submitted charges.

  "UCR 80" is a shorthand reference to the 80th UCR percentile. Historically, it has been customary for healthcare insurance providers to use "UCR 80" as a standard benchmark against which to measure the acceptability of charges.

  In addition to its relatively ubiquitous application by healthcare payers, use of UCR 80 is also mandated by various states and federal agencies, for example:

  1. The use of UCR 80 is mandated by the Texas State Legislature to resolve disagreements between out-of-network healthcare providers and insurers.[16]

  2. The State of New York has enacted a statute to prevent "surprise bills" and defines the "usual and customary cost" as "the eightieth percentile of all charges for the particular health care service performed by a provider in the same or similar specialty and provided in the same geographical area".[17]

---

[16] Person, J., Texas Department of Insurance, Title 28, Chapter 21, Trade Practices, Austin, Texas, 2019.

[17] New York Financial Services Law, McKinney's Financial Services Law, Article 6: Emergency Medical Services and Surprise Bills, New York, 2015

3.  <u>The United States Veterans Administration ("VA") has mandated that "reasonable charges for medical care or services provided or furnished by VA to a veteran" use the "80th percentile of community charges," with "community" defined using a 3-digit Geo-Zip parameter.[18]</u>

UCR 80 is also the most commonly employed UCR percentile in the discipline of life care planning, and its use is advocated by the American Academy of Physician Life Care Planners.

For these reasons, and because this life care plan presumes the provision of optimal medical care in order to accomplish the *Clinical Objectives of Life Care Planning*, I have used UCR 80 (the 80th UCR percentile) as the conversion factor when sourcing UCR data in this Vendor Survey.

- **Employing UCR Data**

    In order to obtain appropriate UCR cost data, it is necessary to define two basic parameters:

    1.  A subject's zip code that specifies a geographic region.

    2.  Specific CPT (Current Procedural Terminology) codes, or specific DRG (Diagnosis-Related Group) codes, or specific HCPCS (Healthcare Common Procedure Coding System) codes.

    As previously stated, I have selected the zip code 98408, which defines Mr. Tapia's probable location of care.

    UCR Data, as provided by Context4Healthcare is structured into "modules", which include "Medical", "Outpatient Facility", "Inpatient Facility", "Anesthesia", and "HCPCS".

    The future medical requirements specified in this Life Care Plan have been coded for the purpose of soliciting UCR data from relevant UCR modules.

    a.  CPT codes have been assigned to future medical requirements in this life care plan to solicit UCR cost data contained in the Medical Module.  Such items include professional service fees, e.g. physician services, routine diagnostics, laboratory services, etc.

    b.  CPT codes have also been assigned to future medical requirements in this life care plan to solicit UCR cost data contained in the Outpatient Facility Module.  Such items would include outpatient facility fees, e.g. acute care services performed in outpatient hospital settings, ambulatory surgical centers, etc.

    c.  DRG codes have been assigned to future medical requirements in this life care plan to solicit UCR cost data contained in the Inpatient Facility Module.  Such items would include inpatient facility fees, e.g. acute care services performed in inpatient facilities, including inpatient hospitalizations, in-patient admissions ("stays"), etc.

---

[18] Department of Veterans Affairs, 38 CFR Part 17: Reasonable Charges for Medical Care or Services; 2003 Methodology Changes; Proposed Rule and Notice, 2003.

d.  CPT codes have been assigned to future medical requirements in this life care plan to solicit UCR cost data contained in the Anesthesia Module for anesthesia-related fees, such as minimal, moderate, and deep sedation.

e.  HCPCS codes have been assigned to future medical requirements in this life care plan to solicit UCR cost data contained in the HCPCS Module.  The HCPCS Module contains cost data for services not included in the Current Procedural Terminology (CPT) codes, e.g. durable medical equipment and supplies such as mobility devices, hospital beds, injection supplies, orthotics and prosthetics, and other services such as ambulance services, hearing and speech pathology services, etc.

[This space intentionally left blank.]

## 6.2    Cost Data/Vendor Sample

### 6.2.1    Physician Services

- **Physical Medicine & Rehabilitation - New**
  Usual Customary & Reasonable (UCR 80)                                    $478.51
  Medical: 99204

- **Physical Medicine & Rehabilitation**
  Usual Customary & Reasonable (UCR 80)                                    $321.49
  Medical: 99214

- **Pain Management - New**
  Usual Customary & Reasonable (UCR 80)                                    $478.51
  Medical: 99204

- **Pain Management**
  Usual Customary & Reasonable (UCR 80)                                    $321.49
  Medical: 99214

- **Orthopedic Surgeon - New**
  Usual Customary & Reasonable (UCR 80)                                    $478.51
  Medical: 99204

- **Orthopedic Surgeon**
  Usual Customary & Reasonable (UCR 80)                                    $321.49
  Medical: 99214

- **Primary Care Physician**
  Usual Customary & Reasonable (UCR 80)                                    $219.96
  Medical: 99213

- **Wound Management - New**
  Usual Customary & Reasonable (UCR 80)                                    $478.51
  Medical: 99204

- **Wound Management**
  Usual Customary & Reasonable (UCR 80)                                    $321.49
  Medical: 99214

- **Psychologist (1 hr) - New**
  Usual Customary & Reasonable (UCR 80)                                    $284.15
  Medical: 90791

- **Psychologist (1 hr)**
  Usual Customary & Reasonable (UCR 80)                                    $223.86
  Medical: 90837

### 6.2.2   Routine Diagnostics

- **X-Rays: Tibia/Fibula**
  Usual Customary & Reasonable (UCR 80)                                    $110.90
  Medical: 73590

- **X-Rays: Foot: Complete (Min 3 Views)**
  Usual Customary & Reasonable (UCR 80)                                    $133.25
  Medical: 73630

- **X-Rays: Ankle**
  Usual Customary & Reasonable (UCR 80)                                    $139.27
  Medical: 73610

- **X-Rays: Knee (Bilateral)**
  Usual Customary & Reasonable (UCR 80)                                    $349.04
  Medical: 73564 ($349.04 ($174.52 x 2 units))

- **X-Rays: Hip (Min 3-4 views Bilateral)**
  Usual Customary & Reasonable (UCR 80)                                    $183.12
  Medical: 73522

- **X-Rays: Lumbar Spine (2-3 Views)**
  Usual Customary & Reasonable (UCR 80)                                    $171.12
  Medical: 72100

- **X-Rays: Cervical Spine (2-3 Views)**
  Usual Customary & Reasonable (UCR 80)                                    $144.47
  Medical: 72040

- **X-Rays: Shoulder (Min 2 Views)**
  Usual Customary & Reasonable (UCR 80)                                    $151.66
  Medical: 73030

- **EMG/NCS: Upper Extremity (Bilateral, 11-12 Studies)**
  Usual Customary & Reasonable (UCR 80)                                  $1,574.79
  Medical: 95886 ($325.41)
  Medical: 95886 ($325.41)
  Medical: 95912 ($923.97)

### 6.2.3  Medications

Entries accompanied by an asterisk ("*") denote cost samples associated with generic, rather than brand name medications.

- **Neuroleptic**
  **Neurontin** (Gabapentin) 300 mg, #90

  | | |
  |---|---|
  | CVS - Tacoma<br>3320 S. 23rd St.<br>Tacoma, Washington, 98405<br>(253) 414-0303 | $732.99 |
  | CVS - Tacoma*<br>3320 S. 23rd St.<br>Tacoma, Washington, 98405<br>(253) 414-0303 | $80.99 |
  | Rite Aid - Tacoma<br>1850 S. Mildred St.<br>Tacoma, Washington, 98465<br>(253) 460-9599 | $812.00 |
  | Rite Aid - Tacoma*<br>1850 S. Mildred St.<br>Tacoma, Washington, 98465<br>(253) 460-9599 | $103.00 |
  | Walgreens - Tacoma<br>8405 Pacific Ave.<br>Tacoma, Washington, 98444<br>(253) 536-3778 | $665.19 |
  | Walgreens - Tacoma*<br>8405 Pacific Ave.<br>Tacoma, Washington, 98444<br>(253) 536-3778 | $86.99 |
  | Average Cost | $413.53 |

- **NSAID**
  **Naprosyn** (Naproxen) 500 mg, #120

  | | |
  |---|---|
  | CVS - Tacoma<br>3320 S. 23rd St.<br>Tacoma, Washington, 98405<br>(253) 414-0303 | $875.99 |

| | |
|---|---|
| CVS - Tacoma*<br>3320 S. 23rd St.<br>Tacoma, Washington, 98405<br>(253) 414-0303 | $67.99 |
| Rite Aid - Tacoma<br>1850 S. Mildred St.<br>Tacoma, Washington, 98465<br>(253) 460-9599 | $800.00 |
| Rite Aid - Tacoma*<br>1850 S. Mildred St.<br>Tacoma, Washington, 98465<br>(253) 460-9599 | $180.00 |
| Walgreens - Tacoma<br>8405 Pacific Ave.<br>Tacoma, Washington, 98444<br>(253) 536-3778 | $882.79 |
| Walgreens - Tacoma*<br>8405 Pacific Ave.<br>Tacoma, Washington, 98444<br>(253) 536-3778 | $68.49 |
| Average Cost | $479.21 |

- **Analgesic**
  **Tylenol** 325 mg, #100

| | |
|---|---|
| CVS.com | $12.49 |
| Walgreens.com | $10.99 |
| Walmart.com | $9.99 |
| Average Cost | $11.16 |

### 6.2.4  Laboratory Studies

- **Comprehensive Metabolic Panel (Chemistry Profile)**
  Usual Customary & Reasonable (UCR 80)                                  $95.24
  Medical: 80053

- **Complete Blood Count (CBC)**
  Usual Customary & Reasonable (UCR 80)                                  $47.25
  Medical: 85025

- **Urinalysis**
  Usual Customary & Reasonable (UCR 80)                                  $48.17
  Medical: 81001

- **Wound Culture**
  Usual Customary & Reasonable (UCR 80)                                  $107.01
  Medical: 87070

### 6.2.5   Rehabilitation Services

- **Gym Membership (Aquatics)**

  LA Fitness - Tukwila                                              $49.99
  350 Baker Blvd.
  Tukwila, Washington, 98188
  (206) 331-4071

  Matt Griffin YMCA                                                $91.00
  3595 S. 188th St.
  SeaTac, Washington, 98188
  (206) 244-5880

  West Seattle Health Club                                         $68.99
  2629 S.W. Andover St.
  Seattle, Washington, 98126
  (206) 556-3280

  Average Cost                                                     $69.99

- **Personal Trainer**

  FitnessTrainer.com                                               $59.50

  Beometry Personal Training                                       $118.75
  6409 6th Ave., Ste. 6
  Tacoma, Washington, 98406
  (253) 227-5483

  Organically Grown Muscle, L.L.C.                                 $125.00
  5218 S. Tacoma Way
  Tacoma, Washington, 98409
  (360) 434-3896

  Average Cost                                                     $101.08

- **Vocational Evaluation**

  Luis Mas & Associates                                            $2,950.00
  (714) 242-3462

  Premier Vocational Experts, Inc.                                 $5,000.00
  (908) 268-0592

  Average Cost                                                     $3,975.00

- **Vocational Counseling**

  Cotter Careers                                                              $175.00
  (860) 896-5111

  Premier Vocational Experts, Inc.                                            $150.00
  (908) 268-0592

  Average Cost                                                               $162.50

- **Physical Therapy Evaluation (1 hr)**
  Usual Customary & Reasonable (UCR 80)                                       $407.32
  Medical: 97162 ($407.32 ($203.66 x 2 units))

- **Physical Therapy Evaluation: Post Operative (1 hr)**
  Usual Customary & Reasonable (UCR 80)                                       $407.32
  Medical: 97162 ($407.32 ($203.66 x 2 units))

- **Physical Therapy: Periodic (1 hr)**
  Usual Customary & Reasonable (UCR 80)                                       $302.44
  Medical: 97110 ($302.44 ($75.61 x 4 units))

- **Physical Therapy: Post Operative (1 hr)**
  Usual Customary & Reasonable (UCR 80)                                       $302.44
  Medical: 97110 ($302.44 ($75.61 x 4 units))

## 6.2.6   Equipment & Supplies

- **Manual Wheelchair: Maintenance**

  SpinLife.com                                                              $249.00

  WheelchairAndScooterRepairs.com                                          $175.00

  Average Cost                                                             $212.00

- **Power Scooter: Maintenance**

  SpinLife.com                                                              $249.00

  StateWideMobility.com                                                    $125.00

  WSRSolutions.com                                                         $182.50

  Average Cost                                                             $185.50

- **Power Scooter Lift for Vehicle (Hold, Raise & Store)**

  Amazon.com                                                             $2,700.00

  RehabMart.com                                                          $2,480.77

  SpinLife.com                                                           $2,160.00

  Average Cost                                                           $2,446.92

- **Power Scooter Lift for Vehicle (Hold, Raise & Store): Maintenance**

  SpinLife.com                                                              $249.00

  Cost                                                                     $249.00

- **Below Knee Prosthesis**
  Usual Customary & Reasonable (UCR 80)                    $19,926.03
  HCPCS: L5301 ($4,182.14)
  HCPCS: L5620 ($503.97)
  HCPCS: L5629 ($592.44)
  HCPCS: L5637 ($555.06)
  HCPCS: L5645 ($1,331.89)
  HCPCS: L5647 ($1,462.13)
  HCPCS: L5685 ($202.96)
  HCPCS: L5781 ($6,018.26)
  HCPCS: L5910 ($623.15)
  HCPCS: L5940 ($905.71)
  HCPCS: L5970 ($365.12)
  HCPCS: L5988 ($3,020.98)
  HCPCS: L8400 ($86.94 ($28.98 x 3 units))
  HCPCS: L8440 ($75.28)

- **Below Knee Prosthesis: Repair/Maintenance (45 min)**
  Usual Customary & Reasonable (UCR 80)                    $610.22
  HCPCS: L7510 ($429.59)
  HCPCS: L7520 ($180.63 ($60.21 x 3 units))

- **Below Knee Prosthesis: Recreational Leg**
  Usual Customary & Reasonable (UCR 80)                    $28,322.95
  HCPCS: L5301 ($4,182.14)
  HCPCS: L5620 ($503.97)
  HCPCS: L5629 ($592.44)
  HCPCS: L5637 ($555.06)
  HCPCS: L5645 ($1,331.89)
  HCPCS: L5647 ($1,462.13)
  HCPCS: L5671 ($890.30)
  HCPCS: L5781 ($6,018.26)
  HCPCS: L5910 ($623.15)
  HCPCS: L5940 ($905.71)
  HCPCS: L5980 ($5,946.35)
  HCPCS: L5984 ($1,022.77)
  HCPCS: L5986 ($1,105.58)
  HCPCS: L5988 ($3,020.98)
  HCPCS: L8400 ($86.94 ($28.98 x 3 units))
  HCPCS: L8440 ($75.28)

- **Below Knee Prosthesis: Recreational Leg - Repair/Maintenance (45 min)**
  Usual Customary & Reasonable (UCR 80)                    $610.22
  HCPCS: L7510 ($429.59)
  HCPCS: L7520 ($180.63 ($60.21 x 3 units))

- **Below Knee Prosthesis: Water Leg**
  Usual Customary & Reasonable (UCR 80)                                    $18,924.48
  HCPCS: L5301 ($4,182.14)
  HCPCS: L5622 ($668.15)
  HCPCS: L5637 ($555.06)
  HCPCS: L5645 ($1,331.89)
  HCPCS: L5647 ($1,462.13)
  HCPCS: L5653 ($935.96)
  HCPCS: L5679 ($1,968.80 ($984.40 x 2 units))
  HCPCS: L5685 ($202.96)
  HCPCS: L5910 ($623.15)
  HCPCS: L5940 ($905.71)
  HCPCS: L5981 ($4,982.95)
  HCPCS: L5986 ($1,105.58)

- **Below Knee Prosthesis: Water Leg - Repair/Maintenance (45 min)**
  Usual Customary & Reasonable (UCR 80)                                    $610.22
  HCPCS: L7510 ($429.59)
  HCPCS: L7520 ($180.63 ($60.21 x 3 units))

- **Below Knee Prosthesis: Liner & Sealing Sleeve**
  Usual Customary & Reasonable (UCR 80)                                    $1,187.36
  HCPCS: L5679 ($984.40)
  HCPCS: L5685 ($202.96)

- **Below Knee Prosthesis: Sock (Single Ply)**
  Usual Customary & Reasonable (UCR 80)                                    $11.88
  HCPCS: L8470

- **Below Knee Prosthesis: Sock (Multiple Ply)**
  Usual Customary & Reasonable (UCR 80)                                    $34.05
  HCPCS: L8420

- **Single Tip Cane**
  Usual Customary & Reasonable (UCR 80)                                    $39.70
  HCPCS: E0100

- **Crutches**
  Usual Customary & Reasonable (UCR 80)                                    $93.14
  HCPCS: E0114

- **Folding Walker**
  Usual Customary & Reasonable (UCR 80)                                    $123.11
  HCPCS: E0135

Physician Life Care Planning™

- **Lightweight Wheelchair for Travel/Backup**
  Usual Customary & Reasonable (UCR 80)                          $2,407.61
  HCPCS: K0004

- **Wheelchair Seat Cushion**
  Usual Customary & Reasonable (UCR 80)                          $122.72
  HCPCS: E2601

- **Wheelchair Seat Cushion Cover**
  Usual Customary & Reasonable (UCR 80)                          $230.46
  HCPCS: E2619

- **Power Scooter**
  Usual Customary & Reasonable (UCR 80)                          $5,674.07
  HCPCS: E1230 ($4,078.49)
  HCPCS: E2363 ($1,595.58 ($797.79 x 2 units))

- **Power Scooter: Battery (2)**
  Usual Customary & Reasonable (UCR 80)                          $1,595.58
  HCPCS: E2363 ($1,595.58 ($797.79 x 2 units))

### 6.2.7   Environmental Modifications & Essential Services

- **Essential Services**
  Allowance                                                    $100.00

### 6.2.8  Nursing & Attendant Care

- **Home Health Aide 4 Hours**

  CayCare Elder Care                                        $32.50 hourly ($130.00 for 4 hours)
  2723 E. Main St.
  Puyallup, Washington, 98372
  (253) 777-3804

  Eden Home Health - King/Pierce County                    $37.50 hourly ($150.00 for 4 hours)
  733 7th Ave., Ste. 110
  Kirkland, Washington, 98033
  (206) 717-8161

  Right at Home - Seattle                                  $43.50 hourly ($174.00 for 4 hours)
  11222 N.E. Roosevelt Way
  Seattle, Washington, 98125
  (206) 774-1100
  _____
  Average Cost                                             $151.32 (for 4 hours)

- **Home Health Aide 8 Hours**

  CayCare Elder Care                                        $32.50 hourly ($260.00 for 8 hours)
  2723 E. Main St.
  Puyallup, Washington, 98372
  (253) 777-3804

  Eden Home Health - King/Pierce County                    $37.50 hourly ($300.00 for 8 hours)
  733 7th Ave., Ste. 110
  Kirkland, Washington, 98033
  (206) 717-8161

  Right at Home - Seattle                                  $43.50 hourly ($348.00 for 8 hours)
  11222 N.E. Roosevelt Way
  Seattle, Washington, 98125
  (206) 774-1100
  _____
  Average Cost                                             $302.64 (for 8 hours)

- **RN Supervision**

  CayCare Elder Care                                        $200.00
  2723 E. Main St.
  Puyallup, Washington, 98372
  (253) 777-3804

Physician Life Care Planning™

Eden Home Health - King/Pierce County                                    $250.00
733 7th Ave., Ste. 110
Kirkland, Washington, 98033
(206) 717-8161

Right at Home - Seattle                                                  $250.00
11222 N.E. Roosevelt Way
Seattle, Washington, 98125
(206) 774-1100

                                                                        _____
Average Cost                                                             $233.33

Physician Life Care Planning™

### 6.2.9   Acute Care Services

- **Below Knee Residual Limb Revision: Minor (3 Days, Anesthesia 120 min)**
  Usual Customary & Reasonable (UCR 80)                                          $51,500.94
  DRG-IP FAC: 00476 ($45,487.65 ($15,162.55 x 3 days))
  Anesthesia: 01482 ($2,056.98 (120 min))
  Medical: 27884 ($3,956.31)

# 7   Cost Analysis

This Cost Analysis ("Analysis") quantifies the nominal monetary value of providing Mr. Tapia with the medically-related goods and services specified in Section 5, Future Medical Requirements.

## 7.1    Definition & Discussion of Quantitative Methods

### 7.1.1    Nominal Value

This Analysis quantifies all costs in nominal value, or "today's dollars", and it does not account for the time value of money, i.e. it does not account for inflation or discounts to formulate future and/or present values.

### 7.1.2    Accounting Methods

This Analysis quantifies the value of future medical requirements by employing Cash Method Accounting, in which values are accounted for within periods in which cash outflows associated with the acquisition of future medical requirements are forecast to occur.

### 7.1.3    Variables

#### 7.1.3.1    Independent Variables

To quantify this life care plan's future medical requirements, this cost analysis considers the following independent variables:

1. Start Date (starting period)

2. Quantity

3. Interval

4. Duration

5. Unit Cost

#### 7.1.3.2    Dependent Variables

From the preceding independent variables, the following dependent variable is derived:

1. Frequency = (Quantity ÷ Interval)

### 7.1.3.3    Unit Costs

- In cases in which Usual Customary & Reasonable (UCR) data has been employed, single value unit costs, as specified in this Life Care Plan's Cost/Vendor Sample are employed.

- In cases in which multiple prices have been sourced from independent vendors/providers, unit costs = arithmetic means.  An arithmetic mean = the sum of the values in the sample ÷ the number of values in the sample.

- In cases in which multiple component costs have been sourced to constitute a single item, e.g. a surgery consisting of multiple components, all component costs are summed into a consolidated, single value.

### 7.1.3.4    Counts & Conventions

All quantities, intervals, and durations employed in this Cost Analysis are exhibited within the heading of each future medical requirement contained in this cost analysis.  All variables pertaining to time correlate to the Gregorian Calendar.

### 7.1.4    Miscellaneous

- **Nursing and/or Attendant Care:** accounts only for services directly associated with providing nursing and/or attendant care.  Nursing and attendant care does not account for "Essential Services", or "Household Services", i.e. "domestic services", or replacement services which include the execution of household chores, and other activities associated with maintaining a household, e.g. inside housework, food cooking & cleanup, obtaining services for household, etc.

## 7.2    Summary Restatement of Central Opinions

### 7.2.1    Relevant Diagnostic Condition Affecting Necessity of Future Care

- **Condition 1:** Complications associated with left lower extremity phlegmasia cerulea dolens (acute extensive venous thrombosis) reported to have been diagnosed on October 1, 2018.

- **Condition 2:** Status post left transtibial amputation on October 10, 2018.

- **Condition 3:** Residual limb pain and skin problems.

- **Condition 4:** Phantom limb sensation and pain.

- **Condition 5:** Gait disorder with mobility and activities of daily living skills deficits.

- **Condition 6:** Left knee pain.

- **Condition 7:** Right ankle/foot pain.

- **Condition 8:** Mechanical cervical and lumbar spine pain.

- **Condition 9:** Left shoulder pain.

- **Condition 10:** Adjustment disorder with anxiety and depressed mood.

### 7.2.2    Relevant Disabilities Affecting Necessity of Future Care

- Decreased ability to perform activities of daily living (ADLs) e.g. bathing, dressing, etc.

- Decreased locomotion e.g. walking, transferring, etc.

- Decreased external mobility e.g. community ambulation, etc.

- Decreased ability to perform household services e.g. inside housework, food cooking & clean-up, caring for and maintaining pets, home and vehicles, household management, shopping for household, etc.

- Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc.

- Decreased ability to perform or maintain traditional roles within family, relationships or other social units.

- Decreased ability to interact and/or socialize with family, and/or friends and acquaintances.

- Decreased ability to participate in social avocational activities, i.e. participation in activities with others e.g. participation in sports, participation in community activities, etc.

- Decreased physical function affecting a loss of vocational capacities/opportunities.

### 7.2.3   Probable Duration of Care Metrics

- Name                                                                      Javier Tapia

- Date of Birth                                                          March 3, 1982

- Date of Injury/Illness                                          October 1, 2018

- Present Date                                                        January 17, 2024

- Current Age                                                        41

- Average Residual Years                                        37

- Average Life Expectancy                                      78

- Projected Duration of Care                                  37

## 7.3   Quantitative Summary of Future Medical Requirements

### 7.3.1   Summary of Cost Projections

| Care / Treatment Category | Life Time Cost | Percentage of Total |
|---|---|---|
| Physician Services | $99,257.55 | 4.05% |
| Routine Diagnostics | $16,177.28 | 0.66% |
| Medications | $208,595.88 | 8.51% |
| Laboratory Studies | $7,482.46 | 0.31% |
| Rehabilitation Services | $81,456.76 | 3.32% |
| Equipment & Supplies | $694,902.50 | 28.34% |
| Environmental Modifications & Essential Services | $44,400.00 | 1.81% |
| Nursing & Attendant Care | $1,197,175.20 | 48.82% |
| Acute Care Services | $103,001.88 | 4.20% |
| **TOTAL** | **$2,452,449.51** | **100%** |

**7.3.1.1   Summary of Cost Projections, Continued**



## 7.4    Categorical Quantification of Future Medical Requirements

### 7.4.1    Physician Services Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (per) | Duration | Unit Cost | Total Cost |
|------|------------------|--------------|------------------|----------------|----------|-----------|------------|
| 1 | Physical Medicine & Rehabilitation - New | 41 | 1 | 1 year | 1 year | $478.51 | $478.51 |
| 2 | Physical Medicine & Rehabilitation | 41 | 3 | 1 year | 37 years | $321.49 | $35,685.39 |
| 3 | Pain Management - New | 41 | 1 | 1 year | 1 year | $478.51 | $478.51 |
| 4 | Pain Management | 41 | 3 | 1 year | 3 years | $321.49 | $2,893.41 |
| 5 | Pain Management | 44 | 1 | 1 year | 34 years | $321.49 | $10,930.66 |
| 6 | Orthopedic Surgeon - New | 41 | 1 | 5 years | 37 years | $478.51 | $3,828.08 |
| 7 | Orthopedic Surgeon | 41 | 4 | 5 years | 37 years | $321.49 | $10,287.68 |
| 8 | Primary Care Physician | 41 | 1 | 1 year | 37 years | $219.96 | $8,138.52 |
| 9 | Wound Management - New | 41 | 1 | 10 years | 37 years | $478.51 | $1,914.04 |
| 10 | Wound Management | 41 | 5 | 10 years | 37 years | $321.49 | $6,429.80 |
| 11 | Psychologist (1 hr) - New | 41 | 1 | 1 year | 1 year | $284.15 | $284.15 |
| 12 | Psychologist (1 hr) | 41 | 10 | 5 years | 37 years | $223.86 | $17,908.80 |
| **Physician Services Subtotal** | | | | | | | **$99,257.55** |

| 1. Physical Medicine & Rehabilitation - New: Start at Age 41; 1 time, per 1 year, for 1 year, at $478.51 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $478.51 | $478.51 |
| **Subtotal** | | | | **$478.51** |

Physician Life Care Planning™

| | | | | |
|---|---|---|---|---|
| **2. Physical Medicine & Rehabilitation: Start at Age 41; 3 times, per 1 year, for 37 years, at $321.49 per unit.** | | | | |
| **Age** | **Year** | **Quantity per Year** | **Unit Cost** | **Nominal Value** |
| 41 | 1 | 3 | $321.49 | $964.47 |
| 42 | 2 | 3 | $321.49 | $964.47 |
| 43 | 3 | 3 | $321.49 | $964.47 |
| 44 | 4 | 3 | $321.49 | $964.47 |
| 45 | 5 | 3 | $321.49 | $964.47 |
| 46 | 6 | 3 | $321.49 | $964.47 |
| 47 | 7 | 3 | $321.49 | $964.47 |
| 48 | 8 | 3 | $321.49 | $964.47 |
| 49 | 9 | 3 | $321.49 | $964.47 |
| 50 | 10 | 3 | $321.49 | $964.47 |
| 51 | 11 | 3 | $321.49 | $964.47 |
| 52 | 12 | 3 | $321.49 | $964.47 |
| 53 | 13 | 3 | $321.49 | $964.47 |
| 54 | 14 | 3 | $321.49 | $964.47 |
| 55 | 15 | 3 | $321.49 | $964.47 |
| 56 | 16 | 3 | $321.49 | $964.47 |
| 57 | 17 | 3 | $321.49 | $964.47 |
| 58 | 18 | 3 | $321.49 | $964.47 |
| 59 | 19 | 3 | $321.49 | $964.47 |
| 60 | 20 | 3 | $321.49 | $964.47 |
| 61 | 21 | 3 | $321.49 | $964.47 |
| 62 | 22 | 3 | $321.49 | $964.47 |
| 63 | 23 | 3 | $321.49 | $964.47 |
| 64 | 24 | 3 | $321.49 | $964.47 |
| 65 | 25 | 3 | $321.49 | $964.47 |

| | | | | |
|---|---|---|---|---|
| 66 | 26 | 3 | $321.49 | $964.47 |
| 67 | 27 | 3 | $321.49 | $964.47 |
| 68 | 28 | 3 | $321.49 | $964.47 |
| 69 | 29 | 3 | $321.49 | $964.47 |
| 70 | 30 | 3 | $321.49 | $964.47 |
| 71 | 31 | 3 | $321.49 | $964.47 |
| 72 | 32 | 3 | $321.49 | $964.47 |
| 73 | 33 | 3 | $321.49 | $964.47 |
| 74 | 34 | 3 | $321.49 | $964.47 |
| 75 | 35 | 3 | $321.49 | $964.47 |
| 76 | 36 | 3 | $321.49 | $964.47 |
| 77 | 37 | 3 | $321.49 | $964.47 |
| **Subtotal** | | | | **$35,685.39** |

| 3. Pain Management - New: Start at Age 41; 1 time, per 1 year, for 1 year, at $478.51 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $478.51 | $478.51 |
| **Subtotal** | | | | **$478.51** |

| 4. Pain Management: Start at Age 41; 3 times, per 1 year, for 3 years, at $321.49 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 3 | $321.49 | $964.47 |
| 42 | 2 | 3 | $321.49 | $964.47 |
| 43 | 3 | 3 | $321.49 | $964.47 |
| Subtotal | | | | $2,893.41 |

**5. Pain Management: Start at Age 44; 1 time, per 1 year, for 34 years, at $321.49 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 44 | 1 | 1 | $321.49 | $321.49 |
| 45 | 2 | 1 | $321.49 | $321.49 |
| 46 | 3 | 1 | $321.49 | $321.49 |
| 47 | 4 | 1 | $321.49 | $321.49 |
| 48 | 5 | 1 | $321.49 | $321.49 |
| 49 | 6 | 1 | $321.49 | $321.49 |
| 50 | 7 | 1 | $321.49 | $321.49 |
| 51 | 8 | 1 | $321.49 | $321.49 |
| 52 | 9 | 1 | $321.49 | $321.49 |
| 53 | 10 | 1 | $321.49 | $321.49 |
| 54 | 11 | 1 | $321.49 | $321.49 |
| 55 | 12 | 1 | $321.49 | $321.49 |
| 56 | 13 | 1 | $321.49 | $321.49 |
| 57 | 14 | 1 | $321.49 | $321.49 |
| 58 | 15 | 1 | $321.49 | $321.49 |
| 59 | 16 | 1 | $321.49 | $321.49 |
| 60 | 17 | 1 | $321.49 | $321.49 |
| 61 | 18 | 1 | $321.49 | $321.49 |
| 62 | 19 | 1 | $321.49 | $321.49 |
| 63 | 20 | 1 | $321.49 | $321.49 |
| 64 | 21 | 1 | $321.49 | $321.49 |
| 65 | 22 | 1 | $321.49 | $321.49 |
| 66 | 23 | 1 | $321.49 | $321.49 |
| 67 | 24 | 1 | $321.49 | $321.49 |
| 68 | 25 | 1 | $321.49 | $321.49 |

| 69 | 26 | 1 | $321.49 | $321.49 |
|----|----|----|---------|---------|
| 70 | 27 | 1 | $321.49 | $321.49 |
| 71 | 28 | 1 | $321.49 | $321.49 |
| 72 | 29 | 1 | $321.49 | $321.49 |
| 73 | 30 | 1 | $321.49 | $321.49 |
| 74 | 31 | 1 | $321.49 | $321.49 |
| 75 | 32 | 1 | $321.49 | $321.49 |
| 76 | 33 | 1 | $321.49 | $321.49 |
| 77 | 34 | 1 | $321.49 | $321.49 |
| **Subtotal** | | | | **$10,930.66** |

Physician Life Care Planning™

| 6. Orthopedic Surgeon - New: Start at Age 41; 1 time, per 5 years, for 37 years, at $478.51 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $478.51 | $478.51 |
| 46 | 6 | 1 | $478.51 | $478.51 |
| 51 | 11 | 1 | $478.51 | $478.51 |
| 56 | 16 | 1 | $478.51 | $478.51 |
| 61 | 21 | 1 | $478.51 | $478.51 |
| 66 | 26 | 1 | $478.51 | $478.51 |
| 71 | 31 | 1 | $478.51 | $478.51 |
| 76 | 36 | 1 | $478.51 | $478.51 |
| **Subtotal** | | | | **$3,828.08** |

| **7. Orthopedic Surgeon: Start at Age 41; 4 times, per 5 years, for 37 years, at $321.49 per unit.** | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 4 | $321.49 | $1,285.96 |
| 46 | 6 | 4 | $321.49 | $1,285.96 |
| 51 | 11 | 4 | $321.49 | $1,285.96 |
| 56 | 16 | 4 | $321.49 | $1,285.96 |
| 61 | 21 | 4 | $321.49 | $1,285.96 |
| 66 | 26 | 4 | $321.49 | $1,285.96 |
| 71 | 31 | 4 | $321.49 | $1,285.96 |
| 76 | 36 | 4 | $321.49 | $1,285.96 |
| **Subtotal** | | | | **$10,287.68** |

**8. Primary Care Physician: Start at Age 41; 1 time, per 1 year, for 37 years, at $219.96 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 41 | 1 | 1 | $219.96 | $219.96 |
| 42 | 2 | 1 | $219.96 | $219.96 |
| 43 | 3 | 1 | $219.96 | $219.96 |
| 44 | 4 | 1 | $219.96 | $219.96 |
| 45 | 5 | 1 | $219.96 | $219.96 |
| 46 | 6 | 1 | $219.96 | $219.96 |
| 47 | 7 | 1 | $219.96 | $219.96 |
| 48 | 8 | 1 | $219.96 | $219.96 |
| 49 | 9 | 1 | $219.96 | $219.96 |
| 50 | 10 | 1 | $219.96 | $219.96 |
| 51 | 11 | 1 | $219.96 | $219.96 |
| 52 | 12 | 1 | $219.96 | $219.96 |
| 53 | 13 | 1 | $219.96 | $219.96 |
| 54 | 14 | 1 | $219.96 | $219.96 |
| 55 | 15 | 1 | $219.96 | $219.96 |
| 56 | 16 | 1 | $219.96 | $219.96 |
| 57 | 17 | 1 | $219.96 | $219.96 |
| 58 | 18 | 1 | $219.96 | $219.96 |
| 59 | 19 | 1 | $219.96 | $219.96 |
| 60 | 20 | 1 | $219.96 | $219.96 |
| 61 | 21 | 1 | $219.96 | $219.96 |
| 62 | 22 | 1 | $219.96 | $219.96 |
| 63 | 23 | 1 | $219.96 | $219.96 |
| 64 | 24 | 1 | $219.96 | $219.96 |
| 65 | 25 | 1 | $219.96 | $219.96 |

| 66 | 26 | 1 | $219.96 | $219.96 |
|---|---|---|---|---|
| 67 | 27 | 1 | $219.96 | $219.96 |
| 68 | 28 | 1 | $219.96 | $219.96 |
| 69 | 29 | 1 | $219.96 | $219.96 |
| 70 | 30 | 1 | $219.96 | $219.96 |
| 71 | 31 | 1 | $219.96 | $219.96 |
| 72 | 32 | 1 | $219.96 | $219.96 |
| 73 | 33 | 1 | $219.96 | $219.96 |
| 74 | 34 | 1 | $219.96 | $219.96 |
| 75 | 35 | 1 | $219.96 | $219.96 |
| 76 | 36 | 1 | $219.96 | $219.96 |
| 77 | 37 | 1 | $219.96 | $219.96 |
| **Subtotal** | | | | **$8,138.52** |

**9. Wound Management - New: Start at Age 41; 1 time, per 10 years, for 37 years, at $478.51 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 41 | 1 | 1 | $478.51 | $478.51 |
| 51 | 11 | 1 | $478.51 | $478.51 |
| 61 | 21 | 1 | $478.51 | $478.51 |
| 71 | 31 | 1 | $478.51 | $478.51 |
| **Subtotal** | | | | **$1,914.04** |

| 10. Wound Management: Start at Age 41; 5 times, per 10 years, for 37 years, at $321.49 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 5 | $321.49 | $1,607.45 |
| 51 | 11 | 5 | $321.49 | $1,607.45 |
| 61 | 21 | 5 | $321.49 | $1,607.45 |
| 71 | 31 | 5 | $321.49 | $1,607.45 |
| Subtotal | | | | $6,429.80 |

Physician Life Care Planning™

| 11. Psychologist (1 hr) - New: Start at Age 41; 1 time, per 1 year, for 1 year, at $284.15 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $284.15 | $284.15 |
| **Subtotal** | | | | **$284.15** |

| 12. Psychologist (1 hr): Start at Age 41; 10 times, per 5 years, for 37 years, at $223.86 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 10 | $223.86 | $2,238.60 |
| 46 | 6 | 10 | $223.86 | $2,238.60 |
| 51 | 11 | 10 | $223.86 | $2,238.60 |
| 56 | 16 | 10 | $223.86 | $2,238.60 |
| 61 | 21 | 10 | $223.86 | $2,238.60 |
| 66 | 26 | 10 | $223.86 | $2,238.60 |
| 71 | 31 | 10 | $223.86 | $2,238.60 |
| 76 | 36 | 10 | $223.86 | $2,238.60 |
| **Subtotal** | | | | **$17,908.80** |

Physician Life Care Planning™

## 7.4.2  Routine Diagnostics Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (per) | Duration | Unit Cost | Total Cost |
|------|-----------------|--------------|------------------|----------------|----------|-----------|------------|
| 1 | X-Rays: Tibia/Fibula | 41 | 1 | 5 years | 37 years | $110.90 | $887.20 |
| 2 | X-Rays: Foot: Complete (Min 3 Views) | 41 | 1 | 5 years | 37 years | $133.25 | $1,066.00 |
| 3 | X-Rays: Ankle | 41 | 1 | 5 years | 37 years | $139.27 | $1,114.16 |
| 4 | X-Rays: Knee (Bilateral) | 41 | 1 | 5 years | 37 years | $349.04 | $2,792.32 |
| 5 | X-Rays: Hip (Min 3-4 views Bilateral) | 41 | 1 | 5 years | 37 years | $183.12 | $1,464.96 |
| 6 | X-Rays: Lumbar Spine (2-3 Views) | 41 | 1 | 5 years | 37 years | $171.12 | $1,368.96 |
| 7 | X-Rays: Cervical Spine (2-3 Views) | 41 | 1 | 10 years | 37 years | $144.47 | $577.88 |
| 8 | X-Rays: Shoulder (Min 2 Views) | 41 | 1 | 10 years | 37 years | $151.66 | $606.64 |
| 9 | EMG/NCS: Upper Extremity (Bilateral, 11-12 Studies) | 41 | 1 | 10 years | 37 years | $1,574.79 | $6,299.16 |
| **Routine Diagnostics Subtotal** | | | | | | | **$16,177.28** |

| 1. X-Rays: Tibia/Fibula: Start at Age 41; 1 time, per 5 years, for 37 years, at $110.90 per unit. | | | | |
|---|---|---|---|---|
| **Age** | **Year** | **Quantity per Year** | **Unit Cost** | **Nominal Value** |
| 41 | 1 | 1 | $110.90 | $110.90 |
| 46 | 6 | 1 | $110.90 | $110.90 |
| 51 | 11 | 1 | $110.90 | $110.90 |
| 56 | 16 | 1 | $110.90 | $110.90 |
| 61 | 21 | 1 | $110.90 | $110.90 |
| 66 | 26 | 1 | $110.90 | $110.90 |
| 71 | 31 | 1 | $110.90 | $110.90 |
| 76 | 36 | 1 | $110.90 | $110.90 |
| **Subtotal** | | | | **$887.20** |

| 2. X-Rays: Foot: Complete (Min 3 Views): Start at Age 41; 1 time, per 5 years, for 37 years, at $133.25 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $133.25 | $133.25 |
| 46 | 6 | 1 | $133.25 | $133.25 |
| 51 | 11 | 1 | $133.25 | $133.25 |
| 56 | 16 | 1 | $133.25 | $133.25 |
| 61 | 21 | 1 | $133.25 | $133.25 |
| 66 | 26 | 1 | $133.25 | $133.25 |
| 71 | 31 | 1 | $133.25 | $133.25 |
| 76 | 36 | 1 | $133.25 | $133.25 |
| **Subtotal** | | | | **$1,066.00** |

| 3. X-Rays: Ankle: Start at Age 41; 1 time, per 5 years, for 37 years, at $139.27 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $139.27 | $139.27 |
| 46 | 6 | 1 | $139.27 | $139.27 |
| 51 | 11 | 1 | $139.27 | $139.27 |
| 56 | 16 | 1 | $139.27 | $139.27 |
| 61 | 21 | 1 | $139.27 | $139.27 |
| 66 | 26 | 1 | $139.27 | $139.27 |
| 71 | 31 | 1 | $139.27 | $139.27 |
| 76 | 36 | 1 | $139.27 | $139.27 |
| **Subtotal** | | | | **$1,114.16** |

| 4. X-Rays: Knee (Bilateral): Start at Age 41; 1 time, per 5 years, for 37 years, at $349.04 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $349.04 | $349.04 |
| 46 | 6 | 1 | $349.04 | $349.04 |
| 51 | 11 | 1 | $349.04 | $349.04 |
| 56 | 16 | 1 | $349.04 | $349.04 |
| 61 | 21 | 1 | $349.04 | $349.04 |
| 66 | 26 | 1 | $349.04 | $349.04 |
| 71 | 31 | 1 | $349.04 | $349.04 |
| 76 | 36 | 1 | $349.04 | $349.04 |
| **Subtotal** | | | | **$2,792.32** |

| 5. X-Rays: Hip (Min 3-4 views Bilateral): Start at Age 41; 1 time, per 5 years, for 37 years, at $183.12 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $183.12 | $183.12 |
| 46 | 6 | 1 | $183.12 | $183.12 |
| 51 | 11 | 1 | $183.12 | $183.12 |
| 56 | 16 | 1 | $183.12 | $183.12 |
| 61 | 21 | 1 | $183.12 | $183.12 |
| 66 | 26 | 1 | $183.12 | $183.12 |
| 71 | 31 | 1 | $183.12 | $183.12 |
| 76 | 36 | 1 | $183.12 | $183.12 |
| Subtotal | | | | $1,464.96 |

Physician Life Care Planning™

| 6. X-Rays: Lumbar Spine (2-3 Views): Start at Age 41; 1 time, per 5 years, for 37 years, at $171.12 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $171.12 | $171.12 |
| 46 | 6 | 1 | $171.12 | $171.12 |
| 51 | 11 | 1 | $171.12 | $171.12 |
| 56 | 16 | 1 | $171.12 | $171.12 |
| 61 | 21 | 1 | $171.12 | $171.12 |
| 66 | 26 | 1 | $171.12 | $171.12 |
| 71 | 31 | 1 | $171.12 | $171.12 |
| 76 | 36 | 1 | $171.12 | $171.12 |
| **Subtotal** | | | | **$1,368.96** |

| 7. X-Rays: Cervical Spine (2-3 Views): Start at Age 41; 1 time, per 10 years, for 37 years, at $144.47 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $144.47 | $144.47 |
| 51 | 11 | 1 | $144.47 | $144.47 |
| 61 | 21 | 1 | $144.47 | $144.47 |
| 71 | 31 | 1 | $144.47 | $144.47 |
| **Subtotal** | | | | **$577.88** |

| 8. X-Rays: Shoulder (Min 2 Views): Start at Age 41; 1 time, per 10 years, for 37 years, at $151.66 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $151.66 | $151.66 |
| 51 | 11 | 1 | $151.66 | $151.66 |
| 61 | 21 | 1 | $151.66 | $151.66 |
| 71 | 31 | 1 | $151.66 | $151.66 |
| Subtotal | | | | $606.64 |

**9. EMG/NCS: Upper Extremity (Bilateral, 11-12 Studies): Start at Age 41; 1 time, per 10 years, for 37 years, at $1,574.79 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|---|---|---|---|---|
| 41 | 1 | 1 | $1,574.79 | $1,574.79 |
| 51 | 11 | 1 | $1,574.79 | $1,574.79 |
| 61 | 21 | 1 | $1,574.79 | $1,574.79 |
| 71 | 31 | 1 | $1,574.79 | $1,574.79 |
| **Subtotal** | | | | **$6,299.16** |

### 7.4.3  Medications Costs

| Item | Item Description | Begin at Age | Quantity (Doses) | Interval (per) | Duration | Doses per Container | Unit (Container) Cost | Total Cost |
|------|------------------|--------------|------------------|----------------|----------|---------------------|-----------------------|------------|
| 1 | Neuroleptic: Neurontin | 41 | 90 | 1 month | 37 years | 90 | $413.53 | $183,607.32 |
| 2 | NSAID: Naprosyn | 41 | 120 | 6 months | 24 years | 120 | $479.21 | $23,002.08 |
| 3 | Analgesic: Tylenol | 41 | 120 | 3 months | 37 years | 100 | $11.16 | $1,986.48 |
| **Medications Subtotal** | | | | | | | | **$208,595.88** |

Physician Life Care Planning™

| 1. Neuroleptic: Neurontin: Start at Age 41; 90 doses, per 1 month, for 37 years, at $413.53 per unit, quantity per container: 90 |

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 41 | 1 | 12 | $413.53 | $4,962.36 |
| 42 | 2 | 12 | $413.53 | $4,962.36 |
| 43 | 3 | 12 | $413.53 | $4,962.36 |
| 44 | 4 | 12 | $413.53 | $4,962.36 |
| 45 | 5 | 12 | $413.53 | $4,962.36 |
| 46 | 6 | 12 | $413.53 | $4,962.36 |
| 47 | 7 | 12 | $413.53 | $4,962.36 |
| 48 | 8 | 12 | $413.53 | $4,962.36 |
| 49 | 9 | 12 | $413.53 | $4,962.36 |
| 50 | 10 | 12 | $413.53 | $4,962.36 |
| 51 | 11 | 12 | $413.53 | $4,962.36 |
| 52 | 12 | 12 | $413.53 | $4,962.36 |
| 53 | 13 | 12 | $413.53 | $4,962.36 |
| 54 | 14 | 12 | $413.53 | $4,962.36 |
| 55 | 15 | 12 | $413.53 | $4,962.36 |
| 56 | 16 | 12 | $413.53 | $4,962.36 |
| 57 | 17 | 12 | $413.53 | $4,962.36 |
| 58 | 18 | 12 | $413.53 | $4,962.36 |
| 59 | 19 | 12 | $413.53 | $4,962.36 |
| 60 | 20 | 12 | $413.53 | $4,962.36 |
| 61 | 21 | 12 | $413.53 | $4,962.36 |
| 62 | 22 | 12 | $413.53 | $4,962.36 |
| 63 | 23 | 12 | $413.53 | $4,962.36 |
| 64 | 24 | 12 | $413.53 | $4,962.36 |
| 65 | 25 | 12 | $413.53 | $4,962.36 |

| 66 | 26 | 12 | $413.53 | $4,962.36 |
|---|---|---|---|---|
| 67 | 27 | 12 | $413.53 | $4,962.36 |
| 68 | 28 | 12 | $413.53 | $4,962.36 |
| 69 | 29 | 12 | $413.53 | $4,962.36 |
| 70 | 30 | 12 | $413.53 | $4,962.36 |
| 71 | 31 | 12 | $413.53 | $4,962.36 |
| 72 | 32 | 12 | $413.53 | $4,962.36 |
| 73 | 33 | 12 | $413.53 | $4,962.36 |
| 74 | 34 | 12 | $413.53 | $4,962.36 |
| 75 | 35 | 12 | $413.53 | $4,962.36 |
| 76 | 36 | 12 | $413.53 | $4,962.36 |
| 77 | 37 | 12 | $413.53 | $4,962.36 |
| **Subtotal** | | | | **$183,607.32** |

Physician Life Care Planning™

| **2. NSAID: Naprosyn: Start at Age 41; 120 doses, per 6 months, for 24 years, at \$479.21 per unit, quantity per container: 120** |
|---|
| **Age** | **Year** | **Quantity per Year** | **Unit Cost** | **Nominal Value** |
| 41 | 1 | 2 | $479.21 | $958.42 |
| 42 | 2 | 2 | $479.21 | $958.42 |
| 43 | 3 | 2 | $479.21 | $958.42 |
| 44 | 4 | 2 | $479.21 | $958.42 |
| 45 | 5 | 2 | $479.21 | $958.42 |
| 46 | 6 | 2 | $479.21 | $958.42 |
| 47 | 7 | 2 | $479.21 | $958.42 |
| 48 | 8 | 2 | $479.21 | $958.42 |
| 49 | 9 | 2 | $479.21 | $958.42 |
| 50 | 10 | 2 | $479.21 | $958.42 |
| 51 | 11 | 2 | $479.21 | $958.42 |
| 52 | 12 | 2 | $479.21 | $958.42 |
| 53 | 13 | 2 | $479.21 | $958.42 |
| 54 | 14 | 2 | $479.21 | $958.42 |
| 55 | 15 | 2 | $479.21 | $958.42 |
| 56 | 16 | 2 | $479.21 | $958.42 |
| 57 | 17 | 2 | $479.21 | $958.42 |
| 58 | 18 | 2 | $479.21 | $958.42 |
| 59 | 19 | 2 | $479.21 | $958.42 |
| 60 | 20 | 2 | $479.21 | $958.42 |
| 61 | 21 | 2 | $479.21 | $958.42 |
| 62 | 22 | 2 | $479.21 | $958.42 |
| 63 | 23 | 2 | $479.21 | $958.42 |
| 64 | 24 | 2 | $479.21 | $958.42 |
| **Subtotal** | | | | **$23,002.08** |

| 3. Analgesic: Tylenol: Start at Age 41; 120 doses, per 3 months, for 37 years, at $11.16 per unit, quantity per container: 100 | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 5 | $11.16 | $55.80 |
| 42 | 2 | 5 | $11.16 | $55.80 |
| 43 | 3 | 5 | $11.16 | $55.80 |
| 44 | 4 | 5 | $11.16 | $55.80 |
| 45 | 5 | 4 | $11.16 | $44.64 |
| 46 | 6 | 5 | $11.16 | $55.80 |
| 47 | 7 | 5 | $11.16 | $55.80 |
| 48 | 8 | 5 | $11.16 | $55.80 |
| 49 | 9 | 5 | $11.16 | $55.80 |
| 50 | 10 | 4 | $11.16 | $44.64 |
| 51 | 11 | 5 | $11.16 | $55.80 |
| 52 | 12 | 5 | $11.16 | $55.80 |
| 53 | 13 | 5 | $11.16 | $55.80 |
| 54 | 14 | 5 | $11.16 | $55.80 |
| 55 | 15 | 4 | $11.16 | $44.64 |
| 56 | 16 | 5 | $11.16 | $55.80 |
| 57 | 17 | 5 | $11.16 | $55.80 |
| 58 | 18 | 5 | $11.16 | $55.80 |
| 59 | 19 | 5 | $11.16 | $55.80 |
| 60 | 20 | 4 | $11.16 | $44.64 |
| 61 | 21 | 5 | $11.16 | $55.80 |
| 62 | 22 | 5 | $11.16 | $55.80 |
| 63 | 23 | 5 | $11.16 | $55.80 |
| 64 | 24 | 5 | $11.16 | $55.80 |
| 65 | 25 | 4 | $11.16 | $44.64 |

| 66 | 26 | 5 | $11.16 | $55.80 |
|---|---|---|---|---|
| 67 | 27 | 5 | $11.16 | $55.80 |
| 68 | 28 | 5 | $11.16 | $55.80 |
| 69 | 29 | 5 | $11.16 | $55.80 |
| 70 | 30 | 4 | $11.16 | $44.64 |
| 71 | 31 | 5 | $11.16 | $55.80 |
| 72 | 32 | 5 | $11.16 | $55.80 |
| 73 | 33 | 5 | $11.16 | $55.80 |
| 74 | 34 | 5 | $11.16 | $55.80 |
| 75 | 35 | 4 | $11.16 | $44.64 |
| 76 | 36 | 5 | $11.16 | $55.80 |
| 77 | 37 | 5 | $11.16 | $55.80 |
| **Subtotal** | | | | **$1,986.48** |

### 7.4.4   Laboratory Studies Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (per) | Duration | Unit Cost | Total Cost |
|------|------------------|--------------|------------------|----------------|----------|-----------|------------|
| 1 | Comprehensive Metabolic Panel (Chemistry Profile) | 41 | 1 | 1 year | 37 years | $95.24 | $3,523.88 |
| 2 | Complete Blood Count (CBC) | 41 | 1 | 1 year | 37 years | $47.25 | $1,748.25 |
| 3 | Urinalysis | 41 | 1 | 1 year | 37 years | $48.17 | $1,782.29 |
| 4 | Wound Culture | 41 | 1 | 10 years | 37 years | $107.01 | $428.04 |
| **Laboratory Studies Subtotal** | | | | | | | **$7,482.46** |

| \| 1. Comprehensive Metabolic Panel (Chemistry Profile): Start at Age 41; 1 time, per 1 year, for 37 years, at $95.24 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $95.24 | $95.24 |
| 42 | 2 | 1 | $95.24 | $95.24 |
| 43 | 3 | 1 | $95.24 | $95.24 |
| 44 | 4 | 1 | $95.24 | $95.24 |
| 45 | 5 | 1 | $95.24 | $95.24 |
| 46 | 6 | 1 | $95.24 | $95.24 |
| 47 | 7 | 1 | $95.24 | $95.24 |
| 48 | 8 | 1 | $95.24 | $95.24 |
| 49 | 9 | 1 | $95.24 | $95.24 |
| 50 | 10 | 1 | $95.24 | $95.24 |
| 51 | 11 | 1 | $95.24 | $95.24 |
| 52 | 12 | 1 | $95.24 | $95.24 |
| 53 | 13 | 1 | $95.24 | $95.24 |
| 54 | 14 | 1 | $95.24 | $95.24 |
| 55 | 15 | 1 | $95.24 | $95.24 |
| 56 | 16 | 1 | $95.24 | $95.24 |
| 57 | 17 | 1 | $95.24 | $95.24 |
| 58 | 18 | 1 | $95.24 | $95.24 |
| 59 | 19 | 1 | $95.24 | $95.24 |
| 60 | 20 | 1 | $95.24 | $95.24 |
| 61 | 21 | 1 | $95.24 | $95.24 |
| 62 | 22 | 1 | $95.24 | $95.24 |
| 63 | 23 | 1 | $95.24 | $95.24 |
| 64 | 24 | 1 | $95.24 | $95.24 |
| 65 | 25 | 1 | $95.24 | $95.24 |

| 66 | 26 | 1 | $95.24 | $95.24 |
|----|----|----|--------|--------|
| 67 | 27 | 1 | $95.24 | $95.24 |
| 68 | 28 | 1 | $95.24 | $95.24 |
| 69 | 29 | 1 | $95.24 | $95.24 |
| 70 | 30 | 1 | $95.24 | $95.24 |
| 71 | 31 | 1 | $95.24 | $95.24 |
| 72 | 32 | 1 | $95.24 | $95.24 |
| 73 | 33 | 1 | $95.24 | $95.24 |
| 74 | 34 | 1 | $95.24 | $95.24 |
| 75 | 35 | 1 | $95.24 | $95.24 |
| 76 | 36 | 1 | $95.24 | $95.24 |
| 77 | 37 | 1 | $95.24 | $95.24 |
| **Subtotal** | | | | **$3,523.88** |

**2. Complete Blood Count (CBC): Start at Age 41; 1 time, per 1 year, for 37 years, at $47.25 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 41 | 1 | 1 | $47.25 | $47.25 |
| 42 | 2 | 1 | $47.25 | $47.25 |
| 43 | 3 | 1 | $47.25 | $47.25 |
| 44 | 4 | 1 | $47.25 | $47.25 |
| 45 | 5 | 1 | $47.25 | $47.25 |
| 46 | 6 | 1 | $47.25 | $47.25 |
| 47 | 7 | 1 | $47.25 | $47.25 |
| 48 | 8 | 1 | $47.25 | $47.25 |
| 49 | 9 | 1 | $47.25 | $47.25 |
| 50 | 10 | 1 | $47.25 | $47.25 |
| 51 | 11 | 1 | $47.25 | $47.25 |
| 52 | 12 | 1 | $47.25 | $47.25 |
| 53 | 13 | 1 | $47.25 | $47.25 |
| 54 | 14 | 1 | $47.25 | $47.25 |
| 55 | 15 | 1 | $47.25 | $47.25 |
| 56 | 16 | 1 | $47.25 | $47.25 |
| 57 | 17 | 1 | $47.25 | $47.25 |
| 58 | 18 | 1 | $47.25 | $47.25 |
| 59 | 19 | 1 | $47.25 | $47.25 |
| 60 | 20 | 1 | $47.25 | $47.25 |
| 61 | 21 | 1 | $47.25 | $47.25 |
| 62 | 22 | 1 | $47.25 | $47.25 |
| 63 | 23 | 1 | $47.25 | $47.25 |
| 64 | 24 | 1 | $47.25 | $47.25 |
| 65 | 25 | 1 | $47.25 | $47.25 |

| 66 | 26 | 1 | $47.25 | $47.25 |
|---|---|---|---|---|
| 67 | 27 | 1 | $47.25 | $47.25 |
| 68 | 28 | 1 | $47.25 | $47.25 |
| 69 | 29 | 1 | $47.25 | $47.25 |
| 70 | 30 | 1 | $47.25 | $47.25 |
| 71 | 31 | 1 | $47.25 | $47.25 |
| 72 | 32 | 1 | $47.25 | $47.25 |
| 73 | 33 | 1 | $47.25 | $47.25 |
| 74 | 34 | 1 | $47.25 | $47.25 |
| 75 | 35 | 1 | $47.25 | $47.25 |
| 76 | 36 | 1 | $47.25 | $47.25 |
| 77 | 37 | 1 | $47.25 | $47.25 |
| **Subtotal** | | | | **$1,748.25** |

| | | | | |
|---|---|---|---|---|
| **3. Urinalysis: Start at Age 41; 1 time, per 1 year, for 37 years, at $48.17 per unit.** | | | | |
| **Age** | **Year** | **Quantity per Year** | **Unit Cost** | **Nominal Value** |
| 41 | 1 | 1 | $48.17 | $48.17 |
| 42 | 2 | 1 | $48.17 | $48.17 |
| 43 | 3 | 1 | $48.17 | $48.17 |
| 44 | 4 | 1 | $48.17 | $48.17 |
| 45 | 5 | 1 | $48.17 | $48.17 |
| 46 | 6 | 1 | $48.17 | $48.17 |
| 47 | 7 | 1 | $48.17 | $48.17 |
| 48 | 8 | 1 | $48.17 | $48.17 |
| 49 | 9 | 1 | $48.17 | $48.17 |
| 50 | 10 | 1 | $48.17 | $48.17 |
| 51 | 11 | 1 | $48.17 | $48.17 |
| 52 | 12 | 1 | $48.17 | $48.17 |
| 53 | 13 | 1 | $48.17 | $48.17 |
| 54 | 14 | 1 | $48.17 | $48.17 |
| 55 | 15 | 1 | $48.17 | $48.17 |
| 56 | 16 | 1 | $48.17 | $48.17 |
| 57 | 17 | 1 | $48.17 | $48.17 |
| 58 | 18 | 1 | $48.17 | $48.17 |
| 59 | 19 | 1 | $48.17 | $48.17 |
| 60 | 20 | 1 | $48.17 | $48.17 |
| 61 | 21 | 1 | $48.17 | $48.17 |
| 62 | 22 | 1 | $48.17 | $48.17 |
| 63 | 23 | 1 | $48.17 | $48.17 |
| 64 | 24 | 1 | $48.17 | $48.17 |
| 65 | 25 | 1 | $48.17 | $48.17 |

| 66 | 26 | 1 | $48.17 | $48.17 |
|---|---|---|---|---|
| 67 | 27 | 1 | $48.17 | $48.17 |
| 68 | 28 | 1 | $48.17 | $48.17 |
| 69 | 29 | 1 | $48.17 | $48.17 |
| 70 | 30 | 1 | $48.17 | $48.17 |
| 71 | 31 | 1 | $48.17 | $48.17 |
| 72 | 32 | 1 | $48.17 | $48.17 |
| 73 | 33 | 1 | $48.17 | $48.17 |
| 74 | 34 | 1 | $48.17 | $48.17 |
| 75 | 35 | 1 | $48.17 | $48.17 |
| 76 | 36 | 1 | $48.17 | $48.17 |
| 77 | 37 | 1 | $48.17 | $48.17 |
| **Subtotal** | | | | **$1,782.29** |

| **4. Wound Culture: Start at Age 41; 1 time, per 10 years, for 37 years, at $107.01 per unit.** |
|---|---|---|---|---|
| **Age** | **Year** | **Quantity per Year** | **Unit Cost** | **Nominal Value** |
| 41 | 1 | 1 | $107.01 | $107.01 |
| 51 | 11 | 1 | $107.01 | $107.01 |
| 61 | 21 | 1 | $107.01 | $107.01 |
| 71 | 31 | 1 | $107.01 | $107.01 |
| **Subtotal** | | | | **$428.04** |

### 7.4.5    Rehabilitation Services Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (per) | Duration | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | Physical Therapy Evaluation (1 hr) | 41 | 1 | 5 years | 37 years | $407.32 | $3,258.56 |
| 2 | Physical Therapy Evaluation: Post Operative (1 hr) | 50 | 1 | 15 years | 28 years | $407.32 | $814.64 |
| 3 | Physical Therapy: Periodic (1 hr) | 41 | 12 | 5 years | 37 years | $302.44 | $29,034.24 |
| 4 | Physical Therapy: Post Operative (1 hr) | 50 | 5 | 15 years | 28 years | $302.44 | $3,024.40 |
| 5 | Gym Membership (Aquatics) | 41 | 12 | 1 year | 37 years | $69.99 | $31,075.56 |
| 6 | Personal Trainer | 41 | 1 | 1 month | 1 year | $101.08 | $1,212.96 |
| 7 | Personal Trainer | 42 | 10 | 5 years | 36 years | $101.08 | $8,086.40 |
| 8 | Vocational Evaluation | 41 | 1 | 1 year | 1 year | $3,975.00 | $3,975.00 |
| 9 | Vocational Counseling | 41 | 6 | 1 year | 1 year | $162.50 | $975.00 |
| **Rehabilitation Services Subtotal** | | | | | | | **$81,456.76** |

Physician Life Care Planning™

| 1. Physical Therapy Evaluation (1 hr): Start at Age 41; 1 time, per 5 years, for 37 years, at $407.32 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $407.32 | $407.32 |
| 46 | 6 | 1 | $407.32 | $407.32 |
| 51 | 11 | 1 | $407.32 | $407.32 |
| 56 | 16 | 1 | $407.32 | $407.32 |
| 61 | 21 | 1 | $407.32 | $407.32 |
| 66 | 26 | 1 | $407.32 | $407.32 |
| 71 | 31 | 1 | $407.32 | $407.32 |
| 76 | 36 | 1 | $407.32 | $407.32 |
| **Subtotal** | | | | **$3,258.56** |

| 2. Physical Therapy Evaluation: Post Operative (1 hr): Start at Age 50; 1 time, per 15 years, for 28 years, at $407.32 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 50 | 1 | 1 | $407.32 | $407.32 |
| 65 | 16 | 1 | $407.32 | $407.32 |
| **Subtotal** | | | | **$814.64** |

**3. Physical Therapy: Periodic (1 hr): Start at Age 41; 12 times, per 5 years, for 37 years, at $302.44 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|---|---|---|---|---|
| 41 | 1 | 12 | $302.44 | $3,629.28 |
| 46 | 6 | 12 | $302.44 | $3,629.28 |
| 51 | 11 | 12 | $302.44 | $3,629.28 |
| 56 | 16 | 12 | $302.44 | $3,629.28 |
| 61 | 21 | 12 | $302.44 | $3,629.28 |
| 66 | 26 | 12 | $302.44 | $3,629.28 |
| 71 | 31 | 12 | $302.44 | $3,629.28 |
| 76 | 36 | 12 | $302.44 | $3,629.28 |
| **Subtotal** | | | | **$29,034.24** |

| 4. Physical Therapy: Post Operative (1 hr): Start at Age 50; 5 times, per 15 years, for 28 years, at $302.44 per unit. | | | | |
|---|---|---|---|---|
| **Age** | **Year** | **Quantity per Year** | **Unit Cost** | **Nominal Value** |
| 50 | 1 | 5 | $302.44 | $1,512.20 |
| 65 | 16 | 5 | $302.44 | $1,512.20 |
| **Subtotal** | | | | **$3,024.40** |

| | | | | |
|---|---|---|---|---|
| **5. Gym Membership (Aquatics): Start at Age 41; 12 times, per 1 year, for 37 years, at $69.99 per unit.** | | | | |
| **Age** | **Year** | **Quantity per Year** | **Unit Cost** | **Nominal Value** |
| 41 | 1 | 12 | $69.99 | $839.88 |
| 42 | 2 | 12 | $69.99 | $839.88 |
| 43 | 3 | 12 | $69.99 | $839.88 |
| 44 | 4 | 12 | $69.99 | $839.88 |
| 45 | 5 | 12 | $69.99 | $839.88 |
| 46 | 6 | 12 | $69.99 | $839.88 |
| 47 | 7 | 12 | $69.99 | $839.88 |
| 48 | 8 | 12 | $69.99 | $839.88 |
| 49 | 9 | 12 | $69.99 | $839.88 |
| 50 | 10 | 12 | $69.99 | $839.88 |
| 51 | 11 | 12 | $69.99 | $839.88 |
| 52 | 12 | 12 | $69.99 | $839.88 |
| 53 | 13 | 12 | $69.99 | $839.88 |
| 54 | 14 | 12 | $69.99 | $839.88 |
| 55 | 15 | 12 | $69.99 | $839.88 |
| 56 | 16 | 12 | $69.99 | $839.88 |
| 57 | 17 | 12 | $69.99 | $839.88 |
| 58 | 18 | 12 | $69.99 | $839.88 |
| 59 | 19 | 12 | $69.99 | $839.88 |
| 60 | 20 | 12 | $69.99 | $839.88 |
| 61 | 21 | 12 | $69.99 | $839.88 |
| 62 | 22 | 12 | $69.99 | $839.88 |
| 63 | 23 | 12 | $69.99 | $839.88 |
| 64 | 24 | 12 | $69.99 | $839.88 |
| 65 | 25 | 12 | $69.99 | $839.88 |

| 66 | 26 | 12 | $69.99 | $839.88 |
|---|---|---|---|---|
| 67 | 27 | 12 | $69.99 | $839.88 |
| 68 | 28 | 12 | $69.99 | $839.88 |
| 69 | 29 | 12 | $69.99 | $839.88 |
| 70 | 30 | 12 | $69.99 | $839.88 |
| 71 | 31 | 12 | $69.99 | $839.88 |
| 72 | 32 | 12 | $69.99 | $839.88 |
| 73 | 33 | 12 | $69.99 | $839.88 |
| 74 | 34 | 12 | $69.99 | $839.88 |
| 75 | 35 | 12 | $69.99 | $839.88 |
| 76 | 36 | 12 | $69.99 | $839.88 |
| 77 | 37 | 12 | $69.99 | $839.88 |
| **Subtotal** | | | | **$31,075.56** |

Physician Life Care Planning™

| 6. Personal Trainer: Start at Age 41; 1 time, per 1 month, for 1 year, at $101.08 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 12 | $101.08 | $1,212.96 |
| **Subtotal** | | | | **$1,212.96** |

| 7. Personal Trainer: Start at Age 42; 10 times, per 5 years, for 36 years, at $101.08 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 42 | 1 | 10 | $101.08 | $1,010.80 |
| 47 | 6 | 10 | $101.08 | $1,010.80 |
| 52 | 11 | 10 | $101.08 | $1,010.80 |
| 57 | 16 | 10 | $101.08 | $1,010.80 |
| 62 | 21 | 10 | $101.08 | $1,010.80 |
| 67 | 26 | 10 | $101.08 | $1,010.80 |
| 72 | 31 | 10 | $101.08 | $1,010.80 |
| 77 | 36 | 10 | $101.08 | $1,010.80 |
| Subtotal | | | | $8,086.40 |

| 8. Vocational Evaluation: Start at Age 41; 1 time, per 1 year, for 1 year, at $3,975.00 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $3,975.00 | $3,975.00 |
| **Subtotal** | | | | **$3,975.00** |

Physician Life Care Planning™

| 9. Vocational Counseling: Start at Age 41; 6 times, per 1 year, for 1 year, at $162.50 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 6 | $162.50 | $975.00 |
| **Subtotal** | | | | **$975.00** |

Physician Life Care Planning™

## 7.4.6   Equipment & Supplies Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (per) | Duration | Unit Cost | Total Cost |
|---|---|---|---|---|---|---|---|
| 1 | Below Knee Prosthesis | 43 | 1 | 5 years | 35 years | $19,926.03 | $139,482.21 |
| 2 | Below Knee Prosthesis: Repair/Maintenance (45 min) | 41 | 1 | 1 year | 37 years | $610.22 | $22,578.14 |
| 3 | Below Knee Prosthesis: Recreational Leg | 41 | 1 | 5 years | 29 years | $28,322.95 | $169,937.70 |
| 4 | Below Knee Prosthesis: Recreational Leg - Repair/Maintenance (45 min) | 41 | 1 | 1 year | 29 years | $610.22 | $17,696.38 |
| 5 | Below Knee Prosthesis: Water Leg | 41 | 1 | 5 years | 29 years | $18,924.48 | $113,546.88 |
| 6 | Below Knee Prosthesis: Water Leg - Repair/Maintenance (45 min) | 41 | 1 | 1 year | 29 years | $610.22 | $17,696.38 |
| 7 | Below Knee Prosthesis: Liner & Sealing Sleeve | 41 | 3 | 1 year | 37 years | $1,187.36 | $131,796.96 |
| 8 | Below Knee Prosthesis: Sock (Single Ply) | 41 | 3 | 1 year | 37 years | $11.88 | $1,318.68 |
| 9 | Below Knee Prosthesis: Sock (Multiple Ply) | 41 | 3 | 1 year | 37 years | $34.05 | $3,779.55 |
| 10 | Single Tip Cane | 41 | 1 | 5 years | 37 years | $39.70 | $317.60 |
| 11 | Crutches | 41 | 1 | 5 years | 37 years | $93.14 | $745.12 |
| 12 | Folding Walker | 41 | 1 | 5 years | 37 years | $123.11 | $984.88 |
| 13 | Lightweight Wheelchair for Travel/Backup | 41 | 1 | 5 years | 37 years | $2,407.61 | $19,260.88 |
| 14 | Wheelchair Seat Cushion | 41 | 1 | 5 years | 37 years | $122.72 | $981.76 |
| 15 | Wheelchair Seat Cushion Cover | 41 | 1 | 5 years | 37 years | $230.46 | $1,843.68 |
| 16 | Manual Wheelchair: Maintenance | 41 | 1 | 1 year | 37 years | $212.00 | $7,844.00 |
| 17 | Power Scooter | 60 | 1 | 5 years | 18 years | $5,674.07 | $22,696.28 |

| 18 | Power Scooter: Battery (2) | 63 | 1 | 5 years | 15 years | $1,595.58 | $4,786.74 |
| 19 | Power Scooter: Maintenance | 60 | 1 | 1 year | 18 years | $185.50 | $3,339.00 |
| 20 | Power Scooter Lift for Vehicle (Hold, Raise & Store) | 60 | 1 | 5 years | 18 years | $2,446.92 | $9,787.68 |
| 21 | Power Scooter Lift for Vehicle (Hold, Raise & Store): Maintenance | 60 | 1 | 1 year | 18 years | $249.00 | $4,482.00 |
| **Equipment & Supplies Subtotal** | | | | | | | **$694,902.50** |

| 1. Below Knee Prosthesis: Start at Age 43; 1 time, per 5 years, for 35 years, at $19,926.03 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 43 | 1 | 1 | $19,926.03 | $19,926.03 |
| 48 | 6 | 1 | $19,926.03 | $19,926.03 |
| 53 | 11 | 1 | $19,926.03 | $19,926.03 |
| 58 | 16 | 1 | $19,926.03 | $19,926.03 |
| 63 | 21 | 1 | $19,926.03 | $19,926.03 |
| 68 | 26 | 1 | $19,926.03 | $19,926.03 |
| 73 | 31 | 1 | $19,926.03 | $19,926.03 |
| **Subtotal** | | | | **$139,482.21** |

Physician Life Care Planning™

**2. Below Knee Prosthesis: Repair/Maintenance (45 min): Start at Age 41; 1 time, per 1 year, for 37 years, at $610.22 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 41 | 1 | 1 | $610.22 | $610.22 |
| 42 | 2 | 1 | $610.22 | $610.22 |
| 43 | 3 | 1 | $610.22 | $610.22 |
| 44 | 4 | 1 | $610.22 | $610.22 |
| 45 | 5 | 1 | $610.22 | $610.22 |
| 46 | 6 | 1 | $610.22 | $610.22 |
| 47 | 7 | 1 | $610.22 | $610.22 |
| 48 | 8 | 1 | $610.22 | $610.22 |
| 49 | 9 | 1 | $610.22 | $610.22 |
| 50 | 10 | 1 | $610.22 | $610.22 |
| 51 | 11 | 1 | $610.22 | $610.22 |
| 52 | 12 | 1 | $610.22 | $610.22 |
| 53 | 13 | 1 | $610.22 | $610.22 |
| 54 | 14 | 1 | $610.22 | $610.22 |
| 55 | 15 | 1 | $610.22 | $610.22 |
| 56 | 16 | 1 | $610.22 | $610.22 |
| 57 | 17 | 1 | $610.22 | $610.22 |
| 58 | 18 | 1 | $610.22 | $610.22 |
| 59 | 19 | 1 | $610.22 | $610.22 |
| 60 | 20 | 1 | $610.22 | $610.22 |
| 61 | 21 | 1 | $610.22 | $610.22 |
| 62 | 22 | 1 | $610.22 | $610.22 |
| 63 | 23 | 1 | $610.22 | $610.22 |
| 64 | 24 | 1 | $610.22 | $610.22 |
| 65 | 25 | 1 | $610.22 | $610.22 |

| 66 | 26 | 1 | $610.22 | $610.22 |
|----|----|----|---------|---------|
| 67 | 27 | 1 | $610.22 | $610.22 |
| 68 | 28 | 1 | $610.22 | $610.22 |
| 69 | 29 | 1 | $610.22 | $610.22 |
| 70 | 30 | 1 | $610.22 | $610.22 |
| 71 | 31 | 1 | $610.22 | $610.22 |
| 72 | 32 | 1 | $610.22 | $610.22 |
| 73 | 33 | 1 | $610.22 | $610.22 |
| 74 | 34 | 1 | $610.22 | $610.22 |
| 75 | 35 | 1 | $610.22 | $610.22 |
| 76 | 36 | 1 | $610.22 | $610.22 |
| 77 | 37 | 1 | $610.22 | $610.22 |
| **Subtotal** | | | | **$22,578.14** |

| 3. Below Knee Prosthesis: Recreational Leg: Start at Age 41; 1 time, per 5 years, for 29 years, at $28,322.95 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $28,322.95 | $28,322.95 |
| 46 | 6 | 1 | $28,322.95 | $28,322.95 |
| 51 | 11 | 1 | $28,322.95 | $28,322.95 |
| 56 | 16 | 1 | $28,322.95 | $28,322.95 |
| 61 | 21 | 1 | $28,322.95 | $28,322.95 |
| 66 | 26 | 1 | $28,322.95 | $28,322.95 |
| Subtotal | | | | $169,937.70 |

**4. Below Knee Prosthesis: Recreational Leg - Repair/Maintenance (45 min): Start at Age 41; 1 time, per 1 year, for 29 years, at $610.22 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 41 | 1 | 1 | $610.22 | $610.22 |
| 42 | 2 | 1 | $610.22 | $610.22 |
| 43 | 3 | 1 | $610.22 | $610.22 |
| 44 | 4 | 1 | $610.22 | $610.22 |
| 45 | 5 | 1 | $610.22 | $610.22 |
| 46 | 6 | 1 | $610.22 | $610.22 |
| 47 | 7 | 1 | $610.22 | $610.22 |
| 48 | 8 | 1 | $610.22 | $610.22 |
| 49 | 9 | 1 | $610.22 | $610.22 |
| 50 | 10 | 1 | $610.22 | $610.22 |
| 51 | 11 | 1 | $610.22 | $610.22 |
| 52 | 12 | 1 | $610.22 | $610.22 |
| 53 | 13 | 1 | $610.22 | $610.22 |
| 54 | 14 | 1 | $610.22 | $610.22 |
| 55 | 15 | 1 | $610.22 | $610.22 |
| 56 | 16 | 1 | $610.22 | $610.22 |
| 57 | 17 | 1 | $610.22 | $610.22 |
| 58 | 18 | 1 | $610.22 | $610.22 |
| 59 | 19 | 1 | $610.22 | $610.22 |
| 60 | 20 | 1 | $610.22 | $610.22 |
| 61 | 21 | 1 | $610.22 | $610.22 |
| 62 | 22 | 1 | $610.22 | $610.22 |
| 63 | 23 | 1 | $610.22 | $610.22 |
| 64 | 24 | 1 | $610.22 | $610.22 |
| 65 | 25 | 1 | $610.22 | $610.22 |

| 66 | 26 | 1 | $610.22 | $610.22 |
|---|---|---|---|---|
| 67 | 27 | 1 | $610.22 | $610.22 |
| 68 | 28 | 1 | $610.22 | $610.22 |
| 69 | 29 | 1 | $610.22 | $610.22 |
| **Subtotal** | | | | **$17,696.38** |

| 5. Below Knee Prosthesis: Water Leg: Start at Age 41; 1 time, per 5 years, for 29 years, at $18,924.48 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $18,924.48 | $18,924.48 |
| 46 | 6 | 1 | $18,924.48 | $18,924.48 |
| 51 | 11 | 1 | $18,924.48 | $18,924.48 |
| 56 | 16 | 1 | $18,924.48 | $18,924.48 |
| 61 | 21 | 1 | $18,924.48 | $18,924.48 |
| 66 | 26 | 1 | $18,924.48 | $18,924.48 |
| **Subtotal** | | | | **$113,546.88** |

| 6. Below Knee Prosthesis: Water Leg - Repair/Maintenance (45 min): Start at Age 41; 1 time, per 1 year, for 29 years, at $610.22 per unit. |
|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $610.22 | $610.22 |
| 42 | 2 | 1 | $610.22 | $610.22 |
| 43 | 3 | 1 | $610.22 | $610.22 |
| 44 | 4 | 1 | $610.22 | $610.22 |
| 45 | 5 | 1 | $610.22 | $610.22 |
| 46 | 6 | 1 | $610.22 | $610.22 |
| 47 | 7 | 1 | $610.22 | $610.22 |
| 48 | 8 | 1 | $610.22 | $610.22 |
| 49 | 9 | 1 | $610.22 | $610.22 |
| 50 | 10 | 1 | $610.22 | $610.22 |
| 51 | 11 | 1 | $610.22 | $610.22 |
| 52 | 12 | 1 | $610.22 | $610.22 |
| 53 | 13 | 1 | $610.22 | $610.22 |
| 54 | 14 | 1 | $610.22 | $610.22 |
| 55 | 15 | 1 | $610.22 | $610.22 |
| 56 | 16 | 1 | $610.22 | $610.22 |
| 57 | 17 | 1 | $610.22 | $610.22 |
| 58 | 18 | 1 | $610.22 | $610.22 |
| 59 | 19 | 1 | $610.22 | $610.22 |
| 60 | 20 | 1 | $610.22 | $610.22 |
| 61 | 21 | 1 | $610.22 | $610.22 |
| 62 | 22 | 1 | $610.22 | $610.22 |
| 63 | 23 | 1 | $610.22 | $610.22 |
| 64 | 24 | 1 | $610.22 | $610.22 |
| 65 | 25 | 1 | $610.22 | $610.22 |

| 66 | 26 | 1 | $610.22 | $610.22 |
|---|---|---|---|---|
| 67 | 27 | 1 | $610.22 | $610.22 |
| 68 | 28 | 1 | $610.22 | $610.22 |
| 69 | 29 | 1 | $610.22 | $610.22 |
| Subtotal | | | | $17,696.38 |

**7. Below Knee Prosthesis: Liner & Sealing Sleeve: Start at Age 41; 3 times, per 1 year, for 37 years, at $1,187.36 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 41 | 1 | 3 | $1,187.36 | $3,562.08 |
| 42 | 2 | 3 | $1,187.36 | $3,562.08 |
| 43 | 3 | 3 | $1,187.36 | $3,562.08 |
| 44 | 4 | 3 | $1,187.36 | $3,562.08 |
| 45 | 5 | 3 | $1,187.36 | $3,562.08 |
| 46 | 6 | 3 | $1,187.36 | $3,562.08 |
| 47 | 7 | 3 | $1,187.36 | $3,562.08 |
| 48 | 8 | 3 | $1,187.36 | $3,562.08 |
| 49 | 9 | 3 | $1,187.36 | $3,562.08 |
| 50 | 10 | 3 | $1,187.36 | $3,562.08 |
| 51 | 11 | 3 | $1,187.36 | $3,562.08 |
| 52 | 12 | 3 | $1,187.36 | $3,562.08 |
| 53 | 13 | 3 | $1,187.36 | $3,562.08 |
| 54 | 14 | 3 | $1,187.36 | $3,562.08 |
| 55 | 15 | 3 | $1,187.36 | $3,562.08 |
| 56 | 16 | 3 | $1,187.36 | $3,562.08 |
| 57 | 17 | 3 | $1,187.36 | $3,562.08 |
| 58 | 18 | 3 | $1,187.36 | $3,562.08 |
| 59 | 19 | 3 | $1,187.36 | $3,562.08 |
| 60 | 20 | 3 | $1,187.36 | $3,562.08 |
| 61 | 21 | 3 | $1,187.36 | $3,562.08 |
| 62 | 22 | 3 | $1,187.36 | $3,562.08 |
| 63 | 23 | 3 | $1,187.36 | $3,562.08 |
| 64 | 24 | 3 | $1,187.36 | $3,562.08 |
| 65 | 25 | 3 | $1,187.36 | $3,562.08 |

| 66 | 26 | 3 | $1,187.36 | $3,562.08 |
|----|----|---|-----------|-----------|
| 67 | 27 | 3 | $1,187.36 | $3,562.08 |
| 68 | 28 | 3 | $1,187.36 | $3,562.08 |
| 69 | 29 | 3 | $1,187.36 | $3,562.08 |
| 70 | 30 | 3 | $1,187.36 | $3,562.08 |
| 71 | 31 | 3 | $1,187.36 | $3,562.08 |
| 72 | 32 | 3 | $1,187.36 | $3,562.08 |
| 73 | 33 | 3 | $1,187.36 | $3,562.08 |
| 74 | 34 | 3 | $1,187.36 | $3,562.08 |
| 75 | 35 | 3 | $1,187.36 | $3,562.08 |
| 76 | 36 | 3 | $1,187.36 | $3,562.08 |
| 77 | 37 | 3 | $1,187.36 | $3,562.08 |
| **Subtotal** | | | | **$131,796.96** |

**8. Below Knee Prosthesis: Sock (Single Ply): Start at Age 41; 3 times, per 1 year, for 37 years, at $11.88 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 41 | 1 | 3 | $11.88 | $35.64 |
| 42 | 2 | 3 | $11.88 | $35.64 |
| 43 | 3 | 3 | $11.88 | $35.64 |
| 44 | 4 | 3 | $11.88 | $35.64 |
| 45 | 5 | 3 | $11.88 | $35.64 |
| 46 | 6 | 3 | $11.88 | $35.64 |
| 47 | 7 | 3 | $11.88 | $35.64 |
| 48 | 8 | 3 | $11.88 | $35.64 |
| 49 | 9 | 3 | $11.88 | $35.64 |
| 50 | 10 | 3 | $11.88 | $35.64 |
| 51 | 11 | 3 | $11.88 | $35.64 |
| 52 | 12 | 3 | $11.88 | $35.64 |
| 53 | 13 | 3 | $11.88 | $35.64 |
| 54 | 14 | 3 | $11.88 | $35.64 |
| 55 | 15 | 3 | $11.88 | $35.64 |
| 56 | 16 | 3 | $11.88 | $35.64 |
| 57 | 17 | 3 | $11.88 | $35.64 |
| 58 | 18 | 3 | $11.88 | $35.64 |
| 59 | 19 | 3 | $11.88 | $35.64 |
| 60 | 20 | 3 | $11.88 | $35.64 |
| 61 | 21 | 3 | $11.88 | $35.64 |
| 62 | 22 | 3 | $11.88 | $35.64 |
| 63 | 23 | 3 | $11.88 | $35.64 |
| 64 | 24 | 3 | $11.88 | $35.64 |
| 65 | 25 | 3 | $11.88 | $35.64 |

| 66 | 26 | 3 | $11.88 | $35.64 |
|---|---|---|---|---|
| 67 | 27 | 3 | $11.88 | $35.64 |
| 68 | 28 | 3 | $11.88 | $35.64 |
| 69 | 29 | 3 | $11.88 | $35.64 |
| 70 | 30 | 3 | $11.88 | $35.64 |
| 71 | 31 | 3 | $11.88 | $35.64 |
| 72 | 32 | 3 | $11.88 | $35.64 |
| 73 | 33 | 3 | $11.88 | $35.64 |
| 74 | 34 | 3 | $11.88 | $35.64 |
| 75 | 35 | 3 | $11.88 | $35.64 |
| 76 | 36 | 3 | $11.88 | $35.64 |
| 77 | 37 | 3 | $11.88 | $35.64 |
| **Subtotal** | | | | **$1,318.68** |

| 9. Below Knee Prosthesis: Sock (Multiple Ply): Start at Age 41; 3 times, per 1 year, for 37 years, at $34.05 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 3 | $34.05 | $102.15 |
| 42 | 2 | 3 | $34.05 | $102.15 |
| 43 | 3 | 3 | $34.05 | $102.15 |
| 44 | 4 | 3 | $34.05 | $102.15 |
| 45 | 5 | 3 | $34.05 | $102.15 |
| 46 | 6 | 3 | $34.05 | $102.15 |
| 47 | 7 | 3 | $34.05 | $102.15 |
| 48 | 8 | 3 | $34.05 | $102.15 |
| 49 | 9 | 3 | $34.05 | $102.15 |
| 50 | 10 | 3 | $34.05 | $102.15 |
| 51 | 11 | 3 | $34.05 | $102.15 |
| 52 | 12 | 3 | $34.05 | $102.15 |
| 53 | 13 | 3 | $34.05 | $102.15 |
| 54 | 14 | 3 | $34.05 | $102.15 |
| 55 | 15 | 3 | $34.05 | $102.15 |
| 56 | 16 | 3 | $34.05 | $102.15 |
| 57 | 17 | 3 | $34.05 | $102.15 |
| 58 | 18 | 3 | $34.05 | $102.15 |
| 59 | 19 | 3 | $34.05 | $102.15 |
| 60 | 20 | 3 | $34.05 | $102.15 |
| 61 | 21 | 3 | $34.05 | $102.15 |
| 62 | 22 | 3 | $34.05 | $102.15 |
| 63 | 23 | 3 | $34.05 | $102.15 |
| 64 | 24 | 3 | $34.05 | $102.15 |
| 65 | 25 | 3 | $34.05 | $102.15 |

| 66 | 26 | 3 | $34.05 | $102.15 |
|----|----|----|--------|---------|
| 67 | 27 | 3 | $34.05 | $102.15 |
| 68 | 28 | 3 | $34.05 | $102.15 |
| 69 | 29 | 3 | $34.05 | $102.15 |
| 70 | 30 | 3 | $34.05 | $102.15 |
| 71 | 31 | 3 | $34.05 | $102.15 |
| 72 | 32 | 3 | $34.05 | $102.15 |
| 73 | 33 | 3 | $34.05 | $102.15 |
| 74 | 34 | 3 | $34.05 | $102.15 |
| 75 | 35 | 3 | $34.05 | $102.15 |
| 76 | 36 | 3 | $34.05 | $102.15 |
| 77 | 37 | 3 | $34.05 | $102.15 |
| **Subtotal** | | | | **$3,779.55** |

| **10. Single Tip Cane: Start at Age 41; 1 time, per 5 years, for 37 years, at $39.70 per unit.** | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $39.70 | $39.70 |
| 46 | 6 | 1 | $39.70 | $39.70 |
| 51 | 11 | 1 | $39.70 | $39.70 |
| 56 | 16 | 1 | $39.70 | $39.70 |
| 61 | 21 | 1 | $39.70 | $39.70 |
| 66 | 26 | 1 | $39.70 | $39.70 |
| 71 | 31 | 1 | $39.70 | $39.70 |
| 76 | 36 | 1 | $39.70 | $39.70 |
| **Subtotal** | | | | **$317.60** |

| 11. Crutches: Start at Age 41; 1 time, per 5 years, for 37 years, at $93.14 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $93.14 | $93.14 |
| 46 | 6 | 1 | $93.14 | $93.14 |
| 51 | 11 | 1 | $93.14 | $93.14 |
| 56 | 16 | 1 | $93.14 | $93.14 |
| 61 | 21 | 1 | $93.14 | $93.14 |
| 66 | 26 | 1 | $93.14 | $93.14 |
| 71 | 31 | 1 | $93.14 | $93.14 |
| 76 | 36 | 1 | $93.14 | $93.14 |
| Subtotal | | | | $745.12 |

| 12. Folding Walker: Start at Age 41; 1 time, per 5 years, for 37 years, at $123.11 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $123.11 | $123.11 |
| 46 | 6 | 1 | $123.11 | $123.11 |
| 51 | 11 | 1 | $123.11 | $123.11 |
| 56 | 16 | 1 | $123.11 | $123.11 |
| 61 | 21 | 1 | $123.11 | $123.11 |
| 66 | 26 | 1 | $123.11 | $123.11 |
| 71 | 31 | 1 | $123.11 | $123.11 |
| 76 | 36 | 1 | $123.11 | $123.11 |
| **Subtotal** | | | | **$984.88** |

**13. Lightweight Wheelchair for Travel/Backup: Start at Age 41; 1 time, per 5 years, for 37 years, at $2,407.61 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 41 | 1 | 1 | $2,407.61 | $2,407.61 |
| 46 | 6 | 1 | $2,407.61 | $2,407.61 |
| 51 | 11 | 1 | $2,407.61 | $2,407.61 |
| 56 | 16 | 1 | $2,407.61 | $2,407.61 |
| 61 | 21 | 1 | $2,407.61 | $2,407.61 |
| 66 | 26 | 1 | $2,407.61 | $2,407.61 |
| 71 | 31 | 1 | $2,407.61 | $2,407.61 |
| 76 | 36 | 1 | $2,407.61 | $2,407.61 |
| **Subtotal** | | | | **$19,260.88** |

| 14. Wheelchair Seat Cushion: Start at Age 41; 1 time, per 5 years, for 37 years, at $122.72 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $122.72 | $122.72 |
| 46 | 6 | 1 | $122.72 | $122.72 |
| 51 | 11 | 1 | $122.72 | $122.72 |
| 56 | 16 | 1 | $122.72 | $122.72 |
| 61 | 21 | 1 | $122.72 | $122.72 |
| 66 | 26 | 1 | $122.72 | $122.72 |
| 71 | 31 | 1 | $122.72 | $122.72 |
| 76 | 36 | 1 | $122.72 | $122.72 |
| Subtotal | | | | $981.76 |

Physician Life Care Planning™

| 15. Wheelchair Seat Cushion Cover: Start at Age 41; 1 time, per 5 years, for 37 years, at $230.46 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 1 | $230.46 | $230.46 |
| 46 | 6 | 1 | $230.46 | $230.46 |
| 51 | 11 | 1 | $230.46 | $230.46 |
| 56 | 16 | 1 | $230.46 | $230.46 |
| 61 | 21 | 1 | $230.46 | $230.46 |
| 66 | 26 | 1 | $230.46 | $230.46 |
| 71 | 31 | 1 | $230.46 | $230.46 |
| 76 | 36 | 1 | $230.46 | $230.46 |
| Subtotal | | | | $1,843.68 |

**16. Manual Wheelchair: Maintenance: Start at Age 41; 1 time, per 1 year, for 37 years, at $212.00 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|---|---|---|---|---|
| 41 | 1 | 1 | $212.00 | $212.00 |
| 42 | 2 | 1 | $212.00 | $212.00 |
| 43 | 3 | 1 | $212.00 | $212.00 |
| 44 | 4 | 1 | $212.00 | $212.00 |
| 45 | 5 | 1 | $212.00 | $212.00 |
| 46 | 6 | 1 | $212.00 | $212.00 |
| 47 | 7 | 1 | $212.00 | $212.00 |
| 48 | 8 | 1 | $212.00 | $212.00 |
| 49 | 9 | 1 | $212.00 | $212.00 |
| 50 | 10 | 1 | $212.00 | $212.00 |
| 51 | 11 | 1 | $212.00 | $212.00 |
| 52 | 12 | 1 | $212.00 | $212.00 |
| 53 | 13 | 1 | $212.00 | $212.00 |
| 54 | 14 | 1 | $212.00 | $212.00 |
| 55 | 15 | 1 | $212.00 | $212.00 |
| 56 | 16 | 1 | $212.00 | $212.00 |
| 57 | 17 | 1 | $212.00 | $212.00 |
| 58 | 18 | 1 | $212.00 | $212.00 |
| 59 | 19 | 1 | $212.00 | $212.00 |
| 60 | 20 | 1 | $212.00 | $212.00 |
| 61 | 21 | 1 | $212.00 | $212.00 |
| 62 | 22 | 1 | $212.00 | $212.00 |
| 63 | 23 | 1 | $212.00 | $212.00 |
| 64 | 24 | 1 | $212.00 | $212.00 |
| 65 | 25 | 1 | $212.00 | $212.00 |

| | | | | |
|---|---|---|---|---|
| 66 | 26 | 1 | $212.00 | $212.00 |
| 67 | 27 | 1 | $212.00 | $212.00 |
| 68 | 28 | 1 | $212.00 | $212.00 |
| 69 | 29 | 1 | $212.00 | $212.00 |
| 70 | 30 | 1 | $212.00 | $212.00 |
| 71 | 31 | 1 | $212.00 | $212.00 |
| 72 | 32 | 1 | $212.00 | $212.00 |
| 73 | 33 | 1 | $212.00 | $212.00 |
| 74 | 34 | 1 | $212.00 | $212.00 |
| 75 | 35 | 1 | $212.00 | $212.00 |
| 76 | 36 | 1 | $212.00 | $212.00 |
| 77 | 37 | 1 | $212.00 | $212.00 |
| **Subtotal** | | | | **$7,844.00** |

| 17. Power Scooter: Start at Age 60; 1 time, per 5 years, for 18 years, at $5,674.07 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 60 | 1 | 1 | $5,674.07 | $5,674.07 |
| 65 | 6 | 1 | $5,674.07 | $5,674.07 |
| 70 | 11 | 1 | $5,674.07 | $5,674.07 |
| 75 | 16 | 1 | $5,674.07 | $5,674.07 |
| **Subtotal** | | | | **$22,696.28** |

**18. Power Scooter: Battery (2): Start at Age 63; 1 time, per 5 years, for 15 years, at $1,595.58 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|---|---|---|---|---|
| 63 | 1 | 1 | $1,595.58 | $1,595.58 |
| 68 | 6 | 1 | $1,595.58 | $1,595.58 |
| 73 | 11 | 1 | $1,595.58 | $1,595.58 |
| **Subtotal** | | | | **$4,786.74** |

**19. Power Scooter: Maintenance: Start at Age 60; 1 time, per 1 year, for 18 years, at $185.50 per unit.**

| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
|-----|------|-------------------|-----------|---------------|
| 60 | 1 | 1 | $185.50 | $185.50 |
| 61 | 2 | 1 | $185.50 | $185.50 |
| 62 | 3 | 1 | $185.50 | $185.50 |
| 63 | 4 | 1 | $185.50 | $185.50 |
| 64 | 5 | 1 | $185.50 | $185.50 |
| 65 | 6 | 1 | $185.50 | $185.50 |
| 66 | 7 | 1 | $185.50 | $185.50 |
| 67 | 8 | 1 | $185.50 | $185.50 |
| 68 | 9 | 1 | $185.50 | $185.50 |
| 69 | 10 | 1 | $185.50 | $185.50 |
| 70 | 11 | 1 | $185.50 | $185.50 |
| 71 | 12 | 1 | $185.50 | $185.50 |
| 72 | 13 | 1 | $185.50 | $185.50 |
| 73 | 14 | 1 | $185.50 | $185.50 |
| 74 | 15 | 1 | $185.50 | $185.50 |
| 75 | 16 | 1 | $185.50 | $185.50 |
| 76 | 17 | 1 | $185.50 | $185.50 |
| 77 | 18 | 1 | $185.50 | $185.50 |
| **Subtotal** | | | | **$3,339.00** |

| 20. Power Scooter Lift for Vehicle (Hold, Raise & Store): Start at Age 60; 1 time, per 5 years, for 18 years, at $2,446.92 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 60 | 1 | 1 | $2,446.92 | $2,446.92 |
| 65 | 6 | 1 | $2,446.92 | $2,446.92 |
| 70 | 11 | 1 | $2,446.92 | $2,446.92 |
| 75 | 16 | 1 | $2,446.92 | $2,446.92 |
| **Subtotal** | | | | **$9,787.68** |

| 21. Power Scooter Lift for Vehicle (Hold, Raise & Store): Maintenance: Start at Age 60; 1 time, per 1 year, for 18 years, at $249.00 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 60 | 1 | 1 | $249.00 | $249.00 |
| 61 | 2 | 1 | $249.00 | $249.00 |
| 62 | 3 | 1 | $249.00 | $249.00 |
| 63 | 4 | 1 | $249.00 | $249.00 |
| 64 | 5 | 1 | $249.00 | $249.00 |
| 65 | 6 | 1 | $249.00 | $249.00 |
| 66 | 7 | 1 | $249.00 | $249.00 |
| 67 | 8 | 1 | $249.00 | $249.00 |
| 68 | 9 | 1 | $249.00 | $249.00 |
| 69 | 10 | 1 | $249.00 | $249.00 |
| 70 | 11 | 1 | $249.00 | $249.00 |
| 71 | 12 | 1 | $249.00 | $249.00 |
| 72 | 13 | 1 | $249.00 | $249.00 |
| 73 | 14 | 1 | $249.00 | $249.00 |
| 74 | 15 | 1 | $249.00 | $249.00 |
| 75 | 16 | 1 | $249.00 | $249.00 |
| 76 | 17 | 1 | $249.00 | $249.00 |
| 77 | 18 | 1 | $249.00 | $249.00 |
| Subtotal | | | | $4,482.00 |

### 7.4.7   Environmental Modifications & Essential Services Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (per) | Duration | Unit Cost | Total Cost |
|------|-----------------|--------------|------------------|----------------|----------|-----------|------------|
| 1 | Essential Services | 41 | 1 | 1 month | 37 years | $100.00 | $44,400.00 |
| **Environmental Modifications & Essential Services Subtotal** | | | | | | | **$44,400.00** |

Physician Life Care Planning™

| 1. Essential Services: Start at Age 41; 1 time, per 1 month, for 37 years, at $100.00 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 41 | 1 | 12 | $100.00 | $1,200.00 |
| 42 | 2 | 12 | $100.00 | $1,200.00 |
| 43 | 3 | 12 | $100.00 | $1,200.00 |
| 44 | 4 | 12 | $100.00 | $1,200.00 |
| 45 | 5 | 12 | $100.00 | $1,200.00 |
| 46 | 6 | 12 | $100.00 | $1,200.00 |
| 47 | 7 | 12 | $100.00 | $1,200.00 |
| 48 | 8 | 12 | $100.00 | $1,200.00 |
| 49 | 9 | 12 | $100.00 | $1,200.00 |
| 50 | 10 | 12 | $100.00 | $1,200.00 |
| 51 | 11 | 12 | $100.00 | $1,200.00 |
| 52 | 12 | 12 | $100.00 | $1,200.00 |
| 53 | 13 | 12 | $100.00 | $1,200.00 |
| 54 | 14 | 12 | $100.00 | $1,200.00 |
| 55 | 15 | 12 | $100.00 | $1,200.00 |
| 56 | 16 | 12 | $100.00 | $1,200.00 |
| 57 | 17 | 12 | $100.00 | $1,200.00 |
| 58 | 18 | 12 | $100.00 | $1,200.00 |
| 59 | 19 | 12 | $100.00 | $1,200.00 |
| 60 | 20 | 12 | $100.00 | $1,200.00 |
| 61 | 21 | 12 | $100.00 | $1,200.00 |
| 62 | 22 | 12 | $100.00 | $1,200.00 |
| 63 | 23 | 12 | $100.00 | $1,200.00 |
| 64 | 24 | 12 | $100.00 | $1,200.00 |
| 65 | 25 | 12 | $100.00 | $1,200.00 |

| 66 | 26 | 12 | $100.00 | $1,200.00 |
|---|---|---|---|---|
| 67 | 27 | 12 | $100.00 | $1,200.00 |
| 68 | 28 | 12 | $100.00 | $1,200.00 |
| 69 | 29 | 12 | $100.00 | $1,200.00 |
| 70 | 30 | 12 | $100.00 | $1,200.00 |
| 71 | 31 | 12 | $100.00 | $1,200.00 |
| 72 | 32 | 12 | $100.00 | $1,200.00 |
| 73 | 33 | 12 | $100.00 | $1,200.00 |
| 74 | 34 | 12 | $100.00 | $1,200.00 |
| 75 | 35 | 12 | $100.00 | $1,200.00 |
| 76 | 36 | 12 | $100.00 | $1,200.00 |
| 77 | 37 | 12 | $100.00 | $1,200.00 |
| **Subtotal** | | | | **$44,400.00** |

### 7.4.8   Nursing & Attendant Care Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (per) | Duration | Unit Cost | Total Cost |
|------|------------------|--------------|------------------|----------------|----------|-----------|------------|
| 1 | Home Health Aide 4 Hours | 65 | 1 | 1 day | 5 years | $151.32 | $276,461.64 |
| 2 | Home Health Aide 8 Hours | 70 | 1 | 1 day | 8 years | $302.64 | $884,314.08 |
| 3 | RN Supervision | 65 | 1 | 1 month | 13 years | $233.33 | $36,399.48 |
| **Nursing & Attendant Care Subtotal** | | | | | | | **$1,197,175.20** |

| 1. Home Health Aide 4 Hours: Start at Age 65; 1 time, per 1 day, for 5 years, at $151.32 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 65 | 1 | 366 | $151.32 | $55,383.12 |
| 66 | 2 | 365 | $151.32 | $55,231.80 |
| 67 | 3 | 365 | $151.32 | $55,231.80 |
| 68 | 4 | 365 | $151.32 | $55,231.80 |
| 69 | 5 | 366 | $151.32 | $55,383.12 |
| Subtotal | | | | $276,461.64 |

| 2. Home Health Aide 8 Hours: Start at Age 70; 1 time, per 1 day, for 8 years, at $302.64 per unit. | | | | |
|---|---|---|---|---|
| Age | Year | Quantity per Year | Unit Cost | Nominal Value |
| 70 | 1 | 365 | $302.64 | $110,463.60 |
| 71 | 2 | 365 | $302.64 | $110,463.60 |
| 72 | 3 | 365 | $302.64 | $110,463.60 |
| 73 | 4 | 366 | $302.64 | $110,766.24 |
| 74 | 5 | 365 | $302.64 | $110,463.60 |
| 75 | 6 | 365 | $302.64 | $110,463.60 |
| 76 | 7 | 365 | $302.64 | $110,463.60 |
| 77 | 8 | 366 | $302.64 | $110,766.24 |
| Subtotal | | | | $884,314.08 |

| 3. RN Supervision: Start at Age 65; 1 time, per 1 month, for 13 years, at $233.33 per unit. | | | | |
|---|---|---|---|---|
| **Age** | **Year** | **Quantity per Year** | **Unit Cost** | **Nominal Value** |
| 65 | 1 | 12 | $233.33 | $2,799.96 |
| 66 | 2 | 12 | $233.33 | $2,799.96 |
| 67 | 3 | 12 | $233.33 | $2,799.96 |
| 68 | 4 | 12 | $233.33 | $2,799.96 |
| 69 | 5 | 12 | $233.33 | $2,799.96 |
| 70 | 6 | 12 | $233.33 | $2,799.96 |
| 71 | 7 | 12 | $233.33 | $2,799.96 |
| 72 | 8 | 12 | $233.33 | $2,799.96 |
| 73 | 9 | 12 | $233.33 | $2,799.96 |
| 74 | 10 | 12 | $233.33 | $2,799.96 |
| 75 | 11 | 12 | $233.33 | $2,799.96 |
| 76 | 12 | 12 | $233.33 | $2,799.96 |
| 77 | 13 | 12 | $233.33 | $2,799.96 |
| **Subtotal** | | | | **$36,399.48** |

### 7.4.9   Acute Care Services Costs

| Item | Item Description | Begin at Age | Quantity (Units) | Interval (per) | Duration | Unit Cost | Total Cost |
|------|------------------|:---:|:---:|:---:|:---:|---:|---:|
| 1 | Below Knee Residual Limb Revision: Minor (3 Days, Anesthesia 120 min) | 50 | 1 | 15 years | 28 years | $51,500.94 | $103,001.88 |
| **Acute Care Services Subtotal** | | | | | | | **$103,001.88** |

| | | | | |
|---|---|---|---|---|
| **1. Below Knee Residual Limb Revision: Minor (3 Days, Anesthesia 120 min): Start at Age 50; 1 time, per 15 years, for 28 years, at $51,500.94 per unit.** | | | | |
| **Age** | **Year** | **Quantity per Year** | **Unit Cost** | **Nominal Value** |
| 50 | 1 | 1 | $51,500.94 | $51,500.94 |
| 65 | 16 | 1 | $51,500.94 | $51,500.94 |
| **Subtotal** | | | | **$103,001.88** |

Physician Life Care Planning™

## 8   Exhibits




Physician Life Care Planning™





## Hans Carlson
### MD, FAAPMR, CLCP

### BIOGRAPHY



**Dr. Hans Carlson** is a Physical Medicine & Rehabilitation specialist, and an Electrodiagnostic Medicine specialist who has practiced medicine since 1992.

Dr. Carlson is a licensed physician in the state of Oregon, and he is certified by the American Board of Physical Medicine & Rehabilitation and the American Board of Electrodiagnostic Medicine.  He is also a Certified Life Care Planner (CLCP), as designated by the International Commission on Health Care Certification.

Dr. Carlson's professional career includes clinical, hospital, and academic appointments at institutions including: Oregon Health & Sciences University, Providence St. Vincent's Medical Center, Tuality Healthcare, and the University of Illinois at Chicago Medical Center.

Dr. Carlson's professional associations include the American Academy of Physical Medicine & Rehabilitation, the American Academy of Physician Life Care Planners, and the American Association of Neuromuscular and Electrodiagnostic Medicine.

Dr. Carlson earned a Doctor of Medicine from Oregon Health & Science University in Portland, and a Bachelor of Arts in Mathematics from Willamette University in Salem, Oregon.

In addition to practicing clinical physiatry, Dr. Carlson is a prolific lecturer and author on topics of Physical Medicine and Rehabilitation, Electrodiagnostic Medicine, and Musculoskeletal Medicine.



11550 IH 10 West
Suite 273
San Antonio, Texas 78230
Phone: (210) 501-0995
email: info@PhysicianLCP.com

## Hans Carlson
**MD, FAAPMR, CLCP**

# Curriculum Vitae



# Specialties

- Physical Medicine & Rehabilitation (Board Certified)

- Electrodiagnostic Medicine (Board Certified)

# Educational Background

Oregon Health & Science University
Portland, Oregon
Degree: Doctor of Medicine
Awarded: 1992

Willamette University
Salem, Oregon
Degree: Bachelor of Arts, Mathematics
Awarded: 1987

# Post Graduate Medical Training

University of Illinois at Chicago Medical Center
Rehabilitation Medicine
Fellowship
Chicago, Illinois
1996 - 1997

Spaulding Rehabilitation Hospital
Harvard Medical School, Department of Physical Medicine & Rehabilitation
Physical Medicine & Rehabilitation Residency
Boston, Massachusetts
1993 - 1996

Mary Imogene Bassett Hospital
Transitional Internship
Cooperstown, New York
1992 - 1993

# Accreditations

International Commission on Health Care Certification
Certified Life Care Planner (CLCP)
Status: Active
Issued: 2021

American Board of Physical Medicine & Rehabilitation
Board Certification
Status: Active
Recertification: 2007, 2017
Issued: 1997

American Board of Electrodiagnostic Medicine
Board Certification
Status: Active
Issued: 2019

**Physician** Life Care Planning
America's Leading Life Care Planner

11550 IH 10 West
Suite 273
San Antonio, Texas 78230
Phone: (210) 501-0995
email: info@PhysicianLCP.com

**Hans Carlson**
MD, FAAPMR, CLCP

# Curriculum Vitae

## Accreditations (Continued)

Oregon State Medical License
License Number: MD20746
Status: Active
Issued: 1997

## Professional Experience

Physician Life Care Planning, LLC
Associate Physician
San Antonio, Texas
2020 - Present

Providence St. Vincent's Medical Center
Courtesy Staff
Portland, Oregon
2006 - Present

Standard Insurance
Physician Consultant
Portland, Oregon
2003 - 2019

Oregon Health & Sciences University
Physical Medicine & Rehabilitation Faculty
Portland, Oregon
1998 - Present

Tuality Healthcare
Courtesy Staff
Hillsboro, Oregon
1998 - Present

## Academic Appointments

Oregon Health & Sciences University
Associate Professor, Physical Medicine & Rehabilitation
Portland, Oregon
2012 - Present

Oregon Health & Sciences University
Assistant Professor, Physical Medicine & Rehabilitation
Portland, Oregon
1998 - 2012

University of Illinois at Chicago Medical Center
Visiting Assistant Professor, Clinical Rehabilitation Medicine
Chicago, Illinois
1997 - 1998

**Hans Carlson**
MD, FAAPMR, CLCP

# Curriculum Vitae

## Chairmanships, Board Memberships, Executive, and Committee Appointments

American Academy of Physical Medicine & Rehabilitation
Member, Patient Safety Notices Task Force
Rosemont, Illinois
2013 - Present

American Academy of Physical Medicine & Rehabilitation
Member, Self-Assessment Exam Committee
Rosemont, Illinois
2011 - 2019

Oregon Health & Sciences University
Department of Orthopaedics and Rehabilitation
Chair, Musculoskeletal Education Committee
2011 - 2015

American Board of Physical Medicine and Rehabilitation
Oral Board Guest Examiner
Rochester, Minnesota
2011 - 2013

Oregon Medical Association
Member, Workers Compensation Committee
Portland, Oregon
2010 - 2014

Archives of Physical Medicine and Rehabilitation
Journal Reviewer
Reston, Virginia
2003 - 2006

State of Oregon Workers Compensation Division
Member, Medical Advisory Committee
Portland, Oregon
2006 - 2014

Spaulding Rehabilitation Hospital
Harvard Medical School, Department of Physical Medicine and Rehabilitation
Member, PM&R Residency Admissions Committee
Boston, Massachusetts
1994 - 1996

## Professional Associations

- American Academy of Physical Medicine & Rehabilitation

- American Academy of Physician Life Care Planners

- American Association of Neuromuscular and Electrodiagnostic Medicine

**Hans Carlson**
MD, FAAPMR, CLCP

# Curriculum Vitae

## Honors & Awards

CME Distinguished Lecturer
Oregon Health & Sciences University
Portland, Oregon
2020

Best Teacher Award
Oregon Health & Sciences University
Portland, Oregon
2011 - 2013

Medical Staff Recognition Award for Mind Stretcher/Educator
Tuality Healthcare
Hillsboro, Oregon
2006

Top Doctors
Portland Monthly Magazine
Portland, Oregon
2005 - 2008, 2012, 2014, 2018, 2020

Outstanding Service Excellence Award
Oregon Health & Sciences University
Portland, Oregon
1999, 2000, 2003 - 2005, 2007

Chief Resident
Spaulding Rehabilitation Hospital
Harvard Medical School, Department of Physical Medicine and
Rehabilitation
Boston, Massachusetts
1994 - 1996

## Presentations

- Carlson, H., *Chronic Low Back Pain: Diagnostic Accuracy and Implications*, 27th Annual Internal Medicine Review, Oregon Health & Science University, Portland, Oregon, 2020

- Carlson, H., *Overview and Management of Persistent Musculoskeletal Pain*, Traveling CME Program, Oregon Health & Science University, Oregon State University, Corvallis, Oregon, 2016

- Carlson, H., *Managing Pain: Name the Groan, The Spine, The Knee, The Shoulder*, 2nd Annual Musculoskeletal Update for Primary Care, Oregon Health & Science University, Welches, Oregon, 2016

- Carlson, H., *Understanding Functional and Radiographic Wrist Anatomy*, 4th Annual Orthopaedics for Primary Care: The Extreme Extremities, Oregon Health & Science University, Portland, Oregon, 2015

**Hans Carlson**
MD, FAAPMR, CLCP

**CURRICULUM VITAE**

## PRESENTATIONS (CONTINUED)

- Carlson, H., *Overview of the Management of Persistent Musculoskeletal Pain*, Traveling CME program, Oregon Health & Science University, Samaritan Health Internal Medicine Residency Program, Corvallis, Oregon, Portland, Oregon, 2015

- Carlson, H., *Low Back Pain in Young Adults*, 3rd Annual Orthopedics for Primary Care: The Spine & Hips, Oregon Health and Science University, Portland, Oregon, 2014

- Carlson, H., *Conservative and Surgical Management of Osteoporotic Compression Fractures*, Oregon Health & Science University, Brain Institute, 4th Annual Clinical Neuroscience for Primary Care Providers, Gleneden Beach, Oregon, 2014

- Carlson, H., *Electrodiagnostic Interpretation for Primary Care Providers*, Traveling CME program, Oregon Health and Science University, St. Vincent's Hospital, Portland, Oregon, 2014

- Carlson, H., *Upper Extremity Anatomy and Cross Sections, Upper Extremity Kinematics and Examination*, Portland Doctors Demystify, Oregon Health and Science University, Portland, Oregon, 2014

- Carlson, H., *Sports Medicine*, Oregon Health & Science University, Orthopedics-Rheumatology, Lecture Series for First Year Medical Students, Portland, Oregon, 2013

- Carlson, H., *Nerve Entrapment and Radiculopathy*, Oregon Health & Science University, Orthopedics for Primary Care: The Shoulder Conference, Portland, Oregon, 2013

- Carlson, H., *Medical Management of Neck and Arm Pain*, Oregon Health & Science University, Brain Institute, 3rd Annual Clinical Neuroscience on the Oregon Coast: A Symposium for Primary Care Providers, Gleneden Beach, Oregon, 2013

- Carlson, H., *Carpal Tunnel Syndrome: Effectiveness of Non-Surgical Options, Injection Techniques, What do Patients Ask?*, Oregon Health & Science University, Department of Rheumatic Diseases & Department of Orthopaedics and Rehabilitation, Annual Musculoskeletal Medicine Update for Primary Care: Critical Appraisal of Novel Treatments in Rheumatology, Sunriver, Oregon, 2013

- Carlson, H., *Entrapment Neuropathies and Nerve Conduction Studies*, American College of Rheumatology Annual Scientific Meeting, Chicago, Illinois, 2011

- Carlson, H., *Pain: Soft Tissue Rheumatism*, American College of Rheumatology Annual Scientific Meeting, Philadelphia, Pennsylvania, 2009

**Hans Carlson**
MD, FAAPMR, CLCP

# Curriculum Vitae

## Presentations (Continued)

- Carlson, H., *Carpal Tunnel Syndrome; Advances in Assessment and Non -Surgical Management*, American College of Rheumatology Annual Scientific Meeting, Philadelphia, Pennsylvania, 2009

- Carlson, H., *Electromyography and Nerve Conduction Interpretation for Rheumatologists*, American College of Rheumatology Annual Scientific Meeting; Philadelphia, Pennsylvania, 2009

- Carlson, H., *Pain: Soft Tissue Rheumatism*, American College of Rheumatology Annual Scientific Meeting, San Francisco, California, 2008

- Carlson, H., *Electromyography and Nerve Conduction Interpretation for Rheumatologists*, American College of Rheumatology Annual Scientific Meeting, San Francisco, California, 2008

- Carlson, H., *Pain: Soft Tissue Rheumatism*, American College of Rheumatology Annual Scientific Meeting, Boston, Massachusetts, 2007

- Carlson, H., *Electromyography and Nerve Conduction Interpretation for Rheumatologists*, American College of Rheumatology Annual Scientific Meeting, Boston, Massachusetts, 2007

- Carlson, H., *Electromyography and Nerve Conduction Interpretation for Rheumatologists*, American College of Rheumatology Annual Scientific Meeting, Washington, D.C., 2006

- Carlson, H., *Diagnosis and Management of Non-Traumatic Knee Instability*, American Academy of Physical Medicine & Rehabilitation 59th Annual Assembly, Atlanta, Georgia, 1997

- Carlson, H., *Normal and Abnormal Gait*, University of Illinois at Chicago Review Course in Physical Medicine and Rehabilitation, Chicago, Illinois, 1997

- Carlson, H., *Adolescent Anabolic Steroid Users vs. Non users*, Differences in Knowledge and Attitudes, American College of Sports Medicine National Meetingl Dallas, Texas, 1992

- Carlson, H., *Ergogenic Drug Use Among High School Athletes-Trends*, American College of Sports Medicine National Meeting; Orlando, Florida 1991

## Publications

- Carlson, H., Thompson, A., Pettersson, D., Goodwin, B., Deloughery, T., Carlson, N., Marshall, L., Prevalence and clinical significance of incidental vertebral marrow signal abnormality in thoracolumbar spine MRI.  Spine. 2020 Mar 15; 45 (6):390-6.

- Thompson, A., Christopherson, Z., Marshall, L., Carlson, H., Carlson, N., A pilot randomized controlled trial for aerobic and strengthening exercises on physical function and pain for hip osteoarthritis. PM&R, 2020 Mar; 12 (3):229-237.

**Hans Carlson**
MD, FAAPMR, CLCP

# Curriculum Vitae

# Publications (Continued)

- Yoo, J., McIver, T., Hiratzka, J., Carlson, H., Carlson, N., Radoslovich, S., Gernhart, T., Boshears, E., Kane, M., The presence of Waddell signs depends on age and gender, not diagnosis. Bone Joint J 2018;100-B (2):219-225.

- Cox, J., Blizzard, S., Carlson, H., Hiratzka, J., Yoo, J.U., Lumbar magnetic resonance imaging findings in patients with and without Waddell signs. Spine J 2017;17:990-994.

- Carpenter, B., Pettersson, D., Mirarchi, A., Groshong, D., Carlson, H., Nonsurgical treatment of delayed onset brachial plexopathy due to hypertrophic clavicular callus- a case report, PM&R 2017.08.448.

- Marshall, L., Harrison, S., Cawthorn, P., Kado, D., Deyo, R., Makris, U., Carlson, H., Nevitt, M., A Prospective Study of Back Pain and Risk of Falls Among Community-Dwelling Women.  J Gerontol: Series A, Volume 71, Issue 9, 1 September 2016, Pages 1177-1186, https://doi.org/10.1093/gerona/glv225.

- Edgar, E., Carlson, H., Egan, R., Ricelli, L., Culper, E., Absence of Gluteal Muscles, Optic Nerve Hypoplasia, and Central Nervous System Hamartomas. Clinical Dysmorphology. 2012 Apr;21(2):106-8.

- Carlson, H., Carlson, N., An Overview of the Management of Persistent Musculoskeletal Pain.  Therapeutic Advances in Musculoskeletal Disease. 2011; 3(2): 91-99.

- Colbert, A., Carlson, H., Carlson, N., et al. Static Magnetic Field Therapy for Carpal Tunnel Syndrome: A Pilot Study. Archives of Physical Medicine and Rehabilitation 2010; 91(7): 1098-104.

- Carlson, H., Colbert, A., Frydl, J., Arnall, A., Elliott, M., Carlson, N., Current Options for Non-Surgical Management of Carpal Tunnel Syndrome. International Journal of Clinical Rheumatology 2010; 5:129-142.

- Carlson, H., Electromyography.  In Kagen L (ed): The Inflammatory Myopathies.  New York, Human Press, 2009.

- Rizzo, M., Conney, W., Carlson, H., Mays, W., Hand and wrist reconstruction.  In Fischgrund J (ed):  Orthopaedic Knowledge Update 9.  Rosemont, IL, American Academy of Orthopaedic Surgeons, 2008.

- Carlson, H., Mays, W., Lower extremity amputation.  In Fischgrund J (ed): Orthopaedic Knowledge Update 9.  Rosemont, IL.  American Academy of Orthopaedic Surgeons, 2008.

- Carlson, H., Carlson, N., Pasternak, B., Balderston, K., Understanding and managing the back pain of pregnancy.  Current Women's Health Reports 2003; 3:65-71.

**Hans Carlson**
MD, FAAPMR, CLCP

# Curriculum Vitae

## Publications (Continued)

- Carlson, H., Carlson, N., Electrodiagnostic evaluation.  In Bernstein J (ed):  Musculoskeletal Medicine.  Rosemont, IL., American Academy of Orthopaedic Surgeons, 2003.

- Carlson, H., Review of "Occupational Musculoskeletal Disorders, 2nd Edition" by, N. Hadler.  Doody's Health Science Book Review Journal, Volume 7, Number 5, 1999.

- Carlson, N., Carlson, H., Frontera, W., Exercise prescription in cardiac dysfunction.  In Shankar K (ed):  Exercise Prescription.  Philadelphia, Hanley and Belfus, 1998.

- Carlson H., Haig A., Stewart D., Snapping scapula syndrome: three case reports and an analysis of the literature.  Archives of Phys Med and Rehab 1997; 78: 506-511.

## Abstracts

- Carlson, H., Thompson, A., Penrose, A., Groshong, A., Ensrud, E., Shoulder Girdle Weakness in the Setting of Sustained Repetitive Upper Extremity Traction Forces.  An Unusual Mechanism for Brachial Plexopathy: A Case Report.  PM&R Annual Assembly; San Antonio, TX; November 2019.

- Montgomery, T., Thompson A, Smith S, Gillis C, Carlson H, Carlson N, Yoo J, Marshall LM. Agreement of degenerative spondylolisthesis definitions: standing and supine lateral radiographs in consecutive new patients. NASS Annual Meeting; Los Angeles, CA; September, 2018.

- Carlson H, Baer N.  Transient Bilateral Hand Paresthesias with Micturition. An Unusual Presentation of Cervical Stenosis: A Case Report.  PM&R 2016 Sep;8(9S):S285.

- Marshall, L., Harrison, S., Cawthon, P., Kado, D., Makris, U., Deyo, R., Carlson, H., Nevitt, M., Back Pain Is Associated with Increased Risk of Recurrent Falls Among Older US Women.  J Bone Miner Res. 2014; 29 (Suppl 1).  Available at http://www.asbmr.org/education/2014-abstracts.  Accessed 4/28/2015.

- O'Connor, M., Carlson, H., Peterson, A., The Effect of Strength on Balance in Individuals with Parkinson's Disease. PM&R Volume 5, Issue 9, Supplement , Pages S179-S180, September 2013.

- Carlson, N., Christopehrson, Z., Arnall, E., Mohn, S., Holton, K., Marshall, L., Carlson, H., A Pilot Study on the Effects of Strength and Aerobic Conditioning in Patients with Hip Osteoarthritis.  OARSI 2011.

- Carlson, H., Bradley, M., Horn, J.L., Residual Limb Neuroma Formation in Trans-Femoral Amputees.  American Academy of Physical Medicine & Rehabilitation 2010.

- Carlson, H., Arnall, E., Carlson, N., Colbert, P., Edinger, T., Elmer, P., Gregory, W., Usefulness of Patient-Reported Symptoms Questionnaire as a Clinical Tool in Predicting Severity of Electrodiagnostic Parameters in Carpal Tunnel Syndrome.  PM&R 2009; 1:S147.

**Hans Carlson**
MD, FAAPMR, CLCP

**CURRICULUM VITAE**

# ABSTRACTS (CONTINUED)

- Colbert, A., Markov, M., Gregory, W., Carlson, H., Carlson, N., Souder, J., Elmer, P., Carpal Tunnel Syndrome and Static Magnetic Therapy. Bioelectromagnetics Society Symposium 2009.

- Edgar, E., Carlson, H., Egan, R., Ricelli, L.P., Cupler, E., Congenital Absence of the Gluteal Muscles, Optic Nerve Hypoplasia, and CNS Hamartomas – A Previously Unreported Syndrome. American Academy of Neurology 2008.

- Abdulhadi, H., Millender, L., Carlson, H., Gasett, S., Liewehr, S., Thoracic outlet syndrome: presentation and treatment. Archives of Phys. Med. & Rehab, 1995; 76:1046.

- Carlson, N., Carlson, H., The effect of clinical experience and familiarity with the American spinal injury association international standards for neurological classification of spinal injury on inter-observer reliability: a composition of the 1992 revision. Archives of Phys. Med. & Rehab, 1995: 76:1077.

- Carlson, H., Kerrigan, C., Carlson, N., Deming, L., A study off ankle biomechanics during jumping: take-off versus landing. Archives of Phys. Med. & Rehab, 1995; 76:1049.

- Folker, R., Ganter, B., Cleary, B., Carlson, H., Elliot, D., Goldberg, L., Adolescent anabolic steroid users vs. non-users: differences in knowledge and attitudes. Med. Sci. Sports Exerc., 1992; 24:S44.

- Ganter, B., Carlson, H., Carlson, N., Thompson, H., Elliot, D., Goldberg, L., Deterring anabolic steroid use: when to intervene. Med Sci Sports Exerc 1992; 24:S44.

- Jarrett, G., Ganter, B., Carlson, H., Carlson, N., Folker, R., Elliot, D., Goldberg, L. Peer delivered anabolic steroid education:" adolescent acceptability and outcomes. Med Sci Sports Exerc 1992; 24:S44.

- Cleary, B., Folker, R., Thompson, H., Carlson, H., Jarrett, G., Eliot, D., Goldberg, L., Increasing adolescent anabolic steroid use: five-year data. Med Sci Sports Exerc. 1992; 24:S45.

- Thompson, H., Cleary, B., Folker, R., Carlson, H., Carlson, N., Elliot, D., Goldberg, L., Adolescent athletes and anabolic steroid abuse: features that characterize the potential use. Med Sci Sports Exerc 1991; 23:S18.

- Folker, R., Cleary, B., Carlson, N., Carlson, H., Jarrett, G., Elliot, D., Goldberg, L., A teaching model of anabolic steroids, sports nutrition and strength training: knowledge and behavior outcomes. Med Sci Sports Exerc 1991; 23:S18.

- Jarrett, G., Cleary, B., Bents, R., Thompson, H., Carlson, H., Elliot, D., Goldberg, L., Beliefs and behaviors of adolescent athletes vs. non-athletes: drugs, nutrition and strength training. Med Sci Sports Exerc 1991;23:S19.

# Hans Carlson
## MD, FAAPMR, CLCP

## CURRICULUM VITAE

## ABSTRACTS (CONTINUED)

- Carlson, H., Cleary, B., Carlson, N., Elliot, D., Goldberg, L., Ergogenic drugs among high school athletes: trends in knowledge and abuse. Med Sci Sports Exerc 1991; 23:S18.

- Boyea, S., Bosworth, E., Bents, R., Carlson, H., Elliot, D., Goldberg, L., et al. Ergogenic drug use among high school athletes: a three-year sequential study. Med Sci Sports Exerc 1990; 22:S63

- Carlson, H., et al., An Effective Educational Program Alters Attitudes Towards Steroid Use Among Adolescent Athletes; Oregon Health Sciences University Student Research Forum; Portland, Oregon; 1990 (poster presentation).

## PEER-REVIEWED EXAMINATION PUBLICATIONS

- Patel A, Carlson H, et al. 2019 SAE-P: Interventional Pain. PM&R.

- Patel A, Carlson H, et al. 2019 SAE-P: Bone Health. PM&R.

- Patel A, Carlson H, et al. 2019 SAE-P: Idiopathic Pelvic Girdle Pain as it Relates to the Sacroiliac Joint. PM&R. 2019 (11):S122-3.

- Patel A, Carlson H, et al. 2018 SAE-P: Update in Concussion. PM&R.

- Patel A, Carlson H, et al. 2017 SAE-P: Geriatrics. PM&R.

- Patel A, Carlson H, et al. 2017 SAE-P: Contemporary Issues in Cancer Rehabilitation. PM&R. 2017 (9):S434-6.

- Phelan A, Carlson H, et al . 2016 SAE-P: Advanced Sports Medicine Concepts and Controversies. PM&R. 2016 8(3):S144-7.



**RETENTION AGREEMENT**

This Retention Agreement ("Agreement") defines the terms that shall govern this engagement between You and Us, and which pertains to Mr. Javier Tapia.

**PRODUCTS**

**Life Care Planning**

- Life Care Plans (includes interview and examination)                $10,950

- Catastrophic Life Care Plans (includes interview and examination)   $15,950

- Counter-Party Life Care Plan Reviews & Analyses                     $750/hour (8 hr. min)

- Record Review with/without Narrative                                $750/hour (5 hr. min)

- Narratives, Updates, Amendments, and Supplemental Assessments       $750/hour (3 hr. min)

While we make a good faith effort at the beginning of an engagement to anticipate the correct classification of the type of life care plan your case will require, the final classification of a life care plan (Life Care Plan vs. Catastrophic Life Care Plan) shall ultimately be determined at the sole discretion of the physician life care planner in this engagement.

**Vocational / Loss-of-Earnings-Capacity Assessments**

- Vocational/Loss of Earnings Capacity Assessments                    $5,250

- Narratives, Updates, Amendments, Supplemental Assessments           $575/hour (3 hr. min)

**Financial & Economic Assessments**

- Present Value Assessments of Life Care Plans                        $3,250

- Present Value Assessments of Catastrophic Life Care Plans           $3,750

- Present Value Loss of Earnings Assessments                          $5,250

- Present Value Loss of Household Services Assessments                $575/hour (6 hr. min)

- Updates, Amendments, Supplemental Assessments                       $575/hour (3 hr. min)

**Record Analyses**

- Past Medical Care Assessment                                        $750/hour (2 hr. min)
  (Assessment of the medical necessity of past medical care)

- Narratives, Updates, Amendments, Supplemental Assessments           $750/hour (3 hr. min)

Copyright © 2023 – Physician Life Care Planning, LLC                                                1
All Rights Reserved

**Expert Designation:** In the event You wish to designate an expert, prior to ordering a Product(s), you shall be charged $3,500 per expert on a non-refundable basis. Payment for such charges are due upon receipt of invoice. If at a later date, you choose to have the designated expert(s) produce assessments associated with this case, then 50% of each expert-specific non-refundable retainer shall be applied towards the cost of each expert-specific assessment(s).

**Standard Delivery** for Products is typically 8 weeks (subject to scheduling availability). Add 2 weeks additional lead-time for each additional product. Standard lead times for Narratives, Updates, Amendments, and Supplemental Assessments are 6 weeks (subject to scheduling availability). Add 1 week of additional lead-time for each additional product.

**Expedite Delivery Available** (subject to scheduling availability)

| Level 1 Expedite (per product) | $ 2,500 |
|---|---|
| Level 2 Expedite (per product) | $ 3,000 |
| Level 3 Expedite (per product) | $ 3,500 |
| Level 4 Expedite (per product) | $ 4,500 |

**Delivery Schedule**

| Number of Products | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Standard Delivery | ≥ 8 weeks | ≥ 10 weeks | ≥ 12 weeks | ≥ 14 weeks | ≥ 16 weeks | ≥ 18 weeks |
| Level 1 Expedite | < 8 weeks | < 10 weeks | < 12 weeks | < 14 weeks | < 16 weeks | < 18 weeks |
| Level 2 Expedite | ≤ 6 weeks | ≤ 8 weeks | ≤ 10 weeks | ≤ 12 weeks | ≤ 14 weeks | ≤ 16 weeks |
| Level 3 Expedite | ≤ 4 weeks | ≤ 6 weeks | ≤ 8 weeks | ≤ 10 weeks | ≤ 12 weeks | ≤ 14 weeks |
| Level 4 Expedite | ≤ 2 weeks | ≤ 4 weeks | ≤ 6 weeks | ≤ 8 weeks | ≤ 10 weeks | ≤ 12 weeks |

**Corresponding Expedite Charges**

| Number of Products | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Standard Delivery | $ - | $ - | $ - | $ - | $ - | $ - |
| Level 1 Expedite | $ 2,500 | $ 5,000 | $ 7,500 | $ 10,000 | $ 12,500 | $ 15,000 |
| Level 2 Expedite | $ 3,000 | $ 6,000 | $ 9,000 | $ 12,000 | $ 15,000 | $ 18,000 |
| Level 3 Expedite | $ 3,500 | $ 7,000 | $ 10,500 | $ 14,000 | $ 17,500 | $ 21,000 |
| Level 4 Expedite | $ 4,500 | $ 9,000 | $ 13,500 | $ 18,000 | $ 22,500 | $ 27,000 |

Expedite delivery of Narratives, Updates, Amendments, and Supplemental Assessments = a Level 1 Expedite when requested in less than 6 weeks, a Level 2 Expedite when requested in less than 4 weeks, a Level 3 Expedite when requested in less than 2 weeks, and a Level 4 Expedite when requested in less than 1 week.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**SERVICES**

**Life Care Planning**

- In-office Life Care Plan Interviews and Examinations      $1,500

- Sworn Testimonies/Court Appearance      $4,250/½ day + travel + expenses

- Sworn Testimonies/Court Appearance      $8,500/day + travel + expenses

- Travel (half day/full day (10-hour max))      $3,750/$7,500 + expenses

- Additional Time in Testimony      $850/hour

- Additional Travel      $750/hour + expenses

- Preparation Time, Meetings, Conferences, etc.      $750/hour ($187.50/15 mins.)

**Vocational**

- In-office Vocational Examination      $575/hour (2 hr. min.)

- Sworn Testimonies/Court Appearance      $3,000/½ day + travel + expenses

- Sworn Testimonies/Court Appearance      $6,000/day + travel + expenses

- Travel (half day/full day (10-hour max))      $2,750/$5,500 + expenses

- Additional Time in Testimony      $600/hour

- Additional Travel      $575/hour + expenses

- Preparation Time, Meetings, Conferences, etc.      $575/hour ($143.75/15 mins.)

**Financial & Economic**

- Sworn Testimonies/Court Appearance      $3,000/½ day + travel + expenses

- Sworn Testimonies/Court Appearance      $6,000/day + travel + expenses

- Travel (half day/full day (10-hour max))      $2,750/$5,500 + expenses

- Additional Time in Testimony      $600/hour

- Additional Travel      $575/hour + expenses

- Preparation Time, Meetings, Conferences, etc.      $575/hour ($143.75/15 mins.)

**Record Analyses**

- Sworn Testimonies/Court Appearance      $4,250/½ day + travel + expenses

- Sworn Testimonies/Court Appearance      $8,500/day + travel + expenses

| | |
|---|---|
| • Travel (half day/full day (10-hour max)) | $3,750/$7,500 + expenses |
| • Additional Time in Testimony | $850/hour |
| • Additional Travel | $750/hour + expenses |
| • Preparation Time, Meetings, Conferences, etc. | $750/hour ($187.50/15 mins.) |

**TERMS**

**Products**: An initial non-refundable retainer of 50% of the professional fee is due upon the commencement of the engagement. The initial retainer must be received before we can assure our availability. The remaining 50% of the professional fee, and any reimbursable expenses are payable prior to the release of any product. All expedite fees [if any] are payable in full upon initial invoice. Products billed on an hourly basis, e.g. Narratives, Updates, Amendments, Supplements, or those Products billed on an hourly basis, are payable in full upon invoice.

**Life Care Plans vs. Catastrophic Life Care Plans**: The guiding principle in determining whether a life care plan, for the purposes of this engagement, is classified as a Life Care Plan, or as a Catastrophic Life Care Plan, is the subject's current, and/or anticipated loss of capacity to perform basic activities of daily living (basic ADLs). While we make a good faith effort at the beginning of an engagement to anticipate the correct classification of the type of life care plan your case will require, the final classification of a life care plan (Life Care Plan vs. Catastrophic Life Care Plan) shall ultimately be determined at the sole discretion of the physician life care planner assigned to your case.

**Present Value Assessments of 3rd Party Life Care Plans** are billed at $575/hour (8 hr. min).

**Record Submission Deadline, and Late/Additional Records:**

- IN ORDER TO GUARANTEE COMPLETION OF YOUR REPORT(S) BY FEBRUARY 12, 2024, ALL MEDICAL AND/OR OTHER RECORDS MUST BE SUBMITTED TO US BY JANUARY 01, 2024.

- Records submitted after January 01, 2024, and before the finalization of a life care plan's Diagnostic Conditions, shall affect a movement of the Product Delivery Deadline to a later date (to be determined subject to scheduling/availability) at no charge; or

- Records submitted after January 01, 2024, and after the finalization of a life care plan's Diagnostic Conditions, shall be incorporated into the life care plan at an hourly rate of $750 per hour, and the original deadline shall be maintained (subject to scheduling/availability).

In instances in which additional records are submitted after a life care plan has been completed:

- You can instruct Us to review the additional records and amend/supplement the existing report. Cost: $750/hr. (3 hr. min.). Completion date/deadline subject to availability.

- You can instruct Us to review the records, and standby for further instruction. Cost $750/hr.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

- Additional records which need to be reviewed prior to deposition or trial must be received ≥ 30 days prior to such deposition or trial to guarantee their review.

**Amended Deadlines**

In the event the deadline date(s) for the delivery of product(s) are amended for any reason, the parties to this Agreement (You and Us) shall memorialize the newly agreed upon deadline(s) with an Amended Deadline Addendum, which shall be signed by both parties, and which shall then supersede the Product Delivery Deadline specified in the Engagement Details provision of this Agreement.

**Services**: Payment for Services is due upon invoice.

<u>YOU ARE ULTIMATELY RESPONSIBLE FOR ALL PAYMENTS TO US, PURSUANT TO THE TERMS OF THIS AGREEMENT, REGARDLESS OF LOCAL CUSTOM AND/OR CIVIL PROCEDURE. UNDER NO CIRCUMSTANCE SHALL WE BE RESPONSIBLE FOR COLLECTING PAYMENT FROM ANY OPPOSING COUNSEL OR THIRD PARTY FOR ANY SERVICES.</u>

Payment for depositions and trials must be received within seven (7) calendar days of invoice in order to guarantee the reservation of an expert's time.

**Deposition Transcripts & Opposing Expert Reports:** Transcripts of depositions and opposing expert reports will be reviewed at the hourly rate of the relevant professional, e.g., $750 per hour for a life care planner, $575 per hour for a vocational specialist, financial analyst, economist, etc.

**Preparation Time for sworn testimonies** will be invoiced at the hourly rate of the relevant professional, e.g. $750 per hour for a life care planner, $575 per hour for a vocational specialist, financial analyst, economist, etc. Any/all billing for preparation time is payable by You regardless of local custom or civil procedure. Records which need to be reviewed prior to deposition or trial must be received ≥ 30 days prior to such deposition or trial to guarantee their review.

**Out of Office Interviews & Examinations** will be invoiced at the rate of the relevant professional, e.g. $1500 for a life care planner, $575 per hour for a vocational specialist, etc.

**Travel for Out of Office Interviews & Examinations:** Local transit for interviews & examinations will be billed at the hourly rate of the relevant professional, e.g. $750 per hour for a life care planner, $575 per hour for a vocational specialist, etc. Out of town travel for interviews & examinations will be billed on a full day/half day basis, according to this Agreement's Services fee schedule.

**Travel for Sworn Testimonies & Court Appearances:** Local transit for sworn testimonies and court appearances will be billed at the hourly rate of the relevant professional, e.g. $750 per hour for a life care planner, $575 per hour for a vocational specialist, etc. Out of town travel for sworn testimonies and court appearances will be billed on a full day/half day basis, according to this Agreement's Services fee schedule. Any/all billing for travel time is payable by You regardless of local custom or civil procedure.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**Stand-by Status:** You will be invoiced, pursuant to the terms of this Agreement, for any additional time associated with the placement of any Associate Physician or other expert, on stand-by status, whether such status is the result of a request made by You, or any request, verbal or written order, and/or demand of any judge, court, or other third party. Any/all billing for stand-by-status is payable by You regardless of local custom or civil procedure.

**Expenses:** You are responsible to reimburse Us for all out-of-pocket expenses; and all such expenses are payable upon invoice. Such expenses may include, but are not limited to airfare, accommodation, auto rental, tolls, parking, meals, printing, postage, etc. Any/all billing for expenses is payable by You regardless of local custom or civil procedure.

**Conference Rooms for Deposition** will be charged to You at cost. Payment for conference room charges is due upon invoice. Any/all billing for conference room for depositions is payable by You regardless of local custom or civil procedure.

**Scheduling for Depositions & Trials** requires more than four (4) weeks' notice for deposition, and more than six (6) weeks' notice for trials. Hold times for deposition and trial are no greater than 3 business days for confirmation.

Scheduling not performed within requisite lead times will affect a 25% increase in the billable rates for trial and deposition services.

Scheduling performed with less than six (6) business days will incur a 50% increase in the billable rates for trial and deposition services.

Scheduling performed within less than four (4) business days will incur a 100% increase in the billable rates for trial and deposition services.

*Note: In the unlikely event an expert is unexpectedly notified they must attend trial on a date on which they were previously scheduled to attend an unrelated deposition, the necessities of trial will take precedence over the previously scheduled deposition. These occurrences are rare. We sincerely appreciate your understanding, as we do our best to accommodate the pressing needs of all our clients. In such cases, every effort will be made to accommodate the previously scheduled party by rescheduling their deposition at a time which is most convenient for them.*

**Cancellations, Rescheduling & Missed Appointments**:

- No refunds will be issued for deposition or trial cancellations or rescheduling with less than eight (8) business days prior notice.

- No refunds will be issued for deposits on vocational evaluation appointments for cancellations or rescheduling with less than four (4) business days prior notice.

- No refunds will be issued for cancellation or rescheduling of a Life Care Plan Interview and Examination with less than four (4) business days prior notice. Interviews and examinations that are included with life care plans, and which are canceled or rescheduled with less than

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

four (4) business days prior notice will be forfeited, and any subsequent rescheduling will be billed at the cost of a Life Care Plan Interview and Examination, i.e. $1500.

**Late Payment:** Accounts not paid within the Terms specified herein are subject to a 2% monthly finance charge.

**Electronic Records:** All medical and/or other records are required to be submitted in electronic format. Records not submitted in electronic format will incur a $500 electronic conversion fee. Should You request physical records be returned to You, courier fees will be billed to You at cost

**Ownership:** Upon receipt of your full payment, we grant You a limited, non-exclusive, royalty-free right to reproduce and distribute the Life Care Plan, Vocational Assessment, Present Value Assessment, Record Analysis, etc. delivered to You under this Agreement, solely for use in connection with the matter for which the Product was originally developed. We retain all other rights in our Products.

**Non-solicitation:** You agree that during the term of this Agreement and for 24 months thereafter, you shall not: (i) solicit, directly or indirectly, any of our Associate Physicians and/or other Experts to reduce or terminate their relationship with us, or (ii) solicit any of our Associate Physicians and/or other Experts for employment or engagement as an independent contractor, subcontractor, and/or consultant, or employ or engage as an independent contractor, subcontractor, and/or consultant any of our Associate Physicians and/or other Experts.

**No Doctor/Patient Relationship:** You expressly recognize and agree that the services performed by Us will not give rise to a doctor/patient relationship between Us (and/or our Associate Physicians, and/or other Experts) and You (and/or your clients). The purpose of this Agreement is not to have Us render medical care or treatment, nor is the purpose of this Agreement to have Us render medical advice.

**HIPAA & Privacy:** Attorney and Firm, on behalf of their client(s), acknowledge that films, images, interpretation reports, medical records, lab reports, itemized billing statements, confidential records, proprietary material, or private documents (collectively "Case Material") may constitute private or trade secret information, or Protected Health Information for purposes of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the regulations promulgated thereunder. Attorney and Firm, on behalf of, and with authorization of their client(s), hereby authorize Physician Life Care Planning and/or its assigns to review and utilize Case Material in its work, and to release said Case Material to other third parties as it deems necessary to perform work on the case. Attorney and Firm acknowledge that these third parties may, or may not, be subject to the HIPAA privacy standards. Attorney and Firm's authority to make this authorization shall expire upon dismissal, abandonment, settlement, satisfaction or judgment of Attorney's client's claim, or upon termination of Attorney and Firm's representation of their client.

**Sole Agreement:** This Retention Agreement is the sole, entire, and final Agreement between You and Us regarding the subject matter hereof, and it supersedes any and all other written and/or oral agreements, understandings, statements and/or representations.

**Authority:** Attorney and Firm, individually and collectively, represent and warrant that each has the power and authority to enter into this Agreement, and to perform the obligations hereunder. This

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

Agreement has been duly authorized, executed and delivered by, and constitutes a valid and binding obligation of Attorney and Firm, jointly, and severally, enforceable against Attorney and Firm in accordance with its terms. Attorney and Firm also represent and warrant that the individual signing this Agreement has the right, power and authority to bind Attorney and Firm to perform the obligations hereunder.

**Effective Date:** The effective date of this Agreement will be retroactive to the date that we first performed consulting services on the Case. Even if this Agreement is not properly executed or is lost, Attorney and Firm are jointly, severally and individually responsible to pay the reasonable value of any service performed by Physician Life Care Planning as well as any incurred expenses.

**Termination:** Either party may at any time and without cause terminate this Agreement by giving 30 days written notice of termination to the other party. In the event of such termination, You shall pay Us for all work product and services rendered, and expenses incurred by Us prior to the date of termination.

**Disclaimer:** The work product and services provided hereunder will be provided in a professional and workmanlike manner. The preceding is our only warranty concerning any work product and services and is made expressly in lieu of all other warranties and representations, express or implied, including any implied warranties of fitness for a particular purpose, merchantability or otherwise. We make no warranty regarding the outcome of any settlement, arbitration or trial related to the subject matter of our work products or services.

**Assignable:** Attorney and Firm agree that the rights of Physician Life Care Planning, LLC to receive payment from Attorney and Firm can be assigned to a third-party. Attorney and Firm waive any objection to any such assignment and consent to any such assignment. In the event these rights are assigned, Attorney and Firm agree that the assignee will receive and be entitled to the same rights as Physician Life Care Planning, LLC under this Agreement.

**Indemnification:** You shall indemnify and hold harmless, Us, our partners, employees, Associate Physicians and other experts from and against any loss, claim, damage, or liability (or actions in respect thereof) that may be asserted by any third party) that may result from any third party claims arising out of or relating to the services, the products, or any use by You of any services or products and You will reimburse Us for all expenses (including attorney's fees) as incurred by Us in connection with any such action or claim, except to the extent any such claim (i) is finally determined to have resulted from our negligence or willful misconduct.

Should Physician Life Care Planning, LLC, and/or its partners, Associate Physicians, experts, employees and/or representatives require the services of independent legal counsel, in respect to any matter associated with this engagement, Physician Life Care Planning, and/or its members, partners, Associate Physicians, experts, employees and/or representatives hereby retain the right to hire legal counsel of its/their own choosing, and You shall be responsible for paying all fees and expenses incurred.

**Limitation of Liability:** Neither party shall be liable for consequential, incidental, or punitive loss, damages or expenses (including lost profits or savings) even if advised of their possible existence. The limit of our liability (whether in contract, tort, negligence, strict liability in tort or by statute, or

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

otherwise) to You or your client(s) concerning performance or non-performance by Us, or in any manner related to this Agreement, for any and all claims shall not in the aggregate exceed the fees and expenses paid by You hereunder with respect to the Products or Services involved.

**Attorneys' Fees:** If a legal action or other proceeding is brought related to this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party will be entitled to recover reasonable attorney's fees, costs and all expenses, even if not taxable as court costs, incurred in the legal action.

**COURT FILINGS:** <u>**IF ANY FILING IS MADE WITH A COURT TO STRIKE, PROHIBIT, OR CHALLENGE (INCLUDING CHALLENGES TO ANY DAUBERT, FRYE, RULE 702, AND/OR SIMILAR CHALLENGES), OR IN ANY WAY LIMIT ANY OR ALL OF THE PRODUCTS OR SERVICES OF, OR THE TESTIMONY OF PHYSICIAN LIFE CARE PLANNING, ITS ASSOCIATE PHYSICIANS AND/OR OTHER REPRESENTATIVES, AND/OR EXPERTS SUBJECT TO THIS AGREEMENT, ATTORNEY AND FIRM AGREE TO: 1) PROVIDE COPIES OF ALL SUCH DOCUMENTS TO PHYSICIAN LIFE CARE PLANNING WITHIN THREE (3) CALENDAR DAYS SUBSEQUENT TO SUCH FILING;**</u> 2) FULLY, TIMELY AND COMPLETELY RESPOND IN WRITING TO SUCH COURT FILING, AND CONSIDER RECOMMENDATIONS OF PHYSICIAN LIFE CARE PLANNING, ITS ASSOCIATE PHYSICIANS AND/OR OTHER REPRESENTATIVES AND/OR EXPERTS; AND 3) ATTEND ANY AND ALL HEARINGS OR OTHER PROCEEDINGS RELATING TO SUCH COURT FILING, THEREBY STRENUOUSLY ARGUING AGAINST ANY STRIKE, PROHIBITION OR ANY OTHER LIMITATION, WITHOUT EXCEPTION, OF ANY AND ALL PRODUCTS SERVICES, OR TESTIMONY PHYSICIAN LIFE CARE PLANNING, ITS ASSOCIATE PHYSICIANS AND/OR OTHER REPRESENTATIVES AND/OR EXPERTS. IF ATTORNEY OR FIRM FAIL OR REFUSE TO ADEQUATELY PERFORM ANY OF THE OBLIGATIONS SET OUT IN THIS CLAUSE, THEN PHYSICIAN LIFE CARE PLANNING, LLC MAY HIRE ATTORNEYS OF ITS CHOOSING TO PERFORM SUCH OBLIGATIONS AND ATTORNEY AND FIRM WILL INDEMNIFY AND/OR REIMBURSE PHYSICIAN LIFE CARE PLANNING FOR ALL SUCH FEES, EXPENSES AND DAMAGES INCURRED INCLUDING, BUT NOT LIMITED TO, ATTORNEY FEES AND EXPENSES.

**Confidentiality:** Any information disclosed by one party ("Disclosing Party") to the other party ("Recipient") in connection with this Agreement that is marked confidential or that due to its character and nature, a reasonable person under like circumstances would treat as confidential (the "Confidential Information") will be protected and held in confidence by the Recipient.

Confidential Information will be used only for the purposes of this Agreement and related internal administrative purposes. Disclosure of the Confidential Information will be restricted to the Recipient's employees, contractors, or agents on a "need to know" basis in connection with the services, who are bound by confidentiality obligations no less stringent than these prior to any disclosure. Confidential Information does not include information which: (i) is already known to the other party at the time of disclosure; (ii) or becomes publicly known through no wrongful act or failure of the Recipient; (iii) is independently developed without use or benefit of the other's Confidential Information; or (iv) is received from a third party which is not under, and does not thereby breach an obligation of confidentiality. Each party agrees to protect the other's Confidential Information at all times and in the same manner as each protects the confidentiality of its own proprietary and confidential materials, but in no event with less than a reasonable standard of care. A Recipient may disclose Confidential Information to the extent required by law, but that disclosure does not relieve Recipient of its confidentiality obligations with respect to any other party.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**Maintenance of Records:** Physician Life Care Planning is authorized, after the case is concluded, to destroy records provided by the Attorney and/or Firm and any papers remaining in Physician Life Care Planning's possession if the Attorney and/or Firm has not retrieved such records and any original papers within three (3) months from the date the Case is resolved or otherwise concluded, or this Agreement is terminated, unless specifically instructed in writing by Attorney or Firm to the contrary. Physician Life Care Planning reserves the right, at its sole discretion, to maintain copies of reports or materials created by or originating from the clerical and professional work performed directly by Physician Life Care Planning and any consultants engaged by it for services rendered.

**Severability:** Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any party or under any circumstances, is invalid or unenforceable to any extent under applicable law, then such provision will be deemed severed from this Agreement with respect to such party or such circumstance, without invalidating the remainder of this Agreement, and a new provision will be deemed substituted in lieu of the provision so severed which new provision will, to the extent possible, accomplish the intent of the parties hereto as evidenced by the provision so severed.

**Enforcement:** Failure to enforce any provision of this Agreement in a given instance shall not constitute a waiver of such provision with regard to any other instance or any other term of this Agreement.

**Counterparts, Electronic Signatures:** This Agreement may be executed in counterparts, each of which shall be deemed an original and binding on the signatory thereto, but both of which together will constitute one and the same instrument. Facsimile signatures, scanned and e-mailed signatures, and other electronic signatures on this Agreement shall be deemed to be original signatures, for all purposes.

**Choice of Law and Venue:** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without giving effect to the principles of conflict of laws. The parties hereby submit to the jurisdiction of all courts of Bexar County, Texas and hereby agree that any such court shall be a proper forum for the determination of any dispute arising hereunder.

### MISCELLANEOUS

- You agree to promptly notify US, our Associate Physician(s) and other expert(s) of all parties and lawyers in the case so that they may check for conflicts of interest.

- You shall consult with our Associate Physician(s) and other expert(s) before drafting any answers to interrogatories concerning them or their testimonies.

- You agree to be available to prepare our Associate Physician(s) and other expert(s) for any testimony.

- You shall promptly notify Us, our Associate Physician(s) and other expert(s) regarding any settlement or final resolution of the underlying case.

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

- Our Associate Physician(s) and other expert(s) maintain the right to withdraw from your case and/or this engagement if not provided adequate time and resources to form a well-founded opinion(s). In the event of, and at the time of such a withdrawal, You shall pay Us for all work product and/or services rendered, and expenses incurred by Us prior to the date of termination.

- Necessary travel and hotel accommodations for Associate Physician and other experts shall be arranged by You, unless otherwise notified by Us. All flights shall be direct, and non-stop if available. Any voyage of greater than three (3) total hours in duration shall be business class, or first class, if business class is unavailable.

- Physician Life Care Planning, LLC, and its Associate Physicians and other experts maintain the right to withdraw from your case if You breach any rules of professional conduct. In the event of, and at the time of such a withdrawal, You shall pay Us for all work product and/or services rendered, and expenses incurred by Us prior to the date of termination.

- Physician Life Care Planning, LLC, and its Associate Physicians and other experts maintain the right to withdraw from your case if You breach, or if you are in breach of any of the terms of this Agreement. In the event of, and at the time of such a withdrawal, You shall pay Us for all work product and/or services rendered, and expenses incurred by Us prior to the date of termination.

- Physician Life Care Planning, LLC, and its Associate Physicians and other experts are under no duty and/or obligation to work for/with a successor law firm and You shall inform Us and them promptly should the Firm cease to be lead counsel in the matter.

**ENGAGEMENT DETAILS**

- Name of Subject:                                                          Javier Tapia

- Date of Intake:                                                      August 17, 2023

- Date of Engagement:                                                August 17, 2023

- Record Submission Deadline:                                      January 01, 2024

- Product(s) Delivery Deadline:                                    February 12, 2024

[This space left intentionally blank.]

Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved

**SIGNATURES**

**Attorney & Firm ("You")**

*Ryan DREVESKRACHT*
_____
Ryan Dreveskracht, Individually, and on behalf of Galanda Broadman, PLLC


**Physician Life Care Planning LLC ("Us")**

_____
William L. Davenport, President & Chief Financial Officer


[This space left intentionally blank.]


Copyright © 2023 – Physician Life Care Planning, LLC
All Rights Reserved                                                    12

# Exhibit F

Rule 26 Report
March 15, 2024

Javier Tapia v. Naphcare Inc., et. al.

Johnny E. Bates MD MMM CPE CCHP CCHP-P FASAM FACCP
johnny.bates@qchcweb.net

**Introduction:**   I have been retained by Plaintiff Counsel's Ryan Dreveskracht with Galanda Broadman, PLLC, to review the case of *Javier Tapia v. Naphcare et.al*.

**Qualifications to Render These Expert Opinions:**  My opinions are based on my skill, knowledge, training, education, expertise, and experience as set forth the attached curriculum vitae.   My opinions are based on reasonable probability and medical certainty.  I have been involved in correctional healthcare for over thirty years and have owned and managed a correctional healthcare company for the last nineteen years with over 350 employees. I am intimately familiar with the correctional setting and the capabilities and limitations of practicing in this setting.  I am a CCHP-P through the NCCHC and I am a Fellow of the American College of Correctional Physicians.

**Ongoing Discovery.**  I am submitting this report on the specific matters set out below in connection with this litigation.  I understand that this case is ongoing discovery and, as such, I reserve the right to amend and modify this report including its summaries, opinions and all other elements.

**Compensation.**  I am being compensated at the rate of $650.00 per hour for all activities related to this case.

**Documents Reviewed:**

1) Amended Complaint
2) Deposition Transcript of Bradley, Jonah and exhibits
3) Deposition Transcript of Carrillo, Carmen and exhibits
4) Deposition Transcript of Garcia, Nicholas D and exhibits
5) Deposition Transcript of Knight, Jonathan and exhibits
6) Deposition Transcript of Labine, Lucas and exhibits
7) Deposition Transcript of Nealis, Darren and exhibits
8) Deposition Transcript of Perez, Jesus Tono and exhibits
9) Deposition Transcript of Prather, Duane and exhibits
10) Deposition Transcript of Ricci, Debra and exhibits
11) Deposition Transcript of Slothower, Jonathan and exhibits
12) Deposition Transcript of Tapia, Javier and exhibits
13) Deposition Transcript of Valley, Jane and exhibits
14) Deposition Transcript of Wade, Elliot and exhibits
15) Deposition Transcript of Warren, Elizabeth and exhibits
16) Naphcare Policy Procedure and Employee Job Description
17) Photos Pre and Post Op
18) Pierce County Jail Records
19) Naphcare Medical Records
20) Washington DOC Medical Records
21) Multicare Health System Medical Records including color photos

22) Medical Records from St. Joseph's Medical Center
23) 2024-03-08 Pierce County Supplemental Initial Disclosures
24) Health Care Authority Records
25) Hanger Clinic Records

**EXPERT OPINION 1**:  Mr. Tapia was admitted to the Pierce County Jail in June of 2018 with his lower extremities intact and had the reasonable expectation to leave with both limbs when he was released. Due to a series of repeated half-measures and failures to adhere to common community standards of care, Mr. Tapia was subjected to the loss of a limb. This process was extremely painful and will negatively impact him for the rest of his life. It appears that the problems that led to the below knee amputation began in the early part of September.  Mr. Tapia has little recall of these events and so the documentation provided by NaphCare and Pierce County is the best evidence available to piece what happened to him together. A summary of these events follows.

On September 10, 2018, the following is documented in Mr. Tapia's jail records: **"Seems to have difficulty following simple rules such as 1400hrs lockdown. Placed between the Gates, will return to unit at 1445."** There is no prior documentation since his intake in June of 2018 that the patient had problems following directions except for an early cancellation of a scheduled visit on 7/11/2018.

On September 15, 2018, the following is documented in Mr. Tapia's jail records: **"Warned not to cross yellow line by officers station."**

On September 17, 2018, Mr. Tapia's confusion and abnormal behavior continue with the following documentation: **"Inmate Behavior / Disturbing Mannerisms."**[1]

On September 18, 2018, the documentation in Mr. Tapia's jail records is very illuminating and convincing as to the fact of Mr. Tapia's deteriorated condition:

> **Met with I/M at about 1100 for initial assessment in response to C/D report. He came to the door and was cooperative during the interview, but appears to be confused and was unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time. Recommend continued level 1 MH housing at this time for further assessment, MH will f/u.**

This note was provided by mental health practitioner Nealis and is very concerning for its lack of information that one would expect from a similarly situated provider.  For example, Mr. Nealis states that the patient appears to be confused but doesn't describe in what manner, which is

---

[1] It should be noted that this title is a choice from a drop-down box and is very limited in the amount of information it conveys. While I understand that more detailed documentation can be added to the drop-down box, the Pierce County Jail would do well to improve the documentation at the jail, as drop-down menus do not allow the full panoply of what might be at-issue and can be misleading, as it was here.

what is expected of a similarly situated provider.  Mr. Nealis notes the patient is non-verbal; so how did he assess confusion? It is apparent from this note that the patient was seen at the request of the correctional staff.

Mr. Tapia's sudden altered mental status—demonstrated by confusion, disorientation, and nonverbal presentation—should have set off alarm bells and led to the immediate transfer or referral of the patient to medical for evaluation.  It should be noted that in his sworn deposition testimony Mr. Nealis conducted this "interview," to the extent one can call it that, outside the door of the cell. The cell door has a small window and a food trap. This is not conducive to the evaluation of patients because an assessment conducted pursuant to the standard of care requires the patient to be brought out into the light in an area where a visualization of the patient can occur. At the very least, Mr. Nealis should have notified his supervisor that a complete evaluation of the patient had not occurred and that further measures needed to be taken. This is the beginning of half-measures and failure to thoroughly investigate the reason for Mr. Tapia's sudden change in mental status.

This patient had no prior history of mental illness except for a diagnosis of psychosis at the age of 16 without any subsequent admissions or treatment for mental illness.[2] And this diagnosis was not even known to anybody at Pierce County, including its contracted medical providers. There is no explanation or even assessment for why the Mr. Tapia "appears decompensated"—the complete lack of curiosity here is extraordinary and not what is expected of a similarly situated provider with Mr. Nealis' training and licensure under the standard of care.

On September 19, 2018, Mr. Nealis recommended a medical evaluation for Mr. Tapia—the first referral to medical he received for his altered mental status.  However, the medical evaluation which occurred was conducted by LPN Mr. Carrillo, who was unqualified to complete a formal evaluation. Mr. Carillo recorded the following in the medical record: **"pt referred to medical due to being nonresponsive, pt BP hypertensive skin PWD, does not appear in distress, states he does not have any medical concern at this time but is upset of being in 3SC, states no SI will continue to monitor 9/19/2018 6:23:31 PM CDT."**[3]  This note fails to meet the standard of care for someone being evaluated for an altered mental status. An altered mental status requires a full diagnostic evaluation. That did not occur in regard to Mr. Tapia. First, the vital signs are incomplete with only a blood pressure noted. A full set of vital signs would have included a heart

---

[2] SJMC_0228. In essence, Mr. Tapia went to the hospital because he was paranoid after ingesting marijuana. In his altered state, Mr. Tapia's description of the incident when he was a child may have been interpreted as a "history of paranoid schizophrenia." 191204 Multicare - Recs and Bills.pdf, at 262.

[3] The medical record is replete with time errors in events being recorded—times are recorded in CDT as opposed to PST.  This could lead to numerous medication and documentation errors. Ensuring accurate time zone information is important for maintaining the chronological accuracy of medical records, especially for tracking patient care, medication administration, and other critical events. In healthcare settings where patients may travel or providers may operate across different time zones, accurately recording the time zone helps maintain consistency and clarity in patient care documentation. Failure to document times in the correct time zone could lead to confusion, errors in treatment, and potential legal issues. Therefore, it's standard practice for EHR systems to support time zone settings and for healthcare professionals to document times according to the relevant time zone.

rate, respiratory rate, and temperature. Second, the sudden onset of an altered mental status is alarming and required a complete and thorough workup, including a complete and accurate set of vital signs. The failure to perform such a work-up is the antecedent cause for the loss of Mr. Tapia's leg.

This failure to recognize the seriousness of this sudden onset of altered mental status and refer Mr. Tapia for appropriate evaluation extended throughout the organizational structure of NaphCare. In her deposition, Ms. Warren, a Naphcare RN, testified that LPNs did evaluations as a matter of NaphCare established practice. This in confirmed by the number of times NaphCare LPNs "attempted" to evaluate Mr. Tapia. RN Warren stated that "they look and see if people look like they're not normal today or they're not acting normal or their vitals are not normal." According to RN Warren, if the LPN had concerns, they would call the clinic and tell the charge nurse their concerns, and an RN would go up and evaluate the patient at that time, if there was a need. LPN Carrillo testified to the following: "I collected the data and reported the data back to the clinic RN." There is some question as to whether this actually occurred in Mr. Tapia's case because there is no documented record. Assuming that it did take place, if Mr. Carillo did in fact report concerns to the charge nurse, then the RN was negligent in not requesting a full examination, including a complete set of vital signs and a thorough assessment of the patient's mental status, including level or orientation, ability to follow commands, and neurological assessment. This could not be completed by the LPN as being outside their scope of practice, so an RN would have been obligated to complete such an assessment. If Mr. Carillo did not in fact report concerns to the charge nurse, he was practicing outside his scope of practice and failed to comport with the standard of care. This was the earliest time that a NaphCare intervention could have changed the course and outcome for Mr. Tapia, and the opportunity was squandered.

Also on September 19, 2018, the patient was seen again by Mr. Nealis. Mr. Nealis' note is almost a duplicate of his note the day prior, on 9/18/2018:

> **Met with I/M at about 1045 for initial assessment in response to C/D report. He presented again today as confused. I/M was again unable to verbally respond to my questions. He has been here at PCJ since June, but appears to be decompensated at this time. Officers report that he appears to be "way off his baseline," and he was nonverbal in court today as well. He could have an unknown medical condition. S/P: Referred to medical for assessment. Recommend continued level 1 MH housing at this time for further assessment, IVH will f/u. Referred to medical department for assessment. R/P: Deferred.**

It is extraordinary that Mr. Nealis documented that the patient was decompensated, way off his baseline, and non-verbal in court and then assumed that he had an unknown medical condition, but did not perform a complete mental health assessment. The standard of care required that he do a much more detailed mental health assessment, review Mr. Tapia's prior records, and initiate frequent reassessments under these circumstances. Mr. Tapia necessitated at least a phone call between mental health and medical providers. It appears throughout this record that the health care provided was disjointed and disorganized. The lack of communication between disciplines

was another rung in the ladder of cause and effect that led to the poor outcome for Mr. Tapia. The lack of communication between disciplines falls well below the standard of care.

There was also a lack of a standardized method of evaluation, as Mental Health provider Duane Prather testified to in his deposition.  When asked if there was a standard for evaluating mental health status, Mr. Prather answered: "there could be."  Prather also testified that there were forms available if someone felt like they needed them. Unfortunately for Mr. Tapia, Prather needed the form, because he did not "evaluate" Mr. Tapia at all. Instead, Mr. Prather testified that Pierce County mental health providers "did not do diagnoses . . . because we weren't billing insurance."

On September 20, 2018, Mr. Nealis had his next encounter with Mr. Tapia. Mr. Nealis' note is nearly identical to all of Mr. Nealis' previous notes in that it reflects the deterioration of Mr. Tapia.  "**Mr. Tapia was awake but stays on bunk.  I/M does not respond in any way to MHP, he just stared.  I/M would not even shake his head yes or no.  I/M was seen by medical yesterday. Recommend level 1 MH housing for observation. M/H to f/u.**"  As with the other times that Mr. Tapia is seen by mental health, nothing is undertaken to discern why Mr. Tapia is in the condition he is in.

On September 26, 2018, it is unclear to me why when Mr. Tapia is seen, again by Mr. Nealis, but perhaps it was because he had not been seen by any provider—medical or mental health—in six days, despite his deteriorating condition and in contravention of the standard of care. Mr. Nealis noted: "Assessment: Attempted to meet with I/Mat about 1100 for initial assessment in response to C/D report. He presented again toda yas confused and non-verbal. He has been here at PCJ since June, but appears to be decompensated at this time." The note is almost verbatim to the note of 9/19/2018. The note should have indicated that the patient was continuing to decline and certainly that something beyond observation was needed. This would have been clear to even a non-professional, casual observer.

On September 28, 2018, Mr. Tapia is visited by a mental health provider and it is documented that he "**refused MH interview.  IM would not answer mental health questions.  IM just looked at MHP and did not respond to basic questions.  Continue current housing.  MH will f/u.**" Continued housing and follow up were not adequate substitutes for evaluation and treatment, which is what Mr. Tapia required and what the standard of care demanded: a full diagnostic evaluation. This is a case of the failure of the ability to comply and understand being mistook for refusal.  This was clearly a case where the patient lacked capacity to refuse and there are no signed refusal documents by the patient.  There should have been clear documentation of his mental status, correctly documented and signed refusal forms, and documentation of his mental capacity to refuse.

On September 29, 2018, Elizabeth Warren, RN, finally visited Mr. Tapia at the request of a jail sergeant.   She documented the following:

**Cell smells of urine. Sheet wrapped around waist. Alert, sitting up, one side of his bunk, under his own power. Makes eye contact when he is spoken to. Inmate will not verbally respond. Inmate will follow instructions with calm encouragement. Allowed assessment. 96.9 Apical pulse 100, S1S2 slow even respirations, rate 14-16, BP 127/77. Tongue wet, skin does not tent. No acute distress noted. Not sure inmate is eating every meal. Offered a chocolate ensure and he drank approx. ½ the container. Officer prepared his sandwich for him, handed it to him and he took the sandwich. Spoke with Sgt. Finley and ask if inmate could be put on a meal log and he agreed to start "Meal Log" Scheduled daily monitoring of VS x 3 days and scheduled Provider visit for evaluation.**

I find this note interesting because of the level of dehydration that the patient was noted to have two days later when he was admitted to the hospital with a blood urea nitrogen of 110, indicating severe dehydration. It should also be noted that there had been several days that the patient had been reported as not eating. One very simple way to assess his health status would have been to weigh him and collect a urine sample to assess for urine specific gravity. The fact that the cell smelled like urine was never addressed. Why did the cell smell like urine? Was it because Mr. Tapia was wetting in the floor or his bed because he was unable to get to the toilet? None of the most obvious and simple questions were ever answered by any of the providers who saw Mr. Tapia. The first question of importance would have been what's going on with this man who is way off his baseline? It was likely from the events and care provided to Mr. Tapia up to this point that his situation was not going to end well. That this registered nurse failed to recognize—or recognized and ignored—Mr. Tapia's decompensation is inexcusable. At this point, the need for a full diagnostic evaluation would have been obvious to the layman, let alone a medical or mental health professional.

On September 30, 2018, Mr. Tapia is noted to be "**uncooperative with MH interview. IM appears to be sleeping and did not respond to MHP knocks on door or calling name. I/M was observed moving and breathing in his bed. I/M cell was observed as messy and disorganized**." This is an example of the "drive-by" health care provided to Mr. Tapia. Except for two occasions, none of the practitioners entered the cell. This lack of responsiveness by the patient required a more thorough direct evaluation as to level of consciousness, orientation, and physical condition. There is no indication that this patient was able to cooperate with the MHP and there is no signed documentation of refusal.

On October 1, 2018, Mr. Tapia was seen by a correctional officer, who unlike the numerous medical professionals who had seen the patient in the previous days, noticed that his toes were turning black. The patient was noted to be non-verbal. Finally, Mr. Tapia was going to be transferred and evaluated for the first time in weeks.

Throughout this process, there was a lack of any oversight up the chain on the part of medical providers. There is no evidence that LPNs were being supervised by RNs, and no evidence that RNs are being supervised by a physician. Dr. Balderrama should have known about and

formulated a plan to assess and treat Mr. Tapia. The fact that the care provided to Mr. Tapia was left up to lower-level LPNs and mental health providers is indefensible.

**EXPERT OPINION 2:**   The Mental Health Department only treated symptoms and did not make diagnoses. This is clearly not in compliance with the standard of care, which requires a diagnosis. "Diagnosis is a key part of how we communicate with our patients and each other. Indeed, in any situation in which more than one intervention is available some form of classification/diagnosis is needed to guide logical decisions about which intervention is better (or whether no intervention is the optimal option)."[4]

> **Throughout the diagnostic process, there is an ongoing assessment of whether sufficient information has been collected. If the diagnostic team members are not satisfied that the necessary information has been collected to explain the patient's health problem or that the information available is not consistent with a diagnosis, then the process of information gathering, information integration and interpretation, and developing a working diagnosis continues. When the diagnostic team members judge that they have arrived at an accurate and timely explanation of the patient's health problem, they communicate that explanation to the patient as the diagnosis.[5]**

Failure to try to arrive at a diagnosis is another rung in the ladder of failures that led to Mr. Tapia's poor outcome.  It is unfortunate, and not consistent with the standard of care or my training and experience, that providers at the Pierce County Jail viewed the importance of a diagnosis as being related to billing insurance instead of a requirement to the provision of inmate care.

**Expert Opinion 3:**  Observation is not a form of treatment.  Mr. Tapia was kept in level 1 housing for further assessment; the only problem with this is that an assessment was never performed. It was required that all patients in level one housing be seen daily. At one point, Mr. Tapia was not seen for six consecutive days by any mental health or medical provider.  Between September 20th to September the 26th the patient was not seen and evaluated, which was not within the standard of care. The standard of care dictates that an inmate in Mr. Tapia's condition and housing should be evaluated by a medical provider every day. He was not given the opportunity to have his mental health status changes evaluated and treated, which in my medical opinion would have prevented the deep venous thrombosis that the patient developed.

**EXPERT OPINION 4:**   The medical record is replete with policies and established practices that caused Mr. Tapia's obvious and serious medical condition to slip through the cracks, as identified above. For instance:

---

[4]        https://www.cambridge.org/core/journals/the-british-journal-of-psychiatry/article/psychiatric-diagnosis-impersonal-imperfect-and-important/C29813EAC72CCC801F4F17AC96126093
[5] https://www.ncbi.nlm.nih.gov/books/NBK338593/

- Not requiring medical or mental health providers to treat an inmate's sudden altered mental status as a medical emergency. This is basic medicine.[6]

- Attempting assessments through a small window and a food trap on the door of an inmate's cell (a.k.a. "drive-by" healthcare).

- Allowing LPNs to act outside of their scope of practice by conducting medical evaluations without adequate supervision.

- The lack of communication between mental health and medical providers.

- The lack of any oversight up the chain on the part of medical providers.

- Refusals (of medical care, mental health care, and meals) based on an inmate's non-response.

That these policies and established practices would result in serious harm or death to inmates would be obvious to any medical provider exercising his or her professional judgment.

**Expert Opinion 5**:  The unfortunate outcome for Mr. Tapia is destined to be repeated. When asked in his deposition whether a sudden alteration in mental status can be a medical condition, Jonathan Slothower, NaphCare's nursing staff supervisor, answered "rarely it can be hypothetically." Mr. Shothower's lack of knowledge regarding the most basic aspects of medical care is astonishing. The evaluation and management of an altered mental status is broad and requires careful history and physical examination to eliminate life-threatening situations. Changes in consciousness can be categorized into changes of arousal, the content of consciousness, or a combination of both. Arousal includes wakefulness and/or alertness and can be described as hypoactivity or hyperactivity, while changes in the content of consciousness can lead to changes in self-awareness, expression, language, and emotions. The type of diagnostic evaluation that would have detected these symptoms did not occur at any time for Mr. Tapia. And, what is worse, even after the results of Mr. Tapia's  poor care were known, no change in policy to prevent future such episodes. To the contrary, after Mr. Tapia's leg was amputated Mr. Slothower reviewed the medical record and did not "see anything outside of NaphCare policy or established practice." What is worse, Dr. Elliot Wade, NaphCare's Medical Director for Western States, approved the acts and omissions of the NaphCare nurses and LPNs in charge of Mr. Tapia's care, writing years after the fact, on June 16, 2020:

> Your notes were not lengthy at all, but they contained all of the necessary information needed at the time. And helped to establish that he was seen and taken seriously. . . . He's mad about his below the knee amputation, but in my opinion you did everything right and he's lucky. I know that this is often a thankless job, and just wanted to reach out and thank you all for the great job you did with him.

---

[6] https://my.clevelandclinic.org/health/diseases/23159-altered-mental-status-ams

Mr. Tapia's sudden altered mental status is well documented. It is well documented on multiple occasions that Mr. Tapia was not eating and not being himself. It is documented on more than one occasion that he was non-verbal. NaphCare's top brass' endorsement of the care provided to Mr. Tapia exhibits an institutional reckless disregard to the substantial risk of harm to similarly situated inmates. NaphCare's inability to assess the failure to comply with the standard of care leads one to believe that this could easily result in future patient harm.

In sum, Mr. Tapia suffered from a serious medical condition that would have been apparent to the most casual observer. But despite being seen by multiple providers, he was not given the thorough mental health and physical examination the standard of care required. Even after losing his limb the providers involved fail to recognize their substandard care. This lack of reflective hindsight is probably one of the more troubling aspects of this case.

_____

Johnny E. Bates, MD MMM CPE CCHP CCHP-P FASAM

**Johnny E. Bates, MD MMM CPE CCHP CCHP-P CPHIMS**
**Testimony List**
**Updated June 2023**

1) *Wilder v. Rockdale County, GA et al*.-United States District Court for the Northern District of Georgia (Atlanta Division) Case Number: 1:13-CV-27l5-RWS-Deposition Testimony.

2) *Mary Becker, as Temporary and/or Permanent Administrator of the Estate of Jason Hewitt Armsden v. Gayle Mercer et al*. United States District Court for the Northern District of Georgia (Gainesville Division) Case Number: NO. 2:09-CV-0047-RWS-Deposition Testimony.

3) *Frank Kruse, as Personal Representative of the Estates of Jacob Ashley Jordan v. Jimmie L. Williams et al.*, In Circuit Court of Baldwin County, Alabama Case Number CV-2013-901707-Trial Testimony.

4) *Irvin Shell, as Administrator of the Estate of Annie Ruth Peterson, deceased, v. City of Montgomery*, et al. In the Circuit Court of Montgomery County, Alabama, Case Number-CV- 2014-901569-Deposition Testimony.

5) *Bridgette Minton v. Jarvis Culver, et al.* In the United States District Court for the Middle District of Georgia (Macon Division) Case Number: 5:20-CV-00122-TES-Deposition Testimony.

6) *Wayne Gebhart v. William Spanenberg, M.D. and Crystal Brickert*, In the United States District Court for the Southern District of Indiana Case Number: No.: 2:19-cv-00387 Deposition Testimony

7) *James A. Boley, Jr., as Administrator of the estate of Robert Lee Boley, deceased v. Amor Correctional Services*, et al. In the United States District Court for the Eastern Division of Virginia (Norfolk Division) Case Number: 2:21-cv-00197 *De Bene* Esse Deposition

8) *Laura Garrett and Michael Garrett Sr., individually and as representatives of the Estate of Michael Garrett, Jr., deceased v. Comal County, et al*. In the United States District Court for the Western District of Texas (San Antonio Division) Case Number: 5:21-CV-00803-JKP-RBF Deposition Testimony.

9) *Gwandela Terrell and Lashunda Thompson as administrators of the estate of Lewis Terrell v. Phoebe Putney Memorial Hospital, Inc*., *et al.* In the State Court of Dougherty County (Georgia) Civil Action No.: STSV2020000374-Deposition Testimony.

# Expert Witness – 2022 Rates

## Johnny Edward "Rusty" Bates, MD, MMM, CPE, CCHP, CCHP-P, CPHIMS

| Activity | Rate |
|---|---|
| **Retainer** (will be applied to initial case review activities) | **$1,800.00** |
| **Case Review Expert Services**<br>All case activity, 30+ days before any verbal or written report is due. | **$600/Hour** |
| **Rush Rates for Case Review Expert Services**<br>Less than 30 Full days before any verbal or written report is due. | **$650/Hour** |
| **Testifying for Deposition**<br><br>Fee must be paid in advance by requesting attorney, 15 days prior.<br><br>If cancelled or rescheduled, 10 or more days prior, full refund.<br>If cancelled or rescheduled, 4-9 days prior, 75% refund.<br>If cancelled or rescheduled, less than 3 days prior, no refund and no rescheduling without new fee.<br><br>All estimated travel expenses must be paid by requesting attorney, 15 days prior.<br><br>Half day rate is arrival time to departure time at location, 4 hours.  Continued questioning after 4 hours is billed. | **$3,500 per Half Day Flat Rate 0-4 hours**<br><br>**$600.00/Hour thereafter** |
| **Testifying for Panel Hearings, Trials, Arbitrations, and Mediations**<br><br>Fee must be paid in advance by requesting attorney, 15 days prior.<br><br>If cancelled or rescheduled, 10 or more business days prior, full refund.<br>If cancelled or rescheduled, 4-9 business days prior, 75% refund.<br>If cancelled or rescheduled, less than 3 business days prior, no refund and no rescheduling without new fee.<br><br>All estimated travel expenses must be paid by requesting attorney, 15 days prior.<br><br>Half day rate is arrival to departure time at location., 4 hours.  Time on site greater than 4 hours is billed for full day. | **$3,500.00 Half Day Flat Rate 0-4 hours**<br><br>**$6,000 per Full Day** |
| **Travel Time for Testifying**<br>Maximum 8 hours per day.  Overnight travel will be billed at 8 hours per day.  Time calculated door to door. | **$250.00/Hour** |
| **Billable Expenses**<br>Meals while traveling - $100 per day, flat rate.  Prepaid. | **$100 Daily for Meals** |
| | |
| **Invoices will typically be submitted at the end of each month that work is performed.**<br>**Invoices must be paid within 30 days, or case activity will be suspended until account is zero balance.**<br>**Balances 60+ days past due will be assessed a 5% monthly fee charged on 1st of each month until paid in full.**<br>**Zero balance required for all depositions and trial testimony.  If short deadline, inquire about estimate to complete.**<br>**Submission of retainer constitutes absolute agreement with fee schedule terms.  Do not use USPS for critical payments.** | **REQUIRED TERMS** |

Dr. Johnny Edward "Rusty" Bates

MD FASAM FACCP MMM CPE CCHP CCHP-P CPHIMS

88 Salser Lane

Columbiana, Alabama 35051

Telephone: (205) 382-2619          Email: johnny.bates@qchcweb.net

BIOGRAPHICAL                    DOB: 4/26/1956
                                Spouse: Patricia
                                Children: Kameron, Bron, Karea

EDUCATION
                                University of Alabama Birmingham
                                Bachelor of Science in Mathematics, 1979

                                University of Alabama School of Medicine
                                Birmingham, Alabama
                                Medical Doctor, 1983

INTERNSHIP                      University of Texas Medical Branch
                                Galveston, Texas
                                4/1/1983 to 3/30/1984

RESIDENCY                       University of Texas Medical Branch
                                Galveston, Texas
                                4/1/1984 to 3/30/1986

MASTERS PROGRAMS                Hines School of Public Policy
                                Carnegie-Mellon University
                                Degree: Masters of Medical Management, 2002

Licenses                        Alabama, Mississippi, Kentucky, Tennessee, Louisiana, and Illinois

BOARD CERTIFICATION             American Board of Preventive Medicine
                                Specialty: Addiction Medicine
                                Certification Date: 1/1/2020 Expiration: 12/31/2029
                                Certification Number: 61-3290

                                American Board of Internal Medicine
                                Effective Date: 9/16/1987 Exp: N/A
                                Certificate Number: 11073

OTHER CERTIFICATIONS/HONORS

Fellow, American Society of Addiction Medicine (FASAM)
Fellow, American College Correctional Physicians (FACCP)

Certification: Artificial Intelligence in Health Care Massachusetts Institute of Technology Sloan School of Management, Completed November 2021

The University of Texas at Austin McCombs School of Business Post Graduate Program in Artificial Intelligence and Machine Learning, Completed March 2022

American Board of Artificial Intelligence in Medicine, Credential for Knowledge in the Principles and Application of Artificial Intelligence and Human Cognition in Medicine and Healthcare, Granted February 2023

Certified Correctional Healthcare Professional (CCHP),
Certified Correctional Healthcare Professional-Physician (CCHP-P)
National Commission Correctional Healthcare

Certified Physician Executive
American College of Physician Executives

Certified Professional in Health Information and Management Systems
Healthcare Information and Management Systems Society

Advanced Trauma Life Support
American College of Surgeons

Advanced Cardiac Life Support
American Heart Association

WORK HISTORY

Quality Correctional Health Care
Birmingham, AL
Founder, President & CEO, 8/2005-Present

North Mississippi Medical Center-Hamilton
Hamilton, AL
8/1990-2004, Internal Medicine and Emergency Medicine

Citizens Baptist Medical Center
Talladega, AL
2006-2008, Emergency Medicine

NaphCare, Inc
Birmingham, AL
10/2003 to 8/2005, Corporate Medical Director & Chief Medical
Information Officer

Hamilton Aged and Infirm Prison
Hamilton, AL
1992 to 4/2004, Medical Director

Marion County Nursing Home
Hamilton, AL
8/1990 to 4/2004

Johnny E. Bates, MDPC
Fayette, AL
4/1986 to 2/1990, Private Internal Medicine Practice

PROFESSIONAL LEADERSHIP

Patient Safety and Quality Outcomes Committee
Healthcare Information and Management Systems Society
Dates: 2005 to 2008

Alabama Medical Licensure Commission
Montgomery, AL
Dates: 2000 to 2010

Board of Directors NMHS
Dates: 1999 to 2004

Chief of Staff Marion County Medical Center
Dates: 1999 to 2002

Board of Directors Info Solutions
Blue Cross Blue Shield of Alabama
Electronic Health Records

PROFESSIONAL ASSOCIATIONS

American Medical Association
American Medical Informatics Association
American College of Physician Executives

American College of Physicians
Healthcare Information and Management Society
Microsoft Healthcare Users Group
American Correctional Health Services Association

PRESENTATIONS

"APPLYING AI AND MACHINE LEARNING IN CORRECTIONAL MEDICINE" National Conference on Correctional Healthcare (NCCHC) Conference Spring 2023 New Orleans, Louisiana

"BODY SCANNERS 101" National Institute of Jail Operations Jail Conference West June 2021 Scottsdale, Arizona

"DRUG UPDATE PART 2: SYMPTOMS AND EFFECTS AND HOW TO BE A FIRST RESPONDER IF MEDICAL IS NOT AVAILABLE" National Institute of Jail Operations Jail Conference West June 2021 Scottsdale, Arizona

"MENTAL HEALTH-PSYCHOSIS AND SELF HARM" National Institute of Jail Operations Jail Conference West June 2021 Scottsdale, Arizona

"BOOKING AND SCREENING FOR WITHDRAWAL" Alabama Jail Training Association -Mental Health Basics October 2020 Prattville, Alabama.

"COMMUNICABLE DISEASES IN JAILS" Detention and Corrections Online Training Academy (DACOTA) for National Institute for Jail Operations (NIJO) March 2020

"THE LAST 48." National Institute of Jail Operations Jail Conference South August 2019 New Orleans, Louisiana

"DETOX: BOOKING, 3 DAY, LONG TERM." National Institute of Jail Operations Jail Conference South August 2019 New Orleans, Louisiana

"DETOX: BOOKING, 3 DAY, LONG TERM." National Institute of Jail Operations Jail Conference West June 2019 Scottsdale, Arizona

"DETOX PROTOCOLS FOR ALCOHOL AND OPIOID WITHDRAWAL" National Institute of Jail Operations Jail Conference South August 2018 New Orleans, Louisiana

# Exhibit G

# Daphne Glindmeyer, M.D.

### 611 River Highlands Blvd. Suite B Covington, Louisiana 70433

Phone: (504) 392-8348                    Phone: (985) 888-1414
Fax: (504) 398-4334                       Fax: (985) 888-1415

March 13, 2024

Ryan Dreveskracht, Esq.
Corinne Sebren, Esq.
Galanda Broadman, P.L.L.C.
Post Office Box 15146
Seattle, Washington 981115

Via email:   ryan@galandabroadman.com
             corinne@galandabroadman.com

Re:    Javier Tapia v. NaphCare, Inc., et al.

Dear Mr. Dreveskracht and Ms. Sebren,
My name is Daphne Glindmeyer.  My office address is 611 River Highlands Boulevard, Suite B, Covington, Louisiana.  I am a medical doctor, licensed to practice medicine in the state of Louisiana and in the state of Texas.

I am a graduate of the Louisiana State University Health Sciences Center.  I completed a residency in Adult Psychiatry, a fellowship in Child and Adolescent Psychiatry, and a fellowship in Forensic Psychiatry.  I am board certified in Adult Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry.  I am a Distinguished Fellow of the American Psychiatric Association, past President of the Louisiana Psychiatric Medical Association, and past President of the Louisiana Council on Child and Adolescent Psychiatry.

I am currently in private practice, providing psychiatric evaluation and medication management services to child, adolescent, and adult clients as well as forensic consultation.  My fee for forensic consultation, charged in this case, is $550.00 per hour, with approximately 26 hours spent on this review/report.  Testimony, if required, is also charged at $550.00 per hour, in four-hour blocks.  For further information, please refer to my attached Curriculum Vitae and Fee Agreement.  In addition, I have attached my testimony log detailing depositions and courtroom testimony for the past four years.

Statement of Opinion:
Mr. Dreveskracht and Ms. Sebren requested my opinions in the above noted case.  My opinions are based on my skill, education, training, experience, knowledge of medical and scientific literature, other materials reasonably relied upon by members of my
Javier Tapia v. NaphCare, Inc., et al.                                        1

medical specialty, and my review of the case information available at this time. Should additional information become available that modifies my opinions and conclusions, an addendum will be authored.

To provide this opinion, information regarding this case including case pleadings, depositions, photographs, medical/mental health, and other records were reviewed. For a complete listing of all information reviewed, please refer to the list of documents and pertinent information from each included below.

Based on the available information, it is my opinion, to a reasonable degree of psychiatric certainty, that there were significant deviations from the standard of care with regard to the medical/mental health treatment and monitoring provided to Mr. Tapia. In my opinion, the failures on the part of medical and mental health staff resulted in Mr. Tapia's preventable injuries.

Document Review:
As part of the evaluation, the following documents, provided by Ryan Dreveskracht, Esq. and Corinne Sebren, Esq., were reviewed: *(Pertinent information regarding each document will be included here. Please note common medical abbreviations have been deciphered for the reader.)*

Legal:
In the United States District Court for the Western District of Washington at Seattle Second Amended Complaint in the case of Javier Tapia v. NaphCare, Inc., et al. filed October 18, 2022. Per this document:
a. NaphCare, Inc. was providing health care services at the Pierce County Jail. "The services provided by NaphCare range from physician and nursing services, dental care, mental health/psychiatric care, pharmaceuticals, utilization management, and administrative support...
b. On June 16, 2018, Javier was arrested for driving a stolen vehicle and outstanding Washington State Department of Corrections...warrants. He was booked into the Pierce County Jail...as a pretrial detainee at approximately 2:00 a.m...
c. Registered Nurse Etsuko Yagi, a NaphCare employee, conducted a mental health screening, indicating that Javier had not previously '[h]ad any treatment for mental health issues,' been 'psychiatric hospitaliz[ed],' or experienced any 'delusional thought processes or psychosis'...
d. Javier's incarceration was largely unremarkable for about three months until September 10, when Javier began demonstrating signs of disordered thinking...
e. On September 14, Javier put in a sick call request, complaining of 'insomnia.' Nurse Jesus Perez...cancelled the appointment, instructing Javier 'to kite'...mental health...
f. On September 17, Corrections Deputy Jonathan Knight made" an entry into Mr. Tapia's chart describing "odd behavior and unknown mental state...he was laying down in the fetal position and I told him to get up and he just stared at me. I gained control of his right arm and he started crying and mumbling

Javier Tapia v. NaphCare, Inc., et al.

2

unintelligibly...on the way out of the Unit, he mumbled a few unintelligible remarks and was tearful and was acting very strange...he was placed in a timeout cell by responding deputies."

g. Mr. Tapia was seen the next day by Mental Health Provider, Darren Nealis for an initial assessment. It was documented that Mr. Tapia, "appears to be confused and was unable to verbally respond to my questions...appears to be decompensated at this time. His urinalysis was positive for methamphetamine when he booked in on 6/16/18...Javier began refusing meals at this time...

h. According to medical records, Javier was 'involved in several fights' during or shortly before this time period, 'developing trauma to the left head'...

i. September 19, MHP Nealis assessed Javier again, ignoring his serious and obvious medical condition, writing...He presented again today as confused...unable to verbally respond to my questions. He has been here...since June but appears to be decompensated at this time. Officers report that he appears to be 'way off his baseline' and he was nonverbal in court today...He could have an unknown medical condition...Referred to medical for assessment...mental health will follow up...

j. Javier was not seen by a medical doctor but was seen by Licensed Practical Nurse Cameron Carrillo...roughly an hour after Nealis' referral. Carrillo did not physically examine Javier...he simply observed that Javier did 'not appear in distress...did not have any medical concern at this time..."

k. "Pierce County and NaphCare providers engaged with Javier and observed his serious and obvious medical condition on September 20...September 26...and September 28...Javier continued to present as...'confused and non-verbal'...none of these providers referred Javier to a medical doctor."

l. On September 29, "corrections deputy...observed Javier's serious medical condition...and...noted that Javier was exhibiting 'disturbing mannerisms.'"

m. "Later that day, Nurse Elizabeth Warren...'assessed' Javier...did not refer Javier to a medical provider, order a physical evaluation or other medical assessment."

n. "On the morning of October 1, Licensed Practical Nurse Debra Ricci...wrote that Javier '[r]efused' her attempt to take his vitals...did not refer Javier to a medical provider...Later that day, Nurse Ashley Chalk...write 'asked to see inmate...complaint of 'toes turning black'...inmate is non-verbal and does not answer questions...Inmate transferred to Tacoma General."

o. "October 2, Dr. Lucas Labine hypothesized that Javier's mental health issues may have been 'due to azotemia/uremia...other metabolic or vasculitis process...or neoplasm... Javier's mental health issues completely resolved after receiving treatment at Tacoma General Hospital."

Medical/Corrections Records:

1. Medical records from the Hanger Clinic dated April 2019 through January 2022.

2. Medical records from the State of Washington Health Care Authority dated March 31, 2012 through December 14, 2021:

Javier Tapia v. NaphCare, Inc., et al.                                                              3

a. In 2012 and 2013, Mr. Tapia had diagnoses including adjustment reaction, not otherwise specified and adjustment disorder with anxiety/depression. The service description noted "alcohol and/or drug outreach" and "behavioral health."

3. Medical records from MultiCare:
   a. 10.1.18 – photographs of Mr. Tapia's feet.
   b. 10.1.18 – 10.22.18 – Tacoma General Hospital admission.
      i. Mr. Tapia was "admitted from jail 10.1.18 for painful swollen left leg with blackened foot and a diagnosis of phlegmasia cerulea dolens and gangrenous left foot.
      ii. Mr. Tapia underwent a "left transtibial guillotine amputation for necrosis and cellulitis of the left foot a complication of end stage phlegmasia cerules dolens."
      iii. 10.1.18 – Mr. Tapia weighed 168 pounds. He was described at admission as "thin, tremulous, tired appearing…oriented to person, place, year. Mood – alert, nervous and affect normal. No visual or auditory hallucinations. No tangential or circumferential thought processes. Judgement clear and intact. Speech clear."
      iv. 10.2.18 Nutrition Assessment Evaluation noted "severe loss of muscle and subcutaneous fat upper extremities…diagnosis: severe malnutrition related to social circumstance (incarceration) as evidenced by weight loss greater than 10% past month self-reported and poor oral intake estimated less than 50% for over one month with physical appearance of severe losses of subcutaneous fat muscle…increased nutrient needs related to wound/gangrene foot.
      v. 10.3.18 – "Mental status changes: unclear etiology, could be due to azotemia/uremia, opiate pain meds vs. other metabolic or vasculitis process vs neoplasm…will likely need brain imaging…reported history of paranoid schizophrenia in distant past, unclear if this is an active diagnosis…no clear indication for psychiatric intervention at this time."
      vi. 10.5.18 – CT of head negative for acute intracranial process.
      vii. 10.9.18 – History of paranoid schizophrenia reported in distant past uncertain if active diagnosis, appears stable at this time. Note: medication list does not include psychotropic medications. Weight on this date 178 pounds.
      viii. 10.11.18 - Mr. Tapia weighed 182 pounds.
      ix. 10.13.18 – Seen by nutrition and felt to have severe malnutrition based on weight loss over the last month secondary to incarceration and poor oral intake.
   c. 9.26.13 – Allenmore Hospital Emergency Room visit due to a motor vehicle accident. Discharge diagnosis "cervical strain…bilateral elbow

contusions ...right upper arm laceration...right lower leg lacerations...lumbar strain."

4. Medical records from NaphCare dated October 2016 through November 2018:
    a. 11.8.16 – 11.9.16 – Auburn Medical Center "he recently got out of jail and has been having a rash on his left shoulder with noted chills." Discharge diagnosis of "shingles...cellulitis."
    b. 10.1.18 – 10.22.18 – Tacoma General Hospital
    c. 6.16.18 – Receiving Screening weight 153 pounds indicates no known chronic or acute medical conditions and no history of mental health assessments or treatment. There is a notation of a history of alcohol and drug withdrawal, with use more than five days per week, taking Percocet, "withdrawal: achy, restless leg." He was assigned to general population.
    d. 6.16.18 – Mental Health Screening – notes history of substance use. Notes Mr. Tapia is "mildly unkempt...cooperative...housing assignment general population."
    e. 9.14.18 – Sick Calls complaint of insomnia, cancelled by Jesus Perez on 9.14.18 "please encourage inmate to kite mental health office with current needs."
    f. 9.18.18 – Mental Health Provider Darren Nealis, "met with inmate at about 11:00 for initial assessment...came to the door and was cooperative during the interview, but appears to be confused and was unable to verbally respond to my questions...been here...since June but appears to be decompensated at this time...urinalysis was positive for methamphetamine when he booked in on 6.16.18...recommend continued level 1 mental health housing at this time for further assessment. Mental health will follow-up."
    g. 9.19.18 – Mental Health Provider Darren Nealis, "met with inmate at about 10:45 for initial assessment...presented again today as confused...again unable to verbally respond to my questions...been here...since June... appears to be decompensated at this time. Officers report that he appears to be 'way off his baseline' and he was. Nonverbal in court today as well...could have an unknown medical condition...referred to medical for assessment. Recommend continued level 1 mental health housing at this time for further assessment."
    h. 9.19.18 – RN Cameron Carrillo, "referred to medical due to being nonresponsive...blood pressure hypertensive...does not appear in distress, states he does not have any medical concern at this time...will continue to monitor."
    i. 9.20.18 – Mental Health Provider Duane Prather, "Inmate seen about 11:1- for mental health follow up...awake but stays on his bunk...does not respond in anyway...he just stared...would not even shake his head yes or no...was seen by medical yesterday...recommend level 1 mental health housing for observation. Mental health to follow-up."

Javier Tapia v. NaphCare, Inc., et al.                                                           5

j.  9.26.18 – Mental Health Provider Darren Nealis, "attempted to meet with inmate at about 11:00 for initial assessment in response to C/D report...presented again as confused and nonverbal...has been here...since June but appears to be decompensated at this time...recommend continued level 1 mental health housing at this time for further assessment, mental health will follow-up."

k.  9.28.18 – Mental Health Provider Jesus Perez, "seen at about 10:30 for mental health follow up...refused mental health interview...presents [with] mental health symptoms...would not answer mental health questions...just looked at MHP and did not respond to basic questions...continue current housing, mental health will follow-up."

l.  9.29.18 – Sick Calls "mental health ask that a provider evaluate inmate to rule out any medical issues."

m.  9.29.19 – RN Elizabeth Warren "12:10 pm saw inmate in his cell as requested by Sergeant.  Cell smells of urine...alert, sitting up, on the side of the bunk...makes eye contact when he is spoken to...will not verbally respond...will follow instructions with calm encouragement...no acute distress noted...not sure if inmate is eating every meal.  Offered a chocolate ensure and he drank approximately ½ the container.  Officer prepared his sandwich for him...he took the sandwich...ask if inmate could be put on a meal log...start "meal log" schedule daily monitoring of vital signs x3 days and scheduled provider visit for evaluation."

n.  9.30.18 – Mental Health Provider Ismael Conception Poo, "seen at about 10:40 for assessment in response to corrections deputy report...was uncooperative with mental health interview...appeared to be sleeping and did not respond to MHP knocks on door or calling of name...was observed moving and breathing in his bed...cell was observed as messy and disorganized ...recommend level 1 mental health housing.  Mental Health to follow-up."

o.  10.1.18 Mental Health Provider Darren Nealis, "met with inmate at about 10:45 for mental health follow up in the clinic.  He presented again today as confused and nonverbal but was also calm and cooperating with medical staff...will be sent to emergency room for further assessment.  Recommend continued level 1 mental health housing at this time for further assessment.  Mental health will follow-up."

p.  10.1.18 12:32 pm CDT – RN Ashley Chalk "asked to see inmate by unit officer for complaint of 'toes turning black'...left foot slightly swollen and severely discolored...patient nonverbal and does not answer questions...referred to Tacoma General Emergency Department."

q.  10.1.18 12:35 pm CDT – Medical Director Dr. Balderrama "seen with nursing staff has evidence of possible vascular deficits on left foot...needs emergency room evaluation for possible emergent surgical management."

r.  10.22.18 – Mental Health Provider Kim Peebles, "seen...upon return from the hospital...processing his current circumstances, but presents

stable...while at hospital...left leg, below the knee was amputated, due to a medical condition...reports he remembers this writer from the day he was oriented x1 and sent to the emergency room...he does not remember how his condition started, other that feeling really tired...now oriented x3, alert, and organized...presents with a flat affect and is beginning to process his los... offered resources on grief and loss, but he declined..."

s.  11.10.18 – Mental Health Provider Jesus Perez "inmate cooperated with mental health interview...oriented...was in stable emotional control...able to deny current risk of harm to self and others...future oriented with family support...good insight and is able to manage as he awaits transport to prison. Inmate discussed PTSD symptoms associated with losing his leg and reviewed coping skills he can use while at Pierce County Jail...expects to go to prison this week and will follow-up with providers there..."

5.  Medical records from Pulser Heart Institute:
   a.  11.26.18 – Wound check
   b.  5.24.23 - Mr. Tapia's problem list included: Elevated Factor VIII, on warfarin; Hypercholesterolemia; prior marijuana smoking; prior alcohol use; left lower extremity phlegmasia cerulea dolens with foot venous gangrene/left below the knee amputation.

6.  Medical records from St. Joseph's Medical Center dated 2.18.99 through 3.16.22. Per these documents:
   a.  2.18.99- 2.25.99 – admission due to rule out psychosis, "admitted because of paranoid ideation...brought here by his father who was concerned...he and his girlfriend took some marijuana and he has never been the same...very paranoid...fearful...would hardly communicate...very poor historian...very guarded...would only give a few words at a time with thought blocking...urinalysis negative...final diagnosis: atypical psychosis, rule out organic psychosis from marijuana use." Medication prescribed was Zyprexa 10 mg twice daily.

7.  Pierce County Corrections
   a.  6.30.19 – 11.23.18 Inmate Behavior Log Printout
      i.  9.18.18 – Mental Health "met with inmate for initial assessment...came to the door and was cooperative...but appears to be confused...unable to verbally respond to my questions...been here...since June...appears to be decompensated at this time. Recommend continued level 1 mental health housing."
      ii.  9.18.18 refused dinner
      iii.  9.18.18 refused breakfast

Javier Tapia v. NaphCare, Inc., et al.                                    7

iv. 9.19.18 Mental Health - "met with inmate...for initial assessment...presented again today as confused...unable to verbally respond to my questions...continued level 1 mental health housing...referred to medical department for assessment.

v. 9.20.18 refused breakfast

vi. 9.20.18 Mental Health – "Inmate is awake but stays on his bunk...does not respond in any way to mental health provider, he just stared...would not even shake his head yes or no...was seen by medical yesterday...level 1 mental health housing for observation."

vii. 9.21.18 verbally refused dinner

viii. 9.22.18 verbally refused lunch

ix. 9.22.18 verbally refused dinner

x. 9.24.18 verbally refused breakfast

xi. 9.25.18 refused lunch

xii. 9.25.18 verbally refused dinner

xiii. 9.26.18 Mental Health "here...since June but appears to be decompensated at this time...continued level 1 mental health housing."

xiv. 9.26.18 verbally refused dinner

xv. 9.28.18 refused breakfast

xvi. 9.28.18 refused lunch

xvii. 9.28.18 Mental Health "Inmate refused mental health interview...presents [with] mental health symptoms...would not answer mental health questions...just looked at mental health provider and did not respond to basic questions."

xviii. 9.29.18 refused breakfast

xix. 9.29.18 refused lunch

xx. 9.29.18 Inmate Behavior/Disturbing Mannerisms

xxi. 9.29.18 Info "Nurse did an assessment on Tapia de to his odd behavior and lack of response to verbal interaction."

xxii. 9.29.18 refused dinner

xxiii. 9.29.18 Info "Inmate has been mostly unresponsive to verbal interactions, however, he was seen moving around while appearing asleep and was seen at his cell window once tonight."

xxiv. 9.30.18 refused breakfast

xxv. 9.30.18 Mental Health "seen...for assessment...was uncooperative with mental health interview...appeared to be sleeping and did not respond...to knocks on door or calling of name...observed moving and breathing in his bed."

xxvi. 10.1.18 Info "while serving lunch, Corrections Deputy Paukert observed inmate's foot to be a purple/black color...immediately called the clinic...inmate was transported to the clinic bin a wheelchair."

      xxvii.  10.1.18 Mental Health "met with Inmate at about 1045 for mental health follow-up...presented again today as confused and non-verbal but was also calm and cooperating with medical staff.

      xxviii.  10.1.18 Info "Inmate was admitted to the hospital."

b. 9.16.19 Housing Moves/Peace and Harmony regarding Mr. Tapia, "exited the upper tier...with...possessions and informed me that they needed to move...Tapia told me that the upper tier found out that he was a 'snitch' and that he felt endangered remaining in the unit...didn't point to any individual inmates, but stated it was a general dislike for them among many in the upper tier...Tapia moved to 2B6.."

c. 9.17.18 Inmate Behavior/Disturbing Mannerisms, documented by J. Knight, "On 9.17.18 at 2025...observed Inmate Tapia...get off his bunk and throw his hands in the air and roll onto the floor...and begin to flail around and roll around the floor...called for an escort to step in due to his odd behavior and unknown mental state...he was laying down in the fetal position and I told him to get up and he just stared at me. I gained control of his right arm and he started crying and mumbling unintelligibly...gained control of his other arm and assisted him up and applied wrist restraints without incident. On the way out of the Unit, he mumbled a few unintelligible remarks and was tearful and was acting very strange...escorted him out of the Unit and he was placed in a time out cell by responding deputies...Tapia arrived to my unit as a...move and I observed him acting odd from the moment he walked it. He wouldn't make eye contact and was looking all around...he didn't acknowledge me verbally...only shook his head...the entire time he spent in 2D, he never made his bed and sat there looking around and intermittently covering his ears which was very strange to me...went to talk to him and asked if he was alright and he just shook his head yes but would not make eye contact...may have taken an unknown substance or suffer from unknown mental health issues...will be moved to 3SC16. Classification review and mental health evaluation requested."

d. 9.29.18 Inmate Behavior/Disturbing Mannerisms, documented by R. Oeltjen, "Inmate. Tapia would not respond to me verbally when I asked him if he wanted lunch. He did look up at me but would not give me an answer...his behavior log indicates he has been refusing meals periodically...placed a sack meal in his cell and will monitor to see if he eats. Recommend mental health follow-up." Final Approval by F. Ake, "Inmate assessed by Nurse Warren, Mental Health and clinic to follow up. Please log meal refusals."

e. Request report dated 6.29.18 through 11.12.18.

      i.  9.13.18 "need sleep medication can't sleep. Having sleep issues."

      9.13.18 "you're scheduled to see the sick call nurse, please go when called."

f. Pierce County Detention and Corrections Center Health Services Division Chronological Record of Dental Care dated 10.23.12.

    g. Pierce County Detention and Corrections Center Health Services Division Chronological Record of Medical Care dated 3.7.07 through 1.1.14.

8. Pierce County documents regarding Mr. Tapia's arrest including Booking Identification Sheet, Booking Form, Charges and Sentence. Mr. Tapia was booked into the Pierce County Jail June 16, 2018 due to charges of theft of a motor vehicle and obstructing a law enforcement officer.

9. Washington Department of Corrections records regarding Mr. Tapia dated 2014 through 2022.

## Depositions:

- Deposition of Darren Nealis dated September 15, 2023 with exhibits. Per this document:
    - a. Mr. Nealis has a bachelor's degree in psychology and a master's degree in clinical social work. He had 20 years of experience in community mental health prior to beginning work at Pierce County in 2015. He stopped working at Pierce County in 2022. In 2018, Mr. Nealis was a Mental Health Professional at Pierce County Jail. He described the role of a Mental Health Professional as "doing assessments... Mental health assessments with inmates, collaborating with the medical team and collaborating with outside agencies and family members to get them linked up with services on their way out or to get more information about them when they were coming in and then sometimes collaborating with the state hospital... collaborating with correctional officers regarding the care of the inmates."
    - b. Mr. Nealis noted that he was required to comply with written policies and established practices at Pierce County and that his interactions with Mr. Tapia comported with those policies and practices.
    - c. He recalled that in the scope of his work at Pierce County, "we weren't required to formulate diagnoses...we were all certified to do so...but we were not formulating diagnosis in the sense that you often do in a setting when you're billing insurance companies...when we would staff cases...or make a referral for medications, we would talk about the symptoms that they were experiencing..." With regard to Mr. Tapia, Mr. Nealis stated, "no one was required to diagnose...". He agreed that "...you have to formulate a diagnosis in order to provide ongoing mental health care...in the jail setting...our system wasn't set up to...include a formulated diagnosis...it was also sometimes difficult to get all of the information needed to formulate a diagnosis..." For Mr. Tapia, he agreed that "no one was responsible for [a] formal diagnosis."
    - d. He recalled two forms of documentation used at Pierce County Jail, the NaphCare electronic medical record and the jail system, "Linx."
    - e. He indicated that Pierce County Jail did not have a policy in place for documentation of refusals of assessments or health care, "if they refused,

we would document that, and then we would see the next person on the unit...we would move on to the next...we would attempt to interact with...everyone each time we went to do rounds on the unit...typically three times a week...I don't believe that was a written policy...based on staffing levels...and also based on the acuity of the unit..."

f. He recalled that Mr. Tapia was housed in "the Level 1 unit...those units were typically scheduled for [mental health rounds] three times a week."

g. With regard to documentation, he recalled that there was "not...a separate section for treatment plan that we used."

h. He indicated that notes were not required to be signed off by a supervisor.

i. He recalled that assessments, specifically "assessing potential safety issues in terms of suicide risk and also assessing substance use or mental health symptoms" were "more often than not" performed cell side through the door with the port closed.

j. He recalled that "oftentimes" medical would evaluate an individual "depending on the situation...if we thought there was something going on medically, physically instead of mental health or in addition to mental health symptoms...mental health staff would typically collaborate with the medical staff just by...making a referral or asking them...the collaboration was mostly verbal...then we would document that...we had the interaction...there wasn't a paper form or an electronic form...you would talk to the nurses station and have the interaction...it was still formal, but not a form based...it was just supposed to be documented in your note that you made a referral."

k. Mr. Nealis recalled that he made a referral to medical for Mr. Tapia, "I did in at least one situation refer him to medical after seeing him...I believe I did document that I made a referral to medical."

l. Mr. Nealis was not able to recall what he told medical regarding Mr. Tapia, "typically, it would have been whatever I was observing...in this case, I wasn't getting...verbal responses from him, so...I would have told them that..."

m. Mr. Nealis indicated he was "not sure" that Mr. Tapia was experiencing a medical issue, "but I knew it was possible."

n. Although Mr. Tapia was scheduled to see medical following a kite request dated September 13, this was cancelled by Jesus Perez on September 14, 2018. Mr. Nealis did not recall seeing cancellations of sick calls.

o. With regard to the documentation of J. Knight on September 17, Mr. Nealis stated, "I don't think anyone was sure what had happened, but they had moved him to the other unit and then requested that mental health see him...". Mr. Nealis saw Mr. Tapia on September 18th, but he did not recall if he saw Mr. Tapia through the cell door with the port open or closed. He did not have independent memory of the visit but was able to recall the visit via reviewing the progress note. He did recall visualizing Mr. Tapia, "I remember that he did come to the door...like he just wasn't

verbally talking to me, he was just looking at me. He had gotten out of his bunk and come to the door...it looked like he either didn't understand me or wasn't able to respond to my questions."

p. Mr. Nealis saw Mr. Tapia again on September 18, "he did not come to the door on that second interaction...I don't have a specific recollection...on this day, I believe he stayed in his bunk." After this interaction, Mr. Nealis referred Mr. Tapia to medical, "I don't recall exactly what I said to medical, but I would have just made a referral...asking that he be seen."

q. Mr. Nealis did not disagree that after September 20, there was no other mental health interaction with Mr. Tapia until September 26 when Mr. Nealis saw Mr. Tapia who at that time, "appears decompensated...on that day, he didn't come to the door again...". Mr. Nealis described "decompensated" as "seemingly functioning differently than someone's baseline than how they normally are functioning...". Mr. Nealis indicated that while he was credentialed to formulate mental health diagnoses, "we did not formally do that because we didn't bill insurance companies. I was attempting to assess his mental health and/or substance use symptoms to see how I could best help him..."

r. With regard to treatment Mr. Tapia was receiving, "I believe that I was under the impression that he had not been engaging with staff...going to the door and trying to engage...that's a form of treatment...but...if he wasn't engaging, that was the extent of the interaction was the attempt to engage...I wasn't sure...what was wrong with him...". Mr. Nealis did not recall talking to a nurse practitioner or to the medical doctor about Mr. Tapia's condition, "I don't believe so, I would have documented that."

s. Mr. Nealis agreed that Mr. Tapia did not have a mental health interaction from September 20 to September 26, "we would try to...see people three times a week if they were in the Level 1 housing...it looked like it was three days in a row in the one week...typically we weren't doing the rounds on weekends...it looked to me like it was within the three times a week...that could vary based on staffing..."

t. Mr. Nealis not know if a complete assessment of Mr. Tapia was performed.

u. Mr. Nealis stated, "I saw that he appeared to be decompensated...I was unable to complete my typical full assessment...I just made a referral...at the nurse's station...sometimes a referral like that would lead to other medical visits...".

v. Mr. Nealis was not sure if medical attempted to see Mr. Tapia, do a physical assessment of him, or if they met with him through the door like Mr. Nealis did. Six days after Mr. Nealis made this referral, he again saw Mr. Tapia who continued to be decompensated. He agreed that the record indicated that for six days, Mr. Tapia did not have contact with medical or mental health staff. He indicated that this would not violate any established polices because, "he was being seen by the correctional officers..."

Javier Tapia v. NaphCare, Inc., et al.                                    12

w. He indicated that although mental health does not rely on corrections staff to monitor Mr. Tapia, "that is what happens...it's a collaboration between correctional staff, NaphCare staff, and mental health staff...those three teams were always functioning together...to interact with the inmates."

x. Mr. Nealis indicated that typically, he reviewed medical records prior to seeing individuals and he would have seen entries regarding Mr. Tapia's declining food and Mr. Carillo's note regarding his interaction with Mr. Tapia and "it looked to me like there was more of an interaction than the mental health staff had been able to have..."

- Deposition of Cameron Carrillo dated October 9, 2023 with exhibits. Per this document:

  a. Mr. Carrillo is a Licensed Practical Nurse who began working at the Pierce County jail in 2013. He recalled transitioning from other jail contract health care companies to NaphCare in 2015.

  b. He described the role of the Licensed Practical Nurse at the jail facility as "med passes and data collection...give medication to the patients on the floor I'm covering for that day." He described data collection as "vitals, general patient condition...take that information and report it to someone with a higher licensure."

  c. Mr. Carrillo reported he can "perform quite a few tasks as delegated by the RN [Registered Nurse] ...I collect the data and then I report back to the RN or provider."

  d. Mr. Carrillo reviewed a progress note regarding Mr. Tapia written by Mr. Carrillo dated September 19, 2018 at 6:23pm CST. He reported that although it was not documented, it would be "standard practice to always report back to the clinic RN...patient condition ..." He indicated this would be via a verbal report to the clinic RN.

  e. Mr. Carrillo recalled that in order to complete the progress note dated September 19, 2018 he "entered [Mr. Tapia's] cell."

  f. He noted that Mr. Tapia was referred to medical due to being nonresponsive, "someone from mental health was talking to the clinic RN about Mr. Tapia being nonresponsive. I made myself part of the conversation because I had just finished my med pass and the RN delegated me to collect the data for them...to check on the patient due to him being nonresponsive."

  g. Mr. Carrillo would not have reviewed the progress note written by Mr. Nealis an hour earlier. He stated, "like it says in my note, he was nonresponsive so they [indicating mental health] wanted someone from medical to check on him. But, when I saw him, he was responsive, and he was talking to me, and I collected blood pressure and reported back to the clinic RN."

  h. Mr. Carrillo indicated he would not have had any other information about when Mr. Tapia began experiencing mental health issues, his length of

incarceration, or meal refusals. Per his license, he is not able to do assessments or to diagnose, "my purpose of my visit was to collect the data and check on a patient who was nonresponsive ...just a general appearance, vital signs...generally ask them if they have any medical or mental health concerns...since he was already being seen by mental health, I just asked him if he had any medical concerns, and he stated no...the data collection was just a general 'see how the patient's doing.' I collect the data and reported back to the clinic RN...they said he was nonresponsive, which was not the case when I saw him..."

i. Mr. Nealis' chart note described Mr. Tapia as "decompensated" but Mr. Carrillo would not have had that information prior to seeing Mr. Tapia, "all I know if I was told that the patient was nonresponsive. I went down, and the patient I saw was very responsive and was talking to me...I believe he was sitting on the ground...with a blanket over...his lap...I took a blood pressure...his appearance was good. He was not diaphoretic. He was not pale, he was not overly fidgety, not guarded, and he said he had no medical concerns...He was just upset about being in the new unit, and...it was okay for me to come get his blood pressure...and that he didn't have any suicidal ideations..."

j. The progress note Mr. Carrillo wrote included the statement "continue to monitor." In the unit where Mr. Tapia was housed at this time, "he's being checked on...every hour or half hour...patients in these cells are seen – I think Pierce County jail allows either once or twice a week to be assessed for any medical or mental health needs..." For the monitoring, Mr. Carrillo stated this would be per "correction officers or as needed by nursing staff."

k. Mr. Carrillo administered medications to Mr. Tapia on October 25, 2018. He did not recall anything about his interaction with Mr. Tapia on that date.

l. Mr. Carrillo stated, "I collected the data and reported the data back to the clinic RN...it would be up to the clinic RN to either follow up with data collection or be okay with the patient's condition...when I reported...it back to the RN and the RN wanted me to get more vitals, I would have to go back and get more vitals."

- Deposition of Jonathon Knight dated September 25, 2003 with exhibits. Per this document:

  a. Mr. Knight received his master's degree in psychology in 2022. In the fall of 2018, Mr. Knight was enrolled in "school...online."

  b. In 2016 after an honorable discharge from military service, Mr. Knight began working as a corrections deputy at Pierce County jail. He reported his job description as "care and custody."

  c. Mr. Knight reviewed a behavior log printout that indicated Mr. Tapia was booked into the jail on June 15, 2018 and "there's nothing annotated in

this behavior log that I'm reviewing that states he was exhibiting any mental health issues leading up to that point [September 2018]."

d. Mr. Knight agreed that he documented on September 17, 2018 that Mr. Tapia was "exhibiting disturbing mannerisms." He did not recall knowing Mr. Tapia before this incident.

e. Mr. Knight was aware that Mr. Tapia experienced a change of housing on September 17, 2018 "a peace and harmony move...on the 17th, he did come to my unit...as a new inmate...that leads into the report that I wrote and what I witnessed...". Mr. Knight did not remember why Mr. Tapia was moved to his unit, 2D.

f. Mr. Knight described unit 2D as "a general population...direct supervision unit...I'm always there...always observing the people that are in custody in the unit. They're not locked behind a door...it's an open dorm setting...there's specific lockdowns and formal count for everyone has to be on their bunks per policy and accounted for...it's an open dorm setting, so people that are in these units are generally pretty well behaved..."

g. Mr. Knight reviewed the report he wrote regarding Mr. Tapia on September 17, 2018, "he came into my unit and was acting a little strange, which isn't uncommon...so I kept an eye on him for his safety..."

h. Mr. Knight recalled, "I don't believe he [indicating Mr. Tapia] said really anything that made sense or was understood clearly, from what I recall...I was under the impression that maybe he was exhibiting some sort of mental health crisis, but I am not a mental health professional, so I wasn't entirely sure what was going on with him..." Mr. Knight further recalled that he recalled Mr. Tapia, "getting up, walking a short distance around and then beginning to flail around while throwing his hands in the air and have kind of a slow fall...more or less like he kind of just guided himself down on the ground and sat down and laid on his back and rolled around...he was abler to stand and he was able to walk out of the unit without incident..."

i. Mr. Knight requested a mental health evaluation for Mr. Tapia via documentation in the LINX system. He did not recall having any interaction with the mental health provider who responded to the evaluation request.

j. After Mr. Knight saw Mr. Tapia and documented his concerns, another corrections officer, Mr. Wade saw Mr. Tapia and Mr. Tapia was transferred to a different unit, "3S...mental health, max security housing...another unit over in our main jail that a lot of people get sent to for mental health concerns, behavioral concerns...it's an indirect supervision unit...officers go through every 30 minutes and check on everyone...the people...assigned to this unit will be allotted one hour out a day...typically, people aren't housed there for very long until mental health can evaluate and medical can evaluate."

Javier Tapia v. NaphCare, Inc., et al.                                                    15

    k.  Mr. Knight did not have any further interaction with Mr. Tapia after he transferred to mental health housing.

- Deposition of Debra Ricci dated September 29, 2023 with exhibits. Per this document:
      a.  Ms. Ricci is a Licensed Practical Nurse who has been working for NaphCare at the Pierce County jail since 2016. She described her job as "passing medications to the jail population and responding to emergencies...I can answer kites, medical kites."
      b.  She agreed that in the state of Washington, she can only perform tasks under the direction of a physician or an RN.
      c.  Ms. Ricci reviewed a medical record entry she made October 1, 2018 at 7:13 am. She did not recall the name of the physician or RN she was working under on this date. She indicated the document was "a refusal." And that Mr. Tapia refused vital signs.
      d.  She agreed that at this time, Mr. Tapia was in a single cell with a closed door and a small window where you could look in and a port that could be opened by corrections staff.
      e.  She did not recall speaking with Mr. Tapia at the time of this refusal, "I must have if I got the refusal."
      f.  On September 30, there was an entry by I. Concepcion Poo, a mental health professional, who wrote that Mr. Tapia appeared to be sleeping and did not respond to the mental health professional knocks on the door or calling of name. Ms. Ricci did not recall if this was how Mr. Tapia appeared when she attempted to take his vital signs.
      g.  Mr. Tapia did not sign the refusal form, Ms. Ricci stated, "when the inmate refuses to sign the refusal...and the witness is generally the corrections officer, and they most of the time don't want to sign it either." Ms. Ricci did not recall if she notified her supervising physician or RN about Mr. Tapia's refusal.
      h.  NaphCare policy and procedure regarding "Refusal of Health Care Services" was reviewed, and Ms. Ricci did not follow policy as she did not obtain the signature of a witness, "If I asked the corrections officers and they say no, then I don't have anybody else to ask." She did not recall asking a corrections officer to sign the refusal document, "my general practice is when the inmate refuses his medication or his treatments, then I ask the corrections officer...if the inmate won't sign and the corrections officer won't sign, then...I have to go with that."
      i.  Ms. Ricci did not recall informing the facility's medical director of Mr. Tapia's alleged refusal, although she reported "I have the ability to contact the provider or I contact the charge nurse." As this contact was not documented, Ms. Ricci agreed that it is more likely than not that she did not contact a higher-level provider or request a psychiatric evaluation.

      j.  Per policy, Ms. Ricci would not have been required to report Mr. Tapia's refusal to allow vital sign monitoring.

      k.  Ms. Ricci indicated it was not her practice to review Mr. Tapia's behavioral log prior to attempting to interact with Mr. Tapia.

- Deposition of Jesus Tono Perez dated September 14, 2023 with exhibits. Per this document:

      a.  Mr. Perez has a master's degree in counseling and psychology. He began work at the Pierce County jail in 2015 as a mental health professional where he worked full time from 2015 to 2020. While working at the jail, he was employed by the Pierce County Sheriff's Department. His main job was "suicide assessment and then doing rounds checking in on...mental health units on a regular basis...creating release plans...going to the units and checking in with everybody...seeing what their needs are, and then referring them over to medical if they need to be seen by medical..."

      b.  He recalled communicating issues with NaphCare staff and making referrals to medical staff, "we're right there in the same general area...typically we write it in the NaphCare note...as I'm walking by, I'll be like...this guy's not looking well...they'll pull up the chart...you guys should put him on your list and check in...they'll put him on the list...sometimes, they'll go right there and then to check in on a person."

      c.  Mr. Perez did not recall the need to document refusals, "I know NaphCare does...but me as a Pierce County employee...I don't have anything like that." He agreed that if an inmate refused an ordered assessment, he would mark that in the chart notes and move on to the next patient.

      d.  "If the person's not communicating and not engaging...in an assessment, then we keep them in the mental health unit...they're going to stay...not going to leave until...they communicate to use...they'll stay there until I move them, until I clear them to be moved...If I saw someone on Monday and they weren't cooperating, I probably would have got back to them on Wednesday."

      e.  Mr. Perez described the mental health unit and indicated, "I come around and figure out who's...truly mentally ill or who's just...detoxing or just a behavioral problem." Mr. Perez agreed that it would essentially be up to him to determine whether or not it was a mental health issue or a medical issue. "We're assessing for mental health risks, and if I have some kind of medical concern...then I go to the clinic."

      f.  Mr. Perez indicated that if an individual was housed in mental health housing, that it was the County's policy that a stabilization plan is created, "as the person stabilizes...we staff the person's case with my coworkers, so everybody kind of has their take on what is going on with then...everybody's seeing the person, it's not just one mental health provider...as they are getting better...we all just kind of formulate a plan verbally in our morning meetings...they kind of just go up the level

system...". He indicated there is not a specific form or document in the electronic medical record that says stabilization plan.

g. The stabilization plan is not approved by a supervisor, "because we're all licensed, so we...pretty much can do what we need to do,"

h. The stabilization plan is not shared with corrections staff, "corrections wouldn't need to see that. We have our own way of communicating with them in another system, the Linx system."

i. Mr. Perez agreed that one goal of the jail mental health program is to provide a timely assessment. He described an assessment as "an evaluation of how the inmate is doing, essentially...I go and speak to them, I get to know them..." The assessments are performed by mental health providers, and although the mental health providers "could [diagnose mental health disorders] we don't typically need to do that because I would just refer...like if somebody needs to be diagnosed...in order to be prescribed meds, I would document that and then just review it over to the provider who would be the one...to technically diagnose...in my role, there's really no need for it...we look for the ARNP..."

j. The assessments that the mental health providers perform are typically done cell side, "they can't leave [the mental health] unit until we clear them." Mr. Perez stated, "typically we could do it through the door."

k. Mr. Perez indicated there is no specific format for the assessment and that the assessments are documented in the NaphCare medical records.

l. Mr. Perez was not aware of any shared written policies regarding the mental health program working cooperatively with the medical clinic staff. He agreed that medical and mental health staff would typically provide care independent of each other.

m. Mr. Perez is a licensed mental health counselor, and it is within his scope of practice to diagnose mental health disorders, but at Pierce County jail in the fall of 2018, the medical director, Dr. Balderrama and the APRIN Ms. Azusa was responsible for diagnosis. Mr. Perez did not know if either of these individuals ever evaluated Mr. Tapia or if Mr. Tapia was referred to them, "not by me."

n. Mr. Tapia put in a kite to see medical on September 13 at 9:07 am for insomnia. Mr. Tapia was informed he was going to see a sick call nurse, but Mr. Perez cancelled Mr. Tapia's medical kite. He stated, "it looks like that's what I did...we're trying to help...so the system was getting bogged down...there's so many kites coming throughout the time, that we wanted everybody to be communicating directly...Mr. Tapia...he needed to kite me directly, he didn't need to kite medical about insomnia...he needs to communicate directly to me...you don't need to go to...the nursing staff...cut out middleman...that's the way of training staff and then inmates...the inmates catch on pretty quickly...so that was basically an attempt to try and not bog down the system...nursing was saying...insomnia is not something that we're managing, mental health needs to do it, so they'll send me the kite...I didn't cancel the sick

call...my intention wasn't to cancel the sick call nurse meeting. My intention cancelling this was just cancelling this actual sick call kite that was sent directly to mental health...I'm trying to help the nurses understand that...this is not a medical problem...you need to refer him...when they bring it up to you, you need to say...you need to communicate with mental health staff directly and kite them directly...we're trying to teach everybody how to use the system."

o. Mr. Perez agreed that something mentally goes wrong with Mr. Tapia on September 17 and he is nonverbal. He agreed that prior to this time, Mr. Tapia had not shown any signs or symptoms of mental illness. A mental health evaluation was ordered. Mr. Nealis attempted to assess Mr. Tapia but he was not able to because Mr. Tapia was nonverbal, then he began refusing meals. Mr. Perez agreed that would have had knowledge of all these prior entries before he saw him on September 28.

p. When Mr. Perez met with Mr. Tapia on September 28, he did not recall if he had the officers open the trapdoor. Mr. Perez documented "Inmate refused mental health interview" which he stated "I would assume he waved me off...I'm not really sure what he did that made me interpret him refusing the interview...at this point,...we're probably going to start a hunger strike log because he's refusing so many meals...there would be little red flags that are going off in my head..." Mr. Perez did not recall if he made a referral to a higher level provider at this time.

q. Mr. Perez indicated that Mr. Tapia was experiencing "some kind of mental health crisis." He indicated he did not know why he did not make a referral for a higher level of care, "I really don't know why I didn't at the time." If Mr. Perez had made a referral, "I would have wrote a NaphCare note."

r. Mr. Perez indicated that based on the information he reviewed during the deposition that Mr. Tapia's mental health symptoms observed in September 2018 were caused by some sort of issue with his infection and not due to a diagnosable mental disorder, "based on what we reviewed today...it's clearly connected."

s. Mr. Perez did not recall having conversations with or making referrals for Mr. Tapia to Dr. Balderrama or to an advanced practice RN, as if he did, it would have been documented, "I get to decide if somebody gets referred...I make that clinical judgement..."

• Deposition of Elliot Wade, M.D. dated September 28, 2023 with exhibits. Per this document:

a. Dr. Wade is currently the corporate medical director west for NaphCare. He reports to NaphCare's chief medical officer, Dr. Alvarez.

b. In this role, Dr. Wade is responsible for "23 jails in eight states...all of those medical directors at the site level report to me...I review all ER send-out and returns throughout all NaphCare facilities, not just specifically the west. I do a lot with our substance abuse care and

treatments...performance reviews for providers. Keeping people up to date on policies, answering questions...". He is also currently the medical director for Spokane County.

c. At Pierce County jail, the medical director is Dr. Miguel Balderrama, he is an employee of Pierce County.

d. Dr. Wade is also responsible for the oversight of advance practice RNs [APRN], but he was not sure if there was currently someone in that role at Pierce County.

e. With regard to NaphCare policy and procedure, Dr. Wade stated, "it's a team decision, but, ultimately, the final say...is the chief medical officer, Dr. Alvarez.

f. Dr. Balderrama is the medical director at Pierce County responsible for clinical oversight of medical care at the facility. Dr. Wade does his yearly peer review.

g. Jonathon Slothower is the health services administrator, "the leader of the site...everyone reports to the health services administrator including the medical director."

h. Dr. Wade was asked by "NaphCare legal department to review the...care of Javier Tapia...subsequent to that, I sent this email to the staff."

⊙ Deposition of Jonah Bradley dated December 12, 2023 with exhibits. Per this document:

a. Mr. Bradley is a Corrections Deputy at Pierce County Jail where he has worked since October 2016.

a. Mr. Bradley indicated that 3SC16 is "3-South-Charlie-16 is "our admin segregation unit...usually housed for Level 1 inmates which could be based on behavior, charges, mental health." In this unit, Mr. Bradley stated inmates are in a cell by themselves and are allowed out "one hour a day."

b. Mr. Bradley noted that when an inmate refuses a meal, the only option for documenting this in the behavior log is "just verbally refused meal." If an inmate waved him off without saying anything, "I would take that as a refusal," and it would be logged as verbally refused meal.

c. Mr. Bradley indicated that if an inmate "are refusing meals for I don't know how many days...they end up getting put on a hunger strike."

d. With regard to reporting meal refusals to medical staff, Mr. Bradley stated, "with the talking to medical, line staff usually does not talk to medical and determine whether the inmate goes on hunger strike. That is between the lieutenant and supervisors."

e. Mr. Bradley indicated breakfast "usually comes around 4:15 in the morning." Lunch is at "roughly 9:30" and dinner "3:45 to 4:00."

f. Mr. Bradley noted that he documented "verbally refused" even if an inmate didn't say anything, even if it's a hand motion, or if the inmate didn't acknowledge his presence in any way.

Javier Tapia v. NaphCare, Inc., et al.                                                    20

     g. Mr. Bradley noted if he saw an inmate limping, he would ask them if anything was wrong or if they needed medical attention. If the inmate didn't respond, "I would continue on." He would not report the information anywhere, "not unless he complained to me."

     h. Mr. Bradley indicated it was correct that if an inmate had not eaten a meal that had been served to him, this would not be documented unless the process for a hunger strike was initiated previously by a medical provider.

- Deposition of Jane M. Valley, R.D. dated December 14, 2023 with exhibits. Per this document:

     a. Ms. Valley is a licensed registered dietician. In 2018 she was working "between Tacoma General, Good Sam Hospital, and Allenmore Hospital."

     b. Ms. Valley performed an initial nutrition assessment for Mr. Tapia on October 2, 2018. Ms. Valley documented that Mr. Tapia was a "poor historian...he would not have been able to answer some of the questions...too many holes for me to make an evaluation."

     c. Based on Mr. Tapia's weight in June 2018 documented at 153 pounds, Mr. Tapia did not loose 20 pounds by October when his weight was 168 pounds.

     d. Ms. Valley stated it was correct that she could not say for certain that Mr. Tapia's weight loss, poor intake, or physical appearance was due to actual weight loss or Mr. Tapia's self-report.

     e. Ms. Valley stated that "based on...the discussion today...I would say no [that she would still have the opinion that Mr. Tapia was severely malnourished at the time of her assessment].

     f. As there were two different weights recorded for Mr. Tapia on intake to Pierce County Jail on June 16, 2018 [153 pounds at 2:28 pm and 168 pounds at 2:00 pm] Ms. Valley did not know which weight was accurate, "I don't know the source."

     g. Mr. Tapia had two weights documented at the hospital 168 pounds and 147 pounds. The first in the emergency room, the second on admission to the floor. Ms. Valley relied on the weight measurement of 147 as "I would have assumed that that was a more accurate weight because it would have been on the floor...the nurses would have done a more accurate assessment at that point."

     h. Ms. Valley stated it was correct that Mr. Tapia's weight fluctuated during the hospital stay, that weights are not the only criteria to determine if Mr. Tapia was malnourished as other criteria include his physical appearance and food intake prior to hospitalization.

     i. Ms. Valley stated it was correct that she could not say to a reasonable degree of nutritional certainty that Mr. Tapia was malnourished on October 2nd.

     j. Ms. Valley agreed that during the hospitalization, until the amputation, Mr. Tapia was slowly gaining weight, "he did have positive weight gain."

    k.  Ms. Valley indicated if a patient did not eat for a week, 'weight would come down" and that someone can experience malnutrition over the course of a one-week period.

- Deposition of Duane Prather dated October 13, 2023 with exhibits.  Per this document:
  a.  Mr. Prather has a bachelor's degree in "mental health psychology" and a master's degree.  He worked at the Pierce County Jail for five years 2017-2022.  At the Pierce County Jail, he was a "mental health evaluation specialist...we would see mental health patients in the units and try to do assessments on their mental state...help classification decide what housing would be appropriate, if they needed mental health housing or not...follow-up in the mental health units...and suicide assessments primarily."
  b.  It was within the scope of Mr. Prather's license to diagnose mental disorders.
  c.  Mr. Prather indicated that there was no refusal form or policy regarding refusals, "not for mental health...we would document in a behavior tab and typically follow-up the next day...if they were Level 1 housing, we would follow-up daily."  He indicted Level 1 was "the most restrictive housing, the sickest people, the people on suicide watch."
  d.  Mr. Prather described assessments performed, a suicide risk assessment and "basic mental health status exams...how they were functioning cognitively; are they oriented; are they showing any signs of mental health symptoms...see if they come in drug impaired...we did not do diagnoses, as I recall, because we weren't billing insurance...we would treat symptoms...we would refer to the...mental health nurse practitioner if we had concerns over something that looked like...the patient would benefit from medication."
  e.  For the basic mental health status exam, Mr. Prather recalled there "were forms available if somebody felt like they needed 'em."  He recalled that the exams were typically done without using a form.  He indicated there was no policy or established practice on the criteria for the mental health assessments.
  f.  Mr. Prather did not recall Mr. Tapia, but from a review of the record he discussed a referral to the nurse practitioner, "if there was some compelling reason, I would have...when a person's not responding, you can't get an accurate assessment of their mental health status anyway...based on what I'm reading from my note, I probably wouldn't have referred the person...I could have if I felt there was a need..."
  g.  Mr. Prather recommended Mr. Tapia move to Level 1 mental health housing, "typically I would recommend Level 1...if a person...didn't seem to be cooperative...you can't do an assessment on somebody who doesn't talk to you, so the logical thing would be to try and keep him in mental health housing until you could get an accurate assessment."
  h.  After Mr. Prather saw Mr. Tapia and recommended Level 1 housing, he wasn't seen by mental health for six days, "that's what the record would

indicate." With further questioning, Mr. Prather agreed that Mr. Tapia was in Level 1 mental health housing as of September 18.

- Deposition of Jonathon Slothower dated November 29, 2023 with exhibits. Per this document:
  a. Mr. Slothower is a Registered Nurse and has worked at Pierce County Jail since 2013. He is the Health Services Administrator, "essentially a clinic manager...administrative manager of the clinic...everything except for clinical decisions...the medical director does not report to me."
  b. Mr. Slothower did not recall reviewing any records or having any conversations with other staff regarding Mr. Tapia's care prior to Mr. Tapia being sent to the hospital.
  c. With regard to Mr. Nealis' referral to medical, "Mr. Nealis asked medical to see the patient because he was not responding verbally...Mr. Carrillo went and saw the patient to verify that he was able to respond verbally...Mr. Nealis is a layperson...not a medical person...he is not asking for a medical assessment. He is asking for us to go and look at the patient and...assess whether or not he was verbal."
  d. After Mr. Carrillo had an interaction with Mr. Tapia on the 19th, he was not seen by a NaphCare employee for another ten days, "that's not clear from this. That's the next note that's on this document...doesn't mean that he wasn't seen by medical...we do segregation rounds..."
  e. Mr. Slothower indicated that a sudden altered mental state can be a medical condition "rarely. It can be...rarely. It can hypothetically...there's a lot of reasons that people in our facility act in the ways that were described in that report...correctional officers aren't qualified to recognize mental health conditions. They just ask for mental health to see them...an altered mental state, it can be a medical problem, but it's rare."

- Deposition of Elizabeth Warren dated November 2, 2023 with exhibits. Per this document:
  a. Ms. Warren is a Registered Nurse. She began work with NaphCare in April 2016 at Pierce County Jail until she retired in 2020.
  b. Ms. Warren indicated that "LPNs...do evaluate. They do look and see if people look like they're not normal today or they're not acting normal or their vitals are not normal...then they would call the clinic and tell the charge nurse...an RN would go up and evaluate the patient...if there was a need."
  c. Ms. Warren reviewed the vital signs that were documented after Mr. Tapia's LPN visit, it was not a full set of vitals "generally you're going to take a full set of vitals...you have to do a full set to do an assessment...even with a full set, if there was nothing else...sticking out, you'd still need more information ...you have to assess them."
  d. Ms. Warren saw Mr. Tapia on September 29th. She was not aware of what was going on with Mr. Tapia prior to that date.

Javier Tapia v. NaphCare, Inc., et al.                                                    23

   e. Ms. Warren stated that with regard to Dr. Balderrama and instructions regarding Mr. Tapia, "everything that Dr. Balderrama would have wanted would have eventually ended up in the medical records."

   f. In her assessment of Mr. Tapia September 29th, she wrote that "Inmate will not verbally respond...I didn't say he wasn't able...his vitals are ok. He is not acting strange."

   g. Ms. Warren documented that a sergeant requested she see Mr. Tapia, "based on my note, not sure if inmate is eating every meal...they wanted medical to assess him." Ms. Warren was unable to recall anything about Mr. Tapia or this assessment. She indicated that her assessment was "a standard protocol."

   h. Ms. Warren documented that Mr. Tapia would be "scheduled...for a provider visit." And that would occur "the following Monday...my only concern was if he really continued the whole weekend not to eat or drink at all, maybe he should be looked at on Monday...it's a Saturday that I saw him."

- Deposition of Nicholas D. Garcia, M.D. dated January 19, 2024 with exhibits. Per this document:

   a. Dr. Garcia is a vascular surgeon. He practices at MultiCare via the Pulse Heart Institute Vascular Services.

   b. Dr. Garcia reviewed his progress notes related to Mr. Tapia, "I documented that he had poor recollection of the timeline and it was unclear of the exact timing of...what his problem was...this would have been something I put in there because I was uncertain of his mental status exactly as far as his ability to understand everything we were talking about...he did communicate with words...he was having pain...he was telling us he was having pain...it looks like he was not giving me a lot of history and I was given history from other sources...I was able to determine his memory was poor and he was...unable to give me an accurate timeline..."

   c. Based on the appearance of Mr. Tapia's foot, "I have been doing this for 22 years and so we see how wounds look and how feet look when they lose their circulation...when it's gangrenous like this, it's...been there for a little while...at least probably one to two weeks."

- Deposition of Lucas P. Labine, M.D. dated January 9, 2024 with exhibits. Per this document:

   a. Dr. Labine completed a residency in Family Medicine. He was working as a resident at Tacoma General during Mr. Tapia's hospitalization.

   b. Dr. Labine documented that Mr. Tapia was alert, oriented, and nervous, "probably he was a little nervous...just by visual appearance." He indicated that Mr. Tapia's mental status exam was not remarkable for "anything extreme or obvious." This was consistent over the course of Mr. Tapia's hospitalization.

   c. There was documentation of a history of intravenous drug use and "a reported history of schizophrenia which apparently has not been treated

for years." Per Dr. Labine, "general information life this would either come from...the computer charts, from information from the patient, or from people who knew him."

- Deposition of Javier Tapia dated February 1, 2024 with exhibits. Per this document:
  a. Mr. Tapia was born March 3, 1982.
  b. Mr. Tapia denied any history of intravenous drug abuse. He last used drugs in 2018 prior to his last admission to Pierce County Jail.
  c. Mr. Tapia reported at approximately age 16-18, "I went to a party...after that party, my father said I was acting strange...like something was put in the drink...he had me checked into St. Josephs and they did drug screens and stuff...they couldn't find anything that would cause me to act that way...follow-up treatment consistent of going to another doctor where he put me on medication, and I took it for a short period of time...for a few months...I stopped...because I felt like I was mentally stable."
  d. Mr. Tapia did not tell anyone at Pierce County Jail about his history of mental health treatment, "I didn't feel...ever feel like that ever since."
  e. While incarcerated and in isolation in 2018 at Pierce County Jail, Mr. Tapia could not recall how often nurses performed rounds, "I don't know the timeframe...at one point in time, they did come check on me for my vitals."
  f. He recalled while in isolation, "I could have been sleeping. I slept a lot in there...the only recollection I have is them coming for my vitals and after...that they had me on meal watch drinking Ensures...it's hard to remember that whole situation...I remember my belongings all over the floor...then just sleeping...I remember trying to push a button to call, but I would just go back to my bunk and fall asleep...it felt like I couldn't stay awake...memory was real fuzzy...I do recall being real confused what was going on in the time in there...I was just confused..."
  g. He recalled, "I was in regular population for X amount of days, almost three months and then I ended up in isolation...like mentally something was going on with me...I slept...my body just wanted to sleep."
  h. Mr. Tapia reported that his infection "could have been...underlying cause to my mental state of mind...there has to be...some type of reason...it was gangrene...I had no recollection to how that happened...it was fuzzy...I couldn't put two and two together...I remember being upset about the situation...there's got to be something you guys can do...the surgeon said...it wasn't gonna be my toes; it was gonna be my foot...I remember being very upset about that, and asked to call my family...and my daughter was like...I don't want to lose my dad, so just do it..."

Reports:
- Expert report of Denise M. Panosky, DNP, RN, CNE, CCHP, FCNS dated January 31, 2024. Per this report, it was opined that nursing staff at Pierce County Jail providing care to Mr. Tapia, "failed to exercise that degree of care, skill, and learning

expected of a reasonable, prudent nurse acting in the same or similar circumstances. There was an obvious risk of Mr. Tapia suffering serious harm, or even death, that any trained registered nurse and/ or licensed practical nurse would have recognized, and those nurses' intentional decisions and failures to take any reasonable and necessary actions to mitigate the risk, based on their nursing training and education, was unacceptable and fell below what a reasonable and prudent nurse would do in the same or similar circumstances. It is my further opinion that the acts and omissions of Registered Nurses... Registered Nurses supervising Licensed Practical Nurses and Licensed Practical Nurses... fell below the nursing standard of care."

<u>Case Summary:</u>
Mr. Javier Tapia was born March 3, 1982, and was 36 years old when he was booked into the Pierce County Jail on June 16, 2018. At the time of his admission to the facility, Mr. Tapia did not report any history of experiencing mental health symptoms or of mental health treatment other than a history of substance use. This was consistent with his prior booking admissions to the facility.

The first three months of Mr. Tapia's incarceration at the Pierce County Jail progressed without incident, typical of his prior admissions to the facility. Beginning in September 2018, Mr. Tapia began to experience difficulties. First, he submitted a health care request or "kite" on September 14, 2018 due to a complaint of "insomnia." Although Mr. Tapia was scheduled to see a nurse the next day, a mental health provider, Mr. Jesus Perez, cancelled the sick call indicating that Mr. Tapia should submit another "kite" to mental health.

Next, Mr. Tapia experienced an acute mental status change. On September 17, 2018 he was reported by a Corrections Deputy as exhibiting "Disturbing Mannerisms" where Mr. Tapia was described as flailing and rolling around on the floor, lying in a fetal position, crying, mumbling unintelligibly, and acting "very strange." Further it was noted that Mr. Tapia would not make eye contact or acknowledge corrections staff verbally. Given this behavior, the corrections deputy requested a mental health evaluation.

Mr. Tapia was seen by mental health, Mr. Nealis, on September 18, 2018 for an initial assessment. Despite Mr. Tapia appearing confused and unable to verbally respond to questions, no further assessment or intervention was requested other than to continue Level 1 mental health housing. Mr. Tapia was seen by mental health on September 19, 2018. Again, Mr. Tapia was noted as "confused...unable to verbally respond to questions... decompensated...way off his baseline." At this time, the mental health provider documented that Mr. Tapia could "have an unknown medical condition" and referred Mr. Tapia to medical for an assessment.

On 9.19.18, a Licensed Practical Nurse, Mr. Carrillo, responded to the request for a medical assessment. There was documentation of a blood pressure measurement,

Javier Tapia v. NaphCare, Inc., et al.                                                    26

but no other assessment was documented. The progress note indicated "will continue to monitor" but there were no further progress notes from nursing or medical staff for the next 10 days.

On 9.20.18, Mr. Tapia was seen by mental health, Mr. Prather. At this time, Mr. Tapia did not respond to the mental health provider, "he just stared...would not even shake his head yes or no." This mental health provider again recommended Mr. Tapia remain in level 1 mental health housing and "mental health to follow up" but there were no further progress notes from mental health staff for the next six days.

On 9.26.18, mental health, Mr. Nealis "attempted" to meet with Mr. Tapia, but he presented as "confused and nonverbal...appears to be decompensated at this time."

On 9.28.18, mental health, Mr. Perez noted that Mr. Tapia, "refused mental health symptoms...would not answer mental health questions." Following each of these meetings, the mental health provider noted that Level 1 mental health housing was appropriate for Mr. Tapia due to the need for further assessment and that mental health would follow-up.

On 9.29.18, in response to a Corrections Deputy request due to Mr. Tapia refusing meals and not responding verbally, Mr. Tapia was again referred to medical and mental health. Nursing saw Mr. Tapia on 9.29.18 and documented that the cell "smells of urine" and that Mr. Tapia, although alert, sitting up, and making eye contact, will not verbally respond. At this point, nursing requested a "meal log" and "daily monitoring of vital signs for three days" and schedule a "provider visit for an evaluation." This provider visit was planned for the next clinic day, Monday October 1, 2018.

Mental health met with Mr. Tapia 9.30.18 in response to the Corrections Deputy report of 9.29.18. Again, Mr. Tapia did not participate in an assessment, he "appeared to be sleeping and did not respond to...knocks on door or calling of name." Mental health again met with Mr. Tapia on 10.1.18, where he again presented as confused and nonverbal. Finally, on 10.1.18, a Corrections Deputy asked medical to see Mr. Tapia as his toes were turning black, and Mr. Tapia was transferred to the emergency department at Tacoma General Hospital.

Mr. Tapia was hospitalized at Tacoma General Hospital where due to advanced circulation issues complicated by gangrene of his left foot; he required a left below the knee amputation. Mr. Tapia returned to the Pierce County Jail 10.22.18 where it was noted that he did not remember how his condition started other than he recalled feeling "really tired."

Conclusions:
Mr. Tapia's injuries as a result of his untreated medical condition resulted from a confluence of system and treatment failures that were identifiable, but in multiple

Javier Tapia v. NaphCare, Inc., et al.                                    27

deviations from the standard of care, were ignored by jail medical and mental health staff. These deviations will be addressed individually below in no particular order:

*Access to Care:*
Mr. Tapia first requested medical care via a "kite" on September 13, 2018. In a deviation from the standard of care and an impediment to Mr. Tapia's access to care, this "kite" where Mr. Tapia reported experiencing insomnia, while initially scheduled for a meeting with nursing staff, was cancelled by mental health staff. This is not appropriate. Requests for medical care must be reviewed by nursing and triaged by nursing staff prior to being referred to mental health.

Per the National Commission on Correctional Health Care [NCCNC] Standards for Health Services in Jails 2018, inmates must have access to care for their serious medical, dental, and mental health needs. The standard indicates that the "responsible health authority must identify and eliminate any unreasonable barriers, intentional and unintentional, to inmates receiving health care." The NCCHC defined access to care as "in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment, and receives care that is ordered."

The NCCHC reviews some barriers to an inmate's access to health services, one of which, seen in this case, is having "an understaffed, underfunded, or poorly organized system with the result that it is not able to provide appropriate and timely access to care." Another barrier, seen in this case, is "having a utilization review process that inappropriately delays or denies necessary health care."

In the deposition of Mr. Jesus Perez, he indicated that he cancelled Mr. Tapia's medical care request because "we're trying to help...the system was getting bogged down...so many kites coming through." While per Mr. Perez "nursing was saying...insomnia is not something we're managing, mental health needs to do it," it is inappropriate for him to cancel the sick call request as nursing must to triage and ensure that Mr. Tapia's report of insomnia is not a symptom of another medical condition.

*Housing:*
Housing was a precipitating factor in Mr. Tapia's injuries as he was ultimately housed in a single cell, isolated from others. Mr. Tapia was referred for a mental health assessment via a corrections deputy on September 17, 2018 due to an acute mental status change. At that time he was transitioned to Level 1 mental health housing, which is described as essentially administrative segregation, single cell housing with one hour outside of the cell per day. He remained in this housing situation from September 17, 2018 until his transfer to Tacoma General Hospital on October 1, 2018. As Mr. Tapia was experiencing an acute mental status change, placement in this type of housing would only serve to further isolate him and potentially exacerbate his pathology as discussed below.

Javier Tapia v. NaphCare, Inc., et al.                                                    28

The negative impact of isolation on individuals is well accepted in the scientific literature. Grassian (2006) described "severe psychiatric harm" resulting from solitary confinement wherein individuals experienced either reoccurrence of preexisting mental illness or acute mental health symptoms. He noted that individuals exposed to isolation experienced consistent symptoms including: hyperresponsivity to external stimuli; panic attacks; difficulty with thinking, concentration, and memory; intrusive obsessional thoughts; overt paranoia; problems with impulse control; and delirium.

The deleterious effects of confinement and seclusion have been well documented in adult settings (Haney, 2003). Specific effects include psychological consequences associated with lack of social contact, sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilation. Metzner and Dvoskin (2006) also documented psychological harm associated with seclusion in Supermax correctional settings. Seclusion has been associated with exacerbation of pre-existing conditions, as well as psychoses, depression, and anxiety in individuals with a history of mental health problems. Individuals without a pre-existing history of mental health problems experienced a greater amount of irritability, anxiety, and dysphoric symptoms.

*Failure to Monitor:*
Pierce County Jail policy for Level 1 mental health housing indicates that an individual will be assessed by mental health a minimum of three times per week. A review of records indicated that in a deviation from facility policy, there was a period of six days from 9.20.18 to 9.26.18 where Mr. Tapia was not assessed by mental health.

NCCHC standards for Mental Health Services in Correctional Facilities 2015 indicate that for segregated inmates, such as Mr. Tapia, while residing in Level 1 mental health housing, "the health professional's monitoring of a segregated inmate is based on the degree of isolation...inmates in solitary confinement with little or no contact with other individuals are monitored daily by medical staff." In a deviation from the standard of care, there was no documentation of daily monitoring of Mr. Tapia by medical staff. In fact, medical staff only documented seeing Mr. Tapia twice during the 14 days he was housed in Level 1 mental health housing. Both of those visits were prompted by requests from other staff disciplines, either mental health or correctional staff.

For individuals in mental health programs and residential units such as the Level 1 mental health housing described at Pierce County Jail, an acute mental health residential unit, the NCCHC Standards for Mental Health Services in Correctional Facilities 2015 notes requirements including: a minimum of continuous coverage by mental health staff assigned to the unit, orientation and training for correctional officers assigned to the unit, daily patient evaluation by mental health staff, programming or appropriate therapies, individual treatment plans, and housing in a safe and therapeutic environment. Given the description of the Level 1 mental health housing at Pierce County Jail, it is obvious that in a deviation from the standard of care, these standards were not met.

Per the deposition of Mr. Nealis, although mental health staff does not rely on corrections deputies to monitor inmates, "that is what happens." This is inappropriate and a deviation from the standard of care. Corrections deputies are not trained to monitor inmates in mental health housing or inmates who are experiencing a mental health crisis. There was no documentation of daily cell checks or required corrections deputy monitoring of Mr. Tapia during his stay in Level 1 mental health housing. As noted above, there were significant spans of time (e.g. six days) where other than documenting meal refusals, there was no documentation indicating any attempts on the part of mental health, medical, or corrections deputies to interact with Mr. Tapia.

*Failure to Assess:*
Per the NCCHC standards, Mr. Tapia, like all inmates admitted to the Pierce County Jail, should have had a mental health assessment documented within 14 days of admission that included a structured interview with inquiries into his history of psychiatric hospitalization, psychotropic medication, and outpatient treatment; substance use hospitalization; detoxification and outpatient treatment; suicidal behavior; violent behavior; victimization; special education placement; cerebral trauma or seizures; physical trauma or abuse; sex offenses; his current mental health status; and emotional response to incarceration. If Mr. Tapia had a positive screen for any of the above items, a full mental health evaluation would be required within 30 days. Given Mr. Tapia's history of a substance use disorder, he would have met criteria for a full evaluation. In a deviation from the standard of care, neither of these assessments were documented.

Mr. Tapia was referred for a mental health assessment on September 17, 2018 by a corrections deputy due to a change in mental status. Mr. Tapia was seen by four different mental staff on September 18, 19, 20, 26, 28, 30, and October 1, 2018 and despite repetitive descriptions of Mr. Tapia appearing "confused" and "unable to verbally respond" and "decompensated", mental health staff simply continued his Level 1 mental health housing and indicated they would "follow-up." This is not acceptable and a deviation from the standard of care.

Mental health staff reported that due to Mr. Tapia's lack of verbal interaction, they were unable to complete a mental health assessment or mental status examination. This is inaccurate and a deviation from the standard of care. The mental status examination includes multiple non-verbal components and indicators that can be used to determine an individual's mental state including but not limited to appearance, level of alertness, ability to follow commands, tics/tremors, apparent response to internal stimuli, and psychomotor retardation or agitation. Further, depositions revealed that in a deviation from the standard of care, it was common practice for mental health staff to attempt to engage with inmates through the cell door or through the port hole in the door. They did not typically enter the cell or take the inmate to a separate location, choosing to engage with the inmate cell side. This is inappropriate and a barrier to engagement, assessment, and treatment.

Javier Tapia v. NaphCare, Inc., et al.                                                            30

Given Mr. Tapia's acute mental status change, consideration of a medical cause of his difficulties should have been primary. On September 19, 2018, mental health staff did acknowledge the possibility of a medical cause for Mr. Tapia's difficulties and requested a medical assessment. In a deviation from the standard of care, an assessment did not occur, rather a Licensed Practical Nurse came to Mr. Tapia's cell and obtained a blood pressure measurement. No other clinical data were obtained. Given Mr. Tapia's challenges, an organic work-up or a medical assessment to determine an etiology or cause of Mr. Tapia's symptoms was necessary.

Despite the mental health provider's licensure and experience, they all failed to recognize that Mr. Tapia was experiencing delirium and attributed his behavior to mental health symptoms or volitional behavior. Mental health staff indicated that while they are qualified to make diagnoses, they do not as they "don't bill insurance" for the care provided in the Pierce County Jail. This is unacceptable. It is not possible to develop a treatment plan to address specific symptoms related to a diagnosis without a diagnostic formulation. Mr. Tapia had no diagnostic formulation documented and no treatment plan. Had the mental health staff generated a diagnostic formulation for Mr. Tapia, an individual with an acute mental status change, delirium would have been included in the differential diagnosis list. Delirium is essentially an acute mental status change or psychosis caused by medical issues, in this case, Mr. Tapia's lower extremity circulation issues and resultant gangrene.

During delirium, individuals become confused and unable to think or remember clearly. The symptoms are acute, meaning they start suddenly, and they can wax and wane. The most common symptoms of delirium are memory problems, trouble concentrating, hallucinations and delusions, incontinence, emotional changes, disrupted sleep patterns/sleepiness, disorganized thinking or unintelligible speech, confusion, and changes in levels of consciousness/alertness. The documentation included in Mr. Tapia's record indicated he was experiencing confusion, disrupted sleep patterns, unintelligible speech, and changes in levels of consciousness/alertness. Given the symptoms Mr. Tapia was experiencing, mental health staff should have referred him for an emergency medical assessment. Even more concerning is that initially, mental health did request a medical assessment, and this was performed by a Licensed Practical Nurse who, in a deviation from the standard of care, did not fully assess Mr. Tapia or refer him for further assessment by a higher-level clinician.

If the initial mental health assessment and subsequent mental health evaluation were appropriately performed for Mr. Tapia, Pierce County Jail mental health staff would have had access to additional information regarding Mr. Tapia's history. For example, while hospitalized at Tacoma General, there was a question as to whether Mr. Tapia had engaged in intravenous drug abuse. Mr. Tapia has denied intravenous use and his toxicology screen on admission to Tacoma General was negative, indicating substance use was not a contributing factor to his condition.

Javier Tapia v. NaphCare, Inc., et al.                                                                                31

At Tacoma General, there was a question as to whether Mr. Tapia had a history of a diagnosis of Schizophrenia. Had mental health staff at Pierce County Jail completed the required assessment and evaluation process, they would have known that Mr. Tapia did not have a history of Schizophrenia, rather he had a history of an inpatient psychiatric hospitalization as a teenager due to becoming paranoid as a result of experimenting with marijuana. Further, once Mr. Tapia was admitted to Tacoma General and received medical treatment for his serious medical issues, his mental status improved as his delirium resolved.

As discussed above, it is my opinion that Mr. Tapia's acute mental status change due to delirium and the delay in his receiving appropriate medical care resulted from a series of system failures and deviations from the standard of care by medical and mental health staff at Pierce County Jail.  Had Mr. Tapia been properly identified, evaluated, monitored, and treated, his injuries could have been averted.

Please note the above opinions are provided to a reasonable degree of psychiatric certainty. If additional information or collateral documentation becomes available, I reserve the right to change my opinions based on such, and that will be included as an addendum to this report.  Should you have any questions, or require any further information regarding these opinions, please contact me at 504.392.8348.

Submitted by:

Daphne Glindmeyer, M.D., D.F.A.P.A.
Board Certified Child, Adolescent, and Adult Psychiatrist
Board Certified Forensic Psychiatrist

Testimony and Depositions
Daphne Glindmeyer, M.D.

| | | |
|---|---|---|
| 09.27.05 | Judicial Commitment of J.D. | 24th Judicial District Court |
| 03.23.06 | Deposition – Succession of R.A.A.M. | |
| 11.03.06 | Judicial Commitment of M.T. | 24th Judicial District Court |
| 11.15.06 | Judicial Commitment of A.D. | 24th Judicial District Court |
| 01.05.07 | Judicial Commitment of G.C. | 24th Judicial District Court |
| 01.19.07 | Judicial Commitment of D.E. | 24th Judicial District Court |
| 04.27.07 | Judicial Commitment of L.H. | 24th Judicial District Court |
| 05.15.07 | Judicial Commitment of E.A. | 24th Judicial District Court |
| 08.24.07 | Deposition – C.D. v. H.L.B. Jr. | |
| 05.15.08 | Deposition – R.D. v. P.A., et al | |
| 07.31.08 | Judicial Commitment of G.D. | Orleans Parish Civil Court |
| 10.23.08 | Deposition – S.K. v. Dollar General Corp | |
| 09.02.09 | State of La. v. J.B. | 24th Judicial District Court |
| 10.08.09 | State of La. v. A.C. | 22nd Judicial District Court |
| 11.30.09 | Judicial Commitment of S.K. | 21st Judicial District Court |
| 01.12.10 | The Matter of the Mental Health of R.R. | 22nd Judicial District Court |
| 02.04.10 | State of La. v. T.V. | 22nd Judicial District Court |
| 04.06.10 | State of La. v. E.H.T. | 24th Judicial District Court |
| 04.27.10 | State of La. v. E.W. | 24th Judicial District Court |
| 04.29.10 | Judicial Commitment of S.J. | 22nd Judicial District Court |
| 02.14.11 | Deposition - JB v. Art Catering | |
| 10.19.11 | State of La. v. A.J. | Hammond City Court |
| 10.20.11 | D.G.  v.  R.F. | 24th Judicial District Court |
| 11.07.11 | State of La. v. S.S. | 41st Judicial Criminal Court |
| 12.21.11 | I.F. v. K.K. and Safeco Insurance Company of America | U.S. District Court - Eastern District of Louisiana |
| 01.26.12 | State of La. v. D.B. | 24th Judicial District Court |
| 01.27.12 | Deposition - I.F. v. Tulane University | |
| 02.07.12 | Deposition – J.W. ex rel. Williams v. A.C. Roper | |
| 04.26.12 | I.F. v. Tulane University | Orleans Parish Civil Court |
| 08.17.12 | Deposition –C. H. v. G. J. | |
| 09.12.12 | Hughes v. Judd | United States District Court- Florida, Tampa Division |
| 11.29.12 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 2.14.13 | Deposition – C.H. v. G.J. | |
| 2.19.13 | Judicial Commitment of D.P. | 24th Judicial District Court |
| 2.28.13 | Deposition – C.H. v. G.J. | |
| 4.2.13 | L.R. v. D.P.W. | Personnel Board Jefferson Parish |
| 4.3.13 | J. v. G. | United States District Court – Eastern District of Louisiana |
| 7.2.13 | Deposition – J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | |
| 7.23.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |

| | | |
|---|---|---|
| 7.25.13 | J.D., Individually and on behalf of his minor child, M.D. v. A.V., et al | Terrebonne Parish Clerk of Court |
| 10.29.13 | Deposition - Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 11.25.13 thru 11.27.13 | Hughes v. Judd, et al | United States District Court Florida, Tampa Division |
| 01.21.14 | Deposition - D. H. v. Coroner, St. Tammany Parish The State of Louisiana, et al | 22nd Judicial District Court |
| 02.05.14 | State of La. v. A.T. | 40th Judicial District Court |
| 05.08.14 | Deposition – C.C. V. LC. | |
| 08.27.14 | Jefferson Parish Human Services Authority v. D.T. | 24th Judicial District Court |
| 09.25.14 | In re D.T. | 24th Judicial District Court |
| 01.22.15 | Depositions- J.B. v. R.J. Reynolds Tobacco Co. | |
| 01.23.15 | J.W. ex rel. Williams, et al. v. Birmingham Board of Education, et al. | United States District Court Northern District of AL, Southern Div. |
| 05.15.15 | Deposition- B.P., et al v. River Oaks, Inc., et al | |
| 06.18.14 | E v. E | Orleans Parish Civil District Court |
| 09.22.15 | Deposition- B.D. v. S.D. | |
| 09.28.15 | B.D. v. S.D. | 22nd Judicial District Court |
| 09.29.15 | A.F. v. United States of America | United States District Court for the Eastern District of New York |
| 11.23.15 | Deposition- P.J. v. R.J. Reynolds Tobaccco Co. | |
| 01.13.16 | State of La. V. D.R. | 18th Judicial Court |
| 02.17.16 | State of La. V. E.P. | 24th Judicial Court |
| 03.08.16 | Deposition- G.J. v. C.A., et al | |
| 07.29.16 | Deposition- S.S. v. R.J. Reynolds Tobacco Co. | |
| 12.02.16 | Deposition- D.H., et al v. City of New Orleans, et al | |
| 02.13.17 | State of La. V. J.D. | 29th Judicial Court |
| 08.24.18 | Deposition L.C., et al v. Evergreen, et al | |
| 08.31.18 | M.A. v. R.A. | 24th Judicial Court |
| 11.26.18 | Daubert Hearing- L.C., et al v. Evergreen, et al | 21st Judicial Court |
| 02.07.20 | Deposition- J.A. v. E.C., et al | |
| 02.11.20 | State of La v. A.H. | 24th Judicial Court |
| 11.16.20 | Deposition- D.M. et al v. Erie County, Ohio et al | |
| 03.09.21 | Interdiction of E.M. | 24th Judicial Court |
| 03.12.21 | Deposition- Vargas v. Sheriff of Cook County, et al | United States District Court for the Northern District of Illinois, Eastern Division |
| 05.04.22 | State of LA v. B.J. | 24th Judicial Court |

*Information prior to August 2005 unavailable

Curriculum Vitae
# Daphne A. Glindmeyer, M.D.

_____

Business Address:                    Phone:    (504) 392-8348
                                     Fax:      (504) 398-4334
611 River Highlands Blvd., Suite B   Email:    psychdoctors@gmail.com
Covington, Louisiana 70433

Mailing Address:

Post Office Box 4240
Covington, Louisiana 70434

_____

## EDUCATION

**Post Graduate Medical Education:**

Louisiana State University Health Sciences Center
Division of Law and Psychiatry
Forensic Psychiatry Fellowship, 1998-1999
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Division of Infant, Child, and Adolescent Psychiatry
Child Psychiatry Fellowship, 1995-1997
New Orleans, Louisiana

Louisiana State University Health Sciences Center
Psychiatry Residency Training Program
Adult Psychiatry Residency, 1993-1995; 1997-1998

**Medical Education:**

Louisiana State University Health Sciences Center
Doctor of Medicine, 1989-1993
New Orleans, Louisiana

**Undergraduate Education:**

University of New Orleans
Premedical Curriculum, 1987-1989
New Orleans, Louisiana

Mississippi Gulf Coast Community College
Premedical Curriculum, 1985-1987
Gulfport, Mississippi

Loyola University
Bachelor of Business Administration/Finance, 1981-1985
New Orleans, Louisiana

_____

## PROFESSIONAL LICENSES AND CERTIFICATIONS

**Medical License:**

Louisiana, 1993
Texas, 2015

**Board Certification:**

| | | |
|---|---|---|
| Psychiatry | October 1999 | **Recertification:** December 2019 |
| Forensic Psychiatry | April 2001 | **Recertification:** January 2022 |
| Child and Adolescent Psychiatry | November 2002 | **Recertification:** April 2012 |

_____

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

American Psychiatric Association
  Fellow 2009
  Distinguished Fellow 2016

American Academy of Psychiatry and the Law
  Program Committee, 2000-2002

Louisiana Council of Child and Adolescent Psychiatry
  President 2009-2012

Louisiana Psychiatric Medical Association
  Executive Council Resident Program Representative 1997-1999
  Law and Psychiatry Committee 1999-Present
  Chairman Law and Psychiatry Committee 2009-Present
  Co-Chairman Child and Adolescent Psychiatry Committee 2003-2005
  Parliamentarian 2005-2006
  Secretary 2006-2007
  President 2007-2008

Louisiana State Medical Society
     Membership Committee 2004-2007
     Mental Health and Substance Abuse Committee 2004-2007
     Council on Membership Services 2008-2010

Selected by her peers for inclusion in Best Doctors in America® from 2007 to 2018

Orleans Parish Medical Society
     Women's Taskforce 2004-2005

Jefferson Parish Medical Society 2010-Present

Louisiana State University Health Sciences Center
Student Government Association 1989-1993
     Senior Class Vice President
     Executive Council Vice President of Social Affairs
     Sophomore Class Vice President
     Freshman Class Vice President

Student Representative Five Year Planning Committee 1993

Psychiatric Resident Representative to the Committee for
Professional Conduct 1997-1998

---

## CURRENT EXPERIENCE

**March 2004-Present**       Daphne Glindmeyer, M.D., A.P.M.C.
                                Private Practice
Psychiatric evaluation and psychotropic medication management services for children, adolescents and adults are provided in outpatient setting.  Also perform forensic consultations for adolescents and adults (civil and criminal).

**June 2010-Present**         Compliance Monitor
                                  Harchik and Associates, L.L.C.
                                  State of Texas
Compliance monitoring regarding psychiatric services in supported living centers in the State of Texas pursuant to a consent decree.

**April 2020 – Present**        Subject Matter Expert
                                  Iowa Boys State Training School
Compliance monitoring regarding mental health services in a juvenile justice center in the State of Iowa pursuant to a consent decree.

**December 2022 – Present**         United States District Court for the District of Rhode Island
                                    Court Appointed Rule 706 Expert
Consultation regarding conditions of confinement in Rhode Island Department of
Corrections.

**March 2023 – Present**            Subject Matter Expert
                                    Bailey and Associates, L.L.C.
                                    Glenwood Resource Center
Compliance monitoring regarding psychiatric services in a supported living center in the
State of Iowa pursuant to a consent decree.

---

## PAST EXPERIENCE

**August 2016- 2022**               Consultant
                                    Carter Goble Associates, LLC
Completed Consultations:
        Alaska Juvenile Privatization Feasibility Study
        Alabama Department of Corrections
        Florida Department of Corrections
        Montgomery County Jail
        Nevada Juvenile Staffing Review & Organization Assessment Project
        Sacramento County Jail Facilities
        Wyoming Department of Corrections

**2008-2015**                       Psychiatric Consultant
                                    Department of Justice
                                    Special Litigation Section
Completed Consultations:
        Investigation-New York Juvenile Justice System.
        Compliance Monitor-South Bend Juvenile Correctional Center.
        Investigation-California Youth Authority, N.A. Chaderjian Facility.
        Investigation – Pendleton Juvenile Correctional Center
        Compliance Monitor-State of Ohio, Scioto Juvenile Correctional
        Facility.

**September 2011-2015**             S.H. v. Reed
Compliance monitoring regarding psychiatric services in three juvenile correctional facilities
pursuant to a consent decree.

**February 2012-July 2012**         Psychiatric Consultant
Psychiatric consultant to the mental health compliance monitor in New York's secure juvenile
facilities.

4

**May 2011- December 2014**        Compliance Monitor
                                   Scioto, Ohio
Compliance monitoring regarding psychiatric services in a juvenile correctional facility
pursuant to a consent decree.

**January 2011-April 2015**        Psychiatric Consultant
                                   Southern Poverty Law Center
Completed Consultations:
        Walnut Grove Youth Correctional Facility
        Birmingham City School District
        Polk County Jail
        Orleans Parish Prison

**April 2009-January 2014**        Compliance Monitor
                                   Los Angeles County, California
Compliance monitoring regarding psychiatric services in juvenile correctional facilities
pursuant to a consent decree.

**January 2008-2010**              Compliance Monitor
                                   Attorney General's Office
                                   State of Mississippi
Compliance monitoring regarding mental health and rehabilitative
services in Mississippi's secure juvenile correctional facilities pursuant to a
Consent decree.

**March 2004-December 2010**       Psychiatrist
                                   Louisiana State University Health Science Center
                                   Juvenile Justice Program
Provided psychiatric evaluation and medical management to youth in a secure juvenile
correctional facility, Bridge City Center for Youth.  In addition, supervised and directed the
resident rotations for Child and Adolescent Psychiatry and Forensic Psychiatry residents within
the Juvenile Justice Program.

**March 2004-October 2007**        Medical Director
                                   West Jefferson General Hospital
                                   Behavioral Medicine Center
Medical Director for inpatient and outpatient psychiatric services at
West Jefferson Hospital.  Responsible for administrative decisions as well as
providing clinical services to both acutely mentally ill psychiatric
inpatients and outpatients attending intensive outpatient and partial
hospitalization programs.  In addition, provided consult liaison psychiatric
services to the general hospital.

**November 2003-August 2015**   Medical Director
                                 Assertive Community Treatment
Administrative responsibilities as well as providing intensive outpatient home based
psychiatric services to adults with serious and persistent mental illness.

**January 2003-September 2012**  Consulting Psychiatrist
                                  Community Support Team
                                  Resource Center for Psychiatric and Behavioral
                                  Supports
                                  Stabilization Unit at Northlake Supports and
                                  Services
Provided consultative psychiatric services for individuals with developmental disabilities.

**July 2002-March 2004**         Director of Psychiatry
                                  Louisiana State University Health Sciences
                                  Center
                                  Juvenile Corrections Program
Administrative supervision of lead psychiatrists at individual facilities,
Provided direct psychiatric care to youth in Louisiana's secure correctional facilities, and
supervised psychiatric residents and fellows rotating at
Bridge City Center for Youth.  Additional duties included serving as the
Course Director for the Child and Adolescent Psychiatry Forensic Lecture
Series.

**July 2000-March 2002**         Director of Clinical Operations
                                  Louisiana State University Health Sciences
                                  Center
                                  Juvenile Corrections Program
Administrative supervision and implementation of medical, mental health,
and dental care for youth in Louisiana's secure correctional facilities.

**July 1999-July 2000**          Attending Psychiatrist
                                  Medical Center of Louisiana, New Orleans
Provided psychiatric care to adult patients hospitalized in the acute psychiatric unit,
supervision of medical students, psychology interns, psychiatric interns, and residents.

**July 1999-July 2000**          Medical Director
                                  Jefferson Parish Adult Drug Court Program
Responsible for the clinical quality of court-mandated substance abuse
treatment for first time nonviolent offenders, evaluation and treatment of
dual diagnosis clients, and the supervision of social services staff and
forensic psychiatric fellows.

**July 1999-July 2000**            Medical Director
                                   Jefferson Parish Juvenile Drug Court
                                   Program
Responsible for the clinical quality of court mandated substance abuse
treatment and the psychiatric evaluation and treatment of juvenile offenders.

**July 1999-July 2000**            Medical Director
**July 1995-July 1999**            Staff Psychiatrist
                                   Jefferson Parish Human Services Authority
                                   Mobile Crisis Team
Crisis assessment, evaluation, and disposition planning for adult, child,
and adolescent clients, and the supervision of child psychiatrists and
child psychiatry fellows.

**1994-1999**                      Clinic Psychiatrist
                                   Orleans Parish Prison
Evaluation and treatment of incarcerated individuals.

**1996-1997**                      Duty Doctor
                                   New Orleans Adolescent Hospital
Crisis assessment, evaluation, and emergency hospitalization of
children and adolescents, after hour's management of acute inpatient unit.

**1994-1996**                      On-Call Provider
                                   Child and Adolescent Mental Health
                                   Program
Crisis assessment, evaluation, and treatment disposition for children
and adolescents in Orleans Parish.

---

## PRESENTATION AND TEACHING ACTIVITIES

<u>Adolescent Brain Development: Implications in Juvenile Justice</u> (May 2018). Daphne
Glindmeyer, M.D. Presented to staff at the Nevada Youth Training Center and Caliente
Youth Center.

<u>Psychotropic Medication and Developmental Disabilities</u> (February, 2015). Daphne
Glindmeyer, M.D. Presented to the Louisiana and Mississippi Councils for Child and
Adolescent Psychiatry Annual Spring Meeting.

<u>Better Living through Chemistry? A review of psychopharmacology and developmental
disabilities.</u> (April, 2011). Daphne Glindmeyer, M.D.  Presented to the Louisiana Disability
Summit Annual Conference.

<u>Autism Spectrum Disorder.</u> (March, 2010).  Daphne Glindmeyer, M.D.   Presented to Louisiana Public Health Association Annual Educational Conference.

Speakers Bureau:        Pfizer, 2007-2011
                        Eli Lily, 2008-2010
                        Astra Zeneca, 2010-2013
                        Abbott, 2007-2008
                        Pam Lab, 2010-2015
                        Otsuka 2012-2015

<u>Landmark Cases in Child and Adolescent Psychiatry</u>.  (May, 2004).
Daphne Glindmeyer, M.D.   Presented to LSUHSC psychology students.

<u>Psychopharmacology and Metabolic Syndrome</u>.  (November, 2008).
 Daphne Glindmeyer, M.D.  Presented to the Medical Staff of Northlake Supports and Services.

<u>Bipolar Mood Disorder:  Diagnosis and Treatment</u>. (October, 2007).
Daphne Glindmeyer, M.D.   Presented to the Louisiana Society of Nurse Practitioners.

<u>Mental Status Examinations</u>.  (May 2004).  Daphne Glindmeyer, M.D.  Presented to psychology students at University of New Orleans.

<u>Psychopharmacology and Developmental Disabilities.</u>  Daphne Glindmeyer, M.D. (March, 2004).  Presented to the American Academy of Family Physicians, and presented to the Region II Office of Citizens with Developmental Disabilities staff.

<u>Child and Adolescent Forensic Lecture Series.</u>  (2003).  Daphne Glindmeyer, M.D.   Course Director.
        Overview of the Juvenile Justice System
        Introduction to the Court Process

<u>Forensic Issues in Inpatient Psychiatry</u>.  (1999).

<u>Stalking:  The Psychiatric Perspective.</u>  (1999).

<u>Child Abuse and Confidentiality in the treatment of Children and Adolescents.</u>
(1998)

<u>Psychiatry Clerkship Small Group Leader.</u>  (1997-1998).

<u>Adolescent Depression and Juvenile Delinquency</u>.  (1997).

<u>Psychiatry and Medicine Small Group Leader.</u> (1996-1997).

8

**PUBLICATIONS**

Glindmeyer, D.A. & Cruise, K.R.  (2003).  Callous and Unemotional Traits in a Juvenile Offender, A clinical case study.  Published in the Journal of Forensic Psychology Practice, 3, 73-78.

**REFERENCES**

Available upon request.

# Daphne Glindmeyer, M.D.

Post Office Box 4240 Covington, Louisiana 70434

Phone: (504) 392-8348                                    Phone: (985) 888-1414
Facsimile: (504) 398-4334                              Facsimile: (985) 888-1415

Fee Schedule

My fee for expert consultation is $550.00 per hour. This includes travel time (portal to portal), record review, interviews, research, report writing, consultation with attorneys, site visits, and any other activity necessary to complete the consultation.

Testimony or depositions are charged at the same rate ($550.00 per hour); however, a four hour minimum is applied. Any testimony or deposition exceeding four hours is charged at a daily rate of $4400.00. A four-business day notice is required for cancellation of appointments, testimony, or court appearances. If the required notice is not provided, the scheduled time will be billed.

Any travel expenses (airfare, hotel, taxi, car rental, food, etc.) are to be reimbursed fully with receipts provided. Incidental expenses (copies, mailing charges) are to be reimbursed fully with receipts provided.

Retainer fees will be discussed with the referring party and determined based on the consultation requested. The client will be billed only for the hours worked, and any unused portion of the retainer will be returned. Any remaining balance must be satisfied prior to the delivery of the final report. Testimony and deposition fees must be satisfied prior to appearance.

A minimum of 60 days is required to complete evaluations/reports. In some cases, this time period may be longer; however, that will be discussed with the referring client. If the services requested must be completed within 60 days, a rush fee will be required. This fee will be discussed with the referring client.