THE HONORABLE KYMBERLY K. EVANSON

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAVIER TAPIA,

      Plaintiff,

 v.

NAPHCARE, INC., et al.,

      Defendants.

NO.  2:22-cv-01141-KKE

PLAINTIFF'S RESPONSE IN
OPPOSITION TO NAPHCARE, INC.'S
POST-TRIAL MOTIONS

## I.  INTRODUCTION

The Court should deny NaphCare's post-trial motions because its arguments are legally wrong, contrary to the evidence, and procedurally restrained.

## II.  APPLICABLE STANDARDS

### A.  RULE 50

Judgment as a matter of law is appropriate where "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002). This is the same standard as the summary judgment standard under Rule 56. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). A jury's verdict must be upheld if it is supported by "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the

PLAINTIFF'S RESPONSE IN OPPOSITION TO
NAPHCARE, INC.'S POST-TRIAL MOTIONS - 1
Case No. 2:22-cv-01141-KKE

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

same evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (citation omitted).

"Rule 50(b) sets a high bar to obtain relief. Indeed, Rule 50(b) motions are cautiously and sparingly granted." *Young v. Corr. Healthcare Companies*, No. 13-315, 2024 WL 81547, at *1 (N.D. Okla. Jan. 8, 2024) (citation omitted).

**B.     RULE 59**

A grant of a new trial under Rule 59 "requires an error that is direct, obvious, and observable," and "is not meant to allow a disappointed litigant to attempt to persuade the court to change its mind." *Sec. & Exch. Comm'n v. Beck*, No. 22-0812, 2024 WL 2110034, at *2 (C.D. Cal. Apr. 1, 2024) (quotation omitted). A Rule 59 motion "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003).

### III.     LAW AND ARGUMENT

**A.     NAPHCARE'S RULE 50 MOTION SHOULD BE DENIED.**

**1.     Evidence of NaphCare's Unconstitutional Practices Was Overwhelming.**

**a.     Failure to Communicate**

On September 18, 2018, Pierce County Mental Health Professional ("MHP") Darren Nealis made an entry into NaphCare's medical chart indicating that Javier Tapia ("Tapia") was "confused," "unable to verbally respond," and appeared "decompensated." Dkt. 175-2, at 16–17; *see, e.g.*, Dkt. 297, at 170–72; Dkt. 301, at 17–18. The next day, MHP Nealis charted the same, this time adding that even correctional officers were reporting that Tapia was "way off his baseline" and that "he was nonverbal in court today as well." Dkt. 175-2, at 16; Dkt. 297, at 172–73; Dkt. 303, at 86. MHP Nealis' chart entry also noted his conclusion that Tapia "could have an unknown medical condition" and that he "[r]eferred" Tapia to NaphCare "for assessment." Dkt.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

175-2, at 16. In response to this referral, Registered Nurse ("RN") Darilyn Inglemon asked Licensed Practical Nurse ("LPN") Cameron Carrillo "to go see [Tapia], due to him being nonresponsive." Dkt. 301, at 108. LPN Carrillo received no instructions as to what data to collect or what he was supposed to assess—he was "relying on [his] own judgment." Dkt. 301, at 112. And because *LPN Carrillo did not review the chart entries*, he did not know that, in addition to being nonverbal, Tapia was referred to NaphCare because he "was confused, decompensated, and way off his baseline." Dkt. 301, at 109. So he did not assess those things—he got some sort of verbal response, and that was good enough for him.[1] Dkt. 301, at 105. It was also good enough for NaphCare's charge nurse—RN Inglemon—who relied on LPN Carillo's judgment. Dkt. 303, at 27–28.

The next day, MHP Duane Prather made another entry in Tapia's NaphCare medical chart, indicating that he was completely nonresponsive and "just stared" when asked questions. Dkt. 175-2, at 16; Dkt. 301, at 25. Six days later, MHP Nealis made another entry in NaphCare's medical chart, again documenting that Tapia remained "confused and non-verbal" and "appear[ed] to be decompensated." Dkt. 175-2, at 16; Dkt. 297, at 186. Two days later, another Pierce County MHP documented the same. Dkt. 175-2, at 16; Dkt. 297, at 187.

But nobody from NaphCare received these communications. Tapia's chart was not even opened by a NaphCare employee. Dkt. 299, at 70. As Dr. Daphne Glindmeyer testified:

Q. Is there any record during that nine-day period of NaphCare taking any action relating to Mr. Tapia?

A. There's nothing documented, no.

Q. Any record of a call, e-mail, or inquiry by NaphCare?

A. No. There's nothing documented.

Q. During that nine-day period, is there any record that anyone from NaphCare spoke with county mental health staff about Mr. Tapia?

---

[1] To LPN Carrillo's credit, he did commit to "continue to monitor" Tapia. Dkt. 175-2, at 16.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

A. That's not documented anywhere.

Q. Is there any record that anyone from NaphCare sought to speak with county mental health staff about Mr. Tapia?

A. Again, that's not documented anywhere.

Q. During that nine-day period, is there any record that anyone from NaphCare spoke with corrections officers about Mr. Tapia?

A. That's not documented anywhere.

Q. Is there any record that NaphCare did anything at all relating to Mr. Tapia during that nine-day period of time?

A. No.

Dkt. 297, at 188–89.

On September 29—ten days after he was referred to NaphCare for a medical assessment that never happened, and ten days after NaphCare committed to medically monitor him—Tapia was referred to NaphCare by a *corrections officer* due to a concern that he had stopped eating. Dkt. 214, at 110:24–111:3; Dkt. 299, at 78–79. The responding nurse (RN Elizabeth Warren) noted that Tapia was nonverbal when she saw him, but she did not medically assess him or know that he had been presenting with an altered mental status for the previous ten days because *she did not review the chart entries or talk to* Jail staff about his condition. Dkt. 299, at 78–84; Dkt. 214, at 45:13–25. RN Warren testified that her actions "comport[ed] with NaphCare's policies and established practices." Dkt. 214, at 99:17–20.

Echoing RN Warren's conclusion, Dr. Elliott Wade, NaphCare's Medical Director, subsequently emailed RN Warren and LPN Carrillo to let them "know that they did everything right." Dkt. 299, at 166, 172. In addition, RN Bridget Stixrood—a NaphCare employee who was "familiar with the regular and established customs and practices of NaphCare"—testified that the communication between Pierce County MHPs and NaphCare nursing staff was "fragmented" during Tapia's detention. Dkt. 298, at 186, 194. What is more, after Tapia's amputation, there was

no internal investigation "at any level" to identify mistakes that may have been made regarding his care. Dkt. 301, at 54–55.

NaphCare nursing staff are responsible for receiving communications entered into a patient's chart. Dkt. 299, at 50, 136, 139–40. According to LPN Carrillo, "[t]he medical record is the main communication, in medicine." Dkt. 301, at 144; *see also* Dkt. 302, at 22 (same). But, as Dr. Denise Panosky testified, that communication "*repeatedly*" did not happen:

> [Tapia] needed an assessment. . . . Somebody needed to help him to figure out what was going on. [H]e's nonresponsive, confused, decompensating, way off their baseline. People were realizing that. **People were documenting that. The mental health people were documenting it**. The corrections officers were documenting it. **It was in his chart. The nurses could have read his chart**. . . . Days and days and days are going by, and no care is given. . . . Somebody should have seen him, to evaluate him, to see what was causing this. . . . **[MHPs] continue writing that he's not responding, they continue writing that he's decompensating, that he's below his baseline, that he's not responding.** He needed something. They knew something was going on. . . . Medical -- the nurses weren't there for him. They didn't check on him. . . . **There really was no communication between nursing staff [and] mental health staff . . . [,] something that happened repeatedly** . . . . They're documenting what they're doing. But **nobody from NaphCare has seen these communications or viewed the chart** . . . .

Dkt. 299, at 71–73, 99–100, 140 (emphasis added). Dr. Johnny Bates similarly testified that "over a consistent, sustained period of time . . . [t]here was little to no communication between the mental health professionals and NaphCare." Dkt. 299, at 169.

NaphCare's anemic arguments to the contrary are misguided. First, NaphCare's contention that there is an "absence here of any evidence of a pattern" is belied by the record. Dkt. 327, at 20 (quotation omitted). Indeed, Tapia presented *more* evidence of the existence of this custom at trial than he did at summary judgment. *Cf.* Dkt. 186, at 22–24. There can thus be no question that Tapia presented the "substantial evidence" adequate to support the jury's conclusions. *Young*, 2024 WL 81547, at *2. Second, NaphCare's apparent assertion that its "final policymakers" must have knowledge about communication breakdowns "prior to or during" Tapia's detention is not the law. Dkt. 327, at 20. "An entity's policy or custom need not be formally approved or written down. . . .

[R]outine practices can amount to a custom or policy." *Hill v. NaphCare, Inc.*, No. 23-2741, 2025 WL 1098549, at *2 (9th Cir. Apr. 14, 2025) (quotation omitted); *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016).

Finally, Tapia did not need to evidence "similar incident[s]" involving other patients for the jury to find that a custom existed. Dkt. 327, at 19. "There is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual[.]" *Oyenik v. Corizon Health*, 696 F. App'x 792, 794 (9th Cir. 2017). Just seven months ago, the Ninth Circuit held that a custom could be inferred from the fact that jail staff performed multiple constitutionally inadequate checks on a single jail inmate during the hours leading to his death, without the need to show that other specific people were subjected to or harmed by the practice. *Nyarecha v. Cnty. of Los Angeles*, No. 23-55773, 2024 WL 4511616 (9th Cir. 2024). Indeed, courts in the Ninth Circuit frequently find that "multiple failures" of a similar type toward a single patient suffice to evidence an actionable custom. *Bossardet v. Centurion Healthcare*, No. 21-0179, 2024 WL 4534618, at *35 (D. Ariz. Mar. 27, 2024); *see also* Dkt. 186, at 13 (citing cases); *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997); *Al & Sons Towing v. City of Pomona*, No. 21-8806, 2024 WL 607350, at *5 (C.D. Cal. Jan. 3, 2024); *Trejo v. Cnty. of Imperial*, No. 20-1465, 2023 WL 4194442, at *6 (S.D. Cal. June 26, 2023); *Branum v. City of Phoenix*, No. 21-0357, 2022 WL 20741828, at *5 (D. Ariz. July 1, 2022). NaphCare's reliance on *Tsao v. Desert Palace*, 698 F.3d 1128, 1145 (9th Cir. 2012) is misplaced. *See* Dkt. 327, at 19–20. *Tsao* involved a single incident of an alleged false arrest at a casino—it was not, as here, a prolonged detention in which many days of repeated behavior.

Additionally, NaphCare's decision not to discipline any of its employees, change its policies, solicit feedback from its staff, or take any other remedial steps following Tapia's loss of

PLAINTIFF'S RESPONSE IN OPPOSITION TO
NAPHCARE, INC.'S POST-TRIAL MOTIONS - 6
Case No. 2:22-cv-01141-KKE

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   limb are "also relevant evidence of a policy." *Hill*, 2025 WL 1098549, at *3 (citing *Henry*, 132

2   F.3d at 519).

3                    **b.      Using LPNs Outside the Scope of Their Licensure**

4           RN Stixrood testified that the practice "of directing LPNs to independently evaluate and

5   make medical decisions about patients and sending LPNs to answer medical calls that required

6   medical evaluations and diagnoses . . . continue[d] throughout [her] three years of employment at

7   NaphCare" and was NaphCare's "usual custom." Dkt. 298, at 192. This was confirmed by, for

8   example, LPN Deborah Ricci "work[ing] outside of her practice by not reporting" an alleged

9   "refusal of care" by Tapia "to her supervising physician or nurse." Dkt. 299, at 90. It was also

10  confirmed by RN Inglemon's testimony that she "[a]bsolutely . . . relied on LPN Carrillo's

11  assessment . . . of Mr. Tapia's condition." Dkt. 303, at 28. It was also confirmed by LPN Carrillo

12  "relying on [his] own judgment." Dkt. 301, at 112. And it was confirmed by the fact that NaphCare

13  sent LPN Carrillo to assess an "unknown medical condition" for a patient experiencing a sudden

14  altered mental status without being given any specific instruction. Dkt. 175-2, at 16; Dkt. 299, at

15  175; Dkt. 301, at 104–09.

16          RN Stixrood also testified that it was "a regular practice for LPNs to serve as gatekeepers,

17  by deciding which patients were and were not sick enough to see a doctor." Dkt. 298, at 193–94.

18  This was confirmed by, for example, RN Warren, who testified that sending an LPN to evaluate a

19  patient referred to NaphCare for a medical assessment was "customary": "The LPNs do it -- they

20  do evaluate." Dkt. 214, at 31:17–25.

21          But LPNs are not allowed to "perform the type of assessment . . . that was needed for Mr.

22  Tapia." Dkt. 299, at 57; *see also id.* at 162 (LPNs are not "licensed, authorized, or capable of doing

23  anything close to the kind of actual medical assessment that Mr. Tapia needed"); Declaration of

24  Ryan Dreveskracht in Support of Plaintiff's Response in Opposition to NaphCare's Post-Trial

25

Motions ("Dreveskracht Decl."), Exhibit A, at 4–5 ("The LPN may not analyze, synthesize, or evaluate the data or develop the nursing care plan."). For almost two weeks though, NaphCare "rel[ied] on LPNs" who "definitely were working outside their scope of practice." Dkt. 299, at 99. This was "something that happened repeatedly." Dkt. 299, at 100. It was, according to Dr. Bates—who "paid particular attention to duration and frequency and the consistency with which [NaphCare's] customs and practices showed up in the record"—"*a well established practice*" for NaphCare. Dkt. 199, at 156, 163 (emphasis added).

Here, again, Tapia presented *more* evidence of the existence of this custom at trial than he did at summary judgment. *Cf.* Dkt. 186, at 10–17. NaphCare responds to this evidence by denying that it exists. It submits that every "LPN who had any interaction with Mr. Tapia acted . . . within their licensure." Dkt. 327, at 20. In essence, NaphCare doubles down on its trial strategy to discredit Tapia's experts. At trial, the parties submitted competing evidence for the various LPN interactions (or lack thereof) with Tapia,[2] with competing experts. That NaphCare disagrees with the jury's view of the evidence "does not mean the jury's conclusion was not based on *any* evidence whatsoever." *EnerTrode v. Gen. Capacitor*, No. 16-2458, 2019 WL 1715170, at *4 (N.D. Cal. Apr. 17, 2019) (emphasis in original). The jury "had the right to rely upon" Tapia's experts and "reject any testimony proffered by" NaphCare's experts. *Finjan v. Juniper Networks*, No. 17-5659, 2019 WL 1116243, at *2 (N.D. Cal. Mar. 11, 2019) (quotation omitted).

In many ways, this case was a battle of the experts. Multiple opinions and theories were put forth during trial. Open questions existed. And those competing opinions and open questions required resolution by the finder of fact. Ultimately, the jury weighed the evidence and found in

---

[2] As discussed in more detail below, LPN Carrillo's credibility was compromised. Because he did not document reporting to or receiving instruction from RN Inglemon, to provide just one example, the jury may not have credited his account.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

favor of Tapia. The outcome was based upon substantial evidence, including on the existence of a custom of using LPNs outside the scope of their licensure.

### c.      Relying on Corrections Staff to Monitor Patients

As LPN Carrillo recognized, it was important that Tapia continue to be medically monitored. Dkt. 297, at 182; *see also* Dkt. 299, at 61 ("*[N]ursing* needs to continue to monitor the patient.") (emphasis added); *id.* at 64 ("When a 'will continue to monitor' is written by a nursing perspective, then nursing needs to continue to monitor."). But from September 20th to September 28th, Tapia received no medical monitoring by NaphCare. His chart was not even opened by a NaphCare employee. Dkt. 299, at 70. This lack of medical monitoring repeated on September 30 and October 1 until a *corrections officer* alerted NaphCare that Mr. Tapia's foot was black. Dkt. 299, at 84–90.[3]

Because NaphCare was not monitoring Tapia, it was left "up to the COs, the corrections officers, to monitor him and look at him." Dkt. 299, at 75; *see also id.* at 102. This was confirmed by the fact that, for example, it was a corrections officer, not a NaphCare employee, that perceived that Tapia was not eating. Dkt. 175-2, at 15. And it was a corrections officer, not a NaphCare employee, that detected that Tapia's toes were "turning black." *Id.*

Here, again, Tapia presented *more* evidence of the existence of this custom at trial than he did at summary judgment. *Cf.* Dkt. 186, at 19–20. And once again, NaphCare responds to this evidence by denying it exists. It argues that Tapia "introduced zero evidence" of relying on guards to monitor patients Dkt. 327, at 21. But this is clearly contradicted by the evidence presented at trial, where the jury heard that despite LPN Carillo's commitment that NaphCare nurses would

---

[3] While there was some suggestion that NaphCare conducted "daily rounds," *see, e.g.*, Dkt. 303, at 17–18, "daily rounds" are not anywhere close to the kind of monitoring Tapia needed, there was no documentation of these rounds (in violation of official NaphCare policy, Dkt. 299, at 45, 77–78; Dkt. 302, at 60–61), and NaphCare did not call a single witness who testified that these suggested "daily rounds" were done for Tapia. Dkt. 298, at 38–39.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

"continue to monitor" Tapia, he was not medically monitored; instead, he was monitored by corrections officers. This was not a sporadic incident or momentary oversight by a single employee. It was consistent and sustained for a period of nearly two weeks.

### 2. NaphCare Cannot Avoid *Monell* Liability Based on Insufficient Evidence of Deliberate Indifference.

#### a. One or More NaphCare Employees Made an Intentional Decision That Obviously Delayed or Denied Adequate Medical Care.

NaphCare argues "no NaphCare nurse made any deliberate decision that obviously put Tapia at substantial risk of serious harm." Dkt. 327, at 17. Not so. Dr. Panosky testified that NaphCare nurses "had every day to help him, and they didn't. They chose not to. They deliberately didn't go see him." Dkt. 299, at 103. She also testified that between September 19 and 29, while County MHPs had been reporting in NaphCare's medical chart that Mr. Tapia's condition was deteriorating, NaphCare nurses did not even open the chart to monitor or review those notes. Dkt. 299, at 137–39; *see also id.* at 140.[4] Likewise, Dr. Bates testified:

> Mr. Tapia's sudden altered mental status is well documented. . . . NaphCare's top brass endorsement of the care provided to Mr. Tapia exhibits an institutional **reckless disregard to the substantial risk of harm to similarly situated inmates**. NaphCare's inability to assess the failure to comply with the standard of care leads one to believe that this could easily result in future patient harm.

> In sum, Mr. Tapia suffered from a serious medical condition that would have been **apparent to the most casual observer**, but despite being seen by multiple providers, he was not given the thorough mental health and physical examination standard of care required. Even after losing his limb, the providers involved fail to recognize their substandard care. This lack of reflective hindsight is probably one of the most troubling aspects of this case.

Dkt. 299, at 176 (emphasis added).

The jury also heard about nursing staff failing to conduct vital sign monitoring on September 30 and October 1. Dkt. 301, at 35–40. They heard about LPN Ricci, who failed to

---

[4] As discussed elsewhere, LPN Carillo and RN Warren both testified that they did not review Mr. Tapia's medical chart even when he was referred to them for medical assessment. Dkt. 301, at 109; Dkt. 214, at 44–45.

PLAINTIFF'S RESPONSE IN OPPOSITION TO
NAPHCARE, INC.'S POST-TRIAL MOTIONS - 10
Case No. 2:22-cv-01141-KKE

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    conduct vital sign monitoring on the morning of October 1, the day Tapia was sent to the hospital

2    with gangrene, and who failed to follow NaphCare policy. Dkt. 299, at 85–93.

3        All of NaphCare's nursing staff had an obligation to attend to Tapia's "serious medical

4    condition that would have been apparent to the most casual observer," which required thorough

5    "physical examination," but they deliberately chose not to provide that care. Dkt. 299, at 176. This

6    included RN Inglemon, who deliberately sent LPN Carrillo—who cannot diagnose—to use his

7    independent judgment to assess Tapia's serious medical condition. Dkt. 301, at 19–20. It included

8    LPN Carrillo and RN Inglemon, who knew that Tapia needed continued medical monitoring, but

9    did no medical monitoring whatsoever and took no steps to ensure that medical monitoring

10   occurred.[5] It includes the nurses assigned to Tapia's unit between September 19 and 29 who chose

11   not to even open Tapia's chart. It includes the nurses, like LPN Ricci, who failed to conduct vital

12   sign monitoring in the days immediately prior to Tapia's hospitalization. As a result, any medical

13   monitoring that occurred was left to untrained corrections officers by default. These NaphCare

14   employees each "made an intentional decision" regarding Mr. Tapia's care. *Gordon v. Cnty. of*

15   *Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). And while each NaphCare employee may not have

16   subjectively intended to cause injury to Mr. Tapia, the Ninth Circuit's deliberate indifference

17   standard does not require proof of subjective intent. *Id.*

18           **b.    *NaphCare Had Constructive Notice That Its Customs Were Substantially***
           ***Certain to Result in the Violation of Patients' Constitutional Rights.***

19

20       An entity's deliberate indifference, when relevant,[6] is always "an objective inquiry."

21   *Castro*, 833 F.3d at 1076. This is because "entities do not themselves have states of mind." *Id.*

22   Thus, corporations are on "constructive notice that [their] practices [are] substantially certain to

23

24   _____

[5] RN Inglemon also chose not to monitor Tapia herself or follow up on the extremely limited chart note LPN Carillo documented. Dkt. 303, at 27–28; *see also* Dkt. 301, at 120–22.

[6] Here, deliberate indifference was only relevant to Instruction 9, NaphCare's custom of failing to communicate. Dkt. 283, at 12. Nonetheless, Tapia provided substantial evidence on deliberate indifference as to all three customs.

25
    **Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    result in the violation of the constitutional rights of its citizens" if those practices violate industry

2    standards or internal standards intended to prevent a risk of serious harm. *Sandoval v. County of*

3    *San Diego*, 985 F.3d 657, 682 (9th Cir. 2021); *see, e.g., Hill*, 2025 WL 1098549, at *3; *Castro*,

4    833 F.3d at 1077; *United States v. Buntyn*, 104 F.4th 805, 811 (10th Cir. 2024); *Jackson v. Wilkins*,

5    517 F. App'x 311, 319 (6th Cir. 2013); *Nguyen v. City of San Jose*, No. 21-0092, 2024 WL

6    3908115, at *8 (N.D. Cal. Aug. 20, 2024); *see also Petties v. Carter*, 836 F.3d 722, 729 (7th Cir.

7    2016) ("While published requirements for health care do not create constitutional rights, such

8    protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a

9    substantial risk of serious harm.") (quoting *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005));

10   *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) ("Deliberate indifference may also

11   be shown through expert testimony that a practice condoned by the defendant municipality was

12   contrary to the practice of most police departments and was particularly dangerous because it

13   presented an unusually high risk that constitutional rights would be violated."); *Howell v. Evans*,

14   922 F.2d 712, 719 (11th Cir.), *reinstated sub nom. Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994)

15   ("[T]he contemporary standards and opinions of the medical profession also are highly relevant in

16   determining what constitutes deliberate indifference to medical care."). And, of course, where

17   delayed medical care is a "plainly obvious" consequence of a practice or custom, a jury may infer

18   constructive notice. *Pope v. McComas*, No. 07-1191, 2011 WL 1584213, at *15 (W.D. Wash. Mar.

19   10, 2011) (quoting *Bd. of Cnty. Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410–11

20   (1997)).[7]

---

[7] While NaphCare is correct that "evidence of a pattern" of harm caused by its customs is one way to prove "actual or constructive notice," it is not the only way. Dkt. 327, at 20 (quotation omitted); *cf. Castro*, 833 F.3d at 1074 n.7; *Sandoval*, 985 F.3d at 682.

PLAINTIFF'S RESPONSE IN OPPOSITION TO
NAPHCARE, INC.'S POST-TRIAL MOTIONS - 12
Case No. 2:22-cv-01141-KKE

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Here, Tapia's experts testified about applicable contemporary standards (and NaphCare's own written standards),[8] NaphCare's significant departure from those standards, and the plainly obvious consequences that would follow from: (1) using NaphCare LPNs to provide care outside the scope of their licensure; (2) relying on medically untrained correctional guards to provide medical monitoring for inmates; and (3) failing to adequately communicate with Pierce County MHPs. Dkt. 297, at 129–30, 166, 175–77; 180–82, 215–18; Dkt. 298, at 38–39; Dkt. 299, at 19–22, 27, 35, 44–45, 57–58, 69, 84, 98–103, 158, 168, 176. They testified these customs put similarly situated patients at an "**obvious** risk . . . of harm." Dkt. 299, at 102 (emphasis added); *id.* at 163; *id.* at 176. NaphCare's constructive knowledge of the risk is inferable from its departure from these norms. To say that NaphCare would be ignorant of the risks of these customs would defy common sense and NaphCare's expertise as "one of the biggest companies in the whole United States when it comes to the correctional healthcare industry." Dkt. 301, at 45.

Moreover, "a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference" based on a lack of policy change, discipline, or admission of error following a significant event. *Henry*, 132 F.3d at 519. The jury heard testimony that NaphCare's supervisors conducted no "internal investigation, at any level" after Tapia lost his limb and they saw evidence that NaphCare's corporate Medical Director told staff after learning of Tapia's lawsuit that NaphCare "did everything right." Dkt. 301, at 55–57. NaphCare's abject failure to change its practices after Tapia's loss of limb, despite its knowledge of what happened, bears directly on that indifference. *See* Dkt. 301, at 57 (NaphCare's post-event conduct sent "a clear and unmistakable message from NaphCare corporate that for the next patient, they should not do anything different"). Additionally, NaphCare's "failure even after being sued" to correct or

---

[8] *See, e.g.*, Dkt. 303, at 54 (NaphCare had "policies in place that required nurses to practice within their scope"); Dkt. 300, at 122–23 (NaphCare nurses are required by policy to communicate with mental health); Dkt. 327, at 19 ("It is undisputed that NaphCare's official policy requires effective communication between NaphCare and Pierce County.").

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

modify its customs is also "persuasive evidence of deliberate indifference." *Henry*, 132 F.3d at 520; *see also Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 171 (5th Cir. 1985) (same).

And the jury thought so too. By awarding punitive damages, it necessarily found that NaphCare acted with "a complete indifference to [Tapia's] safety or rights." Dkt. 283, at 29; *see also Hill*, 2025 WL 1098549, at *4.

### 3. NaphCare's Practices Were the Moving Force Behind Tapia's Pain, Suffering, And Limb Loss.

"Causation is generally a question for the jury." *Chaney v. Auto Trackers & Recovery N.*, No. 19-272, 2021 WL 2383714, at *7 (E.D. Wash. June 10, 2021).

NaphCare argues that because Tapia "expressly told LPN Carrillo on September 19 that he had no medical concerns," this "breaks the causal chain." Dkt. No. 327, at 15. It does not. First, it was for the jury to decide whether Tapia's altered mental state at that time made him capable of telling anyone about his medical concerns (he was not).[9] Tapia was referred to NaphCare on September 19 by a well-credentialed MHP because he decided, based on his clinical judgment, that Tapia required a medical assessment. Dkt. 297, at 173; Dkt. 301, at 18. According to NaphCare's own expert, the MHP's clinical judgment was something that "nee[ed] to be taken seriously." Dkt. 303, at 86. And it was NaphCare's job "do the medical assessment that Mr. Tapia need[ed]." Dkt. 301, at 19. Regardless of what Tapia allegedly told LPN Carrillo—while he was confused and his brain was "taking a bath in kidney wastes"—he never received the requested (and necessary) medical assessment. Dkt. 297, at 215; Dkt. 299, at 54–62; *see also* Dkt. 299, at 158 ("This gentleman needed a complete physical workup . . . ."). Second, the jury simply may not have believed that Tapia verbally told LPN Carrillo he had no medical concerns or that LPN

---

[9] Similarly, NaphCare argues that Tapia could have pushed an emergency button at any time if he needed care, but because he did not, the causal chain is broken. Dkt. 327, at 8–9. This argument fails for the same reason. It was for the jury to determine whether Tapia had this capability—clearly, they agreed with Tapia that he did not.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Carillo's note was accurate. Every other person interacting with Tapia during this timeframe charted that he was nonverbal or nonresponsive. Dkt. 175-2, at 15–17; *see also* Dkt. 299, at 75; Dkt. 301, at 26–27. Tapia was even nonverbal on October 1, when "his toes were all black." Dkt. 299, at 135; *see also* Dkt. 175-2, at 15. In addition, LPN Carrillo was impeached at trial, explaining that he "must have misspoke" in sworn deposition testimony. Dkt. 301, at 105–07. LPN Carrillo's credibility was compromised.

NaphCare also argues that because RN Warren "was unable to detect any sign of DVT or PCD on September 29, the jury could not reasonably find that an RN (as opposed to an LPN) would likely have detected it before that date." Dkt. No. 327, at 15. NaphCare misses the point.[10] RN Warren did not "do any kind of physical examination." Dkt. 299, at 82; *see also id.*, at 83–84. Dr. Garcia—who personally treated Tapia—testified that his blood clotting condition had been going on for "weeks . . . [p]robably over two weeks at least, two to three weeks." Dkt. No. 297, at 20, 87, 92. This timeframe aligns with the timeframe in which Tapia was exhibiting "an acute mental status change." Dkt. 297, at 190. And Dr. Jimenez, a renowned vascular expert, testified that if Tapia had received a complete physical examination in the two weeks leading up to October 1, his clotting condition would have been detected. Dkt. 298, at 88–92.

Acute mental status change is "a medical emergency" that requires a "medical assessment by a person qualified" to conduct a full "medical examination." Dkt. 297, at 174–75, 177, 190. LPNs are "not qualified to do this." Dkt. 299, at 175; *see also* Dkt. 298, at 189–90. But because of RN Warren's failure to communicate with correctional officers and MHPs, RN Warren had no clue that Tapia had been presenting with an acute mental status change for the previous ten days and therefore did not appropriately examine him or immediately refer him to a physician to conduct

---

[10] NaphCare also misrepresents that Tapia needed to prove that its customs caused Tapia's blood clotting. Dkt. 327, at 15–16. The correct analysis is whether its customs "caused . . . the delay or denial of adequate medical care." Dkt. 283, at 7.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

the requisite examination. Dkt. 299, at 81; Dkt. 214, at 44:6–45:23. In other words, nobody from NaphCare did a full medical assessment and nobody from NaphCare tried to find someone qualified to do a full medical assessment. Dkt. 297, at 180–81. Had a complete assessment been performed, it would have revealed the "swelling" and "skin changes" that were present on his foot and lower leg, and Tapia's limb would have been salvaged. Dkt. 297, at 103; *see also* Dkt. 298, at 63–68, 88–92, 101–102; Dkt. 299, at 199; Dkt. 298, at 101.

In sum, the jury heard evidence that NaphCare did not provide Tapia a complete medical assessment because, as discussed above, NaphCare maintained unofficial customs that—either exclusively or when viewed in combination—prevented such an assessment from ever taking place, thereby putting him at an "obvious risk . . . of harm." Dkt. 299, at 102; *see also* Dkt. 299, at 163 (risk of harm posed by NaphCare "would have been obvious to any medical professional exercising his or her professional judgment"); Dkt. 299, at 173 ("NaphCare maintained policies and customs that caused Mr. Tapia's leg amputation[.]").

### 4. Tapia Presented Substantial Evidence on Punitive Damages.

"A jury award of punitive damages, if supportable, should not be lightly disturbed." *Bjornson v. Dave Smith Motors*, 578 F. Supp. 2d 1269, 1281 (D. Idaho 2008). Here, NaphCare submits that an award of punitive damages is unsupported because Tapia "failed to establish any evidence at trial about what any NaphCare official with final policymaking authority knew or thought about any events in this case." Dkt. 327, at 21–22.

But what NaphCare officials knew or thought about the care provided to Tapia is not an essential element of punitive damages. Dkt. 283, at 29. Indeed, NaphCare has represented that NaphCare officials have no "first-hand knowledge of the relevant issues in this case" at all. Dkt. 202, at 20 (citing Dkt. 87, at 2); *see also* Dkt. 218, at 3. Under NaphCare's theory, then, NaphCare could never be subject to punitive damages as long as it kept its "final policymak[ers]" in the dark

PLAINTIFF'S RESPONSE IN OPPOSITION TO
NAPHCARE, INC.'S POST-TRIAL MOTIONS - 16
Case No. 2:22-cv-01141-KKE

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

about the effects of their unconstitutional policies. Dkt. 327, at 22. If anything, NaphCare's argument here provides only more evidence of its willingness to go to extraordinary lengths to avoid accountability.[11]

**B.    NAPHCARE'S RULE 59 MOTION SHOULD BE DENIED.**

**1.    NaphCare's "Deliberate Indifference" Argument Should Be Stricken.**

NaphCare urges the Court to revisit its ruling that "two of Plaintiff's alleged customs did not require a showing of deliberate indifference." Dkt. No. 327, at 23. As NaphCare recognizes, it already made this argument, and the Court already ruled on it.[12] *See, e.g.*, Dkt. 267, at 11 (citing Dkt. 186, at 24 n.8). This attempt to "'relitigate old matters'" is not allowed under Rule 59. *McCarthy v. Amazon.com*, No. 23-0263, 2023 WL 5509258, at *3 (W.D. Wash. Aug. 25, 2023) (quoting *Guenther v. Lockheed Martin*, 972 F.3d 1043, 1058 (9th Cir. 2020)). Because this argument was "litigated in the parties' motions for summary judgment," it cannot be raised again post-trial in a Rule 59 motion. *Wang v. City of Pleasanton*, No. 09-5838, 2010 WL 11537583, at *1 (N.D. Cal. Apr. 28, 2010), *aff'd*, 434 F. App'x 666 (9th Cir. 2011).

**2.    NaphCare's New Evidence Should Be Stricken.**

The Court should ignore the new evidence submitted with NaphCare's post-trial motions. In support of its punitive damages argument, NaphCare submitted a new declaration from its Chief Financial Officer, Connie Young, to complain that the punitive verdict is an undue financial burden, writing at length about the financial impact on the company. Dkt. 328. But NaphCare put none of this evidence before the jury. The rule is clear: "The duty then is on the defendant to present evidence. . . of [its] limited resources if [it] wishes that factor to be weighed in the

---

[11] NaphCare's other argument—i.e., that NaphCare presented evidence it provided extra nursing hours—is beside the point. Dkt. 327, at 22. Tapia did not maintain that the Jail was understaffed.
[12] To the extent the Court revisits the issue, Plaintiff incorporates its briefing on that issue by reference. Dkt. 103, at 4–5, 18–20. At any rate, "the jury's imposition of punitive damages in this case necessarily relied on a finding of deliberate indifference, so neither NaphCare's substantial rights nor the proceedings were affected by the omission of a specific deliberate-indifference instruction." *Hill*, 2025 WL 1098549, at *4.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    calculation of punitive damages." *Tourgeman v. Nelson & Kennard*, 900 F.3d 1105, 1110 (9th Cir.

2    2018) (quotation omitted). In *Thomas v. Cannon*, for example, the court likewise held:

3    "Defendants cannot argue their inability to pay [punitive damages] at this stage when no evidence

4    on the matter was introduced during trial. The Court will not second guess the jury by considering

5    evidence that the jury did not have before it." 289 F. Supp. 3d 1182, 1211 (W.D. Wash. 2018).

6        Nor would it be fair to permit new post-trial evidence that has not been subject to any cross-

7    examination. While Ms. Young represents that NaphCare was paid a specific amount from Pierce

8    County from 2017 to 2013, she also notes that amount is exclusive of "the cost of

9    pharmaceuticals." Dkt. 328, ¶3. But "the cost of pharmaceuticals" also goes to NaphCare

10   Pharmacy. Dkt. 168. The number given by Ms. Young also represents its "gross revenue across

11   the entire company," but that number is exclusive of monies funneled to an insurance broker and

12   Cayman Island-incorporated insurance company, both of which are under common control with

13   NaphCare. Dkt. 328, ¶5; Dkt. 168. It is understandable that NaphCare did not want to air its

14   revenue stream—out of and into the corporation—to the jury. But not doing so was a choice; and

15   that choice had consequences. The Court should disregard Ms. Young's declaration, the exhibits

16   attached thereto, and the arguments based on it.

17      **3.    Tapia Did Not Present Life Expectancy Evidence to the Jury.**

18       NaphCare argues they should get a new trial because it was "unfairly surprised" by the

19   introduction of life expectancy evidence in closing argument. Dkt. 327, at 26. NaphCare cites to

20   *Conway v. Chem. Leaman Tank Lines* for support. *Id.* (citing 687 F.2d 108, 111 (5th Cir. 1982)).

21   This argument is meritless.

22       *Conway* is inapposite. *Conway* supports the proposition that a party can be granted a new

23   trial when a party is unfairly surprised by **evidence** introduced at trial, and the surprise is

24   "inconsistent with substantial justice." 687 F.2d, at 111. In *Conway*, a previously unidentified

25

witness was called to testify about a never presented theory. But here, as NaphCare acknowledges, Tapia introduced no life expectancy **evidence** and did not call a life expectancy expert. *Id.* at 18. As the jury was expressly instructed on multiple occasions, arguments presented by attorneys in closing statements are **not evidence**. Dkt. 296, at 86, 88–89; Dkt. 304, at 24–25.

Furthermore, Tapia's closing statement merely presented a suggestion to the jury on how they *might* calculate compensatory damages based on what was obviously a hypothetical. Dkt. 304, at 55. The closing argument was clear that determining damages based on units of time was merely one possible manner of calculation for compensatory damages. *Id.* Counsel mentioned a 40-year life expectancy as a hypothetical; she did not say that Tapia's life expectancy was, in fact, 40 years.

In addition, there was no "unfair surprise" such that it was "inconsistent with substantial justice." *Conway*, 687 F.2d, at 111. NaphCare delivered its closing argument *after* Tapia. If NaphCare wanted to introduce its own suggestion about how to calculate damages based upon a different hypothetical life expectancy, or challenge Tapia's hypothetical, it had every opportunity to do so.

Finally, and dispositively, NaphCare did not object to counsel's suggestion during closing argument. "When defense counsel—an able and experienced lawyer—chose to remain silent, he waived his objections." *United States v. Sehnal*, 930 F.2d 1420, 1425 (9th Cir. 1991); *see also In re Crowder*, No. 7-96-10336, 2007 WL 1428582, at *3 (Bankr. D.N.M. May 11, 2007) (distinguishing *Conway* based on the fact that in that case the appellant "immediately voiced to the Court their objection to the testimony of the surprise witness").

### 4.     The Principle of Party Presentation is Not Implicated Here.

The principle of party presentation "states that in both civil and criminal cases . . . we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of

matters the parties present." *Whyte Monkee Prods. v. Netflix*, No. 23-3438-, 2025 WL 974940, at

*4 (N.D. Cal. Apr. 1, 2025) (quotation omitted). Here, as NaphCare acknowledges, the Court

allowed the mitigation instruction to proceed to trial. Dkt. 327, at 27. But at trial, NaphCare:

> presented no evidence—expert or otherwise—that might support a failure to
> mitigate instruction. NaphCare did not even suggest a proposed treatment that Mr.
> Tapia failed to procure; let alone one that, under the circumstances, was
> *unreasonable* for Mr. Tapia to refuse to undergo.

Dkt. 271, at 3 (emphasis in original). Tapia thus moved for judgment as a matter of law on

NaphCare's mitigation affirmative defense, which was granted. *Id.*; Dkt. 304, at 5. "Far from going

outside of its discretionary bounds," the Court did not *sua sponte* strike NaphCare's affirmative

defense. *Whyte Monkee Prods.*, 2025 WL 974940, at *4. It appropriately ruled on a motion that

was presented after the evidence was submitted to the jury.

### 5.    The Court Did Not Materially Alter Jury Instructions Mid-Deliberation.

At summary judgment, the Court properly characterized Tapia's non-communication

theory as "communication failures [that] led to delayed diagnosis and treatment." Dkt. 186, at 26.

In its briefing throughout the pendency of this case, even NaphCare consistently referred to a

"'practice' of communication failures between medical and mental health." Dkt. 141, at 8; *see*

*also, e.g.,* Dkt. 105, at 17 ("failures to communicate"); Dkt. 100, at 29 ("communication

breakdown"). Clearly, at no time prior to trial did the parties understand Tapia's theory to "mean

zero" communication between NaphCare and Pierce County *at all* during the period of his

incarceration. Dkt. 289, at 1. This was reflected in Instruction 9, which broadened the term "non-

communication" to a "failure to communicate with Pierce County [that] was substantially certain

to result in delay or denial of adequate medical care." Dkt. 283. At trial, too—in its opening

statement and its closing argument—NaphCare referred to a "miscommunication custom" and a

"breakdown in communication." Dkt. 296, at 157–58; Dkt. 304, at 70, 72, 95. It is thus not

surprising that the jury "need[ed] further clarification on the term . . . 'non-communication.'" Dkt.

289, at 1. In response, the Court clarified that the term "non-communication" meant what the parties tacitly agreed it meant before and during trial: "failure to communicate with Pierce County staff in a manner sufficient to ensure adequate medical care." *Id.* at 2.

The Court's clarification of the term "non-communication" was appropriate and *necessary*. "When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *United States v. Frega*, 179 F.3d 793, 809 (9th Cir. 1999). "In responding to the jury's inquiry in these circumstances 'it is not sufficient for the court to rely on more general statements in its prior charge.'" *United States v. Warren*, 984 F.2d 325, 330 (9th Cir. 1993) (quoting *United States v. Nunez*, 889 F.2d 1564, 1568 (6th Cir.1989)). "The judge has a duty to respond to the jury's request with sufficient specificity to clarify the jury's problem." *Davis v. Greer*, 675 F.2d 141, 145 (7th Cir. 1982). Here, the Court did just that.

**6.    The Damages Awarded by the Jury Were Not Unlawfully Excessive.**

*a.    The Jury's Compensatory Damages Were Not Grossly Excessive.*

"The jury's verdict must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork. In determining whether an award is grossly excessive, the foremost priority is the evidence presented at trial, though we may also consider awards in comparable cases." *Erhart v. BofI Fed. Bank*, No. 23-3065, 2025 WL 417000, at *2 (9th Cir. Feb. 6, 2025) (quotation omitted).

NaphCare argues that Tapia's leg amputation does not support the jury's $5 million compensatory verdict because "he stands [on a prosthetic] for eight hours per day at his current employment" and "his amputation does not prevent him from working." Dkt. 327, at 28. Such a glib and myopic view of the pain, suffering, and loss of enjoyment of life Tapia has sustained—and will continue to experience—is offensive. According to NaphCare's own experts, Tapia's condition was "agonizingly painful"; so painful that Dr. Starnes, NaphCare's vascular expert,

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

found it impossible to envisage that Mr. Tapia would have been anything but "bedridden." Dkt. 302, at 104; *see also id.*, at 115–116 (same). Every day, he has to "take [his] time" and use a handrail to get in and out of his second-floor apartment. Dkt. 300, at 20. His hobbies are "limited," and he relies on his sister for assistance trying to accomplish the pastimes that he is able to participate in. *Id.*, at 23. He is unable to work out due to the "residual shrinkage" of muscle on his limb. *Id.*, at 24–25. The little exercise he does get is limited to paved "flat terrain," which he is "constantly scanning" because if he's on "uneven terrain" he is prone to "hyperextend [his] knee backwards." *Id.* at 25–26. He frequently experiences "pressure sores, "bruising," and "tenderness" on his limb. *Id.* at 26–27. He has to be vigilant getting in and out of vehicles to avoid falling; at one point he had to seek hospital treatment after "free falling" out of a bus. *Id.*, at 27–29. The jury saw Tapia's prosthesis and witnessed the process that he has to go through multiple times a day to put it on and take it off. *Id.* at 38-41. He has not been in an intimate relationship since his amputation. *Id.* at 64. And he showed the jury the remainder of his limb and described the efforts he must undertake on a daily basis to care for himself.

The sole amputation case cited by NaphCare, *Sung-Ho Hwang v. Grace Rd. Church*, is an outlier that only considered "pain and suffering," not loss of enjoyment of life. No. 14-7187, 2018 WL 4921638 (E.D.N.Y. Aug. 10, 2018); *cf.* Dkt. 283, at 28. More representative amputation cases demonstrate that the jury's compensatory damages verdict was on the *lower* end of reasonable:[13]

- *Luppold v. Flores*, No. 1681CV01287 (Mass. Super.) – failure to treat DVT, resulting in loss of limb – $20,000,000 non-economic compensatory verdict.

- *Schneider v. Southern Connecticut Vascular Center*, Nos. CV-12-6031521 S, CV-12-603722 S (Conn. Super Ct.) – failure to treat DVT, resulting in loss of limb – $24,900,000 non-economic compensatory verdict.

- *Sfameni v. Rhode Island Hospital*, No PC-2013-01368 (R.I. Super.) – failure to treat DVT, resulting in gangrene and loss of limb – $61,606,575 non-economic compensatory verdict.

---

[13] Verdict summaries for these cases are attached. Dreveskracht Decl., Exhibits C–H.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

- *M.M. & N.S. v. Nicolopoulos*, No. 2CV10189 (Or. Cir. Ct.) – bacterial infection, resulting in loss of limb – $70,000,000 non-economic compensatory damages.

- *Parks v. Temple University Hospital*, No. 2019-06-005457 (Pa. Com. Pl.) – failure to recognize vascular injury, resulting in loss of limb – $20,000,000 non-economic compensatory damages.

- *Fern v. Bohmer*, No. 2023-L-001970 (Ill. Cir. Ct.) – failure to treat DVT, resulting in loss of limb – $ 31,600,000 non-economic compensatory damages.

> ### b.    The Jury's Punitive Damages Verdict is Not Grossly Excessive or Unconstitutional.

The Supreme Court has set three guideposts to help answer whether a punitive damages award comports with due process: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1996)).

**The conduct at issue was highly reprehensible.** "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 419. The Supreme Court has "instructed courts to determine the reprehensibility of a defendant by considering" five factors, the first of which asks if the harm was "physical" or merely economic. *Id.* Here, the harm was both physical and extreme. Tapia suffered a slow, excruciating, catastrophic loss of his limb. For nearly two weeks, Tapia was locked alone in a solitary cell and received little to no help from NaphCare while his foot and leg became "mummified." Dkt. 298, at 74. He was referred to NaphCare for a medical assessment, but was **never** assessed. Dkt. 175-2, at 16; Dkt. 301, at 17. He almost died. This is a far cry from the purely economic harm in *Gore* and the economic and emotional harm in *State Farm*.

As to the second reprehensibility factor—"whether the defendant's conduct demonstrated an indifference to or a reckless disregard of the health or safety of others"—the jury found that

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

NaphCare acted with "reckless disregard of [Tapia's] rights," i.e., with complete indifference to his "safety or rights" or in the "face of a perceived risk" that its actions would violate his federal rights. *State Farm*, 538 U.S. at 419; Dkt. 283, at 29. Whereas "reprehensibility should be discounted if defendants act promptly and comprehensively to ameliorate any harm they caused," a "clear failure to remedy or even address" that same conduct warrants opposite consideration. *Bains v. Arco Prods.*, 405 F.3d 764, 775 (9th Cir. 2005). Here, there was substantial evidence of NaphCare's failure to remediate. *See, e.g.,* Dkt. 299, at 176 ("[NaphCare's] lack of reflective hindsight is probably one of the most troubling aspects of this case.").

The third factor—the plaintiff's vulnerability—also supports the jury's verdict. *State Farm*, 538 U.S. at 419. Applied here, this factor necessarily focuses on physical or medical vulnerability. *Moutal v. Exel.*, No. 17-1444, 2021 WL 1187020, at *7 n.1 (D. Or. Mar. 29, 2021) (citing *In re Actos (Pioglitazone) Prods. Liab. Litig.*, No. 11-2299, 2014 WL 5461859, at *87 n.164 (W.D. La. Oct. 27, 2014)). Tapia was uniquely vulnerable. Once he entered the Jail, his access to medical care was entirely at NaphCare's mercy. This vulnerability was (and is) shared by every detainee at the Jail. *See Shea v. City of Spokane*, 562 P.2d 264, 267 (Wash. App. 1977), *aff'd*, 578 P.2d 42 (Wash. 1978) ("[W]hen one is arrested and imprisoned for the protection of the public, he is deprived of his liberty, as well as his ability to care for himself.").

The fourth factor—whether the wrongful conduct involved repeated actions—also weighs in Tapia's favor. *State Farm*, 538 U.S. at 419. For almost two weeks—hour after hour and day after day—NaphCare did *nothing* to diagnose what was causing Tapia's deteriorating condition. For 10 of those days, no one from NaphCare even opened his chart. And when confronted with this reality, NaphCare's treatment of Tapia was endorsed by its "top brass," exhibiting "an institutional reckless disregard to the substantial risk of harm to similarly situated inmates." Dkt. 299, at 176.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

The fifth factor—whether the harm was "the result of intentional malice, trickery, or deceit, or mere accident"—is to the same effect. *State Farm*, 538 U.S. at 419. While Tapia's amputation may not have been a result of malice, trickery, or deceit,[14] it was not a "mere accident." *Id.* It was a foreseeable and obvious consequence of using LPNs to do things that are not within their scope of practice, relying on medically untrained jail guards to monitor patients in need of medical monitoring, and failing to adequately communicate with Pierce County MHPs. NaphCare adhered to these customs despite the obvious risks, and Tapia introduced strong circumstantial evidence that NaphCare's customs were a financially motivated business decision to save costs at the expense of patient care. *See, e.g.,* Dkt. 298, at 191; *see also Exxon Shipping v. Baker*, 554 U.S. 471, 494 (2008) ("Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability . . . ."). This, too, indicates heightened reprehensibility.

Gliding over the *Gore/State Farm* analysis, NaphCare cites to *Hill*, where the Ninth Circuit held that "[w]here, as here, the amount of compensatory damages is significant, the ratio of punitive to compensatory damages should not exceed four to one unless the defendant's behavior was particularly egregious or reprehensible." 2025 WL 1098549, at *4. NaphCare ignores the first passage of this sentence—which approves **the exact verdict in this case**, four ($20 million) to one ($5 million)[15]—and argues that conduct here is not "sufficiently reprehensible because "[i]n this case, no one died." Dkt. 327, at 31. Putting aside the fact that **because the jury's punitive damages verdict was four to one, Tapia did not need to demonstrate that NaphCare's**

---

[14] Malice, trickery, and deceit are not elements of Tapia's claim so it is impossible to know what the jury determined with respect to state of mind. That said, the jury heard about NaphCare's policies and practices related to the lack of care he received from NaphCare employees who worked at the jail during the relevant time, determined their credibility (or lack thereof) and states of mind. Most important, the jury was appropriately instructed that intentionality was an element of Tapia's claim and they determined he received a delay or denial of health care that was not mere accident. Dkt. 283, at 9.

[15] In reality, the ratio will end up being closer to three to eight. Dkt. 310, at 2. In civil rights cases "the majority of courts across the country that have considered this issue have agreed that an award of attorneys' fees should be taken into account as part of the compensatory damages factor in the *Gore* analysis." *Blount v. Stroud*, 915 N.E.2d 925, 943 (Ill. App. Ct. 2009); *see also Willow Inn v. Public Serv. Mut.*, 399 F.3d 224, 237 (3rd Cir. 2005) (same).

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

conduct was "particularly egregious or reprehensible," *Hill*, 2025 WL 1098549, at *4—it is not for NaphCare to say that causing a young man to have to live the rest of his life without a limb is more or less reprehensible than the loss of life in another case. This is the exact type of existential question that is entrusted to juries, not judges. In addition, the jury was presented with evidence that NaphCare's improper treatment of patients was not limited to the Pierce County Jail, but spanned to "more than 430 local, state, and federal correctional facilities across 49 states." Dkt. 301, at 50.

**The four to one ratio is not constitutionally excessive.** Again, the Ninth Circuit explicitly held so last month. *Hill*, 2025 WL 1098549, at *4.

The Supreme Court has suggested that punitive damages at or above a 10-to-1 ratio are constitutionally suspect. *See State Farm*, 538 U.S. at 425. But the Supreme Court has never invalidated a single-digit ratio. And numerous courts in the post-*State Farm/Gore* era, including in the Ninth Circuit, have upheld ratios at or near 9:1. *See, e.g.*, *Planned Parenthood of Columbia v. Am. Coal. Of Life Activists*, 422 F.3d 949, 963 (9th Cir. 2005) (9:1); *Bains v. ARCO Prods.*, 405 F.3d 764, 777 (9th Cir. 2005) (6:1 to 9:1); *Zhang v. Am. Gem Seafoods*, 339 F.3d 1020, 1044 (9th Cir. 2003) (7:1); *Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008) (9:1); *Diaz v. Tesla*, 598 F. Supp. 3d 809, 845 (N.D. Cal. 2022) (9:1).

Other than distorting *Hill*, NaphCare's sole argument is that the jury's punitive damages verdict would "do far more than 'sting' NaphCare." Dkt. 327, at 32. It then goes on to describe that its ability to pay is extremely limited. *Id.* First, as discussed above, NaphCare had every opportunity to present this argument and evidence to the jury but chose not to. A "defendant's ability to pay" is "well suited to the jury's role of finding facts" and is not one of the "policy-related elements" that courts consider post-trial. *Atlas Food Sys. v. Crane Nat. Vendors*, 99 F.3d 587, 594 (4th Cir. 1996). Based on the evidence **before the jury**, NaphCare had a "top-line revenue

reaching nearly $1 billion." Dreveskracht Decl., Exhibit B; Dkt. 301, at 47. And "[u]nder well-settled law . . . factors such as [net worth] are typically considered in assessing punitive damages." *Txo Prod. v. Alliance Res.*, 509 U.S. 443, 462 n.28 (1993). "One primary purpose of punitive damages, after all, is deterrence." *Diaz*, 598 F. Supp. 3d at 845. If NaphCare wanted the jury to consider additional evidence about its financial condition, it should have presented it. But NaphCare made the strategic decision not to. The fact that it regrets that decision does not make the jury's verdict unconstitutional. Second, Tapia has reason to believe that the evidence NaphCare relies on is misleading, at best. In addition to the reasons discussed above, NaphCare has made conflicting representations to a sister court as recently as last month. *Hill v. NaphCare*, No. 20-410 (E.D. Wash. Apr. 22, 2025), Dkt. 379.

**Comparable civil penalties do not shed light on the *Gore* analysis.** The third guidepost looks to whether there are civil penalties or fines authorized for similar conduct. Here, the Civil Rights of Institutionalized Persons Act authorizes the Department of Justice to pursue equitable relief against correctional institutions that violate the civil rights of people in their custody, but it does not authorize monetary penalties. 42 U.S.C. § 1997, *et seq.* Therefore, "this guidepost cannot shed any light on the reasonableness and proportionality of the punitive damages." *Pioglitazone*, 2014 WL 5461859, at *33. NaphCare points to no comparable civil penalty to mitigate the award. Instead, it asks to look at gross awards in other cases. The Supreme Court discourages this:

> Such awards are the product of numerous, and sometimes intangible, factors; a jury imposing a punitive damages award must make a qualitative assessment based on a host of facts and circumstances unique to the particular case before it. Because no two cases are truly identical, meaningful comparisons of such awards are difficult to make

*Txo Prod.*, 509 U.S. at 458 (1993). At any rate, as discussed above, a number of juries have returned verdicts similar to or exceeding Tapia's.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   **The jury's verdict does not exceed common law limits.** NaphCare asserts that "[a]s a

2 matter of federal common law, the Supreme Court has imposed a 1:1 cap on the permissible ratio

3 of punitive to compensatory damages." Dkt. 327, at 33 (citing *Exxon*, 554 U.S. at 513-14).

4 NaphCare knows better. *Hill*, 2025 WL 1098549, at *4. The Supreme Court "has steadfastly

5 refused to create a bright-line ratio[,]" *Arizona v. Asarco*, 733 F.3d 882 (9th Cir. 2013), and has

6 "consistently rejected the notion that the constitutional line is marked by a simple mathematical

7 formula." *Flores v. City of Westminster*, 873 F.3d 739, 759 (9th Cir. 2017) (quotation omitted).

8 Instead, as noted above, "[t]he precise award in any case . . . must be based upon the facts and

9 circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm*, 538 U.S. at

10 425.

11   And *Exxon* is wholly inapplicable. In that case, the Supreme Court explicitly noted that it

12 was reviewing the punitive award there "for conformity with *maritime law*, rather than the outer

13 limit allowed by due process." *Id*. at 502 (emphasis added). In the seventeen years since *Exxon*, no

14 court has ever extended this maritime limit to a § 1983 case or any civil rights case. In *Mendez v.*

15 *Cnty. of San Bernardino*, 540 F.3d 1109, 1122-23 (9th Cir. 2009), for example, the Ninth Circuit

16 declined a clear opportunity to extend *Exxon's* 1:1 ceiling to "constitutional torts," noting that to

17 do so would not "carry out the purpose and policy of § 1983." *Id.* at 1122–23 (quotation omitted).

18 NaphCare ignores this language from the Ninth Circuit.[16] NaphCare similarly ignores the multiple

19 district court cases that explicitly reject overtures to apply the *Exxon* maritime rule to § 1983 cases.

20 *See, e.g., Henderson v. Young*, No. 05-0234, 2008 WL 11454792, at *9 (N.D. Cal. July 17, 2008)

21 (noting that "the context and purpose of § 1983 counsel strongly against the extension of *Exxon*");

22 *Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852, 879-80 (E.D. Wis. 2015) (same).

23

24 [16] The Seventh Circuit case cited by NaphCare did not apply a 1:1 ratio, it only offered it as one example of many that "[c]ourts could follow." *Beard v. Wexford Health Sources*, 900 F.3d 951, 956 (7th Cir. 2018). Other Seventh Circuit cases have soundly rejected this suggestion. *See Kunz v. DeFelice*, 538 F.3d 667, 678 (7th Cir. 2008).

25    **Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**The jury's verdict was not the product of unfair bias.** NaphCare argues it was subject to "unfair bias" because "Plaintiff repeatedly mentioned NaphCare's size and Alabama headquarters." Dkt. 327, at 32–34. First, NaphCare does not cite anywhere in the record where Tapia supposedly pointed to the fact that NaphCare is an Alabama incorporated business in a way that was intended to "inflame unfair biases." *Wolde-Giorgis v. Christiansen*, 438 F. Supp. 2d 1076, 1081 (D. Ariz. 2006), *aff'd*, 307 F. App'x 67 (9th Cir. 2009). Because it did not happen. Indeed, one of Tapia's experts hailed from Alabama and "trained at the University of Alabama." Dkt. 299, at 152. Second, NaphCare cites to nowhere in the record where Tapia referred to NaphCare's size in a way that was intended to inflame unfair biases. Because it did not happen. The fact that NaphCare "is a very large company with contracts all over the country" is simply a fact. Dkt. 301, at 50. And it was Tapia's burden to get this fact on the record in order to prove: (1) that "the conduct that harmed Mr. Tapia was particularly reprehensible because it also posed a substantial risk of harm to people who are not parties to this case; and (2) that because of its sophistication NaphCare was on "constructive notice" that its customs were "substantially certain to result in delay or denial of adequate medical care." Dkt. 283, at 13, 29. Finally, again, NaphCare's failure to object to any of this is dispositive. *Sehnal*, 930 F.2d at 1425.

## C. NaphCare's Request For Remittitur Should Be Denied.

NaphCare argues that both compensatory and punitive damages are "grossly excessive" such that remittitur is warranted. Dkt. 327, at 34.

In considering remittitur, courts must uphold the jury's verdict unless the amount is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1028 (9th Cir. 2008) (quotation omitted). Courts afford "substantial deference to a jury's finding of the appropriate amount of damages." *Id.* And although courts can look to comparable cases as part of

PLAINTIFF'S RESPONSE IN OPPOSITION TO
NAPHCARE, INC.'S POST-TRIAL MOTIONS - 29
Case No. 2:22-cv-01141-KKE

1    the analysis, if the evidence is sufficient to support even a high award, there is no need. *Bell v.*

2    *Williams*, 108 F.4th 809, 832 (9th Cir. 2024).

3        Here, as already described above, the jury heard substantial testimony about the physical

4    as well as emotional pain and suffering Tapia endured and continues to endure as a result of his

5    permanent physical disability. They heard this testimony from Tapia himself. *See* Dkt. 300, at 23–

6    29, 38–43, 49, 52–59, 63–64; *see Harper*, 533 F.3d, at 1029 ("The testimony of the plaintiff alone

7    can substantiate a jury's award of emotional distress damages."). They also heard from Dr.

8    Jimenez, a limb salvage specialist, who testified about the substantial pain and suffering endured

9    by Mr. Tapia. Dkt. 298, at 83–84. And from NaphCare's own expert, who testified to the pain of

10   Tapia's condition. Dkt. 302, at 104, 110, 115–116.

11       There is substantial evidence in the record to support the compensatory damage award such

12   that comparison of applicable cases is not necessary. However, even when comparing cases, the

13   compensatory damages are not grossly excessive. In *Harper*, for example, the Ninth Circuit upheld

14   the denial of remittitur for $5 million damages awards to officers who suffered emotional damage

15   and reputational harm from being falsely accused; no physical harm was even alleged. As noted

16   above, other juries have found even more substantial awards in permanent limb loss cases. And

17   neither are the punitive damages excessive—a 4:1 ratio is well within bounds in the Ninth Circuit.

18   *Hill*, 2025 WL 1098549.

19                            **IV.    CONCLUSION**

20       In light of the above, Plaintiff respectfully requests that NaphCare's post-trial motions be

21   DENIED.

22       Dated: May 22, 2025.

23

                                    *s/ Ryan D. Dreveskracht*
24                                   Ryan D. Dreveskracht, WSBA #42593
                                     Corinne Sebren, WSBA #58777
25

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

I certify that this memorandum contains 10,657 words, in compliance with the Local Civil Rules.

Galanda Broadman PLLC
8606 35th Avenue NE, Suite L1
P.O. Box 15146
Seattle, WA 98115
Phone: (206) 557-7509
Fax: (206) 299-7690
ryan@galandabroadman.com
corinne@galandabroadman.com
*Attorneys for Plaintiff*


*s/ Edwin S. Budge*
Edwin S. Budge, WSBA #24182
Budge & Heipt, PLLC
808 East Roy Street
Seattle, WA 98102
Telephone: (206) 624-3060
Email: ed@budgeandheipt.com
*Attorney for Plaintiff*

PLAINTIFF'S RESPONSE IN OPPOSITION TO
NAPHCARE, INC.'S POST-TRIAL MOTIONS - 31
Case No. 2:22-cv-01141-KKE

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509