1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAVIER TAPIA,<br><br>                 Plaintiff(s),<br><br>   v.<br><br>NAPHCARE INC., et al.,<br><br>               Defendant(s). | CASE NO. C22-1141-KKE<br><br>ORDER DENYING RULE 50(B) AND 59 MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR |

12
13
14
15
16
17
18
19
20
21
22
23
24

While incarcerated as a pretrial detainee at Pierce County Jail, Plaintiff Javier Tapia developed blood clotting, which ultimately led to the amputation of his left leg below the knee. Tapia sued both Pierce County and NaphCare, Inc. ("NaphCare"), the private company contracted to provide medical care to inmates at Pierce County Jail. Tapia alleged that NaphCare violated his constitutional rights by failing to provide adequate medical care under 42 U.S.C. § 1983. Tapia and Pierce County settled, and Pierce County was dismissed from the case. The remaining claim against NaphCare proceeded to a nine-day jury trial, after which the jury returned a verdict for Tapia. Dkt. No. 293. The jury awarded Tapia $5 million in compensatory damages and $20 million in punitive damages. *Id.* at 2–3.

NaphCare challenges the jury verdict under Federal Rules of Civil Procedure 50 and 59. Dkt. No. 327. NaphCare moves for judgment as a matter of law, contending that Tapia failed to provide substantial evidence to support his § 1983 claim against NaphCare. *Id.* Alternatively,

1

2  NaphCare argues that the Court should order a new trial or remittitur because the verdict was against the clear weight of the evidence, the trial was unfair, and the damages were grossly excessive. *Id.*

3

4  For the reasons explained below, NaphCare has not met its burden on either motion, and

5  the Court denies NaphCare's request for judgment as a matter of law, new trial, and/or remittitur.

6  Dkt. No. 327.

7  ## I.    BACKGROUND

8  **A.    Procedural History**

9  Tapia filed this case in King County Superior Court on March 21, 2021, and NaphCare

10  removed the case to this Court on August 15, 2022. Dkt. Nos. 1, 1-2. Tapia filed a second amended

11  complaint on October 7, 2022, and included two claims against NaphCare for corporate negligence

12  and deprivation of constitutional rights under § 1983. Dkt. No. 18-1 at 21–22.

13  NaphCare moved to dismiss the second amended complaint. Dkt. No. 19. The Court

14  granted the motion in part, dismissing Tapia's claim against NaphCare for corporate negligence

15  without prejudice. Dkt. No. 31 at 5–6. The Court also dismissed Tapia's § 1983 claim against

16  NaphCare for inadequate medical care arising from a failure to train. *Id.* at 6. However, it

17  preserved Tapia's § 1983 claim "for inadequate medical care arising from the policy of

18  withholding care." *Id.* NaphCare moved for summary judgment on the remaining claim (Dkt. No.

19  100), and the Court denied its summary judgment motion on January 14, 2025. Dkt. No. 186.

20  On the eve of trial, Tapia settled with Pierce County and dismissed the claims against the

21  County. Dkt. No. 211. Beginning on March 24, 2025, the Court presided over a nine-day jury

22  trial on Tapia's remaining claim against NaphCare. Dkt. Nos. 245, 249, 254, 256, 259, 265, 266,

23  272, 279, 285. At trial, Tapia argued that NaphCare violated his rights under the Fourteenth

24  Amendment by depriving him of adequate medical care while he was in jail, leading to his

amputation. *See* Dkt. No. 283 at 4. He asserted that NaphCare violated his constitutional rights by maintaining one or more practices or customs that caused Tapia's suffering and loss of limb. *Id.* at 7–9. Tapia argued that NaphCare maintained three unconstitutional practices: (1) a custom of allowing NaphCare Licensed Practical Nurses ("LPNs") to provide care outside the scope of their licensure, (2) a custom of relying on medically untrained correctional guards to provide medical monitoring for inmates, and (3) a custom of non-communication between Pierce County staff and NaphCare staff. *Id.* at 10–13.

**B.    Evidence Presented to the Jury**

1.    Tapia's detention at Pierce County Jail

Tapia was booked into Pierce County Jail as a pretrial detainee on June 16, 2018. Ex. 1 at 000592.[1] On the day he was booked, NaphCare Registered Nurse ("RN")[2] Etsuko Yagi completed an opiate withdrawal screening. *Id.* RN Yagi also initiated a plan for clinical opiate withdrawal scale ("COWS") assessments to track his opiate withdrawal. *Id.*; *see* Dkt. No. 299 at 99, 183. In the following days, LPNs completed the COWS assessments. Dkt. No. 299 at 99. Tapia showed mild symptoms during his withdrawal period. *Id.* at 184. Tapia's nursing expert, Denise Panosky testified regarding the nursing care Tapia received. According to Panosky, LPNs are authorized to gather vital signs, distribute medication, and chart a COWS assessment. *Id.* at 99, 183. Panosky opined that:

> There are a lot of functions [LPNs] can do on their own … But any kind of assessment is done with data collection, then reporting off to the RN. An LPN is always supervised or delegated to do things by an RN. They cannot independently make decisions. They cannot collect all the data and decide: Do I tell the RN or don't I tell the RN.

---

[1] In this order, the Court refers to the exhibits by number as admitted during trial.

[2] The RNs and LPNs discussed here are NaphCare employees. The Mental Health Providers and correctional officers are Pierce County employees.

*Id.* at 36. She concluded that the LPNs incorrectly performed the COWS assessments because "they didn't report their findings, from day one." *Id.* at 99.

The first three months of Tapia's incarceration were unremarkable. In the weeks leading up to September 2018, Tapia's records did not indicate any unusual medical or mental health concerns. Dkt. No. 297 at 150. He did not have any behavioral issues, and was a "trustee," which meant that he was permitted to work outside of his unit. *Id.* at 149–50.

On the night of September 17, 2018, Corrections Deputy Jonathan Knight noticed Tapia acting "very strange" in his cell. Ex. 55 at 000049. Deputy Knight testified that he saw Tapia exhibit "unusual behavior" and came under the impression that Tapia was experiencing a mental health problem. Dkt. No. 298 at 149. He made a request for Tapia to undergo a mental health evaluation. *Id.* In his incident report, Deputy Knight did not indicate that Tapia had lost his temper or otherwise become upset.[3] *Id.* Rather, he documented that Tapia "was laying down in the fetal position" and "started crying and mumbling unintelligibly" when Deputy Knight grabbed his arm. Ex. 55 at 000049. Tapia did not acknowledge Deputy Knight verbally, would not make eye contact, and intermittently covered his ears. *Id.* That night, Tapia was moved from the general housing unit to 3SC, the segregation unit, for mental health evaluation due to this "odd behavior and unpredictability[.]" *Id.*; Dkt. No. 298 at 132, 153.

The next day, on September 18, a Pierce County Mental Health Provider ("MHP") visited Tapia.[4] Ex. 1 at 000224–25. The MHP charted:

---

[3] NaphCare described Tapia's behavior as a "temper tantrum" resulting from the cancellation of his visit with his daughter. Dkt. No. 300 at 48, Dkt. No. 327 at 11. NaphCare based this characterization on Tapia's description of the episode during his deposition, which was played for the jury. *See* Dkt. No. 300 at 48. Tapia's trial testimony clarified that he only "vaguely" remembered Deputy Knight's visit. He also explained that he had described his behavior as a tantrum based on what he had learned about it from media sources after his amputation. *Id.* at 47–49. Tapia explained that the behavior he learned about including rolling on the floor, flailing, and covering his ears, was "not normal for [him]self" and not how he would have responded to a cancelled visitation. *Id.* at 47–48.

[4] Mental health interviews take place through the cell door. Dkt. No. 298 at 12–13. MHPs do not enter the cell for these visits. *Id.* (describing MHPs speaking to inmates through the food port door of the cells).

> Met with [inmate] at about 1100 for initial assessment in response to C/D report. He came to the door and was cooperative during interview, but appears to be confused and was unable to verbally respond to my questions. He has been here at [Pierce County Jail] since June, but appears to be decompensated at this time.

*Id.*; Dkt. No. 297 at 171–72.

An MHP met with Tapia again on September 19, 2018.  Ex. 1 at 000224.  The MHP charted:

> He presented again today as confused. [Inmate] was again unable to verbally respond to my questions. He has been here at [Pierce County Jail] since June, but appears to be decompensated at this time. Officers report that he appears to be "way off his baseline," and he was nonverbal in court today as well. He could have an unknown medical condition.

*Id*.  The MHP also charted that Tapia was "[r]eferred to medical for assessment.  Recommend continued level 1 [mental health] housing at this time for further assessment."  *Id.*  During this time, the inmates in Tapia's unit were allowed an hour out of their cells.  *See* Dkt. No. 298 at 156.  On September 19, a corrections officer documented that Tapia "refused" to come out for his hour out.  *Id.* at 157; Ex. 42 at 402744.  Dr. Denise Glindmeyer, Tapia's psychiatry expert, testified that based on his medical records, whatever issue Tapia experienced on September 17 and 18 was ongoing.  Dkt. No. 297 at 173.

Later on September 19, RN Inglemon sent LPN Cameron Carrillo to "go see [Tapia], due to being nonresponsive" based on the MHP's referral.  Dkt. No. 301 at 19–20, 92–93, 108; Dkt. No. 303 at 20; Ex. 1 at 000224.  RN Inglemon did not provide any specific instructions, including what data he was meant to collect and report back.  Dkt. No. 301 at 111–12.  LPN Carrillo testified that he knew that RN Inglemon wanted him to talk to Tapia, "make sure he had no medical concerns at this time[,]" take his vital signs, and look at his general appearance.  *Id.* at 112.

Before visiting Tapia, LPN Carrillo did not review Tapia's medical chart, which included the notes by the MHPs, or the behavior log entries written by the corrections staff.  Dkt. 301 at

109, 110.  LPN Carrillo testified that his choice was "deliberate" because he did not want "anyone else's bias [to] come in."  *Id.* at 109.  He testified that he did not open the chart because he wanted to "go in with fresh eyes and do [his] own data collection, [his] own assessment, and report that back to the RN without any other biases."  *Id.*  After visiting Tapia, LPN Carrillo charted "[patient] referred to medical due to being nonresponsive, [patient blood pressure] hypertensive skin PWD, does not appear in distress, states he does not have any medical concern at this time but is upset of being in 3SC, states no [suicidal ideation] will continue to monitor."  Ex. 1 at 000224.  At trial, LPN Carrillo testified that he reported his findings back to RN Inglemon verbally and in writing, but there is no written indication of his report to an RN.  Dkt. No. 301 at 93, 120; Dkt. No. 303 at 21.  RN Inglemon chose not to monitor Tapia herself or follow up on LPN Carrillo's chart note.  Dkt. No. 303 at 27–28, Dkt. No. 301 at 120–22.  At trial, she testified that she "[a]bsolutely … relied on LPN Carrillo's assessment" of Tapia.  Dkt. No. 303 at 28.  When asked about this interaction with LPN Carrillo, Tapia testified that he could not remember LPN Carrillo's visit.  Dkt. No. 300 at 49, 81.

On September 20, 2018, another MHP saw Tapia, again through the food port in the cell door, though he was unable to meaningfully evaluate him.  Ex. 1 at 000224.  This MHP charted "[inmate] seen about 1110 for [mental health follow up].  [Inmate] is awake but stays on his bunk.  [Inmate] does not respond in any way to MHP, he just stared.  [Inmate] would not even shake his head yes or no.  [Inmate] was seen by medical yesterday."  *Id.*  According to Dr. Glindmeyer, Tapia was exhibiting signs "indicative of a delirium or a mental status change."  Dkt. No. 297 at 183.  According to the behavioral logbook for September 20, Tapia again "refused" to go outside for his "one hour out."  Dkt. No. 298 at 157; Ex. 42 at 402745.

No medical or mental health provider attempted to see Tapia until six days later, on September 26, 2018.  Ex. 1 at 000224; Ex. 54.  The MHP who went to Tapia's cell that day charted:

"Attempted to meet with [inmate] at about 1100 for initial assessment in response to C/D report. He presented again today as confused and non-verbal. He has been here at [Pierce County Jail] since June, but appears to be decompensated at this time." Ex. 1 at 000224.

Two days later, on September 28, 2018, an MHP attempted to visit Tapia, but was again unsuccessful in evaluating him. Ex. 1 at 000224. The MHP charted: "[Inmate] was seen at about 10:30 for [mental health follow up]. [Inmate] refused [mental health] interview. [Inmate] presents [mental health] symptoms. [Inmate] would not answer [mental health] questions. [Inmate] just looked at MHP and did not respond to basic questions." *Id.*

No NaphCare employee opened Tapia's medical chart between the evening of September 19, 2018, and the morning of September 29, 2018. Ex. 54; Ex. 1 at 000223–24; Dkt. No. 299 at 69–70. Panosky testified that NaphCare staff should have read Tapia's chart (and visited Tapia) after LPN Carrillo charted that Tapia should continue to be monitored. Dkt. No. 299 at 71. Panosky further testified that while mental health and correctional staff were documenting his escalating decompensation, no NaphCare employee did a medical assessment during this time. *Id.* Finally, Panosky testified that the MHP visits on September 20, 26, and 28 did not constitute medical monitoring. *Id.* at 72.

On September 29, 2018, RN Elizabeth Warren saw Tapia at the request of the corrections sergeant. Ex. 1 at 000223. A corrections officer had observed that Tapia had stopped eating and was unresponsive to the officer. Dkt. No. 214 at 35, Dkt. No. 299 at 78–79; Ex. 55 at 000048. At the time RN Warren visited Tapia, she had not reviewed his chart nor read any of the prior notes made by the MHPs or LPN Carrillo. Dkt. No. 214 at 18–19. After visiting Tapia, RN Warren charted:

> 12:10 pm[.] Saw inmate in his cell as requested by Sergeant. Cell smells of urine. Sheet wrapped around waist. Alert, sitting up, on the side of his bunk, under his [own] power. Makes eye contact when he is spoken to. Inmate will not verbally

respond. Inmate will follow instructions with calm encouragement. Allowed assessment. 96.9 Apical pulse 100, S1S2, slow, even respirations, rate 14–16, B/P 127/77. Tongue wet, skin does not tent. No acute distress noted. Not sure if inmate is eating every meal. Offered a chocolate ensure and he drank approx. ½ the container. Officer prepared his sandwich for him, handed it to him and he took the sandwich. Spoke with Sgt Finley and ask if inmate could be put on a meal log and agreed to start "Meal Log" Schedule daily monitoring of [vital signs] x 3 days and scheduled Provider visit for evaluation.

Ex. 1 at 000223. RN Warren testified that her actions "comport[ed] with NaphCare's policies and established practices." Dkt. No. 214 at 32.

Though RN Warren had ordered daily monitoring of vital signs by a medical provider, no NaphCare employee saw Tapia until October 1, 2018. Ex. 1 at 000207. Rather, on September 30, 2018, an MHP attempted to visit Tapia as a result of a report from a corrections officer. *Id.* at 000223. The MHP charted:

[Inmate] seen at about 1040 for assessment in response to C/D report. [Inmate] was uncooperative with MH interview. [Inmate] appeared to be sleeping and did not respond to MHP knocks on door or calling of name. [Inmate] was observed moving and breathing in his bed. [Inmate] cell was observed as messy and disorganized.

*Id.*

On the morning of October 1, 2018, LPN Deborah Ricci attempted to take Tapia's vital signs. Dkt. No. 303 at 41; Ex. 1 at 000610. LPN Ricci documented that Tapia had "refused" to have his vitals taken, but also testified that she could not recall whether Tapia was sleeping or otherwise responded to her attempts to take his vital signs. Dkt. No. 299 at 85–86, Dkt. No. 303 at 44. The refusal form in the record was unsigned by Tapia or any other witness. Ex. 1 at 000610. Panosky testified that Tapia should have signed the refusal form, or LPN Ricci should have had a corrections officer sign it in the event Tapia would not. Dkt. No. 299 at 86. The trial record does not show that LPN Ricci reported Tapia's refusal of care to a supervising physician or RN, verbally or otherwise. *Id.* at 90–91.

1

2    Later that day, RN Ashley Chalk visited Tapia, again based on a corrections officer's

3    request.  Ex. 1 at 000223.  While serving lunch, the corrections officer observed Tapia's foot

4    turning black.  Ex. 31.  RN Chalk charted:

> Asked to see inmate by unit officer for c/o "toes turning black". Upon visual
> inspection, left foot slightly swollen and severely discolored. Inmate brought to
> clinic via wheelchair. Vitals: BP 111/80 T 97.9 P 105 SpO2 94% RA. Inmate is
> non-verbal and does not answer questions. Spoken to by MHP and reported having
> pain, but does not recall what happened or when … Inmate referred to Tacoma
> General [Emergency Department].

Ex. 1 at 000223.  Tapia was transported to Tacoma General Hospital, where he was admitted for

gangrene and diagnosed with Phlegmasia Cerulea Dolens ("PCD").  Ex. 1 at 000612; Ex. 3 at

100652–53.  Tapia's condition deteriorated, and his leg was amputated below the knee over the

course of two surgeries on October 10 and 16, 2018.  Ex. 3 at 100587.

NaphCare conducted no investigation of the circumstances surrounding Tapia's care or

subsequent amputation.  Dkt. No. 301 at 55–56.  On June 16, 2020, Dr. Elliot Wade, NaphCare's

Regional Medical Director, sent an email to RN Warren, LPN Carrillo, and RN Chalk, about two

years after Tapia's detention.  Ex. 22.  NaphCare's legal department had asked Dr. Wade to review

Tapia's medical record in anticipation of litigation.  *Id.*  The email stated that the nurses' notes

were not lengthy, contained all the necessary information needed at the time, and that the staff "did

everything right and he's lucky."  *Id.*

2.  Tapia's additional witnesses

Dr. Garcia, the physician who treated Tapia at Tacoma General Hospital, testified that

when Tapia arrived at the hospital on October 1, he faced a "very serious[,]" life threatening

diagnosis because "that blood clot in the leg can go to the lungs and to the heart and cause you to

die."  Dkt. No. 297 at 92.  Dr. Garcia testified that Tapia had an "altered mental status" upon

admission and that Tapia's mental status fluctuated during his stay at the hospital, potentially due

1    to uremia or kidney dysfunction. *Id.* at 83. According to Dr. Garcia, in his vascular specialty, he

2    sees patients with altered mental statuses presenting with vascular issues. *Id.* at 78. Dr. Garcia

3    concluded that Tapia's blood-clotting condition had been going on for weeks before he was

4    hospitalized. *Id.* at 92.

5          The jury also heard from Dr. Jimenez, Tapia's vascular disease expert. Dr. Jimenez also

6    described PCD to the jury as a blood clotting disease that occurs over time. Dkt. No. 298 at 60–

7    62. He noted that PCD is rare "because it takes an extensive amount of pathology to get to that

8    point … you need to have no more veins in the leg that are able to take blood out of the leg[.]" *Id.*

9    at 62–63. According to Dr. Jimenez, deep venous thrombosis ("DVT") or less severe blood clots

10   are usually caught before they progress to the PCD stage; it would be extremely unlikely for a

11   person to rapidly develop PCD in a day. *Id.* at 63, 66. Dr. Jimenez opined that based on Tapia's

12   medical records, "there are some signs that this condition likely started two to four weeks before

13   he presented to the hospital[.]" *Id.* at 63. As an example, Dr. Jimenez pointed to Deputy Knight's

14   documentation that showed that Tapia's behavior "changed fairly dramatically" approximately

15   three weeks prior to his hospitalization, as well as records showing that he was unresponsive,

16   confused, and acting strangely. *Id.* at 64. Like Dr. Garcia, Dr. Jimenez opined that Tapia was in

17   renal failure upon admission to the hospital which "could very well explain the mental-status

18   changes that began occurring on the 16th of September or earlier in the month." *Id.* at 85.

19         Dr. Jimenez further explained that he has treated patients with PCD who had altered mental

20   statuses, including one who required an amputation and presented with "generalized confusion";

21   like Tapia, he testified these patients had exhibited difficulty thinking and communicating. *Id.* at

22   85–86. Dr. Jimenez also stated that while physicians need to evaluate the patient and get as much

23   information from the patient's history and by listening to the patient, if they are unable to get

24

ORDER DENYING RULE 50(B) AND 59 MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW
TRIAL, AND/OR REMITTITUR - 10

accurate information from a patient, physicians must make a diagnosis using other information. *Id.* at 66.

RN Bridget Stixrood, a nurse who previously worked at Pierce County Jail during Tapia's detention, testified that it was NaphCare's "usual custom" to "direct[] LPNs to independently evaluate and make medical decisions about patients and send[] LPNs to answer medical calls that required medical evaluations and diagnoses[.]" Dkt. No. 298 at 185–86, 192. RN Stixrood further testified that this practice "continue[d] throughout [her] three years of employment at NaphCare[.]" *Id.* at 192. Stixrood also testified that during her tenure at NaphCare, communication between MHPs and NaphCare employees was "fragmented." *Id.* at 194.

In addition to nursing expert Panosky and psychiatrist Dr. Glindmeyer, Tapia also presented testimony on corrections practices from Dr. Johnny Bates. After reviewing the record, Dr. Bates concluded that NaphCare had a custom of LPNs practicing beyond the scope of their licensure. Dkt. No. 299 at 174–75. He also testified that Tapia's blood pressure was elevated the day LPN Carrillo saw him, but that no follow-up from the medical staff occurred. *Id.* at 200. According to Dr. Bates, on September 19, Tapia needed "a workup by a nurse practitioner/physician," a fact that "would have been obvious to any medical professional exercising his or her professional judgment." *Id.* at 162–63. But he noted that no assessment or follow-up monitoring occurred, during which "obvious abnormalities" could have been "easily discovered just by looking at his foot[.]" *Id.* at 199–200, 177. In particular, Dr. Bates opined that if NaphCare completed a full assessment for Tapia between September 19 and September 29, Tapia's leg would have been, at minimum, red and swollen and there would have "been obvious, obvious findings" signaling DVT. *Id.* at 177. Lastly, Dr. Bates also concluded that "[t]here was little to no communication between the mental health professionals and NaphCare. The documentation was there, but it doesn't appear it was ever looked at." *Id.* at 169–70.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

   3.  <u>Damages testimony</u>

At trial, Tapia sought only non-economic damages.  Tapia testified how his life had changed after the amputation, including his lack of mobility, the limitations on his hobbies, and his necessary reliance on his family members for assistance.  Dkt. No. 300 at 20, 23, 24–25.  He cannot exercise, which was his past hobby, because of "residual shrinkage" of the muscles on his amputated limb.  *Id.* at 24–25.  Because he is prone to hyperextending his knee backwards, he must remain vigilant while walking with his prosthetic.  *Id.* at 25–26.  Tapia often experiences pressure sores, bruising, and tenderness on his limb.  *Id.* at 26–27.  Tapia described the impact of his injury on his personal life, including that he has not been in an intimate relationship since his amputation.  *Id.* at 63–64.  In a live demonstration before the jury, Tapia showed the jury the remainder of his limb and demonstrated the use and maintenance of his prosthetic.  He also testified as to steps he takes each day to take care of himself.  Tapia also presented evidence regarding NaphCare's finances based on materials from its website discussing its revenue growth to nearly $1 billion.  Ex. 18.

NaphCare did not present evidence on damages.

## C.   **The Jury's Verdict**

After a day and a half of deliberations, on April 4, 2025, the jury returned a verdict for Tapia, awarding $5 million in compensatory damages for Tapia's non-economic injuries.  Dkt. No. 285 at 2.  The jury also found that NaphCare's conduct showed reckless disregard of Tapia's rights, and that NaphCare should be required to pay punitive damages in the amount of $20 million.  *Id.* at 3.

NaphCare filed its post-trial motions on May 7, 2025, and also moved to redact or seal certain information in the motions and an attached declaration by NaphCare's Chief Financial

1    Officer Connie Young.  Dkt. Nos. 325, 327.  The parties fully briefed all motions, and the Court

2    heard argument on July 14, 2025.  Dkt. No. 346.

3                    II.    MOTION FOR JUDGMENT AS A MATTER OF LAW

4    **A.    Legal Standard**

5         The Court may grant a renewed[5] motion for judgment as a matter of law "[i]f a party has

6    been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not

7    have a legally sufficient evidentiary basis to find for the party on that issue[.]"  Fed. R. Civ. P.

8    50(a).  A jury verdict lacks "a legally sufficient evidentiary basis" if the evidence allows only one

9    reasonable conclusion—which is contrary to the jury verdict.  *Velazquez v. City of Long Beach*,

10   793 F.3d 1010, 1018 (9th Cir. 2015).  The Court should not grant a Rule 50 motion "[i]f reasonable

11   minds could differ as to the import of the evidence[.]"  *Id.* (quoting *Anderson v. Liberty Lobby,*

12   *Inc.*, 477 U.S. 242, 250 (1986)).  "A jury's verdict must be upheld if it is supported by substantial

13   evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to

14   draw a contrary conclusion."  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

15        "[I]n entertaining a motion for judgment as a matter of law, the court should review all of

16   the evidence in the record … [and] draw all reasonable inferences in favor of the nonmoving party,

17   and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson*

18   *Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

19   **B.    Entity Liability Under 42 U.S.C. § 1983**

20        Under § 1983, any "person" acting "under color of" state law who violates rights "secured

---

[5] NaphCare properly preserved its arguments in the instant renewed motion because it moved for judgment as a matter of law before the case was submitted to the jury.  Dkt. No. 267; *see also Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1081 (9th Cir. 2009).

ORDER DENYING RULE 50(B) AND 59 MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR - 13

by the Constitution" shall be liable to the injured party.  42 U.S.C. § 1983.  Thus, Tapia must establish (1) that his civil rights were violated, (2) by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).  "Pretrial detainees[, like Tapia,] have a constitutional right to adequate medical care while in the custody of the government and awaiting trial."  *Est. of Nelson v. Chelan Cnty.*, No. 2:22-CV-0308-TOR, 2024 WL 1705923, at *9 (E.D. Wash. Apr. 19, 2024) (citing *Russell v. Lumitap*, 31 F.4th 729, 738 (9th Cir. 2022)).

Municipalities and other bodies of local government may be considered "persons" and subject to liability under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]"  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  A private company like NaphCare is a "person" under § 1983 when it stands in the shoes of a municipality while providing public services under a contract.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139–40 (9th Cir. 2012).

Plaintiffs may establish municipal liability for constitutional violations under § 1983 through three pathways: (1) the municipality's official policies or longstanding practice or custom inflict the constitutional injury, (2) the municipality's omissions or failures to act "when such omissions amount to the local government's own official policy[,]" or (3) a municipal policymaker ratifies a subordinate's unconstitutional decision or action and the basis for it.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016).  Here, Tapia asserts NaphCare's liability based on unofficial policies and longstanding customs (*i.e.*, the first pathway).

To establish liability based on an unofficial policy or custom, Tapia must show (1) that a policy or custom existed; (2) a direct causal link between the policy or custom and the constitutional deprivation; and (3) if the policy is one of inaction (*i.e.*, if the policy does not directly

1  require unconstitutional conduct) that the defendant acted with deliberate indifference. *See*

2  *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 681–82 (9th Cir. 2021) (*Monell* analysis proceeding

3  in this order). Policies of inaction occur when a plaintiff "pursues liability based on a failure to

4  act," such as claims that the defendant failed to train employees. *Park v. City & Cnty. of Honolulu*,

5  952 F.3d 1136, 1141 (9th Cir. 2020).

6  **C.    The Court Denies NaphCare's Motion for Judgment as a Matter of Law.**

7       NaphCare moves for judgment as a matter of law on three bases. First, Tapia failed to

8  prove the existence of an unconstitutional NaphCare custom. Dkt. No. 327 at 9–10. Second, Tapia

9  failed to prove a constitutional violation because he "did not introduce evidence that any NaphCare

10  nurse made any intentional decision to disregard an obvious risk to his medical welfare." *Id.* at 9.

11  And third, NaphCare argues that Tapia did not establish that any of the alleged *Monell* policies

12  caused Tapia's injury. *Id.* at 8–9. The Court addresses each of NaphCare's arguments in turn.

13       For the reasons below, the Court denies NaphCare's motion for judgment as a matter of

14  law because substantial evidence supports the jury's conclusion that one or more unofficial

15  NaphCare customs caused Tapia's constitutional injury.

16       1.    <u>The jury reasonably concluded that one or more unconstitutional NaphCare customs
         exist.</u>

17       NaphCare argues that Tapia failed to show that any of the alleged *Monell* customs exist.

18  Tapia asserts that NaphCare maintains three unofficial "widespread customs" that violated his

19  constitutional right to medical care. First, Tapia claims that NaphCare maintained a policy of

20  LPNs working outside their nursing scope of practice ("LPN policy"). Second, Tapia argues that

21  NaphCare had a policy of relying on correctional officers to provide medical monitoring, rather

22  than trained medical professionals. And third, Tapia asserts that NaphCare had a policy of non-

23

24

communication between mental health (Pierce County employees) and medical providers (NaphCare employees) and a custom of lack of oversight.

To show the existence of these policies, Tapia needed to demonstrate that each policy was "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir. 2021) ("*Gordon II*") (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168 (1970)). That said, "[a]n unconstitutional policy need not be formal or written to create municipal liability under Section 1983[.]" *Id.* "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)).

### a. LPN policy

As evidence of the LPN policy, Tapia provided multiple examples of NaphCare LPNs conducting independent assessments and evaluations that they were not licensed to complete. Again, where there is conflicting evidence presented on an issue, "it is the function of the jury, not th[e] court, to resolve the conflict." *Walker v. KFC Corp.*, 728 F.2d 1215, 1223 (9th Cir. 1984). The Court is not free to reweigh evidence or make its own credibility determinations.

This evidence principally focused on Tapia's expert, Panosky, who testified at length about the various ways in which NaphCare LPNs practiced outside of the scope of their licensure. Panosky explained that LPNs are allowed to complete "focused assessments[,]" in which the LPN tries to "collect as much information as they can" and conduct data collection. Dkt. No. 299 at 37. Panosky also testified, however, that even though LPNs may complete focused assessments, they do so under the supervision of a nurse, who reviews the information they collect. *Id.* at 38–39. LPNs cannot do independent assessments, or "analyze the data … or make a plan of care." *Id.* According to Panosky, this systematic data collection and reporting did not happen for Tapia. She

opined that NaphCare LPNs treating Tapia had inappropriately collected data without reporting it, independently conducted patient evaluations, and made care plans "which they are not allowed to do." *Id.* at 137, 90, 99.  Regarding LPN Carrillo, Panosky testified that as an LPN, Carrillo "did not have the authority to even say that we'll continue to monitor." *Id.* at 61.  She continued, "That's the RN's position.  The RN didn't write anything about that.  And the LPN isn't allowed, under their license, to write a plan of care." *Id.*

Consistent with Panosky's opinion, LPN Carrillo testified that RN Inglemon did not give him specific instructions on September 19, and instead, he relied on his own judgment when he assessed Tapia, and in fact, consciously chose to disregard available information regarding Tapia's condition so that he could evaluate Tapia independently.  Dkt. No. 301 at 104–09, 112; Dkt. No. 299 at 175–77; Ex. 1 at 000224.  Similarly, a few days before Tapia was hospitalized, LPN Ricci failed to document Tapia's refusal to submit to vital signs, and likewise apparently failed to report this refusal to an RN or other provider.  Dkt. No. 299 at 90.  And lastly, RN Stixrood, a former NaphCare RN, testified that it was a "regular practice" for LPNs to "decid[e] which patients were and were not sick enough to see a doctor."  Dkt. 298 at 193–94.  This testimony is consistent with RN Warren's testimony that NaphCare LPNs evaluated patients, which Panosky testified they are not licensed to do.  Dkt. No. 214 at 31; Dkt. No. 299 at 35, 40.

Thus, the proof at trial showed "practices of sufficient duration, frequency and consistency" that LPNs exceeding the scope of their licensure has become "a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918.  The trial record shows more than seven occasions where a NaphCare LPN made an independent assessment or decision without RN supervision, which is sufficient to establish a pattern for *Monell* purposes. *See, e.g.*, *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) (finding a pattern based on three instances), *opinion amended on denial of reh'g*, 137 F.3d 1372 (9th Cir. 1998).  Testimony from RN Stixrood further established

that such practices were common throughout her three-year tenure. Dkt. No. 298 at 193–94 (noting that it was NaphCare's "regular practice for LPNs to serve as gatekeepers, by deciding which patients were and were not sick enough to see a doctor"), Dkt. No. 299 at 90.

Whether viewed as the entirety of Tapia's pre-hospitalization incarceration (approximately four months) or the three weeks of Tapia's escalating decompensation, the duration of the LPN policy is also sufficient to find a *Monell* policy. *See Nyarecha v. Cnty. of Los Angeles*, No. 23-55773, 2024 WL 4511616, at *2 (9th Cir. Oct. 17, 2024) ("The fact that the constitutionally inadequate checks occurred in quick succession over a relatively short period of time does not bar *Monell* liability." (citing *Menotti v. City of Seattle*, 409 F.3d 1113, 1147–49 (9th Cir. 2005)), *cert. denied sub nom. Los Angeles Cnty., California v. Nyarecha*, 145 S. Ct. 1930 (2025).

Finally, in light of this testimony and authority, Tapia was also not required to identify other incidents involving other inmates in order to show a policy. "There is no case law indicating that a custom cannot be inferred from a pattern of behavior towards a single individual[.]" *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017) (unpublished); *see also Nyarecha*, 2024 WL 4511616, at *2 (death of single inmate); *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) ("The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act." (quoting *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). NaphCare provides no contrary authority.

Thus, the jury could have reasonably found a custom of NaphCare using LPNs outside the scope of their licensure.

### b.    Relying on correctional guards to medically monitor inmates

NaphCare does not dispute that Tapia's chart went unopened by any NaphCare employee for 10 days. Dkt. No. 299 at 70. This gap in monitoring occurred after LPN Carrillo committed

the nursing staff to continue to monitor Tapia. Ex. 1 at 000224. NaphCare offered no evidence that any medical provider monitored Tapia during this time, beyond RN Warren's testimony that typically the nurses conducted "daily rounds" to pass out medication and Deputy Knight's testimony that he had generally seen nurses complete these rounds in 2018. Dkt. No. 303 at 17–18, Dkt. No. 214 at 20, Dkt. No. 298 at 170–73. But no NaphCare witness testified that Tapia was taking medication that would have resulted in a daily round nursing visit, nor did any NaphCare witness testify that they personally visited Tapia in this ten-day span. Dkt. No. 298 at 36–37.

And while Deputy Knight denied that guards provide medical monitoring, the proof at trial revealed that nearly every medical or mental health intervention Tapia received was the result of a referral from a corrections officer. *See* Ex. 1 at 000224–25 (MHP visiting on September 18 because of report from correctional staff), 000224 (MHP visit on September 19 in response to correctional staff's report), 000224 (MHP visit on September 26 for the same reason), 000223 (RN Warren's visit on September 29 per referral from the sergeant), 000223 (MHP visit on September 30 in response to correctional staff referral), 000223 (RN Chalk's visit on October 1 due to unit officer's report that Tapia's toes were turning black). No NaphCare witness testified that such referrals from guards were unusual or out of the ordinary. The jury could have relied on this evidence to conclude that NaphCare had a custom of relying on corrections officers for medical monitoring. Dkt. No. 298 at 147–48; Ex. 55; Ex. 31; *see also Est. of Hill by & through Grube v. NaphCare, Inc.*, No. 23-2741, 2025 WL 1588738, at *3 (9th Cir. June 5, 2025) (fact that officers transported ill inmate without protest supported reasonable inference that practice was customary for *Monell* purposes). In sum, this evidence demonstrates sufficient duration, frequency, and consistency to allow the jury to conclude that a custom of relying on guards for medical monitoring existed. *See Trevino*, 99 F.3d at 918.

1

*c.    Non-communication between NaphCare staff and Pierce County*

2

Tapia provided substantial evidence showing a lack of adequate communication between

3

NaphCare and Pierce County, as shown by the multiple occasions where NaphCare staff decided

4

not to check the MHPs' notes before assessing Tapia, and the 10-day period where no NaphCare

5

staff opened Tapia's chart at all.  Dkt. No. 299 at 137–39, 40; Dkt. No. 301 at 109–10; Dkt. No.

6

214 at 18.  Though MHPs were documenting Tapia's continued deterioration, no NaphCare

7

employee was aware of these developments.  Tapia proffered expert testimony explaining why

8

this conduct was problematic and below national standards of care.  Dkt. No. 299 at 71–73, 99–

9

100, 140, 169 ("[O]ver a consistent, sustained period of time … [t]here was little to no

10

communication between the mental health professionals and NaphCare.").  While Deputy Knight

11

testified that NaphCare communicates well with correctional staff and MHPs, the credibility of

12

this testimony was within the province of the jury to evaluate.  Dkt. No. 298 at 162–63; *see Reeves*,

13

530 U.S. at 150.

14

Because this third policy is a policy of inaction, the jury was required to find that the policy

15

constituted deliberate indifference to Tapia's right to adequate medical care.  *See Tsao*, 698 F.3d

16

at 1143.  In other words, Tapia was required to show "actual or constructive notice" that

17

NaphCare's custom of non-communication is substantially certain to result in the violation of

18

constitutional rights.  *Park*, 952 F.3d at 1142 (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)

19

(requiring reason to know of foreseeable risk to plaintiff's constitutional rights)).  The jury can

20

infer deliberate indifference from circumstantial evidence.  *See Sandoval*, 985 F.3d at 683.  Expert

21

testimony regarding deviations from national standards can support a finding of deliberate

22

indifference.  *See Hill*, 2025 WL 1588738, at *3.

23

There is substantial evidence in the record that NaphCare had constructive notice that a

24

policy of non-communication is substantially certain to result in inadequate medical care.  This

evidence was comprised of (1) expert and fact testimony concluding that adequate communication between Pierce County and NaphCare staff was necessary to meet national standards and provide adequate care; (2) expert testimony asserting that the risk of inadequate medical care based on this record was "plainly obvious"; and (3) post hoc evidence showing a lack of remedial efforts after Tapia's injury.

As to the first point, while both parties provide conflicting testimony on whether communication between Pierce County and NaphCare was *actually* deficient, they both agreed that communication between these two departments is necessary.  Correctional Officer Delgado testified that good communication between NaphCare employees and mental health providers was "absolutely" important.  Dkt. No. 302 at 191.  Dr. Crum, NaphCare's expert on correctional healthcare, testified that "[T]he medical record is the main communication, in medicine.  It's where everybody knows where to look."  Dkt. No. 301 at 144–45.  RN Slothower described his expectation that the Pierce County and NaphCare staffs would communicate regarding mental health, medical, and safety issues.  Dkt. No. 300 at 122–23.  Tapia's experts testified about applicable national standards, and how a lack of communication between the MHPs and NaphCare staff put Tapia at a risk of harm "to the most casual observer[.]"  *See* Dkt. No. 299 at 167–69 (Dr. Bates opining that the standard of care required NaphCare medical providers to be aware of the charting entries by the MHPs), 84 (Panosky testifying that the standard of care required RN Warren to check the MHPs' prior visits before assessing Tapia), 71–73, 99–100, 140.

Indeed, NaphCare concedes its official policies require effective communication between NaphCare and Pierce County.  Dkt. No. 327 at 19 (referring to Dkt. No. 101-15 at 13) (contract with Pierce County).  The jury also saw NaphCare's Policy for Segregated Inmates, which incorporated national correctional health care standards and, among other things, required health staff to review an inmate's medical chart, to document significant health findings and to "promptly

identify and inform custody officials of inmates who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of failing health." Ex. 70. The fact that NaphCare's written policy requires effective communication between different departments reasonably suggests that NaphCare was aware of the risks of poorly communicating with Pierce County. *See Sandoval*, 985 F.3d at 683. By providing testimony regarding existing national healthcare standards, how those standards are necessary to protect patients' wellbeing, and how it is unlikely that NaphCare was unaware of the dangers of deficient communication with Pierce County staff, Tapia supplied enough proof to allow a reasonable jury to find NaphCare's deliberate indifference to Tapia's constitutional rights. *See Nguyen v. City of San Jose*, No. 5:21-CV-00092-EJD, 2024 WL 3908115, at *8 (N.D. Cal. Aug. 20, 2024) (specific facts regarding existing industry standards can support a finding of deliberate indifference).

Moreover, the evidence at trial demonstrated that NaphCare was more than "the most casual observer." The jury heard evidence on the scale and size of NaphCare's operations from both sides. For instance, NaphCare emphasized its staffing levels at Pierce County Jail compared to other facilities (Dkt. No. 302 at 44), and Tapia presented statements from NaphCare's former CEO asserting that he believes the company's top-line revenue will grow from $350 million to nearly $1 billion (Ex. 29). Put differently, NaphCare held itself out as experts in the correctional healthcare field. From this evidence, the jury could have reasonably inferred that NaphCare is a sophisticated and experienced provider of correctional healthcare, and should have been aware that deficient communication between two key health departments at the jail would necessarily lead to delayed care for the inmates. Dkt. No. 299 at 99–102 (Panosky opining that a practice of non-communication contributed to Tapia's harm because if "things were recognized earlier, … sooner, whenever he started showing these symptoms that he was showing all along, that they could have done something").

NaphCare emphasizes that the jury heard "no evidence whatsoever about what NaphCare's final policymakers knew" about the alleged defects in communication. Dkt. No. 327 at 19. Essentially, NaphCare argues for a subjective test for deliberate indifference which ignores the authority finding deliberate indifference based on constructive notice. *Id.* at 16 n.1. That is not the law, and the Court will not overturn the jury's verdict on this basis. *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) ("*Gordon I*"); *Castro*, 833 F.3d at 1076. Moreover, where delayed medical care is a "plainly obvious" consequence of a particular practice or custom, a jury may infer constructive notice. *Pope v. McComas*, No. 07-1191, 2011 WL 1584213, at *15 (W.D. Wash. Mar. 10, 2011) (citing *Bd. of Cnty. Com'rs of Bryan County*, 520 U.S. at 410–11). Here, Tapia presented expert testimony concluding that the risks of NaphCare's failures to communicate were plainly obvious. *See, e.g.*, Dkt. No. 299 at 102–03, 175–76.

Finally, Tapia also presented post-hoc evidence demonstrating NaphCare's lack of remedial measures in response to Tapia's injury, supporting the existence of deliberate indifference. Ex. 22; Dkt. No. 301 at 55–56. Specifically, Tapia presented an email from NaphCare Medical Director Dr. Wade, who reviewed Tapia's medical records and concluded that the NaphCare staff "did everything right[.]" Ex. 22; Dkt. No. 299 at 165. RN Jonathon Slothower, a NaphCare supervisor and health services administrator at Pierce County Jail, testified that NaphCare did not conduct an internal investigation of any kind after Tapia's injury, despite acknowledging the significance of the event for the jail. Dkt. No. 301 at 55–56. No evidence of remedial measures was presented. Lastly, Dr. Bates, Tapia's expert, testified that "this lack of reflective hindsight is probably one of the most troubling aspects of this case" and "exhibits an institutional reckless disregard to the substantial risk of harm to similarly situated inmates." Dkt. No. 299 at 176. The jury could have reasonably concluded that NaphCare's failure to investigate or make any changes to its practices around care, communication, or monitoring to prevent

recurring incidents of delayed care evidenced deliberate indifference to the risk to inmates' well-being. *See Henry*, 132 F.3d at 519 (entity's failure to make changes in order to prevent recurring violations evidenced the city's preexisting policy of deliberate indifference).

In sum, the jury reasonably concluded that one or more of the above customs existed.

2. Substantial evidence at trial supports the conclusion that one or more NaphCare employees made an intentional decision relating to Tapia's delayed medical care that put Tapia at substantial risk of serious harm.

To show that Tapia's constitutional right to medical care under the Fourteenth Amendment was violated, Tapia was required to show: (i) a NaphCare employee "made an intentional decision with respect to" delay or denial of Tapia's care; (ii) that delay or denial "put [Tapia] at substantial risk of suffering serious harm"; (iii) the NaphCare employee "did not take reasonable available measures to abate that risk, even though a reasonable [employee] in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious"; and (iv) by not taking such measures, [the NaphCare employee] caused the plaintiff's injuries." *Gordon I*, 888 F.3d at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Id.* (quoting *Castro*, 833 F.3d at 1071). NaphCare argues that Tapia failed to satisfy the first three requirements because Tapia did not introduce evidence that any NaphCare nurse made any intentional decision to disregard an obvious risk to his medical welfare. Dkt. No. 327 at 17. The jury disagreed, as does the Court.

The trial record is replete with instances where NaphCare nurses made intentional decisions that delayed necessary care to Tapia and thus, put him at substantial risk of serious harm. For example, on September 19, after receiving a report that Tapia was non-responsive, RN Inglemon intentionally sent LPN Carrillo to visit Tapia, but provided no specific instructions on what information to gather. Dkt. No. 301 at 111–12. She never followed up on LPN Carrillo's

assessment, which he was not qualified to perform, and admitted that she relied on his evaluation. Dkt. No. 303 at 27–28, Dkt. No. 301 at 120–22.  LPN Carrillo testified that he deliberately chose not to review Tapia's medical chart before the September 19 visit because he did not want to be affected by other opinions while assessing Tapia, though such exercises of independent judgment are not within his licensure.  Dkt. 301 at 109.  LPN Carrillo then independently determined that Tapia required further medical monitoring, yet no medical monitoring was provided for ten days. Ex. 1 at 000224.

From September 19 to 29, no NaphCare employee opened Tapia's chart even though MHPs documented Tapia's decompensation and LPN Carrillo committed the nursing staff to further monitoring.  Ex. 1 at 000223–24, Ex. 54.  RN Warren also chose not to open Tapia's chart and review the MHP notes before assessing Tapia on September 29.  Dkt. No. 214 at 14–15.  LPNs failed to properly conduct vital sign monitoring on September 30 and October 1, and failed to report Tapia's refusal of care to a supervisor.  Dkt. No. 301 at 35–40, Dkt. No. 299 at 85–93.  There is no evidence in the trial record showing that Tapia received a full physical examination at any point leading up to his hospitalization, which according to Tapia's expert testimony, was necessary given the symptoms he exhibited.  Dkt. No. 299 at 82–84, 158.  Tapia's experts provided context to these decisions, allowing the jury to conclude that NaphCare staff had opportunities before October 1 to abate Tapia's risk of harm—as evinced by Tapia's deteriorating condition and well-documented altered mental state.  *See, e.g.*, Dkt. No. 297 at 129–30, 166, 175–77, 180–82, 215–18; Dkt. No. 298 at 38–39; Dkt. No. 299 at 19–22, 27, 35, 57–58, 69, 84, 98–103, 158, 168, 176. Thus, the jury had sufficient evidence to conclude that a NaphCare employee "made an intentional decision with respect to" delay or denial of Tapia's care and that that delay or denial "put [Tapia] at substantial risk of suffering serious harm[.]"  *Gordon I*, 888 F.3d at 1125.

The Court next considers whether Tapia submitted sufficient evidence to show that the NaphCare employees did not take sufficient measures to abate the risk, even though the consequences of their decisions were objectively obvious (*i.e.*, the third requirement under *Gordon I*). The answer is yes. The evidence at trial allowed the jury to conclude that a reasonable nurse or doctor would have appreciated the high degree of risk from LPNs making independent medical decisions outside the scope of their license, relying on and defaulting to correctional officers to provide medical monitoring, and failing to communicate with Pierce County staff. *See Gordon I*, 888 F.3d at 1125. In particular, Tapia's experts testified what a reasonable nurse or doctor would have done in the circumstances of this case. Dkt. No. 299 at 71 ("It was in his chart … Days and days and days are going by, and no care is given. Somebody should have seen him, to evaluate him, to see what was causing this[.]"), 176 ("Mr. Tapia suffered from a serious medical condition that would have been apparent to the most casual observer, but despite being seen by multiple providers, he was not given the thorough mental health and physical examination standard of care required.").

Therefore, substantial evidence at trial supports the jury's conclusion that one or more NaphCare employees made an intentional decision relating to Tapia's delayed medical care that put Tapia at substantial risk of serious harm.

3. <u>The trial evidence sufficiently shows that one or more NaphCare customs directly caused Tapia's constitutional injury.</u>

NaphCare claims that Tapia did not prove causation at trial because the causal chain was broken by two events: RN Warren's visit to Tapia on September 29 and LPN Carrillo's interaction with Tapia on September 19.[6] Dkt. No. 327 at 14–16. To establish direct causation between a

---

[6] Though unclear, NaphCare appears to argue that RN Warren's visit and Tapia's disputed capacity to report his own symptoms breaks the causal chain for all three policies. Dkt. No. 327 at 14–16, Dkt. No. 338 at 11–12.

policy and a constitutional injury, a plaintiff must prove causation-in-fact and proximate causation. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). Traditional tort law analysis applies to § 1983 actions in this regard, and intervening causes can break the chain of proximate causation. *See Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996). In other words, a defendant's "conduct is not the proximate cause of a [plaintiff's] alleged injuries if another cause intervenes and supersedes his liability for the subsequent events." *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990). But "*foreseeable* intervening causes" do not supersede a defendant's responsibility. *Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th Cir. 2010) (en banc), *vacated by City of Reno v. Conn*, 563 U.S. 915 (2011), *reinstated in relevant part by Conn v. City of Reno*, 658 F.3d 897 (9th Cir. 2011).

NaphCare argues that on September 29, RN Warren assessed Tapia and found no sign of DVT or PCD; therefore, "the jury could not reasonably find that an RN (as opposed to an LPN) would likely have detected it before that date[.]" Dkt. No. 327 at 15 (discussing *Rapp v. NaphCare Inc.*, 2025 WL 90918 (W.D. Wash. Jan. 14, 2025)). NaphCare adds that "even assuming some communication breakdown prevented an RN from assessing Tapia prior to September 29, it is sheer 'speculation' to say that Tapia's … condition would have been obvious to another RN." Dkt. No. 338 at 11. The thrust of NaphCare's argument is that because RN Warren determined that Tapia was "normal" on September 29, none of the customs that delayed his medical care caused his PCD and amputation. Dkt. No. 327 at 12. NaphCare also asserts that even if RN Warren's assessment was somehow inadequate, it cannot be vicariously liable for its employee's individual wrongdoings. *Id.* at 13.

NaphCare ignores the weight of the evidence presented at trial. It is undisputed that RN Warren chose not to review Tapia's chart or the behavioral log before visiting him, and that she did not otherwise communicate with Pierce County staff about his condition in the weeks prior to

her assessment.  Accordingly, when she saw Tapia, she had no idea that he had been presenting with an acute mental status change for the prior ten days.  Tapia provided expert testimony that mental status changes indicate a "medical emergency" that require a "medical assessment" by qualified practitioners—not by LPNs.  Dkt. No. 297 at 174–75, 77, 190.  Moreover, according to Panosky, RN Warren did not complete "any kind of physical examination" beyond taking some basic vitals.  Dkt. No. 299 at 82; *see also* Dkt. No. 299 at 84 (Panosky opining that the standard of care required RN Warren to review the documentation before visiting Tapia, especially when the patient in segregated housing), 98, 158 (Dr. Bates testifying that Tapia needed a complete physical workup as early as September 19), 168.  Tapia's vascular expert, Dr. Jimenez, testified that if Tapia had received a complete physical examination in the weeks prior to October 1, his clotting condition could have been detected and his outcome could have changed.  Dkt. No. 298 at 88–92.  Dr. Jimenez's opinion is substantiated by Dr. Garcia's conclusion that Tapia's clotting condition had been going on for "weeks … [p]robably over two weeks at least, two to three weeks."  Dkt. No. 297 at 87, 92.  From this evidence, the jury could reasonably conclude that RN Warren's brief assessment was deficient, and did not show that Tapia's condition would have been undetectable at an earlier date with a proper evaluation.  Moreover, given that Tapia was still non-verbal and confused during RN Warren's assessment, the jury could have reasonably rejected NaphCare's argument that he did not require additional medical care at that time.

Furthermore, the jury could have also reasonably concluded that RN Warren's conduct was not an intervening cause that disrupted the causal chain, but rather constituted a product of the third alleged *Monell* custom—a custom of non-communication and lack of oversight.  The record shows that MHPs and correctional officers had documented Tapia's decompensation over the span of several weeks.  Ex. 1 at 000223–25; *see also* Dkt. No. 299 at 75; Dkt. No. 301 at 26–27.  But RN Warren testified that she did not know what the MHPs or correctional officers had documented

about Tapia's condition when she saw him, including the record of Tapia's continuous deterioration. Dkt. No. 214 at 17. The jury could have reasonably concluded that because she lacked that information, RN Warren did not complete a full physical examination. To assume, as NaphCare insists, that RN Warren's examination was adequate would require the Court to construe the facts in NaphCare's favor, which the Court cannot do.

NaphCare also contends that Tapia cannot show causation because "Tapia expressly told LPN Carrillo on September 19 that he had no medical concerns and he was simply upset that he was in the administrative segregation unit." Dkt. No. 327 at 15. According to NaphCare, LPN Carrillo's visit was not the only occasion that Tapia could have notified the medical staff of his symptoms because he "could have accessed healthcare literally at the push of a button in his cell[.]" *Id.* In NaphCare's view, Tapia's decision to not alert the medical staff caused his own injury.

NaphCare's argument hinges on a factual dispute regarding whether Tapia was coherent and capable of communicating his symptoms or refusing care. Tapia testified that he could not remember his interaction with LPN Carrillo, and that in the weeks leading up to October 1, he had gaps in his memory. Dkt. No. 300 at 49, 79–82. This is consistent with expert testimony opining that Tapia was likely delirious as the blood clotting worsened, which impaired his memory. Dkt. No. 297 at 215 ("Memory is one of the things that is impaired post-delirium … [Tapia] was sort of taking a brain bath in kidney waste … [T]hat impacts your brain's ability to encode memory."). Moreover, LPN Carrillo was the only provider who saw Tapia between September 17 and October 1 who reported that Tapia was able to speak at all. *See* Ex. 1 at 000223–24. Every other provider who saw him before and after Carrillo's September 19 visit charted that he was "non-verbal[,]" "unable to respond," or "will not verbally respond[,]" including at his court appearance. *Id.* at 000223–25; Dkt. No. 301 at 17. Carrillo's credibility was also called into question during his testimony. *Id.* at 105–07.

1    In deciding a Rule 50 motion, the Court must take all factual inferences in Tapia's favor.

2    *See Reeves*, 530 U.S. at 150. That means that the Court assumes that the jury discredited LPN

3    Carrillo and believed Tapia's testimony that he lacked the capacity to refuse care or accurately

4    communicate his symptoms on September 19. *See Tan Lam v. City of Los Banos*, 976 F.3d 986,

5    995 (9th Cir. 2020) (in deciding a Rule 50 motion, the court "must disregard all evidence favorable

6    to the moving party that the jury was not required to believe"). The Court will not replace the

7    jury's credibility assessment with its own.

8    Overall, there is substantial evidence showing that one or more NaphCare customs were

9    the moving force behind Tapia's delayed medical care, and NaphCare is not entitled to judgment

10   as a matter of law.

11       4.   <u>Substantial evidence supports the jury's decision to award punitive damages.</u>

12   According to NaphCare, Tapia did not submit sufficient evidence to support punitive

13   damages because he did not "establish any evidence at trial about what any NaphCare official with

14   final policymaking authority knew or thought about any events in this case." Dkt. No. 327 at 21–

15   22. NaphCare's argument is unpersuasive. "The standard for punitive damages under § 1983

16   mirrors the standard for punitive damages under common law tort cases." *Dang v. Cross*, 422 F.3d

17   800, 807 (9th Cir. 2005). The jury can award punitive damages if it found that NaphCare acted in

18   reckless disregard of his rights. *See id.* at 808. Here, the jury's award of punitive damages is

19   supported by substantial evidence at trial.

20   As detailed above, a reasonable jury could find on this record that NaphCare's conduct

21   showed deliberate indifference to Tapia's medical needs. *See supra* Section II(C)(1)(c).

22   Accordingly, the Court denies NaphCare's motion.

23                       **III.  MOTION FOR NEW TRIAL**

24

1

A.    **Legal Standard**

2

Under Rule 59, "[t]he court may, on motion, grant a new trial on all or some of the issues

3

… after a jury trial, for any reason for which a new trial has heretofore been granted in an action

4

at law in federal court[.]"  Fed. R. Civ. P. 59(a)(1).  A motion for new trial is "an extraordinary

5

remedy, to be used sparingly in the interests of finality and conservation of judicial resources."

6

*Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Kona Enters., Inc. v. Estate of Bishop*,

7

229 F.3d 877, 890 (9th Cir. 2000)).  Because "Rule 59 does not specify the grounds on which a

8

motion for new trial may be granted[,]" the Court is "bound by those grounds that have been

9

historically recognized." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting

10

*Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)).  Those historically

11

recognized grounds include, but are not limited to, claims "that the verdict is against the weight of

12

the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the

13

party moving." *Id.* (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

14

Unlike under Rule 50, in considering a motion for new trial, the Court is not required to

15

view the trial evidence in the light most favorable to the verdict and nonmoving party.  *See*

16

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).

17

Additionally, the Court can weigh the evidence, make credibility assessments, and raise *sua sponte*

18

its own concerns about the damages verdict.  *See id.*  That said, the Court cannot grant a motion

19

for new trial simply because it would have arrived at a different verdict.  *See Pavao*, 307 F.3d at

20

918.  The Court applies a "stringent standard" and only grants a new trial if "it is quite clear that

21

the jury has reached a seriously erroneous result." *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d

22

1336, 1347 (9th Cir. 1984) (internal quotations omitted).

23

24

**B.    The Court Denies NaphCare's Motion for New Trial.**

1.    <u>The jury verdict was not against the weight of the evidence.</u>

NaphCare claims that the jury verdict is against the weight of the evidence for the same reasons argued in its motion for judgment as a matter of law. Dkt. No. 327 at 23. As explained in the Court's discussion of the Rule 50 motion, the Court finds that substantial evidence supports the jury's conclusion that NaphCare maintained one or more unofficial policies that violated Tapia's right to adequate medical care. This was a close case, hinging on several credibility determinations of multiple expert and fact witnesses. The jury rationally credited and relied on Tapia and his witnesses instead of NaphCare's. Though the Court may reweigh the evidence in deciding a motion for new trial, it nonetheless cannot say conclusively that the jury reached an erroneous result. *See Digidyne*, 734 F.2d at 1347.

2.    <u>The trial was not unfair.</u>

a.    *Deliberate indifference jury instruction*

NaphCare asserts that the Court erred by instructing the jury that two of Tapia's alleged customs did not require a showing of deliberate indifference. Dkt. No. 327 at 23. It claims that, as a matter of law, Tapia was required to prove NaphCare's deliberate indifference in maintaining the LPN policy and the custom of medical monitoring by guards. *Id.* at 23–24. The Ninth Circuit has held that the "deliberate indifference standard does not apply when a *Monell* defendant's policies, customs, or practices directly require unconstitutional conduct[.]" *Sandoval*, 985 F.3d at 682 n.17. In contrast, when a plaintiff "pursues liability based on a failure to act, she must allege that the municipality exhibited deliberate indifference to the violation of her federally protected rights." *Park*, 952 F.3d at 1141 (citing *Tsao*, 698 F.3d at 1143).

The two customs that NaphCare argues require a showing of deliberate indifference are policies of action. As discussed above, Tapia argued and provided evidence that the LPNs

regularly worked outside of their scope of practice. Dkt. No. 298 at 193–94; Dkt. No. 299 at 57, 90, 175; Dkt. No. 301 at 11; Dkt. No. 301 at 104–09; Dkt. No. 303 at 112. The LPN policy is not premised on an omission; for example, Tapia did not allege that NaphCare failed to train LPNs on certain protocols. Rather, the LPN policy is based on concrete actions where LPNs attempted to provide care that they were not licensed to give. Likewise, the alleged custom of untrained guards conducting medical monitoring is a policy of action that does not require a deliberate indifference instruction. Tapia presented evidence that nearly every medical or mental health interaction he received was because of a referral from a corrections officer, not a healthcare provider. Again, this policy relies on action—reliance on correctional officers to complete medical monitoring. Therefore, the Court was not required to instruct the jury on deliberate indifference for these two customs.

Regardless, even if the Court erred by failing to provide a deliberate indifference instruction for the LPN and monitoring policies, such error is harmless and an insufficient basis for overturning the jury's verdict. The Court required the jury to make a finding that NaphCare acted in "reckless disregard of Tapia's rights (*i.e.*, the conduct reflected a complete indifference to the person's safety or rights)" in order to award punitive damages. Dkt. No. 293 at 3. The jury did so here. *See id.*; *see also Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) ("If, however, the error in the jury instruction is harmless, it does not warrant reversal."); *Hill*, 2025 WL 1588738, at *4 (rejecting NaphCare's argument that the district court erred by omitting a specific deliberate indifference instruction because "the jury's imposition of punitive damages in this case necessarily relied on a finding of deliberate indifference").

### b.    *Life expectancy argument*

NaphCare asserts that Tapia unfairly argued about Tapia's life expectancy during closing arguments when life expectancy testimony had been excluded. In the Court's order on the parties'

motions in limine, the Court concluded that evidence on Tapia's life expectancy was irrelevant to his non-economic damages.  Dkt. No. 227 at 10–11.  At trial, the Court excluded life expectancy testimony from NaphCare's expert, Dr. Alan Abrams, and cautioned Tapia that if he attempted to introduce evidence of his life expectancy through his expert (Dr. Hans Carlson), Tapia would "open the door" to such evidence from NaphCare.  Dkt. No. 299 at 148–49.  Tapia chose not to. *Id.* at 49.

NaphCare contends that in its closing argument, Tapia's counsel violated the Court's order by making an argument about Tapia's life expectancy.  Tapia's counsel stated the following during the closing statements:

> Mr. Tapia is not asking for your sympathy, he is asking for justice. And as he told you himself, justice for him is that no one else in a NaphCare jail is neglected the way that he was. There is no mathematical formula for determining the amount that will make Mr. Tapia whole. All, all we can do is offer a suggestion. One way to look at this is in terms of units of time. What, for example, would a person have to demand, to go through what Mr. Tapia did, for one day? For one week. For one year. Mr. Tapia's leg was taken from him at the age of 36. If he lives to be 76, that's 40 years. If, for example, you determined a person would have to demand just $250,000 a year to go through what Mr. Tapia did, and does, and will go through, and you multiplied that by 40 years, it would be $10 million. But if you thought it should be more, like $500,000 per year, it would be $20 million. And that is our suggestion. Somewhere in the range of 10- to 20-million dollars to make Mr. Tapia whole for his past, his present, and his future losses. His pain and his suffering.

Dkt. No. 304 at 55.  NaphCare argues that by this point, it could not call its expert and was "unfairly surprised by this argument[.]"  Dkt. No. 327 at 25–26.  NaphCare argues that because it was unable to rebut and was "unfairly made the victim of surprise," it is entitled to a new trial.  *Id.* at 25 (citing *Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108, 111 (5th Cir. 1982)).

Evidence that unfairly surprises a party may warrant a new trial if the surprise actually prejudiced the party's case.  *See Cairns v. Idaho Falls Sch. Dist. No. 91*, No. 4:18-cv-00564-BLW, 2022 WL 595759, at *6 (D. Idaho Feb. 28, 2022); *Crowley v. Epicept Corp.*, 883 F.3d 739, 751 (9th Cir. 2018) ("Under Rule 59, a court may grant a new trial … to prevent a miscarriage of

justice."); *Phillips v. IRS*, 144 F.R.D. 107, 109 (D. Haw. 1992) ("[T]he error of surprising a litigant with new evidence is sufficient to grant a new trial[.]"); *Conway*, 687 F.2d at 112 ("The district court is therefore entitled to grant a new trial only if the admission of the surprise testimony actually prejudiced the plaintiffs' case."). Here, there is no evidence of prejudice. Unlike in *Conway*, Tapia's counsel did not introduce unexpected *evidence* on Tapia's life expectancy. She merely posed a hypothetical to help the jury quantify Tapia's non-economic harm, expressly cabining her statements as an "example" and "suggestion" on how the jury may compensate Tapia's injury. Indeed, NaphCare's counsel was free to propose a counter hypothetical in NaphCare's closing statement but elected not to. Nor did NaphCare object.

Moreover, the Court instructed the jury that the lawyers' arguments are not evidence. Dkt. No. 304 at 25. "[A] jury is presumed to follow the trial court's instructions." *Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir. 2016) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)). The Court therefore presumes that the jury did not consider these statements made by Tapia's counsel as evidence of his life expectancy. Thus, even if insinuation that Tapia could live 40 more years was potentially prejudicial, the Court's instructions cured such concerns. As such, NaphCare has not shown an unfair surprise that justifies a new trial.

### c.    *Party presentation principle*

NaphCare next argues that the Court violated the party presentation principle by "rais[ing] its own argument about why [a] mitigation instruction should not be given." Dkt. No. 327 at 27. To make this argument, NaphCare mischaracterizes the record.

"[A]s a general rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.'" *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (citing *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring)). That said, "a court is not hidebound by

the precise arguments of counsel[.]" *United States v. Sineneng-Smith*, 590 U.S. 371, 380 (2020).

"The party presentation principle is supple, not ironclad. There are no doubt circumstances in

which a modest initiating role for a court is appropriate[,]" such as when the parties' positions have

not crystallized, and the Court must seek clarification. *See id.* at 376. The Court does not violate

the party presentation principle if it "d[oes] not venture into unbriefed arguments[.]" *Vanderhoof

v. Comm'r of Soc. Sec.*, No. 3:23-cv-05570-TLF, 2024 WL 3936068, at *2 (W.D. Wash. Aug. 26,

2024). "[B]ut even if the Court's analysis [is] slightly different from the discussion by the parties,

it [is] within the 'supple, not ironclad' party presentation rule." *Id.* (quoting *Sineneng-Smith*, 590

U.S. at 376).

The Court did not violate the party presentation principle. Though the parties stipulated to

a mitigation instruction before trial (Dkt. No. 199 at 6), their pre-trial briefing also indicated

disagreement about the meaning of "mitigation" in the § 1983 context.[7] Because of these

inconsistencies, during the pretrial conference, the Court asked the parties to clarify their positions

on the meaning of mitigation and their expectations on how NaphCare would present this defense

at trial. Dkt. No. 264 at 66 ("I notice that the parties have agreed on a mitigation instruction. But

my sense is, based on your submissions, there may be an underlying disagreement about what

mitigation is, what failure to mitigate is."). The Court heard argument from both parties.

NaphCare argued that Tapia's failure to notify NaphCare staff of his medical concerns "goes both

to causation … but absolutely to mitigation." *Id.* at 67. Tapia disagreed and stated that the only

applicable mitigation defense would be to mitigation of damages that occurred post-amputation.

*Id.* at 68. The Court took the parties' proposed jury instructions under advisement. *Id.* at 71.

---

[7] For example, NaphCare proposed a disputed jury instruction which stated that any monetary damages "should be reduced to account for [Tapia's] failure to mitigate his harm because Mr. Tapia was capable of informing NaphCare's staff that he was experiencing pain at all times during his incarceration and when he arrived at the hospital." Dkt. No. 200 at 25. In contrast, Tapia's proposed instruction on the parties' claims and defenses omitted the failure to mitigate defense. *Id.* at 22. Tapia also omitted any mention of failure to mitigate on his proposed verdict form. *Id.* at 47.

1    During trial, Tapia moved for judgment as a matter of law on NaphCare's affirmative

2 defense of mitigation, seeking to remove the stipulated mitigation instruction because NaphCare

3 did not provide sufficient evidence to support that defense.  Dkt. No. 271.  NaphCare requested

4 time to respond, which the Court allowed.  Dkt. No. 276.  The Court granted Tapia's motion on

5 the record and removed the mitigation instruction.  Dkt. No. 304 at 5–6.  The Court ruled:

> While as a general matter, mitigation can apply in Section 1983 cases, to give the
> instruction, defendant needs to put on evidence that reasonable alternatives were
> available to the plaintiff that he unreasonably failed to pursue.  Defendant also has
> to put on expert testimony on causation.  Expert testimony that the plaintiff's
> unreasonable failure to secure or submit to treatment, that would more likely than
> not improve or cure the plaintiff's condition, is necessary to give the jury a basis on
> which to segregate the damages between the damages proximately caused by the
> underlying injury, and the portion that was unavoidable due to the failure to
> mitigate.  The testimony is required so that the jury does not base its decision on
> speculation.  That is from *Salisbury v. City of Seattle*, 25 Wn. App. 2d 305. That's
> a 2023 case cited in plaintiff's brief.  The defendant has not made that argument or
> that showing here. In fact, they have argued the opposite, that no full medical
> examination, at any point before October 1st, would have improved plaintiff's
> condition.  The reference to a single line of testimony from Starnes about a delay
> in the amputation and a related infection is insufficient and has not been connected
> in any way with a basis to segregate damages.  Defendant's remaining arguments
> about plaintiff's alleged failures to seek assistance from NaphCare go to causation.
> And they can make those arguments. But it is not mitigation.  So I will not instruct
> on mitigation.

*Id.*

The Court did not order the parties to brief the issue of whether NaphCare provided

sufficient evidence to submit its mitigation defense to the jury.  Rather, Tapia moved for exclusion

of the mitigation instruction on his own accord, NaphCare responded, and the Court decided the

issue based on the parties' briefs.

Thus, the Court did not "venture into unbriefed arguments."  *Vanderhoof*, 2024 WL

3936068, at *2.  Rather, the parties' inconsistent pretrial submissions indicated that they disagreed

on what evidence NaphCare could use to support a failure to mitigate defense, and the Court

attempted to clarify the party's positions during the pretrial conference.  Notably, NaphCare cites

no authority holding that by stipulating to the language of a generic defense instruction, a party waives their right to challenge the same defense on a Rule 50 motion. Nor does NaphCare provide any authority requiring the Court to instruct the jury on stipulated instructions. Rather, the opposite is true: NaphCare is only entitled to a mitigation instruction "if it is supported by law and has foundation in the evidence." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Put differently, even if failure to mitigate is a permissible affirmative defense in § 1983 cases, NaphCare would have had to marshal enough evidence to give the jury a basis to segregate the damages between those proximately caused by the underlying injury, and the portion caused by the alleged failure to mitigate. *See Salisbury v. City of Seattle*, 522 P.3d 1019, 1028–29 (Wash. Ct. App. 2023) (expert testimony sufficient to enable the jury to segregate damages is required in order to warrant a mitigation instruction). It is undisputed that NaphCare offered no evidence on damages at all, let alone evidence that would permit the jury to segregate based on mitigation. It cannot now call for a re-do by claiming that the Court went beyond the parties' framing of the issues.

### d.    *Response to jury question*

NaphCare asserts that the trial was unfair because the Court changed the jury instructions mid-deliberations in response to a jury question. Dkt. No. 327 at 27. As detailed below, the Court's instructions to the jury were consistent with applicable law and did not cause an unfair trial.

On the first day of deliberations, the jury submitted the following question: "Need further clarification on the term from Instruction No. 9 'non-communication' as it pertains to various sections. Does 'some' communication apply? Does 'non-communication' mean zero?" Dkt. No. 288 at 1. The jury was referring to the description of Tapia's third alleged *Monell* policy, a custom of "non-communication between Pierce County staff and NaphCare staff." Dkt. No. 283 at 12. Before the charging conference, Tapia had considered revising the term in Instruction No. 9 from

"non-communication" to "inadequate communication." Dkt. No. 234 at 7. However, during the charging conference, Tapia did not make this request. *See* Dkt. No. 304 at 3–15.

Because the question came at the end of the day, the Court granted the parties' request to brief proposals for the Court's response to the jury question. Dkt. Nos. 280, 281. After considering the parties' arguments and further objections, the Court answered the jury question as follows: "Non-communication means NaphCare's failure to communicate with Pierce County staff in a manner sufficient to ensure adequate medical care." Dkt. No. 288 at 2; Dkt. No. 305 at 3–9. NaphCare argues the Court's instruction denied it a fair trial.

First, NaphCare argues the Court should not have considered Tapia's proposed answer because Tapia waived his opportunity to revise the instruction pre-trial. The Court disagrees that the issue was waived. While Tapia could not have argued a different instruction should have been given if he had lost at trial, he did not waive the ability to respond to a jury question seeking clarification of the instruction he had agreed to. Because the ambiguity surrounding the term "non-communication" resurfaced through a jury question, the Court—charged with "the responsibility to eliminate the jury's confusion"—appropriately opted to hear from both parties. *United States v. Frega*, 179 F.3d 793, 809 (9th Cir. 1999).

Second, in providing a supplemental instruction, the Court fulfilled its duty to clear up the jury's uncertainty without any material changes to the meaning of "non-communication." "When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Frega*, 179 F.3d at 809 (quoting *Bollenbach v. United States*, 326 U.S. 607, 612–13 (1946)). Because the Court holds an affirmative responsibility to eliminate the jury's confusion, in some circumstances, "it is not sufficient for the court to rely on more general statements in its prior charge." *United States v. Warren*, 984 F.2d 325, 330 (9th Cir. 1993) (quoting *United States v. Nunez*, 889 F.2d 1564, 1568 (6th Cir. 1989)). Here, the original instructions did not define "non-

communication," so if the Court had simply referred the jury back to the instructions, it would have been unresponsive to the jury's question.

Citing *Gibson v. Mayor & Council of City of Wilmington*, a case from the Third Circuit, NaphCare claims that the Court erred by changing the meaning of "non-communication." Dkt. No. 327 at 28 (citing *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 231 n.9 (3d Cir. 2004)). In a footnote, the Third Circuit held that "[p]roviding a plain English language definition of a legal term is not problematic if the supplemental definition does not alter the essential meaning of the word." *Gibson*, 355 F.3d at 231 n.9. However, it would be improper if the Court's response to a jury question "alter[s] the meaning of the word[.]" *Id.*

Neither party suggested that the Court should provide a dictionary definition[8] of non-communication.[9] And even if they did, the definition of non-communication would be inadequate here because the ambiguity arose within the context of Tapia's theory of liability, not a statute or other legal term. In other words, the "essential meaning" of "non-communication" is grounded in how the parties framed and argued the *Monell* custom. Directing the jury to a plain, ordinary meaning of "non-communication" would have been unhelpful and inconsistent with the Court's obligations.

Finally, as stated on the record, the Court based its supplemental instruction on the parties' arguments before and during trial. Throughout the case, NaphCare referred to a "practice of

---

[8] Even if the Court used the dictionary definition, it would likely have been unresponsive to the jury's question. For instance, the Merriam-Webster Dictionary defines "noncommunication" as "a lack of communication[.]" *Noncommunication*, MERRIAM-WEBSTER.COM, http://bit.ly/3GT2teb (last visited Aug. 3, 2025). This definition does not clarify whether non-communication means some or zero communication, and importantly, does not take into account how non-communication was defined during trial.

[9] Tellingly, in making this argument, NaphCare does not explain what "essential meaning" the Court strayed from. And at no point during this case did NaphCare argue that "non-communication" means "zero communication." As a result, because NaphCare fails to meaningfully address how the Court's supplemental instruction was substantively deficient, NaphCare also fails to articulate what prejudicial and unfair effect the instruction had on NaphCare. *See* Dkt. No. 327 at 27, Dkt. No. 338 at 22.

ORDER DENYING RULE 50(B) AND 59 MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR - 40

communication failures between medical and mental health" (Dkt. No. 141 at 8), "failures to communicate" (Dkt. No. 105 at 17), and a "communication breakdown" (Dkt. No. 100 at 29). During its opening and closing argument, NaphCare referred to a "miscommunication custom" and a "systemic breakdown in communication." Dkt. No. 296 at 157–58, Dkt. No. 304 at 70, 72, 95. Likewise, during his closing argument, Tapia described "non-communication" as a "custom of failing to communicate with the mental health professional." Dkt. No. 305 at 6–7. In short, both parties tacitly agreed that "non-communication" meant *some* amount of communication that deteriorated or was inadequate. This was the definition of "non-communication" that both parties argued before the jury, and thus, the meaning the Court provided in its instruction. Dkt. No. 289 at 2. As such, the Court's response to the jury question does not justify a new trial.

    3. <u>The compensatory and punitive damages are constitutional and supported by the evidence.</u>

NaphCare argues that the Court should grant a new trial because (1) the compensatory damages are unsupported and impermissibly punitive and (2) the punitive damages are grossly excessive. Neither argument is persuasive.

    *a.*    *Compensatory damages*

First, NaphCare claims that the compensatory damages are unsupported and impermissibly punitive because "the evidence that Tapia presented at trial did not come close to supporting $5 million in compensatory damages." Dkt. No. 327 at 28. To support its argument, NaphCare distinguishes Tapia's $5 million compensatory damages award with the award in *Hill*, 2025 WL 1588738, and *Hwang v. Grace Rd. Church*, No. 14 CV 7187 (KAM) (RML), 2018 WL 4921638 (E.D.N.Y. Aug. 10, 2018). Dkt. No. 327 at 29.

The Court disagrees. Section 1983 allows compensation for non-economic damages, such as pain and suffering, and emotional distress. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S.

299, 307 (1986). "The testimony of the plaintiff alone can substantiate a jury's award of emotional distress damages." *Harper*, 533 F.3d at 1029. Compensatory damages may be awarded for emotional distress "inferred from the circumstances, whether or not plaintiffs submit evidence of … mental or physical symptoms." *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994); *Greisen v. Hanken*, 252 F. Supp. 3d 1042, 1065 (D. Or. 2017) (rejecting argument that plaintiff needs to present evidence from a psychologist, psychiatrist, or other mental health professional to show non-economic damages for emotional distress), *aff'd*, 925 F.3d 1097 (9th Cir. 2019).

Here, multiple medical doctors, including NaphCare's vascular disease expert, testified that PCD is "agonizingly painful." Dkt. No. 302 at 104, 115–16. At trial, Tapia described his experiences with "pressure sores[,]" "bruising[,]" and "tenderness" on his amputated limb. Dkt. No. 300 at 26–27. He described his limitations as an amputee in his daily life, and how he had to seek hospital treatment after falling out of a bus. *Id.* at 23 (describing reliance on family members), 24–25 (describing shrinkage of muscle on his limb), 26–27 (describing occasions where he hyperextends his knee backwards), 27–29 (describing falling when trying to step off a bus); Ex. 25 (describing abscesses Tapia developed post-amputation). Before the jury, Tapia demonstrated the process he goes through multiple times a day to put on and take off his prosthetic. Dkt. No. 300 at 38–41. Tapia testified regarding his loss of enjoyment in life and ability to engage in hobbies he once enjoyed, and explained that he has not been in an intimate relationship since his amputation. *Id.* at 23, 64. Holistically, the evidence presented at trial is sufficient to support the compensatory damages award.

"If the evidence is sufficient to support even a high award, there is no need to compare cases." *Bell v. Williams*, 108 F.4th 809, 832 (9th Cir. 2024). That said, Tapia relies on other cases involving vascular diseases and leg amputations that resulted in higher non-economic damages awards than $5 million; these verdicts provide a helpful point of comparison on how juries across

the country have quantified pain and suffering from delayed or inadequate medical treatment of vascular injuries.  *See, e.g.*, *Luppold v. Flores*, No. 1681CV01287, 2023 WL 4348312 (Mass. Super. Ct. Middlesex Cnty. Mar. 24, 2023) ($20 million awarded for pain and suffering resulting from above-the-knee amputation due to untreated DVT and arterial thrombosis); *M.M. & N.S. v. Nicolopoulos*, No. 20CV10189, 2023 WL 3336636 (Or. Cir. Ct. Multnomah Cnty. Feb. 13, 2023) ($70 million in non-economic damages for amputee plaintiff); *Parks v. Temple Univ. Hosp. Inc.*, No. 2019-06-005457, 2023 WL 3816644 (Pa. Ct. Com. Pl. Phila. Cnty. May 9, 2023) ($20 million in non-economic damages for vascular injury and amputated leg); *Schneider v. S. Conn. Vascular Ctr. LLC*, No. AAN-CV20-6035249-S (Conn. Super. Ct. New Haven Cnty. Jan. 19, 2024) ($20,669,950 in non-economic damages); *Sfameni v. Ryan*, No. PC-2013-01368, 2017 WL 6270850 (R.I. Super. Ct. Providence Cnty. Sept. 21, 2017) ($40 million award for pain and suffering from vascular injury resulting in leg amputation); *see also* Dkt. No. 336-7 (jury verdict form in *Schneider*).

NaphCare's cited cases are less useful.  The singular case NaphCare cites involving an amputee plaintiff was resolved via a default judgment, and the magistrate judge determined damages.  *Hwang*, 2018 WL 4921638; at *8–9; Dkt. Nos. 86, 87.  While the injury is technically similar, the Court will not overturn the jury's verdict here based on *one* case in which a plaintiff was awarded less than Tapia.  "A court should not substitute a jury's damages verdict with its own figure merely because a plaintiff in a similar case was perhaps not able to plead his facts to the jury as well."  *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 313 (7th Cir. 2010) (cleaned up).  NaphCare's reliance on *Hill* is also not persuasive because *Hill* does not involve the pain and suffering from a vascular disease and resultant amputation.  Even if the Court could properly compare the intangible effects of death versus loss of a limb (which it declines to do), other courts in this circuit and outside of the Ninth Circuit have upheld higher awards for inmate deaths,

indicating that *Hill*'s compensatory damages award need not be the ceiling for this type of injury. *See, e.g.*, *Enyart v. Cnty. of San Bernardino*, No. 5:23-cv-00540-RGK-SHK, 2024 WL 4497433 (C.D. Cal. Sept. 30, 2024) (approving of $6.4 million in compensatory damages for inmate death); *Borges v. Cnty. of Humboldt*, No. 15-cv-00846 YGR, 2017 WL 4552006, at *1 (N.D. Cal. Oct. 12, 2017) ($2.5 million); *Estate of Sandoval v. County of San Diego et al.*, No. 3:16-cv-01004-BEN-AGS, 2024 WL 3996048, *7 (S.D. Cal. Aug. 29, 2024) ($2.75 million for loss of life); *Burke v. Regalado*, 935 F.3d 960, 980 (10th Cir. 2019) ($10 million in compensatory damages and $250,000 in punitive damages).

Therefore, considering the evidence presented at trial and comparable cases, the Court finds that the $5 million award for Tapia's non-economic damages was sufficiently supported by proof.

### b. *Punitive damages*

Second, NaphCare asserts that the punitive damages amount is grossly excessive and should be overturned.  Dkt. No. 327 at 29–34.  To decide whether punitive damages are "grossly excessive[,]" the Court weighs three factors: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *Hardeman v. Monsanto Co.*, 997 F.3d 941, 973 (9th Cir. 2021) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).  Additionally, "[a] punitive damages award is supposed to sting so as to deter a defendant's reprehensible conduct, and juries have traditionally been permitted to consider a defendant's assets in determining an award that will carry the right degree of sting."  *Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 777 (9th Cir. 2005).  The Court should determine whether the punitive damages award delivers "the right degree of sting."  *Id.*  The

defendant's wealth cannot justify an otherwise unconstitutional punitive damages award, and cannot make up for the failure of the other three factors. *Id.*

Considering the evidence provided at trial, the punitive damages award was not grossly excessive.

### (i)  Degree of Reprehensibility

To analyze the reprehensibility of Naphcare's conduct, the Court analyzes whether:

> [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Hardeman*, 997 F.3d at 972–73 (quoting *Campbell*, 538 U.S. at 419).  Here, Tapia's injury was physical and not merely economic.  The jury heard evidence showing that the deterioration of his leg took place over several weeks, and that Tapia suffered from a vascular disease that experts from both sides agreed was extremely painful.  The only testifying physician who treated Tapia noted he could have died from this injury, and ultimately, he lost his limb.  The first subfactor weighs in favor of finding reprehensibility.

Additionally, the jury specifically found that NaphCare's conduct evinced a "reckless disregard" for Tapia's rights and safety, despite the perceived risk.  There is evidence in the record to support this conclusion.  Experts at trial also testified that while blood clots are a common ailment generally, PCD is rare because blood clots are readily treated and prevented.  The jury could infer from this evidence that the fact that Tapia experienced PCD at all was not accidental, but instead proof that his well-being was disregarded.  Dr. Bates, Tapia's expert, also opined that NaphCare's failure to change its policies and procedures after Tapia's injury showed "an institutional reckless disregard to the substantial risk of harm to similarly situated inmates."  Dkt. No. 299 at 176.  Indeed, the jury heard from RN Slothower that no investigation was conducted

after this incident, and they also saw Dr. Wade's email, showing that he not only found no need for policy or procedural reform, but expressly concluded that the NaphCare staff had performed well, even though Tapia lost his leg.  Given NaphCare's "clear failure to remedy or even address" the effects of its policies, the jury could properly have concluded that punitive damages were necessary to deter similar policies from NaphCare in the future.  *Bains*, 405 F.3d at 775.  The second subfactor thus weighs in Tapia's favor.

The third subfactor—Tapia's financial vulnerability—is not "particularly relevant in a mostly noneconomic damages case[.]"[10]  *Hardeman*, 997 F.3d at 973–74 (citing *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1066 (10th Cir. 2016) (finding that plaintiff's financial vulnerability was not relevant where plaintiff alleged physical rather than financial harm)).  This factor therefore weighs neutrally on the Court's analysis.

The fourth subfactor weighs in Tapia's favor because Tapia showed evidence of NaphCare employees' pattern of conduct, as explained above.  Tapia presented sufficient proof that the policies maintained by NaphCare systemically failed Tapia and led to his injury.  Most obviously, more than one NaphCare employee failed to open Tapia's medical file or check in on him over the course of 10 days.  But additionally, NaphCare provided no proof at trial that it has done anything to change its policies since Tapia left its care with an amputated leg; rather, NaphCare argued that no part of Tapia's treatment or NaphCare's policies were deficient, and that NaphCare's medical director believes Tapia was "lucky."  Ex. 22.  The jury could thus reasonably infer that NaphCare

---

[10] While the Ninth Circuit has not addressed this issue expressly, other courts have extended these factors to include non-financial vulnerability where the dispute involves physical or emotional harm.  *See, e.g.*, *Moutal v. Exel, Inc.*, No. 3:17-cv-01444-HZ, 2021 WL 1187020, at *7 n.1 (D. Or. Mar. 29, 2021), *aff'd*, No. 21-35303, 2022 WL 3031580 (9th Cir. Aug. 1, 2022); *Hull ex rel. Senne v. Ability Ins. Co.*, No. CV-10-116-BLG-RFC, 2012 WL 6083614, at *8 (D. Mont. Dec. 6, 2012) (finding that punitive damages were warranted because the target was elderly and "inherently vulnerable"); *see generally BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996) (analyzing target's financial vulnerability because the harm was "purely economic").  In Tapia's case, he was clearly vulnerable in non-economic ways.  The Supreme Court has recognized that inmates' access to healthcare is limited, and this population is entirely dependent on the healthcare provided by the prison.  *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.").

ORDER DENYING RULE 50(B) AND 59 MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR - 46

continues to maintain these exact policies that caused Tapia's constitutional harm. *See, e.g.*, *In re Roundup Prods. Liab. Litig.*, 385 F. Supp. 3d 1042, 1047 (N.D. Cal. 2019) (finding defendant's conduct reprehensible because it "repeatedly sold—and continues to sell—Roundup without any form of warning label"), *aff'd sub nom. Hardeman*, 997 F.3d 941.

The last subfactor weighs against Tapia because while there is sufficient evidence to show that NaphCare's customs show deliberate indifference, the proof does not show that NaphCare acted with malice or intent to harm Tapia. On balance, the evidence at trial included proof that NaphCare acted reprehensibly, thus supporting an award of punitive damages.

### (ii) Disparity of Harm

Next, to decide whether the punitive damages were excessive, the Court considers "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award[.]" *Hardeman*, 997 F.3d at 972. The Court does so by comparing the ratio between the compensatory and punitive damages. The Supreme Court has declined to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582–83 (1996). However, punitive damages must bear a "reasonable relationship" to compensatory damages. *Id.* at 580. In most cases, "[s]ingle-digit multipliers are more likely to comport with due process." *See Campbell*, 538 U.S. at 425; *Gore*, 517 U.S. at 583 (finding 4:1 and 10:1 reasonable, but 500:1 likely to "raise a suspicious judicial eyebrow"). That said, the Supreme Court also found that "[a] higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582.

The jury awarded $5 million in compensatory damages and $20 million in punitive damages, or a ratio of 4:1. Despite NaphCare's contentions, this ratio is appropriate. The ratio is within the single digits. *See Campbell*, 538 U.S. at 425. The Ninth Circuit has approved of higher

single-digit ratios. *See, e.g.*, *Bains*, 405 F.3d at 776 (finding a 9:1 ratio acceptable); *Zhang*, 339 F.3d at 1044 (upholding a 7:1 ratio); *Planned Parenthood of Columbia v. Am. Coal. Of Life Activists*, 422 F.3d 949, 965 (9th Cir. 2005) (remitting to a sum of a 9:1 ratio). And the Ninth Circuit recently approved of this precise ratio in *Hill*. 2025 WL 1588738, at *4. Moreover, the type of harm described here is the intangible, "hard to detect[,]" non-economic harm that the Supreme Court found may justify higher ratios. *Gore*, 517 U.S. at 582; *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001) ("[T]he personal distress and indignity visited upon Swinton are difficult to calculate. Indeed, … 'where the injury is primarily personal, a greater ratio may be appropriate.'" (quoting *Deters v. Equifax Credit Info. Servs.*, 202 F.3d 1262, 1273 (10th Cir. 2000)). Therefore, the second factor weighs in favor of upholding the punitive damages award.

### (iii) Civil penalties imposed in comparable cases

The third factor looks to whether there are civil penalties or fines authorized for similar conduct. Tapia argues that while the Civil Rights of Institutionalized Persons Act authorizes the federal government to pursue equitable relief against correctional institutions that violate the civil rights of people in their custody, the statute does not authorize monetary penalties. Dkt. No. 335 at 27. NaphCare does not identify any comparable civil penalty. Accordingly, this factor is not relevant here.

### (iv) NaphCare's financial state

Throughout this litigation, NaphCare has persistently resisted disclosure of information relating to its financial state. This information has been the subject of several discovery motions, motions for reconsideration, and motions for Rule 11 sanctions. Dkt. Nos. 87, 88, 98, 194. Now, as part of its post-trial motion, NaphCare attempts to introduce new evidence regarding its financial condition in order to attack the jury's punitive damages award. Dkt. No. 327 at 32. NaphCare offers a declaration from its Chief Financial Officer and summaries of NaphCare's expenses and

1    revenue across the entire company for 2024, and expenses and revenues for seven years (2017–

2    2023) under NaphCare's contract with Pierce County.  Dkt. No. 325 at 2.  NaphCare even seeks

3    to reopen discovery on the issue of its own finances.  Dkt. No. 338 at 10 and n.2.

4         The Court will not consider this new information introduced at the post-trial phase.  To

5    start, evidence related to NaphCare's financial condition—while potentially relevant—is not a

6    *requirement* for awarding punitive damages.  *See Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776,

7    806 (9th Cir. 2018) ("Under federal law, 'ability to pay is of some importance' in assessing the

8    propriety of a punitive damages award but it is not dispositive." (quoting *Tri-Tron Int'l v. Velto*,

9    525 F.2d 432, 438 (9th Cir. 1975))).  Indeed, "[t]here is no constitutional prohibition of awards in

10   excess of a party's net worth."  *Dawe v. Corr. USA*, 506 F. App'x 657, 660 (9th Cir. 2013)

11   (unpublished) (rejecting party's argument that the damages award was unconstitutional because it

12   was nearly four times the defendants' net worth).

13        Moreover, this is a problem of NaphCare's own making.  As shown by the extensive

14   motions practice leading up to trial, NaphCare made the strategic choice not to present evidence

15   of its finances, and in fact vigorously resisted discovery on this subject.  It was NaphCare's burden

16   to offer evidence of its inability to pay if it sought to minimize a punitive damages award on that

17   basis.  *See Thomas v. Cannon*, 289 F. Supp. 3d 1182, 1211 (W.D. Wash. 2018).  "The Ninth Circuit

18   has refrained from interfering with a punitive damages award when defendants offered no evidence

19   of their financial ability to pay."  *Id.* (citing *Tri–Tron*, 525 F.2d at 438; *El Ranco, Inc. v. First Nat'l*

20   *Bank of Nev.*, 406 F.2d 1205 (9th Cir. 1968), *cert. denied*, 396 U.S. 875 (1969)).  "This is a

21   common rule across the country."  *Id.* (collecting cases).

22

23

24

NaphCare has not argued the information it seeks to present was unavailable at the time of trial.[11]  The jury heard evidence that NaphCare's "top-line revenue [has grown] from $350 million to nearly $1 billion" and that the CEO expects the company to surpass that amount in 2024.  Ex. 29.  NaphCare now claims that "gross revenue has no bearing on NaphCare's assets or financial condition."  Dkt. No. 327 at 32, Dkt. No. 301 at 47–49.  NaphCare had the opportunity to make that argument and submit rebuttal evidence to the jury.  It did not.  "The Court will not second guess the jury by considering evidence that the jury did not have before it."  *Thomas*, 289 F. Supp. 3d at 1211.

(v) NaphCare's remaining arguments challenging the jury's punitive damages award

Lastly, NaphCare argues that the punitive damages award is improper because it exceeds federal common law limits and because it was the product of unfair bias.  Dkt. No. 327 at 33–34.  Neither argument sustains NaphCare's request for a new trial.

NaphCare claims that federal common law imposes a 1:1 cap on punitive damages in § 1983 cases.  For this proposition, NaphCare relies on *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008) and *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951 (7th Cir. 2018).  NaphCare misapplies these cases.  *Exxon Shipping* is a maritime case in which the Supreme Court provided a limit on punitive damages awards.  *Exxon Shipping*, 554 U.S. at 513–14.  It did not extend this rule to § 1983.  *Id.* at 513 ("[W]e consider that a 1:1 ratio, which is above the median award, is a

---

[11] Citing *White v. Ford*, 500 F.3d 963, 974 (9th Cir. 2007), NaphCare argues in its reply brief that "Tapia errs in suggesting that the level of punitive damages is a jury question" and that this task "falls to the Court."  Dkt. No. 338 at 8.  According to NaphCare, *White* justifies NaphCare's decision to submit this financial information to the Court post-trial, rather than to the jury before the close of evidence.  *Id.* at 9–10.  NaphCare misapplies *White*.  The *White* court held that while the "constitutional ceiling on a punitive damage award is a matter of law[,]" "the initial damage calculation" rests with the jury.  500 F.3d at 974.  The factual considerations underlying the amount of the punitive damage award—such as the defendant's ability to pay—is "well suited to the jury's role of finding facts."  *Atlas Food Sys. & Servs. v. Crane Nat'l Vendors*, 99 F.3d 587, 594 (4th Cir. 1996).  NaphCare cannot strategically withhold information within its control from the jury, and then decry the jury's award as unconstitutional.  Simply put, this is not a question about the "constitutional ceiling."  Regardless, the Court has evaluated the applicable factors and concluded the award is not unconstitutionally excessive.

ORDER DENYING RULE 50(B) AND 59 MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND/OR REMITTITUR - 50

fair upper limit in such *maritime cases*.") (emphasis added).  NaphCare misreads *Beard*, claiming that the Seventh Circuit extended *Exxon Shipping*'s 1:1 cap to § 1983 cases.  Dkt. No. 327 at 33. In *Beard*, the Seventh Circuit discussed whether *Exxon Shipping*'s holding could apply in the § 1983 context, but also expressly stated that the panel "raise[s] the subject only to call attention to it so that statutory decisions precede constitutional adjudications.  Both legal and factual issues are open on remand."  *Beard*, 900 F.3d at 957.  Indeed, in *dicta*, the *Beard* court identified the problems with applying *Exxon Shipping* to this context: in *Exxon Shipping*, the Supreme Court sat as a "common law court of last review[.]"  *Id.* at 956.  Punitive damages at issue here are authorized by 42 U.S.C. § 1983, "so any nonconstitutional cap derived by courts also must respect the limits on punitive damages chosen by Congress."  *Id.*; *see also Henderson v. Young*, No. C05-0234 VRW/WAF, 2008 WL 11454792, at *9 (N.D. Cal. July 17, 2008) ("The Court therefore cannot conclude that the Supreme Court intended *Exxon Shipping* to overturn the substantial body of precedent governing punitive damages in civil rights cases and replace it in all cases with a strict ratio requirement.").  In sum, federal common law does not warrant reversing the punitive damages here.

Finally, NaphCare claims that the Washington jury was prejudiced against NaphCare by mentions of the company's size and headquarters in Alabama.  Dkt. No. 327 at 34, Dkt. No. 338 at 23.  NaphCare also claims that during *voir dire*, several potential jurors expressed their opinions that prisons should not be privatized.  *Id.*  None of these statements warrant a new trial.

It is undisputed that NaphCare is a for-profit corporation based in Alabama.  This fact was presented to the jury in Tapia's opening statement, which the Court advised was not evidence. Dkt. No. 296 at 101.  Tapia's counsel also referenced Alabama's time zone because Tapia's medical records were dated based on the Central Time Zone; the record shows that these statements helped orient the witness and the jury to the time of day during which the events occurred.  Dkt.

No. 297 at 143, 170, 178, 199, 160.  Indeed, as Tapia fairly points out, one of Tapia's experts hailed from and was medically trained in Alabama, a fact he proudly shared with the jury.  Dkt. No. 335 at 29, Dkt. No. 299 at 152.  Nothing about the context or framing of these statements suggests that Tapia sought to inflame the jury's emotions or otherwise compromise its judgment.  Likewise, the off-hand comment from a potential juror regarding the privatization of prisons[12] was never mentioned again by either party during the presentation of evidence.  Having closely reviewed the trial record, the Court cannot conclude that these statements were improper and "sufficiently permeate[d the] entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict."  *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir. 1994).

For the forementioned reasons, the Court denies NaphCare's motion for new trial.

## IV.   MOTION FOR REMITTITUR

### A.   NaphCare's Motion for Remittitur Is Denied.

"On a motion for a new trial or remittitur, if the Court, after viewing the evidence concerning damages in the light most favorable to the prevailing party, determines that the damages award is excessive, it has two alternatives: it may grant defendant's motion for a new trial or deny the motion conditioned upon the prevailing party accepting a remittitur."  *Nat'l Prods., Inc. v. Arkon Res., Inc.*, 294 F. Supp. 3d 1042, 1065 (W.D. Wash. 2018), *aff'd*, 773 F. App'x 377 (9th Cir. 2019).  "Generally, a jury's award of damages is entitled to great deference, and should

---

[12] Moreover, the potential jurors who expressed this opinion were not seated on the jury, and the Court granted NaphCare's motion to strike these jurors from the pool.  Dkt. No. 296 at 75 (granting motion to strike for cause with respect to Juror #37 who stated that prisons should not be privatized), 74 (granting motion to strike for cause with respect to Juror #7 who opposed privatized prisons and stated that prison reform is needed).  Additionally, though NaphCare argued that these jurors should not be included in the jury, during trial, NaphCare never asked the Court to take corrective action such as through a curative instruction.  Indeed, NaphCare never contended that these statements were so prejudicial that they obstructed NaphCare's right to an impartial jury until its instant post-trial motion.  *See United States v. Turrey*, 135 F.4th 1183, 1185–86 (9th Cir. 2025) ("By not objecting or asking the district court to take remedial action, Turrey relinquished his known right to stop *voir dire* or ask for other corrective action.").  NaphCare cannot now complain of error.

be upheld unless it is 'clearly not supported by the evidence' or 'only based on speculation or guesswork.'" *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006) (quoting *Los Angeles Mem'l Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986)). "If the damages award is supported by the evidence, it 'must be affirmed unless it is "grossly excessive" or "monstrous" or "shocking to the conscience."'" *Nunez v. Santos*, 427 F. Supp. 3d 1165, 1189 (N.D. Cal. 2019) (quoting *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988)).

Because the Court finds that the jury verdict is not excessive or improper, the Court likewise denies NaphCare's motion for remittitur. *See Nat'l Prods.*, 294 F. Supp. 3d at 1063.

## V.    CONCLUSION

The Court DENIES NaphCare's motions for judgment as a matter of law, new trial, and/or remittitur. Dkt. No. 327. The Court LIFTS the stay on briefing for Plaintiff's motion for attorneys' fees and ORDERS the parties to submit a joint status report proposing a briefing schedule for the motion by **August 15, 2025**. *See* Dkt. Nos. 315, 324.

Dated this 7th day of August, 2025.

Kymberly K. Evanson
United States District Judge